IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

UNITED STATES OF AMERICA,

        Plaintiff,

   v.                                    Criminal No. 18-cr-45-RGA

PATRICK TITUS,

        Defendant.

MEMORANDUM ORDER

Before me is the Government's motion to exclude the testimony of Dr. Jonathan Mack. (D.I. 49). I heard oral argument on this motion on June 16, 2021 (D.I. 82) and the parties have submitted helpful briefing. (D.I. 49, 55, 83). [1] For the reasons set forth below, the Government's motion is GRANTED.

**I.    BACKGROUND**

Defendant Dr. Patrick Titus is charged with fourteen counts of knowingly and intentionally distributing controlled substances outside the usual course of professional practice and not for a legitimate medical purpose in violation of 21 U.S.C. § 841(a)(1) and 841(b)(1)(C). (D.I. 3 ¶ 24). Dr. Titus is also charged with one count of maintaining a drug-involved premises in violation of 21 U.S.C. § 856(a)(1) and 18 U.S.C. § 2. (*Id*. ¶¶ 25-26).

Dr. Titus noticed his intent to introduce the testimony of Dr. Mack relating to mental disease or defect bearing on the issue of guilt under Federal Rule of Criminal Procedure 12.2(b). (D.I. 41). The Government argues that Dr. Mack's proposed testimony violates the applicable legal standards set forth in *United States v. Pohlot* and the Insanity Defense Reform Act (IDRA). (D.I. 49 at 1).

---

[1] The motion for leave to file (D.I. 90) is DENIED as the proposed letter (D.I. 90-2) adds nothing to the arguments previously made.

1

## II. LEGAL STANDARD

The Third Circuit case, *United States v. Pohlot*, 827 F.2d 889 (3d Cir. 1987), provides the governing standard. In *Pohlot*, the Court explained:

> We conclude that although Congress intended § 17(a) [of IDRA] to prohibit the defenses of diminished responsibility and diminished capacity, Congress distinguished those defenses from the use of evidence of mental abnormality to negate specific intent or any other mens rea, which are elements of the offense. While the contours of the doctrines of diminished responsibility and diminished capacity are unclear, the defenses that Congress intended to preclude usually permit exoneration or mitigation of an offense because of a defendant's supposed psychiatric compulsion or inability or failure to engage in normal reflection; however, these matters do not strictly negate mens rea.
>
> Despite our disagreement with the government's broad contention, we agree that the Congressional prohibition of diminished responsibility defenses requires courts to carefully scrutinize psychiatric defense theories bearing on mens rea. Psychiatrists are capable of supplying elastic descriptions of mental states that appear to but do not truly negate the legal requirements of mens rea. Presenting defense theories or psychiatric testimony to juries that do not truly negate mens rea may cause confusion about what the law requires.

*Id*. at 890. Following *Pohlot*, courts in this Circuit have applied the *Pohlot* standard to a variety of proffered expert testimony. *See, e.g.*, *United States v. Andrews*, 811 F. Supp. 2d 1158 (E.D. Pa. 2011); *United States v. Sacks*, 2009 WL 4114169 (D.N.J. Nov. 23, 2009); *United States v. Mister*, 533 F. Supp. 2d 377 (D.N.J. 2008).

In particular, the Court in *Mister* engaged in a lengthy examination of *Pohlot* as applied to a "knowledge" crime rather than an "intent" crime. *Mister*, 553 F. Supp. 2d at 384. The Court's analysis is instructive and highly relevant to the facts at hand. I will follow the approach of *Mister*, beginning with the proffered testimony, the applicable mens rea, and the link, if any, between the testimony and the elements of the charged crimes. *See id.* at 381-88; *see also Sacks*, 2009 WL 4114169, at *4-7 (considering the pertinent mens rea, the proffered testimony, and applying the *Pohlot* standard).

## III. DISCUSSION

### A. Proposed Testimony

The description of the proposed testimony has varied over time. The original notice, in January 2021, was brief:

> Dr. Titus suffers impairments in reasoning and mental organization, which rendered him unqualified to practice medicine based on being unfit for duty due to substandard neurocognitive functioning. The substandard neurocognitive functioning reached the level of chronic brain damage with evidence of Organic Personality Syndrome and Mild Neurocognitive Disorder predominately connected to the right cerebral hemisphere.

