```
 1                    IN THE UNITED STATES DISTRICT COURT

 2                      FOR THE DISTRICT OF DELAWARE

 3

 4     UNITED STATES OF AMERICA,    )
                                    )
 5                  Plaintiff,      )
                                    ) Criminal Action No. 18-45-RGA
 6     v.                           )
                                    ) Trial Volume I
 7     PATRICK TITUS,               )
                                    )
 8                  Defendant.      )

 9
                                          J. Caleb Boggs Courthouse
10                                        844 North King Street
                                          Wilmington, Delaware
11
                                          Tuesday, July 6, 2021
12                                        9:08 a.m.
                                          Jury Trial
13

14
       BEFORE:  THE HONORABLE RICHARD G. ANDREWS, U.S.D.C.J.
15

16     APPEARANCES:

17

18                  U.S. DEPARTMENT OF JUSTICE - CRIMINAL DIVISION
                    BY:  ALEZA S. REMIS, ESQUIRE
19                  BY:  CLAIRE SOBCZAK, ESQUIRE
                    BY:  JUSTIN WOODARD, ESQUIRE
20
                                          For the Plaintiff
21
                    OFFICE OF THE FEDERAL PUBLIC DEFENDER
22                  BY:  ELENI KOUSOULIS, ESQUIRE

23                        -and-

24                  THE BOSTIC LAW FIRM
                    BY:  EDSON A. BOSTIC, ESQUIRE
25
                                          For the Defendant
```

```
 1                    ***  PROCEEDINGS  ***

 2              THE COURT:  So while we're getting chairs and

 3    stuff, there is just one or two administrative matters that

 4    I wanted to go over.  And first off, I'm advised that we

 5    have 41 qualified jurors in the building.  So the first 32

 6    will be brought in here in due course.  They're busy

 7    randomizing the 42.

 8              Then they will -- and so there will be a list,

 9    and so it's taking a little bit of time to do that.  But

10    after all, we don't usually start until 9:30, so maybe we're

11    on time.

12              The second thing is I understand from my clerk

13    that the Defense says Dr. Warfield can be here on July 19th;

14    is that right?

15              MS. KOUSOULIS:  Yes, Your Honor.  Only thing is

16    she would have to be done on the 19th.  She has to be in San

17    Diego on the 20th, but we did arrange her flight so she

18    can -- her flight, I think, is at like nine o'clock that

19    night, so we would have like, you know, the whole day with

20    her.  So I guess we could just see where we're at the week

21    before.  We don't anticipate taking more than a day for her

22    to do direct and cross as long as --

23              THE COURT:  I would hope so.  So in that regard,

24    one thing that I thought would help is we're not going to

25    have trial this Friday, but if we had trial next Friday, is
```

1    that a problem for anyone?

2              MS. REMIS:  No, Your Honor.

3              MR. BOSTIC:  No, Your Honor.

4              MS. KOUSOULIS:  There was an additional issue,

5    though, that may affect the trial's schedule that we wanted

6    to bring to Your Honor's attention.  Late yesterday, around

7    eight o'clock yesterday, we received an email from the

8    Government indicating there was additional discovery that

9    they were provided.  So we weren't able to download it until

10   about 10:00 or 10:30 because it came through U.S. AFX.

11             One of the items on there, Your Honor -- well,

12   first of all, we haven't even had a chance to really go

13   through all of it to see if any of it would be -- we would

14   potentially want to use, and so we'd like, you know,

15   additional time to do that.

16             But one of the items, Your Honor, was a

17   recording from -- there apparently was an attempt to do an

18   undercover -- to send in an undercover in this case to

19   Dr. Titus' practice to establish a relationship as part of

20   their investigation and that undercover -- and this is the

21   first time we're hearing that.  And in our mind, Dr. Titus

22   did accept -- after reviewing this person's record, did not

23   accept this person as a patient, did not feel a need, and so

24   we believe that that is exculpatory information that we were

25   just provided late last night.  We want a chance to kind of

1    digest it and work it into our defense given that we were

2    supposed to start today.  So we were going to ask that we

3    pick the jury, but not start until Monday to give us a

4    chance to finish reviewing the discovery that was just

5    provided, and to figure out, you know, how we're going to

6    make use of this exculpatory evidence, including the nature

7    of the witnesses that we need are available.

8                   THE COURT:  Yes.

9                   MS. REMIS:  Yes, Your Honor.  And I will tell

10   you that the way that this came about is that we were going

11   through the case files one last time out of an abundance of

12   caution to ensure that everything that was in there had been

13   properly disclosed.  And as soon as we saw it, we downloaded

14   it to our system, uploaded it to U.S. AFX and provided it to

15   defense counsel.

16                   I'm still trying to understand the circumstances

17   surrounding this recording, but I will tell you it's

18   about -- it's like four, excuse me, it's like six snippets.

19   Three of them are phone calls that last about three or

20   four minutes each, and then the last three are in person.  I

21   guess the individual who was a task force officer at DEA who

22   is no longer affiliated with DEA, I don't believe, this is

23   the first time I've heard this person's name associated with

24   this case.

25                   And she goes into the clinic.  She speaks with

1    the front desk person and she says, I've been trying to get

2    my records to be sent over.  I believe they've been sent

3    over.  And the person at the front desk essentially says, We

4    haven't received them or we can't see you and she leaves.

5    So in total it's approximately 20 or 30 minutes' worth of

6    recording, if that.

7              And you know, I understand the defense's

8    position that they would like the time to listen to them,

9    but the recordings are very short.  There's no actual

10   communication with Dr. Titus, and we will make available the

11   task force officer who made those recordings.  And, again,

12   if I could have a few minutes, I also can speak with the

13   agents to understand more if the Court has more questions.

14             THE COURT:  Okay.  So I didn't understand your

15   math there, Ms. Remis.  I thought you said there was six

16   snippets and three of them were telephone calls.  And I

17   presume then three of them were in the office, but you

18   described one conversation with a receptionist.

19             MS. REMIS:  The first three are telephone calls

20   and the last three are she goes into the office to speak

21   with the receptionist.

22             THE COURT:  Okay.  So basically the last three

23   are all part of this 20 to 30 minutes?

24             MS. REMIS:  Yes.

25             THE COURT:  Okay.  Well -- yes, Ms. Kousoulis.

 1            MS. KOUSOULIS:  Your Honor, it's not just the

 2  fact that recordings themselves are short.  There's a lot

 3  that goes -- that's involved in that.  Like we want to --

 4  you know, like they're saying that now the other person

 5  that's heard in the recording when the agent goes back into

 6  the parking lot is no longer available.  But perhaps --

 7            MS. REMIS:  I'm sorry.  I didn't say that.

 8            MS. KOUSOULIS:  Well, the task force officer you

 9  said you don't -- that they're no longer with the Task

10  Force?

11            THE COURT:  What I understood her to say is that

12  the Task Force officer is presumably back with whatever

13  police organization he or she was with before, but the

14  person hasn't disappeared from the face of the earth.

15            MS. REMIS:  Correct.

16            THE COURT:  And that's who they will make

17  available because I assume that person is still a police

18  officer somewhere in Delaware?

19            MS. REMIS:  Yes, that's correct, Your Honor.

20            MS. KOUSOULIS:  And Your Honor, these recordings

21  happened back in August and September in 2014.

22            THE COURT:  Yeah.

23            MS. KOUSOULIS:  And so given the fact that just

24  a month ago when we had the motion in limine and we were

25  discussing whether or not undercover recordings were used in

1   this case and, you know, the fact that that didn't maybe

2   alert, you know, them to perhaps inquire as to the other

3   agents that have been investigating this case, if that ever

4   happened, where this could have been disclosed earlier.  And

5   it's not just the fact of listening to these tapes, there's

6   other things that go on with it with regard to when the

7   report is done.  In order to even do an undercover

8   investigation, sometimes there's -- you have to get like

9   approval.  And we want to know everything, everyone that was

10  involved in that team and perhaps investigate it.  And

11  perhaps even these tapes are kind of hard to listen to, if

12  we need to enhance them at all, you know.

13          THE COURT:  Well, if you need to enhance them,

14  you're not going to do that by Monday, are you?

15          MS. KOUSOULIS:  No, Your Honor.  But there might

16  be a way to -- I don't know.  There might be a way that we

17  can sort of clean them up a little bit.  But in any event,

18  Your Honor, it's not just in terms of having to like figure

19  out like working this into, you know, our defense and the

20  fact that they were just provided last minute, like, I find

21  it, you know, hard to believe that the -- that none of the

22  agents working on the case, no one involved in this case for

23  the last five years knew that this happened, especially

24  since we made a point about this particular type of

25  investigation just a month or two ago.

1              MR. BOSTIC:  Your Honor, may I have one moment

2      with my colleague?

3              THE COURT:  Sure.

4              MS. KOUSOULIS:  Your Honor, what we're trying to

5      wrestle with is the fact that, obviously, we don't want

6      to -- you know, we have a jury out there.  We don't want to

7      delay things unnecessarily, but there is a lot that might be

8      involved in this that we're not even sure.  Like you know --

9      we find it hard to believe that this -- that this

10     undercover, her attempts span over a month's time and that

11     we're being told that there's no reports, that she prepared

12     no reports with regard to this, that all we have is these

13     snippets and no report.  It wasn't documented anywhere.

14             And so, you know, we want to make sure -- and

15     that's what we're being told, but maybe -- we want to ensure

16     that's not the case.  We want to maybe find out who else was

17     on the Task Force that investigated it and talk to them.

18             To us, Your Honor, this is like important

19     information.  And the fact that, again, it's just being

20     disclosed last minute, it wasn't even that it was

21     disclosed -- they found out about it yesterday afternoon at

22     three o'clock.  So instead of contacting us and saying, Hey,

23     we just found this out, it almost is like they buried it in

24     this discovery dump with a bunch of other things, you know,

25     at eight o'clock -- you know, at eight o'clock at night.

1    And you know, normally the practice in this district, you

2    know, U.S. Attorney's Office, they would normally give us a

3    heads up, say, Hey, this is coming your way being the eve of

4    trial.

5            And so we just need -- again, we shouldn't be at

6    a disadvantage to have to rush now to try to figure out what

7    we want to do with this new evidence.  And in our mind, Your

8    Honor, it is exculpatory.  The fact that they sent an

9    undercover in to try to establish a relationship and their

10   theory is that Dr. Titus will just see anyone that comes to

11   him just to, you know, provide pills, and here's one

12   indication that it didn't happen, and perhaps there were

13   other attempts made.  And you know, the Government has

14   maintained that they talked to agents and that there weren't

15   any other attempts made, but without talking to the people

16   on this Task Force and the people that were involved with

17   this, how do they know that other attempts weren't made.

18           THE COURT:  All right.  Do you know, Ms. Remis,

19   whether the DEA Task Force officer who was supervising this

20   effort was at that time an official Task Force officer?

21           MS. REMIS:  I -- do you mean the person who did

22   the recording or --

23           THE COURT:  No, I assume the person who did the

24   recording was some -- the person who did the recording, was

25   that a Task Force officer?

```
 1              MS. REMIS:  That person was a Task Force
 2    officer.  My understanding is that she is back to being a
 3    police officer.
 4              THE COURT:  No, no, No.  But back when she did
 5    this, was she actually a Task Force officer, you know, sworn
 6    in and all that sort of thing?
 7              MS. REMIS:  Yes, at DEA.
 8              THE COURT:  Okay.  Have you looked through the
 9    DEA files in regards to this case, not maybe you personally,
10    but somebody looking?  I mean, I guess, are you representing
11    that, other than making the recordings, there is no actual
12    other documentation that this event happened?
13              MS. REMIS:  That is my understanding.  And I can
14    tell you yesterday what I was doing was I was in the DEA
15    system going through file by file, and this is how I learned
16    of this.  And I did not see any reports or, you know,
17    whatever other --
18              THE COURT:  Okay.
19              MS. REMIS:  -- thing that was supposed to
20    happen.
21              THE COURT:  All right.  Well, so basically what
22    I think is this:  I think we should go ahead and try to pick
23    the jury today.  I think we should go ahead and start the
24    trial tomorrow and Thursday.  It is, after all, the
25    Government's case and, you know, the fact that there was an
```

1    undercover attempt is now revealed.  Since they're not going

2    to be calling the person who actually did it, the amount of

3    cross-examination you can do based on that is probably

4    pretty little.

5              And you know, you'll have a chance -- you know,

6    there's a three-day weekend because we're not having trial

7    on Friday -- to try to figure out what you're going to do

8    with it in the overall strategy.  But I --

9              MS. KOUSOULIS:  Your Honor, if I may, in terms

10   of even how we're going to frame our opening and how we're

11   going to present the case, how we're going to -- one of the

12   people they're going to call, you know, one of the first two

13   days is the DEA agent who's now the agent with the case.  We

14   may want to cross-examine him regarding -- you know,

15   regarding what happened with that.  But again, having -- and

16   it's not even just this recording.  They provided like a lot

17   of other discovery late last night at like ten o'clock at

18   night.

19             So we would at least ask if you're not going to

20   give us until Monday, until at least Thursday so we can

21   digest what they're given us.  It's not just a question of

22   put it on in our case, but it's how we're going to

23   cross-examine their witnesses leading up to that, how we're

24   going to open it, what our theory of defense is going to be

25   with this new information that we were just provided.  It

1  was like 10,000 pages of discovery, you know, documents is

2  what was given to us yesterday.

3           THE COURT:  Is that right?

4           MS. REMIS:  Your Honor, I'm not exactly sure how

5  many pages, but I can tell you exactly what was included.

6           THE COURT:  Well, why don't we start by just:

7  Does 10,000 pages sound like the ball park?

8           MS. REMIS:  No.

9           THE COURT:  Ms. Kousoulis, I'm just curious,

10  your 10,000, you know, I'm not expecting a hundred percent

11  accuracy, is that based on some numbering system or what?

12           MS. KOUSOULIS:  Your Honor, it was based on we

13  asked our computer, our CSA, who was downloading it in terms

14  of how much -- you know, how much was involved, and that's

15  what --

16           MR. BOSTIC:  Your Honor, if I may address the

17  Court as Ms. Kousoulis is looking for it.  Your Honor,

18  Mr. Marek, who the Court has seen here, went through and

19  documented the amount of documents.  It was over 3.5

20  gigabytes of information and over 10,000 pages in documents.

21           THE COURT:  All right.

22           MS. KOUSOULIS:  It was yesterday he indicated,

23  Your Honor, it was 5,821 pages of PDFs, plus there were

24  images with Dr. Titus' iPhone that he has -- he was not able

25  to completely unpack.  And it was in the neighborhood of

1    10,000 plus files, but he didn't know if they were texts,

2    pictures, messages, calls, because, again, we were still

3    trying to kind of unpack that very late last night.  And so

4    again, Your Honor, in terms of just being able to go through

5    it before we decide exactly how we want to present our case,

6    obviously, when we open, we're going to give the jury a

7    roadmap to our case.  And it's going to be, you know,

8    without having been able to fully digest the new information

9    we were just given that we believe is helpful to us.

10           We need to -- you know, we would just ask for a

11   little bit of additional time.  And again, if the Court is

12   not willing to do Monday, we would at least ask until

13   Thursday, especially since we need to find out, and we would

14   be requesting, Your Honor, not just the Task Force officer

15   who was on the recording, but there's someone else with her

16   in the parking lot.  And we would ask that that person be

17   identified and for that person to be available, also.

18           And at this stage, I believe Ms. Remis indicates

19   she doesn't know who that is.

20           MS. REMIS:  Your Honor, sorry.

21           THE COURT:  True?

22           MS. REMIS:  I do not know who that is, but I can

23   certainly --

24           THE COURT:  I take --

25           MS. REMIS:  -- figure it out.

1        THE COURT:  I take it that part of the issue

2   here, too, is that the DEA agents who were actually around

3   in 2014, they, too, have moved on to somewhere else?

4        MS. REMIS:  Well, some of them are here, Your

5   Honor, and I don't -- I don't know exactly how the oversight

6   occurred.  And I can do more -- I am intending to do more

7   digging trying to figure that out, but we can certainly make

8   the TFO available really at any time, Your Honor.

9        I think in terms of the Thursday request, we are

10  amenable to -- Special Agent Smith is the special agent who

11  is going to testify early on in our case.  For scheduling

12  reasons, we can certainly hold him off until Thursday

13  morning to give them additional time to review those

14  recordings and to, you know, speak with -- we can speak with

15  the TFO.

16        THE COURT:  Can you hold him off until next

17  week?

18        MS. REMIS:  He has a scheduling issue, so we

19  can't.

20        MS. KOUSOULIS:  Your Honor.

21        MS. REMIS:  I mean, we can -- we can try and

22  figure it out, Your Honor.

23        MS. KOUSOULIS:  Your Honor, this is -- I'm

24  sorry.

25        MS. REMIS:  And just one other thing with the

1    discovery, Your Honor.  A large part of that was the iPhone,

2    which I believe we've already produced.  It was the iPhone

3    that was copied at the 2018 arrest, so it's much older than

4    the -- it's not like the iPhone that he was using at the

5    time of this case.  And I believe they imaged it and

6    returned it to him, so it was technically already in his

7    possession.  But again, out of an abundance of caution,

8    going through everything in advance of trial to make sure

9    that we had produced what we needed to produce.

10            MS. KOUSOULIS:  Your Honor, we don't understand

11   why the -- Agent Smith has been involved in this case since

12   2014.  He's on some of these witness interviews.  He

13   interviewed witnesses back at that time.  You're saying he

14   wasn't involved.

15            And Agent McDonald, who I believe is on the

16   witness list and is still around, he was back then -- here

17   back then.  So I don't understand how some of the people

18   that were involved in the case back then --

19            THE COURT:  Wait, wait.  Hold on a minute.  So

20   the agent you're going to have testify this week, he was

21   doing something else in 2014?

22            MS. REMIS:  The agent who's going to testify, he

23   is now the case agent on this case because of -- some people

24   who have moved on.  The people are all here.  They're all

25   here, the ones who are the actual agents on this case.

1          THE COURT:  Right, right.  But the agents on the

2   case, they don't really matter that much because after all

3   they don't actually have any first-hand knowledge.

4          MS. REMIS:  The agent who's going to testify was

5   peripherally involved in the investigation including

6   executing the search warrants and interviewing the Defendant

7   in 2014, but he was not interviewing a ton of witnesses.

8          THE COURT:  Who was in charge in 2014?

9          MS. REMIS:  The case agents were.  Diversion

10   Investigator Lynda Eleazer from the DEA.

11          THE COURT:  Yes.

12          MS. REMIS:  And HHSOIG Special Agent Bill

13   McDonald.

14          THE COURT:  So Eleazer and McDonald?

15          MS. REMIS:  Yes, Your Honor, and McDonald is on

16   our witness list.

17          THE COURT:  What about -- and Eleazer is not?

18          MS. REMIS:  She's not.

19          MS. KOUSOULIS:  We would ask for her to be

20   available and we've entered the response to a request, so we

21   were looking into that.  But in light of all this, Your

22   Honor, we would ask that she be available.

23          And, again, although Agent Smith might not have

24   been exactly, you know, involved in this aspect of it, he's

25   still -- I have a hard time believing as case agent and as

1    being involved in it back -- at least back in 2014 and '15,

2    even if he was peripherally involved that he would not have

3    known there was an undercover recording.  And he's been

4    present in the courtroom and knew we were talking about

5    undercover recordings just last month.

6              And that's the thing, I accept that the, you

7    know, attorneys, Your Honor, were not aware of this and that

8    Ms. Remis was not aware of this, but the agents are an

9    extension of the Government, and I find it hard to believe

10   that the agents were unaware of this until the last minute.

11   And if it wasn't for Ms. Remis finding it, we would have

12   never known about it.  None of the DEA agents or any of the

13   agents in this case, McDonald, Eleazer, Smith, like, alerted

14   the attorneys to it, which is also troubling.

15             THE COURT:  So to the extent the request is that

16   we postpone starting based on the last production of this

17   evidence if there was an undercover investigation, I really

18   don't see the prejudice to the defense in starting.  And if

19   it's the case that -- you know, and I think the Government

20   may need to consult with Agent Smith and postpone.

21             And I take it McDonald isn't testifying until

22   some time next week; right?

23             MS. REMIS:  Until the end of our case, if at

24   all, Your Honor.

25             THE COURT:  You know, in the end, you know,

1    things are never perfect, but I just don't see that the

2    defense can't adjust, as they think necessary, to this

3    information.

4              And you know, at this point I really don't have

5    any comment on the Government.  While I appreciate their

6    disclosure of all this material, perhaps the day before

7    trial wasn't the day to be doing this work for a case that's

8    been hanging around for three years, but right now it is

9    what it is.  And so I'm going to deny the request for

10   postponement of the start of trial.

11             MS. KOUSOULIS:  Your Honor, we would at least

12   ask if we can start on Thursday just so they can finish

13   looking into this to see if there's any other documents that

14   could be potentially relevant.  And we would also ask, Your

15   Honor, given the late disclosure and the fact that it's

16   unclear when we're going to get through everything that

17   they, you know, not be permitted -- anything they provided

18   yesterday, that they not be permitted to use any of that

19   information if they were planning to in either their case in

20   chief or rebuttal.

21             THE COURT:  Well, that's a different request.

22   I'm guessing they weren't planning to so I think --

23             MS. KOUSOULIS:  But again, Your Honor, we would

24   ask for a Thursday start just to give us a chance to --

25   again, we're going to be here all day, just to give us a

1    chance to figure out what we're going to do and how we want

2    to work this in because we do think it's an important piece,

3    and we don't think we should be prejudiced and rushed to put

4    this all together when we were given things at the 11th

5    hour.

6                    THE COURT:  All right.  Well, as I said, I'm not

7    convinced that there is any prejudice, so I'm going to start

8    the trial tomorrow, assuming we get a jury picked today.

9    All right?

10                   Okay.  All right.  Let me just check and see how

11   we're doing on the jury.

12                   All right.  So the jury is ready to go.  And so

13   the people who are sitting in the back of the courtroom,

14   other than the court security officers, you need to

15   relocate.

16                   Okay.

17                   (Jury pool entering the courtroom.)

18                   THE COURT:  Ms. Kousoulis.

19                   Good morning, ladies and gentlemen.  My name is

20   Richard Andrews.  I'm a judge of the Court here.  We're

21   going to start the process of selecting a jury in a criminal

22   case that's called *United States vs. Patrick Titus*.

23                   I'm going to ask you a series of questions to

24   help me and the attorneys in the jury selection process, but

25   before I ask any questions I'm going to ask the deputy clerk

```
 1    to swear the entire panel to answer all questions

 2    truthfully.

 3              Could we swear the panel?

 4              DEPUTY CLERK:  Members of the jury panel, will

 5    you please rise and raise your right hand?  You and each of

 6    you do solemnly swear, those of you who swear, and you and

 7    each of you do affirm, those of you who affirm, that you

 8    will true answer make to such questions as may be asked you

 9    touching the matter now before the Court, so help you God,

10    those of you who swear and you do so affirm, those of you

11    who do affirm.

12              The correct response is I do.

13              THE JURY POOL:  I do.

14              DEPUTY CLERK:  Thank you.

15              THE COURT:  All right.  So one thing before we

16    get started, if you have any electronic devices with you,

17    turn them off.  Don't do anything to learn anything about

18    this case, either by using electronic devices or by talking

19    to other people.

20              All right.  So this process, as I said, is to

21    select a jury.  And so I'm going to ask this series of

22    questions.  When I ask a question, if your answer to the

23    question is yes, I want you to raise your hand.  I'm going

24    to ask you what your jury number is, and everybody here's

25    jury number should be somewhere between 1 and 32.  And at
```

1    the end of this general questioning I'm going to do, you're

2    going to go to the courtroom next door, and then I will talk

3    to each of you one at a time mostly so that I can ask those

4    of you who answered yes to one or more questions to discuss

5    those answers with me.

6             So as background, the presentation of evidence

7    in this case is expected to take approximately three weeks,

8    though jury deliberations could extend your service beyond

9    that.  The schedule that I expect to keep over the days of

10   evidence presentation will include a morning break of

11   15 minutes, a lunch break of up to an hour, and an afternoon

12   break of 15 minutes.  We will start at 9:30 a.m., which

13   means you have to be here before then, and finish no later

14   than 5:00 p.m. each day.  We will have trial this week only

15   today, tomorrow and Thursday, no trial Friday of this week,

16   but otherwise it will be a five-day trial week.

17            So the first question is:  Does the schedule

18   that I've just mentioned to you present a special hardship

19   to you?  If so, raise your hand.

20            All right.

21            THE JUROR:  Number four.

22            THE COURT:  Thank you.

23            THE JUROR:  Number two.

24            THE JUROR:  Six.

25            THE JUROR:  Twelve.

```
 1                    THE JUROR:  Thirty-one.

 2                    THE COURT:  Thirty-one?

 3                    THE JUROR:  Yeah.

 4                    THE COURT:  Yes.

 5                    THE JUROR:  Twenty-nine.

 6                    THE COURT:  All right.  Raise them high if there

 7      are any more hands.  I don't see any.

 8                    All right.  Thank you.

 9                    So this is a criminal case involving charges

10      that the Defendant, Patrick Titus -- and I would ask

11      Dr. Titus to stand for just a minute.

12                    (Whereupon Dr. Titus stood.)

13                    THE COURT:  All right.  Thank you.

14                    The Defendant distributed and dispensed outside

15      the usual course of professional practice and not for a

16      legitimate medical purpose a mixture in substance containing

17      a detectable amount of controlled substances including

18      Oxycodone, Oxycontin, Methadone, Morphine and Fentanyl.

19                    The Defendant, Dr. Titus, is also charged with

20      maintaining a drug-involved premises.  The Defendant was

21      formally a licensed medical doctor who ran a clinic in

22      Milford, Delaware that was called Lighthouse Internal

23      Medicine.  The jury in this case will be asked to decide

24      whether the Defendant is guilty beyond a reasonable doubt of

25      the charges against him.
```

```
 1                   So have you heard or read anything at all about
 2      this case?
 3                   Yes.
 4                   THE JUROR:  Juror 14.
 5                   THE COURT:  I'm sorry?
 6                   THE JUROR:  Fourteen.
 7                   THE COURT:  Fourteen?
 8                   THE JUROR:  Yes.
 9                   THE COURT:  Anyone else?
10                   THE JUROR:  One.
11                   THE COURT:  And --
12                   THE JUROR:  Twenty-three.
13                   THE COURT:  I don't see any other hands.
14                   All right.  Is there anything about the nature
15      of the charges that would prevent you from being a fair and
16      impartial juror?
17                   Yes.
18                   THE JUROR:  Twenty-eight.
19                   THE JUROR:  Twelve.
20                   THE COURT:  Twelve?
21                   THE JUROR:  Yes.
22                   THE COURT:  I don't see any -- ah, yes.
23                   THE JUROR:  Thirty-one.
24                   THE COURT:  All right.  I don't see any other
25      hands.
```

 1              Does any member of the panel know the Defendant,

 2    Mr. Titus?

 3              THE JUROR:  One.

 4              THE COURT:  All right.  All right.  I don't see

 5    any other hands.

 6              Is any member of the panel familiar with

 7    Lighthouse Internal Medicine?

 8              I don't see any hands.

 9              So the lawyers involved in this case, let me ask

10    Ms. Remis to introduce her side and her paralegals.

11              MS. REMIS:  Good morning, everybody.  My name is

12    Aleza Remis.  I'm from the Department of Justice.  I have

13    with me trial attorney Justin Woodard and Claire Sobczak.

14    And our paralegals, we have Lisa Leal, Jodi-Kay Williams,

15    Alexa Kane, and a slew of our case agents.

16              Shall I introduce them?

17              THE COURT:  No, I will take care of them later.

18              Okay.  And Mr. Bostic.

19              MR. BOSTIC:  Good morning again, Your Honor.

20    And we have Eleni Kousoulis, we're counsel for Mr. Titus.

21              THE COURT:  And you have a paralegal, though I

22    guess not present now who might be present later; right?

23              MR. BOSTIC:  We have a paralegal that has

24    assisted with Dr. Titus' case.  She will be in and out of

25    the office.

```
 1                    MS. KOUSOULIS:  That's correct, Your Honor, and
 2     we also have --
 3                    THE COURT:  And her name is?
 4                    MS. KOUSOULIS:  Oh, Kali Sudler.  And we have a
 5     computer analyst, Andrew Marek, that will be assisting us
 6     during trial.
 7                    THE COURT:  All right.  So do any of you or your
 8     immediate families, to your knowledge, immediate family
 9     being spouse, child, parent or sibling, know any of the
10     people who have just stood up or have just been named?
11                    I see no response.
12                    Have you or any of your immediate families had
13     any business dealings with or been employed by any of these
14     attorneys or the United States Attorney's Office in
15     Delaware?
16                    THE JUROR:  I have a question, I'm sorry.  Can
17     you repeat that one?
18                    THE COURT:  Yes.  Sure.
19                    Have you or any of your immediate families had
20     any business dealings with or been employed by any of these
21     attorneys or the United States Attorney's Office in
22     Delaware?
23                    Yes.
24                    THE JUROR:  Fourteen.
25                    THE COURT:  Anyone else?
```

 1              I see no further response.

 2              Now, the potential witnesses in this case, and I

 3      say potential because people are listed who won't

 4      necessarily be called, or they don't have to be called just

 5      because they're listed.  And I've handed out or caused to be

 6      handed out this list that has their names in writing, and

 7      for a lot of them, most of them, it has something like where

 8      they live or if they're a member of some -- if they're a

 9      doctor or some other thing, to indicate maybe what their

10      connection to the case is if they're -- in some cases.  And

11      so I'm just going to read their name, but you've got the

12      little added description.

13              And the question at the end of this long list is

14      going to be:  Are you familiar with any of these potential

15      witnesses?

16              So they are Amanda Molesi.  Ashley Webb.  Betty

17      Whaley.  Bill Pucci.  Bonita Benson.  Brent Hood.  Carla

18      Haynes.  Chasity Calhoun.  Christine Bowie, formally

19      Christine Armstrong.  Cindy Molesi.  Cliff Waples.  Delores

20      Perry.  Dr. Adam Brownstein.  Dr. Joseph Raziano.

21      Dr. Marisa Conti.  Dr. Andrew Daley.  Dr. Carol Warfield.

22      Scott Bender.  Dr. Stephen Thomas.  Actually Scott Bender,

23      is he still -- no, forget Scott Bender.  Dr. Stephen Thomas.

24      Edward Sullivan.  Henry Lankford.  Jane Webb.  Jacqueline

25      Miller.  Jeffrey Timmerman.  Jeremy Smith.  John Zalewski.

1    Johnny Diogo.  Joseph Morales.  Josie Walters.  Kristyn

2    Pipher.  Leana Waples.  Lisa Cody.  Lucille Brown.

3    Marguerite Lenhardt.  Megan Miller.  Melissa Silbereisen.

4    Michael Adams.  Mike Petron.  Percy Dhamodiwala.  Rebecca

5    Benson.  Shannon Holleger.  Tracie Owens.  Valerie Pucci.

6    Victoria Titus.  And William McDonald.

7              So are you familiar with any of these potential

8    witnesses?

9              THE JUROR:  One.

10             THE COURT:  One.

11             THE JUROR:  Eight.

12             THE JUROR:  Twenty-four.

13             THE JUROR:  Thirty-one.

14             THE JUROR:  Seventeen.

15             THE JUROR:  Sixteen.

16             THE COURT:  I don't see any other hands.

17             The law enforcement agencies involved in this

18   case are the Drug Enforcement Administration, usually called

19   the DEA, and the Department of Health and Human Services,

20   sometimes called HHS.  Would the fact that the DEA or HHS

21   participated in the investigation in this case interfere

22   with your ability to be a fair and impartial juror?

