```
 1                  IN THE UNITED STATES DISTRICT COURT

 2                     FOR THE DISTRICT OF DELAWARE

 3

 4    UNITED STATES OF AMERICA,   )
                                  )
 5               Plaintiff,       )
                                  ) Criminal Action No. 18-45-RGA
 6    v.                          )
                                  ) Trial Volume II
 7    PATRICK TITUS,              )
                                  )
 8               Defendant.       )

 9
                                      J. Caleb Boggs Courthouse
10                                    844 North King Street
                                      Wilmington, Delaware
11
                                      Wednesday, July 7, 2021
12                                    9:00 a.m.
                                      Jury Trial
13

14
      BEFORE:  THE HONORABLE RICHARD G. ANDREWS, U.S.D.C.J.
15

16    APPEARANCES:

17               U.S. DEPARTMENT OF JUSTICE - CRIMINAL DIVISION
                 BY:  ALEZA S. REMIS, ESQUIRE
18               BY:  CLAIRE SOBCZAK, ESQUIRE
                 BY:  JUSTIN WOODARD, ESQUIRE
19
                                      For the Plaintiff
20
                 OFFICE OF THE FEDERAL PUBLIC DEFENDER
21               BY:  ELENI KOUSOULIS, ESQUIRE

22                       -and-

23               THE BOSTIC LAW FIRM
                 BY:  EDSON A. BOSTIC, ESQUIRE
24
                                      For the Defendant
25
```

```
 1                 ***  PROCEEDINGS  ***

 2                 THE COURT:  All right.  Please be seated.  So

 3      the first order of business is if you're fully vaccinated,

 4      you don't have to wear your mask.  And so I am fully

 5      vaccinated, but I nevertheless wore it down for old times'

 6      sake.

 7                 All right.  So...

 8                 MS. KOUSOULIS:  Sorry.

 9                 THE COURT:  And, yeah, let me actually just set

10      up because one thing, since it's not my courtroom, I'm

11      trying to be able to be in communication with people I need

12      to be in communication with.  And it seems to be working.

13      Okay.

14                 All right.  So are there any things you want to

15      discuss before we go to openings at 9:30?

16                 MR. WOODARD:  Yes, Your Honor.  Good morning.

17      Justin Woodard.  On the issue of the excerpts of the two

18      interviews --

19                 THE COURT:  Yes.

20                 MR. WOODARD:  -- of Dr. Titus, the parties have

21      been working diligently and have agreed on six excerpts

22      where both parties are good with the highlights.

23                 THE COURT:  Okay.

24                 MR. WOODARD:  So the Government's working on

25      cutting those recordings.  The Defense offered some changes
```

1   to the transcript itself where there was typos and things,

2   and we'll work through that today --

3                THE COURT:  Okay.

4                MR. WOODARD:  -- to make sure that's done in

5   time.  My understanding is there's just one remaining

6   dispute.

7                There are two transcripts, one from 2015, one

8   from 2018.  The Government has decided not to introduce any

9   of Dr. Titus' statements from the 2018 interview.

10                THE COURT:  Okay.

11                MR. WOODARD:  The Defense has requested,

12   however, to add some of those statements under the rule of

13   completeness; although, we're talking about three years

14   later in an interview that the Government doesn't introduce.

15   So our position is that should not be included, Your Honor.

16                THE COURT:  Yeah, which way -- who wants to say

17   the rule of completeness includes something that happened

18   three years differently?

19                MS. KOUSOULIS:  Well, Your Honor, it's to

20   conceptualize what's in the other -- other interview.  Like

21   they talk about drug testing, they talk about certain things

22   in both interviews, and it gives answers regarding similar

23   questions.  And so, in our mind, Your Honor, under the rule

24   of completeness, we -- it's required that -- that any --

25   that the statements relating to that topic since -- you

1    know, would come in.

2             THE COURT:  No, it's to -- the rule of

3    completeness is to understand what was said in 2015.  So if

4    the -- and that's based on the context of the 2015.  You

5    know, if Dr. Titus issued a statement yesterday saying let

6    me explain what happened in 2015, you wouldn't be here

7    saying, oh, yeah, okay, rule of completeness, that comes in.

8             MS. KOUSOULIS:  Your Honor, we would -- we would

9    submit that under the rule of completeness, one thing is,

10   yes, to explain the admitted portion, but it's also to place

11   the admitted portion in context, to avoid misleading the

12   trier of fact, and ensure a fair and impartial

13   understanding.

14            And it's like they asked him, like, the same

15   questions three times, and they just picked the answer --

16   you know, related to the same topic, just picked the answer

17   that they liked.  I don't think that's fair to Dr. Titus,

18   and I don't think that's, you know, what the rule requires.

19   I think the rule, in order to conceptualize it, you know,

20   requires basically his complete answer.

21            That would -- that would allow the Government to

22   ask, like, the same question six different ways, you know,

23   and then just pick whichever answer they like the best.

24            THE COURT:  Well, perhaps that's what is

25   allowed, but I do not believe there is any authority for

1       saying that something that was said three years ago

2       differently comes in under the rule of completeness.  I

3       don't think that's what the rule is -- and even the part,

4       what you just quoted, that's to put a statement made in

5       2015, you know -- you know, if he said something there, you

6       needed some other sentence in the nearby vicinity to, you

7       know, contextualize, that would be one thing.

8                    But so anyway --

9                    MS. KOUSOULIS:  Your Honor, I would submit that

10      there's a Middle District of Pennsylvania, *Layton vs. United*

11      *States* that indicated Rule 106 prohibits a party from

12      misleading the trier of fact by stripping statements of

13      their appropriate context or cherry-picking only favorable

14      testimony within a particular document.  Now, yes, that was

15      talking about within a particular document --

16                   THE COURT:  Yes.

17                   MS. KOUSOULIS:  -- but I think it can be

18      extrapolated, you know, with regard to Dr. Titus having the

19      right to introduce additional portions of his statement that

20      are explanatory and relevant and relate to the same topic

21      that the Government is trying to introduce.

22                   THE COURT:  All right.  Well, I overrule your

23      objection.

24                   All right.  So that's it in terms of disputes

25      this morning?

1          MS. KOUSOULIS:  No, Your Honor, there's another

2     with regard to the exhibits.  Exhibits -- there are certain

3     exhibits the Government wants to introduce that are pictures

4     of the 14 patients that are in the indictment.  We just

5     don't under -- I guess we don't understand the relevance of

6     introducing pictures.

7          I mean, the patients are going to testify.

8     There will be live witnesses and the jury can see them.

9          But in terms of introducing the pictures,

10    especially in our mind, the pictures are somewhat

11    prejudicial in the sense that they're not the most

12    flattering pictures, you know.  And the Government is going

13    to be alleging some of these patients are drug addicts, you

14    know.  And to allow them to introduce pictures without the

15    witnesses, you know, being here or even with the witnesses

16    being here, I think it inflames the passion of the jury to

17    invoke sympathy, and it's just not relevant or needed.

18          THE COURT:  I understand your objection there.

19          MS. SOBCZAK:  Your Honor, these are pictures of

20    the 14 patients with counts that were charged in the

21    indictment.  The pictures presented in the exhibit list are

22    pictures that were taken that were contemporaneous with the

23    time that Dr. Titus was treating this patient.

24          We will be seeking testimony regarding what

25    patients looked like when they came into Dr. Titus' office.

1   And, also, this is what -- this is directly probative of

2   what was charged in the indictment.  The appearance of these

3   patients is in no way gruesome or offensive.  And under the

4   case law --

5            THE COURT:  No.  I think the objection is

6   just -- is irrelevant, not that it's -- well, maybe she said

7   prejudicial, but clearly I don't really see how there could

8   be any unfair prejudice, and -- but your proffer about

9   relevance is this is a picture that, at least at some point

10  during the relevant time period, of what they looked like,

11  and what they looked like is part of what Dr. Titus should

12  have taken into account.

13           MS. SOBCZAK:  That's correct, Your Honor.  This

14  is how they appeared when they came into the office and --

15           MS. KOUSOULIS:  Your Honor --

16           THE COURT:  So I get that.  What do you have to

17  say?

18           MS. KOUSOULIS:  Your Honor, we don't know --

19  we've been provided nothing in terms of who took the

20  pictures, when exactly they were taken, what witness they're

21  planning on introducing them through.  So until the proper

22  foundation is laid, we would ask that they not --

23           THE COURT:  Well, that's a different objection.

24  I take it you have a plan -- at least some of these people

25  are probably going to identify pictures of themselves, but

1    are you confident that there's going to be a foundation that

2    each of these pictures represented an accurate depiction of

3    them at some point during this year and a half?

4              MS. SOBCZAK:  We will seek that testimony from

5    the patients who are unavailable to testify -- or I'm

6    sorry --

7              THE COURT:  Maybe the ones who are available

8    more likely, yes.

9              MS. SOBCZAK:  Yes.  Yes, Your Honor.

10             THE COURT:  Sorry.

11             MS. KOUSOULIS:  And then if we could -- like,

12   who took the pictures?  Like, I guess we're trying to figure

13   out how they got the --

14             THE COURT:  Well, who took them is irrelevant.

15   If somebody identifies, yes, this is what so-and-so looked

16   like at the time.

17             MS. KOUSOULIS:  So --

18             MS. SOBCZAK:  And also, Your Honor, just to

19   clarify, the pictures were taken either for driver's

20   licenses or as part of police department photos.

21             THE COURT:  Oh, well, that will probably help

22   identify what time we're talking about.

23             MS. KOUSOULIS:  And but, Your Honor, again, it

24   doesn't necessarily show that that's what they looked like

25   at the time, unless they were pictures that were taken

1    during the time period when they were in Dr. Titus' office.

2    People can change, from one day to the next, their

3    appearances.

4              THE COURT:  Well, and that goes to the weight.

5    So based on the proffer, which strikes me that driver's

6    license photos and police arrest photos or which at least is

7    what I assume these are, they are easily identifiable or

8    should be easily identifiable to show the foundation that

9    it's during the relevant time period.  And you know, in the

10   end, how probative that is, that's kind of a weight question

11   and a good subject for cross-examination.

12             So I'll permit the pictures.

13             MS. SOBCZAK:  Thank you, Your Honor.

14             THE COURT:  All right.  Anything else?

15             MS. KOUSOULIS:  Your Honor, just with regard --

16   I believe, there was -- and the witness is not testifying

17   today, but with regard to Dr. Raziano's testimony, Your

18   Honor, there is a -- you had ruled that the complaints that

19   the doctors made were not admissible.  Dr. Raziano's

20   complaint was contained within Lisa Parsons' patient file,

21   and so the Government intends to introduce it.

22             But I think the same reasons you had excluded it

23   to begin with, the fact that it's in a doctor's patient

24   file, I don't think that changes the prejudicial value of

25   it, or the hearsay that's contained in it, or any of the

 1   other reasons that Your Honor has already ruled it's not

 2   admissible.

 3             THE COURT:  Is it possible to say when it was

 4   placed in the file?

 5             MS. KOUSOULIS:  I don't believe so, Your Honor.

 6             MS. REMIS:  I don't believe so -- well, there's

 7   no date on the actual -- what it is, Your Honor, is there's

 8   an email attached to the complaint, so it's --

 9             THE COURT:  So the email is from somebody to

10   Dr. Titus' office?

11             MS. REMIS:  No, the email is from Dr. Raziano to

12   the State, and it describes what the issue was with

13   Ms. Parsons.  And then the email above it, you can see that

14   it was forwarded from somebody to the State investigator on

15   January 23rd.  The page following that -- that page in the

16   patient file is a discharge letter from Dr. Titus dated

17   January 23rd that refers to the subject matter of the

18   complaint.

19             So we know, at least inferentially, that by the

20   time he wrote this discharge letter, he knew of the subject

21   matter of the complaint, which is next to it in the patient

22   file.

23             THE COURT:  So, basically, the email that

24   started this is maybe two weeks before Dr. Titus discharges

25   this particular patient from his practice?

1            MS. REMIS:  My recollection, Your Honor, is that

2     the email from Dr. Raziano, the complaint to the State, is

3     on January 10th, 2014, and it's forwarded from somebody to

4     the State investigator on January 23rd.  And that's what's

5     in the file, the complaint, the email part.

6            THE COURT:  So what, the complaint is like

7     essentially closing the file because the person is no longer

8     a patient?

9            MS. REMIS:  Essentially.  There's a discharge

10    letter the next page over on the same date, January 23rd.

11           MS. KOUSOULIS:  I think that's an assumption.

12    We're not arguing -- we're not saying Dr. Titus didn't have

13    notice of the complaint that --

14           THE COURT:  No, no. I think I get what the issue

15    is.

16           Well, so my view is that just because Dr. Titus

17    or somebody on the staff stuck it in the file, it doesn't

18    really change the underlining rationale of why I excluded

19    the attached portions in the first place is because sticking

20    them in a file isn't Dr. Titus going, Oh, yeah, that's true.

21    I mean, it's -- so I think that should be excluded from the

22    file.

23           MS. REMIS:  Yes, Your Honor.  Is it okay if we

24    just redact that page because it's --

25           THE COURT:  When you say "redact that page,"

 1    you're talking about the email page or the --

 2              MS. REMIS:  Oh, you know what, we're not going

 3    to show it.  And then we'll -- we'll remove it from the

 4    patient file, that the paper is going to go back to the

 5    jury.  Is that --

 6              THE COURT:  Okay.  Well, make sure -- talk to

 7    Ms. Kousoulis and make sure that you all are on the same

 8    page, but I think you are.  But make sure that you are.

 9              MS. REMIS:  Okay.

10              MS. KOUSOULIS:  That's fine, Your Honor.

11              MS. REMIS:  Thank you, Your Honor.

12              THE COURT:  Anything else?

13              MS. KOUSOULIS:  I think that's all for right

14    now.

15              MS. REMIS:  Oh, one other housekeeping question.

16              THE COURT:  Sure.

17              MS. REMIS:  We have a few agents in here.

18    Diversion Investigator Linda Eleazer is not testifying.

19              MS. KOUSOULIS:  Wait.  I'm sorry.  I was telling

20    him --

21              MS. REMIS:  Oh, sorry.  So she's sitting here.

22              But then we have Special Agent Jeremy Smith,

23    who's sitting in the second row right there, who we

24    anticipate calling on Thursday.  And Special Agent Bill

25    McDonald from -- formerly of HHS, now of FDA, who is --

1           THE COURT:  Well, you get one case agent and

2    that person is not sequestered.

3           MS. REMIS:  Okay.

4           THE COURT:  Just because -- are you Ms. Eleazer?

5           MS. ELEAZER:  Yes, sir.

6           THE COURT:  Okay.

7           Well, so she's not your case agent, she's just

8    sitting there for whatever reason, and you're not

9    expecting -- are you expecting to call her?

10          MS. KOUSOULIS:  We may expect to call her as a

11   witness, so we would ask that -- again, if she's the case

12   agent, then -- like you said, that she could designate her

13   as the case agent.

14          THE COURT:  Well, and so it's obviously up to --

15          MS. KOUSOULIS:  Correct.

16          THE COURT:  -- to pick whoever it is, one of

17   these three people, or however many, to be the case agent.

18          MS. KOUSOULIS:  All these three witnesses are

19   potential witnesses for us, even if the Government doesn't

20   call them.

21          THE COURT:  Well, and at least the Government

22   has got two of them on the witness list.  But if you're

23   representing in good faith, as I assume you are, that

24   Ms. Eleazer is a possible witness for you, that's fine.  So

25   they can stay and watch the opening statements, but once we

1   start the testimony, only one of the three can stay.

2          MS. KOUSOULIS:  And Your Honor, that's fine.

3   And the last thing is with regard to the issue we brought up

4   yesterday with regard to the tape, the undercover

5   recording --

6          THE COURT:  Yes.

7          MS. KOUSOULIS:  -- we didn't really get much

8   more clarification other than the officer that was involved

9   in it doesn't remember anything, didn't take any notes,

10  doesn't know anything, doesn't know who else was with her.

11  But we would ask that anyone that was on the Task Force at

12  the time be -- those names be provided to us and be -- and

13  so we can, you know, subpoena everyone that was involved so

14  we can try to get some answers.

15         THE COURT:  What do you say to that?

16         MS. REMIS:  I just want to clarify that we

17  provided all of the information that we --

18         THE COURT:  No, no.  I get that.  What I think

19  Ms. Kousoulis is saying is that all the information that is

20  available in the file, in order to make use of this, she'd

21  like to be able to do some more exploration so she has a

22  thought as to how one could do that.

23         And maybe what you're saying is -- because I'm

24  sure DEA could actually say who was on the Task Force at the

25  time.  And, you know, even though they seem to have nothing

1    to do with this.

2             So unless you have some good reason, if you

3    could get from DEA who they are and provide, you know, the

4    names of the officers who were on the Task Force, and

5    Ms. Kousoulis can take it from there.

6             MS. REMIS:  Sure.

7             MS. KOUSOULIS:  Including who was the supervisor

8    of the Task Force.

9             THE COURT:  Well, I'm sorry.  Too many people

10   talking at once.

11            MS. KOUSOULIS:  Sorry.

12            THE COURT:  Are you saying and the supervisor of

13   the Task Force or are you just saying the supervisor?

14            MS. KOUSOULIS:  No, including all the people on

15   the Task Force.

16            THE COURT:  Okay.  Well, the supervisor usually

17   is considered to be part of it, but okay --

18            MS. KOUSOULIS:  Correct.

19            THE COURT:  -- and the supervisor.

20            MS. KOUSOULIS:  Thank you, Your Honor.

21            MS. REMIS:  Yes, Your Honor.  We will provide

22   her a list.  And they've all been called yesterday to find

23   out what happened.

24            THE COURT:  Okay.

25            MS. REMIS:  And I notified Ms. Kousoulis of

1    their response, which was essentially they don't remember,

2    but I will be happy to provide the names.

3                    THE COURT:  Okay.

4                    MS. REMIS:  Thank you.

5                    THE COURT:  Anything else?

6                    MS. KOUSOULIS:  No, Your Honor.

7                    MS. REMIS:  No, nothing.

8                    THE COURT:  Okay.  All right.

9                    Well, I guess we'll take a short recess until

10   9:30.

11                   Ms. Remis, are you doing the opening for your

12   side?

13                   MS. REMIS:  No, I'm not.  Mr. Woodard is.

14                   THE COURT:  Okay.  Mr. Woodard.

15                   And who's doing it for your side?

16                   MS. KOUSOULIS:  I am, Your Honor.

17                   THE COURT:  Okay.

18                   All right.  Well, we'll be -- are you still in

19   the 15-to-20-minute range?

20                   MR. WOODARD:  Yes, sir.

21                   THE COURT:  Okay.  And you --

22                   MS. KOUSOULIS:  Similarly.  About 15 minutes.

23                   THE COURT:  Oh, really?  Okay.  Well, then, once

24   you're done, you'll just call your first witness?

25                   MR. WOODARD:  Yes.

```
 1                    THE COURT:  Okay.  All right.  I will be back in
 2      15 minutes.
 3                    DEPUTY CLERK:  All rise.
 4                    (Recess was taken.)
 5                    DEPUTY CLERK:  All rise.
 6                    MS. KOUSOULIS:  Your Honor, Mr. Bostic needed to
 7      use the restroom.  He'll be right back.
 8                    THE COURT:  Yeah, yeah.  I came in early because
 9      the jury is all here, and so they're ready to go.  But,
10      obviously --
11                    MS. KOUSOULIS:  We're ready as soon as he gets
12      back.
13                    THE COURT:  Yeah.  There's no worries.
14                    All right.  Are we ready now?
15                    MR. WOODARD:  Yes, Your Honor.
16                    MS. KOUSOULIS:  Yes, Your Honor.
17                    THE COURT:  Okay.  So let's get the jury.
18                    I'm sorry.  The gentleman in the yellow tie,
19      would you mind moving back two rows or moving somewhere else
20      not to crowd the jury too much?
21                    And I'm sorry, sir, Agent, could you just move
22      back at least one row?  I'm trying to keep the jury from
23      being too crowded.
24                    (Jury entering the courtroom.)
25                    THE JUROR:  Same seats as yesterday?
```

1                   THE COURT:  Yes, same seats.

2                   All right.  So everyone be seated.  Members of

3     the jury, when you walk in, you can just sit.  You don't

4     have to wait for any instructions.  Basically, the parties

5     stand when you're coming in just out of respect for your

6     function, but you make yourselves comfortable once you get

7     in.

8                   All right.  So I think we're ready for opening

9     statements.

10                  Mr. Woodard.

11                  MR. WOODARD:  Yes, Your Honor.  Thank you.

12                  Good morning, ladies and gentlemen.  Chasity

13    Calhoun, which was 17 years old when she became a patient of

14    the Defendant, Patrick Titus, a medical doctor.  Just months

15    after her first appointment, the Defendant was prescribing

16    her dangerous combinations of an opioid, Adderall, a

17    stimulant, and a muscle relaxer.  Hundreds of pills each

18    month.

19                  By the age of 21, the Defendant was prescribing

20    Ms. Calhoun OxyCodone, an even stronger opioid.  Ms. Calhoun

21    quickly became addicted to the opioids that the Defendant

22    was prescribing.

23                  The Defendant kept prescribing her these pills

24    over and over, like clockwork.  Over the years, ladies and

25    gentlemen, the Defendant prescribed Ms. Calhoun over 4,000

1    Oxycodone pills.  4,000 Oxycodone pills.  And all the while,

2    Ms. Calhoun was addicted.  The evidence will show that the

3    Defendant knew, but continued to prescribe month after

4    month, year after year.

5              Ladies and gentlemen, this case is about a

6    doctor who became a drug dealer.  In just over one year, the

7    Defendant distributed over one million opioid pills to his

8    patients, and he brought in over $1 million to his clinic.

9              The evidence will show that he distributed these

10   opioids to patients who were using illicit street drugs,

11   patients who suffered from addiction, patients who woke up

12   in the emergency room from an overdose.

13             You'll hear that the waiting room at his clinic

14   was full.  You'll hear that patients waited hours and hours

15   to get their prescriptions.  And you'll hear that he got

16   paid cash almost every time he dealt a prescription for

17   these opioids.  Up to 180 bucks a pop, 40 or more patients a

18   day.

19             You do the math, ladies and gentlemen.  You'll

20   learn that he profited when patients suffered.  And you'll

21   learn that he knew better.

22             The evidence will show that the Defendant, a

23   self-proclaimed pain management doctor, did not actually

24   treat pain.  Instead, the evidence will show that over and

25   over the Defendant simply wrote a prescription for high

1    doses of the same opioid drugs.

2            The drug-dealing operation in this case took

3    place at a medical clinic down in Milford called Lighthouse

4    Internal Medicine.  The Defendant, Patrick Titus, was the

5    only doctor at the clinic.  As the only doctor, the owner,

6    the boss, he saw every patient who came in, sometimes 40 or

7    more patients a day.

8            And the evidence will show that even though the

9    Defendant was not a pain management specialist, he

10   prescribed nearly all of his patients opioids, Oxycodone,

11   and Oxycontin pills, Methadone, Morphine pills, Fentanyl

12   patches.  And you'll see that he often prescribed these

13   patients multiple types of these addictive drugs at the same

14   time.

15           Now, let's take a step back for a minute.  A

16   medical doctor can prescribe opioids to his or her patients

17   when the patient legitimately needs it.  During the course

18   of this trial, you'll learn about the circumstances when

19   prescribing these opioid drugs could be appropriate, when it

20   could be legitimate.  And you'll hear that some of his pain

21   patients came to the clinic in pain.  But you'll also hear

22   that prescribing opioids to patients who are suffering from

23   addiction, who overdosed on these drugs, or who month after

24   month demonstrate that they aren't actually taking the drugs

25   is not appropriate.  It has no legitimate medical purpose.

1          And ladies and gentlemen, intentionally

2     prescribing drugs with no legitimate medical purpose is

3     illegal.  It is drug dealing, plain and simple.

4          The evidence will show that the vast majority of

5     the prescriptions the Defendant issued from Lighthouse

6     Internal Medicine for opioid drugs had no legitimate medical

7     purpose and were far outside the course of medical practice.

8          During this trial, you'll learn that the

9     Defendant rarely counseled patients about the dangers of

10    opioids.  He rarely recommended alternative treatments like

11    physical therapy or seeing a specialist.  He rarely referred

12    patients who were clearly struggling from addiction to detox

13    or rehab.  He rarely provided legitimate medical care

14    designed to wean patients off the drugs he prescribed.

15    You'll learn that some patients may have come in pain, but

16    they left in more pain.  You'll learn that the Defendant's

17    medical practice, Lighthouse Internal Medicine, was nothing

18    more than a sham, a drug-dealing operation dressed up as a

19    doctor's office.

20         So here's how his operation at Lighthouse

21    worked.  Almost every morning around 6:00 a.m., the doors

22    were unlocked at the clinic.  By that time, there were

23    people already waiting in the parking lot for the clinic to

24    open.  When it did, they flooded the reception area, hoping

25    to be first in line so they could get in, get a

1    prescription, and get out.

2              The evidence will show that it was an assembly

3    line of prescriptions for cash, that many of these patients

4    walked into a medical office with a wad of cash and got

5    prescriptions for drugs.  Cash for drugs.

6              During this trial, you'll see the cash receipts.

7    You'll see the patient charts for the Defendant's purported

8    evaluations of these patients.  These are almost carbon

9    copies of one another, showing no meaningful medical

10   treatment had been provided.  Simply pages and pages of

11   boilerplate copied notes.

12             You'll also see the prescriptions he wrote them,

13   the Oxycodone, the Oxycontin, the Fentanyl patches, as well

14   as dangerous combinations of these and other drugs.

15             You'll also hear from several of these patients

16   in this trial, and you'll learn specifically about 14 of

17   them.  The 14 patients whose prescriptions form the basis of

18   Counts 1 through 14 of the indictment.

19             Ladies and gentlemen, you'll hear from Brent

20   Hood, a patient who suffered from addiction and went to the

21   Defendant to get his fix.  He'll tell you how he showed up

22   each month at the Defendant's office, sometimes in obvious

23   withdrawal, because he had run out of his pills early,

24   shaking, sweating, irritable.  In exchange for $155 cash,

25   the Defendant gave Mr. Hood prescription after prescription

1    for Oxycodone and Methadone, both opioids.  Mr. Hood will

2    describe the Defendant's clinic as a revolving door,

3    patients constantly cycling in and out to get their pills

4    and hand over their cash.

5           You'll learn that one night Mr. Hood was dropped

6    off at the emergency room passed out from a drug overdose.

7    At the ER, he was put on a breathing tube because he could

8    not breathe on his own.  He had opioids, cocaine, and other

9    drugs in his system.  But when he got out of the hospital a

10   couple days later, he went back to see the Defendant almost

11   immediately.  And what did Dr. Titus do?  The evidence will

12   show that the Defendant dealt Mr. Hood more of the same

13   pills, Oxycodone and Methadone, knowing that Mr. Hood had

14   just overdosed days before.

15          You'll also hear from Ms. Calhoun.  She'll tell

16   you about her first appointments with the Defendant, when

17   she was just a teenager, that she had never abused drugs

18   before she saw the Defendant, but that she became addicted

19   to the opioids the Defendant prescribed her.  And soon she

20   was hooked.  She'll tell you that even though she had

21   Medicaid, the Defendant wouldn't accept her insurance.  So

22   she sold pills on the street just to pay for her monthly

23   fix.  The evidence will show that these patient stories were

24   not unique, ladies and gentlemen.

25          You'll also hear about some of these patients,

 1    including the "backdoor patients."  Patients who had the

 2    Defendant's personal cell phone number, patients who got to

 3    cut the line of other patients waiting to see the doctor.

 4           You'll hear about Lucille Moody and Delores

 5    Perry and others.  Patients who, despite failing their drug

 6    tests repeatedly, wouldn't get discharged.  Or if they got

 7    discharged, they kept coming back, and the Defendant kept

 8    writing their prescriptions.  Because the evidence will show

 9    that these were "special patients," patients who had

10    personal relationships with the Defendant.

11           You'll also hear from emergency room doctors who

12    had to treat the Defendant's patients from suffered

13    overdoses.  One of these patients, Lisa Parsons, showed up

14    in the emergency room with Fentanyl patches stuck all over

15    her body.  These are not Band-Aids.  These are long-lasting

16    potent opioids, up to a hundred times the strength of

17    Morphine, stuck on this patient's body.

18           But after Ms. Parsons' release from the ER, what

19    did the Defendant keep prescribing?  Opioids.

20           You'll hear from a Probation Officer who was

21    responsible for supervising one of the Defendant's patients

22    who had gotten into trouble.  She was not a doctor, but it

23    was obvious to her that this patient suffering from

24    addiction should not have been getting the amount of opioid

25    pills the Defendant kept prescribing.  You'll hear how she

1    actually called the doctor to raise her concerns.

2              But what did he do?  The evidence will show that

3    the Defendant mocked her when she questioned the

4    prescribing.  He asked if she was the doctor instead of him.

5              You'll also hear from pharmacists who refused to

6    fill the Defendant's prescriptions.  These pharmacists were

7    concerned that the opioids were not for a legitimate medical

8    purpose, that they were not in the patient's best medical

9    interest.  They refused to fill his prescriptions.

10             You must be asking why, why did the Defendant

11   keep prescribing?  Because the evidence will show for that

12   many of the pain patients who walked through the door, the

13   defendant charged 150, 175, $180 in cash per patient per

14   month.  You'll learn that all this cash for pills added up

15   to thousands of dollars a day, and his clinic brought in

16   over a million dollars in just about a year.  You'll hear

17   how the Defendant was planning his retirement with all this

18   money.

19             Now, the evidence will show that the Defendant

20   knew exactly what he was doing when prescribing these pills

21   in exchange for cash.  He was the only doctor, the one with

22   the medical license, and he was in charge.

23             The evidence will show that he knew about the

24   risks of addiction.  He knew how to appropriately and

25   legitimately prescribe those opioids.  And it didn't take a

1    doctor to know that the Defendant was prescribing to people

2    who were abusing their drugs or selling their drugs or

3    suffering from addiction.

4           How did he know?  For one, you'll hear about

5    drug tests.  What does it mean if a patient fails a drug

6    test?  These tests are designed to tell the doctor that,

7    when a patient is abusing their drugs or taking illegal

8    drugs or possibly selling their pills.

9           You'll learn that the Defendant's employees

10   flagged these failed drug tests for the Defendant.  They

11   literally put sticky notes on the files.  They circled, they

12   highlighted these failed drug tests for the doctor.  But

13   when faced with these failed drug tests and other warnings,

14   the Defendant kept on prescribing the same opioids.

15          He wrote thousands of prescriptions for opioids

16   to patients who had failed their drug tests, including his

17   go-to, Oxycodone 15, 150 or more pills a month.  Each

18   prescription meant more money.  And when the Defendant

19   warned his patients about these failed drug screens or

20   discharged them, the evidence will show he didn't follow

21   through.  You see his warning letters notifying patients

22   that it was their first and only notice.  But time after

23   time, warning sign after warning sign, the Defendant

24   continued prescribing the same opioids.

25          And even after finally discharging a patient,

1    the evidence will show that the Defendant prescribed those

2    persons the same opioids and the same quantities to a person

3    who's no longer a patient.

4              So it's no surprise, ladies and gentlemen, that

5    some of the patients liked Dr. Titus, that they thought he

6    was a nice guy.  Remember that the Defendant was writing

7    prescriptions for drugs that some of them wanted.

8              But you'll hear that a doctor's job is not to

9    please his patients and give them what they want or get them

10   to like him and be friends.  No.  The Defendant's job was to

11   prescribe these opioids when it was for a legitimate medical

12   purpose, when it was in the patient's best medical interest,

13   not to get patients addicted.

14             You may also learn that some of the patients

15   were less than truthful with Dr. Titus.  They didn't tell

16   him that they snorted their Oxycodone or they sold their

17   pills on the street.  But this case is not about the

18   patients' choices.  This case is about what the Defendant

19   knew when he prescribed over one million opioids in just

20   about a year.  That's about how the Defendant took advantage

21   of vulnerable people for his own personal gain.

22             Ladies and gentlemen, over the next few days,

23   you will hear evidence that proves beyond a reasonable doubt

24   that the Defendant ran a drug-dealing operation dressed up

25   as a medical clinic, and that he dealt drugs to 14 specific

1    patients, drugs that caused addiction, drugs that caused

2    withdrawal, and drugs that caused more pain.

3              At the end of this trial, we will stand before

4    you and ask you to hold the Defendant responsible for his

5    choices and the devastation and pain he caused, and find him

6    guilty on all charges.

7              Thank you very much.

8              THE COURT:  Thank you, Mr. Woodard.

9              Ms. Kousoulis.

10             MS. KOUSOULIS:  May it please the Court.

11             The Government, in an effort to prove up their

12   case, sent an undercover agent to Dr. Patrick Titus' medical

13   office in September of 2014, in an attempt to get Dr. Titus

14   to improperly prescribe opioids to a patient who did not

15   need them.

16             Using an undercover agent in this capacity is a

17   standard investigative tool in cases where the Government

18   believes that a doctor is unlawfully prescribing opioids

19   outside the normal course of medical practice.  However, the

20   result in this case showed to the contrary.  Dr. Titus shut

21   the efforts of the undercover agent down.  He declined to

22   take her on as a patient.

23             The Government's efforts in attempting to use an

24   undercover agent to get Dr. Titus to prescribe illegally was

25   a bust.  And the evidence will show that the reason for this

1    is that Dr. Titus was not operating a medical practice where

2    he was prescribing opioids outside the normal course of

3    medical practice.

4              Good morning, ladies and gentlemen.  My name is

5    Eleni Kousoulis, and I, along with Edson Bostic, represent

6    Dr. Patrick Titus.  Seated with us at counsel table is our

7    computers systems analyst, Andy Marek.

8              At the outset, I'd like to caution you that what

9    the Government just told you is not evidence.  It's what the

10   Government hopes to prove.  Evidence will come from the

11   testimony of the witnesses who take that stand.  And you, as

12   jurors, have the power to believe all, some, or none of that

13   testimony.

14             It is not a crime for a licensed medical

15   practitioner to write a prescription for a controlled

16   substance if there is a legitimate medical purpose for such

17   a prescription, or if the doctor has a good faith belief

18   that the prescription is being written for a legitimate

19   medical purpose.  The evidence will show that the

20   prescriptions Dr. Titus wrote were written in good faith for

21   treatment of his patients' chronic pain, which was a

22   legitimate medical purpose.

23             The evidence will show that the Government is

24   overreaching in this case.  Listen closely to the evidence.

25   The evidence in this case will be twisted by the Government.

1          The Government just told you about a patient

2    named Brent Hood.  He told you how you will hear that Brent

3    Hood overdosed on opioids and cocaine, and that immediately

4    following his -- his release from the hospital, that

5    Dr. Titus prescribed him Oxycodone and methadone.

6          But what he didn't tell you is that the treating

7    physician at the hospital, Dr. Michael Sweeney, who prepared

8    the discharge summary for Mr. Hood, included in his

9    discharge instructions that Mr. Hood could start back on his

10   Methadone, ten milligrams twice a day, and his Oxycontin,

11   15 milligrams a day.  And instructed him that he was not

12   going to write prescriptions for him, but that he should

13   follow up with Dr. Titus with regard to that.

14         In addition, the Government also will ask you to

15   convict Dr. Titus because they believe he was prescribing

16   controlled substances without doing proper examinations and

17   without reviewing appropriate files or medical -- or medical

18   records.  But yet they will also ask you to credit and

19   accept the testimony of pharmacists who concluded that

20   patients that brought in prescriptions were not in need of

21   the opiates Dr. -- the opioids that Dr. Titus was

22   prescribing, based on nothing more but the dosage that was

23   in the prescription.

24         Dr. Titus did not knowingly prescribe controlled

25   substances for anything but a legitimate medical purpose.

1    He believed in good faith that his patients were in pain,

2    that his patients had a legitimate medical need for the

3    prescriptions he was writing them, and that he was acting in

4    good faith in treating his patients.

5              He examined them.  He talked to them to

6    determine their level of pain.  The patients explained to

7    Dr. Titus their chronic pain.  Dr. Titus treated the pain

8    that his patients reported to him that they were suffering

9    from.

10             You will hear that patients sign informed

11   consent documents for their opioid treatment and pain

12   management agreements.  You will hear that Dr. Titus did

13   counsel patients and discharge them when they violated their

14   pain management agreements.

15             Unfortunately, Dr. Titus did not always do a

16   thorough job of documenting each patient's visit.  He was

17   not the most organized individual.  The evidence will show

18   that Dr. Titus was not the perfect doctor, but he was a

19   caring doctor.  He made mistakes and used poor judgment at

20   times.  He did not do a great job of maintaining legible and

21   complete patient records.  But the evidence will show that

22   mistakes and poor judgment did not equate to knowingly and

23   intentionally distributing narcotics outside the normal

24   course of medical practice without a legitimate medical

25   purpose.

1            We are not disputing, as the Government pointed

2    out, that Dr. Titus gave patients several chances as he

3    attempted to address their chronic pain, or that he at times

4    increased their dosages that he was prescribing them.  While

5    the Government points to this evidence, that is evidence to

6    show that Dr. Titus was practicing outside the normal course

7    of professional practice, the evidence will show that this

8    was not the case.

9            In fact, you will hear from Dr. Carol Warfield,

10   an endowed professor and pain management specialist at

11   Harvard Medical School, that in the field of pain

12   management -- pain medicine, there is a wide variety and

13   variation in the standard of care when it comes to the

14   treatment of chronic pain with opioids.

15           Dr. Warfield will explain to you that while some

16   practitioners never prescribe opioids to treat chronic pain,

17   other practitioners believe that it is not appropriate to

18   deny a patient in severe pain these painkillers simply

19   because there is a chance of addiction or abuse, or simply

20   because they've been addicted to drugs at some point in

21   their lives.  And that, contrary to the Government's

22   assertions, there is no requirement that all other treatment

23   modalities and options fail before opiates are prescribed

24   as -- for pain relief.

25           She will further explain that while it is

1    helpful to have a positive MRI finding to confirm a pain

2    diagnosis, many patients with severe chronic pain have no

3    such findings, and that there are many causes of chronic

4    pain which do not appear on radiological imaging.

5            Moreover, Dr. Warfield will tell you that while

6    medical records from previous providers can be helpful,

7    obtaining such records is not a standard of care, and many

8    physicians do not have a patient's previous medical records,

9    and that the regulations in opioid treatment guidelines do

10   not require the obtaining of old records prior to opioid

11   prescription.

12           Moreover, contrary to the Government's

13   assertions, Dr. Warfield will also explain to you that it is

14   not uncommon or outside the normal course of medical

15   practice to provide patients that are being discharged from

16   violating their pain management agreements with a tapering

17   dose of controlled substances.

18           In this case, the Government has the burden of

19   proving Dr. Titus is guilty beyond a reasonable doubt.  They

20   must convince you beyond a reasonable doubt that when

21   Dr. Titus prescribed these drugs, he did so not to treat a

22   patient for pain, but rather and for an

23   other-than-legitimate purpose.  We submit to you that the

24   Government will not be able to carry this burden.

25           Dr. Titus made mistakes.  He was not perfect,

1    far from it.  But the evidence will show that when Dr. Titus

2    was working at his practice, he treated every patient he

3    encountered, every one of them, in good faith, wanting to

4    help them manage their chronic pain.  Maybe he gave some of

5    his patients too many chances, but the evidence will show

6    that his purpose in continuing to treat and prescribe them

7    opioids after they violated the pain management agreement

8    was because he, in good faith, believed that they needed the

9    medication to treat their unrelenting pain.

10            The evidence will show that after Dr. Titus had

11   some issues with the Delaware State Medical Board in 2011

12   and '12, he instituted additional policies and procedures to

13   help guide and guard against diversion of drugs within his

14   practice.

15            The evidence will show that new pain management

16   patients could not get an appointment with him without

17   having some documentation, such as an MRI or prior medical

18   records from another doctor.  And when a patient did not

19   have such records, Dr. Titus would send them for an MRI or

20   other testing because Dr. Titus would not agree to take on a

21   patient until after he determined that there was a need for

22   treatment.

23            Patients are required to come in every 30 days

24   to get evaluated, to determine if they were still in need of

25   pain medication.  Dr. Titus performed random drug tests.  He

1    split a patient's monthly prescription in two, requiring

2    them to come in every two weeks so they would not have too

3    many pills at the same time, to help guard against

4    diversion.  This is what the evidence will show.

5              Now, the Government alleges that the types of

6    pills and dosages that Dr. Titus prescribed was way too

7    much, alleging that his dosing habits and the types of

8    narcotics he was prescribing is evidence that he was

9    prescribing outside the normal course of medical practice.

10             However, as you listen to the testimony, keep an

11   open mind, as Dr. Warfield will explain to you that in her

12   expert opinion this was not the case, and that dose

13   escalations are common -- commonly needed in the treatment

14   of chronic pain, especially in patients who have previously

15   been taking opioids.

16             Remember, as Judge Andrews has instructed you,

17   Patrick Titus sits here presumed innocent.  And this

18   presumption of innocence stays with him throughout the

19   entire trial and in your deliberations.  And that Dr. Titus

20   has absolutely no burden to prove himself innocent.  It is

21   the Government's burden to prove him guilty beyond a

22   reasonable doubt.

23             And as Judge Andrews will instruct you at the

24   conclusion of this trial, a reasonable doubt is the type of

25   doubt that would cause you to pause or hesitate when making

1    an important decision in your own lives.  And you cannot

2    guess, speculate, or assume as to any of the Government's

3    evidence.

4              I am confident that if you pay close attention,

5    use your common sense, and keep an open mind, you will come

6    to the only conclusion, which is that Patrick Titus

7    prescribed controlled substances within the normal course of

8    medical practice for a legitimate medical need, that he is

9    innocent of these charges, and that the only possible

10   verdict is not guilty.

11             Thank you.

12             THE COURT:  Thank you, Ms. Kousoulis.

13             All right.  Can you call your first witness?

14             MR. WOODARD:  Yes, Your Honor.  The Government

15   calls Brent Hood.

16             DEPUTY CLERK:  Mr. Hood, please state and spell

17   your full name for the record.

18             THE WITNESS:  Brent Hood, B-R-E-N-T H-O-O-D.

19             DEPUTY CLERK:  Do you affirm that the testimony

20   you are about to give to the Court and the jury in the case

21   now pending will be the truth, the whole truth, and nothing

22   but the truth, you do so affirm?

23             THE WITNESS:  Yes.

24             DEPUTY CLERK:  Thank you.

25             THE COURT:  Mr. Hood, you can take your mask off

263

Hood - Direct

1    while you're testifying.

2                  THE WITNESS:  Okay.

3                        BRENT HOOD, the witness herein, after

4    having been duly sworn under oath, was examined and

5    testified as follows:

6                        DIRECT EXAMINATION

7    BY MR. WOODARD:

8    Q.    Good morning, Mr. Hood.

9    A.    Good morning.

10   Q.    Where do you live, sir?

11   A.    1280 Slaughter Station Rd, Hartly, Delaware.

12   Q.    Are you married?

13   A.    Yes.

14   Q.    Are you currently employed?

15   A.    No.

16   Q.    Were you previously employed?

17   A.    Yes.

18   Q.    How so?

19   A.    I used to work for Local 19, Union Sheet Metal

20   Workers.

21   Q.    For how long did you work there?

22   A.    Eighteen years.

23   Q.    Did you suffer any injuries while on the job?

24   A.    Yes.

25   Q.    What were those?

Hood - Direct

1    A.    I ended up having carpal tunnel surgery done on my

2    hands.

3    Q.    About how long ago was that?

4    A.    2005, I believe it was.

5    Q.    So you mentioned surgeries.  Did you get medical

6    treatment for this carpal tunnel syndrome?

7    A.    Yes.

8    Q.    Who did you first see to get treatment?

9    A.    Dr. Osterman at the Philadelphia Hand Center in

10   Philadelphia.

11   Q.    Anyone else after that?

12   A.    Dr. DuShuttle did my other hand.  And I seen Dr. Amir

13   and Dr. Titus.

14   Q.    Okay.  Let's just stop there.  Was there a certain

15   reason you stopped seeing Dr. Amir before seeing Dr. Titus?

16   A.    I got discharged.

17   Q.    Why was that?

18   A.    Because I went to see another doctor.  He referred me

19   to another doctor because I got in a car accident.  And he

20   ended up writing me a prescription for pain killers, and I

21   had got them filled, so he discharged me.

22   Q.    Can you just try to make sure you're speaking into

23   the microphone so everyone can hear you?

24   A.    Sorry.

25   Q.    No problem.

Hood - Direct

```
1              So you mentioned you started seeing Dr. Titus.
2    Around when was that?
3    A.    2012.
4    Q.    Okay.  Do you recognize Dr. Titus here in the
5    courtroom today?
6    A.    Yes.
7    Q.    Could you identify him by an article of clothing?
8    A.    Yellow tie.
9    Q.    Thank you.
10             Let the record reflect the witness pointed to
11   the Defendant.
12             THE COURT:  So noted.
13   BY MR. WOODARD:
14   Q.    And how did you come to find Dr. Titus, Mr. Hood?
15   A.    Through a guy I grew up with.  He told me he used to
16   see him.
17   Q.    Okay.  What were you going to see Dr. Titus for?
18   A.    Pain medication.
19   Q.    And had you been taking pain medication up until that
20   time?
21   A.    Yes, I had.
22   Q.    Okay.  So at your first visit, 2012, what did you
23   tell Dr. Titus you were there for?
24   A.    Pain medication.
25   Q.    Did he conduct any kind of physical examination?
```

266

Hood - Direct

1   A.     Yes.  He held my hands and went over my hands, and

2   that was about it.

3   Q.     All right.  And do you recall what was prescribed

4   during this first visit?

5   A.     Oxycodone, 15 milligrams, and Ambien.

6              MR. WOODARD:  Ms. Leal, if you could please pull

7   up Government's Exhibit 100 at Page 149.

8              Your Honor, my understanding is there's been no

9   objection to this patient file, so we would offer it into

10  evidence.

11             MS. KOUSOULIS:  No objection.

12             THE COURT:  All right.  It's admitted without

13  objection.  That's GX 100?

14             (Government Exhibit No. 100 was admitted into

15  evidence.)

16             MR. WOODARD:  Yes, sir.

17             THE COURT:  All right.

18  BY MR. WOODARD:

19  Q.     All right.  Mr. Hood, can you see that on the screen?

20  A.     Yes.

21  Q.     Okay.  Do you recognize that?

22  A.     I do.

23  Q.     What is it?

24  A.     Oxycodone, 15 milligrams, 75 tablets.  And Ambien, I

25  guess, ten milligrams, 30 tablets.

Hood - Direct

1   Q.      And who are these prescriptions written to?

2   A.      Brent Hood.

3   Q.      On what date?

4   A.      10/1/12.

5   Q.      And who are they written by?

6   A.      Patrick Titus.

7   Q.      Okay.  Did Dr. Titus tell you why you were receiving

8   both Oxycodone and Ambien?

9   A.      Yes.

10  Q.      Why was that?

11  A.      I guess for pain, and I think the one was for sleep.

12  Q.      And what's your understanding of what Oxycodone is?

13  A.      It's a strong narcotic.

14  Q.      How many pills did you get on this first visit?

15  A.      Seventy-five.

16  Q.      Are you aware of any risks of taking Oxycodone and

17  Ambien at the same time?

18  A.      I was not.

19  Q.      So after your first visit, Mr. Hood, did you continue

20  to see Dr. Titus?

21  A.      Yes.

22  Q.      For what?

23  A.      For pain management.

24  Q.      Okay.  So about how long were these appointments?

25  A.      Ten minutes maybe.

Hood - Direct

1   Q.      Were there physical examinations done at those

2   appointments?

3   A.      No.

4   Q.      How would you describe the visit overall?

5   A.      Like a revolving door, in and out.

6   Q.      What makes you say that?

7   A.      It was just you're in and out of the place.  You go,

8   check in, you sit there and wait, you get called back, and

9   then you leave, get your prescription.

10  Q.      How would you pay for those appointments?

11  A.      Cash.

12  Q.      And how much, if you remember?

13  A.      $155.

14  Q.      So --

15  A.      If I recall.

16  Q.      Sorry.  Would you physically bring in a wad of cash

17  to the clinic?

18  A.      Yes.

19  Q.      Would you be given, like, a receipt after you paid?

20  A.      Yes, I believe so.  Yes.

21  Q.      Okay.  Now, Mr. Hood, how would you take the

22  medication prescribed by Dr. Titus?

23  A.      I would snort it.

24  Q.      And I'm sorry to ask this, but were you addicted?

25  A.      Yes, I was.

1   Q.      So the jury can understand, what did it feel like to

2   be addicted?

3   A.      It was horrible.

4   Q.      How so?

5   A.      You're sick all the time.  You can -- you needed the

6   medication just to get out of bed, just to function in

7   everyday life.

8   Q.      And in your mind, Mr. Hood, was it evident that you

9   were addicted?

10   A.      Absolutely.

11   Q.      How so?

12   A.      I know when I would go in there, I would be sick,

13   sweaty, anxious.  It was a sure sign that anybody could

14   tell.

15   Q.      What were these -- the sweating, the anxiety, what

16   was that a symptom of?

17   A.      Withdrawal from not having my medication.

18   Q.      Did Dr. Titus ever counsel you on the risks of

19   addiction for the opioids he prescribed?

20   A.      No, he didn't.

21   Q.      Did he ever talk to you about your withdrawal

22   symptoms?

23   A.      No, he didn't.

24   Q.      So after the first visit, how often would you go see

25   Dr. Titus?

Hood - Direct

1    A.      I believe it was every two weeks.

2    Q.      Okay.  Would you ever show up early for your next

3    appointment?

4    A.      I believe I have.

5    Q.      Why was that?

6    A.      Because I would run out of my medication early.

7    Q.      What would happen when you would show up at the

8    clinic early?

9    A.      He would either write me another prescription or he

10   wouldn't see me.

11   Q.      Okay.  Let's talk about the clinic.  If you could

12   describe, Mr. Hood, what was the waiting room like?

13   A.      You just come in the door, and I believe there was

14   three or four seats and a bathroom off to the left.  And

15   then your receptionist area, and that was about it.

16   Q.      Was it busy, not busy?

17   A.      I mean, it was kind of busy.

18   Q.      Were people -- would people be talking in the waiting

19   room?

20   A.      Yeah.  It was like a congregation every couple weeks.

21   You see the same people.  You meet them at the pharmacy, you

22   know, talking about buying drugs, selling drugs.

23   Q.      What -- did you ever see any drug selling?

24   A.      Absolutely.

25               MS. KOUSOULIS:  I'll object to the leading

271

Hood - Direct

1   nature of the questions and to the -- calls for speculation.

2           THE COURT:  Well, it's not leading, and you

3   know, I'm going to overrule the objection.

4   BY MR. WOODARD:

5   Q.      And if you know, Mr. Hood, did you observe any drug

6   activity?

7   A.      Yes.

8   Q.      Could you describe that for us, please?

9   A.      I actually purchased pills at the pharmacy from them.

10  Q.      Okay.

11  A.      From somebody who went there.

12  Q.      While at Dr. Titus' clinic, did you ever get drug

13  tested?

14  A.      Yes, I have.

15  Q.      And what is that?

16  A.      It's when you go in there and you get called for a

17  random drug test to see if you have your medication in you.

18  Q.      Did you ever fail a drug test?

19  A.      Yes, I have.

20  Q.      What's it mean to fail a drug test?

21  A.      That you have illegal drugs in your system that you

22  shouldn't have.

23  Q.      Do you remember any specific instances when you

24  failed a drug test at Dr. Titus' clinic?

25  A.      I do.

Hood - Direct

1    Q.      What was that for?

2    A.      Cocaine, I believe.

3    Q.      Did that happen more than once?

4    A.      Yes.

5    Q.      When that would happen, would you talk to Dr. Titus

6    about it?

7    A.      No, I wouldn't.

8    Q.      Now, Mr. Hood, eventually during your treatment, did

9    Dr. Titus begin to prescribe anything in addition to

10   Oxycodone?

11   A.      Yes.

12   Q.      What was that?

13   A.      Methadone, ten milligrams.

14   Q.      And what's Methadone?

15   A.      It's a painkiller.

16          MR. WOODARD:  Ms. Leal, if you could please show

17   Government's Exhibit 100 at 112.

18   BY MR. WOODARD:

19   Q.      Do you recognize this, Mr. Hood?

20   A.      Yes.

21   Q.      What is that?

22   A.      Oxycodone, 15 milligrams, 75 tablets; and Methadone,

23   ten milligrams, 30 tablets.

24   Q.      Did Dr. Titus explain why you were being prescribed

25   both of these drugs at the same time?

Hood - Direct

1    A.    No.

2    Q.    Did he describe any risks associated with Methadone?

3    A.    No.

4    Q.    All right.  Mr. Hood, at some point during your

5    treatment, did you suffer from an overdose?

6    A.    Yes.

7    Q.    And about when was that, if you remember?

8    A.    2013.

9    Q.    Okay.  And what happened?

10   A.    I overdosed on the Oxycodone, heroin, and cocaine.

11   Q.    Were you taken to the hospital?

12   A.    Yes.

13   Q.    And what state were you in when you got there?

14   A.    I was almost dead.

15   Q.    Were you able to breathe on your own?

16   A.    My oxygen level was down to 12 percent when I went in

17   there.  Yes, I guess.

18   Q.    And what -- what all drugs were in your system, if

19   you remember?

20   A.    Heroin, Oxycodone, cocaine, Xanax.

21   Q.    Did you get discharged a couple days later?

22   A.    Yes.

23   Q.    And after your discharge, did you go see Dr. Titus

24   again?

25   A.    Yes, I did.

Hood - Direct

1    Q.      Why did you go back?

2    A.      Because it was time for me to pick up my

3    prescriptions.

4    Q.      Were you still addicted at that time?

5    A.      Yes.

6    Q.      And at that -- and let me ask:  How soon after your

7    discharge from the hospital did you go see Dr. Titus?

8    A.      I believe it was two days.

9    Q.      And what was prescribed at that visit?

10   A.      Oxycodone, 15 milligrams; and Methadone, ten

11   milligrams.

12   Q.      And, Mr. Hood, what did you do with those pills?

13   A.      I snorted them.

14            MR. WOODARD:  Ms. Leal, if you could show

15   Government's Exhibit 100 at 33.

16   BY MR. WOODARD:

17   Q.      Do you recognize this, Mr. Hood?

18   A.      I do.

19   Q.      What is that?

20   A.      It's a letter for discharge.

21   Q.      Who did you receive that from?

22   A.      Dr. Titus.

23   Q.      And was this after you had the overdose?

24   A.      Yes.

25   Q.      Okay.  If you could read where it begins "I will give

Hood - Direct

1    you," please.

2    A.    "I will give you 30 days of emergency care.  After

3    these 30 days, I will no longer provide you with medical

4    care.  Emergency care does not include narcotic

5    prescriptions."

6    Q.    Thank you.

7              MR. WOODARD:  Ms. Leal, if you could go to the

8    next page, Page 34.

9    BY MR. WOODARD:

10   Q.    Do you recognize this, Mr. Hood?

11   A.    I do.

12   Q.    Is this dated the same date as that letter we just

13   looked at?

14   A.    Yes.

15   Q.    Okay.  What was this prescription for?

16   A.    Methadone, ten milligrams, 30 of them.  Oxycodone,

17   15 milligrams, 75 of them.

18   Q.    Are these the same prescriptions we looked at

19   previously?

20   A.    Yes.

21   Q.    Okay.  And is it your under -- what's your

22   understanding of whether these drugs are narcotics?

23   A.    What's my --

24   Q.    Do you know whether these drugs are narcotics?

25   A.    Yes.

Hood - Cross

1   Q.      Mr. Hood, when you were seeing Dr. Titus, did he ever

2   refer you to a specialist?

3   A.      I don't believe so.

4   Q.      Did he ever discuss any alternative treatments other

5   than opioids?

6   A.      No.

7   Q.      And when seeing Dr. Titus and receiving these

8   prescriptions, did the pain ever go away?

9   A.      Absolutely not.  It was worse.

10          MR. WOODARD:  May I just have one moment, Your

11  Honor?

12          THE COURT:  Yes.

13  BY MR. WOODARD:

14  Q.      Just to follow up, Mr. Hood, why was it worse?

15  A.      Because when I would run out of my medication, the

16  pain was so much worse in your body.  It just hurt -- you

17  hurt all over.

18          MR. WOODARD:  All right.  Thank you, Mr. Hood.

19          I tender the witness, Your Honor.

20          THE COURT:  All right.

21          Cross-examination, Ms. Kousoulis.

22          MS. KOUSOULIS:  One moment, Your Honor.

23          THE COURT:  Yeah.

24                    CROSS-EXAMINATION

25  BY MS. KOUSOULIS:

Hood - Cross

1   Q.      Good morning, Mr. Hood.

2   A.      How are you?

3   Q.      Now, Mr. Hood, you began treating with Dr. Titus in

4   October of 2012; correct?

5   A.      Yes.

6   Q.      And prior to seeing Dr. Titus, you were seeing other

7   doctors for pain management; correct?

8   A.      Yes.

9   Q.      And those other doctors were prescribing you

10  narcotics to treat your pain; correct?

11  A.      Yes.

12  Q.      And prior to treating with Dr. Titus, you provided

13  him with your medical records; correct?

14  A.      Yes.

15  Q.      And you also signed a release with Dr. Titus' office

16  so you could get any other medical records that he might

17  need; correct?

18  A.      Yes.

19  Q.      And at your first visit with him, he gave you a drug

20  test; correct?

21  A.      Yes.

22  Q.      And he had you fill out some forms, including a pain

23  scale, to let him know what your level of pain was that you

24  were suffering from; correct?

25  A.      Yes.

Hood - Cross

1    Q.      And when you would go back to see him on subsequent

2    visits, he would also have you fill out a pain rating scale

3    to determine what your level of pain was at that time before

4    he prescribed you any narcotics; correct?

5    A.      I believe so.

6    Q.      Okay.

7                MS. KOUSOULIS:  Give me one moment, Your Honor.

8                And, Your Honor, if I might mark collectively

9    portions of the patient file as Defense Exhibit 2.

10               THE COURT:  All right.  So these are things

11   already part of --

12               MS. KOUSOULIS:  Yes, Your Honor.

13               THE COURT:  -- GX 100?

14               MS. KOUSOULIS:  Yes, Your Honor, they're --

15               THE COURT:  So can you, like, number them some

16   way so that they will be easily identifiable as being part

17   of the same file?

18               MS. KOUSOULIS:  We can, Your Honor.  Some of my

19   printouts were not directly from the Government exhibits,

20   but were from -- as they were marked -- like I prepared this

21   prior to getting the final marked exhibits from the

22   Government.

23               THE COURT:  Okay.  Well, so we'll use your

24   numbers now, but maybe we can do something so that if the

25   jury at some point is looking at these, they can figure out

Hood - Cross

1   what goes with what.

2         MS. KOUSOULIS:  That's fine, Your Honor.

3   Everything that I'm introducing is contained in the patient

4   file that was introduced by the Government.

5         THE COURT:  So Defense Exhibit 2?

6         MS. KOUSOULIS:  Yes.

7   BY MS. KOUSOULIS:

8   Q.    Now, Mr. Hood, I just asked you if when you went

9   to -- when you went to your patient visits with Dr. Titus,

10  he had you fill out a pain rating scale so he could

11  determine your level of pain; correct?

12  A.    Yes.

13  Q.    And the forms he had you fill out were, for example,

14  this --

15        MS. KOUSOULIS:  Sorry.  Not technologically

16  savvy.  One moment.  All right.  Thank you.  Thank you for

17  your patience.

18  BY MS. KOUSOULIS:

19  Q.    Mr. Hood, is this one of the pain rating scales that

20  you filled out?  This one is dated May 13th, 2013.

21  A.    I think so.

22  Q.    That's your writing on the top; correct?

23  A.    It does not look like my handwriting, but I guess it

24  is.

25  Q.    But these are the forms that -- that Dr. Titus had

Hood - Cross

1    you fill out when you -- when you went to the office;

2    correct?

3    A.     Yes.

4    Q.     And you rated your pain on this visit as between an 8

5    and 9 or 7 and 8; correct?

6    A.     Yes.

7    Q.     And then on -- showing you your -- the visit from

8    July 8th, 2013, you rated your pain either a 7 or 8 or 8 or

9    9; correct?

10   A.     Yes.

11   Q.     And on August 7th, 2013, you rated your pain as an 8

12   or 9; correct?

13   A.     Yes.

14   Q.     And he also had you fill out at times an ongoing pain

15   assessment, correct, such as this one that was filled out on

16   February 14th, correct, where you rated your pain at this

17   time between a 7 and 8 out of a scale of 10; correct?

18   A.     I don't remember this page.

19   Q.     But you do remember that when you went to the office,

20   Dr. Titus would have you fill out during -- before each

21   visit pain assessments so he could, you know, determine your

22   level of pain at that time; correct?

23   A.     I do remember them.

24   Q.     Now, at the time you were seeing Dr. Titus, you were

25   suffering from a nerve disease called reflex sympathetic

Hood - Cross

1    dystrophy; correct?  RSD for short?

2    A.     Yes.

3    Q.     And it's fair to say that RSD causes you to have

4    really bad nerve pain; correct?

5    A.     Yes.

6    Q.     And at times, it can be debilitating; correct?

7    A.     Yes.

8    Q.     And, in fact, your understanding was that eventually

9    it may cause you to need a wheelchair; correct?

10   A.     Yes.

11   Q.     And you explained to Dr. Titus the pain you were in

12   with regard to suffering from this disease; correct?

13   A.     Yes.

14   Q.     And during the time Dr. Titus was treating you, you

15   would see him every 30 days?

16   A.     I believe it was every two weeks, I think.

17   Q.     Well, would you -- if I -- you would see -- would you

18   actually -- you would go --

19   A.     No, no, you're right.  It would -- 30 days.

20   Q.     Okay.  But you would go every two weeks --

21   A.     For the prescription.

22   Q.     -- to pick up your prescription?

23   A.     Right.

24   Q.     Because one of his practices was he would not give

25   you a full month's prescription at one time; correct?  He

Hood - Cross

1   would divide it into a two-week supply, and you would have

2   to go back in two weeks to pick up the second half?

3   A.      Right.

4   Q.      And there were times when you -- you were given

5   random drug tests when you would see -- go in for your

6   visits; correct?

7   A.      Yes.

8   Q.      Now, you testified earlier that Dr. Titus never

9   referred you for any -- to any other doctors; is that your

10  testimony?

11  A.      Yes.

12  Q.      Okay.

13          MS. KOUSOULIS:  Your Honor, for now I'll mark

14  this Defense Exhibit 3, but I believe it's in the --

15          THE COURT:  Go ahead.

16          MS. KOUSOULIS:  Mr. Marek, can you pick -- can

17  you pull up Page 46?  I'll just use this one for now.

18  BY MS. KOUSOULIS:

19  Q.      Mr. Hood, this is a prescription made out to you

20  dated April 11th, 2013, where Dr. Titus was referring you to

21  Dr. Cemerlic for a pain evaluation, asking him to please

22  consult and evaluate you; is that -- is that correct?

23  A.      I see it.  I don't remember it.

24  Q.      You don't remember it, though?

25  A.      No.

Hood - Cross

1    Q.      But you were seeing Dr. Titus back on April 11th,

2    2013; correct?

3    A.      Yes.

4    Q.      Now, you testified that on August -- on August 4th,

5    2013, you were admitted to Kent General Hospital because you

6    overdosed on drugs; correct?

7    A.      Yes.

8    Q.      And prior to overdosing, you had ingested cocaine,

9    among other things; correct?

10   A.      Yes.

11   Q.      Dr. Titus did not prescribe you cocaine; correct?

12   A.      No.

13   Q.      In fact, during your office visit with Dr. Titus, he

14   did counsel you regarding the dangers of mixing your

15   prescription drugs with other narcotics; correct?

16   A.      I don't believe so.  I --

17   Q.      Now, prior -- go ahead.

18   A.      I failed a drug test with cocaine in me, and he still

19   gave me pills.

20   Q.      And at those times, you were reporting to him that

21   you had this debilitating pain; correct?

22   A.      I was.

23   Q.      Now, prior to being discharged from the hospital, you

24   met with a doctor with regard to your discharge, Dr. Michael

25   Sweeney; correct?  If you recall.  If you recall, you met

Hood - Cross

1    with doctors during your stay there; correct?

2    A.    Yes.

3    Q.    And were you provided -- you were provided with

4    discharge instructions?

5    A.    Yes.

6    Q.    This is also --

7         MS. KOUSOULIS:  Your Honor, marking what's

8    Defense Exhibit 4.

9         THE COURT:  All right.

10         MS. KOUSOULIS:  I believe it is contained within

11    one of the Government's files they have not yet introduced,

12    but it's part of the medical records.

13         THE COURT:  All right.

14    BY MS. KOUSOULIS:

15    Q.    So this is a copy of your discharge summary; correct,

16    Mr. Hood?

17    A.    Sure.

18    Q.    And when you were discharged, you were given

19    instructions by Dr. Sweeney, and your -- the instructions

20    included that you may start back on your Methadone, ten

21    milligrams twice a day, and your Oxycodone, 15 milligrams,

22    every six hours as needed for pain.  And that prescriptions

23    were not provided with medication, but that this was being

24    prescribed by Dr. Titus.  And Dr. Sweeney recommended that

25    you follow up with Dr. Titus within the next week; correct?

Hood - Cross

1    A.      That's what it says.

2    Q.      And did you, in fact, follow up with Dr. Titus within

3    that next week?

4    A.      I did.

5    Q.      And when you went to see Dr. Titus, Dr. Titus was

6    aware that you had overdosed; correct?

7    A.      Yes.

8    Q.      And at that next patient visit on August on August --

9    I believe it was on August 7th, he discharged you from his

10   practice because you had tested positive for cocaine;

11   correct?

12   A.      I guess that's why.

13           MS. KOUSOULIS:  One moment, Your Honor.  One

14   moment, Your Honor.

15           THE COURT:  Yeah.

16           MS. KOUSOULIS:  I thought I had it.  I'll move

17   on.

18   BY MS. KOUSOULIS:

19   Q.      Now, at the time Dr. Titus discharged you, he

20   provided you with the tapering dose of narcotics; correct?

21   He provided you with a prescription; correct?

22   A.      Yes.

23   Q.      And he broke that prescription up into two -- into

24   two-week supplies, as he had done in the past; correct?

25   A.      Yes.

Hood - Cross

1    Q.      Now, you were -- initially in this case, you were

2    interviewed by law enforcement; correct?

3    A.      For the withdrawal?

4    Q.      No.

5    A.      Or the overdose?

6    Q.      Dr. -- Ms. -- law enforcement -- DEA Diversion

7    Investigator Lisa -- Linda Eleazer questioned you regarding

8    your interaction with Dr. Titus; correct?

9    A.      Yes.

10   Q.      Okay.  Now, in your testimony, you indicated you were

11   abusing the prescription medication that Dr. Titus

12   prescribed you; correct?

13   A.      Yes.

14   Q.      You never told Dr. Titus you were abusing this

15   medication; correct?

16   A.      No.

17   Q.      And the reason you didn't tell him that is because

18   you were afraid if you told him you were abusing your

19   medication, he wouldn't prescribe you any more; correct?

20   A.      I guess.

21   Q.      Now, in the past, you've done physical therapy;

22   correct, and that did not alleviate your pain?

23   A.      You're right.

24   Q.      And you had done the physical therapy prior to being

25   treated by Dr. Titus; correct?

287

Hood - Cross

1    A.    Yes.

2    Q.    And prior to being treated by Dr. Titus, you also

3    tried other -- you also tried injections and other forms of

4    treatment, also; correct?

5    A.    Yes.

6    Q.    And none of that alleviated your pain; correct?

7    A.    No.

8    Q.    It's fair --

9    A.    It made it worse.

10   Q.    It's fair to say that the only thing that alleviated

11   your pain was prescription opioids; correct?

12   A.    No.

13   Q.    What else relieved your pain?

14   A.    I had a TENS unit I would use, a paraffin wax machine

15   I would use all the time, and water therapy did help.

16   Q.    Okay.  But at the time you were seeing Dr. Titus, you

17   reported to him that you needed the opioids in order to

18   manage your pain; correct?

19   A.    Yes.  At that time, I needed them just to function.

20   Q.    So at the time you saw Dr. Titus, you needed the

21   opioids to function; correct?

22   A.    Yes.

23            MS. KOUSOULIS:  One moment, Your Honor.

24   BY MS. KOUSOULIS:

25   Q.    I'm showing you what's been marked as Defense

Hood - Cross

1    Exhibit 5, which are part of your discharge records from

2    Kent General Hospital at the time you overdosed.  Is that

3    your signature on the last page?

4    A.    Yes.

5    Q.    And that's dated August 6th, 2013; correct?

6    A.    Yes.

7    Q.    And in this document, it indicates the medications

8    that you're being -- it indicates that you're to continue

9    with your Oxycodone and your Methadone; correct?

10   A.    Where does it say that?  It says Levaquin.

11   Q.    Oxycodone, oral, continue.

12   A.    Oh, okay.

13   Q.    Methadone, oral, continue; correct?

14   A.    Yes.

15   Q.    And this is what -- and you signed this after reading

16   it at the hospital, presumably; correct?

17   A.    Yes.

18   Q.    Okay.

19               MS. KOUSOULIS:  I have no further questions,

20   Your Honor.

21               THE COURT:  All right.

22               Any redirect?

23               MR. WOODARD:  Yes, Your Honor.

24               THE COURT:  Go ahead.

25               MR. WOODARD:  Thank you, Your Honor.

Hood - Redirect

1          MS. KOUSOULIS:  Wait one second, Your Honor.

2     BY MS. KOUSOULIS:

3     Q.     Mr. Hood, on July 6th -- on June 6th of this year,

4     you met with Mr. Bostic and an investigator from my office,

5     Mr. Donovan.  Do you recall that?

6     A.     Yes.

7     Q.     Do you recall meeting with them and discussing this

8     case with them?

9     A.     I don't -- yes.

10    Q.     And at that time, you had indicated to them that you

11    were going to make Dr. Titus pay for all the bad treatment

12    you got from your prior pain management doctors; correct?

13    A.     I said I'd like to see all the doctors pay for what

14    they had done.

15         MS. KOUSOULIS:  No further questions, Your

16    Honor.

17         THE COURT:  All right.  Thank you.

18         Mr. Woodard.

19         MR. WOODARD:  Thank you.

20              REDIRECT EXAMINATION

21    BY MR. WOODARD:

22    Q.     Almost done, Mr. Hood.

23    A.     All right.

24    Q.     Ms. Kousoulis asked you about a pain scale.  Do you

25    remember that?

Hood - Redirect

1    A.    I do.

2    Q.    How long did Dr. Titus spend with you going over

3    these pain scales every visit you had?

4    A.    He didn't.

5    Q.    She asked you about a pain diary.  Do you remember

6    that?

7    A.    I do not remember too much, but obviously I did it.

8    Q.    Did Dr. Titus go over these pain diaries with you?

9    A.    No.

10   Q.    You were asked about your nerve pain a minute ago.

11   Do you remember that?

12   A.    Yes.

13   Q.    Has that nerve pain been treated?

14   A.    No.

15   Q.    Did the opioids help that nerve pain?

16   A.    No.

17   Q.    All right.  Let's talk about this referral to

18   Dr. Cemerlic.  You saw that a minute ago.  Do you remember

19   that?

20   A.    Yes.

21            MR. WOODARD:  Ms. Leal, if you could please pull

22   up Page 46.

23   BY MR. WOODARD:

24   Q.    The referral was dated May 13th of '13.  Do you see

25   that?

Hood - Redirect

1    A.      Yes.

2    Q.      Do you recall discussing this referral with

3    Dr. Titus?

4    A.      I do not.

5    Q.      Do you recall even ever seeing this document before?

6    A.      I do not.

7              MR. WOODARD:  Ms. Leal, if you could pull up

8    Page 94.

9    BY MR. WOODARD:

10   Q.      On the same date, Mr. Hood, what were you prescribed

11   by Dr. Titus?

12   A.      Oxycodone, 15 milligrams, 75 tablets; and Methadone,

13   ten milligrams, 30 tablets.

14             MR. WOODARD:  Ms. Leal, if you could go to

15   Page 85.

16   BY MR. WOODARD:

17   Q.      Was this about a month later?

18   A.      Yes.  Yes.

19   Q.      And what were you prescribed on that date by

20   Dr. Titus?

21   A.      Oxycodone, 15 milligrams, 75 tablets; Methadone, ten

22   milligrams, 30 tablets.

23   Q.      And did Dr. Titus ask if you had gone to see this

24   Dr. Cemerlic?

25   A.      No.

Hood - Recross

1    Q.     You were asked, Mr. Hood, whether Dr. Titus

2    prescribed a tapering dose a minute ago.  Do you remember

3    that?

4    A.     Yes.

5    Q.     Were you prescribed the same dose and type of drugs,

6    both before and after your overdose?

7    A.     Yes.

8    Q.     And you said you needed those drugs to function?

9    A.     That's correct.

10   Q.     Why was that, Mr. Hood?

11   A.     Because I couldn't get out of bed, and I was highly

12   addicted to them at that time.

13              MR. WOODARD:  Thank you, Your Honor.  No further

14   questions.

15              THE COURT:  All right.

16              MS. KOUSOULIS:  Your Honor, I may just have a

17   few follow-ups that I forgot to ask.

18              THE COURT:  All right.  Well, let's try not to

19   forget in the future.

20              MS. KOUSOULIS:  I know.  I'm sorry, Your Honor.

21   One moment.

22                       RECROSS-EXAMINATION

23   BY MS. KOUSOULIS:

24   Q.     Mr. Hood, in 2000 -- you have prior convictions for

25   burglary; correct?

Hood - Recross

1    A.    I do.

2    Q.    And for theft; correct?

3    A.    I do.

4    Q.    And, in fact, you've been convicted of burglary three

5    times; correct?

6    A.    I don't know if it's been three times.  Maybe.

7    Q.    And twice for theft; correct?

8    A.    Yes.

9                MS. KOUSOULIS:  No further questions, Your

10   Honor.

11               THE COURT:  All right.

12               Thank you, Mr. Hood.  You're excused.  You may

13   leave.

14               THE WITNESS:  All right.  Thank you.

15               THE COURT:  All right.  Let's have another

16   witness.

17               MS. SOBCZAK:  Your Honor, the Government calls

18   Amanda Molesi.

19               DEPUTY CLERK:  Please state and spell your full

20   name for the record.

21               THE WITNESS:  Amanda Molesi, A-M-A-N-D-A

22   M-O-L-E-S-I.

23               DEPUTY CLERK:  Do you affirm that the testimony

24   you are about to give to the Court and the jury in the case

25   now pending will be the truth, the whole truth, and nothing

Molesi - Direct

1    but the truth, you do so affirm?

2              THE WITNESS:  Yes.

3              DEPUTY CLERK:  Thank you.

4              AMANDA MOLESI, the witness herein, after having

5    been first duly affirmed under oath, was examined and

6    testified as follows:

7                   DIRECT EXAMINATION

8    BY MS. SOBCZAK:

9    Q.    Good morning, Ms. Molesi.

10   A.    Good morning.

11   Q.    Ms. Molesi, where do you live?

12   A.    In Bridgeville, Delaware.

13   Q.    And how long have you lived in Delaware?

14   A.    All my life.

15   Q.    Are you currently employed?

16   A.    Yes.

17   Q.    Where do you work?

18   A.    The Car Store.

19   Q.    How long have you worked there?

20   A.    Four months.

21   Q.    Are you familiar with an individual named Patrick

22   Titus?

23   A.    Yes.

24   Q.    Do you see Patrick Titus in the courtroom today?

25   A.    I do.

Molesi - Direct

1    Q.    Can you identify an article of clothing he's wearing?

2    A.    A white shirt with a yellow tie.

3              MS. SOBCZAK:  Can the Court please note that

4    Ms. Molesi has identified the Defendant, Patrick Titus?

5              THE COURT:  All right.  Noted.

6    BY MS. SOBCZAK:

7    Q.    Ms. Molesi, how do you know Patrick Titus?

8    A.    He was my employer.

9    Q.    And when did you work for Patrick Titus?

10   A.    From '06 until 2013 when I left for a year in '14.

11   Q.    How did you start working for Dr. Titus?

12   A.    My mom.  She worked there originally, so she got me

13   the job.

14   Q.    And what was the name of Dr. Titus' practice?

15   A.    Lighthouse Internal Medicine.

16   Q.    Where was this office located?

17   A.     In Milford, Delaware.

18             MS. SOBCZAK:  Ms. Leal, I'll ask you to pull up

19   Government Exhibit 400, please.

20             Your Honor, the Government moves to admit

21   Exhibit 400.

22             MR. BOSTIC:  No objection, Your Honor.

23             THE COURT:  All right.  Admitted without

24   objection.

25             (Government Exhibit No. 400 was admitted into

Molesi - Direct

1    evidence.)

2    BY MS. SOBCZAK:

3    Q.    Ms. Molesi, do you recognize this photograph?

4    A.    That's the site location of our office.

5    Q.    And where was that office located?

6    A.    It was on DuPont Highway.

7    Q.    And in Milford -- it was in Milford, Delaware; is

8    that correct?

9    A.    Yes.

10   Q.    And what years did you work at this location?

11   A.    I want to say it was '08 or '09, maybe 2010 to 2013.

12             MS. SOBCZAK:  And Ms. Leal --

13             Your Honor, the Government seeks to admit

14   Government Exhibit 700.

15             THE COURT:  All right.

16             MR. BOSTIC:  No objection, Your Honor.

17             THE COURT:  All right.  It's admitted without

18   objection.

19             (Government Exhibit No. 700 was admitted into

20   evidence.)

21   BY MS. SOBCZAK:

22   Q.    Ms. Molesi, do you recognize this photograph?

23   A.    This is the third location that they moved to.

24   Q.    What -- where was that location?

25   A.    On Church Street in Milford, Delaware.

Molesi - Direct

1    Q.      Did you work at that location?

2    A.      I did not.

3    Q.      Did you ever go to that location?

4    A.      I stopped by there twice to see my mother.

5    Q.      And when you worked at Lighthouse Internal Medicine,

6    what were your duties there?

7    A.      I checked patients in, brought patients into the

8    rooms, took their vitals, filed chart notes, filed their

9    charts away.  And then helped, like, get the scripts ready

10   for the day before the next day, and office notes.

11   Q.      Did Dr. Titus keep patient files?

12   A.      Sorry?

13   Q.      Did Dr. Titus keep patient files?

14   A.      He didn't -- you mean, like, keep --

15   Q.      Did he maintain patient files at Lighthouse?

16   A.      Yes.

17   Q.      And did you work with the patient files?

18   A.      Yes.

19   Q.      What was your role working with the patient files?

20   A.      I filed papers into the files, like any demographics,

21   any test that had been done.  And when the patients checked

22   in, I would write the information on the top of the note,

23   like their name and date of birth, and then I would put,

24   like, their weight and their vitals.

25   Q.      And were you involved with the prescriptions?

Molesi - Direct

1    A.    I was.

2    Q.    How were you involved with the prescriptions?

3    A.    I handwrote the prescriptions out the night before,

4    and then Dr. Titus would sign them when the patients came

5    in.

6    Q.    What other individuals did you work with at

7    Lighthouse?

8    A.    My mom, Lotti Molesi, Jane Webb, Sean Sharpe, and

9    Josie Walters.

10   Q.    And who is Josie Walters?

11   A.    She was the office manager.

12   Q.    And who was Jane Webb?

13   A.    She was just another employee.  She did the same

14   thing I did.

15   Q.    What type of practice was Lighthouse when you started

16   working there?

17   A.    A family practice.  Internal medicine.

18   Q.    And did it remain that type of practice?

19   A.    It always was internal medicine, we just saw more

20   pain patients as the years went on.

21   Q.    And so following up on that, what types of patients

22   did Dr. Titus treat?

23   A.    We treated anywhere from sick patients with just

24   blood pressure issues to patients with pain, patients that

25   other doctors didn't want to see.

Molesi - Direct

1    Q.    And when you say pain patients or pain medicine, what

2    does that mean?

3    A.    That means that they have, like, an injury so they're

4    in pain, so they get a controlled substance narcotic like

5    Oxycodone and Percocet.

6    Q.    And by the end of your time working at Lighthouse,

7    how much of Dr. Titus' practice involved pain management?

8    A.    Probably 96, 97 percent.

9    Q.    And how much of that practice involved the

10   prescribing of controlled substances?

11   A.    Ninety-six, 97.

12   Q.    So I'd like to talk about what a typical day was like

13   at Lighthouse.  What time would you get to work?

14   A.    I believe we got there at like 8:30, nine o'clock,

15   but they opened early and saw patients around -- I think

16   they started seeing patients at like 7:00.

17   Q.    And what time -- would you ever get there early to

18   open up?

19   A.    There was a couple months where I was opening on

20   Fridays and I was the one that opened up.

21   Q.    And what time would you get there to open on Fridays?

22   A.    About six o'clock.

23   Q.    And can you describe the scene when you arrived at

24   that time in the morning?

25   A.    There would be patients sitting out there waiting

Molesi - Direct

1   already.  There would be, like, two or three cars.  It was

2   dark, the parking lot was, so they would be either standing

3   outside of their cars, sitting there with their car doors

4   open smoking a cigarette, just waiting for us to open up.

5   Q.      Was it dark outside when you got to the office?

6   A.      Yes.

7   Q.      Can you describe what the waiting room was like once

8   you opened at Lighthouse?

9   A.      Patients would come in.  I would check them in, take

10  their co-pay, and then I would bring them back to the rooms,

11  and that was -- our waiting room was always busy.

12  Q.      When you say "busy," how many patients?

13  A.      It was full.  We had -- there were no seats

14  sometimes.  Like, I don't even know how many patients were

15  out there.  It was a lot.

16  Q.      How many patients would Dr. Titus see on an average

17  day?

18  A.      Fifty, 60.  I don't know.  A lot.

19  Q.      Did these patients have insurance?

20  A.      They did.

21  Q.      What kind of insurance did they have?

22  A.      Medicaid, Blue Cross Blue Shield, Coventry, Medicare.

23  Q.      Did the majority of the patients have a certain type

24  of insurance?

25  A.      Medicaid.

Molesi - Direct

1    Q.      And did their Medicaid insurance cover the costs of a

2    visit with Dr. Titus?

3    A.      In the beginning it did, but in the end we did not

4    take Medicaid any more so they were paying cash.

5    Q.      And for what reason did you not take Medicaid?

6                MR. BOSTIC:  Objection, Your Honor.

7                THE COURT:  And what rule are you citing?

8                MR. BOSTIC:  I believe this will be hearsay.

9    I --

10               THE COURT:  All right.  That's a reasonable

11   objection.  Unless you can lay some foundation for why she

12   would know, you should move on.

13               MS. SOBCZAK:  Okay.

14   BY MS. SOBCZAK:

15   Q.      When did Lighthouse stop taking Medicaid?

16   A.      2000 -- the end of 2010, beginning of 2011, because I

17   ended up leaving because my pay got changed because of that.

18   Q.      And how did you know that Lighthouse originally

19   accepted Medicaid?

20   A.      Because I was the one that would check to see if the

21   patient was covered with their Medicaid and take their

22   insurance.

23   Q.      And how do you know that patients were no longer

24   using their Medicaid to see Dr. Titus?

25   A.      Because they were paying us cash instead of giving us

Molesi - Direct

1    the Medicaid, but it was on file that they still had

2    Medicaid.

3    Q.    And about how much did patients pay when they paid in

4    cash?

5    A.    I believe the visit was like 175, 185.

6    Q.    How often were they paying in cash?

7    A.    Every month.

8    Q.    And when would patients pay for their visit?

9    A.    When they got there.  So before they got to the back,

10   they would have to pay.

11   Q.    So would it be before they saw Dr. Titus that they

12   would have to pay?

13   A.    Correct.

14   Q.    And would they pay the full amount at that time?

15   A.    They would.

16   Q.    And how did -- who at the office handled taking

17   payments from the patients?

18   A.    My mom, for the most part, did.  But if she wasn't

19   there, we all chipped in and filled in for each other.

20   Q.    How did you and the other -- how did you take -- or

21   excuse me.  How did you keep track of the cash that patients

22   were paying?

23   A.    We had receipt books.

24             MS. SOBCZAK:  Ms. Leal, if you could pull up

25   Government Exhibit 203.

Molesi - Direct

1          Your Honor, the Government seeks to admit this

2   exhibit into evidence.

3               MR. BOSTIC:  No objection, Your Honor.

4               THE COURT:  Admitted without objection.

5               (Government Exhibit No. 203 was admitted into

6   evidence.)

7               MS. SOBCZAK:  Your Honor, 203 is a physical

8   exhibit that we don't have -- oh, it is?  Okay.

9   BY MS. SOBCZAK:

10  Q.     Ms. Molesi, do you recognize these exhibits?

11  A.     Those are the receipt books we used.

12              MS. SOBCZAK:  And Ms. Leal, if you could pull up

13  Government Exhibit 204.

14              Your Honor, the Government also seeks to admit

15  this exhibit into evidence.  Sorry.  204 is on --

16              MR. BOSTIC:  No objection, Your Honor.

17              THE COURT:  All right.  Admitted without

18  objection.

19              (Government Exhibit No. 204 was admitted into

20  evidence.)

21  BY MS. SOBCZAK:

22  Q.     Ms. Molesi, do you recognize what is on the screen in

23  front of you?

24  A.     It's a receipt for patients paying for their visit.

25  Q.     Is that what's in one of these receipt books?

Molesi - Direct

1    A.      Yes.

2    Q.      Can you describe what information was recorded in the

3    receipt books?

4    A.      The date that the patient was there, their name, how

5    much they paid, how they paid, and then the initial or

6    signature of who took the payment.

7    Q.      And would the patient receive a copy of this receipt?

8    A.      Yes.

9    Q.      And then this was the leftover -- was this the

10   leftover portion?

11   A.      Correct.

12   Q.      So Ms. Molesi, you stated that most of the patients

13   came to Dr. Titus for pain management.  What types of

14   treatment did Dr. Titus provide?

15   A.      He -- he sent some patients out for -- to see

16   specialists, but we also prescribed a lot of narcotics.  We

17   gave them Oxycodone or Oxycodone and Soma.

18   Q.      And how do you know that he wrote these

19   prescriptions?

20   A.      Because we would write them out the night before, but

21   also when they checked out, we had to stamp the

22   prescriptions to say what pharmacy they were supposed to go

23   to.

24   Q.      And of the patients who came in, how many patients

25   would leave with a prescription?

Molesi - Direct

1   A.      Almost all of them.

2   Q.      What happened to the patients who did not have cash

3   to pay?

4   A.      They weren't seen.

5   Q.      How did the patients respond to that, when they did

6   not get a prescription?

7   A.      They were very unhappy.

8   Q.      Can you describe what that --

9   A.      They would be rude to us.  Just, I don't know, like a

10  child, like a two-year-old would act when you tell them no.

11  Q.      And did any patients pay who did not get controlled

12  substances?

13  A.      Yes.

14  Q.      How often would that happen?

15  A.      It depended when -- if they had their records --

16  like, if they had their correct records or not when -- if

17  they got them.  So it was hit and miss.  I don't...

18  Q.      You mentioned earlier that you worked with patient

19  files.  What was your involvement with the patient files?

20  A.      I filed demographics into them.  I filed office

21  notes.  I filed records on, like, tests, blood work.

22  Q.      And what form were the patient files kept in at

23  Lighthouse?  Were they in paper form?

24  A.      Oh, yes.  When I was there, they were.

25  Q.      And did you ever fill in information in the patient

Molesi - Direct

1   files?

2   A.     I did.

3   Q.     What information would you write in the patient

4   files?

5   A.     Their name, their age, the date they were being seen,

6   their vitals.  And at the end, we started writing -- like,

7   the top portion, we would copy the note from the night

8   before so it was in the process of.

9   Q.     And how did you know what information to add the

10  night before when you were entering that information into

11  the file?

12  A.     We were told to just copy the note from the previous

13  visit.

14  Q.     And who told you to do that?

15  A.     Josie, which, of course, came from Dr. Titus, is what

16  we were told.

17          MR. BOSTIC:  Your Honor, I object and move to

18  strike the hearsay as to what she was told.

19          THE COURT:  I think the foundation is going to

20  be laid later on, so I'll take that under advisement.  And

21  if the foundation is not laid, you can later on move to have

22  it struck.

23          MR. BOSTIC:  Very well, Your Honor.

24  BY MS. SOBCZAK:

25  Q.     And just one moment.

Molesi - Direct

1             Did Dr. Titus ever conduct drug tests?

2    A.     Yes.

3    Q.     And when did he begin implementing drug tests?

4    A.     It became man -- like Ameritox came into our office

5    in 2013.  Well, end of 2012, beginning of 2013, after we had

6    been temporary closed, and they told us that was a guideline

7    we had to have to be able to open up.

8    Q.     And were you involved with these drug tests?

9    A.     I got the results, but I didn't perform them.  We had

10   a company in there performing them.

11   Q.     But would you see the results when they --

12   A.     Yes.

13   Q.     How were the drug tests administered at Lighthouse?

14   A.     I have no clue.

15             MR. BOSTIC:  Objection, Your Honor.

16             THE COURT:  Well, I think she's just about to

17   say she doesn't know; right?

18             THE WITNESS:  Mm-hmm.

19   BY MS. SOBCZAK:

20   Q.     Were patients monitored during these --

21             MR. BOSTIC:  Objection, Your Honor.  She said

22   she didn't know.

23             THE COURT:  No, no.  That was a different

24   question.

25             So why don't you ask a more complete question,

Molesi - Direct

1    if you think she can answer it.

2    BY MS. SOBCZAK:

3    Q.     Did drug testing occur at Lighthouse?

4    A.     Yes.

5    Q.     Did you see the drug testing occur or did you see

6    patients get drug tested at Lighthouse?

7    A.     Yes.

8    Q.     And where would the patients get drug tested at

9    Lighthouse?

10   A.     They would go into the Ameritox room, which was in

11   the back, get their cup.  And then they would go into the

12   waiting room bathroom, and give the test, and then take it

13   back to the Ameritox person.

14   Q.     And in the process of going into that bathroom to

15   take the test, was anyone monitoring the bathroom while

16   patients were taking their drug tests?

17   A.     No.

18   Q.     Did multiple patients go in at the same time?

19   A.     They didn't go in at the same time.

20          MR. BOSTIC:  I'm going to object to leading

21   questions.  It's --

22          MS. SOBCZAK:  Would you --

23          THE COURT:  All right.  It's overruled.

24   BY MS. SOBCZAK:

25   Q.     You can answer the question.

Molesi - Direct

1    A.    They wouldn't go in at the same time, but there was a

2    mother/daughter that the daughter went in before the mother,

3    like right before the mother.  Then the mother went in, and

4    as she was going in, she said, "It's in there."

5              MR. BOSTIC:  Objection, Your Honor.  Move to

6    strike again.  It's hearsay.

7              THE COURT:  Well, I didn't quite hear what the

8    witness said, but I don't think it's actually offered for

9    the truth of the matter asserted, so it's overruled.

10             MR. BOSTIC:  Very well, Your Honor.

11   BY MS. SOBCZAK:

12   Q.    So you stated that you would see the results of these

13   drug tests; is that right?

14   A.    Correct.

15   Q.    Did patients ever fail the drug tests?

16   A.    Yes.

17   Q.    And what are the ways in which a patient can fail a

18   drug test?

19   A.    Their prescription is not in the test at all.

20   There's no screening of it, it's negative, or you have

21   street drugs in your system.

22   Q.    And what would happen if a patient failed a drug

23   test?

24   A.    It was up to Dr. Titus on what happened to them.

25   Sometimes they'd get discharged.  Sometimes he would give

Molesi - Direct

1    them another chance.

2    Q.    Would you notify Dr. Titus when a patient failed a

3    drug test?

4    A.    Yes.

5    Q.    And what was Dr. Titus' response when you told him

6    that a patient failed a drug test?

7    A.    He usually would tell us to discharge them.  But if

8    the patient had a fit, then he would allow them to continue

9    to be seen.

10          MS. SOBCZAK:  Your Honor, the Government is

11   seeking to introduce Government Exhibit 713.  There's no

12   objection to this exhibit.

13          THE COURT:  All right.  Well, it's admitted

14   without objection.

15          (Government Exhibit No. 713 was admitted into

16   evidence.)

17   BY MS. SOBCZAK:

18   Q.    Ms. Molesi, I'm showing you what's been marked as

19   Government Exhibit 713.  Do you recognize this picture?

20   A.    I do.

21   Q.    And who is this individual?

22   A.    Lucille Moody.

23   Q.    Who was Lucille Moody?

24   A.    She was a patient of ours.

25   Q.    Was she a pain patient?

Molesi - Direct

1   A.      She was.

2   Q.      And I'm showing you now --

3           MS. SOBCZAK:  Your Honor, we're also seeking to

4   introduce Government Exhibit 127.  There's no objection to

5   this exhibit.

6           THE COURT:  All right.  It's admitted without

7   objection.

8           (Government Exhibit No. 127 was admitted into

9   evidence.)

10  BY MS. SOBCZAK:

11  Q.      So Ms. Molesi, do you recognize this document?

12  A.      It's a prescription.

13  Q.      And it's Government Exhibit at Page 332.  So

14  Ms. Molesi, do you recognize this exhibit?

15  A.      It's an office note.

16  Q.      And can you describe what is noted at the top of that

17  note?

18  A.      Her name, date of birth -- or her name, her age, the

19  date that she was seen, and her weight, and then the chief

20  complaint.

21  Q.      And whose writing is at the top of that note?

22  A.      The name and all that is mine.  The chief complaint

23  is Dr. Titus'.

24  Q.      And how are you able to note that that's Dr. Titus'

25  handwriting?

Molesi - Direct

1    A.     Because his handwriting -- I worked there for so

2    long, I know his handwriting.  It's one of a kind.

3    Q.     And would this be information that -- on the top that

4    you would fill in the night before?

5    A.     Yes.

6           MS. SOBCZAK:  Ms. Leal, if you can now turn to

7    Government Exhibit 127 at 196.

8    BY MS. SOBCZAK:

9    Q.     And Ms. Molesi, do you recognize these documents?

10   A.     Yes.

11   Q.     And can you describe what these documents are?

12   A.     They're prescriptions for her controlled substances.

13   Q.     And these are for Lucille Moody's controlled

14   substances?

15   A.     Correct.

16   Q.     What are the -- what is the date on these

17   prescriptions?

18   A.     8/12/2008.

19   Q.     And is this the same date that corresponds with the

20   progress note we just reviewed?

21   A.     I didn't look at the date.  I'm sorry.

22          MS. SOBCZAK:  Could you go back to the previous

23   exhibit on Page 332?

24          THE WITNESS:  Yes.

25   BY MS. SOBCZAK:

313

Molesi - Direct

1    Q.     So if you look -- scroll in.

2           What is the date there?

3    A.     8/12/08.

4    Q.     And is that the same date that's on the prescriptions

5    we just looked at?

6    A.     Yes.

7           MS. SOBCZAK:  And Ms. Leal, if you could please

8    go back to Page 196.

9    BY MS. SOBCZAK:

10   Q.     So going back to these prescriptions, what

11   medications were prescribed on August 12th, 2012?

12   A.     Percocet, 10/325.  Soma, 350 milligrams.  And Ambien,

13   ten milligrams.

14          MS. SOBCZAK:  And Ms. Leal, if you could go to

15   Government Exhibit 127 at Page 52.

16   BY MS. SOBCZAK:

17   Q.     Do you recognize this document, Ms. Molesi?

18   A.     It's a progress note.

19   Q.     And is this a progress note for Lucille Moody?

20   A.     Yes.

21   Q.     What's the date on it?

22   A.     1/3/13.

23   Q.     And whose writing is that at the top?

24   A.     That's my writing at the top.

25   Q.     And whose writing is below?

Molesi - Direct

1    A.     Dr. Titus.

2              MS. SOBCZAK:  And if you could please, Ms. Leal,

3    go to Government Exhibit 127 at Page 60.

4    BY MS. SOBCZAK:

5    Q.     Do you recognize these documents, Ms. Molesi?

6    A.     They're prescriptions for controlled substances.

7    Q.     And are these dated the same date as the progress

8    note?

9    A.     Yes.

10   Q.     I am now going to show you Government Exhibit 127 at

11   39.

12             Do you recognize this exhibit, Ms. Molesi?

13   A.     It's a drug test.

14   Q.     Is it a drug test for Lucille Moody?

15   A.     Yes.

16   Q.     And if you look in at number three, what does it

17   state?

18   A.     It states that her Oxycodone was in her system,

19   Fentanyl was not, and Seroquel was not tested.

20   Q.     And going back to Page 60, is there a Fentanyl

21   prescription?

22   A.     Yes.

23   Q.     And the date on that is what, again?

24   A.     1/3/13.

25             MS. SOBCZAK:  And then going back to Exhibit 39,

Molesi - Direct

1    Ms. Leal.  I'm sorry.

2    BY MS. SOBCZAK:

3    Q.    What is the date on this drug screen?

4    A.    2/26/13.

5    Q.    And what does it say regarding Ms. Moody's Fentanyl?

6    A.    That it was negative.  It was not in her system.

7    Q.    And this is after previous prescriptions that we had

8    just looked at for Fentanyl?

9    A.    Yes.

10   Q.    And then just one more exhibit.

11        MS. SOBCZAK:  Ms. Leal, if you will go to

12   Exhibit 127 at Page 10.

13   BY MS. SOBCZAK:

14   Q.    Do you recognize this exhibit?

15   A.    It's controlled substances again and a referral to a

16   pain -- to a surgeon.

17   Q.    And so if you look down at the bottom left, what is

18   that prescription?

19   A.    The Fentanyl patches.

20   Q.    And what's the date on that prescription?

21   A.    4/22/13.

22   Q.    And is this date after the date that she failed her

23   drug test for lack of Fentanyl in her system?

24   A.    Yes.

25   Q.    Were you aware that Ms. Moody was failing drug tests

316

Molesi - Direct

1   at Lighthouse?

2   A.      Yes.

3   Q.      And how were you aware of that?

4   A.      Because I was usually the one that filed them away.

5   Q.      And when you say "filed them away," what did you do?

6   A.      Put them in her chart and -- after Dr. Titus had

7   reviewed it.

8   Q.      So can you walk us through that?  So once the drug

9   test would come in, what would you do?

10  A.      Dr. Titus would review them, and then he would tell

11  us what to do, and then we would file them away into their

12  charts.

13  Q.      And did you raise any concerns with Dr. Titus related

14  to the drug -- failed drug tests?

15  A.      We always did.  It was -- if they failed, we made

16  sure that he knew definitely that they did fail.  We brought

17  it to his attention.  But Moody -- Lucille Moody was never

18  going to be discharged.

19  Q.      And why do you say that?

20  A.      Because we had discharged her, and he just brought

21  her back.

22  Q.      How do you know that she kept coming back?

23  A.      Because I was the one that usually had to discharge

24  her, and then he would bring her right back every time.

25  Q.      And did Lucille Moody stick out to you as a patient

Molesi - Direct

1    for any reason?

2    A.    She was classified as a backdoor patient.  She -- if

3    she didn't get her way, she would call him, and he would

4    have her walk around, have her come in the back door.

5    Q.    And did you have any reason to believe that Ms. Moody

6    was selling her pills?

7               MR. BOSTIC:  Objection, Your Honor.  Calls for

8    hearsay.

9               THE COURT:  Well, let's see what -- so let's lay

10   a foundation that's not hearsay.

11   BY MS. SOBCZAK:

12   Q.    Do you know if Ms. Moody was selling her pills?

13   A.    I do not.

14              MR. BOSTIC:  Your Honor, withdrawn.

15              MS. SOBCZAK:  Your Honor, the Government seeks

16   to introduce Exhibit 705.  There's no objection to this

17   exhibit.

18              THE COURT:  All right.

19   BY MS. SOBCZAK:

20   Q.    Ms. Molesi, do you recognize this photograph?

21   A.    That's Dione Dickerson.

22   Q.    And who is Dione Dickerson?

23   A.    She was a patient of Dr. Titus.

24   Q.    Was she a pain patient?

25   A.    She was.

Molesi - Direct

```
 1                  MS. SOBCZAK:  Ms. Leal, if you'd please go to

 2    Exhibit 109, Government Exhibit 109 at Page 285.

 3                  Your Honor --

 4                  THE COURT:  Ms. Sobczak, I didn't realize we

 5    were switching topics here.

 6                  MS. SOBCZAK:  I'm so sorry, Your Honor.

 7                  THE COURT:  That's all right.  Why don't we take

 8    our morning break.

 9                  So we're going to take a 15-minute break, and so

10    we'll start again at about 20 after 11:00.

11                  MS. SOBCZAK:  Okay.

12                  THE COURT:  All right.  Can we take the jury

13    out?

14                  (Jury leaving the courtroom.)

15                  THE COURT:  All right.  So we'll be in recess

16    for 15 minutes.

17                  MR. WOODARD:  Thank you.

18                  (Recess was taken.)

19                  DEPUTY CLERK:  All rise.

20                  THE COURT:  All right.

21                  Ms. Sobczak, are you ready?

22                  MS. SOBCZAK:  I'm ready.

23                  THE COURT:  Okay.

24                  MS. SOBCZAK:  Yes.  We'll just need to enter one

25    more exhibit into evidence.  I apologize for the confusion
```

Molesi - Direct

1    on that.

2              THE COURT:  Okay.  Well, we can -- I'm not sure

3    what you're telling me.

4              MS. SOBCZAK:  We'll deal with it on one of

5    the --

6              THE COURT:  Okay.  All right.  That would have

7    been my instinct.

8              You all ready?

9              MR. BOSTIC:  Oh, yeah.  Here comes Dr. Titus.

10             THE COURT:  Yeah, good point.

11             Okay.  Let's get the jury.

12             And is Ms. Molesi around?

13             MS. REMIS:  Oh, Ms. Molesi.

14             MS. ELEAZER:  You want her now?

15             THE COURT:  Yeah, yeah.  She should come in.

16             MS. ELEAZER:  Do you mind if I just step out?

17             (Jury entering the courtroom.)

18             THE COURT:  Members of the jury, welcome back.

19   We're just getting the witness.  Everyone can be seated.

20             All right.  You may continue.

21   BY MS. SOBCZAK:

22   Q.    Hi, Ms. Molesi.

23   A.    Hi.

24   Q.    There's a couple of things I wanted to follow up on

25   before we moved to the second patient we were talking about.

Molesi - Direct

1   So related to Lucille Moody, you referred to her as a

2   backdoor patient.

3            How do you know that she would call Dr. Titus?

4   A.    She would do it in front of us, the whole staff.  She

5   would stand right at our window and call him.

6   Q.    And was this after she had been discharged or what

7   was the circumstance of her calling him?

8   A.    If she didn't like what we told her, if we told her

9   she couldn't be seen that day, if she didn't have an

10  appointment, if she didn't like what we said, she'd call

11  him.

12  Q.    Are there any examples, other examples of things that

13  you would have said that she didn't like?

14  A.    I mean, telling her that she couldn't be seen,

15  telling -- discharging her.  And that's about it really.

16  Q.    And once she was discharged, how would she be

17  discharged?

18  A.    We would give her a letter and tell her that she was

19  no longer allowed to be seen at that practice.

20  Q.    And then following that, was she -- did she come

21  back?

22  A.    Yes.

23  Q.    And how do you know that she came back?

24  A.    Because I would see her when she came in for her

25  visit and paid for it, and I was the one that brought her

Molesi - Direct

1    back into the waiting room when she did come back for a

2    visit.

3    Q.    Were there any other backdoor patients besides

4    Lucille Moody?

5    A.    Her husband was one.  And Jack Redmiller.

6    Q.    And what kind of -- what did that mean for them?

7    A.    Same thing.  They just called him on his cell phone.

8    They had his personal number, so they would call his cell

9    phone, and he would let them come back in the office back

10   door.  So they would be seen without actually having an

11   appointment that day.

12   Q.    And you said earlier that the office was very busy.

13   How did that square with the busy office?

14   A.    Patients would get upset because, I mean, there was a

15   wait.  There was at least a two-hour wait every day.  So --

16   and then you have somebody like one of those three, he would

17   be in the room for a long time, and you could hear him

18   laughing and carrying on.  And patients would get very upset

19   because they're waiting so long.

20   Q.    And when you say he was in there "for a long time,"

21   what was a long time?

22   A.    An hour, two.  I mean, it all depends on what they

23   were talking about.  If they were talking about religion,

24   they were in there for about two hours probably.

25   Q.    So I now want to turn to another individual.  And one

Molesi - Direct

1    second.

2                    MS. SOBCZAK:  Ms. Leal, if you could turn to

3    Government Exhibit 705 which, Your Honor, I believe has

4    already been admitted into evidence.

5                    THE COURT:  I think so.  Yes.

6                    MS. SOBCZAK:  Thank you.

7                    Ms. Leal, Exhibit 705.  Oh, is it loading?

8                    MS. LEAL:  You need to change it over.

9                    MS. SOBCZAK:  Sorry, it's technology.  Oh, here

10   it is.  Okay.

11   BY MS. SOBCZAK:

12   Q.    Ms. Molesi, do you recognize this photograph?

13   A.    That's Dione Dickerson.

14   Q.    And who was Dione Dickerson?

15   A.    A pain patient of ours.

16   Q.    And I'd like to show you --

17                    MS. SOBCZAK:  Ms. Leal, if you could go to

18   Government Exhibit 109.

19                    Your Honor, the Government is offering this

20   exhibit into evidence, and there is no objection to this

21   exhibit.

22                    THE COURT:  All right.  It's admitted without

23   objection.

24                    (Government Exhibit No. 109 was admitted into

25   evidence.)

Molesi - Direct

```
 1            MS. SOBCZAK:  And could you please go to
 2    Page 285, Ms. Leal?
 3            MS. LEAL:  85?
 4            MS. SOBCZAK:  285.
 5    BY MS. SOBCZAK:
 6    Q.    So Ms. Molesi, do you recognize this document?
 7    A.    I do.  It's a prescription.
 8    Q.    Prescription for whom?
 9    A.    For Dione Dickerson.
10    Q.    What is the date on this prescription?
11    A.    2/1/10.
12    Q.    And what is the prescription for?
13    A.    Percocet, 10/325.
14    Q.    And do you recognize the writing on this
15    prescription?
16    A.    That's my handwriting.
17    Q.    I'd now like to turn your attention to Government
18    Exhibit 109, Page 164.  Do you recognize this exhibit as
19    well?
20    A.    That's some more prescriptions for Dione Dickerson.
21    Q.    And what's the date on this?
22    A.    4/3/13.
23    Q.    And what was she prescribed on that date?
24    A.    Oxycodone, ten milligrams; and Morphine Sulfate DR,
25    15 milligrams.
```

Molesi - Direct

1    Q.    So in 2010, it looked like she had been prescribed

2    Percocet.  And then in 20 -- did that differ from what she

3    was prescribed here?

4    A.    Yes.

5    Q.    And what's the difference between Percocet?

6    A.    The Percocet --

7              MR. BOSTIC:  Your Honor, I will object to this.

8    I don't know that there's foundation laid for -- as to her

9    background, her knowledge as to the difference between

10   controlled substances.

11             THE COURT:  All right.  Well, it's hard to say.

12   The question is pretty open-ended.  So why don't you

13   rephrase the question, and we'll see whether there's a

14   reason for an objection.

15   BY MS. SOBCZAK:

16   Q.    In your time working at Lighthouse, was there a

17   difference in prescriptions that Dr. Titus prescribed over

18   the time that you worked there?

19   A.    Yes.

20   Q.    And what was that difference?

21   A.    We started writing more Oxycodone -- Oxycodone

22   prescriptions instead of Percocet prescriptions.

23   Q.    And based on your experience working at Lighthouse,

24   what is the difference between a Percocet and a Oxycodone

25   prescription?

325

Molesi - Direct

```
 1              MR. BOSTIC:  Your Honor, I would have to object
 2     again.  I don't believe that this witness --
 3              MS. SOBCZAK:  Your Honor, I can come back to
 4     this.
 5              THE COURT:  I'm sorry.
 6              MS. SOBCZAK:  I can actually come back to this
 7     later.
 8              THE COURT:  All right.
 9              MS. SOBCZAK:  It's all right.
10              Ms. Leal, if you would turn to Government
11     Exhibit 109 at Page 390.  And if you could zoom in to the
12     top portion of that.
13     BY MS. SOBCZAK:
14     Q.     Ms. Molesi, do you recognize this exhibit?
15     A.     It's a drug test for Dione Dickerson.
16     Q.     What's the date on this?
17     A.     4/3/13.
18     Q.     And if you turn to under number three, what does that
19     state?
20     A.     It states Percocet was negative.
21     Q.     And what does that indicate?
22     A.     That the medicine was not in her system.
23     Q.     And was she also prescribed controlled substances on
24     that same date, 4/3/2013?
25     A.     Yes.
```

326
Molesi - Direct

1   Q.      And I noticed that where it says Percocet tablets --

2              MS. SOBCZAK:  If you could highlight that,

3   Ms. Leal.

4   BY MS. SOBCZAK:

5   Q.      It's highlighted where it says Percocet tablets; is

6   that correct?

7   A.      Correct.  Yes.

8   Q.      And is it also highlighted where it says negative?

9   A.      Yes.

10  Q.      What was the purpose -- or who would highlight that

11  information?

12  A.      Either me, Jane, my mother, so that way Dr. Titus saw

13  that it was negative when he saw the patient.

14  Q.      And so is this a document that you would bring in to

15  Dr. Titus?

16  A.      Yes.

17             MS. SOBCZAK:  And, finally, Ms. Leal, could you

18  turn to Government Exhibit 109 at Page 161.

19  BY MS. SOBCZAK:

20  Q.      And Ms. Molesi, do you recognize this exhibit?

21  A.      Yes.  That's prescriptions for Dione Dickerson, also.

22  Q.      And what's the date on those prescriptions?

23  A.      4/22/13.

24  Q.      And what are those prescriptions?

25  A.      Oxycodone, ten milligrams; and Morphine Sulfate, 15

Molesi - Direct

1    milligrams.

2    Q.    And was this after she failed her drug test?

3    A.    Yes.

4    Q.    And that drug test was earlier in that month?

5    A.    Yes.  This was for her second half of her monthly

6    script.

7    Q.    And so you said before that negative drug tests were

8    something that you would flag for Dr. Titus.  Did you have

9    concerns about these negative drug tests related to Dione

10   Dickerson?

11   A.    I did.

12   Q.    And were you aware that she was failing her drug

13   tests?

14   A.    I was.

15   Q.    Do you have any understanding of what she was doing

16   with the pills that she was being prescribed?

17                MR. BOSTIC:  Objection, Your Honor.

18                THE COURT:  You're going to have to lay some

19   foundation for that.

20   BY MS. SOBCZAK:

21   Q.    Did you know Dione Dickerson personally?

22   A.    I did.

23   Q.    How did you know her?

24   A.    I knew her through a friend of ours, Debbie Harris.

25   Q.    And -- go ahead.

Molesi - Direct

1   A.      She was really good friends with her and was always

2   over there when I would go over there.

3   Q.      And what would happen when you went over and hung out

4   with Dione and Debbie?

5   A.      I only went over there to get pills from Debbie, and

6   it was usually -- she would have different pill bottles.

7   Q.      And what were the pill bottles that Dione would have?

8   I'm sorry, Debbie.

9   A.      Actually, Debbie would have some of Dione's pill

10  bottles.

11  Q.      And how did you know that Debbie's pill bottles were

12  Dione's?

13  A.      Because she would give me some of the pills out of

14  that bottle.

15  Q.      And were those --

16  A.      And they had her name on it.

17  Q.      Were those pills prescribed by Dr. Titus?

18  A.      Yes.

19  Q.      Did you raise to Dr. Titus that you knew that Debbie

20  was receiving pills from Dione?

21  A.      I did not.

22  Q.      Did you raise generally that you were concerned about

23  Dione Dickerson?

24  A.      I voiced my concern about all the patients that I had

25  concerns about.

Molesi - Direct

1   Q.      And what was his response when you were concerned

2   about these patients?

3   A.      That we -- there's no proof that any of it was going

4   on, so we can only go by what the patient tells us on their

5   pain and how -- because you can't rate pain.

6   Q.      Did you ever see Dr. Titus as a patient?

7   A.      I did.

8   Q.      And when did you start seeing Dr. Titus?

9   A.      In 2008.

10  Q.      What were the circumstances that you started seeing

11  him under?

12  A.      I was in a bad car accident, and I couldn't have my

13  surgery because the PIP insurance had run out.  So Dr. Titus

14  started seeing me so that way I could get medication for it.

15  Q.      And what did he do to treat you?

16  A.      He started me on Percocet, 5 milligrams, onto five

17  25s, and then he upped me to Oxycodone 30 milligrams.

18  Q.      And had you taken any controlled substances before

19  seeing Dr. Titus?

20  A.      No.

21  Q.      And what -- did he examine you?

22  A.      He did.  I had my office visits, but I mean, they

23  were quick.  They were fast visits.

24  Q.      Can you describe what happened during the office

25  visits?

330

Molesi - Direct

1  A.     I would wait until the -- I would have an

2  appointment, but I would wait until the end of the day, and

3  I would say, all right, you can go ahead and get my visit

4  in.  And we would go in and he would just talk, really.

5  He'd ask how I was, and then he'd give me my script, and I'd

6  go home.

7  Q.     Did he conduct a physical exam?

8  A.     No.

9  Q.     Was there anything else, any other treatment he

10  offered related to your pain?

11  A.     No.

12  Q.     And you mentioned changing dosages.  What was that

13  change in dosages?

14  A.     It was a change of Percocet 5s up to Oxycodone -- I

15  want to say he started -- it was either Oxycodone 15s or

16  30s, I don't remember which one I got switched to.

17  Q.     Mm-hmm.

18  A.     But it was -- it was higher.  I shouldn't have been

19  over ten milligrams, if you ask me.

20  Q.     Did he provide a reason why he was upping the dosage?

21  A.     The Tylenol in the Percocet was hurting my stomach.

22  It was because I was taking so much of it.  So the Oxycodone

23  does not have Tylenol in it, so he was able to give me

24  something that would not upset my stomach.

25  Q.     And did you become addicted to these pills?

331

Molesi - Direct

1    A.    I did.

2    Q.    And did you ever have to -- did you ever have a drug

3    screen?

4    A.    No.

5    Q.    So you never had to take one of the urine tests that

6    the other patients did?

7    A.    No.

8    Q.    Did you ever sell the pills that Dr. Titus

9    prescribed?

10   A.    I did.  I got arrested for it.

11   Q.    So going back to the change in prescriptions that we

12   were talking about earlier, do you have an understanding

13   of -- since you were prescribed Percocet and also prescribed

14   Oxycodone, do you have an understanding of the difference

15   between those two drugs?

16   A.    I do.

17   Q.    And so based upon your personal experience, being

18   prescribed both of those drugs by Dr. Titus, what is the

19   difference between those two?

20   A.    Percocet has Tylenol in it where Oxycodone does not

21   have any Tylenol in it.

22   Q.    And so what's -- is there a difference in effect of

23   those two drugs?

24   A.    Oxycodone is stronger than Percocet.

25   Q.    Did Dr. Titus ever talk to you about money?

Molesi - Direct

1    A.      Yes.  I mean, it wasn't really like talk, but I mean,

2    we knew when he gave money out, so...

3    Q.      Did he ever give money to you?

4    A.      He did.  He paid my car off for me.

5    Q.      When did that happen?

6    A.      '07.  2007.

7    Q.      And what was the circumstance of that happening?

8    A.      I really don't know why it happened.  He wanted to be

9    generous and say, when you have stuff, you know, you give

10   and it comes back to you.  And I tried not to take it.  My

11   mom told him she didn't want him to give it to me, but he

12   gave us this long -- you know, if you're drowning, then, you

13   know, you get sent three people, three boats.  And then you

14   go up to heaven and you're like, why didn't you save me?

15   And he's like, I sent you three things.  So it was like, I

16   don't know, felt like we had to.

17   Q.      And so you mentioned your mother.  Did you say that

18   your mother worked at Lighthouse?

19   A.      She did.  She was the second employee.

20   Q.      And was she aware that Dr. Titus was seeing you as a

21   patient?

22   A.      She was.  She wasn't happy.

23   Q.      Why wasn't she happy?

24   A.      Because she knew I was getting addicted to them.

25   Q.      And how did -- what -- was there evidence that you

Molesi - Cross

1  were getting addicted?

2  A.    I got my script upped.  I would come in a little

3  earlier.  I was using more than I should.

4  Q.    When you say you would come in "earlier," what does

5  that mean?

6  A.    Like I wouldn't come in like two weeks early, but I'd

7  come in like a couple days earlier than my actual visit was.

8  Q.    And would Dr. Titus fill the prescriptions for you

9  early?

10  A.    Yes.

11        MS. SOBCZAK:  Your Honor, may I confer with my

12  co-counsel?

13        THE COURT:  Yes.

14        MS. SOBCZAK:  The Government has no more

15  questions.

16        THE COURT:  All right.  Thank you.

17        Mr. Bostic.

18        MR. BOSTIC:  Thank you, Your Honor.

19                    CROSS-EXAMINATION

20  BY MR. BOSTIC:

21  Q.    Good afternoon.  Good morning, Ms. Molesi.

22        You identified these books as books kept by

23  Dr. Titus; am I correct?

24  A.    Correct.

25  Q.    And every person that paid with cash, it was locked

Molesi - Cross

1   into this these books?

2   A.      Yes.

3   Q.      Now, you reference a friend of yours you go to, I

4   believe Lucille Moody's house?

5   A.      No, I didn't understand you at first.

6   Q.      I'm sorry.  Didn't you say you had a friend that you

7   would go to a house?  I'm sorry.  You were friends with

8   Dione Dickerson's friend?

9   A.      Correct.

10  Q.      And you would go to their house, Dione Dickerson's

11  house?

12  A.      No.

13  Q.      Okay.  You would go to this friend.  What was her

14  name?

15  A.      Debbie.

16  Q.      Debbie.  And you said you would buy drugs off of

17  Debbie?

18  A.      I would.

19  Q.      Right.  And you never saw Debbie with a receipt book

20  logging in money that you paid her for the drugs that you

21  bought off of her?

22  A.      No, that was my personal time.

23  Q.      And, in fact, it was your personal time, but my

24  question to you was:  Did you ever see Debbie fill out a

25  receipt book and say, I received --

Molesi - Cross

1    A.      No --

2    Q.      -- from Amanda Molesi --

3    A.      -- sorry.  I misunderstood what you said.

4    Q.      Okay.  Drug dealers don't keep books?

5    A.      Correct.

6    Q.      Right.  And, in fact, you and Debbie were pretty

7    tight?

8    A.      We were.

9    Q.      And, in fact, you also sold drugs; am I correct?

10   A.      I did.

11   Q.      And did you ever keep a receipt book?

12   A.      No.

13   Q.      Now, you talked about Dr. Titus upping your

14   medication.

15   A.      He did.

16   Q.      Right?  Isn't it correct that you came to Dr. Titus

17   and told him that your medication was no longer working or

18   effective?

19   A.      Correct.  It wasn't.

20   Q.      And so there was a basis for him to increase it.

21   A.      Yes.

22   Q.      Yes?

23   A.      Yes.

24           DEPUTY CLERK:  Ms. Molesi, can you move the mic

25   just a bit closer?  I'm sorry to interrupt.  Thank you.

Molesi - Cross

1          THE WITNESS:  Mm-hmm.

2    BY MR. BOSTIC:

3    Q.      Now, how long did you sell drugs?

4    A.      It wasn't long.  It was maybe a couple months, and

5    then I got busted.

6    Q.      Wasn't it more than a couple months, because you and

7    your boyfriend were doing this together?

8    A.      It wasn't more than a couple months.

9    Q.      It wasn't more than a couple months.  And when you

10   were selling these drugs, where would you go to sell these

11   drugs?

12   A.      We would meet people, they would -- we would either

13   go to their house or we would meet them at -- like, at

14   Walgreens or something.

15   Q.      In a parking lot somewhere?

16   A.      Yes.

17   Q.      And you would hide as you're doing this?

18   A.      No.

19   Q.      You are doing it in the open?

20   A.      I did it in the open.

21   Q.      Oh, that's --

22   A.      I didn't know any better.  Like --

23   Q.      Oh, you didn't --

24   A.      -- I was not -- I was naive to it.  I was naive

25   until --

337

Molesi - Cross

1   Q.     You were naive to it?

2   A.     I was.

3   Q.     So you would come in to Dr. Titus, and you would

4   complain of pain, and you would get pills that you then went

5   to sell for cash?

6   A.     I would take most of them, but yes, I would sell some

7   of them for cash.

8   Q.     Well, so we are clear, you would get pills and you

9   would sell some of them for cash?

10  A.     Correct.

11  Q.     And not once did you tell Dr. Titus, Dr. Titus, I'm

12  abusing my pills; I'm diverting them and selling them for

13  cash money?

14  A.     No drug addict would tell him that.  You wanted --

15  your -- your -- your thought is to get your prescription

16  because you're -- when you're addicted, that's all -- you

17  want that prescription.

18  Q.     My question to you --

19  A.     So no, I did not.

20  Q.     You did not.  And you hid your addiction from him; am

21  I correct?  You never told him you were addicted?

22  A.     I didn't know I was addicted at the time.

23  Q.     So I -- let me bring you back.  If you need more

24  pills and you're selling these pills, the two don't come

25  together; right?  You're saying that you're addicted and you

Molesi - Cross

1    need these pills, but yet you're on the street slinging them

2    to whoever comes along?

3    A.    I wasn't slinging them to whoever comes along.

4    Q.    Well, then let me rephrase.

5    A.    I was slinging them out to where I had enough for

6    myself so I could keep my addiction at bay, and then I still

7    got rid of some of them.

8    Q.    Now, I understand that when you went to Dr. Titus,

9    you went to him because you were in a car accident?

10   A.    Correct.

11   Q.    And, in fact, you had shoulder and back pain?

12   A.    I did.  I still do.

13   Q.    And -- I'm sorry?

14   A.    I still do.

15   Q.    Right.  And it was serious and high-level pain?

16   A.    It was.

17   Q.    Right.  And that's how you presented to Dr. Titus?

18   A.    That's how it was.

19   Q.    Right.  And, in fact, it was so serious, you were

20   supposed to have surgery, but you couldn't afford the

21   surgery?

22   A.    Correct.

23   Q.    And, in fact, you talked about Dr. Titus sharing

24   money with people that he considered to be less fortunate?

25   A.    Yes.

Molesi - Cross

1   Q.    And at that time, you and your mom were going through

2   a difficult period financially; would that be true to say?

3   A.    We always struggled, I mean, but I was fine.

4   Q.    And he was so concerned that --

5            MR. BOSTIC:  Mr. Marek, can you pull up Defense

6   Exhibit 01 for me, please?  Let me get you a copy of this.

7   BY MR. BOSTIC:

8   Q.    Have you seen this document before?

9            MR. BOSTIC:  Can you blow that up?

10           THE WITNESS:  It's one of the notes that go --

11  I'm sorry.  It's the note that states what your diagnoses

12  are.

13  BY MR. BOSTIC:

14  Q.    Isn't it more than that?  Isn't it a bill?

15  A.    That's what it looks like, but I never got a bill.

16  Q.    You never got a bill?

17  A.    No.

18  Q.    Okay.  Did the Government --

19  A.    I didn't pay for my visits.

20  Q.    Okay.  You didn't pay for your visits.

21           My question to you is:  Did the Government not

22  show you this document?

23           MS. SOBCZAK:  Objection, Your Honor.

24           THE COURT:  Yeah, I'm going to strike that

25  question.

                          Molesi - Cross

1              MR. BOSTIC:  Okay.

2    BY MR. BOSTIC:

3    Q.    So you testified earlier that you helped with

4    billing; am I correct?

5    A.    I didn't help.  I just took the patient's co-pay when

6    they came in.  I didn't do billing.

7    Q.    Okay.

8              MR. BOSTIC:  So if I may approach the witness

9    with a copy, I'm going to ask her to look at it so we

10   don't --

11             THE COURT:  Go ahead.

12   BY MR. BOSTIC:

13   Q.    Can you take a look at that, please, all several

14   pages?

15             Would it be fair to say that in the document,

16   Defense Exhibit 1 that you're looking at, it reflects

17   appointment dates that you had with Dr. Titus?

18   A.    Yes.

19   Q.    And it would be fair to say that it reflects the

20   costs of these visits?

21   A.    Correct.

22             MR. BOSTIC:  And if you flip to the last page,

23   Mr. Marek, if you could pull that up for me.

24   BY MR. BOSTIC:

25   Q.    And you said earlier that you didn't have to pay for

Molesi - Cross

1    your visits?

2    A.    I didn't in the beginning.  When I got Blue Cross --

3    when we got the insurance that he took, then I started

4    paying the co-pay, yes.  That was like the last -- that was

5    in 2011, 2012.

6    Q.    It shows there the charges being --

7              MR. BOSTIC:  And you can pull that up for me,

8    Mr. Marek.

9    BY MR. BOSTIC:

10   Q.    -- approximately $3,180; am I correct?

11   A.    Yes.

12   Q.    And it showed that Dr. Titus wrote off $1,136.45; is

13   that correct?

14   A.    Correct.

15   Q.    He was a generous man?

16   A.    He was.

17   Q.    He was a care and kind -- a kind and caring man?

18   A.    He was.

19   Q.    And, in fact, that's not the only money that he gave

20   to you and your family; am I right?

21   A.    I babysat for him.

22   Q.    That was not my question.

23   A.    Oh, okay.  Yes.

24   Q.    My question was --

25   A.    Sorry.

Molesi - Cross

1    Q.      -- that was not the only money that he gifted to you

2    and your family?

3    A.      That was not the only money he gifted to me.  I don't

4    know about my family.  I don't know what he gave them.

5    Q.      Okay.  He provided you $8,000 to pay off your car?

6    A.      Correct.

7    Q.      And you did a little stint in college; am I correct?

8    A.      I did.

9    Q.      And you're aware that he gave your mother $7,000 to

10   go to your college tuition?

11   A.      No, because I had to get a student loan, so...

12   Q.      So you never discussed it --

13   A.      I never -- no.

14   Q.      Okay.  Now, and his gift giving and his charity

15   didn't stop with you.  Did you know he helped other people

16   out --

17   A.      He did.

18   Q.      -- that were in need?  He bought a wheelchair for one

19   patient?

20   A.      He did.

21           MS. SOBCZAK:  Objection, Your Honor.  Relevance.

22           THE COURT:  I'm going to sustain it.

23           MR. BOSTIC:  Now, if I may have a moment, Your

24   Honor.

25           THE COURT:  Sure.

Molesi - Cross

1   BY MR. BOSTIC:

2   Q.     There was the time that we talked about and you

3   talked about it where, I believe, you got arrested for

4   selling drugs.

5   A.     Correct.

6   Q.     Right?  And when that rumor started circulating,

7   because it was a rumor initially, right, around the office?

8   A.     I guess it had been said.  I wasn't working there at

9   the time, but somebody had said it, yes.  But I was never

10  asked about it.

11  Q.     So did you tell Dr. Titus at that time -- I think you

12  said you did not tell him of the arrest?

13  A.     Correct.

14  Q.     But you know he spoke to your mother; right?

15         MS. SOBCZAK:  Objection, Your Honor.  Hearsay.

16         THE COURT:  Well, the first question is

17  knowledge, so I'm going to let her answer it.

18         THE WITNESS:  No, I did not know he spoke to my

19  mother.  I know that my mom said that --

20  BY MR. BOSTIC:

21  Q.     Ma'am, there's no question in front of you right now.

22  Okay.  Give me a moment, please.

23         Didn't you tell the Government that Dr. Titus

24  spoke to your mother --

25         MS. SOBCZAK:  Objection, Your Honor, hearsay.

Molesi - Cross

1           MR. BOSTIC:  Wait a minute.  Let me --

2    BY MR. BOSTIC:

3    Q.      -- about your arrest, and your mother lied to

4    Dr. Titus?

5    A.      I was told that a patient had mentioned the arrest

6    and she overheard it, and she said that it was not me.  But

7    I don't know that it was Dr. Titus that said it or if it was

8    that patient that said it.  She said that a patient told

9    Dr. Titus.  She never said that it was exactly Dr. Titus

10   asked her.

11   Q.      So your testimony here today is that the conversation

12   was between some patient and somebody else, and it wasn't

13   particularly a conversation between your mother, Cindy

14   Molesi, and Dr. Titus?

15   A.      To my knowledge, correct.

16   Q.      Okay.

17   A.      I wasn't there, so I don't know.

18   Q.      And it's your testimony here today as well that you

19   didn't tell Agent Eleazer, and I believe it's Agent McDonald

20   when you interviewed with them that, in fact --

21           MS. SOBCZAK:  Objection, Your Honor.

22           THE COURT:  Overruled.

23   BY MR. BOSTIC:

24   Q.      That, in fact, Dr. Titus had spoken to your mother

25   about your arrest and that your mother lied?

345

Molesi - Cross

1    A.    I don't remember saying that he had spoke to her

2    straightforward about that, no.

3    Q.    Okay.  Now, you testified about the urine screens

4    that you weren't involved in other than getting the reports

5    after, but you did not conduct the tests?

6    A.    Right.

7    Q.    And you testified that there were people from

8    Ameritox in the office that were supposed to oversee that?

9    A.    Right.

10    Q.    And you testified that on one occasion, you saw a

11    mother -- a daughter go -- went in, and then the mother went

12    in afterwards and the daughter said something about "It's in

13    there"?

14    A.    Correct.

15    Q.    And you did not go into the bathroom at that point;

16    am I correct?

17    A.    I did not.  I told --

18    Q.    And you --

19    A.    I told the lady at Ameritox about it.

20    Q.    Okay.  And who was the lady you told about it?

21    A.    I don't remember her name.

22    Q.    Okay.  But you didn't tell Dr. Titus, did you?

23    A.    No.  He wasn't conducting the test.  Like, so in my

24    eyes, they were supposed to redo another test.

25    Q.    I appreciate what you just said, but my question

346

Molesi - Cross

1   remains to you:  You did not tell Dr. Titus that you saw

2   something untoward with respect to the conducting of the

3   test?

4   A.    No.  No.

5   Q.    Now, are you familiar with the entire Ameritox report

6   in terms of urine tests?

7   A.    I was.

8   Q.    I'm going to show you what I believe is Page 390, the

9   test relating to March -- I'm sorry, April 5, 2013.  The

10  Government referenced it and showed you part earlier.

11  A.    Okay.

12  Q.    Okay.  I think you said you brought to Dr. Titus'

13  attention this test and that he did not discharge this

14  individual.  Is that what you said?  Dione -- I think it's

15  Dione Dickerson; is that correct?

16  A.    Right.

17  Q.    Now, you were not in the room at the time that

18  Dr. Titus met with Ms. Dickerson --

19  A.    Correct.

20  Q.    -- and discussed this test; am I correct?

21  A.    Correct.

22  Q.    And you highlighted this section here with respect to

23  the negative part.  Did you do that highlighting?

24  A.    I didn't highlight it, no.

25  Q.    Okay.  Oh, so this is the Government's highlighting?

Molesi - Cross

1          MS. SOBCZAK:  Objection.

2          THE WITNESS:  No, no.  It was highlighted, but

3    it wasn't by me.

4    BY MR. BOSTIC:

5    Q.    I apologize.  It was highlighted in the office?

6    A.    Correct.

7    Q.    And I want to show you what I believe is Page 4 of

8    the test results.  Are you familiar with this section of the

9    test results?  See if I can blow it up for you some more.

10   A.    It just states the limit -- that the drug could be in

11   her system, but it could be very low and not readable.

12   Q.    And it's basically indicating that the person is

13   taking the medication, and it could still show negative on

14   the test results; would that be fair to say?

15   A.    If they were taking it correctly, yes, that's fair to

16   say.

17   Q.    Okay.  So you don't know whether Ms. Dickerson

18   explained to Dr. Titus what was going on that would cause it

19   to show a negative in this test result; would that be fair?

20   A.    Correct.

21   Q.    And also staying with Dione Dickerson, which is

22   Government Exhibit 109, that file, I think there was some

23   conversation, though -- well, let me ask it this way:  You

24   agree with me that Dr. Titus would use other treatment

25   modalities with individuals, send them for injections or

Molesi - Cross

1    stuff like that?

2    A.      Correct.  Yes.

3    Q.      Okay.  Now, regarding Lucille Moody, and I think it

4    centered around a test that the results were negative or

5    there may have been some issue with the results of her test

6    at some point that you believe should have caused her

7    discharge?

8    A.      Correct.

9    Q.      Now, you're aware that Dr. Titus referred Ms. Moody

10   to Mind and Body Consortium for drug counseling?

11   A.      No, I was not.

12   Q.      But you handled and prepared files?

13   A.      Not always.  Not always.

14   Q.      Well, let me show you what is Government Exhibit 128.

15   Let me show you what is marked as Government Exhibit 128,

16   Page 281.

17   A.      I wasn't even working at Dr. Titus' at that time.

18   Q.      You were not working at Dr. Titus'?

19   A.      Correct.  I left August of 2013.

20   Q.      Okay.  Well, let me ask you a question:  You have

21   seen these types of referrals before in other files; would

22   it be fair to say?

23   A.      I don't remember ever seeing anybody get sent there

24   when I was working there, no.

25   Q.      You had never seen a letter like this in any of the

349

Molesi - Cross

1  other patient files that you --

2  A.     I don't think so, no.

3  Q.     Okay.  So when you were talking to the Government and

4  going through Lucille Moody's file, you're telling us now

5  you really don't know what was going on because you were not

6  there?

7  A.     I know what was going on up until I left.

8  Q.     Okay.  And didn't you say that Lucille Moody was

9  discharged?

10  A.     Her husband was discharged.

11  Q.     So you weren't -- indeed, then, you weren't talking

12  about Lucille Moody, you were talking about her husband?

13  A.     With the backdoor patient thing, correct.  Like --

14  Q.     I'm not asking about backdoor patients.

15  A.     But that's where that was coming from in the chart.

16  Q.     Right.  But I'm asking you this question because I

17  thought you testified that Lucille Moody was discharged, and

18  you had an exchange with the Government about that.

19  A.     She was supposed to be discharged, yes, but she did

20  not get discharged.

21  Q.     Okay.  But you just told me you weren't there at the

22  time --

23  A.     For that time.  I'm talking about a different time.

24  There's no -- there's not going to be a note because she

25  wasn't discharged.

Molesi - Cross

1    Q.      And when was that time, as you sit here and recall

2    that?

3    A.      That would have been probably 2009, 2011.

4    Q.      2009, 2011.  And you have -- that's what?  My math

5    isn't too good, but that's about 12 years ago?

6    A.      Mm-hmm.

7    Q.      And you worked at another pain management clinic; am

8    I correct?

9    A.      I did.

10   Q.      And you worked there for how long?

11   A.      A year.

12   Q.      A year.  And in between these periods -- let me go

13   back and ask you this:  Dr. Titus fired you on one occasion?

14   A.      He did not fire me.  I was never fired.  I quit both

15   times.

16   Q.      He -- was it one of these things, you're fired and

17   you quit?

18   A.      No.  I quit on my own.  I gave my two weeks' notice

19   and I had another job lined up both times.

20   Q.      So there would not have been any reason for your

21   mother to approach Dr. Titus and ask him to rehire you at

22   any time?

23   A.      No.  Dr. Titus reached out to me.

24   Q.      There's no --

25   A.      I was fine.

                          Molesi - Cross

1    Q.      You've answered my question.  Okay.

2                MR. BOSTIC:  If I may have a moment, Your Honor?

3                THE COURT:  Yes.

4    BY MR. BOSTIC:

5    Q.     Oh, Ms. Molesi, when you spoke to the agents, I think

6    initially in September of 2015, I think you saw Agent

7    Eleazer?

8    A.      I don't remember their names.

9    Q.      But there were like three agents that you spoke to?

10   A.      Yes.

11   Q.      And at that time, they showed you their badges;

12   right?

13   A.      Correct.

14   Q.      Right.  And since you had been locked up for drug

15   dealing before --

16   A.      Wait --

17                MS. SOBCZAK:  Objection, Your Honor.

18                MR. BOSTIC:  Let me finish.  I'll rephrase.

19                THE COURT:  There's lots of commotion going on

20   here, so let him proceed.

21   BY MR. BOSTIC:

22   Q.      Since you were arrested for drug dealing before,

23   right --

24   A.      Mm-hmm.

25   Q.      -- you knew that these agents had the authority to

Molesi - Redirect

1    arrest you for the selling of your pills?

2    A.    No, because my case was dismissed, and I was informed

3    by them that I could not be tried for that again unless I

4    got caught selling my pills.

5    Q.    So that's what the case agents told you?

6    A.    That's what my -- when I got arrested, that's what

7    the DEA and my lawyer told me.

8    Q.    So you were arrested by the feds for selling your

9    pills by the Federal Government?

10   A.    Correct.  Well, I guess -- I guess that's who it is,

11   the DEA.  I don't know.

12   Q.    In your conversations with them, as I understand,

13   they made it clear that there would be no consequences for

14   that arrest in your discussion with them in 2015?

15   A.    No, I did not discuss that with them.  I told them

16   that they were not able to use that, because I was told by

17   my lawyer, and the judge, and the DEA back then that it

18   could never be used against me, unless I got in trouble with

19   the law again.

20              MR. BOSTIC:  Thank you.  I have nothing else.

21              THE COURT:  All right.  Any redirect?

22              MS. SOBCZAK:  Yes, Your Honor.

23                    REDIRECT EXAMINATION

24   BY MS. SOBCZAK:

25   Q.    So, Ms. Molesi, hello again.  Were you selling your

Molesi - Redirect

1   drugs while you were working at Lighthouse?

2   A.      I was.

3   Q.      So were you coming into work every day addicted to

4   drugs?

5            MR. BOSTIC:  Objection to a leading question,

6   Your Honor.

7            THE COURT:  Sustained.

8   BY MS. SOBCZAK:

9   Q.      Did you develop your addiction while you were working

10  for Dr. Titus?

11  A.      Yes.

12  Q.      And your selling of drugs, was that to get more

13  drugs?

14  A.      No.  I was only using the pills.  I don't know why I

15  sold the drugs, to tell you the truth.  I have no clue.  Now

16  that I look back, it was stupid because I didn't need the

17  money.  I just -- I don't know.

18  Q.      And at the time you were selling the drugs, though,

19  as you just said, you were working for Dr. Titus?

20  A.      Correct.  When I got caught, busted, though, I had

21  just left Dr. Titus and started at the other doctor's

22  office.

23  Q.      And were you asking for pills early at the time you

24  were working for Dr. Titus?

25  A.      I had asked him to --

Molesi - Redirect

1          MR. BOSTIC:  Objection to the leading question,

2   Your Honor.

3          THE COURT:  Yeah, I'm going to sustain it.

4   BY MS. SOBCZAK:

5   Q.    Regarding the drug tests, you're not a doctor, are

6   you?

7   A.    No.

8   Q.    And what was your role, again, as far as providing

9   the documents for the drug tests to Dr. Titus?

10  A.    We were to give them to Dr. Titus.

11  Q.    So did you highlight --

12  A.    We highlighted what was negative, if the prescription

13  should have been there.  We would highlight the results if

14  it was negative.  And then we would give it to him to

15  review.

16  Q.    And so that was Dr. Titus' -- was that Dr. Titus'

17  decision what to do with that?

18  A.    Yes.

19  Q.    And Dr. Titus was the boss at Lighthouse; right?

20  A.    Correct.

21  Q.    Was Dr. Titus the final decisionmaker on everything

22  that happened at Lighthouse?

23  A.    To my knowledge, he was.  Josie would be the one that

24  would tell us, but Dr. Titus was always who made that final

25  decision of what happened.

Molesi - Recross

 1    Q.      So when Josie told you something --

 2    A.      If Dr. Titus didn't agree, he would tell us don't --

 3    disregard that, do what I say.

 4    Q.      And as far as your arrest goes, do you know who -- if

 5    it was the DEA or State agency that arrested you?

 6    A.      I was told it was the DEA, but I don't know.  They

 7    had a mask on.  They were undercover, so that's all I know.

 8    Q.      And just one last thing.  When you started taking

 9    controlled substances, were you addicted to them or -- I'm

10    sorry.  Had you taken controlled substances before Dr. Titus

11    prescribed them to you?

12    A.      No, not on the everyday basis.

13    Q.      Did anyone else prescribe you controlled substances?

14    A.      The surgeon did right before my surgery, but it was

15    literally one script, like, for five days' worth.

16    Q.      And at the time you stopped working at Dr. Titus',

17    were you addicted to controlled substances?

18    A.      Yes.

19              MS. SOBCZAK:  Thank you.  No further questions.

20              MR. BOSTIC:  Your Honor, very brief redirect on

21    this issue.

22                       RECROSS-EXAMINATION

23    BY MR. BOSTIC:

24    Q.      Ma'am, you said that you didn't know why you were

25    selling your pills?

Molesi - Recross

1    A.    I don't.  I look back now, and I don't know why I

2    sold them.  It was dumb.  Like, I didn't need the money, I

3    just did it.

4    Q.    But you went and you got pills, and you sold them

5    illegally and got cash; right?

6    A.    I did, but I didn't need the money is what I'm

7    saying, so I don't know why I did it.

8    Q.    And you only got busted when the DEA sent an

9    undercover agent to you --

10              MS. SOBCZAK:  Objection.

11   BY MR. BOSTIC:

12   Q.    -- and you sold to that agent?

13   A.    No, my best friend set me up because he got busted.

14   Q.    But that incident involved an undercover agent.  You

15   just testified that there was an undercover agent --

16   A.    Correct.  There was.

17   Q.    -- and that the agent was wearing a mask.

18   A.    He was wearing a mask when I went into the room with

19   them, but I didn't give them the pills.  I --

20              MS. SOBCZAK:  Objection, Your Honor.

21              THE COURT:  All right.

22              MR. BOSTIC:  Nothing else, Your Honor.  Thank

23   you.

24              THE COURT:  All right.

25              Ms. Molesi, thank you.  You're excused.  You may

Miller - Direct

1    go.

2              All right.  Who's your next witness?

3              MS. REMIS:  Your Honor, the Government calls

4    Megan Miller.

5              THE COURT:  All right.

6              DEPUTY CLERK:  Please state and spell your full

7    name for the record.

8              THE WITNESS:  Megan Miller, M-E-G-A-N

9    M-I-L-L-E-R.

10             DEPUTY CLERK:  Do you affirm that the testimony

11   you are about to give to the Court and the jury in the case

12   now pending will be the truth, the whole truth, and nothing

13   but the truth, you do so affirm?

14             THE WITNESS:  I do.

15             DEPUTY CLERK:  Thank you.

16             MEGAN MILLER, the witness herein, after having

17   been duly affirmed under oath, was examined and testified as

18   follows:

19                     DIRECT EXAMINATION

20   BY MS. REMIS:

21   Q.    Good afternoon, Ms. Miller.  Could you please

22   introduce yourself to the jury?

23   A.    My name is Megan Miller.  I'm lead investigator with

24   the Department of State Division of Professional Regulation.

25   Q.    And what is the Division of -- excuse me, Division of

Miller - Direct

1    Professional Regulation?

2    A.      It is an umbrella agency that pretty much handles the

3    public safety of licensees, rules and regulations for

4    licensees of the State.

5    Q.      And what are some examples of licensees in the State?

6    A.      Medical doctor, nurse, accountant, veterinarian.

7    Q.      And what is your role specifically at the Department

8    of Professional -- Division of Professional Regulation?

9    A.      I'm the lead investigator.  I support the

10   investigative supervisor for the investigative unit.

11   Q.      So does the Division of Professional Regulation -- is

12   it okay if I call it the DPR?

13   A.      Yes.

14   Q.      Does the DPR have a group of investigators that work

15   there?

16   A.      Yes.

17   Q.      And what's the role of the investigator?

18   A.      To investigate complaints filed against licensees.

19   Q.      When did you start at the DPR?

20   A.      Approximately 2014.

21   Q.      Can you describe just generally how the DPR is

22   organized?

23   A.      Again, we're an umbrella agency, so we have admins

24   that support the boards to issue licenses for the licensees,

25   basically administrative responsibilities.  Part of our

Miller - Direct

1    agency as an investigative unit, we would investigate
2    complaints filed against licensees that would come from the
3    public.
4    Q.    Okay.  And in addition to investigating licensees and
5    overseeing licenses, does the board also oversee controlled
6    substance registrations?
7    A.    Yes.
8    Q.    And what is the controlled substance registration?
9    A.    It's a board that has -- has set forth laws, rules,
10   and regulations for prescribing controlled substances.
11   Q.    What licenses does a physician need to practice
12   medicine in the State of Delaware?
13   A.    He needs a medical doctor's license to practice.
14   Q.    And does a physician need anything special in order
15   to be able to prescribe controlled substances?
16   A.    Yes.  He would need a controlled substance, CSR
17   license.
18   Q.    So without a CSR, controlled license registration and
19   a medical license, can a doctor practice in Delaware?
20   A.    He can practice medicine, but he wouldn't be able to
21   prescribe narcotics.
22   Q.    Why do medical professionals in Delaware need a
23   license to specifically prescribe controlled substances?
24   A.    There's specific rules and regulations on how to
25   prescribe opioids and narcotics that they need to follow and

1    adhere to.

2    Q.     And when a physician obtains a controlled substance

3    registration, do they essentially agree to follow those

4    rules and regulations?

5    A.     Yes.

6    Q.     Let's talk about the -- you mentioned the

7    investigative unit at DPR.  Are you one of those

8    investigators?

9    A.     Yes.

10   Q.     And about how many investigators are there at the

11   DPR?

12   A.     Approximately 14.

13   Q.     And was that also true in 2014?

14   A.     Yes.

15   Q.     What do the investigators at the DPR do?

16   A.     When a complaint is filed against a licensee, the

17   investigator is assigned to look into the allegations to

18   whether -- to substantiate or unsubstantiate the allegations

19   against the licensee.

20   Q.     And what types of complaints are investigated related

21   to medical licenses, for example?

22   A.     Negligence.  Misconduct.  Unprofessional conduct.

23   Inappropriate prescribing.

24   Q.     And what about complaints relating to controlled

25   substance registrations?

Miller - Direct

1    A.      Yes.  We investigate against anything, any

2    allegations made in reference to prescribing.

3    Q.      To be clear, does the DPR investigate crimes?

4    A.      No.

5    Q.      So you are not a criminal investigator?

6    A.      No, I am not.

7    Q.      Okay.  Let's talk about the process of complaints and

8    investigations.  How does the whole thing begin?

9    A.      A complaint is initiated by a public member or it

10   could be another agency.  They would file a complaint

11   against the licensee.  It could be for inappropriate

12   prescribing or medical negligence.  The -- we receive, the

13   investigative supervisor and myself, receive the complaint.

14   We triage the complaint, make sure it's within our

15   jurisdiction.

16          We then would assign the complaint to an

17   investigator to begin the investigative process to talk to

18   the complainant or respondent, the person who filed the

19   complaint or the person who it's against and gather

20   information.

21   Q.      Okay.  So taking a step back, do you investigate

22   anything just on your own without a complaint?

23   A.      No.  We're completely complaint driven.

24   Q.      Okay.  And how would somebody file a complaint if

25   they have one?

Miller - Direct

1    A.    They would go to our website, our portal.  They could

2    walk into the office.  They could telephone us, email us.

3    Q.    And I just want to be clear, let's focus on the time

4    frame around 2014.  Okay?

5    A.    Yes.

6    Q.    And was that all true in 2014 as well?

7    A.    Yes.

8    Q.    What information would a person include on a

9    complaint?

10   A.    The complainants would give their name, address,

11   phone number.  They would file the complaint against the

12   respondent with their name, if they have their phone number,

13   address information.  A detailed complaint of the

14   allegations they're making against the licensee.

15   Q.    And when you say "complainant," what do you mean?

16   A.    The person filing the complaint.

17   Q.    And when you say "respondent," what do you mean by

18   that?

19   A.    The person who the complaint is filed against.

20   Q.    Okay.  And you mentioned that they would include like

21   a description or something like that.  What would that

22   include?

23   A.    It would give us the details to know what the

24   complaint is about that they were filing against the doctor.

25   It would give a -- possibly a patient name, date of birth,

Miller - Direct

1    and the details of why they're filing the complaint.

2    Q.    Now, you mentioned that you, as the investigative

3    lead, would triage the complaint?

4    A.    Yes.

5    Q.    Just generally, what types of things are you looking

6    for?

7    A.    Mainly making sure it's within our jurisdiction, that

8    it happened in the State of Delaware, if it's -- there's

9    certain areas we don't investigate, like billing.  We don't

10   investigate billing issues.  So we're looking to make sure

11   it's within the laws, rules and regs that's been mandated by

12   the board.

13   Q.    Okay.  And is the respondent, as you call it, the

14   person who's being complained about, is that person ever

15   notified of the complaint?

16   A.    Yes, they are.

17   Q.    And how are they notified of that complaint?

18   A.    We send a letter of notification along with a copy of

19   the complaint.

20   Q.    So you said a letter and a copy of the complaint?

21   A.    Yes.

22   Q.    And is that the original complaint that whoever made

23   the complaint wrote up?

24   A.    Yes.

25   Q.    So, and would that include the details that you

Miller - Direct

1   mentioned in the sort of explanation?

2   A.      Yes.

3   Q.      Why does the State provide that notice?

4   A.      So they can respond appropriately to the allegations

5   made against them.

6   Q.      And does the person who's being complained about have

7   to respond?

8   A.      They should respond at some point, yes.

9   Q.      And what happens after the respondent or the person

10  being complained about is notified of the complaint?

11  A.      I'm sorry.  Can you repeat that?

12  Q.      Sure.  I'm sorry.  What happens after the person

13  being complained about is notified of the complaint?

14  A.      The person who's being -- so the respondent?

15  Q.      Yes.

16  A.      Once they're notified of the complaint, we ask them

17  to respond within 20 days.  And then -- I'm sorry.

18  Q.      That's okay.  And then what happens after that?

19  A.      It's assigned to an investigator to start the

20  investigative process.

21  Q.      Okay.  And what kinds of investigative tools does the

22  investigator use?

23  A.      He or she would interview the complainant, the

24  respondent, any witnesses, subpoena records, if necessary,

25  consult with a board member after they gathered all the

Miller - Direct

1    information.  Then they would consult with the board member

2    to see if the allegations were substantiated and/or

3    unsubstantiated.

4    Q.    Okay.  And after that, what happens?

5    A.    If the case -- if we have substantiated the

6    allegations, it would then move forward to the Attorney

7    General's Office for further review.

8    Q.    And what are the options from the Attorney General's

9    Office after the Attorney General's Office is notified?

10   A.    Once they're notified, they can review the case.

11   They can decide to dismiss it, or they could decide to

12   proceed with, I guess, a hearing or consent.

13   Q.    So are those two different options for how a case is

14   resolved?

15   A.    Yes.

16   Q.    And I'm just going to put up a little picture here

17   just so we can follow you.  I think it's the lectern, right?

18   Doc Cam.  Sorry.

19            All right.  Is this the sort of process we have?

20   It starts with the complaint.  You give notice to the

21   respondent.

22            And then what did you say the two options were

23   for resolving the complaint?

24   A.    If it's substantiated, it would go to the Attorney

25   General's Office.

366

Miller - Direct

1    Q.      Okay.

2    A.      If it's not substantiated, we would close the

3    complaint.

4    Q.      Okay.  And then once it goes to the Attorney

5    General's Office?

6    A.      We -- it would either be dismissed --

7    Q.      Okay.

8    A.      -- or it would be -- go to a consent or to a hearing.

9    Q.      I know there's a lot of steps, but is that

10   essentially --

11   A.      That's the gist.

12   Q.      -- what happens?  Okay.

13          Let's talk about a Consent Agreement, which is

14   one of the options down below.  What is it, a Consent

15   Agreement?

16   A.      The Consent Agreement is drawn up by the Attorney

17   General that -- basically where the respondent will

18   acknowledge to wrongdoing and sign off on it, and maybe come

19   to terms on what the reprimand will be.

20   Q.      And who enters into a Consent Agreement?

21   A.      The respondent.

22   Q.      And who else?

23   A.      The Attorney General.  And the board, actually.  The

24   board.

25   Q.      The Medical Board?

Miller - Direct

1    A.      That board -- yes.  The Board of Medical -- Board of

2    Discipline and Licensure.

3    Q.      And that's a Delaware State Board; right?

4    A.      That is correct.

5    Q.      And what types of different agreements can be

6    included in a Consent Agreement?

7    A.      They could request that they have continuing

8    education.  They could request that they pay a fine, be

9    audited.  Those are a couple examples.

10   Q.      And is that Consent Agreement kind of like a

11   contract?

12   A.      Yes.

13   Q.      And it's binding on both of the parties who sign it?

14   A.      Yes.

15   Q.      Okay.  Are you familiar with somebody named Patrick

16   Titus?

17   A.      Yes.

18   Q.      How are you familiar with him?

19   A.      He is a medical doctor in the State of Delaware.  He

20   was --

21   Q.      Sorry about that.  Go ahead.

22   A.      He's been investigated here in Delaware.

23   Q.      Okay.  And did your office conduct those

24   investigations?

25   A.      Yes, we did.

Miller - Direct

1    Q.      Did you personally work on any of those cases?

2    A.      I did not.

3    Q.      I want to focus on the years 2011 and 2012.  At that

4    time, was your office investigating Dr. Titus' prescribing

5    habits?

6    A.      Yes.

7    Q.      And, again, you weren't the -- personally

8    investigating him?

9    A.      I was not.

10   Q.      Okay.  What actions, if any, did the board take based

11   on their findings in 2011 or so, 2011, 2012?

12   A.      My recollection is there was a Consent Agreement in

13   2011.

14   Q.      And what was that a result of?  What had happened in

15   order to get to the Consent Agreement phase?

16           MS. KOUSOULIS:  I'll object.  She wasn't

17   involved.  Unless there's a foundation that she knows, other

18   than based on hearsay, what was involved because she said

19   she wasn't personally involved necessarily with Dr. Titus'

20   case.  I'm not sure the basis of knowledge.

21           THE COURT:  Well, I think it's based on records;

22   right?

23           THE WITNESS:  Yes.

24           THE COURT:  So obviously, she ought to stick to

25   the records because that's all she's got, but go ahead.

Miller - Direct

1          MS. REMIS:  Thank you, Your Honor.

2     BY MS. REMIS:

3     Q.    You're familiar with the cases against Dr. Titus

4     because of your role at the board, is that right, or at the

5     DPR?

6     A.    Yes.

7     Q.    And before coming here today, have you reviewed those

8     records?

9     A.    Yes.

10    Q.    And are those records that are kept in the ordinary

11    course of the DPR's business?

12    A.    Yes.

13    Q.    Okay.  Let's talk a little bit about the 2012 Consent

14    Decree.  I'm going to show --

15          MS. REMIS:  One moment, Your Honor.

16          Okay.  Your Honor, the Government moves to admit

17    Government Exhibit 614.  The Defendant doesn't object.

18          MS. KOUSOULIS:  No objection, Your Honor.

19          THE COURT:  All right.  Admitted without

20    objection.

21          (Government Exhibit No. 614 was admitted into

22    evidence.)

23          MS. REMUS:  All right.  If we can pull up

24    Government Exhibit 614, please.

25    BY MS. REMIS:

Miller - Direct

1    Q.    Ms. Miller, what are we looking at here?

2    A.    A Consent Agreement.

3    Q.    And who is it between?

4    A.    Patrick Titus and the Delaware Secretary of State.

5          MS. REMIS:  And if we could go to Page 5 of the

6    agreement, please.  Okay.

7    BY MS. REMIS:

8    Q.    At the bottom of the page, there are two lines to

9    the -- whose name is on the right?

10   A.    On the right --

11   Q.    Yes.

12   A.    -- would be Barbara Gadbois.

13   Q.    Okay.  And --

14   A.    The Attorney General.

15   Q.    Okay.  And is she a lawyer for the State?

16   A.    Yes.

17   Q.    And it says Department of Justice there.  That's a

18   different Department of Justice than the Department of

19   Justice where I work; right?

20   A.    That is Department of Justice for the State of

21   Delaware.

22   Q.    Okay.  And what's the date under her signature?

23   A.    March 22nd, 2012.

24   Q.    And whose name is on the left?

25   A.    Patrick Titus.  Sorry, Patrick Titus, M.D.

Miller - Direct

1    Q.      And what does it say underneath his name?

2    A.      Respondent.

3    Q.      And that means that that's the person who was

4    complained about?

5    A.      That is correct.

6    Q.      And on what date was it signed?

7    A.      March 22nd, 2012.

8    Q.      Okay.  Let's read a few parts of the complaint,

9    starting with Paragraph 2 on Page 1, please.  Okay.

10            MS. REMIS:  And if we could just blow up

11   paragraphs -- yeah, through the end of the page would be

12   great.

13            Thank you.

14   BY MS. REMIS:

15   Q.      Could you read Paragraph 2, please?

16   A.      Starting with Number 1?

17   Q.      With Number 2.

18   A.      Oh, Number 2.  I'm sorry.  "Dr. Titus's controlled

19   substances registration, Number MD3949, was issued in 2001

20   and was suspended on December 8, 2011."

21   Q.      Okay.  And if you could read Number 3, please.

22   A.      "Dr. Titus's primary specialty is internal medicine."

23   He's also -- "he also provides pain management treatment to

24   chronic pain patients."

25   Q.      Okay.  And if you could just go through 4 and 5 as

Miller - Direct

1    well, please.

2    A.      "Dr. Titus currently requires additional training,

3    education and knowledge to manage chronic pain patients and

4    to safely and effectively prescribe narcotics and other

5    controlled substances for patients with chronic pain."

6    Q.      And Number 5, please?

7    A.      "Dr. Titus has been treating increased numbers of

8    chronic pain patients and has been prescribing increased

9    amounts of controlled substances to his chronic pain

10   patients."

11   Q.      And everything that you've just read is something

12   that Dr. Titus acknowledged when he signed the document;

13   right?

14   A.      Yes.

15   Q.      If we could turn to Page 2, please.  And could you

16   read Paragraph 6?

17   A.      "Dr. Titus recognizes that the" -- "that some of the

18   controls he had established to prevent diversion of

19   controlled substances from his office into non-legitimate

20   and illegal channels may have led to abuse of those

21   controlled substances."

22   Q.      Okay.  And if we could exit out of that.

23           Now, Paragraph 9 there, does that paragraph

24   detail things that Dr. Titus would be required to do in

25   order to get his controlled substance registration back?

373

Miller - Direct

1  A.     Yes.

2  Q.     Okay.  And if we could look at Paragraph 9A, there's

3  a list of different regulations and policies that Dr. Titus

4  will comply with.

5         Is that accurate?

6  A.     Yes.

7  Q.     Okay.  Could you just read the three -- there's one

8  starting with the words "regulation."  If you could read

9  starting there.  Starting with "regulation," sorry.  The

10 second line under A.

11 A.     Second line under A.  "Regulation of the use of

12 controlled substances for the treatment of pain of the

13 Delaware Board of Medical Licensure and Discipline ("Board")

14 the Model Policy, for the Use of Controlled Substances For

15 the Treatment of Pain of the Federation of State Medical

16 Boards of the United States, Inc., as adopted by the Board

17 on June 2, 2009, as well as the guidelines of the American

18 Pain Society and the American Academy of Pain Medicine

19 ("AAPM") concerning appropriate opioid practices published

20 in the Journal of Pain, Volume 10, Number 2 (February 2009)"

21 and on -- "and online at" --

22 Q.     You don't have to read that.

23 A.     Thank you.

24 Q.     Are those three regulations and policies that govern

25 the prescribing of controlled substances?

374

Miller - Direct

1    A.    Yes.

2    Q.    And below that, are there specific steps that

3    Dr. Titus agreed to take with respect to his practice?

4    A.    Yes.

5    Q.    And were those steps in order to comply with those

6    policies and regulations?

7    A.    Yes.

8    Q.    Okay.  At the bottom of Page 2, right where we just

9    were, there's a number two.  Do you see that right at the

10   bottom line?

11   A.    Yes.

12   Q.    Could you read starting there, and then we'll switch

13   to the next page when you're done with this page?

14   A.    "Dr. Titus will require toxicology screens in his

15   treatment of patients."

16   Q.    Okay.  And then onto Page 3 at the top, please?

17   A.    "And will provide copies of any vendor agreements

18   entered into for the purpose of providing toxicology screens

19   or implementing other controls."

20   Q.    And so what does that requirement -- what did that

21   requirement ask Dr. Titus to do?

22   A.    Providing urine samples, looking for either of the

23   drugs, that being prescribed or drugs that are not being

24   prescribed.

25   Q.    So conduct toxicology screens?

Miller - Direct

1   A.      Yes.

2   Q.      Okay.  And then on Page 5 we have -- excuse me,

3   Number 5, on Page 3, at the bottom of that same paragraph,

4   what does it say there?

5   A.      Paragraph -- you said Line 5.  Okay.

6   Q.      Where it says five.

7   A.      Five.  There it is.  "Out of an abundance of caution,

8   Dr. Titus will provide treatment for each pain management

9   patient for no longer than six months and, thereafter,

10  Dr. Titus will refer each such patient to a recognized pain

11  management physician for reevaluation, and Dr. Titus shall

12  rely on and follow the recommendations of the pain

13  management physician before he undertakes to again treat any

14  such patient."

15  Q.      And what does that require of Dr. Titus?

16  A.      To refer his patient to a pain management specialist.

17  Q.      Okay.  And according to this agreement, is he allowed

18  to treat those patients before they have seen that pain

19  management specialist?

20  A.      Yes.

21  Q.      Sorry.

22  A.      Yes.

23  Q.      It says at the end that "Dr. Titus shall rely on and

24  follow the recommendations of the pain management physician

25  before he undertakes to again treat any such patient."

Miller - Direct

1    A.      Right.  After he's referred them, correct.

2    Q.      So essentially he has to wait until they've seen that

3    doctor before treating them again?

4    A.      Yes.

5    Q.      Okay.  Did Dr. --

6              MS. REMIS:  If we could back out of that,

7    please.  Thank you, Ms. Leal.

8    BY MS. REMIS:

9    Q.      If we look below at B, did Dr. Titus also agree that

10   his staff would be instructed on all of these regulations

11   and policies as well as the practices included in this

12   Consent Agreement?

13   A.      Yes.

14   Q.      And that he would responsively monitor all staff

15   members to ensure compliance?

16   A.      Yes.

17   Q.      Okay.  And then, finally, on Paragraph 9(d), could

18   you read that for us?

19   A.      Yes.  "Dr. Titus will submit to the Secretary

20   evidence of his successful completion of 12 continuing

21   medical education hours on opioid prescription practices,

22   treatment of chronic pain, or other related topics given by

23   AAPM or other providers approved by the Secretary before his

24   suspension will be lifted.  Thereafter, Dr. Titus agrees he

25   will take six CME hours" --

Miller - Direct

1    Q.      Okay.  Go to the next page quickly.

2    A.      -- "on these topics from either the AAPM or other

3    provider approved by the Secretary annually for the next two

4    years.  These CMEs are in addition to those regularly

5    required for renewal of his medical license."

6    Q.      Okay.  And again, what is a CME?

7    A.      Continuing medical education.

8    Q.      And is that something that the board commonly

9    requires physicians to do when they enter a Consent

10   Agreement?

11   A.      It can be, yes.

12   Q.      Okay.  And just generally, what is included in a CME?

13   A.      It's continuing education on specific items they feel

14   like they need more education.

15   Q.      Okay.  And so going to Page 5 once more, please.

16   What is the date of this Consent Agreement?

17   A.      March 22nd, 2012.

18   Q.      Okay.  So by signing this Consent Agreement, did

19   Dr. Titus agree to all the terms and conditions in the

20   agreement?

21   A.      Yes.

22   Q.      Okay.  Now, one of the agreements that Dr. Titus made

23   was to take CMEs on opioid prescription practices; right?

24   A.      Yes.

25   Q.      And did the State ever receive proof that Dr. Titus

Miller - Direct

1    had completed the CMEs required by this?

2    A.    Yes.

3    Q.    Did they also receive proof that Dr. Titus had taken

4    other CMEs as required?

5    A.    Yes.

6    Q.    Okay.  I'm going to -- one moment, Your Honor.

7              THE COURT:  Yes.

8              MS. REMIS:  Your Honor, I move to admit

9    Government Exhibit 619.  The Defendant has --

10             MS. KOUSOULIS:  No objection.

11             MS. REMIS:  No objection.  Great.

12             THE COURT:  All right.  Admitted without

13   objection.

14             (Government Exhibit No. 619 was admitted into

15   evidence.)

16             MS. REMIS:  Okay.  And may I approach the

17   witness, Your Honor?

18             THE COURT:  Yes.

19   BY MS. REMIS:

20   Q.    Ms. Miller, I've just handed you Government

21   Exhibit 619.  Before coming to court today, have you looked

22   through those?

23   A.    Yes.

24   Q.    And what are they, just in general?

25   A.    They are CME certificates showing proof of continuing

Miller - Direct

1    education.

2    Q.    Okay.  And if we could go to Page 23, please.  Is

3    Page 23, if you could just flip to the back page of what you

4    have, is that the 23rd page?  Are there 23 certificates?

5    A.    Yes.

6    Q.    Okay.  And what is the date range on those

7    certificates?  You can just look at --

8    A.    2007 to 2008.

9    Q.    Okay.  If you look right below it, is that the date

10   that it was completed?

11   A.    August 14th, 2014.

12   Q.    Okay.  Just from flipping through those CMEs that the

13   State had in its possession, what was the year that these

14   were completed in?

15   A.    2014.

16   Q.    Okay.  Now, following Dr. Titus' suspension in 2011

17   and the Consent Decree in 2012, did Dr. Titus at some point

18   get his controlled substance registration back?

19   A.    After 2014, yes.  I'd have to see something to --

20   Q.    Refresh your memory?

21   A.    -- refresh my memory, please.

22   Q.    Well, the Consent Decree, if we look on Page 5 of

23   Government Exhibit 614, this is dated 2012; is that right?

24   A.    Correct.

25   Q.    And do you recall how long the Consent Decree lasted

Miller - Direct

1  offhand?

2  A.      The Consent Agreement was -- I'd -- was in 2012.

3  Q.      And Ms. Miller?

4  A.      Yes.

5  Q.      Do you agree that at some point Dr. Titus got his

6  license, his controlled substance registration back around

7  2012?

8  A.      Yes.

9  Q.      Okay.  Let's go on to following 2012, after he got

10  his controlled substance registration back.

11  A.      Yes.

12  Q.      Were there other and additional complaints lodged

13  against Dr. Titus?

14  A.      Yes.

15  Q.      And those were complaints that were filed with the

16  DPR?

17  A.      Yes.

18  Q.      Is that right?

19  A.      Yes.

20  Q.      Did the DPR investigate those complaints?

21  A.      Yes.

22  Q.      And again, were you personally involved in

23  investigating those complaints?

24  A.      I was not.

25  Q.      Okay.  Now, we talked about earlier the whole

Miller - Direct

1    complaint process, and I went through that paper.  Would the

2    same process have applied to the complaints that were lodged

3    against Dr. Titus following the 2012 consent decree?

4    A.    Yes.

5    Q.    Specifically, was Dr. Titus notified about any

6    complaint that would have come in?

7    A.    Yes.

8    Q.    And how would he have been notified?

9    A.    We would have sent him a letter of notification and a

10   copy of the complaint.

11   Q.    Okay.  Let's go through some of those letters of

12   notification, if we can.

13              Your Honor, I'm about to admit or seek to admit

14   Government Exhibits 605 through 610.  I don't believe

15   there's an objection from the Defense.

16              MS. KOUSOULIS:  No, no objection, Your Honor.

17              THE COURT:  Admitted without objection.

18              MS. REMIS:  Thank you, Your Honor.

19              (Government Exhibit Nos. 605 to 610 were

20   admitted into evidence.)

21              THE COURT:  All right.

22              MS. REMIS:  All right.  Let's start with

23   Government Exhibit 607.  If we could pull that up, please.

24   BY MS. REMIS:

25   Q.    What is this?

Miller - Direct

1    A.     This is a letter to Dr. Titus, a notification that a

2    complaint has been filed against him.

3    Q.     Okay.  And what's the date on the letter?

4    A.     August 21st, 2013.

5    Q.     Okay.  There's a complaint number there at the top

6    starting with 10-157-13.  Do you see that?

7    A.     Yes.

8    Q.     Does that mean that it's associated with a specific

9    complaint?

10   A.     Yes.

11   Q.     And do you know whether that complaint related to a

12   specific patient?

13   A.     I would actually have to see the complaint in order

14   to associate it with a patient.

15   Q.     And you would what?

16   A.     I would have to actually see the complaint in order

17   to know what patient it's associated with.

18   Q.     Okay.  And is that because the same case number is on

19   the complaint itself?

20   A.     That is correct.

21          MS. REMIS:  Okay.  Your Honor, may I approach

22   the witness again?

23          THE COURT:  Yes.

24   BY MS. REMIS:

25   Q.     And I'm just going to ask you if any of the documents

Miller - Direct

1    there refresh your recollection on what Complaint Number

2    10-157-13, what patient it's associated with.  If you could

3    just look at any of those and look up when you're done

4    reading, that would be great.

5    A.    Yes.

6    Q.    Okay.  So what is the name of the patient who's

7    associated with Complaint Number 10-157-13?

8    A.    Dione Dickerson.

9    Q.    And can you tell who the name of the complainant was

10   in that complaint?

11   A.    Dave Johnson.

12   Q.    Okay.  Let's go on to Government Exhibit 610, please.

13   To whom is this letter addressed?

14   A.    The letter is addressed to Dr. Titus.

15   Q.    Okay.  And on what date?

16   A.    September 13th, 2013.

17   Q.    Okay.  And again, there is a Complaint Number

18   10-174-13?

19   A.    Yes.

20   Q.    Was this complaint related to a specific patient as

21   well?

22   A.    Yes.

23   Q.    And do you recall who that patient was?

24   A.    I would not be able to know without looking at the

25   actual complaint.

384

Miller - Direct

1    Q.    And if you would just take a moment to look through

2    and raise your head after you're done reading.

3    A.    Brent Hood.

4    Q.    Okay.  If you could just let me know that you're done

5    and I'll ask a question.

6    A.    I'm sorry.

7    Q.    That's okay.  So patient Brent Hood.  And do you know

8    by whom the complaint was made?  So who made the complaint

9    about Brent Hood?

10   A.    Marissa Conti.

11   Q.    Okay.  Let's go on to Government Exhibit 608, please.

12   And what's the date of this letter?

13   A.    January 29th, 2014.

14   Q.    And what's the complaint number there?

15   A.    10-11-14.

16   Q.    And again, who's this letter addressed to?

17   A.    Dr. Titus.

18   Q.    And just to be clear, all of these letters that we're

19   showing you, are these just form letters that the board or

20   that the DPR sends out?

21   A.    Yes.  They are form letters.

22   Q.    And attached to the form letter is the actual

23   complaint?

24   A.    Yes.

25   Q.    Okay.  So for this is Exhibit Number 608, on

Miller - Direct

1    January 29th, 2014.  Was this also about a specific patient?

2    A.    Yes.

3    Q.    And do you recall who that specific patient was?

4    A.    By referring to the complaint, I can tell you.

5    Q.    Okay.  And if you could just read it and look up, and

6    I'll ask you if that refreshes your memory.

7    A.    Okay.  (Witness reviewing.)

8    Q.    Do you recall now?

9    A.    Yes.

10   Q.    And who was that?

11   A.    Lisa M. Parsons.

12   Q.    Okay.  And can you tell who made the complaint about

13   Lisa Parsons?

14   A.    Ralph Timmerman.

15   Q.    And who is Ralph Timmerman?

16   A.    He is one of our investigators.

17   Q.    Is it possible -- how does it come about that an

18   investigator makes a complaint?

19   A.    It could be that somebody approached him and asked

20   for a certain amount of -- be anonymous for a certain amount

21   of time at the beginning of the complaint.  It could have

22   been brought to his attention in other means where he would

23   have filed the complaint in our system so it could be

24   investigated.

25   Q.    And was this complaint made by somebody else that was

Miller - Direct

1    relayed to Mr. Timmerman?

2    A.    I believe it was brought to his attention by the

3    patient's family, but I don't -- I don't know for certain.

4    Q.    Okay.  Let's move on to Government Exhibit 606,

5    please.

6              And what's the date on this letter?

7    A.    March 6th, 2014.

8    Q.    Okay.  And again, who is the letter addressed to?

9    A.    Dr. Titus.

10   Q.    And what is the complaint number?

11   A.    38-02-14.

12   Q.    Okay.  Do you recall who this -- is this complaint

13   also about a patient of Dr. Titus'?

14   A.    Yes.

15   Q.    And can you recall who that patient is?

16   A.    By referring to the complaint.

17   Q.    Okay.  Go ahead and refresh your memory.

18   A.    (Witness reviewing.)

19   Q.    Do you remember?  Does it refresh your memory?

20   A.    Yes.

21   Q.    And what is that patient's last name who is the

22   subject of this complaint?

23   A.    Bradley.

24   Q.    Okay.  And moving on to Government Exhibit 605,

25   please.  Just two more of these.

Miller - Direct

1          What's the date on this letter?

2     A.     October 31st, 2014.

3     Q.     Okay.  And what's the complaint number here?

4     A.     10-150-14.

5     Q.     And again, is this addressed to Dr. Titus?

6     A.     Yes.

7     Q.     Is this also related to a specific patient of

8     Dr. Titus'?

9     A.     Yes.

10    Q.     Okay.  And if you need to refresh your recollection,

11    you may do so and let me know when you've refreshed it.

12    A.     (Witness reviewing.)

13    Q.     And what was the name of the patient associated with

14    that complaint?

15    A.     Jara Carmen.

16    Q.     Okay.  And can you tell who made that complaint?

17    A.     It was Adam Brownstein.

18    Q.     Is he a physician?

19    A.     Yes.

20    Q.     Okay.  If we could go to Government Exhibit 609,

21    please.  And last one, what is the date on this?

22    A.     December 24th, 2014.

23    Q.     And is this, again, a letter addressed to Dr. Titus?

24    A.     Yes.

25    Q.     And what is the complaint number?

                          Miller - Cross

1    A.      10-170-14.

2    Q.      Okay.  And again, is this related to a specific

3    patient of Dr. Titus'?

4    A.      Yes.

5    Q.      And what is the name of that patient?

6    A.      Greg L. Smith, Sr.

7    Q.      And who made the complaint?

8    A.      Carla Haynes.

9    Q.      Now, all of these complaints were dated between

10   August of 2013 and December of 2014; is that right?

11   A.      Yes.

12   Q.      And that was after the State lifted the controlled

13   substance registration suspension; right?

14   A.      Yes.

15   Q.      And after the Consent Decree we just reviewed?

16   A.      Yes.

17           MS. REMIS:  Okay.  One moment, Your Honor.

18   Okay.  Pass the witness, Your Honor.

19           THE COURT:  All right.  Thank you.

20                   CROSS-EXAMINATION

21   BY MS. KOUSOULIS:

22   Q.      Good afternoon, Ms. Miller.  I just have a couple of

23   questions.

24           With regard to the 2012 Consent Decree that you

25   testified to, there were certain conditions that Dr. Titus

Miller - Redirect

1    had to abide by and complete in order to get his CSR license

2    back; correct?

3    A.    Correct.

4    Q.    And at some point he did get his license back;

5    correct?

6    A.    Correct.

7    Q.    So that means that he complied with all the

8    conditions outlined in the CSR, in the Consent Decree;

9    correct?

10   A.    Correct.

11   Q.    Because he would not have gotten his license back had

12   he not complied?

13   A.    Correct.

14            MS. KOUSOULIS:  I have no further questions.

15            THE COURT:  All right.

16            MS. REMIS:  Very briefly, Your Honor.  Sorry.

17                        REDIRECT EXAMINATION

18   BY MS. REMIS:

19   Q.    Ms. Miller, you just said the State gave Dr. Titus

20   his controlled substance registration back after 2012;

21   right?

22   A.    Correct.

23   Q.    And that he would have had to comply to get his

24   license back?

25   A.    Correct.

Miller - Redirect

1    Q.      Does the State routinely do followups to ensure that

2    every condition of the Consent Decree is followed?

3    A.      No.

4    Q.      Why not?

5    A.      We do not have the manpower to look up every -- we

6    are -- they are -- have to be truthful with us.  If it's

7    found out they're not, then it's a condition of their

8    license if there's any fraud found.  So it's their word.

9    Q.      Okay.  So how does the State know the physician is

10   following the Consent Decree?

11   A.      In this case, he would submit copies of the

12   continuing education certificates.  I don't remember all the

13   different decrees that -- right at this moment.

14   Q.      Would the State just have to trust the doctor?

15   A.      Yes.

16           MS. REMIS:  Okay.  No further questions, Your

17   Honor.

18           THE COURT:  All right.  Ms. Miller, thank you.

19   You're finished.  You're excused.  All right.  You may go.

20           Members of the jury, we're going to take our

21   lunch break now.  Because it's just about quarter of 1:00,

22   so we'll be on our lunch break until quarter of 2:00.

23           All right?

24           So can we take the jury out?

25           (Jury leaving the courtroom.)

Miller - Redirect

1          THE COURT:  All right.  So we're going to break

2     for lunch ourselves in just a minute.  I'm just wondering,

3     are you going faster or slower than you expected or about

4     the same?

5          MR. WOODARD:  About the same.

6          THE COURT:  Okay.  All right.  Is there anything

7     else we need to talk about?

8          MS. KOUSOULIS:  No.

9          THE COURT:  Otherwise, I'll see you all at

10    quarter of 1:00.  Okay?

11         MS KOUSOULIS:  Thank you, Your Honor.

12         MR. WOODARD:  Thank you, Your Honor.

13         THE COURT:  We'll be in recess.

14         DEPUTY CLERK:  All rise.

15         (Luncheon recess was taken.)

16         DEPUTY CLERK:  All rise.

17         THE COURT:  All right.  Well, have a seat.

18    Who's the next witness?

19         MS. SOBCZAK:  Marguerite Lenhardt.

20         THE COURT:  Okay.  Is she outside?

21         MS. SOBCZAK:  She's going to the bathroom right

22    now.  Oh.

23         THE COURT:  No, no.  You can say that word

24    delicately.  Okay.

25         Well, can someone be on the lookout for her so

Miller - Redirect

1     that whenever she's back she can be brought back in?

2               MS. KOUSOULIS:  Me and Mr. Bostic were not

3     together.

4               THE COURT:  Off the record here.

5               (Discussion held off the record:)

6               THE COURT:  All right.  So we're ready for the

7     jury?  Are we ready for the jury?

8               MS. KOUSOULIS:  Yes, Your Honor.

9               THE COURT:  And remind me, after Lenhardt, who's

10    next?

11              MS. REMIS:  Christine Armstrong.

12              THE COURT:  Oh, she's the previous probation

13    officer.  Are you Ms. Lenhardt?  Come on and sit in the

14    witness box.

15              THE WITNESS:  Right here?

16              THE COURT:  Yeah, right there.  And it will just

17    take a moment for us to get the jury.  And if you want, when

18    you're testifying or you can now actually take your mask

19    off.  You don't have to, but if you want to.

20              THE WITNESS:  Thank you.

21              (Jury entering the courtroom.)

22              THE COURT:  All right.  Members of the jury,

23    welcome back.  Everyone, you may be seated.

24              Ms. Sobczak, call your next witness.

25              MS. SOBCZAK:  Yes, Your Honor.  The Government

393
                        Lenhardt - Direct

 1    calls Marguerite Lenhardt.

 2                 DEPUTY CLERK:  Please state and spell your full

 3    name for the record.

 4                 THE WITNESS:  Marguerite Lenhardt,

 5    M-A-R-G-U-E-R-I-T-E L-E-N-H-A-R-D-T.

 6                 DEPUTY CLERK:  Do you affirm that the testimony

 7    you are about to give to the Court and the jury in the case

 8    now pending will be the truth, the whole truth and nothing

 9    but the truth, you do so affirm?

10                 THE WITNESS:  Yes, I do.

11                 DEPUTY CLERK:  Thank you.

12                 MARGUERITE LENHARDT, the witness herein, after

13    having been duly affirmed under oath, was examined and

14    testified as follows:

15                      DIRECT EXAMINATION

16    BY MS. SOBCZAK:

17    Q.     Good afternoon, Ms. Lenhardt.

18    A.     Good afternoon.

19    Q.     Ms. Lenhardt, where do you live?

20    A.     Magnolia, Delaware.

21    Q.     And how long have you lived in Delaware?

22    A.     Since 2001.

23    Q.     What do you do for a living?

24    A.     I'm retired, but I was a nurse practitioner.

25    Q.     And when did you become a nurse practitioner?

Lenhardt - Direct

1    A.     2001.  I graduated from Bethesda.  My first base was

2    at Dover.

3    Q.     At Dover?  Is that in Delaware?

4    A.     Yes.

5    Q.     And so what was your -- did you become licensed to

6    practice nursing in 2001 as well?

7    A.     As a nurse practitioner.  I was licensed as an RN

8    since 1985 and then an LPN since 1978 prior to that.

9    Q.     And where did you work starting in 2001?

10   A.     Dover Air Force Base in the Family Practice Clinic.

11   Q.     How long did you work at Dover Air Force Base?

12   A.     Until 2004, and then I moved to Germany.

13   Q.     And how long were you in Germany?

14   A.     Five years, until 2009.  Then I returned to Delaware.

15   Q.     Are you familiar with an individual named Patrick

16   Titus?

17   A.     Yes.

18   Q.     How are you familiar with him?

19   A.     I first met him when he first came to Dover.  They

20   brought him around to all the different providers to

21   introduce him.  That's when I first met him.

22   Q.     And in what role did you meet him?  Is that when you

23   were working as a nurse practitioner?

24   A.     I was working as a nurse practitioner.  When we have

25   new providers, they bring them around to introduce them to

Lenhardt - Direct

1   the new providers.  We were told he's the new internal

2   medicine doctor coming in, so I was looking forward to that.

3   Q.    And what was the extent of your interaction with him

4   at Dover Air Force Base?

5   A.    Hi.  How are you?  Nice to me you.

6   Q.    Did you ever work with him directly?

7   A.    Not at Dover, no.

8   Q.    And it sounds like you met him -- did you say you met

9   him in 2004?

10  A.    Yes, it was 2004, right before I left for Germany.  I

11  left in July, so probably around June.

12  Q.    And following you leaving Dover Air Force base in

13  June, did you ever interact with Dr. Titus after that?

14  A.    No, until I came back to Delaware.

15  Q.    When you came back to Delaware, when did you see

16  Dr. Titus again?

17  A.    It wasn't until about 2012.  I was working at

18  Bayhealth Occupational Clinic, Urgent Care Clinic, and he

19  came in to talk to my colleague and we shared the office.

20  And when he walked in, we recognized each other and said

21  "Hi."

22  Q.    And what happened from there?

23  A.    That's where he wanted to talk to us about a court

24  case and that he just came from a court case, and he said,

25  "My court case has ended, but the Court gave a

Lenhardt - Direct

1    recommendation."

2              Do you want me to go into all that?

3    Q.    Yes, please.

4    A.    He said that he was on probation and he is limited to

5    only writing prescriptions for Class 4 prescriptions, not

6    for Class 2 or Schedule II narcotics.  And the

7    recommendation by the Court was that if he could bring on

8    some mid-level professionals to come in, he would see the

9    patients, we would review his chart and offer

10   recommendations and as far as medications and write the

11   prescriptions for the narcotics that he could not write.

12   Q.    And you said this occurred in 2012.  Do you remember

13   when in 2012?

14   A.    It had to be February because the plan was we would

15   start February 23rd with helping him out.  And my colleague

16   was going to take the bulk of it.  She was willing to help

17   him out.  She had worked with him before.

18              And so I said, "I'll pick up whatever hours if

19   you can't meet the whole demand that was planned, that I

20   will pick up like maybe five to eight hours per week to help

21   out, meet those hours."

22   Q.    Let's go back to that initial conversation at

23   Bayhealth.  What other information did you get about this

24   court case?

25   A.    Well, when he came in, Dr. Titus came in, he had a

Lenhardt - Direct

1    rolled up paper, you know, kind of like a baton.  He had it

2    rolled up.  And while he was talking about what the Court

3    recommended, we kind of almost said it together, "Are those

4    the papers?  Are those the instructions from the Court?"  He

5    said, "No, these are just my notes.  When I get those

6    instructions, I'll give them to you."

7              So we -- because we thought it was kind of

8    strange that we wouldn't be seeing the patients because he

9    would be seeing the patients and we would just review the

10   chart after he sees the patients, and then we would write

11   whether we wanted other options for pain management, like

12   physical therapy, aquatherapy.  There's many others other

13   than the medication.  And if they need a refill of a

14   narcotic, we would do so, but we would not -- we would have

15   a limit of how much we would be prescribing for, which is

16   what our usual standard is.

17   Q.    And you just said it was "strange," the setup.  What

18   was strange about it?

19   A.    Well, it was strange because we're mid-level, and I

20   would think that they would want a doctor at his level to

21   review his -- when he saw the patients and things like that.

22   And at mid-level, that's a lower level than a doctor.  Just

23   like with any kind of review, a doctor can review my charts,

24   a nurse practitioner can review my charts, but I cannot

25   review a doctor's charts.  It has to be another doctor to

Lenhardt - Direct

1   review another doctor's charts.  So also, and not being able

2   to see the patients.

3   Q.     So at the time that you discussed this arrangement

4   with him at Bayhealth, did you raise these concerns?

5   A.     Yes.  And he said, "No, this is how the Court said it

6   was okay to do it that way."

7   Q.     And did you see the court document that day?

8   A.     No.  No.  And afterwards, my colleague and I did try

9   to look up the court case online, but we couldn't find

10  anything.

11  Q.     So following that, what was the arrangement then

12  for -- did you agree to work for Dr. Titus?

13  A.     Yes, basically helping my colleague out.  We were

14  going to start February 23rd.

15             MS. KOUSOULIS:  Your Honor, I would just object

16  to the we and her.  Limit her testimony to what she did or

17  what her actions were.

18             THE COURT:  Well, I think the last we was fine,

19  but --

20             THE WITNESS:  Okay.

21             THE COURT:  -- you know, if there's -- so I'm

22  going to overrule it right now, but you can make the

23  objection again if it's appropriate.

24             MS. KOUSOULIS:  Okay.

25  BY MS. SOBCZAK:

Lenhardt - Direct

1    Q.    So again, Ms. Lenhardt, what was the arrangement as

2    you understood it for what you would do?

3    A.    That I would help out one, maybe five to eight hours

4    a week, and it would not interfere with my work at the

5    Occupational Health.  So it may be after work or before my

6    regular schedule.

7    Q.    So following your meeting with Dr. Titus at

8    Bayhealth, when did you begin working for him?

9    A.    I worked March 6th, and I did it after work so when

10   I -- and that's -- I was supposed to go back.  At first I

11   thought I went back on the 13th, but I didn't.  It was

12   actually the 14th of March I was supposed to go back.

13   Q.    Go back where?

14   A.    To the clinic, Lighthouse, Dr. Titus' clinic to work.

15   Q.    Okay.  I just want to make sure I have the timeline

16   straight.  So it sounds like you met, you and your colleague

17   talked to Dr. Titus at some point in February of 2012?

18   A.    Yes.

19   Q.    At that point, was it during your meeting with him

20   that day that you and your colleague agreed to help him out

21   at Lighthouse?

22   A.    Yes.

23   Q.    Okay.  And so then how long, was it a couple days or

24   weeks or how long after you agreed to work for him did you

25   start working at Lighthouse?

Lenhardt - Direct

1    A.      For me, not until March 6th.

2    Q.      Okay.  And so then at that time, can you describe

3    what -- when you started working at Lighthouse what your

4    role was there and how it worked?

5    A.      It was primarily how he had laid it out, that the

6    Court had recommended it is that we would -- he would see

7    the patient.  We would sit in a different room.  And when

8    he's finished seeing the patient, we would just review the

9    chart and review his notes, and then we would make any

10   additional arrangements.

11           And we discussed this -- I discussed this with

12   him that if we make other recommendations like aquatherapy,

13   or occupational therapy, or repeat x-rays, will he go along

14   with that?  And he said he will.  So we would make the

15   recommend -- I would make the recommendations when I would

16   look at the chart, which included also writing prescriptions

17   for narcotics.

18   Q.      Just going back to the court document, what was your

19   understanding of why this court document came about or what

20   was the basis for the court document?

21   A.      I was -- he had a case, but I was not familiar with

22   what case he was going through at that time.  But when he

23   came into the office, he said the case is finished, but he's

24   under probation, but he has limited prescription writing

25   capabilities.  He could only write for Class 4, Schedule IV

Lenhardt - Direct

1   medications, which like cough syrup with Codeine.  That's

2   it.  But anything stronger than that, the more addictive

3   medications, he was not able to write, but he could get

4   mid-levels to come in to help him and write those

5   prescriptions so he can continue seeing his patients and

6   continue with his practice.

7   Q.     But did you ever see the actual court document?

8   A.     No, Never.

9   Q.     So did you know what the court document said?

10  A.     No.

11  Q.     And do you know if the Court even recommended this?

12  A.     No, the only way I knew this was when our national

13  provider identifier number got blocked.  An investigator

14  from the nursing license department came, and we told them

15  the situation.  And we said, "We looked up the court case

16  and we couldn't find anything."  And he said, "You wouldn't

17  find anything because" --

18              MS. KOUSOULIS:  Your Honor, I'd object to any

19  hearsay.

20              THE WITNESS:  Okay.

21              THE COURT:  So that's all right, Ms. Lenhardt.

22  I don't think this is going to be -- is this offered for the

23  truth of the matter asserted, what she's about to say?

24              MS. SOBCZAK:  No, this is offered for her

25  impression of the information that was received, Your Honor,

Lenhardt - Direct

1    and for the relevance of that.

2              THE COURT:  I'm going to allow it.  Go ahead.

3    Or maybe you should ask the question again.

4    BY MS. SOBCZAK:

5    Q.    Ms. Lenhardt, did you know what the court --

6              THE COURT:  Actually, you know what, it doesn't

7    matter.  She didn't ever find the case.  Why don't you move

8    on.

9              MS. SOBCZAK:  Okay.  All right.

10   BY MS. SOBCZAK:

11   Q.    Well, let's move on to when you started working at

12   Lighthouse.  So you were saying that -- can you describe

13   where exactly in Lighthouse you were situated?

14   A.    It -- it was like a break room.  It was behind where

15   the reception area, where the waiting room was, waiting area

16   was.  It was in the back in a break area.  You could go down

17   the hallway and then on the other side of the building is

18   where the exam rooms were.  Because it was round tables and

19   coffee maker, and snacks if needed, that's why I got the

20   impression it was probably a break room.

21   Q.    And did you see any patients?

22   A.    No, I did not.

23   Q.    So how did the process work then?

24   A.    Dr. Titus -- Dr. Titus would see the patient and one

25   of his assistants would bring the chart to me.  I would

Lenhardt - Direct

1    review the notes, try to look back at the charts as best I

2    could to see what has been done so far, and I would make

3    additional recommendations like physical therapy,

4    occupational therapy, maybe repeat x-rays, and write for a

5    prescription.

6    Q.    Did you ever disagree with Dr. Titus over what he was

7    intending to prescribe?

8    A.    His primary was continuing with their pain

9    medication.  I was trying to find other modalities to help

10   taper the use of the pain medication and how much they would

11   need.

12   Q.    And did you recommend those other modalities to

13   Dr. Titus?

14   A.    Yes, I did and I wrote -- I would write it in the

15   chart.

16   Q.    And what was Dr. Titus' response to your

17   recommendations?

18   A.    He didn't disagree, but I -- I didn't have any idea

19   if it was followed through on, but he did not disagree.  We

20   wrote it in the plan and that's what I expected the plan to

21   be.

22   Q.    Did the patient charts you reviewed all include

23   prescriptions for controlled substances?

24   A.    Yes.

25   Q.    Did any of the charts you reviewed not result in you

1    signing off on a controlled substance prescription?

2    A.    No, because that was the main reason we were there so

3    we could write the controlled substance that he is not --

4    was not able to write.

5    Q.    And you mentioned the date of March 6th.  Why does

6    that date stick out to you?

7    A.    Because that evening when I went home, I got a call

8    from my colleague, and she told us there was a problem with

9    us not seeing the patients.  So we -- I said, "Then we

10   should be seeing the patients next time."

11   Q.    And then what did you -- what was the problem with

12   not seeing the patients?

13              MS. KOUSOULIS:  Your Honor, I'd object that it

14   calls for hearsay.

15              THE COURT:  I think this is -- actually I'm

16   going to sustain that.  So what happened the next time is

17   probably the next thing.

18              MS. SOBCZAK:  Okay.

19   BY MS. SOBCZAK:

20   Q.    So what happened after you talked to your colleague

21   that day?

22   A.    That we have to see the patients, which is what I had

23   wanted to do from the beginning was to see the patients.

24   That's how I would normally practice.

25   Q.    And did you start seeing the patients after that?

1    A.      That was my plan, and I thought that I was supposed

2    to go on the 13th.  But I realized as I was recollecting my

3    memory that on the 13th my colleague worked that night

4    because I had to work the 14th early morning.  I had to

5    start the early shift.  So it was that 14th, March 14th,

6    that I was supposed to work, but I also got another call

7    from her on the 13th, that night.

8              MS. KOUSOULIS:  Again, Your Honor, I would

9    object to any hearsay.

10             THE COURT:  Well, I think she's going to explain

11   something about what she did on the 14th on the basis of

12   this call, so I'm going to overrule it.

13             THE WITNESS:  The call.

14             THE COURT:  Yeah.  Go ahead, Ms. Lenhardt.

15             THE WITNESS:  The call to say that our NPI

16   numbers were blocked.  So we could not write for Medicare or

17   Medicaid patients because our NPI numbers were blocked

18   because of our -- because of my affiliation with Dr. Titus.

19   BY MS. SOBCZAK:

20   Q.     And what was the reason that they were blocked?

21   A.     Because we -- I was not seeing the patient when I was

22   writing before I wrote the prescription.

23   Q.     And why is it so important to see patients before you

24   write a prescription?

25   A.     The best way I could describe it is that's the way it

Lenhardt - Direct

1    should be done.  I cannot write -- I should not be writing a

2    prescription for a patient that I did not see, that I did

3    not examine, that I did not put my hands on.

4    Q.    Was there any way to know that what you were

5    prescribing was appropriate without seeing the patients?

6    A.    Not to my knowledge.

7    Q.    So then following this March 13th day, what happened

8    after that?

9    A.    That morning, I was on my way to work and my plan was

10   that I was going to call Dr. Titus to let him know that I

11   cannot help him anymore because it is now interfering with

12   my work at Bayhealth when my NPI number is blocked because

13   we saw a lot of Medicaid/Medicare patients at Bayhealth.

14   But on my way to work, I got a call from Dr. Titus.

15   Q.    And what did you say in that conversation?

16   A.    I told him that I cannot work for him anymore because

17   my NPI number is blocked, and I had told him that I will

18   only help if it does not interfere with my work at

19   Bayhealth.  He had said he understands, but even with my NPI

20   number blocked, would I still be willing to work with him?

21   And I told him, "No."  I told him it's best he just sticks

22   to internal medicine and forget the pain management.

23   Q.    And was there anything further that was said in that

24   conversation?

25   A.    No, it was just a vague response.

Lenhardt - Direct

1   Q.      And by "vague response", what do you mean?

2   A.      Ah.

3   Q.      Is that --

4   A.      That's basically it.  Yeah.

5   Q.      Back to the patient notes for a second.  Can you

6   describe what the patient notes look like that you were

7   reviewing, even though you weren't seeing the patients?

8   A.      It was very vague.  My notes tend to be more

9   detailed.  I would explain how the patient came in the room,

10  were they limping, how difficult was it getting up out of

11  the chair, how difficult was it going on the exam table.

12  Was I able to replicate the pain?  What caused the pain?

13  What eased the pain?  You know, what made it worse?  What

14  made it better?  The person's demeanor.  Were they

15  disheveled?  Were they well groomed?  Was there body odor

16  where maybe they were not taking care of themselves?  My

17  notes would be more involving and his were more vague.

18  Q.      Did you ever speak with him about the vague nature of

19  the notes or anything contained in patient notes you were

20  reviewing?

21  A.      No.

22  Q.      And about how many patients' charts were you

23  reviewing each time you were working at Lighthouse?

24  A.      I really can't remember.  It may be five to eight.  I

25  really can't remember.

Lenhardt - Cross

1    Q.    Again, how many hours were you working there at a

2    time?

3    A.    I might have worked about five hours that day on the

4    6th.

5              MS. SOBCZAK:  One moment, Your Honor.

6              THE COURT:  All right.  Let me see if I've got

7    something straight.

8              Ms. Lenhardt, your total amount of time at

9    working at Lighthouse was those five hours on March 6th?

10             THE WITNESS:  That's right.

11   BY MS. SOBCZAK:

12   Q.    Did you say that you worked there before March 6th?

13   A.    No, we were going to start -- again, I have to use

14   we, but the February 23rd -- but when I, my shift was -- my

15   first time working was March 6th.  I cannot speak for my

16   colleague.

17             MS. SOBCZAK:  That's all from the Government,

18   Your Honor.

19             THE COURT:  All right.  Thank you.

20             Cross-examination, Ms. Kousoulis.

21             MS. KOUSOULIS:  Thank you, Your Honor.

22                        CROSS-EXAMINATION

23   BY MS. KOUSOULIS:

24   Q.    Good afternoon, Ms. Lenhardt.

25   A.    Good afternoon.

Lenhardt - Cross

1    Q.      Prior to working for Dr. Titus at his practice, you

2    were familiar with him from your time in the Air Force?

3    A.      Yes, from meeting him initially.

4    Q.      Okay.  He -- you're an Air Force veteran yourself?

5    A.      Yes.

6    Q.      And Dr. Titus is also an Air Force veteran?

7    A.      I don't know that.

8    Q.      But you met him at the Air Force Base.  He was coming

9    onto -- he was --

10   A.      Yes, he was in the Air Force then.

11   Q.      Exactly.  So like when you said that he was on base

12   being introduced around as the new internal medicine doctor,

13   he was in the Air Force at that time?

14   A.      Yes.

15   Q.      Now, you testified that Dr. Titus told you that it

16   was recommended to him that he bring on in his practice

17   mid-level providers to review his examinations, review

18   patient charts and history, and discuss with him alternative

19   methods for pain management?

20   A.      Yes.

21   Q.      And he told you that this is what the Court had told

22   him; correct?

23   A.      Yes.

24   Q.      And you don't know what conversations Dr. Titus might

25   have had with representatives from the Court or the Medical

Lenhardt - Cross

1   Board; correct?

2   A.     No.  He did -- I'm sorry.  When I was there, I think

3   on the 6th, Dr. Titus did say that someone from the Court

4   had come in and saw our setup and was pleased with what we

5   were doing.

6   Q.     And you have no way of knowing, you know, what the

7   conversations Dr. Titus might have had with that person,

8   correct --

9   A.     No.  No.

10  Q.     -- or what representation that person may have made?

11  A.     No.  It just came from Dr. Titus.

12  Q.     Now, you said when you initially started working

13  there, Dr. Titus would see the patients and you would just

14  review the charts afterwards; correct?

15  A.     Yes.

16  Q.     And it's fair to say that he spent about, would you

17  say about 15 to 20 minutes with each patient?

18  A.     About -- how much time he spent with them?

19  Q.     Yes.

20  A.     Maybe about 15.  I don't know for sure.

21  Q.     Okay.  And when he was done, you testified the day

22  that you worked there when he was done examining the

23  patient, he would bring you the patient's file to have you

24  review his findings and make recommendations?

25  A.     Yes.

411

Lenhardt - Cross

1    Q.     And you said that you did, you know with the files

2    were reviewed, you did make recommendations, including

3    adding physical therapy, aquatherapy, or other

4    recommendations; is that correct?

5    A.     Yes.

6    Q.     And Dr. Titus welcomed your input; correct?

7    A.     He did not bring me the chart.  One of his assistants

8    would bring me the chart because he would be seeing another

9    patient.

10   Q.     Okay.  But he -- but Dr. Titus didn't argue with you

11   or didn't disagree with your recommendations; correct?

12   A.     No.  From the very beginning, we said we will -- "I

13   will make recommendations even if it's not narcotics and

14   would you go along with that?"  And he said, "Yes."

15              MS. KOUSOULIS:  Okay.  I have no further

16   questions, Your Honor.

17              THE COURT:  All right.

18              MS. SOBCZAK:  No redirect, Your Honor.

19              THE COURT:  All right.  Ms. Lenhardt, thank you

20   very much.  You're excused.  You may go.

21              THE WITNESS:  Thank you.

22              MR. WOODARD:  The Government calls Christine

23   Bowie.

24              DEPUTY CLERK:  You can take your mask off.

25   Please state and spell your full name for the record.

Bowie- Direct

1          THE WITNESS:  Christine Bowie.  Chirstine is

2    C-H-R-I-S-T-I-N-E.  Last name Bowie, B-O-W-I-E.

3          DEPUTY CLERK:  Do you affirm that the testimony

4    you are about to give to the Court and the jury in the case

5    now pending will be the truth, the whole truth and nothing

6    but the truth, you do so affirm?

7          THE WITNESS:  I do.

8          DEPUTY CLERK:  Thank you.

9          CHRISTINE BOWIE, the witness herein, after

10   having been duly affirmed under oath, was examined and

11   testified as follows:

12                DIRECT EXAMINATION

13   BY MR. WOODARD:

14   Q.    Good afternoon, Ms. Bowie.

15   A.    Good morning or afternoon.

16   Q.    Did you previously go by a different name?

17   A.    Yes, Bowie is my married name.  My new name is

18   Armstrong.

19   Q.    Okay.  Thank you.  And where do you live?

20   A.    Magnolia, Delaware.

21   Q.    And how are you employed currently?

22   A.    I'm currently employed by the Delaware State Police.

23   Q.    How long have you been with the Delaware State

24   Police?

25   A.    I have been with them seven years in September.

Bowie- Direct

1   Q.      So about since 2014?

2   A.      '14, yes, sir.

3   Q.      And what was your position prior --

4   A.      Prior to that, I was a Senior Probation and Parole

5   Officer with the State of Delaware.

6   Q.      And when did you become a Parole Officer?

7   A.      2008.

8   Q.      Okay.  What was your duty station as a Parole

9   Officer?

10  A.      In probation and parole, I was assigned to be drug --

11  it's called a CREST aftercare case load, which was compiled

12  of individuals sentenced with some sort of substance abuse,

13  and it was a step-down program from the treatment they

14  received at a Level 4 or Level 5 incarceration.

15  Q.      So in this role, would you interact daily with

16  probationers who had substance abuse issues?

17  A.      Yes, I would.  I was assigned a case load of

18  approximately 20 to 30 individuals who had -- all had either

19  a drug dealing or a drug substance abuse related issue

20  related to their offense.

21  Q.      Okay.  And just so the jury understands, what does a

22  Probation Officer do in the first place?  How does a parolee

23  come to you?

24  A.      Probation by definition is kind of in lieu of

25  incarceration.  So part of their sentence might be -- it

414

Bowie- Direct

1    might read eight years at Level 5, Level 5 meaning

2    incarceration in a jail, and that would be suspended for "X"

3    amount of time at Level 4, 3, 2 or 1.  Each of those levels

4    corresponds with the amount of supervision they received

5    from the Probation Officer.

6              For instance, Level 4 is more electronic

7    monitoring, your GPS, your home confinement.

8              Level 3 is what I was, that was considered more

9    intensive.  You would see them weekly within the office as

10   well as weekly within the community, whether that be at

11   their job or at home.

12             Level 2 would be monthly reporting.

13             And Level 1 was a not reporting, just more of an

14   administration supervision.

15   Q.      Thanks, Ms. Bowie.

16             And let's go back to the CREST Program.  How

17   often would you meet with persons in that program?

18   A.      Again, everybody from my case load was involved in

19   the CREST Aftercare Program, so I would meet with them

20   weekly within my office.  In addition to meeting with myself

21   weekly, they would have the Aftercare Program which they

22   would meet at least twice a week for a group setting

23   treatment program.  And a lot of the individuals also had

24   another treatment program called TASK where both myself and

25   the TASK Program would do urinalysis monitoring.

Bowie- Direct

1   Q.     All right.  And what was the purpose of this

2   urinalysis monitoring, as you called it?

3   A.     They were at random, and obviously, that was to

4   ensure that there was compliance with the conditions set

5   forth with the Court and to monitor anybody's relapse or

6   substance abuse issues.

7   Q.     Okay.  Thank you.

8           Ms. Bowie, are you familiar with an individual

9   named Patrick Titus?

10  A.     I am.

11  Q.     And how so?

12  A.     Dr. Titus was the prescriber of one of the

13  individuals on my case load.  His name was Gerald Bradley.

14  Q.     Was he in the CREST Program you described?

15  A.     Yes, he was.

16  Q.     And around what time, if you remember?

17  A.     Mr. Bradley, I believe, was in the 2013 realm.

18  Q.     Okay.  Why was Mr. Bradley in the program?

19  A.     He was in the program for a DUI sixth conviction.

20  Part of that sentence, he had to complete the Level 5

21  program, which was called the KEY at the time.  After

22  completion of that, he completed the Level 4 program which

23  was the CREST and then he came to me to complete the Level 3

24  step-down program of the CREST Aftercare.

25  Q.     And do you know if he had any issues with drugs or

Bowie- Direct

1   alcohol?

2   A.    Mr. Bradley did struggle with both.  When I came in

3   to -- when I inherited his case from the previous officer, I

4   had seen that he had struggled with substance abuse for a

5   really long time.

6   Q.    And how are you able to tell that?

7   A.    Truthfully, a lot of ways.  One just from there are

8   certain different interview techniques that we have when an

9   individual is on community supervision where they will kind

10  of divulge their own struggles, in addition to previous

11  convictions, their criminal history, and again, just what

12  they report to the treatment programs.

13  Q.    Were there any external signs that you noticed with

14  Mr. Bradley where you could tell he was suffering from

15  addiction issues?

16  A.    So something that concerned me with Mr. Bradley is

17  from dealing with individuals who battled with substance

18  abuse, it was a telltale sign when they would come into your

19  office sober or not.  And by that, I mean, an individual who

20  is really on the road to recovery and trying their best, you

21  know, a lot of times, of course, they have bad days, but you

22  can tell there's a clarity in their -- their eyes and in

23  their speech.  They -- just their communication.

24            However, for a number of weeks, Mr. Bradley

25  would come into my office and be very lethargic, very droopy

Bowie- Direct

1    eyes, just having the characteristics of, in my experience,

2    somebody who was currently under the influence.

3    Q.    And was this still around the 2013 time frame?

4    A.    Yes.

5    Q.    During your supervision of Mr. Bradley, did you learn

6    whether he was receiving prescriptions?

7    A.    So with the treatment program, one of the conditions

8    that he had to do was to inform any treatment medical

9    provider that he was somebody that suffered from substance

10   abuse.  Because of the urinalysis screening, Mr. Bradley had

11   tested positive for Oxycodone.  From that, he brought in a

12   prescription that stated he was being prescribed Oxycodone

13   pills from Dr. Titus.  With that I made him sign a release

14   form so that I may speak with him as well to verify some

15   information.

16   Q.    Okay.  And as the person supervising Mr. Bradley in

17   this program, did that prescription raise any concerns in

18   your mind?

19   A.    It did.  While I am forthcoming with the fact that I

20   do not have any medical experience, in my experience with

21   individuals who had chronic pain issues, as Mr. Bradley

22   cited as his own problem, Mr. Bradley was prescribed 75

23   Oxycodone pills every two weeks.  That raised a concern to

24   me just based on the other prescriptions I was provided from

25   other individuals, that it just seemed like a little bit

Bowie- Direct

1    much.  Again, I don't have any medical experience, but it

2    seemed to be, if I kind of put myself in that individual's

3    shoes where I myself was taking medication.

4                    MR. BOSTIC:  Your Honor, I'm going to object to

5    this.  We're diving in the area of expert testimony.  I

6    didn't know if that can be admitted.

7                    THE COURT:  Well, I don't think this is expert

8    testimony, so I'm going to overrule the objection.  Keep

9    going.

10                   THE WITNESS:  Yes, sir.  Being an individual to

11   take 75 pills every two weeks is approximately five or six

12   pills a day.  Again, it just -- it seemed a little bit much

13   for somebody struggling with substance abuse.

14   BY MR. WOODARD:

15   Q.    And just to be sure, who was writing these

16   prescriptions for Oxycodone that you described?

17   A.    Mr. -- or excuse me, Dr. Titus.

18   Q.    Okay.  Did you ever actually see the prescriptions

19   that were written to Mr. Bradley?

20   A.    Mr. Bradley would bring in his -- the pill bottle so

21   I could also do -- at first I -- you started -- just do pill

22   counting.  So every week when he would come in, I would try

23   to at least see that he was going at his prescribed rate.

24                   After that, I did ask for him -- I asked if he

25   confirmed with Dr. Titus that Dr. Titus was aware of his

Bowie- Direct

1    substance abuse struggles, and he said that he was.  And

2    unfortunately, some people are not always truthful in their

3    statements so I asked for proof that he did provide that

4    information to Dr. Titus.

5    Q.    And was any proof provided to you?

6    A.    I did receive a letter from Dr. Titus stating that he

7    was aware of Mr. Bradley's substance abuse history, and he

8    was comfortable with the prescribed amount.

9    Q.    Okay.

10          MR. WOODARD:  One moment.  Your Honor, we'd

11   offer Government Exhibit 300 without objection.

12          THE COURT:  All right.  Admitted without

13   objection.

14          (Government Exhibit No. 300 was admitted into

15   evidence.)

16   BY MR. WOODARD:

17   Q.    Ms. Bowie, do you recognize this document?

18   A.    I do.

19   Q.    And what is that?

20   A.    This is the letter that Mr. Bradley provided to me in

21   the office visit that was, again, from Dr. Titus confirming

22   the prescription.

23   Q.    And could you please read this letter for the jury?

24   A.    "To whom it may concern:  Gerald Bradley, date of

25   birth 10/31/62.  Mr. Bradley is currently a patient under my

Bowie- Direct

1    care.  Mr. Bradley is being seen for degenerative joint

2    disease.  As part of Mr. Bradley's treatment, he is

3    prescribed a prescription for Oxycodone ten-milligram

4    tablets.  I am fully aware of Mr. Bradley's drug and alcohol

5    program.  If you have any further questions regarding the

6    care of this patient, please contact my office."

7    Q.     Thank you.

8           So after seeing the prescription and getting

9    this letter and knowing Mr. Bradley was struggling from

10   addiction issues, what did you think when you got this

11   letter?

12   A.     I just wanted to make sure that Dr. Titus and myself

13   were on the same page as far as the struggles that

14   Mr. Bradley had incurred, and I wanted to make sure that

15   both of us had his best interests in mind.

16   Q.     Okay.  So what did you do?

17   A.     At that, the closing statement being if I have any

18   further questions, I could contact his office.  I did so.  I

19   contacted him by phone.

20   Q.     Okay.  How did you get his number?

21   A.     Right off the letter.

22   Q.     All right.  And again, are we in 2013?

23   A.     Yes, sir.

24   Q.     Okay.  So how did the call begin?

25   A.     Well, at the time Dr. Bradley (sic) played phone tag

Bowie- Direct

1    a couple of times, but when I did finally get ahold of him,

2    I informed him who I was.  And I first asked that he

3    received the -- the HIPPA form to release information so

4    that he could freely speak with me, and he confirmed that he

5    had.

6    Q.    And I think you said Dr. Bradley, did you mean

7    Dr. Titus?

8    A.    I'm sorry.  So sorry.

9    Q.    So what happened after that?

10   A.    After I identified who I was to Dr. Titus, I informed

11   him I first wanted to confirm that the prescription that I

12   did see was valid and that he was prescribing the 75 pills

13   every two weeks.  And Dr. Titus confirmed yes.

14   Q.    Okay.  What did you say next?

15   A.    I acknowledged that I did not have any medical

16   experience, but I asked if that was a normal amount to

17   prescribe to somebody who struggled with an opiate

18   addiction.

19   Q.    And what did Dr. Titus say in exchange?

20   A.    Dr. Titus laughed at me, kind of gave a snarf and

21   said, "I'm the doctor here, not you.  And if there is a more

22   appropriate amount, then by all means tell me now."

23         I said, that's not what -- "I wasn't inferring

24   that you don't know what you're doing, but I was just

25   concerned that Mr. Bradley seems to be suffering from this

Bowie- Direct

1    medication" and asked if there was any alternative option

2    that we could offer him.  Again, my limited knowledge, that

3    I believed that there could possibly be some opiate

4    alternative to some pain management.

5    Q.     And what was said in response to your proposal for

6    alternative treatments?

7    A.     He, again, suggested that if I'm the doctor that he

8    should -- that I should come treat people instead of him.

9    Q.     Did you say anything about an oath he took?

10   A.     Yes.  I said, "Sir, with all due respect, didn't you

11   take an oath to put the needs of the patients first and

12   foremost?"  And he said -- he said that he did and that this

13   is his business, not mine.

14   Q.     Okay.

15   A.     The conversation ended very confrontationally.  Like

16   I said, I got -- I just felt that Dr. Titus was not looking

17   out for the needs of my -- our mutual individual and that it

18   just -- it just seemed to -- his struggles were not his

19   problem.

20   Q.     Do you know whether after your call, Dr. Titus

21   continued prescribing to Mr. Bradley?

22   A.     For the remainder of my supervision of Mr. Bradley,

23   yes, he did.

24   Q.     Do you know what he continued to prescribe?

25   A.     Oxycodone.

Bowie- Cross

1    Q.     All right.  After this phone call, did you raise your

2    concerns in any other way?

3    A.     I suggested to Mr. Bradley that he take it upon

4    himself to seek alternative measures for his pain

5    management, that I acknowledged that, yes, while this is a

6    valid prescription for the medication, I just felt that it

7    would not benefit his life in the long run if he continued

8    to be dependent on such an addictive substance.

9    Q.     And without saying what may have been said, did you

10   make any complaints about your interactions with Dr. Titus?

11   A.     Yes.  From -- from my frustration with it, I felt

12   that somebody needed to know.  Somebody else needed to know

13   about this.

14           MR. WOODARD:  Just one moment, Your Honor.  No

15   further questions, Your Honor.

16           THE COURT:  All right.  Cross-examination,

17   Mr. Bostic.

18           MR. BOSTIC:  Thank you.

19                   CROSS-EXAMINATION

20   BY MR. BOSTIC:

21   Q.     Good afternoon, Ms. Bowie.  I've been used to

22   greeting you as Christine Armstrong.  Congratulations.

23   A.     Yes, sir.

24   Q.     Now, as I understand, you would test Mr. Bradley

25   weekly, was it, or random?

424

Bowie- Cross

1   A.      Random, sir.

2   Q.      And those urine tests showed that he had Oxy in his

3   urine?

4   A.      Yes, sir.

5   Q.      And he didn't have any other controlled substances?

6   A.      Correct.

7   Q.      And your view became a concern that as a person that

8   was struggling with other addiction, right, that perhaps the

9   medication he was receiving was too much?

10  A.      Yes.  I was concerned that somebody who had struggled

11  with addiction of opiates as well as other substances, I was

12  concerned.  Yes.

13  Q.      And now, you testified that at times when you saw

14  him, he may have been droopy eyed, sleepy, a little

15  lethargic.  Did I hear you say that?

16  A.      Yes, sir.  There's, in my experience, just a

17  difference between somebody who's lethargic and somebody who

18  appeared under the influence, yes.

19  Q.      And a person under the influence, you're talking

20  influence of Oxy, because that's all that showed up in his

21  urine test?

22  A.      To be fair, I couldn't say that every time that he

23  came in because he wasn't screened every time.  Yes.

24  Q.      Well, when he came in and you thought that maybe

25  perhaps he was on something else, you had the ability to

Bowie- Cross

1    randomly test him?

2    A.    Yes, sir.

3    Q.    Right.  And no test that you conducted ever showed

4    that he was using any other type of controlled substance; is

5    that correct?

6    A.    Correct.

7    Q.    Okay.  And now, you referenced that you don't have

8    any medical training.  Now, did you ever discuss with

9    Mr. Bradley, his pain issues, his chronic pain issues?

10    A.    Yes.

11    Q.    And those pain issues were real?

12    A.    Absolutely.

13    Q.    You just disagreed with how his pain management

14    doctor, Dr. Titus, was treating him; is that correct?

15    A.    By the method, yes, sir.

16    Q.    Yes.  And I think I read somewhere you said, and I

17    think you said it again here, Dr. Titus was sarcastic and

18    said to you, that he was the doctor; right?

19    A.    Yes.

20    Q.    And would it be fair to say that upset you?

21    A.    Yes, sir.

22          MR. BOSTIC:  If I may have a moment, Your Honor.

23          THE COURT:  All right.

24          MR. BOSTIC:  Ms. Bowie, thank you so much.  I

25    have nothing else.

Timmerman - Direct

1                MR. WOODARD:  No redirect, Your Honor.

2                THE COURT:  All right.  Ms. Bowie, thank you

3     very much.  You're excused.

4                MS. SOBCZAK:  Your Honor, the Government calls

5     Jeffrey Timmerman.

6                THE COURT:  All right.

7                DEPUTY CLERK:  Please state and spell your full

8     name for the record.

9                THE WITNESS:  It's Jeffrey Allen Timmerman.

10                DEPUTY CLERK:  Do you affirm that the testimony

11    you are about to give to the Court and the jury in the case

12    now pending will be the truth, the whole truth and nothing

13    but the truth, you do so affirm?

14                THE WITNESS:  I do.

15                DEPUTY CLERK:  Thank you.

16                JEFFREY TIMMERMAN, the witness herein, after

17    having been duly affirmed under oath, was examined and

18    testified as follows:

19                      DIRECT EXAMINATION

20    BY MS. SOBCZAK:

21    Q.     Good afternoon, Mr. Timmerman.  Hello, Mr. Timmerman.

22                Where do you live?

23    A.     So I live in Newark, Delaware.

24    Q.     And how long have you lived in Delaware?

25    A.     I've lived in Delaware for about ten years.

Timmerman - Direct

1   Q.      What do you do for a living?

2   A.      I am a pharmacist.

3   Q.      When did you become a pharmacist?

4   A.      So I graduated pharmacy school in 2006.

5   Q.      Where did you go to pharmacy school?

6   A.      University of Illinois, Chicago.

7   Q.      And when did you become licensed to practice

8   pharmacy?

9   A.      2006.

10  Q.      And so you said you started living in Delaware in

11  2010 or ten years ago.  So is that --

12  A.      Yeah, 2010.

13  Q.      Where did you start working when you moved to

14  Delaware?

15  A.      That would be CVS Pharmacy.

16  Q.      Did you work at different locations at CVS?

17  A.      I did.  Originally, I started in the Bethany Beach

18  location.  Then I moved over to Rehoboth.  And then in 2013,

19  I opened up a store in Milford.

20  Q.      Are you familiar with an individual named Patrick

21  Titus?

22  A.      I am.

23  Q.      How are you familiar with Patrick Titus?

24  A.      Just from the prescriptions.

25  Q.      And can you expand upon that?  What do you mean by

428

Timmerman - Direct

1    that?

2    A.    So basically prescriptions we began receiving after

3    we opened up that pharmacy from that provider, so that's how

4    I knew of Patrick Titus.

5    Q.    And which pharmacy are you referring to?

6    A.    This would be CVS in Milford.

7    Q.    And again, when did you open that pharmacy?

8    A.    October 2013.

9    Q.    So what kind of prescriptions were coming in that you

10   noted?

11   A.    So we would see prescriptions that would come in

12   basically for three or four items, prescriptions, Class 2

13   controlled opiates, Methadone, Fentanyl, Oxycodone and I

14   believe that's it.

15         We also received some other prescriptions,

16   albeit not that often, for benzodiazapine, also included in

17   that, but that was mainly what we received prescriptions

18   from that provider for.

19   Q.    And can you walk us through how did the prescriptions

20   come in to the pharmacy?

21   A.    These were hand dropped off by individuals.

22   Q.    And how did you know that Dr. Titus was prescribing

23   those prescriptions?

24   A.    Because his -- it was on his prescription pad with

25   his name on top.

Timmerman - Direct

1    Q.      And I'm going to show you Government Exhibit 109 at

2    Page 103.

3              Do you recognize this document, Mr. Timmerman?

4    A.      I recognize the prescription pads and the

5    prescriptions that were written on there.  I don't -- I

6    don't recognize a specific patient or anything, just the

7    prescriptions themselves.

8    Q.      Is this prescription similar to the ones that were

9    brought in to your pharmacy?

10   A.      These were identical.  These were the exact

11   prescription pads.

12   Q.      And what do you recognize about this prescription?

13   A.      In terms of?  I'm sorry.

14   Q.      Going through it from the beginning, what about this

15   prescription is similar to what you recognize from the

16   one --

17   A.      I recognize it simply because of the volume of

18   prescriptions that we saw, so it was -- there were a lot of

19   prescriptions on this pad that came to our pharmacy.  So

20   while the medications may have changed, the prescriptions

21   pads themselves were the same prescription pads from my

22   memory.

23   Q.      And when you say "volume," what do you mean by

24   volume?

25   A.      I mean the physical amount of paper prescriptions

Timmerman - Direct

1    written for these medications that were showing up at my

2    pharmacy.

3    Q.     And so day to day?

4    A.     Yeah, on a day-to-day basis.  So soon after we had

5    opened, I started to see an increased amount of volume,

6    physical prescriptions from Patrick Titus come to our

7    pharmacy, yes, on these pads.

8    Q.     And what was being prescribed on these pads?

9    A.     Usually Oxycodone, Morphine.  There may have been

10   some Hydrocodone, but it was usually all for Class 2

11   controlled opiates.

12   Q.     Can you just describe Class 2 controlled opiates?

13   A.     So Class 2 controlled opiates are ones that generally

14   are accepted in the medical community that they have a very

15   strong addiction potential.  They're not the strongest,

16   Class 1's are, but there's no accepted medical use for --

17   generally for Class 1 medications.

18   Q.     What's an example of a Class 1 medication?

19   A.     I believe -- I believe cocaine.

20   Q.     And what are some examples of Class 2?

21   A.     Your Oxycodone, your Fentanyl, your Hydrocodone.

22   There's a lot of them.

23   Q.     And were you seeing any specific combinations of

24   drugs that were coming in?

25   A.     There were combinations at times for the opiates in

431

Timmerman - Direct

1    addition to skeletal muscle relaxer, that's another one, and

2    the benzodiazapines at times.

3    Q.    What were the dosages of the prescriptions that were

4    coming in from Dr. Titus?

5    A.    The dosages of the actual pain medications

6    themselves, they varied depending upon what the prescription

7    was.  Same thing with the muscle relaxers.  Same thing with

8    pretty much any of the medications because doses will vary

9    depending on the actual medications.

10   Q.    Do you know what type of medicine Dr. Titus

11   practiced?

12   A.    From my recollection, he's an internal medicine

13   doctor.  At least that's what I ascertained from the

14   prescription pad itself.

15   Q.    Mm-hmm.  And did anything about the information --

16   actually, before I go into anything further, can you

17   describe what a benzodiazapine is.

18   A.    So that would be like your Temazepam, Alprazolam,

19   medications like this that are centrally acting.

20   Q.    And what's a muscle relaxer?

21   A.    That's another medication like Cyclobenzaprine.

22   That's a typical one.  So they are the ones that relax

23   skeletal muscles as well.

24   Q.    And you described some combinations of these

25   different types of drugs.  What are the concerns over these

Timmerman - Direct

1    combinations?

2    A.    So the combinations used generally aren't recommended

3    because in the case, depending upon the patient, they could

4    be predisposed to respiratory depression if they use these.

5    So it can actually depress the CNS and cause patients to

6    actually -- depending upon the doses, and they're

7    predisposed to, it could cause them to have cardiac arrest.

8    Q.    Can you explain some of the -- I just caught a term

9    and I don't remember what it was.  The CNS?

10   A.    Central nervous system.  So medications that actually

11   work in the brain on the central nervous system to depress

12   breathing, for instance.  So the patient takes the

13   medication, maybe they fall asleep, and then they depress

14   their breathing, and that's when they stop breathing.

15   Q.    So you mentioned the volume of prescriptions, the

16   dosages.  Did these raise concerns to you?

17   A.    They did raise concerns, yes.

18   Q.    What were your concerns?

19   A.    So my concern was the medications being used

20   concurrently or together was a concern, and then also the

21   volume of prescriptions.  The amount of people that were

22   coming in for the same stuff that was written.  Usually, in

23   my experience, and what I've been taught is pain management

24   is individualized.  You don't see -- you know you'll see

25   things, but it's individualized to the patient.  When you

Timmerman - Direct

1    start seeing prescriptions that are written for the same

2    things, the same quantities, the high quantities, the

3    amount.  The patient comes in and gets a prescription, let's

4    say, for a hundred tablets or for, you know, 180 tablets,

5    240 tablets, things like this, you start to go -- you

6    start -- it starts to raise flags like what's going on here,

7    especially in the absence of other medications.

8            Pain isn't just treated with opiates.  Pain, a

9    lot of times, can be treated with other medications and

10   other modalities such as physical therapy and stuff.  And

11   while I'm not privy to that information, that would be

12   things that generally when I talk to the patient, they would

13   say, Oh, I'm doing this, and I would never --

14   Q.    Can I pause right there?  I think you're speaking --

15   I have a tendency to speak very quickly.

16   A.    I'm sorry.

17           THE COURT:  Well, okay.  Wait.  So everyone stop

18   talking at once.

19           All right.  Mr. Bostic, you want to say

20   something?

21           MR. BOSTIC:  I want to object as to any hearsay

22   testimony.  I think some of this came into the record, and

23   I'm not going to go back by, but I ask that the witness be

24   cautioned as to --

25           THE COURT:  Well, I'm not in the practice of

Timmerman - Direct

1    cautioning witnesses generally.  So why don't we go back to

2    Ms. Sobczak asking a question, and Mr. Timmerman, you can

3    then respond.

4                 MS. SOBCZAK:  Mr. Timmerman, I talk fast as

5    well, so I just want to make sure that the Court is able to

6    get everything that you're saying.  So I'm probably going to

7    be mindful of that.

8                 THE WITNESS:  Okay.

9    BY MS. SOBCZAK:

10   Q.    So you were just talking about some of your concerns.

11   Where -- were you -- excuse me.

12                Were there any concerns you saw related to

13   seeing prescriptions coming in from an internal medicine

14   doctor of this nature?

15   A.    That was some -- that was concerning to me, yes.  And

16   I guess the reason for that is because I didn't see any

17   other prescriptions that normally I would think you would

18   see from an internal medicine doctor.  It was just the

19   opiates and the benzodiazapines as I discussed before and

20   the skeletal muscle relaxers.

21   Q.    Is that based on your past experience?

22   A.    That is correct.

23   Q.    And so what would you usually see from internal

24   medicine doctors that they would prescribe?

25   A.    So internal medicine doctors that they prescribe

Timmerman - Direct

1    because they work on the body systems, you would see other

2    things, maybe things for diabetes, other organ system-type

3    prescriptions that you would see that would come through.

4    Q.    As a pharmacist, do you have any obligation when it

5    comes to filling controlled substances?

6    A.    We do.  We have something that they call

7    corresponding responsibility.  So ultimately the doctor's

8    the first.  I would be considered to be the second line.  So

9    the prescription has to be prescribed in a manner that is

10   for legitimate medical purpose and the usual course of their

11   therapy.

12             So as a pharmacist, I also have to go back and

13   look at them and then look and see if there's any, what we

14   call, red flags, which is kind of what we discussed

15   previously.  Red flags from the patient standpoint, red

16   flags from the therapy standpoint.

17             So if I'm looking at their piece and I'm going,

18   this is a lot of short acting, you know opiates, I need to

19   delve a little bit further.  And then I'll look at what

20   other prescriptions may be in the profile or I'll access the

21   State prescription monitoring system to look at things

22   they've had in the past. So I'll kind of compare things and

23   I'll look at it.

24             I'll also look at it from the patient's

25   standpoint.  You know, are they running down the way to my

Timmerman - Direct

1    pharmacy to get their medication.  That's a little weird.

2    What are they telling me at the counter when they drop the

3    prescriptions off?  Are they telling me certain things

4    about, you know, their history or whatnot?

5           So I take all this stuff the best I can into

6    context and decide at that point in time, because the law

7    gives me that leeway to decide if I'm going to dispense this

8    medication or not.  And that would be my duty -- it's

9    actually my duty as a pharmacist to do that on every

10   prescription that comes through.

11   Q.    And so, Mr. Timmerman, you mentioned -- you're

12   speaking kind of generally just about in your practice, and

13   you used the word delving.  Did you do any delving related

14   to Dr. Titus?

15   A.    So when we came first into Milford, because again,

16   Delaware communities are spaced kind of far apart, so you

17   might not see a certain provider necessarily.  If I'm down

18   the beach where I was, I would hope I would not see any

19   prescriptions generally from this provider.  But when I

20   moved to Milford, it's a whole new ball game, so to speak.

21          So when I would go there, we first opened --

22   when you first open, your volume is not very high.  You

23   don't do a lot of prescriptions.  You're trying to build

24   business for that area.  So at that point in time, I would

25   have patients that would come in for, let's say, a hundred

Timmerman - Direct

1    and -- speaking in terms of the situation here, a lot of

2    these, I wouldn't have.  So I'd have to call another

3    pharmacy and say, "Do you have these in stock?"  So I

4    would -- then at that point in time, they would ask -- the

5    pharmacist would ask me questions about who it is who wrote

6    for it, so on and so forth.  They would provide me

7    information as to how --

8              MR. BOSTIC:  Your Honor, I'll object to this.

9    This, again, is based on hearsay.  We don't have a

10   witness --

11             THE COURT:  Please, Mr. Bostic, he's not said

12   anything that's hearsay.  He's discussing what he does.

13             MR. BOSTIC:  Very well, Your Honor.

14             THE COURT:  So overruled.

15   BY MS. SOBCZAK:

16   Q.    And Mr. Timmerman, can you keep it specific to

17   related to Dr. Titus and the prescriptions that were coming

18   in.  So when you saw this --

19   A.    I guess in this case, it's a little bit confusing

20   because it's specific to these prescriptions as to what I'm

21   asking somebody else and the information that's provided to

22   me, so I can make a determination on what I would do as a

23   pharmacist.  So that's why I'm a little bit confused here.

24   Q.    So continue with what you were talking about.

25   A.    Okay.  So I would call over to a competitor and they

Timmerman - Direct

1    would go through kind of their red flag situation of who's,

2    you know, the patient, have you seen them before, who's the

3    provider, so on and so forth.  It was at that point, again,

4    and I'm new to the area, so I don't know, you know, the

5    providers in the area that they would say, you know or --

6                THE COURT:  Wait.  So do you know what he's

7    going to say now?

8                MR. BOSTIC:  Your Honor, I do not.

9                THE COURT:  No.  No. I'm sorry, Mr. Bostic, I

10   mean, Ms. Sobczak.

11               MS. SOBCZAK:  Yes.

12               THE COURT:  All right.

13               MS. SOBCZAK:  Your Honor.

14               THE COURT:  Should he be allowed to say it?

15               MS. SOBCZAK:  He's going to say what is based on

16   his own impression and the impression that was provided to

17   him.

18               THE COURT:  All right.

19               MS. SOBCZAK:  Do you mind if I ask a question?

20               THE COURT:  Go ahead.

21   BY MS. SOBCZAK:

22   Q.    So Mr. Timmerman, did you call pharmacies related to

23   Dr. Titus?

24   A.    I did.

25   Q.    And what information did you obtain?

Timmerman - Direct

1     A.     I obtained about --

2            MR. BOSTIC:  Objection, Your Honor.  I believe

3     this is going to be clearly hearsay.

4            THE COURT:  Yeah, so I think, you know, he

5     obtained information and then he did something.  So let's go

6     to what he did after he obtained the information.

7     BY MS. SOBCZAK:

8     Q.     So what did you do after you called the pharmacies?

9     A.     I -- at that point in time, I didn't have the

10    medication, so I would tell them that I couldn't fill for

11    them, and then I would give them the prescriptions back.

12    And then they would go wherever they were going to go.

13    Q.     When you say "they," who is they?

14    A.     The patients.

15    Q.     So that was one of my next questions.  So did you

16    choose -- did you decide whether to fill or not fill the

17    prescriptions for Dr. Titus or that were prescribed by

18    Dr. Titus?

19    A.     Are we talking about this specific instance or are we

20    talking about future?  There's two different --

21    Q.     So is this the specific instance where you called

22    pharmacies?

23    A.     That was because I didn't have the medication in

24    stock.

25    Q.     Okay.  So let's -- when did you not have the

1    medication in stock?

2    A.    When we first started opening because of the

3    quantities, I couldn't fill them.  So then we would send

4    them to another pharmacy, but that was -- at that point in

5    time, I talked to other pharmacists and they did -- would

6    decide whether they were going to fill them or not.  They

7    would funnel me the information when I first moved there.

8    Q.    And so what information?

9    A.    So the information that they gave me is that they --

10                MR. BOSTIC:  Objection, Your Honor.  This is

11   hearsay.

12                MS. SOBCZAK:  Okay.

13                THE COURT:  I think it is problematic, so I'm

14   going to sustain the objection, and you can proceed.

15                MS. SOBCZAK:  Okay.

16   BY MS. SOBCZAK:

17   Q.    So moving forward, Mr. Timmerman, given all the red

18   flags, as you said you were talking about, what did you

19   ultimately do with the prescriptions that were prescribed by

20   Dr. Titus that came into your pharmacy?

21   A.    Ultimately, I made a decision, because I was the

22   pharmacy manager.  And then my colleague, who was the staff

23   pharmacist, we had a meeting and decided that based on the

24   prescriptions themselves, the volume, the combinations, that

25   we were no longer going to fill for -- prescriptions for

441

Timmerman - Cross

1    Mr. Titus.

2    Q.    And did you ever call Dr. Titus to discuss this?

3    A.    I don't recollect because given the volume of

4    prescriptions that we were seeing, the decision was made

5    very early on to not fill prescriptions --

6    Q.    Mm-hmm.

7    A.    -- for him.  So the standard course that we would

8    call -- I do not recollect any direct calls to his office to

9    do that.  I think it was a decision that we had jointly made

10   based on the volume of prescriptions we had seen in the

11   office.

12   Q.    And how soon into opening the CVS in Milford, did you

13   decide not to fill Dr. Titus' prescriptions?

14   A.    I can't give you an actual date, but I can tell you

15   the time frame was very quick once we had opened.  I would

16   say within a couple months tops.

17               MS. SOBCZAK:  One second.  Thank you,

18   Mr. Timmerman.  Pass the witness.

19               THE COURT:  All right.

20               Mr. Bostic.

21                    CROSS-EXAMINATION

22   BY MR. BOSTIC:

23   Q.    Mr. Timmerman, as I understand it, you said in this

24   case you did you not reach out to Dr. Titus and voice any

25   concern to him based on what you were seeing?

Timmerman - Cross

1    A.      I have no recollection of a phone call to his office

2    for that.

3    Q.      Right.  So we would agree that you did not.  You seem

4    to have a fairly good memory of things; right?

5    A.      I would say that that would be accurate.

6    Q.      All right.  Now, and you talked about your obligation

7    in that you have discretion whether or not to fill a given

8    prescription; is that correct?

9    A.      That is correct.

10   Q.      And you would agree with me that you never went to

11   medical school?

12   A.      I did not go to medical school.

13   Q.      And you would agree with me that doctors also have

14   discretion in determining whether, based upon their

15   interaction with a patient, review of MRIs, various things,

16   whether or not they're going to prescribe to an individual

17   and to what level or doses they'll prescribe; right?

18   A.      I would say that's correct, but can I add something

19   to that?

20   Q.      Sir, just answer my questions, please.  Thank you.

21           And you talked about the high dosing level;

22   right, in terms of Oxy or whatever it may be; right?

23   A.      (Witness shook his head.)

24   Q.      Have you ever treated anyone for chronic pain?  I

25   assume the answer is no, right, because you're not a medical

443

Timmerman - Cross

1    doctor?

2    A.     I'm not a medical doctor, so no.

3    Q.     But you should be aware that with the treatment of

4    chronic pain that ordinarily it doesn't get better after a

5    certain point, it gets worse.

6    A.     That is a generalized statement.  I mean, some

7    patients could get better or worse, I guess, depending upon

8    what their condition is.

9    Q.     But with respect to these patients whom you were

10   seeing, you have no conception to sit here what was going on

11   with them physically in terms of pain thresholds or any

12   other information of that sort?

13   A.     I don't.  The only thing that I have is basically

14   what is considered to be standardized.  I won't say

15   standardized, but what would be considered to be medically

16   accepted, evidence-based protocols for patients.

17   Q.     But again, those protocols as applied to an

18   individual case, fall within the discretion and the good

19   faith belief of the prescribing doctor as to what is needed

20   by a given patient; would that be fair to say?

21   A.     It would be fair -- it would be fair to say in terms

22   of potentially, but there also are evidence-based standards.

23   If you're prescribing high volumes for everyone, then it's

24   no longer extemporaneous circumstance.

25   Q.     So by that statement, you are looking at a short

444

Timmerman - Cross

1    window.  You said you determine it based on a very short

2    period of time; right?  That's correct; right?  You just

3    said that?

4    A.    Say it again for me.  I'm sorry.

5    Q.    You said that you stopped filling prescriptions for

6    his clients, Dr. Titus' clients in a very short window of

7    time.  You said that earlier.

8    A.    That is correct.

9    Q.    So you were making assumptions and reaching

10   conclusions based upon a very short period of time and not

11   knowing how many other patients --

12            THE COURT:  Right.  So Mr. Bostic, you're

13   opening the door here.  Do you really want to?

14            MR. BOSTIC:  I'll rephrase that question.  I'll

15   rephrase that question.

16   BY MR. BOSTIC:

17   Q.    You based your decision only on those individuals

18   that you saw at your facility, the scripts that were

19   presented to you?

20   A.    I based it on the scripts presented to me based on

21   what I have seen in my practice and what I've seen around

22   the surrounding area.

23   Q.    And to end it here, I think I covered this, you never

24   saw any of the medical files or anything like that?

25   A.    I am not privy to that information.

Timmerman - Redirect

```
 1                 MR. BOSTIC:  Thank you, Mr. Timmerman.
 2                 THE COURT:  Mr. Timmerman, how far was the CVS
 3      from where Dr. Titus' office was?
 4                 THE WITNESS:  I didn't know his exact location
 5      of where he was.
 6                 THE COURT:  I think it was on North Church
 7      Street.
 8                 THE WITNESS:  I don't live in Milford, I only
 9      commuted to work there.  So I can't tell you exactly where
10      it was.  Milford not being very large, I don't think it was
11      very far, but I can't give you --
12                 THE COURT:  All right.
13                 THE WITNESS:  -- exact --
14                 THE COURT:  All right.  Any redirect?
15                 MS. SOBCZAK:  Yes, Your Honor.
16                       REDIRECT EXAMINATION
17      BY MS. SOBCZAK:
18      Q.    Mr. Timmerman, would you see the patients coming in
19      to have their prescriptions filled?
20      A.    I would see them, yeah.  Yeah, you could say that.
21      Q.    And how long did you say Titus, Dr. Titus' patients
22      were bringing in prescriptions before you decided not to
23      fill?
24      A.    Again, I don't know the exact dates, but I would say
25      within a couple months.  It was at that point in time we
```

Timmerman - Redirect

1    made that determination.

2    Q.     But it was not days into it, there were --

3    A.     No.  No.

4    Q.     -- days or weeks that you had to see patterns of

5    prescriptions coming in?

6    A.     It was enough time to see the -- and be alarmed at

7    the amount of prescriptions we were receiving on a daily

8    basis, yes.

9    Q.     And you had mentioned a term called PMP.  Can you

10   describe what that is?

11   A.     So that's a prescription monitoring.

12           MR. BOSTIC:  Objection, Your Honor.  Beyond the

13   scope of cross.

14           THE COURT:  Yes, that's accurate.  So I'm going

15   to sustain the objection.

16   BY MS. SOBCZAK:

17   Q.     So Mr. Timmerman, I think we've established and would

18   you agree that you're not a doctor?

19   A.     I'm not a medical doctor.  No.

20   Q.     But you are a pharmacist; is that right?

21   A.     I have a doctor of pharmacy degree, yes.

22   Q.     So you went to graduate school.  Did you go to

23   graduate school for pharmacy?

24   A.     Pharmacy school.  Four years of pharmacy school.

25   Q.     And with that, does that come certain obligations as

Timmerman - Redirect

1    far as filling prescriptions?

2    A.    Well, there's, of course -- I mean, every

3    prescription you have --

4              MR. BOSTIC:  I'm going to object.  This was

5    asked and answered in the Government's direct.

6              THE COURT:  I think that's true, so I'm going to

7    sustain that.

8    BY MS. SOBCZAK:

9    Q.    Even though you're not a doctor, Mr. Timmerman, do

10   you still have a corresponding responsibility to fill or not

11   fill prescriptions?

12   A.    Yes, I do.

13   Q.    And did you exercise that judgment relating to

14   Dr. Titus' prescriptions?

15   A.    Yes, I did.

16             THE COURT:  All right.  Mr. Timmerman, thank you

17   very much.  You're excused.  You may go.

18             MS. REMIS:  Your Honor, may we approach for just

19   a moment?

20             THE COURT:  You can.

21             (Beginning of conference held at side-bar:)

22             MS. REMIS:  We have our next witness who's going

23   to be here in approximately eight minutes.  We could call

24   the agent right now, and he could get up on the stand, but

25   we'd love to get this other guy that drove a while to get

Timmerman - Redirect

1    here.

2              So I'm wondering if Your Honor prefers one of

3    two things.  One, I could call the agent and we can get him

4    on and maybe --

5              THE COURT:  Why don't you just start the agent

6    and then we'll get the other guy on.

7              MS. REMIS:  Can I start after the break?  Is

8    that all right with you?

9              MS. KOUSOULIS:  I'm fine.

10             THE COURT:  Yeah, yeah.

11             MS. REMIS:  Put that guy on before the break.

12             (Conclusion of conference held at side-bar.)

13             MR. WOODARD:  We may actually be able to call

14   the person we wanted to call.

15             MS. SOBCZAK:  He just arrived.

16             MR. WOODARD:  The Government calls Percy

17   Dhamodiwala.

18             THE COURT:  All right.  So members of the jury,

19   I'm not entirely sure the witness is right outside the door,

20   so it may take a minute.  I think he's in the building.

21             MR. WOODARD:  Yes, sir.  That's my

22   understanding.

23             DEPUTY CLERK:  You can pull your mask down.

24             THE WITNESS:  Thank you.

25             DEPUTY CLERK:  Please state and spell your full

Dhamodiwala - Direct

1    name for the record.

2              THE WITNESS:  Yeah.  My name is Percy

3    Dhamodiwala.  P-E-R-C-Y.  Last name is

4    D-H-A-M-O-D-I-W-A-L-A.

5              DEPUTY CLERK:  Do you affirm that the testimony

6    you are about to give to the Court and the jury in the case

7    now pending will be the truth, the whole truth and nothing

8    but the truth, you do so affirm?

9              THE WITNESS:  Yes, I do.

10             DEPUTY CLERK:  Thank you.

11             PERCY DHAMODIWALA, the witness herein, after

12   having been duly affirmed under oath, was examined and

13   testified as follows:

14             THE COURT:  You may be seated.

15             THE WITNESS:  Thank you.

16                  DIRECT EXAMINATION

17   BY MR. WOODARD:

18   Q.    Good afternoon, sir.

19   A.    Yes.

20   Q.    Did you just pull in?

21   A.    Yeah, I just pulled in.

22   Q.    Okay.  Thank you.

23             Could you please introduce yourself to the jury?

24   A.    Yeah.  My name is Percy Dhamodiwala.  My profession,

25   I'm a pharmacist, and I also own my own pharmacy.

Dhamodiwala - Direct

1    Q.     And may I call you Percy?

2    A.     Yes, sir.

3    Q.     Thank you, sir.

4            And where do you live, sir?

5    A.     So I live in Rehoboth Beach, Delaware.

6    Q.     All right.  You mentioned you're a pharmacist.  So

7    when did you become a pharmacist?

8    A.     Yeah, I graduated in India in 1986.  And after coming

9    to the United States in the year 2000, I got my license as a

10   pharmacist in the state of Maryland first in year 2004.

11   Q.     Okay.  Are you licensed to practice pharmacy in

12   Delaware currently?

13   A.     Yes, sir.

14   Q.     Okay.  And just briefly, if you could give us the

15   rundown of your work history after becoming licensed as a

16   pharmacist?

17   A.     Yes.  After coming to the United States, I joined

18   Rite Aid as an intern, and I completed my internship hours

19   and got my license in year 2004.  And I worked as a staff

20   pharmacist at Rite Aid in Maryland since the Maryland

21   location.  And I become a pharmacist in 2006.  In 2008 --

22   2007, when at Rite Aid, they bought all the Eckerd stores

23   bringing all the pharmacists from the Eckerd stores and the

24   technicians of the Eckerd stores.  And we would give them

25   the system.

Dhamodiwala - Direct

1          After the acquisition was completed, I was

2    promoted at the time as a pharmacy district manager in Rite

3    Aid.  So from 2008, I worked with Rite Aid as a pharmacy

4    district manager supervising around 30 to 35 stores between

5    Maryland and Delaware.  And my whole responsibility was the

6    pharmacy operation.

7          MR. WOODARD:  I'm going to stop you right there.

8    Mr. Percy, if you could just lean a little bit forward into

9    the microphone.

10          THE WITNESS:  Yes.

11    BY MR. WOODARD:

12    Q.    And then just please slow down a little bit to make

13    sure we can get --

14    A.    Yes.  Yes, I'm sorry.

15    Q.    Thank you, sir.

16    A.    Yeah.

17    Q.    You were talking about your time as district manager?

18    A.    At the time, I was a district manager.  I was

19    supervising Rite Aid stores on the Eastern Shore of Maryland

20    and certain other stores until I left Rite Aid in 2015 to

21    start my own business.

22    Q.    Okay.  And Mr. Percy, we're going to talk about

23    around 2012 and '13.  Were you a district manager at that

24    time?

25    A.    Yes, sir.

Dhamodiwala - Direct

1    Q.    And did your areas of responsibility include Milford,

2    Delaware?

3    A.    Yes, sir.

4    Q.    Okay.  All right.

5          Mr. Percy, are you familiar with an individual

6    named Patrick Titus?

7    A.    Yes.

8    Q.    Okay.  And who is he?

9    A.    I have not seen him personally, but I am -- I'm -- he

10   was -- he is a doctor, and I am familiar because of my

11   profession and my professional responsibilities, and some of

12   the things what corporate asked me to do.

13   Q.    Okay.  We'll talk about that in just a minute.  Do

14   you recall about when you first came to learn of Dr. Titus?

15   A.    Yes.  As a pharmacist and as pharmacist supervisor,

16   we always get some kind of feedback from our fellow

17   pharmacists where they feel uncomfortable.

18         MS. KOUSOULIS:  Your Honor, I would just object

19   to any hearsay in terms of what he's being told by other

20   pharmacists.

21         THE COURT:  Well, I'm going to let him say, in a

22   general kind of way, how they get information because I

23   think that's what he's talking about.

24         MS. KOUSOULIS:  That actually --

25         THE COURT:  When we get to more specific things,

Dhamodiwala - Direct

1    we'll try to -- you can stand up again.

2              MS. KOUSOULIS:   Okay.

3    BY MR. WOODARD:

4    Q.    Mr. Percy, please try not to say what others told you

5    specifically, but you're talking about gathering

6    information?

7    A.    Yes.  So as a supervisor, when I used to visit my

8    pharmacy and pharmacists, they always told me certain

9    doctors where they don't feel comfortable filling the

10   prescriptions.  And I used to always give them, "Well, use

11   your professional judgment.  And as your supervisor, I will

12   never pressure you to fill any prescriptions where you think

13   that you are going to compromise your professional

14   judgment."

15   Q.    And we're talking about Dr. Titus.  So when did he

16   first come on your radar, sir?

17   A.    Yes.

18   Q.    When?

19   A.    He came in 2013.  One of the pharmacists in my

20   area -- first, let me take one step back.  In year 2013,

21   Rite Aid revised the system for the pharmacists to report

22   the prescription back in which they feel that those are not

23   within the scope of normal professional judgment.

24             MS. KOUSOULIS:   Your Honor, I would object and

25   perhaps can we see you at side-bar for a second?

Dhamodiwala - Direct

1          THE COURT:  No.  I'm going to let him talk about

2      the professional obligations.

3          THE WITNESS:  Yeah.  So one of the pharmacists

4      reported to Rite Aid corporate, which I don't know about it

5      until I got the investigation for it from Rite Aid

6      corporation.  And as a pharmacy district manager, it was my

7      obligation to follow the instructions from the corporate and

8      those instructions were to investigate Dr. Patrick Titus and

9      about his prescription pattern.

10     BY MR. WOODARD:

11     Q.    Let's stop there, Percy.  Okay.  Was investigating

12     doctors and others part of your day-to-day responsibilities

13     as the district manager?

14     A.    Not investigating the doctors was my responsibility,

15     but I was ensured to make sure that my stores are filling

16     the prescriptions within the guidelines of the regulations.

17     Q.    Okay.  And we're talking, again, around 2012 and '13.

18     Did you have any concerns about the prescriptions you saw

19     written by Dr. Titus?

20     A.    No, I was not working on the bench.  I was not

21     filling the prescriptions.  I was the pharmacist supervisor.

22     Q.    Okay.  At some point, did you begin an investigation

23     into Dr. Titus?

24     A.    Yes.  In 2013 when I received the direction from Rite

25     Aid corporate to let me know to go and see the pattern of

Dhamodiwala - Direct

1    the practice of this doctor, and they also asked me to visit

2    the location.

3    Q.     Okay.  We'll talk about that in just a minute.

4           What were some of the things you were looking

5    for when conducting this investigation?

6    A.     Yes.  We compared the facts run by the corporate,

7    like how many prescriptions a normal doctor would prescribe

8    for Oxycodones, Hydrocodones, and also we call it a

9    community combination, which comprises of Oxycodone,

10   Hydrocodones, benzodiazepines, which we call it the

11   Diazepam, Lorazepam and the muscle relaxant together.  And

12   once --

13   Q.     Mr. Percy, those drugs you mentioned, are we talking

14   about opioid drugs?  What were those?

15   A.     Yes.  Oxycodone, Hydrocodone are opioid drugs.  So

16   when you take this within the combination -- in the

17   pharmacist world, we call it as a cocktail in combination.

18   It is not -- those cocktails or those combinations are

19   really not good for human beings in that they can be --

20          MS. KOUSOULIS:  Your Honor, I would just object.

21   I mean, this is delving into expert testimony.  He hasn't

22   been qualified as an expert giving some medical advice as to

23   what's good or what's not good, what's normal.

24          THE COURT:  He's explaining his own decisions in

25   2013, so I'm going to overrule it.

Dhamodiwala - Direct

1    BY MR. WOODARD:

2    Q.    Okay.  We talked about the combinations and the

3    amount of pills.  What else were you looking for when

4    conducting your investigation?

5    A.    So while conducting the investigation, I was

6    partnered up by my Loss Prevention Manager on the

7    instruction of corporate that we should go and visit the

8    location.  So as a part of investigation, we had to see what

9    kind of practice doctor has.  We survey the parking lot.  We

10   went to the facility.  We drove around the cars.  And we saw

11   many cars in the parking lot and some of the cars, the

12   registrations were out of state.  And --

13   Q.    Why did you look for the license plates of the cars?

14   A.    Yeah, as far as the guidelines by corporate given to

15   us that some of the factors of which a pharmacy should raise

16   a red flag when they fill the prescription of any

17   individual, if a pharmacist is one ZIP Code and if an

18   individual is coming from, say, 20, 25 miles difference or

19   different state, that itself is -- for the corporate

20   guidelines, that was a red flag.

21   Q.    Okay.  And you mentioned you actually drove to

22   Dr. Titus' parking lot.

23   A.    Yes, sir.

24   Q.    Okay.  Let's break this down.  Around what time in

25   the morning, if it was the morning, did you arrive?

457

Dhamodiwala - Direct

1    A.     Yeah.  Yes, first time, it was in 2013.  I can tell

2    you around, it was 9:30 or ten o'clock.

3    Q.     Okay.  So what did you see?

4    A.     There were multiple cars over there, and we can see

5    that those cars, they not only had Delaware registrations,

6    registrations were from Maryland, from Pennsylvania, New

7    Jersey.

8    Q.     And did you take any photographs while you were in

9    the parking lot?

10   A.     Yes, my loss prevention manager took many pictures.

11   Q.     Okay.  Just one moment, Mr. Percy.

12          Ms. Leal, if you could please pull up

13   Government's Exhibit 400.

14          Okay.  Mr. Percy, do you recognize this?

15   A.     Yes, sir.

16   Q.     When was this picture taken?

17   A.     This was somewhere in October of 2013.

18   Q.     Okay.  Are there more pages, Ms. Leal?  What about

19   this picture?

20   A.     Yes, this was also taken during my visit.

21   Q.     Okay.  And are some of these cars vehicles that you

22   noticed with license plates from out of state?

23   A.     Yes.

24   Q.     And the next picture, Ms. Leal.

25          Was that also taken around the same time?

Dhamodiwala - Direct

1    A.      Yes.

2    Q.      And one more, Ms. Leal.

3            Was that picture also taken around this time?

4    A.      Yes.

5    Q.      Okay.  So we've talked about one visit to the

6    doctor's clinic.  Did you return?

7    A.      Yes, sir.  As far as the corporate guidelines, we

8    went there early in the morning around 6:30.

9    Q.      Why so early?

10   A.      Just to make sure that the -- how the parking lot was

11   at that time because in that business, there was not the

12   business like a restaurant or anything.  So we went there

13   around 6:30 in the morning to see what kind of things are

14   there, and we saw many cars parked during that time at 6:30,

15   6:45.

16   Q.      Okay.  Was the clinic open at that time?

17   A.      At that point, I'm not sure, but I think there was no

18   other businesses in there.  So I'm not sure.  I didn't go

19   there to see whether it was open or not.

20   Q.      Did you see whether people were waiting in their

21   cars?

22   A.      Yes, I saw people waiting in their cars.

23   Q.      Did that raise any importance to you in your

24   investigation, what you saw with these persons outside the

25   clinic around 6:00 a.m.?

Dhamodiwala - Direct

1    A.    Yes, sir, because we, as pharmacists, we have not

2    seen any internal medicine doctor starting around 6:30 or

3    so.  And so that was one of the reasons why we went there

4    early.  And I'm not sure whether the clinic was open or not,

5    but we saw many cars.

6    Q.    And did you ever try to go inside of the clinic?

7    A.    Yes, the day when we went around 9:30, 9:45, me and

8    my Loss Prevention Manager, yes, we stepped into the clinic,

9    also.

10   Q.    And were you able to speak with Dr. Titus?

11   A.    No.  I was not able to speak with the Dr. Titus.  I

12   was talking with the front desk receptionist.

13   Q.    Okay.  Had you asked to speak with him?

14   A.    Yes, I asked that.

15   Q.    Were you allowed to?

16   A.    Yes, I was told he was not able to.

17   Q.    Okay.  We've talked about the clinic.  Did you also

18   review documents in your investigation?

19   A.    Yes.

20   Q.    Okay.  One moment, Your Honor.

21         DEPUTY CLERK:  Sir, do you mind just like

22   speaking into the mic a little bit more?

23         THE WITNESS:  A little bit more?

24         DEPUTY CLERK:  Yeah, just like that.  Thank you.

25         THE WITNESS:  Sorry.

460

Dhamodiwala - Direct

```
 1                DEPUTY CLERK:  No, you're fine.

 2                MR. WOODARD:  Your Honor, we'd offer Government

 3   Exhibit 401 into evidence without objection.

 4                THE COURT:  All right.  Admitted without

 5   objection.

 6                (Government Exhibit No. 401 was admitted into

 7   evidence.)

 8                MR. WOODARD:  Ms. Leal.

 9   BY MR. WOODARD:

10   Q.    Mr. Percy, do you recognize this document?

11   A.    Yes, I recognize this document.

12   Q.    What is it?

13   A.    This was the prescriptions prescribed by Dr. Titus in

14   six months of time from February 20, 2013 to August 20th,

15   2013.

16   Q.    And why was this report run?

17   A.    Yes.  As we all know, there are five classes of

18   narcotics, and pharmacy could dispense four of them.  So

19   corporate wanted to see the pattern of prescriptions

20   prescribed by Dr. Titus in that six months of time.

21   Q.    Okay.  Do you see there are various classes listed

22   here?

23   A.    Yes.

24   Q.    Which class do you see had the highest amount of

25   prescriptions?
```

Dhamodiwala - Direct

1    A.      Class 2 narcotics.

2    Q.      And could you give the jury some examples of Class 2

3    narcotics?

4    A.      Yes, Class 2 narcotics are OxyCodones, Hydrocodones,

5    Morphine, Methadone, Hydromorphone.  Those are -- Fentanyl,

6    those are the Class 2 narcotics.

7    Q.      And the number on the left, 1672, what was that?

8    A.      Yes, this was number of prescriptions written by

9    Dr. Titus from the Rite Aid data between those dates range.

10   Q.      In about a six-month time period?

11   A.      Yes.  And those were the prescriptions filled at the

12   all the Rite Aid locations.

13   Q.      Okay.  So only prescriptions written by Dr. Titus

14   filled at Rite Aids?

15   A.      Yes.

16   Q.      Okay.  Did this number strike you as unusual?

17   A.      Yes.  To me, as a pharmacist, that number when I

18   refill any prescriptions with that number is a little bit

19   unusual for me.

20   Q.      Why was that?

21   A.      Yeah, because if you see all the classes, like

22   Class 2, Class 3, or Class 5, and if you see all scripts

23   between all scripts of the controlled classifications,

24   68 percent of those prescriptions were Class 2 narcotics.

25   Q.      And do you know what Dr. Titus' specialty was in or

Dhamodiwala - Direct

1    his practice focus?

2    A.    He was a internal medicine doctor, so that was --

3    that would be his specialty.

4    Q.    Okay.  Did the fact that he was an internal medicine

5    doctor have any bearing on you seeing this amount of Class 2

6    prescriptions?

7    A.    Yes, and that was not only my concern, but the

8    concern --

9             MS. KOUSOULIS:  Objection to the concerns.

10             THE COURT:  Yeah.  We're mostly interested in

11    your concern.

12             THE WITNESS:  Yes.  Yes, it would be concern as

13    a pharmacist seeing this.

14             MR. WOODARD: Okay.  If we could go to the next

15    page, Ms. Leal.

16    BY MR. WOODARD:

17    Q.    And what's this document, Mr. Percy?

18    A.    Yes, this document, it shows from the top prescribing

19    medicines from the top to bottom.  I think this is like top

20    20 or top 25 prescriptions prescribed by Dr. Titus during

21    that six-month time range.

22    Q.    Okay.  And only that would have been filled by Rite

23    Aid; correct?

24    A.    Yes.  It ours only, of course.

25    Q.    Okay.  Let's go through the columns here.  So what's

Dhamodiwala - Direct

1    the first column?

2    A.    This is the number of prescriptions written, say for

3    example, 15 milligrams.  Number of prescriptions written was

4    798.

5    Q.    And what's sum of quantity WR?

6    A.    Oh, that is the number of prescriptions.  These are

7    the quantities that are the number of tablets, tablets

8    written in those 798 prescription.

9    Q.    That's the number of tablets in Column 2?

10   A.    Yes.

11   Q.    Okay.  Okay.  So turning to the far left, what was

12   the most frequently prescribed drug by Dr. Titus during this

13   time frame?

14   A.    Yes, Oxycodone 15 milligrams; Oxycodone ten

15   milligrams; Methadone ten milligrams.

16   Q.    Okay.  And you can stop there.

17         For Oxycodone 15 milligrams, in six months, how

18   many prescriptions did Dr. Titus write that were filled only

19   at Rite Aid pharmacies?

20   A.    798 prescriptions.

21   Q.    And how many pills?

22   A.    61,709.

23   Q.    And those were all specifically for 15 milligrams?

24   A.    Yes.

25   Q.    Okay.  Below that is Oxycodone ten and Methadone ten?

Dhamodiwala - Direct

1  A.     Yes.

2  Q.     What are those drugs?

3  A.     These are also classified as narcotic Class 2 drugs.

4  Q.     And what is Carisoprodol?

5  A.     Carisoprodol is a muscle relaxer.

6  Q.     In your experience, when you see Oxycodone or similar

7  opioids and Carisoprodol, does that raise any concerns to

8  you?

9  A.     Yes.  That was the reason given to us by Rite Aid and

10 that is what we have learned that any time narcotics along

11 with muscle relaxants, those are the -- those are the

12 combinations which should raise a red flag.

13 Q.     Okay.  Is there something specifically about this

14 drug and the opioids that creates that concern?

15 A.     Yes, because with the combination of those drugs,

16 muscle relaxant and any benzodiazapines, it would impact the

17 respiratory system of the body and people can be -- can have

18 cardiac arrest on that.  Also, this combination is highly --

19 you can create more dependence, let me put it that way.

20 That it would create more dependence when you are on this

21 combination.

22 Q.     Thank you.

23        So after reviewing these documents and

24 conducting your surveillance, what ultimately did Rite Aid

25 decide to do with regards to Dr. Titus?

Dhamodiwala - Direct

1    A.     Yes.  So whatever investigation was there, myself and

2    my loss prevention manager, we sent in the pictures and what

3    we saw to Rite Aid Corporation.  And maybe after 35,

4    40 days, Rite Aid took the position that no Rite Aid stores

5    would be allowed to fill any controlled class prescriptions

6    by Dr. Titus.

7                MR. WOODARD:  One moment.  Your Honor, the

8    Government would offer Government's Exhibit 402 without

9    objection.

10               THE COURT:  All right.  Admitted without

11   objection.

12               (Government Exhibit No. 402 was admitted into

13   evidence.)

14   BY MR. WOODARD:

15   Q.     All right.  Finally, Mr. Percy, do you recognize this

16   document?

17   A.     Yes.

18   Q.     What is that, sir?

19   A.     This was a document -- this was a letter sent to

20   Dr. Titus by corporate Rite Aid.

21   Q.     What's the date?

22   A.     This was written on December 30th, 2013.

23   Q.     Okay.  And Mr. Percy, if you could just read that

24   first paragraph for the jury?

25   A.     Yes.  It says, "Dear Dr. Titus, this is to notify you

Dhamodiwala - Cross

1   that our pharmacy locations will no longer fill

2   prescriptions from your office for Schedule II, III, IV, and

3   V controlled substances effective Tuesday, January 7, 2014.

4   Rite Aid has taken this action because of our concern about

5   increased reports of prescription drug abuse, especially

6   Oxycodone.  Rite Aid and our pharmacists have a

7   responsibility to take appropriate steps to reduce the

8   potential that drugs we dispense are not diverted or abused.

9   We will continue to review information relevant to this

10  issue and will notify you if our current policies change in

11  the future."

12              MR. WOODARD:  Okay.  One moment, Your Honor.

13              All right.  No further questions, Judge.

14              THE COURT:  All right.  Thank you.

15              Ms. Kousoulis.

16              MS. KOUSOULIS:  Yes, Your Honor.

17                        CROSS-EXAMINATION

18  BY MS. KOUSOULIS:

19  Q.     Good afternoon.  Do you mind if I call you Mr. Percy,

20  also?

21  A.     Yes.  Yes.

22  Q.     Now, Mr. Percy, you had testified that there were

23  certain red flags that you noticed with regard to the

24  prescriptions Dr. Titus was writing; is that correct?

25  A.     I would not say that I considered.  It was the

Dhamodiwala - Cross

1    corporate screening and the guidelines of those three drugs

2    which are considered.

3    Q.      And just to go over some of the guidelines you

4    mentioned.  One guideline you mentioned was the fact that it

5    was the belief that patients were traveling long distances

6    to see Dr. Titus; is that correct?

7    A.      Yeah, when we see number of cars with -- with

8    registrations from out of state, that was -- that was the

9    conclusion.  That was the picture sent with the writing.

10   Q.      Now, with regard to that, when you were shown

11   Government Exhibit 400, that was the picture that you took

12   during your investigation, fair to say that the complex

13   where Dr. Titus' office was located, there were other

14   businesses also located within that complex; correct?

15   A.      Yes.

16   Q.      And so it's fair to say that those cars could have

17   been cars that were associated with other businesses in that

18   complex; correct?

19   A.      Yeah, I would say so.

20   Q.      And when you -- the fact that patients may have

21   traveled long distances, you don't know the circumstances of

22   any of the patients as to whether they're seeing other

23   doctors in the area, whether they work in the area, you

24   know, why they're in the area in terms of why they would be

25   seeing Dr. Titus.  You have no information specific to any

468

Dhamodiwala - Cross

1    of the patients who were presenting the scripts; correct?

2    A.    No.

3    Q.    Okay.  Now, you also indicated that when you went

4    there at 6:30 in the morning and you saw cars in the parking

5    lot, that was a concern; correct?

6    A.    Yes.

7    Q.    And it's fair to say that you don't -- even if, let's

8    say for argument's sake, Dr. Titus' practice started seeing

9    patients at 5:30, six o'clock in the morning, you have no

10   way of knowing whether that's for convenience of the

11   patients because patients, you would agree with me, that

12   people work usually between the hours of 9:00 to 5:00?

13   A.    I agree.

14   Q.    So if a patient was unable to miss work, then it

15   would be -- having office hours either before someone has to

16   go to work early in the morning or late at night after

17   they're home from work would be a way to accommodate your

18   patients; correct?

19   A.    I would say so.

20   Q.    Now, you don't treat chronic pain patients; correct?

21   A.    No.

22   Q.    And you also said that with regard to -- another

23   concern was that combination of drugs that were being

24   prescribed; is that correct?

25   A.    Yes.

Dhamodiwala - Cross

1   Q.      And you have not -- you know, you never personally

2   interviewed any of the patients that were presenting the

3   scripts; correct?

4   A.      No.

5   Q.      And you never reviewed their medical files; correct?

6   A.      I never?

7   Q.      Reviewed their medical files?

8   A.      No.  No.

9   Q.      So you don't have any way of knowing what any of

10  these patients are -- any injuries or any issues with pain

11  that these patients are suffering from; correct?

12  A.      No.

13  Q.      And you had -- you know -- you know, you had

14  indicated that you did a -- you compiled that chart of

15  Dr. Titus' prescriptions, and there were a lot of

16  prescriptions for Oxycodone; correct?

17  A.      Yeah, I would not say I compiled it.  It was done by

18  corporate.

19  Q.      It was sent.  Okay.

20          It's fair to say that even if two people's pain

21  is caused by different things, like one person might have a

22  degenerative disc disease, some person might have been in a

23  car accident and hurt themselves that way.  At the end of

24  the day, you could still treat each person's pain, even if

25  they developed that pain differently, with the same

1  medication; correct?

2  A.     Yes.

3             MS. KOUSOULIS:  I have no further questions,

4  Your Honor.

5             THE COURT:  All right.  Any redirect?

6             MR. WOODARD:  No, Your Honor.

7             THE COURT:  All right.  Mr. Dhamodiwala, thank

8  you very much for coming here, and you're excused.

9             All right.

10            THE WITNESS:  Thank you so much.

11            THE COURT:  So members of the jury, we're going

12 to take our afternoon break.  So we'll take a break until

13 approximately 20 minutes of 4:00.

14            Okay.  Can we take the jury out?

15            (Jury leaving the courtroom.)

16            THE COURT:  So am I correct that your next

17 witness and the witness that you expect to take the rest of

18 the day is Agent Smith?

19            MS. REMIS:  Yes, Your Honor.

20            THE COURT:  Okay.  All right.  We'll be in

21 recess until 20 of 4:00.

22            DEPUTY CLERK:  All rise.

23            (Recess was taken.)

24            DEPUTY CLERK:  All rise.

25            THE COURT:  All right.  Are we ready to go?

```
 1                    MS. REMIS:  Yes, Your Honor.

 2                    THE COURT:  Okay.  Let's get the jury.

 3                    (Jury entering the courtroom.)

 4                    THE COURT:  And just remind me:  Agent Smith, he

 5       wasn't involved in the actual investigation when it was

 6       happening, he was really later; right".

 7                    MS. REMIS:  Well, he was not the case agent on

 8       the case.

 9                    THE COURT:  But he was in the office here?

10                    MS. REMIS:  Exactly, and he did a few

11       investigative things.  He was part of the search warrant.

12       He interviewed the Defendant.

13                    THE COURT:  Are you Agent Smith?

14                    THE WITNESS:  Yes, Your Honor.

15                    THE COURT:  You can come and sit in the chair.

16       You'll be called soon enough.

17                    THE WITNESS:  Thank you, Your Honor.

18                    (Jury entering the courtroom.)

19                    THE COURT:  All right.  Members of the jury,

20       welcome back, everyone.  You may be seated.

21                    Ms. Remis, you may call your witness.

22                    MS. REMIS:  Your Honor, the Government calls

23       Special Agent Jeremy Smith.

24                    DEPUTY CLERK:  Please state and spell your full

25       name for the record.
```

Smith - Direct

```
 1              THE WITNESS:  Special Agent Jeremy R. Smith,
 2     S-M-I-T-H.
 3              DEPUTY CLERK:  Do you affirm that the testimony
 4     you are about to give to the Court and the jury in the case
 5     now pending will be the truth, the whole truth and nothing
 6     but the truth, you do so affirm?
 7              THE WITNESS:  I do.
 8              DEPUTY CLERK:  Thank you.
 9              JEREMY SMITH, the witness herein, after having
10     been duly affirmed under oath, was examined and testified as
11     follows:
12                    DIRECT EXAMINATION
13     BY MS. REMIS:
14     Q.    Good afternoon, Agent Smith.
15     A.    Good afternoon.
16     Q.    Could you please introduce yourself to the jury?
17     A.    My name is Special Agent Jeremy Smith.
18     Q.    And where do you work, Special Agent Smith?
19     A.    I'm currently assigned to the Wilmington Resident
20     Office of the Drug Enforcement Administration located here
21     in New Castle, Delaware.
22     Q.    And how long have you worked for the Drug Enforcement
23     Administration?
24     A.    Since, approximately, August 2006.
25     Q.    And what did you do before that?
```

Smith - Direct

1   A.      My first duty assignment was as a special agent in

2   our Louisville District Office.  I was assigned there from

3   February 2007 to approximately June of 2011.

4   Q.      Okay.  And were you on a specific squad in

5   Louisville?

6   A.      I was not.  I was assigned to a general enforcement

7   group within the Louisville office.

8   Q.      So what kinds of crimes were you investigating there?

9   A.      In general, I investigated several different types of

10  drug crimes, typical illicit street drugs, cocaine, heroin.

11  I also had some involvement in pharmaceutical investigations

12  as well.

13  Q.      Okay.  And after Louisville, did you get transferred

14  somewhere else?

15  A.      Yes, in June of 2011, I was transferred to the

16  Philadelphia -- I'm sorry, in September 2011, I was

17  transferred to the Philadelphia Division Office in

18  Philadelphia, PA.

19  Q.      And how long were you in Philadelphia for?

20  A.      I was in Philadelphia from September 2011 until June

21  of 2013.

22  Q.      And were you on a specific squad in Philadelphia?

23  A.      Yes.  I was assigned to the Philadelphia Division

24  Office Tactical Diversion Squad.

25  Q.      And what is the Tactical Diversion Squad?

Smith - Direct

1    A.      Tactical Diversion Squads are enforcement groups that

2    were set up by the DEA to help combat the opioid epidemic.

3    These are groups that are specifically designed to conduct

4    pharmaceutical diversion investigations.  Typically, they

5    are made up of special agents and state local Task Force

6    officers, intelligence analysts, as well as diversion

7    investigators.

8    Q.      Now, you mentioned that they were formulated to

9    combat the opioid crisis.  When did DEA first put together

10   Tactical Diversion Squads?

11   A.      Some of the first Tactical Diversion Squads were

12   formed in the DEA in approximately 2010.

13   Q.      And was that about the time that the opioid epidemic

14   started getting worse?

15   A.      Yes.

16   Q.      And you mentioned diversion of pharmaceutical

17   controlled substances.  What is diversion?

18   A.      Pharmaceutical drugs, specifically those outlined in

19   Schedule II through V, are drugs that can be lawfully

20   possessed and distributed; however, that has to remain

21   within the distribution cycle.  It's fairly tightly

22   controlled by DEA from the point that these drugs are

23   manufactured within the factories at the manufacturers.

24   They are then subsequently transferred to distributors who

25   will further distribute these pills to the pharmacies.

Smith - Direct

1        And then pharmacies, they receive legitimate

2    prescriptions.  The pharmacies will, of course, issue the

3    prescriptions, the pills themselves to the patients who

4    present those prescriptions to the pharmacy.  And the DEA

5    controls, and monitors, and regulates every step of that

6    process.

7        And it's what we refer to as a closed system of

8    distribution.  In other words, when the pills are only

9    intended to go from manufacturers to the retailers to the

10   pharmacists to the intended patient.  If they somehow

11   deviate from that cycle, that is what we refer to as drug

12   diversion.  The pills are diverted from their intended

13   purpose and use.

14   Q.    And are you currently assigned to a Tactical

15   Diversion Squad?

16   A.    Yes, I am.

17   Q.    And you mentioned you're in Wilmington; is that

18   right?

19   A.    That's correct.

20   Q.    Where is your office actually located?

21   A.    We are in New Castle, Delaware.

22   Q.    And when did you start in New Castle, Delaware?

23   A.    June of 2013.

24   Q.    And what's your role on the squad?

25   A.    I'm one of the senior special agents within the

Smith - Direct

1    group.

2    Q.      How does one become a senior special agent?

3    A.      Just based upon my tenure and my time, almost

4    15 years with the DEA now, based upon, you know, my

5    experience, particularly within the Tactical Diversion

6    Squads in Philadelphia, now in Wilmington.  I am essentially

7    a backup to the group supervisor of our group in my current

8    role.

9    Q.      And you mentioned earlier that the Tactical Diversion

10   Squad is made up of different kinds of officers, and

11   analysts, and investigators.  What's the purpose of having

12   all those types of people on the same squad?

13   A.      The purpose is to have another level of resources, to

14   leverage our state and local counterparts who also are out

15   there fighting and conducting these sort of investigations.

16   So the off-site intel analysts are very instrumental in the

17   process, helping us to collect, and gather, and analyze

18   intelligence throughout the course of our investigations.

19          Diversion investigators are also another

20   critical component of the Tactical Diversion Squad.  They

21   have a lot of training and experience specifically as it

22   relates to pharmacies, retailers, manufacturers.  In fact,

23   that's a big part of what a diversion investigator typically

24   does in terms of conducting inspections of some of these

25   facilities to ensure that they're in compliance with all of

Smith - Direct

1    the appropriate regulations.

2    Q.     Is a diversion investigator the same thing as a

3    special agent?

4    A.     No, it is not.

5    Q.     What are the main differences?

6    A.     The principle difference between a diversion

7    investigator and a special agent is that diversion

8    investigators typically -- their typical role is to conduct

9    investigations, regulatory investigations.  Again, as I

10   described, they will often go out to pharmacies, retailers

11   and the like.  They will do everything from conducting pill

12   counts to inspecting records of transfers of pills from --

13   you know, so at a pharmacy, they will check all the records

14   of the drugs that they've received, the drugs that the

15   pharmacy has dispensed.  And so in that capacity they help

16   ensure that these DEA registrants, as they're often referred

17   to, are in compliance with appropriate regulations.

18          Special agents generally focus on criminal

19   investigations.  That is, violations of the controlled

20   substance acts specifically.  And so, again, within the TDS

21   group, we often work together leveraging the different

22   resources and the different experience levels and expertise

23   in carrying out our investigations.

24   Q.     Now, what types of investigations does the TDS focus

25   on generally?

Smith - Direct

1    A.     Generally, we focus on pharmaceutical drug

2    investigations.  This may involve a variety of people in the

3    process.  We conduct investigations of pharmacies.  We

4    conduct investigations of doctors.  We -- or other

5    registrants.  It could be a dentist.  Anyone that possesses

6    a DEA registration can certainly be a subject of an

7    investigation of ours.

8              We also often times investigate patients or

9    other drug trafficking organizations that are involved in

10   the diversion of pharmaceutical drugs.

11   Q.     And you mentioned the DEA registration number.  What

12   is that exactly?

13   A.     Every individual, again, even pharmacies or

14   manufacturers and individual medical providers and the like

15   possess a DEA registration number with us.  This is what

16   allows them to possess these controlled substances, write

17   prescriptions for controlled substances and the like.  If

18   they do not possess the requisite DEA registrations, then

19   they're unable to carry out those functions.

20   Q.     And how does -- let's focus on physicians right now.

21   How would a physician come to have a DEA registration

22   number?

23   A.     They would have to apply with the DEA.  They would

24   have to show that they possessed a medical license and often

25   a state controlled substance registration.  So if the

Smith - Direct

1    individual, and again, specifically a doctor, did not

2    possess a medical license and a legitimate controlled

3    substance registration within a particular state, they could

4    not lawfully have a DEA registration.  Those items often go

5    hand in hand with one another.

6    Q.     In Delaware, what does a doctor need in order to have

7    a DEA registration number?

8    A.     In Delaware, they are required to have a legitimate

9    and valid medical license, valid controlled substance

10   registration, along with an active DEA registration which

11   they have to maintain from year to year.

12   Q.     Are physicians legally allowed to distribute

13   controlled substances?

14   A.     Yes.

15   Q.     Always or only under certain circumstances?

16   A.     Doctors are permitted to write prescriptions if

17   they're written in the normal course of medical practice and

18   for a legitimate medical purpose.  If either of those two

19   facts are not present, then it is drug dealing, and it is

20   not legitimate medical prescribing.

21   Q.     Approximately how many investigations have you taken

22   part in as a member of the TDS Squad in Wilmington?

23   A.     Within Wilmington?  I would say approximately 75.

24   Q.     Okay.  And approximately, how many of those have been

25   into doctors?

Smith - Direct

1    A.      I have investigated approximately 10 to 12 doctors in

2    the course of my time assigned with the Tactical Diversion

3    Squad, both in Wilmington and in Philadelphia.

4    Q.      Can you describe generally some of the investigative

5    tools the Tactical Diversion Squad uses to investigate

6    pharmaceutical diversion?

7    A.      Sure.  Often times the investigations may start with

8    monitoring the prescription monitoring program, which I'm

9    sure the jury may have heard about already.  This allows

10   us -- this gives us an idea or starting point of the

11   controlled substances that a doctor is prescribing in a

12   particular state.  Oftentimes, you know, particularly here

13   in Delaware since we are kind of in a tri-state area with

14   several other states adjacent to us, we may also, in

15   addition to Delaware, we often will query the states of

16   Pennsylvania, New Jersey and Maryland to get a full picture

17   of the prescribing activity of a particular registrant.

18   Q.      And if I could just interrupt you.  I'm not sure that

19   we have heard of the prescription monitoring program, so

20   could you just briefly describe what that is?

21   A.      The prescription monitoring program was established

22   in Delaware.  In particular, it was established in

23   approximately 2012.  It's essentially every time a patient

24   fills a controlled substance prescription at a pharmacy,

25   that information is entered into a database.  That database

Smith - Direct

1    is capable of being queried by other registrants, other

2    doctors, who may want to help ensure that their patients are

3    not seeing other medical providers.  It also can be used by

4    the pharmacies themselves to see where the patients may be

5    filling other prescriptions.  And it can also be used in the

6    case of bona fide investigations conducted by law

7    enforcement, again, to get a handle on what prescriptions

8    are being filled by whom and where.

9    Q.    And what kind of information specifically is listed

10   in the prescription monitoring program, which is in short

11   called the PMP; right?

12   A.    Yes, it is referred to as the PMP for short.  It, of

13   course, will have the patient's name, their -- often usually

14   their address, the location of the pharmacy where the

15   prescription was filled, the medical prior or the DEA

16   registrant that issued that prescription.  Of course, the

17   specific number, and quantity, and dosage units of the

18   prescription medications that were filled.  And that's the

19   primary data points that are maintained by the PMP.

20   Q.    Does it include the date written on the prescription?

21   A.    Yes, it does.

22   Q.    And does it also include the date the prescription

23   was dispensed by the pharmacy?

24   A.    Yes, it does.

25   Q.    Okay.  And you mentioned that Delaware has one since

Smith - Direct

1   2012.   Do other states also maintain a PMP?

2   A.      Yes, they do.

3   Q.      Most other states?

4   A.      At this point in time, I believe it's nearly

5   universal throughout the United States.  So almost every

6   state in the United States has a prescription monitoring

7   program.  There may be still a couple of exceptions yet, but

8   certainly all of the states in our immediate tri-state area

9   do maintain a PMP.

10  Q.      So you mentioned that physicians have access to the

11  prescription monitoring program; right?

12  A.      Yes.

13  Q.      And did they have access starting in 2012?

14  A.      Yes.

15  Q.      And how could a physician use the PMP to look up a

16  patient's prescription history?

17  A.      The doctor could simply make a query in the database

18  using the patient's name and other personally identifying

19  information such as the date of birth, and that would allow

20  them to bring up all the prescriptions that that individual

21  had filled within the state.

22  Q.      And so one could search the PMP by patient name; is

23  that right?

24  A.      That's correct.

25  Q.      Can you also search it by physician name or

Smith - Direct

1   prescriber name?

2   A.      That is possible as well.  Correct.

3   Q.      Okay.  So DEA uses the prescription monitoring

4   program as an investigative tool?

5   A.      Yes, absolutely.

6   Q.      And what other investigative tools does DEA use in

7   its pharmaceutical diversion cases?

8   A.      Well, each case is very unique and each case presents

9   different opportunities to leverage different investigative

10  tools.  Often times I would say physical surveillance is a

11  tool that's often used by us to just get a general feel for

12  a medical practice.  The amount and flow of activity at the

13  particular medical provider is one thing that can be helpful

14  in our cases.  We often will conduct interviews of people

15  that have been arrested by -- by law enforcement that may be

16  a patient of a particular medical provider.  That is often

17  very common.  And those are some of the immediate tools that

18  come to mind.

19  Q.      Okay.  Do you ever conduct search warrants?

20  A.      Yes, search warrants are often conducted.  They may

21  be physical searches of the medical practice, may be

22  searches of residences associated with the medical practice.

23  And also may include search warrants for electronics that

24  can also be carried out for computers or other electronic

25  media.

484

Smith - Direct

1   Q.    What about undercover visits or use of controlled

2   buys, for example?

3   A.    Yes, that is often a tool that we attempt to

4   leverage.  It's not always possible to use an undercover in

5   all of our cases.  So, but that is often one thing that is

6   considered if it is both safe and plausible to do so.

7   Q.    Would you describe using an undercover as a standard

8   investigative tool?

9   A.    I think in most cases, we would at least make an

10  effort to utilize an undercover; however, not -- every case

11  is unique.  In the course of my 15 years with the DEA, not

12  every case allows or affords the opportunity to successfully

13  and safely introduce an undercover.  We may want to

14  introduce an undercover, but the situation does not always

15  allow that.

16  Q.    Why would a situation -- what are some circumstances

17  in which you would not be able to introduce an undercover?

18  A.    Undercovers often in various cases requires someone

19  to introduce that undercover.  Obviously, our undercovers

20  have not been dealing with the targets of our investigation

21  typically throughout time, so there is a requirement to

22  introduce them to there in some way, shape or form or

23  through some mechanism.  So that mechanism isn't always in

24  place.

25          Sometimes the target of the particular

Smith - Direct

1    investigation may have their guard up and be very much so on

2    the lookout for anything suspicious or unusual.  If they

3    think they're under investigation, they may be extremely

4    leery of meeting someone new, someone that they haven't been

5    dealing with for any reasonable period of time.  Maybe they

6    even have reservations about the person that's even doing

7    the introduction, let alone the person that actually would

8    be carrying out the undercover.  It truly is a case-by-case

9    basis.

10   Q.    Are there ever situations where you would attempt to

11   introduce an undercover, but it would be unsuccessful in the

12   end?

13   A.    Absolutely.  It's happened many times throughout my

14   career.

15   Q.    And what are some circumstances in which it's --

16   let's focus on investigating physicians' offices or

17   physicians.  What are some circumstances where that may

18   occur?

19   A.    The primary -- the primary ones that come to mind as

20   it relates to physicians are that the practice may not be

21   accepting new patients.  That is often a roadblock that we

22   run into.  And the other roadblock would be that the

23   practice simply chooses not to accept that patient as a

24   member of the practice for one reason or another.  Sometimes

25   it's related to us, sometimes we're simply told they cannot

Smith - Direct

1    become a patient at the practice.

2    Q.     Did you say sometimes that's related to us?  Is that

3    what you just said?

4    A.     I don't believe so.  I'm sorry.

5    Q.     I'm sorry.  I misheard you then.  So in this case was

6    an undercover attempted to be introduced?

7    A.     Yes, there was.

8    Q.     And did that attempt result in an undercover -- well,

9    what would the goal of an undercover introduction be in a

10   physician investigation?

11   A.     Introduction of an undercover in this sort of case

12   would be a mechanism to capture the essence of what may

13   happen in the course of a medical visit with the provider.

14   The opportunity to record that visit and provide the

15   investigation -- provide the investigators with an idea of

16   what may be happening in the course of the medical business.

17   Q.     And in this case, I'll just ask you:  An attempt was

18   made; right?

19   A.     Correct.

20   Q.     And was the attempt successful?  Did the undercover

21   get in to see Dr. Titus?

22   A.     No.

23   Q.     Do you know why?

24   A.     When -- she was ultimately told by a staff member of

25   the practice that she could not become a patient of the

Smith - Direct

1    practice, the -- in reviewing the recording relating to

2    that, the undercover.

3              MS. KOUSOULIS:  Your Honor, I would object.  And

4    the recording is available, will be available, and this is

5    hearsay regarding this witness.

6              MS. REMIS:  I can ask my next question, Your

7    Honor.

8              THE COURT:  All right.  Well, why don't we have

9    another question then.

10   BY MS. REMIS:

11   Q.    And in your investigation in this case, and we'll get

12   into what your role was, was there anything recovered in

13   this case that would suggest that there was any suspicion

14   about undercovers coming into the clinic?

15   A.    Yes, there was.

16   Q.    And can you describe what that was?

17   A.    Although we haven't touched on it yet, in the course

18   of an execution of a federally obtained search warrant for

19   Josie Walters, the office manager of Dr. Titus, in the

20   course of execution of the search warrant at her residence,

21   a spiral notebook was recovered.  Within that notebook, it

22   had listed a patient's name and the word undercover,

23   question mark, was listed by that name.

24   Q.    Now, do you know if that undercover referred to the

25   undercover that DEA attempted to send in?

Smith - Direct

1    A.      No, I do not.

2    Q.      Okay.  Now, let's talk specifically about your role

3    in this -- actually, let me ask you one other question,

4    which is:  You mentioned that the goal of an undercover is

5    to capture sort of the goings on in the office; right?

6    A.      Yes.

7    Q.      Are there other investigative tools that you could

8    use that would result in the same type of information?

9    A.      Without question, and it's often a tool we rely on to

10   a much greater degree in these sort of investigations, and

11   that would be the interview of patients that have been

12   there.  Again, they may be interviewed at various stages of

13   their time with the practice.  They may be an active patient

14   of the practice.  They may be a former patient of the

15   practice.  But then that is another tool and mechanism for

16   us to gain an understanding of what typically occurs in the

17   course of visits to the practice.

18   Q.      Okay.  Thanks.

19           And are you familiar with somebody named Patrick

20   Titus?

21   A.      Yes, I am.

22   Q.      And do you see him here in the courtroom?

23   A.      Yes, I do.

24   Q.      Can you identify him by where he's sitting and what

25   he's wearing?

Smith - Direct

1    A.      He's seated at the defense table.  He's wearing a

2    white shirt with a gold tie and mask.

3    Q.      Thank you.

4            MS. REMIS:  And I believe we've already

5    identified him, but just for the record, Your Honor.

6    BY MS. REMIS:

7    Q.      When did you first become familiar with Dr. Titus?

8    A.      Our office initiated a formal investigation of

9    Dr. Titus in January of 2014.

10   Q.      And were you the lead case agent assigned to that

11   case at the time that the case was initiated in 2014?

12   A.      I was not.

13   Q.      Were you familiar with the fact that your office was

14   investigating him?

15   A.      Yes, I was.

16   Q.      Is your office fairly small?

17   A.      Fairly small, yes.

18   Q.      Okay.  And at some point, did you transition into a

19   more leadership role in this case?

20   A.      Yes, after the -- there became a point in time when

21   the primary case agent in this case, the primary DEA case

22   agent had been promoted.  That occurred, I believe, in 2018,

23   and at which point in time I took more of a primary lead

24   role in the case.

25   Q.      Is that a common thing that happens in agencies,

1    people move and get promoted and things like that?

2    A.     Yes, it is.

3    Q.     And what other agencies took part in this

4    investigation besides the DEA?

5    A.     Health and Human Services, Office of Inspector

6    General or HHSOIG was the other principal participant in

7    this investigation.

8    Q.     Before becoming a more primary case agent in this

9    case, did you have anything to do with the investigation?

10   Did you take any part in it?

11   A.     Yes, I did.

12   Q.     What did you do?

13   A.     My primary role was the planning and execution of

14   three federal search warrants that were executed in this

15   case on January 30th, 2015.

16   Q.     Now, to be clear, did you write and apply for those

17   search warrants yourself?

18   A.     I did not.

19   Q.     Did a different agent do that?

20   A.     Yes, that's correct.

21   Q.     And once those search warrants were obtained, were

22   you part of the team that executed those search warrants?

23   A.     Yes, I was.

24   Q.     Okay.  I want to talk to you a little bit about

25   another investigative step.  In advance of this trial, did

Smith - Direct

1    you locate any photographs of the patients who are listed in

2    the indictment?

3    A.     Yes, I did.

4    Q.     And how did you do that?

5    A.     Queried law enforcement databases available to us

6    with, of course, the ability to locate driver's license

7    photos and arrest photos of individuals here within the

8    State of Delaware and other instances, leveraging other

9    state and local counterparts where databases in other states

10   may possess those photographs.

11   Q.     And what information did you put into those systems

12   to get those photographs?  What identifiers?  Sorry.

13   A.     Yes, it would be names.  Names and dates of birth.

14   Q.     And was there any specific limitations that you were

15   looking for for those photographs?

16   A.     Yes.

17   Q.     And what was that?

18   A.     We were primarily focusing on the time frame of this

19   investigation, so we were seeking photos of the individuals

20   in the time frame of 2013 to 2014 should they be available.

21   Q.     And why were you looking for that time frame?

22   A.     These photos would have been most contemporaneous to

23   the treatment and the time that these individuals were

24   patients of Dr. Titus.

25            MS. REMIS:  At this time, Your Honor, I'd like

Smith - Direct

1    to move to admit Government Exhibit 701 through 714 which

2    are the photographs of the patients he just described.

3                    THE COURT:  All right.  Admitted without

4    objection.

5                    (Government Exhibit Nos. 701 to 714 were

6    admitted into evidence.)

7                    MS. KOUSOULIS:  Your Honor, with regard to

8    our -- you know, with regard to the Court's earlier ruling,

9    at this point we're not objecting, but we just reserve the

10   right for further review.

11                   THE COURT:  Well, they're admitted.

12                   MS. REMIS:  Thank you, Your Honor.

13   BY MS. REMIS:

14   Q.    Okay.  Now, let's talk a little bit about the search

15   warrants that you mentioned earlier.  You mentioned you

16   assisted with the execution and planning of the search

17   warrants in this case, I'm paraphrasing.

18                   Is that right?

19   A.    That's correct.

20   Q.    And when were those search warrants executed?

21   A.    January 30th, 2015.

22   Q.    Where were they executed?

23   A.    They were executed at three locations.  The first

24   location was Dr. Titus' residence.  Second location was his

25   office manager, Josie Walters' residence.  And the third was

Smith - Direct

1    the residence of Shannon Holleger, an employee of

2    Dr. Titus'.

3    Q.     And how are those -- how is the office manager's home

4    and the former employee, Ms. Holleger's home, why were those

5    searched?

6    A.     The essence of why they were searched is that

7    evidence was uncovered that medical files of Dr. Titus' may

8    be located within the residences.

9    Q.     Okay.  And were all three of those search warrants --

10   well, let me ask you:  Were all three of those located in

11   Milford, if you recall?

12   A.     No, the -- they were not.  They -- I believe it was

13   Felton, Delaware.  I'm sorry.  I don't know all the states,

14   but it was not exclusively in Milford, Delaware.

15   Q.     Okay.  And were they all executed on the same day?

16   A.     Yes.

17   Q.     Why wasn't a search warrant executed at Dr. Titus'

18   office location?

19   A.     His practice was closed at that time.

20   Q.     What was the name of that practice?

21   A.     Lighthouse Internal Medicine.  And if I may also

22   clarify, it's not that it was closed because it was off

23   hours.  The practice itself had been closed.

24   Q.     So you didn't believe there could be any files at

25   that location or other materials?

494

Smith - Direct

1    A.      Correct.

2    Q.      And you mentioned you were present on the day of the

3    search; right?

4    A.      I was.

5    Q.      Where were you located?

6    A.      I participated in the execution of the search warrant

7    at Dr. Titus' residence.

8    Q.      And what was your role in that search?

9    A.      My primary role during the course of that was to

10   attempt to conduct an interview of Dr. Titus while we were

11   inside of his residence and the search warrant was being

12   executed.

13   Q.      What, if anything, was seized from Dr. Titus' home

14   specifically?

15   A.      There were various documents that were seized from

16   the -- seized from the residence.  There were also

17   electronic devices, computers, things of that nature, that

18   had also been seized from the residence.

19   Q.      And what about Ms. Walters' home, what in general was

20   ceased from her house?

21   A.      Principally, that was medical files, but also other

22   documents were seized from the residence.

23   Q.      Okay.  And lastly, from Ms. Holleger's home, what was

24   generally seized from there?

25   A.      Generally seized from there were additional patient

Smith - Direct

1    files.

2    Q.    At the time of the search at Dr. Titus' home, did you

3    discuss with Dr. Titus whether or not he had any other

4    places where he stored patient files or other records?

5    A.    Yes, I did.

6    Q.    And did he?

7    A.    Yes.

8    Q.    Where was that?

9    A.    He indicated that several -- the majority of his

10   patient files were located at a storage facility in Milford,

11   Delaware.  Milford Mini-Storage, I believe is the name.

12   Q.    Okay.  And was that storage unit eventually searched

13   as well?

14   A.    Yes, it was.

15   Q.    How did DEA get authority to go into that storage

16   unit and search and seize evidence?

17   A.    Dr. Titus provided us with his verbal and written

18   consent to search that location.

19   Q.    Meaning he gave you the okay?

20   A.    Correct.

21   Q.    And generally speaking, what was seized from that

22   location?

23   A.    Primarily, it was a large volume of patient files,

24   along with other documents related to the practice.

25   Q.    And when you say "a large volume of patient files,"

1    do you have a sense of how many patient files were seized?

2    A.    Yes, it was over 7,000 files.

3    Q.    Okay.  And were all 7,000 of those files pertaining

4    to patients who are characterized as patients?

5    A.    No, they were not.

6    Q.    There were other types of patient files in there?

7    A.    Correct.

8    Q.    Now, have you reviewed every single one of those

9    patient files?

10   A.    No, I have not.

11   Q.    Can you explain sort of, on average, based on your

12   participation in this investigation about how many pages

13   might be in one of those patient files?

14   A.    The average length of the files that come -- that

15   I've come to look at would probably be approximately 200.

16   Q.    Okay.  And are they like this thick?  I'm showing you

17   like two inches.

18   A.    Yes.  That was -- that would be an approximate --

19   that would be an appropriate approximation.

20   Q.    Is it fair to say that several of the patient files

21   cover many years?  Span many years?

22   A.    Yes.

23   Q.    And primarily of the patient files that you have

24   reviewed, were they for family medicine patients or pain

25   patients?

Smith - Direct

1    A.      Pain patients.

2    Q.      Okay.  Aside from the warrants that were at the homes

3    of Dr. Titus, Ms. Walters, and Ms. Holleger, were there any

4    search warrants executed for other types of documents in

5    this case?

6    A.      Yes.

7    Q.      And what was that?

8    A.      Subsequent search warrants were obtained for the

9    electronic medical record of Dr. Titus.

10   Q.      And just generally, what's an electronic medical

11   record?

12   A.      Electronic medical record is often a software or a

13   database that doctors such as Dr. Titus utilized to maintain

14   their records.  Items can be scanned, uploaded into these

15   databases.  Other information can be contained within the

16   data -- within these databases, patient's schedules, other

17   patient information, things of that nature.

18   Q.      And when was that search conducted?

19   A.      I do not recall.  It was sometime after the execution

20   of the search warrants in January of 2015.

21   Q.      Do you recall if there was an accompanying electronic

22   medical record for every one of Dr. Titus' patients?

23   A.      No, there was not.

24   Q.      So some patients only had a paper file, for example?

25   A.      Correct.

Smith - Direct

1  Q.    And you mentioned that documents could be scanned in

2  to an electronic medical record.  Were several of the

3  electronic medical records in this case -- did several of

4  them contain the same documents that were in the paper file?

5  A.    Yes.

6  Q.    Okay.  Okay.  Let's talk about some of the types of

7  evidence that was seized from the execution of these search

8  warrants.  You mentioned that DEA recovered 7,000-ish

9  patient files as well as electronic medical records.

10              Is that right?

11 A.    Correct.

12 Q.    Prior to coming to court -- did you want to say

13 something else?  Oh, I thought you were.

14 A.    No.

15 Q.    Sorry.  Prior to coming to court today, did you have

16 a chance to review, what I'll call the 100 series of the

17 Government exhibits, the patient files and the electronic

18 medical records or at least look at them?

19 A.    Yes.

20              MS. REMIS:  Okay.  Your Honor, at this time I'd

21 like to move to introduce several of our patient files and

22 electronic medical records.

23              MS. KOUSOULIS:  No objection.

24              THE COURT:  All right.

25              MS. REMIS:  So just for the record, the

499

Smith - Direct

1    Government is seeking to introduce Government Exhibits 101

2    through 108.  109 is already in evidence.  110 through 126

3    and 127 is already in evidence.  128 through 182, please,

4    Your Honor.

5              THE COURT:  All right.  Well, they're admitted

6    without objection.

7              (Government Exhibit Nos. Exhibits 101 to 108 and

8    128 to 182 were admitted into evidence.)

9              MS. REMIS:  Thank you.

10   BY MS. REMIS:

11   Q.    Okay.  Now, just in terms of the exhibits that we

12   just admitted, based on your review of those, are all of

13   them an entire patient file or are some of them just

14   excerpts of patient files?

15   A.    Some of them are excerpts of patient files.

16   Q.    Okay.  And whose patient files, in general, are they?

17   A.    They are the 14 patients related to the indictment in

18   this case.

19   Q.    And do they also include other patients randomly

20   selected?

21   A.    Yes, they do.

22   Q.    Okay.  Let's go through some of those patient files

23   together.  Ms. Leal, could you please pull up Government

24   Exhibit 100.  Oh, there we go.

25              Do you have it on your screen there, Special

Smith - Direct

1    Agent Smith?

2    A.      Yes, I do.

3    Q.      Okay.  What is Government Exhibit 100?

4    A.      This is the patient file for Brent Hood.

5    Q.      Okay.  And I know you weren't in here, but did

6    Brent -- do you know if Brent Hood is the patient who

7    testified earlier today?

8    A.      Yes, I'm aware of that.  Yes.

9    Q.      Okay.  And at which search warrant location was

10   Mr. Hood's file found?

11   A.      The storage unit.

12   Q.      Okay.  Let's turn to Government Exhibit 100 at

13   Page 68, please.  What are we looking at here, Special Agent

14   Smith?

15   A.      Yes, these are two prescriptions issued by Dr. Titus

16   to Brent Hood on July 22nd, 2013.  The first prescription is

17   for 75 Oxycodone 15-milligram tablets and the second is for

18   30 Methadone ten-milligram tablets.

19   Q.      Okay.  And let's look at Government Exhibit 100 at

20   Page 32, please.  And if we could just blow up like the

21   first half until history.

22           Perfect.  That's great.  Thank you.

23           What is this, Agent Smith?

24   A.      This is a discharge letter for Brent Hood with an

25   admission date of August 4th, 2013 from Kent General

Smith - Direct

1    Hospital in Dover, Delaware.

2    Q.    And was this document inside of Mr. Hood's patient

3    file that was recovered from Dr. Titus' storage unit?

4    A.    Yes.

5    Q.    Okay.  And what does it say under "Final Diagnosis"

6    right under that?

7    A.    Number one, "polydrug overdose with acute respiratory

8    failure."

9    Q.    Okay.  And if we could exit out of this big part and

10   then right at the bottom upsidedown -- sorry to ask you to

11   read upside down.  Excuse me.

12        Actually, what does it say under "Dictated and

13   transcribed" right there?  Whoops.  Sorry.  You were right.

14   That was my fault.  Thank you.

15        What is the date listed there?

16   A.    The date listed is August 6th, 2013.

17   Q.    Okay.  And if you read upside down, is that what's

18   commonly known to be a fax ribbon?

19   A.    Yes.

20   Q.    And what is the date listed there?

21   A.    Also, August 6th, 2013.

22   Q.    Okay.  And does that say 12:15, if I'm reading --

23   A.    Correct, 12:15.

24   Q.    Okay.  We can exit out of this page.

25        And if we turn to Page 33, please.  Have you

Smith - Direct

1    seen these types of letters in the course of the

2    investigation?

3    A.    Yes.

4    Q.    We refer to them as a discharge letter?

5    A.    Yes, they are.

6    Q.    And Lighthouse Internal Medicine, that's Dr. Titus'

7    practice; correct?

8    A.    Correct.

9    Q.    What's the date on this letter?

10   A.    August 7th, 2013.

11   Q.    And who is it to?

12   A.    Brent Hood.

13   Q.    And what does it say in the first sentence and a

14   half?

15   A.    "This letter is to inform you that as of August 6,

16   2013, I will no longer be your primary care provider for the

17   following reason:  Testing positive for illicit drugs,

18   cocaine and heroin."

19   Q.    Okay.  And in the last line, what does it say

20   underlined partially in bold?

21   A.    "Emergency care does not include narcotic

22   prescriptions.

23   Q.    Okay.  Let's go to Government exhibit -- same

24   exhibit, Page 34, please.

25            Okay.  If we could make this a little bit

Smith - Direct

1    bigger.

2              And what is this?

3    A.    This is prescriptions issued by Dr. Titus to Brent

4    Hood on August 7th, 2013.  The first is for 30 Methadone

5    ten-milligram tablets, and the second is for 75 Oxycodone

6    15-milligram tablets.

7    Q.    Okay.  And is that the same quantity and dose of

8    Oxycodone 15, 75 of those and Methadone ten, 30 of those as

9    we just looked at in July of 2013?

10   A.    Yes.

11   Q.    If we could pull up Government Exhibit 1, please.

12   Oh, just actually one moment.

13              MS. REMIS:  Okay.  Your Honor, I'd like to move

14   to admit Government Exhibits 1 through 14 which I'm going to

15   go through.

16              MS. KOUSOULIS:  Not waiving our objection from

17   earlier that the Court already ruled on, we have no further

18   objection.

19              THE COURT:  I'm sorry.  One through 14, the

20   photographs?

21              MS. REMIS:  One through 14 are summaries of the

22   counts, Your Honor, that are in the indictment that contain

23   a photograph -- there's a photograph on the page.

24              THE COURT:  Okay.  I thought we just admitted

25   the photographs and started with 700.

Smith - Direct

1            MS. REMIS:  We did.  So the photographs are 701

2   to 714.  These are separate exhibits, but they have the

3   photograph on them.

4            THE COURT:  Okay.  So the objection is just to

5   the photograph, nothing else?

6            MS. KOUSOULIS:  That's correct, Your Honor.

7            THE COURT:  All right.  Well, overruled.

8            (Government Exhibit Nos.  701 to 714 were

9   admitted into evidence.)

10  BY MS. REMIS:

11  Q.     Okay.  We can pull up Government Exhibit 1, please.

12  Okay.

13            Does this document summarize the Kent General

14  Hospital paperwork, the discharge letter and the two

15  prescriptions that we just reviewed?

16  A.     Yes.

17  Q.     And are those the documents related to Count 1 in the

18  indictment --

19  A.     Yes, they are.

20  Q.     -- with respect to Brent Hood's prescription on

21  August 7th, 2013?

22  A.     Correct.

23  Q.     All right.  Let's move on to Government Exhibit 102,

24  please.  And what is this?

25  A.     This is a patient file from Dr. Titus' office for

Smith - Direct

1    Scott Jones.

2    Q.     Okay.  And at which search location was this found?

3    A.     The storage unit.

4    Q.     Okay.  Let's turn to Government Exhibit 102 at

5    Page 47, please.  What is this?

6    A.     This is a urine drug screening test result.

7    Q.     And what patient is it for?  It's very small up there

8    at the top.

9    A.     This is for Scott Jones.

10   Q.     Okay.  And what is the collection date on the right

11   side?

12   A.     That collection date is September 5th, 2013.

13   Q.     And what's the date of the final report?

14   A.     September 13th, 2013.

15   Q.     And up at the top, there are some fax lines; is that

16   right?

17   A.     Yes.

18   Q.     What are the dates on there?

19   A.     September 16th, 2013.

20   Q.     And what else?

21   A.     At 8:25 a.m. and there's another date of

22   September 13th, 2013, at 1601 or 4:01 p.m.

23   Q.     And you don't know which one is the date that it was

24   actually faxed to Dr. Titus' office, do you?

25   A.     I do not.

Smith - Direct

1   Q.      But this was, nevertheless, found in Scott Jones'

2   patient file at Dr. Titus' office; right?

3   A.      Correct.

4   Q.      Okay.  If you could read under confirmed analytes

5   right up at the top again.  What is highlighted in pink?

6   A.      "Six MAM."

7   Q.      Okay.  And if you could scroll down a little bit to

8   the other pink highlights on that page.  Perfect.

9           All the way to the right, it says "six MAM

10  confirmed."  And what does that say is a metabolite of what?

11  A.      Of the illicit substance heroin.

12  Q.      Okay.  And then down below, there's a little sticky

13  flag; right?

14  A.      Yes.

15  Q.      I know this is an electronic copy, but on the real

16  one is it like a sticky note?

17  A.      Yes.

18  Q.      Okay.  What does it say on there?

19  A.      "POS.  Heroin."

20  Q.      Okay.  Was the highlighting and the sticky notes on

21  this file at the time it was seized from Dr. Titus'

22  possession?

23  A.      Yes, they were.

24  Q.      Okay.  Let's move to Government Exhibit 102 at

25  Page 40, please.

Smith - Direct

1            And is this another example of a discharge

2    letter?

3    A.    Yes.

4    Q.    What's the date on this one?

5    A.    September 16th, 2013.

6    Q.    And who is it addressed to?

7    A.    Scott Jones.

8    Q.    Okay.  And what is the purpose -- what is the reason

9    for the dismissal?

10   A.    Testing positive for an illegal substance, heroin,

11   and for the absence of the prescribed medication in your

12   system, which is a violation of your pain management

13   agreement.

14   Q.    And again, the last line, what does it say?

15   A.    "Emergency care does not include narcotic

16   prescriptions."

17   Q.    Okay.  Let's go to Government Exhibit 40.  Sorry,

18   same exhibit, Page 41, please.  What is this?

19   A.    This is a prescription issued to Scott Jones by

20   Dr. Titus dated September 19th, 2013.  It is for 80

21   Oxycodone 15-milligram tablets.

22   Q.    Okay.  Is that three days following the discharge

23   letter?

24   A.    Yes.

25   Q.    Okay.  Let's go to Government Exhibit 2, please.

508

Smith - Direct

1  Okay.  And what are we looking at here?

2  A.      This is a summary of the documents which we just

3  discussed relating to Count 2 of the indictment in relation

4  to the prescription for Scott Jones on September 19th, 2013.

5  Q.      Okay.  And let's move on to Government Exhibit 104,

6  please.  And what is this or whose patient file is -- this

7  is the first page?

8  A.      Delores Perry.

9  Q.      And where was it found at?

10  A.      Within the storage unit.

11  Q.      What are we looking at here on just the first page of

12  the file?

13  A.      This is a discharge letter issued by Dr. Titus to

14  Delores Perry on October 2nd, 2013.

15  Q.      And what was the rationale for the discharge,

16  according to the letter?

17  A.      Testing positive for an illegal substance, cocaine.

18  Q.      And same warning at the bottom, "Emergency care does

19  not include narcotic prescriptions"?

20  A.      Yes.

21  Q.      Okay.  Let's go to Government, same exhibit on

22  Page 3, please.

23          Okay.  And you can see up at the top, and I'm

24  sorry this is blacked out.  Do you know if this was blacked

25  up here on the original file?

Smith - Direct

1    A.    Yes, I believe it would have been.  I do not know

2    ultimately whether it was -- I certainly did not blackout

3    the document.

4              MS. REMIS:  Okay.  May I have a moment, Your

5    Honor?

6              THE COURT:  Sure.

7    BY MS. REMIS:

8    Q.    And I'll move on for a second and come back to that

9    one.

10             MS. REMIS:  Ms. Leal, are you plugged in almost.

11   And Ms. Leal, if you could pull up 104 at Page 2, please.

12   Sorry.  104, Page 3, yeah, that page.  Great.

13   BY MS. REMIS:

14   Q.    Okay.  What are we looking at here?

15   A.    These are prescriptions issued by Dr. Titus to

16   Delores Perry dated October 16th, 2013.  The first is for 30

17   Morphine 15-milligram tablets and the second is for 75

18   Oxycodone 15 tablets.

19   Q.    Okay.  And if we could go back to Government

20   Exhibit 104 at Page 3, please.  Now, this was in Ms. Perry's

21   patient file; right?

22   A.    Yes.

23   Q.    And I will submit to you that the black was actually

24   pink on the patient file and we're trying to --

25             MS. KOUSOULIS:  Your Honor, I would just object

510

Smith - Direct

1   to Ms. Remis testifying.

2              THE COURT:  Well, I think she's about to explain

3   that they're trying to get to the original.

4              MS. REMIS:  We are.  I can skip that part.

5   BY MS. REMIS:

6   Q.    Let's just focus on the dates.  Under collection

7   date, what is listed there?

8   A.    October 2nd, 2013.

9   Q.    Okay.  And what is the date that's listed as fax?

10  A.    October 7th, 2013.

11  Q.    Okay.  And under the box that says "Not Prescribed -

12  Detected," what does it say there, if you can read that

13  word?

14  A.    Prescribed -- Not detected?

15  Q.    Well, first "Not Prescribed - Detected," right up

16  there.

17  A.    Yes.

18  Q.    Upper right.

19  A.    Benzoylecgonine.

20  Q.    And what is that?

21  A.    That is a metabolite of cocaine.

22  Q.    Okay.  And then what about "Prescribed - Not

23  Detected"?

24  A.    Oxycodone and Morphine.

25  Q.    Okay.  And we just looked at a discharge letter that

Smith - Direct

1    was dated on October 2nd, 2013; right?

2    A.     Yes.

3    Q.     And that's the same date as this test; right?

4    A.     Yes.

5    Q.     Okay.  And then after that, you read a prescription

6    from October 16th, 2015; is that right?

7    A.     Not 2015.  2013.

8    Q.     Yes, 2013.  I was testing you.

9    A.     Yes.

10   Q.     Okay.  And if we could please turn to Government

11   Exhibit 3, and what are we looking at here?

12   A.     This is a summary of the documents which we just

13   discussed as relating to Count 3 of the indictment involving

14   patient Delores Perry and the prescriptions issued by

15   Dr. Titus dated October 16th, 2013.

16   Q.     Okay.  Let's go to Government Exhibit 107, please.

17   Okay.

18                And whose patient file or what are we looking at

19   here?

20   A.     This is the patient file for Maryjane Mench.

21   Q.     Okay.  And if we could go to -- again, which search

22   location was this found at?

23   A.     The storage unit.

24   Q.     Let's go to Page 84, please.  Excuse me.  And what

25   are we looking at on Page 84?

Smith - Direct

1   A.      These are prescriptions issued by Dr. Titus for

2   Maryjane Mench dated October 28th, 2013.  The first is for

3   90 Methadone ten-milligram tablets, and the second is for 90

4   15 milligrams for Roxicodone tablets.

5   Q.      And just to be clear, based on your review of those

6   files, did Dr. Titus often issue one prescription a month or

7   two prescriptions a month?

8   A.      Two.

9   Q.      So this would be half of a prescription?

10  A.      Correct.

11  Q.      And what is Roxicodone?

12  A.      It's a brand name for Oxycodone.

13  Q.      So essentially the same drug, just a different name?

14  A.      That's correct.

15  Q.      If we could go to Government Exhibit 107 at 75,

16  please.  What are we looking at here?

17  A.      Yes, this is a lab result for patient Maryjane Mench.

18  Q.      And what's the date on the collection date?

19  A.      Collection date is November 11th, 2013.

20  Q.      And what is the fax date?

21  A.      November 15th, 2013.

22  Q.      And what does it say in the box that says "Prescribed

23  - Not Detected"?

24  A.      Alprazolam.  Oxycodone.  Methadone.

25  Q.      Does Alprazolam have like a common name that is more

Smith - Direct

1    common than Alprazolam?

2    A.     Yes.

3    Q.     What is it?

4    A.     Xanax.

5    Q.     Okay.  And if we could back out of that, please.  The

6    circles that are on this page, were those circles there at

7    the time that you seized the file?

8    A.     Yes.

9    Q.     So nobody added them after the fact?

10   A.     No.

11   Q.     Okay.  Let's go on to Government Exhibit 107 at

12   Page 69, please.  What are we looking at here?

13   A.      These are prescriptions issued by Dr. Titus to

14   Maryjane Mench dated December 9, 2013.  The first is for 30

15   Oxycontin 20-milligram tablets and the second is for 90

16   Roxicodone 15-milligram tablets.

17   Q.     Okay.  And that's after the drug test results we just

18   saw with Maryjane Mench showing she had no Oxycodone or

19   Methadone in her system; right?

20   A.      Right.

21   Q.     And that's what Dr. Titus had previously prescribed?

22   A.      Correct.

23   Q.     And if we could look at Government Exhibit 4, please.

24   Does this document summarize the drug test that we just

25   looked at and the prescription for December 9th, 2013 to

Smith - Direct

1    Maryjane Mench that is related to Count 4 in the indictment?

2    A.    Yes, it does.

3    Q.    Now, according to Ms. Mench's file, did Dr. Titus

4    continue or did Ms. Mench continue to be a patient of

5    Dr. Titus' even after this December 9th, 2013, prescription?

6    A.    Yes.

7    Q.    Can we look at Government Exhibit 107, Page 68,

8    please?  And at the top box, what are we looking at there?

9    A.    There are two prescriptions there.  Both are

10   prescriptions issued by Dr. Titus to Maryjane Mench dated

11   December 23rd, 2013.

12   Q.    Okay.  And what -- sorry.  Go ahead.

13   A.    The first is for 90 Roxicodone 15-milligram tablets

14   and the second is for 30 Methadone ten-milligram tablets.

15   Q.    Okay.  And you see in the background there where it

16   says void a hundred times?

17   A.    Yes.

18   Q.    It's not really a hundred.  A lot of times?

19   A.    Yes.

20   Q.    Okay.  What's the significance of that?

21   A.    That's a tampering mechanism that's on the

22   prescription paper so that when the prescriptions are

23   actually photocopied, the word void will come through on the

24   copy to help identify them as photocopies and not the actual

25   original.

515

Smith - Direct

1    Q.     So what we're looking at here from the patient files

2    are copies of the original prescriptions; right?

3    A.     Correct.

4    Q.     It doesn't mean that they were void when issued?

5    A.     No.

6    Q.     Okay.  Could we go to Government Exhibit 107,

7    Page 62, please?  And what are we looking at here?

8    A.     This is the lab results for Maryjane Mench.

9    Q.     On which date?

10   A.     Dated January 9th.  The collection date is

11   January 9th, 2014, and it has a fax date of January 15th,

12   2014.

13   Q.     So this is about two months after the previous drug

14   test we looked at; right?

15   A.     Correct.

16   Q.     And according to this test, what drugs were not

17   prescribed, but detected?

18   A.     And I'll do my best with some of the words, but

19   Nordiazepam, Temazepam, Morphine, Hydromorphone,

20   Normorphine, Codeine, Benzoylecgonine, Methamphetamine,

21   Amphetamine.

22   Q.     And what were the drugs that were prescribed, but not

23   detected?

24   A.     Oxycodone.

25   Q.     And at the bottom of the page, if we could exit out

Smith - Direct

1   of this part, and you could just make bigger just this --

2   yeah, that's great.  Perfect.  Thank you.

3             What is highlighted there, just the highlighted

4   part?

5   A.    It says "MB:  Cocaine, DW - 12 to 24 hours."

6   Q.    Do you know what MB or DW means?

7   A.    I do not.

8   Q.    And this highlighting, was this also on the drug test

9   result at the time the Government seized the patient file?

10  Sorry.

11  A.    Yes.

12  Q.    According to this file, did Dr. Titus write another

13  prescription for Maryjane Mench after she tested positive

14  for cocaine in January of 2014?

15  A.    Yes.

16  Q.    Let's look at Government Exhibit 107 at Page 61,

17  please.  And what are we looking at here?

18  A.    These are two prescriptions issued by Dr. Titus, both

19  dated December 23rd, 2004 for Maryjane Mench.

20  Q.    And what are they for?

21  A.    The first is for 75 Oxycodone 15-milligram tablets

22  and the second is for 90 Methadone ten-milligram tablets.

23  Q.    And when we just looked at the prescriptions for

24  December, which was the month before; right?

25  A.    Yes.

517

Smith - Direct

1   Q.      The prescription for Methadone was just 30 Methadone

2   pills; is that right?

3   A.      Yes.

4   Q.      So is this one more or less pills?

5   A.      More.

6   Q.      Okay.  And let's move to Government Exhibit 4,

7   please.  No, actually we already did that.

8           So I want to move on to Government Exhibit 109,

9   please.  And what are we looking at now?

10  A.      This is the patient file for Dione Dickerson.

11  Q.      And if we could go to -- at which search location was

12  this file found?

13  A.      Storage unit.

14  Q.      If we could go to 109 at Page 110, please.  What are

15  we looking at here?

16  A.      These are two prescriptions issued by Dr. Titus to

17  Dione Dickerson dated November 6th, 2013.  The first is for

18  30 Morphine 15-milligram tablets and the second is for 80

19  Oxycodone ten-milligram tablets.

20  Q.      Okay.  If we could look at Government Exhibit 109 at

21  Page 101, please.

22              MS. LEAL:  Sorry, 101?

23              MS. REMIS:  Yes.

24  BY MS. REMIS:

25  Q.      What are we looking at here?

518

Smith - Direct

1    A.      This is the laboratory result for Dione Dickerson

2    listing a collection date of November 20th, 2013 and the fax

3    date of 11/27/2013.

4    Q.      Okay.  And what drugs are listed under "Prescribed -

5    Not Detected"?

6    A.      Morphine and Oxycodone.

7    Q.      Okay.  And those are the two exact drugs that we just

8    looked at on the previous prescription from November 6th;

9    correct?

10   A.      Right.

11   Q.      And again, highlighting on the document; is that

12   right?

13   A.      Correct.  That was there when the patient file was

14   seized.

15   Q.      Okay.  If we could go -- following this drug screen,

16   and again, there was some highlighting on the bottom of the

17   document as well; right?

18   A.      That's correct.  And that was also there at the time

19   the document was seized.

20   Q.      If we could go to Government exhibit, same exhibit,

21   Page 103, please.  What are we looking at here?

22   A.      These are -- these are prescriptions issued by

23   Dr. Titus to Dione Dickerson dated -- both dated

24   December 4th, 2013.  The first is for 80 Oxycodone

25   ten-milligram tablets and the second is for 30 Morphine

Smith - Direct

1   15-milligram tablets.

2   Q.    Okay.  And if we could go to Government Exhibit 5,

3   please.  Oh, you know what, I'm sorry.  I missed a page.

4         Can we go to Government Exhibit 74?  No, I'm

5   sorry, 109 at 74.

6         Okay.  And if you could highlight the top two.

7   And what's the date on these prescriptions?

8   A.    December 18th, 2013.

9   Q.    And what are the prescriptions for?

10  A.    The first is for 80 Oxycodone ten-milligram pills and

11  the second is for 30 Morphine 15-milligram pills.

12  Q.    On that same day, if we exit out of this, does it

13  appear that Dione Dickerson got a prescription for worsening

14  abdominal pain to be evaluated at Milford Hospital?

15  A.    Yes.

16  Q.    And if we could go to Government Exhibit 5, please.

17  What are we looking at here?

18  A.    This is a summary of the documents we just discussed

19  relating to Count 5 of the indictment for -- involving the

20  patient, Dione Dickerson, and the prescription is issued by

21  Dr. Titus on December 18th, 2013.

22  Q.    And let's move on to Government Exhibit 111.  What

23  are we looking at here?

24  A.    This is the patient file for Lisa Parsons.

25  Q.    Okay.  And where was Ms. Parsons' patient file found?

Smith - Direct

1   A.      The storage unit.

2   Q.      And if we could look at Page 67, please.  What is

3   this?

4   A.      This is laboratory results for a patient, Lisa

5   Parsons.

6   Q.      Okay.  And what is the date of collection?

7   A.      Collection date is December 9th, 2013, and fax date

8   is December 16th, 2013.

9   Q.      The date of the final report?

10  A.      Date of the final report, I'm sorry.  Thank you.

11  Q.      And up at the top, there is what appears to be a fax

12  line.  What is the date on that?

13  A.      There's two dates.  The first is December 16th, 2013,

14  at 1918 or 7:18 p.m.

15          And the second is also December 16th, 2013, at

16  1923 or 7:23 p.m.

17  Q.      And if you could read under confirmed analytes,

18  please?

19  A.      Yes.  Alprazolam, Hydrocodone, cocaine, Oxycodone,

20  Benzoylecgonine.

21  Q.      Okay.  And Alprazolam is Xanax; right?

22  A.      Correct.

23  Q.      And then midway through the page, if you exit out of

24  this part, midway through the page there's a circle around

25  the word is confirmed.  Do you see that?

Smith - Direct

1    A.    Yes, I do.

2    Q.    What does that say to the right under remarks?

3    A.    Cocaine is an illicit substance.  Benzoylecgonine is

4    a metabolite of the illicit substance cocaine.

5    Q.    Let's go to the same exhibit and if we could go to

6    Page 53, please.  And if you could make that a little

7    larger, please.  Thank you.

8          And the fax date that we just saw on that fax

9    was 12/16/13; is that right?

10   A.    Correct.

11   Q.    And now what date are we at?

12   A.    January 6th, 2014.

13   Q.    And what are these?

14   A.    These are prescriptions issued by Dr. Titus to Lisa

15   Parsons dated January 6th, 2014.  The first is for 90

16   Oxycodone 15-milligram tablets and the second is for ten

17   75-microgram Fentanyl patches.

18   Q.    Okay.  And let's go out of that and we can go to

19   Government exhibit, same exhibit, Page 34, please.

20         Now, at some point Ms. Parsons got discharged;

21   is that right?

22   A.    Yes.

23   Q.    And what is the date on this letter here?

24   A.    January 23rd, 2014.

25   Q.    Okay.  And the prescription we just looked at was

Smith - Direct

1    January 20th, 2014; right?

2    A.      Correct.

3    Q.      And the drug screen we looked at before, that was

4    December of 2013?

5    A.      Correct.

6    Q.      Okay.  And would you read this discharge letter,

7    please?

8    A.      "Ms. Lisa Parsons:  Due to your recent drug overdose

9    on January 10, 2014, I feel it's in the best interest of

10   your healthcare and this practice to discharge you from this

11   practice and to refer you out to psychiatry in order to

12   address your substance abuse issues.  You will also be given

13   a referral to a substance abuse program, in order to resolve

14   your substance abuse issue.

15            Over the course of the next month, I will wean

16   you down off of your prescribed medications.  Also, over the

17   next month, you must come weekly for appointments, must pay

18   weekly for appointments, drug testing weekly, and submit to

19   weekly pill counts.

20            I will reevaluate you in one month to see if you

21   are adhering to the above-mentioned guidelines.  You will

22   then be referred out for Drug Counsel and also referred out

23   for Pain Management.

24            Thank you for your understanding and the

25   opportunity to provide you quality healthcare services.

Smith - Direct

1    Respectfully,

2    Patrick A Titus, M.D."

3  Q.    Now, did you see any evidence in the record that

4  Dr. Titus re-evaluated Ms. Parsons --

5  A.    No.

6  Q.    -- in the next month?

7  A.    No.

8  Q.    Does this discharge letter look similar to the other

9  discharge letters you've looked at today?

10 A.    No, it does not.

11 Q.    What's different about it?

12 A.    Some of the basic information in terms of the heading

13 is different.  But overall, the content of this particular

14 letter is more detailed in relation to, you know,

15 referencing the referrals to substance abuse, and some of

16 the other content of the letter is much different than most

17 of the other letters that I've reviewed in this case.

18 Q.    And this doesn't have that line saying, "Emergency

19 care does not include narcotics"; right?

20 A.    It does not.

21    MS. REMIS:  May I have a moment just to confer,

22 Your Honor?

23    THE COURT:  All right.

24    MS. REMIS:  Okay.  All right.  Let's look at

25 Government Exhibit 6, please.

Smith - Direct

1    BY MS. REMIS:

2    Q.    And what does this summarize?

3    A.    This summarizes the documents just discussed that

4    relates to Count 6 of the indictment involving patient Lisa

5    Parsons and the prescription issued by Dr. Titus on

6    January 20th, 2014.

7    Q.    Okay.  Let's look at Government Exhibit 113.  What

8    are we looking at here?

9    A.    This is the patient file for Gregg Smith.

10   Q.    Okay.  And if we could look at Page 37, please.

11         What is on Page 37?

12   A.    These are two prescriptions issued by Dr. Titus to

13   Gregg Smith, both dated March 6th, 2014.  The first is for

14   75 Oxycodone 15-milligram tablets and the second is for ten

15   100-microgram Fentanyl patches.

16   Q.    And based on your experience in investigations, what

17   is a Fentanyl patch?

18   A.    A Fentanyl patch is a method of delivering Fentanyl

19   to the body.  It's a patch which is placed on the body and

20   will slowly release Fentanyl into the individual's

21   bloodstream and into their body.

22   Q.    So it's not a pill; right?

23   A.    It is not.

24   Q.    Could we go to Page 37, please, of this exhibit?

25         Okay.  And what are we looking at here?

525

Smith - Direct

1    A.    This is a laboratory result for patient Gregg Smith.

2    Q.    And what's the date collected here?

3    A.    March 6th, 2014.

4    Q.    And is that the same day as the prescription we just

5    saw?

6    A.    Yes.

7    Q.    And what's the date faxed?

8    A.    March 10th, 2014.

9    Q.    Okay.  And what's the date in the fax line up at the

10   top?

11   A.    March 11th, 2014.

12   Q.    What's listed under "Not Prescribed - Detected"?

13   A.    Tramadol and Methyl Tramadol.

14   Q.    Is Tramadol also an opioid?

15   A.    Yes, it's a synthetic opioid.

16   Q.    Okay.  Did Mr. Smith continue to get prescriptions

17   after this drug screen?

18   A.    Yes.

19   Q.    Let's go to Page 34, please.  What are we looking at

20   here?

21   A.    These are two prescriptions issued by Dr. Titus to

22   Gregg Smith dated April 3rd, 2014.  The first is for 75

23   Oxycodone 15-milligram patch -- pills, and the second is for

24   ten 100-microgram Fentanyl patches.

25   Q.    Okay.  And that's the same prescription as March 6th,

Smith - Direct

1   2014; right?

2   A.      Yes.

3   Q.      If we look at Government Exhibit 7, please, and is

4   this the drug screen we just looked at and the two

5   prescriptions from April 3rd, 2014; right?

6   A.      Yes.

7   Q.      And does that support the counts in Count 7 for --

8   A.      Yes.

9   Q.      -- a prescription on April 3rd, 2014 to Gregg Smith?

10  A.      Yes, it does.

11  Q.      Okay.  And let's go to Government Exhibit 115,

12  please.  And what are we looking at here?  Whose patient

13  file is this?

14  A.      This is the patient file of Donald Meck.

15  Q.      And where was Donald Meck's file found?

16  A.      Donald Meck's file was found within Josie Walters'

17  residence.

18  Q.      And what about Government Exhibit 116, please?

19  Whose patient file is this?

20  A.      This is Donald Meck.

21  Q.      Did Donald Meck have two patient files?

22  A.      Yes.

23  Q.      And where was this one found?

24  A.      This was, I believe, also found within Josie Walters'

25  residence.

Smith - Direct

1    Q.    Okay.  If we could go to Government Exhibit 115 at

2    Page 10, please.  What are we looking at?

3    A.    This is a prescription issued by Dr. Titus to Donald

4    Meck dated January 13th, 2014.  It is for 80 Oxycodone

5    15-milligram tablets.

6    Q.    Okay.  And let's look at Government Exhibit 115 at

7    Page 66, please.  And is this another drug screen test

8    result for Donald Meck?

9    A.    Yes.

10   Q.    And what's the date collected?

11   A.    Date collected is January 28th, 2014.

12   Q.    And the date of the final report?

13   A.    February 3rd, 2014.

14   Q.    And up at the top, what are those fax number dates?

15   A.    February 3rd, 2014 with a time of 4:04 or 16:04 which

16   is 4:04 p.m.  And it looks like another date which is

17   partially cut off, but does appear to be February 3rd, 2014.

18   Q.    Okay.  Thanks.

19             And there's some -- under confirmed analytes and

20   then next to it -- great.  Thank you -- what does it say

21   under confirmed analytes?

22   A.    Fentanyl and Norfentanyl.

23   Q.    Okay.  And it says under prescribed medications,

24   Fentanyl and what else?

25   A.    Oxycodone.

528

Smith - Direct

1    Q.    Okay.  Let's go to Government, same exhibit, Page 6,

2    please.  What are we looking at?

3    A.    These are prescriptions issued by Dr. Titus dated

4    January 28th, 2014 to Donald Meck.  The first is for ten,

5    50-microgram Fentanyl patches, along with 80 Oxycodone

6    15-milligram pills.

7    Q.    Okay.  And on the drug test we just looked at, the

8    only analytes that were confirmed were Fentanyl and

9    Norfentanyl; correct?

10   A.    Right.

11   Q.    But it said that Oxycodone and Fentanyl were

12   prescribed?

13   A.    Correct.

14   Q.    And so here just a few days or a bit later, we have

15   another prescription for Fentanyl, but also for Oxycodone

16   15; right?

17   A.    Correct.

18   Q.    Okay.  Let's look at Government exhibit, same

19   exhibit, Page 65, please.  What are we looking at here?

20   What is this?

21   A.    This is what is referred to as a warning letter

22   issued to Donald Meck from Lighthouse Internal Medicine

23   dated February 6th, 2014.

24   Q.    Okay.  And what is the warning regarding?

25   A.    This is -- it states that, "Due to your recent

Smith - Direct

1    toxicology screening, the result concluded the absence of

2    the medications prescribed by this facility."

3    Q.      Okay.  And down at the bottom is the second paragraph

4    after, it says that, This will not be tolerated and it's a

5    violation.

6            What does it say after that?

7    A.      "Please review your treatment agreement and be

8    advised that this is your first and only notice regarding

9    this issue."

10   Q.      Okay.  If we could go to Government Exhibit 115 at

11   Page 1, please.

12           And what is -- what are the two prescriptions up

13   at the top?

14   A.      Those two prescriptions are issued to Donald Meck

15   from Dr. Titus.  The -- both are dated February 25th, 2014.

16   The first is for 80 Oxycodone 15-milligram pills and the

17   second is for ten Fentanyl -- Fentanyl 50-microgram patches.

18   Q.      And that's the same prescription as the ones we just

19   looked at; is that right?

20   A.      Yes.

21   Q.      If we can go to Government Exhibit 115 at Page 165,

22   please.  And just to speed things up a little bit, is this a

23   March 25th, 2014 prescription?

24   A.      Yes.

25   Q.      Also, for the same drugs that we just read out?

Smith - Direct

1    A.      Yes.

2    Q.      Okay.  Let's go to Government Exhibit Page 115 at 62,

3    please.  Okay.  What are we looking at here?

4    A.      This is another lab result for Donald Meck.

5    Q.      Okay.  If we could highlight just the top half,

6    please.  What is the collection date and the fax date?

7    A.      Collection date November -- I'm sorry, March 25th,

8    2014.

9    Q.      And the fax date?

10   A.      I'm sorry.  Yes, March 31st, 2014.

11   Q.      And what does the fax line say up at the top?

12   A.      It's at 4:27 p.m. from the Advanced Laboratory

13   Service.

14   Q.      Okay.  Thank you.

15           And what does it say under "Not Prescribed -

16   Detected"?

17   A.      Fentanyl, Norfentanyl, Fluoxetine, Nortriptyline, and

18   Cotinine.

19   Q.      Okay.  And if we could go to Page 1 -- Government

20   Exhibit 116 at Page 164, please.

21           MS. LEAL:  116 or 115?

22           MS. REMIS:  Sorry.  116.  Wait.  Sorry.

23           Now, I'm confused.  Let me double-check.  We are

24   looking for Page 62 -- no, Government Exhibit 116 at

25   Page 164.

Smith - Direct

1        Okay.  If you could highlight the top part

2   there.

3   BY MS. REMIS:

4   Q.    Can you see it's sort of grayed up at the top, but

5   can you see the date of that prescription?

6   A.    April 8th, 2014.

7   Q.    Okay.  And what's it for?

8   A.    This is for Oxycodone 15-milligram tablets.  It

9   indicates take one tablet every four to six hours for 80

10  pills.

11  Q.    Okay.  And if we could go to Government Exhibit 116

12  at Page 159, please.  What are we looking at here?

13  A.    These are two prescriptions issued by Dr. Titus to

14  Donald Meck both dated April 22nd, 2014.  The first is for

15  80 Oxycodone 15-milligram pills and the second is for ten

16  50-microgram Fentanyl patches.

17  Q.    Okay.  And if we could pull up Government Exhibit 8,

18  please.  Okay.

19        What is this summarizing, this information?

20  A.    This summarizes Count 8 in the indictment involving

21  patient Donald Meck and the prescriptions issued by

22  Dr. Titus on April 22nd, 2014.

23  Q.    Okay.  Let's move on to Government Exhibit 1 --

24        THE COURT:  Let's not.

25        MS. REMIS:  Oh, okay.

1          THE COURT:  Sorry.  Mr. Woodard, is there

2    something you wanted to tell her to clean up?

3          MR. WOODARD:  I was just going to offer that

4    this might be a good time to take a break.

5          THE COURT:  All right.  So members of the jury,

6    we can resume tomorrow morning.  We will try to start again

7    at 9:30.  I appreciate that you all were here on time this

8    morning.  Let's try to be on time again tomorrow morning.

9          I would just like to remind you of the two

10   things that I said I was going to say every day at the end

11   which is don't talk about the case with anyone.  Don't let

12   anyone talk to you about the case.  And you know, by talk, I

13   mean any way, in person, telephone, electronic.

14         The second thing is don't do any research about

15   the case.  Don't try to look up anything on the Internet

16   about anybody involved in the case or anything that's being

17   discussed in the case.  Make sure that everything you learn

18   about the case you learn here in the courtroom with all of

19   us.

20         So thank you for your attention today.  Have a

21   good evening.  We'll see you tomorrow.

22         Can we take the jury out, please?

23         (Jury leaving the courtroom.)

24         THE COURT:  You all can be seated.  All right.

25   I don't want to hold you up long.

Smith - Direct

1          I gather Agent Smith may be on the stand for a

2     while longer.  What do you have besides for him planned for

3     tomorrow?  And don't speak too fast.

4               MR. WOODARD:  Okay.  We are certainly ahead of

5     schedule, Your Honor, so we'll have Agent Smith.  Michael

6     Adams, a patient.  Henry Lankford, relative of a patient.

7     Dr. Marisa Conti.  And we're working on some things now, but

8     John Zaleswki, Z-A-L-E-W-S-K-I.

9               THE COURT:  Yes.

10              MR. WOODARD:  And Dr. Joseph Raziano.  And we're

11    about to go make some calls, Judge, so we'll certainly

12    update the Defense as we go through the evening as well.

13              THE COURT:  Okay.  All right.

14              Okay.  All right.  Well, it sounds good.  Just

15    remember we're not going to be having trial on Friday.

16    Okay.  You probably haven't forgotten that.

17              All right.  Anything else you want to talk

18    about?

19              Mr. Bostic.

20              MR. BOSTIC:  Yes, briefly.  Amanda Molesi, we

21    got the patient file, I think, after eleven o'clock last

22    night.  I wasn't able to review it before her cross today.

23    We expect we'll have to call her back very briefly to

24    identify some things in the file.  We'll work with the

25    Government to see if we can stipulate, but there are a

534

Smith - Direct

1   couple of things that we just may need her for.

2            THE COURT:  Okay.  Well, talk to the Government

3   and see what you can work out.

4            Okay?

5            MR. BOSTIC:  Thank you, Your Honor.

6            THE COURT:  All right.  Anything else?

7            MS. REMIS:  Can I just ask one quick question?

8            THE COURT:  Sure.

9            MS. REMIS:  Actually, you know, we'll figure it

10  out, and I'll raise it in the morning.

11           THE COURT:  Okay.  So I will be here at

12  9:00 a.m., and if there's things you need to work out, I

13  will try to help you on that.

14           MS. REMIS:  Thank you.

15           THE COURT:  Okay.  Have a good evening.

16           MR. WOODARD:  Thank you.  You, too.

17           DEPUTY CLERK:  All rise.

18           (Court was recessed at 5:01 p.m.)

19           I hereby certify the foregoing is a true and

20  accurate transcript from my stenographic notes in the

21  proceeding.

22                    /s/ Heather M. Triozzi
                      Certified Merit and Real-Time Reporter
23                    U.S. District Court

24

25