535

```
 1                    IN THE UNITED STATES DISTRICT COURT

 2                      FOR THE DISTRICT OF DELAWARE

 3

 4    UNITED STATES OF AMERICA,   )
                                  )
 5               Plaintiff,       )
                                  ) Criminal Action No. 18-45-RGA
 6    v.                          )
                                  ) Trial Volume III
 7    PATRICK TITUS,              )
                                  )
 8               Defendant.       )

 9
                                     J. Caleb Boggs Courthouse
10                                   844 North King Street
                                     Wilmington, Delaware
11
                                     Thursday, July 8, 2021
12                                   9:00 a.m.
                                     Jury Trial
13

14    BEFORE:  THE HONORABLE RICHARD G. ANDREWS, U.S.D.C.J.

15    APPEARANCES:

16                 U.S. DEPARTMENT OF JUSTICE - CRIMINAL DIVISION
                   BY:  ALEZA S. REMIS, ESQUIRE
17                 BY:  CLAIRE SOBCZAK, ESQUIRE
                   BY:  JUSTIN WOODARD, ESQUIRE
18
                                     For the Plaintiff
19
                   OFFICE OF THE FEDERAL PUBLIC DEFENDER
20                 BY:  ELENI KOUSOULIS, ESQUIRE

21                     -and-

22                 THE BOSTIC LAW FIRM
                   BY:  EDSON A. BOSTIC, ESQUIRE
23
                                     For the Defendant
24

25
```

```
 1                    ***  PROCEEDINGS  ***

 2                 DEPUTY CLERK:  All rise.

 3                 THE COURT:  All right.  Please be seated.

 4                 MR. WOODARD:  Good morning.

 5                 THE COURT:  So do we have any issues you want to

 6    bring up with me this morning?

 7                 MS. REMIS:  Just briefly, Your Honor.  We are

 8    intending to play just five snippets of the recording this

 9    morning.

10                 THE COURT:  Yes.

11                 MS. REMIS:  We have the transcript that we've

12    discussed a couple times.  It's just -- it's not evidence.

13    It's just to help the jury.

14                 THE COURT:  Yes.

15                 MS. REMIS:  And there's a couple edits that the

16    Defense counsel has, which is totally fine with us, but we

17    didn't have a chance to make it since last night.  And so we

18    just wanted to notify the jury that the transcript is a

19    little bit wrong and that it should say X instead of Y.

20    How --

21                 THE COURT:  Well, you know, that's kind of a

22    hard thing to do when it's not actually evidence, you know.

23                 MS. REMIS:  Right.

24                 THE COURT:  How significant are these changes?

25                 MS. KOUSOULIS:  And Your Honor, I don't have --
```

1    I mean, I don't have it in front of me and looking at so

2    much stuff.  If they can provide me real quick with what

3    they're planning on handing out to the jury, I have what we

4    ask to be changed.  At this point, if we can get it because

5    I've been looking at so many other things that -- you know,

6    and there have been so many changes, I'm trying to make

7    sure.

8                THE COURT:  No, I appreciate what you're saying,

9    Ms. Kousoulis.

10               MS. REMIS:  Just while she's looking, would it

11   be okay with the Court if I said something along the lines

12   of, like, permission to publish transcripts to the jury and

13   handed them out, or how would you like me to do that?

14               THE COURT:  Well, so one thing is I would like

15   my deputy clerk to hand out anything that's going to go to

16   the jury.

17               MS. REMIS:  Great.

18               THE COURT:  So you would need to have at least

19   14 copies for the jury.

20               MS. REMIS:  We have that.

21               THE COURT:  Okay.  I take it the number of pages

22   that we're talking about is like less than ten probably?

23               MS. REMIS:  I can hand it up if Your Honor would

24   like it.

25               THE COURT:  It's very thin.  Okay.  Hand it up.

```
 1                    DEPUTY CLERK:  Thank you.

 2                    MS. REMIS:  Sure.

 3                    THE COURT:  It's thicker than it looks.

 4                    I hesitate to say something while Ms. Kousoulis

 5       is obviously reading --

 6                    MS. REMIS:  No, that's okay.

 7                    THE COURT:  -- because she should be reading

 8       and --

 9                    MS. REMIS:  Yeah.

10                    (Discussion held off the record:)

11                    MS. REMIS:  I mean, maybe it would resolve it

12       and --

13                    THE COURT:  Well, so if you agree the changes

14       should be made, I don't understand why, if there are just a

15       few of them, you don't just take a pen and write in -- cross

16       out the word you don't like and add in the word, if it's

17       that kind of thing.  Or if it's bigger than that.

18                    MS. REMIS:  It's like a clause of a sentence

19       that's missing.  I mean, it can -- I don't know that

20       they're -- I assume -- I don't mean to assume, Your Honor,

21       but I assume that you -- when -- would you instruct the jury

22       that, like, the transcripts are not the evidence?

23                    THE COURT:  I would do that.  That is -- a lot

24       of instructions, I need to be prompted, but that's one that

25       I would do without prompting.
```

```
 1              MS. REMIS:  And is that sufficient, Eleni?

 2              MS. KOUSOULIS:  The second is not that

 3    significant.  Well, let me show you where it is.

 4              MS. REMIS:  Your Honor, I'm not going to get to

 5    the transcripts for maybe, like, a while.  So if everybody

 6    just takes a few and starts writing in that part, I think we

 7    can probably get it done on 14 copies.

 8              THE COURT:  Okay.

 9              MS. REMIS:  It will be a little messy because

10    it's handwriting, but...

11              THE COURT:  Well, you know, get it to the person

12    with the best handwriting.

13              MS. REMIS:  We can write it once and copy it.

14    My colleague is very smart.  And --

15              MS. KOUSOULIS:  But, Your Honor, the one --

16    there's, like, a sentence missing that we agreed was going

17    to be -- that's part of the recording; right?  It's in the

18    recording?

19              MS. REMIS:  Right.  So we'll write it in one and

20    then --

21              MS. KOUSOULIS:  So I could -- I mean, couldn't

22    they just print --

23              THE COURT:  So the logistics, I was just trying

24    to suggest a shortcut.  You know, I'm dealing with a deficit

25    of knowledge here.
```

```
 1                MS. REMIS:  Yes.

 2                THE COURT:  If she's not going to get to it for

 3      a while, why don't you have somebody put this on a disk or

 4      something, somebody add in the sentence and print some more

 5      copies.

 6                MR. WOODARD:  Your Honor, if you could just

 7      excuse me, I'll go deal with this and --

 8                THE COURT:  Okay.  Thank you, Mr. Woodard.

 9                MR. WOODARD:  Yes, Your Honor.

10                THE COURT:  And by the way, in terms of that,

11      you know, you don't all have to be sitting here every minute

12      that the jury is here.

13                MR. WOODARD:  Mm-hmm.

14                THE COURT:  That goes for both sides.  You know,

15      if one of you needs to be here, two of you even need to be

16      doing something, you know, you don't have to be present and

17      you don't need my permission not to be present.

18                MR. WOODARD:  Okay.  Thank you.

19                MS. SOBCZAK:  Thank you, Your Honor.

20                MS. REMIS:  Thank you, Your Honor.

21                So we'll figure this out, Your Honor.

22                MS. KOUSOULIS:  Okay.

23                THE COURT:  So are there any other issues, so to

24      speak?

25                MS. REMIS:  One other quick thing is related to
```

1    your ruling yesterday on Lisa Parsons' file which contains

2    the complaint from Dr. Raziano that you ruled we were going

3    to take out.

4              THE COURT:  Yes.  Yes.

5              MS. REMIS:  I wanted to ask Special Agent Smith

6    if there is an email with the name of the State

7    investigator, one page in front of the discharge letter,

8    without talking about the substance or the fact that it

9    contained the complaint.

10             THE COURT:  I mean, this is a letter already in

11   evidence coming from the other side, isn't it?

12             MS. REMIS:  No.  This email is the one that we

13   were going to redact yesterday, the substance of the email.

14   And so I just wanted to ask him if there was an email from a

15   State investigator in the file.

16             THE COURT:  Oh, I think that's --

17             MS. REMIS:  Okay.

18             THE COURT:  -- if you've got a date for the

19   email.

20             MS. REMIS:  Yes, the date on the email is

21   January 23rd.

22             THE COURT:  So Mr. Bostic and Ms. Kousoulis are

23   both kind of busy right now.

24             MS. KOUSOULIS:  I'm sorry.

25             MS. REMIS:  It's about Lisa Parsons' file.

```
 1              MS. KOUSOULIS:  We were discussing that when you

 2    were coming out.  If she can show me what it would -- like,

 3    you know, I would just have to visualize it.

 4              THE COURT:  Okay.  But the concept, I'm fine

 5    with asking that because the whole point is he gets notice,

 6    but the jury doesn't get the speculative hearsay.

 7              MS. KOUSOULIS:  Right.

 8              MS. REMIS:  Correct.

 9              THE COURT:  You know, history of bad behavior

10    for a long period of time.

11              MS. REMIS:  Right.  Exactly.  So we can -- I'll

12    show Ms. Kousoulis what I think it would look like.  It just

13    has significance, I think.

14              THE COURT:  Ms. Kousoulis, you have something

15    you want to bring up?

16              MS. KOUSOULIS:  Yeah, one last issue, Your

17    Honor.  Dr. Raziano is going to be testifying today, as

18    Ms. Remis just mentioned.  And I know we had talked about

19    this last week, but, you know, with regard to -- but I think

20    it's an important issue.  With regard to Dr. Raziano

21    testifying, that there were several patients that --

22    Dr. Titus' patients that presented and died as a result of

23    overdoses.

24              And, again, we believe that it's -- the jury is

25    going to draw an impermissible inference that Dr. Titus was
```

1    responsible, like his prescription habits and him

2    prescribing these narcotics was the reason they -- you know,

3    was the reason they died.  I don't know how they wouldn't

4    draw that because why else would the Government be bringing

5    in that evidence other than to show that Dr. Titus was

6    somehow responsible for those deaths.

7              And I think -- and we have no way to challenge

8    it.  You know, we have no ability to ask the hospital to

9    give us records of all their, you know, overdose deaths.

10   And, you know, and we don't really see the relevance, like,

11   what it's going to go to.

12             There's plenty of evidence regarding knowledge.

13   You know, there's other -- you know, there is testimony

14   about overdoses themselves.  Patients have testified, you

15   know, that there were overdoses of -- Lisa Parsons'

16   overdose, you know.

17             And that's going to be brought up.  Dr. Raziano

18   is going to talk about Lisa Parsons' overdose.  So I just

19   feel that allowing, you know, Dr. Raziano to testify that

20   there were, you know, several deaths, you know, related to

21   Dr. Titus' patients as a result of overdoses, and that, you

22   know, it's going to be heard that there was medication he

23   supplied, he was somehow responsible.  And I think that's

24   highly prejudicial.

25             And you know, given that its probativeness is

1    not very significant in light of what he's charged with,

2    he's not charged with the overdose deaths.  And in light of

3    the Court's ruling with regard to keeping out Gregg Smith's

4    death, overdose death, you know, I think it goes along the

5    same lines as why that death was excluded.  And so I don't

6    really see the need for it.  I think it's highly

7    prejudicial, and I don't see how the jury wouldn't draw, you

8    know, an impermissible inference.

9                THE COURT:  All right.  I understand what you've

10    said.

11                Ms. Sobczak.

12                MS. SOBCZAK:  Your Honor, Dr. Raziano will not

13    be testifying to that.  He will be testifying that it was

14    his practice to, when a patient died from an overdose, to

15    call the primary physician of the patients.  He will not be

16    linking any overdose deaths specifically to Dr. Titus.  He

17    will testify to that he would call Dr. Titus if a patient of

18    Dr. Titus' died as a result of an overdose, but that was his

19    ongoing practice with all primary care physicians.  And that

20    is in no way linking the overdoses to Dr. Titus.

21                THE COURT:  Well, and so what is the follow on

22    from that testimony?  In other words, that testimony by

23    itself, you know, that's like a bridge to somewhere else.

24                What is it a bridge to?  Is it then, I called

25    Dr. Titus five times, or what comes next?

1          MS. SOBCZAK:  Well, it links to his notice that

2     Dr. Raziano spoke to Dr. Titus related to Dr. Titus'

3     patients regarding the outcome of these patients in the ER.

4          THE COURT:  So Dr. Raziano, you said, what's

5     your practice?  Okay.  When someone dies, I call a doctor.

6     You know, I call some other doctor to tell them this.

7     Then -- okay.

8          So let's talk about Dr. Titus.  What's the

9     question you're going to ask him?  What's the answer he's

10    going to give?

11         MS. SOBCZAK:  We would ask him, did you ever

12    speak to Dr. Titus?

13         THE COURT:  And he's going to say yes.

14         MS. SOBCZAK:  He's going to say yes.

15         When did you speak to Dr. Titus?

16         I spoke to him when there were patients who came

17    into the ER who overdosed and died as a result of the

18    overdose.

19         MS. KOUSOULIS:  Well, he should be stopping --

20         THE COURT:  So I don't understand, how is that

21    not exactly what -- I mean, I'm not saying it should be kept

22    out, but how is that not exactly what Ms. Kousoulis is

23    trying to keep out?

24         MS. SOBCZAK:  Because that's not -- Your Honor,

25    that is not linking Dr. Titus to the overdose.  Dr. Titus

546

1    was listed as the primary care physician.  I would follow up

2    and ask:  Why were you calling Dr. Titus?  It was not

3    because Dr. Titus was responsible for the death.  It's

4    because --

5                THE COURT:  Oh, oh.

6                MS. SOBCZAK:  -- in the patient chart -- we'll

7    just go through the patient charts.  And the information

8    that Dr. Raziano had when patients entered the ER, it would

9    include the primary care physician.  In many of these

10   instances, Dr. Titus was the internal medicine primary care

11   physician.  Therefore, as part of his practice, if a patient

12   were to die from an overdose, it was his policy, and I think

13   it's the policy of Bayhealth in general, or the ER

14   physicians in general, Dr. Raziano will testify to that,

15   that the ER physician has to call whoever the primary care

16   physician is of that patient.

17               MS. KOUSOULIS:  But Your Honor, Dr. Raziano is

18   also going to be testifying that the majority of the

19   patients he saw were Dr. Titus' pain patients, and that he

20   had been prescribing -- you know, the majority of

21   Dr. Raziano's testimony is going to be about Dr. Titus'

22   prescribing habits and, his opinion, overprescribing habits.

23               And so -- and I think at one point in the

24   statement he says he primarily, like, saw in the ER Titus'

25   pain patients, not his primary care patients.  So when you

1    link that part of his testimony with the other part of the

2    testimony, I think the jury is going to draw an

3    impermissible inference.

4            And we're not saying that he can't say that when

5    patients over -- Dr. Titus' patients came in that -- you

6    know, I mean, she can still get the same thing in, but stop

7    it at the overdose.  Like, I don't know why we have to add

8    in and they died.  Like he -- like, just let them know, your

9    patient -- if they went in because they want Dr. Titus to

10   know that his patients are abusing their prescription, and

11   put Dr. Titus on notice, so perhaps he'll look at them a

12   little more closely.

13           THE COURT:  So is it the case Dr. Raziano would

14   call the primary care physicians when the person died, or

15   did he call when the person overdosed and survived?

16           MS. SOBCZAK:  The only time when he would have

17   to -- well, what he will testify to is the only time he

18   would have to call a physician is when there was a death

19   resulting from an overdose.

20           THE COURT:  Is that like some Bayhealth policy?

21           MS. SOBCZAK:  That is the policy.  That is

22   not -- we are not introducing this evidence to show that the

23   pills resulted in the death.  We're showing it as the policy

24   of Bayhealth and what the policy Dr. Raziano had to follow

25   to call Dr. Titus related to when a death occurred.

1           MS. KOUSOULIS:  What does the policy of

2     Bayhealth have to do with this trial?

3           MS. SOBCZAK:  This is Dr. Titus' practice and

4     part of his practice -- Dr. Raziano's practice.

5           THE COURT:  I can understand why it makes sense

6     in terms of explaining why Dr. Raziano's calling, that it is

7     the policy of Bayhealth to call under circumstances where a

8     patient dies.

9           What is Dr. Raziano generally going to say

10    about -- first off, do you know, is he going to say how many

11    times he's called Dr. Titus?  I mean, the number he has?

12          MS. SOBCZAK:  I believe he will estimate the

13    number of times.  I don't think he has a specific number.

14          THE COURT:  You think it's like in the five to

15    ten range or the 20 to 30 range or what?

16          MS. SOBCZAK:  It would be under ten times.

17          THE COURT:  Okay.  And when he called, is there

18    something memorable about any of these conversations that

19    he's going to testify about, or is he just going to say, I

20    called and said this patient died, you know, in the ER from

21    an over -- I mean, presumably, he's going to say from an

22    overdose; right?

23          MS. SOBCZAK:  And that would be his testimony.

24    I can't speak to exactly what he will say his verbiage was;

25    however, that would be the context in why he was calling.

1          THE COURT:  And then does Dr. Titus -- is he

2     going to say, this is what Dr. Titus' typical response was,

3     or this is his response?

4          MS. SOBCZAK:  Yes, he would respond with what --

5     the nature of the conversation, what he said and what the

6     response was of Dr. Titus.

7          THE COURT:  And what kind of response would he

8     say that Dr. Titus had?

9          MS. SOBCZAK:  It would -- I mean, I think it

10    would be a vague response.

11         THE COURT:  Okay.

12         MS. KOUSOULIS:  And Your Honor, again, we don't,

13    you know, object to any of that up until, you know, she --

14    the purpose of them wanting that information in and

15    Dr. Titus' knowledge can all be accomplished without adding

16    the death part.  We're not going to be arguing that he's

17    going against hospital policy in not fully informing, you

18    know, Dr. Titus, you know, of the death.

19         So, again, I don't see -- just because a

20    Bayhealth policy, I'm not sure how that factors in to this

21    case.  I think informing, like, calling Dr. Titus, letting

22    him know that, you know, his patients have, you know,

23    overdosed, I think that's one thing.  And, you know,

24    Dr. Titus' response to that.

25         But I think adding in the death part, I don't --

1    I think it's -- you know, I think any relevance is minimal

2    compared to the undue and harsh prejudice that it's going to

3    cause in this case.

4              THE COURT:  What's the time frame, Ms. Sobczak,

5    that these calls to Dr. Titus are going to cover?

6              MS. SOBCZAK:  So he covers -- the time frame of

7    2010 to 2014 is primarily what he will testify to, and his

8    testimony will focus on Lisa Parsons.  However, that call --

9    or he may not have called related to that because that did

10   not result in a death.

11             Your Honor, if I may, one more thing.

12             THE COURT:  Yes.

13             MS. SOBCZAK:  I just -- to respond to the

14   defense, it seems inextricable as to the questioning of if

15   Dr. Raziano ever spoke to Dr. Titus because the premise upon

16   which he would have spoken to him is based upon a death of a

17   patient.  That is not linking the death of the patient to

18   Dr. Titus' prescribing or the pills that he prescribed.

19             THE COURT:  But I think it is when you say --

20   you know, I mean, I think it's going to, and I think you

21   kind of said that.  Notwithstanding that, you know, I don't

22   think this is quite like Gregg Smith.  You know, Gregg

23   Smith, among other things, there were his representations

24   about the Fentanyl patch in his mouth and toothaches and,

25   you know, it seemed like a fairly -- it seemed like a

1    mini-trial kind of situation on the side.

2              Actually, I should be looking at Ms. Kousoulis

3    here.  And, you know -- and it seemed to be a lead-in for

4    his sister to, you know, make an accusation six or

5    eight months later.  And it seemed to me that the balance in

6    there was not in favor of letting that evidence in.

7              I think the balancing -- because, you know,

8    based on what -- you know, it's hard to say exactly what the

9    rest of the case is going to present, but it seems to me

10   that it is not a good thing for me to completely be -- you

11   know, take out the severity of the consequences of overdoses

12   from the case.

13             And I think the knowledge -- and I think

14   Dr. Raziano's testimony about here's Bayhealth policy,

15   pursuant to this policy, I called the primary care doctor,

16   Dr. Titus, five to ten times and told him whatever he told

17   him, and Dr. Titus had whatever response he had.  It doesn't

18   seem to me to be unfairly prejudicial.

19             And I don't think it's going to create a

20   mini-trial over why these people died.  And I think it

21   provides the basis for why Dr. Raziano would be calling

22   Dr. Titus, and sort of the amount of impact that it should

23   have on the person and whatever the conversation was is what

24   the conversation was.

25             So I think that it has probative value, but I

1    don't think it's substantially outweighed by the risk of

2    unfair prejudice.  And I guess I don't expect the Government

3    to be harping on this, you know, down the road.  So that's

4    my ruling.

5              MS. KOUSOULIS:  Your Honor, part of the

6    problem -- and you'll see when he testifies, he testifies

7    consistent with how he presented in his interviews.  He is

8    going to be talking a lot about how Dr. Titus was

9    overprescribing, how, in his opinion, it was reckless, it

10   was --

11             THE COURT:  Well, he shouldn't be saying what

12   his opinion is.  And the way Ms. -- you know, that's not

13   what -- you know, he is, as you pointed out, not testifying

14   as an expert.  That's Dr. Thomas who will testify as to

15   reckless or beyond the reasonable -- you know, that sort of

16   thing.

17             So I assume that the Government's -- and I

18   understand doctors are sometimes difficult to control, but

19   that you're telling him, you know, this is not just a free

20   exercise of you telling every opinion you have about what

21   happened here; right?

22             MS. SOBCZAK:  Understood, Your Honor.  Yes, Your

23   Honor.

24             THE COURT:  Okay.  So --

25             MS. KOUSOULIS:  One moment, Your Honor.  Your

1   Honor, if I may.

2              So one -- and I think I talked about this the

3   other day.  One of the issues is that Dr. Raziano indicates

4   that -- he just makes general statements about Dr. Titus'

5   patients coming in the ER having overdosed and dying, you

6   know, as a result of the overdose.  But we don't have any,

7   you know, records to be able to cross-examine him

8   regarding -- and to determine whether, you know -- what the

9   basis of the overdose was.  Like, for example, many of these

10  cases of overdoses, it's not just the medication that

11  they're on from Dr. Titus, they have other illegal and

12  illicit drugs in their system.

13             THE COURT:  Well, if you want to cross-examine

14  them on that, go right ahead.

15             MS. KOUSOULIS:  Your Honor, without the records,

16  we would ask to have an opportunity to get the records, you

17  know, with regard to the patients he's referring to.

18             MS. REMIS:  May I just comment on that one last

19  thing?

20             THE COURT:  Yes.

21             MS. REMIS:  We provided in discovery an Excel

22  file that we obtained by subpoena from Bayhealth of all the

23  overdose deaths associated with Dr. Thomas.  It's an Excel

24  file --

25             THE COURT:  Titus.

```
1              MS. REMIS:  Sorry.  I'm so sorry, Dr. Titus.

2              It doesn't -- it's not the patient files.

3    There's like 50 of them, but it is the names of the

4    patients, and the primary care physician.  And I think it

5    has the diagnosis code.

6              MS. KOUSOULIS:  Wait.  So I'm sorry, Your Honor.

7    There's been and been constant even, you know, every day,

8    like discovery, and they re-provided discovery they

9    previously provided.  So I don't -- what was it you

10   provided?

11             MS. REMIS:  We can resend it to you this

12   morning.

13             MS. KOUSOULIS:  And what did it contain?

14             MS. REMIS:  I'll just resend it to you.  I just

15   wanted to be clear about that, Your Honor, that this isn't

16   totally contextless.

17             THE COURT:  Well, I take it what you're telling

18   me is there's a list of some number of patients up to 50 of

19   Dr. Thomas' --

20             MS. REMIS:  I know.

21             THE COURT:  Now, you've got me doing it.

22   Dr.  Titus' patients who have died or something?

23             MS. REMIS:  Who overdosed at Bayhealth.

24             THE COURT:  Oh, who overdosed.  Okay.

25             MS. REMIS:  And the name of the PCP -- and I
```

1    believe it has like a diagnosis code or something.  I

2    haven't looked at it in a few -- like a few months, but

3    something along those lines.

4              MR. BOSTIC:  Your Honor, may I respond to

5    Attorney Remis' comments?  Your Honor, we would ask the

6    Court, pursuant to 17(c), to direct the production of those

7    files from Bayhealth.  They have the names.  Because without

8    having the files to go through, looking at the toxicology

9    reports, we lack the ability to properly and adequately

10   cross-examine Dr. Raziano.

11             It's now a due process violation, from my

12   perspective, because Dr. Titus cannot adequately present a

13   defense with phantom documents or lack of documents that he

14   and his attorneys cannot review to determine whether or not

15   what Dr. Raziano is concluding and stating on the witness

16   stand is actually correct.

17             And contrary to what has been said, the deaths

18   of individuals connected to an overdose, if entered into the

19   record and without the ability to properly and adequately

20   cross-examine Dr. Raziano, we may as well step away from

21   this trial and have the verdict entered because it's going

22   to be so prejudicial.  And there's nothing we can do about

23   it to combat that prejudice.  So we would ask for the

24   production of those 50 medical files.

25             THE COURT:  All right.  Well, submit me

1      something that I can sign.

2                  All right.  Okay.

3                  Is there anything else in the three minutes

4      before we get the jury?

5                  MS. KOUSOULIS:  No, Your Honor.

6                  MS. REMIS:  Sorry.  No, Your Honor.

7                  THE COURT:  Okay.  Well, we'll be in recess for

8      a few minutes.

9                  DEPUTY CLERK:  All rise.

10                 (Recess was taken.)

11                 DEPUTY CLERK:  All rise.

12                 THE COURT:  All right.  Are you all ready to

13     begin?

14                 MR. WOODARD:  Yes, Your Honor.

15                 THE COURT:  Just before we get the jury, I take

16     it we expect Agent Smith will be on the stand until the next

17     break; right?

18                 MS. REMIS:  Yes, I think so, Your Honor.

19                 THE COURT:  Okay.  And then the second thing is,

20     just the thought hadn't fully occurred to me, but I guess I

21     understand from Ms. Sobczak, the point is, when Dr. Raziano

22     calls and says, Your patient died of an overdose, he's not

23     going to say necessarily it's the Oxy that you prescribed to

24     him.  It could have been cocaine, heroin.  It could have

25     been anything; right?

                        Smith - Direct

1            MS. SOBCZAK:  That's correct, Your Honor.

2            THE COURT:  All right.  Let's get the jury.

3            THE COURT:  Ms. Remis, I noticed you've given

4    these five excerpts all different or seem to have given them

5    all different exhibit numbers.  I take it, though, it's just

6    going to be one continuous play when you do it; right?

7            MS. REMIS:  No, Your Honor.  It's going to be

8    five separate plays.

9            THE COURT:  Okay.

10           (Jury entering the courtroom.)

11           THE COURT:  All right.  Members of the jury,

12   welcome back.  Thank you for all being here on time.  We are

13   ready to proceed.

14           Ms. Remis, you may proceed.

15           MS. REMIS:  Thank you, Your Honor.

16           CONTINUED DIRECT EXAMINATION

17   BY MS. REMIS:

18   Q.    Good morning, Special Agent Smith.

19   A.    Good morning.

20   Q.    Okay.  I want to just discuss a couple things that we

21   reviewed yesterday.

22           MS. REMIS:  If we could go to Government

23   Exhibit 111 at Page 34, please.

24   BY MS. REMIS:

25   Q.    Okay.  And do you recall discussing this discharge

Smith - Direct

1    letter yesterday regarding Lisa Parsons?

2    A.    Yes, I do.

3    Q.    Okay.  And I believe yesterday we discussed the

4    differences between this discharge letter and the other

5    discharge letters we had seen; is that right?

6    A.    Yes.

7    Q.    Now, did you see on the previous page in Ms. Parsons'

8    patient file any evidence suggesting that there was an email

9    copying a State investigator relating to a complaint from

10   the State that had been filed related to Dr. Titus?

11   A.    Yes, I did.

12   Q.    Okay.  And if we could go to that version, that page.

13   This is Page 33 of the same file; right?

14   A.    Yes.

15   Q.    And that's just the page before the discharge letter;

16   right?

17   A.    Correct.

18           MS. REMIS:  And if you scroll down just a tad,

19   Ms. Leal.

20   BY MS. REMIS:

21   Q.    What is the name of the person where it says from?

22   A.    Joe Raziano.

23   Q.    And what's the date there?

24   A.    Friday, January 10th, 2014 at 3:59 a.m.

25   Q.    Okay.  And who's it to?

559

Smith - Direct

1   A.      Jean Betley.

2   Q.      And do you know what D.O.S. stands for?

3   A.      I believe that's Department of State.

4   Q.      Okay.

5           MS. REMIS:  And if you could scroll up,

6   Ms. Parsons -- excuse me.  Oh, my gosh.  Ms. Leal.

7   BY MS. REMIS:

8   Q.      And who is this email up here from?

9   A.      This is from Jean Betley.

10  Q.      And who is it sent to?

11  A.      Anthony Kemmerlin.

12  Q.      And what's the subject?

13  A.      "Forward:  Medication concern/overdose."

14  Q.      And Jean Betley here, on her signature line, what's

15  her title?

16  A.      License Investigator 3.

17  Q.      And are you familiar with who Anthony Kemmerlin is?

18  A.      Yes.

19  Q.      Who is he?

20  A.      He is also an investigator with the Division of

21  Professional Regulation for the Delaware Department of

22  State.

23  Q.      Okay.  Thank you.

24          MS. REMIS:  And if we could turn now to

25  Government Exhibit 104 at 3.

Smith - Direct

1   BY MS. REMIS:

2   Q.     I showed you this file yesterday, and it had some

3   black markings on that.  Do you recall that?  It had a

4   black -- it looked like a black highlighting?

5   A.     Yes.

6   Q.     Okay.  Okay.  And whose patient file is this?

7   A.     This is from Delores Perry.

8   Q.     Okay.  And yesterday we looked at it.  It was the

9   same document, just the -- what is pink now looked black

10  yesterday; right?

11  A.     That's correct.

12  Q.     And why was that?

13  A.     Just in the process of scanning it, the pink

14  highlighting blocked the words and came out as black.

15  Q.     Okay.  So just to quickly review, what was the

16  collection date on this lab test?

17  A.     Collection date was October 2nd, 2013.

18  Q.     And the fax date?

19  A.     October 7th, 2013.

20  Q.     Okay.  And if we could look down to the bottom where

21  it's highlighted below, what does it say in the right-hand

22  line under "Comments"?

23  A.     "MB:  Cocaine.  DW:  12 to 24 hours."

24  Q.     Okay.  And this highlighting was on the chart at the

25  time it was seized?

561

Smith - Direct

1    A.    Yes.

2    Q.    After this failed drug screen on October 7th we

3    looked at yesterday.   Government Exhibit 104 at 2, please.

4    And what is this?

5    A.    These are two prescriptions, both issued to Delores

6    Perry by Dr. Titus, dated October 16th, 2013.

7    Q.    And what are they for?

8    A.    First is for 30 morphine 15-milligram tablets, and

9    the second is for 75 OxyCodone 15-milligram tablets.

10   Q.    Okay.

11         MS. REMIS:   And if we could go to Government

12   Exhibit 104 at 17, please.   Actually -- yes, at 17, please.

13   BY MS. REMIS:

14   Q.    So we just looked at the October 16th prescription,

15   which is after the date of the drug screen; right?

16   A.    Correct.

17   Q.    And now we're looking at what?

18   A.    These are two prescriptions issued by Dr. Titus to

19   Delores Perry on September 18th, 2013.

20   Q.    So is this before or after the drug screen?

21   A.    This is before.

22   Q.    And are the -- what are -- what is being prescribed

23   here?

24   A.    This is 30 Morphine 15-milligram tablets, and 75

25   Oxycodone 15-milligram tablets.

Smith - Direct

1    Q.      Is this the same exact prescription in September as

2    in October after the discharge?

3    A.      Yes.

4    Q.      Okay.

5            MS. REMIS:  Let's go on to Government

6    Exhibit 115 at 62, please.

7    BY MS. REMIS:

8    Q.      And yesterday I think we ended with Donald Meck.  Do

9    you remember that?

10   A.      Yes.

11   Q.      And I showed you this drug screen, which was

12   collected on March 25th, 2014, faxed over on March 31st,

13   2014.  Do you remember that?

14   A.      Yes, I do.

15   Q.      Okay.  And it says on here under, "Not Prescribed -

16   Detected" Fentanyl; right?

17   A.      Correct.

18           MS. REMIS:  If we could pull up Government

19   Exhibit 116 at 166, please.  And if you could blow up the

20   top part.

21   BY MS. REMIS:

22   Q.      Can you read the date on this top part?  Under --

23   A.      I cannot.

24   Q.      Okay.  Do we have the original patient file here with

25   us?

Smith - Direct

1    A.        Yes, we do.

2    Q.        Okay.  Can I have it?

3             MS. REMIS:  May I approach, Your Honor?

4             THE COURT:  Yes.

5    BY MS. REMIS:

6    Q.        Do you have the original patient file there?

7    A.        Yes, I do.

8    Q.        And is that legible, what you're looking at?

9    A.        Yes, it is.

10   Q.        And what's the date of this prescription?

11   A.        March 11th, 2014.

12   Q.        Okay.  And what was prescribed then?

13   A.        It was -- prescribed was 80 OxyCodone 15-milligram

14   tablets.

15   Q.        Okay.  Great.  Thank you.

16             MS. REMIS:  And if we could look at Government

17   Exhibit 116 at 1, please.

18             1 -- sorry, this must be 115 at 1.  Yes.

19             Can you blow up the top?  Great.

20   BY MS. REMIS:

21   Q.        And on the right-hand side, there's a Fentanyl patch

22   prescription.  Do you see that?

23   A.        Yes, I do.

24   Q.        What's the date on that?

25   A.        February 25th, 2014.

Smith - Direct

1    Q.     And how many Fentanyl patches?

2    A.     Ten.

3    Q.     And it says at the bottom, "Apply one" -- it looks

4    like -- "every 72 hours PRN."  Is that right?

5    A.     Correct.

6    Q.     So how many days, in theory, would that cover?

7    A.     The -- that, in theory, would cover 30 days.

8              MS. REMIS:  Okay.  If we could go to 115 at 62,

9    please, again.  And blow up the top, please.

10   BY MS. REMIS:

11   Q.     So just to be clear, Dr. Titus wrote a prescription

12   on 2/25/14 for enough Fentanyl patches to last 30 days;

13   right?

14   A.     Correct.

15   Q.     And this drug test was 30 days out; right?

16   A.     Correct.

17   Q.     So do you believe that it's a mistake that this says,

18   "Not Prescribed - Detected" for Fentanyl here?

19   A.     I do.

20   Q.     Okay.  I just wanted to clarify that.

21            So, and just one last question on that.  The

22   March --

23            MS. KOUSOULIS:  Your Honor, I would like to go

24   back to that.  I would move to strike.  I don't think he has

25   any personal knowledge of whether that was a mistake or not

565

Smith - Direct

1  or why that was in there, so I would ask that that answer be

2  stricken.

3            THE COURT:  I'm inclined to do that, so I'm

4  going to strike the last question and answer.  And so you

5  should ignore it.

6            Go ahead.

7            MS. REMIS:  Thank you, Your Honor.

8  BY MS. REMIS:

9  Q.    And just to be clear, based on your review of these

10 records, there's usually two prescriptions per month; right?

11 A.    Correct.

12 Q.    And so the prescription one month before this drug

13 test contained Fentanyl and Oxycodone?

14 A.    Correct.

15 Q.    The prescription two weeks before this drug test only

16 contained Oxycodone?

17 A.    That's correct.

18 Q.    Okay.  You mentioned yesterday that Donald Meck's

19 file was found at Josie Walters' home; right?

20 A.    Yes.

21            MS. REMIS:  Okay.  Let's go to Government

22 Exhibit 116 at 81, please.

23            MS. LEAL:  Eighty-one?

24            MS. REMIS:  Eighty-one.

25 BY MS. REMIS:

Smith - Direct

1   Q.     What are we looking at here?

2   A.     This is a patient progress note for Donald Meck dated

3   January 28th, 2014.

4   Q.     And based on your review of the records, is this the

5   first page of a standard progress note from the office?

6   A.     Yes.

7          MS. REMIS:  If we could just scroll down through

8   the next three pages, please.  Thank you.

9   BY MS. REMIS:

10  Q.     And are those four pages just what make up the

11  standard progress note?

12  A.     Yes.

13  Q.     Okay.  We are now on Government Exhibit 116 at

14  Page 84.  What does it say here under "Impression/Treatment

15  and Diagnosis Objectives"?

16  A.     It looks like -- if we could blow that up possibly.

17  It looks like a --

18         MS. KOUSOULIS:  Your Honor, if he's saying it

19  looks like, if he doesn't know, that should be for the jury

20  to decide what it is.  I'm not sure what he thinks it says

21  is relevant.  It's for the jury to decide, and they will

22  have these documents in the deliberation room.

23         THE COURT:  If you can lay some foundation that

24  he has some more knowledge than the ordinary person to

25  interpret this, I'll allow it.

Smith - Direct

1          MS. REMIS:  Your Honor, he is just going to read

2    what the letters are.

3          THE COURT:  Okay.  Well, he can do that, too.

4    BY MS. REMIS:

5    Q.    What are the letters listed there?

6    A.    "A/P -".

7    Q.    Okay.

8          MS. REMIS:  Can we go to Government Exhibit 116

9    at 85, please?

10   BY MS. REMIS:

11   Q.    What is this?

12   A.    This is a patient progress note, also for Donald

13   Meck, dated February 25th, 2014.

14   Q.    And so that's the month right after we just looked

15   at?

16   A.    Correct.

17         MS. REMIS:  And if we could go to the last page

18   of this progress note on Page 88, please.

19   BY MS. REMIS:

20   Q.    What does it say, again, under "Impression/Diagnosis

21   and Treatment Objectives"?

22   A.    "A/P-".

23         MS. REMIS:  Okay.  Let's go to Page 89, which is

24   the next page, please.

25   BY MS. REMIS:

568

Smith - Direct

1    Q.      And what's the date on here?

2    A.      February -- I'm sorry, March 25th, 2014.

3    Q.      And, again, this is the first page of Donald Meck's

4    progress notes for that day?

5    A.      Yes.

6            MS. REMIS:  If you could scroll down to the last

7    page of this note, which is, I believe, 92, it looks like.

8    BY MS. REMIS:

9    Q.      What's listed under this "Impression/Diagnosis and

10   Treatment Objectives"?

11   A.      "A/P -".

12   Q.      And it's blank other than that; right?

13   A.      Correct.

14           MS. REMIS:  Let's go to Government Exhibit 116

15   at 95, please.

16   BY MS. REMIS:

17   Q.      And what's the date on this progress note?

18   A.      April 22nd, 2014.

19   Q.      And this is the same progress note date as the date

20   for Count 8 related to Donald Meck; right?

21   A.      Correct.

22           MS. REMIS:  If we could scroll down to the last

23   page, please.

24   BY MS. REMIS:

25   Q.      What does it say there at the bottom?

Smith - Direct

1    A.    "A/P -".

2    Q.    And blank otherwise?

3    A.    Yes.

4    Q.    So the four notes up to and including the date of

5    Donald Meck's prescription on Count 8 are blank, other than

6    A/P; is that right?

7    A.    Correct.

8              MS. REMIS:  Let's go to Government Exhibit 116

9    at 32, please.

10   BY MS. REMIS:

11   Q.    Now, what are we looking at here?

12   A.    Patient progress note for Donald Meck, dated

13   September 10th, 2014.

14   Q.    Based on your participation in this investigation,

15   have you become familiar with Dr. Titus' handwriting?

16   A.    Yes, I have.

17   Q.    And under "Chief complaint and HPI," does that appear

18   to be Dr. Titus' handwriting to you?

19   A.    No, it does not.

20   Q.    Okay.  And on page --

21             MS. REMIS:  If we could go to the same exhibit

22   at Page 30 -- 33, please.

23   BY MS. REMIS:

24   Q.    Under urine toxification screen history, right in the

25   middle of the page --

Smith - Direct

1    A.      Yes.

2    Q.      -- does this appear to be Dr. Titus' handwriting to

3    you?

4                MS. KOUSOULIS:  Your Honor, again, I don't know

5    what foundation more so than the jury is going to have

6    regarding what Dr. Titus' hand --

7                THE COURT:  Well, I think he laid it, so I'm

8    going to overrule your objection.

9                THE WITNESS:  Yes.  That does not appear to be

10   Dr. Titus' handwriting.

11               MS. REMIS:  Okay.  And if we could go to

12   Page 35, please.

13   BY MS. REMIS:

14   Q.      Under "Impression/Diagnosis and Treatment

15   Objectives," does that appear to be Dr. Titus' handwriting?

16   A.      No, it does not.

17   Q.      There's that A/P we've seen before; is that right?

18   A.      That's correct.

19   Q.      And does that appear to be a similar A/P as the other

20   files we looked at?

21   A.      Yes, it does.

22   Q.      Could you read what the "Impression/Diagnosis and

23   Treatment Objectives" are under there?

24   A.      "Chronic pain syndrome secondary to above-mentioned

25   conditions.  Clinically stable with occasional worsening

Smith - Direct

1    symptoms.  Continue with regimen of Fentanyl patch,

2    50 micrograms an hour, #10.  Apply one patch every 72 hours

3    PRN.  And Oxycodone 15-milligram tablets, #80.  One tablet

4    every four hours for PRN.  Return to clinic in one week for

5    a pill count, two weeks for remainder of prescription, and

6    in one month for followup and further treatment."

7    Q.    Thank you.

8              MS. KOUSOULIS:  Can I just ask again what

9    exhibit number this is?  I'm having a hard time --

10             MS. REMIS:  Sure.  It's 116 at 35.

11             MS. KOUSOULIS:  Okay.

12             MS. REMIS:  And now we're moving to 116 at 40.

13   BY MS. REMIS:

14   Q.    So this is still Donald Meck's patient file; right?

15   A.    Correct.

16   Q.    And, again, where did you find Donald Meck's patient

17   file?

18   A.    Josie Walters' residence.

19             MS. REMIS:  Okay.  And if you could just

20   highlight just the side of this file right here, Ms. Leal,

21   where it says PC.

22   BY MS. REMIS:

23   Q.    Does this appear to be Dr. Titus' handwriting, can

24   you tell?

25   A.    It does not appear to be his handwriting.

572

Smith - Direct

1           MS. REMIS:  Okay.  And if we could go to, again,

2   the last page, which is Government Exhibit 116.  I believe

3   it's 44.  No, 43.  I'm sorry.  And if you could blow up that

4   bottom part as well.

5           Thank you.

6   BY MS. REMIS:

7   Q.     And, again, does this appear to be Dr. Titus'

8   handwriting?

9   A.     It does not.

10  Q.     Could you read it for the jury, please?

11  A.     "Chronic pain syndrome secondary to above-mentioned

12  conditions.  Clinically stable with some improving symptoms.

13  Continue with regimen of Fentanyl patch, 50 micrograms an

14  hour, #10.  Apply one patch every 72 hours PRN.  And

15  Oxycodone, 15-milligram, #80.  One tablet every four to

16  six hours PRN.  Return in two weeks for second half of

17  script and in one month for reevaluation."

18  Q.     And based on your review of this note and the note we

19  just read out loud, are the two relatively similar?

20  A.     Yes, they are.

21  Q.     Are there just a couple differences in the two?

22  A.     Yes, that's correct.

23          MS. REMIS:  And if we could go to Government

24  exhibit -- page -- same Exhibit 116, Page 44, please.

25  BY MS. REMIS:

573

Smith - Direct

1    Q.    What is the date on this patient note?

2    A.    November 5th, 2014.

3              MS. REMIS:  Okay.  And if we could go to

4    Page 47, which is the last page of this note on that date.

5              And Ms. Leal, if you could blow up the bottom

6    part of this, Page 47, and put it next to the bottom part on

7    Page 35, please.

8    BY MS. REMIS:

9    Q.    And the note on Page 35 was the note that we looked

10   at for September 10th, 2014; right?

11   A.    Right.

12   Q.    And that's the one that's now on the left?

13   A.    Yes.

14             MS. REMIS:  And I don't know.  Can you blow up

15   on two sides?  Okay.  So we can keep it small.

16             MS. LEAL:  Oh, I can.

17             MS. REMIS:  Well done.

18             MS. LEAL:  It's going to overlap.

19             MS. REMIS:  That's okay.

20   BY MS. REMIS:

21   Q.    Can you read the one on the right, please?

22   A.    Yes.  "Chronic pain syndrome" -- could that be blown

23   up, please?  I'm sorry.

24             MS. LEAL:  Yes.

25             THE WITNESS:  Thank you.

Smith - Direct

1           "Chronic pain syndrome secondary to

2     above-mentioned conditions.  Clinically stable with

3     occasional worsening symptoms.  Continue with" -- and I'm

4     not sure of that word -- "medical regimen of Oxycodone,

5     15-milligrams, #80.  One tablet every four to six hours PRN.

6     And Fentanyl patch, 50 micrograms an hour, #10.  Apply one

7     patch every 72 hours PRN.  Return in two weeks for remainder

8     of prescription, and in one month for evaluation and further

9     treatment."

10    BY MS. REMIS:

11    Q.    Other than the order in which the drugs are

12    written --

13           MS. REMIS:  And you can click out of that,

14    please.

15    BY MS. REMIS:

16    Q.    -- and the fact that the one on the left says come

17    back for two weeks and -- for a pill count, are the two the

18    same?

19    A.    Yes.

20           MS. REMIS:  Okay.  I'd like to move on to

21    Government Exhibit 119, please.

22    BY MS. REMIS:

23    Q.    What are we looking at here?

24    A.    This is the patient file for Loretta Connelly.

25    Q.    Okay.

575

Smith - Direct

1          MS. REMIS:  And if we could go to 119 at

2     Page 121, please.

3     BY MS. REMIS:

4     Q.     What is this?

5     A.     This is a lab result for Loretta Connelly.

6     Q.     On what -- excuse me -- on what date was it

7     collected?

8     A.     It was collected on June 1st, 2014.

9     Q.     Okay.

10          MS. REMIS:  And if we could blow it up,

11     actually, a little bit bigger, please.  Even bigger, just

12     right at the top.  Right there.

13     BY MS. REMIS:

14     Q.     As it's bigger, does it still look like June 1st or

15     is it maybe a different --

16     A.     That appears to be May 1st, 2014.

17     Q.     Okay.  And what's the date of the fax?

18     A.     May 5th, 2014.

19     Q.     Okay.  Under "Prescribed - Not Detected," what do we

20     have listed there?

21     A.     Oxycodone and Fentanyl.

22     Q.     And -- excuse me.  Sorry.  And under "Not

23     Prescribed - Detected" what --

24          MS. REMIS:  Thank you, Ms. Leal.

25     BY MS. REMIS:

Smith - Direct

1    Q.      Under not prescribed but detected, what do you see

2    there?

3    A.      First one is Zolpidem 4 Carboxy and Gabapentin.

4    Q.      Okay.

5            MS. REMIS:   Now, if we could go to Government

6    Exhibit 119 at 59, please.   Oh -- yes.   Thank you.   Great.

7    BY MS. REMIS:

8    Q.      And what is the date that this drug screen was

9    collected?

10   A.      May 29th, 2014.

11   Q.      And also for Loretta Connelly?

12   A.      Yes.

13   Q.      And so May 29th is just less than a month after the

14   previous drug screen; right?

15   A.      Twenty-eight days.

16   Q.      Great.   And what was the date faxed here?

17   A.      Faxed on June 2nd, 2014.

18   Q.      And what are the drugs listed under prescribed, but

19   not detected?

20   A.      Oxycodone, again.

21   Q.      And what's listed under "Not Prescribed - Detected"?

22   A.      Amphetamine and Benzoylecgonine.

23           MS. REMIS:   Okay.   If we could exit out of that

24   highlight, please.

25           Could you go to -- let's see.   On to the next

Smith - Direct

1    page, please.  About halfway down, if you could highlight

2    the middle portion where it says benzo -- I can't read the

3    word.

4    BY MS. REMIS:

5    Q.    What does it say in the right-hand column next to

6    that?

7    A.    "MB:  Cocaine.  DW:  12 to 24 hours."

8          MS. REMIS:  And so if we could go to Government

9    Exhibit 119 at 58.

10   BY MS. REMIS:

11   Q.    What are we looking at here?

12   A.    This is a discharge letter for Loretta Connelly,

13   dated -- from Dr. Titus dated June 3rd, 2014.

14   Q.    So that's the day after the previous drug test was

15   faxed?

16   A.    Correct.

17   Q.    And what does it say for -- what's the reason for

18   discharge there?

19   A.    "Testing positive for an illegal substance, cocaine."

20   Q.    And what does it say again about emergency treatment

21   in the second to last line?

22   A.    "Emergency treatment does not include narcotic

23   medication."

24         MS. REMIS:  Okay.  If we could go to 119 at 57,

25   please.

Smith - Direct

1    BY MS. REMIS:

2    Q.    What is the date of this prescription?

3    A.    This prescription is dated June 12th, 2014.

4    Q.    And what is it for?

5    A.    75 Oxycodone 15-milligram tablets.

6    Q.    Okay.  And that is approximately nine days after the

7    discharge letter?

8    A.    Correct.

9          MS. REMIS:  If we could go to Government

10   Exhibit 9, please.

11   BY MS. REMIS:

12   Q.    What are we looking at here?

13   A.    So looking at it from our left to -- left to right,

14   first we have a warning letter that was issued to Loretta

15   Connelly for the absence of the medications prescribed from

16   the facility.  Again, that was on May 6th, 2014.

17         And then, moving across the screen, we have the

18   lab results, which showed that she was prescribed, but

19   wasn't detected Oxycodone and Fentanyl.  And that was in

20   May -- on May 1st, 2014.  And then, ultimately, the

21   discharge -- I'm sorry -- the discharge letter dated on

22   June 3rd, 2014.  Yet after that discharge letter, she

23   received a additional prescription dated June 12th, 2014.

24   Q.    And what's missing from this document is the drug

25   screen collected on May 29th, 2014, showing a positive for

Smith - Direct

1    cocaine; is that right?

2    A.    Correct.

3              MS. REMIS:  Okay.  Let's move on to Government

4    Exhibit 121, please.

5    BY MS. REMIS:

6    Q.    What are we looking at here?

7    A.    This is the patient file for Chasity Calhoun.

8    Q.    And from which location was this seized?

9    A.    The storage unit.

10   Q.    Did Ms. Calhoun have a second patient file?

11   A.    If she did, I believe that was also located at the

12   storage unit.

13   Q.    Okay.  And is that Government Exhibit 120?

14             MS. REMIS:  If you could go to the front page of

15   that, please.

16             THE WITNESS:  Yes.

17             MS. REMIS:  Let's go to Government Exhibit 121

18   at Page 59.

19   BY MS. REMIS:

20   Q.    What are we looking at here?

21   A.    These are two prescriptions issued by Dr. Titus to

22   Chasity Calhoun, dated June 18th, 2014.

23   Q.    And what are they for?

24   A.    The first on the top is for 30 OxyContin

25   ten-milligram tablets; and the bottom is for 74 Oxycodone

580

Smith - Direct

1   15-milligram tablets.

2   Q.      So OxyContin and Oxycodone?

3   A.      Correct.  Both.

4           MS. REMIS:  If we could go to exhibit -- same

5   Exhibit 121 at Page 43, please.

6   BY MS. REMIS:

7   Q.      What are we looking at here?

8   A.      This is a laboratory result for Chasity Calhoun.

9   Q.      And what is the collection date of the specimen?

10  A.      July 2nd, 2014.

11  Q.      What's the date of the final report?

12  A.      July 8th, 2014.

13  Q.      And at the top, what are the -- what does the fax

14  line say -- or it appears to read here?

15  A.      Appears July 10th, 2014, at 9:23 a.m.

16  Q.      And the other two?

17  A.      There's also a date there for July 8th, 2014, at 1522

18  or 3:22 in the afternoon.  And July 8th, 2014, two minutes

19  later, at 3:34 p.m.

20  Q.      And, again, you don't know which of those fax dates

21  is the correct one that -- showing when it went to

22  Dr. Titus' office, do you?

23  A.      Correct.  I do not.

24  Q.      Now, there's a circle in the middle of this page

25  here.  If you could just read the last portion of it there.

Smith - Direct

1    6-MAM is?

2    A.    A metabolite of an illicit substance, heroin.

3    Q.    Okay.  Again, this circle, was it there when you

4    seized the file?

5    A.    Yes, it was.

6              MS. REMIS:  Let's go to Government Exhibit 121

7    at Page 39, please.

8    BY MS. REMIS:

9    Q.    What is the date listed on this document?

10   A.    July 14th, 2014.

11   Q.    And what are we looking at?

12   A.    It's a discharge letter issued by Dr. Titus to

13   Chasity Calhoun.

14   Q.    On the drug screen we just looked at, there were a

15   couple of different options for fax dates.  Were those

16   July 8th or July 10th?

17   A.    Correct.

18   Q.    Okay.  And what is listed as the reason for

19   discharge?

20   A.    Reason for discharge is testing positive for an

21   illegal substance, heroin.

22   Q.    Okay.  And according to the file, did Dr. Titus

23   prescribe more drugs following this discharge?

24   A.    Yes.

25             MS. REMIS:  Let's look at Government Exhibit 121

Smith - Direct

1    at Page 41, please.

2    BY MS. REMIS:

3    Q.     What is listed here?  What are these prescriptions

4    for?

5    A.     These are two prescriptions issued by Dr. Titus to

6    Chasity Calhoun, dated July 16th, 2014.

7    Q.     And what are they for?

8    A.     The first on top is for 30 OxyContin ten-milligram

9    tablets; and the bottom is for 74 Oxycodone 15-milligram

10   tablets.

11   Q.     Okay.  And this is after the date of the discharge;

12   is that right?

13   A.     That is correct.

14   Q.     And is that the same exact prescription as was

15   provided before the heroin drug screen?

16   A.     Yes, it was.

17          MS. REMIS:  Okay.  Let's go to Government

18   Exhibit 121 -- oh, excuse me.  Government Exhibit 10,

19   please.

20   BY MS. REMIS:

21   Q.     And what do we have here?

22   A.     So, again, here I'll go from -- I'll start over here

23   on the right on this particular document.  That was the lab

24   result for Chasity Calhoun that indicated she had tested

25   positive for heroin.

583

Smith - Direct

1              And then we have, on the left, the discharge

2      letter that is dated July 14th issued by Dr. Titus saying

3      she is being discharged because she tested positive for

4      heroin.

5              And following that, in the middle, now we have a

6      prescription issued by Dr. Titus for Oxycodone and OxyContin

7      to Ms. Calhoun on July 16th, 2014.

8      Q.     Thank you.

9              MS. REMIS:  If we could go to Government

10     Exhibit 123, please.

11     BY MS. REMIS:

12     Q.     What are we looking at here?

13     A.     This is the patient file for Tracie Owens.

14     Q.     And which location was this seized from?

15     A.     The storage unit.

16             MS. REMIS:  Can we pull up Page 213, please?

17     BY MS. REMIS:

18     Q.     What is the date of this prescription?

19     A.     June 24th, 2014.

20     Q.     And what is it for?

21     A.     This is for 120 Oxycodone 15-milligram tablets.

22     Q.     Okay.  And down below, just at the bottom there, what

23     does that look like to you?

24     A.     It looks like an appointment card --

25     Q.     And --

584

Smith - Direct

1    A.      -- for Ms. Owens for an appointment on July 22nd.

2    Q.      About a month later?

3    A.      Correct.

4            MS. REMIS:  If we could go to Exhibit 123 at

5    Page 329, please.

6    BY MS. REMIS:

7    Q.      What is this?

8    A.      This is a warning letter that has been issued by

9    Dr. Titus to Tracie Owens.  It's dated June 30th, 2014.

10   Q.      And what's the address of Lighthouse Internal

11   Medicine there up at the top?

12   A.      10 North Church Street, Milford, Delaware 19963.

13   Q.      Okay.  And what's the warning about?

14   A.      The warning is about the absence of the medications

15   prescribed by Dr. Titus.

16   Q.      And what's it say up at the top in the circle, the

17   handwritten part?

18   A.      3rd Notice.

19           MS. REMIS:  Okay.  Let's go to Government

20   Exhibit 123 at 207, please.

21   BY MS. REMIS:

22   Q.      What's the date of this prescription?

23   A.      July 22nd, 2014.

24   Q.      And that's the date of the appointment card we just

25   saw before; right?

Smith - Direct

1    A.      That's correct.

2    Q.      And what's the prescription for?

3    A.      This is for 120 Oxycodone 15-milligram tablets again.

4    Q.      Okay.  And this appears -- how many -- how frequently

5    does it appear Ms. Owens is getting prescriptions for

6    Oxycodone?

7    A.      Once a month.

8    Q.      Okay.  And is that different than some of the other

9    patients?

10   A.      Yes, it is.

11   Q.      Do you have any idea why?

12   A.      I do not.

13   Q.      Is this prescription exactly the same as the

14   prescription we just looked at from June 24th, 2014?

15   A.      Yes.

16   Q.      And it takes place about a month after that third

17   notice we looked at; right?

18   A.      That's correct.

19           MS. REMIS:  If we could look at Exhibit 123,

20   Page 339, please.

21   BY MS. REMIS:

22   Q.      What are we looking at here?

23   A.      This is a lab result for Tracie Owens.

24   Q.      And what is the date and what's the result?

25   A.      The collection date is May 27th, 2014, with a fax

Smith - Direct

1    date of May 30th, 2014.  And the result is, once again,

2    "Prescribed - Not Detected," Percocet or Oxycodone.

3                    MS. REMIS:  Okay.  And if we could go to

4    Page 345, please.

5    BY MS. REMIS:

6    Q.     What is this?

7    A.     This is another warning letter issued to Tracie Owens

8    from Dr. Titus, dated March 10th, 2014.

9    Q.     Okay.  And what's the warning about?

10   A.     Once again, for the absence of the medications

11   prescribed by Dr. Titus.

12   Q.     Okay.  And the address is the 10 North Church Street

13   address?

14   A.     That is correct.

15   Q.     And at the bottom it says, "Be advised that this is

16   your first and only notice regarding the issue"; right?

17   A.     Yes.

18   Q.     Okay.  So that's March 10th, 2014; right?

19   A.     Yes.

20                    MS. REMIS:  If we could go to Government -- same

21   exhibit, Page 337, please.

22   BY MS. REMIS:

23   Q.     What are we looking at here?

24   A.     This is another warning letter issued by Dr. Titus to

25   Tracie Owens.  This one is on June 3rd, 2014.  Again, the

Smith - Direct

1    warning letter issued -- is issued for the absence of the

2    medications that Dr. Titus has prescribed Ms. Owens.

3    Q.    And it says "second one" right at the top?

4    A.    Correct.

5    Q.    And, again, 10 North Church Street?

6    A.    That's correct.

7    Q.    And I apologize, I went a little bit out of order

8    here, but is this a few days after the drug test we looked

9    at a few moments ago at Page 339?

10   A.    Yes.

11   Q.    Okay.  So we have three warning letters; is that

12   right?

13   A.    Correct.

14   Q.    And the final warning letter that we looked at

15   first -- again, apologies for going a little bit out of

16   order -- was from June 30th, 2014?

17   A.    Yes.

18   Q.    So March, June -- March 10th, June 3rd, and

19   June 30th, 2014; right?

20   A.    Yes.

21            MS. REMIS:  Okay.  Let's go to Government

22   Exhibit 123 at 479, please.

23            MS. LEAL:  479?

24            MS. REMIS:  479.  I'm sorry.  207.  I'm sorry

25   about that.

588

Smith - Direct

1   BY MS. REMIS:

2   Q.     What is this a prescription for?

3   A.     This is a prescription for 120 Oxycodone 15-milligram

4   tablets.

5   Q.     And what's the date?

6   A.     July 22nd, 2014, issued by Dr. Titus to Tracie Owens.

7   Q.     Okay.  So this is the same prescription as about a

8   month before on June 24th, 2014?

9   A.     Yes.

10  Q.     And the same day as the third notice for the warning

11  letter?

12  A.     Yes.

13           MS. REMIS:  Okay.  Can we go to Government

14  Exhibit 11, please.

15  BY MS. REMIS:

16  Q.     What are we looking at here?

17  A.     Okay.  I'll start with the prescription issued over

18  there on July 22nd -- I'm sorry.  Let's start on the left

19  with the warning notice.

20           Again, I'll highlight, this is dated June 30th,

21  2014.  It's -- at the top it's written 3rd notice.  This is

22  warning Tracie Owens of the absence of the prescribed

23  medications from Dr. Titus, again, June 30th, 2014.  The --

24  that is supported by the document in the middle, which is

25  the screen -- drug screening for Tracie Owens, which

Smith - Direct

1    indicates that she's tested negative for Oxycodone, the drug

2    prescribed by Dr. Titus to her.

3              And on the right is a prescription issued after

4    the third notice of the fact that she didn't have the

5    medications in her system for July 22nd, 2014, again, for

6    120 Oxycodone 15-milligram tablets.

7    Q.    Okay.  Thanks.

8              MS. REMIS:  And let's go to Government

9    Exhibit 125, please.

10   BY MS. REMIS:

11   Q.    What are we looking at here?

12   A.    So the patient file of Michael Adams.

13   Q.    And where was this patient file seized from?

14   A.    The storage unit.

15             MS. REMIS:  And let's go to Government

16   Exhibit 125 at 93, please.

17   BY MS. REMIS:

18   Q.    What are we looking at here?

19   A.    These are two prescriptions issued by Dr. Titus to

20   Michael Adams, both are dated August 13th, 2014.  The first

21   is for 30 Oxycodone -- I'm sorry, Oxycontin ten-milligram

22   tablets; and the one on the bottom is for 80 Oxycodone

23   15-milligram tablets.

24             MS. REMIS:  Let's go to Government Exhibit 125

25   at Page 180, please.

Smith - Direct

1          MS. KOUSOULIS:  What page is it?

2          MS. REMIS:  180.

3          And if we could pull up the top half, please.

4    Thank you.

5    BY MS. REMIS:

6    Q.    What is the date collected listed here?

7    A.    August 26th, 2014.

8    Q.    And the date reported?

9    A.    September 4th, 2014.

10   Q.    And, again, for Michael B. Adams?

11   A.    Correct.

12   Q.    What is the result?  This looks a little bit

13   different than some of the other drug tests; right?

14   A.    It does.

15   Q.    Do you know why that is?

16   A.    I believe it's a different lab that was performing

17   the analysis.

18   Q.    Okay.  What does it say under "Key Summary"?

19   A.    Yes.  Reflects that Oxycodone was not detected;

20   however, the drugs EDDP was detected, but not anticipated.

21   And the same with Methadone, that it was inconsistent in

22   that it was detected, but not anticipated.

23   Q.    Okay.  And if we could go -- so just to be clear,

24   Oxycodone was not detected, but the drug testing thought it

25   should be detected?

Smith - Direct

1    A.      Correct.  It reflects that was a prescribed drug.

2    Q.      And EDDP and Methadone were detected, but not

3    anticipated?

4    A.      Correct.  And not prescribed.

5    Q.      Okay.  Thanks.

6            MS. REMIS:  And if we could go to Government

7    Exhibit 125 at 179.

8    BY MS. REMIS:

9    Q.      What are we looking at here?

10   A.      This is a warning letter issued by Dr. Titus to

11   Michael Adams, and it's dated on September 9th, 2014.

12   Q.      And what's the address of Lighthouse Internal

13   Medicine there?

14   A.      10 North Church Street in Milford.

15   Q.      Okay.  And what's the rationale for the warning?

16   A.      "The inclusion of a medication not prescribed by this

17   facility to you, specifically Methadone."

18   Q.      Okay.  And, again, first and only notice?

19   A.      That's -- that's what the -- that's the warning --

20   that's what the warning letter states.

21           MS. REMIS:  Okay.  Let's go to Government

22   Exhibit 125 at Page 87, please.  If we could make this

23   bigger, please.

24   BY MS. REMIS:

25   Q.      Again, what's the date here?

Smith - Direct

1    A.      This is dated September 10th, 2014.

2    Q.      And what are the prescriptions for?

3    A.      The first is for 30 Oxycontin ten-milligram tablets;

4    and the second is for 80 Oxycodone 15-milligram tablets.

5    Q.      And so this prescription is about two -- a little

6    more than two weeks after -- no, maybe it's a little more

7    than two weeks after the previous one we looked at, 8/13/14;

8    is that right?

9    A.      Correct.

10            MS. REMIS:  And then let's go to Government

11   Exhibit 125 at 81, please.

12   BY MS. REMIS:

13   Q.      And what are we looking at here?

14   A.      This is a discharge letter issued to Michael Adams,

15   dated September 24th, 2014.

16   Q.      And what's the reason for discharge?

17   A.      "Having none of the prescribed medications in your

18   system and testing positive for Methadone, which is not

19   prescribed by this facility to you at this time."

20   Q.      Okay.  And, again, does it say, "Emergency care does

21   not include narcotics"?

22   A.      Yes.

23            MS. REMIS:  Okay.  Let's take a look at

24   Government Exhibit 125 at 82, please.  125 at 82.  If you

25   could blow this up.  Thank you.

Smith - Direct

1   BY MS. REMIS:

2   Q.      What is this?

3   A.      These are two prescriptions issued to Michael Adams

4   by Dr. Titus, both dated September 24th, 2014.

5   Q.      Okay.  And that's about 14 days after the prior

6   prescription?

7   A.      Correct.

8   Q.      And the same day as the discharge letter?

9   A.      Yes.

10  Q.      And what is it for?

11  A.      The first is for 160 Oxycodone 15-milligram tablets;

12  and the second is for 60 Oxycontin ten-milligram tablets.

13          MS. REMIS:  If we could put, Ms. Leal,

14  Government Exhibit 125 at 87 next to Government Exhibit 125

15  at 82, please.  125.  Sorry.

16  BY MS. REMIS:

17  Q.      Agent Smith, these are the two most recent

18  prescriptions we looked at; right?

19  A.      Yes.

20  Q.      September 10th, 2014 and September 24th, 2014?

21  A.      Yes.

22  Q.      And the one on the left, the September 10th, 2014,

23  that's before the discharge letter; right?

24  A.      That's correct.

25  Q.      And the one to the right is on the same day as the

Smith - Direct

1  discharge letter?

2  A.    That's correct.

3  Q.    What's the difference between these two

4  prescriptions?

5  A.    The -- we'll start with the Oxycontin prescriptions.

6  The earlier prescription on September 10th is for 30

7  Oxycontin ten-milligram tablets; however, the prescription

8  issued on the 24th is for twice that amount, 60 tablets.

9           And regarding the Oxycodone prescriptions, the

10  same could be said.  On the left, there is 80

11  prescription -- 80 pills, 15-milligram tablets, and the one

12  on the right, the later prescription is double for to -- 160

13  pills.

14  Q.    Okay.  And the one on the right says one-month

15  supply; right?

16  A.    Correct.

17  Q.    But it's double the amount in the previous

18  prescription; right?

19  A.    That's correct.

20           MS. REMIS:  Okay.  Let's go to Government

21  Exhibit 12, please.

22  BY MS. REMIS:

23  Q.    What are we looking at here?

24  A.    Okay.  The -- start in the middle with the warning

25  letter kind of in the background there.  That is a warning

595

Smith - Direct

1    letter to Michael Adams.  It was back on September 20 --

2    sorry, September 9th, 2014, again, warning Mr. Adams that he

3    has medications in his system that are not prescribed by

4    Dr. Titus.

5             And then moving -- that's, again, supported by

6    the document on the left, which is the urine drug screening,

7    which, again, shows not only was Methadone and EDDP in his

8    system that wasn't prescribed, but Oxycodone, the one

9    drug -- one of the drugs that was prescribed to him, was not

10   detected.

11            And so -- and then moving over to the right, we

12   have a discharge letter issued by Dr. Titus, September 24th,

13   2014, saying that Mr. Adams is going to be discharged from

14   the practice.  And two prescriptions issued to Mr. Adams

15   that same day.

16   Q.    And that prescription is double the prior

17   prescription; right?

18   A.    That is correct.

19   Q.    And are these the -- is this the prescription that is

20   listed in Count 12 of the indictment?

21   A.    Yes.

22            MS. REMIS:  Let's go to Government Exhibit 127,

23   please.

24   BY MS. REMIS:

25   Q.    And what are we looking at here?

Smith - Direct

1   A.      This is the patient file for Lucille Moody.

2   Q.      And did Ms. Moody have two files?

3   A.      Yes, she did.

4           MS. REMIS:  Let's look at Government

5   Exhibit 128, please.

6   BY MS. REMIS:

7   Q.      Is this the second one?

8   A.      Yes.

9   Q.      Where were these files found at?

10  A.      One of the files was located within Ms. Walters'

11  residence, and the other was located within the storage

12  unit.

13  Q.      Do you remember which one was which?

14  A.      I do not.

15          MS. REMIS:  Okay.  Let's look at Government

16  Exhibit 128, Page 131, please.

17  BY MS. REMIS:

18  Q.      What are we looking at here?

19  A.      These are two prescriptions issued by Dr. Titus to

20  Lucille Moody, both dated September 29th, 2014.  And also,

21  on the bottom, there is an appointment card for Ms. Moody,

22  dated for October the 6th.

23  Q.      Okay.  So that's a little less than -- it's about a

24  week after that; right?

25  A.      One week, yes.

597

Smith - Direct

1    Q.     And what does it say on that appointment card?

2    A.     It has "bring pills and patches."

3    Q.     Okay.  If you could tell us -- I don't -- I might

4    have missed it, but did you read what the prescription was

5    for?

6    A.     Yes, it was -- the first is for 70 Oxycodone

7    15-milligram tablets; and the one on the right is for ten

8    100-microgram Fentanyl patches.

9              MS. REMIS:  Okay.  Let's go to Government

10   Exhibit 128 at 259, please.

11   BY MS. REMIS:

12   Q.     And what are we looking at here?

13   A.     This is a lab result for Ms. Moody.

14   Q.     And when was the specimen collected?

15   A.     September 29th, 2014.

16   Q.     And was that the same day as the prescription we just

17   looked at?

18   A.     Yes.

19   Q.     And when was it recorded?

20   A.     October 1st, 2014.

21   Q.     Okay.  Now, up at the top there's a fax date, it

22   looks like?

23   A.     Yes.

24   Q.     What's that?

25   A.     October 23rd, 2014, at 12:50 p.m.

Smith - Direct

1          MS. REMIS:  Okay.  If we could go to Government

2  Exhibit 128 at 258, please.

3  BY MS. REMIS:

4  Q.     What are we looking at here?

5  A.     This is a warning letter issued to -- by Dr. Titus to

6  Lucille Moody, dated October 2nd, 2014.

7  Q.     Okay.  And that's before, it looks like, those

8  results were ready on the October 1st, 20 -- sorry, the

9  September 29th, 2014, drug screen; right?

10         MS. KOUSOULIS:  Your Honor, I'll just object to

11  the leading questions.  I haven't up until this point,

12  but...

13         THE COURT:  Well, they're records and so I'm

14  going to overrule the objection.

15         THE WITNESS:  I'm sorry.  Can you restate the

16  question?

17  BY MS. REMIS:

18  Q.     Sure.  This is dated October 2nd, 2014; is that

19  right?

20  A.     Yes.

21  Q.     And is that before or after the fax date on the drug

22  screen we just looked at?

23  A.     I'm sorry.  Could you bring that -- bring that back

24  up, please?

25  Q.     Sure.  That was Exhibit 128 at 259.

599

Smith - Direct

1    A.      Yes, that would have been before the fax date on this

2    report.

3    Q.      But after the reported date?

4    A.      Correct.

5    Q.      And you don't know when the fax actually came

6    through, do you?

7    A.      I do not.

8    Q.      And what is this for?

9    A.      This is a warning letter, again, for the absence of

10   the medication prescribed by Dr. Titus, specifically

11   Fentanyl.

12          MS. REMIS:  Okay.  If we could look at

13   Government Exhibit 128 at 126, please.  Oh, I'm sorry.

14   Actually, if you could just go out of this highlight.

15   BY MS. REMIS:

16   Q.      At the bottom right-hand corner, what does it say?

17   A.      It says "Patient counseled on 10/27/14."

18   Q.      Based on your participation in the investigation, can

19   you tell whose handwriting that is?

20   A.      Dr. Titus'.

21   Q.      Okay.  So the counsel -- so the letter is dated

22   October 2nd, 2014, but the note is saying counseled on

23   10/27/14?

24   A.      Yes.

25   Q.      According to that first prescription we looked at,

Smith - Direct

1    which was on Page 128 -- 131, I'm sorry, Page 131, does it

2    say when Ms. Moody was supposed to come back into the

3    office?

4    A.     October the 6th.

5              MS. REMIS:  Okay.  And let's go to Government

6    Exhibit 128 at Page 126, please.

7    BY MS. REMIS:

8    Q.     What are we looking at here?

9    A.     These are two prescriptions issued by Dr. Titus to

10   Lucille Moody, both dated October 27th, 2014.  And also, at

11   the bottom is an appointment card for Ms. Moody, dated

12   November 24th.

13   Q.     So 70 Oxy 15, ten Fentanyl 100 micrograms?

14   A.     Correct.

15   Q.     Is that the same exact prescription as the month

16   before?

17   A.     Yes.

18   Q.     And there's another appointment letter here; is that

19   right?

20   A.     Yes.

21             MS. REMIS:  Let's go to Government Exhibit 13,

22   please.

23   BY MS. REMIS:

24   Q.     What are we looking at here?

25   A.     Okay.  We'll start with the urine drug screening --

Smith - Direct

1    or the laboratory result on the left.  Again, it was

2    collected on September 29th, 2014, reported October 1st,

3    2014.  And, again, shows that the Fentanyl prescribed by

4    Dr. Titus was not detected in Lucille Moody's system.

5            Then moving over to the warning letter on

6    October the 2nd, 2014, and, again, a letter issued by

7    Dr. Titus to Lucille Moody indicating that the medications

8    were absent, specifically the Fentanyl was absent from her

9    system.  And a further notation that she was counseled

10   regarding this on 10/27/14.

11           And then, finally, we have two prescriptions

12   issued to Ms. Moody on October 27th, 2014.

13   Q.    And there was an appointment card on the 10/27/14

14   prescription for another appointment; right?

15   A.    Correct.

16           MS. REMIS:  Let's go to Government Exhibit 130,

17   please.

18   BY MS. REMIS:

19   Q.    And what are we looking at here?

20   A.    This is the patient file for Melissa Silbereisen.

21           MS. REMIS:  And let's go to Page 113 --

22   BY MS. REMIS:

23   Q.    Where was this found?  Sorry.

24   A.    The storage unit.

25           MS. REMIS:  Let's go to Page 113, please.

602

Smith - Direct

1   BY MS. REMIS:

2   Q.    And if you could walk the jury through this lab

3   result?

4   A.    Yes.  This is a lab result from Melissa Silbereisen.

5   It was collected on August 19th, 2014, and the report date

6   is listed as August 25th, 2014.  There are three, what they

7   refer to, as not anticipated results or inconsistent results

8   from this urine -- from this screen.  The first is for

9   Naloxone, then Morphine, then Hydromorphone.

10  Q.    And what was inconsistent about them?

11  A.    They were not prescribed by Dr. Titus.

12        MS. REMIS:  And let's go to Government

13  Exhibit 130 at 120, please.

14  BY MS. REMIS:

15  Q.    What is this?

16  A.    This is a prescription issued by Dr. Titus to Melissa

17  Silbereisen, dated September 30th, 2014, for 74 Oxycodone

18  15-milligram tablets.

19  Q.    Okay.  And is this after the date that the drug

20  screen said it was recorded?

21  A.    Yes.

22        MS. REMIS:  Sorry.  Let's just go back to 113

23  for just a second.

24  BY MS. REMIS:

25  Q.    Up at the top, do you see that fax line?

603

Smith - Direct

1   A.      Yes.

2   Q.      Do you know what -- what's the date on it?

3   A.      October 13th, 2014.

4   Q.      Do you know whether this is the date that it was

5   faxed to Dr. Titus or somewhere else?

6   A.      I do not.

7               MS. REMIS:  Okay.  Let's go back to Government

8   Exhibit 130 at 110, please.

9   BY MS. REMIS:

10  Q.      What's the date on this?

11  A.      The date is October 9th, 2014.

12  Q.      And what does it say or what kind of letter is this?

13  A.      This is a discharge letter to Melissa Silbereisen.

14  Q.      Okay.  And what is the rationale for discharge?

15  A.      "The use of Naloxone, which is a violation of your

16  treatment agreement, which you signed before receiving any

17  treatment from this practice."

18  Q.      And what's the address on Lighthouse Internal

19  Medicine here?

20  A.      10 North Church Ave, Milford.

21  Q.      Now, Naloxone wasn't the only drug that was positive,

22  but not prescribed on that drug screen, was it?

23  A.      Correct.  There were two others.

24  Q.      Do you remember what those were?

25  A.      I'd have to refer back to the document.

604

Smith - Direct

1        MS. REMIS:  Can we look at 113 briefly, please?

2        THE WITNESS:  Yes, thank you.  The two

3   additional drugs were Morphine and Hydromorphone.

4   BY MS. REMIS:

5   Q.      Does Hydromorphone have a more common name?

6   A.      Opana is a -- is a typical name of the drug for

7   Hydromorphone.

8        MS. REMIS:  If we could go to Government

9   Exhibit 130 at 112, please.

10   BY MS. REMIS:

11   Q.      What are we looking at here?

12   A.      These are two prescriptions issued to Melissa

13   Silbereisen on -- by Dr. Titus on October 14th, 2014.

14   Q.      Okay.  And what are these for?

15   A.      The first is for 74 Oxycodone 15-milligram tablets;

16   and the second is for ten 100-microgram Fentanyl patches.

17   Q.      Is that actually more Oxycodone than were prescribed

18   the prior month, in October?

19   A.      Yes.

20   Q.      And that is 10/14/14, so about five days after the

21   discharge letter?

22   A.      Correct.

23        MS. REMIS:  Let's go to Government Exhibit 130

24   at 111, please.

25   BY MS. REMIS:

Smith - Direct

1    Q.      And what are we looking at here?

2    A.      This is a prescription issued by Dr. Titus to Melissa

3    Silbereisen, dated October 30th, 2014.

4    Q.      And what for?

5    A.      This is for 74 Oxycodone 15-milligram tablets.

6    Q.      Okay.  And how many days or weeks is this after the

7    discharge letter?

8    A.      I'm sorry.  Can we refer back to the letter, please?

9    Q.      Sure.

10          MS. REMIS:  It's Page 110, please.

11          THE WITNESS:  This appears to be 21 days after

12   the discharge letter, or three weeks.

13   BY MS. REMIS:

14   Q.      So two prescriptions after the discharge, both for 74

15   Oxy 15; is that right?

16   A.      That's right.

17   Q.      And the one -- and one of them also had ten Fentanyl

18   patches on it?

19   A.      Correct.

20          MS. REMIS:  Let's go to Government 14, please.

21   BY MS. REMIS:

22   Q.      What are we looking at here?

23   A.      Yeah.  So we'll start over here on the left with the

24   toxicology results.  Again, as we discussed, this is showing

25   that she tested positive for three different drugs that were

Smith - Direct

1    not prescribed to her, Naloxone, Morphine, and

2    Hydromorphone.

3              The -- in the middle is a discharge letter that

4    is dated October 9th, 2014, to Ms. Silbereisen from

5    Dr. Titus.  And, again, indicating she's being discharged

6    from the practice due to her inconsistent toxicology screen.

7    And then approximately three weeks later is a prescription

8    dated October 30th, 2014, for 74 Oxycodone 15-milligram

9    tablets.

10   Q.    And what's not on this is also the other prescription

11   from October 14th, 2014; right?

12   A.     Correct.

13   Q.    Okay.  And this is the prescription that supports

14   Count 14 in the indictment?

15   A.     Correct.

16              MS. REMIS:  I want to pull up again Government

17   Exhibit 614, please.

18   BY MS. REMIS:

19   Q.     Have you seen this document before?

20   A.     Yes, I have.

21   Q.     What is it?

22   A.     This is a Consent Agreement between Dr. Titus and the

23   Delaware Secretary of State.

24              MS. REMIS:  Okay.  And if we could go to -- if

25   you could scroll down.  Can you scroll?

Smith - Direct

1              Okay.  Stop right there, please.

2    BY MS. REMIS:

3    Q.     Under Paragraph 9, what does it say about -- in the

4    first sentence -- if you could just read the first

5    paragraph, under nine?

6    A.     "In consideration of the fact that Dr. Titus'

7    controlled substance registration has been suspended since

8    December 8, 2011, Dr. Titus and the State of Delaware agree

9    that the suspension of his controlled substances

10   registration shall be withdrawn upon showing that

11   reinstating his registration is not consistent with public

12   interest."

13   Q.     And it says "including all of the following"; right?

14   A.     Including all of the following.

15   Q.     And then down at the bottom, it says "two, Dr." --

16   can you read that part?

17   A.     Sure.

18              THE COURT:  Just for the record, it doesn't say

19   not consistent, it says not inconsistent.

20              MS. REMIS:  Oh, I'm sorry.  I missed that, Your

21   Honor.

22              THE WITNESS:  Thank you, Your Honor.

23   BY MS. REMIS:

24   Q.     So "not inconsistent with the public interest,

25   including all of the following"; is that right?

Smith - Direct

1    A.      Yes.

2    Q.      Okay.  So number two, down below.

3    A.      "Dr. Titus will require toxicology screens in his

4    treatment of patients."

5            MS. REMIS:  Okay.  And if we could go to --

6    scroll down a little bit more, please.

7    BY MS. REMIS:

8    Q.      And then what's the rest of that sentence up at the

9    top?

10   A.      "And will provide copies of any vendor agreements

11   entered into for the purpose of providing toxicology screens

12   or implementing other controls."

13           MS. REMIS:  Okay.  And if you could exit out of

14   that big part, please.  If you could scroll down a little

15   bit more, please.  Okay.  And stop.

16   BY MS. REMIS:

17   Q.      If you could just read Paragraph E, please.

18   A.      "Dr. Titus' controlled substance registration will be

19   reinstated as soon as possible after the secretary is

20   satisfied that Dr. Titus' registration is not inconsistent

21   with the public interest."

22           MS. REMIS:  Okay.  And if we could go to the

23   last page, please.

24   BY MS. REMIS:

25   Q.      What is the date of the signature on this Consent

Smith - Direct

1    Agreement?

2    A.      March 22nd, 2012.

3              MS. REMIS:  Okay.  If we could go again, just to

4    Government Exhibit 1 and Government Exhibit 14 side by side,

5    please.

6    BY MS. REMIS:

7    Q.    Is Count 1 the earliest date of a prescription listed

8    in the indictment?

9    A.      Yes, August 7th, 2013.

10   Q.    And then what about Count 14, is that the latest

11   date?

12   A.      Yes.  August -- I'm sorry, October 30th, 2014.

13   Q.    Are the prescriptions that we looked at that support

14   Counts 1 through Count -- Count 1 through Count 14 before or

15   after the Consent Agreement we just looked at?

16   A.      After.

17   Q.      All of them?

18   A.      Yes.

19              MS. REMIS:  Okay.  Let's go to Government --

20   BY MS. REMIS:

21   Q.      Actually, let me ask you this:  Aside from patient

22   files, what other types of records were seized at the search

23   warrant?

24   A.      Could you specify the search warrant location?

25   Q.      Oh, sure.  At the three search warrants on

610

Smith - Direct

1    January 30th, 2015.

2    A.    Yes.  So in addition to the patient files, there were

3    other documents relating to the office.  There were some

4    handwritten documents that were located and things of that

5    nature.

6              MS. REMIS:  Okay.  May I have a moment to confer

7    with counsel, Your Honor?

8              THE COURT:  Yes.

9              MS. REMIS:  Your Honor, I'd like to just move

10   all of the exhibits I'm going to use into evidence for

11   efficiency.  It's Exhibits 200 through 202.  203 and 204 are

12   already in.  And then 205 through 213, please, Your Honor.

13             THE COURT:  All right.  So they're admitted

14   without objection.

15             MS. KOUSOULIS:  Correct, Your Honor.  No

16   objection.

17             MS. REMIS:  Thank you.

18        (Government Exhibit Nos. 200 through 202 were

19   admitted into evidence.)

20        (Government Exhibit Nos. 205 through 213 were

21   admitted into evidence.)

22             MS. REMIS:  All right.  Let's take a look at

23   Government Exhibit 201, please.

24   BY MS. REMIS:

25   Q.    What are we looking at here?

611

Smith - Direct

1   A.      This is a non-binding letter of intent between

2   Dr. Titus and Mobious Investments LLC.

3   Q.      Do you know what Mobious Investments LLC is?

4   A.      They are the owners of the property at 10 Church

5   Street or Church Ave in Milford.

6   Q.      Okay.  Is that the soon-to-be-location of Lighthouse

7   Internal Medicine?

8   A.      Yes.

9   Q.      Okay.  What's the date of this?

10  A.      October 28th, 2013.

11  Q.      And if you look down at Number 4, what is the address

12  that the letter of intent relates to?

13  A.      It says Draper Building, 10-12 North Church Street,

14  Milford, Delaware 19963.

15  Q.      And where was this document recovered?

16  A.      From the storage unit.

17  Q.      Okay.  And under "Use," what does it say there?

18  A.      "The tenant shall only use the premises" -- "use the

19  premises as" -- "premises as a doctor's office."

20  Q.      Okay.  And under "Base Rent" under Number 6, what

21  does it say the base rent will be?

22  A.      Minimum $3,800 per month.

23          MS. REMIS:  Okay.  Let's go to the second page

24  of this document, please.

25  BY MS. REMIS:

612

Smith - Direct

1    Q.     It says -- down at the bottom, it says, "agreed and

2    acknowledged."  Whose name is on the right?

3    A.     Dr.  Patrick Titus.

4    Q.     Okay.  And what's the date?

5    A.     October 28th, 2013.

6    Q.     And who's on the left?

7    A.     Alexander Berardi.

8    Q.     And is he just -- does it appear he's an employee for

9    Mobious Investments?

10   A.     Yes.

11   Q.     And that's the property manager?

12   A.     Correct.

13            MS. REMIS:  Let's go to Government Exhibit 202,

14   please.

15   BY MS. REMIS:

16   Q.     What is this document?

17   A.     This is a lease agreement signed between Mobious

18   Investments and Dr. Titus for the lease of the practice

19   location for Lighthouse Internal Medicine.

20   Q.     And what's the date of the lease agreement up at the

21   top?

22   A.     Dated November 4th, 2013.

23            MS. REMIS:  Okay.  And if we could go to --

24   BY MS. REMIS:

25   Q.     Or where was this found, this document?

613

Smith - Direct

1    A.      This document was also found in the storage unit.

2              MS. REMIS:  Okay.  Let's go to the last page,

3    which I can't remember what page it is.  If you could keep

4    scrolling.  Thank you.

5              Twenty-one, please.  Thank you.

6              Actually, if we could go up maybe three pages,

7    keep going.  Keep going.  One more.  Two more.  There you

8    go.  Thank you.

9    BY MS. REMIS:

10   Q.      So we're looking at Government Exhibit 202 at 15;

11   right?

12   A.      Yes.

13   Q.      And who signs as Mobious Investments, or what's the

14   name there?

15   A.      Alexander G. Berardi.

16   Q.      And it says "Property Manager"?

17   A.      Yes.

18   Q.      And what about Lighthouse Internal Medicine?

19   A.      Patrick A. Titus, M.D.

20   Q.      And what's his title listed there?

21   A.      President.

22   Q.      Okay.  And -- okay.

23             MS. REMIS:  Let's move to Government

24   Exhibit 213, please.

25   BY MS. REMIS:

Smith - Direct

1    Q.      What are we looking at here?

2    A.      This is the model policy for the use of controlled

3    substances for the treatment of pain.

4    Q.      And what's it say underneath that?

5    A.      It's issued by the Federation of the State Medical

6    Boards of the United States.

7    Q.      And where was this found?

8    A.      Josie Walters' residence.

9              MS. REMIS:  Okay.  If we could just pull up next

10   to this Government Exhibit 614, please.  And I believe it's

11   at page -- I think it's Page 2.  Yeah.

12   BY MS. REMIS:

13   Q.      This says "Model Policy for the Use of Controlled

14   Substances For the Treatment of Pain"; right?

15   A.      Yes.

16   Q.      Is that the same policy that's listed on the right in

17   this -- is this the Consent Decree on the right?

18   A.      Yes, it is.

19   Q.      Is this the same policy that's listed on the right

20   under Paragraph 9A?

21   A.      Yes.

22   Q.      Okay.  Thank you.

23            And, again, where did you say you found this

24   document?

25   A.      Josie Walters' residence.

615

Smith - Direct

1            MS. REMIS:  Okay.  Let's go to Government

2   Exhibit 209, please.

3   BY MS. REMIS:

4   Q.     What is this?

5   A.     This is the MSD Guidelines for the Use of Controlled

6   Substances for the Treatment of Pain.

7   Q.     Okay.  And do you see -- where was this found?

8   A.     Dr. Titus' residence.

9   Q.     Okay.  Do you see some handwriting on here?

10  A.     Yes.

11  Q.     Do you recognize, from your experience in the

12  investigation, whose handwriting it is?

13  A.     Yes.

14            MS. REMIS:  Okay.  If we could scroll down to

15  Page 3, please.

16  BY MS. REMIS:

17  Q.     And there's some checkmarks and underlining and

18  things like that?

19  A.     Yes.

20  Q.     Were those checkmarks and underlines there when you

21  seized this document from Dr. Titus' home?

22  A.     Yes, they were.

23  Q.     And if you could just read what's underlined under --

24  in the middle?

25  A.     If we could blow that up, it might be helpful.

Smith - Direct

1    "Evaluation of the patient.  A medical history and physical

2    examination must be obtained, evaluated, and documented in

3    the medical record."

4    Q.    And you can keep going.

5    A.    "The evaluation must document:  Etiology, the nature

6    and intensity of the pain; current and past treatments for

7    pain; underlying or co-existing diseases or conditions; the

8    effect of the pain on physical and psychological function

9    and history of substance abuse; and the presence of one or

10   more recognized medical indications for the use of a

11   controlled substance."

12               MS. REMIS:  Okay.  And if we could go out of

13   that blowup, please.

14   BY MS. REMIS:

15   Q.    And then under there, there's a section called

16   "Treatment Plan"; right?

17   A.    Yes.

18   Q.    Sorry.  One above that.  Yeah.  And if you could just

19   read the first sentence.

20   A.    "A treatment plan should be discussed and should

21   include goals and objectives that will be used to determine

22   treatment outcomes such as pain relief and improved physical

23   and psychological function, and should indicate if any

24   further diagnostic evaluations or other treatments are

25   planned."

Smith - Direct

1    Q.      Okay.  And -- sorry, if you could keep going.

2    A.      "The treatment plan should address whether treatment

3    modalities or a rehabilitation program are necessary,

4    depending on the etiology of the pain and the extent to

5    which the pain is associated with physical and psychological

6    impairment."

7    Q.      And I think it says "psychosocial impairment"?

8    A.      Psychosocial.  Thank you.

9    Q.      Okay.  And the last sentence?

10   A.      "After treatment begins, the practitioner should

11   adjust drug therapy to the individual medical needs of each

12   patient."

13            MS. REMIS:  Okay.  If we could exit out of that,

14   please.

15   BY MS. REMIS:

16   Q.      And then could you please read the underlined portion

17   under 2.2?

18   A.      "Chronic pain treatment requires monitoring the

19   effects of the medication on pain levels and patient's level

20   of functioning."

21   Q.      And so these two parts are discussing treatment

22   plans; right?

23   A.      Yes.

24            MS. REMIS:  If we could just go back to

25   Government Exhibit 116 at Page 88.

Smith - Direct

1    BY MS. REMIS:

2    Q.    Do you remember looking at these files earlier?

3    A.    Yes.

4    Q.    And do you recall what patient this is associated

5    with?

6    A.    Donald Meck.

7    Q.    Okay.  Under "Treatment Objectives," is this blank

8    other than A/P?

9    A.    Yes.

10   Q.    Okay.  And did we look at a few of these earlier

11   today?

12   A.    Yes, we did.

13   Q.    And were these all essentially blank other than A/P

14   under "Treatment Objectives"?

15   A.    There were several that were blank besides A/P, and

16   we did also look at an example where there was some

17   notations made afterwards.

18        MS. REMIS:  Okay.  And let's go back to --

19   that's all for Government Exhibit 209.  We can exit out of

20   this one as well.

21   BY MS. REMIS:

22   Q.    Do you know what a CME is or what CME stands for?

23   A.    Continuing medical education.

24   Q.    Okay.  During the course of the search warrant, did

25   DEA seize any CME certificates?

Smith - Direct

1    A.      Yes, we did.

2            MS. REMIS:  Okay.  Let's pull up Government

3    Exhibit 206, please.  Okay.

4    BY MS. REMIS:

5    Q.      And what are we looking at here?

6    A.      This is a "Certificate of Continuing Professional

7    Education" issued to Dr. Titus.

8    Q.      Okay.  And does this document have multiple pages?

9    A.      It does.

10   Q.      What is the date on this first page, up at the

11   top-right corner or top right?

12   A.      Yes.  September 30th, 2010.

13   Q.      And whose name is on it?

14   A.      Patrick A. Titus, M.D.

15   Q.      Okay.  And what are these -- what's listed below

16   here?

17   A.      The different course works for the continuing

18   professional education courses completed.  It lists dates

19   which the training was completed, the titles of the types of

20   training that was received, test results, and what that

21   particular training qualifies for.

22   Q.      Okay.  And all of these, what do they qualify for?

23   A.      Pain management.

24   Q.      What day were all of them taken?

25   A.      September 30th, 2010.

Smith - Direct

1           MS. REMIS:  Okay.  And if you could go down to

2     the next page, please.  Keep going, please.  Okay.

3     BY MS. REMIS:

4     Q.     And sorry this is sideways, but what is this?

5     A.     This is a certificate of credit issued by Dr. -- to

6     Dr. Titus for a course titled "The Safe Use of Opioids in

7     the Treatment of Pain."

8     Q.     And what's the date?

9     A.     August 14th, 2014.

10          MS. REMIS:  Okay.  And if we could go to the

11    next page, please.

12    BY MS. REMIS:

13    Q.     What is the date on this certificate right there?

14    A.     August 14th, 2014.

15    Q.     And who is it certifying completed this or

16    participated in the educational activity?

17    A.     Patrick Titus, M.D.

18    Q.     Okay.  What's the title there?

19    A.     "ER/LA Opioid REMS:  Achieving Safe Use While

20    Improving Patient Care" with a completion date of

21    August 14th, 2014.

22    Q.     Do you know what ER/LA stands for?

23    A.     Extended release/long-acting.

24    Q.     Okay.  Do you know what REMS stands for?

25    A.     I do not.

Smith - Direct

1          MS. REMIS:  Okay.  If we could go to the next

2     page, please.

3     BY MS. REMIS:

4     Q.     And, again, what's the date here and what's this for?

5     A.     It's another continuing medical education certificate

6     issued to Dr. Titus.  Taught course title is "Does Poor Pain

7     Management Prevail in Primary Care," dated August 14th,

8     2014.

9     Q.     Does Poor Pain Management Prevail in Primary Care?

10    A.     Correct.

11    Q.     Okay.  And August 14th, 2014?

12    A.     Yes.

13          MS. REMIS:  Could you go to the next page,

14    please?

15    BY MS. REMIS:

16    Q.     What are -- what's this one?

17    A.     This is another CME issued to Dr. Titus for the

18    course title "Module IV:  Talk to me:  Proven Methods to

19    Counsel You Patients on ER/LA Opioids and Achieve Positive

20    Outcomes," dated August 14th, 2014.

21    Q.     And, again, ER/LA is extended release/long-acting?

22    A.     Yes.

23          MS. REMIS:  Okay.  If we could go to the next

24    page, please.

25    BY MS. REMIS:

Smith - Direct

1    Q.      What's this one?

2    A.      Another CME.  This one is titled "Module II:  Best

3    Practices For How to Start Therapy with ER/LA Opioids, How

4    to Stop, and What to Do in Between," issued to Dr. Titus

5    August 14th, 2014.

6    Q.      And that's all.  And then the next page, please?

7    A.      Yes.  This is another -- a CME issued to Dr. Titus,

8    dated August 14th, 2014, titled "Module III:  Evidence-Based

9    Tools for Screening for Patients at Risk and Monitoring for

10   Adherence to Prescribed ER/LA Opioids."

11   Q.      Again, extended release/long-acting?

12   A.      Yes.

13   Q.      What's the date?

14   A.      August 14th, 2014.

15   Q.      Okay.  So we just looked at eight pages of CME

16   certificates; right?

17   A.      Yes.

18   Q.      How many of those were for August 14th, 2014?

19   A.      I'd have to look at that again.  I'm sorry.

20          MS. REMIS:  Okay.  So if we can go back to

21   Page 3, please.  And you can scroll.

22   BY MS. REMIS:

23   Q.      Can you count as we scroll?

24   A.      Yes.

25   Q.      Okay.  One?

Smith - Direct

1    A.    One.   Okay.

2              MS. REMIS:  Next page.

3              THE WITNESS:  Okay.  Okay.  Yes.  Yes.

4    BY MS. REMIS:

5    Q.    Six?

6    A.    Six.

7    Q.    Okay.  Great.

8              Did --

9              MS. REMIS:  Can we also pull up Government

10   Exhibit 619, please?

11   BY MS. REMIS:

12   Q.    What are these; do you know?

13   A.    These are certificates issued by the American Pain

14   Society.

15   Q.    And were these obtained from somewhere other than the

16   search warrant?

17   A.    Yes.

18   Q.    Where from?

19   A.    They were obtained -- I believe we had a trial

20   subpoena to the entities that carried out the curriculum for

21   Dr. Titus.

22   Q.    Okay.

23             MS. KOUSOULIS:  I'm sorry.

24             MS. REMIS:  Sorry, I can be more clear.  This is

25   Government Exhibit 619.

624

Smith - Direct

 1          MS. KOUSOULIS:  Oh, okay.

 2          MS. REMIS:  And these are already in evidence.

 3   BY MS. REMIS:

 4   Q.     And let's go through -- before coming to court today,

 5   did you review the pages in this document?

 6   A.     Yes.

 7   Q.     How many pages are there?

 8   A.     I'm sorry, I don't recall.

 9          MS. REMIS:  Can we go to Exhibit 619 at Page 23,

10   please?

11   BY MS. REMIS:

12   Q.     This is the last page of the document.

13   A.     Twenty-three.

14          MS. REMIS:  And just one moment, Your Honor.

15   May I approach, Your Honor?

16          THE COURT:  Yes.

17          THE WITNESS:  Thank you.

18   BY MS. REMIS:

19   Q.     Okay.  Did you review these before coming to testify

20   today?

21   A.     Yes.

22   Q.     And did you sort them by -- can you just generally

23   say what's in there?

24   A.     Yes.  These are the continuing education certificates

25   for various courses, all issued to Dr. Titus on various

625

Smith - Direct

1    dates.

2    Q.    Okay.  And these were provided by the State.

3                And so what is the date on -- what are the dates

4    on which these certificates show Dr. Titus took his CMEs?

5    A.    The first date would be August 14th, 2014.  There

6    were additional courses that were taken on August 26th,

7    2014.  And I believe there's one other date, if you'll give

8    me one moment.

9    Q.    Sure.

10   A.    August 25th, 2014.

11   Q.    So August 26th, August 25th, and August 14th?

12   A.    Correct.

13   Q.    And I'm sorry to ask you to do this, but how many are

14   on each date?

15   A.    Okay.  I'll need a moment.

16   Q.    Yes.  Go ahead.

17   A.    I have approximately 18 certificates from

18   August 14th, 2014.

19   Q.    Okay.

20   A.    And I have three certificates -- I'm sorry, four

21   certificates from August 25th, 2014, and one certificate

22   from August 26th, 2014.

23               MS. REMIS:  Okay.  Let's take a look at

24   Government Exhibit 200, please.

25   BY MS. REMIS:

Smith - Direct

1    Q.      Before coming to court today, did you review this

2    exhibit?

3    A.      Yes, I did.

4    Q.      Is it a big exhibit or a small exhibit?

5    A.      Big.

6           MS. REMIS:  Okay.  If we can go to Government

7    Exhibit -- this exhibit at Page 653 -- or sorry.  653, I

8    believe.  It's the last page of the exhibit.

9           THE WITNESS:  Yes.

10   BY MS. REMIS:

11   Q.      So are there 653 pages?

12   A.      Yes.

13          MS. REMIS:  Okay.  If we go back to Page 1, that

14   would be great, please.

15   BY MS. REMIS:

16   Q.      What's in Exhibit 200, generally?

17   A.      Generally, this is a tracking sheet which details on

18   various particular dates how many patients were seen at the

19   office, the total amount of cash that was collected during

20   the course of the day, the checks that were -- the amount of

21   any checks that were collected, credit cards, transaction

22   totals, and for a grand total of front desk money, and

23   the -- and then it details by patient, not by name, but just

24   by amount, what the various transactions were, be they for

25   cash, check, or credit.

Smith - Direct

1    Q.    Okay.  And you're just detailing what's on the face

2    of this form; right?  You don't have any personal knowledge

3    of what the purpose was?

4    A.    No.

5              MS. REMIS:  Okay.  If we can go to the next

6    page, please.

7    BY MS. REMIS:

8    Q.    Were there additional forms that looked like this

9    included in Government Exhibit 200?

10   A.    Yes.

11   Q.    And are they arranged by date?

12   A.    Yes, they are.

13             MS. REMIS:  Okay.  Let's go to Government

14   Exhibit --

15   BY MS. REMIS:

16   Q.    And where were these documents that make up

17   Government Exhibit 200 found?

18   A.    They were located in a couple different locations,

19   both at Dr. Titus' residence and at Josie Walters'

20   residence.  So this is a conglomeration of the documents put

21   together.

22             MS. REMIS:  Okay.  And if we can go --

23   BY MS. REMIS:

24   Q.    So this is -- the first date, what is the date listed

25   here?

Smith - Direct

1    A.      December 31st, 2012.

2              MS. REMIS:  And if we could go back to

3    Government Exhibit -- to 560, please.  Page 5.  No, sorry,

4    650.

5    BY MS. REMIS:

6    Q.      What's the last date listed up at the top?

7    A.      November 5th, 2014.

8    Q.      Okay.  And are they in date order?

9    A.      Yes.

10             MS. REMIS:  Okay.  Let's look at Government

11   Exhibit 200, Page 570, please.

12   BY MS. REMIS:

13   Q.      What's the date on this form?

14   A.      August 14th, 2014.

15   Q.      And does that date stand out to you for any reason?

16   A.      Yes, it does.

17   Q.      Why?

18   A.      Because it's the date we've just discussed where

19   Dr. Titus had completed the numerous continuing medical

20   education courses.

21   Q.      And you said 18; right?

22   A.      Eighteen.

23   Q.      Okay.  And how many patients does this form -- does

24   this document show were seen at the office?

25   A.      Twenty-seven.

Smith - Direct

1   Q.     Okay.  And how much cash in total or how much total

2   front desk money was brought in on that day?

3   A.     2,224.

4          MS. REMIS:  Okay.  And let's go to the same

5   exhibit, Page 577, please.

6   BY MS. REMIS:

7   Q.     What date is this?

8   A.     August 25th, 2014.

9   Q.     Okay.  And does this date stand out?

10  A.     Yes, that's another date in which Dr. Titus, I

11  believe, specified he had completed, it looks like, six

12  continuing medical education courses on that date.

13  Q.     I think before you said four.

14  A.     Let me -- can I get one moment, please?

15  Q.     Sure.  Sorry.  Sorry to make you do that again.

16  A.     Yes, that's correct.  It was four courses.

17  Q.     Okay.  And how many patients, according to this

18  document, were seen at the office on this day?

19  A.     Forty.

20  Q.     Okay.  And how much total cash, total front desk

21  money was brought in?

22  A.     5,229.

23  Q.     Okay.  Just while we're looking at it, what's the

24  range of amounts on cash payments on this document here?

25  A.     The lowest amount that I see on this particular

630
Smith - Direct

1    document on this page is $22.  And it looks like the largest

2    amount I see is $245.

3              MS. REMIS:  And if we could go Page 579, please.

4    BY MS. REMIS:

5    Q.    Is this also for August 25th, 2014?

6    A.    Yes.

7    Q.    How many patients -- or what time, according to this

8    document, was the first patient seen?

9    A.    5:30 a.m.

10             MS. REMIS:  If you can blow it up, I think it

11   says something different.

12             THE WITNESS:  Sorry.  5:50 a.m.

13   BY MS. REMIS:

14   Q.    Okay.  And on this sheet, when is the last one?

15   A.    2:00 p.m.

16   Q.    Okay.  And the patient is slotted for 1:50?

17   A.    Correct.

18   Q.    How many patients between 5:50 a.m. and 1:50 p.m.?

19   A.    Thirty-four.

20             MS. REMIS:  Okay.  And if you could exit out of

21   that, please.

22   BY MS. REMIS:

23   Q.    If you just look down the patient names, it says --

24   does it say pain next to some of them?

25   A.    Yes.  In fact, the -- if you give me a moment.  It

Smith - Direct

1    does specify that there was one walk-in, there was a pill

2    count, a couple of follow-up visits, and the new patient.

3    But several do list pain.

4    Q.    Okay.  And what were the time increments between

5    patients here?

6    A.    Ten minutes.

7              MS. REMIS:  Okay.  Now, if we could go to the

8    next page, please, 580.  The top part.  Great.

9    BY MS. REMIS:

10   Q.    How many patients between 2:10 and 3:20?

11   A.    Six.

12   Q.    Okay.  And mostly for pain?

13   A.    They all specify pain.

14   Q.    Okay.  And how much -- what's the range of payments

15   there?  Or actually, strike that, Your Honor.

16              So for a total number of how many patients

17   listed there?

18   A.    Total number is 40.

19   Q.    Okay.  And, again, ten-minute increments?

20   A.    Yes.

21   Q.    Okay.  Aside from these types of documents, did DEA

22   seize any other documents that tracked cash payments?

23   A.    Yes, we did.

24   Q.    And --

25              MS. REMIS:  May I have a moment, Your Honor?

Smith - Direct

1                        THE COURT:  Yes.

2                        MS. REMIS:  Your Honor, may my colleague, Justin

3    Woodard, approach to carry a box?

4                        THE COURT:  Yes.

5                        MS. REMIS:  Thank you.  Thank you so much.

6    BY MS. REMIS:

7    Q.      Okay.  Agent Smith, what is in the box?

8    A.      These are spiral-bound notebooks with receipts,

9    carbon copies.  Each of them contain 200 carbon sets.  And

10   there's handwritten notations on the back of each indicating

11   date range of the receipts included there -- therein.

12   Q.      And what's the date range on the one you are holding?

13   A.      November 21st, 2013.

14   Q.      Okay.  And then can you look at the end of that

15   package that's in there and tell me what the date is on the

16   last one?

17   A.      The last one is -- the ending date on that is

18   December 15th, 2014.

19   Q.      So November '13 through December '14?

20   A.      Correct.

21   Q.      And how many of those notebooks are in there?

22   A.      Let me just count.  I counted 33.

23   Q.      Okay.  And how many -- according to the front of that

24   notebook, how many receipts are in each book?

25   A.      Two hundred.

Smith - Direct

1    Q.      Okay.  Can you tell me about how many total receipts

2    that is from November 2013 through December 2014?

3    A.      Over 6,000.

4    Q.      Okay.  Now, you mentioned yesterday that before you

5    were on the TDS Squad, you investigated just regular illicit

6    drug cases; right?

7    A.      That's right.

8    Q.      When you investigated those cases, did you ever see

9    that those drug dealers, for lack of a better term,

10   maintained some sort of receipt log or receipt book?

11   A.      Yes.

12   Q.      How frequently?

13   A.      On most search warrants, it would be very frequent

14   that we would encounter what we refer to as pay/owe sheets

15   where drug dealers would keep track of money owed to them by

16   various individuals.  So I would say it was very common in

17   search warrants that we've conducted in the course of my

18   career.

19              MS. REMIS:  Okay.  Let's take a look at

20   Government Exhibit 204, please.

21   BY MS. REMIS:

22   Q.      What's in Exhibit 204?

23   A.      This is a copy of the receipt books with the receipts

24   referenced for it.

25   Q.      Okay.  And did you pull these pages?

Smith - Direct

1    A.      Yes, I did.

2    Q.      And what were you looking for specifically?

3    A.      I was looking for receipts for the -- for patients,

4    and counts from the -- listed in the 1 through 4 of the -- 1

5    through 14 of the indictment.

6    Q.      Okay.  So on Page 1, do you see Brent Hood there?

7    A.      Yes, I do.

8    Q.      Is he the patient listed in Count 1 in the

9    indictment?

10   A.      Yes.

11   Q.      What's the date of that receipt?

12   A.      August 7th, 2013.

13   Q.      And how much does this receipt show that he paid?

14   A.      $155.

15   Q.      And what box is checked there right there?  Sorry,

16   payment method?

17   A.      Cash.

18            MS. REMIS:  Okay.  Let's go to Page 3, please.

19   BY MS. REMIS:

20   Q.      And at the bottom there is Maryjane Mench; is that

21   right?

22   A.      Yes.

23   Q.      And Maryjane Mench is associated with Count 4.

24   What's the date there?

25   A.      December 9th, 2013.

Smith - Direct

1    Q.    And how much money, according to this receipt, did

2    Maryjane Mench pay?

3    A.    It's like $21.

4    Q.    Do you have any knowledge of why it's 21 versus

5    something like 150 that we looked at before?

6    A.    No, I do not.

7            MS. REMIS:  Okay.  Let's go to Page 2, please.

8    And if we can highlight the second one down for Dione

9    Dickerson.

10   BY MS. REMIS:

11   Q.    And Ms. Dickerson is associated with Count 5 of the

12   indictment?

13   A.    Yes.

14   Q.    And what's the date of this receipt?

15   A.    December 18th, 2013.

16   Q.    And how much money?

17   A.    $155.

18   Q.    And what form of payment?

19   A.    Credit card.

20           MS. REMIS:  Okay.  Let's go to Page 4, please.

21   And if we could highlight Gregg Smith.

22   BY MS. REMIS:

23   Q.    And what's the date there?

24   A.    April 3rd, 2014.

25   Q.    Is that the date of Count 7 listed in the indictment?

Smith - Direct

1    A.    Yes.

2    Q.    And how much did Gregg Smith pay, according to this

3    receipt?

4    A.    $180 cash.

5          MS. REMIS:  Okay.  Let's go to Page 5, please.

6    BY MS. REMIS:

7    Q.    Third one down, Donald Meck?

8    A.    Yes.

9    Q.    And what's the date there?

10   A.    April 22nd, 2014.

11   Q.    And is that the date associated with Count 8 in the

12   indictment?

13   A.    Yes.

14   Q.    Again, how much money?

15   A.    $22 cash.

16         MS. REMIS:  Okay.  And Page 6, please.  If you

17   could highlight the second one.

18   BY MS. REMIS:

19   Q.    Who's that?

20   A.    Tracie Owens.

21   Q.    On what date?

22   A.    July 22nd, 2014.

23   Q.    And is that associated with Count 11?

24   A.    Yes.

25   Q.    How much money did Ms. Owens pay, according to this

Smith - Direct

1    receipt?

2    A.    $180 via credit card.

3              MS. REMIS:   Okay.   And the next page, please.

4    Right at the bottom.

5    BY MS. REMIS:

6    Q.    Who is this?

7    A.    Michael Adams.

8    Q.    And on what date?

9    A.    September 24th, 2014.

10   Q.    And is that associated with Count 12?

11   A.    Yes.

12   Q.    How much?

13   A.    $150 via credit card.

14   Q.    Okay.   Great.

15             MS. REMIS:   And then last page, please.   If we

16   could highlight the third one down, please.

17   BY MS. REMIS:

18   Q.    Who is that?

19   A.    Lucille Moody.

20   Q.    And what is the date?

21   A.    October 27th, 2014.

22   Q.    And is that associated with Count 13?

23   A.    Yes.

24   Q.    And how much money?

25   A.    $22 cash.

Smith - Direct

1    Q.    Okay.  And, again, do you know why some paid 22, some

2    paid 27, some paid 155, 150, 180?

3    A.    I do not.

4    Q.    Okay.  All right.

5              MS. REMIS:  Let's go to Government Exhibit 205,

6    please.

7              Your Honor, I don't know if you're waiting on me

8    to suggest a break, but --

9              THE COURT:  Well, I was thinking in a few

10   minutes, but this is a fine time.

11             MS. REMIS:  Okay.

12             THE COURT:  So members of the jury, why don't we

13   take our morning break of 15 minutes.  So come on back at

14   11:25.

15             (Jury leaving the courtroom.)

16             THE COURT:  So, yes, it's fine to suggest when

17   we should take a break.

18             MS. REMIS:  Okay.  Sorry.

19             THE COURT:  No, no.  It's fine.

20             MS. REMIS:  I didn't want to be presumptuous.

21             THE COURT:  No, no, no.  So it's good.  The main

22   thing to keep in mind is, I've sort of divided into four

23   one-and-a-half-hour increments.  The first one in the

24   morning, the first one in the afternoon, or I could go

25   beyond that hour and a half because I'm one of those people

Smith - Direct

1    that likes to get more than 50 percent done in time, so you

2    have less to do the second half.

3                MS. REMIS:  I'm with you.

4                THE COURT:  So in any event --

5                MS. REMIS:  Okay.  Thank you.

6                THE COURT:  And if you suggest it and for some

7    reason I say no, I'll be nice about it.

8                MS. REMIS:  I've had all sorts of experiences,

9    Your Honor, so I wasn't sure where you --

10               THE COURT:  So we'll be in recess for a few

11   minutes.  Well, until -- what did I say?

12               MR. WOODARD:  25 --

13               THE COURT:  25 after 11:00.

14               MS. REMIS:  Okay.  Thank you, Your Honor.

15               DEPUTY CLERK:  All rise.

16               (Recess was taken.)

17               DEPUTY CLERK:  All rise.

18               THE COURT:  All right.  Are we ready to begin?

19               MS. REMIS:  Yes, Your Honor.

20               THE COURT:  All right.  Let's get the jury.

21               And, Ms. Remis, for what it's worth, in terms of

22   just, you know, if you want to call the -- if you're still

23   doing direct in another hour and a half, you know, I'll be

24   trying to get as close to one o'clock as I can.

25               MS. REMIS:  Yes, sir.  Will do.

Smith - Direct

1              MR. WOODARD:  Your Honor, I have the

2      transcripts, if I could approach.

3              THE COURT:  Sure.  Yeah, yeah, yeah.  But I take

4      it this is now an agreed transcript?

5              MR. WOODARD:  Yes, Your Honor.

6              MS. KOUSOULIS:  Yes.

7              THE COURT:  Thank you.

8              MR. WOODARD:  I believe there's 15, in case

9      anyone --

10              THE COURT:  No, that's all right.  I'm good.

11              Why don't you not hand them out now.  You know,

12      they'll start reading it or doing something else.

13              MR. WOODARD:  And I think the court reporter

14      indicated she would appreciate it.

15              THE COURT:  So give her one.

16              DEPUTY CLERK:  Thank you.

17              (Jury entering the courtroom.)

18              THE COURT:  All right.  Everyone, welcome back.

19              Ms. Remis, you may proceed.

20              Everyone be seated.

21              MS. REMIS:  Thank you, Your Honor.

22      BY MS. REMIS:

23      Q.    Special Agent Smith, before we broke for a few

24      minutes, we were talking about cash and credit card

25      payments.

Smith - Direct

1    A.    Yes.

2    Q.    Do you remember that?

3          I'm showing you Government Exhibit 205.  What

4    are we looking at here?

5    A.    This is a credit card transaction receipt for Michael

6    Adams.

7    Q.    Okay.  And how much is it for?

8    A.    $180.

9    Q.    And what's the date on it?

10   A.    April 9th, 2014.

11   Q.    And what's the address associated with Lighthouse?

12   A.    10 North Church Ave, Milford, Delaware.

13          MS. REMIS:  Okay.  And if we can go to Page 2,

14   please.

15   BY MS. REMIS:

16   Q.    Also a credit card receipt?

17   A.    Yes.

18   Q.    And who for?

19   A.    This is for Melissa Silbereisen.

20   Q.    On what date?

21   A.    March 3rd, 2014.

22   Q.    And how much is that for?

23   A.    $180.

24   Q.    Okay.

25          MS. REMIS:  And on the last page, please.

642

Smith - Direct

1    BY MS. REMIS:

2    Q.      Who's this for?

3    A.      This is an additional receipt for Melissa

4    Silbereisen, dated March 31st, 2014, $180.

5    Q.      And that's at Lighthouse on 10 North Church Street?

6    A.      Yes.

7    Q.      Okay.  And where were these receipts seized from?

8    A.      The storage unit.

9    Q.      Okay.

10            MS. REMIS:  I'd like to pull up Government

11   Exhibit 210, please.

12   BY MS. REMIS:

13   Q.      This is a four-page document.  Where was this found?

14   A.      Dr. Titus' residence.

15   Q.      And based on your experience or your participation in

16   this investigation, whose handwriting does this appear to

17   be?

18   A.      Dr. Titus.

19   Q.      Okay.  Now, all the way in the left-hand column on

20   this page, there's different notations next to the word

21   "year."

22            What is that?  What do those say?

23   A.      It lists year one through year six.

24   Q.      Okay.  And what are the -- is there a year?

25   A.      Yes.

Smith - Direct

1   Q.     What are those?

2   A.     Year one is 2012 to 2013, and they expand one year

3   each out to year seven, which is 2018 to 2019.

4   Q.     Okay.

5           MS. REMIS:  And if we could pull out of that a

6   little bit.

7   BY MS. REMIS:

8   Q.     What are -- can you read any of the words next to

9   these numbers in the second -- for example, in the second

10  year, it says -- what does it say down there?

11  A.     If you could -- thank you.  I see words "expenses

12  spent."

13  Q.     Okay.

14  A.     I see other names.

15  Q.     And then other than that, is it mostly numbers?

16  A.     Yes.

17  Q.     Do you see any specific names?

18  A.     I see David.

19  Q.     Okay.

20  A.     And Ryan.

21  Q.     Okay.

22          MS. REMIS:  And if we could go to Page 4 of this

23  exhibit, please.

24  BY MS. REMIS:

25  Q.     What does it say in the circle there?

644
Smith - Direct

1   A.      "Retire with 4,322,000 at age 71."

2   Q.      Okay.  And then down at the bottom, on the bottom

3   right corner, there's some more notations there.  Do you see

4   that?

5   A.      Yes.

6   Q.      What does that say?

7   A.      "Without touching 4,033,000 in cash."

8   Q.      Okay.  And let's -- do you know what the significance

9   of any of this is?

10  A.      I do not.

11  Q.      Where did you say you recovered it from?

12  A.      Dr. Titus' residence.

13  Q.      Did you find any other document similar to this one

14  in your search?

15  A.      Yes.

16  Q.      Okay.

17          MS. REMIS:  Let's go to Government Exhibit 211,

18  please.

19  BY MS. REMIS:

20  Q.      According to your participation on this

21  investigation, whose handwriting does this appear to be?

22  A.      Dr. Titus.

23  Q.      And where was this found?

24  A.      Within his residence.

25  Q.      Okay.  And up at the top, there's two things circled.

Smith - Direct

1    Do you see that?  Two numbers circled?

2    A.    Yes.

3    Q.    What is that?

4    A.    It says one year, two year.

5    Q.    Okay.  And then in the different sort of boxes below,

6    what is it -- if you can read any of those notations?

7    A.    It says -- lists some different year ranges.  So, for

8    instance, year 2014 to 2015, year 2015 to 2016, again,

9    extending yearly up until year 2019, 2020 at the bottom.

10   Q.    Okay.  And then right next to the exhibit sticker,

11   there's -- it says words starting with "save."  Can you read

12   that?

13   A.    Save 1 million of 2020.

14   Q.    Okay.  And then at the bottom of the page start --

15   it's sort of bottom middle.

16          MS. REMIS:  If you could make that part bigger,

17   Ms. Leal.  Thank you.

18   BY MS. REMIS:

19   Q.    What does that say?

20   A.    "Leave inheritance to grandchildren."

21   Q.    And underneath that?

22   A.    "Leave legacy at Howard University."

23   Q.    And then under that?

24   A.    "Live off, invest equals retire with 4,950,000."

25   Q.    And you said "live off, invest."  Could that be a

Smith - Direct

1    different word or are you not sure?

2    A.     I'm not sure.

3    Q.     Okay.

4            MS. REMIS:  And then if we could go out of that

5    one.

6    BY MS. REMIS:

7    Q.     And then right above it, one over from save 1

8    million, to the right.  Do you see that?

9            MS. REMIS:  If you could make that part bigger.

10   BY MS. REMIS:

11   Q.     What does that say?

12   A.     "Retire with $4.3 million by myself."

13   Q.     Okay.  And where did you say you seized this document

14   from?

15   A.     Dr. Titus' residence.

16   Q.     Okay.  And do you know the significance of this?

17   A.     I do not.

18   Q.     During the course of the search warrant, did you have

19   the opportunity to interview Dr. Titus?

20   A.     Yes.

21   Q.     Okay.  And was anyone else present with you from law

22   enforcement who interviewed him?

23   A.     Yes.

24   Q.     Where were you when you conducted that interview?

25   A.     In Dr. Titus' kitchen.

Smith - Direct

1    Q.     Okay.  And who else was with you?

2    A.     Diversion Investigator Linda Eleazer.

3    Q.     Okay.

4               MS. REMIS:  Your Honor, we've provided the

5    courtroom deputy with transcripts, if they could be

6    presented to the jury.

7               THE COURT:  All right.  So if we could hand out

8    the transcripts.

9               Don't start reading the transcript.

10              THE JUROR:  No, no.

11              THE COURT:  I have something I need to tell you

12   when they're all handed out.

13              All right.  So what I wanted to tell you is

14   this:  So I believe the Government is going to play some

15   recordings, and the transcript is supposed to be a

16   transcript of the recordings that they're going to play, but

17   the transcripts are not evidence.

18              The reason you're getting them is to help you

19   follow and maybe identify the speakers and, you know, help

20   you listen.  At the end, you're not going to have the

21   transcripts with you in the jury room, and they are not the

22   evidence.  The evidence is whatever it is you actually hear

23   on the recordings.  And so if you don't hear things on the

24   recordings that are in the transcripts, you should ignore

25   what is in the transcripts.  Okay?  And hopefully the audio

Smith - Direct

1    quality will be good, but I don't know.

2              All right.  Are you ready to go, Ms. Remis?

3              MS. REMIS:  Yes, I am, Your Honor.

4    BY MS. REMIS:

5    Q.    Special Agent Smith, is one of the topics that you

6    discussed with Dr. Titus drug testing and discharge

7    policies?

8    A.    Yes.

9    Q.    Okay.  Let's go ahead and play Government

10   Exhibit 301, which is I believe the first excerpt.

11             (Whereupon Government Exhibit No. 301 was

12   played.)

13   BY MS. REMIS:

14   Q.    Special Agent Smith, who was the woman's voice on

15   there?

16   A.    Linda Eleazer.

17   Q.    And is she a diversion investigator.

18   A.    Yes.

19   Q.    Is she sitting right there?

20   A.    Yes.

21   Q.    And whose was the man's voice?

22   A.    Dr. Titus.

23   Q.    Okay.  Did you ask a couple other questions about

24   drug discharges and the policies of the clinic?

25   A.    Yes.

Smith - Direct

1    MS. REMIS:  If we could go to Government

2    Exhibit 304, which I believe is the third excerpt in the

3    transcript that's been provided to the jury.  It starts at

4    minute 46:25.  So that's Exhibit 304.

5    MS. LEAL:  It should be --

6    MS. REMIS:  They should be in order in the

7    transcripts.

8    If we could play 304, please.

9    (Whereupon Government Exhibit No. 304 was

10   played.

11   BY MS. REMIS:

12   Q.    Now, in that excerpt, there was some talk of doctor

13   hopping or doctor shopping.  What is that?

14   A.    It's when individuals will go to multiple doctors,

15   often seeking the same medications, and ultimately in the

16   hopes that they can obtain those medications from multiple

17   providers simultaneously.

18   Q.    Okay.  And was there also discussions about warnings

19   from pharmacists?

20   A.    Yes.

21   Q.    And did Dr. Titus acknowledge that he had sometimes

22   received those?

23   A.    Yes.

24   Q.    And then there was discussion at the end about

25   counseling and discharge letters; right?

Smith - Direct

1    A.      Correct.

2    Q.      And are those the letters that we've spent a lot of

3    time going through earlier?

4    A.      Yes, they are.

5    Q.      Okay.  There was also what sounded like a little

6    kid's voice; is that right?

7    A.      Yes.

8    Q.      Was there a child around?

9    A.      Yes.

10   Q.      And who was that?

11   A.      It was Victoria Titus' child, his wife's child.

12   Q.      Okay.  An ex-wife?

13   A.      Ex-wife.

14   Q.      Okay.  And then would there -- just one other excerpt

15   where you talked about drug testing and discharges and

16   things like that?

17   A.      Yes.

18           MS. REMIS:  Okay.  If we could pull up

19   Government Exhibit 302, please.  I believe that starts

20   around 34 or 48.  Yeah, can you play it.

21           (Whereupon Government Exhibit No. 302 was

22   played.)

23   BY MS. REMIS:

24   Q.      I'd like to go through some of the statements that

25   Dr. Titus made.  Give me one quick moment, please.

651
Smith - Direct

1           Right at the end of the recording, there was

2    some discussion about, I believe it was Dr. Titus said that

3    he'll counsel once.  Is that right?

4    A.     Yes.

5    Q.     And that some doctors have a three strike policy, but

6    Dr. Titus thought it was too liberal?

7    A.     Correct.

8    Q.     Okay.

9           MS. REMIS:  Let's take a look at Government

10   Exhibit 123, please.

11   BY MS. REMIS:

12   Q.     Whose patient file is this?

13   A.     Tracie Owens.

14   Q.     And did we look extensively at Tracie Owens' patient

15   file before?

16   A.     Yes.

17   Q.     And if you give me just one moment, please.

18           MS. REMIS:  Could we please look at Government

19   Exhibit 123 at Page 345, please.

20   BY MS. REMIS:

21   Q.     And is this the warning letter we looked at from

22   March 10th, 2014?

23   A.     Yes, it is.

24   Q.     And, again, this is absence of medications

25   prescribed?

652

Smith - Direct

1    A.    Correct.

2              MS. REMIS:  And let's look at Government

3    Exhibit 123 at 33, please.  Oh, sorry.  That's not right.

4    123 at -- just give me one moment.  I'm sorry.  337, please.

5    By MS. REMIS:

6    Q.    And is this June 3rd, 2014, another warning letter?

7    A.    Correct.

8    Q.    And it says "2nd one"?

9    A.    Correct.

10   Q.    Okay.  And, again, this is for absence of medications

11   prescribed?

12   A.    Correct.

13             MS. REMIS:  And if we could go to Government

14   Exhibit 123 at Page 329, please.

15   BY MS. REMIS:

16   Q.    Again, this is a warning letter, June 30th, 2014?

17   A.    Yes.

18   Q.    And what does it say at the top there?

19   A.    "3rd notice."

20   Q.    Okay.  And we already looked at some of the

21   prescriptions following that.  This is Tracie Owens.  So we

22   looked at the July 22nd, 2014, prescription.

23             MS. REMIS:  Which is on Page 1 -- Page 207,

24   please.

25   BY MS. REMIS:

Smith - Direct

1    Q.    And this is about a month after that warning letter;

2    right?

3    A.    Correct.

4    Q.    Okay.

5           MS. REMIS:  And then if we could go to

6    Government Exhibit 123, Page 208, please.  That's not right.

7    Try Page 201.

8           There we go.

9    BY MS. REMIS:

10   Q.    What's the date on this prescription?

11   A.    August 19th, 2014.

12   Q.    Okay.  So that's about two months after that third

13   notice warning letter?

14   A.    Correct.

15   Q.    Okay.  And what about -- and what's the prescription

16   for?

17   A.    120 Oxycodone 15-milligram tablets.

18   Q.    Okay.  And there's an appointment reminder at the

19   bottom there?

20   A.    Yes.

21   Q.    What about Government Exhibit 123 at Page 195, what

22   is the date here?

23   A.    Another prescription.  This one is September 16th,

24   2014.

25   Q.    Okay.  And what's it for?

Smith - Direct

1    A.      120 Oxycodone 15 pills.

2    Q.      Okay.  So that's about three months after the third

3    notice warning letter?

4    A.      Correct.

5    Q.      Okay.  What about Government Exhibit 123 at Page 189,

6    please, what do we see here?

7    A.      This is another prescription for 120 Oxycodone

8    15-milligram pills, dated October 20th, 2014.

9    Q.      Okay.  And same exact prescription as in July,

10   August, and September?

11   A.      Yes.

12   Q.      And, again, this is four months after the third

13   notice?

14   A.      Correct.  Four months.

15   Q.      And is there another notice there of another upcoming

16   appointment?

17   A.      Yes, there is.

18   Q.      And when was that supposed to be?

19   A.      November 17th.

20   Q.      Okay.  So approximately how many Oxycodone pills did

21   Dr. Titus prescribe Tracie Owens after her third warning in

22   June of 2014?

23   A.      By my calculations, it would be approximately 480.

24   Q.      So there's four prescriptions each with 120; right?

25   A.      Right.

Smith - Direct

1    Q.     Which is 480 --

2    A.     Yes.

3    Q.     -- correct?  You're right.

4    A.     Thank you.

5    Q.     Okay.

6           MS. REMIS:  So let's also take a look at

7    Government Exhibit 128 at 214, please.

8    BY MS. REMIS:

9    Q.     Who's patient file are we looking at here?

10   A.     Lucille Moody.

11   Q.     Okay.  And when we were talking about counseling

12   letters, again, there was some -- there was a discussion in

13   this -- in the recording that it was counseling once, that

14   three strikes is too liberal; is that right?

15   A.     That's correct.

16   Q.     And that people generally get -- let me just make

17   sure.  What was said about discharging after heroin or

18   cocaine?

19   A.     That it would be an automatic discharge.

20          MS. REMIS:  Let's go to Government Exhibit 128

21   at 214.

22   BY MS. REMIS:

23   Q.     And what we are we looking at here?

24   A.     It's a prescription for Lucille Moody for

25   September 24th, 2013, 90 Oxycodone 15 pills.

Smith - Direct

1    Q.    Okay.

2              MS. REMIS:  And if we could go back to

3    Government Exhibit 128 at 208, please.

4    BY MS. REMIS:

5    Q.    And what are we looking at here?

6    A.    Two prescriptions to Lucille Moody.  One is for the

7    ten Fentanyl patches, and the other is for the 90 Oxycodone

8    15-milligram pills.

9    Q.    And what is the date on the prescription?

10   A.    November 25th, 2013.

11   Q.    Okay.  And what about Government Exhibit 128 at

12   two -- sorry.  Just one moment, please.  Okay.  I'm sorry.

13             MS. REMIS:  Let's go to Government Exhibit 128

14   at 282, please.

15   BY MS. REMIS:

16   Q.    What is the date here?

17   A.    9/29 -- I'm sorry.  Up top is dated 9/10/2013.

18   Q.    Okay.  And down at the bottom, there's two other

19   dates.  What year are those?

20   A.    2014.

21   Q.    Do you have any knowledge of why the date at the top

22   says '13 versus the other ones say '14?

23   A.    I do not.

24   Q.    Okay.  What is this letter?

25   A.    This is a warning letter issued by Dr. Titus to

Smith - Direct

1    Lucille Moody for the testing of an illicit drug, cocaine.

2    Q.    Okay.  And what does it say under patient?

3    A.    "Per Dr. Titus, patient did not have to sign."

4    Q.    And what's the -- excuse me.  What's the date there?

5    A.    September 29th, 2014.

6    Q.    Okay.  And what does it say underneath there,

7    "patient discharged"?

8    A.    "Patient discharged today, September 29th, 2014."

9    Q.    Okay.  So the date at the top is September 10th.  The

10   date at the bottom is September 29th; is that right?

11   A.    Correct.

12             MS. REMIS:  Let's look at Government

13   Exhibit 128, Page 135, please.  Oh, sorry, I mean, Page 130.

14   BY MS. REMIS:

15   Q.    And what's the date of this prescription?

16   A.    October 13th, 2014.

17   Q.    And what's the prescription for?

18   A.    70 Oxycodone 15-milligram tablets.

19             MS. REMIS:  And then if we could just go back

20   one to Government Exhibit 128 at 258, please.

21   BY MS. REMIS:

22   Q.    What is this?

23   A.    This is a counseling letter or warning letter dated

24   October 2nd, 2014.

25   Q.    Okay.  And what is the counseling letter for?

Smith - Direct

1    A.      "The absence of the medications prescribed to you by

2    this facility."

3    Q.      Okay.  And at the bottom there, there's some

4    handwriting at the corner.  What does that say?

5    A.      "Patient counseled on October 27th, 2014."

6    Q.      Okay.  And this is after we read that note on the

7    other warning letter saying that the patient had been

8    discharged on September 29th, 2014?

9    A.      That's correct.

10   Q.      Okay.  And if we could go -- we just looked at a

11   prescription from October 13th, 2014; right?

12   A.      Yes.

13   Q.      And that's after this date?

14   A.      Yes.

15          MS. REMIS:  And now, can we look at Page 126,

16   please?

17   BY MS. REMIS:

18   Q.      And what is the date of the prescription there?

19   A.      October 27th, 2014.

20   Q.      Okay.  And what is the prescription for?

21   A.      One is for 70 Oxycodone 15-milligram pills, and the

22   other is for ten Fentanyl patches.

23   Q.      Okay.  And just to go back to that warning letter we

24   just looked at, it said that Ms. Moody failed her test

25   because she had no Fentanyl in her system; right?

Smith - Direct

1    A.      That's correct.

2    Q.      And then later that month, another prescription for

3    Fentanyl?

4    A.      Correct.

5    Q.      And down at the bottom, what is that there?

6    A.      It's an appointment card for November 24th.

7    Q.      Okay.  So this is multiple prescriptions after a

8    warning letter for absence of Fentanyl in October of 2014;

9    right?

10   A.      Yes.

11   Q.      And that's after the patient was said to be

12   discharged on September 29th, 2014?

13   A.      Yes.

14   Q.      Okay.  Now, I want to go through one more example, if

15   we can.

16            MS. REMIS:  And I'd like to take a look at

17   Government Exhibit 104, Page 10, please.

18   BY MS. REMIS:

19   Q.      And, again, we are -- we just listened to the snippet

20   about discharges related to heroin and cocaine; right?

21   A.      Yes.

22   Q.      And, again, what was the policy according to

23   Dr. Titus?

24   A.      Automatic discharge.

25   Q.      And I'd like you, as we go through this, to keep a

Smith - Direct

1  tally of how many prescriptions we're going to look at.

2  Okay?

3  A.     Can I take a note?

4  Q.     Yes.

5  A.     Thank you.

6  Q.     Do you have a pen?

7  A.     Yes, I do.

8  Q.     Okay.  Great.  What are we looking at here?

9          First of all, who are we talking about?

10 A.     This is Delores Perry.

11 Q.     Okay.  And what is this?

12 A.     This is a toxicology screen result.

13 Q.     Okay.  What does it show?

14 A.     It shows that it tested positive for illicit drug,

15 cocaine.

16 Q.     Okay.  And on what date?

17 A.     That was on -- that was collected on July 8th and the

18 report is dated July 11th, 2013.

19 Q.     And illicit drug, cocaine, that's one of the drugs

20 that was discussed in the recording; right?

21 A.     Yes.

22          MS. REMIS:  Let's go to Page 27 -- 28 of that

23 same file, please.

24 BY MS. REMIS:

25 Q.     And what is this prescription for or what's the date,

Smith - Direct

1    I should say?

2    A.    July 8th, 2013.

3    Q.    So that's the same date as the drug test?

4    A.    Yes.

5    Q.    And what's it for?

6    A.    It is for 75 Oxycodone 15s and 30 Morphine pills.

7    Q.    What strength?

8    A.    Fifteen milligrams.

9    Q.    Okay.

10           MS. REMIS:  And then let's go to Page 27,

11   please.

12   BY MS. REMIS:

13   Q.    What's the date on this prescription?

14   A.    July 22nd, 2013.

15   Q.    Okay.  And about how many days after the receipt of

16   the -- or the date that the drug test that it was faxed are

17   we at, if you remember?

18   A.    I have to go back and look at that fax date again.

19   I'm sorry.

20           MS. REMIS:  Can we go back and look at Page 10,

21   please?

22           THE WITNESS:  Yes, so that was reported on

23   July 11th, so it would have been approximately 11 days

24   later.

25   BY MS. REMIS:

Smith - Direct

1    Q.     Okay.  And going back to -- and just the fax line up

2    at the top also says July 11th; right?

3    A.     Yes.

4    Q.     Okay.

5          MS. REMIS:  If we could go back to Page 27,

6    please.

7    BY MS. REMIS:

8    Q.     So we're 11 days later.  And what is -- what is this?

9    A.     Prescription one is for 30 Morphine 15-milligram

10   pills, and the other is for 75 Oxycodone 15.

11   Q.     Okay.  So this is the same prescription that was

12   issued on July 8th, 2013; right?

13   A.     Correct.

14   Q.     But the first prescription issued after the receipt

15   of this -- the cocaine drug test; right?

16   A.     Correct.

17   Q.     Okay.  So let's count that as number one.

18   A.     Yes.

19          MS. REMIS:  Go on to Page 21, please.  Okay.

20   BY MS. REMIS:

21   Q.     And what are we looking at here?

22   A.     Prescriptions dated August 5th, 2013 --

23   Q.     Okay.

24   A.     -- for Delores Perry.

25   Q.     And for what?

Smith - Direct

1    A.    Zanaflex, 120 count.  It looks like four milligrams.

2    Morphine, 30 Morphine pills, 15 milligrams.  And 75

3    Oxycodone 15 milligrams.

4    Q.    All right.  Do you know what Zanaflex is?

5    A.    I believe it's a muscle relaxant.

6    Q.    Okay.  And then what about for the Morphine and the

7    Oxycodone, is that the same prescription as the July 8th,

8    2013, we saw before the drug screen came back?

9    A.    Yes.

10    Q.    And the same one as the previous month?

11    A.    Correct.

12    Q.    And so we're two months out from the drug screen; is

13    that right?

14    A.    Correct.

15    Q.    And so let's mark this as number two.

16          MS. REMIS:  Let's go to Page 20, please.

17    BY MS. REMIS:

18    Q.    What are we looking at here?

19    A.    This is two prescriptions issued to Delores Perry for

20    75 Oxycodone 15-milligram pills, and for 30 Morphine

21    ten-milligram pills.

22    Q.    Okay.  And on what date?

23    A.    August 19th, 2013.

24    Q.    Okay.  And is this the same prescription as we looked

25    at before?

Smith - Direct

1    A.      Yes.

2    Q.      And how many weeks after the previous prescription?

3    A.      That would have been approximately two weeks.

4    Q.      Two weeks after the previous prescription?  And about

5    how long after the fax date of July 11th, 2013?

6    A.      Now, it's approximately five weeks.  A little over

7    five weeks.

8    Q.      Okay.  That's number three.

9            MS. REMIS:  Let's go to Page 19, please.  And

10   sorry that this is sideways.

11           I wonder if you click that little orange arrow

12   on the right.  Just kidding.

13   BY MS. REMIS:

14   Q.      Okay.  Can you read sideways?

15   A.      Yes.

16   Q.      Okay.  What's the date?

17   A.      September 4th, 2013.

18   Q.      And what's the prescription for?

19   A.      One is for Oxycodone, 75 Oxycodone 15-milligram

20   pills, and the other is for 30 Morphine 15-milligram pills.

21   Q.      Okay.  So how many prescriptions are we after the

22   cocaine drug screen?

23   A.      This is number four.

24   Q.      And is it the same amount, same dose and strength and

25   amount of both of these types of pills?

665

Smith - Direct

1    A.      Yes.

2    Q.      Okay.

3            MS. REMIS:  Let's go to Page 9 of the patient

4    file, please.

5    BY MS. REMIS:

6    Q.      What are we looking at here?

7    A.      This is a counseling letter or warning letter issued

8    to Delores Perry on September 14th, 2013.

9    Q.      Okay.  Could you read that date again?

10   A.      September 4th, 2013.

11   Q.      Okay.

12   A.      Thank you.

13   Q.      And what is it counseling Ms. Perry for?

14   A.      A letter for counseling for substance abuse, it

15   specifies, due to her toxicology screening test result and a

16   detection of illicit drug, cocaine.

17   Q.      Okay.  And at the bottom line, second paragraph, what

18   does it say, "please be advised" -- "and be advised."  Just

19   at the bottom.

20   A.      "And be advised that this is your first and only

21   notice regarding this issue."

22   Q.      Okay.  And so September 4th, is that the same day as

23   the prescription we just looked at?

24   A.      Yes.

25   Q.      This is not a discharge letter, is it?

Smith - Direct

1    A.    It is not.

2    Q.    Okay.  According to the patient file, did Dr. Titus

3    continue prescribing even after that warning letter?

4    A.    Yes.

5    Q.    Okay.  And just to keep track, so far how many

6    prescriptions are we at after --

7    A.    Four.

8    Q.    Four.  Okay.

9              MS. REMIS:  Let's look at Government Exhibit 104

10   at 17, please.

11   BY MS. REMIS:

12   Q.    What's the date on this prescription?

13   A.    September 18th, 2013.

14   Q.    Okay.  And what is the prescription for?

15   A.    It is, again, for 30 Morphine 15-milligram pills and

16   75 Oxycodone 15-milligram pills.

17   Q.    Okay.  And what's the date?

18   A.    September 18th, 2013.

19   Q.    Okay.  Again, is this the same prescription as the

20   prior four prescriptions?

21   A.    Yes.

22   Q.    Okay.  And how many months are we out from the

23   cocaine drug screen?

24   A.    Just over two months.

25   Q.    Okay.

Smith - Direct

1          MS. REMIS:  If we could look at Government

2    Exhibit 104 at 1.

3    BY MS. REMIS:

4    Q.    What are we looking at here?

5    A.    This is a discharge letter to Delores Perry, dated

6    October 2nd, 2013.

7    Q.    And why is Delores Perry being discharged?

8    A.     It states that for testing positive for an illegal

9    substance, cocaine.

10   Q.    Okay.  And how many months after she tested positive

11   for cocaine is this discharge letter issued?

12   A.    Over two months.  Approximately two and a half

13   months.

14   Q.    Okay.  That was in July; right?

15   A.    Correct.

16   Q.    And at the bottom, what does it say, "Emergency

17   care"?

18   A.    "Does not include narcotic prescriptions."

19   Q.    Okay.  That wasn't it, was it?

20   A.    No, it was not.

21   Q.    Okay.

22          MS. REMIS:  Let's go to Government Exhibit 104

23   at 6.

24   BY MS. REMIS:

25   Q.    What are we looking at here?

Smith - Direct

1    A.    These are, again, two additional prescriptions.

2    First is 75 Oxycodone 15s.  This other is for 30 Morphine

3    15-milligram pills, dated October 2nd, 2013.

4    Q.    Okay.  And is this, again, the same exact type of

5    drugs, milligrams and number of pills as the other prior

6    prescriptions?

7    A.    Yes, it is.

8    Q.    And what are we up to now?

9    A.    Six.

10   Q.    Okay.

11         MS. REMIS:  Let's go to Government Exhibit --

12   BY MS. REMIS:

13   Q.    And this is -- how many -- how long after the

14   discharge letter are we looking here?

15   A.    Again, the discharge letter was dated that same --

16   same date, October 2nd.

17   Q.    Got you.

18         MS. REMIS:  And if we could go to 104 at 2,

19   please.

20   BY MS. REMIS:

21   Q.    What's the date on this prescription?

22   A.    October 16th, 2013.

23   Q.    Okay.  And what is the prescription for?

24   A.    Same, 30 Morphine 15-milligram pills and 75 Oxycodone

25   15-milligram pills.

669

Smith - Direct

1    Q.     Okay.  And same prescription as before?

2    A.     Correct.

3    Q.     Let's --

4           MS. REMIS:  We can go out of that.

5    BY MS. REMIS:

6    Q.     What number prescription is that?

7    A.     Seven.

8    Q.     Okay.  Each prescription was for how many Oxycodone?

9    A.     Seventy-five.

10   Q.     Okay.  I have my phone calculator, but if you're good

11   at mental math, what is 75 times seven?

12   A.     We do --

13   Q.     Do you want me to give you my phone?

14   A.     No.

15   Q.     Okay.

16   A.     Thank you.

17   Q.     You're welcome.

18   A.     I calculate 425.

19   Q.     I believe it's actually 525; right?  Five -- you know

20   what, the calculator is wrong.  Five times 75.  Wait.  I'm

21   wrong.  Seven times 75.

22   A.     525.

23   Q.     Right?

24   A.     Yes.

25   Q.     Okay.  So that's 525 Oxycodone 15-milligram pills;

Smith - Direct

1    right?

2    A.    Yes.

3    Q.    All prescribed after Ms. Moody tested positive for

4    cocaine?

5    A.    Ms. Perry.

6    Q.    I'm sorry, Ms. Perry tested positive for cocaine?

7    A.    Yes.

8    Q.    And then we have 30 Morphine pills.  And how many

9    prescriptions did you tally?

10   A.    Seven.

11   Q.    Seven?

12   A.    210.

13   Q.    Much easier.

14   A.    Yes.

15   Q.    That's 210 Morphine 15 pills after Ms. Perry tested

16   positive for cocaine?

17   A.    Correct.

18   Q.    Okay.

19         MS. REMIS:  Let's move on to Government

20   Exhibit 303, please, which is another one of the recordings.

21   You can play it.

22         (Whereupon Government Exhibit No. 303 was

23   played.)

24   BY MS. REMIS:

25   Q.    Agent Smith, whose voices -- who was asking the

Smith - Direct

1    questions in that snippet?

2    A.    I was.

3    Q.    And who was answering them?

4    A.    Dr. Titus.

5    Q.    Okay.

6              MS. REMIS:  I want to take a look at Government

7    Exhibit 208, please.

8    BY MS. REMIS:

9    Q.    And just to be clear, how many patients did Dr. Titus

10   say he sees a day?

11   A.    On average, 27.

12   Q.    Okay.

13             MS. REMIS:  And could you pull up Page 208 --

14   Exhibit 208, please?

15   BY MS. REMIS:

16   Q.    Is this a document that was seized during the search

17   warrants?

18   A.    Yes.

19   Q.    What does it say under "Monday through Wednesday"?

20   A.    "Book 47 patients to see 45 patients with the last

21   patient being booked at 5:00 p.m."

22   Q.    And what does it say under Thursday?

23   A.    "Book 38 patients to see 36 patients with the last

24   patient being booked at 3:00 p.m."

25   Q.    Okay.  And earlier during your testimony, we looked

Smith - Direct

1    at Government Exhibit 200.  Do you remember that?

2    A.    Yes.

3    Q.    That was, like, the huge patient file.  It's not --

4    excuse me, not patient file.  The huge --

5    A.    Appointment schedule.

6    Q.    Yes, thank you.

7              MS. REMIS:  And let's go to Government

8    Exhibit 200 at Page 235, please.

9    BY MS. REMIS:

10   Q.    What's the date here?

11   A.    November 7th, 2013.

12   Q.    Okay.  And how many patients, according to this

13   document, were seen on that day?

14   A.    Forty-nine.

15   Q.    Okay.  And how much front desk money was brought in?

16   A.    $5,277.

17   Q.    Okay.

18             MS. REMIS:  Let's go to Government Exhibit 200

19   at Page 249, please.

20   BY MS. REMIS:

21   Q.    What's the date?

22             MS. REMIS:  If you just want to highlight the

23   top for all of these as we go through.

24   BY MS. REMIS:

25   Q.    What's the date here?

Smith - Direct

1    A.    November 14th, 2013.

2    Q.    Okay.  And how many patients total were seen?

3    A.    Forty-seven.

4    Q.    And according to the document, what was the total

5    front desk money?

6    A.    $5,088.70.

7    Q.    Forty-seven is how many more than 27?

8    A.    Twenty.

9    Q.    Okay.

10         MS. REMIS:  Let's go to Government Exhibit 200

11   at Page 282, please.

12   BY MS. REMIS:

13   Q.    And what's the date?

14   A.    November 27th, 2013.

15   Q.    Okay.  And how many total patients seen?

16   A.    Forty-six.

17   Q.    And what's the total front desk money that day?

18   A.    $4,251.22.

19   Q.    Okay.  And just to be clear, we're not going page by

20   page; right?

21   A.    Correct.

22   Q.    So there's some other pages in between?

23   A.    Absolutely.

24   Q.    And did you review sort of the number of patients

25   seen on each day included in this group of appointment

Smith - Direct

1    schedules and documents?

2    A.    Yes.

3    Q.    Okay.  But we're just going through some?

4    A.    Correct.

5    Q.    All right.

6            MS. REMIS:  Let's go to Government Exhibit 200,

7    Page 316.

8    BY MS. REMIS:

9    Q.    And what's the date here?

10   A.    December 12th, 2013.

11   Q.    Okay.  And how many patients seen there?

12   A.    Forty-eight.

13   Q.    And what is the total front desk money?

14   A.    4,920.

15   Q.    Okay.

16           MS. REMIS:  And we can exit out of that one.

17   BY MS. REMIS:

18   Q.    How many more than 27 is 48?

19   A.    Twenty-one.

20   Q.    Okay.

21           MS. REMIS:  Let's go to Government Exhibit 200,

22   Page 358.

23   BY MS. REMIS:

24   Q.    What's the date here?

25   A.    March 19th, 2014.

675

Smith - Direct

1  Q.      How many patients seen?

2  A.      Twenty-seven.

3  Q.      Okay.  And how much money was brought in?

4  A.      $2,740.38.

5  Q.      Fair to say there were a couple days when there were,

6  in fact, 27 patients?

7  A.      Yes.

8  Q.      Were there very many days, based on your review, when

9  there were fewer than 27 patients?

10  A.      No.

11  Q.      Do you recall sort of the general amount of patients

12  that were seen?

13  A.      Most of the -- number of patients that were seen

14  would have been closer to 35 to 40 would be a concerned

15  investment on my part.

16  Q.      Okay.

17          MS. REMIS:  If we could go to Government Exhibit

18  200 at Page 365, please.

19  BY MS. REMIS:

20  Q.      What's the date on this page?

21  A.      April 3rd, 2014.

22  Q.      Okay.  And how many patients?

23  A.      Fifty.

24  Q.      And what's the total amount of cash that the front

25  desk apparently brought in?

Smith - Direct

1    A.       6,251.

2    Q.       Okay.  And how many more than 27 is 50?

3    A.       Twenty-three.

4            MS. REMIS:  Let's go to Government Exhibit 200

5    at Page 447, please.

6    BY MS. REMIS:

7    Q.       And up at the top, what's the date?

8    A.       May 28th, 2014.

9    Q.       And how many patients?

10   A.       Forty-three.

11   Q.       How many didn't show up?

12   A.       Two.

13   Q.       Okay.  And what's the total front desk money?

14   A.       $4,574.74.

15   Q.       Okay.  Fair to say more than 27?

16   A.       Yes.

17           MS. REMIS:  Go to 451, please.

18   BY MS. REMIS:

19   Q.       5/29/2014; is that right?

20   A.       Yes.

21   Q.       And how many patients?

22   A.       Fifty-two.

23   Q.       How many no-shows?

24   A.       One.

25   Q.       And what's the total front desk money?

Smith - Direct

1    A.     $6,297.81.

2    Q.     Okay.

3              MS. REMIS:  And last, let's go to Government

4    Exhibit 200 on Page 548.  548.

5    BY MS. REMIS:

6    Q.     What's the date here?

7    A.     Fifty -- I'm sorry.  July 17th, 2014.

8    Q.     How many patients?

9    A.     Fifty.

10   Q.     And how many no-shows?

11   A.     One.

12   Q.     And what's the total front desk money there?

13   A.     $4,440.45.

14   Q.     Okay.  Fair to say that there were a lot of days

15   where the average was not close to 27?

16   A.     Very fair to say.

17   Q.     Okay.

18             MS. REMIS:  And the last recording is on -- is

19   Government Exhibit 305.  If we could please play that.  And

20   that is -- in the transcript, it should be the last

21   recording in the transcript starting at 149, 15.

22             (Whereupon Government Exhibit No. 305 was

23   played.)

24   BY MS. REMIS:

25   Q.     So, Special Agent Smith, was there two -- a new man's

Smith - Direct

 1    voice in this recording?

 2    A.      Yes.

 3    Q.      Who was that?

 4    A.      Group Supervisor David Hughes.

 5    Q.      Okay.  And was he present at the time of the search,

 6    also?

 7    A.      Yes, he was.

 8    Q.      Did somebody else in this case conduct a financial

 9    analysis?

10    A.      Yes.

11    Q.      Was that person you?

12    A.      It was not.

13    Q.      Okay.  Now, I'd like to move on to just one last

14    topic.  At some point, I think you mentioned way at the

15    beginning of your testimony that you were involved in the

16    arrest of Dr. Titus; is that right?

17    A.      That's correct.

18    Q.      When was he arrested?

19    A.      June 20th, 2018.

20    Q.      About that date?

21    A.      Approximately, yes.

22    Q.      Okay.  Did you personally execute that arrest

23    warrant?

24    A.      Yes, I did.

25    Q.      At the time of the arrest, were you with anybody?

Smith - Direct

1    A.      Yes, I was.

2    Q.      Who else?  Or how many other people?

3    A.      There were three others total present in the area.

4    Q.      Okay.  At the time of the arrest, did you seize any

5    additional documents or records?

6    A.      Yes.

7    Q.      Did you seize anything other than documents or

8    records?

9    A.      Yes.

10   Q.      What?  Or what types of things?

11   A.      I was also seizing Dr. Titus' cell phone.

12   Q.      Okay.

13   A.      And that was primarily it.

14   Q.      And where did you seize these things from?

15   A.      From his vehicle that he was driving at the time he

16   was arrested.

17   Q.      Okay.

18           MS. REMIS:  I'd like to go to Government

19   Exhibit 212, please.  Okay.

20   BY MS. REMIS:

21   Q.      And where was this document?  Is this one of the

22   documents that you seized?

23   A.      Yes, it is.

24   Q.      Where was it seized from?

25   A.      Inside of Dr. Titus' vehicle.

Smith - Direct

1    Q.      Okay.  And, again, based on your experience or your

2    participation in this investigation, do you know whose

3    handwriting this is?

4    A.      Yes.

5    Q.      Whose is it?

6    A.      Dr. Titus'.

7    Q.      All right.  Let's go through a couple of these

8    things, starting with number one right there.  There's four

9    numbers.  What does number one say?

10   A.      Number one, "remorse."

11   Q.      And what does it say next to that?

12   A.      "Deep regret for wrong committed."

13   Q.      Okay.  And what about number two?

14   A.      "Rehabilitation."

15   Q.      And what -- can you read what's next to that?

16   A.      "My plan of" -- and I cannot read that other word.

17   Q.      Okay.  And then under number three, what's crossed

18   out, if you can tell?

19   A.      "Regret."

20   Q.      Okay.  And what about number four?

21   A.      "Humility."

22   Q.      Okay.

23              MS. REMIS:  Let's go down to the middle of the

24   page.  And there's a circle that starts with "I failed."

25   Can you make that bigger?  Yeah, that's great.

Smith - Direct

1   BY MS. REMIS:

2   Q.     What does that say?

3   A.     "I tried" -- it says, "I tried to comply with some of

4   the guidelines outlined in the Medical Practice Act."

5   Q.     Okay.  And then right underneath that is another

6   circled thing.  What does that say?

7   A.     "I see how some of my actions could have led to

8   diversion to" -- and I can't read that word there -- "abuse

9   and misuse of controlled substances by my patients."

10  Q.     Okay.

11          MS. REMIS:  And if we could back out of that,

12  please.  If we could go to the -- just right of where we

13  just read, starting with "I have."  It's down a little bit.

14  I don't think I can write on this.  It says, "I see."  Right

15  underneath it.  No, up.

16          If you just blow up the whole right-hand side,

17  that would work.  Great.

18  BY MS. REMIS:

19  Q.     And if you could read under -- in the second -- sort

20  of the lower half of that highlighted portion, where it

21  says, "I have time."  If you can see that.

22          MS. REMIS:  No.  The other direction.  Yeah.

23  There you go.

24          THE WITNESS:  It says, "I have time to think

25  about" -- I cannot read the additional part.

Smith - Cross

1    BY MS. REMIS:

2    Q.     Okay.

3    A.     But below that it says, "I see the errors of my

4    ways."

5    Q.     And then what does it say underneath that?

6    A.     "I see the importance of diversion prevention."

7    Q.     And then right next to it?

8    A.     "In light of the" -- and I cannot read that word --

9    "opioid abuse epidemic."

10   Q.     Okay.

11              MS. REMIS:  Just one moment, Your Honor.

12              Your Honor, I pass the witness.

13              THE COURT:  All right.  Cross-examination.

14              MS. KOUSOULIS:  If I could have one moment, Your

15   Honor.

16                        CROSS-EXAMINATION

17   BY MS. KOUSOULIS:

18   Q.     Good afternoon --

19   A.     Good afternoon.

20   Q.     -- Agent Smith.

21              MS. KOUSOULIS:  If we could just have -- pull up

22   Government Exhibit 212 where you were just looking at real

23   quick.  Oh, sorry, I have to -- I did hit defense PC.  It's

24   not working.

25              Sorry.  Technological difficulties.

Smith - Cross

1    BY MS. KOUSOULIS:

2    Q.    Government Exhibit 212, Agent Smith, is what we were

3    just talking about; correct?

4    A.    Yes.

5    Q.    And you don't know -- it's fair to say that a lot of

6    the language in here is language that is a similar language

7    to what's in the Consent Decree; correct?

8    A.    It may be some parallels there, but I couldn't say

9    it -- blanketly that they're the same, no.

10   Q.    And you have no idea when this document was created;

11   correct?

12   A.    I do not.

13   Q.    And you don't know the circumstances as to why it was

14   created?

15   A.    I do not.

16   Q.    Okay.

17             MS. KOUSOULIS:  You can take that down,

18   Mr. Marek.  Thank you.

19   BY MS. KOUSOULIS:

20   Q.    Now, you testified yesterday that in 2013, you

21   started working in New Castle, Delaware; correct?  You came

22   from Philadelphia?

23   A.    Yes, correct.

24   Q.    And at that time, you were on the Tactical Diversion

25   Squad in Wilmington?

Smith - Cross

1    A.      Yes.

2    Q.      And currently you're still on that squad?

3    A.      Correct.

4    Q.      And, in fact, you're one of the senior special agents

5    with that group?

6    A.      That's correct.

7    Q.      And your current role, you're also presently a backup

8    to your group supervisor?

9    A.      Yes.

10   Q.      And as backup to the group supervisor, it's fair to

11   say that you're familiar with all the investigations that

12   your group is working on right now; correct?

13   A.      At varying levels of familiarity, but yes, I'm

14   generally familiar with most of the group's investigations

15   to some degree.

16   Q.      Okay.  Now, you testified that one investigation --

17   one investigative tool that is used when investigating drug

18   diversion cases is to send in an undercover agent to the

19   practice to capture, like, what's going on in the practice;

20   is that correct?

21   A.      Yes.

22   Q.      And, in fact, you testified yesterday that in most

23   cases, you make an attempt to use an undercover; correct?

24   A.      When -- when safe and plausible to do so, yes.

25   Q.      Now, in cases where an undercover is used, who makes

Smith - Cross

1    that decision of whether or not to use an undercover?

2    A.    Typically, it's a discussion amongst the case agents.

3    Q.    And how many case agents usually are assigned to a

4    case?

5    A.    Usually two.

6    Q.    And with regard -- when utilizing an undercover agent

7    in this capacity, the undercover agent a lot of times will

8    wear a wire so you can record what's going on; correct?

9    A.    Correct.

10   Q.    And in January of 2014 is when the Tactical Diversion

11   Squad that you're a part of began investigating Dr. Titus;

12   correct?

13   A.    Yes.

14   Q.    And you were a part of the squad at that time;

15   correct?

16   A.    Yes.

17   Q.    And were you also involved in that investigation of

18   Dr. Titus back in January of 2014 when they began

19   investigating him?

20   A.    My involvement in the investigation was very limited.

21   The first meaningful involvement that I recall having in the

22   case was when we executed the search warrants on

23   January 30th, 2015.

24   Q.    And in connection with executing the search warrants,

25   did you -- well, let me back up.

Smith - Cross

1          Did the DEA -- the DEA had created a case file

2    on Dr. Titus in connection with this investigation; correct?

3    A.      Yes.

4    Q.      And when you became more involved in the case with

5    regard to the search warrants, it's fair to say you would

6    have reviewed the DEA case file to see what was going on

7    with the case to get yourself up to speed; correct?

8    A.      No, not necessarily.  I mean, the -- at that time, in

9    January of 2015, again, my role was to author the reports

10   relating to investigative actions that I had taken, to

11   specifically involvement in the search warrant

12   participation, in the interview of Dr. Titus, things of that

13   nature.  I did not -- there wasn't a need to take a holistic

14   review of the case at that time.

15   Q.      So even though you were taking a more active role and

16   even though you were going to be involved in interviewing

17   Dr. Titus, you didn't think it was necessary to try to find

18   out what had gone on in the case up until that point, and

19   that could inform on what questions you asked, where the

20   investigation is going, what evidence you have?

21   A.      I was aware of some of the details of the case, but

22   no, I don't specifically recall going back and reviewing

23   everything that had happened leading up to that point.  No.

24   Q.      So you didn't think that was an important thing to

25   do?

Smith - Cross

1    A.      I did not do that, no.

2    Q.      Now, it was in August of 2014 that an undercover

3    agent was used in Dr. Titus' case; correct?

4    A.      It was when an undercover was attempted --

5    Q.      Right.

6    A.      -- in this case, yes.

7    Q.      Right.  So in this case -- and when I say an

8    undercover agent was used, what I mean is that your team

9    attempted to have an undercover agent become a patient of

10   Dr. Titus in an attempt to get him to illegally prescribe

11   for narcotics; correct?

12   A.      No.  I wouldn't -- I have an issue with the last part

13   of your statement.  The goal was to introduce the undercover

14   so that we could see what was happening in the course of the

15   controlled visit.

16   Q.      Because at that time, it was your belief that

17   something illegal was going on with the way Dr. Titus was

18   prescribing medication; correct?

19   A.      Yes.

20   Q.      And -- but the attempt, just as you just testified,

21   to introduce the undercover was unsuccessful; correct?

22   A.      Correct.

23   Q.      Meaning that Dr. Titus didn't take her on as a

24   patient; correct?

25   A.      That is correct.

688

Smith - Cross

1   Q.      Were you at all involved with that operation in

2   August and September of 2014 when the undercover was

3   attempted to be introduced?

4   A.      I was not.

5   Q.      When did you first learn that an attempt to use an

6   undercover at that time was used?  When did you first learn

7   that information?

8   A.      It would have been on Monday, July -- July the 5th.

9   It was brought to my attention that an undercover had been

10  previously attempted in the case.  And that's of this year,

11  2021.

12  Q.      So just last week?

13  A.      This week.

14  Q.      This week.  Okay.

15          So although you've been involved in the case

16  tangentially since January of 2014, and you took a more

17  active role in January of '15, and you are currently -- it

18  wasn't until three days ago that you found out that an

19  undercover was used in this case?

20  A.      That's correct.

21  Q.      How many people are on the squad?

22  A.      It varies from any given time.  When the -- you know,

23  certain personnel come and go.  Currently, for instance --

24  or perhaps, more appropriately, at that time, this time

25  frame of this investigation, I believe, including the group

Smith - Cross

1    supervisor, we would have had approximately seven

2    individuals in the group.

3    Q.     So back in the time period of August, September 2014,

4    you would have been seven or eight people in that group?

5    A.     Correct.

6    Q.     And did that include the officer who -- the

7    undercover officer who attempted to become a patient of

8    Dr. Titus back in August of 2014?  I believe her name was

9    Joelle Forrester.

10   A.     Yes.

11   Q.     Now Ryan?

12   A.     Yes, I'm sorry.  Yes, she was a member of the group.

13   She would have been one of those seven.

14   Q.     And you don't know -- do you know whose decision it

15   was in the group at that time to use an undercover?

16   A.     I do not.

17   Q.     And since -- are you the case agent -- are you the

18   lead case agent on the case right now?

19   A.     Yes.  Currently, I would -- I would say I'm the lead

20   case agent.

21   Q.     And when did you become the lead case agent?

22   A.     That would have been in approximately August 2018,

23   after Diversion Investigator Linda Eleazer was promoted and

24   transferred to another office.

25   Q.     At the time you became the lead case agent, did you

Smith - Cross

1    at that time take it upon yourself to review the DEA's file

2    on Dr. Titus to become more intimately knowledgeable of

3    everything going on with this investigation as the lead case

4    agent?

5    A.      No, I did not.

6    Q.      So there never came a time that you decided to look

7    in the file and see everything that was in -- you know,

8    familiarize yourself thoroughly with what was in the file?

9    A.      No, there was not.

10   Q.      And, in fact, how did it come to your attention that

11   an undercover had been used in this case?

12            MS. REMIS:  Objection.

13            THE WITNESS:  On Monday --

14            THE COURT:  I'm going to sustain the objection.

15   BY MS. KOUSOULIS:

16   Q.      Now, one moment.

17            And you testified that prior to your involvement

18   on -- on this Task Force investigating pharmaceutical drug

19   investigations of this sort, you also have some experience

20   as an agent investigating, like, street-level -- what I

21   would call street-level drug dealing, not dealing with

22   doctors and pharmacies, but illegal drugs that are sold, you

23   know, on the street by individuals; is that correct?

24   A.      Yes, absolutely.

25   Q.      And you testified a little bit to that on direct

Smith - Cross

1    today; correct?

2    A.    Yes.

3    Q.    And in your experience in investigating street-level

4    drug dealing, did the individual -- did the drug dealers

5    that you were investigating, did they normally provide

6    written receipts to the buyer?

7    A.    No, I never recall that happening.

8    Q.    And it's fair to say that the buyers didn't pay with

9    credit cards on the street-level drug dealing that you

10   talked about earlier?

11   A.    No, they did not.  I also participated in other

12   investigations involving --

13   Q.    Okay.  That was my question.

14              Now, in this case, you interviewed Dr. Titus

15   twice in connection with this case; correct?

16   A.    That's correct.

17   Q.    And the first interview was the -- was in January,

18   January 30th, 2015; correct?

19   A.    Yes.

20   Q.    And that interview was audio taped; correct?

21   A.    Yes.

22   Q.    And, in fact, that was the portions of the interview

23   that we listened to a little earlier?

24   A.    Correct.

25   Q.    And on that recording -- you had mentioned this

Smith - Cross

1   before -- you hear a child's voice in the background;

2   correct?

3   A.      Yes.

4   Q.      And that was Dr. Titus' stepson at the time?

5   A.      Yes.

6   Q.      And he was actually -- and he was about three years

7   old?

8   A.      That would seem about right.

9   Q.      And Dr. Titus was caring for him at the time that you

10  went to execute the search warrant; correct?

11  A.      Yes.

12  Q.      Now, the second interview occurred in June of 2018 at

13  the time that Dr. Titus was arrested in this case; correct?

14  A.      Yes.

15  Q.      And that was also audio taped; correct?

16  A.      Yes.

17  Q.      Now, the June -- the first interview in January of

18  2015, that interview lasted approximately two hours and

19  15 minutes; correct?

20  A.      That sounds correct.  Yes.

21  Q.      And the interview in 2018 lasted about an hour and

22  20 minutes; correct?

23  A.      That sounds correct, yes.

24  Q.      And at both times, Dr. Titus agreed to speak to you

25  without a lawyer; correct?

Smith - Cross

1    A.      Yes, he did.

2    Q.      And he answered all your questions?

3    A.      Yes, he did.

4    Q.      Okay.  One moment.

5           And during both those interviews, you asked him

6    questions regarding his practice and different things

7    involving his practice and his patients; correct?

8    A.      Yes.

9    Q.      And the portion we heard is just a small portion,

10   probably about 15 minutes of the entirety of the -- which

11   was -- we only heard about 15 minutes today of what was in

12   the tape; correct?

13   A.      That's correct.

14   Q.      Now, in addition to the excerpts played by the

15   Government, Dr. Titus had told you other things, you know,

16   regarding his discharge policies; correct?

17            MS. REMIS:  Objection, Your Honor.

18            THE COURT:  All right.  It's sustained.

19            MS. KOUSOULIS:  I have no further questions,

20   Your Honor.

21            THE COURT:  All right.

22            Any redirect?

23            MS. REMIS:  No, Your Honor.

24            THE COURT:  All right.

25            Agent Smith, you may step down.

Smith - Cross

1                THE WITNESS:  Thank you, Your Honor.

2                THE COURT:  Do you have another witness?

3                MR. WOODARD:  We do, Your Honor.  The Government

4      would call Henry Lankford.

5                THE COURT:  Okay.

6                DEPUTY CLERK:  You can take your mask down, if

7      you want.

8                Please state and spell your full name for the

9      record.

10               THE COURT:  Try speaking louder.

11               DEPUTY CLERK:  Please state and spell your full

12     name for the record.

13               THE WITNESS:  Henry F. Lankford, Jr.  H-E-N-R-Y,

14     F as in Fred, L-A-N-K-F-OR-D, Jr.

15               DEPUTY CLERK:  Do you affirm that the testimony

16     you are about to give to the Court and the jury in the case

17     now pending will be the truth, the whole truth and nothing

18     but the truth, you do so affirm?

19               THE WITNESS:  Yes, ma'am.

20               DEPUTY CLERK:  Thank you.

21               HENRY F. LANKFORD, JR., the witness herein,

22     after having been duly affirmed under oath, was examined and

23     testified as follows:

24               DEPUTY CLERK:  Thank you.

25                         DIRECT EXAMINATION

Lankford - Direct

```
 1   BY MR. WOODARD:

 2   Q.    Good afternoon, Mr. Lankford.

 3   A.    Good afternoon, sir.

 4   Q.    Where do you live?

 5   A.    Dover, Delaware.

 6   Q.    And are you employed?

 7   A.    Yes, sir.

 8   Q.    How so?

 9   A.    I work for a company in Denton, Maryland as a

10   mechanic.

11   Q.    Do you have any children or stepchildren?

12   A.    Yes, sir.  I have five stepchildren.

13   Q.    Was one of those stepchildren Ms. Lisa Parsons?

14   A.    Yes, sir.

15   Q.    And I'm sorry to ask, but is she alive today?

16   A.    No, sir.

17   Q.    And when was it that she passed away?

18   A.    I believe it was five years ago.

19   Q.    Okay.

20              MR. WOODARD:  Ms. Leal, if you could please show

21   Government's Exhibit 706.

22   BY MR. WOODARD:

23   Q.    Mr. Lankford, do you recognize that individual?

24   A.    Yes, sir.

25   Q.    And who is that?
```

Lankford - Direct

1    A.      That's my daughter.

2    Q.      And, Mr. Lankford, how did your daughter pass away?

3    A.      She had a good battle with cancer, but she lost.

4    Q.      Okay.  Thank you, sir.

5            All right.  Mr. Lankford, to your knowledge, did

6    Ms. Parsons ever see Dr. Titus?

7    A.      Yes, sir.

8    Q.      Okay.  And do you recall when she started seeing

9    Dr. Titus?

10   A.      The exact date, I'm not sure of, sir.

11   Q.      Okay.  Do you have a rough time frame, what year?

12   A.      Probably eight, nine years ago.

13   Q.      Okay.  Thank you.

14           And if you could guess, about how old was

15   Ms. Parsons at that time?

16   A.      About 33, I think.

17   Q.      And do you know whether she had any issues with pain

18   at that time?

19   A.      No, sir, none.

20   Q.      Okay.  Had she developed cancer by that time?

21   A.      No, sir, she had not.

22   Q.      Okay.  And Mr. Lankford, let me take you back to

23   around 2014.  Did Ms. Parsons suffer an overdose that year?

24   A.      Yes, sir.

25   Q.      And how did you find that out?

Lankford - Direct

1    A.    My wife and I just stopped by to see her.

2    Q.    And what happened when you stopped by?

3    A.    We found her on the bed almost comatosed,

4    unresponsive, so we had her taken to Milford Memorial

5    Hospital.

6    Q.    And you said she was "on the bed."  Was anyone else

7    at the house at that time?

8    A.    No, sir.

9    Q.    Did she have any children?

10   A.    Yes, sir.  She had one son.

11   Q.    So you found her on the bed.  What did she look like

12   when you found her?

13   A.    Pale.  Limp.

14   Q.    Okay.  Let me just pause here, Mr. Lankford, and

15   let's go back to when Ms. Parsons started seeing Dr. Titus.

16   Before that, was she holding a job?

17   A.    Yes, she ran a company in Harrington called True

18   Grain.  And she also worked for the Delmar Police Department

19   on the weekends, doing their laptops and their patrol cars

20   and stuff.

21   Q.    Do you know whether, prior to seeing Dr. Titus, she

22   had any issues with drug abuse?

23   A.    No, she didn't.

24   Q.    When she started seeing Dr. Titus, did anything

25   change?

Lankford - Direct

1   A.      Yeah, a lot changed.  Can I -- can I explain how she

2   met Dr. Titus?

3   Q.      Let me just try to instruct the witness.

4           Mr. Lankford, we can't have you testify to what

5   someone else may have told you, if that's what you're trying

6   to do.

7   A.      No, sir, that's not what I'm trying to say.

8   Q.      Okay.

9   A.      How she became acquaintances with Dr. Titus' office.

10          MR. BOSTIC:  Your Honor, out of --

11          THE COURT:  So, if we're going to do -- if

12  you're going to go this way, you need to lay some

13  foundation.  Otherwise, you need to skip -- go on to

14  something else.

15  BY MR. WOODARD:

16  Q.      Mr. Lankford, we'll move on.  Okay?

17  A.      Yes, sir.

18  Q.      We were talking about what had changed when

19  Ms. Parsons began seeing Dr. Titus, and I think you said a

20  lot changed.  Do you mind elaborating there?

21  A.      She lost her job.  She didn't even seek work.  She

22  stayed high most of the time.

23  Q.      How do you know that?

24  A.      Because she came over to our house so high she could

25  hardly talk.

Lankford - Direct

1    Q.      How did she appear?

2    A.      Drunk.  She would not take care of herself

3    hygienically properly, as what she would do before.

4    Q.      And that had changed after she began seeing

5    Dr. Titus?

6    A.      Definitely.  Yes, sir.

7    Q.      Was it clear to you that she had developed some sort

8    of addiction issues?

9    A.      Yes, sir.

10   Q.      Now, going back to this unfortunate incident with the

11   overdose, what did you and your wife do once you found

12   Ms. Parsons?

13   A.      We called the ambulance to take her to Milford

14   Memorial Hospital.

15   Q.      And was she treated there?

16   A.      Yes, sir, she was.

17   Q.      Do you know what the diagnosis was or, you know, why

18   she needed to receive medical treatment?

19   A.      She had so many different drugs in her body that her

20   body would just not function.

21   Q.      And as a result of this incident, did you have

22   concerns over any of the medical care being provided by

23   Dr. Titus?

24   A.      Yes, sir, I did.

25   Q.      What was that?

Lankford - Cross

1    A.      That he was prescribing her too many drugs.

2    Q.      Do you know whether he was prescribing multiple types

3    of drugs to Ms. Parsons?

4    A.      From what I understand --

5              MR. BOSTIC:  Objection, Your Honor.  I think

6    this calls for hearsay.

7              THE COURT:  All right.  So I'm going to sustain

8    the objection unless there's some foundation.

9    BY MR. WOODARD:

10   Q.     Mr. Parsons, you mentioned your concerns.  Did you

11   raise these concerns to anyone?

12   A.     Yes, the emergency room doctor.

13             MR. WOODARD:  All right.  Mr. Lankford, thank

14   you.

15             I'm going to tender the witness, Your Honor.

16             THE COURT:  All right.

17             Any cross?

18             MR. BOSTIC:  Very briefly.

19                      CROSS-EXAMINATION

20   BY MR. BOSTIC:

21   Q.     Mr. Lankford, first of all, my condolences about your

22   daughter passing from a cancer-related condition.  But I

23   have a question -- a couple of questions for you.

24             You said that she started to see Dr. Titus

25   around 2014?

Lankford - Cross

1    A.    It's somewhere around that, sir.

2    Q.    Right.  And you knew she was treating with Dr. Titus

3    for severe pain-related issues, correct, or did you not know

4    that?

5    A.    No, sir.  She did not have pain when she started

6    seeing Dr. Titus.

7    Q.    So, okay.

8              MR. BOSTIC:  Nothing else.  Thank you, sir.

9              THE COURT:  All right.

10             Any redirect?

11             MR. WOODARD:  No, Your Honor.

12             THE COURT:  All right.

13             Mr. Lankford, thank you for being here.  You're

14   excused.  You may go.

15             THE WITNESS:  Thank you, sir.

16             THE COURT:  All right.  Do you have another one?

17             MR. WOODARD:  We do, Your Honor.  I doubt we

18   could finish before --

19             THE COURT:  Well, we can start.

20             MR. WOODARD:  Okay.

21             MS. SOBCZAK:  Your Honor, the Government calls

22   Joseph Raziano.

23             THE COURT:  All right.

24             Actually, can I just see Ms. Sobczak and

25   Mr. Bostic over at side-bar for a minute?  I don't need a

Lankford - Cross

1    court reporter.

2                    (Discussion held at side-bar off the

3    stenographic record.)

4                    DEPUTY CLERK:  Dr. Raziano, you can take your

5    mask down.

6                    THE WITNESS:  Oh, sorry.

7                    DEPUTY CLERK:  No, you're fine.

8                    THE COURT:  No, it's your option, but you don't

9    have to wear it if you don't want to.

10                   THE WITNESS:  I've had enough of it.  Thank you.

11                   MS. SOBCZAK:  Your Honor, do you mind if I have

12   one moment?

13                   THE COURT:  Yes.

14                   MS. SOBCZAK:  Thank you.

15                   Thank you, Your Honor.

16                   DEPUTY CLERK:  Please state and spell your full

17   name for the record.

18                   THE WITNESS:  Joseph Walter Raziano.

19                   DEPUTY CLERK:  Do you affirm that the testimony

20   you are about to give to the Court and the jury in the case

21   now pending will be the truth, the whole truth and nothing

22   but the truth, you do so affirm?

23                   THE WITNESS:  Yes, ma'am.

24                   DEPUTY CLERK:  Thank you.

25                   JOSEPH W. RAZIANO, the witness herein, after

Raziano - Direct

1    having been duly affirmed under oath, was examined and

2    testified as follows:

3                        DIRECT EXAMINATION

4    BY MS. SOBCZAK:

5    Q.     Good afternoon.

6    A.     Hi.

7    Q.     Where do you currently live?

8    A.     Where do I live?

9    Q.     Yeah.

10   A.     Wilmington.  Trolley Square, Delaware.

11   Q.     How long have you lived in Delaware?

12   A.     Since about 2005 or '6.

13   Q.     And what do you do for a living?

14   A.     I'm a board-certified emergency medicine physician.

15   Q.     So I am assuming, did you go to medical school?

16   A.     Yes, I did, ma'am.

17   Q.     Did you go to medical school in the area?

18   A.     No, ma'am.

19   Q.     Where did you go to school?

20   A.     I went to medical school at Tulane in New Orleans.

21   Q.     When did you graduate from medical school?

22   A.     1996.

23   Q.     And are you licensed to practice medicine in the

24   State of Delaware?

25   A.     Yes, ma'am.

Raziano - Direct

1   Q.      When did you become licensed in Delaware?

2   A.      Approximately 2005, 2006.

3   Q.      Do you have an area of specialty?

4   A.      Yeah.  Do I have a specialty?

5   Q.      Yes.  Do you have a specialty?

6   A.      Board-certified emergency medicine physician.

7   Q.      Can you describe what is emergency medicine?

8   A.      Mostly it's the antithesis of being a family practice

9   doctor.  They take care of people who are relatively healthy

10  across the spectrum of medicine, and I do just the opposite.

11  Plus, I have specialized training in trauma.

12  Q.      And what does that specialized training in trauma

13  entail?  What is the training?

14  A.      Well, family practice doctor, you know, advanced

15  traumas, anything that's critically emergent.  And it's a

16  very broad field.

17  Q.      So Dr. Raziano, where do you currently work?

18  A.      I currently work in Pennsylvania.

19  Q.      And where at in Pennsylvania?

20  A.      Penn Highlands Healthcare.

21  Q.      How long have you worked there?

22  A.      There, approximately three or four years.

23  Q.      And where did you work before Penn Highlands?

24  A.      I've worked a lot of places.  I have ten medical

25  licenses.  It's common for us.  For emergency medicine

Raziano - Direct

1    physicians, it's common for us to be on staff at multiple

2    places and multiple states.  It's semi part of the job

3    and -- in a way nowadays.

4    Q.    And so you said you were licensed in Delaware; is

5    that right?

6    A.    I'm licensed in Delaware.

7    Q.    Did you ever practice medicine in Delaware?

8    A.    Yes.

9    Q.    When?  When did you practice in Delaware?

10   A.    Probably from 2005 -- actively, from 2005 to 2017.

11   Q.    And during that time, where did you work in Delaware?

12   A.    I've worked at Nanticoke.  I've worked at Bayhealth.

13   I've worked at VA.

14   Q.    You said "Bayhealth."  When did you work at

15   Bayhealth?

16   A.    From 2005 to 2017.  Approximately 2005, 2006.

17   Q.    And Dr. Raziano, while you worked at Bayhealth, were

18   you involved in a medical malpractice lawsuit?

19   A.    One.

20   Q.    Did that malpractice lawsuit have anything to do with

21   the treatment of pain patients?

22   A.    Oh, yeah, it did, actually.  The guy was positive for

23   narcotics.

24   Q.    Did the suit involve the treatment of pain?

25   A.    I don't know.  He wasn't -- he really wasn't my

Raziano - Direct

1    patient.  He was an ICU patient who crashed in the middle of

2    the night.  You know, he was dead.  I managed to save him,

3    but sometimes when you're dealing with people who are in

4    such a condition -- he's lucky that he's alive.

5    Q.    And did that lawsuit have anything to do with your

6    departure from Bayhealth?

7    A.    No, I was planning on it anyway.  I was waiting for

8    my appointment to the VA.  You've got to get an appointment,

9    you're not just hired.  I don't understand how Government

10   works, but it's -- the wheels of justice or our Government

11   are quite slow sometimes.  It's odd.

12   Q.    Are you familiar, Dr. Raziano, with an individual

13   named Patrick Titus?

14   A.    Absolutely, yes.

15   Q.    When did you first become familiar with Patrick

16   Titus?

17   A.    I can't give you an exact date, but he's -- he was

18   pretty infamous in the area.

19   Q.    How did you become familiar with him?

20   A.    He was the drug dealing doctor in the area.

21            MS. KOUSOULIS:  Your Honor, if I may object and

22   move to strike and ask for a side-bar.

23            THE COURT:  All right.

24            So, yeah, I'm going to strike the last answer,

25   and yes, you can come over to side-bar.

Raziano - Direct

1                  (Whereupon the following conference was held at

2      side-bar.)

3                  MS. SOBCZAK:  Your Honor, I did not know he was

4      going to say anything.

5                  THE COURT:  So I think we ought to break for

6      lunch and have a conversation.  Okay?

7                  MS. SOBCZAK:  Okay.

8                  (Conclusion of conference held at side-bar.)

9                  THE COURT:  So members of the jury, we're going

10     to break for lunch now, so we'll have an hour.  You can plan

11     to be back at, let's say, quarter of 2:00.  Okay?

12                 (Jury leaving the courtroom.)

13                 THE COURT:  So Dr. Raziano, did you talk with

14     the Government's attorney before today?

15                 THE WITNESS:  Yes, Your Honor.

16                 THE COURT:  All right.  And can you give me just

17     an idea, like, for maybe half an hour, an hour, or how long?

18                 THE WITNESS:  Those guys?

19                 THE COURT:  Yes.

20                 THE WITNESS:  I met with them twice, and maybe

21     it was an hour each time.

22                 THE COURT:  Okay.  And so I'm going to let

23     Ms. --

24                 THE WITNESS:  You want me to sit down, Judge?

25                 THE COURT:  Yeah.  Yeah, you can sit.  Everyone

Raziano - Direct

1    can sit.

2              So my understanding of why you're here to

3    testify is to testify about some of your firsthand

4    observations back -- relative to Dr. Titus' patients back in

5    the period maybe of 2010 to 2014, something like that.

6              But because of the rules of evidence, there's

7    some things that witnesses, when they say it, it just causes

8    problems because they're really outside of the rules of

9    evidence.

10             Now, you're a doctor, you're not expected to

11   know the rules of evidence.  That's something -- and so I'm

12   going to break for lunch in a minute, but I do want you to

13   talk to the Government attorneys for a minute, or for

14   however long is necessary, and try to get an idea of what

15   sorts of things you should not say.

16             For example, just to give a short list that I've

17   heard so far, there's no reason to say that Dr. Titus was

18   infamous, and there's no reason to say that he was known as

19   the drug-dealing doctor.  Those things don't help the jury

20   get to the truth here, and they just tend to prejudice

21   Dr. Titus.

22             So you're here to testify factually about what

23   you saw and did and if you talked to Dr. Titus, maybe about

24   that.  Do you understand what I'm saying?

25             THE WITNESS:  Yeah.  But, I mean, that's how we

Raziano - Direct

1    all knew him.

2                THE COURT:  Well, sometimes we have to skip --

3                THE WITNESS:  I mean, it would be a lie to say

4    otherwise.

5                THE COURT:  Well, right.  You don't have to say

6    anything at all about it.  In other words, just because

7    something is true doesn't make it actually admissible

8    evidence.

9                THE WITNESS:  I understand.  I'll use --

10                THE COURT:  Well, so in other words, if the

11    question is:  Do you know Patrick Titus?  The answer is yes.

12    And then there's another question from the Government's

13    attorney, I don't know what the question might be, but you

14    know, you've got -- you're just going to cause problems for

15    getting this trial --

16                THE WITNESS:  I'm sorry.

17                THE COURT:  So, again, I'm not being -- you

18    know, you're a witness.  You're not the one who's actually

19    responsible -- it's up to the Government attorneys to sort

20    of say what the limits are.  So I'm going to let you talk to

21    them over lunch, and we'll start up again when -- I guess,

22    what did I tell the jury?  Ten of 1:00, ten of 2:00.  I

23    think I said ten of 2:00.

24                MS. KOUSOULIS:  Your Honor, before -- I know I

25    have my objection, you sustained it, but I actually would

Raziano - Direct

```
 1    like to move for a mistrial.  I mean, I think that was
 2    highly prejudicial.  And I also think, in his statement
 3    that -- I'm trying to find it -- there were references made,
 4    when he made those same type of comments, and that's
 5    something that the Government should have definitely
 6    counseled him on to avoid that.
 7              They were aware that that could have been an
 8    issue.  And, in fact, they didn't address it with him, and
 9    now it came out to the prejudice of Dr. Titus.  I mean,
10    this -- especially coming from another doctor.  It would be
11    different if it was, like, you know -- but I think, you
12    know, people sometimes tend to hold people in professions,
13    lawyers, doctors, in a little more esteem, and take what
14    they say, even when they're not called as experts, you know,
15    a little more seriously.  And I think the fact that it came
16    from a witness like that, you know, makes it even more
17    prejudicial.
18              And given the nature of this case, I don't think
19    that that bell can be unrung, even with the curative
20    instruction.  And so we would move for a mistrial.
21              THE COURT:  All right.  And you'll agree that I
22    gave the appropriate kind of curative instruction when you
23    made the objection; right?  I mean, in other words, I did as
24    much as I can do; right?
25              MS. KOUSOULIS:  Well, Your Honor, that's why I
```

711

Raziano - Direct

1    asked for the side-bar, because, again, I think that -- I

2    don't think it's a type of statement that can be --

3                THE COURT:  No, No.  Ms. Kousoulis, listen to my

4    question.  Is there something more -- I understand what

5    you're saying.  It's a mess.  You can't do anything about

6    it.

7                But in terms of what I could do about it, did I

8    give as good a curative instruction as you would have liked?

9                MS. KOUSOULIS:  Well, Your Honor, it's hard to

10   answer that because I don't think it's something that can be

11   cured.  So --

12               THE COURT:  All right.  Well, that's fine.  I

13   just want to make sure that, to the extent that there was

14   something more I could do, you said what it is.

15               So I'm going to deny the motion --

16               MR. BOSTIC:  Your Honor, may I have a moment to

17   speak to Ms. Kousoulis?

18               THE COURT:  Okay.  Yes, Mr. Bostic.

19               MS. KOUSOULIS:  Your Honor, I would just like to

20   put on the record that there was a discussion -- Your Honor

21   was concerned that, perhaps based on my previous objection

22   earlier, with regard to what this witness was going to

23   testify to, that the Government had spoken to the witness to

24   make sure that, you know, he was counseled properly.  And

25   there was a side-bar discussion involving Mr. Bostic and

Raziano - Direct

1    Ms. Sobczak --

2              MS. SOBCZAK:  Sobczak.

3              MS. KOUSOULIS:  Sobczak.  Where Your Honor asked

4    the Government if they needed time to talk to the witness to

5    make sure something like this didn't happen, and they said

6    they didn't need that.  And, again, this isn't something

7    that they didn't necessarily have notice of because he's

8    made these statements before, and I would have assumed that

9    they would have counseled him as to what he can say and

10   couldn't say.

11             And so the fact that it is the Government's

12   responsibility and not the witness', and the fact that it

13   wasn't undertaken, and now we have this statement out there

14   that is, in our mind, not curable, I think it requires a

15   mistrial.

16             THE COURT:  All right.  And so just to

17   supplement the record, because you have accurately stated,

18   but it's not on the record because I didn't think it needed

19   to be, yes, I did talk to Ms. Sobczak and to Mr. Bostic and

20   asked, you know, do -- because it was 20 to 1:00, whether

21   they needed a recess or would they like a recess to make

22   sure that the witness was on board about what the limits

23   were.

24             And Ms. Sobczak pretty much assured me she

25   didn't need it, and so we went forward.  And -- but that

Raziano - Direct

 1    doesn't really change my belief that I gave a prompt

 2    curative instruction and that it's going to be a long trial,

 3    and the jury, I believe, will follow the instructions and

 4    the evidence in this case.  And so I'm going to deny the

 5    motion for a mistrial.

 6              All right.  Ms. Remis, do you have something

 7    more?

 8              MS. REMIS:  I was just going to suggest, Your

 9    Honor, that if the Defense prefers, we have no objection to,

10    like, an additional instruction when the jury returns.  But

11    I understand --

12              THE COURT:  Somebody needs to write down what it

13    is because I've already said everything I can think of

14    saying.

15              MS. REMIS:  Then nothing else, Your Honor.  And

16    I believe that there is also an instruction at the end of

17    the trial about not considering evidence --

18              THE COURT:  Well, yeah, that's pretty standard.

19    Okay.

20              Well, in any event, Ms. Remis, you should make

21    sure that --

22              MS. REMIS:  We will --

23              THE COURT:  -- since you're, again, responsible

24    for everything here --

25              MS. REMIS:  Yes, Your Honor.  Absolutely.  Not

Raziano - Direct

1      the jury.

2                  THE COURT:  All right.  We'll be in recess.

3                  DEPUTY CLERK:  All rise.

4                  (Recess was taken.)

5                  THE CLERK:  All rise.

6                  THE COURT:  Have a seat.

7                  MR. BOSTIC:  Just glad we're not the one in

8      trouble today.

9                  MS. KOUSOULIS:  Hey, the day's still not over.

10                  MS. SOBCZAK:  Our apologies, Your Honor.

11                  THE COURT:  No, no.  You're not late.

12                  MS. SOBCZAK:  We're not?

13                  THE COURT:  No, this time we're early.

14                  MS. SOBCZAK:  That hour just went by very

15      quickly.

16                  THE COURT:  So is this your witness,

17      Ms. Kousoulis?

18                  MS. KOUSOULIS:  Yes.

19                  THE COURT:  Can I just see you and the court

20      reporter and I mean Mr. Bostic too, if he wants?

21                  (Beginning of conference held at side-bar:)

22                  THE COURT:  All right.  So two things.  One of

23      which is it occurred to me that I ought to put on the

24      record, I believe based on what I've seen and the way the

25      questions were asked, that I think the Government certainly

Raziano - Direct

1    was not trying to elicit the answers that they got.

2              The second thing is this:  I don't know exactly

3    what kind of conversations you've had with the witness, but

4    it was occurring to me that you might want to do some

5    leading.

6              MS. SOBCZAK:  If that's okay with Your Honor,

7    that's great with us.

8              MS. REMIS:  Yes, Your Honor.

9              MS. KOUSOULIS:  That's fine, Your Honor.

10             MR. BOSTIC:  That's one situation where, yeah,

11    leading questions --

12             MS. SOBCZAK:  That would be excellent.

13             MR. BOSTIC:  -- are necessary.

14             MS. REMIS:  Your Honor, we've shortened our

15    outline to ten questions.

16             MS. SOBCZAK:  Yes.

17             THE COURT:  Okay.  Well, that's probably pretty

18    wise, also.

19             Well, maybe just period.  All right.

20             As I said, part of the reason I came back early

21    was, and it's still not actually -- you would still not be

22    late even if you weren't here yet, was because I did just

23    want to have a chance to chat without holding up the jury.

24             But okay, we'll go on that principle.  Okay.

25             MS. SOBCZAK:  Thank you, Your Honor.

Raziano - Direct

 1                    (Conclusion of conference held at side-bar.)

 2                    (Jury entering the courtroom.)

 3                    THE COURT:  All right.  Welcome back, everyone.

 4       So before we renew, it occurred to me that the transcripts

 5       that were handed out that I had not collected them back, so

 6       the deputy clerk is going to come.  I think she already took

 7       the first gentleman's --

 8                    THE JUROR:  Yeah, you did.

 9                    THE COURT:  -- from the chair, but get all the

10       transcripts, please.

11                    Dr. Raziano, you can sit down.

12                    THE COURT:  All right.  Ms. Sobczak, you may

13       continue.

14                    MS. SOBCZAK:  Thank you, Your Honor.

15       BY MS. SOBCZAK:

16       Q.      Hi, again, Dr. Raziano.

17       A.      Hi.

18       Q.      Dr. Raziano, are you familiar with Dr. Titus?

19       A.      He's a local physician in the Milford area.

20       Q.      Did you see some of Dr. Titus' patients in the ER?

21       A.      Yes.

22       Q.      Were some of those patients that you saw in the year

23       2014?

24       A.      Yes.

25       Q.      At some point in 2014, were you the ER doctor for a

Raziano - Direct

1    patient named Lisa Parsons?

2    A.    Yes.

3    Q.    Did Ms. Parsons come into the ER on January 10th,

4    2014?

5    A.    Yes.

6    Q.    Can you describe for the jury how did she present to

7    the ER?

8    A.    Lethargic.

9    Q.    Were her symptoms consistent with a drug overdose?

10   A.    Yes.

11   Q.    Can you describe her appearance when she presented in

12   the ER?

13   A.    Lethargic and unconscious/semi-conscious, lethargic

14   with symptoms consistent with a drug overdose.

15   Q.    Did you have to take off her clothes at one point to

16   examine her?

17   A.    Yes.

18   Q.    And what was her appearance?

19   A.    She was covered in Fentanyl patches of varying

20   degrees of age.

21   Q.    And how do you remember this?

22   A.    I had never seen any -- anything similar to this in

23   30 years of practice.

24   Q.    And did you determine that Dr. Titus was Ms. Parsons'

25   primary care physician?

718

Raziano - Direct

1    A.     I was able to determine that, yes.

2    Q.     And how did you determine that?

3    A.     Specifically, either the patient would have told me.

4    We would have had old records on our electronic medical

5    record system.  If I'm not able to find it there, I would

6    also check the computer system that links all the medical

7    records throughout the Delaware area or the Delaware

8    Hospital systems, plus I check the PMP, particularly in

9    patients who are overdosed.  The PMP shows -- I imagine the

10   DEA puts it together, I'm not sure, but nonetheless, it

11   shows us who -- the drug that a patient was prescribed that

12   is scheduled, the number of prescribed, the date filled, and

13   the prescribing doctor.

14   Q.     Dr. Raziano, do you know for sure whether or not the

15   Fentanyl patches that were on Lisa Parsons' body at that

16   time were prescribed by Dr. Titus?

17   A.     Those specific patches, I'm unsure if they were

18   prescribed by Dr. Titus.

19   Q.     And aside from Fentanyl, what other drugs was

20   Ms. Parsons on at that time?

21   A.     I did a drug screen on Mrs. Parsons.  She was also on

22   a benzodiazapine, which would be anything from Ativan,

23   Valium, Percocet.  She was also positive for opiates.

24          Now, for clarification, Fentanyl does not -- on

25   our drug screen does not come up positive.  So she was not

Raziano - Direct

1    only on Fentanyl, but another opiate, which would be in the

2    area of Percocet, Oxycontin, one of those, nonspecific, plus

3    marijuana was also -- came up positive on her drug screen.

4    Q.    Dr. Raziano, did Ms. Parsons survive the overdose?

5    A.    Yes, she did.

6    Q.    At some point after her overdose, did you file a

7    complaint regarding your experiences with Ms. Parsons?

8    A.    Yes.  I wrote an email to Detective Bentley for the

9    State Medical Board.

10   Q.    And why did you file a complaint?

11   A.    I filed it for two reasons.  One, at the behest of

12   the patient's father because this is her --

13              MS. KOUSOULIS:  Your Honor, objection if he's

14   going to relate any information related to him by the

15   patient's father.  That would be hearsay.

16              THE COURT:  All right.  So I'm going to sustain

17   that.

18              MS. SOBCZAK:  Yes, Your Honor.

19   BY MS. SOBCZAK:

20   Q.    Dr. Raziano, what was the second reason you filed the

21   complaint?

22   A.    The second reason I mentioned earlier that the

23   patient's presentation was remarkable concerned to prior

24   overdoses that I've seen in my career.

25              MS. SOBCZAK:  That's all, Your Honor.  Pass the

Raziano - Direct

1   witness.

2              THE COURT:  All right.  Ms. Kousoulis.

3              MS. KOUSOULIS:  One moment, Your Honor.

4              Your Honor, I have no questions.

5              THE COURT:  All right.  Dr. Raziano, thank you.

6   You're excused.  You may go.

7              THE WITNESS:  Thank you, Your Honor.

8              MS. REMIS:  Your Honor, the Government calls

9   Michael Adams.

10             THE COURT:  All right.

11             DEPUTY CLERK:  Mr. Adams, if you want to, you

12  can take your mask off.

13             THE WITNESS:  Okay.  Thank you.

14             THE COURT:  Please state and spell your full

15  name for the record.

16             THE WITNESS:  Michael B. Adams.

17             DEPUTY CLERK:  Do you affirm that the testimony

18  you are about to give to the Court and the jury in the case

19  now pending will be the truth, the whole truth and nothing

20  but the truth, you do so affirm?

21             THE WITNESS:  I do.

22             DEPUTY CLERK:  Thank you.

23             MICHAEL ADAMS, the witness herein, after having

24  been duly affirmed under oath, was examined and testified as

25  follows:

Adams - Direct

1    BY MS. REMIS:

2    Q.    Good afternoon, Mr. Adams.

3    A.    Good afternoon.

4    Q.    Could you please introduce yourself to the jury?

5    A.    I'm Michael Adams.  I was a patient of Dr. Titus'

6    for three or four years probably.  And other than that, I

7    don't know anything else to say.

8    Q.    And where are you from, Mr. Adams?

9    A.    I'm from Selbyville, Delaware.

10   Q.    And if you could just make sure to lean into the

11   microphone when you speak and speak as slowly as possible,

12   that would be great.

13   A.    Sure.

14   Q.    Okay.  And how old are you, Mr. Adams?

15   A.    I'll be 70 in September.

16   Q.    What do you do?

17   A.    I'm a drywall repairman.

18   Q.    How long have you been a drywall repairman for?

19   A.    I've been doing drywall for 48 years.

20   Q.    And is drywall repair a very physical job?

21   A.    Yes, it is.

22   Q.    Can you describe what you do sort of on a day-to-day

23   basis?

24   A.    Sometimes I'll scrape texture off ceilings on stilts.

25   Sometimes I'll tear ceilings out, replace it with drywall.

Adams - Direct

1    I have a drywall lift.  I work by myself exclusively, and I

2    sand it when I'm done.  And that's how it goes.

3    Q.    Okay.  And do you own your own business?

4    A.    Yes.

5    Q.    When do you plan to retire?

6    A.    I'm basically semi-retired now.

7    Q.    Okay.  So about how many hours do you work a week?

8    A.    I work maybe 20 hours a week.

9    Q.    Okay.  Back in 2012, 2013, 2014, were you retired

10   then?

11   A.    No, I was working full time.

12   Q.    Which was how many hours?

13   A.    At least 40 hours a week.

14   Q.    Okay.  Are you familiar with somebody named Patrick

15   Titus?

16   A.    Yes.

17   Q.    Okay.  And how are you familiar with him?

18   A.    He was my doctor.

19   Q.    When did you first start seeing Dr. Titus, if you can

20   recall?

21   A.    Shoot, boy, I tell you what, I'm thinking it was the

22   fall of maybe 2010 or 2011.  I'm not really certain on the

23   exact date.

24   Q.    Okay.  Was Dr. Titus -- why did you start seeing

25   Dr. Titus, for what kind of treatment?

Adams - Direct

1    A.      Well, I had been seeing a previous doctor somewhere

2    else and I had a bad back, lower back bothering me, my feet

3    bothering me, and it just seemed like I just needed help to

4    go to work every day.  I got to pay for my house.  That was

5    how my mindset was for a long time and still is.

6    Q.      Okay.

7    A.      So.

8    Q.      And you mentioned that you had seen another pain

9    doctor before?

10   A.      Yes.

11   Q.      And who was that?

12   A.      Dr. Perreti from Ocean City, Maryland.  He has since

13   retired, medical reason.

14   Q.      And what was Dr. Perreti treating you for?

15   A.      For the same thing and kind of suggested maybe --

16   maybe I need to get some surgery because I couldn't maintain

17   on the pills or maybe if I've got a drug problem, maybe I

18   should seek counseling or something for drug abuse.

19   Q.      Okay.  And that's what Dr. Perreti counseled you?

20   A.      That's kind of what he was suggesting.  At that time

21   I'm thinking, you know, I don't want to be cut on.  I've got

22   to work.  I don't know what we mean by abusing it.  I get up

23   and go to work using it and come home.  I don't feel abusive

24   about that part of it.  So I said, you know, I need to find

25   somebody else.  That's how I felt.

724

Adams - Direct

1   Q.      And you left Dr. Perreti?

2   A.      Yes, I did.

3   Q.      And did you switch to Dr. Titus then or did you see

4   another doctor after Dr. Perreti?

5   A.      I saw Dr. Titus next.

6   Q.      Okay.  Let's take a step back for a moment.  When was

7   the first time you took opioid drugs?

8   A.      I would say when they were first on the market.  I

9   would say the early '90s.  Small amounts.

10  Q.      Okay.  And did you take it -- what kinds of opioid

11  drugs did you start with?

12  A.      Well, they came out with the Oxycontin 40 milligram,

13  and I was a boss on numerous jobs for the company I worked

14  for.  So consequently you take care of the boss when you're

15  on the job and the fellow workers, I got this from mom, try

16  this, Mike.  So that's how I was introduced to the opioids.

17  I never thought that they would do what they did for me.

18  They gave me extra strength for the day.

19  Q.      Mm-hmm.

20  A.      That's what they did for me.  They don't do that for

21  everybody, but they gave me extra strength.

22  Q.      And would you say you took these opioids casually at

23  first?

24  A.      Yes, I did.  Casually.

25  Q.      Okay.  And then at a certain point, did you start

Adams - Direct

1   taking them a little more seriously?

2   A.    I did start abusing them.  I considered that.  When

3   you take them more than a couple days a week, that's

4   probably getting carried away.

5   Q.    Okay.  And are you still taking opioids now, even

6   today?

7   A.    I am, to some degree, yes.

8   Q.    Okay.  And just to go back, you said, you know, you

9   were taking them causally starting in the early '90s.  Were

10  you working at that time?

11  A.    Yes.

12  Q.    Okay.  And what are you taking now?

13  A.    I'm taking 30 milligrams of Methadone about

14  five o'clock in the morning.

15  Q.    Why so early?

16  A.    Well, it takes a couple hours to get your body

17  moving.  I've got the neuropathy in my feet, the pinched

18  nerve in my back, bladder cancer last year.  So I'm kind of

19  feeling like a wasted human being, kind of, when I wake up

20  at 5:00.  But I can't sleep past that because I wake up

21  every hour because my bladder is compromised.  I've got a

22  lot of issues, but I can still work, and I'm still happy

23  with life.

24          But the 30 milligrams of Methadone makes a

25  difference.  If I didn't have it, I probably wouldn't be

Adams - Direct

1    able to go to work.

2    Q.    Okay.  Where do you get the Methadone from?

3    A.    I can't really say where I get it from, but I don't

4    get it where I should get it from.

5    Q.    You don't get it prescribed by a doctor?

6    A.    No, I do not.

7    Q.    And 30 milligrams, how many pills is that?

8    A.    That's three ten-milligram tablets.

9    Q.    And just to be clear, Mr. Adams, when you say you

10   don't get this from a doctor, does that mean you just get it

11   from a friend or --

12   A.    I get it from a friend who has a prescription that

13   doesn't use all of his medication on a monthly basis.

14   Q.    Okay.  And you know that that's not legal to get?

15   A.    I know that.  Exactly.  It's shameful.  It's

16   disappointing.  But you know what, you have to make the

17   choices of worse or worser.  So that's all I can explain.

18   Q.    How frequently do you take these 30 milligrams of

19   Methadone?

20   A.    This is a daily for the rest of my life, probably.

21   Q.    Okay.  And why do you take them?

22   A.    I hurt.

23   Q.    Okay.  Have you ever been off opioids long enough to

24   know whether or not you would hurt if you didn't take them?

25   A.    That's -- I would love to know that.  Because I'm

Adams - Direct

1   afraid that if I went to a rehab, they'd stop it all and

2   then I'm sitting there whining and not be able to function.

3   And they're going to look at me, like, what's wrong with

4   you.  I don't think I take them because I like to take them,

5   to be honest with you, but I just think they do the job and

6   that's what they're for.  And that's where I'm at.

7   Q.      But you don't really know because you --

8   A.      No, I do not know.  I do not know.

9   Q.      Okay.  What does it feel like between five o'clock in

10  the morning when you wake up and whenever the pills kick in?

11  A.      Just kind of a -- can't really walk, to be honest

12  with you.

13  Q.      Okay.

14  A.      I have a hard time going up the steps to wake my wife

15  up for work in the morning.  I can barely get up the steps.

16  Q.      So you have pain?

17  A.      Yeah.  Oh, yeah, definitely so.

18  Q.      Do you have any sort of psychological symptoms when

19  you wake up in the morning at 5:00 when you haven't taken

20  your pills yet?

21  A.      I would say depression is pretty standard for people

22  who are on opioids, in my opinion, or maybe it's because I'm

23  almost 70.  I think depression it's with me all the time.

24  Q.      Would you characterize yourself as having an

25  addiction?

Adams - Direct

1    A.      I think at this stage, I finally admit it.  Yes, I
2    do.
3    Q.      And have you ever received any sort of treatment for
4    addiction at all?
5    A.      No.
6    Q.      Can you describe what your addiction feels like?
7    A.      Well, until you get the effect of the medication, you
8    kind of feel depressed about every day you have to take
9    something to function.  And then you worry about suppose
10   your medication isn't there anymore, what are you going to
11   do?  So my -- I had in my mind that I'll go to the clinic
12   that I always hear about and I will get treatment.  That's
13   my plan.  But I don't know until it happens.
14   Q.      And would you say you built up a tolerance to opioids
15   over time?
16   A.      Oh, very much so.
17   Q.      And how does that work?
18   A.      Well, you just -- it doesn't -- it barely -- the 30
19   milligrams of Methadone barely does the job daily, barely.
20   But you know, I'm not going to expand the use of it, period.
21   Everybody has to draw a line in the sand somewhere on where
22   their limits are in life and my limits are there.
23   Q.      And you're able to limit yourself to 30 milligrams --
24   A.      Yes.
25   Q.      -- a day?

Adams - Direct

1    A.      Yes.  Yes, I am.  I truly am.

2    Q.      Does having taken opioids for such a long time affect

3    your memory?

4    A.      Yeah, some things -- yeah, important things, you

5    remember, but the little insignificant stuff from day-to-day

6    doesn't stick with you too much.

7    Q.      Are you able to remember events that occurred from

8    around 2012 through 2014 that we'll be discussing here

9    today?

10   A.      Most likely I will remember most of those, yes.

11   Q.      And how do you remember certain things?

12   A.      Well, because if you drive to Wilmington to see

13   Dr. Xing, you remember driving to Wilmington to see her.

14   That's kind of how I would relate to that.

15   Q.      Okay.  Let's talk about Dr. Titus specifically.  Do

16   you recall when you first -- you mentioned earlier you think

17   you started seeing him, when did you say?

18   A.      Maybe 2011, end of 2010, I'm not quite sure.  You can

19   probably correct me on that.

20   Q.      And where were you living at the time?

21   A.      In Selbyville.

22   Q.      And how far is Selbyville from Milford?

23   A.      A good 45 minutes.

24   Q.      Why did you drive so far?

25   A.      Well, I was told that Dr. Titus would be the doctor

Adams - Direct

1    for me to see.

2    Q.     Okay.  How many locations did you visit Dr. Titus at

3    when you were a patient, how many different offices?

4    A.     Three different offices.

5    Q.     Okay.  And what was the name of the clinic?

6    A.     Lighthouse Medicine.

7              MS. REMIS:  If we could pull up Government

8    Exhibit 717, please.  717.  I'm sorry.  My numbers are

9    wrong.  It should be Government Exhibit 400.  I apologize.

10   BY MS. REMIS:

11   Q.     Do you recognize this, Mr. Adams?

12   A.     Yes, I do.

13   Q.     What are we looking at here?

14   A.     We're looking at Dr. Titus' office, the second office

15   I went to on 113 dual highway in Milford.

16   Q.     Is that -- okay.

17              And if we could go to Government Exhibit 700,

18   please.  Do you recognize this?

19   A.     Yes, that's the final office that I went to to see

20   him.

21   Q.     And do you recall where this is located?

22   A.     In Downtown Milford.

23   Q.     On Church Street?

24   A.     I think that's Church Street.  Yeah, right there by

25   the lake.

Adams - Direct

1    Q.      And then if we could go to Page 2 of this exhibit,

2    please.  Is this the same building just a different view?

3    A.      Yes, just a different angle.

4    Q.      And when you went to this clinic, where would you

5    park?

6    A.      I would work -- park in the very back.

7    Q.      So sort of around where we can't see?

8    A.      Around the back of the building, yes.

9    Q.      And if we could go back to Page 1, please.  Do you

10   see this door right at the front of the picture?

11   A.      Yes.

12   Q.      Is that where you would enter?

13   A.      Yes, you would.

14   Q.      Okay.  Can you recall some of your early visits with

15   Dr. Titus?

16   A.      Very pleasant.  I find Dr. Titus a very, very nice

17   gentleman.  He's a God fearing man and my visits were as

18   much about spiritual talks from him as it was.  I have no

19   faith, and I know he knew that, but he spoke his faith

20   strongly about just about every visit for three years or

21   more.

22   Q.      And you mentioned that you went to three separate

23   locations; right?

24   A.      Yes.

25   Q.      And so was your first visit at either of the

Adams - Direct

1    locations we just looked at?

2    A.      No.

3    Q.      Okay.  Did you have to bring anything with you to

4    your first visit?

5    A.      My first visit, I had to bring MRI images.  The

6    office manager said that he probably would not read them,

7    but I had to have them in order to see him.

8    Q.      Okay.  And did you bring in an MRI?

9    A.      Yes, I did.

10   Q.      And if you could just describe what happened during

11   that first visit?

12   A.      Well, I sat in the waiting room because I didn't get

13   an early visit because I'm a new patient, and probably an

14   hour and a half or so or maybe two hours I saw the doctor.

15   Q.      Okay.  And did you mention to Dr. Titus that you had

16   previously seen a pain doctor before?

17   A.      Yes, I did.  I was trying to be forward with him and

18   casual talk about the doctor I was seeing.  His partner had

19   just been arrested for selling his prescriptions for sex.

20   So talked about that and Dr. Titus said, "What?  Who would

21   do something that foolish?"

22   Q.      Okay.

23   A.      Those were the words he used.

24   Q.      And that's Dr. Perreti's partner you were talking

25   about?

Adams - Direct

1    A.     Yes.

2    Q.     Okay.  And did you tell Dr. Titus about Dr. Perreti's

3    recommendation for you to get surgery?

4    A.     I may have mentioned it that I just wasn't up for

5    surgery.

6    Q.     Okay.  Did you tell Dr. Titus that Dr. Perreti had

7    concerns about substance abuse?

8    A.     I'm sure I did not say that.

9    Q.     Why are you sure?

10   A.     Well, I'm going to Dr. Titus to get a prescription

11   for my pain.  I certainly don't want to -- I tell him -- I

12   don't want him to think right from the get that I've got

13   problems.

14   Q.     Okay.  -- in your recollection, did you get a

15   prescription from Dr. Titus on your first visit?

16   A.     I did.  Yes, I did.

17   Q.     And you just mentioned that you were going to

18   Dr. Titus to get a prescription; is that right?

19   A.     That is correct.

20   Q.     And so what were you hoping to get on that first

21   visit?

22   A.     I was hoping to get the Oxycodone that he prescribed

23   me.

24   Q.     Okay.  How frequently did you see Dr. Titus after

25   that first visit?

734

Adams - Direct

1  A.      Monthly visits.

2  Q.      Okay.  And approximately how much did you pay?

3  A.      Yeah, I think it went from 150 maybe to 180 a visit

4  or something.

5  Q.      Did you have insurance at that time?

6  A.      I had insurance for a while, but I can't recollect

7  when it stopped, and then I just started paying cash or my

8  debit card or whichever.

9  Q.      Okay.  I'm going to show you Government Exhibit 204

10 at 7.  And if we could blow up that bottom one there.

11         Can you see that?

12 A.      Yes, I can.

13 Q.      Okay.  And what's the date or do you recognize this

14 kind of thing?

15 A.      Yes, I do.

16 Q.      And what is it?

17 A.      9/24/14, $150.

18 Q.      And is that you, Michael Adams?

19 A.      That's me.  It was more, I apologize.

20 Q.      And according to this receipt, how did you pay?

21 A.      It says credit card.

22 Q.      Okay.  And that's something you recall paying with?

23 A.      Yes.  Yes, I do.

24 Q.      Let's go to Government Exhibit 205 at 1, please.

25 A.      One second.

Adams - Direct

1   Q.      Sure.

2   A.      It says on that picture, balance 204.70.  What did

3   that mean?

4   Q.      I think that's a page number.

5   A.      Oh, okay.  I'm sorry.

6   Q.      Sorry for the confusion.  If you could go to

7   Government Exhibit 205, Page 1 and blow that up, please,

8   Ms. Leal.

9   A.      Okay.

10  Q.      And do you see that, Mr. Adams?

11  A.      Yes, I do.

12  Q.      What does it say right at the top up there?

13  A.      Lighthouse Internal Medicine.

14  Q.      What's the address listed?

15  A.      10 Church Avenue.

16  Q.      And what's the date?

17  A.      4/9/2014.

18  Q.      Okay.  Is that your signature right at the bottom?

19  A.      Yes, it is.

20  Q.      And how much does it say you paid that day?

21  A.      180.  That's more than I thought I paid. I don't know

22  why the other one was 150.  I have no clue.

23  Q.      Okay.  And did you -- what time did you -- you said

24  you started seeing Dr. Titus monthly; right?

25  A.      Yes.

Adams - Direct

1    Q.      What time did you usually have your appointments at?

2    A.      I always tried to get a six o'clock in the morning

3    appointment.

4    Q.      Why is that?

5    A.      I work.  I don't want to miss work to go see the

6    doctor because it's all about economics for people like me.

7    If you miss two hours of work, you've got to take -- add

8    that to the cost of seeing the doctor.  So if you go at 6:00

9    in the morning, you don't miss any work and you don't -- it

10   doesn't run the price of seeing your doctor up.

11   Q.      Okay.  And when you were there at 6:00 in the

12   morning, can you describe the waiting room, please?

13   A.      Well, at 6:00 in the morning, it was a pretty calm

14   waiting room with, you know, a couple people, two or three

15   people and that would be it.  But if you didn't get your six

16   o'clock appointment, it would be a circus by 10 or

17   11 o'clock probably.

18   Q.      Okay.  So did you ever have experiences where you

19   didn't get a six o'clock appointment?

20   A.      I did several times for various reasons.

21   Q.      Okay.  And what was the waiting room like when you

22   didn't get the six o'clock appointment?

23   A.      Well, a lot of people.  Dr. Titus sometimes isn't as

24   fast as he wants to be with his patients so he starts

25   getting patients built up and then people waiting outside.

Adams - Direct

1   So when you pull up, you're looking around like what's going

2   on here and.  Then you just say, you know what, I'm here to

3   get my medication.  I won't pay attention to anybody else.

4   So that's the atmosphere, so to speak.

5   Q.    When you say you pull up and you look around and

6   there's cars and you say what's going on here, what do you

7   mean?

8   A.    He just doesn't -- and Dr. Titus would probably

9   surely agree.  Every year it seemed that the --

10              MR. BOSTIC:  Your Honor, I object because --

11              THE WITNESS:  Yeah.

12              MR. BOSTIC:  -- the question calls for

13   speculation.

14              THE WITNESS:  Yeah, I think you're exactly

15   right.  So I don't know why he --

16              THE COURT:  All right.  The objection is

17   sustained.  I'm going to sustain Mr. Bostic's objection.  Go

18   ahead and ask your question.

19   BY MS. REMIS:

20   Q.    Mr. Adams, you mentioned that the waiting room was a

21   little more crowded during the day?

22   A.    Yes, truly so.

23   Q.    Can you describe what the other patients, their

24   appearances, what the waiting room felt like?

25   A.    Well, I did feel like the people that I was around

Adams - Direct

1    that they were working folks.  I don't want to be critical

2    of people, but you can tell if people have work shoes on or

3    if they don't have work shoes on.

4           And that's me.  I'm older.  I criticize people

5    and I apologize for it, but I am what I am.

6    Q.    Okay.  Are you familiar with the symptoms of

7    withdrawal?

8    A.    Oh, yes.  I've -- I have lots of -- in the

9    construction business, you know a lot of people.  And people

10   tell you when it's a bad time.  They tell you how it is.

11   Q.    Do you recall ever observing other patients in the

12   waiting room who appeared to be in withdrawal?

13   A.    No, I don't think I ever did.

14   Q.    All right.  Let's see.

15           Sorry.  Just one moment.

16           Once you got to the clinic and you saw

17   Dr. Titus, how long would your visits with Dr. Titus

18   actually last?

19   A.    In his office, I was probably in there at least

20   15 minutes each day, each visit.

21   Q.    Okay.  And can you describe what would happen during

22   the visits?

23   A.    Well, we would do the blood pressure, check my

24   overall wellbeing, and that would be pretty much it.  Asked

25   me how I was doing, is everything all right, and then we'd

Adams - Direct

1    stray off on to other conversation.

2    Q.    Okay.  And when you say check your 'wellbeing,' what

3    exactly do you mean?

4    A.    As far as my blood pressure, you know, listen to my

5    heart, my neck, you know, for carotid artery things.  And

6    that's about all you can do short of getting real personal.

7    Q.    Okay.  And you mentioned that after he would check

8    your heart and your blood pressure and your pulse that you

9    would discuss other things?

10   A.    Yeah, we talk private life, how's the kids, you know,

11   and what do I do for a living, this and that and so on.

12   Q.    Did you ever talk about Dr. Titus' life and his

13   family?

14   A.    Yes.  Yes, we shared personal items, his wife and how

15   he liked -- what he liked about women.

16   Q.    What was that?

17             MR. BOSTIC:  Your Honor --

18             THE WITNESS:  He liked his women --

19             THE COURT:  Yeah, yeah.  So I'm going to sustain

20   that objection.

21             MS. REMIS:  Okay.

22   BY MS. REMIS:

23   Q.    Did you ever talk about any hobbies or anything like

24   that?

25   A.    Dr. Titus said he liked to travel every weekend if he

Adams - Direct

1    could.  Liked to go to Florida and Atlanta and stuff like

2    that.

3    Q.    Okay.  Did Dr. Titus ever refer you for an MRI or an

4    x-ray?

5    A.    No.

6    Q.    Did he ever provide you any other alternative

7    treatments or recommendations or non-drug treatments?

8    A.    No.

9    Q.    Did he ever provide you regular medical services like

10   primary care services?

11   A.    He prescribed -- I had an ear infection or whatever

12   one time.  I got some antibiotics from him, but he didn't do

13   any physicals or anything like that.

14   Q.    Did you ever discuss having a physical, or

15   colonoscopy, or anything?

16   A.    No.  We talked about a colonoscopy one time and he

17   really wasn't -- he didn't believe in them, so to speak,

18   medically.  He didn't think they were a safe procedure.

19   Q.    So even though you were going to Dr. Titus every

20   month, would you have described him as your primary care

21   physician?

22   A.    No, I would not have.  He was my pain doctor, but I

23   had no primary care physician for 30 years probably.

24   Q.    Okay.  Did Dr. Titus ever actually treat your pain

25   with anything other than drugs?

Adams - Direct

1    A.      No.

2    Q.      At some point during your time with Dr. Titus, did he

3    become unable to prescribe you controlled substances?

4    A.      Several times, yes.

5    Q.      And do you remember about when that was?

6    A.      It was December of maybe '13.  The only reason I

7    remember is right before Christmas and we're like what are

8    we going to do; what am I going to do?

9    Q.      Okay.  Do you remember about how long he couldn't

10   prescribe controlled substances for?

11   A.      I think it was about six months all the way up until

12   July of the following year, I think.

13   Q.      Okay.  What did you do -- just to be clear, could it

14   have been another year other than 2013?

15   A.      It could have been.  I'm not exact on the years.  My

16   final year with him I know was 2014.

17   Q.      Okay.

18   A.      But it could have been the year before, 2013 or 2012.

19   I'm not quite exactly sure.

20   Q.      Okay.  What did you do during the time when Dr. Titus

21   couldn't prescribe you controlled substances?

22   A.      Well, I still have to work, so I have an acquaintance

23   that had the Methadone.  And I had been prescribed Methadone

24   from Dr. Titus several times, so I knew what that did.  So

25   my friend said, "Mike, if you need it, I can hook you up.

742

Adams - Direct

1   Maybe enough to get you by.  Don't count on it."

2              I said, "Okay, but I don't know what Dr. Titus

3   is going to do."  I said, "I'm not going to be able to get

4   my records and go see somebody else."  There's probably 800

5   people trying to find somebody else.

6              It's irritating that the system didn't have a

7   fallback on him.  There's nobody to treat all these patients

8   if they get medication for several years.  All of a sudden,

9   you've got nobody.  Now, what do these people do.  I had a

10  solution, but most people probably didn't.

11  Q.    At some point, did you start seeing Dr. Titus again?

12  A.    Yes.  I found out, I don't know how I found out, but

13  I found out that he had been reinstated, his prescription

14  privileges, and then I called him and made an appointment.

15  Q.    Okay.  When you came back to Dr. Titus' office, were

16  there any changes in the way that the clinic ran that you

17  observed?

18  A.    Well, somewhere along the line there was, what they

19  call a, not an RN, but a nurse practitioner that was writing

20  prescriptions, a limit of ten-milligram tablets.  Maybe 90

21  ten-milligram tablets was the maximum and that was until he

22  got his certification back.

23  Q.    And when you say "90," do you mean 90 a month?

24  A.    Ninety a month, yes.

25  Q.    And was that fewer than you had been getting?

Adams - Direct

1    A.    Yes, quite a bit.

2    Q.    Okay.  And then after that when Dr. Titus again

3    started prescribing, did the clinic change any of its sort

4    of policies that you had to follow?

5    A.    Well, yeah.  They -- you had to -- they went through

6    a pill count every two weeks.  You had to drive back to the

7    office and get your pills counted.  They went through a --

8    Dr. Titus did everything he could to satisfy the pressure, I

9    felt he was under.  The pill counts, the urine peeing,

10   the -- sometimes you only got a half a prescription.  You

11   had to come back in two weeks to get the other half.  It

12   just was -- he was doing everything at that time -- I felt

13   as a patient, I felt he was doing everything he could.

14   Q.    And you had to go through a bunch of extra steps?

15   A.    Absolutely.  Doing your part, you had to do it.

16   Q.    You mentioned that you had to go back twice a month.

17   Why was that?

18   A.    They were doing the pill counts.  You had to have the

19   right amount of pills after 14 days.

20   Q.    And did you also pick up a second prescription after

21   half the month?

22   A.    If he wrote a prescription for a half a month, when

23   you went after two weeks, you got a prescription for the

24   other half.

25   Q.    Okay.  And you said Selbyville is how far away from

Adams - Direct

1    Milford?

2    A.      It's 45 minutes, maybe 50.

3    Q.      So now you have to double your driving distance?

4    A.      Yes, it wasn't nice, but you know what, when you want

5    what he has, you just got to do it.

6    Q.      And so why did you keep going?

7    A.      I know that's what kept me working daily or I felt it

8    did, maybe it was a psychological fix.  And that's what I

9    did.

10   Q.      Now, after Dr. Titus started back up, did Dr. Titus

11   tell you about any other changes he was making to his

12   office?

13   A.      I don't think there was anything noteworthy that I

14   can think of that was, other than the pill counts and the

15   urine testing, and that's pretty much the gamut.

16   Q.      Let's look at Government Exhibit 125 at Page 218,

17   please.  Do you see this document, Mr. Adams?

18   A.      I see a document on the screen here.  Yes.

19   Q.      Okay.  And can you see on the top left-hand corner,

20   it says Advanced Xing Pain & Rehabilitation Clinic?

21   A.      Yes.

22   Q.      Do you recall seeing a doctor named Dr. Xing?

23   A.      I do.

24   Q.      And why did you see Dr. Xing?

25   A.      This was one of the criteria when Dr. Titus got his

1    prescription pads back.  He had to have a certain amount of

2    patients.  I felt it was to be analyzed to make sure that

3    the patients were in need of what they were being

4    prescribed.  I think that's what it was.  Accountability, I

5    think is what it was for.

6    Q.    Okay.  And it says seen on, and it's in the right

7    corner.  Do you see that?

8    A.    Yes.

9    Q.    What's the date there?

10   A.    April 21st -- oh, 4/14/2014.

11   Q.    April 14th, 2014?

12   A.    Yes.

13   Q.    And where was Dr. Xing's office located that you

14   would visit?

15   A.    Up in Wilmington, Christiana Highway or something

16   like that, I think, if I remember.

17   Q.    Okay.  How far is that from Selbyville?

18   A.    Oh, that's about two hours or more.

19   Q.    Why did you travel all that way to see Dr. Xing?

20   A.    I had to --

21   Q.    Why?

22   A.    -- or I would no longer be in the program.

23   Q.    And which program is that?

24   A.    Dr. Titus' program.

25   Q.    Okay.  What did Dr. Xing or whoever you saw at

Adams - Direct

1    Dr. Xing's office do at that visit?

2    A.    She just kind of talked with me, didn't really do a

3    lot.  I think she kind of was looking at my records and she

4    thought I was on way too much medication, and I thought I

5    needed some more, to be honest with you.  So after seeing my

6    chart, I cannot explain it, to be honest with you, but I

7    felt that I needed more.  I really did.

8    Q.    You felt you needed more?

9    A.    I felt I needed more.  I mean, it's the blind leading

10   the blind.  I don't know what to say.

11   Q.    But you said the doctor you saw at Dr. Xing's office?

12   A.    She said, "You're doing too much."

13   Q.    She said you're doing too much?

14   A.    "But come see me if Dr. Titus doesn't go back in

15   business.  You can some see me" is what she did offer, but

16   I'm like, I don't want to go up there.

17   Q.    Why wouldn't you want to go up there?

18   A.    Two hours, that's --

19   Q.    That's too much?

20   A.    Too much.

21   Q.    All right.  Let's go to Government Exhibit 125

22   Page 221.  And if you could just highlight under P, please,

23   the first few lines.

24   A.    Okay.

25   Q.    And what does it say under

Adams - Direct

1    "Recommendations/Therapeutic Plan"?

2    A.      Consider trial of PT, chiro, facet joint injections,

3    injections for lumbar, knee injections for osteoarthritis.

4    Consider reduction of Oxycodone.  It says continue

5    Oxycontin, ten milligrams and need to consider any dosage

6    adjustment in the near future, if necessary.

7    Q.      Okay.

8    A.      Informed signs and symptoms for the patient to be

9    aware of due to high addiction potential of Oxycontin and

10   several times per day dosing of Oxycodone.

11   Q.      Okay.  So this says consider reduction of Oxycodone

12   to BID PRN dosing and could consider dose adjustment in the

13   near future essentially; right?

14   A.      Right.

15   Q.      And that's basically what -- we can exit out of this,

16   please.  That's basically what the doctor told you at that

17   clinic that you had?

18   A.      I believe that's what she was inferring to.

19   Q.      Okay.  After the visit with Dr. Xing, did you return

20   to see Dr. Titus?

21   A.      Yes.

22   Q.      Did you discuss Dr. Xing's findings with Dr. Titus?

23   A.      No, not to my recollection.

24   Q.      Okay.  Let's look at Government Exhibit 125 at 119,

25   please.  And if we could just blow up just the top part.

748

Adams - Direct

1              Can you see that, Mr. Adams?

2    A.     Uh-huh.

3    Q.     And what's the date on that prescription?

4    A.     The date is 4/9/14.

5    Q.     And what were you being prescribed on that date?

6    A.     76 15-milligram Oxycodone.

7    Q.     Okay.

8    A.     And 30 ten-milligram Oxycontin.

9    Q.     Okay.  And we looked just a moment ago of that record

10   from Dr. Xing's office on April 14th; right?

11   A.     Yes.

12   Q.     So this prescription was right before then?

13   A.     Yes.

14   Q.     Okay.  And if we could go to Government Exhibit 125.

15   And just to be clear, you mentioned earlier that you had an

16   ear infection or something like that; right?

17   A.     Right.  Mm-hmm.

18   Q.     Is that what that Amoxicillin is?

19   A.     I believe so.

20   Q.     Can we go to 125 at 118, please.

21              And do you see the date up in the top corner of

22   the first prescription?

23   A.     Yes, I do.

24   Q.     What's that?

25   A.     April 23rd, 2014.

Adams - Direct

1    Q.      And what's the first prescription for?

2    A.      Oxycontin, ten milligrams, 30.

3    Q.      And what's the bottom one for?

4    A.      15-milligram Oxycodone and the number is 76.

5    Q.      So this is April 23rd.  We just looked at the same

6    type of prescription from April 9th; right?

7    A.      So that's half the prescription and this is the other

8    half for that month, I'm assuming.

9    Q.      Okay.  So you got 76 Oxycodone 15s, plus 75 Oxycodone

10   15s the April 9th prescription; right?

11   A.      Right.  I think it was 76 each two weeks.

12   Q.      Okay.  And then 30 Oxycontins twice a month?

13   A.      Yes.

14   Q.      Okay.  And this is the prescription that's right

15   after you went to see Dr. Xing; right?

16   A.      That is true.

17   Q.      And that's after Dr. Xing recommended that you lower

18   your dosage; right?

19   A.      Yes.

20   Q.      Okay.  During the course of your treatment with

21   Dr. Titus, how frequently did you get prescriptions from

22   him?

23   A.      Monthly.

24   Q.      And sometimes twice a month?

25   A.      Only if they're cut in half for regulation.

Adams - Direct

1    Q.     Okay.  So let's go to Government exhibit -- what

2    exhibit is this?  125, at Page 126 -- 176 please.

3                And just to be clear, when you got prescriptions

4    twice a month when they were split up into two, do you

5    recall seeing Dr. Titus both times or just the first time?

6    A.     Just the first time.

7    Q.     Okay.  And when you went the second time to pick up

8    the prescription, what happened during that part?

9    A.     You just picked up your prescription and went on

10   about your business.

11   Q.     Did you pick it up -- where did you pick it up from?

12   A.     From the office.

13   Q.     Like from the front desk?

14   A.     Front desk, yes.

15   Q.     And would you pay once a month or twice a month?

16   A.     You'd pay once a month, if I recall correctly, and

17   then you came back two weeks later to pick up the balance of

18   your prescription.

19   Q.     Okay.  And so what is this prescription for right at

20   the top, the two at the top, please?

21   A.     Oxycodone, ten milligrams.

22   Q.     How many?

23   A.     Seventy-five.

24   Q.     Okay.  And what about the other one?

25   A.     Sixty Methadone, ten milligrams.

Adams - Direct

1    Q.      And what's the date of this prescription?

2    A.      10/23/13.

3    Q.      Okay.  And then what about Page 172, please?

4            What is prescribed here?

5    A.      Seventy-five milligrams of -- I mean, 75 tablets or

6    70 -- yeah, 75, I guess that's Oxycodone, ten milligrams.

7    Yes, that's what it is.

8    Q.      Okay.  And on what date?

9    A.      The date is November 6th, 2013.

10   Q.      Okay.  And if we could look at Government Exhibit 125

11   at 167, please.

12           And what are we looking at here?

13   A.      Methadone 60, ten milligrams and then 75

14   ten-milligram Oxycodone.

15   Q.      On what date?

16   A.      November the 20th, 2013.

17   Q.      Okay.  And if we could go to Page 163, please.

18           And what's this prescription?

19   A.      This is 75 Oxycodone, ten milligrams and the date is

20   December 4th, 2013.

21   Q.      Okay.  And I'm going to skip down to Government

22   Exhibit 125 at -- actually, let's do one more which is --

23   sorry.  158, please.

24           And what is this for?

25   A.      This would be the 75 Oxycodone December the 18th,

Adams - Direct

1    2013 and 60 Methadone, ten milligrams December the 18th,

2    2013.

3    Q.     Okay.  And so it looks like you were getting

4    Methadone and Oxycodone about every two weeks; is that

5    right?

6    A.     Yes, half a prescription.  I never paid more than one

7    visit monthly.

8    Q.     Okay.

9    A.     I don't know if it's insinuating I'm seeing him twice

10   a month and paying.  That never happened.  I just -- it just

11   has to be -- it's 400, $500 a month.

12   Q.     You just paid once a month?

13   A.     Yes.

14   Q.     And got two sets of prescriptions?

15   A.     Because of the rule.

16   Q.     Right.

17   A.     Yeah.

18   Q.     And when you would go to fill the prescriptions at

19   the pharmacies, how much would it cost you to fill the

20   Oxycodone prescription, if you remember?

21   A.     Again, I'm spending 150, maybe more if I can get

22   it -- that's a bad subject.  The pharmacies were terrible.

23   They wouldn't fill the prescriptions.  You had to hit five

24   pharmacies.  And when you finally found one, you were very

25   grateful that they would fill it monthly.

Adams - Direct

1              They just had their own agenda, the pharmacists

2     did, and Dr. Titus said, "They can do what they like."  But

3     they were not very kind to Dr. Titus.

4     Q.     And if we could -- if you -- you said $150; is that

5     right?

6     A.     Maybe 180.  I just can't recall exactly what it was.

7     Q.     Is that just for the Oxycodone?

8     A.     Yes, probably just for the Oxy.  The Methadone is

9     relatively cheap, maybe $40 or something.  The Oxycodone is

10    pretty expensive.

11    Q.     So you were paying around 190 or $200?

12    A.     200 bucks would be a good estimate of it.

13    Q.     For the pills?

14    A.     Yes.

15    Q.     And then that's in addition to what you paid every

16    month?

17    A.     I think I figured about $400 a month for my medical

18    visit and my prescriptions, and that says I can work

19    40 hours a week.  It makes a difference.

20    Q.     Okay.  All right.  Let's go to Government Exhibit 125

21    at Page 119, please.

22    A.     Truly embarrassing to see all the prescriptions that

23    I've consumed over the years.  I am just appalled by it, to

24    be honest with you.  I'm sorry.  I'm sad.  I don't know what

25    else to say.

754

Adams - Direct

1   Q.      Why are you apologizing?

2   A.      It's just you don't realize you're doing this much

3   when you're doing it.  I'm looking at them like, how did I

4   function?  I don't know.  But I guess the immunity, you get

5   so used to it that you don't know that you're taking.

6   That's all I can say.  I don't know.

7   Q.      And just looking back through these records, is that

8   the feeling --

9   A.      Oh, it's awakening, to say the least.  To say the

10  least.

11  Q.      It's a lot?

12  A.      Yes.

13  Q.      And can you tell me -- we looked at this prescription

14  already.  Actually, this is April 9th, 2014.

15          Do you recall looking at this a moment ago?

16  A.      Yes.  Yes, I do.

17  Q.      Here you have a prescription for Oxycodone and

18  Oxycontin?

19  A.      Mm-hmm.

20  Q.      Do you know why you were switched from Methadone to

21  Oxycontin?

22  A.      I think Dr. Titus told me that they were more

23  concerned of the Methadone being abused by the DEA or

24  whoever is pumping the information to him and that it was

25  abused more than anything else, the Methadone was, which I

Adams - Direct

1    never understood.  I don't think he did, either, but you

2    know what, they're the boss.  So that's why.

3    Q.      And in your experience, is Oxy --

4    A.      Oxy is opposite.  OxyCodones are very abusive, easy

5    to abuse where the Methadones you got -- you swallow them

6    and that's all you do.  You eat them and you go to work.

7    Q.      And how can you -- why is Oxycodone more easily

8    abused?

9    A.      Well, Oxycodone you can crush and snort if you choose

10   to or chew them up like a baby aspirin, whichever suits

11   you.  It's just a way of ingesting them.

12                And the Methadone you don't dare that.  You

13   swallow it like a serious pill because it's so bitter.

14   Q.      Okay.

15   A.      It's really bad.

16   Q.      So if you snorted Methadone, what would happen?

17   A.      It would burn.  I never tried it, but I was told you

18   don't want to do it.

19   Q.      Okay.  But you can snort Oxy?

20   A.      You can snort the Oxycodone.  You can do that.

21   Q.      And --

22   A.      Bypass the stomach.

23   Q.      And what about Oxycontin?

24   A.      Same way, unless you got the newer kind which have a

25   gel that if you break them up, they'll gel and they won't

1    work.

2    Q.     Meaning you can't snort them?

3    A.     They cannot be snorted, no.

4    Q.     And how were you taking your Oxycodone?

5    A.     I was crushing mine up.  And after a short period of

6    time, I found out that was the best system for me.

7    Embarrassing.  Never told nobody I did it.

8    Q.     Except for the jury.

9    A.     It's shameful.  It's just not the way to do it.  And

10   Dr. Titus would have kicked me out of the office if I told

11   him I did it that way, I know.

12   Q.     You're guessing, though.  You didn't tell him?

13   A.     I'm guessing because I didn't tell him.  I know you

14   don't tell a doctor that.

15   Q.     You kept some things from Dr. Titus, didn't you?

16   A.     I did, I imagine.  Yes, I did.

17   Q.     And why did you do that?

18   A.     I did not want to lose my privileges to be prescribed

19   medications so I could go to work.

20   Q.     And you're describing it as a privilege.  Did you see

21   getting your prescription as a privilege?

22   A.     I did.  I do.

23   Q.     Okay.  And why is that?

24   A.     Well, there's so much nowadays with the opioids.

25   Everybody is a villain.  You're bad because you take them.

Adams - Direct

1   You're bad if you sit home.  My back hurts.  I'm not going

2   to work ever again.

3              You know, the Government -- you know, where do

4   you go?  What's the worst of the worst?  So you try to -- I

5   try to narrow the best path that suits for me and my family.

6   Q.    So you viewed getting your prescriptions from

7   Dr. Titus as a privilege you didn't want to lose?

8   A.    It was a privilege that I needed.  It was very

9   important.

10  Q.    Okay.  And you mentioned that you would snort your

11  Oxycodone; right?

12  A.    Yes.

13  Q.    And about how many would you say you were taking a

14  day back in 2013?

15  A.    Probably, it looks like the pill count six or eight a

16  day, and I just -- I know that they don't last as long when

17  you snort them because I know when I was first interviewed

18  by the DEA three years ago.

19  Q.    I'm just going to pause you for one second.

20  A.    Okay.

21  Q.    Instead of talking about what you told the DEA, why

22  don't you tell us why you would snort them instead of --

23  A.    Well, they affect you quicker, but they also leave

24  your body quicker.  So I know you're all sort of wondering

25  how can you do that many in a day, but only because they

758

Adams - Direct

1    left my body so quick was I able to continue doing them, I

2    assume.  I don't know.  I'm not a chemist or whatever, but

3    by snorting them you really fast pace them.

4    Q.    Okay.  What would happen if you didn't take the

5    OxyCodones regularly enough?

6    A.    I would be very anxious, I'm sure.

7    Q.    And what -- anxious how?

8    A.    Nervous, can't focus on anything.  You know, just

9    like fidgety, that type of type of thing.

10   Q.    Did you say itchy?

11   A.    No, fidgety.

12   Q.    Fidgety.  Okay.  And would those be symptoms of

13   withdrawal?

14   A.    I would think that would be, yeah.

15   Q.    Were you ever drug tested at Dr. Titus' office that

16   you can recall?

17   A.    Yes, I was.

18   Q.    Okay.  And what was your understanding of the purpose

19   of the drug test?

20   A.    Well, to make sure that you had -- the medication he

21   prescribed to you was in your urine.

22   Q.    Okay.  Did you ever discuss your drug test results

23   with Dr. Titus that you remember?

24   A.    The last two I did.  I don't remember the earlier

25   ones.  I don't know why, maybe because I was on so much

Adams - Direct

1    Oxycodone.  I just don't remember that period.  I would have

2    been alarmed had we discussed them much earlier in our

3    visits because I would not want to lose my visiting rights

4    with him.  But at the very end, the last two visits, I had a

5    good urine.  And the final visit I was released and I was

6    like, Okay.

7    Q.     Okay.

8    A.     I understood.

9    Q.     Let's go through that a little bit.  Okay?

10   A.     Okay.

11   Q.     All right.  So let's look at Government Exhibit 125

12   at Page 187, please.  Okay.  And if we could blow that top

13   part up, please.

14          Now, I'm guessing you haven't reviewed your own

15   records; right?

16   A.     No, I have not.  I never got my records.  I never

17   asked for them.  I just was not going to another doctor so I

18   had no need for them.

19   Q.     Okay.  Well, is this your name in the upper left

20   corner, Michael Adams?

21   A.     Yes, it is?

22   Q.     Is that your date of birth, September 24th 1951?

23   A.     Yes.

24   Q.     And under the about the bottom right box, it says

25   "Prescribed - Not Detected."  What does it say there?

Adams - Direct

1    A.       Oxycodone.

2    Q.       Okay.  And if we could go to Page 186, please.

3             Sorry.  That was on November 20th, 2013.  Do you

4    see that up in the corner?

5    A.       I did not, but if you read it, I'm sure it's there.

6    Q.       Well, I'll let you make that decision.

7    A.       Yes, that's 11/20/2013.

8    Q.       Okay.  And it says there at the bottom, "Patient

9    counseled."  But did you just testify you don't recall or --

10   A.       I do not recall.

11   Q.       And if we could go to Government exhibit, same

12   exhibit, Page 186, please.

13   A.       Yes.

14   Q.       Okay.  Is that your signature there at the bottom?

15   A.       It is.

16   Q.       Do you recall discussing the absence of medications

17   on December 4th, 2013 with Dr. Titus?

18   A.       I do not recall that at all.

19   Q.       Okay.  Let's go to Government Exhibit 125 at 183,

20   please.

21            And this is a similar looking document, isn't

22   it?

23   A.       Yes.

24   Q.       And is that Lighthouse Internal Medicine on Church

25   Street?

Adams - Direct

1    A.      Yes.

2    Q.      What's the date on --

3    A.      July the 8th, 2014.

4    Q.      Okay.  That's your signature down there; right?

5    A.      Yes.

6    Q.      Do you remember having a discussion with Dr. Titus

7    about this warning letter on July 8th, 2014?

8    A.      Not at all.  I just don't remember it.

9    Q.      Okay.  And what about on -- let's go to Government

10   Exhibit 125 at 191.  Okay.

11           And this is August 4th, 2014.  Do you see that?

12   A.      Yes.  I see that.

13   Q.      And again, is that your signature down there?

14   A.      Yes, it is.

15   Q.      And why were you being -- what does this warning

16   letter say?

17   A.      "Due to recent toxicology screening, the absence of

18   medications prescribed by the facility."

19   Q.      Okay.  And at that time in August of 2014, you -- let

20   me see here just one moment, please.  If we could look at

21   Government Exhibit 90 at Page 94, please.

22           What were you being prescribed around this time,

23   if you can read on here?

24   A.      July 30th, 2014, 30 ten-milligram Oxycontin and 80

25   15-milligram Oxycontin.

Adams - Direct

1    Q.      Okay.  And if you look here at the bottom also,

2    there's a little card.  Do you see that?

3    A.      Yes.

4    Q.      What was the appointment date?  What is this little

5    card?

6    A.      That's the appointment of prescription pickup on the

7    13th of August, pill count on the 6th of August.

8    Q.      And when would you have your next appointment?

9    A.      Appointment August the 27th.

10   Q.      Okay.  So on July 30th, you got a card that said when

11   your pill count would be?

12   A.      Right.

13   Q.      Okay.  And so you were notified in advance of your

14   pill count?

15   A.      Yes, you knew when it was coming.

16   Q.      So if you knew when it was coming, could you make

17   sure that you had enough pills?

18   A.      Oh, you make sure you set those aside and that's it.

19   You run out and do without.

20   Q.      Okay.

21   A.      You set them aside.  Yeah.

22   Q.      Why would you set them aside?

23   A.      Because if your count's not right, you'll probably be

24   dismissed from the program.

25   Q.      Okay.  Did you ever tell Dr. Titus you were setting

763

Adams - Direct

1    your pills aside?

2    A.    I think common sense would say everybody does that.

3    I mean, you just don't want to make a mistake.

4    Q.    Because you'd lose your privileges?

5    A.    Absolutely.  You'll lose everything.

6    Q.    Okay.  So back in July of 2014, you have Oxycontin

7    and Oxycodone; is that right?

8    A.    Yes.

9    Q.    And then let's go to Page 192, please.  And if we

10   could just blow up the top part.

11          And this is -- this is your name, right,

12   Mr. Adams?

13   A.    Yes.

14   Q.    And date of birth 9/24/51?

15   A.    Yes.

16   Q.    And down in the corner where it's circled right down

17   there, it says "Prescribed - Not Detected."  What does that

18   say?

19   A.    Oxycodone, Oxycontin.

20   Q.    And then it says "Not Prescribed - Detected."  What

21   does that say?

22   A.    Methadone.

23   Q.    Okay.  And what's the date of this?

24   A.    The date is -- let me see here.

25   Q.    It's up in the right corner right there.

Adams - Direct

1    A.      The date is 7/30/2014.

2    Q.      Okay.  And then if we could just go back to 191,

3    please.

4            So that said you were positive for Methadone

5    which hadn't been prescribed; right?

6    A.      Yes.

7    Q.      But negative for Oxycodone which had?

8    A.      Right.

9    Q.      Why would you have been negative for Oxycodone if you

10   had been prescribed it?

11   A.      I do not know.  I guess if I ran out and just

12   finished my week out on Methadone, but I -- by snorting it,

13   I guess it didn't stay in my system long enough for it to

14   show up in my urine a week later.

15   Q.      Let me ask you this:  Were there times when you did

16   run out because you took it to -- the Oxycodone too?

17   A.      Well, if I did, I knew I had -- I had my Methadone

18   sitting off to the side.

19   Q.      Okay.  And sometimes would you run out of your

20   Oxycodone and you would take Methadone that Dr. Titus hadn't

21   prescribed you?

22   A.      Yes, that's correct.

23   Q.      And is that how you would have Methadone in your

24   system, but no Oxycodone?

25   A.      That is correct.  I think I discussed it with him and

Adams - Direct

1    he said, "You can't do that."

2    Q.    Okay.

3    A.    And I understood that, but I told him that's what I

4    did.

5    Q.    Okay.  Did you ever purchase pills outside of the

6    practice to satisfy a pill count?

7    A.    No, never.

8    Q.    You just set them to the side?

9    A.    I set them off to the side.  Yeah.

10   Q.    Okay.  All right.  So we just looked at a warning

11   letter from August 4th, 2014; right?

12   A.    Yes.

13   Q.    And let's go to Page 179, please.

14         And again, this letter, what's the date on it up

15   at the top?

16   A.    September 9th, 2014.

17   Q.    And is that your prescription down there below?

18   A.    Yes.

19   Q.    And what does it say as the reason for the letter?

20   A.    The lack of the medication he has prescribed in my

21   blood is not there.

22   Q.    Okay.  Let me just be clear.  It says that the result

23   included the inclusion of a medication not prescribed by

24   this facility to you; right?

25   A.    Yes.

Adams - Direct

1    Q.      Methadone.  So that means Methadone was there, but it
2    hadn't been prescribed?
3    A.      Precisely.
4    Q.      Okay.  And down here at the bottom, if you can
5    highlight, Ms. Leal, it says -- starting with "Please
6    review," what does this say?
7    A.      "Please review your treatment agreement and be
8    advised that this is your first and only notice regarding
9    this issue."
10   Q.      Okay.  And we've looked at a couple of these already;
11   right?
12   A.      Yes.
13   Q.      So this is -- we looked at July 8th; do you remember
14   that?
15   A.      Yes.
16   Q.      And August 4th?
17   A.      Yes.
18   Q.      And now we're looking at September 9th?
19   A.      The doctor was very kind to me.
20   Q.      Very kind.  So it wasn't really your first and only
21   notice; right?
22   A.      No, not from what I see.  I remember the last two in
23   September or August and September and that the last two
24   notice I recall.  I know my signature is my signature, so I
25   accept that.

Adams - Direct

1  Q.    But you don't have any recollection of having a

2  conversation with Dr. Titus before that time?

3  A.    No.

4  Q.    Okay.  He never said to you, you know, Michael,

5  you're having a problem?

6  A.    No.  He didn't discuss that.

7  Q.    Did you ever discuss that you might -- that --

8  actually, I'll pause on that question.

9          Let's go to -- okay.  You mentioned earlier that

10  you believe that you suffer from a substance abuse issue; is

11  that right?

12  A.    Oh, I believe so, yeah.

13  Q.    And at the time that you were seeing Dr. Titus, did

14  you have an inkling that you might have an addiction

15  problem, too?

16  A.    I didn't think so at that time because I was kind of

17  fresh and I was hurting and I was, like -- and I asked

18  Dr. Titus, I said, "Addiction?  Habitual?  What do we got

19  here?"  He said, "You're probably not addicted, but you've

20  created a habit."

21  Q.    Okay.  And in your mind, was there a difference

22  between addiction and a habit?

23  A.    In my mind, I thought about it, but I think a habit

24  and an addiction can run side by side and be the same

25  possibly.

Adams - Direct

1    Q.     Okay.  And you raised that with Dr. Titus that there

2    might be?

3    A.     Well, no, I didn't debate that with him.  He just

4    told me what his feelings were on -- a habit and addiction

5    were two different words, and I listened to him.

6    Q.     I'm sorry.  My question wasn't clear.  You raised to

7    him that you were concerned you might have an addiction?

8    A.     I did ask him.  I said is this -- "Am I creating a

9    addiction or a habit?"  He said, "No, probably a habit, but

10   probably not an addiction."

11   Q.     And after that conversation, did Dr. Titus refer you

12   to any sort of drug detox?

13   A.     No.  We didn't go any farther.  I wouldn't have gone

14   probably had he done that.  I wouldn't have gone I'm sure.

15   Q.     But did he refer you to any drug rehabilitation

16   program?

17   A.     No, we did not go there.

18   Q.     Okay.  And he continued to prescribe you medication

19   after that?

20   A.     Yes.

21   Q.     Okay.  Let's go to -- sorry.  Just one moment.

22          Now, we looked at several of your prescriptions

23   over time; right?

24   A.     Yes.

25   Q.     And did Dr. Titus ever reduce the number of pills

769

Adams - Direct

1    that you were getting aside from breaking it up into two

2    prescriptions?

3    A.      No.

4    Q.      Did he ever try to wean you off of any pills?

5    A.      No.

6    Q.      Did you ever discuss -- well, let me ask you this:

7    Did your pain ever improve based on Dr. Titus' treatment of

8    you?

9    A.      No, it stayed the same all the time.

10   Q.      In fact, you were still in a lot of pain; right?

11   A.      At times, yes.

12   Q.      And in the morning when you woke up before you took

13   your pills, would you be in pain?

14   A.      Yes, and I discussed about what -- and this is

15   probably why we got into the Oxycontin ten, I got to share

16   that with you, because I told him when I went to bed at

17   night, I was really in a lot of pain because I take

18   medication in the morning.  But actually his -- he felt I

19   was taking it accordingly like I should have, but I wasn't.

20            So he said, "Well, maybe we get time release and

21   you take it in the evening.  That way when you wake in the

22   morning, you're not feeling so bad."

23            That was the theory, I think, behind the

24   Oxycontin ten at the time.

25   Q.      So you asked for Oxycontin?

770

Adams - Direct

1    A.     I don't think I did, but I think he thought that that

2    would be helpful.

3    Q.     Okay.  And you had described that you needed

4    something longer?

5    A.     Yeah, by the time I went to bed, I'm crawling to bed.

6    And I wake up and I'm crawling out of bed, so...

7    Q.     Okay.  And he gave you what you asked for?

8    A.     Yeah.  Yeah.

9            MR. BOSTIC:  Your Honor.

10           THE WITNESS:  Tried to work with me.

11           MR. BOSTIC:  I move to strike that the leading

12   question are -- we're at a point --

13           THE COURT:  Well, can you rephrase the last

14   question?

15           MS. REMIS:  Sure.

16   BY MS. REMIS:

17   Q.     When you discussed that you needed something longer

18   lasting, did you end up receiving it?

19   A.     Yes, I did.

20   Q.     Okay.  If Dr. Titus had stopped prescribing you

21   drugs, would you have continued to see him?

22   A.     No.

23   Q.     What was the purpose of going to Dr. Titus' office?

24   A.     Medication so I can go to work daily.

25   Q.     Okay.  At some point did you, in fact, stop seeing

771

Adams - Direct

1   Dr. Titus?

2   A.     Yes.  He dismissed me in September, late September of

3   2014 because of my failure of the urine test.

4   Q.     Okay.  How do you remember that date?

5   A.     Well, it's my birthday, first of all, 24th.  And

6   secondly, the next month we were going on our anniversary

7   trip to the Carolinas, so that was my last prescription and

8   that would have gotten me through my vacation and not having

9   to go through a lot of psychological changes of not having

10  any medication.

11         So that's why I remember it well, and I just was

12  surprised to be released.  I wasn't mad.  I just said, "I

13  appreciate it and I understand and my fault, not his.  My

14  fault.  And no hard feelings.  Nothing's forever."

15  Q.     Okay.  And if you could -- you mentioned that you

16  were -- let's pull up Government Exhibit 125 at Page 81,

17  please.

18         Do you recognize this, Mr. Adams?

19  A.     Yes.

20  Q.     What is it?

21  A.     Yes, I do.

22  Q.     What is it?

23  A.     That's my release from his services.

24  Q.     Okay.

25  A.     And I actually never received it.  It's probably in

Adams - Direct

1    my file, but I actually never received it.  I don't think I

2    did.  It's a long time, so I can't recall if I received it.

3    Q.     Okay.  How did you know that you had been discharged

4    then?

5    A.     He told me.  He told me right there in the office

6    that, "I can't see you no more.  You've broken the rules and

7    that's the law."  And I said, "I understand."

8    Q.     Okay.  And that was after you had received --

9    A.     He wrote me my last prescription for my visit and

10   that was it.

11   Q.     Okay.  And sorry.  My question was:  This letter was

12   after you received three warnings; right?

13   A.     Yes, it was.

14   Q.     Or I should say after there were warnings in your

15   file?

16   A.     Yes, there was.

17   Q.     And can you read the last line, the second to last

18   line?  It says "Emergency care" right there?

19   A.     "Emergency care does not include narcotics."

20   Q.     Okay.  Let's go to Government Exhibit 80 -- 125 at

21   Page 82, please.  What's the date of this prescription?

22   A.     9/24/14.

23   Q.     Is that the same date as the letter that we just

24   looked at?

25   A.     Same day.

Adams - Direct

1    Q.      And what's the prescription for?

2    A.      160 Oxycontin 15, and 60 Oxycontin ten.

3    Q.      Okay.  Was that more than you usually were prescribed

4    in one single prescription?

5    A.      That was my final visit, and it wasn't going to be

6    split in half for pill counts or anything.  So I don't know

7    what I did the month before, but that's generally what I

8    would get.

9    Q.      Okay.  Well, we can look, right, at the month before?

10   A.      Sure we can.

11   Q.      Page 87, please.

12           And what's the date of this prescription?

13   A.      This is 9/10/2014.

14   Q.      So just about two weeks before the other one?

15   A.      9/10, yes.

16   Q.      Okay.  And what's that for?

17   A.      That was for 30 ten-milligram Oxycontin and 80

18   15-milligram Oxycodone.

19   Q.      Okay.  This is page --

20   A.      That would go for the next two weeks until my next

21   visit.  Yeah.

22   Q.      Okay.  And so on the last one, you got what appears

23   to be a full month?

24   A.      A full month supply in my final visit.  Yes, I did.

25   Q.      Okay.  You mentioned that when you got discharged,

774

Adams - Direct

1   you were surprised; is that right?

2   A.     Yes, I was.

3   Q.     And why was that?

4   A.     Well, I kind of thought maybe he should have done

5   some browbeating a few months ahead of time.  Not that it's

6   his responsibility, but sometimes browbeating works.  And if

7   it was too late for browbeating, then release me.  You know,

8   that's the right thing to do.  But I just was surprised,

9   that's all.

10  Q.     Because you hadn't been --

11  A.     We hadn't --

12  Q.     -- browbeaten?

13  A.     We hadn't had any heavy conversation about it other

14  than the month before said, We're dirty.  That's kind of all

15  he said and then the next month I got released.  So not a

16  lot of debating on it, but not that -- hey, dirty is dirty.

17  So I understand that.  So no hard feelings.

18  Q.     And when you walked out the door with that last

19  prescription on September 24th, 2014, that was double the

20  half prescriptions that you --

21  A.     But he gave me the whole month instead of two weeks,

22  yes.

23  Q.     And do you remember talking to him about this

24  anniversary trip that you had or anything like that?

25  A.     Maybe just in casual, but I don't recall if I did or

Adams - Cross

1   not, but it's -- it wasn't an issue really with that I don't

2   think.

3   Q.     Did you fill the prescription you got?

4   A.     Yes, I did.

5          MS. REMIS:  Just one moment, Your Honor.  Your

6   Honor, I pass the witness.

7          THE COURT:  All right.  Any cross-examination,

8   Mr. Bostic?

9          MR. BOSTIC:  Thank you, Your Honor.

10                    CROSS-EXAMINATION

11  BY MR. BOSTIC:

12  Q.     Good afternoon, Mr. Adams.  How are you?

13  A.     I'm okay.  Thank you.

14  Q.     You know I'm going to talk drywall with you; right?

15  A.     It would be fine with me.

16  Q.     You know what you're doing; right?

17  A.     Forty-eight years, I better.

18  Q.     But you know, let's talk about this pain that you

19  were talking about.  When you went to see Dr. Titus, you

20  were in awful pain?

21  A.     I was.

22  Q.     And your job involving drywalling, you do a lot of

23  bending, you do a lot of lifting and -- you're shaking your

24  head?

25  A.     Yes, I do a lot of all that and then some.

Adams - Cross

1    Q.      And in fact, you did a lot of ceilings, too; right?

2    A.      Absolutely.

3    Q.      Did you ever have to remove popcorn ceiling?

4    A.      I do it all the time.  It's hard work.

5    Q.      And, you know, sometimes you're working alone and

6    you're using the dead man to prop up the side --

7    A.      Yeah, that's me.

8    Q.      Did the drywall ever fall on you?

9    A.      Oh, yeah, yeah.  You got the experience.

10   Q.      Now, you didn't think I had that experience, did you?

11   Right?

12   A.      I started out with none, but I got plenty now.

13   Q.      Well, look, I ask you all these questions to get to

14   the root of what's going on here.  And I can show you

15   records.  I can show you where and when you went to see

16   Dr. Titus --

17            MS. REMIS:  Objection, Your Honor, narrative.

18            MR. BOSTIC:  Let me --

19            THE COURT:  So maybe a question --

20            MR. BOSTIC:  There is a question coming, Your

21   Honor.

22            THE COURT:  Well, let's get to the question.

23   BY MR. BOSTIC:

24   Q.      But you would agree with me, the pain that you were

25   experiencing every day from your perspective was off the

Adams - Cross

1    charts?

2    A.      It had to be addressed if I was going to continue on

3    my journey in life.  Yes.

4    Q.      And I think you saw Dr. Perreti in Maryland at some

5    point for your pain?

6    A.      Yes, I did.

7    Q.      And you told him you're not going to take this -- do

8    that surgery?

9    A.      No.  I -- as long as I can work and function, there

10   was no need to go under a knife with no guarantees.

11   Q.      And you would agree with me that the prescriptions

12   that you received made the difference in your ability to

13   function day to day to do your job?

14   A.      Absolutely.

15   Q.      And it made a difference in your ability to earn

16   money and take care of your family?

17   A.      Absolutely.

18   Q.      And you know, none of us -- sometimes we say and do

19   things that we're not proud of, but I heard you say you

20   didn't tell Dr. Titus certain things because you knew he was

21   going to discharge you?

22   A.      Absolutely.

23   Q.      Remember when you talked to the case agents in this

24   case --

25   A.      Yes.

Adams - Cross

1    Q.      -- the very first time?

2    A.      Yes.

3    Q.      I think it was Bill McDonald and Linda Eleazer?

4    A.      Yes.

5    Q.      Right.  And would you agree with me, and I'm not

6    asking you to say what was said, but would you agree with me

7    that when they came to speak to you, they said a lot of

8    negative things about Dr. Titus?

9            MS. REMIS:  Objection, Your Honor.  Calls for

10   hearsay.

11           MR. BOSTIC:  We have them both on our witness

12   list.

13           MS. REMIS:  Still.

14           THE COURT:  Well, so the -- I don't think it's

15   hearsay because it's not being offered to prove the truth of

16   the matter asserted.  So I'm going to allow the question.

17   BY MR. BOSTIC:

18   Q.      Am I correct in that, sir?

19   A.      Yes.  He was --

20   Q.      I'm not asking you to tell us what they said.

21   A.      Okay.

22   Q.      Okay.  Now, and you talked about at some point doing

23   some work for Dr. Titus at his home, some drywall or

24   something?

25   A.      Yes, I did.  He had some damages in his first wife's

Adams - Cross

1   house and his children's house, and I said, "Let me go up

2   there."  It's out of my way, but I would do it for

3   Dr. Titus.

4   Q.     Okay.  And let me ask you this:  Right.  And you had

5   some ulterior motives in wanting to do the work; right,

6   because -- let me finish my question.

7   A.     Yeah, I'll let you finish.

8   Q.     Because you thought perhaps you could get some more

9   pills out of Dr. Titus than what you ordinarily would get?

10  A.     I knew you would say that and I thought the

11  prosecution was going to try to get me on that, but that was

12  not the case.  I charged him $40 an hour or 35 like I was

13  charging everybody and we never discussed pills period.

14  Q.     Right.  I know you did not.  I know you did not.

15  A.     Never once.

16  Q.     But when you talked to Agent Eleazer and McDonald,

17  they asked you about whether or not you could get pills or

18  got pills for the work that you did?

19             MS. REMIS:  Objection, Your Honor.  Hearsay.

20             THE COURT:  That's irrelevant.  So it's

21  sustained.

22  BY MR. BOSTIC:

23  Q.     Let me rephrase that question for a minute.  Do you

24  recall whether as part of your interview with the agents

25  that there was a discussion about whether you could get

Adams - Cross

1    pills -- let me finish my question.

2              MS. REMIS:  I'm not saying anything.

3    BY MR. BOSTIC:

4    Q.    -- in exchange for the work that you did for

5    Dr. Titus?

6              THE COURT:  All right.  I sustained the

7    objection to that.

8              MR. BOSTIC:  I wasn't certain if my question was

9    clear.  I'll move on.

10   BY MR. BOSTIC:

11   Q.    The Government's showed you a couple of documents

12   with respect to counseling or your discharge, but sticking

13   with counseling, and you would agree with me that you saw

14   your signature on those documents?

15   A.    I did see my signature.  Yes.

16   Q.    And you put those up, your signatures?

17   A.    Yes, they're my signatures.  I can verify that.

18             MR. BOSTIC:  One moment, Your Honor.

19             THE COURT:  Sure.

20             MR. BOSTIC:  Mr. Marek, could you do me a favor

21   and bring up Government 125, Page 233?

22             THE WITNESS:  If I can address the Court on a

23   subject matter?

24             THE COURT:  No, no.  You don't just address the

25   Court.

Adams - Cross

1              THE WITNESS:  I apologize, sir.

2              THE COURT:  No, that's all right.  You don't

3      know, but I'm telling you that that's not the way it works.

4              THE WITNESS:  Okay.  Thank you.

5      BY MR. BOSTIC:

6      Q.    And just so we -- oh, I've got to turn this on.

7      Sorry.

8              You see what's in front of you?

9      A.    Yes.

10     Q.    And I'm not going to ask you to read or explain the

11     terms, but this is so the jury gets an understanding of --

12     you had an MRI; right?  It says that on there.

13     A.    Yes, yes.  I had an MRI done.

14     Q.    And it talks about your condition, your back and what

15     have you?

16     A.    Yes.

17     Q.    I'm not going to ask you to explain.  At the end of

18     the day when you saw Dr. Titus and for the period that you

19     treated with him, you were afflicted by the problems

20     described here?

21     A.    Yes.

22     Q.    And those problems translated into incapacitating

23     pain for you in terms of ability to work?

24     A.    Yes.

25              MR. BOSTIC:  Thank you.  I have nothing else.

Adams - Redirect

1              THE COURT:  All right.  Any redirect?

2              MS. REMIS:  Just very briefly, Your Honor.

3              THE COURT:  All right.

4                         REDIRECT EXAMINATION

5    BY MS. REMIS:

6    Q.    And Mr. Adams, if we could pull up Government

7    Exhibit 128, please.  Sorry, 125 at 128, please.

8              You remember testifying just now and also on

9    direct?

10             MR. BOSTIC:  Can I get to the document, please?

11             MS. REMIS:  Sure.  Sure.  Page 128.

12             MS. KOUSOULIS:  From 125?

13             MS. REMIS:  Yes.

14             MS. KOUSOULIS:  Okay.

15   BY MS. REMIS:

16   Q.    I'm just going to pull it up, Ms. Leal.  Oh, it's

17   taking one second.  Just a couple other questions.

18   A.    Okay.  That's fine.

19   Q.    Okay.  Let me know when you're there.  We're looking

20   at a prescription from March 2014.

21             MR. BOSTIC:  Objection, Your Honor.  Beyond the

22   scope of cross.

23             MS. REMIS:  It is not, Your Honor.

24             THE COURT:  I'm not sure that it is, so I'm

25   going to allow it.

783

Adams - Redirect

1   BY MS. REMIS:

2   Q.    Okay.  Mr. Adams, you mentioned, both on

3   cross-examination and on direct, that you have a lot of

4   pain; right?

5   A.    Yes.

6   Q.    And Mr. Bostic asked you about that debilitating pain

7   that you have; right?

8   A.    Right.

9   Q.    Now, if we look at this prescription from March of

10  2014, it says that you were prescribed Methadone ten, that's

11  ten milligrams, 60 for a month; right?

12  A.    Yes.

13  Q.    And so how many would that be per day?

14  A.    That's two per day.

15  Q.    Okay.  And you said you take now how many per day?

16  A.    I take three per day.

17  Q.    Okay.  So that's just one more ten-milligram tablet?

18  A.    Right.

19  Q.    And you haven't -- have you taken anything other than

20  Methadone ten three a day since you were dismissed from

21  Dr. Titus?

22  A.    I can't say I haven't taken anything, but generally

23  speaking, my go to is my three tablets daily.

24  Q.    Okay.  So that's your --

25  A.    That's my routine.  That's my regimen.

Adams - Recross

1    Q.      Okay.  And back when you were seeing Dr. Titus, you

2    were also getting 15 -- 75 Oxycodone 15 milligrams, two

3    prescriptions per month; right?

4    A.      Yes.

5    Q.      So that's another 150 Oxycodone 15 per month?

6    A.      Yes.

7    Q.      But you subsist now without those; don't you?

8    A.      I do.  It's amazing that you can come back down to

9    that level.  It truly is.

10            MS. REMIS:  No further questions, Your Honor.

11            MR. BOSTIC:  Just one question, if I may, Your

12   Honor.

13            THE COURT:  All right.

14                    RECROSS EXAMINATION

15   BY MR. BOSTIC:

16   Q.      I think when you came in earlier you mentioned that

17   you're still in pain at this point?

18   A.      I'll always have this.  Yes.

19   Q.      So you still deal with a lot of pain?

20   A.      I've been diagnosed with vertebrae 5 and 4 pinched

21   nerve which is giving me neuropathy in both legs and feet,

22   and I had bladder cancer last January.  That has nothing to

23   do with that, but --

24   Q.      And presently you're semi-retired?

25   A.      Twenty hours a week, yeah.

Adams - Recross

1    Q.      You're not doing the lifting?

2    A.      I'm doing it all.  You can't stop.  You cannot stop

3    doing it.

4    Q.      But you're not doing it every day anymore; right?

5    A.      Every day, but five hours a day.  Yeah, every day.

6    Q.      Okay.

7    A.      Five days.  Monday through Friday.

8                THE COURT:  All right.  Mr. Adams, thank you

9    very much.  You may be excused.  All right.

10                THE WITNESS:  Thank you for your time.

11   Hopefully I shared some information to you all.

12                MR. WOODARD:  The Government calls Dr. Marisa

13   Conti.

14                THE COURT:  All right.

15                DEPUTY CLERK:  Dr. Conti, you can take your mask

16   down if you want to.

17                THE WITNESS:  Sure.  Thank you.

18                DEPUTY CLERK:  Please state and spell your full

19   name for the record.

20                THE WITNESS:  My name is Marisa Conti.

21   M-A-R-I-S-A C-O-N-T-I.

22                DEPUTY CLERK:  Do you affirm that the testimony

23   you are about to give to the Court and the jury in the case

24   now pending will be the truth, the whole truth and nothing

25   but the truth, you do so affirm?

1           THE WITNESS:  Yes, I do.

2           DEPUTY CLERK:  Thank you.

3           MARISA CONTI, the witness herein, after having

4    been duly affirmed under oath, was examined and testified as

5    follows:

6                    DIRECT EXAMINATION

7    BY MR. WOODARD:

8    Q.     Hi, Dr. Conti.  Good afternoon.

9    A.     Good afternoon.

10   Q.     Where are you employed, ma'am?

11   A.     I'm an internal medicine physician at Internal

12   Medicine of Dover in Dover, Delaware.

13   Q.     All right.  Where do you live?

14   A.     I live in Dover, Delaware.

15   Q.     Okay.  You said you're a physician.  So do you have a

16   medical doctor degree?

17   A.     Yes.  I'm a doctor of osteopath medicine.  I

18   graduated in 1997 and finished my internal medicine

19   residency in 2007.  I was board certified in internal

20   medicine in 2001 and recertified in 2011.

21   Q.     And are you licensed to practice here in Delaware?

22   A.     Yes, I am.

23   Q.     Okay.  Are you also affiliated with Bayhealth?

24   A.     Yes.  We, for many years, had admitting privileges at

25   Bayhealth, and then for the past six years we have

Conti - Direct

1    outpatient privileges at Bayhealth.

2    Q.     What does "admitting privileges" mean?

3    A.     At the time we would admit our patients from our

4    practice into the hospital for hospital care.  And often we

5    covered unassigned patients who didn't have a doctor listed

6    on their admission paperwork, and we would be assigned them

7    to care for them while they were in the hospital.

8    Q.     Okay.  Would you also handle emergency care or is

9    there a better word for that?

10   A.     So our association with the emergency room is the

11   emergency room would see the patient.  And if they required

12   admission to the hospital, then they would call us and we

13   would come and admit them from the emergency room into the

14   hospital.

15   Q.     Okay.  But your day-to-day practice, like, focused on

16   internal medicine?

17   A.     Yes.

18   Q.     All right.  Dr. Conti, are you familiar with an

19   individual named Patrick Titus?

20   A.     Yes.

21   Q.     And have you treated any patients who were patients

22   of Dr. Titus?

23   A.     Yes, I did.

24   Q.     Okay.  Have you ever treated a patient named Brent

25   Hood?

Conti - Direct

1    A.    Yes, I did.

2    Q.    I'm going to show you what's been marked as

3    Government's Exhibit 701 at Page 2, Ms. Leal.

4          And Dr. Conti, do you recognize this?

5    A.    Yes.

6    Q.    Who's that individual?

7    A.    Brent Hood.

8    Q.    Okay.  Thank you.

9          When did you treat Mr. Hood?

10   A.    When we had hospital work.  It was back in 2013.

11   Q.    2013.  Okay.

12         You mentioned "hospital work."  To the best of

13   your recollection, where were you working on that date?

14   A.    We only covered Bayhealth in Kent County, so it was

15   the Dover Hospital of Bayhealth.

16   Q.    Okay.  And why did Mr. Hood present to the hospital

17   on that date?

18   A.    We were called to admit him to the hospital because

19   he was unresponsive and intubated from a poly substance

20   overdose.

21   Q.    Okay.  A couple technical words there.  What does

22   intubated mean?

23   A.    Intubation is when a person can't breathe on their

24   own and a tube is put down into their trachea so that a

25   machine can breathe for them.

Conti - Direct

1   Q.     Okay.  And poly substance overdose, could you explain

2   that one?

3   A.     Yeah, it's a medical term meaning that there were

4   multiple medications involved that caused the person to

5   overdose as opposed to a heroin overdose, a cocaine

6   overdose.  Poly substance meaning there was multiple things

7   that caused the overdose.

8   Q.     Okay.  Had you ever met Mr. Hood before this date?

9   A.     No.

10          MR. WOODARD:  Just one moment, Your Honor.  Your

11  Honor, I'm going to offer Government's Exhibit 616 into

12  evidence without objection.

13          MS. KOUSOULIS:  No objection.

14          THE COURT:  All right.  Admitted without

15  objection.

16          (Government Exhibit No. 616 was admitted into

17  evidence.)

18          MR. WOODARD:  If you could pull that up,

19  Ms. Leal, and just start on Page 2.

20  BY MR. WOODARD:

21  Q.     And do you recognize what we're looking at here,

22  Dr. Conti?

23  A.     Yes.  That's the face sheet from Kent General

24  Hospital.

25  Q.     Okay.

Conti - Direct

1    A.      Sorry.

2    Q.      No, go ahead.

3    A.      It's sort of a document that has insurance, patient

4    information, phone numbers, sometimes next of kin and things

5    like that.

6    Q.      Okay.  So let's go through this for a minute.  First

7    off, who's the admitting doctor?

8    A.      It's myself, Marisa Conti.

9    Q.      Okay.  And what is the patient's name here?

10   A.      Brent Hood.

11   Q.      Okay.  And if you could go down towards the bottom,

12   diagnosis, complaint.  What was that?

13   A.      The admitting diagnosis was acute respiratory

14   failure.  If I could say that that's just a diagnosis.  That

15   wouldn't be something that gets put in like by a physician.

16   It's usually some -- a staff that just puts in a diagnosis

17   that gets a person admitted to the hospital.

18   Q.      Sure.  Okay.

19           And at the top right, what does it say under

20   "Primary care doctor"?

21   A.      It has no family doctor listed.

22   Q.      Okay.  Do you know why that is?

23   A.      So again, that's usually a secretarial issue.  We

24   have patients that get admitted to Bayhealth now that have

25   been our patients for 20 years.  They don't tell the

791

Conti - Direct

1    hospital that we're their doctors, then something like that

2    would be listed as no family doctor.

3                So at the moment the patient came in, I suppose

4    he wasn't able to say who his family doctor was or if he had

5    one, and so that's what got put in there.

6    Q.    Okay.  So let's go through the records a little bit

7    and, Ms. Leal, if we can go to Page 16 of this document.

8                Okay.  Dr. Conti, what are we looking at here?

9    A.    This is a dictation of a history and physical which

10   is what I do when I see a patient in the emergency room.

11   Q.    Thank you.

12   A.    When I see a patient in the emergency room, and we do

13   an assessment, we usually write -- this is when we had paper

14   records, now we have electronic, but you would write a

15   little note on the progress note.  And then this gets

16   dictated and put into the chart after it's typed up.  So

17   this is sort of a summary of the patient's admission.

18   Q.    Okay.  And just to be sure, we're talking about

19   Mr. Hood?

20   A.    Yes.  Brent Hood.

21   Q.    And the physician here?

22   A.    It's myself, Dr. Conti.

23   Q.    Okay.  And you said history and physical.  What's the

24   history part of that?

25   A.    For this patient or in general?

792

Conti - Direct

1    Q.      In general.

2    A.      A history is usually made up of a couple of different

3    things.  We have something called the history of present

4    illness which is what brought them into the hospital, what

5    their complaints were when they came in.  That kind of

6    focuses on that particular reason for admission.

7            And then we'll do a past medical history which

8    is where we talk about other medical problems that they've

9    had in the past that may or may not contribute to this

10   current admission, but it gives you an idea of what to keep

11   in mind as you're caring for the patient.  And then past

12   surgical history is their surgical history and medications.

13   And as you can see, social history and then family history

14   or medication allergies.

15   Q.      If you don't mind just slowing down a little bit,

16   Dr. Conti.  Why is the history taking important?

17   A.      In medicine, history is really important because

18   we'll have patients who may have diabetes or history of

19   heart attack and be coming in with nausea.  And you have to

20   keep in mind if they have a cardiac history, the nausea may

21   be cardiac equivalent, a heart problem and not just a

22   stomach problem.  So the history helps you think about what

23   other medical problems are going on in the past for the

24   patient and how you should kind of direct your care based on

25   what they've had in the past.

Conti - Direct

1    Q.     Okay.  And I believe the second part of history and

2    physical is physical, so what does that entail?

3    A.     So a physical exam is when you actually physically

4    examine the patient.  It's made up of the vital signs, which

5    are the pulse, the temperature, the pulse ox, which is

6    oxygen level, blood pressure, weight, height, respirations.

7    And then the physical exam is when you actually examine the

8    patient.  There's sort of a recipe we go by, if you will,

9    where we do sort of head-to-toe examination on a patient.

10   Q.     And will that sometimes include hands-on examination?

11   A.     Yes.  Yes.

12   Q.     And ultimately, why is this physical examination

13   important?

14   A.     So a lot of times you'll -- if you don't examine the

15   patient or see the patient, they could have a wound under

16   their gown, or on their leg, on their buttocks that you

17   won't see if you don't actually turn and look at the

18   patient.  So let's say you're admitting them for a fever and

19   you don't examine them, you could find a wound that might be

20   causing a fever.  And if you don't examine them, you're sort

21   of treating in the dark.

22   Q.     Okay.  And ultimately, this history and physical,

23   does this lead to development of the treatment plan of the

24   patient?

25   A.     Yes.

1    Q.    Okay.  Thank you, Dr. Conti.

2          Let's talk about Mr. Hood here.  So if you could

3    read for the jury the "History of present illness"?

4    A.    "The patient is a 43-year-old male who does not have

5    a family doctor.  I am covering for the unassigned medicine

6    and was asked to admit this patient.  He was dropped off in

7    the Emergency Department by some friends stating that he

8    overdosed on Xanax and heroine."  It was mistyped as

9    heroine, but it was heroin.  "The patient was unresponsive

10   and intubated in the emergency department.  He is unable to

11   provide any history.  When I reviewed his medical record

12   through the computer, it appears that the patient was

13   hospitalized in February for a GI bleed and transfused.  He

14   had an esophagogastroduodenoscopy."

15         Do you need me to spell that?

16         MR. WOODARD:  We'll get it to the court reporter

17   later.

18         THE WITNESS:  Sorry, "that showed a Dieulafoy

19   lesion.  He also has a B12 deficiency."

20   BY MR. WOODARD:

21   Q.    Thank you, Dr. Conti.  Let's stop there.

22         You talked about reviewing his medical record

23   through the computer.  What's that mean?

24   A.    So at Bayhealth, there's -- medical records are kept

25   in the computer system, and we had access to any admissions

1    in the hospital at our -- and at our particular hospital at

2    Milford, or at Bayhealth, or at Kent, which is both

3    Bayhealth, any time that any patient has been in that

4    particular hospital before.  So it's a good way to examine

5    things that have happened in the past if you're unable to

6    get overall history or family history from a patient.  So I

7    was able to access his past hospitalization that was in

8    February.

9    Q.    And did you also look up the patient's past medical

10   history?

11   A.    Whatever was available on the computer as a past

12   medical history, yes.

13   Q.    And if you could read that next paragraph to the

14   jury?

15   A.    "He has a past medical history of reflex sympathetic

16   dystrophy.  According to the Delaware Information Network,

17   he has been getting Methadone, ten milligrams and Oxycodone

18   at least twice a month in high doses by Dr. Titus, and he

19   has been having these filled at multiple different

20   pharmacies throughout the state."

21   Q.    Okay.  So let's break this down.  The Delaware

22   Information Network, what is that?

23   A.    So our state has had -- it's actually one of the

24   first states to have it, a global information website that

25   you can -- that you have access to as a physician with

Conti - Direct

 1    certain credentials to be able to see any controlled

 2    substances that are prescribed for any particular patient in

 3    the State of Delaware, and it's actually -- some other

 4    states are involved as well.  I don't remember who was

 5    involved at that time, but that's where I was able to see --

 6    it will get you what medications, how many pills, what the

 7    dose is, who prescribed the medication and where the patient

 8    had it filled in the pharmacy and the dates that they were

 9    filled.

10    Q.    Is this something you consult when interacting with

11    patients who are taking controlled substances?

12    A.    Yes.

13    Q.    Okay.  Why is that?

14    A.    In all honesty, it keeps the patients honest.  It's a

15    safety measure to make sure that they're not getting too

16    many medications from -- if they don't understand that two

17    medications might interact with each other or not understand

18    that they both have the same function that they're getting

19    from two different physicians, it allows you to kind of

20    track how much medicine they're getting.

21    Q.    I think you mentioned honesty.  Are there instances

22    where patients sometimes lie about the medications that

23    they're on?

24    A.    Yes, or they don't understand.

25    Q.    Sure.  And is this one way to verify or find out what

Conti - Direct

1    the truth is?

2    A.    Absolutely.

3    Q.    Okay.  Is this something you do routinely when

4    interacting with these types of patients?

5    A.    Any patient that I have -- that I have a controlled

6    substance, including Xanax, or Ambien or Adderall, every

7    time I check the PMP, which is what it's called now, before

8    I refill any medication.

9    Q.    Okay.  Now, on the next sentence, is it fair to say

10   you determined that Mr. Hood was receiving prescriptions

11   from Dr. Titus?

12   A.    Yes.

13   Q.    Was that something you saw through the PMP?

14   A.    Yes.

15   Q.    And what specific drugs did you see were being

16   prescribed by Dr. Titus?

17   A.    According to the records, it was Methadone and

18   Oxycodone.

19   Q.    Okay.  And what are Methadone and Oxycodone?

20   A.    They're opiate narcotics.

21   Q.    I see you wrote down ten milligrams.  Is there some

22   reason that was important to you?

23   A.    It just was the dose.  I did notice I didn't write

24   down what the dose of Oxycodone was.

25   Q.    Okay.  And you also wrote at least twice a month.  Is

Conti - Direct

1   there some reason that was important to write down?

2   A.    Yes, often times it would be an inconvenience for a

3   patient to have to go twice, every two weeks, to a pharmacy

4   to have medication filled.  Often that would be in people

5   who may be unreliable in getting their medications, so that

6   you can keep a close eye on them.  And also sometimes it --

7   pharmacies have a limit to how much narcotics they'll give

8   in one particular fill.  And so when I saw that, it seemed a

9   little odd that somebody would be -- have to be requiring

10  two trips to the pharmacy a month for pain pills or any

11  controlled substance.

12  Q.    Okay.  You also wrote that Mr. Hood had been having

13  these prescriptions filled at multiple different pharmacies.

14  Why did you write that?

15  A.    So another sort of safety gap in or safety point in

16  the reason for having a PMP is to track whether or not

17  people are going to different pharmacies.  A lot of

18  pharmacists are very responsible and will notice that if a

19  particular patient is coming back many times for a

20  medication, then they may flag it as this is maybe unusual

21  behavior.  And when a patient would go in to multiple

22  pharmacies, it's -- a lot of times they're trying to sort of

23  bypass that safety gap.  So it sort of sends up a flag for

24  me.

25  Q.    So is that why you wrote it down, it was a flag or a

Conti - Direct

1    concern to you?

2    A.     Yes.  Mm-hmm.

3    Q.     So you wrote here that the prescriptions were by

4    Dr. Titus.  Why at the very top does it say family doctor,

5    no?

6    A.     So again, that's a secretarial thing sometimes.  And

7    so that's what was put into the computer, and so I really

8    don't know why that says that.

9    Q.     Okay.  And last question on this document is:  You

10   wrote that the prescriptions were in high doses.  Do you see

11   that?

12   A.     I'm looking.

13   Q.     All right.  Back to the yellow highlight and the

14   third line.

15   A.     Okay.  Methadone and Oxycodone twice a month, yes, I

16   do see that.

17   Q.     What made you write that?

18   A.     I guess when I looked at it, it appeared alarming to

19   me that he would require that high of a medication which is

20   not what I commonly see with patients.

21   Q.     Okay.  Do you sometimes prescribe opioids in your

22   practice?

23   A.     Yes.

24   Q.     Are opioids always the first thing you use to treat

25   pain?

Conti - Direct

1    A.      It is not.

2    Q.      What are some other methods you use to approach pain?

3    A.      We use physical therapy, aquatherapy.  Sometimes

4    they'll go to a specialist for an injection, a steroid

5    injection.  There's other medications like NSAIDS, Tylenol,

6    and there's also things like Gabapentin which are sort of

7    used for pain, also, to sort of bypass using opiates.

8    Q.      And when you choose to write prescriptions for

9    opioids, do you counsel on any risks of addiction or abuse?

10   A.      Yes, the state actually has laws about how to proceed

11   with prescribing opiates.  If it's greater than seven days

12   for, say, an acute injury and you know you're going to be

13   doing this on a monthly basis, you have to get a contract to

14   sign with the patient which is an indication that they're

15   agreeable to submitting to a urine drug screen at any time.

16   That they're going to be having it filled at one pharmacy by

17   one doctor.  They're not allowed to have any other narcotics

18   or controlled substances prescribed by any other physician

19   or that violates the contract.  And that they're going to

20   allow you to bring them in at any time for a pill count so

21   that you can make sure that they're taking their medications

22   appropriately.

23   Q.      Okay.  At the bottom of this document, do you see

24   physical examination?

25   A.      Yes.

1  Q.     Okay.  Was a physical exam conducted?

2  A.     Yes.

3  Q.     All right.  Let's turn to the next page, please,

4  Ms. Leal.

5         And if you can zoom back in for us.  Okay.  So

6  what kind of physical examination did you conduct on

7  Mr. Hood?

8  A.     So this was a typical physical exam.  The patient was

9  in the emergency room on a hospital stretcher.  He was

10 attached to a ventilator, meaning that the tube was in his

11 throat, and he was sedated and unable to provide any verbal

12 history or follow any directions if I asked him to move.

13 His -- it's a typical exam where you go through the body and

14 check for lungs and CP, if there's any signs of discomfort,

15 if you could even elicit that, or any swelling, or heart

16 murmurs or abnormal lung sounds.

17 Q.     Okay.  I see several parts of the body mentioned

18 here.  Are those at least some of the parts of the body you

19 typically examine in your physical examination?

20 A.     Yes.  Yes.

21 Q.     Okay.  Under lab data, what's that section mean?

22 A.     So lab data is what is available through the computer

23 that was drawn by the emergency department and resulted in

24 the medical chart.

25 Q.     Okay.

1   A.      Blood work.  It could be a urine analysis.  It would

2   be a sputum sample, things of that nature that would go to

3   the lab to be checked out.

4   Q.      Okay.  Under "Lab Data," do you see where it says

5   "Urine Drug Screen"?

6   A.      Yes.

7   Q.      Okay.  We'll read this in a second, but why was a

8   urine drug screen conducted?

9   A.      It's emergency room protocol when a person comes in

10  unresponsive to do a drug screen to make sure there isn't

11  something reversible such as Narcan that can be given for an

12  opioid overdose or Romazicon, which is for a Benzodiazepine

13  overdose.

14  Q.      Are urine drug screens something you use with

15  patients that are using opioid drugs?

16  A.      Yes.

17  Q.      Why is that?

18  A.      Could you rephrase the question?

19  Q.      Why do you use drug screens with patients who receive

20  opioids or take opioid drugs.

21  A.      So in the outpatient setting, it's part of the

22  contract to make sure that they actually have the drug in

23  their system and they're not diverting it.  And then in a

24  situation like this, there's an acetaminophen level and

25  salicylate level, an alcohol level, also, which is typically

803

Conti - Direct

1    what the emergency room does in a case of overdose so that

2    you're not missing a different cause of an overdose when

3    they're not able to tell you what they took.

4    Q.     And when conducting these drug screens like you

5    talked about if you determine there's diversion or

6    something, do you change your practice at that point with

7    regard to that patient?

8    A.     Yes.

9    Q.     Why?

10   A.     Well, you have a contract with the patient that

11   they're supposed to be responsibly taking the medication

12   because there's many risks involved with that particular

13   medication.  And if they are showing that they're not

14   responsible to take it properly and that would put them at

15   risk of sickness, overdose or in case diversion which is

16   something that is not legal, then that would be a reason to

17   not prescribe opiates.

18   Q.     Okay.  So what did the urine test in this instance

19   reveal?

20   A.     So the record says his urine drug screen was positive

21   for benzodiazapines, cocaine, and opiates.

22   Q.     And what are benzodiazapines?

23   A.     Those are sedatives like Valium and Alprazolam.

24   Q.     Is there anything remarkable about there being

25   benzodiazapines, cocaine and opiates in one's system?

804

Conti - Direct

1    A.      Cocaine is illegal, so that's something that someone

2    on opiates, if they have that in their urine drug screen as

3    an outpatient, would indicate violation of the contract.

4    And with benzos, if they're not prescribed, then that would

5    be someone taking something that's not prescribed to them.

6            In addition, there's been a lot of studies

7    showing that benzos and opiates together put patients at a

8    higher risk of overdose, so they're not meant to be given

9    together.

10   Q.      Okay.  Thank you.

11           So overall, what was your medical impression

12   here of Mr. Hood?

13   A.      He, at the time, was suffering from an acute overdose

14   and required support for ventilation.

15   Q.      All right.  And so I guess under plan here, you may

16   have covered that, but what did you do after going through

17   your history and physical and deciding on a plan for

18   Mr. Hood?

19   A.      So he was put into the Intensive Care Unit which is

20   where patients who are intubated go.  And typical things

21   that we do for intubated patients are protect their GI tract

22   and protect them from blood clots since they're not moving.

23   So all of that stuff was put in place.  We had the

24   pulmonologist see him, and he was given sedative medication

25   so that he wouldn't be struggling on a vent or in case he

Conti - Direct

1    started waking up.

2    Q.    Okay.  And at some point was Mr. Hood discharged?

3    A.    Yes.

4    Q.    Okay.  Ms. Leal, if you could go to Page 3 of this

5    document.  Okay.

6              Do you see that, Dr. Conti?

7    A.    Yes.

8    Q.    What does this show us?

9    A.    So this is the opposite of an admission dictation,

10   it's a discharge summary.  And this is a summary of what

11   happened during the hospital stay.  It's not comprehensive,

12   so it's not meant to say everything that's happened.  But

13   it's supposed to go to the outpatient physician, whoever the

14   patient does see, so that they can see what had happened in

15   the hospital, what was done, what the follow-up plan was, if

16   there's, you know, lab work that needs to be re-checked or

17   something like that.  So it's sort of a summary that we use

18   to give to the next person who we transfer care to so that

19   they can continue the care.

20   Q.    Okay.  And in this case, was this summary intended to

21   go to Dr. Titus?

22   A.    Well, on this paperwork it says family doctor not

23   listed, and so I don't know where -- if they would have just

24   been in the record or had it been listed, it would have went

25   to him.  I honestly don't know.

Conti - Direct

1    Q.      Okay.  And Ms. Leal, if you could go to the last page

2    of this document.

3              And what are we looking at here, Dr. Conti?

4    A.      So I have to correct you.  That's not the last page

5    of the document.  Did you mean the last page of the

6    discharge summary?

7    Q.      Just I meant of the exhibit I'm showing you in

8    particular.

9    A.      Okay.  I'm sorry.

10   Q.      I'm being legalistic.

11   A.      So this is the -- as I said, when I do a dictation, I

12   also -- that takes a couple of hours to come back into the

13   medical record.  So I normally will write a little note like

14   this which goes into the chart which gets taken up to the

15   patient since, again, these were paper charts at the time.

16   So that if something happened overnight or the emergency

17   room or sorry, the pulmonary doctor came in during the night

18   to see the patient and the dictation wasn't available, he or

19   she would be able to refer to this note to kind of get a

20   brief idea of what I was doing.

21   Q.      Okay.  So these are your notes.  Could we zoom in on

22   where it says Rx by Dr. Titus, Ms. Leal?

23              Okay.  Are those your notes there?

24   A.      Yes.

25   Q.      And how did you come to the conclusion Rx by

Conti - Direct

1    Dr. Titus at different pharmacies?

2    A.    So based on the PMP that I had checked out when I

3    admitted him, that's where the records were that there was

4    different pharmacies involved.

5    Q.    Okay.

6    A.    And if I could add, I didn't dictate the Oxycodone

7    dose, but I wrote it here.  It's right above the line above

8    pharmacies.

9    Q.    Could you zoom in on that, Ms. Leal?  Okay.

10            So do you see where it says "meds per DEL info

11   website"?

12   A.    Yes.

13   Q.    Is this part of the PMP process you were describing

14   earlier?

15   A.    Yes, it is.  And so that gives me an idea of the date

16   that he had those prescribed and how many pills that he had

17   prescribed which can be helpful if you're trying to track

18   how much a person had taken, depending on if you had

19   availability of the bottle.  And there was -- I think that

20   says 30.  But say there was 30 pills prescribed on this day

21   and two days later there was ten pills in the bottle, then

22   you could at least have an idea of how much was taken.

23   Q.    Okay.  So I'm not a doctor.  What are you trying to

24   write in terms of the quantity of pills for both here?

25   A.    That was the number of pills that was prescribed on

Conti - Direct

1   that date that was available on the PMP.

2   Q.    Okay.  So is it 30 Methadone pills?

3   A.    I think.

4   Q.    And 75 Oxycodone pills?

5   A.    Yes.

6   Q.    Okay.  And this amount of pills, did that factor into

7   your decision to write that the prescriptions were in high

8   doses by Dr. Titus?

9   A.    Yes.

10  Q.    What is it about this quantity of pills that made you

11  write that?

12  A.    So typically a patient wouldn't require to be on

13  Methadone and Oxycodone at the same time since they're

14  relatively similarly the same thing and do the same thing.

15  And then the amount of 75 pills, 15 milligrams is a rather

16  high dose.  Typically it's five.  And to give 75 pills

17  would -- and if he was getting them filled twice a month,

18  then that was 150 pills a month.  And that just seems --

19  it's unusual for that high dose to be prescribed.

20          And going back to his available medical history,

21  he didn't have metastatic bone cancer or some type of

22  catastrophic injury that might lead you to the direction

23  that he would need that kind of pain relief.

24  Q.    You mentioned bone cancer.  In what circumstances, if

25  any, have you seen this quantity of pills prescribed?

Conti - Direct

1    A.      If a patient has, say, metastatic breast cancer or

2    some type of multiple myeloma, which is a bone cancer, and

3    their body is just breaking apart, bone pain is very, very

4    painful and occasionally, they would use higher quantities

5    of opioids to help control the pain.

6    Q.      Are you referring to sort of end of life treatment?

7    A.      Yes.

8    Q.      Okay.  Okay.  Let's get back to the discharge here.

9    And Ms. Leal, if you could change exhibits to Government's

10   Exhibit 100.

11              THE COURT:  So, Mr. Woodard, I think we better

12   take our afternoon break here.

13              MR. WOODARD:  Yes, Your Honor.

14              THE COURT:  So members of the jury, we're going

15   to take a 15-minute break.  So we'll start again at about 5

16   of 4:00.

17              Can we take the jury out?

18              (Jury leaving the courtroom.)

19              MS. SOBCZAK:  Your Honor, we are.

20              MS. REMIS:  We're good.

21              MS. SOBCZAK:  Are we good?  Never mind.

22              THE COURT:  Okay.  Are you almost done?

23              MR. WOODARD:  Yes, sir, pretty close.

24              MS. KOUSOULIS:  And I don't have a lot for her.

25              THE COURT:  And I take it we have another

Conti - Direct

1    witness or two after this?

2                    MR. WOODARD:  We have one, Your Honor.

3                    MS. SOBCZAK:  We've got one.

4                    THE COURT:  Okay.  All right.  Okay.  We'll be

5    in recess --

6                    DEPUTY CLERK:  All rise.

7                    THE COURT:  -- until 5 of 4:00.

8                    DEPUTY CLERK:  All rise.

9                    (Recess was taken.)

10                   DEPUTY CLERK:  All rise.

11                   THE COURT:  All right.  So we're going to get

12   the jury.  Do I take it that you think that you might

13   actually finish today before five o'clock?

14                   MR. WOODARD:  That's a possibility, Your Honor.

15                   THE COURT:  Okay.  The witness who's coming on

16   after Dr. Conti, is that someone that is basically it would

17   be ridiculous to have that person come back if they're not

18   finished?

19                   MR. WOODARD:  No.  No.

20                   MS. SOBCZAK:  No.  They could come back.

21                   MS. REMIS:  He's a DEA financial analyst.  So

22   we're good.

23                   THE COURT:  This is Joe Morales?

24                   MS. REMIS:  It is.

25                   THE COURT:  All right.

Conti - Direct

1              MS. REMIS:  So we still have the end of

2    Dr. Conti and I think we'll probably finish by 5:00, but --

3              THE COURT:  Yeah.  You know, yeah.  You know, I

4    was concerned.  You know, yesterday you had this guy John

5    Zalewski on the list, and I figured he's coming from

6    Milford.

7              MS. REMIS:  Oh, it's not him.

8              THE COURT:  If it's somebody from Wilmington,

9    it's no big deal.

10             MS. REMIS:  Nobody can beat Percy.

11             (Jury entering the courtroom.)

12             THE COURT:  All right.  Everyone, welcome back.

13   Everyone, you may be seated.

14             Mr. Woodard, you may continue.

15   BY MR. WOODARD:

16   Q.    Okay.  Dr. Conti, we were talking about Mr. Hood's

17   discharge.

18             Do you remember that?

19   A.    Yes.

20   Q.    And Ms. Leal, if you could pull up Government's 100

21   at 56.  Okay.

22             You see that, Dr. Conti?

23   A.    Yes.

24   Q.    What is this?

25   A.    Honestly, this looks like the thing -- the page that

Conti - Direct

1    the nurse would print out for the patient to take home when

2    they left the hospital.

3    Q.     Okay.  What does it say by name, specialty, phone,

4    appointment?

5    A.     So it says discharge Dr. Titus medical with a phone

6    number.

7    Q.     Okay.  Does there appear to be an appointment

8    scheduled with Dr. Titus?

9    A.     Yes, there does.  There is.  It does.

10   Q.     And what's the date on that?

11   A.     August 7th, 2013, at 10:40 a.m.

12   Q.     Okay.  If we could go to the next page, please,

13   Ms. Leal.

14          What does this show under "Medication Summary"?

15   A.     This is the page that the patient takes home about

16   the medications that they're supposed to be taking at home.

17   Q.     Okay.  So is it fair to say that Mr. Hood was

18   discharged with certain medications?

19   A.     Yes.

20   Q.     Okay.  And what were those?

21   A.     According to the record, Levaquin 500 once a day,

22   which is an antibiotic, Methadone, ten milligrams every

23   12 hours, Oxycodone, 15 milligrams every six hours.

24   Acetomorphine is Tylenol, every four hours as needed for

25   pain or temp in suppositories.

Conti - Direct

1          So what actually happens sometimes is the nurses

2     don't click off things that they are on in the hospital, and

3     they get put on a discharge summary because there's no

4     reason he would need an acetaminophen suppository.  That was

5     when he was intubated, so that's what that was.

6     Q.     All right.  Understood.

7          When you've discharged patients for drug

8     overdoses, what are -- do you sometimes prescribe --

9     continue to prescribe opioids to them?

10    A.     I do not.

11    Q.     Why is that?

12    A.     Well, when we take care of them in the hospital, we

13    don't assume care for them in followup.  So it would be your

14    responsibility to provide pain meds for someone who just

15    overdosed on them, and we wouldn't be able to -- actually it

16    would be violating a contract also if we gave them

17    prescription pain meds.

18    Q.     When you do treat these patients suffering overdoses,

19    what are some of the things you do and you counsel them upon

20    discharge?

21    A.     So when the patient's hospitalized, we -- at the time

22    we didn't have a substance abuse counselor in the hospital,

23    and we would consult psychiatry to be sure that it wasn't an

24    intentional overdose and that the patient wasn't at risk of

25    suicidal intention.  So Mr. Hood had a psychiatry evaluation

814
Conti - Direct

1   before discharge and social work also gets involved and

2   would give the patient information on detox centers or rehab

3   units, things that they could pursue either from the

4   hospital, if they wanted to leave and go right to that

5   facility, or to establish as an outpatient.

6   Q.    Are you familiar with the term tapering dose?

7   A.    Yes.

8   Q.    What's that mean?

9   A.    So a taper is when you give somebody a certain amount

10  of medications with the goal of taking a certain amount

11  until they are weaned off of it completely.

12  Q.    Okay.  Do you recall the amount of Methadone and

13  Oxycodone in this instance that you saw had been prescribed

14  by Dr. Titus that we looked at earlier?  And I could show

15  you that page again if that would help.

16  A.    Yes, please.

17  Q.    Ms. Leal, if you could go to the last page of

18  Government's Exhibit 616.

19         And do you see Methadone and Oxycodone at the

20  right there?

21  A.    Yes, that's just giving the milligram dosage, but not

22  the frequency.

23  Q.    Okay.  What do you mean exactly by "the frequency"?

24  A.    So Methadone could be every eight hours, every six

25  hours, every 12 hours.  Oxycodone could be every six, every

Conti - Direct

1    eight, every 12.  So I document that in here.

2              Could you go to the dictation?  I don't know if

3    I put it on that one.

4    Q.    Ms. Leal, if you could go to Page 16, please.

5              Do you see anything there, Dr. Conti?

6    A.    No.

7    Q.    Would a tapering dose constitute the same amount of

8    drugs we had just looked at that had been previously

9    prescribed?

10   A.    No.

11   Q.    Why not?

12   A.    Well, a tapering dose would be done in a short

13   fashion, so it would be only under seven days, ten days of a

14   smaller dose and with a scheduled weaning dose.

15   Q.    Okay.  What does "weaning" mean?

16             MS. KOUSOULIS:  Your Honor, I would just object

17   to this line of questioning.  She's not being called as an

18   expert and they're going to have Dr. Thomas testify --

19             THE COURT:  I agree.  This is, I think -- I'm

20   going to sustain the objection.

21             MR. WOODARD:  Okay.  Thank you, Your Honor.

22   BY MR. WOODARD:

23   Q.    Ms. Leal, if you could go back to Exhibit 100 at 56,

24   please.  And if you could scroll down to the next page.  The

25   next page, please.  And one more.  I'm sorry.

Conti - Direct

1          Okay.  So Dr. Conti, we saw that upon discharge,
2    certain prescriptions were, I guess, provided to Mr. Hood;
3    is that fair?
4    A.     According to this record, yes, Levaquin was
5    prescribed.
6    Q.     Okay.  Could you read here under medications will
7    include?
8    A.     Yes.  Levaquin 500 milligrams daily for the next six
9    days for possible left lower lobe pneumonia.  He may also
10   start back his Methadone, ten milligrams twice a day and
11   Oxycontin 15 milligrams every six hours as needed for pain.
12   Prescriptions were not given for this medication.  This is
13   being prescribed by Dr. Titus.  I recommended followup with
14   Dr. Titus within the next week.
15   Q.     Okay.  So was the hospital essentially putting
16   Mr. Hood back into the care of Dr. Titus here?
17   A.     It appears so.
18   Q.     Okay.  Was the hospital indefinitely prescribing
19   opioids?
20          MS. KOUSOULIS:  Your Honor, I would object to
21   what the hospital is doing.  She didn't prepare the
22   discharge summary and so I think it calls for speculation.
23          THE COURT:  I think the answer is pretty self
24   evident, so I'm going to sustain the objection.
25          MR. WOODARD:  Thank you.

```
 1    BY MR. WOODARD:
 2    Q.     Dr. Conti, does your experience with Mr. Hood stand
 3    out to you for any reason?
 4    A.     Yes.
 5    Q.     Why is that?
 6    A.     This was an unusual amount of pain medications for
 7    somebody who didn't have a medical condition that would
 8    warrant that much in my experience as a physician.
 9                MS. KOUSOULIS:  Your Honor, I would object to
10    that, unless she reviewed all the medical records.  She
11    reviewed some records that Bayhealth had, but I don't think
12    she -- there's no evidence that she had any information from
13    him, that she talked to him, evaluated him, so I think this
14    is based on speculation.
15                MR. WOODARD:  It goes to the weight and
16    cross-examination, Your Honor.
17                THE COURT:  Well, so I think the thing is she
18    said it stood out.  I don't really think -- and I think she
19    said that, so I'm going to sustain the objection.
20                Okay?
21                MR. WOODARD:  Thank you, Your Honor.
22    BY MR. WOODARD:
23    Q.     And Dr. Conti, did you do anything to raise your
24    concerns to anyone?
25    A.     I did.  I called the State at the time of his
```

Conti - Cross

1    admission to the hospital.

2    Q.     Okay.

3                 MR. WOODARD:  Just one moment, Your Honor.

4                 Thank you, Dr. Conti.  No further questions,

5    Your Honor.

6                 THE COURT:  All right.  Ms. Kousoulis.

7                      CROSS-EXAMINATION

8    BY MS. KOUSOULIS:

9    Q.     Good afternoon, Dr. Conti.

10   A.     Good afternoon.

11   Q.     Now, Dr. Conti, you testified that you treated

12   Mr. Hood in the ER; correct?  After he was taken to the ER

13   and then he was admitted, after he was admitted, you treated

14   him; correct?

15   A.     I admitted him from the emergency room to the

16   hospital.

17   Q.     You hadn't had any experience with Mr. Hood before

18   that day; correct?

19   A.     I did not.

20   Q.     And you indicated that you had reviewed some records

21   relating to Mr. Hood after his admission.  Those were

22   records that -- of his treatment he had gotten at Bayhealth

23   at other times that he had visited the hospital; correct?

24   A.     His past medical -- his medical record that were

25   available in the Bayhealth system, yes.

Conti - Cross

1    Q.      Okay.  You never reviewed any of his -- any of

2    Dr. Titus' records with regard to Mr. Hood; is that correct?

3    A.      At the time of his admission, he didn't list a family

4    doctor, so no.

5    Q.      Okay.  And you don't know what his interactions with

6    Dr. Titus were; correct?

7    A.      I did not know.

8    Q.      And you don't know what he reported to Dr. Titus with

9    regard to any pain he was suffering from; correct?

10   A.      No, I do not know.

11   Q.      And you're not a pain management doctor?

12   A.      I am not.

13   Q.      And you don't treat -- you don't routinely treat

14   patients with chronic pain; correct?

15   A.      I do treat patients with chronic pain.

16   Q.      Is that part of your routine practice?

17   A.      It's a percentage of my patients.

18   Q.      Okay.  And you testified that you were alarmed by the

19   high dosage amounts that you saw from the PMP that Mr. Hood

20   was being prescribed; correct?

21   A.      And the fact that there were multiple pharmacies and

22   multiple fills, yes.

23   Q.      Again, you don't know the circumstances of why he had

24   to go to more than one pharmacy; correct?

25   A.      There's no circumstance when you're on narcotics.

1    It's part of your contract to go to the same pharmacy.

2    Q.    Okay.  So you don't know if maybe he went to one

3    pharmacy and they didn't have it, so he had to go to another

4    pharmacy.  It's fair to say you have no way of knowing that;

5    right?

6    A.    The PMP indicates that it was filled at multiple

7    pharmacies so if they didn't have it, they wouldn't have

8    listed that it was filled there.

9    Q.    Now, you indicated that he overdosed.  He had cocaine

10   in his system and benzodiazapine in his system; correct?

11   A.    And opioids, correct.

12   Q.    And Dr. Titus -- there's no indication from the PMP

13   that Dr. Titus prescribed him cocaine; correct?

14   A.    Cocaine is an illicit substance.  It's not prescribed

15   by physicians.

16   Q.    Correct.  So Dr. Titus did not prescribe it; correct?

17   A.    No physician prescribed it.

18   Q.    And Dr. Titus did not prescribe the benzodiazapine;

19   correct?

20   A.    Not according to the PMP.

21   Q.    And you were not the doctor that discharged Mr. Hood

22   from the hospital; correct?

23   A.    No, my partner did.

24            MS. KOUSOULIS:  I have no further questions.

25            THE COURT:  Anymore, Mr. Woodard?

Conti - Cross

 1                    MR. WOODARD:  No, Your Honor.

 2                    THE COURT:  All right.  Dr. Conti, you're

 3     excused.  You may go.

 4                    THE COURT:  All right.  Your next witness.

 5                    MS. SOBCZAK:  Yes, the Government calls Joseph

 6     Morales.

 7                    DEPUTY CLERK:  Please state and spell your full

 8     name for the record.

 9                    THE WITNESS:  Joseph Morales.  J-O-S-E-P-H,

10     Morales, M-O-R-A-L-E-S.

11                    DEPUTY CLERK:  Do you affirm that the testimony

12     you are about to give to the Court and the jury in the case

13     now pending will be the truth, the whole truth and nothing

14     but the truth, you do so affirm.

15                    THE WITNESS:  I do.

16                    DEPUTY CLERK:  Thank you.

17                    JOSEPH MORALES, the witness herein, after having

18     been duly affirmed under oath, was examined and testified as

19     follows:

20                    MS. SOBCZAK:  Your Honor, before we get started,

21     the Government will be seeking to use several exhibits with

22     Mr. Morales that have not been introduced into evidence yet

23     and we seek to introduce them now without objection.

24                    THE COURT:  All right.  Well, just say what they

25     are.

Morales - Direct

1          MS. SOBCZAK:  They are Exhibits 500, 501, 502,

2     and 804.

3          THE COURT:  All right.  There's no objection;

4     right?

5          MR. BOSTIC:  That's correct, Your Honor, no

6     objection.

7          THE COURT:  Admitted without objection.

8          MS. SOBCZAK:  Thank you.

9          (Government Exhibit Nos. 500, 501, 502 and 804

10    were admitted into evidence.)

11                    DIRECT EXAMINATION

12    BY MS. SOBCZAK:

13    Q.    Good afternoon, Mr. Morales.

14    A.    Good afternoon.

15    Q.    Mr. Morales, where are you currently employed?

16    A.    I'm a senior financial investigator employed as a

17    contractor with DEA.

18    Q.    And what is your job with DEA?

19    A.    My responsibilities include financial support for all

20    DEA investigations.

21    Q.    And what does that financial support include?  Can

22    you go through some of your job responsibilities?

23    A.    Sure.  I would search and try to identify assets,

24    examine bank records and any other financial records like

25    property searches, vehicle registration information, just to

823

Morales - Direct

1    identify certain assets and any financial information in the

2    investigation.

3    Q.      How long have you worked at or for the DEA?

4    A.      For approximately seven years.

5    Q.      And have you worked in the role you're currently in

6    the entire time you worked at DEA?

7    A.      Yes, I have.

8    Q.      Where did you work before DEA?

9    A.      Prior to DEA, I worked three months at JP Morgan

10   Chase as a compliance analyst.  After I retired from my

11   other Government job.

12   Q.      And prior to that, where did you work?

13   A.      Prior to that, I was -- I worked for 24 years at the

14   Internal Revenue Service as a special agent.

15   Q.      And did your job responsibilities at either of those

16   other positions also include financial analysis?

17   A.      Yes, they did.

18   Q.      Can you describe what type of work you did at those

19   agencies?

20   A.      Well, at the IRS, my responsibilities included tax

21   investigations, money laundering and structuring

22   investigations.

23   Q.      Mr. Morales, do you have experience working on

24   investigations into the unlawful distribution of controlled

25   substances?

824

Morales - Direct

1    A.     Yes, I do.

2    Q.     And what is the purpose behind conducting a financial

3    analysis in a case that would involve allegations of the

4    unlawful use of controlled substances?

5    A.     Well, a lot of times in these cases, there's always

6    money involved.  And with money, you have to track the

7    money, whether it gets deposited into a bank account or it

8    gets -- track the purchase of the asset.  So wherever the

9    money is, then you'll find the source of that revenue.

10   Q.     So Mr. Morales, are you familiar with a DEA

11   investigation into Patrick Titus?

12   A.     Yes, I am.

13   Q.     And how are you familiar with that investigation?

14   A.     When I started work for DEA, I was assigned to this

15   investigation.  And once I was assigned, I started looking

16   at the financial records.

17   Q.     And when you say you were "looking at the financial

18   records," what was your role related to that?  What did you

19   do?

20   A.     Well, at that time, I examined the bank records.  We

21   had bank records from M&T Bank and PNC Bank.

22   Q.     And related to the bank records, how did you obtain

23   these bank records?

24   A.     Those were obtained through grand jury subpoenas.

25   Q.     And what is a grand jury subpoena?

Morales - Direct

1    A.      A grand jury subpoena is just a request for documents

2    made by a U.S. attorney or U.S. Attorney's Office made to

3    the grand jury panel.

4    Q.      And did you obtain records in any way other than by a

5    grand jury subpoena?

6    A.      Yes, we obtained some records through administrative

7    subpoena or database searches.

8    Q.      And were search warrants also conducted in this case?

9    A.      Yes, they were.

10   Q.      And were any records, financial records obtained

11   through search warrants?

12   A.      Yes.  We obtained different business-associated

13   records with Lighthouse Internal Medicine and Marydel

14   Corporation through the search warrant.

15   Q.      And can you describe what kinds of business records

16   did you obtain through the search warrants?

17   A.      We obtained business receipt books, which were spiral

18   notebooks kept by Lighthouse Internal Medicine, I believe

19   for the period of 2012 through 2014.  We obtained some bank

20   records and other miscellaneous financial records.

21   Q.      So Mr. Morales, it sounds like there are two buckets

22   of ways that you obtained financial information.  You have

23   the bank records through subpoenas and then there's also the

24   search warrant evidence; is that correct?

25   A.      That's correct.

826

Morales - Direct

1   Q.      So can we talk through how did you go about analyzing

2   all of the materials that you obtained through these

3   different mechanisms?

4   A.      Well, with the bank records, when the records were

5   obtained, we obtained bank statements, deposit items,

6   cancelled checks and the signature cards for the various

7   bank accounts.  And for the search warrant records, it was

8   just the examination of the notebook, spiral notebooks

9   obtained from the business.  And what I tried to do with

10  both sources was create spreadsheets for the bank records

11  and for the business receipt books.

12  Q.      And so in those spreadsheets, what information were

13  you inputting?

14  A.      For the business receipts, I identified the patient

15  name, the date the money was received, and the form of

16  payment that was provided by the patient.

17  Q.      And that was related to the bank records; is that

18  correct?

19  A.      That was related to the business receipt books

20  obtained from the search warrant.

21  Q.      And did you do a similar process for the bank

22  records?

23  A.      Similar that we created a spreadsheet, but for the

24  bank records, the bank statements were scanned by a software

25  program that I utilized and created spreadsheets for those

Morales - Direct

1    records and then manually input the deposit items and

2    cancelled checks into that spreadsheet.

3    Q.     And so after the information from the business

4    receipts and the bank records was inputted into these

5    spreadsheets, what did you do with that information?

6    A.     With the bank -- with the bank records, I created a

7    pivot table to summarize the activity in that account.

8    Q.     And what's a pivot table?

9    A.     Well, a pivot table summarized -- like I mentioned,

10   summarizes the activity in the spreadsheet and it also

11   breaks it out by category, what type of transaction it was,

12   will break it out by year, and in this particular instance,

13   it was 2012 through 2014.

14   Q.     And so did you reach any big picture conclusions

15   related to the pivot tables and the bank records?

16   A.     Yes, the pivot tables and -- there were one -- over

17   $1,818,000 in credits during that period and there was over

18   $1,828,000 in debits during that same period of time of 2012

19   through 2014.

20   Q.     Can you describe what's a credit?

21   A.     A credit, that would be money into the account, any

22   additions to that bank account.

23   Q.     So if I use the words money in, is that okay?

24   A.     That's -- yes.

25   Q.     Because I get a little confused sometimes with that.

Morales - Direct

1   A.      Yes, that's fine.

2   Q.      And what's a debit?

3   A.      A debit is -- that would be money out of the account,

4   any subtractions from that account.

5   Q.      And so you were talking -- you've been talking about

6   bank accounts, so I'd like to talk about specific bank

7   accounts you analyzed.  What were the primary bank accounts

8   that were obtained that you reviewed in this investigation?

9   A.      The primary accounts were the Lighthouse Internal

10  Medicine accounts from M&T Bank and also we examined the

11  Marydel Corporation account from M&T Bank.

12  Q.      So let's first talk about the Lighthouse bank

13  account.  I believe you said this already, but which bank

14  was the Lighthouse bank account with?

15  A.      M&T Bank.

16  Q.      And who were the signatories on the account?

17  A.      The signatories on the account were Patrick Titus and

18  Josie Walters.

19  Q.      And can you describe what is a signatory?

20  A.      A signatory is the person authorized to make any

21  additions, deposits to the account or make any withdrawals

22  or subtractions from the account.  They basically have

23  control of that bank account.

24  Q.      And so, Ms. Leal, if you could please pull up GEX,

25  Government Exhibit 500.  And could you go to Page 3, please.

Morales - Direct

1          So this is on an angle.  Can you see that
2   document?
3   A.     Yes, I can.
4   Q.     Can you describe what this is?
5   A.     Yes, that's the signature card for Lighthouse
6   Internal Medicine, M&T Bank account.
7   Q.     And if you look, I guess, at the top of this
8   document, there's a date.  What is the date on this
9   document?
10  A.     This is dated May 10th of 2005.
11  Q.     And are those names associated with this account?
12  A.     Yes, there is.
13  Q.     And what are the names?
14  A.     Patrick A. Titus and Josie A. Walters.
15  Q.     And are there signatures next to those names?
16  A.     Yes.
17  Q.     And you also mentioned the Marydel account.  What is
18  the Marydel account?
19  A.     The Marydel account was a business bank account that
20  Josie Walters set up for her business, her company.
21  Q.     And how do you know that this was Josie Walters' bank
22  account?
23  A.     Well, the signature card identified that this was the
24  bank account for Josie Walters.
25  Q.     And Ms. Leal, can you please pull up GEX 501, please.

Morales - Direct

1        And Mr. Morales, what is this document in front

2    of us?

3    A.      This is a signature card for the M&T Marydel

4    Corporation checking account.

5    Q.      And on the top right there's a date.  What is that

6    date?

7    A.      This signature card is dated 10/22 of 1999.

8    Q.      And is there also a name below that?

9    A.      Yes.

10   Q.      What is the name?

11   A.      Josie Walters.

12   Q.      And is there a signature next to that name?

13   A.      Yes, there is.

14   Q.      Are there any other names on the signature card?

15   A.      No, there isn't.

16   Q.      And so I'd like to talk now about your analysis of

17   these accounts.  What was the time frame of the financial

18   transactions that you reviewed related to the Lighthouse and

19   Marydel accounts?

20   A.      The time frame for the Lighthouse Internal Medicine

21   account was January 1st, 2012 through November 30th of 2014.

22   The Marydel account, I believe, was January 1st, 2012

23   through October of 2014.

24   Q.      And I'd like to just focus specifically on the

25   Lighthouse account.  Were Patrick Titus and Joseph Walters

Morales - Direct

1    the sole signatories on the Lighthouse account during the

2    time frame that you reviewed?

3    A.      Yes, they were.

4    Q.      And was Josie the sole signatory on the Marydel

5    during the time frame that you reviewed?

6    A.      Yes.

7    Q.      Ms. Leal, if you could please pull up Government

8    Exhibit 804.

9                 Mr. Morales, can you please describe what this

10   slide shows?

11   A.      This slide shows the total credits for the Lighthouse

12   Internal Medicine account from January 1st, 2012 through

13   November 30th of 2014.

14   Q.      And I'd just like to break it down a little bit.  So

15   if you look at the first row here, what does that state?

16   A.      The first row is basically the categories that we've

17   broken out the credits, the type of credit it was.

18   Q.      And so what is that -- I guess, why don't we start

19   with the first row and that column over to the left.  What

20   does that state there?

21   A.      Oh, that's cash deposits.

22   Q.      And so did you review cash deposits?

23   A.      Yes, we did.

24   Q.      And so what did you find related to cash deposits

25   that went into the Lighthouse bank account?

Morales - Direct

1    A.    Well, from reviewing the cash deposits into the

2    account, it was obvious that the amount of cash increased

3    from that three-year period from 2012 to upwards of up to

4    $414,000 in 2014 from 81,000.

5    Q.    And what was the total amount of cash that was

6    deposited into the Lighthouse bank account between 2012 and

7    2014?

8    A.    There were over $842,000 in cash deposits during that

9    period of time.

10   Q.    And if you skip to the third row, what does the third

11   row show?

12   A.    The third row is the credit card deposits into the

13   Lighthouse Internal Medicine account.

14   Q.    And the credit card deposits, can you explain what

15   that means?  What were those deposits?

16   A.    This is when a patient came to the practice and he or

17   she paid by credit card, it would be processed at the -- at

18   the practice and then eventually get deposited into the

19   account as a credit card deposit.

20   Q.    And what did your analysis show related to the credit

21   card deposits?

22   A.    The credit cards also increased from 2012 to 2013 and

23   2014 from $2,500 up to 140,000 in 2013 and 122,000 in 2014.

24   Q.    And what in total was the total amount of credit card

25   deposits between 2012 and 2014?

Morales - Direct

1    A.      The total amount was $265,351.78.

2    Q.      And so if you total up the cash and credit card

3    deposits, would that be a total of over $1.1 million,

4    somewhere thereabouts?

5    A.      Yes.

6    Q.      And then if you look at the second and fourth rows of

7    this table, what do those show?

8    A.      The second row shows the Medicaid and Government

9    insurance payment that Lighthouse received during that

10   period of time and the fourth row shows the private

11   insurance payments that Lighthouse received.

12   Q.      And in total, what in Medicaid and other Government

13   insurance was the total that Lighthouse received between

14   2012 and 2014?

15   A.      Lighthouse received over 460,000 in Medicaid and

16   Government insurance payments.

17   Q.      And what was the total of private insurance payments

18   over that time?

19   A.      Private insurance was over 118,000 in payments

20   received.

21   Q.      And then very briefly, there's this other row at the

22   bottom.  What does that show?

23   A.      The other credits were any monies that were returned

24   to Lighthouse.  We saw during 2012, there were payments that

25   were made to American Express, that were returned to the

Morales - Direct

1    bank.  And this occurred three different times.

2              It was a $12,900 payment.  So $38,000 of that

3    amount made up of the 2012 total amount for other credits.

4    And the other years, '13 and '14, were just miscellaneous

5    other credits that weren't -- that didn't fall into the

6    other categories.

7    Q.    So Mr. Morales, in total, how much money went into

8    the Lighthouse bank account between 2012 and November 30th

9    of 2014?

10   A.    The total during that period of time was

11   $1,818,955.36.

12   Q.    And Ms. Leal, if you could go to the next slide,

13   please.

14             So Mr. Morales, can you describe what is

15   depicted in this slide?

16   A.    Yes.  This is the total credits into Lighthouse

17   Internal Medicine for a period of November 3rd, 2013,

18   through November 30th of 2014.

19   Q.    And what is the significance of the date range that

20   you've just named?

21   A.    The significance is important because it signifies

22   the period of time Lighthouse was at 10-12 North Church

23   Street.

24   Q.    And how do you know that Lighthouse was located at

25   10-12 North Church Street at that time?

Morales - Direct

1   A.      Well, during that period of time, the debits from the

2   account, there were rental payments for property management

3   companies that changed from Mobious or changed to Mobious

4   Investments from 3D Corporation.  And we also received

5   information from Delaware Department of Revenue related to a

6   business license for Lighthouse Internal Medicine for

7   that -- for that change of address.

8   Q.      And Ms. Leal, if you can please pull up the first

9   page of Government Exhibit 502.  And if you could enhance

10  the document at the top.  Thank you.

11          Mr. Morales, what is this document?

12  A.      This is a Check Number 4239 from Lighthouse Internal

13  Medicine account ending in 2883 payable to Mobious

14  Investments LLC.

15  Q.      And what is the date on this check?

16  A.      This check is dated November 4th of 2013.

17  Q.      And what is highlighted in the memo line?

18  A.      Security deposit.

19  Q.      Ms. Leal, if you can please go back to Government

20  Exhibit 804.

21          And so proceeding with this, Mr. Morales, what

22  in total was the amount of credits or money that went into

23  the Lighthouse bank account in this time frame that

24  Lighthouse was located at 10-12 North Church Street?

25  A.      The total credits were $946,613.01.

Morales - Direct

1    Q.     And Ms. Leal, if you can go to the next slide.

2           So looking at this slide, can you describe what

3    this depicts?

4    A.     Yes.  This is the total debits into or out of

5    Lighthouse Internal Medicine from the period of January 1st,

6    2012 through November 30th of 2014.

7    Q.     And what were the primary categories you found of

8    where the money went out from that account during this time

9    frame?

10   A.     Primary categories were the rent, Marydel Corporation

11   payments, employee payments, payments to Patrick Titus and

12   family, auto payments, travel, bank and credit card

13   payments, dining, and shopping, and other expenses.

14   Q.     And in total, how much money went out from the

15   Lighthouse bank account in that time frame?

16   A.     There were $1,828,201.24 that were debits to that

17   account during that period.

18   Q.     And Ms. Leal, if you'll go to the next slide, please.

19           And so, Mr. Morales, what does this slide

20   depict?

21   A.     This shows the total debits from the Lighthouse

22   Internal Medicine account during the period of time at 10-12

23   North Church Street.

24   Q.     And I'd like to focus on a few of these categories.

25   Did you look into payments related to travel?

Morales - Direct

1    A.    Yes, I did.

2    Q.    And what were some of the transactions that you

3    found?

4    A.    Some of the transactions that were identified during

5    that period in 2013 from September 30th through

6    November 30th of 2013, there were payments made to the

7    Bellagio Hotel in Las Vegas.  And we noticed five different

8    time payments made during that time frame.  By -- we

9    identified possibly five different trips during that period

10   of time.

11   Q.    And in addition to those five trips to the Bellagio

12   Hotel in Las Vegas in that two-month time frame from around

13   September to November of 2013, did you see any other

14   transactions that stuck out to you related to travel?

15   A.    Yes, in late December, around the holiday time of

16   2013, we identified three payments made to the Ritz Carlton,

17   three different trips, we believe, to a Ritz Carlton in Key

18   Biscayne, Florida, in Naples, Florida and in Puerto Rico.

19   Q.    And for those, the travel surrounding those five

20   trips to the Bellagio, what in total was the amount that

21   your analysis showed the transactions were paid for those

22   trips?

23   A.    The total amount of payment was approximately $3,800

24   during that period of time.

25   Q.    And then for those trips in December of 2013 to the

Morales - Direct

1    three Ritz Carlton hotels, what was the total amount of

2    transactions that you found related to those transactions?

3    A.      Approximately 800 or $8,000 to the Ritz Carlton.

4    Q.      And in total, what was the total you found in the

5    money that went out from the Lighthouse Internal Medicine

6    account in the 10-12 North Church Street time frame?

7    A.      The total was over $954,000 in debits during that

8    time frame.

9    Q.      And Ms. Leal, if you'll go to the next slide.

10            And can you describe what this next slide

11   depicts?

12   A.      Yes, this shows the money that went out of the

13   account and it breaks it out by the categories that we were

14   mentioning earlier.

15   Q.      And of this pie chart, based upon your analysis, how

16   much of that went into what appeared to be personal

17   transactions?

18   A.      The personal transactions appear to be close to

19   40 percent of the total debits to that account.

20   Q.      And if you'll move to the next slide.

21            So Mr. Morales, could you describe what this

22   slide depicts?

23   A.      Yes, this shows the cash received by Lighthouse from

24   the business receipts compared to the cash deposited to the

25   bank account during -- from a period of January 1st, 2012

Morales - Direct

1  through November 30th, of 2014.

2  Q.    And so when you say "cash receipts," what did that

3  include?

4  A.    The cash receipts for the spiral notebooks that we

5  identified as each patient came in and paid cash, we

6  recorded that onto a spreadsheet and came up with the totals

7  for the cash receipts.

8  Q.    And then how does that compare to the cash deposits?

9  What were those?

10  A.    The cash deposited were the -- from the bank

11  statements and the deposit items that identified the cash

12  deposits into the bank account and that's where we came up

13  with the totals for the cash deposits.

14  Q.    And so, Mr. Morales, I'm showing you a document from

15  Exhibit 203.  Do you recognize this notebook?

16  A.    Yes, I do.

17  Q.    What is it?

18  A.    This -- that is one of the spiral cash receipt

19  notebooks that we found at the search warrant.

20  Q.    And so just to open it for the jury, is this -- are

21  these the documents you reviewed when you analyzed the cash

22  receipts?

23  A.    Yes, I did.

24  Q.    And so can you please describe the difference between

25  cash receipts and deposits and what that meant?

840

Morales - Direct

1   A.      Well, from the amount of money that was scheduled and

2   recorded for the cash receipts, we compared that to what was

3   deposited into the bank account and came up with an

4   unidentified cash amount of over $314,000 for that

5   three-year period of time.

6   Q.      And when you say "unidentified cash," what does that

7   mean?

8   A.      Just the difference between what -- the cash received

9   into the business and what was deposited into the bank

10  account.

11  Q.      And Ms. Leal, if you could go to the next slide,

12  please.

13          And so did you conduct the same analysis for the

14  time frame at 10-12 Church Street?

15  A.      Yes.

16  Q.      Does this slide depict that analysis?

17  A.      Yes, it does.

18  Q.      And so can you please describe what you did find

19  during that time frame?

20  A.      During this time frame, we found that there was over

21  $141,000 in unidentified cash during that period of time at

22  10-12 North Church Street.

23  Q.      And next slide, please.

24          And Mr. Morales, can you just describe what this

25  slide depicts?

841

Morales - Direct

1   A.      Yes.  This graph shows the amount of cash received by

2   month for the period of time at 10-12 North Church Street.

3   Q.      And if you'll look into this, do you notice a spike

4   or an increase in the cash intake that month?

5   A.      Yes, during the period of December of 2013 through

6   January of 2014, there was an increase in cash, monthly cash

7   received during that period of time.

8   Q.      And December of 2013, were we just discussing that

9   period earlier?

10  A.      Yes, we were.

11  Q.      And what were we discussing that related to?

12  A.      During December, that was the period where the trips

13  to Las Vegas were taken to the Bellagio and the Ritz

14  Carlton, trips to Florida and Puerto Rico.

15  Q.      And specifically in December of 2013, were those the

16  trips to the Ritz Carlton hotels?

17  A.      Yes, it was.

18  Q.      Next slide, please.

19          So Mr. Morales, what is this slide?

20  A.      This identifies the total money that was received

21  during the period of time, November 4th, 2013 to

22  November 30th of 2013.

23  Q.      And in total, what was the total amount of bank

24  deposits and unidentified cash that you totaled during that

25  time frame?

Morales - Direct

1   A.      That was -- during that period of time, it was a

2   total of over $1,096,000 during that period of time.

3                MS. SOBCZAK:  One second, Your Honor.

4                THE COURT:  Yes.

5   BY MS. SOBCZAK:

6   Q.      Ms. Leal, if you'll go back to Slide 3.  Four,

7   actually.

8                So I just want to clarify a few other things,

9   Mr. Morales.  So if you'd look at that second row, the

10  Marydel Corporation, what again was Marydel Corporation?

11  A.      The Marydel Corporation was the company that was

12  owned by Josie Walters.

13  Q.      And as you said, it was the one signatory on the

14  Marydel account, Josie Walters?

15  A.      Yes.

16  Q.      So what was the total amount that went to the Marydel

17  account operated by Josie Walters during this time frame?

18  A.      During that time frame, there was over $126,000 in

19  payments made to Josie Walters or to Marydel Corporation.

20  Q.      And then related to the Titus transactions, do you

21  know how much money went to Patrick Titus during this time

22  frame or also between the 2014 and -- 2012, 2014 time frame?

23  A.      I don't recall the exact amount that went to Patrick

24  Titus.  I'm not -- I'm not sure what the total amount was.

25  Q.      And related to these other transactions, was there

Morales - Cross

1    anything noteworthy related to dining and shopping that you

2    noticed?

3    A.      Yeah, the dining and shopping were payments made at

4    restaurants, department stores, different locations in and

5    around Delaware and while traveling.

6    Q.      And so just to clarify, the two signatories on the

7    Lighthouse account were whom?

8    A.      The signatures on the Lighthouse account were Patrick

9    Titus and Josie Walters.

10   Q.      And then not insignificant, $126,000 of that went

11   specifically to Marydel; is that correct?

12   A.      That's correct.

13   Q.      And that was specifically operated by Josie Walters?

14   A.      Yes, it was.

15            MS. SOBCZAK:  Okay.  Nothing further, Your

16   Honor.

17            THE COURT:  All right.  Cross-examination.

18            MR. BOSTIC:  Yes, thank you, Your Honor.

19                       CROSS-EXAMINATION

20   BY MR. BOSTIC:

21   Q.      With respect to the business account, Mr. Morales,

22   it's not uncommon, in fact, it's expected that on a business

23   account, a business manager may be a signatory to the bank

24   account; wouldn't that be fair to say?

25   A.      Yes.

844

Morales - Cross

1   Q.     Okay.  And you would agree with me that the medical

2   profession and doctors are some of the best paid people,

3   professional people?

4   A.     Yes.

5   Q.     And you would agree with me that those -- that often

6   times -- let me rephrase that and ask it this way.

7          Did you look and compare the spending habits of

8   doctors making a certain level of income with respect to

9   travel and items that they purchased?

10  A.     No, I did not.

11  Q.     Okay.  So the numbers that you have there with

12  respect to travel and the Bellagio and what have you, really

13  there's nothing that you compared it to to say that

14  Dr. Titus' travel was different from another person in the

15  medical profession?

16  A.     Correct.

17  Q.     And the same thing would be true for dining and

18  different expenses?

19  A.     Correct.

20  Q.     Right.  And I would gather to guess that with respect

21  to the income made in Dr. Titus' practice, you did not do

22  any comparison with another medical doctors who have a pain

23  management --

24          MS. SOBCZAK:  Objection, Your Honor.  Relevance.

25          THE COURT:  I'm going to allow it.

 1   BY MR. BOSTIC:

 2   Q.     Who have a pain management and internal medicine

 3   practice?

 4   A.     No, I did not.

 5              MR. BOSTIC:  Okay.  Thank you.  Nothing else,

 6   Your Honor.

 7              THE COURT:  Any redirect?

 8              MS. SOBCZAK:  Nothing further, Your Honor.

 9              THE COURT:  Thank you.  All right.  Mr. Morales,

10   you may be excused.  Thank you very much.

11              THE WITNESS:  Thank you, Your Honor.

12              THE COURT:  All right.  So members of the jury,

13   I believe it's the case that we have run out of witnesses.

14   Is that the case?

15              MS. REMIS:  Yes, Your Honor.

16              THE COURT:  Okay.  So we're going to be finished

17   for the day.  So I have a couple things to say.

18              Most importantly, we do not have trial tomorrow,

19   so do not come here tomorrow.  We do have trial on Monday

20   morning or Monday and we will start Monday at 9:30.  And so

21   you were here again today, all of you, on time, and I

22   appreciate that, and so let's keep that up for Monday.

23              Then the other thing is I do want to remind you

24   of the two things that I've told you I'm going to remind you

25   of at the end of the day.  By the end of next week, it will

1    be like a rock concert.  I'll just point my finger, and

2    you'll say it.  But right now I do need to tell you and I'm,

3    of course, perfectly serious, that you need to make sure you

4    don't talk to anyone about the case and don't let anyone

5    talk to you about the case.  You know, it can be just as

6    harmful, even if you're keeping your mouth shut, some other

7    person starts to spout off opinions about things.  Don't let

8    that happen.  You know, and don't let that happen by any

9    means with people who are communicating with other people.

10             And the second thing is don't do any research,

11   don't look anything up on the Internet.  If you live

12   downstate, don't drive around Milford looking for things

13   you've heard about.  You know, don't -- just do nothing.

14   You know, I guess some of you might be going to work

15   tomorrow, but you know, do whatever you normally do

16   tomorrow, the weekend, come back here refreshed on Monday,

17   and the trial will continue, and we'll get a fair trial in

18   this case.

19             All right.  So thank you very much.  You're

20   excused for today.  See you on Monday.

21             (Jury leaving the courtroom.)

22             THE COURT:  And sir, can you just pick up that

23   other folder that's left on the chair?

24             THE JUROR:  Yeah.

25             THE JUROR:  And this one, too?

1              THE COURT:  All right.  Thank you.

2              All right.  So you can be seated.

3              All right.  So I guess the first thing is and

4    the Government, you may --- I see Ms. Remis smiling, because

5    I guess she can imagine what my question is.  Do you have

6    any plan for which witnesses you might have on Monday yet or

7    are you going to be working on that tomorrow?

8              MS. REMIS:  We have a plan.  I thought you were

9    going to point out that we are going a lot faster than we

10   had anticipated.

11             THE COURT:  Well, I don't know.  I was going to

12   ask that, but I don't know whether that's true or not.

13             MS. REMIS:  I think it's true, Your Honor.  We

14   are calling -- on Monday, we're most likely to call Chasity

15   Calhoun.  Betty Whaley.  Carla Haynes.

16             Oh, sorry.  Sorry.  I'll slow down.  Chasity

17   Calhoun.  Betty Whaley.  Carla Haynes.  Ashley Webb.  John

18   Zalewski.  Jane Webb, no relation.  Shannon Holleger.  And I

19   think that will take us through the day.

20             THE COURT:  Okay.  I can't recall, was Holleger

21   an employee?

22             MS. REMIS:  She was.  Yes, Your Honor.

23             THE COURT:  And the rest of them are patients or

24   friends of patients?

25             MS. REMIS:  Patients.  Family members of

1    patients.  A pharmacist.

2                 THE COURT:  Ah.

3                 MS. REMIS:  John Zalewski is an HVAC repairman

4    who visited the clinic.  Jane Webb is a former patient.

5                 MS. KOUSOULIS:  With regard to Zalewski, we

6    just, I guess, sort of wanted an offer of proof.  From his

7    report, it looks like he's going to testify as to what his

8    opinions of the clientele were at the clinic when he went to

9    do some repair, but I'm not sure if there's more.  That's

10   what I got from his report.

11                THE COURT:  And maybe he's going to, I guess,

12   testify about his observations some time when he went there

13   to repair?

14                MS. REMIS:  Yes.

15                THE COURT:  Okay.  Well, there you got it.

16                All right.  And you imagine this group of

17   people, that will be enough to keep us busy on Monday.

18                MS. REMIS:  We believe that Ms. Webb will

19   probably take a while.  Jane -- I'm sorry.  And then we're

20   hoping to have available Mr. Petron late afternoon, and then

21   we anticipate Dr. Thomas coming in on Tuesday.

22                THE COURT:  Okay.

23                MS. REMIS:  And --

24                THE COURT:  On the subject of Mr. Petron, I'm

25   just curious because -- and I would encourage you to talk to

1    the defense, I don't have the impression he's doing a real

2    sophisticated math -- I mean, notwithstanding the

3    statistics, I don't think there's going to be any actual

4    challenge to his expertise and, you know, whether he did

5    statistical analysis correctly, or maybe I'm wrong.

6              MR. BOSTIC:  Your Honor, as to his expertise,

7    there will be no challenge assuming the expertise is limited

8    to the statistical aspects of the charts or what have you.

9              MS. KOUSOULIS:  As opposed to analyzing what all

10   the data means.

11             THE COURT:  Well, right.  And my recollection

12   from our earlier discussion is he's not really going to be

13   analyzing what the data means.  That's what Dr. Thomas, if

14   anyone, is going to do; right?

15             MS. REMIS:  You mean medically speaking;

16   correct?

17             THE COURT:  Yes.

18             MS. REMIS:  He's not going to comment on the

19   medical -- anything related to the data, just the data

20   itself.

21             THE COURT:  Well, in any event, the point is

22   talk about it because I'm not sure you need to spend, you

23   know, half an hour describing his expertise.

24             MS. REMIS:  We won't, Your Honor.

25             THE COURT:  Because I don't think that's really

1    going to be an issue, not that I'm trying to rush you to a

2    finish here.  But so let me ask without giving anything

3    away, is there anybody on your witness list that you're

4    thinking has dropped away?

5               MS. REMIS:  We have about three or four people

6    who are on the witness list who are like -- are having some

7    issues either with scheduling or being sick or things like

8    that, so they're sort of in the maybe category now.

9               THE COURT:  Okay.

10              MS. KOUSOULIS:  And Your Honor, if they could

11   just, because obviously, if they're going to finish up

12   sooner, we have witnesses that we were going to subpoena,

13   but we don't want to subpoena them -- we don't want to call

14   them last minute the night before and say you have to come

15   tomorrow.  We also don't want them to take off work if

16   they're not going to be here.  So if they could let us known

17   as soon as possible when they could be finishing up.

18              THE COURT:  Right.  Well, that's a tricky thing

19   and I'm just -- so based on what you've said, expecting

20   Dr. Thomas on Tuesday, do you more or less have in mind that

21   he will probably be an all-day sort of witness?

22              MS. REMIS:  Probably, Your Honor.  I think if I

23   were to estimate based on how quickly we're going, I would

24   say we probably would rest by no later than Wednesday

25   morning which is a lot sooner than we anticipated.

1          THE COURT:  Which certainly sounds like, unless

2    my math is wrong --

3          MS. KOUSOULIS:  There are several.

4          THE COURT:  -- that you're losing a lot of

5    witnesses here.

6          MS. REMIS:  I'm sorry, Your Honor.  He clarified

7    what you were asking.  Yes, to your question earlier about

8    who has fallen away from our witness list, yes, there are

9    several who we've decided not to call.  And I'm sorry, I

10   misunderstood your question.

11         MS. KOUSOULIS:  And Your Honor, if they could

12   let us know even, only because we may want to call some of

13   them.

14         THE COURT:  Well, I'm sure that they will tell

15   you people that they no longer intend to call.

16         MS. KOUSOULIS:  Okay.

17         THE COURT:  And then you can -- right?

18         MS. REMIS:  Yeah, sure.

19         THE COURT:  So let's assume you're being overly

20   optimistic.  I take it that you're thinking you'll be done

21   some time on Wednesday?

22         MS. REMIS:  I believe so.  Yes, Your Honor.

23         THE COURT:  And of course, no matter what

24   happens, Dr. Warfield is not here until the following

25   Monday; right?

1          MS. KOUSOULIS:  That's correct.

2          THE COURT:  And I'm guessing, but I hate to --

3    well, so I shouldn't assume, but my impression was or with

4    the possible exception of Mr. Sullivan, the rest of your

5    witnesses, they're essentially character witnesses; right?

6          MS. KOUSOULIS:  Well, no.  Depending on what

7    witnesses they may not be calling, we may be calling certain

8    witnesses that -- right.

9          THE COURT:  Well --

10          MS. KOUSOULIS:  The ones that we noticed, yes.

11   Other than, Your Honor, given the issue that came up at the

12   11th hour, we were, one, in the process of trying to enhance

13   the tape.  And so -- and we also -- though, we do intend to

14   call, and I forget her name, but the undercover agent and

15   also the other members of the task force, given that we

16   haven't really been given a lot of information about what

17   happened, and we don't know which witness has the

18   information.  And the Government doesn't know which witness

19   has the information.  So we plan on subpoenaing all the

20   people on the Task Force, and we're going to try to work

21   with the Government.

22          THE COURT:  So I guess you're going to litter up

23   Thursday and Friday with that?

24          MS. KOUSOULIS:  Well --

25          THE COURT:  In other words --

```
 1                MS. KOUSOULIS:  Yeah.

 2                THE COURT:  -- what I'm trying to get at is we

 3     think the way this is going to work out is Dr. Warfield is

 4     going to be the last witness next Monday?

 5                MS. KOUSOULIS:  Right.  We may or may not have

 6     through Friday -- I know initially Your Honor wasn't going

 7     to sit on Friday.

 8                THE COURT:  Yeah, yeah.  If it turns out that

 9     you all get it done by Thursday, we just won't have trial on

10     Friday.  Everybody will be happy.  We'll come back and do --

11     you know, we can work on jury instructions.  I mean, there

12     will be other things.

13                MS. KOUSOULIS:  Otherwise, we will plan on

14     having all of our other witnesses next week and just have

15     Dr. Warfield end on Monday so we can speed things along.

16                THE COURT:  And I'm wondering, just from your

17     subpoena point of view is if -- what I'd suggest -- sorry, I

18     couldn't tell, Mr. Bostic, whether you --

19                MR. BOSTIC:  No, I'm waiting on you to finish,

20     Your Honor.

21                THE COURT:  Okay.  I didn't want Ms. Kousoulis

22     to have to be dividing her attention.

23                MR. BOSTIC:  Right.

24                THE COURT:  You know, it seems to me, based on

25     what you're saying, is you should subpoena people for
```

1    Thursday and --

2              MS. KOUSOULIS:  Right.

3              THE COURT:  -- if they finish on Wednesday, you

4    know, maybe you can -- you know, we'll have more chances.

5    So if you want these law enforcement people to be here, I

6    assume that, if necessary, we can probably get them here on

7    Wednesday, but your people who are -- you know, I understand

8    might be more difficult to get to show up, I would say

9    Thursday because there seems like they're for sure going to

10   be finished by Thursday.

11             And you know, if we don't have to have a trial

12   on Friday, I will be happy.  I think the jury will be, too.

13             MR. BOSTIC:  What I was going to tell

14   Ms. Kousoulis and I'll mention it to the Court, there are

15   two witnesses that may have to go on the 20th because I

16   believe they weren't available.  I believe they're

17   unavailable the end of next week, but I will double-check.

18             THE COURT:  So I've lost track.  The 20th is

19   what day?

20             MR. BOSTIC:  That would be Tuesday.

21             MS. KOUSOULIS:  We could make them available on

22   Monday.

23             MR. BOSTIC:  No, they have travel plans.  So I

24   just have to double-check, Judge, and make certain that

25   they're -- that may be a little glitch, but I will check on

1    it as soon as I get back and let the Court know tomorrow.

2    We'll let the Court know.

3              MS. KOUSOULIS:  We'll email the Court.

4              MR. BOSTIC:  If we could contact the Court and

5    the Government to let them know.

6              THE COURT:  Yeah, just let my deputy clerk know

7    or I don't think we're actually going to do much different

8    depending on what it is you say.  In any event, keep talking

9    to each other.

10             So, but I guess the point I'm making is if they

11   finish early on Wednesday, it would be nice if you have

12   something planned to do later on Wednesday, but I -- you

13   know, if you -- but the civilian witnesses, if you haven't

14   subpoenaed them until Thursday, that will be fine with me.

15   And if it turns out you've got nothing else to do Wednesday

16   or Friday, we'll make the best of it.

17             Okay?

18             MS. KOUSOULIS:  Okay, Your Honor.

19             THE COURT:  Is there anything else you want to

20   talk about right now?

21             MS. REMIS:  No, Your Honor.

22             MS. KOUSOULIS:  No, Your Honor.

23             THE COURT:  Okay.  Well, thank you very much.

24   We'll be in recess, and I will see you all on Monday.

25             DEPUTY CLERK:  All rise.

1                    (Court was recessed at 4:57 p.m.)

2                    I hereby certify the foregoing is a true and

3       accurate transcript from my stenographic notes in the

4       proceeding.

5                         /s/ Heather M. Triozzi
                          Certified Merit and Real-Time Reporter
6                         U.S. District Court

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25