(D.I. 49, Ex. A). Dr. Mack's full fifty-page report (D.I. 49, Ex. B) was dated March 1, 2021. Dr. Mack interviewed Dr. Titus for approximately 4-5 hours and administered numerous neuropsychological and psychological tests, in addition to reviewing Dr. Titus' previous neuropsychological evaluation history. (D.I. 49, Ex. B at 2, 3-13, 43). Dr. Mack diagnosed a "chronic mild neurocognitive disorder now presenting with clear lateralizing features to the right temporal parietal region, as well as marked difficulties in certain aspects of executive frontal function, specifically involving nonverbal problem solving and adaptive reasoning." (*Id*. at 47). The report additionally describes two further diagnostic impressions: "Organic Personality Syndrome/Personality Change due to above medical condition/Neurocognitive Disorder with marked stickiness, hyperreligiosity, and excessive religious rumination" and "Schizotypal Personality Disorder." (*Id*. at 48).

In sum, Dr. Mack's lengthy report concluded by opining that Dr. Titus had been working as an "impaired physician" since the early 2000s and that he was unfit to practice medicine during the relevant time period. (*Id*.). The Report goes on to state, "Dr. Titus' impairments in reasoning and mental organization rendered him unable to assess his own performance realistically, and he lapsed in to the arrogant and proselytizing view that his world view and his medical opinions were correct without question." (*Id*. at 49).

After the Government moved to exclude Dr. Mack's report and testimony, Defendant provided an "Addendum." (D.I. 55, Ex. A). The Addendum clarifies Dr. Mack's conclusions on the matter of intent. (D.I. 55, Ex. A at 1). Dr Mack writes, "Dr. Titus has a defective thought process and significant

neurocognitive impairments that resulting in his believing that he was practicing medicine correctly, with the conclusion that he was acting in good faith within the usual course of medical practice." (*Id.*).

At oral argument, there was extensive discussion of what exactly Defendant thought Dr. Mack could properly testify about.

> COUNSEL: Dr. Mack is saying that Dr. Titus suffered from neurocognitive impairment, and then several other impairments that impacted on – causes him to act in a certain way and causes him to, how can I put this, it drives his -- the notion that how he was practicing medicine was consistent with doing so in good faith in serving his patients.
> And Dr. Mack is saying due to his impairments, he wasn't able to reach certain – access certain executive functions and that he has this almost not narci[ssi]stic, but this defect causes him to believe that he knows what he's doing. He can't reflect on that, and that his way is the right way.
> [Dr. Mack] goes through and talks about diagnosing him with substandard neurocognitive functioning that reach levels of chronic brain damage with clear evidence of organic personality syndrome and mild neurocognitive disorder primarily affecting the right cerebral hemisphere. These impairments cause Dr. Titus to have the effective process and significant neurocognitive impairments that resulted in his believing that he was practicing medicine correctly, prescribing in good faith while within the usual course of medical practice.
> [Dr. Mack] states in his report that Dr. Titus's impairments are causing him to believe that he was prescribing medicine correctly and prescribing it with a good faith belief that he was doing so in the usual course of a medical practice. It is about Dr. Titus's -- it is about how these impairments impacted his reasoning at that time with respect to how he conducted his operation, and I think that it goes to the lack of knowledge. It goes to lack of intent in terms of the mens rea aspect of the case.
> THE COURT: Do you think [Dr. Mack] can say [Dr. Titus] was operating in good faith or his state of mind was good faith?
> COUNSEL: Your Honor, if we take up the good faith aspect of it, I believe that he would be saying that . . . Dr. Titus believed that he was practicing medicine and that he was prescribing patients and treating patients within the course of – with prescriptions, opioid prescriptions within the course of a medical practice.
> I believe that if I read the *Cohen* case particularly, I think that there may be some basis for Dr. Mack to talk about that.
> I think at least he should be able to say he believed he was practicing medicine correctly.
> I believe that Dr. Mack can testify that Dr. Titus believed he was practicing medicine correctly in a broader sense, right, and that what led to that is the impairments from which he suffered in this case and his neurocognitive deficits. And I believe that that goes to whether or not -- would support the defense argument that the doctor, Dr. Titus was acting in good faith when he prescribed medication.