23             No response.

24             Have you or any -- this is a two-part question.

25   Have you or any member of your immediate family ever, one,

1      been employed by; or two, been investigated by any law

2      enforcement agency, including the DEA or HHS?

3                    So answer yes if either employed or

4      investigated.  It doesn't have to be both.

5                    THE JUROR:  Nine.

6                    THE JUROR:  Ten.

7                    THE COURT:  I don't see any other hands.  All

8      right.

9                    Have you had any experience with local, state or

10     federal law enforcement officers that left you with strong

11     feelings, good or bad, about law enforcement officers?

12                   THE JUROR:  Twenty-four.

13                   THE JUROR:  Twenty-six.

14                   THE COURT:  I'm sorry, was that 26?

15                   THE JUROR:  Yes, sir.

16                   THE JUROR:  Twenty-three.

17                   THE COURT:  Anybody else?  I don't see any

18     further response.

19                   Do you believe that you will give more or less

20     weight to the testimony of a law enforcement officer simply

21     because he or she is employed as a law enforcement officer?

22                   I don't see any response.

23                   Do you have medical training?  Start here.

24                   THE JUROR:  One.

25                   THE JUROR:  Five.

```
 1                    THE JUROR:  Three.

 2                    THE JUROR:  Twenty-one.

 3                    THE JUROR:  Twenty-eight.

 4                    THE COURT:  Anybody else?  All right.

 5             Have you ever worked in a pain management

 6     clinic?

 7                    THE JUROR:  Thirty-one.

 8                    THE COURT:  Anybody else?  No response.  No

 9     further response.

10             Is there anything about your experience with

11     doctors or the medical profession you think the Government

12     and the Defendant ought to know?

13                    THE JUROR:  Six.

14                    THE COURT:  Anybody else?

15             All right.  No further response.

16             Would your feelings about doctors affect your

17     ability to be a fair and impartial juror in a criminal case

18     where the Defendant is a doctor?

19                    THE JUROR:  Thirty-one.

20                    THE COURT:  All right.  I don't see any further

21     response.

22             The criminal charges in this case relate to

23     prescriptions for controlled substances, in particular to

24     prescriptions for opioids such as Oxycodone, Oxycontin,

25     Hydrocodone, Morphine, Methadone and Fentanyl.  Do you have
```

1    any feelings, opinions or attitudes about the use or abuse

2    of opioids that would impact your ability to be a fair and

3    impartial juror in this case?

4                    THE JUROR:  Thirty-one.

5                    THE JUROR:  Twenty-eight.

6                    THE JUROR:  Twelve.

7                    THE JUROR:  Six.

8                    THE JUROR:  Twenty.

9                    THE JUROR:  Thirty-two.

10                   THE JUROR:  Thirty.

11                   THE COURT:  All right.  I don't see any further

12   response.

13                   Have you or any member of your immediate family

14   ever had problems with the use of prescription opioids?

15                   THE JUROR:  One -- four, sorry.

16                   THE JUROR:  I was going to say, I didn't.

17                   THE JUROR:  Sorry.

18                   THE COURT:  Okay.

19                   THE JUROR:  Twelve.

20                   THE JUROR:  I was thinking anyone.

21                   THE JUROR:  Six.

22                   THE JUROR:  Ten.

23                   THE JUROR:  Twenty-four.

24                   THE JUROR:  Thirty.

25                   THE JUROR:  Thirty-one.

1            THE JUROR:  Seventeen.

2            THE JUROR:  Sixteen.

3            THE COURT:  All right.  I don't see any further

4    response.

5            Do you believe that prescription pain

6    medications are overprescribed?

7            THE JUROR:  Two.

8            MR. BOSTIC:  Your Honor, may we hear that first

9    number again?

10           THE JUROR:  Number two.

11           THE COURT:  Sorry.  Oh, two.  Sorry.  Yes, sir.

12           THE JUROR:  Six.

13           THE JUROR:  Thirteen.

14           THE JUROR:  Twenty-four.

15           THE JUROR:  Thirty.

16           THE JUROR:  Thirty-one.

17           THE JUROR:  Thirty-two.

18           THE JUROR:  Twenty.

19           THE JUROR:  Seventeen.

20           THE JUROR:  Twenty-two.

21           THE JUROR:  Twenty-one.

22           THE JUROR:  Twenty-seven.

23           THE JUROR:  Twenty-eight.

24           THE JUROR:  Fourteen.

25           THE COURT:  I'm sorry, is that 14?

1                THE JUROR:  Fourteen.

2                THE JUROR:  Twelve.

3                THE JUROR:  Twenty-three.

4                THE JUROR:  Twenty-nine.

5                THE COURT:  All right.  I don't see any further

6    response.

7                Have you or any member of your immediate family

8    been in drug rehab?

9                THE JUROR:  Twenty.

10               THE JUROR:  Sixteen.

11               THE JUROR:  Twenty-nine.

12               THE JUROR:  Thirty-one.

13               THE COURT:  All right.  I don't see any further

14   response.

15               Have you or any member of your immediate family

16   ever been, three choices here, a victim of a crime, a

17   witness in a criminal case, or arrested for a crime, not

18   including minor traffic offenses?

19               THE JUROR:  Nine.

20               THE JUROR:  Number two.

21               THE JUROR:  Thirteen.

22               THE JUROR:  Three.

23               THE JUROR:  Twenty.

24               THE JUROR:  Sixteen.

25               THE JUROR:  Twenty-nine.

 1                          THE COURT:  All right.  No further response that

 2      I see.

 3                          Do you have any opinions about the criminal

 4      justice system that might make it difficult for you to be a

 5      fair and impartial juror in this case?

 6                          THE JUROR:  Thirty-one.

 7                          THE COURT:  All right.  I don't see any further

 8      response.

 9                          If you are selected to sit as a juror in this

10      case, are you aware of any reason why you would be unable to

11      render a verdict based solely on the evidence presented at

12      trial?

13                          THE JUROR:  Thirty-one.

14                          THE COURT:  All right.  I don't see any further

15      response.

16                          If you are selected to sit as a juror in this

17      case, are you aware of any reason why you would not be able

18      to follow the law as I give it to you?

19                          All right.  I see no response.

20                          A fundamental principle of our legal system is

21      that when a person is charged with a crime, he or she is

22      presumed to be innocent unless and until the Government

23      proves guilt beyond a reasonable doubt.  If you are selected

24      to sit as a juror in this case, will you have difficulty

25      following this rule of law?

1                     No response.

2                     Does anyone have a religious or moral conviction

3        that would make it difficult for you to find the Defendant

4        either guilty or not guilty?

5                     All right.  No response.

6                     Patrick Titus, as the Defendant in this case,

7        may choose not to testify in his own defense.  And I

8        instruct you that the choice not to testify, if that is his

9        choice, may not be held against him.  If you are selected as

10       a juror in this case, will you have difficulty following

11       this instruction?

12                    THE JUROR:  Twenty-nine.

13                    THE COURT:  All right.  I see no further

14       response.

15                    You may see evidence that was seized during the

16       lawful execution of search warrants.  Do you have any

17       feelings about the use of search warrants that would affect

18       your ability to be an impartial juror in this case?

19                    No response.

20                    Have you served on a jury in a criminal case

21       before?

22                    THE JUROR:  Thirteen.

23                    THE JUROR:  Ten.

24                    THE JUROR:  Twenty-five.

25                    THE COURT:  No further response.

1                    Have you served on a grand jury before?

2                    THE JUROR:  Twenty.

3                    THE JUROR:  Fifteen.

4                    THE COURT:  I see no further response.

5                    Is there anything such as poor vision,

6    difficulty hearing, difficulty understanding spoken or

7    written English that would make it difficult for you to

8    serve on this jury?

9                    No response.

10                   I reviewed the COVID questionnaires that you all

11   filled out.  You're here because I did not see anything in

12   your answers that made me think you should be excused from

13   service as a juror because of COVID concerns, but I now ask

14   you:  Does COVID give you any concern about serving on this

15   jury?

16                   THE JUROR:  Thirty-one.

17                   THE COURT:  All right.  I see no further

18   response.

19                   As you can see, we are wearing masks and

20   practicing social distancing.  Once we have a jury, I

21   expect, which is basically the state law now, I expect that

22   fully vaccinated jurors will have the option, if they want,

23   of taking their masks off while the trial is going on.

24   Jurors who are not fully vaccinated will not have that

25   option.

```
 1              Will you have difficulty complying with those
 2    rules?
 3              No response.
 4              This is the last question that I have for the
 5    group as a whole.  Is there anything else, including
 6    something that you have now remembered in connection with
 7    one of the earlier questions, that you think you would like
 8    to tell me about in connection with your possible service as
 9    a juror in this case?
10              All right.  Starting on this side.  Yes.
11              THE JUROR:  Twenty-three.
12              THE JUROR:  Twenty-eight.
13              THE JUROR:  Thirteen.
14              THE JUROR:  Twenty-six.
15              THE COURT:  Anybody else?
16              All right.  Thank you.
17              So the clerk will now take you back to the other
18    courtroom, and we'll start talking to you one at a time.
19              (Jury pool leaving the courtroom.)
20              THE CLERK:  Okay.  We're going to come this way.
21    You can either stand or sit right in this area, whatever you
22    prefer.
23              THE JUROR:  I'll stand.
24              THE COURT:  Hi, Ms. Bauer.  If you want, you can
25    take your mask off.  So you answered yes to a number of
```

1     questions.

2            THE JUROR:  Yes.

3            THE COURT:  I'd just like to follow up on those.

4     Two of them related to whether you've heard anything about

5     the case or that you knew Dr. Patrick Titus.

6            Can you tell me about that?

7            THE JUROR:  Yes.  I am a nurse at Bayhealth and

8     I used to -- I worked in the emergency room about ten or

9     13 years ago.  I no longer work in the emergency room, but I

10    still do work for Bayhealth.  And I had met Dr. Titus and I

11    had taken orders from him for -- in reference to other

12    patients, to his patients.  I also worked under Dr. Raziano.

13           THE COURT:  All right.  And working under

14    Dr. Raziano, taking orders from Dr. Titus, do you enter this

15    case with any opinions already formed?

16           THE JUROR:  No.

17           THE COURT:  Or do you know anything about this

18    case?

19           THE JUROR:  I -- no.

20           THE COURT:  Your interaction with either

21    Dr. Titus or Dr. Raziano back then, did it give you positive

22    or negative impressions of either one of them?

23           THE JUROR:  Dr. Titus was a very lovely man.  I

24    liked him very much as a doctor and a person.  I didn't have

25    a lot of interaction with him.  He would come in to do

1    rounding and if there was a patient being admitted that was

2    his patient before we had hospitalists, he would see his

3    patients.  I would follow through on some orders to get the

4    patient admitted.  I didn't have any ill opinion of

5    Dr. Titus.

6                THE COURT:  And Dr. Raziano?

7                THE JUROR:  Dr. Raziano was great to work under.

8    He was an ER physician.  I was a nurse.  And he was

9    efficient and got through.

10               THE COURT:  All right.

11               THE JUROR:  It was nice to work under him

12   because you kept moving.

13               THE COURT:  All right.  So either of those

14   interactions in the past wouldn't have any impact, as far as

15   you're concerned, about your ability to judge whatever it is

16   you hear in this case fairly and impartially?

17               THE JUROR:  No.

18               THE COURT:  Okay.  All right.  And so the

19   potential witnesses, that was Dr. Raziano?

20               THE JUROR:  Yes.

21               THE COURT:  And then you also -- well, you

22   talked about medical training.  I guess that's what you

23   mentioned, too.

24               THE JUROR:  Right.

25               THE COURT:  And then the last thing was whether

1   you or a member of your immediate family had either had

2   problems with the use of prescription opioids.

3               THE JUROR:  No, that wasn't me.  She said my

4   number.  Juror 4 said my number.  I don't have any -- any

5   history, any familial history.

6               THE COURT:  So I've now gone over all the

7   questions you answered yes to?

8               THE JUROR:  Correct.

9               THE COURT:  All right.  Does the Government have

10  any questions?

11              MS. REMIS:  No, Your Honor.

12              THE COURT:  Does the Defense?

13              MS. KOUSOULIS:  Yes.  Just one question.  You

14  had said that you worked under Dr. Raziano?

15              THE JUROR:  Correct.

16              MS. KOUSOULIS:  So if he's called as a witness,

17  would you judge his credibility and his answers based on the

18  testimony he gives or if his credibility were challenged,

19  would you bring your opinion of him from what you have

20  outside the courtroom into assess whether or not, you know,

21  you find his testimony credible?

22              THE JUROR:  No.  I would base my opinion

23  completely on the testimony at hand.  I have not seen

24  Dr. Raziano in probably ten years, but as an ER physician,

25  he was succinct, he did his job, and he kept things moving.

1    You know, you can understand when you work in the emergency

2    room, it gets so backed up if you have a physician who

3    doesn't keep things moving.

4              So in my opinion, he kept things moving.  He

5    never seemed to do anything out of the ordinary or not in

6    reason of care that I could foresee.

7              MS. KOUSOULIS:  All right.  Thank you.

8              THE COURT:  All right.  So if you're selected to

9    serve on this jury, you're good with that?

10             THE JUROR:  Yeah.  Yes.  Yes, sir.

11             THE COURT:  Okay.  That's all right.  We're

12   pretty informal here.

13             Okay.  So can you take her back to the

14   courtroom?

15             (Juror leaving the courtroom.)

16             All right.  She looks good to me.

17             MS. KOUSOULIS:  No objection.

18             MS. REMIS:  No objection.

19             THE COURT:  Okay.  All right.

20             (Juror entering the courtroom.)

21             THE CLERK:  You can either stand or sit right

22   here in this area.

23             THE COURT:  Mr. Hooks, you can take your mask

24   off if you'd like.  So you answered, by my count, three

25   questions yes.

1          Let's talk about the first one which was the

2     schedule which presented a hardship for you.  Can you tell

3     me about that?

4          THE JUROR:  I own my own business.  We do

5     trucking and street sweeping.  I'm running very short

6     staffed right now.  I have State contracts going on and it's

7     just hard to make things work up here where I might be

8     needed at nighttime or during the day.

9          THE COURT:  And you are from downstate, Laurel?

10          THE JUROR:  Laurel.

11          THE COURT:  Well, so is there somebody who's

12     going to keep the business doing what it needs to do if

13     you're here?

14          THE JUROR:  I mean, my wife does the scheduling,

15     but as far as like driving the trucks, I'm a CDL driver, so

16     it's hard -- I've got five dump trucks and two street

17     sweepers, and right now I've only got two employees.

18          THE COURT:  So recognizing that jury duty is a

19     civic duty, if I said no, you have to serve on this jury,

20     would that -- besides thinking that I'm crazy, would that

21     impact your ability to give your full time and attention to

22     this case?

23          THE JUROR:  I mean, it -- if something happens

24     like, say, trucks break down and I got -- maybe if I'm up

25     all night working on a truck, my mindset might not be there,

1     but I mean, if I've got to be here, I have got to be here.

2              THE COURT:  Okay.  You also answered two other

3     questions yes.  One of which was that you believe

4     prescription pain medications are overprescribed.

5              That is your belief?

6              THE JUROR:  Oh, absolutely.

7              THE COURT:  And so what do you base that on?

8              THE JUROR:  I just feel like it's always like

9     the number one go to, like if somebody has a back problem,

10    oh, we'll just give you Percocets or whatever.  I mean, it's

11    a temporary solution to a problem, and it ends up becoming a

12    permanent.  They just keep going back and back and back

13    versus actually getting their problem fixed like a surgery

14    or something.

15             THE COURT:  So the evidence in this case is

16    going to be that Dr. Titus is in a pain medication practice

17    and the accusation, you know, involves the prescription of

18    opioids.   Would your beliefs, that you've just expressed,

19    would that color the way you look at the case or would you

20    be able to sort of judge the case just based on what happens

21    here in the courtroom?

22             THE JUROR:  No.  I mean, I would just say -- say

23    if -- say if somebody was getting prescriptions say for like

24    three years, I mean, that's pretty extensive.

25             THE COURT:  So your beliefs would color your

1    ability to be fair to Dr. Titus?

2              THE JUROR:  I guess, yes, in a way.

3              THE COURT:  Okay.  Does the Government have any

4    questions?

5              MR. WOODARD:  No, Your Honor.

6              THE COURT:  All right.  So I'm going to excuse

7    you from service, Mr. Hooks.  I appreciate your candor and

8    you'll be able to leave the building.  And hopefully you'll

9    get called for a jury in Sussex, and it will only be for

10   three days.

11             THE JUROR:  Thank you.  I appreciate it.

12             THE COURT:  Thank you.  You may go.

13             THE CLERK:  Just go out the doors there.

14             THE JUROR:  Thank you.

15             THE CLERK:  Yeah.

16             (Juror leaving the courtroom.)

17             (Juror entering the courtroom.)

18             THE CLERK:  You can either stand or sit.

19             THE JUROR:  Okay.

20             THE CLERK:  Whatever you prefer.

21             THE JUROR:  Okay.

22             THE COURT:  Okay.  And Mr. Bryant, you can take

23   your mask off if you want.

24             THE JUROR:  Okay.  Great.

25             THE COURT:  Sir, you answered I think two

1    questions yes.  One of them was you have medical training.

2              Can you tell me about that?

3              THE JUROR:  Yes, just a simple first aid

4    training that I got when I was working for the State, and I

5    just retired from the State in November, so...

6              THE COURT:  Was the first aid training part of

7    your official duties for the State?

8              THE JUROR:  It was.  It was.

9              THE COURT:  What did you do?

10             THE JUROR:  So I led a group called the Veterans

11   Conservation Corps that was under Americorps for DNREC, and

12   I was team leader.  And so as team leader, I was required to

13   have the first aid training.

14             THE COURT:  Okay.  And then you also answered a

15   question about a member of your immediate family either

16   being a victim, a witness or arrested for a crime.

17             What did you have in mind there?

18             THE JUROR:  Correct.  So in the early '90s, I

19   was arrested in 1990 on some miscellaneous charges dealing

20   with a motorcycle incident from -- that happened in '88.

21   Went to Court, went to trial.  The trial charges were

22   dismissed because I was able to provide evidence I was not

23   the one -- it was mistaken identity basically.

24             THE COURT:  Okay.  Is there anything about that

25   experience, as long ago as it was, that would impact your

```
 1    ability to be fair to both sides in this case?
 2              THE JUROR:  No, sir.
 3              THE COURT:  Okay.  Any questions from the
 4    Government?
 5              MR. WOODARD:  No, Your Honor.
 6              THE COURT:  From the Defense?
 7              MS. KOUSOULIS:  No, Your Honor.
 8              THE COURT:  All right.  Thank you, Mr. Bryant.
 9    So I'm going to take you or -- oh, wait.  Let me ask one
10    more question.
11              THE JUROR:  Sure.
12              THE COURT:  So if you're selected to serve on
13    this jury, you're good with that?
14              THE JUROR:  Yes, sir.
15              THE COURT:  Okay.  Can we take him back to the
16    courtroom?
17              THE CLERK:  Okay.
18              (Juror leaving the courtroom.)
19              (Juror entering the courtroom.)
20              THE CLERK:  You can just have a seat here.
21              THE JUROR:  Thank you.
22              THE CLERK:  Sure.
23              THE COURT:  Hi, Ms. Reed.
24              THE JUROR:  Yes.
25              THE COURT:  You can take your mask off if you
```

1    want.

2               THE JUROR:  Thank you.

3               THE COURT:  So I think you answered two

4    questions yes.  One of them had to do with the schedule.

5               Can you tell me about that?

6               THE JUROR:  I have a funeral on Friday of next

7    week.  It's a double funeral for my in-laws,

8    mother-in-law --

9               THE COURT:  So Friday of next week, a week from

10   this Friday?

11              THE JUROR:  The 16th, yes.

12              THE COURT:  Where is the funeral at?

13              THE JUROR:  Pennsylvania.  Philadelphia.

14              THE JUROR:  It's --

15              THE COURT:  It's important that you be there?

16              THE JUROR:  Yes.  It's in relationship to my

17   other answered question, my father-in-law committed suicide

18   because my mother-in-law was addicted to opioids and --

19              THE COURT:  Okay.  So that's -- I take it so

20   that's a really recent event?

21              THE JUROR:  Yeah.

22              THE COURT:  All right.  I take it you don't

23   think you'd be -- leaving aside your scheduling problem,

24   that's a little too raw to be on this jury?

25              THE JUROR:  Yeah.

1              THE COURT:  All right.  Any questions?

2              MR. WOODARD:  No, Your Honor.

3              MS. KOUSOULIS:  No, Your Honor.

4              MR. BOSTIC:  No, Your Honor.

5              THE COURT:  All right.  Ms. Reed, I'm going to

6    excuse you.  I'm sorry to hear about your loss.  Nothing I

7    can say about that, but thank you for being here today.  All

8    right.

9              THE JUROR:  Thank you.

10             (Juror leaving the courtroom.)

11             (Juror entering the courtroom.)

12             THE CLERK:  You can have a seat here.

13             THE JUROR:  Here?

14             THE CLERK:  Yes, perfect.

15             THE COURT:  Hi, Ms. Sterling.  If you want, you

16   can take your mask off.

17             THE JUROR:  Oh, thank you.

18             THE COURT:  So I think you answered one question

19   yes according to my notes which was that you have some

20   medical training.

21             THE JUROR:  Yeah.  I'm a retired RN at

22   Christiana Care.

23             THE COURT:  Okay.  And do you think that would

24   have any impact on your ability to be a fair and impartial

25   juror in this case?

1           THE JUROR:  I don't think so, no.  I've seen

2   both sides of it, so no, I don't think so.

3           THE COURT:  And when you say "both sides of

4   it" --

5           THE JUROR:  I've seen people impacted by drug

6   use and I see the need also for pain medication.  I see

7   the -- you know, the need for pain medication, but also the

8   other side of it's overprescribed or, you know, or most of

9   the things I saw in the ER were kids overdosing on the

10  streets, you know, from heroin and different things and --

11          THE COURT:  Okay.  So I'm expecting there's

12  going to be some expert testimony about practices relating

13  to opioids and such.

14          THE JUROR:  Yeah.

15          THE COURT:  Will you be able to judge that based

16  on what you see in court from those experts?

17          THE JUROR:  I think so.  I believe so.

18          THE COURT:  Okay.  So overall, do you expect

19  that you can give both the Government and the Defendant a

20  fair trial here?

21          THE JUROR:  Yes.

22          THE COURT:  All right.  Any questions from the

23  Government?

24          MR. WOODARD:  No, Your Honor.

25          THE COURT:  From the Defendant?

```
 1                    MS. KOUSOULIS:  No, Your Honor.

 2                    THE COURT:  Okay.  So Ms. Sterling, I'm going to

 3     ask you to go back to the courtroom.

 4                    THE JUROR:  Okay.

 5                    THE COURT:  I'm sorry.  I keep forgetting.

 6     There is one other question.

 7                    So if you're selected to serve on this jury,

 8     you're good with that?

 9                    THE JUROR:  I am good with that.

10                    THE COURT:  Thank you very much.

11                    THE JUROR:  Mm-hmm.

12                    THE CLERK:  All right.  We're going to go back.

13                    (Juror leaving the courtroom.)

14                    (Juror entering the courtroom.)

15                    THE CLERK:  Have a seat right here.  Okay?

16                    THE JUROR:  Mm-hmm.

17                    THE CLERK:  Thank you.

18                    THE COURT:  Mr. Ritter.

19                    THE JUROR:  Yes.

20                    THE COURT:  You can take your mask off if you

21     want.

22                    THE JUROR:  Thank you.

23                    THE COURT:  So you answered a number of

24     questions yes.  Let's start with the schedule.  You said

25     that would present a hardship for you.
```

1          Can you tell me what you had in mind there?

2          THE JUROR:  Yeah, I'm a sole provider for my

3  family, and this is a particularly busy time for me at work.

4  I'm responsible for the sales of multi-million dollar

5  projects.  I've been working on these projects for years,

6  and I know them inside and out.  Nobody else in the company

7  knows them like I do.  Me not being available for that

8  length of a period of time will put those projects in

9  jeopardy making it possible for my company to lose millions

10  of dollars in business.  And the people that are counting on

11  me to bring those sales in, it would also put their families

12  in jeopardy.

13          THE COURT:  What is --

14          THE JUROR:  Put my position in jeopardy as well.

15          THE COURT:  Sorry.  I didn't quite hear you.

16          THE JUROR:  It could also put my position in the

17  company in jeopardy if I'm not able to perform.

18          THE COURT:  What's the name of the company?

19          THE JUROR:  Premier Tech.

20          THE COURT:  How many employees do they have?

21          THE JUROR:  1,600.

22          THE COURT:  1,600?

23          THE JUROR:  Yeah, roughly.

24          THE COURT:  So my general opinion is that

25  certain sized companies are expected to be good corporate

1    citizens and, you know, to deal with the ups and downs of

2    occasionally having people called for jury service.  If you

3    were -- if you served on this jury, would you not still be

4    paid?

5              THE JUROR:  I would be paid, yeah, but there

6    would be the possibility of the company not, you know,

7    winning these projects because I'm the one that knows all

8    the details of it.  If it were a shorter period of time, I'm

9    sure the company could work around it, but three weeks is --

10   is a very long time for me to be out of touch with the

11   customers.

12             THE COURT:  Okay.  If you were selected to serve

13   on this jury, notwithstanding that, would you be able to pay

14   attention to the evidence or would you be so upset about

15   being here that you wouldn't be able to pay attention?

16             THE JUROR:  I've been working on those projects

17   for so long it would be very -- it would definitely be on my

18   mind.

19             THE COURT:  Okay.  So I mean, the Government

20   there, Dr. Titus over there, would you be able to give these

21   people a fair trial if you were here as a juror?

22             THE JUROR:  I would like to think so, but, you

23   know, my family is very dependent upon me.  And at my age,

24   if I were to lose my job, it would be very difficult for me

25   to find another one.

1          THE COURT:  All right.  Are there any questions

2    from the Government?

3          MR. WOODARD:  Good morning.

4          THE JUROR:  Good morning.

5          MR. WOODARD:  It's a little bit of a difficult

6    question, but do you think you might hold it against either

7    side the fact that you were required to be here for several

8    weeks in trial?

9          THE JUROR:  I would like to say no, but I'm not

10   sure that I wouldn't be able to.  My job -- everything

11   depends on my job.

12         MR. WOODARD:  Thank you.

13         THE COURT:  Anything?

14         MR. BOSTIC:  Not on this particular issue.

15         THE COURT:  Sir, can you step outside for a

16   minute?

17         THE JUROR:  Sure.

18         (Juror leaving the courtroom.)

19         THE COURT:  Well, I have less than a full

20   confidence that he can be a juror who's paying attention

21   because he's getting pretty emotional there, so I'd like to

22   excuse him.

23         MR. BOSTIC:  We have no objection, Your Honor.

24         MR. WOODARD:  No objection.

25         THE COURT:  All right.

```
 1                    (Juror entering the courtroom.)

 2                    THE COURT:  All right.  So Mr. Ritter, I'm going

 3       to excuse you.  And hopefully the next time you're summoned

 4       for a jury trial, it will be a shorter trial.

 5                    All right?

 6                    THE JUROR:  Thank you, Your Honor.

 7                    THE COURT:  Okay.  You may go.

 8                    THE CLERK:  Come this way and just head out the

 9       main front doors, and I'll see you later.

10                    THE JUROR:  Thank you.

11                    THE CLERK:  Yeah.

12                    (Juror leaving the courtroom.)

13                    (Juror entering the courtroom.)

14                    THE CLERK:  All right.  You can -- I'm just

15       going to have you have a seat right here.

16                    THE JUROR:  Okay.

17                    THE COURT:  Is it Ms. Pedicone?

18                    THE JUROR:  Yes.

19                    THE COURT:  You can take your mask off.  So I

20       believe you didn't answer any question yes.

21                    Is that right?

22                    THE JUROR:  That's right.

23                    THE COURT:  And so if you're selected to serve

24       on this jury, you're good with that?

25                    THE JUROR:  I'm good with that.
```

1              THE COURT:  All right.  Thank you.  You may go

2    back to the courtroom.

3              THE JUROR:  Okay.

4              (Juror leaving the courtroom.)

5              (Juror entering the courtroom.)

6              THE CLERK:  Just going to have you have a seat

7    right here.

8              THE JUROR:  Okay.

9              THE COURT:  Good morning, Mr. Gallo.

10             THE JUROR:  Good morning.

11             THE COURT:  You can take the mask off if you

12   want.

13             THE JUROR:  Okay.

14             THE COURT:  So I think you answered one question

15   yes, which was that you knew one or more of the witnesses

16   here.  Who in particular?

17             THE JUROR:  The primary ones.  Dr. Brownstein.

18   He's my primary care physician, so...

19             THE COURT:  I'm sorry, Dr.?

20             THE JUROR:  Dr. Brownstein.

21             THE COURT:  Ah.  So I don't really know what

22   he's going to be testifying about.  If he testifies and

23   is -- well, I take it you have a good opinion of him?

24             THE JUROR:  Well, I like him.  Yeah.

25             THE COURT:  If his credibility were challenged,

1    you know, the things that he observed or says he observed,

2    did he actually observe them, would you decide that based on

3    whatever the evidence is that's presented here in court?

4              THE JUROR:  No.

5              THE COURT:  I mean, if Dr. Brownstein says it,

6    it's good enough for you?

7              THE JUROR:  I mean, I'll listen to him, yeah.

8              THE COURT:  Okay.  All right.  Any questions?

9              MR. WOODARD:  Good morning.

10             THE JUROR:  Yes.  How are you?

11             MR. WOODARD:  If Dr. Brownstein were to testify,

12   would you still be able to listen to all the other evidence

13   in the case and make a fair and impartial decision?

14             THE JUROR:  Yeah.

15             MR. WOODARD:  Thank you.

16             MR. BOSTIC:  No questions.

17             THE COURT:  Can you take Mr. Gallo out for a

18   minute?

19             THE CLERK:  Come this way.

20             (Juror leaving the courtroom.)

21             THE COURT:  So unless I'm missing something, I

22   don't really see what it matters whether he can judge the

23   rest of the evidence because -- so I'm going to excuse him

24   unless I'm missing something.

25             MR. WOODARD:  Your Honor, I would just note that

1    for witness one, she said she personally liked the Defendant

2    and Dr. Raziano, so we're in a similar situation.

3              THE COURT:  I don't really think so because he's

4    saying the man's credibility can't be challenged.  That's

5    not what the first juror said.

6              MR. WOODARD:  Okay.  I may have missed that,

7    Your Honor.

8              THE COURT:  All right.  So I'm going to excuse

9    him.

10             (Juror entering the courtroom.)

11             THE COURT:  Mr. Gallo, I'm sorry.  I'm going to

12   have to excuse you because I don't think Dr. Brownstein is a

13   terribly important part of this case.  But if the one person

14   whose credibility can't be challenged, you really can't be a

15   juror.

16             So thank you very much.  You're excused.

17             THE JUROR:  Okay.  Thank you.

18             THE CLERK:  See you later.  Go out those front

19   doors.  Thanks.

20             (Juror leaving the courtroom.)

21             (Juror entering the courtroom.)