(D.I. 82 at 44-52) (excerpts edited for readability).

### B. Applicable Mens Rea

The fourteen counts charged under 21 U.S.C. § 841 require a mens rea of "knowingly or intentionally." *United States v. Polan*, 970 F.2d 1280, 1282 (3d Cir. 1992). That is, the Government must demonstrate that Dr. Titus knowingly or intentionally distributed a controlled substance. *Id.* The offense does not encompass "drug distribution by a physician in the usual course of professional practice." *Id.*

The fifteenth count is charged under 21 U.S.C. § 856(a)(1), which makes unlawful to "knowingly open, lease, rent, use, or maintain any place, whether permanently or temporarily, for the purpose of manufacturing, distributing, or using any controlled substance." 21 U.S.C. § 856(a)(1); *United States v. Nasir*, 982 F.3d 144, 152 (3d Cir. 2020). The required mens rea is "knowingly." *Id.*

To act "knowingly" with respect to either offense, "is to act with 'knowledge of the facts that constitute the offense' but not necessarily with knowledge that the facts amount to illegal conduct, unless the statute indicates otherwise." *United States v. Barbosa*, 271 F.3d 438, 457-58, (3d Cir. 2001) (quoting *Bryan v. United States*, 524 U.S. 184, 193 (1998)). To act "intentionally," is to act "deliberately and not by accident." *Id.* (quoting *United States v. Fuller*, 162 F.3d 256, 260 (4th Cir. 1998)).

The parties appear to agree that in the context of the first fourteen counts, the precise mens rea is that "the defendant knew that what he distributed and dispensed was a controlled substance and that the distributing or dispensing was outside the usual course of professional practice and not for a legitimate medical purpose." (D.I. 64 at 51 (jointly proposed jury instruction)).

### C. Application

The question at this stage is whether Dr. Mack's testimony tends to negate the mens rea element of one or more of the charged offenses. *Mister*, 553 F. Supp. 2d at 386. At oral argument, the parties focused narrowly on the issues contained in the Addendum concerning Dr. Titus' ability to reflect on his decisions and his belief in his own medical judgment. Defendant's counsel described the disputed testimony as "Dr. Mack is saying due to his impairments, he wasn't able to reach certain – access certain executive functions and that he has this almost not narci[ssi]stic, but this defect causes him to believe that

5

he knows what he's doing. He can't reflect on that, and that his way is the right way." (D.I. 82 at 45:14-19).

The Government argues that this is exactly the testimony prohibited by *Pohlot*. (D.I. 49 at 17). *Pohlot* explicitly stated that one's "inability or failure to engage in normal reflection" does not strictly negate mens rea. *Pohlot*, 827 F.2d at 890. I agree that much of Dr. Mack's testimony appears to center on Dr. Titus' inability to reflect on his own medical practice. For example, Dr. Mack explained that Dr. Titus is "unable to assess his own performance realistically." (D.I. 55, Ex. A at 2). Defendant's counsel also broadly references Dr Titus' impairments and "how these impairments impacted his reasoning at that time with respect to how he conducted his operation." (D.I. 82 at 49: 9-11). This appears to be tied to "lack of insight" that hinders Dr. Titus in his medical practice and makes him "fixed and regimented in his own belief that his judgment and decision-making in his practice of medicine is correct." (D.I. 55, Ex. at 2).