22             THE CLERK:  This way.  Sorry, lost you.  Have a

23   seat right here.  Thank you.

24             THE COURT:  Good morning, Ms. Amato.

25             THE JUROR:  Yes.

1          THE COURT:  And you can take your mask off if

2     you want.

3          THE JUROR:  Okay.

4          THE COURT:  So I think you answered two

5     questions yes, and I just wanted to follow up on those.  One

6     of them was whether a member of your immediate family had

7     ever been employed by or investigated by any law enforcement

8     agency, including the DEA and HHS.

9          THE JUROR:  Well, I wasn't really sure how to

10    answer that because I work for the Delaware Department of

11    Labor Disability Determination Services and so -- because we

12    have federal access because of Social Security.  I've been

13    investigated, but I don't know who actually does that.

14         THE COURT:  You mean you had a background --

15         THE JUROR:  Right, but they ask a big thing on

16    alcohol and drugs, so I'm not sure who does that.

17         THE COURT:  So you were background investigated?

18         THE JUROR:  For employment basically.

19         THE COURT:  Okay.  And then the other question

20    you answered had to do with whether you or a member of your

21    immediate family had ever been a victim of a crime, a

22    witness in a criminal case, or arrested for a crime not

23    including a minor traffic offense.

24         What did you have in mind there?

25         THE JUROR:  About five years ago, our house was

1    broken into.

2              THE COURT:  Okay.  Did the police arrest

3    somebody for that?

4              THE JUROR:  They did finally find someone, yes.

5              THE COURT:  And was there a trial or did you

6    have to testify or anything?

7              THE JUROR:  No.  What happened was they didn't

8    really take much from our house, mostly like loose change

9    and junk jewelry.  So it wasn't enough to claim so I just --

10   when the prosecuting attorney called, whatever, I just said,

11   "Tell the guy to get his act together," like I wasn't --

12             THE COURT:  Okay.  So is there anything about

13   that experience that gave you a positive or negative

14   impression of the police or prosecutors?

15             THE JUROR:  Well, I mean overall, I was, you

16   know, positive that they caught the guy and hopefully --

17   hopefully he cleaned up his act.  I mean...

18             THE COURT:  Okay.

19             THE JUROR:  But it's not going to affect me

20   either way.

21             THE COURT:  Okay.  Any questions?

22             MR. WOODARD:  No, Your Honor.

23             THE COURT:  Any questions?

24             MS. KOUSOULIS:  No, Your Honor.

25             THE COURT:  All right.  Ma'am, if you can go

1    back to the courtroom.

2              Sorry.  I have to write this down.  So if you're

3    selected to serve on this jury, you're good with that.

4              THE JUROR:  Yes.

5              THE COURT:  Okay.  Thank you very much.  You may

6    go back to the courtroom.

7              THE JUROR:  Thank you.

8              (Juror leaving the courtroom.)

9              (Juror entering the courtroom.)

10             THE CLERK:  Just have a seat here.

11             THE JUROR:  Okay.

12             THE COURT:  Hi, Ms. Borders.  You can take your

13   mask off if you'd like.

14             So I think you answered three questions yes, and

15   I just want to follow up on those.  One is whether you or

16   your immediate family had ever been investigated or employed

17   by any law enforcement agency, including the DEA or HHS.

18             THE JUROR:  That wasn't my question.

19             THE COURT:  Sorry.

20             THE JUROR:  My question was in regards to being

21   an employee for the Department of Health and Human Services

22   or the Drug Enforcement Agency.

23             THE COURT:  Okay.  And so just tell me:  What

24   was your interaction with the DEA or HHS?

25             THE JUROR:  HHS, I was a consultant for

1    Hewlett-Packard where we had a contract and working for the

2    Department of Health and Human Services.

3                    THE COURT:  Okay.  So you have been indirectly

4    employed by HHS in the past?

5                    THE JUROR:  Correct.

6                    THE COURT:  Would that affect your ability to be

7    fair?

8                    THE JUROR:  Absolutely not.

9                    THE COURT:  Okay.  Then there was a question

10   about whether you or a member of your immediate family had

11   problems with the use of prescription opioids.

12                   THE JUROR:  Yes.

13                   THE COURT:  Is that you?

14                   THE JUROR:  Yes.  Yes, that was me.

15                   THE COURT:  Okay.  Starting to not trust my

16   notes here.

17                   Can you tell me about that?

18                   THE JUROR:  Sure.  My brother-in-law had a

19   problem with an addiction and we -- from what I was told

20   from his girlfriend after his passing was that he was taking

21   Fentanyl.

22                   THE COURT:  Taking what?

23                   THE JUROR:  Fentanyl.

24                   THE COURT:  Fentanyl?

25                   THE JUROR:  Mm-hmm.

1          THE COURT:  How long ago was that?

2          THE JUROR:  2000 -- four years ago.

3          THE COURT:  2000 and?  Roughly.

4          THE JUROR:  So 2016, 2017.

5          THE COURT:  Okay.  So four or five years ago?

6          THE JUROR:  Yeah.

7          THE COURT:  And was his death a surprise to you?

8          THE JUROR:  Yes.

9          THE COURT:  Had you known about his addiction

10   before that?

11          THE JUROR:  No.

12          THE COURT:  Were there any criminal consequences

13   for anyone arising out of that death?

14          THE JUROR:  No.

15          THE COURT:  You know, the charges in this case

16   involve prescriptions of opioids.  Is there anything about

17   your brother-in-law's addiction and passing that would

18   impact your ability to judge whatever the evidence is in

19   this case fairly?

20          THE JUROR:  No, sir.

21          THE COURT:  Okay.  You're confident you can give

22   both the Government and Dr. Titus a fair shot?

23          THE JUROR:  I do.

24          THE COURT:  Okay.  And then you have one more

25   question which was you'd served on a criminal case before?

1              THE JUROR:  I did.

2              THE COURT:  And tell me about that.

3              THE JUROR:  That was -- I'll apologize because I

4    don't know all the court systems, but it was the court right

5    down the street.

6              THE COURT:  Superior Court?

7              THE JUROR:  On 4th and 6th Street.  I thought it

8    was a county, New Castle County Courthouse.

9              THE COURT:  It's called Superior Court.

10             THE JUROR:  Oh, my bad.

11             THE COURT:  But that's all right.

12             THE JUROR:  Sure.  It was in the case, and I

13   don't remember all the names, but it was in the case where

14   it was a murder case actually that was located here in

15   Wilmington.

16             THE COURT:  And so that trial lasted a while?

17             THE JUROR:  It did.  I think it was two or

18   three weeks.

19             THE COURT:  Okay.

20             THE JUROR:  I was sequestered at the end of the

21   case as well.

22             THE COURT:  And did that experience impact you,

23   you think at all in your ability to be a fair and impartial

24   juror in the next criminal case that comes along?

25             THE JUROR:  No.  No, not at all.

```
1              THE COURT:  Okay.  Any questions?
2              MR. WOODARD:  No, Your Honor.
3              THE COURT:  Any questions?
4              MR. BOSTIC:  No, Your Honor.
5              THE COURT:  Thank you.  All right.
6              Ma'am, thank you very -- I'm sorry.  So if
7    you're selected to serve on this jury, you're good with
8    that?
9              THE JUROR:  Yes, sir.
10             THE COURT:  Okay.  Thank you.  You may go back
11   to the courtroom.
12             THE JUROR:  Thank you.
13             (Juror leaving the courtroom.)
14             (Juror entering the courtroom.)
15             THE CLERK:  Come through over here, and then you
16   can have a seat here.
17             THE COURT:  Good morning.  Is it Mr. Zehner?
18             THE JUROR:  Yes, sir.
19             THE COURT:  You can take your mask off if you
20   want.  So I wanted to -- so you didn't answer any questions
21   yes; is that right?
22             THE JUROR:  Yes, sir.
23             THE COURT:  I tricked you into saying yes.  So
24   if you're selected to serve on this jury, you're good with
25   that?
```

1                       THE JUROR:  Yes.

2                       THE COURT:  All right.  Thank you.  You may

3      return to the courtroom.

4                       (Juror leaving the courtroom.)

5                       (Juror entering the courtroom.)

6                       THE CLERK:  Come through this way.  Just have a

7      seat right here.  Okay?

8                       THE JUROR:  Okay.

9                       THE CLERK:  Thank you.

10                      THE COURT:  Ms. Smith?

11                      THE JUROR:  Yes.

12                      THE COURT:  You can take your mask off if you

13     want.

14                      THE JUROR:  Okay.

15                      THE COURT:  So you answered a number of

16     questions yes.  Let's start with the first one was about the

17     schedule presenting a hardship for you.

18                      Can you tell me about that?

19                      THE JUROR:  It's more of panic attacks ans

20     claustrophobic.  I don't do elevators and I had to walk up

21     the steps.  I'm thinking of doing that for three weeks more

22     or less bringing up everything, the arthritis and

23     everything.  It's not really a hardship, it's just -- well,

24     yeah, it is to me.

25                      THE COURT:  Well, it can be a hardship if it's

 1    going to impact your health.

 2              THE JUROR:  Yeah.

 3              THE COURT:  I mean, and I don't want to -- I

 4    hate to ask medical questions, but you're the best judge of

 5    that.  Would serving on a jury for three weeks more or less,

 6    you know, would you be able to do it?  And if you were able

 7    to do it, would that hurt your health?

 8              THE JUROR:  I think walking up the steps every

 9    day for, you mentioned three weeks, as much as three weeks

10    or more --

11              THE COURT:  Yes.

12              THE JUROR:  -- might impact it a little bit.  I

13    can do it.  I mean, I'm willing to do it, I just --

14              THE COURT:  And so I misunderstood, but you're

15    making it clear now.  So it's not so much like sitting in a

16    jury box, it's more just how you would get from the ground

17    floor up to this floor?

18              THE JUROR:  Right.  It's embarrassing.

19              THE COURT:  So I take it in your daily life, you

20    arrange it so you don't have to climb stairs and you don't

21    have to take elevators?

22              THE JUROR:  Exactly.

23              THE COURT:  So I'm just asking for your

24    subjective opinion.  Do you think it would be, given your

25    medical conditions and since we can't -- well, your medical

1    conditions, you shouldn't serve on this jury on the sixth

2    floor of this courthouse?

3                THE JUROR:  I'm saying if the courtroom was on

4    the first floor, I'd be fine with it.

5                THE COURT:  Okay.

6                THE JUROR:  Six floors is a little bit.

7                THE COURT:  All right.  Do you have any

8    questions?

9                MR. WOODARD:  Good morning, ma'am.  Just with

10   the conditions you described, would that make it difficult

11   for you to follow the evidence and listen in court for a

12   three-week time span?

13               THE JUROR:  It would cause everything to come

14   up, yeah.  It would be painful for a little bit and then,

15   you know, it would subside.

16               MR. WOODARD:  Thank you.

17               THE COURT:  Mr. Bostic?

18               MR. BOSTIC:  Ma'am, good morning.  I get the

19   impression you're saying this would be of some difficulty to

20   you to be here for three weeks and go through the things

21   that you just described.  Am I right?

22               THE JUROR:  Yeah.

23               THE COURT:  And I see you're tapping your chest.

24   You're even somewhat anxious as we speak this morning, would

25   that be fair to say?

```
 1                    THE JUROR:  It just causes a panic attack.
 2                    MR. BOSTIC:  Right.  I understand that.  I have
 3      nothing else, Your Honor.
 4                    THE COURT:  All right.  Can we take Ms. Smith
 5      out for a minute?
 6                    (Juror leaving the courtroom.)
 7                    THE COURT:  All right.  So I'm inclined to
 8      excuse her.
 9                    MR. WOODARD:  No objection.
10                    MS. KOUSOULIS:  No objection.
11                    MR. BOSTIC:  No objection.
12                    THE COURT:  All right.  Bring her back.
13                    (Juror entering the courtroom.)
14                    THE COURT:  All right.  So Ms. Smith, I'm going
15      to excuse you so you can go home or wherever it is you want
16      to do.  Can we assist her in getting out of the building?
17                    THE JUROR:  Thank you.
18                    THE CLERK:  Come this way.
19                    (Discussion held off the record.)
20                    (Juror leaving the courtroom.)
21                    (Juror entering courtroom.)
22                    THE CLERK:  Just going to have you have a seat
23      right here.  Okay?
24                    THE JUROR:  Thanks.
25                    THE COURT:  Good morning, Ms. Solano.  You can
```

1   take your mask off if you want.  I have that you answered

2   four questions yes, but I'd just kind of like to go over and

3   see about them.

4              So one of them was that you believe prescription

5   pain medications are overprescribed; right?

6              THE JUROR:  That is correct.

7              THE COURT:  And how do you form this belief?

8              THE JUROR:  I -- well, I have not had members of

9   my immediate family struggle with addiction.  I've had a

10  couple of close friends die as a result of overdoses.

11             THE COURT:  Okay.  And so the charges in this

12  case relate to what the Government says are

13  overprescription.  That's not the exact way it's framed.

14             Do these experiences you've had that have led to

15  this belief, would that cause you to be, I don't know,

16  suspicious of the Defendant before we even begin the case?

17             THE JUROR:  My bias would be that I would look

18  very critically at it, I guess would be the way to put it.

19             THE COURT:  Okay.  Well, so critical looking is

20  a good thing, but would Dr. Titus have more of a -- would

21  the Government have an easier road to convince you of their

22  case than somebody who hadn't had these experiences that

23  you've had?

24             THE JUROR:  I mean, I would look to take into

25  account both sides and everything, but I would be starting

1    from a place of I would -- of someone that has had close

2    friends go through that and do feel that it's a gateway,

3    prescription drugs into, you know, street drugs.

4              THE COURT:  And so if you look at both sides

5    here, the Government and the Defendant, would it be

6    difficult for you to say I can give both sides a completely

7    fair and impartial case?

8              THE JUROR:  To be honest, I would look to be as

9    fair as I could.

10             THE COURT:  Okay.  So all right.  Hold that

11   thought.

12             So there was another question about have you or

13   any -- well, actually let me ask one more question about

14   that.  So you'd look to be fair.

15             It's always hard to ask someone about something

16   that hasn't happened yet, but do you think you would be

17   fair?

18             THE JUROR:  I would be fair.

19             THE COURT:  Okay.  Then there was another

20   question about whether a member of your immediate family had

21   ever been a victim of a crime, witness in a case, or

22   arrested for a crime not including minor traffic offenses.

23             What did you have in mind there?

24             THE JUROR:  I didn't know if this would be

25   applicable, but my father was -- through part of his career

1  was an expert witness for a number of personal injury

2  trials.

3              THE COURT:  Okay.  And did you form any opinion

4  from that about expert witnesses in general?

5              THE JUROR:  I mean, I'm a believer in them.  I

6  think that they generally are well educated, very analytical

7  people that try to take into account all sides.

8              THE COURT:  Okay.  And there's going to be, I

9  would expect, some conflicting expert testimony in this

10  case.  I take it if the experts don't all agree, you would

11  do your best to sort it out based on however it is you make

12  decisions in your own life?

13              THE JUROR:  I would do my best to sort it out,

14  yes.

15              THE COURT:  Okay.  You also said you served on a

16  criminal jury before?

17              THE JUROR:  I did.

18              THE COURT:  When was that roughly?

19              THE JUROR:  It was about 2012, I believe.

20              THE COURT:  And what kind of case was it?

21              THE JUROR:  I was an alternate for an attempted

22  robbery in the City of Wilmington.

23              THE COURT:  All right.  So you didn't

24  deliberate?

25              THE JUROR:  I did not.  I was excused once that

1    started taking place.

2              THE COURT:  And was there anything about that

3    experience that would impact your ability to be a fair and

4    impartial juror in this case?

5              THE JUROR:  There was not.

6              THE COURT:  All right.  And then you also had

7    one last question which was what I like to call the catchall

8    question.  There was something else you wanted to tell us.

9              THE JUROR:  Yes, upon reflection on the first

10   question about it being a time commitment with the trial, I

11   work as part of a three-person team.  And members of my

12   team, one is going to be out on vacation next week and then

13   the other one is going to be out the last weekend of July.

14   So it has the possibility of creating some staffing issues

15   at work.

16             THE COURT:  Who do you work for?

17             THE JUROR:  Morgan Stanley.

18             THE COURT:  Okay.  So my general view is that

19   the Morgan Stanleys of the world, they have to cover for

20   people who are doing jury service.

21             THE JUROR:  True.

22             THE COURT:  So the fact that they have to cover

23   for you or that maybe to some extent your two teammates have

24   to cover for you, would that impact your ability to be a

25   fair and impartial juror?

```
 1                    THE JUROR:  No.

 2                    THE COURT:  Okay.  Any questions from the

 3      Government?

 4                    MR. WOODARD:  No, Your Honor.

 5                    THE COURT:  Mr. Bostic?

 6                    MR. BOSTIC:  Yes, thank you.  Good morning,

 7      ma'am.

 8                    THE JUROR:  Good morning.

 9                    MR. BOSTIC:  You indicated that your father was

10      an expert witness.  What type of expert?  What was his

11      field?

12                    THE JUROR:  He's an economist.  It was basically

13      the economic impact of someone being injured.  You know,

14      they couldn't have their livelihood.

15                    MR. BOSTIC:  So he was primarily testifying in

16      civil matters?

17                    THE JUROR:  Probably.

18                    MR. BOSTIC:  Now, with respect to the

19      overprescription, you said you had some concerns about that;

20      correct?

21                    THE JUROR:  Correct.

22                    MR. BOSTIC:  And when Judge Andrews asked you a

23      question about whether you could be fair, I think you said

24      you're biased.  If I may, Your Honor.  I think you said your

25      bias would cause you to look at things critically; am I
```

1    correct?

2              THE JUROR:  Correct.

3              MR. BOSTIC:  And when you said "bias," you mean

4    bias against a person who's accused of overprescribing

5    something; would that be fair to say?

6              THE JUROR:  Correct.

7              MR. BOSTIC:  So as we start on this process,

8    you'd be biased against Dr. Titus who's charged with the

9    crime of overprescribing?

10             THE JUROR:  Yes.

11             MR. BOSTIC:  You also talk about the fact that

12   several of your friends died from overdoses.

13             THE JUROR:  Correct.

14             MR. BOSTIC:  Overdoses related to being

15   overprescribed in your mind; would that be fair to say?

16             THE JUROR:  Correct.

17             MR. BOSTIC:  If there is testimony with respect

18   to those issues in this case, that would further cause you

19   to be biased against Dr. Titus; would that be fair to say?

20             THE JUROR:  That's correct.

21             MR. BOSTIC:  Thank you, Your Honor.  I have

22   nothing else.

23             THE COURT:  All right.  Anything further from

24   you?

25             MR. WOODARD:  No, Your Honor.

1          THE COURT:  All right.  So Ms. Solano, I'm going

2     to excuse you from service.  I appreciate your candor and

3     sorry Morgan Stanley can't attribute your services here.

4          But in any event, you're excused and they'll

5     take you out.  Thank you very much for being here.

6          Okay?

7          THE JUROR:  Thank you.

8          (Juror leaving the courtroom.)

9          (Discussion held off the record.)

10          (Juror entering the courtroom.)

11          THE CLERK:  Come over here.  I'll have you have

12     a seat here.

13          THE COURT:  Good morning, Ms.  Ahern.  You can

14     take your mask off if you want.  So I think you answered a

15     few questions yes and I just wanted to follow up on them.

16          One of which was I think you said you had heard

17     something about this case or read something about it.

18          THE JUROR:  Yeah.  A while ago I was -- long

19     story, it's hard to make it a short story, but I did

20     research about opioid addiction in Delaware, and it was a

21     story that I remember reading in Delaware Online.

22          THE COURT:  All right.  And what was your

23     impression of Dr. Titus based on reading that story?

24          THE JUROR:  Disappointed.

25          THE COURT:  All right.  Disappointed because?

1              THE JUROR:  In a -- in the amount of

2    prescriptions that he wrote for pain.

3              THE COURT:  Okay.  In this case with these

4    criminal charges here, did that story sort of influence how

5    you think about it?

6              THE JUROR:  Possibly.

7              THE COURT:  All right.  I mean, as we sit here,

8    do you think Dr. Titus is probably guilty?

9              THE JUROR:  It's -- it's hard to say.  It

10   depends on the actual -- this case might be different.

11             THE COURT:  Okay.  So in terms of what your

12   ultimate decision would be, could it be or would it be based

13   on whatever it is you actually hear in court here?

14             THE JUROR:  It could be.  It couldn't -- but I'm

15   also kind of biased because of prior knowledge.

16             THE COURT:  Okay.  All right.  Do you have any

17   questions?

18             MR. WOODARD:  Good morning.

19             THE JUROR:  Good morning.

20             MR. WOODARD:  If I may ask why you were doing

21   research on opioid addiction?

22             THE JUROR:  One of my coworkers is the head of

23   Attack Addiction, her husband runs it, which is a heroin or

24   it's an addiction awareness organization, non-profit.  And

25   her son had overdosed and she works at my school.  And I

1    support them just through what I've learned about her, and I

2    teach science.  And one of our assignments was to research

3    the relation -- how the brain is affected by pain as well as

4    how to treat pain and how it relates to our community.

5              MR. WOODARD:  Okay.  Would that experience

6    affect your ability to be fair and impartial throughout the

7    trial?

8              THE JUROR:  Possibly.

9              MR. WOODARD:  How so?

10             THE JUROR:  I feel -- well, I've had guest

11   speakers come in and speak about the problem, and especially

12   with Delaware.  It's across the country with opioid

13   addiction and prescription of pain medication for various

14   reasons.  Some is needed and some I feel is overprescribed.

15   But I just know it's a problem in Delaware.

16             MR. WOODARD:  If both sides were to present

17   their case, do you think you could try to keep an open mind

18   throughout the trial?

19             THE JUROR:  I will try.  It's my duty.

20             MR. WOODARD:  Thank you.

21             MS. KOUSOULIS:  No questions.

22             MR. BOSTIC:  If I may, Your Honor?

23             THE COURT:  All right.  Go ahead, Mr. Bostic.

24             MR. BOSTIC:  Your Honor, I just want to

25   double-check something because I'm not sure of this.  Ma'am,

1    you started out by saying you would be biased in this case

2    based on your research.  Would that be fair to say?

3                    THE JUROR:  Probably.  It -- I mean, if the

4    case -- I know that sometimes cases can be brought up if

5    it's just primarily overprescription of pain medicine.  It

6    could be different than that.  I don't know what the

7    argument is.

8                    MR. BOSTIC:  Your Honor.

9                    THE JUROR:  So.

10                   MR. BOSTIC:  The question is -- if I may, Your

11   Honor, the question I have is whether I need to do further

12   voir dire on this witness.

13                   THE COURT:  All right.  So Ms. Ahern, I'm going

14   to excuse you.  Thank you very much.  My staff will take you

15   out.

16                   THE CLERK:  You can come this way.

17                   THE JUROR:  Thanks.

18                   (Juror leaving the courtroom.)

19                   (Juror entering the courtroom.)

20                   MR. BOSTIC:  Your Honor, if I may, I have a

21   severe back and neck problems and I need to --

22                   THE COURT:  Well, you can get some pain

23   medication.

24                   MR. BOSTIC:  I need to walk around a bit and

25   sometimes stretch and I have --

```
 1                    THE COURT:  No, no.  You feel free to walk up
 2      and -- I'll tell you what, we'll take a short break after
 3      this juror and figure this out.
 4                    MR. BOSTIC:  Thank you.
 5                    THE COURT:  Hi.  You are Ms. Ali; right?
 6                    THE JUROR:  Yes.
 7                    THE COURT:  So you can take your mask off if you
 8      want.  I wanted to follow up on, I guess, the only
 9      question -- you answered one question yes; right?
10                    THE JUROR:  Yes.
11                    THE COURT:  And that was whether you served on a
12      grand jury before.
13                    THE JUROR:  Yes, I have.
14                    THE COURT:  Was that --
15                    THE JUROR:  It was.
16                    THE COURT:  -- do you know --
17                    THE JUROR:  Go ahead.
18                    THE COURT:  -- in Federal Court or State Court?
19                    THE JUROR:  State Court.  Not -- it wasn't here.
20      It was in New York.
21                    THE COURT:  Oh, okay.  Was there anything about
22      that experience that would make it difficult for you to be a
23      fair and impartial juror in this case here?
24                    THE JUROR:  No.
25                    THE COURT:  Okay.  Thank you.  You may return to
```

1    the courtroom.

2             THE JUROR:  Thank you.

3             THE COURT:  And Ms. Selmyer, can we just have a

4    minute before you bring the next juror?

5             (Juror leaving the courtroom.)

6             THE COURT:  Sorry, Mr. Bostic, I wanted to hear

7    you out.  What is it?  You know, to the extent that you want

8    to pace up and down, that's fine.  But do you need a break?

9             (Discussion held off the record:)

10            MR. BOSTIC:  Thank you.

11            THE COURT:  All right.  Let me just think for a

12    second.  Okay.  Let's get Juror Number 16.

13            (Juror entering the courtroom.)

14            THE CLERK:  You can have a seat right there.

15            THE COURT:  Good morning, Mr. Wilson.  You can

16    take your mask off if you want.  So I think you answered

17    about four questions yes.

18            One of them was that you knew one or more of the

19    potential witnesses.  Can you tell me who that is?

20            THE JUROR:  Sure.  I'm familiar with Megan

21    Miller from the Division of Professional Regulation.

22            THE COURT:  Okay.  And how is it that you know

23    her, social or through work?

24            THE JUROR:  I was a database -- I'm a database

25    contractor.  I worked at the division for about

1    two-and-a-half years.

2              THE COURT:  And how long ago was that?

3              THE JUROR:  I left there about a year ago.

4              THE COURT:  All right.  And when you were

5    working there, you were doing computer work?

6              THE JUROR:  I was doing database work.  Yes,

7    computer work.

8              THE COURT:  Okay.  So do you know Ms. Miller

9    well?

10             THE JUROR:  No.  When you asked the question, I

11   considered, you know, are you familiar with them.  So yes,

12   I'm familiar with her.  I probably didn't talk to her very

13   much.  I was just familiar with her as a person.

14             THE COURT:  So if she testifies in this case

15   she'll be just like another witness to you?

16             THE JUROR:  Yeah, I would recognize her face,

17   but other than that she would be any other witness.

18             THE COURT:  All right.  So then you also

19   answered some questions relating to opioids that a member of

20   your family or you had had a problem with prescription

21   opioids and that a member of your family had been in drug

22   rehab, I am assuming those two are related.

23             THE JUROR:  Correct.

24             THE COURT:  Can you tell me about that?

25             THE JUROR:  That would be my son.  When he was

1    in high school, he was -- I'm assuming got involved in

2    prescription pills.  And then when that dried up, he moved

3    on to heroin and he was -- has been in rehab -- in and out

4    of rehab for those issues, yes.

5            THE COURT:  And how long ago do you think rehab

6    was?

7            THE JUROR:  I think -- he's in one now, I

8    believe.

9            THE COURT:  Oh, and how old is he now?

10           THE JUROR:  He's 30 now.  He's been doing this

11   for half his life.

12           THE COURT:  And did his original involvement in

13   prescription pills, as far as you know, have anything to do

14   with doctors?

15           THE JUROR:  I don't know.  I don't know if it

16   came through a doctor or from friends.  I don't know.

17           THE COURT:  Based on what you've heard about

18   this case so far, do you think you would have any difficulty

19   being a fair and impartial juror to both sides?

20           THE JUROR:  No.

21           THE COURT:  Okay.  And then there was another

22   question.  Actually, this might be related to the other two,

23   whether a member of your immediate family had ever been

24   convicted of a crime, a witness in a criminal case, or

25   arrested for a crime.

1                          Is this your son, also?

2                          THE JUROR:  It was him again, yes.  He went

3          through a U.S. District Court in Camden for a number of

4          things, bank robbery, a whole list of charges, so...

5                          THE COURT:  So pretty serious charges?

6                          THE JUROR:  Yeah, he was in jail for a number of

7          years.  He's out now, but yes.

8                          THE COURT:  And do you attribute that to the

9          drug addiction?

10                         THE JUROR:  Yeah.  Yes, I mean they're -- it's

11         all tied together, I believe, yes.

12                         THE COURT:  Okay.  The experiences that -- of

13         your son in the criminal justice system, did they cause you

14         to have any either great admiration or animosity to law

15         enforcement?

16                         THE JUROR:  No.

17                         THE COURT:  All right.  So are you confident

18         that you can be a fair and impartial juror to both sides in

19         this case?

20                         THE JUROR:  Yes, sir.

21                         THE COURT:  Any questions?

22                         MR. WOODARD:  Good morning, sir.  If the

23         evidence in this case showed that the doctor had prescribed

24         some of those medications that your son took, you could

25         still be fair and impartial?

1                      THE JUROR:  Yes, I could follow the evidence,

2      yes, and make fair and impartial decisions.

3                      MR. WOODARD:  Okay.  Thank you, sir.

4                      MR. BOSTIC:  Two questions, sir.  You said your

5      son started with using drugs in high school; is that right?

6                      THE JUROR:  I believe that's true, yes.  Yes.

7                      MR. BOSTIC:  At that time, he wasn't treating

8      with a medical professional, as best you can recall?

9                      THE JUROR:  He was under no treatment of a

10     medical professional at that time, no.

11                     MR. BOSTIC:  Okay.  Thank you.

12                     THE COURT:  All right.  So if you're selected to

13     serve on this jury, you're good with that?

14                     THE JUROR:  I'm good.  Yeah.

15                     THE COURT:  Okay.  Can we take Mr. Wilson back

16     to the courtroom?

17                         (Juror leaving the courtroom.)

18                         (Discussion held off the record.)

19                         (Juror entering the courtroom.)

20                     THE CLERK:  You're going to sit right here.

21     Okay?

22                     THE JUROR:  Yeah.

23                     THE COURT:  Hi, Ms. Queen.

24                     THE JUROR:  Yes.

25                     THE COURT:  You can take your mask off if you

1    want.  You don't have to.  So I think you answered yes to a

2    couple questions.  One of them was that you thought you knew

3    one or more potential witnesses in this case.

4                    THE JUROR:  Bonita Benson, Henry Lankford and

5    Dr. Brownstein.

6                    THE COURT:  Dr. Brownstein, Ms. Benson.  And who

7    was the third one?

8                    THE JUROR:  Henry Lankford.

9                    THE COURT:  Okay.  Is Dr. Brownstein your

10   personal physician?

11                   THE JUROR:  He's my husband's physician, and I

12   did not have a high opinion of him.

13                   THE COURT:  You don't, or your husband doesn't,

14   or both of you?

15                   THE JUROR:  Either one of us.

16                   THE COURT:  Okay.  So if he testifies, would you

17   be able to judge his testimony based on whatever he says

18   from the stand and whatever cross-examination there is?

19                   THE JUROR:  I don't think I could be very

20   impartial --

21                   THE COURT:  Okay.

22                   THE JUROR:  -- with regard to --

23                   THE COURT:  You really think he's --

24                   THE JUROR:  Yes.

25                   THE COURT:  -- either a bad doctor, or a bad

1   person or both?

2            THE JUROR:  Yes, bad doctor.

3            THE COURT:  Bad doctor.  Okay.  Any questions

4   from the Government?

5            MR. WOODARD:  No, Your Honor.

6            THE COURT:  All right.  So Ms. Queen, I'm going

7   to excuse you.  You know, and I'm not criticizing you.  We

8   really need to have an open mind for the potential witnesses

9   in the case.