In support of admitting Dr. Mack's testimony, Dr. Titus relies primarily on the Ninth Circuit case *United States v. Cohen*, 510 F.3d 1114 (9th Cir. 2007). There, the Court admitted testimony describing the fact that Cohen's "beliefs are fixed and have led him to significant adverse consequences, he is irrational to the point of dysfunction, demonstrated by his stubborn adherence in the face of overwhelming contradictions and knowledge of substantial penalty" as relevant to "Cohen's ability to form the intent to evade the tax laws." *Cohen*, 510 F.3d at 1125. However, the text of *Pohlot*, which is binding on this Court, concluded that such "diminished capacity"[2] defenses are prohibited under IDRA. *Pohlot*, 889 F.2d at 890. The Ninth Circuit does discuss whether the proffered testimony would negate the mens rea at issue and notes that such testimony would have been helpful in countering the argument

---

[2] The Court in *Pohlot* explained, "A second strain of diminished capacity permits a defendant to show not only that he lacked the mens rea in the particular case but also that he lacked the *capacity* to form the mens rea. Whether a defendant has the capacity to form mens rea is, of course, logically connected to whether the defendant possessed the requisite mens rea. Commentators have agreed, however, that only in the most extraordinary circumstances could a defendant actually lack the capacity to form mens rea as it is normally understood in American law." *Pohlot*, 889 F.2d at 903.

6

that "Cohen knew the [asserted] returns were false." *Cohen*, 510 F.3d at 1124. However, though Defendant relies on *Cohen*, the proffered testimony described at oral argument is only facially comparable. Dr. Mack opines broadly that Dr. Titus is "fixed and regimented" in his beliefs about his medical practice (D.I. 55, Ex A at 2), but appears to rely primarily on Dr. Titus' inability to self-reflect rather than an inability to process contradictory information.

Dr. Titus also argues that the proffered testimony is similar to that admitted in the *Mister* case. (D.I. 82 at 56:5). In *Mister*, the Court admitted testimony concerning the Defendant's low intellectual functioning as relevant to whether Defendant knew the payments he accepted were bribes. *Mister*, 553 F. Supp. 2d at 386. I do not agree that such testimony is analogous. Dr. Mack does not contend that Dr. Titus could not understand the relevant medical standards. Rather, his report implies (but does not go so far as to state) that Dr. Titus was unable to analyze his own performance as a medical professional in the context of those standards. (*See*, *e.g.*, D.I. 55, Ex. A at 2).

Insofar as Dr. Mack's testimony relies on Dr. Titus' "lack of insight" or that Dr. Titus cannot reflect on his conduct, I agree that this testimony is prohibited by *Pohlot*. *Pohlot* stated that, to permit evidence of "Pohlot's meaningful understanding of his actions and their consequences" would expand the concept of "intent" beyond that necessary to prove the charged crime and would improperly focus on the Defendant's unconscious mind. *Pohlot*, 827 F.2d at 907; *see also Mister* 553 F. Supp. 2d at 384 n.11 (explaining the application of the *Pohlot* standard to a "knowledge" crime). Defendant urges the Court to find that *Mister* opened the door to permit a "lack of self-reflection" testimony where the mens rea required is "knowledge" rather than "intent." (D.I. 55 at 7 (citing *Mister*, 553 F. Supp. 2d at 384)). In this Circuit, however, courts have excluded psychiatric evidence that improperly focuses on Defendants' unconscious motivations or failure to comprehend the nature of their behavior, even when one of the relevant elements of the crime is "knowledge." *See*, *e.g.*, *Sacks*, 2009 WL 4114169, at *9 (excluding testimony because it was "[f]ull of conclusory statements, it seeks to justify Defendant's behavior and describes Defendant's unconscious motivations, impaired volitional control, and his inability to reflect on the ultimate consequences of his conduct, which is impermissible"); *United States v. Baxt*, 74 F. Supp. 2d

7

436, 442 (D.N.J. 1999) (excluding testimony that the defendant was "only minimally aware, if at all, of the true nature and consequences of his behavior" because, among other reasons, it did not tend to show that the defendant "did not submit false financial statements knowingly").

Accordingly, I believe that Dr. Mack's testimony, as proposed, fails to meet the test set forth in *Pohlot*. Dr. Mack's testimony appears to be focused primarily on whether Dr. Titus can retroactively assess his medical decisions and whether Dr. Titus has insight into his own deficits rather than on psychological conditions that may be used to infer what his state of mind was during the charged conduct. *See Sacks*, 2009 WL 4114169, at *6 (excluding testimony that Defendant's business judgment would be affected by "deficiencies in concentration, persistence, and pace" as "precisely the type of psychological evidence that *Pohlot* prohibits"). Dr. Titus has not cited to a case in this Circuit that admits comparable expert testimony under the *Pohlot* standard.