10           So thank you very much.  You're excused.

11           THE JUROR:  All right.

12           THE CLERK:  All right.  You can come with me

13  this way, and you're just going to go out through those

14  doors and make it to the elevator.

15           THE JUROR:  Thank you.

16           THE CLERK:  Sure.

17           (Juror leaving the courtroom.)

18           (Juror entering the courtroom.)

19           THE CLERK:  Come over here and you can just have

20  a seat right there.  Okay?

21           THE COURT:  Good morning, ma'am.  You're

22  Ms. Tibbett?

23           THE JUROR:  Yes.

24           THE COURT:  Hi.  You can take your mask off if

25  you want.

 1                    THE JUROR:  Yes.

 2                    THE COURT:  You didn't answer any question yes;

 3      right?

 4                    THE JUROR:  Correct.

 5                    THE COURT:  So if you're selected to serve on

 6      this jury, are you okay with that?

 7                    THE JUROR:  Other than removing my vacation for

 8      the rest of this week, sure.

 9                    THE COURT:  Okay.  But you're willing to do

10      that?

11                    THE JUROR:  Yes.

12                    THE COURT:  All right.  Thank you very much.

13      You may go back to the courtroom.

14                    THE CLERK:  All right.  Come through this way.

15                    (Juror leaving the courtroom.)

16                    THE CLERK:  Just follow me and then have a seat

17      right here.  Okay?

18                    THE JUROR:  Okay.

19                    THE CLERK:  Thanks.

20                    THE COURT:  Hi, Mr. Dowell.

21                    THE JUROR:  Hello.

22                    THE COURT:  You can remove your mask if you

23      want.

24                    THE JUROR:  Thank you.

25                    THE COURT:  According to my notes, you didn't

1    answer any question yes; is that right?

2                THE JUROR:  That's correct.

3                THE COURT:  And so if you're selected to serve

4    on this jury, are you good with that?

5                THE JUROR:  Yes.

6                THE COURT:  Okay.  Well, thank you very much.

7    You may go back to the courtroom.

8                THE JUROR:  Okay.

9                (Juror leaving the courtroom.)

10               THE COURT:  So we'll take like a five-minute

11   break after this next juror.

12               (Juror entering the courtroom.)

13               THE CLERK:  You're going to have a seat here.

14   Okay?

15               THE JUROR:  Okay.

16               THE COURT:  Good morning, Mr. Jackson.

17               THE JUROR:  Good morning.

18               THE COURT:  You can remove your mask if you want

19   to.  You don't have to, but you can.  So you answered a

20   couple of questions yes, and I'd like to follow up on them.

21               According to my notes, a number of the questions

22   centered around the questions relating to prescription

23   opioids and overprescription and whether you've had somebody

24   in your family in drug rehab.

25               THE JUROR:  Yes.

1          THE COURT:  Can you tell me about those things?

2          THE JUROR:  Yes.  From 2010 to 2017, I actually

3   worked for Walgreens, and I was an assistant manager, but

4   the last year and a half, I was a pharmacy technician.  So

5   I've, you know, dealt with prescriptions and, you know, pain

6   prescriptions and stuff like that.

7          And as far as rehab, I personally had to go to

8   rehab when I was a teenager as a part of my plea agreement.

9   I had got caught in high school with some marijuana, and I

10  had to do a drug diversion program.

11         THE COURT:  Okay.  And so basically then you

12  have some familiarity with opioids from your work?

13         THE JUROR:  Yes.

14         THE COURT:  And would that familiarity, because

15  I think among other things, there's probably going to be a

16  pharmacist or two who testifies in this case.

17         THE JUROR:  Right.

18         THE COURT:  Would that impact your ability to be

19  a fair and impartial witness to both sides?

20         THE JUROR:  No, I wouldn't say it would impact

21  me in any way.  No.

22         THE COURT:  Okay.  And the experience with the

23  marijuana program in high school --

24         THE JUROR:  Mm-hmm.

25         THE COURT:  -- does that impact anything in

1    terms of your ability to be a fair and impartial juror in

2    this case?

3                    THE JUROR:  No, it -- no, not at all.

4                    THE COURT:  Okay.  And then I think you also

5    answered the question that either you or a member of your

6    immediate family had either been a victim of a crime, a

7    witness in a criminal case, or arrested for a crime, not

8    including minor traffic offenses.

9                    What did you have in mind there?

10                   THE JUROR:  Yeah, just that situation that

11   happened in high school.

12                   THE COURT:  Yeah, yeah.  You said criminal

13   justice.  Sorry.  Sometimes you think it's a different kind

14   of thing.

15                   So you had interaction with the police when you

16   were a teenager?

17                   THE JUROR:  Yeah.  Yeah, when I was a teenager.

18   Yes.

19                   THE COURT:  And there will be some law

20   enforcement people who will testify, I expect, in this case.

21   Will you be able to judge their testimony like anybody

22   else's?

23                   THE JUROR:  Yeah, absolutely.

24                   THE COURT:  Okay.  And then I believe you also

25   answered the question that you served on a grand jury

1    before?

2                    THE JUROR:  Yes.

3                    THE COURT:  How long ago was that?

4                    THE JUROR:  This was, I want to say, either 2015

5    or 2016, so about five years ago.

6                    THE COURT:  And you're in New Castle County, so

7    was it in the Superior Court down the street?

8                    THE JUROR:  Yeah.

9                    THE COURT:  And was there anything about that

10   experience that would cause you to have difficulty being a

11   fair and impartial juror in this case?

12                   THE JUROR:  No.

13                   THE COURT:  All right.  Any questions?

14                   MR. WOODARD:  Yes, Your Honor.  Good morning.

15                   THE JUROR:  Good morning.

16                   MR. WOODARD:  You talked about your experience

17   at the pharmacy.

18                   THE JUROR:  Uh-huh.

19                   MR. WOODARD:  Were you involved in filling

20   prescriptions for opioid drugs?

21                   THE JUROR:  Yes, like Schedule II drugs, yes.

22                   MR. WOODARD:  Mm-hmm.  Did that create any

23   opinions in your mind about whether opioids were being

24   overprescribed or underprescribed?

25                   THE JUROR:  Yeah, I would say I feel like it was

1    more than it probably should be, but I wouldn't say it's

2    like a bias or anything.

3                MR. WOODARD:  If you were to hear the

4    allegations in this case that there was too much

5    prescribing, would that affect your ability to be fair and

6    impartial?

7                THE JUROR:  No, I don't think so.  No.

8                MR. WOODARD:  You talked about your experience

9    with the plea agreement.

10               THE JUROR:  Uh-huh.

11               MR. WOODARD:  Did you feel like you were

12   mistreated by the police or prosecutors or anyone in the

13   system?

14               THE JUROR:  No.  No, not at all.  No.

15               MR. WOODARD:  Thank you.

16               THE JUROR:  Thank you.

17               THE COURT:  Ms. Kousoulis.

18               MS. KOUSOULIS:  Yes, hi.  Good morning.  Now, as

19   your job as a pharmacy tech, did you deal directly with the

20   customers coming in to fill the prescriptions?

21               THE JUROR:  Yes, like at the counter.  Yes.

22               MS. KOUSOULIS:  Yes.  And if you heard -- if

23   there were testimony from other people that were pharmacists

24   and other people that worked in the pharmacy and that

25   testimony was challenged, would you be able to base your

1    opinion on the evidence presented or would you tend to

2    believe the testimony of a pharmacy tech or pharmacists

3    simply because of what you do?

4              THE JUROR:  No, I don't feel like I would be

5    biased towards someone because I don't do it anymore, so no,

6    I don't feel like I would be biased.

7              MS. KOUSOULIS:  Okay.

8              THE COURT:  All right.

9              MS. KOUSOULIS:  We're fine, Your Honor.  Thank

10   you.

11             THE COURT:  Okay.  Mr. Jackson, I have one more

12   question.  So if you're selected to serve on this jury,

13   you're good with that?

14             THE JUROR:  Yes, that's fine.

15             THE COURT:  Okay.  Can you take him back to the

16   courtroom, please?  And we're going to take a five-minute

17   break.

18             THE CLERK:  Okay.

19             THE COURT:  Okay.  So let's be quick.  I'll see

20   you all shortly.

21             DEPUTY CLERK:  All rise.

22             (Recess was taken.)

23             DEPUTY CLERK:  All rise.

24             THE COURT:  All right.  Be seated.  Let's bring

25   in Juror number 21.

```
 1                    (Juror entering the courtroom.)
 2               THE CLERK:  You're going to come over here and
 3      you can have a seat here.
 4               THE JUROR:  All right.
 5               THE CLERK:  Thanks.
 6               THE COURT:  Good morning, Ms. Brooker.  How are
 7      you?
 8               THE JUROR:  Good.  How are you?
 9               THE COURT:  You can take your mask off if you
10      want.
11               THE JUROR:  Thank you.
12               THE COURT:  So I think you answered two
13      questions yes.  One of them was that you had medical
14      training?
15               THE JUROR:  Yes.
16               THE COURT:  Tell me about that.
17               THE JUROR:  So right out of high school, I was a
18      medic, a first responder.  I'm currently an RN student and I
19      work for Delaware hospice right now and I'm actually in
20      school right now for behavioral science.
21               THE COURT:  So if you serve on this jury or
22      maybe we're on summer vacation?
23               THE JUROR:  Yeah, summer vacation.
24               THE COURT:  Okay.
25               THE JUROR:  Yes.
```

1          THE COURT:  So would there be anything about

2    that medical training that, based on what you've heard about

3    this case, would make you think that you might have

4    difficulty being a fair and impartial?

5          THE JUROR:  Not at all.

6          THE COURT:  Okay.  And then you had a second

7    question, which I think had to do with believing that

8    prescription pain medications are overprescribed; is that

9    right?

10          THE JUROR:  Yes.

11          THE COURT:  So tell me about that.  Is that your

12    belief?

13          THE JUROR:  Yes, I feel like sometimes it is a

14    little pushed, you know, any little situation that someone

15    has.  For example, a car accident, they are quick to kind of

16    push, you know, the prescription opioids and stuff, but I

17    feel like I understand that that is a treatment for pain.

18    But also I feel like there's a lack of treatment after that

19    because there's such an addiction behind that, you know.

20    It's easy to, you know, prescribe those medication then

21    after, you know, the person ends up having an addiction or,

22    you know, something.

23          THE COURT:  So in this case where the

24    Government's allegations involve prescription what or you

25    know what's alleged to be overprescription, and that's a

1    very general description of it, not the legally correct one

2    probably.

3                    THE JUROR:  Right.

4                    THE COURT:  But do you think when you're hearing

5    the evidence, that your beliefs and your experience there,

6    would that affect your ability to judge the evidence fairly

7    and impartially?

8                    THE JUROR:  No.

9                    THE COURT:  And do you think both the Government

10   and Dr. Titus will get a fair and impartial verdict from

11   you?

12                   THE JUROR:  Yes.

13                   THE COURT:  All right.  Any questions?

14                   MR. WOODARD:  Just briefly.  Good morning.

15                   THE JUROR:  Good morning.

16                   MR. WOODARD:  Is it fair to say that there are

17   circumstances where opioids can be prescribed appropriately

18   in your mind?

19                   THE JUROR:  Yes.

20                   MR. WOODARD:  Did you see instances like that,

21   like in your hospice care treatment?

22                   THE JUROR:  Yes.

23                   MR. WOODARD:  No further questions, thank you.

24                   THE COURT:  Mr. Bostic?

25                   MR. BOSTIC:  Good morning, ma'am.

1                    THE JUROR:  Good morning.

2                    MR. BOSTIC:  You reached your opinion that the

3      overprescription based on being in the medical field and

4      your experiences.  Would that be fair to say?

5                    THE JUROR:  Yes.

6                    MR. BOSTIC:  And as you stand here, as you sit

7      here rather, you're of the belief, and I get the impression

8      it's a strong belief, that generally doctors are

9      overprescribing as opposed to trying other modalities.

10                   Would that be fair to say.

11                   THE JUROR:  I'm sorry.  Can you repeat that?

12                   MR. BOSTIC:  As you sit here today and talk to

13     us, I get the impression that you have a strong opinion that

14     doctors are overprescribing as opposed to trying other

15     modalities for treatment of pain?

16                   THE JUROR:  Yes.

17                   MR. BOSTIC:  And your experience where you saw

18     it was okay is where you were dealing with palliative care

19     in the hospice system; right?

20                   THE JUROR:  Yes.

21                   MR. BOSTIC:  And in this case, the Government's

22     theory of the case is that Dr. Titus was overprescribing.

23     And I assume that with your previous position, you will be

24     very concerned that -- as you listen to this evidence in

25     this case?

1          THE JUROR:  Kind of -- yeah.

2          MR. BOSTIC:  Kind of?

3          THE JUROR:  Yeah, kind of.

4          MR. BOSTIC:  And we're just all human beings,

5   right?

6          THE JUROR:  Yes.

7          MR. BOSTIC:  We come to a situation and we have

8   a preconceived conception about what's going on.  Would it

9   be fair to say that you have a preconception at this point

10  about overprescribing?

11         THE JUROR:  A preconception?  No.

12         MR. BOSTIC:  Well, I don't understand.  Help me

13  understand then.

14         You're saying that you believe that there's

15  overprescribing in the medical field.  You're shaking your

16  head.

17         Is that yes?

18         THE JUROR:  Yeah.  Well, in the medical field,

19  yes.

20         MR. BOSTIC:  And you're saying that doctors

21  don't utilize, from your perspective, other treatment

22  modalities.  They go to the pain medication --

23         THE JUROR:  Yes.

24         MR. BOSTIC:  -- instead of using those; right?

25         THE JUROR:  Yes.

1          MR. BOSTIC:  And so it would seem to me that you

2     do have a preconceived notion of what's right and wrong in

3     terms of dealing with people; right?

4          THE JUROR:  You can say that.

5          MR. BOSTIC:  Right?

6          THE JUROR:  Yes.

7          MR. BOSTIC:  Yes.

8          THE JUROR:  Yes.

9          MR. BOSTIC:  And being a human being that you

10    are, it would be fair to say you'll bring that in to how you

11    listen and analyze this evidence in this case?

12         THE JUROR:  Listen, yes, but at the same time

13    I'll be very objective and not be subjective and adding my

14    own feelings and experiences of what I think is right and

15    wrong.

16         MR. BOSTIC:  Okay.  Thank you very much, ma'am.

17         THE JUROR:  You're welcome.

18         THE COURT:  All right.  Can we take Ms. Brooker

19    back outside for just a minute?

20         THE COURT:  Do you object to her?

21         MR. BOSTIC:  Yes, Your Honor.  We move to strike

22    for cause.

23         THE COURT:  What's the cause?

24         MR. BOSTIC:  Your Honor, she has a preconceived

25    perception as to what's fair and right.  I understand she

1    said she'll try to put that aside, but I do believe it will

2    impact on her ability to be fair and impartial in this case.

3    She doesn't believe that -- she believes that doctors go to

4    overprescribing over other treatment modalities.  That's at

5    the heart and center at this case.

6              THE COURT:  No, actually it's not doctors in

7    general, it's Dr. Titus in particular.

8              MR. BOSTIC:  Well, Dr. Titus -- but she did say

9    about doctors in general with respect to about going to

10   opioid pain management as opposed to using other modalities

11   and she would infer that to Dr. Titus.  So that's how we get

12   to Dr. Titus.  But her statement was a general statement.

13             THE COURT:  I don't think you have established

14   that, and from my observations of her she seems to be very

15   fair and very concerned and honest.  And I think she's going

16   to give both sides a fair trial, so I'm going to overrule

17   that objection.

18             MR. BOSTIC:  Thank you, Your Honor.

19             THE COURT:  All right.  Can we bring her back

20   in?

21             (Juror entering the courtroom.)

22             THE COURT:  All right.  Ms. Brooker, I just have

23   one more question.

24             THE JUROR:  Yes.

25             THE COURT:  If you are selected to serve as a

1    juror in this case, are you good with that?

2              THE JUROR:  Yes.

3              THE COURT:  Thank you very much.  You may go

4    back to the courtroom.

5              THE JUROR:  Have a good one, Your Honor.

6              THE COURT:  All right.  Thank you.

7              (Juror leaving the courtroom.)

8              (Juror entering the courtroom.)

9              THE CLERK:  Just follow me and have a seat right

10   here.  Okay?

11             THE JUROR:  Okay.

12             THE CLERK:  Thanks.

13             THE COURT:  Good morning.  Is it Mr. Friberg?

14             THE JUROR:  Yes, exactly.

15             THE COURT:  So you can take your mask off if you

16   want.  I think you answered one question yes, which was the

17   question about whether you believe prescription pain

18   medications are overprescribed.  Can you tell me about that?

19             THE JUROR:  Yes.  Well, all the people

20   overdosing on it and everything, you hear it all on the

21   news, used to all the time.  So you know, I just thought,

22   yeah, I'm pretty sure it is.

23             THE COURT:  So in this particular case, we're

24   not really talking about, you know, in general, we're

25   talking about one particular doctor in particular.

1                THE JUROR:  Right.  Yeah.

2                THE COURT:  What you've heard, would that impact

3       your ability to judge the evidence concerning this doctor

4       fairly or not?

5                THE JUROR:  I would have to try not to.

6                THE COURT:  Okay.  And can you just use

7       different words to say what you've just said?

8                THE JUROR:  Yeah.  I would like to not influence

9       it.  I'd have to work at it, I believe, not to believe that

10      that didn't happen with him.

11               THE COURT:  Okay.  So you start off thinking

12      that the doctor is accused of overprescription.  Actually

13      overprescription is not really what the accusation is, but

14      if a doctor was basically accused of distributing drugs that

15      they probably did it?

16               THE JUROR:  Yeah.  In my family, I have an

17      officer that's -- they see that a lot, and they go on calls,

18      and they go to a lot of overdoses and stuff like that, along

19      with other narcotics.  So just by being with him and him in

20      the family, you know, it's -- it was kind of known that it

21      was very, what's the word, used that way, prescribed.

22               THE COURT:  Okay.  Does the Government have any

23      questions?

24               MR. WOODARD:  Good morning, Mr. Friberg.

25               THE JUROR:  Good morning.

1          MR. WOODARD:  If you were to hear evidence from

2     the Defense in this case that the doctor prescribed drugs

3     legitimately, could you hear that with an open mind?

4          THE JUROR:  I would attempt to.

5          MR. WOODARD:  Do you think you could do that

6     successfully?

7          THE JUROR:  Yeah, I think I could.

8          MR. WOODARD:  All right.  Thank you.

9          THE JUROR:  Okay.

10          THE COURT:  All right.  So Mr. Friberg, I'm

11     going to excuse you.  You know, based on what you've said, I

12     think it would be weighing on you and you might have

13     difficulty just basing Dr. Titus based on whatever the

14     evidence is that actually occurs here.  So I'm going to

15     excuse you.

16          THE JUROR:  Okay.

17          THE COURT:  Thank you very much.

18          THE CLERK:  I'm going to take you this way.  You

19     can head out that main door and go to the elevator.  Okay?

20          THE JUROR:  Thanks.

21          (Juror leaving the courtroom.)

22          (Juror entering the courtroom.)

23          THE COURT:  Hi, Ms. Olsen.

24          THE JUROR:  Hi.

25          THE COURT:  You can take your mask off if you

1    like.

2              THE JUROR:  Okay.

3              THE COURT:  You answered, I guess, four

4    questions yes, but the first one I think was that you had

5    heard or read something about this case.

6              THE JUROR:  Yes, sir.

7              THE COURT:  Can you tell me what you had heard

8    or read?

9              THE JUROR:  Basically what you stated at the

10   beginning, that it was an opioid and prescription case.

11             THE COURT:  And where did you -- did you read

12   this in the newspaper or what?

13             THE JUROR:  Yeah, the News Journal.

14             THE COURT:  And was this some time ago?

15             THE JUROR:  Yes.

16             THE COURT:  Like a couple years ago?

17             THE JUROR:  I don't know.

18             THE COURT:  Okay.  But basically what you got

19   out of what you read is that a doctor, Dr. Titus, was

20   charged with a crime --

21             THE JUROR:  Correct.

22             THE COURT:  -- related to opioid prescriptions?

23             THE JUROR:  Yes, sir.

24             THE COURT:  Would the fact that he was -- and as

25   best you can recall, you don't really recall anything else

1    about what you read?

2              THE JUROR:  No, sir.

3              THE COURT:  Okay.  And so the fact that the

4    newspaper wrote a story about the charges in this case,

5    would that impact your ability to judge the case by what the

6    evidence is actually at trial?

7              THE JUROR:  No, sir.

8              THE COURT:  All right.  Then I think you also

9    answered a question about experiences with local state or

10   federal law enforcement officers that left you with some

11   kind of strong feelings about them?

12             THE JUROR:  Yes, sir.

13             THE COURT:  Can you tell me about that?

14             THE JUROR:  Sure.  So I work as the liaison

15   between the University of Delaware and the City of Newark.

16   And so almost on a weekly basis, I work with the Newark

17   Police Department and the University of Delaware Police

18   Department.

19             THE COURT:  In?

20             THE JUROR:  Coordinating efforts, working on

21   their community events, and I get police reports from our

22   internal police department.

23             THE COURT:  So does that mean -- so you're very

24   familiar with the police?

25             THE JUROR:  Yes.

1           THE COURT:  Would that mean that if some law

2  enforcement officers testified that you'd be inclined to

3  believe them no matter what kind of other testimony you

4  heard?

5           THE JUROR:  I think I would be a little biased,

6  yeah, to believe them.

7           THE COURT:  Okay.  Any questions?

8           MR. WOODARD:  Could you explain -- good morning.

9           THE JUROR:  Good morning.

10          MR. WOODARD:  Could you explain a little bit why

11  you would be biased?

12          THE JUROR:  I have a very trusting relationship

13  with the two police departments and have worked on improving

14  their relationships with each other, and so I work with them

15  a lot personally.  Not on cases.

16          MR. WOODARD:  If a police officer you never met

17  before were to be cross-examined, would you listen to that

18  cross-examination with an open mind?

19          THE JUROR:  Yes, sir.

20          MR. WOODARD:  And would you listen to both sides

21  fairly and impartially?

22          THE JUROR:  I think so.  Yes.  Yes.

23          MR. WOODARD:  Thank you.

24          THE COURT:  Ms. Kousoulis?

25          MS. KOUSOULIS:  So just following up on that.

```
 1                    THE JUROR:  Sure.

 2                    MS. KOUSOULIS:  So if a law enforcement -- if

 3       you heard from a law enforcement witness, one that you

 4       didn't know, but the testimony was challenged, would you

 5       tend to believe that law enforcement officer's testimony

 6       simply because you're a trusting person and you work with

 7       law enforcement and believe that they're trustworthy

 8       overall?

 9                    THE JUROR:  Yes, I would trust that person.

10                    MS. KOUSOULIS:  And you would tend to give their

11       testimony more weight than maybe if their testimony

12       contradicted a civilian, a non-law enforcement testimony,

13       would you tend to believe the law enforcement officer just

14       because they're a law enforcement officer over the civilian?

15                    THE JUROR:  Yes.

16                    MS. KOUSOULIS:  Thank you, Your Honor.

17                    THE COURT:  All right.  Anything further,

18       Mr. Woodard?

19                    MR. WOODARD:  No, Your Honor.

20                    THE COURT:  All right.  Ms. Olsen, I'm going to

21       excuse you.  I appreciate your candor in your responses here

22       and so you may go.  Okay?

23                    THE JUROR:  Okay.  Thank you.

24                    THE CLERK:  We'll go this way.  Thank you.

25                    (Juror leaving the courtroom.)
```

```
 1                        (Juror entering the courtroom.)

 2                   THE CLERK:  So come this way and I'll have you

 3      have a seat right here.  Okay?

 4                   THE JUROR:  Okay.

 5                   THE CLERK:  Thanks.

 6                   THE COURT:  I'm sorry.  And you are Ms. Farley;

 7      right?

 8                   THE JUROR:  Yes.

 9                   THE COURT:  You can take your mask off if you

10      want.

11                   THE JUROR:  Oh, thank you.

12                   THE COURT:  So I had some follow-up questions

13      here.  So I think you said that you thought you knew one or

14      more of the potential witnesses in this case.

15                   Who did you have in mind?

16                   THE JUROR:  Yes, Marisa Conti is my family

17      doctor.

18                   THE COURT:  Okay.  And has Dr. Conti been your

19      family doctor for -- is she your personal doctor, too?

20                   THE JUROR:  Yeah, quite a few years.

21                   THE COURT:  And so if she came in -- and I take

22      it you have a high opinion of her?

23                   THE JUROR:  Pretty much.  I keep going back.

24                   THE COURT:  Okay.  So if she came in and

25      testified, would you judge her testimony like that of any
```

1    other person, I mean, people you've never seen before?

2                    THE JUROR:  No.

3                    THE COURT:  You'd tend to believe whatever it is

4    she said?

5                    THE JUROR:  Yes.

6                    THE COURT:  How much would it take for you to

7    not believe what she said?

8                    THE JUROR:  I don't know that I could.

9                    THE COURT:  Okay.  All right.  So you know, it's

10   tough when you know a witness.  So I think I'm going to have

11   to excuse you.  I appreciate your candor and you're free to

12   go.

13                   Okay?

14                   THE JUROR:  Oh.  Thank you.

15                   THE CLERK:  All right.  Come this way.  And just

16   head out those doors and the elevator is right out there.

17   Okay?  Thank you so much for coming in.

18                   THE JUROR:  Okay.

19                   (Juror leaving the courtroom.)

20                   (Juror entering the courtroom.)

21                   THE COURT:  The record should reflect her

22   disbelief that she could actually not believe the doctor.

23                   THE CLERK:  I'll have you have a seat here.

24   Okay?

25                   THE COURT:  Good morning.  Is it Ms. Gaston?

1             THE JUROR:  Gaston.

2             THE COURT:  Gaston, okay.  And so I believe you

3    answered two questions yes, and one of them was that you had

4    served on a criminal case before?

5             THE JUROR:  That's right.

6             THE COURT:  And what do you remember about what

7    kind of case that was?

8             THE JUROR:  Very little.

9             THE COURT:  Was it a long time ago?

10            THE JUROR:  It was 2008.

11            THE COURT:  Oh, by the way, you can take your

12   mask off if you want.

13            THE JUROR:  Oh, wonderful.

14            THE COURT:  All right.  Do you remember what

15   kind of case it was?

16            THE JUROR:  All I remember is there was -- it

17   was an assault.  There were -- it was a lot of conflicting

18   information, and it ended up being a hung jury.

19            THE COURT:  Okay.  Is there anything about that

20   experience that would make it difficult for you to be a fair

21   and impartial juror in this case?

22            THE JUROR:  No.

23            THE COURT:  And then you also answered that

24   there was something else you wanted to bring up.

25            THE JUROR:  No, I didn't.

1    THE COURT:  Oh, you know, I was having trouble

2    writing the numbers down at this point.  So that was the

3    only question you answered yes?

4    THE JUROR:  Yes.

5    THE COURT:  So if you're selected to serve on

6    this jury, I take it you're good with that?

7    THE JUROR:  I'm fine.  Mm-hmm.

8    THE COURT:  Okay.  Thank you very much.  You may

9    go back to the courtroom.

10    (Juror leaving the courtroom.)

11    (Juror entering the courtroom.)

12    THE CLERK:  Follow me here and you're going to

13    have a seat right here.  Okay?

14    THE JUROR:  Sure.

15    THE CLERK:  Thanks.

16    THE COURT:  Good morning.  Are you Mr. Pennell?

17    THE JUROR:  Yes.  Yes, sir.

18    THE COURT:  And you don't have to wear your mask

19    if you don't want to right now.

20    So I think you answered one question yes, which

21    was that you had experience with law enforcement officers

22    that have left you with strong feelings one way or the other

23    about them.

24    THE JUROR:  Yes.

25    THE COURT:  Did I get that right?

1            THE JUROR:  Yes.

2            THE COURT:  Can you tell me about that?

3            THE JUROR:  Yes.  Well, my job is -- at times I

4    will have to call the law enforcement for theft or

5    shoplifting, and so I have a lot of respect for what they do

6    and what they put up with.

7            THE COURT:  Okay.

8            THE JUROR:  I don't know.  When you say "strong

9    feelings," I mean, I don't know what you mean by strong

10   feelings.  I guess the definition is pretty --

11           THE COURT:  It's designed to be sort of elastic

12   so you can fill in whatever you want.  So in this case we're

13   expecting that some law -- I'm expecting that some law

14   enforcement officers will testify.

15           Would your interactions with the retail theft

16   kind of investigations, would that impact your ability to

17   judge their testimony here fairly and impartially?

18           THE JUROR:  Sure.  It would be fine.  I mean, I

19   would have no problem with it.

20           THE COURT:  Okay.  So sure means it would not

21   impact?

22           THE JUROR:  Correct.  Yes, it would not impact.

23           THE COURT:  Any questions?

24           MR. WOODARD:  Good morning, sir.  I saw your

25   response on the COVID questionnaire, and I won't mention

1   what exactly you said, but are you outspoken in your views

2   about vaccines?

3                    THE JUROR:  No.

4                    MR. WOODARD:  Okay.  Thank you.

5                    THE COURT:  Mr. Bostic, any questions?

6                    MR. BOSTIC:  Your Honor, I have a notation here

7   that Mr. Pennell may have said he wanted to give more

8   information.  I may have gotten that wrong.

9                    THE JUROR:  That was the last question.  Yes.

10                   THE COURT:  Oh, I'm sorry.  I wrote it down on

11  the line above you.  So was there something else you wanted

12  to bring to our attention?

13                   THE JUROR:  Well, yes.  I don't know if it has

14  any bearing on it, but I couldn't remember the name Titus at

15  first when it happened, and there was two things to that.

16  One, you had asked another question, had I ever been a

17  victim of a crime.

18                   THE COURT:  Yes.

19                   THE JUROR:  You went to the next question before

20  I could raise my hand, and 20 years ago I had my wallet and

21  my wife's purse stolen at the beach.  That gets qualified as

22  a crime, I think.

23                   THE COURT:  That is a crime.

24                   THE JUROR:  So I was thinking --

25                   THE COURT:  Let me just follow up on that.  Was

 1   there anything about that that would cause you any concern

 2   about being fair and impartial to both sides here?

 3                THE JUROR:  No, I had actually forgotten about

 4   it, but since I raised my hand, I thought I better say

 5   something about that.  And then about five years, three or

 6   four years ago, I hired a couple young men to work for the

 7   company I work for.  Their last names were Titus.  And when

 8   you kept mentioning Titus, I said, That name sounds

 9   familiar, but I -- they did say their father was a doctor

10   and their mother was a veterinarian, but I have no idea who

11   his father or his mother were.  I never met them, but so --

12                THE COURT:  Were your interactions with these

13   two young men who -- assuming they are Dr. Titus', the

14   Defendant in this case, son or I guess sons, yeah, would

15   that impact your ability at all to judge the facts in this

16   case fairly?

17                THE JUROR:  No, it would not.

18                THE COURT:  Okay.  Do the two young men still

19   work at the company?

20                THE JUROR:  No, they -- they were on their way

21   to college, and it was just a summer job.  And I hired them

22   to slice meat in the deli department that I worked for --

23   company that I worked for.  They were doing great.  They

24   were great kids, so...

25                THE COURT:  All right.  Any questions from the

1    Government?

2              MR. WOODARD:  Just -- good morning, again, Your

3    Honor.  In your interaction with these young men, would you

4    assume they had a good upbringing by an upstanding father?