I also agree that Dr. Mack may not testify that Dr. Titus is/was "unfit to practice medicine." (D.I. 49, Ex. B at 48). Such testimony is not relevant to whether Dr. Titus knew he was prescribing controlled substances outside the course of usual medical practice or whether Dr. Titus knowingly maintained Lighthouse Internal Medicine for the purpose of distributing controlled substances.

In short, every variation of Dr. Mack's proposed testimony (other than those which are clearly barred by Rule 704(b), as stated below) is irrelevant to the relevant mens reas. The testimony in no way tends to negate whether Dr. Titus knew that he was distributing controlled substances, knew what the usual course of professional practice was, or knew what was or was not a legitimate medical purpose.

**D. Rule 704(b)**

The Government also objects to certain portions of Dr. Mack's testimony under Federal Rule of Evidence 704(b). In particular, the Government objects to testimony that Dr. Titus "believed he was practicing medicine correctly" and was "acting in good faith."[3] (D.I. 81-2 at 3). At oral argument,

---

[3] It is unclear, based on a reading of the Addendum, if Dr. Mack's testimony that Dr. Titus "believed he was practicing medicine correctly" and was "acting in good faith" is tied only to Dr. Titus' inability to assess his own medical performance or other impairments referenced in Dr.

8

Defense counsel argued that Dr. Mack should be able to testify that "[Dr Titus'] impairments cause Dr. Titus to have the effective process and significant neurocognitive impairments that resulted in his believing that he was practicing medicine correctly, prescribing in good faith while within the usual course of medical practice." (D.I. 82 at 47:3-7).

Rule 704(b) states, "In a criminal case, an expert witness must not state an opinion about whether the defendant did or did not have a mental state or condition that constitutes an element of the crime charged or of a defense. Those matters are for the trier of fact alone." FED. R. EVID. 704(b). The Third Circuit has explained, "Expert testimony is admissible if it merely 'support [s] an inference or conclusion that the defendant did or did not have the requisite mens rea, so long as the expert does not draw the ultimate inference or conclusion for the jury and the ultimate inference or conclusion does not necessarily follow from the testimony.'" *United States v. Watson*, 260 F.3d 301, 309 (3d Cir. 2001) (quoting *United States v. Bennett*, 161 F.3d 171, 183 (3d Cir. 1998)). Experts may cross into Rule 704(b) territory if they "directly refer[] to the defendant's intent, mental state, or mens rea." *Id*.

The *Mister* case helps illustrate the distinction between admissible and prohibited expert testimony in this context. As the Court stated, testimony concerning "the intelligence, perception and processing evidence are relevant to a fact at issue in the case, whether Defendant knew, at the time of the offense conduct, whether the payments were bribes." *Mister*, 553 F. Supp. 2d at 389. However, requiring the expert to testify as to whether the Defendant knew the payments were bribes would violate Rule 704(b). *Id.*

I agree with the Government that opining as to whether Dr. Titus believed he was practicing medicine correctly and/or in good faith strays into Rule 704(b) territory. Dr. Mack would, in effect, be drawing the ultimate inference regarding Dr. Titus' mental state, which is strictly within the purview of the jury. Thus, I will exclude such testimony.

---

Mack's report. At a minimum, they appear to be related. Regardless of whether such testimony would be appropriate under *Pohlot*, it also is subject to Rule 704(b).

## IV. CONCLUSION

For the reasons stated above, the Government's motion to exclude the testimony of Dr. Mack (D.I. 49) is **GRANTED** to extent explained above. Given what the parties focused on at oral argument and in the briefing, I do not expect that Dr. Titus will seek to admit testimony about other portions of Dr. Mack's report.

IT IS SO ORDERED this 2nd day of July 2021.

      /s/ Richard G. Andrews
United States District Judge