5              THE JUROR:  As far as I know, yes.  They were

6    very respectable.  They did their jobs well, and as far as I

7    know they're doing well in college.

8              MR. WOODARD:  If it turned out that the person

9    was Dr. Titus that was their father, would that create any

10   sort of bias in your head in favor of him?

11             THE JUROR:  No.  I would judge based on the

12   facts and the facts alone.

13             MS. KOUSOULIS:  No questions, Your Honor.

14             THE COURT:  All right.  Mr. Pennell, so I have

15   one last question which is:  If you're selected to serve on

16   this jury, are you good with that?

17             THE JUROR:  Yes, sir.

18             THE COURT:  Okay.  You can go back to the jury

19   room.

20             THE JUROR:  Thank you.

21             THE CLERK:  Follow me.

22             (Juror leaving the courtroom.)

23             (Juror entering the courtroom.

24             THE CLERK:  Okay.  You can have a seat right

25   here.

```
1                    THE COURT:  Are you Ms. Bowe?

2                    THE JUROR:  Yes.

3                    THE COURT:  And you can take your mask off if

4     you want.

5                    So I think you answered one question yes; is

6     that right?

7                    THE JUROR:  Correct.

8                    THE COURT:  And the question had to do with

9     whether you believe prescription pain medications were

10    overprescribed.  I take it your answer was yes?

11                   THE JUROR:  Yes.

12                   THE COURT:  And so what do you base that belief

13    on?

14                   THE JUROR:  Not having immediate family, but

15    spouses of friends that have had quite a bit prescribed, and

16    I think it has done them more harm than good.

17                   THE COURT:  Okay.  And so do you think that

18    experience or that belief, would that impact your ability to

19    judge fairly and honestly the evidence as it relates to one

20    particular doctor?

21                   THE JUROR:  You have to take in the evidence and

22    you have to see how it applies with how the laws are.  I

23    mean, you have to try and judge that fairly.  I don't -- I

24    don't believe that what I've seen is going to color that.

25                   THE COURT:  Okay.  Any questions from the
```

1    Government?

2            MR. WOODARD:  No, Your Honor.

3            THE COURT:  From the Defense?

4            MR. BOSTIC:  Very briefly, ma'am.

5            THE JUROR:  Yes.

6            MR. BOSTIC:  You indicated that spouses of

7    friends, you believe they were overprescribed opioids?

8            THE JUROR:  Yes.

9            MR. BOSTIC:  And you've had long conversations

10   with them or their significant others?

11           THE JUROR:  Yes.

12           MR. BOSTIC:  And would it be fair to say that

13   those conversations, the blame was put upon the doctors who

14   prescribed the medication?

15           THE JUROR:  Yes, there was blame, at least in

16   one instance, because they were advised by the spouse that

17   there was an issue happening, and the doctor did not take

18   that into consideration.

19           MR. BOSTIC:  And so if you hear testimony in

20   this case potentially touching on such issues, given how you

21   feel about overprescribing, would it be fair to say that it

22   might then become difficult for you to be fair and

23   impartial?

24           THE JUROR:  I don't think so.

25           MR. BOSTIC:  Okay.  I have nothing else, Your

1    Honor.  Thank you.

2              THE COURT:  Okay.  All right.  Can we take

3    Ms. Bowe out for just a moment?

4              Oh, wait.  I'm sorry.  Was there -- never mind.

5    You didn't -- right.  Right.  Can you just go out for a

6    minute?

7              (Juror leaving the courtroom.)

8              THE COURT:  I'm good with her.

9              MR. BOSTIC:  No challenge, Your Honor.

10             MR. WOODARD:  No objection.

11             THE COURT:  Okay.  Bring her back.

12             (Juror entering the courtroom.)

13             THE COURT:  So yeah, this is a fly by.  So I

14   have one question which is:  If you're selected to serve on

15   this jury, are you good with that?

16             THE JUROR:  Yes.

17             THE COURT:  Okay.  Thank you.  You may go back

18   to the courtroom.

19             (Juror leaving the courtroom.)

20             (Juror entering the courtroom.)

21             THE CLERK:  Follow me this way.  Okay?  And you

22   can have a seat here.

23             THE JUROR:  Thank you.

24             THE COURT:  Good morning.  You can take your

25   mask off if you'd like.

1                    Are you Ms. Pedrys?

2                    THE JUROR:  That is me.

3                    THE COURT:  And did I pronounce your name right?

4                    THE JUROR:  Yes.

5                    THE COURT:  Okay.  So I think you answered a

6    number of questions yes.

7                    THE JUROR:  Yes.

8                    THE COURT:  It is that you're a certified

9    pharmacy technician, so that perhaps relates to the

10   questions you answered yes about the nature of the

11   charges --

12                   THE JUROR:  Yes.

13                   THE COURT:  -- and experiences with opioids.

14                   THE JUROR:  Yes.

15                   THE COURT:  And what were you thinking with

16   respect to those questions?

17                   THE JUROR:  I've been a certified pharmacy

18   technician for about ten years now.  I've worked both in

19   pharmacies and right now I am the lead supervisor for

20   Delaware Medicaid working on the prescription side of

21   things.  I also operate Delaware Medicaid, that's

22   irrelevant, but I do do prior authorizations for Delaware

23   Medicaid patients and patients that are in pain management.

24                   THE COURT:  So do you have opinions about pain

25   management practices in general?

1          THE JUROR:  As far as -- I mean, I'm not a

2     doctor.

3          THE COURT:  As it relates to opioids.

4          THE JUROR:  Related to opioids, I mean, I'm not

5     a doctor, but I do have opinions on what's an appropriate

6     dosing and, you know, taper plans, things like that, you

7     know.  I wouldn't say I have a bias towards it, just what's

8     considered medically appropriate.

9          THE COURT:  Okay.

10         THE JUROR:  So --

11         THE COURT:  So do you think you have some

12    experience that sort of gives you a head start in terms of

13    judging whether or not a doctor is practicing medicine when

14    they prescribe opioids or not?

15         THE JUROR:  Yes.

16         THE COURT:  And I'm expecting that there's going

17    to be some expert testimony here.  Would you -- your own

18    experiences -- let me start over again.

19         So what you've said so far, do you think that

20    when this particular doctor, Dr. Titus, is accused of

21    essentially distributing opioids, you know, outside of

22    medical practice or outside the rules about medical

23    practice, do you think you'd be able to judge whatever the

24    evidence is fairly and impartially?

25         THE JUROR:  Yes.

1          THE COURT:  And so I take it from one of the

2     questions you answered, you believe that opioids are

3     overprescribed; right?

4          THE JUROR:  Yes.

5          THE COURT:  But in a particular doctor's case

6     whether the doctor was breaking the law, would that general

7     belief impact your ability to decide that question?

8          THE JUROR:  No.  I mean, it goes on a

9     case-by-case basis.  It depends on, you know, what

10    conditions a patient has and exactly how much, you know, how

11    much Morphine equivalents the patient was prescribed, et

12    cetera.  So it's not -- it's a case-by-case patient basis.

13    So I wouldn't say -- I'd say I have a professional working

14    knowledge, but I'm not necessarily biased because opioids

15    are -- I wouldn't say -- oh, my goodness.  I wouldn't say

16    that opioids being overprescribed is an opinion.  I think

17    it's probably fact, so -- but that doesn't mean that it's

18    not needed in cases.

19         THE COURT:  Okay.  You also -- maybe you skipped

20    over this or even though it's obvious.  So your medical

21    training is in pharmacy?

22         THE JUROR:  Yes.

23         THE COURT:  Okay.  You also answered, possibly

24    because my notes are getting bad here -- did you answer the

25    last question that there was something else that you wanted

 1    to tell me?

 2             THE JUROR:  Just that the -- that I work with

 3    Delaware Medicaid.

 4             THE COURT:  Oh, okay.  All right.  So if you

 5    were -- if you were the Defendant here, would you be happy

 6    to have yourself as a juror in this case?

 7             THE JUROR:  I'd say so, yes.

 8             THE COURT:  Okay.  Let's just go to Mr. Bostic.

 9             MR. BOSTIC:  Good afternoon, ma'am.  It just

10    went over; right?  Make sure I get it right.

11             As I understand, you just said that from your

12    perspective, there's no dispute that overprescribing is a

13    fact?

14             THE JUROR:  It's a fact, yes.

15             MR. BOSTIC:  And to the extent that there will

16    be evidence here in the Government's case that they believe

17    Dr. Titus was overprescribing, and therefore, not

18    prescribing in the course of the medical practice --

19             THE JUROR:  Mm-hmm.

20             MR. BOSTIC:  -- we'll come back to the fact that

21    the situation that you believe --

22             THE JUROR:  Mm-hmm.

23             MR. BOSTIC:  -- already is a fact that he would

24    be overprescribing.

25             THE JUROR:  Mm-hmm.

1           MR. BOSTIC:  Would that be fair to say?

2           THE JUROR:  Yes, that would be fair to say.

3           MR. BOSTIC:  And you said that you work for

4    Medicare and Medicaid, and you supervise -- that part of --

5    part of your work involves supervising others in that area.

6           THE JUROR:  Yes.

7           MR. BOSTIC:  Exactly what do you do in terms of

8    when you say supervise others?

9           THE JUROR:  I'm sorry.  Repeat that.

10          MR. BOSTIC:  What exactly do you do when you

11   supervise?

12          THE JUROR:  I am a nationally certified pharmacy

13   technician, and I run the call center for both Oregon

14   Medicaid and Delaware Medicaid.  So in the pharmacy when a

15   medication is denied for non-preferred product, or over

16   quantity limits, or it just requires clinical prior

17   authorization, the doctors and the pharmacies will call us

18   and we will enter the prior authorizations for them based

19   upon things like the prescriber's taxonomy, the ICD 10

20   diagnosis code.  And we have limits that are put into effect

21   by the state.

22          So we have a criteria that we adhere by and, you

23   know, we go through and answer the questions.  And at the

24   end of it, we either say, okay, per criteria, this is

25   approved or per criteria, this is denied.  And that --

1    that's basically what I do.

2                    MR. BOSTIC:  And I thank you for that.  Now, I'm

3    assuming that you work very closely with pharmacists?

4                    THE JUROR:  Yes.

5                    MR. BOSTIC:  And pharmacists have an impact in

6    what you do for Medicaid in terms of determining whether or

7    not in your job description?

8                    THE JUROR:  Yes.  Right.

9                    MR. BOSTIC:  And to the extent that there are

10   potential pharmacists who may come in and offer testimony as

11   to their opinion --

12                   THE JUROR:  Mm-hmm.

13                   MR. BOSTIC:  -- that Dr. Titus may have been --

14   was overprescribing, it would be difficult for you to

15   ignore, and it would be difficult for you to judge their

16   testimony the same way you would judge someone else that may

17   say not.

18                   Wouldn't that be fair to say?

19                   THE JUROR:  No, I don't agree with that.

20                   MR. BOSTIC:  You don't agree with that?

21                   THE JUROR:  I should point out, also, that I'm

22   engaged to a pharmacist --

23                   MR. BOSTIC:  Mm-hmm.

24                   THE JUROR:  -- and we talk medication often, and

25   a lot of my opinions will differ from those of his.

 1    Remember, pharmacists and doctors go to school for a long

 2    time to be able to do this and, you know, I don't have the

 3    credentials, so I'd say that I'm not -- I'm not a person

 4    who's just going to believe what a person of authority says.

 5    You know, I have my own opinions on things and just because

 6    someone who has higher credentials than me says it doesn't

 7    mean that it's true.  So you know, I would have to sit down

 8    and look at the evidence and make an opinion that way.

 9              MR. BOSTIC:  But if I'm clear, you earlier said

10    to me that if someone comes in and testifies consistent with

11    your opinion that overprescribing is a problem, right, that

12    you would tend to believe that individual over another

13    person that gave a contrary opinion?

14              THE JUROR:  Depends entirely on what the person

15    says, you know.

16              MR. BOSTIC:  Okay.  Thank you, ma'am.

17              THE JUROR:  Sorry.

18              THE COURT:  All right.  Ms. Pedrys, why don't

19    you step out for just a second.

20              (Juror leaving the courtroom.)

21              THE COURT:  All right.

22              MR. BOSTIC:  Your Honor, we would challenge for

23    cause on two basis, on two grounds.  One, I do believe that

24    she distinctively said, the juror, that she would credit a

25    person that has -- her opinion that opioids are

1   overprescribed over another individual that would say

2   something to the contrary.  Now, she changed the answer

3   somewhat at the end on my last question.  So that's one

4   basis.

5          The other basis is that she has particular

6   knowledge of the ultimate issues here involved and she helps

7   make decisions.  One of the factors in this case is that the

8   Government tends to present evidence that Dr. Titus'

9   Medicaid privileges in terms of -- were eliminated due to

10  issues with prescribing.

11         That's the field she works in.  That's what she

12  does.  I'm afraid she's going to infect the jury for her own

13  personal knowledge which would extend beyond the facts

14  presented in this case.

15         THE COURT:  All right.  For the second reason

16  there, that doesn't really go to bias.  That goes to why you

17  might exercise a preemptory challenge on her.

18         As to the first reason, you know, what I took

19  away from what she said was other than the fact that she

20  believes that it's a fact that opioids are overprescribed,

21  and you know, it's not the case if this were a bank robbery

22  that if someone said, yeah, there are too many bank

23  robberies, then you'd say, well, you can't serve on this

24  jury.  So you know, the question here in this case is not

25  whether or not opioids are overprescribed, it's a much

1    narrower question.  It has to do with Dr. Titus and she

2    impressed me as somebody who gives things thoughts and will

3    decide the case on the particular facts and the evidence

4    that are presented in the case.  So I'm going to overrule

5    your objection and not excuse her.

6              Can we bring her back?

7              (Juror entering the courtroom.)

8              THE COURT:  So, Ms. Pedrys, I have one more

9    question --

10             THE JUROR:  Yes.

11             THE COURT:  -- which is:  If you're selected to

12   serve on this jury, are you good with that?

13             THE JUROR:  Yes.

14             THE COURT:  Okay.  Thank you very much.  You may

15   go back to the courtroom.

16             THE JUROR:  Thank you.

17             (Juror leaving the courtroom.)

18             (Juror entering the courtroom.)

19             THE CLERK:  Follow me and you can have a seat

20   here.  Okay?

21             THE JUROR:  Yeah.

22             THE COURT:  Hi, Mr. Sporay.  You can take your

23   mask off if you want.  So you had a number of yes questions.

24   I'd like to follow up on some of them.

25             One of them was the schedule presented a

1   hardship to you.  Can you tell me about that?

2             THE JUROR:  Well, with my job, I'm a flat rate

3   technician, and if I don't work, I don't get paid.  They

4   give me three days of jury pay and that's it.

5             And with the bills that I have, I just can't see

6   being here for three weeks.

7             THE COURT:  So it would be essentially an

8   extreme financial hardship?

9             THE JUROR:  Yes.

10            THE COURT:  Do you have any questions?

11            MR. WOODARD:  No, Your Honor.

12            THE COURT:  Mr. Bostic?

13            MR. BOSTIC:  No, Your Honor.

14            THE COURT:  All right.  Mr. Sporay, I'm going to

15   excuse you.  I don't have any good answer for your

16   particular issue that you have.  So thank you very much for

17   being here.

18            All right?

19            THE JUROR:  Thank you.

20            THE CLERK:  Okay.  So you get to go out this

21   way, out the front doors and have a good rest of the day.

22            THE JUROR:  Thanks.

23            THE CLERK:  Thanks.

24            (Juror leaving the courtroom.)

25            (Juror entering the courtroom.)

```
 1                    THE CLERK:  You can have a seat right here.

 2    Okay?

 3                    THE COURT:  Good afternoon, sir.  You can take

 4    your mask off if you want.

 5                    Is your name Mr. Bartges?

 6                    THE JUROR:  Bartges.

 7                    THE COURT:  Bartges?

 8                    THE JUROR:  Bartges.

 9                    THE COURT:  Sorry about that.

10                    THE JUROR:  It's okay.

11                    THE COURT:  So I think you answered basically a

12    cluster of questions relating to opioids yes and I don't

13    think you answered any other questions yes.  Basically,

14    among other things, you answered the question that you think

15    prescription pain medications are overprescribed and that

16    some member of your immediate family had had a problem with

17    prescription opioids.  And I take it that was probably the

18    reason why you also answered that you might have some

19    feelings that would impact your ability relating to the

20    prescription.

21                    Tell me about all of that.

22                    THE JUROR:  My mother has had a number of

23    orthopedic surgeries and got prescribed opioid pain killers

24    as a result.  And I think -- well, I know there was one

25    instance where she inadvertently overdosed herself and had
```

1    to go to the hospital as a result.  So you know, I have an

2    opinion about that.

3                    THE COURT:  Well, so your opinion about that is

4    what?

5                    THE JUROR:  That it was overprescribed, abused,

6    easily abused and it's very addictive.  You know, they like

7    it.  They like the pain killers so they want more.

8                    THE COURT:  Was that the case with your mother?

9                    THE JUROR:  I think so.  Yeah.

10                   THE COURT:  And so -- excuse me.  So do the --

11   in this particular case, the Defendant is charged with

12   basically a crime -- well, crimes that involve the

13   distribution of opioids by use of prescriptions.  Your

14   experience with your mother and your thoughts about -- well,

15   the experiences in particular with your mother, would that

16   color your ability to be a fair and impartial judge in this

17   case?

18                   THE JUROR:  Well, obviously, I'm going to pay

19   attention to the facts and the law, but I also wanted to

20   mention my own situation, if I could.

21                   THE COURT:  Oh, yes.

22                   THE JUROR:  I had a knee surgery, was prescribed

23   Oxycontin.  I think 30 pills.  And I took two of them and

24   I -- that's all I needed.  I should not have been prescribed

25   30 pills.  That's my opinion.

1                    THE COURT:  And so those collective experiences,

2      would they impact the way you'd look at the evidence in this

3      case?

4                    THE JUROR:  It's hard to say without hearing it,

5      but like I said, I would obviously pay attention to the

6      facts, the evidence and the law around it.

7                    THE COURT:  Okay.  If you were -- all right.

8      Does the Defendant have any questions, Ms. Kousoulis?

9                    MS. KOUSOULIS:  Do you believe that based on

10     your experience, you would come into this trial with a bias

11     that if you heard testimony that a large number of opioids

12     were being prescribed to patients that it would mean that

13     they would be prescribed not for like a legitimate medical

14     purpose or that they were being overprescribed, do you think

15     your own experience would tend you to come in through a

16     preconception that, you know, that the doctor would sort of

17     have to dissuade for you in terms of the Government having

18     to prove it?

19                    THE JUROR:  Hmm.  It's hard to say.  I mean,

20     like I said, I think they are overprescribed.  It's my own

21     opinion.  But if it's legal, then I have to -- I can't

22     ignore that.

23                    MS. KOUSOULIS:  If there was a dispute over

24     whether or not it was legal, do you think you would tend to

25     have a bias that it was perhaps illegal based on your own

1    experience and come in with that bias?

2              THE JUROR:  Not necessarily.  I'm not sure how I

3    explain my answer on that.  I -- I -- you know, I also know

4    of people that whenever they can get their hands on an

5    opioid because they're somewhat addicted to it, they're

6    going to find a way to get their hands on it.

7              MS. KOUSOULIS:  When you say you believe that

8    opioids are overprescribed, do you blame the doctors?  Do

9    you think it's the doctor's fault they're being

10   overprescribed or it's the patient's?

11             THE JUROR:  It could be the patient as well just

12   trying to get as many of those pills as they can.

13             MS. KOUSOULIS:  And with regard, in your

14   experience with the overdose that you experienced personally

15   in your family, did you blame the doctor for overprescribing

16   the medication in that sense?  And if you heard that --

17   well, let me start with that.

18             Did you blame the doctor in that case?

19             THE JUROR:  I don't -- I don't consciously blame

20   the doctor, but I think she just had her hands on too many

21   pills.

22             MS. KOUSOULIS:  So you -- so if you -- but do

23   you -- if you heard testimony that a particular doctor's

24   patients had overdosed on numerous occasions, would that

25   cause you to believe, just based on that testimony alone,

1    that perhaps the medication was being overprescribed as the

2    doctor's fault as opposed to the patient's fault?

3                    THE JUROR:  If the doctor is aware of the

4    overdoses and continues to prescribe, yeah.  I think that

5    way --

6                    MS. KOUSOULIS:  Okay.  I have no further

7    questions, Your Honor.

8                    THE COURT:  All right.  And so the bottom line,

9    it sounds to me from what you said, is that though you can't

10   predict what the evidence is, I can't either, basically you

11   will judge -- as a juror, you would judge the case based on

12   whatever the facts are that you determine and whatever the

13   law is that I tell you?

14                   THE JUROR:  Yes.

15                   THE COURT:  Okay.  Anything further,

16   Ms. Kousoulis?

17                   MS. KOUSOULIS:  No, Your Honor.

18                   THE COURT:  All right.  Mr. Bartges, if you

19   could just step out for a minute.

20                   THE JUROR:  Okay.

21                   (Juror leaving the courtroom.)

22                   MS. KOUSOULIS:  Your Honor, I have no challenge.

23                   THE COURT:  Okay.  Bring him back in.

24                   (Juror entering the courtroom.)

25                   THE COURT:  So Mr. Bartges, one last question.

1    If you're selected to serve on this jury, you're good with

2    that?

3                    THE JUROR:  Yes.

4                    THE COURT:  All right.  You may go back to the

5    courtroom.  Thank you.

6                    (Juror leaving the courtroom.)

7                    (Juror entering the courtroom.)

8                    THE CLERK:  You can have a seat right here.

9                    THE COURT:  Ms. Foy, right?

10                   THE JUROR:  Yes.

11                   THE COURT:  Okay.  You can take your mask off if

12   you want.  So you answered quite a few questions yes.  So

13   I'm going to start asking you about them.

14                   So the first one was you said that the schedule

15   that I told you would be a particular hardship.  Can you

16   tell me about that?

17                   THE JUROR:  So I have to -- I have to work

18   tomorrow, Thursday and Friday, and my job is already short

19   staffed on people.  I work in a -- I work in a restaurant

20   and next week I'm supposed to start my new job, and I really

21   don't want to miss that.  And honestly, driving through the

22   city from my house and here gives me the biggest anxiety I

23   could possibly have.  I'm not used to driving in the city

24   and I just had so much anxiety.

25                   THE COURT:  So the new job you're starting next

1    week?

2                    THE JUROR:  Monday.

3                    THE COURT:  Monday.  What is it?

4                    THE JUROR:  It is -- I will be an employment

5    coach for the Community Integrated Services and it's in

6    Milford.  Monday I have -- well, through that whole week, I

7    have online training for it, but it starts at 8:30 until

8    4:00 on Monday.

9                    THE COURT:  So is this -- and so you've been

10   working in a restaurant as a waitress?

11                   THE JUROR:  Server, yeah.

12                   THE COURT:  Server, sorry.  I got to get up with

13   the terminology.  Server.  And you're basically switching

14   fields?

15                   THE JUROR:  Mm-hmm.

16                   THE COURT:  And the unit that is employing you

17   is -- what did you describe it as, your new job?

18                   THE JUROR:  So I'll be working with disabled

19   people in their job environment and making sure that they're

20   on task.

21                   THE COURT:  But who hired you?

22                   THE JUROR:  Community Integrated Services.

23                   THE COURT:  Is that a Government agency?

24                   THE JUROR:  It's a place in Milford.  It's also

25   in Milton.  I'm not entirely sure if it's Government or

 1    what.

 2                 THE COURT:  How long have you been -- when did

 3    you get the new job?

 4                 THE JUROR:  They told me about it on last Friday

 5    that I got the job offer.  And my new hire date was July

 6    the 12th for orientation.

 7                 THE COURT:  Do you think -- the training you're

 8    getting, are other people getting the training at the same

 9    time?

10                 THE JUROR:  Yes.

11                 THE COURT:  So if you miss this training, it's

12    not like they will start it when you are available.  Is it

13    something they do on a periodic basis?

14                 THE JUROR:  I mean, they said they would work

15    around it, but I don't want to miss it because -- I mean,

16    I'm working now and that's also a job that I won't get paid

17    until probably the end of the month.  So if I miss row

18    house, I'm kind of SOL out of money, also.

19                 THE COURT:  Okay.  So obviously, the new job

20    isn't going to start giving you a whole lot of jury pay

21    before you even start working and I guess restaurants don't

22    do that, either.

23                 And it really would be a financial hardship?

24                 (Juror nodding her head.)

25                 THE COURT:  Nodding your head yes.  Do you have

```
 1    any questions?

 2              MR. WOODARD:  No, Your Honor.

 3              THE COURT:  Mr. Bostic?

 4              MR. BOSTIC:  No, Your Honor.

 5              THE COURT:  All right.  Ms. Foy, I'm going to

 6    excuse you.  Good luck with the new job.  Okay?

 7              THE JUROR:  Thank you.

 8              (Juror leaving the courtroom.)

 9              THE CLERK:  You can go right out those double

10    doors there.  Thank you.

11              (Juror entering the courtroom.)

12              THE CLERK:  Just follow me.  You can sit right

13    there.

14              THE JUROR:  Thanks.

15              THE COURT:  Good afternoon, Mr. McManus.  You

16    can take your mask off if you want.  So I think you answered

17    two questions yes.  And they related to opioids and your

18    attitudes about them and including that you believe they're

19    overprescribed.  Is that right?

20              THE JUROR:  Yes, sir.

21              THE COURT:  Can you tell me about that?  Maybe

22    can you start with the overprescription?  What do you base

23    that on?

24              THE JUROR:  I do believe that they are

25    overprescribed, but I also wanted to say that I believe
```

1  people have a choice as to whether or not they become

2  addicted to them.  Those are really the only two thoughts

3  that I thought I should share.

4              THE COURT:  Okay.  And so would your beliefs

5  about that from what you've heard about this case, which is

6  a charge -- charges against the doctor relating to

7  prescription -- to distributing controlled substances, the

8  opioids by prescription, do you think either of those two

9  things would impact your ability to give both the Government

10 and the doctor a fair trial here?

11             THE JUROR:  No, sir.

12             THE COURT:  Okay.  Do you have any questions?

13             MR. WOODARD:  Yes, Your Honor.

14             THE COURT:  Actually, why don't we skip you for

15 a minute --

16             MR. WOODARD:  Sorry.

17             THE COURT:  -- and go to --

18             MR. BOSTIC:  Your Honor, not at this time, Your

19 Honor.

20             THE COURT:  Okay.  Do you want to ask any

21 questions?

22             MR. WOODARD:  I do have a question.  Yes, sir.

23             THE COURT:  Okay.

24             MR. WOODARD:  Do you believe that because a

25 doctor writes a prescription for an opioid means they could

1    never break the law?

2              THE JUROR:  Ask that again.  I'm sorry.

3              MR. WOODARD:  You think just because a doctor

4    writes a prescription for an opioid that they could never

5    break the law, that that's always okay?

6              THE JUROR:  I don't think people always need

7    them, but I'm not a doctor.  Does that answer your question?

8              MR. WOODARD:  You said that patients have the

9    choice?

10             THE JUROR:  Yes.

11             Mr. Woodard:  Do you think if a patient chose

12   and wanted a medication that a doctor could still be held

13   responsible for writing that prescription?

14             THE JUROR:  No, if the patient needed it, but

15   the point I wanted to make is knowing how addictive they

16   are, at some point the patient should be able to make the

17   choice to stop taking them.

18             MR. WOODARD:  Okay.  Thank you.

19             THE JUROR:  Yes.

20             THE COURT:  Any questions now?

21             MS. KOUSOULIS:  No questions, Your Honor.

22             THE COURT:  Okay.  Mr. McManus, can you just

23   step outside for a minute?

24             (Juror leaving the courtroom.)

25             THE COURT:  Does anybody want to challenge him?

```
 1                    MS. KOUSOULIS:  No, Your Honor.

 2                    MR. WOODARD:  No, Your Honor.  Sorry.

 3                    THE COURT:  Okay.  Bring him back.

 4                    (Juror entering the courtroom.)

 5                    THE CLERK:  Don't sit down.

 6                    THE COURT:  Mr. McManus, I have just one more

 7       question which is:  If you're selected to serve on this

 8       jury, are you good with that?

 9                    THE JUROR:  Yes, sir.

10                    THE COURT:  Okay.  Thank you.  You may go back

11       to the courtroom.

12                    Okay.  So that completes this morning's

13       activities.  We had a slight change in plans which I think

14       maybe is because of a misunderstanding, but in any event,

15       we're now going to have a lot of jurors around here this

16       afternoon and, I think -- and so we will basically -- so

17       we'll have a lot of jurors.  And I'm not sure what order

18       they're going to come in, but the jurors that were here this

19       morning that we didn't need, they're still here.  So they, I

20       think, are going to be actually the next group that comes

21       in.

22                    So by my count, we have 19 qualified jurors so

23       far.

24                    MS. KOUSOULIS:  Yes, Your Honor.

25                    THE COURT:  And you know, so I'm optimistic.  It
```

1    took three hours to get this group.  If we take a break for

2    15 minutes, is that enough?

3              MR. WOODARD:  Yes, Your Honor.

4              THE COURT:  Are you sure?  Everybody -- I mean,

5    I -- you know, it's easy for me.  My lunch is ten feet away.

6              MR. WOODARD:  Maybe just 20 minutes, if that's

7    okay, Your Honor.  We have lunch here.

8              THE COURT:  Twenty minutes.

9              MS. KOUSOULIS:  Can I just ask a question?  It's

10   fine.  Can we just bring water bottles in with us?

11             THE COURT:  Yes, yes, yes.  You can bring water

12   bottles, but bring in something so you don't make a mark on

13   the table.  Otherwise, you'll have to pay for it.

14             MS. KOUSOULIS:  Very good.

15             THE COURT:  So in any event, I'm optimistic if

16   we start at 20 of -- well, if we start -- we'll be finished

17   by like -- hopefully before 4:00 because we're working with

18   a surplus here.  But I would really like to then pick the

19   jury this afternoon.

20             All right?  So let's work on that.

21             MR. WOODARD:  Yes, Your Honor.

22             THE COURT:  All right.  We'll be in recess --

23             DEPUTY CLERK:  All rise.

24             THE COURT:  -- until ten of 1:00.

25             (Luncheon recess was taken.)

```
 1                    DEPUTY CLERK:  All rise.

 2                    MS. KOUSOULIS:  Your Honor, Mr. Bostic is stuck

 3      at security.  There's new people, so they're going through

 4      all the stuff.

 5                    THE COURT:  All right.  All right.  Well, you

 6      can be seated.

 7                    MS. KOUSOULIS:  They didn't recognize him.

 8                    THE COURT:  I would say how quickly they forget,

 9      but if they're new then.

10                    MS. KOUSOULIS:  I assume he also -- I had to

11      show him my ID.

12                    THE COURT:  I'm sorry, what?

13                    MS. KOUSOULIS:  I had to show my ID today, too.

14                    THE COURT:  Oh, okay.

15                    MS. KOUSOULIS:  Luckily, I had no papers with

16      me.

17                    (Discussion held off the stenographic record:)

18                    THE COURT:  All right.  Oh, we're still waiting

19      for Mr. Bostic.  Okay.

20                    MR. BOSTIC:  My apologies, Your Honor.

21                    THE COURT:  No, I understand, Mr. Bostic.  No

22      worries.

23                    MS. KOUSOULIS:  Thank you.

24                    THE COURT:  So okay.  Are we ready to get the

25      jury?
```

1          MS. REMIS:  Yes, Your Honor.

2          MS. KOUSOULIS:  Yes, Your Honor.

3          THE COURT:  Okay.  Let's get the jury.

4          MS. REMIS:  Your Honor, may I ask a question?

5          THE COURT:  Sure.

6          MS. REMIS:  Will their stickers say start at 33

7   or will they start one?

8          THE COURT:  I think they'll say 33.

9          DEPUTY CLERK:  Yeah.

10          MS. REMIS:  Okay.  Thank you.

11          THE COURT:  Mr. Bostic, were you able to get

12   your materials for your seat?

13          MR. BOSTIC:  They're in the car.  They're going

14   to the car.  I'll have them tomorrow.  Thank you, Your

15   Honor.

16          THE COURT:  All right.

17          THE CLERK:  All right.  You can come in.

18          (Jury pool entering the courtroom.)

19          THE COURT:  Good morning, everyone.  Good

20   morning.  I'm used to saying good morning.

21          Good afternoon, everyone.  I'm Richard Andrews.

22   I'm the judge of this Court.  We're going to select a jury

23   or take part in selecting a jury in a criminal case called

24   *United States of America vs. Patrick Titus*.

25          I'm going to ask you a series of questions to

```
1    help me and the attorneys in the jury selection process.

2    Before I ask any questions, I'm going to ask the deputy

3    clerk to swear the entire panel to answer any and all

4    questions truthfully.

5              Can we please swear the panel?

6              DEPUTY CLERK:  Members of the jury panel, will

7    you please rise and raise your right hand?

8              You and each of you do solemnly swear, those of

9    you who swear, and you and each of you do affirm, those of

10   you who affirm, that you will true answer make to such

11   questions as may be asked you touching the matter now before

12   the Court, so help you God, those of you who swear, and you

13   do so affirm, those of you who do affirm?

14             The correct response is I do.

15             THE JURY POOL:  I do.

16             THE COURT:  All right.  Before I get started

17   with questions, let me just give one request here, which is

18   if you have any electronic devices with you, turn them off.

19   Don't talk to each other about the case and don't use any

20   electronic devices you may have to do any research about the

21   case or do anything related to the case.

22             All right.  So basically the way this is going

23   to work is I'm going to ask a series of questions, and if

24   you answer yes to a question, raise your hand.  I will look

25   around and either point or call on you.  And when I do, just
```

1   tell me as loudly as you can what your jury number is.

2   Okay?  It should be somewhere between 33 and 64.

3              And basically after I've asked these questions

4   of all of you, which will probably take about 35 minutes or

5   so, then I'm going to talk with each of you one at a time,

6   mostly to follow up on the questions that you've answered

7   yes to.

8              So as background, the presentation of evidence

9   in this case is expected to take approximately three weeks,

10  though jury deliberations could extend your service beyond

11  that.  The schedule that I expect to keep over the days of

12  evidence presentation will include a morning break of

13  15 minutes, a lunch break of up to an hour, and an afternoon

14  break of 15 minutes.  We will start at 9:30 a.m., which

15  means you need to be here before then, and finish no later

16  than 5:00 p.m. each day.

17             This week we're only going to have trial today,

18  tomorrow, and Thursday, but the next week and the week after

19  that, it will be Monday through Friday.

20             Okay.  So the first question:  Does the schedule

21  that I have just mentioned present a special hardship to

22  you?

23             Okay.  Let's start there.  You, sir.

24             THE JUROR:  Fifty-eight.

25             THE COURT:  And in the back row?

```
 1                    THE JUROR:  Sixty-one.
 2                    THE COURT:  And next to you, sir.
 3                    THE JUROR:  Sixty-four.
 4                    THE COURT:  And you, sir.
 5                    THE JUROR:  Fifty-four.
 6                    THE COURT:  You, ma'am.
 7                    THE JUROR:  Sixty-seven.
 8                    THE COURT:  And then?
 9                    THE JUROR:  Fifty-seven.
10                    THE COURT:  Fifty-seven?
11                    THE JUROR:  Yes.
12                    THE JUROR:  Forty-six.
13                    THE COURT:  I'm sorry?
14                    THE JUROR:  Forty-nine.  Would you happen to
15      tell us what you mean by that type of hardship?  Like what
16      would impose that?
17                    THE COURT:  Well, we'll talk about it
18      individually.  And was your hand up, sir?  No.
19                    And you, ma'am.
20                    THE JUROR:  Fifty-six.
21                    THE COURT:  And you, ma'am.
22                    THE JUROR:  Sixty-two.
23                    THE COURT:  All right.  I see no further hands.
24                    So this is a criminal case involving charges
25      that the Defendant, Patrick Titus -- would you stand,
```

1     Dr. Titus?

2                  (Whereupon Dr. Titus stood.)

3                  THE COURT:  Thank you.  Distributed and

4     dispensed outside the usual course of professional practice

5     and not for a legitimate medical purpose mixtures in

6     substances containing a detectable amount of controlled

7     substances including Oxycodone, Oxycontin, Methadone,

8     Morphine, and Fentanyl.  The Defendant is also charged with

9     maintaining a drug-involved premises.  The Defendant was

10    formally a licensed medical doctor who ran a clinic in

11    Milford called Lighthouse Internal Medicine.

12                 The jury in this case will be asked to decide

13    whether the Defendant is guilty beyond a reasonable doubt of

14    the charges against him.

15                 So here's another question.  Have you heard or

16    read anything at all about this case?

17                 I see no response.

18                 Is there anything about the nature of the

19    charges as I have just described them that would prevent you

20    from being a fair and impartial juror?

21                 All right.

22                 THE JUROR:  Thirty-four.

23                 THE JUROR:  Forty-one.

24                 THE JUROR:  Forty-three.

25                 THE JUROR:  Thirty-three.

```
 1                    THE COURT:  Thirty-three, yes.

 2                    THE JUROR:  Forty-nine.

 3                    THE JUROR:  Fifty-four.

 4                    THE COURT:  I don't see any more hands.  All

 5     right.

 6                    Does any member of the panel know the Defendant,

 7     Patrick Titus?

 8                    THE JUROR:  Fifty-five.

 9                    THE COURT:  All right.  I don't see any further

10     hands.

11                    Is any member of the panel familiar with

12     Lighthouse Internal Medicine?

13                    I see no response.

14                    So the lawyers involved in this case, I'm going

15     to ask Ms. Remis to introduce the lawyers from the

16     Government's side and any paralegals that you have here with

17     you.

18                    MS. REMIS:  Good afternoon, everyone.  My name

19     is Aleza Remis.  I'm an attorney with the Department of

20     Justice, and I'm joined by Justin Woodard and Claire

21     Sobczak, also with the Department of Justice.  We have

22     paralegal Lisa Leal with us as well.

23                    THE COURT:  Thank you, Ms. Remis.

24                    MS. REMIS:  Thank you.

25                    THE COURT:  And Mr. Bostic for the Defendant.
```

1                MR. BOSTIC:  Yes.  Thank you, Your Honor.

2                Good afternoon.  My name is Ed Bostic, and with

3     me is Eleni Kousoulis.  We are the attorneys for Dr. Titus.

4     Also, you'll see in the room with us from time to time, and

5     Andy Marek will be here at the table from time to time, our

6     computer systems operator, as well as Kali Sudler who is the

7     paralegal on the case.

8                THE COURT:  All right.  So the question is:  Do

9     you know any of these attorneys or the paralegals that

10    they've mentioned or other personnel?  Do you or to your

11    knowledge, your immediate families, and by immediate

12    families, I mean spouse, child, parent or sibling, know any

13    of these people?

14               I see no response.

15               Have any of you or your immediate families had

16    any business dealings with or been employed by any of these

17    attorneys or by the United States Attorney's Office in

18    Delaware?

19               I see no response.

20               Now, the potential witnesses in this case, it's

21    a long list, and in order to help you focus on whether or

22    not you might know these people, we prepared a typed list

23    that I think has about 44 names on it.  And we tried to

24    indicate where they live, or occasionally what their

25    professional affiliation is when I knew of one.  So I'm

1    going to read the names out, but at the end of it the

2    question is going to be essentially:  Are you familiar with

3    any of these people?  Okay?

4            So here's the list:  Amanda Molesi.  Ashley

5    Webb.  Betty Whaley.  Bill Pucci.  Bonita Benson.  Brent

6    Hood.  Carla Haynes.  Chasity Calhoun.  Christine Bowie,

7    formally Armstrong.  Cindy Molesi.  Cliff Waples.  Delores

8    Perry.  Dr. Adam Brownstein.  Dr. Joseph Raziano.

9    Dr. Marisa Conti.  Dr. Andrew Daley.  Dr. Carol Warfield.

10   Dr. Stephen Thomas.  Edward Sullivan.  Henry Lankford.  Jane

11   Webb.  Jacqueline Miller.  Jeffrey Timmerman.  Jeremy Smith.

12   John Zalewski.  Johnny Diogo.  Joseph Morales.  Josie

13   Walters.  Kristyn Pipher.  Leana Waples.  Lisa Cody.

14   Lucille Brown.  Marguerite Lenhardt.  Megan Miller.  Melissa

15   Silbereisen.  Michael Adams.  Michael Petron.  Percy

16   Dhamodiwala.  Rebecca Benson.  Shannon Holleger.  Tracie

17   Owens.  Valerie Pucci.  Victoria Titus.  And William

18   McDonald.

19           So are you familiar with any of these potential

20   witnesses?

21           THE JUROR:  Thirty-seven.

22           THE COURT:  I don't see any other hands.  All

23   right.

24           And I'm not sure I said this, they're potential

25   witnesses.  They may not actually be witnesses, but it's

1    likely that pretty much every witness in the case will be

2    among those ones whose names I've read.

3              So the law enforcement agencies involved in this

4    case are the Drug Enforcement Administration, or DEA, and

5    the Department of Health and Human Services, or HHS.  Would

6    the fact that the DEA or the HHS participated in the

7    investigation of this case interfere with your ability to be

8    fair and impartial?

9              I see no response.

10             Have you had -- I'm sorry.  Have you or any

11   member of your immediate family ever been employed by or

12   investigated by any law enforcement agency, including the

13   DEA or HHS?

14             I see no response.

15             Have you had any experiences with local, state

16   or federal law enforcement officers that left you with

17   strong feelings, either good or bad, about law enforcement

18   officers?

19             Yes, sir.

20             THE JUROR:  Forty-one.

21             THE COURT:  I don't see any other response.

22             Do you believe that you will give more or less

23   weight to the testimony of a law enforcement officer simply

24   because he or she is employed as a law enforcement officer?

25             All right.  I'm going to take that as 41.

1          Anybody else?

2          I see no further response.

3          Do you have medical training?  Yes.

4          THE JUROR:  Fifty-five.

5          THE JUROR:  Thirty-four.

6          THE COURT:  I'm sorry, was that 36 or 34?

7          THE JUROR:  Thirty-four.

8          THE COURT:  Anybody else?

9          THE JUROR:  Thirty-nine.

10         THE COURT:  All right.  Anybody else?

11         No further response.

12         Have you ever worked in a pain management

13    clinic?

14         I see no response.

15         Is there anything about your experience with

16    doctors or the medical profession that you think the

17    Government and the Defendant ought to know?

18         THE JUROR:  Thirty-four.

19         THE COURT:  Anybody else?

20         No further response.

21         Would your feelings about doctors affect your

22    ability to be a fair and impartial juror in a criminal case

23    where the Defendant is a doctor?

24         No response.

25         So the criminal charges in this case relate to

1    prescriptions for controlled substances, in particular, to

2    prescriptions for opioids such as Oxycodone, Oxycontin,

3    Hydrocodone, Morphine, Methadone and Fentanyl.  Do you have

4    any feelings, opinions or attitudes about the use or abuse

5    of opioids that would impact your ability to be a fair and

6    impartial juror in this case?

7                    THE JUROR:  Thirty-four.

8                    THE JUROR:  Forty-one.

9                    THE JUROR:  Forty-nine.

10                   THE JUROR:  Fifty-eight.

11                   THE JUROR:  Forty-three.

12                   THE JUROR:  Fifty-four.

13                   THE COURT:  All right.  I don't see any more

14   hands.

15                   All right.  Have you or any member of your

16   immediate family ever had problems with the use of

17   prescription opioids?

18                   THE JUROR:  Forty-three.

19                   THE JUROR:  Forty-nine.

20                   THE COURT:  Anybody else?

21                   All right.  No further response.

22                   Do you believe that prescription pain

23   medications are overprescribed?

24                   All right.  Start here.

25                   THE JUROR:  Thirty-three.

1              THE JUROR:  Thirty-four.

2              THE JUROR:  Forty-three.

3              THE JUROR:  Forty-nine.

4              THE JUROR:  Fifty-eight.

5              THE JUROR:  Forty-seven.

6              THE COURT:  All right.  I don't see any further

7    response.

8              Have you or any member of your immediate family

9    been in drug rehab?

10             All right.

11             THE JUROR:  Forty-one.

12             THE JUROR:  Forty-three.

13             THE JUROR:  Forty-nine.

14             THE JUROR:  Fifty.

15             THE JUROR:  Fifty-four.

16             THE COURT:  I'm sorry, what was it?

17             THE JUROR:  Fifty-four.

18             THE JUROR:  Fifty-nine.

19             THE COURT:  Anybody else?

20             I see no further response.

21             All right.  So this is a three-part question.

22   Have you or any member of your immediate family ever been,

23   one, a victim of a crime; two, a witness in a criminal case;

24   or three, arrested for a crime, not including minor traffic

25   offenses?

1              THE JUROR:  Thirty-five.

2              THE JUROR:  Thirty-seven.

3              THE JUROR:  Forty-three.

4              THE JUROR:  Forty-two.

5              THE JUROR:  Fifty-six.

6              THE COURT:  Fifty-six?  Fifty-six?

7              THE JUROR:  Yeah.

8              THE COURT:  Okay.  Yes, sir.

9              THE JUROR:  Thirty-nine.

10             THE COURT:  And you, sir.

11             THE JUROR:  Fifty-eight.

12             THE JUROR:  Sixty-one.

13             THE JUROR:  Fifty-three.

14             THE COURT:  Anybody else?

15             And no further response.

16             Do you have any opinions about the criminal

17   justice system that might make it difficult for you to be a

18   fair and impartial juror in this case?

19             THE JUROR:  Forty-one.

20             THE JUROR:  Forty-three.

21             THE JUROR:  Fifty-three.

22             THE COURT:  And I'm sorry, that was 53?

23             THE JUROR:  Yes, sir.

24             THE COURT:  All right.  Anybody else?

25             No further response.

1           If you're selected to sit as a juror in this

2     case, are you aware of any reason why you would be unable to

3     render a verdict based solely on the evidence presented at

4     trial?

5           No response.

6           If you're selected to sit as a juror in this

7     case, are you aware of any reason why you would not be able

8     to follow the law as I give it to you?

9           No response.

10          A fundamental principle of our legal system is

11    that when a person is charged with a crime, he is presumed

12    to be innocent unless and until the Government proves guilt

13    beyond a reasonable doubt.  If you are selected to sit as a

14    juror in this case, will you have difficulty following this

15    rule of law?

16          No response.

17          Do any of you have a religious or a moral

18    conviction that would make it difficult to find the

19    defendant guilty or not guilty?

20          THE JUROR:  Fifty-eight.

21          THE COURT:  All right.  I don't see any further

22    response.

23          So Patrick Titus, who is the Defendant in this

24    case, may choose not to testify in his own defense.  And I

25    instruct you that the choice not to testify, if that is his

1    choice, may not be held against him.  If you are selected as

2    a juror in this case, will you have difficulty following

3    this instruction?

4              No response.

5              You may see evidence that was seized or in the

6    lawful execution of search warrants.  Do you have any

7    feelings about the use of search warrants that would affect

8    your ability to be an impartial juror in this case?

9              No response.

10             Have you served on a jury in a criminal case

11   before?

12             THE JUROR:  Fifty.

13             THE COURT:  I'm sorry, was that 50?

14             THE JUROR:  Fifty.  5-0.

15             THE COURT:  Oh, yes.

16             THE JUROR:  Fifty-five.

17             THE COURT:  I'm sorry, in the back.

18             THE JUROR:  Fifty-five.

19             THE COURT:  Fifty-five.  Thank you.

20             And there.

21             THE JUROR:  Fifty-six.

22             THE COURT:  Anybody else?  Oh, yes, sorry.

23             THE JUROR:  Thirty-five.

24             THE COURT:  All right.  No further response.

25             Have you served on a grand jury before?

1              No response.

2              Is there anything such as poor vision,

3     difficulty hearing or difficulty understanding spoken or

4     written English that would make it difficult for you to

5     serve on this jury?

6              THE JUROR:  Forty-three.

7              THE COURT:  Okay.  So I reviewed the COVID

8     questionnaires -- well, actually any further response to the

9     last question?  I don't see any.

10             I reviewed the COVID questionnaires that you

11    filled out.  You are here because I did not see anything in

12    your answer that made me think you should be excused from

13    service as a juror because of COVID concerns.

14             Does COVID give you any concern about serving on

15    this jury?

16             I see no response.

17             As you can see, we are generally wearing masks,

18    and I would be if I wasn't speaking, and we are practicing

19    social distancing.  Once we have a jury, I expect that fully

20    vaccinated jurors will have the option, if they want, of

21    taking their masks off while the trial is going on.  Jurors

22    who are not fully vaccinated will not have that option.

23             Will you -- and these are essentially the State

24    of Delaware rules right now.  Will you have difficulty

25    complying with those rules?

1                    I see no response.

2                    So this is the last question:  Is there anything

3     else, including something that you have now remembered in

4     connection with one of the earlier questions, that you think

5     that you would like to tell me in connection with your

6     service as a juror in this case?

7                    Yes.

8                    THE JUROR:  Forty-nine.

9                    THE COURT:  Anyone else?  No.  All right.  So

10    thank you.  That completes the general questioning.

11                   We're now going to take you over to the

12    courtroom next door, and you'll be brought in one at a time.

13                   (Jury pool leaving the courtroom.)

14                   THE COURT:  So according to my count, ten of the

15    jurors didn't answer any question yes, so I think we're

16    looking pretty good.

17                   (Juror entering the courtroom.)

18                   THE CLERK:  I'll have you sit right here.  Okay?

19                   THE JUROR:  Sure.

20                   THE CLERK:  Thank you.

21                   THE COURT:  Good afternoon, Mr. Fitzgerald.  If

22    you'd like you can take your mask off.  So I believe you

23    answered two questions yes, and I think they were probably

24    related to each other.

25                   One of them was about the nature of the charges

1    and the other was about overprescription of prescription

2    pain medications.

3               Are the two, in fact, related?

4               THE JUROR:  Not necessarily.

5               THE COURT:  Okay.

6               THE JUROR:  My first one is I am -- I work

7    for -- I'm a CFO from a medical cannabis company in

8    Maryland.

9               THE COURT:  Oh.

10              THE JUROR:  Again, I just want that to be known

11   that I work --

12              THE COURT:  Okay.  And so let me just follow up

13   on that.  You know, cannabis is not involved in this case.

14              THE JUROR:  No.

15              THE COURT:  Do you think that your, I take it,

16   support of what the company that you're working for is

17   doing, would that in any way -- will that cause you

18   difficulty in terms of evaluating whatever the evidence is

19   in this case?

20              THE JUROR:  I don't believe so.

21              THE COURT:  Okay.  And what's the other thing?

22              THE JUROR:  The other thing has to do with

23   overprescription and I tend to believe, that's just a

24   feeling I have, that there's overprescribing of drugs and

25   there's too much given out and no followup and it just

1    rapidly goes on.

2              THE COURT:  Okay.  And so this case is not

3    about, you know, general practices.  It is about --

4              THE JUROR:  Mm-hmm.

5              THE COURT:  -- one particular person who is the

6    Defendant.  And the evidence will be whatever the evidence

7    will be.

8              Do you think your general feeling, will that

9    impact at all your ability to judge Dr. Titus' case fairly

10   and impartially?

11             THE JUROR:  No.

12             THE COURT:  Okay.

13             THE JUROR:  No, I don't think it would impact me

14   at all.

15             THE COURT:  Okay.  Let's go to the Defendant.

16   Any questions, Mr. Bostic?

17             MR. BOSTIC:  I just want to follow up on one

18   issue.  You said you have a general thought that there's too

19   much you said overprescribing --

20             THE JUROR:  Mm-hmm.

21             THE COURT:  -- and no followup.

22             THE JUROR:  That's correct.

23             THE COURT:  And what did you mean by "no

24   followup"?  By whom?

25             THE JUROR:  Well, for instance, I personally

 1    have gotten prescriptions for pain medication, and I was

 2    able to get a re-prescription of the same thing even though

 3    I didn't need to have it anymore.

 4              MR. BOSTIC:  And to the extent that there was

 5    evidence presented here that would raise that issue on the

 6    one hand and then evidence hopefully that would contradict

 7    that on the other hand, would your thoughts on

 8    overprescribing impact on your ability to be fair to

 9    Dr. Titus or the Government in this case?

10              THE JUROR:  I don't believe so.

11              MR. BOSTIC:  Okay.  Thank you.

12              THE COURT:  And Mr. Woodard, do you have any

13    questions?

14              MR. WOODARD:  No, Your Honor.

15              THE COURT:  Okay.  All right.  Mr. Fitzgerald,

16    you may return to the courtroom.  All right?

17              THE JUROR:  Okay.

18              (Juror leaving the courtroom.)

19              THE COURT:  I take it there's no challenge

20    there, right, Mr. Bostic?

21              MR. BOSTIC:  Oh, my apologies, no challenge.

22              THE COURT:  And I take it there's no challenge

23    there, either?

24              MR. WOODARD:  Correct.

25              THE COURT:  Okay.  I would have overruled any

 1    challenge.

 2                    (Juror entering the courtroom.)

 3                    THE CLERK:  Come this way and if I could have

 4    you sit right here.  Okay?

 5                    THE JUROR:  Thank you.

 6                    THE CLERK:  Oh, you're welcome.

 7                    THE COURT:  Ms. Landgraf.  Good afternoon.

 8                    THE JUROR:  Good afternoon.

 9                    THE COURT:  So you answered a number of

10    questions and I guess the first place to start is that the

11    opioid or what I take it to be the opioid nature of the

12    charges against the doctor, that would cause you difficulty?

13                    THE JUROR:  Yes, sir.

14                    THE COURT:  Can you just explain that?

15                    THE JUROR:  I can.  I served as Cabinet

16    Secretary for the Department of Health and Social Services

17    from 2009 to early 2017 when the whole opioid epidemic

18    surfaced.

19                    THE COURT:  I'm sorry.  You can take the mask

20    off if you want.

21                    THE JUROR:  Oh, that would be nice.  Thank you.

22    And was part of creating working with Governor Markell and

23    Dr. Carol Rattay and Pro Reg in looking at the prescription

24    monitoring program, creating the addiction coalition.  I

25    also served as an advisor to Attack Addiction created to

1    Helpishere.de for the number of people who are impacted by

2    opioid addictions.  So just felt with all that work that was

3    established between that time frame and still actively

4    involved that I wanted to reveal that to all parties.

5              THE COURT:  Well, do you think -- and thank you

6    for that, but do you think that in the particular case of

7    Dr. Titus, all of his work and presumably a certain amount

8    of expertise, would that impact whether you would be able to

9    look at the evidence in this case fairly and impartially?

10             THE JUROR:  I'm concerned I might be bringing

11   bias to the table and fairness.

12             THE COURT:  Okay.  Any questions?

13             MS. KOUSOULIS:  Not from the Defense, Your

14   Honor.

15             THE COURT:  Sorry, I was looking at Mr. Woodard.

16             MS. KOUSOULIS:  Sorry, I wasn't looking up.  You

17   were going to us first?

18             THE COURT:  No.  No.  I'm trying to be strategic

19   here.

20             Mr. Woodard?

21             MR. WOODARD:  No, Your Honor.

22             THE COURT:  All right.  Ms. Landgraf, I'm going

23   to excuse you.  I had actually predicted to the parties last

24   week that you would not make it very far here, but I do

25   appreciate you showing up and hopefully there will be

```
 1   another time when it's not in your wheelhouse.  All right?
 2               THE JUROR:  Thank you, Your Honor.
 3               THE COURT:  All right.  You're excused.
 4               (Juror leaving the courtroom.)
 5               (Juror entering the courtroom.)
 6               THE CLERK:  Just follow me this way and I'll
 7   have you have a seat right there.
 8               THE JUROR:  Okay.
 9               THE COURT:  Good afternoon.  You can take your
10   mask off if you want.
11               THE JUROR:  Okay, thank you.
12               THE COURT:  You are Ms. Leberstien?
13               THE JUROR:  Leberstien.  I had a 50 percent
14   chance.
15               So you answered, according to my count, two
16   questions yes.  One of them was the question about whether
17   you or somebody in your immediate family had been a victim
18   of a crime, or a witness or arrested for a crime.
19               What did you have in mind?
20               THE JUROR:  It was victim of a crime, and it
21   was -- my car was stolen.  The same car stolen twice.
22               THE COURT:  Okay.  And were these recent events?
23               THE JUROR:  No, a long time ago.
24               THE COURT:  And did the car -- so it was stolen
25   twice, so I guess it got recovered the first time.
```

1        THE JUROR:  It got recovered the first time.  It

2   got recovered the second time.  It was damaged.

3        THE COURT:  Did these experiences impact at all,

4   you think, your ability to judge whatever the evidence is in

5   this case fairly and impartially?

6        THE JUROR:  No, sir.  No, sir.

7        THE COURT:  And was the other thing that you

8   answered that you served on a jury before?

9        THE JUROR:  Yes, I wasn't 100 percent sure how

10  to answer that.  It was a criminal trial.  It was in the

11  state of Florida, but we actually never went to trial.  I

12  was selected for the jury, but we didn't go to trial.  It

13  was dismissed.

14       THE COURT:  So that doesn't really --

15       THE JUROR:  I wasn't 100 percent sure.

16       THE COURT:  I appreciate -- you always err on

17  the side of over answering.  So if you're selected to serve

18  on this jury, are you good with that?

19       THE JUROR:  Yeah.

20       THE COURT:  Okay.  Thank you very much.  You may

21  go back to the courtroom.

22       THE JUROR:  Thank you.

23       THE CLERK:  Oh, you're welcome.

24            (Juror leaving the courtroom.)

25            (Juror entering the courtroom.)

```
 1                    THE CLERK:  All right.  Come this way.  I'm

 2     going to have you sit right here.  Okay?

 3                    THE JUROR:  Okay.

 4                    THE COURT:  Mr. Figueroa, you may take your mask

 5     off if you want.  So you didn't answer any question yes.  Am

 6     I correct about that?

 7                    THE JUROR:  Correct.

 8                    THE COURT:  So I do have then just one more

 9     question, which is:  If you're selected to serve on this

10     jury, are you good with that?

11                    THE JUROR:  Yes.

12                    THE COURT:  Okay.  Thank you.  You may go back

13     to the courtroom.

14                    THE JUROR:  Thanks.

15                    (Juror leaving the courtroom.)

16                    (Juror entering the courtroom.)

17                    THE CLERK:  Come this way.  Follow me.  I'm just

18     going to have you sit right here.  Okay?

19                    THE JUROR:  Okay.  Hello.

20                    THE COURT:  Hi.  You are Ms. Edwards?

21                    THE JUROR:  Yes.

22                    THE COURT:  You can take your mask off if you

23     want.

24                    THE JUROR:  Okay.

25                    THE COURT:  So I believe you answered two
```

1    questions yes.  Let me deal with the first, somebody on the

2    witness list, maybe more than one person is somebody that

3    you have some knowledge of.

4                    THE JUROR:  One person, yes.

5                    THE COURT:  Who is that?

6                    THE JUROR:  Josie Walters.

7                    THE COURT:  And is she a friend or just

8    somebody -- casual acquaintance or what?

9                    THE JUROR:  I went to school with her daughter,

10   high school.

11                   THE COURT:  Okay.  So you know of her.  Do you

12   actually kind of know her?

13                   THE JUROR:  I mean, I've seen her in the last

14   six months.  I kind of know her.  I'm still friends with her

15   daughter.

16                   THE COURT:  Okay.  So if she testifies in this

17   case, do you think you're going to -- will you be able to

18   judge her testimony the same as any other witness'

19   testimony?

20                   THE JUROR:  Most likely.

21                   THE COURT:  Okay.  And you say "most likely."

22   Sometimes that's just the way people have of speaking

23   particularly about future events that, after all, are in the

24   future so who knows.  But I mean, are you fairly confident

25   that you would be able to separate the fact that you went to

 1    school with her daughter --

 2                    THE JUROR:  Yes.

 3                    THE COURT:  -- and basically just judge her

 4    testimony?  And I'm here, though I think it will be coming

 5    from there, but judge her testimony like any other witness?

 6                    THE JUROR:  Yes, because I'm friends with her

 7    daughter, I'm not really friends with her.

 8                    THE COURT:  Okay.  Any questions?

 9                    MS. KOUSOULIS:  No, Your Honor.

10                    THE COURT:  Any questions?

11                    MR. WOODARD:  Yes, Your Honor.  Just briefly.

12                    You were friends with Ms. Walters' daughter.

13    Did you ever go to Ms. Walters' house?

14                    THE JUROR:  Yes.

15                    MR. WOODARD:  Did you ever see Dr. Titus there?

16                    THE JUROR:  It's possible.  He does look a

17    little familiar, but I'm not a hundred percent sure.

18                    MR. WOODARD:  Okay.  Do you have any feelings

19    either way about Dr. Titus?

20                    THE JUROR:  I don't know him.

21                    MR. WOODARD:  If you were to hear testimony

22    about Ms. Walters, would you be more inclined to believe or

23    disbelieve what was said about her?

24                    THE JUROR:  It's possible because I do know her

25    and her daughter.  I'm not sure how to answer because I do

1    know them, so...

2                 THE COURT:  Okay.  I don't think -- anything in

3    the case won't really have anything to do with her daughter;

4    right?

5                 MR. WOODARD:  Correct, Your Honor.

6                 THE COURT:  So it's really the fact that you

7    know her daughter.  Is that going to influence how you

8    perceive her mother?

9                 THE JUROR:  No.

10                THE COURT:  Okay.

11                MR. WOODARD:  Nothing further, Judge.

12                THE COURT:  Do you have anything further?

13                MS. KOUSOULIS:  No questions.

14                THE COURT:  All right.  Ms. Edwards, why don't

15   you just step out for a second.

16                THE JUROR:  Okay.

17                THE COURT:  Oh, wait.  I'm sorry.  I didn't

18   actually ask you the second question which I wanted to ask

19   you, which is:  You did answer a second question yes about

20   somebody, either you or a member of your immediate family,

21   either being a victim, a witness or arrested.

22                What did you have in mind there?

23                THE JUROR:  My brother was arrested for -- I

24   mean, it was a murder trial.  He was not convicted.

25   Everything was dropped, but he was arrested for it.

```
 1                    THE COURT:  And how long ago was that?  Roughly.

 2                    THE JUROR:  That was 2012.

 3                    THE COURT:  All right.  Did that process impact

 4       or what did you think of -- did you think he was unfairly

 5       charged?

 6                    THE JUROR:  Well, since the charges were

 7       dropped, yes.

 8                    THE COURT:  Okay.  And did you think that the

 9       police who presumably arrested him, did you think that they

10       did a bad job, or that they were unprofessional, or anything

11       like that?

12                    THE JUROR:  I'm not sure I can really answer

13       that question too honestly because at that point that was

14       almost ten years ago and I was young.  So --

15                    THE COURT:  Okay.

16                    THE JUROR:  -- I wasn't very involved to be able

17       to answer that.

18                    THE COURT:  So if there's some law enforcement

19       officers who testify in this case, you'll judge them the

20       same as anybody else?

21                    THE JUROR:  Correct.  Yes.

22                    THE COURT:  Okay.  Any further questions on

23       either of those?

24                    MS. KOUSOULIS:  No, Your Honor.

25                    MR. WOODARD:  No, Your Honor.
```

```
 1                    THE COURT:  Ms. Edwards, can you just step
 2    outside for a moment?
 3                    THE JUROR:  Yes.
 4                    (Juror leaving the courtroom.)
 5                    THE COURT:  Well, I'm not inclined to excuse
 6    her, but I at least want to give you all a chance.
 7                    MS. KOUSOULIS:  We have no strikes, Your Honor.
 8                    MR. WOODARD:  No motion from the Government.
 9                    THE COURT:  Okay.  Bring her back.
10                    (Juror entering the courtroom.)
11                    THE COURT:  Ms. Edwards, one more question.  If
12    you're selected to serve on this jury, are you good with
13    that?
14                    THE JUROR:  Yes.
15                    THE COURT:  Okay.  Thank you.  You may go back
16    to the courtroom.
17                    (Juror leaving the courtroom.)
18                    (Juror entering the courtroom.)
19                    THE CLERK:  I'm going to have you have a seat
20    right here.  Okay?
21                    THE JUROR:  Thanks.
22                    THE COURT:  Good morning.  You may take your
23    mask off if you want.  You don't have to.
24                    It's Ms. Espinal?
25                    THE JUROR:  Yes.
```

```
 1                    THE COURT:  So I believe that you answered none

 2     of my questions yes; right?

 3                    THE JUROR:  Correct.

 4                    THE COURT:  And so if you're selected to serve

 5     on this jury, are you good with that?

 6                    THE JUROR:  Yes.

 7                    THE COURT:  Okay.  Well, thank you.  You may go

 8     back to the courtroom.

 9                    THE JUROR:  Have a good one.

10                    (Juror leaving the courtroom.)

11                    (Juror entering the courtroom.)

12                    THE CLERK:  Follow me.  And I'm just going to

13     have you take a seat right here.  Okay?

14                    THE JUROR:  Okay.

15                    THE CLERK:  All right.

16                    THE COURT:  Mr. Klinger.

17                    THE JUROR:  Yes.

18                    THE COURT:  Right?  You may take your mask off

19     if you want to.  You don't have to.

20                    So I believe you answered two questions yes, and

21     I just wanted to follow-up on those.  One of them is that

22     you have some medical training.

23                    THE JUROR:  Well, not that much, but I was an

24     emergency medical technician, defib back for a volunteer

25     fire department where I used to live.
```

1            THE COURT:  Okay.  So how long ago was that?

2            THE JUROR:  Oh, probably about eight years ago.

3            THE COURT:  And so did you have to deal with

4   people who had drug overdoses?

5            THE JUROR:  It's possible.  I never had to, but

6   there were other people on the department who did.

7            THE COURT:  Oh, okay.  All right.

8            And so the other thing you answered was that you

9   or a member of your immediate family had either been a

10  victim of a crime, or a witness in a criminal case, or had

11  been arrested.  What did you have in mind there?

12           THE JUROR:  That was my daughter.  This is about

13  ten years ago.  She stole my credit cards and she spent six

14  months in the county jail for that.

15           THE COURT:  Okay.  And so the county jail, I

16  take it this is some place other than Delaware.

17           THE JUROR:  Correct.  That would be in Erie

18  County, New York.

19           THE COURT:  Okay.  Were you treated fairly by

20  the authorities in connection with that arrest?

21           THE JUROR:  Absolutely.

22           THE COURT:  Okay.  Do you have any questions?

23           MR. WOODARD:  Just one, Your Honor.  You talked

24  about some of your colleagues dealing with overdoses.  Did

25  that experience or your discussions affect you in any way

```
 1    such that you couldn't be fair and impartial in this trial?

 2                    THE JUROR:  No, sir.

 3                    MR. WOODARD:  Okay, thank you.

 4                    MS. KOUSOULIS:  No questions, Your Honor.

 5                    THE COURT:  Okay.  Mr. Klinger, I have one more

 6    question.  So if you're selected to serve as a juror in this

 7    case, are you good with that?

 8                    THE JUROR:  Absolutely.

 9                    THE COURT:  All right.  Please take him back to

10    the courtroom.

11                    THE JUROR:  Thank you.

12                    THE COURT:  Thank you.

13                    (Juror leaving the courtroom.)

14                    (Juror entering the courtroom.)

15                    THE CLERK:  Come right here.  I'm just going to

16    have you --

17                    THE JUROR:  Oh, sorry.  Wrong chair.

18                    THE CLERK:  -- have a seat right here.

19                    THE JUROR:  Thank you.

20                    THE CLERK:  Thanks.

21                    THE COURT:  Good afternoon.  You may take your

22    mask off.

23                    THE JUROR:  Oh, sure.

24                    THE COURT:  Is it Ms. Narvaez?

25                    THE JUROR:  Yes.
```

1          THE COURT:  So I believe that you did not answer

2    any question yes; is that correct?

3          THE JUROR:  Correct.

4          THE COURT:  Okay.  So does that mean that if

5    you're selected to serve on this jury, you're good with

6    that?

7          THE JUROR:  I believe that it's my civic duty,

8    so it is my first time being on a jury, but I take it

9    seriously.

10         THE COURT:  Okay.  Well, that's what we wish

11   everybody would say.

12         All right.  You may go back to the courtroom.

13         All right?

14         THE JUROR:  Thank you.

15         (Juror leaving the courtroom.)

16         (Juror entering the courtroom.)

17         THE CLERK:  I'm just going to have you have a

18   seat right here.  Okay?

19         THE JUROR:  Okay.

20         THE COURT:  Mr. Taylor?

21         THE JUROR:  Yes, sir.

22         THE COURT:  You can take your mask off if you'd

23   like.  So you answered a number of questions yes and let me

24   start with the first question which had to do with whether

25   or not the nature of the charges would make it difficult for

1    you to be a fair and impartial juror.  Tell me about that.

2              THE JUROR:  I think it would be the direct

3    impact of family and close associates who have passed on

4    from drug overdoses.  To break my anonymity, I have been in

5    a drug rehab, I'm clean and sober for almost 35 years.  The

6    bigger impact, I think, is the -- one of my previous

7    existence in life, Judge, I was a surety bail agent and I

8    owned a fugitive recovery business for over a decade.  So I

9    pretty much side most of the time with the Court.  I spent a

10   lot of time in court as a bail bond agent, a fugitive

11   curbing agent across the United States.

12             It's very difficult for me to be impartial.  I

13   99 percent of the time think they're guilty.  When you spend

14   ten years chasing criminals around the country listening to

15   a bunch of excuses, they all seem to be excuses.

16             THE COURT:  All right.  Do you have any

17   questions?

18             MR. WOODARD:  No, Your Honor.

19             THE COURT:  So Mr. Taylor, I understand your

20   candor.  I'm sorry about the way it has impacted you, and

21   I'm going to excuse you because you can imagine we really

22   need people who say no, I can.

23             THE JUROR:  If you chase criminals for a living,

24   you can understand, too, Your Honor.

25             THE COURT:  Okay.  Well, thank you.  You're

1    excused.

2              THE JUROR:  Yes, sir.

3              THE COURT:  Nicole, can you just hold on a

4    second before you get the next one.

5              (Juror leaving the courtroom.)

6              THE COURT:  I just wanted to say I believe that

7    Juror Number 50 that will be coming up soon, I just wanted

8    to mention that his daughter and my daughter like went to

9    school together from kindergarten and were extremely close

10   friends.  And you can think about that, but I wanted to tell

11   you about that because I'm going to ask him a question about

12   it.

13             MR. WOODARD:  Thank you.

14             THE COURT:  Okay.  Go ahead.

15             (Juror entering the courtroom.)

16             THE COURT:  Actually his son and -- his daughter

17   and my son are also extremely close friends.

18             THE CLERK:  I'm going to have you have a seat

19   right here.

20             THE COURT:  Ms. Higginbotham?

21             THE JUROR:  Yes.

22             THE COURT:  So I believe -- you can take your

23   mask off if you want.

24             THE JUROR:  Okay.  I believe you answered one

25   question yes, which was that you had either been a -- you or

1    a member of the family had either been a victim of a crime,

2    or a witness in a criminal case, or arrested.

3                    What were you thinking about in response to

4    that?

5                    THE JUROR:  I have two.  My daughter was

6    arrested for shoplifting, but that's like 12 years ago, but

7    it happened.  And my husband was arrested for assault of my

8    ex-husband about ten years ago.

9                    THE COURT:  All right.  And do either of those

10   events cause you any concern about whether you would be able

11   to be fair and impartial to both sides in this case?

12                   THE JUROR:  No.  No.  Both of them were expunged

13   and that has nothing --

14                   THE COURT:  Okay.  Any questions?

15                   MR. WOODARD:  No, Your Honor.

16                   THE COURT:  Any questions?

17                   MS. KOUSOULIS:  No, Your Honor.

18                   THE COURT:  All right.  So Ms. Higginbotham, I

19   just have one more question which is:  If you're selected to

20   serve on this jury, are you good with that?

21                   THE JUROR:  Yes, I just have to let my work

22   know.  They may not be happy, but...

23                   THE COURT:  Okay.  Thank you.  You may go back

24   to the courtroom.

25                   THE JUROR:  Thank you.

```
 1                    (Juror leaving the courtroom.)

 2                    (Juror entering the courtroom.)

 3              THE CLERK:  Follow me.  I'm just going to have

 4    you sit right here.  Okay?

 5              THE JUROR:  Okay.  Thanks.

 6              THE CLERK:  Oh, you're welcome.

 7              THE COURT:  Good afternoon, sir.  You may take

 8    your mask off if you want.

 9              Is it Mr. Forquet?

10              THE JUROR:  Forquet.

11              THE COURT:  Forquet.  And so you answered a

12    number of questions yes and the first group of them had to

13    do with the nature of the charges and then the various

14    questions I asked about opioids.

15              Do you have some strong feelings on the subject?

16              THE JUROR:  Yes, I do.

17              THE COURT:  And can you tell me what they are?

18              THE JUROR:  My cousin died of overdose with --

19    oh, shit.  What's the name of that one?  Opioid.  Any way.

20              THE COURT:  Okay.  How long ago was that?

21              THE JUROR:  About six, six years ago.  It was in

22    Puerto Rico.  That's where I'm from, Puerto Rico.

23    Oxycontin, that's what it was.

24              THE COURT:  Okay.

25              THE JUROR:  And I guess he was going through
```

1    some kind of pain management thing and somehow they

2    increased the dosage and anyway, he -- he overdosed.

3              THE COURT:  So in this case it involves the

4    distribution or the accusation of the illegal distribution

5    of certain opioids by prescription.  Your personal

6    experiences, would that make it difficult for you to judge

7    the evidence fairly and impartially?

8              THE JUROR:  I think so because we were really

9    close.  We grew up together.

10             THE COURT:  You --

11             THE JUROR:  And --

12             THE COURT:  I'm sorry.  And just looking at your

13   face, I mean, it's bringing back sadness as we're just

14   talking here; right?

15             THE JUROR:  Mm-hmm.

16             THE COURT:  All right.  Do you have any

17   questions?

18             MR. WOODARD:  No, Your Honor.

19             THE COURT:  Any questions?

20             MS. KOUSOULIS:  No, Your Honor.

21             THE COURT:  All right.  Sir, I'm going to excuse

22   you and, you know, I appreciate you bringing up stuff that

23   is obviously painful.

24             THE JUROR:  Yeah, I want to be -- I got to tell

25   the truth.

```
 1                    THE COURT:  Yes, yes.  No, that's all right.
 2      It's better than all right.  We encourage that.
 3                    THE JUROR:  I will be fair --
 4                    THE COURT:  All right.  So I'm going to excuse
 5      you.  All right?
 6                    THE JUROR:  Thank you, sir.
 7                    THE CLERK:  So we're going to go this way.
 8                    THE JUROR:  Thank you.
 9                    THE COURT:  All right.  Have a good day, sir.
10                    (Juror leaving the courtroom.)
11                    (Juror entering the courtroom.)
12                    THE CLERK:  I'm going to have you have a seat
13      here.  Okay?
14                    THE JUROR:  Okay.
15                    THE COURT:  Ms. Robinson, you can take your mask
16      off, if you want.  So basically my impression is that you
17      didn't answer any of my questions yes; is that correct?
18                    THE JUROR:  Yes.
19                    THE COURT:  Okay.  And so does that mean that if
20      you're selected to serve on this jury, you're good with
21      that?
22                    THE JUROR:  No.
23                    THE COURT:  No.  Okay.  So tell me why.
24                    THE JUROR:  Well, I guess for obvious reasons.
25      My family and I have been in for a year and a half and we
```

1   just scheduled our vacation, and I have a doctor's

2   appointment on the 26th.

3            THE COURT:  Okay.  Well, so tell me about the

4   vacation.  I mean, you said it's scheduled?

5            THE JUROR:  It's not, no.

6            THE COURT:  Oh.

7            THE JUROR:  It is and it's not.  All depends on,

8   you know, I'm going to -- let me back up.  They said it

9   could be three weeks or more, so the or more doesn't work

10  within my schedule.

11           THE COURT:  Okay.  Well, so how much of the or

12  more does not work?  In other words, when do you turn into a

13  pumpkin?

14           THE JUROR:  The 1st of August.

15           THE COURT:  The 1st of August.  We can beat

16  that.  That's not a problem.

17           If that's not a problem, does that mean that

18  you're good to serve?

19           THE JUROR:  Yeah.

20           THE COURT:  Okay.  All right.  I take it what

21  you are saying is you will do your civic duty, but you'd

22  rather be somewhere else?

23           (Juror nodded her head.)

24           THE COURT:  Okay.  Well, that's a sufficient

25  answer.  So are there any questions?

1          MR. WOODARD:  No.

2          MS. KOUSOULIS:  No, Your Honor.

3          THE COURT:  Okay.  So Ms. Robinson, you're going

4   to be asked to do your civic duty.

5              (Juror leaving the courtroom.)

6          THE COURT:  The record should reflect sarcasm in

7   her answers or something when it literally says is not what

8   she was saying at times.

9              (Juror entering the courtroom.)

10          THE CLERK:  This is Number 37.  Something came

11   to her mind after she got back to the jury room that she

12   wants to mention.

13          THE COURT:  Okay.  Well, that's good.  Why don't

14   you just go over there and you can take your mask off again

15   if you want.

16          So yes, you are Juror 37?

17          THE JUROR:  Yes.

18          THE COURT:  Who is Ms. Edwards.  Go ahead.

19          THE JUROR:  I just remembered we were at Josie

20   Walters' house at the same time once.  I was visiting

21   Ms. Walters' daughter.  So we were at the same location, but

22   I don't really know him, but I just wanted to say we were at

23   the same location.

24          THE COURT:  Okay.  Okay.  Any further questions?

25          MS. KOUSOULIS:  Not from Defense.

```
 1                    MR. WOODARD:  No, sir.

 2                    THE COURT:  All right.  Thank you, Ms. Edwards.

 3                    (Juror leaving the courtroom.)

 4                    (Juror entering the courtroom.)

 5                    THE CLERK:  I'm just going to have you take a

 6    seat right here.  Okay?

 7                    THE JUROR:  Okay.

 8                    THE COURT:  Hi, Ms. Sullivan.  You can take your

 9    mask off if you want.

10                    THE JUROR:  Oh, thank you.

11                    THE COURT:  So good afternoon.  So my impression

12    is that you did not answer even one of my questions yes.  Is

13    that right?

14                    THE JUROR:  Correct.

15                    THE COURT:  Okay.  Does that mean that if you're

16    selected to serve on this jury, you're good with that?

17                    THE JUROR:  Sure.

18                    THE COURT:  Okay.  Well, thank you very much.

19    You may go back to the courtroom.

20                    THE JUROR:  Thank you.

21                    (Juror leaving the courtroom.)

22                    (Juror entering the courtroom.)

23                    THE CLERK:  I'm just going to have you take a

24    seat right there.

25                    THE JUROR:  Okay.  Thank you.
```

```
 1                    THE CLERK:  Sure.
 2                    THE COURT:  Good afternoon.  You can take your
 3     mask off if you want.  Is it Ms. Huk?
 4                    THE JUROR:  Yes.
 5                    THE COURT:  And I believe it's a question that
 6     the or I believe it's the fact that the only question you
 7     answered yes to was about the schedule.
 8                    THE JUROR:  Yeah.
 9                    THE COURT:  Tell me about that.
10                    THE JUROR:  Well, so I'm doing summer school for
11     teaching and then like I guess I'm in an offshore trip, so
12     that would take me away for 24 hours, but I mean I can
13     figure it out if it was need be.
14                    THE COURT:  Well, so wait.  So the offshore
15     trip, that means some time like on a weekend?
16                    THE JUROR:  Next Tuesday, I would be away all
17     day.
18                    THE COURT:  Okay.  And that is -- the offshore
19     trip, I take it is -- can you just give me a --
20                    THE JUROR:  It's a charter trip -- it was a
21     charter trip that was previously paid for like months ago.
22                    THE COURT:  Charter to go fishing or something
23     like that?
24                    THE JUROR:  Yeah.
25                    THE COURT:  Okay.  All right.  Any questions?
```

1          THE JUROR:  And I -- well, I don't know if I can

2     bring -- I don't know.

3          THE COURT:  Well, so here's the thing is I'm

4     getting ready to excuse you because one of our rules is we

5     generally don't make people who have paid some amount of

6     money for something, even if it's fairly -- well, how

7     much -- how much --

8          THE JUROR:  I can figure it out.  If need be, I

9     can figure it out.  It's family run, so it's really not like

10    a dead end, but I do have a question.  Is it --

11         THE COURT:  Well, before you get to your

12    question, I will let you ask your question.

13         THE JUROR:  Okay.

14         THE COURT:  So the one day, 24-hour, that can be

15    essentially, you can -- that will just be tough if you get

16    selected for the jury.  But you also said something about a

17    teacher.

18         Is that something you can work that out, too?

19         THE JUROR:  Yeah, I would just take myself out

20    of it.

21         THE COURT:  Okay.

22         THE JUROR:  It's like summer school.  You sign

23    up for it.

24         THE COURT:  But now you want to ask me a

25    question and I said you could.

```
 1                    THE JUROR:  Well, I'm from Milford.  So the name

 2      kind of rings a bell, and I'm not sure if his wife is a vet.

 3                    THE COURT:  I believe his wife is a vet.  Do you

 4      know her?

 5                    THE JUROR:  Yeah.

 6                    THE COURT:  Well --

 7                    THE JUROR:  She's just my dog's vet.  I was just

 8      like connecting the dots.  I don't know.

 9                    THE COURT:  Where do you live?

10                    THE JUROR:  I grew up in Milford.  I just moved

11      to Harrington.

12                    THE COURT:  Okay.  Right.  Harrington.

13                    All right.  So your appreciation of Dr. Titus'

14      wife or your appreciation of the veterinarian is that she's

15      a good veterinarian that you trust with your pet?

16                    THE JUROR:  Absolutely.  Absolutely.

17                    THE COURT:  Would that impact your ability to be

18      fair and impartial in this trial?  You know, every criminal

19      charge is serious, but a serious criminal charge of her

20      husband?

21                    THE JUROR:  No, I just wanted you to -- it was a

22      connection.  It was bothering me, so I wanted to let you

23      know.

24                    THE COURT:  All right.  So now I'm not planning

25      on excusing you, but let me just see if the lawyers have any
```

1    questions.

2                 MR. WOODARD:  Just one, Your Honor.  Ms. Huk,

3    with the summer school, will you be missing out on pay for

4    the next several weeks?

5                 THE JUROR:  I will, yes.

6                 MR. WOODARD:  Would that be a hardship on you?

7                 THE JUROR:  It's a pretty good pay.  Summer

8    school hours, you get paid a lot more than you usually do as

9    a teacher, but I get it.  This is my civil duty, so...

10                MR. WOODARD:  Thank you.

11                THE COURT:  Any questions?

12                MS. KOUSOULIS:  No, Your Honor.

13                THE COURT:  Okay.  So Ms. Huk, so from what I

14   understand is if you get selected to serve on this jury, you

15   are good with that?

16                THE JUROR:  Yeah, I'll figure it out.  Yeah.

17                THE COURT:  And I take it a large part of this,

18   and this is one thing I appreciate about teachers is you do

19   appreciate your civic duty.

20                THE JUROR:  Yeah.

21                THE COURT:  Okay.  All right.  You can go back.

22                (Juror leaving the courtroom.)

23                MS. KOUSOULIS:  If I may, I'm not sure if it

24   makes a huge difference with regard to the witnesses, but so

25   I'm still trying to process it, but like a couple people

1    have mentioned Dr. Titus' wife, knowing her and she being a

2    vet.  That's his ex-wife, so I'm not sure --

3                    THE COURT:  So the Veronica Titus or whoever her

4    name is who's on the list, is that a different person?

5                    MS. KOUSOULIS:  Yes, and he has a current wife,

6    but she's not either of those people.

7                    THE COURT:  Okay.

8                    MS. KOUSOULIS:  So I am not -- okay.  So I

9    didn't know if --

10                   (Juror entering the courtroom.)

11                   THE CLERK:  I'm going to have you take a seat

12   right here.  All right?

13                   THE JUROR:  All right.

14                   THE COURT:  I believe that you are Mr. Freeland?

15                   THE JUROR:  Yes, sir.

16                   THE COURT:  Hold on just one second.  So good

17   afternoon.  You can take your mask off if you want.

18                   So I believe you answered one question yes which

19   had to do with whether you believe that opioid prescriptions

20   are being overprescribed or pain medications -- actually

21   pain medications generally, and you answered yes; right?

22                   THE JUROR:  Yes.

23                   THE COURT:  And is that based on personal

24   experience, or things that you read, or some combination of

25   that?

1                    THE JUROR:  Personal experience.

2                    THE COURT:  So tell me what kind of personal

3       experiences you're basing that on.

4                    THE JUROR:  I have arthritis in my back and my

5       hips, and my doctor put me on Tramadol, which is an opioid.

6       I was on it for years.  It worked, but if I quit moving, I'd

7       fall asleep.  I quit taking them on my own.  I had about

8       three or four days of withdrawal.  I haven't been on them

9       for about three or four years now.  I don't need it.

10                   THE COURT:  And so your conclusion is that your

11      doctor should have --

12                   THE JUROR:  Gave me something else.

13                   THE COURT:  Overprescribed you Tramadol?

14                   THE JUROR:  Yes.

15                   THE COURT:  So does that personal experience, do

16      you think that would impact your consideration of the

17      criminal charges that are against Dr. Titus for essentially

18      distributing opioids by prescription?  Would that impact

19      your ability to give this case fair and impartial

20      consideration?

21                   THE JUROR:  No, sir.  I don't think so.

22                   THE COURT:  Any questions, Mr. Bostic?

23                   MR. BOSTIC:  Yes, thank you, Your Honor.

24                   THE COURT:  Good afternoon, Mr. Freeland.  It's

25      my understanding that you were on Tramadol for several

1    years.  About how long?

2              THE JUROR:  About five.

3              MR. BOSTIC:  And what I hear you say is you

4    trusted in the doctor to provide these medications for you

5    up until the point you realized that, in essence, he was

6    overprescribing it to you?

7              THE JUROR:  Well, according to the insurance, I

8    could only get my prescription filled certain times.  So if

9    there was a lapse of medicine and the days went by, I felt

10   really terrible.  So I eventually stopped taking them and I

11   still have arthritis everywhere.  I don't need an opioid.

12             MR. BOSTIC:  In terms of overprescribing, that

13   was your words, those were your words; right?  Do you blame

14   the doctor for prescribing the medication?

15             THE JUROR:  No, it worked.  I think it -- you

16   know, it all depends on the person.  Ten years ago I never

17   even took an aspirin.  So I don't blame my doctor.  It did

18   work, I just didn't need it anymore.

19             MR. BOSTIC:  Thank you very much, sir.

20             THE COURT:  All right.  So Mr. Freeland, so if

21   you're selected to serve on this jury, are you good with

22   that?

23             THE JUROR:  Yes, sir.

24             THE COURT:  Okay.  Can you just step outside for

25   a minute?

```
 1                    THE JUROR:  Yeah.

 2                    (Juror leaving the courtroom.)

 3                    MR. BOSTIC:  We have a challenge, Your Honor.

 4                    MR. WOODARD:  No objection.

 5                    THE COURT:  Okay.  All right.  Well, bring him

 6     back for a minute.

 7                    (Juror entering the courtroom.)

 8                    THE COURT:  All right.  So Mr. Freeland, you're

 9     going to be in the pool from which the jury is selected.  So

10     if you can go back to the courtroom.  Okay?

11                    THE JUROR:  Thank you.

12                    (Juror leaving the courtroom.)

13                    THE COURT:  Thank you.

14                    (Discussion held off the stenographic record:)

15                    THE COURT:  Keep going.

16                    (Juror entering the courtroom.)

17                    THE CLERK:  I'm going to have you have a seat

18     right here.

19                    THE JUROR:  Thank you.

20                    THE COURT:  I take it you're Mr. Locke?

21                    THE JUROR:  Yes, Your Honor.

22                    THE COURT:  And you can take your mask off if

23     you want.  So my notes are that you did not answer yes to

24     any of my questions; is that correct?

25                    THE JUROR:  Correct, Your Honor.
```

```
 1                    THE COURT:  Okay.  Does that mean that if you're
 2   selected to serve on this jury, you're good with that?
 3                    THE JUROR:  Yes, Your Honor.
 4                    THE COURT:  Okay.  Well, thank you very much.
 5   You may go back to the courtroom.
 6                    (Juror leaving the courtroom.)
 7                    THE COURT:  And Nicole, let's have another.
 8                    (Juror entering courtroom.)
 9                    THE CLERK:  I'm just going to have you have a
10   seat right here.  Thanks.
11                    THE COURT:  Hi, Ms. Hathaway.
12                    THE JUROR:  Hi.
13                    THE COURT:  You can take your mask off if you
14   want.  So you had answered a number of questions yes, but
15   let's start with the schedule causing a difficulty or a
16   hardship.
17                    THE JUROR:  I just have a vacation planned, but
18   that's why I was asking what the hardship was.
19                    THE COURT:  Well, oh, okay.  And so when you say
20   "vacation planned," is this a vacation --
21                    THE JUROR:  We're flying to Seattle at the end
22   of the month.
23                    THE COURT:  So you bought tickets?
24                    THE JUROR:  Yes.
25                    THE COURT:  What is your departure date?
```

1               THE JUROR:  Tuesday, the 27th.

2               THE COURT:  Okay.  Well, I think on our current

3       schedule, I think that would be okay, but it's a pretty

4       close call.  So do you mind just stepping outside for a

5       moment?

6               THE JUROR:  Yes.

7               (Juror leaving the courtroom.)

8               THE COURT:  So I'd like to just excuse her.

9               MS. REMIS:  No objection, Your Honor.

10              MS. KOUSOULIS:  No objection.

11              MR. BOSTIC:  No objection.

12              MS. REMIS:  Just a quick question.  I believe

13      you said the other day we were aiming for 32.

14              THE COURT:  Yes, we are, but here's the thing --

15      actually let's bring her in and then let me talk to the

16      attorneys.

17              Ms. Hathaway, I hope that we're going to be

18      finished by then, but it's not something that I can

19      guarantee.  And you've already got your ticket, so I'm going

20      to excuse you.

21              Okay?

22              THE JUROR:  Okay.

23              THE COURT:  So you can go out that door.

24              THE JUROR:  Thank you.  Done for the day?  Thank

25      you.

```
 1                    THE COURT:  So let me just explain.  Sorry.
 2       This has nothing to do with you Ms. Hathaway.
 3                    (Juror leaving courtroom.)
 4                    THE COURT:  So yes, we have reached 32.  I'd
 5       like to get at least one or two more just in case people
 6       don't come back from lunch.  You know, I've been doing this
 7       lately and on this kind of short-term thing, everyone has
 8       come back, but I'd like to do that.
 9                    But before we get the next juror, this is the
10       person that I know.  Is this something that you would prefer
11       that he not be on the jury?
12                    MS. REMIS:  We have no objection to excusing
13       him, Your Honor.
14                    MR. BOSTIC:  Yes, no objection.
15                    THE COURT:  Okay.  Well, then let's go get
16       Mr. Bacon.
17                    THE CLERK:  Okay.
18                    MS. KOUSOULIS:  I think Mr. Bostic
19       misunderstood.
20                    MR. BOSTIC:  I apologize, Your Honor.  We would
21       prefer that he not be on the jury.  I misunderstood the
22       question.
23                    THE COURT:  Okay.  Well, I think maybe that's
24       the better thing.
25                    MS. REMIS:  That's what I said, also, Your
```

1    Honor.

2                   THE COURT:  Oh.

3                   MS. REMIS:  Sorry.

4                   THE COURT:  Sorry.  I misunderstood, and then I

5    just piled Mr. Bostic on top.  Okay.

6                   (Juror entering the courtroom.)

7                   THE CLERK:  You're going to follow me and just

8    have a seat right there.

9                   THE COURT:  So let's just go off the record

10   here.

11                  (Discussion held off the stenographic record.)

12                  THE COURT:  Let's try to get one more now.

13                  (Juror entering the courtroom.)

14                  THE COURT:  Off the record.

15                  (Following a discussion held off the

16   stenographic record.)

17                  THE COURT:  Back on the record.  Mr. Preszler?

18                  THE JUROR:  Yes.

19                  THE COURT:  If you want to, you can take your

20   mask off, but you don't have to.

21                  THE JUROR:  Okay.

22                  THE COURT:  So according to my notes, you didn't

23   answer any of the questions yes; is that right?

24                  THE JUROR:  Yes.

25                  THE COURT:  Okay.  And so does that mean that if

1    you're selected to serve on this jury, you're good with

2    that?

3                    THE JUROR:  Yes, sir.

4                    THE COURT:  Okay.  All right.  So you can go

5    back to the courtroom and let's get Juror 52 and hopefully

6    that will be the last juror that we need to get.

7                    (Juror leaving the courtroom.)

8                    (Juror entering the courtroom.)

9                    THE COURT:  Now, the wife's name has come back

10   to me.

11                   THE CLERK:  And you're just going to have a seat

12   right there.

13                   THE COURT:  Good afternoon, Ms. Stevenson.

14                   THE JUROR:  Hi.

15                   THE COURT:  And you can take your mask off if

16   you want.  So my notes are that you didn't answer any of my

17   questions yes; is that right?

18                   THE JUROR:  Right.

19                   THE COURT:  Okay.  Does that mean that if you're

20   selected to serve on this jury, you're good with that?

21                   THE JUROR:  Mm-hmm.

22                   THE COURT:  Okay.  Well, thank you very much.

23   You may go back to the courtroom.

24                   And then Ms. Selmyer, if you can come back and

25   talk to me.

1          Okay.  So -- oh, let me wait a moment.  All

2     right.  So I made a bad logistical call over lunch which is

3     I thought it would take quite a bit longer to go through

4     this afternoon than it did.  So I overruled my staff's

5     better suggestions and said tell the jurors that were here

6     this morning to come back at three o'clock or to be back

7     by 3:00.

8               THE CLERK:  Correct.

9               THE COURT:  So we're not going to have the rest

10    of the jury until three o'clock and maybe that gives you

11    time to strategize over which people you want to strike and

12    not, and then we can do the selection process fairly quick.

13    And then if we do that, I will give them the full opening

14    instructions, unless I notice that they're really sleepy.

15    If they're really sleepy, I'm just going to give them the

16    limited, don't talk to anyone and don't do any research.

17    But I would think that if you have time to think about these

18    jury selections, we could move through fairly quickly.

19              So I don't think there's -- unless there's

20    something else you want to discuss right now.

21              MS. KOUSOULIS:  I am sorry.  Just with regard to

22    the jury selection, so is the way -- I forget the way Your

23    Honor does it.  So are you guys, are you going to, for all

24    the jurors that are in the pool right now, line them up?

25              THE COURT:  They will come in here and sit in

1    seats 1 through 32 so you can look at them while you're

2    striking them.

3              MS. KOUSOULIS:  Right.  But are you going to --

4    sometimes you pull the numbers out and they're seated --

5              THE COURT:  No, this group has already been

6    randomized, so the order in which you saw them today is the

7    order in which they will take their seats.

8              MS. KOUSOULIS:  But I guess if there's more than

9    what we need, how will the ones who you actually pick

10   from -- do you understand what I'm saying?

11             THE COURT:  No, I don't.  So the 34, if they're

12   all 34 here at three o'clock, which is a good chance there

13   are --

14             MS. KOUSOULIS:  Right.

15             THE COURT:  The last two are going to be told

16   remain in the other room because we don't need them.

17             MS. KOUSOULIS:  That's what I was -- all right.

18   The last two that we just saw?

19             THE COURT:  Right.

20             MS. KOUSOULIS:  And then if we don't use all our

21   strikes, the first 14, 12 and 2 will be the ones selected?

22             THE COURT:  Well, so here's the thing, you have

23   to use your strikes.

24             MS. KOUSOULIS:  Okay.

25             THE COURT:  And now actually that you mention

1    it, because the strikes are ten for the Defendant and six

2    for the Government, and then you have one each on the

3    alternates.  So you have to do it.  And I don't understand

4    why this is so difficult.

5         The first ten strikes that the Defendant

6    exercises and the first six strikes that the Government

7    exercises, they have to be against the jurors who are in

8    positions 1 through 28, okay, because those are strikes for

9    the main group.  The alternate strikes then will be done at

10   the end, the last two, and they will only be exercised

11   against 29 to 32.

12        Does everyone understand what I just said?

13        MS. KOUSOULIS:  Yes.

14        MS. REMIS:  Yes.

15        MR. WOODARD:  Yes.

16        THE COURT:  All right.  I'm sorry.  I'm not

17   meaning to be intimidating here.

18        MS. REMIS:  No, I just have one last question

19   about the way Your Honor does this.  Do we strike out loud?

20        THE COURT:  No.  No.

21        MS. REMIS:  Okay.

22        THE COURT:  My staff, Ms. Selmyer and

23   Ms. Kilpatrick, will have a sheet with names and you will

24   draw a line through the person you want to strike.  Maybe --

25   in fact -- well, any further instructions you want to give

1    on that?

2                    THE CLERK:  It's very easy.

3                    MS. REMIS:  Thank you.  Okay.

4                    THE COURT:  Okay.  Any other questions?

5                    MS. KOUSOULIS:  Yeah.  And then 1 to 28 isn't

6    Jurors 1 to 28, it's the first 28 of the ones that are left?

7                    THE COURT:  True.

8                    MS. KOUSOULIS:  I was looking at my numbers and

9    I was like --

10                   THE COURT:  Yes, yes.  Thank you.  That's a good

11   clarification.

12                   Okay.

13                   (Discussion held off the stenographic record:)

14                   THE COURT:  So we'll recess here, and I will

15   expect to see you back at three o'clock.  Okay?

16                   MR. WOODARD:  Yes, Your Honor.

17                   THE CLERK:  All rise.

18                   (Recess was taken.)

19                   DEPUTY CLERK:  All rise.

20                   THE COURT:  All right.  Please be seated.  I

21   think they're just finally lining up the jurors to bring

22   them in.

23                   We're ready to go?

24                   MR. WOODARD:  Yes, Your Honor.

25                   THE COURT:  Ms. Kousoulis, we're ready to go?

1          MS. KOUSOULIS:  Yes, Your Honor.

2          THE COURT:  Okay.

3          THE CLERK:  I'm going to start bringing them in.

4     Okay?

5          THE COURT:  Okay.

6          (Jury pool entering the courtroom.)

7          THE COURT:  So members of the panel, let me just

8     explain what's going on here.  It may not be obvious.

9          So basically under the law, there's kind of a

10    two-part process for selecting the jury.  First, you have to

11    find people who are qualified and able to serve, and that's

12    what we were doing this morning and early afternoon.

13         But then under the law, each side gets to strike

14    some of you -- I mean, remove you from the panel without

15    having to have a good reason.  This morning you could only

16    be removed if there was a good reason, and I was the one who

17    decided whether or not there was a good reason.  Now, the

18    parties just get to knock you down, and we're going to knock

19    you down to a total of 14.

20         So right now your odds are better than even that

21    you won't actually be on the jury, but nobody should do any

22    gambling.  All right.  So keep going.  Don't listen.

23         So I just wanted to tell you what's going on.

24    You've got to be patient.  This process can sometimes take a

25    while, so let's just wait and see how long it takes.

```
 1                    (Whereupon jury selection took place.)

 2                    THE CLERK:  Okay.  When I call your number, it

 3      means you're free to go.

 4                    So Number 1, you're free to go.

 5                    Number 7, you're free.  Good to go.

 6                    THE COURT:  Actually, I'm sorry to interrupt for

 7      just a second.  You are going to be free to go, but rather

 8      than just walking out the door, I do want -- no, don't come

 9      back.

10                    THE JUROR:  Okay.

11                    THE COURT:  I did just want to say on behalf of

12      the Court to the two of you plus the ones to be named in a

13      few minutes or a few seconds if I would stop talking, that

14      we do appreciate you being here.  In order to make the

15      system work, we need to have all of these jurors, all of you

16      to be here today.

17                    And for that, I thank you and the parties, if

18      they were allowed to say something now, they would thank

19      you, too.  So thank you and now you may leave.

20                    THE CLERK:  Juror Number 10, you're good to go.

21      Ten.

22                    Twenty, you're good to go.

23                    As well as 21, good to go.

24                    Number 26, you're free to leave.

25                    Twenty-seven, also.
```

1              Twenty-eight, good to go.

2              Number 30, you're good to go.

3              Thirty-two, you can leave.

4              Thirty-three, you can also leave.

5              Thirty-seven, you're free to go.

6              Thirty-nine, good to go.

7              Forty, you're good to go.

8              Forty-two, good to go.

9              Forty-four, you're also good to go.  Good luck

10  with the vacation.

11             Forty-six, you're free to leave.

12             And 47, you're also good to go.

13             So once we get the last out, we're going to

14  reseat everybody.

15             So Juror Number 3, you're going to move down to

16  this first seat here.

17             And then Juror Number 5, you're going to be in

18  seat number two.

19             And then Juror Number 9, you're going to be in

20  seat number three.

21             Juror 11, you're going to be way down in front

22  here by me.

23             Fifteen, you're going to be in the middle there.

24             Sixteen, right next to her.

25             And then I think that is 1, 2, 3, 4, 5, 6, 7, 8.

```
 1    Okay.  So yeah, we are going to utilize that last chair down
 2    there.
 3              So 19 -- I'm sorry, 18 is going to be right --
 4    you're going to move closer to the wall there.
 5              Okay.  And then 19, you're going to be up front
 6    here.  Sorry.  Looking around.  I'm losing -- watch out.
 7              Twenty-five, you're going to be in the middle
 8    over here in the first row.
 9              Okay.  So then 35, you're going to be down at
10    the end here.
11              Thirty-six, you're going --
12              THE JUROR:  Thirty-five here?
13              THE CLERK:  Yeah, yeah.
14              Then 36 you're going to be in the back here in
15    the corner.
16              And then 38, you're going to be in the middle.
17              And then 45, you'll be at the end.
18              And then 48, you're going to be tucked in the
19    corner over here.  Let us know if you have sight problems
20    when you get over there.
21              THE COURT:  All right.  So I believe now we're
22    going to swear the jury.
23              DEPUTY CLERK:  Members of the jury, please rise
24    and raise your right hand.
25              You and each of you do swear, those of you who
```

1    swear, and you and each of you do affirm, those of you who

2    affirm, that you will well and truly try the issue joined in

3    this indictment between the United States of America, and

4    Defendant, Patrick Titus, and that you will a true verdict

5    render according to the evidence, so help you God, those of

6    you who swear, and you do so affirm, those of you who do

7    affirm?

8              The correct response is I do.

9              THE JURY:  I do.

10              THE COURT:  Thank you.  All right.  Everyone be

11    seated.

12              So I have some preliminary jury instructions and

13    you have a written copy with you.  And basically the plan is

14    I'm going to present these to you and then we're going to be

15    finished for the day.  And so when I finish the preliminary

16    jury instructions, I have one or two other pieces of advice,

17    but let's do the jury instructions first.

18              And so you get them in writing because some

19    people would rather read while I'm talking, some people

20    would rather just listen.  So it's up to you.  And you will

21    get -- well, it's up to you how you try to absorb the

22    information.

23              So you have been sworn and I want to tell you

24    what your role as jurors is in this case.

25              Under our system of justice, the role of the

1    jury is to find the facts of the case based on the evidence

2    presented at trial.  You must decide the facts only from the

3    evidence presented to you in this trial.

4              From the evidence that you will hear and see in

5    Court, you will decide what the facts are and then apply

6    those facts to the law that I will give you in my final

7    instructions.  That is how you will reach your verdict.

8              Whatever your verdict, it is going to have to be

9    unanimous.  All of you will have to agree on it or there

10   will be no verdict.  In the jury room, then you will discuss

11   the case among yourselves, but ultimately each of you will

12   have to make up his or her own mind.  Therefore, each of you

13   has a responsibility which you cannot avoid and you should

14   do your best throughout the trial to fulfill this

15   responsibility.

16             I play no part in finding the facts.  You should

17   not take anything I may say or do during the trial as

18   indicating what I think of the evidence or about what I

19   think your verdict should be.  My role is to make whatever

20   legal decisions have to be made during the course of the

21   trial and to explain to you the legal principles that must

22   guide you in your decisions.

23             You must apply my instructions about the law.

24   Each of the instructions is important.  You must not

25   substitute your own notion or opinion about what the law is

1    or ought to be.  You must follow the law that I give you,

2    whether you agree with it or not.

3                    Perform your duties fairly and impartially.  Do

4    not allow sympathy, prejudice, fear or public opinion to

5    influence you.  You should also not be influenced by any

6    person's race, color, religion, national ancestry, gender,

7    profession, occupation, economic circumstances, or position

8    in life or in the community.

9                    So I have some important rules about your

10   conduct as jurors:

11                   One, keep an open mind.  Do not make up your

12   mind about the verdict until you have heard all of the

13   evidence and you have discussed the case with your fellow

14   jurors during your deliberations.

15                   Two, do not discuss the case among yourselves

16   until the end of the trial when you retire to the jury room

17   to deliberate.

18                   Three, during the trial you should not speak to

19   any of the parties, lawyers, or witnesses involved in this

20   case, not even to pass the time of day.  If any lawyer,

21   party, or witness does not speak to you when you pass in the

22   hall, ride the elevator, or something like that, remember it

23   is because they are not supposed to talk or visit with you,

24   either.

25                   Four, do not talk with anyone else or listen to

1    others talk about the case until the trial has ended and you

2    have been discharged as jurors.  It is important not only

3    that you do justice in this case, but that you give the

4    appearance of doing justice.  If anyone should try to talk

5    to you about the case during the trial, please report that

6    to me, through my courtroom deputies immediately.  If that

7    happens, do not discuss the situation with any other juror.

8              Five, do not discuss the case with anyone

9    outside the courtroom or at home, including your family and

10   friends.  You may, of course, tell your family or friends

11   that you have been selected as a juror in the case and you

12   may tell them how long the trial is expected to last.

13   However, you should also tell them that the judge, who

14   seemed pretty stiff and mean, instructed you not to talk any

15   more about the case and that they should not talk to you

16   about it.  The reason for this is that sometimes someone

17   else's thoughts can influence you.  Your thinking should be

18   influenced only by what you learn in the courtroom.

19             Six, until the trial is over and your verdict is

20   announced, do not read any news, or Internet stories, or

21   articles about the case, if there are any, or about anyone

22   involved with it.

23             Seven, do not use a computer, cell phone, or

24   other electronic device or other tools of technology while

25   in the courtroom or during deliberations.  These devices may

1    be used during breaks or recesses for personal use, but they

2    may not be used to obtain or disclose information about the

3    case.  You must not communicate with anyone about the case

4    by any means, including in person, over a phone, by text

5    messaging, using the Internet, or any social networking

6    website or by any other method.

7               Eight, do not do any research or make any

8    investigation on your own about any matters relating to this

9    case or to this type of case.  That means, for example, do

10   not visit any places that are mentioned, use dictionaries or

11   search the Internet for additional information about the

12   case, the parties to the case, the witnesses, the lawyers,

13   or anyone else connected to the case.  Please do not try to

14   find out information from any source outside the confines of

15   this courtroom.  It would be improper for you to try to find

16   out information on your own.

17              Nine, finally, you should not concern yourselves

18   with or consider the possible punishment that might be

19   imposed if you return a verdict of guilty.

20              During the trial it may be necessary for me to

21   talk with the lawyers out of your hearing.  If this happens,

22   please be patient.

23              I know, because it's human nature, you may be

24   curious about what we are discussing.  We are not trying to

25   keep important information from you.  These conferences are

1  necessary for me to discuss with the lawyers objections to

2  evidence and to be sure that evidence is presented to you

3  correctly under the rules of evidence.  We will, of course,

4  do what we can to keep the number and length of these

5  conferences to a minimum.

6           I may not always grant a lawyer's request for a

7  conference.  I often don't.  Do not consider my granting or

8  denying a request for a conference as suggesting my opinion

9  of the case or of what your verdict should be.

10          The trial will proceed in the following manner:

11          First, tomorrow morning, the lawyers will have

12  an opportunity to make opening statements to you.  The

13  prosecutor may make an opening statement at the beginning of

14  the case.  The Defendant's lawyers may make an opening

15  statement after the prosecutor's statement or the Defendant

16  may postpone the making of an opening statement until after

17  the Government finishes presenting its evidence.

18          The opening statements are simply an outline to

19  help you understand what each party expects the evidence to

20  show.  What is said in the opening statements is not itself

21  evidence.

22          Second, after opening statements, the Government

23  will introduce the evidence that it thinks proves the

24  charges stated in the indictment.

25          Third, after the Government has presented its

1    evidence, the Defendant may present evidence, but he is not

2    required to do so.  As I will tell you many times during the

3    trial, the Government always has the burden or obligation to

4    prove each and every element of the offenses charged beyond

5    a reasonable doubt.  The Defendant is presumed to be

6    innocent of the charges.  The law never imposes on a

7    Defendant in a criminal case the burden of proving his

8    innocence by calling any witnesses, producing any exhibits,

9    or introducing any evidence.

10           Fourth, after you have heard the evidence, I

11   will give you final instructions concerning the law that you

12   must apply to the evidence presented during the trial.

13           Fifth, after you have heard my instructions, the

14   lawyers will have the opportunity to present closing

15   arguments.  Closing arguments are designed to present to you

16   the parties' theories about what the evidence has shown and

17   what conclusions may be drawn from the evidence.  What is

18   said in closing arguments itself, though, is not evidence.

19           And sixth, after that you will retire to

20   consider your verdict and your deliberations will be secret.

21           So I mentioned evidence a number of times

22   already today.  You must make your decision in this case

23   based only on the evidence that you see and hear in the

24   courtroom.  Do not let rumor, suspicions or anything else

25   that you may see or hear outside the court influence your

1    decisions in any way.  The evidence you use to find the

2    facts basically consists of three things:  The testimony of

3    the witnesses, documents and other things that are received

4    as exhibits, and any fact or testimony that is stipulated,

5    that is formally agreed to by the parties.  And if there are

6    any stipulations, I'll tell you the first time that happens

7    so you know what it is.

8            The following things are not evidence:

9    Statements and arguments of the lawyers for the parties in

10   this case, and questions by the lawyers and questions that I

11   might ask.  You must not assume that a fact is true just

12   because one of the lawyers or I ask a question about it.  It

13   is the witness' answers that are the evidence.  Of course,

14   you may need to consider the question to know what a witness

15   means by his or her answer.  For example, if a witness

16   answers yes to a question, you will have to consider the

17   question to understand what the witness is saying.

18           Objections by lawyers, including objections in

19   which the lawyers state facts, that's not evidence.  Any

20   testimony I strike or tell you to disregard, that's not

21   evidence.  And anything you may see or hear about this case

22   outside the courtroom, that's not evidence.

23           The rules of evidence control what can be

24   received into evidence.  When a lawyer asks a question or

25   offers an exhibit into evidence, and a lawyer on the other

1    side thinks that this is not permitted by the rules of

2    evidence, that lawyer may object.  An objection simply means

3    that the party is asking me to decide whether the evidence

4    should be allowed under the rules.  Lawyers have a

5    responsibility to their clients to make objections when they

6    think evidence being offered is improper under the rules of

7    evidence.  You should not be influenced by the fact that an

8    objection is made.

9             You should also not be influenced by my rulings

10   on objections to evidence.  If I overrule an objection, the

11   question may be answered or the exhibit may be received as

12   evidence, and you should treat the testimony or exhibit like

13   any other.  I may allow evidence only for a limited purpose.

14   If I do that, I will instruct you to consider the evidence

15   only for that limited purpose, and you must follow that

16   instruction.

17            If I sustain an objection, the question will not

18   be answered or the exhibit will not be received as evidence.

19   When I sustain an objection, you must disregard the question

20   or the exhibit entirely.  Do not think about or guess what

21   the witness might have said in answer to the question; do

22   not think about or guess what the exhibit might have shown.

23   Sometimes a witness may have already answered before a party

24   objects or before I rule on the objection.  If that happens,

25   and if I sustain the objection, you should disregard the

1    answer that was given.

2            I may order that some testimony or other

3    evidence be stricken or removed from the record.  If I do

4    that, I will instruct you to disregard that evidence.  That

5    means when you are deciding the case, you must not consider

6    or be influenced in any way by the testimony or other

7    evidence that I told you to disregard.

8            Although the lawyers may call your attention to

9    certain facts or factual conclusions that they think are

10   important, what the lawyers say is not evidence and is not

11   binding on you.  It is your own recollection and

12   interpretation of the evidence that controls your decision.

13           In deciding what the facts are, you must decide

14   what testimony you believe and what testimony you do not

15   believe.  You are the sole judges of the credibility of the

16   witnesses.  Credibility refers to whether a witness is

17   worthy of belief.  You may believe everything a witness

18   says, or only part of it or none of it.

19           You may decide whether to believe a witness

20   based on his or her behavior and manner of testifying, the

21   explanations the witness gives, and all the other evidence

22   in the case, just as you would in any important matter where

23   you are trying to decide if a person is truthful,

24   straightforward, and accurate in his or her recollection.

25   In deciding the question of credibility, use your common

1    sense, your good judgment and your experience.

2            In deciding what to believe, you may consider a

3    number of factors:  The opportunity and ability of the

4    witness to see or hear or know the things about which the

5    witness testifies; the quality of the witness' knowledge,

6    understanding and memory; the witness' appearance, behavior

7    and manner while testifying; whether the witness has an

8    interest in the outcome of the case or any motive, bias or

9    prejudice; any relation the witness may have with a party in

10   the case and any effect that the verdict may have on the

11   witness; whether the witness said or wrote anything before

12   trial that is different from the witness' testimony in

13   Court; whether the witness' testimony is consistent or

14   inconsistent with other evidence that you believe; and any

15   other factors that bear on whether the witness should be

16   believed.

17           Inconsistencies or discrepancies in a witness'

18   testimony or between the testimony of different witnesses

19   may or may not cause you to disbelieve that witness'

20   testimony.  Two or more people witnessing an event may

21   simply see or hear it differently.  Mistaken recollection,

22   like failure to recall, is a common human experience.  In

23   weighing the effect of an inconsistency, you should consider

24   whether it is about a matter of importance or an

25   insignificant detail.  You should also consider whether the

1      inconsistency is innocent or intentional.

2              You are not required to accept testimony, even

3      if the testimony is not contradicted and the witness is not

4      impeached.  You may decide that the testimony is not worthy

5      of belief because of the witness' bearing and demeanor, or

6      because of the inherent improbability of the testimony, or

7      for other reasons that are sufficient to you.

8              After you make your own judgment about the

9      believability of a witness, you can then attach to that

10     witness' testimony, the importance or weight that you think

11     it deserves.

12             The weight of the evidence to prove a fact does

13     not necessarily depend on the number of witnesses who

14     testify.  What is more important than numbers is how

15     believable the witnesses are and how much weight you think

16     their testimony deserves.

17             So I've mentioned an indictment.  Let me tell

18     you about that.

19             The Government has charged the Defendant,

20     Patrick Titus, with violating federal laws.  Counts 1

21     through 14 charge the Defendant with distributing and

22     dispensing controlled substances outside the usual course of

23     professional practice and not for a legitimate medical

24     purpose.  Count 15 charges the Defendant with maintaining a

25     drug-involved premises.  The charges against the Defendant

1    are contained in the indictment.  An indictment is just a

2    formal way of specifying the exact crimes the Defendant is

3    accused of committing.  An indictment is simply a

4    description of the charges against a Defendant.  It is an

5    accusation only.  An indictment is not evidence of anything,

6    and you should not give any weight to the fact that the

7    Defendant has been indicted in making your decision in this

8    case.

9            To help you follow the evidence, I will now give

10   you a brief summary of the elements of the offenses, each of

11   which the Government must prove beyond a reasonable doubt in

12   order to convict the Defendant of the offenses charged.

13           The elements of Count 1 through 14 of the

14   indictment, distributing and dispensing controlled

15   substances outside the usual course of professional practice

16   and not for a legitimate medical purpose, that the

17   Government must prove beyond a reasonable doubt are:

18           First, that the Defendant distributed or

19   dispensed a mixture or substance containing a controlled

20   substance.

21           Second, that the Defendant distributed or

22   dispensed the controlled substance outside the usual course

23   of professional practice and not for a legitimate medical

24   purpose.

25           Third, that the Defendant distributed or

1    dispensed the controlled substance outside the usual course

2    of professional practice and not for a legitimate medical

3    purpose knowingly or intentionally.

4              And fourth, that the controlled substance was

5    the particular controlled substance or substances alleged

6    for each of Counts 1 through 14 of the indictment.

7              The elements of Count 15, maintaining a

8    drug-involved premises, that the Government must prove

9    beyond a reasonable doubt are:

10             First, that the Defendant permanently or

11   temporarily maintained or leased or used the place known as

12   Lighthouse Internal Medicine located on Church Street in

13   Milford.

14             Second, that the Defendant maintained that place

15   for the purpose of distributing or dispensing any controlled

16   substance outside the usual course of professional practice

17   and not for a legitimate medical purpose.

18             And third, that the Defendant acted knowingly.

19             What I just told you is only a preliminary

20   outline of the elements of the offenses charged.  At the end

21   of the trial, I will give you final instructions on the

22   elements of the offenses charged and on other matters of

23   law.  Those final instructions will be more detailed.  They

24   will guide you in reaching your verdict in this case.

25             So the last instruction I have basically for

today, the Defendant, Patrick Titus, has pleaded not guilty

to the offenses charged.  The Defendant is presumed to be

innocent.  He starts the trial with a clean slate, with no

evidence against him.  The presumption of innocence stays

with the Defendant unless and until the Government presents

evidence that overcomes that presumption by convincing you

that the Defendant is guilty of the offenses charged beyond

a reasonable doubt.

           The presumption of innocence requires that you

find the Defendant not guilty, unless you are satisfied that

the Government has proved guilt beyond a reasonable doubt.

The presumption of innocence means that the Defendant has no

burden or obligation to present any evidence at all or to

prove that he is not guilty.  The burden or obligation of

proof is on the Government to prove that the Defendant is

guilty, and the burden stays with the Government throughout

the trial.

           In order for you to find the Defendant guilty of

the offense charged, the Government must convince you that

the Defendant is guilty beyond a reasonable doubt.  That

means that the Government must prove each and every element

of the offenses charged beyond a reasonable doubt.  A

Defendant may not be convicted based on suspicion or

conjecture, but only on evidence proving guilt beyond a

reasonable doubt.

1          Proof beyond a reasonable doubt does not mean

2     proof beyond all possible doubt or to a mathematical

3     certainty.  Possible doubts or doubts based on conjecture or

4     speculation are not reasonable doubts.  A reasonable doubt

5     is a fair doubt based on reason, logic, common sense, or

6     experience.  A reasonable doubt means a doubt that would

7     cause an ordinary reasonable person to hesitate to act in

8     matters of importance in his or her own life.  It may arise

9     from the evidence, or from the lack of evidence, or from the

10    nature of the evidence.

11         If, after hearing all the evidence, you are

12    convinced that the Government has proved the Defendant

13    guilty beyond a reasonable doubt, you should return a

14    verdict of guilty as to that offense.  However, if you have

15    a reasonable doubt as to an element of an offense, you then

16    you must return a verdict of not guilty as to that offense.

17         So that concludes my preliminary instructions

18    and so I'm going to let you go for the day in a minute.  I

19    basically, though, wanted to say, even if you're a fully

20    vaccinated juror, wear a mask to the building because I

21    believe the practice of the building is you have to wear a

22    mask in the corridors.  As I've said, if you're a fully

23    vaccinated juror, tomorrow you can choose to take the mask

24    off in the jury box.

25         The second thing is I don't know whether -- you

1    haven't really -- the time that you've been here this

2    afternoon, the temperature has been pretty comfortable.

3    Some of you might have been here this morning and it was

4    pretty hot.  The temperature controls in this building were

5    evidently built by the lowest bidder and they're quite

6    variable and not subject to -- they're like the Titanic.

7    They go off course, they go into the iceberg.  So you may

8    want to bring, you know, some light jacket or something

9    because sometimes it gets pretty chilly.

10             On the other hand, sometimes it gets pretty hot.

11   So if you could prepare for that, that would all be good.

12             So I do intend to start tomorrow morning at

13   9:30.  In order to make that happen, the practice is I meet

14   with the lawyers at nine o'clock to make sure we've all got

15   the various things straightened out that we need to get

16   straightened out.  But your part of that is -- we can't

17   start without every single one of you -- to make sure that

18   you're here before 9:30.  I know that there is another jury

19   being picked tomorrow morning, so there's another 45 people,

20   it's a civil trial, probably going to be here.  So make sure

21   you get here in time to get through the line.

22             And lastly, every day of trial at the end of the

23   trial, I'm going to tell you don't talk to anyone about the

24   case.  Don't let anyone talk to you about the case.  That's

25   one thing.

1           And don't do any research about the case.  It

2    really is important to the system that everything you learn

3    about this case or anything connected to it, you learn in

4    this courtroom.  That's the only fair way for both sides.

5           All right.  I do want to thank all of you,

6    though I'll give you a lot more thanks in a couple weeks,

7    for being here today, and in the meantime you're free to go.

8           Maybe -- I don't know.  I guess we can go out

9    this way and through the other courtroom.  Is that -- yeah,

10   yeah.  Why don't we do that.

11          Okay.  So you're free.  Thank you.

12          DEPUTY CLERK:  Just follow me.

13          (Jury leaving the courtroom.)

14          (Discussion held off the stenographic record.)

15          THE COURT:  All right.  Have a seat for a

16   second.

17          All right.  So my impression is that the

18   Government did, in fact, do some decent slimming down of

19   this witness list that you sent in because I remember

20   Defendant said something like 45 witnesses and I did count

21   that you were at 33.  So thank you for that.

22          So you know, my expectation is that, and I'm

23   directing this to the Government because it will be your

24   burden for the next however many days, that you have enough

25   witnesses here so we don't run out before the end of the

1    day.

2              MS. REMIS:  Yes.

3              THE COURT:  And so then the other thing is so

4    we'll probably spend, based on your estimates, at least an

5    hour, maybe more doing opening statements tomorrow morning,

6    but that will still leave us about four-and-a-half hours of

7    testimony.

8              What do you have on tap for tomorrow?

9              MS. REMIS:  How many witnesses you mean, Your

10   Honor?

11             THE COURT:  Well, just who are they?

12             MS. REMIS:  Tomorrow we have Brent Hood, Amanda

13   Molesi, Megan Miller, Christine Armstrong, Marguerite

14   Lenhardt, Jeffrey Timmerman.  And we've moved Special Agent

15   Smith to Thursday morning, unless we have to start with him

16   tomorrow afternoon.

17             THE COURT:  Okay.  So that's one nurse

18   practitioner.  Did she work at Dr. Titus' practice?

19             MS. REMIS:  Yes, Your Honor.

20             THE COURT:  And the other five are like

21   patients?  Or no, I guess you said one person was the

22   Division of Professional Regulation.

23             MS. REMIS:  That's right.  We have a patient, an

24   office employee, a pharmacist, a probation officer, and --

25             THE COURT:  Oh, okay.  I guess I didn't

1    recognize the names so well, but in any event, all right.

2    Good.

3            All right.  Is there anything else?

4            So I don't know how to word this to get the

5    right answer because I don't really know what the right

6    answer is, but if we meet at nine o'clock tomorrow, is that

7    going to give us enough time to work out whatever issues

8    there might be?

9            MS. REMIS:  I think so, Your Honor.  We're

10   working out a couple evidentiary issues, as we speak.  There

11   may be some issues that we can't resolve, even though we're

12   trying.

13           Just to preview for the Court, one of them is

14   related to the transcripts.  We've significantly,

15   significantly slimmed down.  There's only like five excerpts

16   total, and so we're just having some discussions about rule

17   of completeness.  So we may need Your Honor to weigh in on

18   some of those.

19           THE COURT:  Okay.  I can probably do that.

20           MS. REMIS:  And then just a couple other pretty

21   straightforward objections to some of the exhibits on our

22   list, I think, but we're trying to work them out, Your

23   Honor.

24           THE COURT:  Okay.  Well, I appreciate that.

25           Thank you, Ms. Remis.

 1                    Is there anything the Defendant has on its mind

 2      at this time?

 3                    MS. KOUSOULIS:  Not at this time, Your Honor.

 4                    THE COURT:  Okay.  Well, listen, thank you for

 5      your cooperation today.  I think it's a great thing that we

 6      managed to get this jury picked today, and you all had

 7      something to do with that.  So I'll see you tomorrow morning

 8      at nine o'clock in this courtroom and have a good evening.

 9                    (Everyone said, Thank you, Your Honor.)

10                    DEPUTY CLERK:  All rise.

11                    THE COURT:  You're free to go.

12                    (Court was recessed at 4:08 p.m.)

13                    I hereby certify the foregoing is a true and

14      accurate transcript from my stenographic notes in the

15      proceeding.

16                        /s/ Heather M. Triozzi
                          Certified Merit and Real-Time Reporter
17                        U.S. District Court

18

19

20

21

22

23

24

25