```
 1                   IN THE UNITED STATES DISTRICT COURT

 2                     FOR THE DISTRICT OF DELAWARE

 3

 4    UNITED STATES OF AMERICA,   )
                                  )
 5               Plaintiff,       )
                                  ) Criminal Action No. 18-45-RGA
 6    v.                          )
                                  ) Trial Volume IV
 7    PATRICK TITUS,              )
                                  )
 8               Defendant.       )

 9
                                       J. Caleb Boggs Courthouse
10                                     844 North King Street
                                       Wilmington, Delaware
11
                                       Monday, July 12, 2021
12                                     9:00 a.m.
                                       Jury Trial
13

14    BEFORE:  THE HONORABLE RICHARD G. ANDREWS, U.S.D.C.J.

15    APPEARANCES:

16               U.S. DEPARTMENT OF JUSTICE - CRIMINAL DIVISION
                 BY:  ALEZA S. REMIS, ESQUIRE
17               BY:  CLAIRE SOBCZAK, ESQUIRE
                 BY:  JUSTIN WOODARD, ESQUIRE
18
                                       For the Plaintiff
19
                 OFFICE OF THE FEDERAL PUBLIC DEFENDER
20               BY:  ELENI KOUSOULIS, ESQUIRE

21                        -and-

22               THE BOSTIC LAW FIRM
                 BY:  EDSON A. BOSTIC, ESQUIRE
23
                                       For the Defendant
24

25
```

```
 1                    ***   PROCEEDINGS   ***

 2

 3              DEPUTY CLERK:  All rise.  Court is now in

 4    session.  The Honorable Richard G. Andrews presiding.

 5              THE COURT:  All right.  Please be seated.  Good

 6    morning.

 7              MR. WOODARD:  Good morning.

 8              THE COURT:  All right.  So is there anything

 9    that you all want to talk about?

10              MR. BOSTIC:  I'm sorry.  Go ahead.

11              MS. REMIS:  No.  I was just going to do some

12    scheduling stuff, but I'll...

13              THE COURT:  Okay.  Mr. Bostic?

14              MR. BOSTIC:  Yeah.  Good morning, Your Honor.

15    Your Honor, this morning we filed a motion to have the Court

16    reconsider the issue regarding the -- I believe it's being

17    filed.

18              THE COURT:  It has been filed.  Yes.  I was

19    handed a copy of it a minute ago.

20              MR. BOSTIC:  Right.  We don't expect the Court

21    to address it now.  We will use it for some point in our

22    case-in-chief.  We have -- the Government also received a

23    copy electronically.

24              But also we wanted to make certain that the

25    Court had the specific passages and information that we
```

1    thought was relevant --

2              THE COURT:  Right, right.  The deputy clerk was

3    printing that stuff out for me.  I don't have it right this

4    minute, but I do expect to have it before too long.

5              MR. BOSTIC:  As I said, Your Honor, we don't

6    expect it to be addressed today, but we wanted it on the

7    record.

8              THE COURT:  Okay.  Is there anything else?

9              MR. BOSTIC:  Your Honor, yes.  This afternoon,

10   at about 12:30, I have a status conference in another

11   matter.  I would ask the Court if the Court could break

12   around 12:20 today to --

13             THE COURT:  Is this a status conference that you

14   expect to take very long?

15             MR. BOSTIC:  No, Your Honor.

16             THE COURT:  Do you expect it to start on time?

17             MR. BOSTIC:  Yes.  Yes, I do.

18             THE COURT:  Okay.  All right.  So what time do

19   you need to break in order to catch this conference?

20             MR. BOSTIC:  Your Honor, there's also some other

21   issues.

22             THE COURT:  Wait, wait.  What time do you need

23   to break in order to get this conference?

24             MR. BOSTIC:  12:20 would be fine, Your Honor.

25             THE COURT:  Okay.  Well, I mean, would 12:25 be

1    fine?

2              MR. BOSTIC:  12:25 would be great.

3              THE COURT:  Okay.  All right.

4              MR. BOSTIC:  I expect the judge definitely will

5    be on time, so 12:25 is a good time.

6              THE COURT:  Okay.  All right.  We'll do that.

7    Somebody, though, remind me if I forget.

8              All right.  And Mr. Bostic, you have some other

9    things?

10             MR. BOSTIC:  Yes, there's a scheduling snafu.

11   Last week, the Government informed that they were likely to

12   finish their case on Wednesday, and we scrambled around to

13   get witnesses subpoenaed for Thursday.  Recently the

14   Government has indicated that they think the case was going

15   much faster at this point, even than before, and they'll be

16   finished perhaps Tuesday night.

17             I spent most of yesterday -- part of yesterday

18   trying to reschedule people for Wednesday.  At this point,

19   it does not look as if that's going to be -- to happen.

20   Compounding the issues, that one of our witnesses was

21   involved in a car accident and is currently hospitalized.

22   And so we're working on that issue as well.  But I believe

23   that our first defense witness will be ready and available

24   on Thursday morning.

25             MS. KOUSOULIS:  And, Your Honor, we believe

1   we'll get through all of our witnesses on Thursday, with the

2   exception of Dr. Warfield.

3   And then with regard to the Task Force Officer

4   that's involved with the tape that we just received last

5   week, we're in the process of trying to get it enhanced, and

6   that's taking a little bit of logistics.  And if we have

7   that by Thursday, we'll put the task -- we'll plan on

8   putting the Task Force Officer on on Thursday, too.

9   Otherwise, we'll plan on putting her on on Monday prior to

10  Dr. Warfield.

11  We don't anticipate that testimony is going to

12  take very long.  So either way, we anticipate we'll be

13  finished up, you know, on Monday either way.

14  THE COURT:  Okay.

15  MS. KOUSOULIS:  And we thought maybe on

16  Wednesday, if we don't have witnesses and the Government is

17  done, maybe we could use the opportunity to do a charge

18  conference.  I know there's several jury charge issues that

19  are in dispute that we would need to resolve, and then we

20  wouldn't have to spend that time on Monday or Tuesday doing

21  that, and we could go --

22  THE COURT:  But what you're telling me is you

23  view the schedule for the jury this week as likely being

24  today, tomorrow, Wednesday off, Thursday, Friday off?

25  MS. KOUSOULIS:  Provided that the Government

1   finishes their case tomorrow, yes, Your Honor, because

2   again, I don't anticipate our witnesses will go into Friday.

3              THE COURT:  That's okay.  Let me hear what the

4   Government has to say, if anything.

5              MS. REMIS:  Nothing really, Your Honor.  We --

6   obviously, we would prefer a more compressed schedule, just

7   for the benefit of the jury and their memories, but it is

8   what it is.

9              THE COURT:  Yeah.  Well, you know, I told -- I

10  remember telling the Defendants to subpoena their witnesses

11  for Thursday, based on the way things seemed to be looking

12  on Friday.  So I think it's better to have a full day on

13  Thursday than a part day on Wednesday, if they scramble

14  around to get a few people to show up, and a part day on

15  Thursday.  So, but we don't have to tell the jury anything

16  right now.  We'll see how things go today.

17             And when Dr. Thomas takes the stand -- and I

18  take it, under your view, Dr. Thomas will be your last

19  witness, whenever it is that he testifies?

20             MS. REMIS:  Yes, Your Honor.  We anticipate him

21  getting on tomorrow morning-ish --

22             THE COURT:  Okay.

23             MS. REMIS:  -- first thing or we may need to

24  wrap up with our last witness today if he gets on tomorrow.

25             THE COURT:  Okay.  All right.

1              MS. REMIS:  Yeah.

2              THE COURT:  So is there anything other than

3    telling me what the scheduling issues are?

4              I remember, Mr. Bostic at the end of Friday, you

5    were saying something about you had two witnesses who were

6    on vacation or some other scheduling problem.  Did you get

7    that worked out?

8              MR. BOSTIC:  We're still working on that, Your

9    Honor.  We would expect, worst-case scenario, to present

10   them Monday morning.  They are currently out of town.  We

11   haven't been able to reach them.  I had reached out to them

12   and --

13             THE COURT:  Okay.

14             MR. BOSTIC:  -- it hasn't happened.

15             THE COURT:  All right.  And the schedule of the

16   witnesses that you said at the end of the day Thursday,

17   that's still more or less the plan for today?

18             MS. REMIS:  Yes.  We've moved around the order,

19   but the same witnesses.

20             THE COURT:  Okay.  So is there anything else or

21   should I go back and wait for the jury to be here?

22             MS. REMIS:  Nothing from the Government, Your

23   Honor.

24             MR. BOSTIC:  Nothing from the Defense, Your

25   Honor.

```
 1                    THE COURT:  Okay.  And I've written down here
 2       12:25, so I will hopefully be able to remember that.  But
 3       for sure, if I don't, Mr. Bostic, if no one else says
 4       something, you say something.  Okay?
 5                    MR. BOSTIC:  Yes, indeed.  Thank you, Your
 6       Honor, for considering my request.
 7                    THE COURT:  No, no problem.  And off the record.
 8                    (Following a discussion held off the
 9       stenographic record.
10                    (Recess was taken.)
11                    DEPUTY CLERK:  All rise.
12                    THE COURT:  All right.  Please be seated.  I
13       understood that before we brought the jury in, there was
14       something that somebody wanted to bring up.
15                    MS. KOUSOULIS:  Yes, Your Honor.  One of the
16       witnesses the Government is planning on calling this morning
17       is Ashley Webb.  She is another pharmacist.
18                    THE COURT:  Okay.
19                    MS. KOUSOULIS:  And I just want to be clear as
20       to the parameters of her testimony.  My understanding is
21       she's going to testify as to what she looks for, you know,
22       when filling a prescription, including, you know, what's
23       needed, including the presence of a -- that there's a
24       legitimate purpose for the prescription, that there's a
25       doctor-patient relationship established, and different
```

1    things that have to be present for her to fill a

2    prescription.

3              But -- and I understand, you know, she can

4    testify to this based on her experience.  But what I don't

5    think she can testify to, and I just want to make sure she

6    doesn't, is that, in her opinion, in Dr. Titus' patients,

7    there wasn't the patient-doctor relationship, that he wasn't

8    prescribing for legitimate medical purpose, that there --

9    you know, even if it's in her opinion, I don't think that

10   that's -- again, I think what the jury is to decide -- I

11   don't think she's an expert, and they have Dr. Thomas

12   testifying, so I don't think she should stray into that area

13   testifying as to -- in generally what they -- what needs to

14   be present, but not crossing the line.  And so I just wanted

15   to make sure that that's...

16             THE COURT:  Yes, Ms. Sobczak.

17             MS. SOBCZAK:  Your Honor, Ashley Webb will

18   testify similar to other pharmacists who have already

19   testified in this case.  We will be asking her about her

20   corresponding responsibility as a pharmacist as it related

21   to the filling of prescriptions for Dr. Titus' patients.

22             We will ask her about her corresponding duty

23   related to that, and why she chose not to fill prescriptions

24   of Dr. Titus.  This is related to her experience, her

25   training, and her decisionmaking.  She will not be

1    testifying as to Dr. Titus' decisionmaking regarding his

2    patients.

3              MS. KOUSOULIS:  But her -- sorry, Your Honor.

4              THE COURT:  Yeah, Ms. Kousoulis.

5              MS. KOUSOULIS:  Her decisionmaking, I don't

6    think, is at issue.  And whether or not she thinks it's

7    legitimate, again, that's someone possibly giving expert --

8    quasi expert testimony.  She hasn't been notified as an

9    expert, so I'm not sure why that's relevant.

10             THE COURT:  Okay.  Well, so she's going to say,

11   I take it, she didn't fill these prescriptions?

12             MS. SOBCZAK:  She ultimately did not, as time

13   went on.

14             THE COURT:  Okay.  And why did she say she

15   stopped filling them?

16             MS. SOBCZAK:  She will testify that based upon

17   her training, she has a corresponding duty related to the

18   filling of controlled substances, and that she saw certain

19   warning signs that she -- her testimony will bring out as to

20   things that she thought indicated that these were not being

21   filled appropriately, for a proper medical purpose.  And

22   this will be related to her training as a pharmacist that

23   she made this determination, which is parallel to the

24   decisionmaking of a physician, but falls squarely within her

25   role as a pharmacist to make that determination.

1           THE COURT:  Ms. Kousoulis, anything further?

2           MS. KOUSOULIS:  No, but I believe that crosses

3   the line.  I think that it does, you know, go into somewhat

4   expert testimony, and I think her -- what her beliefs as to

5   whether they should have been filled for those reasons and

6   use of that language is exactly what the jury is being asked

7   to decide, and I think they'll put too much weight on it,

8   and I think it crosses the line.

9           THE COURT:  All right.  Well, it's kind of hard

10  to tell in the abstract without an objection to a particular

11  question.  But I think consistent with what's already

12  happened with the other two pharmacists, at least the first

13  pharmacist, that if she testifies that she took certain

14  actions for certain reasons, I'm going to allow it.

15          MS. KOUSOULIS:  But, Your Honor, I don't believe

16  there was language for the first pharmacist when he said

17  there wasn't a legitimate medical need.  I mean, that's

18  exactly what the jury is being asked to decide.

19           I mean, I think it's one thing to say, as she

20  does in her statement, that there were high dosages, that

21  every patient had the same prescription, and that -- and so

22  for those reasons she decided, you know, not to fill them.

23  But I think if she strays from a certain language, I think

24  it would be inappropriate.

25          MS. SOBCZAK:  Your Honor, her testimony is

1     related on her training and experience as it relates to --

2     specifically to Dr. Titus' patients.  And in that regard,

3     what she elicits will be from her own experience.

4              It's not expert testimony.  It's related

5     squarely within her experience filling prescriptions.

6              THE COURT:  Well, she's going to say, I take it,

7     that it's her opinion that she was not sufficiently

8     convinced that there was -- I mean, it's -- I don't know

9     what she's going to say, and so skip the training,

10    experience.  What is she going to say about what her

11    conclusion was that led her to not fill the prescriptions?

12             MS. SOBCZAK:  Your Honor, we anticipate that her

13    testimony will be that she saw certain warning signs,

14    similar to what the other pharmacist have testified to.  And

15    based upon those warning signs, given her corresponding duty

16    to fill or not fill prescriptions for controlled substances,

17    that she decided not to fill those prescriptions.

18             THE COURT:  Okay.  All right.  Well, you know,

19    based on that proffer, you should go ahead.

20             And Ms. Kousoulis, if she goes -- if the

21    witness -- if something happens that you think is beyond

22    what's permitted, make an objection.

23             MS. KOUSOULIS:  Thank you, Your Honor.

24             THE COURT:  Okay.  Are we ready to get the jury?

25             MS. KOUSOULIS:  Yes, Your Honor.

1              MR. WOODARD:  Yes, Your Honor.

2              THE COURT:  All right.  Let's get the jury.

3              And the first witness, is that person here?

4              MS. REMIS:  Yes, she is, Your Honor.

5              MR. WOODARD:  Yes, Your Honor.

6              THE COURT:  Why don't you bring her in.

7              (Jury entering the courtroom.)

8              THE COURT:  Members of the jury, welcome back.

9     Everybody, you may be seated.

10             Mr. Woodard, you may call your next witness.

11             MR. WOODARD:  Yes, Your Honor.  The Government

12    calls Chasity Calhoun.

13             DEPUTY CLERK:  Ms. Calhoun, you can take your

14    mask down, if you're comfortable with that.  Please state

15    and spell your full name for the record.

16             THE WITNESS:  Chasity Calhoun.  C-H-A-S-I-T-Y

17    C-A-L-H-O-U-N.

18             DEPUTY CLERK:  Do you affirm that the testimony

19    that you are about to give to the Court and the jury in the

20    case now pending will be the truth, the whole truth, and

21    nothing but the truth, you do so affirm?

22             THE WITNESS:  Yes.

23             DEPUTY CLERK:  Thank you.

24             CHASITY CALHOUN, the witness herein, after

25    having been duly affirmed under oath, was examined and

Calhoun - Direct

1   testified as follows:

2                      DIRECT EXAMINATION

3   BY MR. WOODARD:

4   Q.    Good morning, Ms. Calhoun.

5   A.    Good morning.

6   Q.    Where do you live?

7   A.    I live in Milford, Delaware.

8   Q.    Are you from Delaware?

9   A.    Yes.

10   Q.    Do you have any children?

11   A.    Yes, I have two.

12   Q.    And are you employed?

13   A.    Yes.

14   Q.    All right.  Ms. Calhoun, do you know an individual

15   named Patrick Titus?

16   A.    Yes.

17   Q.    How were you first introduced to him?

18   A.    Through my mother and my stepfather.

19   Q.    Okay.  Around when was this?

20   A.    I believe 2019.

21   Q.    2019?

22   A.    Or 2009.  Sorry.

23   Q.    Okay.  That's okay.

24   A.    Sorry.

25   Q.    It's early.  And what's your mom's name?

Calhoun - Direct

1   A.      Shari Miller.

2   Q.      Okay.  And your stepfather?

3   A.      Vergil Miller.

4   Q.      Okay.  How did your parents know Dr. Titus?

5   A.      My mother was a patient.

6   Q.      All right.  Would you and your parents visit with

7   Dr. Titus socially?

8   A.      Yes.

9   Q.      How so?

10  A.      When he first came to Delaware, and my mother was a

11  patient, he came over for dinner a couple times.

12  Q.      Okay.  All right.  So did you become a patient of

13  Dr. Titus'?

14  A.      Yes.

15  Q.      All right.  Let's talk about your first visit.

16          MR. WOODARD:  Ms. Leal, if you could please show

17  Government's 120 at 21.

18  BY MR. WOODARD:

19  Q.      Do you see that, Ms. Calhoun?

20  A.      Yes.

21  Q.      Okay.  What are we looking at here?

22  A.      My medical intake form.

23  Q.      Okay.  And what is the age on here when you first

24  went to see Dr. Titus?

25  A.      Seventeen.

Calhoun - Direct

1    Q.      Okay.  And what was your occupation back then?

2    A.      Unemployed.  Student.

3    Q.      Okay.  Is this your handwriting?

4    A.      No, that's my mother's handwriting.

5    Q.      All right.  So did your mother go with you on this

6    first visit?

7    A.      Yes.

8    Q.      Okay.  Prior to this first visit, had you been seeing

9    any doctors?

10   A.      Yes.

11   Q.      And what for?

12   A.      For Addison's disease.

13   Q.      What's that?

14   A.      It's a rare disease where your hormones and your

15   lower back don't secrete the creative -- the right amount of

16   hormones that make your organs function.

17   Q.      How did that make you feel at the time?

18   A.      Very fatigued.  I had low back pain sometimes.  Just

19   very tired all the time.

20   Q.      Okay.  So when you first went to see Dr. Titus, what

21   were you there for?

22   A.      I was there to get my Adderall refilled that I was

23   previously getting from another doctor for my Addison's and

24   a steroid.

25   Q.      Okay.  So let's talk about this first visit.  Did you

Calhoun - Direct

 1   go into the exam room with Dr. Titus?

 2   A.    Yes.

 3   Q.    And was your mom there with you?

 4   A.    Yes.

 5   Q.    Okay.  What kind of things were talked about in the

 6   first visit?

 7   A.    Just a lot of friendly side talk.  You know, how have

 8   you been?  You know, you're so pretty like your mom.  Just

 9   normal talk.

10   Q.    Okay.  And how old were you during this first visit?

11   A.    Seventeen.

12   Q.    Okay.

13         MR. WOODARD:  Ms. Leal, let's go to Exhibit 121

14   at 421, please.

15   BY MR. WOODARD:

16   Q.    Okay.  So at the conclusion of this first visit, were

17   you prescribed anything?

18   A.    Yes.

19   Q.    What was that?

20   A.    Soma and Tramadol.

21   Q.    Okay.  And that's your name there at the top?

22   A.    Yes.

23   Q.    And what year are we in?

24   A.    2009.

25   Q.    Okay.  What is Soma?

Calhoun - Direct

1    A.      Soma is a muscle relaxer, I believe.

2    Q.      All right.  And what about Tramadol?

3    A.      Tramadol is for pain, I believe.

4    Q.      Okay.  What were you prescribed these two

5    prescriptions for?

6    A.      For back pain.

7    Q.      Okay.  I think you mentioned you were feeling tired

8    all the time.  What was the purpose of the Soma?

9    A.      He said, "When you take them both together, it helps

10   with your pain better."

11   Q.      Okay.  But what's your understanding of whether Soma

12   is a pain medication?

13   A.      I'm not sure.  I think it just relaxes you.

14            MS. KOUSOULIS:  Objection to she's not sure,

15   Your Honor.  Calls for speculation.

16            THE COURT:  Well, that goes to the weight, so

17   overruled.

18   BY MR. WOODARD:

19   Q.      Could you say your answer again?

20   A.      What was the question again?

21   Q.      What's your understanding of whether Soma is a pain

22   reliever?

23   A.      No.

24   Q.      Okay.  And I think you just said the word "relax"?

25   A.      Yes.

Calhoun - Direct

1    Q.      What were you saying?

2    A.      So Soma is to relax your muscles.

3    Q.      Okay.  Did Dr. Titus say anything specifically about

4    why you would take Soma and Tramadol together at the same

5    time?

6    A.      He just said that they worked better together for

7    your pain.

8    Q.      Okay.  Did you go fill those prescriptions?

9    A.      Yes.

10    Q.      And did you take the drugs?

11    A.      Yes.

12    Q.      All right.  How did Tramadol make you feel?

13    A.      Tramadol gave me chest pains.

14    Q.      Okay.  What about the Soma?

15    A.      The Soma, I would describe it as when you have a

16    couple beers and you feel buzzed, that kind of warm feeling,

17    that's how the Somas make me feel.

18    Q.      Okay.  But you were already feeling tired at the

19    time?

20    A.      Yes.

21    Q.      All right.

22            MR. WOODARD:  Okay.  Ms. Leal, if we could go to

23    Page 419.

24    BY MR. WOODARD:

25    Q.      And Ms. Calhoun, is this a subsequent prescription

876

Calhoun - Direct

1   that you received?

2   A.      Yes.

3   Q.      Okay.  And what's the year we're in still?

4   A.      2009.

5   Q.      Okay.  On the right and the bottom, what are those

6   prescriptions?

7   A.      Adderall and Tramadol.

8   Q.      Okay.  So at this point, 2009, were you taking

9   Adderall, Soma, and Tramadol?

10  A.      Yes.

11  Q.      Would you take those all together?

12  A.      Sometimes.

13  Q.      Okay.  Did Dr. Titus give you any instructions about

14  how to take these medications?

15  A.      No.

16  Q.      Did he give you any warnings about taking all three

17  together?

18  A.      No.

19  Q.      Okay.

20          MR. WOODARD:  Okay.  Ms. Leal, if we could go to

21  Page 399.

22  BY MR. WOODARD:

23  Q.      And what year are we in now, Ms. Calhoun?

24  A.      2010.

25  Q.      Okay.  And so what's being prescribed at this point?

877

Calhoun - Direct

1    A.      Adderall, Tramadol, Somas.

2    Q.      Okay.  Again, any instructions from Dr. Titus on how

3    to take these medications?

4    A.      No.

5    Q.      Any warnings about taking them all together?

6    A.      No.

7    Q.      Okay.

8            MR. WOODARD:  Ms. Leal, if we could go to --

9    back to Exhibit 120, at 25, please.

10   BY MR. WOODARD:

11   Q.      What is this document, Ms. Calhoun?

12   A.      My insurance card.

13   Q.      Okay.  What type of insurance specifically?

14   A.      Medicaid.

15   Q.      Okay.  So up to the point of the prescriptions we've

16   gone over so far, how were you paying for your prescriptions

17   and your doctor's visits?

18   A.      Medicaid.

19   Q.      Okay.  Medicaid.

20           MR. WOODARD:  Ms. Leal, if we could go to --

21   back to 121 at 379.

22   BY MR. WOODARD:

23   Q.      What's the date on this document, if you can see

24   that?

25   A.      August 20th, 2010.

878

Calhoun - Direct

1   Q.      Okay.  At some point, did Dr. Titus stop taking

2   Medicaid?

3   A.      Yes.

4   Q.      Okay.  You kept seeing him?

5   A.      Yes.

6   Q.      So how would you pay for your visits and your

7   prescriptions after that?

8   A.      Cash.

9   Q.      Okay.  And when you say "cash," do you mean literally

10  like cash in your pocket?

11  A.      Yes.

12  Q.      Okay.  Okay.  So we're in 2010.

13          MR. WOODARD:  Ms. Leal, if you could go to

14  Page 537 of this document.

15  BY MR. WOODARD:

16  Q.      All right.  What is this, Ms. Calhoun?

17  A.      An MRI.

18  Q.      Okay.  Do you see date of exam?

19  A.      Yes.

20  Q.      What was that?

21  A.      August 18th, 2011.

22  Q.      Okay.  Why was an MRI done?

23  A.      For low back pain.

24  Q.      Okay.  And if you could just read what it says by

25  "Summary."

879

Calhoun - Direct

1   A.      "Small broad-based central disc protrusion at L5

2   through S1.  The disc is seen close to both S1 nerves

3   without definitive nerve compression."

4   Q.     Okay.  Without "definitive nerve compression," how

5   did you feel around this time?

6   A.      Like pressure was on my back.

7   Q.     Okay.  Is it fair to say you were in some pain?

8   A.      Yes.

9   Q.     How would you describe that pain overall?

10  A.      On a scale from one to ten?

11  Q.     Sure.

12  A.      Maybe a five.

13  Q.     Okay.  Did you talk to Dr. Titus about your MRI

14  results?

15  A.      Yes.

16  Q.     What was discussed there?

17  A.      I mean, that I had a slipped disc, but it wasn't

18  pinching my nerve.

19  Q.     Okay.  It was not pinching your nerve?

20  A.      Yes.

21  Q.     Okay.  All right.

22          MR. WOODARD:  Ms. Leal, if we could go to

23  Page 331.

24  BY MR. WOODARD:

25  Q.     So, Ms. Calhoun, what's the date on this one?

Calhoun - Direct

1   A.      August 23rd, 2011.

2   Q.      And what were you prescribed then?

3   A.      Oxycodone ten milligrams.

4   Q.      Okay.  Was this the first time you had been

5   prescribed Oxycodone?

6   A.      Yes.

7   Q.      Had you ever taken Oxycodone before that?

8   A.      No.

9   Q.      When this was prescribed, did Dr. Titus give you any

10  warnings about Oxycodone?

11  A.      No.

12  Q.      Did he describe any risks of addiction?

13  A.      No.

14  Q.      And if you can tell, how many pills did he write for

15  you on this first prescription?

16  A.      120.

17  Q.      Okay.  And not to make you do a memory test here, but

18  around how old were you when you first got this Oxycodone

19  prescription?

20  A.      Twenty.

21  Q.      Okay.  And did you take -- did you fill the Oxycodone

22  and take those drugs?

23  A.      Yes.

24  Q.      How did those make you feel?

25  A.      Numb.  I think that's a good word.

Calhoun - Direct

1    Q.      Okay.

2                MR. WOODARD:  Ms. Leal, if we could go to

3    Page 321.

4    BY MR. WOODARD:

5    Q.      Okay.  Ms. Calhoun, the last prescription was from

6    August 11th, ten milligrams.  What's the date on this

7    prescription?

8    A.      10/19/11.

9    Q.      Okay.  And what's the strength of Oxycodone

10   prescribed here?

11   A.      Fifteen milligrams.

12   Q.      Is that higher than the ten milligrams we just looked

13   at?

14   A.      Yes.

15   Q.      Okay.  Why was a higher strength of Oxycodone

16   prescribed two months later?

17   A.      Because they weren't as effective as the other ones.

18   Q.      What do you mean by that?

19   A.      The ten milligrams weren't helping my pain as much as

20   they were in the beginning.

21   Q.      Okay.  Did you feel like you needed more?

22   A.      Yes.

23   Q.      All right.  What was discussed with Dr. Titus about

24   upping your -- the prescription strength, if anything?

25   A.      Just that he would give me a higher dose, maybe it

882

Calhoun - Direct

1    would work better.

2    Q.    Okay.  Now, Ms. Calhoun, aside from these

3    prescriptions, had you ever taken an opioid prior to seeing

4    Dr. Titus?

5    A.    No.

6    Q.    And after you began to take the Oxycodone, at some

7    point did you become addicted?

8    A.    Yes.

9    Q.    How long did it take to become addicted to Oxycodone?

10   A.    Not very long.  Just a couple months.

11   Q.    Okay.  If you don't mind talking just a little bit

12   louder just to make sure.  I'm sorry.

13   A.    Oh, sorry.

14   Q.    How did you know you had become addicted?

15   A.    Because you wake up one day, and you can't not take

16   it or you'll be very sick.

17   Q.    What does "sick" mean, just to help us understand?

18   A.    So sick withdrawal is you wake up almost like you

19   have the flu, but worse.  You're cold one minute, hot the

20   next.  You have cold chills.  Your stomach aches.  Diarrhea.

21   Nausea.  Your legs just are restless, just pain all in them,

22   and you're just very restless.

23   Q.    And Ms. Calhoun, you talked earlier about the

24   Addison's disease?

25   A.    Mm-hmm.

Calhoun - Direct

1    Q.    Have you determined whether you actually had that

2    issue?

3    A.    Recently.  No, I've been wrongly diagnosed.

4    Q.    Okay.  So when you were being prescribed the

5    Oxycodone and suffering from addiction, would you always

6    take all the medication you'd been prescribed?

7    A.    Yes.

8    Q.    All right.  Let's talk about the offices that you

9    visited to see Dr. Titus.  Were there multiple?

10   A.    Yes.

11   Q.    Okay.  Do you remember the address or location of the

12   first office you visited?

13   A.    First one was located on DuPont, I think, DuPont

14   Highway.

15   Q.    Okay.  And what was it like there?  How long did you

16   wait to see the doctor?

17   A.    About an hour, hour and a half.

18   Q.    Okay.  At some point, did the office location change?

19   A.    Yes.

20   Q.    Do you recall roughly when that was?

21   A.    Maybe 2012.

22   Q.    Okay.  Around then?

23   A.    Yeah.

24   Q.    Okay.  Do you recall the address or location of the

25   new office?

Calhoun - Direct

1    A.      It was off of Church Street.

2    Q.      Church Street.  Okay.

3            So about an hour wait at the first location.

4    What about at the new location on Church Street?

5    A.      Four or five hours.

6    Q.      Four or five hours?

7    A.      Mm-hmm.

8    Q.      Why were you waiting so long?

9    A.      Just so many patients.

10   Q.      In the waiting room?

11   A.      In the waiting room.  Outside in the cars.  Just

12   everywhere.

13   Q.      Okay.  It was crowded?

14   A.      Yeah, very crowded.

15   Q.      Okay.  Could you just kind of give the jury a sense

16   of what that waiting room was like?

17   A.      So some people would be in withdrawal.  You could

18   tell because they'd be pacing.

19           MS. KOUSOULIS:  Your Honor, I'll object just as

20   to her giving a lay opinion.

21           THE COURT:  I think I'm going to allow it.

22   BY MR. WOODARD:

23   Q.      You mentioned withdrawal.  How would you know whether

24   someone was in withdrawal?

25   A.      Some of them would say it.  And --

885

Calhoun - Direct

1              MS. KOUSOULIS:  Objection to any hearsay

2      testimony regarding what anyone said.

3              THE COURT:  All right.  Overruled.

4      BY MR. WOODARD:

5      Q.      You can go ahead, Ms. Calhoun.

6      A.      Sorry.  I could see their symptoms, shaking their

7      legs, hot and cold, going to the bathroom frequently.  Some

8      people would -- I can't say that.  Smoking.  You know,

9      talking about --

10             MS. KOUSOULIS:  Objection to anything people --

11     again, to any hearsay anyone said.  She can testify about

12     her observations, but...

13             THE COURT:  All right.  Overruled.  Go ahead.

14             THE WITNESS:  I can say what they talked about?

15             THE COURT:  Yes.

16             THE WITNESS:  They talked about selling

17     prescriptions.

18             MS. KOUSOULIS:  Your Honor, objection.  Again,

19     it's hearsay.

20             THE COURT:  All right.  So this is not being

21     offered to prove whether other people really were selling

22     prescriptions.  This is being offered to prove what the

23     basis for her opinions are about the people going through

24     withdrawal.

25     BY MR. WOODARD:

886

Calhoun - Direct

1    Q.     Okay.  Let's maybe just step back for a minute.

2    There's been several objections.  We're talking about in the

3    waiting room.

4    A.     Okay.

5    Q.     So what were some of the things you were hearing?

6    A.     That I was hearing?

7    Q.     Yes.

8    A.     Okay.  What milligram are you getting?  Do you get

9    rid of any?  If so, how much?  Some people would say they

10   were really sick.  They would wish the doctor would hurry

11   up.  Just a lot.

12   Q.     Okay.  And you mentioned you suffering through some

13   of the withdrawal symptoms?

14   A.     Mm-hmm.

15   Q.     What would you see in these other patients in the

16   waiting room?

17   A.     The same symptoms, pacing back and forth, having to

18   use the restroom multiple times, shaking their legs to just

19   can't sit still, restless, hot one minute, cold the next,

20   putting on their jacket, taking it off.  Just you could tell

21   they were in withdrawal.

22   Q.     Okay.  And this is at the Church Street address?

23   A.     Yes.

24   Q.     What about, like, the doorway going in and out to the

25   parking lot, what was that like?

887

Calhoun - Direct

1    A.     A lot of foot traffic.

2    Q.     Just does that mean a lot of people?

3    A.     Yeah.

4    Q.     Okay.  You mentioned talking about drug transactions.

5    Did you ever see any drug transactions?

6    A.     No.

7    Q.     Okay.  Did you observe anything about how people were

8    walking in and out of the clinic?

9    A.     Yeah, some people would be sitting there complaining

10   that they were in pain the whole time, and then as soon as

11   they saw the doctor, they'd run out healthy as an ox.

12   Q.     Okay.  All right.  Let's talk -- back to your visit.

13   So you continued to see Dr. Titus?

14   A.     Yes.

15   Q.     Okay.  And when you'd be called back to the

16   examination room, would a physical examination be done?

17   A.     Yes.

18   Q.     And how long would that take?

19   A.     One or two minutes.

20   Q.     Okay.  What would he examine?

21   A.     He'd take a stethoscope to listen to my chest, check

22   my blood pressure, and lean me forward and press on my back

23   and ask if it hurt anywhere.

24   Q.     Okay.  Anything else?

25   A.     That's it.

Calhoun - Direct

1    Q.      All right.  What would you talk about?

2    A.      Just normal day-to-day talk.  How have you been?  You

3    have any plans?  Do you have a boyfriend how?  How are your

4    kids?  Just side talk.

5    Q.      Does "side talk" mean like friendly conversation?

6    A.      Yes, friendly conversation.

7    Q.      Okay.  So how long overall would you be in the exam

8    room?

9    A.      If we talked for a while, sometimes 20, 30 minutes.

10   Q.      Okay.  But how much of that was related to the

11   physical examination?

12   A.      Just a couple minutes.

13   Q.      Okay.  And during those visits, were you addicted?

14   A.      Not in the beginning, no.

15   Q.      Right.  But sort of going forward?

16   A.      Yes.  Yes.

17   Q.      Okay.  So how would you feel when you were sitting in

18   there with Dr. Titus?

19   A.      Eager to leave so I could get my prescription filled.

20   Q.      Okay.

21              MR. WOODARD:  Okay.  Ms. Leal, if we could go

22   back to 121 at 315, please.

23   BY MR. WOODARD:

24   Q.      Okay.  Do you see the date on this, Ms. Calhoun?

25   A.      Yes.

Calhoun - Direct

1    Q.    Is that 2011?

2    A.    Yes.

3    Q.    And on the right, what were you still being

4    prescribed?

5    A.    Oxycodone.

6    Q.    Okay.

7              MR. WOODARD:  If we could jump to Page 277.

8    BY MR. WOODARD:

9    Q.    What's the date on this, Ms. Calhoun?

10   A.    2012.

11   Q.    Okay.  So about a year later?

12   A.    Yes.

13   Q.    And were you still receiving the Oxycodone 15's?

14   A.    Yes.

15   Q.    Okay.  So what happened between 2011 and 2012?

16   A.    I believe that's when he moved offices.

17   Q.    Okay.  Were you able to see him for that roughly year

18   time frame?

19   A.    No.

20   Q.    So you mentioned you're addicted.  What did you do

21   during this time?

22   A.    I got pills off the street.

23   Q.    Okay.  And when you --

24             MR. WOODARD:  If you could pull that back up,

25   Ms. Leal, 277.

Calhoun - Direct

1  BY MR. WOODARD:

2  Q.     When you came back to see Dr. Titus, what did he

3  write you right away?

4  A.     Oxycodone 15 milligrams.

5  Q.     Now, after you started seeing him again, do you

6  remember whether things like pain scales and pain ratings

7  were --

8  A.     Yeah.

9  Q.     -- recorded?

10 A.     Yes.  Yes.

11 Q.     Okay.  Could you just explain to a jury, like, what

12 the pain scale was?

13 A.     You would have to fill out a sheet of paper when you

14 came in and paid for your visit, and circle basically one to

15 ten, how was your pain level.

16 Q.     Okay.  Do you remember whether you signed, like, a

17 pain contract with certain rules of the office?

18 A.     No.

19 Q.     That's okay.  For the pain scales, would you discuss

20 that with Dr. Titus?

21 A.     No.

22 Q.     Okay.  Around this time, did you also begin to take

23 urine drug tests?

24 A.     Yes.

25 Q.     Okay.  Could you just walk us through briefly the

Calhoun - Direct

1    process of providing a urine specimen?

2    A.     So after you saw the secretary at the window to sign

3    in and pay for your visit, they would hand you a urine cup.

4    You would take the urine cup to the nearest restroom,

5    unsupervised.  And after you were done, the urine, there was

6    a shelf with, like, five shelves on it, and you would just

7    set your cup there next to all the rest of the cups.

8    Q.     Okay.  Okay.  Let's look at a couple drug test

9    results.

10             MR. WOODARD:  Ms. Leal, if you could go to

11   Page 487.  And if you could go to the second page, third

12   page.

13   BY MR. WOODARD:

14   Q.     Okay.  Do you see, Ms. Calhoun, under "Results,"

15   explanation, the presence of hydrocodone?

16   A.     Yes.

17   Q.     Does this show that you essentially had Hydrocodone

18   show up in your drug test?

19   A.     Yes.

20   Q.     Okay.  Was that something being prescribed by

21   Dr. Titus?

22   A.     No.

23   Q.     All right.  Was that something you discussed with

24   Dr. Titus?

25   A.     No.

Calhoun - Direct

1           MR. WOODARD:  Ms. Leal, Page 171, please.

2   BY MR. WOODARD:

3   Q.    Okay.  We're in 2013, Ms. Calhoun.  What is this

4   document?

5   A.    A referral.

6   Q.    Okay.  To who?

7   A.    Dr. Cemerlic.

8   Q.    And for what?

9   A.    Pain -- pain management evaluation.

10  Q.    Okay.  Did you ever go see Dr. Cemerlic?

11  A.    No.

12  Q.    Did Dr. Titus ever ask whether you went to see

13  Dr. Cemerlic?

14  A.    No.

15  Q.    Okay.  Now, just kind of moving forward in time.

16          MR. WOODARD:  Ms. Leal, if we could go to

17  Page 147.

18  BY MR. WOODARD:

19  Q.    So what's the date we are on now, Ms. Calhoun?

20  A.    2013.

21  Q.    Okay.  And we looked at the drug test, but now what

22  is the prescription on this date?

23  A.    Oh, Oxycodone on 7/16/13.

24  Q.    And would you get -- how many prescriptions per month

25  would you get?

893
Calhoun - Direct

1    A.      In the beginning, before the two weeks, I was getting

2    one month, and then when we started going every two weeks,

3    you got to get two prescriptions.

4    Q.      Okay.  Was that after the break that we discussed?

5    A.      Yes.  Mm-hmm.

6    Q.      Okay.  This referral we talked about to Dr. Cemerlic,

7    was that after the break we discussed?

8    A.      Yes.

9    Q.      Okay.  All right.

10            MR. WOODARD:  Let's go back to the drug screen.

11   So Page 447, please, Ms. Leal.  If you could blow up the

12   date.

13   BY MR. WOODARD:

14   Q.      So what date are we at now, Ms. Calhoun?

15   A.      2014, January, I believe.

16   Q.      Okay.  And what does it show under "Not Prescribed -

17   Detected"?

18   A.      Morphine, Hydromorphine, Normorphine.

19   Q.      Okay.

20            MR. WOODARD:  Ms. Leal, if we could go to

21   Page 37.

22   BY MR. WOODARD:

23   Q.      And what's the date on this document?

24   A.      February 12th, 2014.

25   Q.      Okay.  What is this?

894

Calhoun - Direct

1    A.      This is a letter to inform you that he will no longer

2    be my pain management provider for having none of the

3    prescribed pain medications in my system.

4    Q.      Okay.  When you were a patient, do you recall ever

5    seeing this document?

6    A.      No.

7    Q.      Do you recall discussing something like this with

8    Dr. Titus?

9    A.      No.

10            MR. WOODARD:  Page 49, please.

11   BY MR. WOODARD:

12   Q.      Okay.  So the last document was February 12th of '14.

13   What's the date on this prescription?

14   A.      February 14th, 2014.

15   Q.      Is it February 11th?

16   A.      Yes.

17   Q.      Okay.  And so right around the time of this letter,

18   what were you prescribed?

19   A.      Oxycodone.

20   Q.      Fifteen milligrams?

21   A.      Yes.

22   Q.      And what about on the right?

23   A.      Methadone.

24   Q.      Okay.  I think this is the first time we're seeing

25   Methadone.  Why was that added?

Calhoun - Direct

1   A.      Methadone was added for -- to act as a long-acting

2   pain reliever, and the Oxycodone was a short reliever --

3   pain reliever.

4   Q.      Okay.

5              MR. WOODARD:  Could we please go to 83,

6   Ms. Leal.

7   BY MR. WOODARD:

8   Q.      All right.  So what date are we at now, Ms. Calhoun?

9   A.      April 9th, 2014.

10  Q.      Okay.  Is this after the discharge letter we looked

11  at?

12  A.      Yes.

13  Q.      Okay.  What are you being prescribed at this point?

14  A.      Oxycodone.

15  Q.      And what about on the right?

16  A.      Oxycontin.

17  Q.      Okay.  I think this is another new one; is that

18  right?

19  A.      Yes.

20  Q.      Why was Oxycontin added?

21  A.      I didn't like the Methadone, so we swapped the

22  Methadone for the Oxycontin.

23  Q.      Okay.  Were you still addicted at this time?

24  A.      Yes.

25  Q.      Okay.

Calhoun - Direct

1            MR. WOODARD:  If we could go to Page 39, please,

2    Ms. Leal.

3    BY MR. WOODARD:

4    Q.    Okay.  What's the date on this one, Ms. Calhoun?

5    A.    July 14th, 2014.

6    Q.    Okay.  Does this look similar to the other letter we

7    looked at?

8    A.    Yes.

9    Q.    And what's this letter stating?

10   A.    That he will no longer be my primary care provider

11   for testing positive for heroin.

12   Q.    Do you recall seeing this letter --

13   A.    Yes.

14   Q.    -- when you were a patient?

15   A.    Yes.

16   Q.    Okay.  Did you talk to Dr. Titus about this letter?

17   A.    Yes.

18   Q.    What was discussed?

19   A.    I waited for him when he got off work.  He said --

20   first, I went to the office for my regular appointment.

21   When I went there, they said they couldn't see me no more,

22   and they handed me this letter.

23            So I waited for him to get off.  He said, "Come

24   in tomorrow.  I'll talk to you about it."

25            So I came in the next day to talk to him about

897

Calhoun - Direct

1    it.  And I went in his office, and he said that there was

2    nothing he could do.  Once you test positive, from now on,

3    there's nothing he can do.  He has to cut you off because

4    the DEA was on his back.

5              And I was very upset.  I said, "I've never done

6    heroin a day in my life.  You know, I'll give you a hair

7    sample.  At the lab, a hair sample goes back six or

8    seven years."  And he just said there was nothing he could

9    do.

10   Q.    Okay.

11             MR. WOODARD:  Ms. Leal, if we could go to

12   Page 43.  If you could zoom in on that circle.

13   BY MR. WOODARD:

14   Q.    Does this drug test show that at least heroin did

15   show up in your system?

16   A.    Yes.

17   Q.    Okay.  All right.

18             MR. WOODARD:  So let's go back really quickly to

19   39, please, Ms. Leal.

20   BY MR. WOODARD:

21   Q.    So -- and the first sentence, what does it state

22   starting "I will no longer"?

23   A.    "I will no longer be your primary care provider for

24   the following reason:  Testing positive for an illegal

25   substance, heroin."

Calhoun - Direct

1   Q.      Okay.  And a couple sentences down, what does it say

2   starting "Emergency treatment"?

3   A.      "Emergency treatment does not include narcotic

4   medication."

5   Q.      And the date here is July 14th?

6   A.      Yes.

7   Q.      Okay.

8           MR. WOODARD:  Ms. Leal, if we could go to

9   Page 41.  And if you could blow that up a little bit.  Okay.

10  BY MR. WOODARD:

11  Q.      What's the date on these prescriptions?

12  A.      July 16th --

13  Q.      Okay.

14  A.      -- 2014.

15  Q.      So two days later?

16  A.      Yes.

17  Q.      And what were you prescribed?

18  A.      Oxycontin and Oxycodone.

19  Q.      Were these in the same strength and quantity as you

20  had received previously from Dr. Titus?

21  A.      Yes.

22  Q.      Did you go fill this prescription?

23  A.      Yes.

24  Q.      Did you take the drugs?

25  A.      Yes.

899

Calhoun - Direct

1   Q.      After receiving the discharge letter, did Dr. Titus

2   essentially ever speak to you regarding your taking of this

3   medication?

4   A.      No.

5   Q.      Did you ever see him in his office?

6   A.      No.

7   Q.      Did he ask you how the medication was working or not

8   working?

9   A.      No.

10  Q.      Okay.

11          MR. WOODARD:  You can pull that down, Ms. Leal.

12  BY MR. WOODARD:

13  Q.      While seeing Dr. Titus, did you ever have to do a

14  pill count?

15  A.      Yes.

16  Q.      And what's that?

17  A.      A pill count is after you come out of the room with

18  Dr. Titus, you would go to the window to the secretary.  She

19  would write you a card to come back in two weeks for a pill

20  count.

21  Q.      Okay.  So when you say in two weeks, does that mean

22  that the date was written there?

23  A.      Yes.

24  Q.      Okay.  So would you know when to show up with your

25  pills?

900

Calhoun - Direct

1   A.      Yes.

2   Q.      Would you bring a certain amount of pills to these

3   pill counts?

4   A.      Yes.

5   Q.      Okay.  Were those always your pills?

6   A.      No.

7   Q.      What do you mean by that?

8   A.      Sometimes I would have to borrow them --

9   Q.      To show up with the right --

10  A.      -- to show up with the right amount.

11  Q.      Okay.  Okay.  Let's just talk for a second about

12  filling the prescription.  So after you got the

13  prescription, where would you go fill them?

14  A.      Most of the time, I would fill it at Pill Box

15  Pharmacy in Milford.

16  Q.      Okay.  Would you use insurance?

17  A.      No.

18  Q.      So how would you pay?

19  A.      Cash.

20  Q.      Okay.  So how much would the visit with Dr. Titus

21  cost in cash?

22  A.      I believe 170.

23  Q.      Okay.  And then how much would going to fill the

24  prescription in cash cost?

25  A.      Sometimes two -- over $200.

Calhoun - Direct

1   Q.      Okay.  So are we talking around 370 --

2               MS. KOUSOULIS:  Your Honor, I just object to the

3   leading questions.

4               MR. WOODARD:  Sure.

5               THE COURT:  All right.  Overruled.

6   BY MR. WOODARD:

7   Q.      So how much total are we talking per month in cash?

8   A.      Around $304.

9   Q.      How were you able to pay that money?

10  A.      Sometimes my boyfriend, sometimes I worked.

11  Sometimes I made money doing other things.

12  Q.      And what do you mean by that, Ms. Calhoun?

13  A.      Sometimes I would buy other people's prescriptions at

14  a low price and sell it to someone else for a higher price

15  to make money.

16  Q.      How much were these prescriptions for Oxycodone

17  worth?

18  A.      On the street?

19  Q.      Yes.

20  A.      Depends what milligram and the quantity.  At the

21  time, one 15-milligram tablet was going for $10, just one

22  tablet.

23  Q.      And how many tablets were you getting in your

24  prescriptions?

25  A.      120.

Calhoun - Direct

1    Q.      Okay.  Can you do the math there, 120 times ten?

2    A.      1,200.

3    Q.      Okay.  For one prescription?

4    A.      Yeah.

5    Q.      Okay.  On the topic of money, did you ever hear

6    Dr. Titus talk about money?

7    A.      Sometimes.

8    Q.      What would he talk about?

9    A.      He said he had a goal in mind.  He wanted to retire

10   and go back to Florida.

11   Q.      Okay.  Did he ever buy anything for you?

12   A.      Yes.

13   Q.      What was that?

14   A.      He gave me a personal check for $4,200.

15   Q.      Why?

16   A.      First, it started off he asked if I had any plans for

17   the next couple months coming up, and I said, No.  And he

18   said, "Well, I'm a member of the Ritz-Carlton.  I can fly

19   you and a friend out.  You can stay for the weekend, go to

20   the spa, whatever, and stay down there."

21           So my friend went to pick up the plane tickets

22   up from his office.  And me and her ended up getting in an

23   argument, so I did not end up going.  So when I went back in

24   to my next visit, he asked how my trip was and I told him I

25   didn't go.  And he said, "Well, I'll just buy you different

Calhoun - Direct

1    tickets and you can go again."

2           And I said, "Well, truthfully, that's a lot of

3    money and I'm a single mother right now, and I don't have a

4    car.  I said I'd rather" -- "I'd rather just have the money

5    for a car than a trip to Florida."  So he said, "I can give

6    you this car here and have it ready for you next month."

7           So when I came in the following month, he said

8    he was in the process of going through a divorce so he

9    couldn't give me the car.  So he wrote me a check.

10   Q.    How much was that check?

11   A.    $4,200.

12   Q.    Okay.  Did you have Dr. Titus' cell phone number?

13   A.    Yes.

14   Q.    Okay.  You mentioned your parents when we started

15   out.  What were your mom and step-dad going to see Dr. Titus

16   for?

17   A.    My mom has rheumatoid arthritis.  My stepfather hurt

18   his back in the woods one day.

19   Q.    Okay.  Do you know what they were prescribed?

20   A.    Oxycodone.

21   Q.    Did they suffer from any addiction issues?

22   A.    Yes.

23   Q.    And did you notice any changes with your stepfather

24   before and after seeing Dr. Titus?

25   A.    Over the years, he went from over 300 pounds to

1    barely 90 pounds.

2    Q.    Was that during the time he was on Oxycodone?

3    A.    Yeah.

4    Q.    All right.  Okay.

5          So we looked at the discharge letter a little

6    while ago.  Do you remember that?

7    A.    Yes.

8    Q.    Were you still addicted at the time you were

9    discharged?

10   A.    Yes.

11   Q.    So what did you do after being discharged from

12   Dr. Titus' office?

13   A.    I sought out a different pain management doctor.  And

14   then after that, I got pills off the street.

15   Q.    Okay.  Did you turn to any other drugs?

16   A.    Yeah, heroin.

17   Q.    Ms. Calhoun, did you eventually get sober?

18   A.    Yes.

19   Q.    Okay.  Are you still suffering from addiction,

20   however?

21   A.    Yeah.  Every day.

22   Q.    All right.  Is that like a lifelong --

23   A.    It's a lifelong scar.

24   Q.    Okay.  How many pills would you say Dr. Titus

25   prescribed you for opioids throughout your treatment?

905

Calhoun - Direct

1    A.      Gosh, maybe 3,000.

2    Q.      If you learned it was closer to 4,000, how would you

3    feel?

4    A.      It sounds about right.

5    Q.      Throughout the course of the treatment and taking all

6    those pills, did your pain ever get better?

7    A.      Truthfully, the pain meds made it worse.

8    Q.      How so?

9    A.      When I got off of the Oxycodone and everything, my --

10   I don't have no pain.  So I, honestly, think it makes it

11   worse.

12   Q.      If you were to be in pain today, how would you go

13   about it?

14   A.      I don't even take Advil maybe once every couple

15   months.

16   Q.      If Dr. Titus had stopped writing you prescriptions

17   for the opioids, would you have continued to see him --

18             MS. KOUSOULIS:  Your Honor, objection to

19   speculation.

20             THE COURT:  I'm going to sustain that objection.

21             MR. WOODARD:  Just one moment, Your Honor.

22             Thank you, Ms. Calhoun, and no further

23   questions.

24             THE COURT:  All right.

25             Ms. Kousoulis.

Calhoun - Cross

1                         CROSS-EXAMINATION

2    BY MS. KOUSOULIS:

3    Q.      Good morning, Ms. Calhoun.

4    A.      Good morning.

5    Q.      Now, you testified that you began seeing Dr. Titus

6    when you were about 17 years old in around 2008?

7    A.      2009.

8    Q.      2009.  And it's fair to say that at the time you were

9    seeing Dr. Titus, you were also suffering from Addison's

10   disease; correct?

11   A.      Correct.

12   Q.      And that had been diagnosed by a different doctor,

13   not Dr. Titus; correct?

14   A.      Correct.

15   Q.      Now, at the time you had seen Dr. Titus, though, you

16   told him, you know, that you had been suffering from

17   Addison's disease, correct?

18   A.      Correct.

19   Q.      And, in fact, Dr. Titus, in an attempt to obtain as

20   much information as to your medical condition and history as

21   he could, referred you to Smyrna Medical Associates to be

22   evaluated further for Addison's disease; correct?

23   A.      Correct.

24   Q.      And I will call up --

25              MS. KOUSOULIS:  If Andy -- Mr. Marek, if you

Calhoun - Cross

1  could bring up Government Exhibit 121 at 431, and Government

2  Exhibit 121 at 427.   121 at 431.   And 121 at 427.

3  BY MS. KOUSOULIS:

4  Q.    And this is -- he wrote you a prescription for Smyrna

5  Medical Associates to evaluate you for adrenaline

6  deficiency, which is the same as Addison's disease; correct?

7  A.    Correct.

8  Q.    Okay.

9         MS. KOUSOULIS:   Thank you, Mr. Marek.

10 BY MS. KOUSOULIS:

11 Q.    Now, you also testified that prior to seeing

12 Dr. Titus, you were seeing another doctor; correct?

13 A.    Prior, yes.

14 Q.    And you were -- at the time you began seeing

15 Dr. Titus, you were already being prescribed Adderall;

16 correct?

17 A.    Correct.

18 Q.    And that -- so another doctor had been prescribing

19 you Adderall before you saw Dr. Titus; correct?

20 A.    Correct.

21 Q.    Now, in August -- in August of 2011 is when Dr. Titus

22 prescribed you an opioid -- Oxycodone for the first time;

23 correct?

24 A.    Correct.

25 Q.    And at the time, you were 20 years old; correct?

Calhoun - Cross

1   A.      Correct.

2   Q.      Now, you went to see Dr. Titus.  Is it fair to say

3   you had an appointment with him on August 15, 2011; correct?

4   Do you recall that?

5   A.      No.

6              MS. KOUSOULIS:  And, Mr. Marek, if you could

7   pull up Government Exhibit 121 at 347.

8   BY MS. KOUSOULIS:

9   Q.      This is an ongoing pain assessment with your name on

10  it.  Do you recall filling this out when you went to see

11  Dr. Titus in August of 2011 before he prescribed you the

12  Oxycodone?

13  A.      Yes.

14  Q.      And this is -- and you had filled this out; correct?

15  A.      Correct.

16  Q.      And it's fair to say that you had described -- that

17  time you had described your pain as between an eight and a

18  ten; correct?

19  A.      Correct.

20  Q.      And on that same date, August --

21             MS. KOUSOULIS:  And you can take that down,

22  Mr. Marek.

23  BY MS. KOUSOULIS:

24  Q.      On that same date, Dr. Titus prescribed --

25             MS. KOUSOULIS:  Mr. Marek, if you can bring up

Calhoun - Cross

1    Government Exhibit 121 at 339 and 121 at 343.

2    BY MS. KOUSOULIS:

3    Q.     And at that time, he sent you for an MRI.  And if you

4    look at 121 at 343, on the right-hand side, that's a

5    radiology prescription for an MRI, correct, of your lumbar

6    back?  Of your lower back?

7    A.     Correct.

8    Q.     And you had indicated to him that you were having

9    pain there, and that's why he sent you for an MRI; correct?

10   A.     Correct.

11   Q.     And the document on the left, 121 at 339, that is

12   where he sent you for the MRI; correct?

13   A.     Correct.

14          MS. KOUSOULIS:  You can take that down,

15   Mr. Marek.

16   BY MS. KOUSOULIS:

17   Q.     And then prior to writing you the prescription on

18   August 23rd, 2011, he received the MRI results back.

19          MS. KOUSOULIS:  Can you please pull up 121 at

20   537, Mr. Marek.

21   BY MS. KOUSOULIS:

22   Q.     And I believe this is the document that the

23   Government showed you earlier, and it was your MRI results;

24   correct?

25   A.     Correct.

910

Calhoun - Cross

1    Q.     And the date -- and I'm not sure if you can see it

2    all the way up at the very, very top, but there was a fax

3    sent to Dr. Titus, and I believe that's dated August 18th,

4    2011, is when he got the results from -- for the MRI?

5    A.     Correct.

6    Q.     And it was following you filling out the pain

7    assessment rating your pain at eight to ten, talking to

8    Dr. Titus about your pain, and him receiving your MRI that

9    he prescribed you your first prescription for Oxycodone;

10   correct?

11   A.     Correct.

12          MS. KOUSOULIS:  Thank you, Mr. Marek.  Can you

13   pull that down?

14   BY MS. KOUSOULIS:

15   Q.     Now, you -- strike that.

16          And the Oxycodone did relieve your pain at the

17   time; correct?

18   A.     Correct.

19   Q.     And at some point, the Oxycodone wasn't being as

20   effective, and you talked to Dr. Titus about this; correct?

21   A.     Correct.

22   Q.     And at that point, he upped your prescription;

23   correct?

24   A.     Correct.

25   Q.     Now, between October, approximately October 2011 to

Calhoun - Cross

1    October 2012, you stopped seeing Dr. Titus; correct?

2    A.      Correct.

3    Q.      And during that time, you were seeing another pain

4    management doctor?

5    A.      No.

6    Q.      And you stopped seeing Dr. Titus because his clinic

7    had been shut down; correct?

8    A.      Yes.

9    Q.      And do you recall being interviewed by agents on

10   June 17th, 2021, in relation to this case?

11   A.      Yes.  Yes.

12   Q.      And at that time, do you recall telling them that

13   when Dr. Titus was shut down, you went to another pain

14   clinic?

15   A.      That was at the last time he shut down, so 2014.

16   Q.      So this wasn't during -- between 2011 and 2012, you

17   didn't see another pain doctor?

18   A.      Not that I remember, no.

19   Q.      Now, when you -- upon your return to Dr. Titus in

20   2000 -- in 2012, in October 2012, he had you complete an

21   updated pain assessment form; correct?

22   A.      Correct.

23             MS. KOUSOULIS:  And, Mr. Marek, if you can pull

24   up Government Exhibit 121 at 283, please.

25   BY MS. KOUSOULIS:

Calhoun - Cross

1    Q.    And this is the pain assessment form you filled out

2    on -- you're -- when you arrived back at the office in 2012;

3    correct?

4    A.    Yes.

5              MS. KOUSOULIS:  And if you could, Mr. Marek,

6    turn to 121 at 285 of this document.  I believe it's the

7    second page of the document.

8    BY MS. KOUSOULIS:

9    Q.    And on here, at the top, it says the date was October

10   that you filled this out, October 25, 2012; correct?

11   A.    Correct.

12   Q.    And on this, in -- at numbers 5 and 6, it talks about

13   your pain.

14             MS. KOUSOULIS:  If you can pull that up,

15   Mr. Marek.

16   BY MS. KOUSOULIS:

17   Q.    And on here it asks how you would rate the intensity

18   of your pain now or during the last five days.  And on a

19   scale of one to ten, you rated it an eight.  And on the

20   scale of one to five, you rated it a four; correct?

21   A.    Correct.

22   Q.    And you also, when asked how much of the time you

23   experienced pain or hurting in the last five days, you

24   checked "almost constantly;" correct?

25   A.    Correct.

913

Calhoun - Cross

1    Q.    And it was after meeting with Dr. Titus and having

2    him review this pain assessment that he again prescribed you

3    narcotics; correct?

4    A.    Correct.

5    Q.    Now, Dr. Titus counseled you as to the risk of

6    addiction to opioids; correct?

7    A.    No.

8          MS. KOUSOULIS:  If you could pull up, Mr. Marek,

9    121 at 293, please.

10   BY MS. KOUSOULIS:

11   Q.    This is a consent for opioid therapy.  Do you recall

12   this document, signing it?

13         MS. KOUSOULIS:  If you could turn to page -- the

14   second page of this document, Mr. Marek, at 295.

15         THE WITNESS:  Yes, there is a signed one.

16   BY MS. KOUSOULIS:

17   Q.    And that's your signature on the bottom; correct?

18   A.    Correct.

19         MS. KOUSOULIS:  And if you go back to Page 1 of

20   the document, Mr. Marek.

21   BY MS. KOUSOULIS:

22   Q.    The second paragraph that starts -- it states, "I am

23   aware that use of such medicine has certain risks associated

24   with it, including but not limited to sleepiness,

25   drowsiness, constipation, nausea, itching, vomiting,

Calhoun - Cross

1    dizziness, allergic reaction, slowing of breathing rate,

2    slowing of reflexes or reaction time, physical dependence

3    tolerance to analgesia, addiction, and possibility that the

4    medicine will not provide complete relief."

5              That is contained in this agreement that you

6    signed; correct?

7    A.    Yeah.  What was the date on that?

8              MS. KOUSOULIS:  If you could go back to the

9    second page.

10   BY MS. KOUSOULIS:

11   Q.    It was October 25th, 2012.

12             MS. KOUSOULIS:  If you can go to 121 at 295,

13   Mr. Marek.

14   BY MS. KOUSOULIS:

15   Q.    And that is the date, October 25th, 2012 is the same

16   date that you filled out the pain assessment form, and is

17   the date that you returned to see Dr. Titus after not seeing

18   him for a year; correct?

19   A.    Yeah, but I had already been getting pain meds from

20   him prior to this.

21   Q.    But my question --

22   A.    Before this paper.

23   Q.    My question was:  At this time, he -- he counseled

24   you.

25             You testified that he never counseled you on

Calhoun - Cross

1    the -- on the risks of pain medication.

2    A.    Not when he first wrote the -- no.

3    Q.    Correct?  Okay.

4          That wasn't your testimony on direct; right?

5    You said he never did.  So, in fact, he did counsel you?

6    A.    Verbally, no, he did not.  On this paper, yes.

7    Q.    And you reviewed this paper before signing it;

8    correct?

9    A.    Correct.

10   Q.    And you also filled out --

11         MS. KOUSOULIS:  Mr. Marek, if you could pull up

12   121 at 297.

13   BY MS. KOUSOULIS:

14   Q.    You also filled out a Pain Management Agreement when

15   you went to the office on October 25th, 2012; correct?

16   A.    Correct.

17         MS. KOUSOULIS:  And if you can go to Page 301 of

18   that document, Mr. Marek.

19   BY MS. KOUSOULIS:

20   Q.    That's your signature at the bottom, dated

21   October 25th, 2012; correct?

22   A.    Correct.

23         MS. KOUSOULIS:  And if you go back to the first

24   page of that, Mr. Marek, at 297.  And -- I'm sorry.

25   BY MS. KOUSOULIS:

Calhoun - Cross

1    Q.     And in the second line of the second paragraph, it

2    says, "There's also the risk of an addictive disorder

3    developing or relapse occurring in persons with prior

4    addiction.  The extent of the risk is not certain."

5           So it's fair to say that this document also

6    warned you of some of the addictive properties of taking

7    opioids; correct?

8    A.     Yes.

9           MS. KOUSOULIS:  Thank you, Mr. Marek.

10   BY MS. KOUSOULIS:

11   Q.     You never told Dr. Titus that the pain meds made you

12   feel worse, did you?

13   A.     I didn't realize that until after I was off of them.

14   Q.     And at the time, they were actually making you feel

15   better, you believed?

16   A.     Yeah.

17   Q.     Dr. Titus wasn't in the waiting room with you when

18   you were waiting to see him for your appointments, was he?

19   A.     No, but he would be --

20   Q.     Okay.  That was my question.

21   A.     Okay.

22   Q.     And it's fair to say you hid your addiction from

23   Dr. Titus because you wanted him to keep prescribing you

24   medication; correct?

25   A.     That's fair to say.

917

Calhoun - Cross

1    Q.    And it's fair to say you never told Dr. Titus you

2    were selling your pills; correct?

3    A.    Correct.

4            MS. KOUSOULIS:  I have no further questions,

5    Your Honor.

6            THE COURT:  Do you have any, Mr. Woodard?

7            MS. KOUSOULIS:  Oh, I'm sorry.  One moment, Your

8    Honor.

9    BY MS. KOUSOULIS:

10   Q.    Now, you testified that Dr. Titus was going to send

11   you on a trip to Florida; correct?

12   A.    Mm-hmm.

13   Q.    Isn't it true that that trip was, he indicated, for

14   you and your girlfriend and your boyfriends to go on the

15   trip together; correct?

16   A.    Right.

17   Q.    Okay.  And you also testified, I believe on direct,

18   that you told him, when he discharged you in July 2014, that

19   you never did heroin.  Was that your testimony?

20   A.    Yes.

21   Q.    When, in fact, as the drug test indicated, you had

22   done heroin; correct?

23   A.    That's not true.  That's false.

24   Q.    Because you're saying the test -- the drug test that

25   you took, the results that were shown to the jury during the

918

Calhoun - Redirect

1    direct examination, the results were not -- were false?

2    A.    A hundred percent.

3              MS. KOUSOULIS:  Okay.  I have no further

4    questions.

5              THE COURT:  All right.

6              Mr. Woodard.

7              MR. WOODARD:  Yes, Your Honor.

8                    REDIRECT EXAMINATION

9    BY MR. WOODARD:

10   Q.    Hi, Ms. Calhoun.

11   A.    Hi.

12   Q.    You were asked about Addison's disease when you were

13   17.  Do you remember that?

14   A.    Yes.

15   Q.    Okay.  And did that at the time make you feel tired?

16   A.    Yes.

17   Q.    All right.  And when you were 17 or 18, were you

18   prescribed Soma?

19   A.    From Dr. Titus, yes.

20   Q.    Yes.  And did that make you feel drunk?

21   A.    Yes.

22   Q.    Although you already felt tired?

23   A.    Yes.

24   Q.    Okay.  You were asked about your first prescription

25   for Oxycodone.  Do you remember that just a minute ago?

Calhoun - Redirect

1    A.     Yes.

2    Q.     Okay.

3           MR. WOODARD:  Ms. Leal, if we could please go to

4    Page 337.

5           MS. LEAL:  121?

6           MR. WOODARD:  121.  I'm sorry.

7    BY MR. WOODARD:

8    Q.     Okay.  Is this the pain scale we discussed that you

9    filled out?

10   A.     Yes.

11   Q.     Did you ever talk about this with Dr. Titus?

12   A.     No.  It just was in the file.

13   Q.     Okay.  And that first prescription you received for

14   Oxycodone, do you remember about how many pills you got?

15   A.     I think 90.

16   Q.     And you had never taken an Oxycodone pill before?

17   A.     No.

18   Q.     Okay.  You were actually --

19          MR. WOODARD:  You can take that down, Ms. Leal.

20   BY MR. WOODARD:

21   Q.     You were asked about referrals a minute ago.  Do you

22   remember that?

23   A.     Mm-hmm.

24   Q.     After the referral for the MRI you were shown, were

25   you ever referred to anyone by Dr. Titus from around 2012 to

Calhoun - Redirect

1    '14?

2    A.      No.

3    Q.      Okay.  You were asked about filling out these pain

4    assessments, you know, every time you would go see the

5    doctor.  In addition to that first visit, would you ever

6    talk about that with Dr. Titus?

7    A.      The pain assessment?

8    Q.      Yes.

9    A.      He would just say, "How is your pain?  Is it any

10   better" --

11   Q.      Mm-hmm.

12   A.      -- when I was in the office with him.

13   Q.      Okay.  And at some point, were you addicted to those

14   pills?

15   A.      Yes.

16   Q.      Was there a reason you were indicating you were in a

17   high level of pain?

18   A.      To get more pills.

19   Q.      Okay.

20          MR. WOODARD:  If we could please pull up

21   Page 293, Ms. Leal.

22   BY MR. WOODARD:

23   Q.      Do you remember being shown this a minute ago,

24   Ms. Calhoun?

25   A.      Yes.

921

Calhoun - Redirect

1    Q.     Okay.  And how old were you at the time that if --
2    roughly when you signed this consent for opioid therapy?
3    A.     Twenty, 21.
4    Q.     Okay.
5           MR. WOODARD:  And, Ms. Leal, if you could zoom
6    in under the "I am aware."  No.  Higher, please, with the
7    lines.
8    BY MR. WOODARD:
9    Q.     What's listed under "Treatments discussed included"?
10   A.     Where are you at?
11   Q.     The three lines.
12   A.     Okay.  "I am aware about the possible risks and
13   benefits of other types of treatment that do not involve the
14   use of opioids.  The other treatments discussed included"
15   blank.
16   Q.     Did you talk about any other treatments?
17   A.     No.
18   Q.     Okay.  Finally, Ms. Calhoun, you were asked about the
19   waiting room, and you didn't get to finish your answer.
20   What were you trying to say there?
21   A.     Oh, if Dr. Titus was ever in the waiting room?
22   Q.     Yes.
23   A.     No, but he -- so it's like a big window where the
24   secretary sits.  He would come in there sometimes, and
25   sometimes he would say, Hi, talk to them through the window

Calhoun - Redirect

1    while they were in the waiting room.

2    Q.     Okay.  Are these the people in the waiting room you

3    described earlier?

4    A.     Yes.  Mm-hmm.

5    Q.     Okay.  All right.

6            And so you were asked about these pain scales

7    and things.  No matter what he wrote, did you get the same

8    prescriptions?

9    A.     Yes.

10           MR. WOODARD:  Okay.  No further questions, Your

11   Honor.

12           THE COURT:  All right.

13           Ms. Calhoun, thank you.  You're excused.  You

14   may go.

15           THE WITNESS:  Thank you.

16           MS. REMIS:  The United States calls Carla

17   Haynes.

18           THE COURT:  All right.

19           DEPUTY CLERK:  Ms. Haynes, you can take your

20   mask down, if you're comfortable.

21           THE WITNESS:  Thank you.

22           DEPUTY CLERK:  Please state and spell your full

23   name for the record.

24           THE WITNESS:  I'm sorry.  I couldn't hear you.

25           DEPUTY CLERK:  Oh, I'm sorry.  Please spell and

Haynes - Direct

1    state your full name for the record.

2              THE WITNESS:  It's Carla Haynes.  C-A-R-L-A

3    H-A-Y-N-E-S.

4              DEPUTY CLERK:  Do you affirm that the testimony

5    you are about to give to the Court and the jury in the case

6    now pending will be the truth, the whole truth, and nothing

7    but the truth, you do so affirm?

8              THE WITNESS:  I do.

9              DEPUTY CLERK:  Thank you.

10             CARLA HAYNES, the witness herein, after having

11   been duly affirmed under oath, was examined and testified as

12   follows:

13                    DIRECT EXAMINATION

14   BY MS. REMIS:

15   Q.    Good morning, Ms. Haynes.

16   A.    Good morning.

17   Q.    Could you please introduce yourself to the jury?

18   A.    Yes, hi.  I'm Carla Haynes from Jonesboro, Georgia.

19   Q.    And how long have you lived in Georgia?

20   A.    It will be eight -- 19 years next month.

21   Q.    What do you do?

22   A.    I work for the Federal Bureau of Prisons.  I'm a

23   Regional Health Systems Specialist.

24   Q.    As a Health Systems Specialist, do you have any

25   background in health care?

924

Haynes - Direct

1    A.    No, health care administration.

2    Q.    Are you familiar with somebody named Patrick Titus?

3    A.    Yes.

4    Q.    Just generally, how are you familiar with him?

5    A.    He was my brother's doctor.

6    Q.    And have you ever met him in person?

7    A.    No, ma'am.

8    Q.    Have you ever spoken to him before?

9    A.    Yes.

10   Q.    I'm going to show you Government Exhibit 707, please.

11   Do you recognize this person?

12   A.    Yes.

13   Q.    Who is it?

14   A.    He was my brother, Gregg.

15   Q.    And is he still living?

16   A.    No.

17   Q.    About when did he pass away?

18   A.    He passed away April the 26th, 2014.

19   Q.    And how old was he at that point?

20   A.    Forty-three.

21   Q.    Where did he live at the time of his death?

22   A.    Harrington, Delaware.

23   Q.    And how long had he lived in Delaware?

24   A.    All his life.

25   Q.    Was he married at the time of his death?

Haynes - Direct

1    A.      No.

2    Q.      To your knowledge, did Mr. Smith struggle with

3    addiction in his life?

4    A.      Yes.

5    Q.      What kind of addiction?

6    A.      Cocaine, that I knew of for sure, and then

7    prescription drugs.

8    Q.      And at some point, did he get clean and sober from

9    the cocaine?

10   A.      Yes.

11   Q.      After becoming sober, did Mr. Smith get in some sort

12   of a car accident?

13   A.      Yes, he did.

14   Q.      And what happened to him?

15   A.      He fractured his pelvis and his arm and --

16   Q.      And about -- I'm sorry.

17   A.      And his arm.

18   Q.      About what year was that?

19   A.      That was in 2001.

20   Q.      And do you know whether or not he began seeing a pain

21   doctor as a result?

22   A.      Yes.

23   Q.      And do you know who that was?

24   A.      I do not.

25   Q.      Okay.  You said he fractured his pelvis and his arm

Haynes - Direct

1   in May 2001; right?

2   A.      Yes.

3   Q.      At some point later in time, did your brother begin

4   seeing Dr. Titus?

5   A.      Yes, he did.

6   Q.      Why?

7              MR. BOSTIC:  Your Honor, objection.  I think

8   this calls for speculation and there is no basis for it.

9              THE COURT:  I would need some foundation.

10  Otherwise, I'm going to sustain the objection.

11             MS. REMIS:  Yes, Your Honor.

12  BY MS. REMIS:

13  Q.      Let's move on.  When your brother started seeing

14  Dr. Titus, was he still suffering from a cocaine addiction?

15  A.      No, he wasn't.  I don't believe so.

16  Q.      Did your brother have any medical issues that you're

17  aware of?

18  A.      Yes.

19  Q.      What were those?

20  A.      Sleep apnea for sure.  An enlarged heart.  And his

21  cocaine addiction, past addiction.

22  Q.      What did your brother do for a living at the time

23  that he was a patient of Dr. Titus'?

24  A.      He was a long-distance truck driver.

25  Q.      And what did that truck driving entail?

Haynes - Direct

1    A.      He drove long distance, from approximately Virginia

2    all the way up to Massachusetts.  And he drove six days a

3    week.  He would leave on Sunday nights and return on

4    Saturday mornings.

5    Q.      What kind of truck did he drive?

6    A.      An 18-Wheeler.

7    Q.      Now, when Mr. Smith was a patient of Dr. Titus', did

8    you have concern that he was abusing drugs again?

9    A.      Yes.

10   Q.      And what was the basis of your concerns?

11   A.      Basically my brother would call me every day.

12            MR. BOSTIC:  Your Honor, I'm going to object to

13   any hearsay statements from her brother.

14            THE COURT:  All right.  Your objection is noted.

15   Go ahead.

16            THE WITNESS:  My brother would call me every day

17   and -- in the mornings, before he parked his truck.  And he

18   sounded normal.  He would -- you know, "Hi, how are you

19   doing, Baby fat?"  That was his nickname for me.

20            And he knew I suffered with anxiety when I drive

21   on the highway.  The extreme traffic in Atlanta made me

22   nervous a lot of times when I was driving to work, so he

23   would talk to me.  And he was normal.

24            And then on the weekends, I would talk to him,

25   and his voice was very slurred.  It sounded like it sounded

Haynes - Cross

1    when he was doing cocaine, so I was -- I was suspecting that

2    he was doing drugs again.

3    BY MS. REMIS:

4    Q.    And did you have any specific concerns about him

5    possibly doing drugs while he was driving his truck?

6    A.    I did.

7    Q.    And what were those?

8    A.    I was afraid that he would harm himself or someone

9    else, especially driving such a large vehicle.  I was always

10   afraid.

11   Q.    To your knowledge, was your brother seeing any other

12   pain doctors to get medication other than Dr. Titus?

13   A.    Not to my knowledge.

14              MS. REMIS:  Just one moment, please.

15              Pass the witness, Your Honor.

16              THE COURT:  All right.

17              Cross-examination.

18              MR. BOSTIC:  Yes.  Thank you.

19                   CROSS-EXAMINATION

20   BY MR. BOSTIC:

21   Q.    Good morning, Ms. Haynes.

22   A.    Good morning.

23   Q.    As I understand it, you said during the week when you

24   would talk to your brother, he would be fine?

25   A.    Yes.

929

Haynes - Cross

1   Q.      And it was on weekends that you had this concern?

2   A.      Well, for the most part, yes.

3   Q.      Right.  Now, you agree with me, as a long-distance

4   truck driver, that your brother was tested often for illegal

5   substances?

6   A.      I would assume so.

7   Q.      Do you know where he worked or for whom he worked?

8   A.      Yes.  Reed Trucking Company.

9   Q.      And, in fact, would it be fair to say that -- you

10  said earlier you had never met Dr. Titus?

11  A.      Correct.

12  Q.      Right?  So you were never present when your brother

13  went to see Dr. Titus?

14  A.      No.

15  Q.      And you're not aware how he presented to Dr. Titus?

16  A.      I do not know.

17  Q.      Now, have you spoken to your brother's longtime

18  partner since you've been to town?

19  A.      Since I've been to town?

20  Q.      Yes.

21  A.      No.

22  Q.      And you talked to him the last couple of weeks?

23  A.      It's been about three or four weeks.

24  Q.      Okay.  And would it be fair to say that -- strike

25  that.  If I may have a moment.

Haynes - Redirect

1           Now, when you had your suspicions about your

2     brother potentially using cocaine again, did you ever ask

3     him?

4     A.     Yes.

5     Q.     Okay.  And he denied it; am I correct?

6     A.     He did.

7           MR. BOSTIC:  Thank you, Your Honor.  I have

8     nothing else.

9           THE COURT:  All right.

10          MS. REMIS:  Just one question, Your Honor.

11          THE COURT:  Okay.

12                    REDIRECT EXAMINATION

13    BY MS. REMIS:

14    Q.     Ms. Haynes, when you discussed having concerns

15    about -- sorry.

16          MR. BOSTIC:  Oh.

17    BY MS. REMIS:

18    Q.     When you had concerns about your brother potentially

19    using drugs again, were you concerned that he was on cocaine

20    or that he was abusing something else?

21    A.     I was afraid he was abusing something else.

22    Q.     And what was that?

23    A.     I thought he was using --

24          MR. BOSTIC:  Objection, Your Honor.  This is

25    speculation.

Haynes - Redirect

```
 1                THE COURT:  Well, I'm going to allow it.
 2                THE WITNESS:  I thought that he was using
 3    Oxycodone or some other type of opioid medication.
 4                MS. REMIS:  Okay.  No further questions.
 5                Thank you, Ms. Haynes.
 6                THE WITNESS:  Thank you.
 7                MR. BOSTIC:  Your Honor, if I may have one
 8    moment.
 9                Nothing else, Your Honor.
10                THE COURT:  All right.
11                Ms. Haynes, thank you very much.  You're
12    excused.
13                THE WITNESS:  Thank you.
14                MS. SOBCZAK:  Your Honor, the Government calls
15    Shannon Holleger.
16                THE COURT:  Okay.
17                DEPUTY CLERK:  Ms. Holleger, you can take your
18    mask down if you're comfortable with that.
19                THE WITNESS:  Thanks.
20                DEPUTY CLERK:  Please state and spell your full
21    name for the record.
22                THE WITNESS:  Shannon Rae Holleger.
23    S-H-A-N-N-O-N R-A-E H-O-L-L-E-G-E-R.
24                DEPUTY CLERK:  Do you affirm that the testimony
25    you are about to give to the Court and the jury in the case
```

Holleger - Direct

1   now pending will be the truth, the whole truth, and nothing

2   but the truth, you do so affirm?

3              THE WITNESS:  Yes.

4              DEPUTY CLERK:  Thank you.

5              SHANNON R. HOLLEGER, the witness herein, after

6   having been duly affirmed under oath, was examined and

7   testified as follows:

8                        DIRECT EXAMINATION

9   BY MS. SOBCZAK:

10  Q.    Good morning, Ms. Holleger.

11  A.    Good morning.

12  Q.    Ms. Holleger, where do you currently live?

13  A.    Milford, Delaware.

14  Q.    And how long have you lived in Delaware?

15  A.    Quite some time.  Over 20 years.

16  Q.    What do you do for a living?

17  A.    I am currently at Bayhealth Medical Group.  I am a

18  certified coder, medical biller.

19  Q.    And were you employed in 2012 or thereabouts?

20  A.    Yes.

21  Q.    Where did you work in 2012?

22  A.    Ameritox Laboratories.

23  Q.    What is Ameritox?

24  A.    It's a specimen collecting laboratory.

25  Q.    And what was your job at Ameritox?

Holleger - Direct

1    A.      I actually just collected specimens for pain

2    management.

3    Q.      And when you say "specimens," what does that mean?

4    A.      Urine specimen or an oral swab.

5    Q.      So would this be in a drug testing capacity?

6    A.      Yes.

7    Q.      And while you were working for Ameritox, did you

8    become acquainted with an individual named Patrick Titus?

9    A.      Yes.

10   Q.      How so?

11   A.      Ameritox actually put me in his office to do the

12   specimen collecting.

13   Q.      So were you working onsite at Dr. Titus' office?

14   A.      Yes.

15   Q.      And how far to -- when you worked at Ameritox, when

16   did you start working in Dr. Titus' office?

17   A.      End of 2012.

18   Q.      And what was the name of Dr. Titus' practice?

19   A.      Lighthouse Internal Medicine.

20   Q.      What were your duties at Dr. Titus' office?

21   A.      Under Ameritox, I strictly just collected the urine

22   specimens from the patients.

23   Q.      And did your duties change at all over time?

24   A.      Yes.  I got kind of bored, so I asked if I could help

25   out in the office, and just started filing and straightening

Holleger - Direct

1    up files.  And I then started checking in patients, checking

2    out patients.

3    Q.    And when you say "filing" or "working on files," what

4    do you mean by that?

5    A.    I would pull files for the patients, the upcoming

6    patients the next day.  I would refile patient charts in the

7    file room.  And then I kind of started helping out with the

8    patient notes, just getting them ready or finishing them up.

9    Q.    So I'd like to start first by talking about the drug

10   screens at Dr. Titus' office.  What was the purpose of

11   conducting drug screens at his office?

12   A.    It was part of their contract, and they were to make

13   sure that the patients had their prescribed medication in

14   their system and that they were not taking illegal drugs.

15   Q.    And what kinds of prescriptions were you checking to

16   be in their systems?

17   A.    For the most part, it was Percocet, Oxycodone,

18   Oxycontin, Morphine.

19   Q.    And what was the importance of these drug screens?

20   A.    To make sure that the patients were correctly taking

21   their medications.

22   Q.    What kinds of patients were taking these drug

23   screens?

24   A.    Pain management patients.

25   Q.    And what was your role in the drug screening process?

Holleger - Direct

1    A.    I actually pulled the patients into my little area,

2    and they would receive a specimen cup.  They would take it

3    to the restroom, bring that cup back.  I would seal the cup

4    and put it in a bag, seal the bag, and then it would be

5    FedExed to Ameritox.

6    Q.    And so let's walk through that a little bit.  How did

7    you know which patients needed a drug screen?

8    A.    Normally I received a list.

9    Q.    Who did you receive the list from?

10   A.    Typically someone in the front office, Josie or one

11   of the other girls working.

12   Q.    And who is Josie?

13   A.    She's the office manager.

14   Q.    And when would you receive this list?

15   A.    Typically the morning of or the evening right before.

16   Q.    Would the patients know if they were being drug

17   screened?

18   A.    I really don't know.  I know that they knew they had

19   to do a drug screen at some point.

20   Q.    How often did drug screens occur for the patients,

21   like per patient; do you know?

22   A.    I believe it was -- if I remember correctly, it was

23   like every other month.

24   Q.    And so you said -- I think you said your "little

25   area."  What was the area that you would see the patients

Holleger - Direct

1    in?

2    A.     It was just a little exam room off to the side.

3    Q.     And once the patient came into the exam room, what

4    happened?

5    A.     They -- well, we went through their paperwork, made

6    sure I had the right patient -- insurance paperwork.  They

7    would receive their specimen cup, take it to the restroom,

8    and then bring that back to me.

9    Q.     And where was the restroom located?

10   A.     If I remember correctly, it was out through the

11   waiting room and off to the side of the waiting room.

12   Q.     And so where was that in relation to where your

13   office was?  Would they have to go back through the waiting

14   room?

15   A.     Yes.

16   Q.     Where were you while the patient was taking their

17   urine specimen?

18   A.     Normally I was right in my room.

19   Q.     So were you waiting in the room while the patient

20   took the specimen?

21   A.     Yes.

22   Q.     Was anyone else from the office overseeing the

23   patient while they took their sample?

24   A.     Not really, no.

25   Q.     And so once a patient came back in with the urine

Holleger - Direct

1   sample, what happened then?

2   A.     I first checked to make sure that the temperature was

3   correct.  There was a temperature gauge right on the

4   specimen cup.  And then I would seal it and put it into the

5   bag, seal the bag, and then it would go into the box until

6   the end of the day for FedEx.

7   Q.     And you said "the temperature gauge."  What was the

8   gauge of the temperature that would have been within the

9   range that you were looking for?

10  A.     Normal body temperature range, 98.6ish, around there.

11  It would be, you know, give or take a few on either side.

12  Q.     Okay.  And so what would, in your recollection, the

13  lowest temperature be before it would, like, raise a problem

14  for you?

15  A.     Under 95 would be -- you know, I would be a little

16  bit leery of those.

17  Q.     And so once you collected the sample from the

18  patient, where would the patient go?

19  A.     They would go back out to the waiting room.

20  Q.     And then would they go wait for their appointment

21  with Dr. Titus?

22  A.     Yes.

23  Q.     And what happened with the sample at that point?

24  A.     As I said, it was put in the specimen -- or the bag,

25  sealed the bag, and then it would go into the box to wait

Holleger - Direct

1    for FedEx.

2    Q.    And so when would you ship the sample at that point?

3    A.    I think FedEx came like around 3:00 or 4:00.  It was

4    towards the end of the day.

5    Q.    How long would it take to get the results back from

6    the urine samples?

7    A.    Typically three to four days, maybe.

8    Q.    And so in the meantime, what was the patient doing?

9    Like, would the patient still see Titus -- or Dr. Titus that

10   day?

11   A.    Yes.

12   Q.    And would patients leave with prescriptions that same

13   day?

14   A.    If they were prescribed them, yes.

15   Q.    And so once you got the results of the drug test

16   back, how would you get those results?

17   A.    Typically by fax.  Sometimes by an email that I had

18   to open up and print out.

19   Q.    And who would receive the results?

20   A.    Either they would come in the fax at the front and I

21   would get them, depending if I was there or not, you know.

22   There was a time that I wasn't there, so the front desk or

23   the front area was taking care of that.

24   Q.    And once the results were faxed or emailed, what did

25   you do with them?

Holleger - Direct

1   A.    I kind of went through them, circled if there was a

2   list of drugs noted in there or highlighted, if their

3   prescriptions weren't in their system.

4   Q.    And after highlighting anything that stuck out to

5   you, what would you do with the file or with the document?

6   A.    Those actually would get put in the patient's file,

7   in their chart.

8   Q.    And where would the patient file go?

9   A.    Depending on, you know, if it needed to be refiled

10  until their next appointment or if they had an appointment

11  coming up, it would go in -- you know, it would just be

12  filed where they needed to be.  If they had an appointment

13  coming up, it would go in there.  If not, it would go back

14  in the files until the next appointment.

15  Q.    And when it was time for that patient's appointment,

16  would the document be in the patient file?

17  A.    Yes.

18  Q.    And would that -- on the day of that appointment,

19  would the patient file go to Dr. Titus?

20  A.    Yes.

21  Q.    I what to talk a little bit about the different types

22  of results that came back on these drug screens.  What were

23  different ways that the drug -- excuse me, the drug results

24  could be negative?

25  A.    Negative for their prescriptions?

Holleger - Direct

1    Q.     Well, what were the different types of results that

2    you saw that came in?

3    A.     Well, if they had -- if they were positive for

4    illegal drugs, it would say positive next to the kind of

5    drug it was that was detected.  It would say detected or not

6    detected.  It could say positive.  Inconsistent.  Negative.

7    Consistent.  You know, just depended on what was being

8    searched for.

9    Q.     And so it sounds like there's a couple different ways

10   that the drug tests could be inconsistent; is that right?

11   A.     Yes.

12   Q.     So there was the one you talked about at first, the

13   illicit drugs that were detected in the patient's urine; is

14   that right?

15   A.     Correct.

16   Q.     And what were some types of illicit drugs that would

17   be detected?

18   A.     Cocaine, meth, heroin, marijuana.

19   Q.     And then you said that they also could be

20   inconsistent if the patient had been prescribed a medicine

21   or drug that that was then not in their system?

22   A.     Correct.

23   Q.     And why would that cause an inconsistency or a

24   problem?

25   A.     Well, for me, if they were prescribed a medication

941

Holleger - Direct

1    and it wasn't in their system, it meant that they weren't

2    taking it.

3    Q.    And just for a second, were there pill counts

4    conducted at Lighthouse?

5    A.    Yes.

6    Q.    What was the purpose of pill counts?

7    A.    To make sure that they were take taking their pain

8    medication correctly.

9    Q.    And were you involved with the pill counts?

10   A.    Yes, I did pill counts.

11   Q.    And so can you describe how that process worked?

12   A.    The patient was called in.  They had their

13   prescription -- prescription in their correct prescription

14   bottle.  The medication was dumped out onto a piece of

15   paper, counted, put back in their bottle, all done in front

16   of the patient.  And then it was noted on -- in their chart

17   in a prescription count paper.

18   Q.    Were patients notified about the pill counts before

19   they came in for their appointment?

20   A.    Not exactly notified.  I believe it was in their

21   contract, so they knew that they had to do them.  But they

22   were -- yes, they were scheduled to come back in for pill

23   counts on certain days.

24   Q.    And if a patient did not have the right amount of

25   pills, what would you do?

Holleger - Direct

1    A.    Me, I don't really -- I didn't really do anything

2    with that.  If they didn't have any, that was a concern.  I

3    just -- I just put the information in the chart.

4    Q.    So you put the information in the chart is what

5    you did?

6    A.    Yes.

7    Q.    Okay.  And would the chart go to Dr. Titus?

8    A.    It would be in the chart at their next -- or in the

9    chart at their next appointment, which that chart goes to

10   Dr. Titus, yes.

11   Q.    So let's talk about some of the drug samples that --

12   or the drug test results that were provided.  When a patient

13   took a urine sample, who would take it?

14   A.    What do you mean?

15   Q.    I'm sorry.  Okay.  Speaking ahead from my outline.

16          Let's look at some drug test results.  I'm

17   sorry.

18          MS. SOBCZAK:  Ms. Leal, could you please go to

19   Government Exhibit 107 at 140.

20   BY MS. SOBCZAK:

21   Q.    Ms. Holleger, do you recognize this document?

22   A.    Yes.

23   Q.    What is it?

24   A.    They are two prescriptions for pain medication.

25   Q.    Who is the prescription for in these prescriptions?

 1  A.      Maryjane Mench.

 2  Q.      And what is the date on these prescriptions?

 3  A.      May 14th, 2013.

 4  Q.      And what are they prescribed for, what drugs?

 5  A.      The first one is Methadone, ten milligrams, 30 pills,

 6  twice a day as needed.

 7  Q.      And what is the second prescription?

 8  A.      Oxycodone, 15 milligrams, 90 pills, one tab every

 9  four to six hours as needed.

10  Q.      And then what's the date on that?

11  A.      May 14th, 2013.

12          MS. SOBCZAK:  So, Ms. Leal, if you could please

13  go to Government Exhibit 107 at 141.

14  BY MS. SOBCZAK:

15  Q.      What is this document?

16  A.      That would be the -- that is the Ameritox order.  I

17  believe that actually went in with the drug screen to

18  Ameritox.

19  Q.      And which patient does this relate to?

20  A.      Maryjane Mench.

21  Q.      Is that the same patient we just talked about the

22  prescription?

23  A.      Yes.

24  Q.      And what is the date on this order summary?

25  A.      Date collected is May 14th, 2013.

Holleger - Direct

1    Q.      And is that the same date as the prescription that

2    was prescribed?

3    A.      Yes.

4    Q.      And who is the specimen processor?

5    A.      Myself.

6    Q.      And if you look just to the left of that, what is to

7    the left of this specimen processor?

8    A.      The urine temperature.

9    Q.      And what is the urine temperature?

10   A.      Eighty-nine.

11   Q.      Is that below the range that would raise a concern

12   for you when you would do these?

13   A.      Very much so.

14   Q.      Do you notice anything else about urine temperature

15   or what is happening on that page?

16   A.      No.

17   Q.      Did you circle that?

18   A.      Oh, yes.  I did circle that.  I probably did circle

19   it.  Yes.

20   Q.      And then is this a document -- what would have

21   happened to this document or documents like this?

22   A.      That is probably a carbon copy, so one went in the

23   chart and one went with the specimen.

24            MS. SOBCZAK:  Ms. Leal, if you could go to

25   Government Exhibit 107 at 134.  And if you could zoom in to

1    the top half portion.

2    BY MS. SOBCZAK:

3    Q.      What does this document show, Ms. Holleger?

4    A.      That looks like that is the specimen result report.

5    Q.      And what is the date that this result was reported?

6    A.      May 18th, 2013.

7    Q.      So a few days after that prescription was prescribed

8    and the drug test was taken?

9    A.      Yes.

10   Q.      And what were the results of this drug test?

11   A.      They were positive for Oxycodone, negative for

12   Fentanyl, negative for Valium tablets.

13   Q.      And what does that result show?  Does it show that

14   it's consistent or inconsistent?

15   A.      I mean, it's saying that they have Oxycodone in their

16   system and that they don't have the other two.  Those are

17   the prescriptions that they were prescribed.  Consistent,

18   yes, for Oxycodone.

19               MS. SOBCZAK:  Just a second.

20               Ms. Leal, can you please go to Government 107 at

21   139?

22   BY MS. SOBCZAK:

23   Q.      And, Ms. Holleger, what is this document?

24   A.      Two prescriptions for Maryjane Mench.

25   Q.      What is the date of these prescriptions?

Holleger - Direct

1    A.      May 28th, 2013.

2    Q.      And what are the prescriptions for?

3    A.      Oxycodone, 15 milligrams, 90 tablets, one tablet

4    every four to six hours as needed.  And Methadone,

5    ten milligrams, 30 tablets, one twice a day as needed.

6    Q.      And do you recognize the writing on the top of this

7    prescription?

8    A.      Yes.

9    Q.      Whose writing is that?

10   A.      My writing.

11   Q.      And you had mentioned before that you worked on

12   patient files.  Did that include working on prescriptions

13   for Dr. Titus' office?

14   A.      Yes.  We got prescriptions ready for the patients

15   that were coming in, yes.

16   Q.      When would you get the prescriptions ready for the

17   patients?

18   A.      Typically the night before.

19   Q.      And what would you do the night before to prepare for

20   the patients coming in that next day?

21   A.      We'd get their files out, create their prescriptions

22   for them, and then have that ready for Dr. Titus.

23   Q.      And how would you know what prescriptions to write

24   before the patient came in for an appointment?

25   A.      I just used the prescriptions that were already

Holleger - Direct

1    prescribed the time before.

2    Q.     And how would you know what to write in the patient

3    file without the patient coming in already?

4    A.     When the patient -- before the patients came in with

5    those, we only did like their name, date, birth date, if

6    they smoked still or not.  Other than that, we didn't do

7    anything that -- before the patients came in.

8    Q.     Okay.  And so then the next day, would that -- I am

9    so sorry.

10            Would that prescription be in the file that

11   would go to Dr. Titus?  It would be written out?

12   A.     Yes.  If a patient was coming in for an appointment,

13   yes.

14            MS. SOBCZAK:  So, Ms. Leal, I'd like to go to

15   Government Exhibit 104 at Page 108, please.

16   BY MS. SOBCZAK:

17   Q.     And, Ms. Holleger, what is this document?

18   A.     Two prescriptions for Delores Perry.

19   Q.     And what is the date of these prescriptions?

20   A.     July 8th, 2013.

21   Q.     And what are these prescriptions for?

22   A.     Oxycodone, 15 milligrams, 75 tablets, one tablet

23   every four to six hours as needed.  Morphine Sulfate ER, 15

24   milligrams, 30 tablets, one tablet twice a day.

25            MS. SOBCZAK:  Ms. Leal, if you could please go

Holleger - Direct

1    to Government Exhibit 104 at Page 11.  And if you could zoom

2    in to the top half.

3    BY MS. SOBCZAK:

4    Q.    Ms. Holleger, what is this document?

5    A.    That is a specimen result report.

6    Q.    For whom?

7    A.    Delores Perry.

8    Q.    And what is the date that these results were

9    reported?

10   A.    They were reported on July 11th, 2013.

11   Q.    And what did these results show?

12   A.    That this patient had cocaine in their system.

13   Q.    And, specifically, can you read the note under

14   "Results Explanation" or next to "Results Explanation"?

15   A.    "The presence of" -- and I cannot pronounce that

16   name -- "metabolite of cocaine has been confirmed.  This is

17   evidence of cocaine use.  Detection time for this drug is

18   two to three days."

19   Q.    And right above that note, what is highlighted by you

20   or circled by you?

21   A.    The positive result.

22   Q.    And forgive me, would that have been something that

23   you would have circled?

24   A.    Yes, I have done that as well.

25   Q.    Okay.

Holleger - Direct

1              MS. SOBCZAK:  Ms. Leal, if you could please go

2    to or actually -- yes, could you please go to Exhibit 104 at

3    Page 27?

4    BY MS. SOBCZAK:

5    Q.      And what is this document?

6    A.      Two more prescriptions for Delores Perry, dated

7    July 22nd, 2013.

8    Q.      And what are these prescriptions for?

9    A.      Morphine Sulfate ER, 15 milligrams and Oxycodone, 15

10   milligrams.

11   Q.      And are these prescriptions dated 11 days after

12   Lighthouse received the results of Delores Perry's drug

13   test?

14   A.      Yes.

15   Q.      And had she tested positive for cocaine in that drug

16   test prior to this prescription being written?

17   A.      Yes.

18   Q.      And also, related to that -- the drug test results we

19   just looked at, where would those results have gone?

20   A.      They would have been in her chart.

21   Q.      And who would the chart have gone to?

22   A.      Well, for her appointment.  It would have gone to

23   Dr. Titus.

24              MS. SOBCZAK:  Ms. Leal, I'd now like to look at

25   Exhibit 7 at -- or Exhibit 104 at Page 7.

950

Holleger - Direct

1              MS. KOUSOULIS:  Page 7.

2              MS. SOBCZAK:  Page 7, Exhibit 104.

3              If you could zoom in here.

4    BY MS. SOBCZAK:

5    Q.     Ms. Holleger, what is this document?

6    A.     It looks like a telephone note.

7    Q.     And when telephone calls came in, how would you

8    record them at the office?

9    A.     Just depended on what kind of telephone call it was.

10   This was actually typed up and put in the patient's chart.

11   Q.     And next to -- what is the date on this?

12   A.     October 2nd, 2013.

13   Q.     And what patient does this relate to?

14   A.     Delores Perry.

15   Q.     Who is the operator?

16   A.     Myself.

17   Q.     And what does that mean?

18   A.     That I took the phone call.

19   Q.     And can you read what the note written was?

20   A.     "Had telephone call from lady who stated that she had

21   just come from Troop 3 because Delores is selling her

22   medication to children.  She has reported to police, and if

23   it happens again, she will call police on everyone."

24   Q.     And what is Troop 3?

25   A.     It is Delaware State Troop 3, and I don't exactly

Holleger - Direct

1    know what area that is.

2    Q.    So is that like the police?

3    A.    Yes.

4    Q.    Okay.  And as you -- I believe you said this earlier,

5    but did this go on the patient file?

6    A.    Yes.

7              MS. SOBCZAK:  Ms. Leal, if you could please go

8    to Exhibit 104 at Page 6.

9    BY MS. SOBCZAK:

10   Q.    Ms. Holleger, what is this document?

11   A.    Two prescriptions for Delores Perry on -- dated

12   10/2/2013.

13   Q.    And is this the same date as that note regarding

14   Delores Perry trying to sell drugs to children?

15   A.    Yes.

16   Q.    And what was prescribed on that day?

17   A.    Oxycodone, 15 milligrams, 75 tablets; and Morphine

18   Sulfate ER, 15 milligrams, 30 tablets.

19             MS. SOBCZAK:  Ms. Leal, if you would please go

20   to Exhibit 104 at Page 5.

21   BY MS. SOBCZAK:

22   Q.    Ms. Holleger, what is this document?

23   A.    It's a discharge notice.

24   Q.    And can you please read this?

25   A.    Sure.  October 2nd, 2013.  Delores Perry.

Holleger - Direct

1              "This letter is to inform you that as of

2     October 2nd, 2013, I will no longer be your primary care

3     provider for the following reason:  Testing positive for an

4     illegal substance (cocaine), which is a violation of your

5     Pain Management Agreement.  This is reason for immediate

6     termination.  I will give you 30 days of emergency care

7     only.  After these 30 days, I will no longer provide you

8     with medical care.  Emergency care does not include narcotic

9     prescriptions."

10             MS. SOBCZAK:  And Ms. Leal, if you could please

11    go to Exhibit 104 at Page 3.

12    BY MS. SOBCZAK:

13    Q.     Ms. Holleger, what is this document?

14    A.     This is an Advanced Laboratory specimen report.

15    Q.     And for which patient?

16    A.     Delores Perry.

17    Q.     And I believe it says "faxed" over to the right.

18    What date was this faxed?

19    A.     October 7th, 2013.

20    Q.     And if you go to the bottom of the page, do you see

21    the part that's highlighted?

22    A.     Yes.

23    Q.     And what does that show?

24    A.     That she is positive for cocaine, inconsistent with

25    what -- it should not be detected.

Holleger - Direct

1    Q.      And just one more document.

2              MS. SOBCZAK:  Ms. Leal, if you could go to

3    Page 2 of Exhibit 104.

4    BY MS. SOBCZAK:

5    Q.      Also, Ms. Holleger, just relating back to that last

6    document, is that the second time Delores Perry tested

7    positive to cocaine, as we've discussed today?

8    A.      Yes.

9    Q.      And so what is this document?

10   A.      Two prescriptions for Delores Perry dated

11   October 16th, 2013.

12   Q.      And is this approximately nine days after the drug

13   results came back in which Delores Perry tested positive?

14   A.      Yes.

15   Q.      And what are these prescriptions for?

16   A.      Morphine Sulfate and Oxycodone.

17   Q.      So we talked a little bit earlier about --

18             THE COURT:  Ms. Sobczak, I think we ought to

19   take our morning break here.

20             MS. SOBCZAK:  Okay.

21             THE COURT:  So can we take the jury out for

22   15 minutes?

23             (Jury leaving the courtroom.)

24             THE COURT:  All right.  So we'll be in recess

25   for 15 minutes.

Holleger - Direct

1                    (Recess was taken.)

2                    DEPUTY CLERK:  All rise.

3                    THE COURT:  All right.  Are you ready to begin?

4                    MS. SOBCZAK:  Yes, Your Honor.

5                    THE COURT:  Okay.  Let's get Ms. Holleger back

6    in here and let's get the jury.

7                    You can sit down, Ms. Holleger.

8                    (Jury entering the courtroom.)

9                    THE COURT:  All right.  Welcome back, everyone.

10   You may be seated.

11                   Ms. Sobczak, you may continue.

12                   MS. SOBCZAK:  Thank you, Your Honor.

13   BY MS. SOBCZAK:

14   Q.    Hi again, Ms. Holleger.

15   A.    Hi.

16   Q.    So where we left off, I'd like to talk now about your

17   role with the patient notes and the prescriptions.  So you

18   talked a little bit about this earlier, but what was your

19   role related to filling out prescriptions?

20   A.    I would just fill out the name, dates, and copy what

21   was on a previous prescription.

22   Q.    And when would you do this?

23   A.    Typically the day before they needed to come in to

24   get them.

25   Q.    Okay.  And so the day before, you would write out

955

Holleger - Direct

1    what was in the prescription.  And how did you know what to

2    write in the prescription?

3    A.    I just copied the previous prescriptions.

4    Q.    And then shifting gears to the patient files.  Would

5    you add information to the patient files?

6    A.    Yes, sometimes.

7    Q.    And would that information include information about

8    previous drug screens?

9    A.    Sometimes, yes.

10   Q.    So I'd like to show you Government Exhibit 113 at

11   Page 190.

12              MS. LEAL:  Sorry.  113?

13              MS. SOBCZAK:  113 at Page 190.

14   BY MS. SOBCZAK:

15   Q.    Ms. Holleger, what is this?

16   A.    That's a patient progress note.

17   Q.    And which patient is this for?

18   A.    Gregg Smith.

19   Q.    And what is the date on this patient file?

20   A.    October 16th, 2012.

21              MS. SOBCZAK:  And, Ms. Leal, if you'll go to the

22   next page, 191.

23              If you could highlight what's noted as "Your

24   intoxication screen history."

25   BY MS. SOBCZAK:

Holleger - Direct

1    Q.    Ms. Holleger, is this your writing?

2    A.    Yes.

3    Q.    And what is written?

4    A.    "9/19/12 - urine tox screen negative for illicit

5    drugs, positive for non-prescribed Fentanyl.  Patient

6    counseled on use of non-prescription pain medicine."

7    Q.    And what is the date written there?

8    A.    September 19th, 2012.

9    Q.    And was this a patient note for October 16th of 2012,

10   as we saw on the first page?

11   A.    Yes.

12         MS. SOBCZAK:  Let's next go to Exhibit 113 at

13   Page 138.

14   BY MS. SOBCZAK:

15   Q.    And what is this document?

16   A.    Progress note for Gregg Smith for -- on May 2nd,

17   2013.

18         MS. SOBCZAK:  And then if you go to Page 159,

19   Ms. Leal.  I'm sorry.  If you could go to Page 139.

20   BY MS. SOBCZAK:

21   Q.    And is this your writing again under "Your

22   intoxification screen history"?

23   A.    Yes.

24   Q.    And what does it say there?

25   A.    "4/4/13 urine tox screen negative for illicit drugs,

Holleger - Direct

1    negative for Fentanyl patch.  Patient counseled on absence

2    of prescribed pain medication."

3    Q.    Would you have any idea of whether a patient had been

4    counseled?

5    A.    Not specifically, no.  I was not in the room.

6    Q.    So how did you know what to enter there?

7    A.    Because that's what I was pretty much told to put

8    down, that they've been counseled.

9    Q.    Who told you that?

10   A.    Probably Josie Walters.

11   Q.    And how did she know or where did that information

12   come from of what to put in the note?

13   A.    She worked for Dr. Titus for a long time, and that's

14   what he typically did if they came up positive for something

15   they shouldn't have or negative.

16   Q.    But were you in the room with Dr. Titus when this

17   happened?

18   A.    I was personally not in the room.

19   Q.    Okay.  So did you ever see Dr. Titus counsel a

20   patient?

21   A.    No.

22         MS. SOBCZAK:  And, Ms. Leal, if you could please

23   go to Government Exhibit 113 at Page 98.

24   BY MS. SOBCZAK:

25   Q.    And what is this, Ms. Holleger?

1   A.      Patient progress note for Gregg Smith, dated

2   September 19th, 2013.

3   Q.      And if you look at the bottom of "Chief Complaints

4   and HPI," is that your writing?

5   A.      The very last sentence, yes.

6   Q.      Can you read the last sentence that would be your

7   writing?

8   A.      "Patient PMP profile was compliant and her opioid

9   risk level is rated low, #1."

10  Q.      Does that say her there?

11  A.      Yes.

12  Q.      Do you have any idea of why it would say her?

13  A.      Mistake.

14          MS. SOBCZAK:  And finally, if you could go to

15  Page 96, Ms. Leal, Government Exhibit.  Actually, no, if you

16  could go back to Page 99.  I'm sorry.

17  BY MS. SOBCZAK:

18  Q.      And if you go to the "Urine toxification screen

19  history," what does it say there?

20  A.      "August 22nd, 2013, Urine tox screen, negative for

21  illicit drug use, negative for prescribed Fentanyl patch.

22  Patient was counseled for absence of prescribed pain

23  medication."

24  Q.      And so can you describe what that means?

25  A.      It means that they did not have any illegal drugs.

Holleger - Direct

1    They also did not have their prescribed Fentanyl patch in

2    their system, and it's stating that the patient was once

3    again counseled for the absence of that prescribed pain

4    medication.

5              MS. SOBCZAK:  And now, Ms. Leal, if you could go

6    to Page 96.

7    BY MS. SOBCZAK:

8    Q.    And what is this document, Ms. Holleger?

9    A.    Four prescriptions for Gregg Smith, dated

10   September 19th, 2013.

11   Q.    And is that the same date as the patient progress

12   note that we just looked at?

13   A.    Yes.

14   Q.    And does that progress note include information about

15   a failed drug screen related to his Fentanyl intake --

16   A.    Yes.

17   Q.    -- for Gregg Smith?

18   A.    Yes.

19   Q.    And if you look at the top right, what is that

20   prescription for?

21   A.    Fentanyl, 100 milligrams, ten of them.  One patch

22   every 72 hours as needed.

23   Q.    So you noted that or you've just been saying that you

24   were seeing inconsistent drug results coming in on these

25   tests.  Did you ever raise concerns about this?

960

Holleger - Direct

1    A.    I did.

2    Q.    Who did you raise concerns to?

3    A.    We -- to the office staff and to Dr. Titus.

4    Q.    And what were your concerns?

5    A.    My concerns were that either they had illegal drugs

6    in their system and shouldn't have, or they did not have

7    their prescribed pain medication in their system and should

8    have.

9    Q.    And what were your concerns related to that that you

10   articulated?

11   A.    First off, shouldn't be using illegal drugs.  And

12   second, why aren't your -- why isn't your pain medication in

13   your system.  Obviously, you're not taking it.

14   Q.    Is there any other option besides not taking it that

15   could be happening with people?

16         MS. KOUSOULIS:  Objection; speculation, Your

17   Honor.

18         THE COURT:  I'm going to sustain the objection.

19   BY MS. SOBCZAK:

20   Q.    Ms. Holleger, how long did you work at Lighthouse?

21   A.    I believe like three or four years maybe.  I don't

22   remember specifically.

23   Q.    What did you do after you -- or what caused you to

24   leave Lighthouse?

25   A.    I had a car accident and kind of got angry really

961

Holleger - Direct

1    quickly with patients.  And it seemed like it was falling

2    back on Josie Walters, and I didn't want that.  So I quit.

3    Q.    And what did you do after you quit?

4    A.    I actually worked for Josie at her home-based office

5    doing kind of the same thing, different doctors and some

6    stuff for Dr. Titus behind the scenes.

7    Q.    And what did you continue to do for Dr. Titus even

8    after you left Lighthouse?

9    A.    I did some charts still, copied charts as well for

10   patients.

11   Q.    And what was there to do on charts?

12   A.    Keep -- I had to finish the charts, the progress

13   notes.

14   Q.    And what did you have to finish in the progress

15   notes?

16   A.    Just pretty much the last paragraph of the progress

17   note, the plan of the -- you know, what the patients'

18   medications were, when they were supposed to take them, how

19   many they were supposed to get, when the next time was that

20   they were supposed to be seen.

21   Q.    And so you were not working at Lighthouse at this

22   time?

23   A.    No, not specifically for them, no.

24   Q.    How would you know what to put in the plan in the

25   patient note?

Holleger - Direct

1    A.      It was a template and Dr. Titus would circle which

2    template he wanted to use in there.

3                  MS. SOBCZAK:  So, Ms. Leal, if you could bring

4    up Government Exhibit 128 at Page 62.

5    BY MS. SOBCZAK:

6    Q.      Ms. Holleger, is this an example of what the template

7    looked like?

8    A.      Yes.

9    Q.      And so what would you do with this?

10   A.      I would just copy down whichever template was --

11   whichever scenario was circled.

12   Q.      Who would circle the template?

13   A.      Dr. Titus.

14   Q.      And how many patient files were you reviewing after

15   you stopped working at Lighthouse?

16   A.      A lot.  I just don't remember how many exactly.

17   Q.      And so for a lot of patient files, you had one of

18   four -- did you have one of four scenarios to choose from?

19   A.      Yes.

20   Q.      Were there any other scenarios aside from these?

21   A.      Not typically, no.

22                  MS. SOBCZAK:  Just a second.

23   BY MS. SOBCZAK:

24   Q.      And does this document we're looking at right now,

25   does this have any circles on it?

Holleger - Direct

1    A.      No.

2              MS. KOUSOULIS:  Can I ask what exhibit that is?

3              MS. SOBCZAK:  This is Government 128 at Page 62.

4    BY MS. SOBCZAK:

5    Q.      Ms. Holleger, was a search warrant conducted at your

6    home in 2015?

7    A.      Yes.

8    Q.      And did agents come to your home?

9    A.      Yes.

10   Q.      Were patient files found at your home?

11   A.      Yes.

12   Q.      And why were these patient files at your home?

13   A.      Because I was trying to keep them up to date, get

14   them finished.

15   Q.      And this was in 2015; is that right?

16   A.      Yes.

17   Q.      Was Lighthouse still open at that time?

18   A.      No, I believe that was after they had closed.

19   Q.      And so what was the purpose of having patient files

20   to fill out after his office was closed?

21   A.      They needed that last paragraph put on there so that

22   when -- so that those notes could be copied and sent with

23   the patient to their next pain management physician so that

24   they knew what -- what they had been on and what they were

25   taking.

Holleger - Direct

1    Q.      And, again, were you filling that out based on the

2    template in one of the circles and one of the four options

3    for the template?

4    A.      Yes.

5             MS. SOBCZAK:  And just a moment.

6    BY MS. SOBCZAK:

7    Q.      Ms. Holleger, you said earlier that you became an

8    angry patient; is that right?  Or an angry -- you became

9    angry at patients.  I'm sorry.

10   A.      I was very quick to be angered.  Yes.

11   Q.      And why were you quick to be angry?

12   A.      It was from my accident.  I struck the steering wheel

13   with my head, so I kind of -- kind of lost that ability to

14   not be angry at people.

15   Q.      Was Dr. Titus aware that you had gotten in an

16   accident?

17   A.      Yes.

18            MS. SOBCZAK:  One second.

19   BY MS. SOBCZAK:

20   Q.      And what made you angry about the patients?

21   A.      Well, I really didn't like them arguing with me about

22   their, you know, last urine screen that they possibly had

23   come up positive for an illegal drug or didn't have their

24   prescriptions in their system.  I didn't really like that.

25   Q.      And did you raise the fact that this was occurring

1    with Dr. Titus or what your concerns were about these

2    patients?

3    A.      Yeah, we had discussed it.

4    Q.      And what did he say?

5    A.      I mean, that was stuff that he, you know -- the

6    conversation was that he couldn't tell a patient's pain

7    other than to believe what they told him which is kind of

8    true.  I understand it, too.  But he would do what he did in

9    a room.  I don't know what he did.  You know, counsel them.

10   Q.      Where would you talk to Dr. Titus?

11   A.      Just in the office.

12   Q.      Would you talk to him, like, in the waiting room

13   ever?

14   A.      No.

15   Q.      Would you talk to him back or -- never mind.

16   A.      Away from patients.  I mean, it was just our

17   conversations that we just had.  It was conversations.

18              MS. SOBCZAK:  Okay.  Nothing further, Your

19   Honor.  Pass the witness.

20              THE COURT:  All right.  Ms. Kousoulis.

21                    CROSS-EXAMINATION

22   BY MS. KOUSOULIS:

23   Q.      Good morning, Ms. Holleger.

24   A.      Good morning.

25   Q.      Now, you testified that when you first started

Holleger - Cross

1    working at Dr. Titus' office, you were working for Ameritox;

2    correct?

3    A.      Correct.

4    Q.      And Ameritox was the drug testing company that

5    Dr. Titus' practice was using to test his patients; correct?

6    A.      Correct.

7    Q.      And Ameritox had a contract with Dr. Titus' office;

8    correct?

9    A.      Correct.

10   Q.      Okay.  And your boss at Ameritox was Sylvester King;

11   correct?

12   A.      Yes.

13   Q.      And sometimes Mr. King is known as Sly; correct?

14   A.      Yes.

15   Q.      And at the time you first started working at

16   Dr. Titus' office, your role was just to collect urine from

17   patients; right?

18   A.      Absolutely.

19   Q.      And the way you collected the urine -- well, strike

20   that.

21          You also had done similar type of jobs at other

22   pain management clinics; right?

23   A.      One before that, yes.

24   Q.      And the way you collected the urine at Dr. Titus'

25   office was giving the patients a cup, they went into the

Holleger - Cross

1    bathroom by themselves, came back out, and handed you the

2    specimen.  Was that the same exact way you did it at the

3    other pain management clinic that you worked in?

4    A.    Yes.

5    Q.    You never -- at the other pain management clinic you

6    worked in, someone didn't go into the bathroom with the

7    patients?

8    A.    No.

9    Q.    Now, you testified that at some point later, you

10   started helping out the office in other ways because you

11   were kind of bored; is that right?

12   A.    Yes.

13   Q.    And you started helping with, like, filing, checking

14   patients in and out, pulling PMP reports, getting paperwork

15   ready, seating patients in the visiting rooms; is that

16   correct?

17   A.    Yes.

18   Q.    And during the time that you were there, some

19   patients paid for their visits using insurance; correct?

20   A.    Some.

21   Q.    Yes.  So Dr. Titus accepted insurance; correct?

22   A.    Yes.

23   Q.    There wasn't a sign in the office that said cash

24   only, was there?

25   A.    No, not that I believe.

968

Holleger - Cross

1   Q.      Okay.  And with regard to your responsibility with

2   collecting urines, sometimes people would try to submit --

3   would there be times when people would try to submit fake

4   urines?

5   A.      Sure.

6   Q.      Okay.  And was there -- when that would happen, would

7   you -- and when I say "fake urines," like you testified

8   previously that someone might submit a urine that's the

9   wrong temperature, and you could tell that maybe it wasn't

10  their urine; correct?

11  A.      Correct.

12  Q.      And when that would happen, you would ask the patient

13  to either submit -- to provide you another urine or to do an

14  oral swab; correct?

15  A.      Correct.

16  Q.      Okay.  And when this happened, you would bring it to

17  Josie's attention; correct?

18  A.      Mm-hmm.

19  Q.      And she would agree with you that they either had to

20  provide another urine or do an oral swab; correct?

21  A.      Yes.

22  Q.      And Dr. Titus also was in support of this policy;

23  correct?

24  A.      I'm sorry?

25  Q.      Dr. Titus was also in support of this policy;

Holleger - Cross

1    correct?

2    A.      Yes.

3    Q.      And on one occasion in particular, there was a new

4    patient who provided you a urine that you thought was fake;

5    correct?

6    A.      Yes.

7    Q.      And you brought that to Dr. Titus' attention;

8    correct?

9    A.      Correct.

10   Q.      And Dr. Titus talked to the patient and told him he

11   could not take him on as a new patient because of his

12   activity; correct?

13   A.      That is correct.

14   Q.      Now, you testified regarding patients that would test

15   positive for drugs they weren't prescribed or negative for

16   drugs they were prescribed; is that correct?

17   A.      Yeah.

18   Q.      Okay.  And you would bring this to Dr. Titus'

19   attention at times; correct?

20   A.      Sometimes, yes.

21   Q.      Okay.  And it's fair to say that he would either

22   discharge the patient or counsel them when you brought that

23   to his attention; correct?

24   A.      That those were his options.

25   Q.      Right.  And he would do one or the other normally;

Holleger - Cross

1   correct?

2   A.      As far as I know.

3   Q.      Okay.  And it's fair to say that you've described

4   Dr. Titus as naive and someone who always wanted to think

5   the best of everyone; correct?

6   A.      I wouldn't say naive, but yes, he wants to think the

7   best of people.

8   Q.      And at times, you thought Dr. Titus should discharge

9   a patient and you would tell him that; correct?

10  A.      Yes.

11  Q.      And he wouldn't discharge the patients always on your

12  advice because he wanted to give them a chance; correct?

13  A.      He would not discharge patients.  I can't say why.  I

14  mean --

15  Q.      Has he discussed with you --

16  A.      -- his choice.

17  Q.      Okay.  Are there times that he discussed with you

18  wanting to give patients another chance because he knew they

19  were in pain and needed his treatment?

20          MS. SOBCZAK:  Objection, Your Honor.

21          THE WITNESS:  Yeah.

22          THE COURT:  I'm going to overrule it.

23          THE WITNESS:  Yes.

24  BY MS. KOUSOULIS:

25  Q.      Now, Dr. Titus scheduled his first patient around

971

Holleger - Cross

1    6:00 a.m.; correct?

2    A.    Yes.

3    Q.    And he would normally schedule patients 15 to

4    20 minutes apart?

5    A.    From what I remember.

6    Q.    Okay.  And were there times that even though he

7    scheduled patients starting at 6:00 a.m., that he would

8    arrive late, like 6:30 or 7:00?  Do you recall that?

9    A.    Yes.

10   Q.    And so at times patients would get backed up because

11   he was arriving late; correct?

12   A.    Yes.

13   Q.    And he would normally spend at least 15 to 20 minutes

14   with each patient, to your recollection; correct?

15   A.    At least, yes.

16   Q.    And from your perspective, is it fair to say that

17   Dr. Titus was trying to make an individualized assessment as

18   to each patient's needs?

19          MS. SOBCZAK:  Objection, Your Honor.

20   Speculation.

21          THE COURT:  All right.  Well, I'm going to allow

22   it.

23          THE WITNESS:  I mean, I can't say what he did in

24   there.

25   BY MS. KOUSOULIS:

972

Holleger - Cross

1    Q.      But he was spending time with the patients in the

2    exam room, from what you recall?

3    A.      He was in with the patients, yes.

4    Q.      Okay.

5            MS. KOUSOULIS:  Mr. Marek, if you could bring up

6    107 at 134 and 107 at 139.

7    BY MS. KOUSOULIS:

8    Q.      Now, Ms. Holleger, these were documents that the

9    Government showed you on your direct examination regarding

10   Mary Mench; correct?

11   A.      Correct.

12   Q.      Now, in this document, they had alluded to the fact

13   that there were some inconsistent results with regard to her

14   drug screen; correct?

15   A.      Correct.

16   Q.      Now, she was being prescribed in May of 2013

17   Oxycodone and Methadone according to 107, 139; correct?

18   A.      Yes.

19   Q.      And she tested positive for Oxycodone; correct?

20   A.      Yes.

21   Q.      Which was one of the drugs she was being prescribed;

22   correct?

23   A.      Yes.

24   Q.      And it says she tested negative for Fentanyl and

25   Valium; correct?

973

Holleger - Cross

1    A.      Yes.

2    Q.      And there's nothing in either of those prescriptions

3    that indicates she was prescribed Fentanyl or Valium;

4    correct?

5    A.      Not in these two prescriptions, no.

6    Q.      Okay.

7            MS. KOUSOULIS:  You can take that down,

8    Mr. Marek.  And can you bring up 104, 005 and 104, 007,

9    please?

10   BY MS. KOUSOULIS:

11   Q.      Now, you were also asked about her discharge, the

12   discharge of Delores Perry; correct?  These documents relate

13   to Delores Perry?

14   A.      Yes.

15   Q.      Now, with regard to the call you fielded on

16   October 2nd, 2013, do you recall discussing this with

17   Dr. Titus?

18   A.      I don't recall that.

19   Q.      Okay.  So you don't know if Dr. Titus ever got this

20   information; correct?

21   A.      Personally, no.  It was in the patient's chart.

22   Q.      Okay.  And is it your experience that sometimes

23   people would call the office -- wait, strike that.

24           It's fair to say that Dr. Titus would indicate

25   that he had no way of knowing whether anything this person

Holleger - Cross

1    said was accurate; correct?

2    A.    I mean, can you restate that?

3    Q.    It's fair to say that Dr. Titus would state that he

4    had no way of knowing whether what was being stated in the

5    phone call had any merit; correct?

6    A.    Correct.

7    Q.    And, in fact, Dr. Titus discharged Ms. Perry --

8          MS. SOBCZAK:  Objection.

9    BY MS. KOUSOULIS:

10   Q.    -- prior to October 2nd, the day --

11         THE COURT:  Wait.  Sorry.  Are you making an

12   objection?

13         MS. SOBCZAK:  Strike that.

14         THE COURT:  Okay.

15         Sorry, Ms. Kousoulis.  Go ahead.

16         MS. KOUSOULIS:  That's okay.

17   BY MS. KOUSOULIS:

18   Q.    In fact, Dr. Titus discharged Ms. Perry on the same

19   date this call came in; correct?

20   A.    Yes.

21         MS. KOUSOULIS:  Thank you, Mr. Marek.

22   BY MS. KOUSOULIS:

23   Q.    Now, you testified that at times you would fill in

24   portions of a patient's progress notes; correct?

25   A.    Yes.

Holleger - Cross

1    Q.     And it's fair to say that --

2              MS. KOUSOULIS:  Well, Mr. Marek, could you pull

3    up 128 at 62?

4    BY MS. KOUSOULIS:

5    Q.     The Government showed you this during your direct

6    examination; correct?

7    A.     Yes.

8    Q.     And when you would fill in information in the patient

9    progress notes or in the patient files, that was information

10   provided to you by Dr. Titus; correct?

11   A.     He would circle one of these scenarios, yes.

12   Q.     So you weren't just writing what you wanted to write

13   in the charts, you were writing what Dr. Titus instructed

14   you to write; right?

15   A.     Correct.

16             MS. KOUSOULIS:  You can take that down,

17   Mr. Marek.

18   BY MS. KOUSOULIS:

19   Q.     And it's fair to say that Dr. Titus was not the most

20   organized record keeper; correct?

21   A.     That's fair to stay.

22   Q.     And when you -- during the time you were in the

23   office, he was very behind in filling out patients' charts

24   and updating the charts; correct?

25   A.     Correct.

976

Holleger - Cross

1    Q.      And you and other staff members were trying to help

2    him complete the patient charts; correct?

3    A.      Correct.

4    Q.      And during the time you were there, Dr. Titus was

5    seeing the patients; correct?

6    A.      Correct.

7    Q.      Now, in January of 2015, there was a search warrant

8    executed at your home and patient files were taken; correct?

9    A.      Yes.

10   Q.      And the reason that you had files at your home at

11   that time is that you were helping Josie to update those

12   files so that patients could have their complete records

13   before seeing another doctor?

14   A.      Correct.

15   Q.      And also, patients would contact Josie to get copies

16   of their files in order for them to be able to go see other

17   doctors and have their patient records; correct?

18   A.      Correct.

19   Q.      And a lot of the files were kept in storage up until

20   a time when the patient needed it, and then the file would

21   be taken out of the storage unit and brought to your house

22   or Josie's house so they could be prepared to give to the

23   patient; correct?

24   A.      Yes.

25   Q.      Now, you testified that you also did work for Josie

Holleger - Redirect

1    Walters that was independent of the work you did for

2    Dr. Titus' office; correct?

3    A.    Yes.

4    Q.    And Josie Walters owned a company named Marydel

5    Corporation; correct?

6    A.    Correct.

7    Q.    And Marydel Corporation is a billing company;

8    correct?

9    A.    Yes.

10   Q.    And Josie Walters did billing work for Dr. Titus;

11   correct?

12   A.    Yes.

13   Q.    And she also did billing work through Marydel for

14   other doctors' offices; correct?

15   A.    Yes.

16             MS. KOUSOULIS:  One moment.

17             No further questions, Your Honor.

18             THE COURT:  All right.  Any redirect?

19             MS. SOBCZAK:  Yes, Your Honor.  Just a few

20   questions.

21                   REDIRECT EXAMINATION

22   BY MS. SOBCZAK:

23   Q.    So, Ms. Holleger, did you go into the exam room with

24   the patients when they saw Dr. Titus?

25   A.    Absolutely not.

Holleger - Redirect

1    Q.    So do you have any idea of knowing what happened in

2    the exam room with the patients?

3    A.    No.

4    Q.    Do you know if the patients were counseled?

5    A.    No.

6    Q.    And was Dr. Titus a trained and licensed physician at

7    the time you worked for him?

8    A.    Yes.

9    Q.    And are you a medical professional?  Are you a nurse

10   or doctor?

11   A.    No.

12   Q.    Did you understand the implications of the results of

13   the drug screen?

14   A.    For the most part, yes.

15   Q.    And did those results of the drug screen go to

16   Dr. Titus?

17   A.    Yes.

18   Q.    And did you also flag certain things that stuck out

19   to you in your experience --

20   A.    I did.

21   Q.    -- for Dr. Titus?

22         MS. SOBCZAK:  And finally, Ms. Leal, if you can

23   go to Government Exhibit 107 at 141.

24   BY MS. SOBCZAK:

25   Q.    Okay.  So we reviewed this document earlier; is that

Holleger - Redirect

1    right?

2    A.      Yes.

3    Q.      And was this for Maryjane Mench?

4    A.      Yes.

5    Q.      And what was the urine temperature on this?

6    A.      Eighty-nine.

7    Q.      And did that raise a concern for you given --

8    A.      Yes.

9    Q.      So do you have any way of knowing if that was

10   actually her urine?

11   A.      I don't.

12           MS. SOBCZAK:  No further questions, Your Honor.

13           THE COURT:  All right.

14           Ms. Holleger, thank you.  You're excused.  You

15   may go.

16           THE WITNESS:  Thank you.

17           MR. WOODARD:  The Government calls John

18   Zalewski.

19           DEPUTY CLERK:  Mr. Zalewski, if you're

20   comfortable, you can take your mask down.

21           THE WITNESS:  I'm hearing impaired, so...

22           DEPUTY CLERK:  I'll speak loud.

23           THE WITNESS:  Okay.

24           DEPUTY CLERK:  Okay.  Please state and spell

25   your full name for the record.

1      THE WITNESS:  My name is John Zalewski, Jr.

2      DEPUTY CLERK:  Do you affirm that the testimony

3  you are about to give to the Court and the jury in the case

4  now pending will be the truth, the whole truth, and nothing

5  but the truth, you do so affirm?

6      THE WITNESS:  Yes, I do.

7      DEPUTY CLERK:  Thank you.

8      JOHN ZALEWSKI, JR., the witness herein, after

9  having been duly affirmed under oath, was examined and

10  testified as follows:

11                 DIRECT EXAMINATION

12  BY MR. WOODARD:

13  Q.    Good morning, Mr. Zalewski.

14  A.    Good morning.

15  Q.    Can you hear me okay?

16  A.    Yes, sir.

17  Q.    Okay.  All right.  Where do you live?

18  A.    Milford, Delaware.

19  Q.    How long have you lived there?

20  A.    Twelve or 13 years.

21  Q.    Are you married?

22  A.    Yes.

23  Q.    Any kids?

24  A.    Yes, I have four children.

25  Q.    All right.  What's your occupation?

Zalewski, Jr. - Direct

1    A.    I'm a HVAC -- HVAC technician.

2    Q.    Okay.  What does that mean day to day?

3    A.    Fixing heating and air-conditioning for clients.

4    Q.    Okay.  How long have you been in that profession?

5    A.    Twenty-five years.

6    Q.    Have you ever encountered an individual named Patrick

7    Titus?

8    A.    I don't -- after the fact.  I didn't actually deal

9    with Mr. Titus, but I do know that he is -- his office was

10   the one that I was servicing, yes.

11   Q.    Let's talk about that.  So around when were you

12   servicing Dr. Titus' clinic?

13   A.    Repeat that.

14   Q.    Around when was that when you were servicing the

15   clinic?

16   A.    2014 or so.  It's been a while.

17   Q.    Sure.  And what was the business location or address

18   of the clinic?

19   A.    I'm not actually sure what the physical address was,

20   but it was in the Draper Building which is owned by the

21   Mobious Group in Milford, Delaware.  It's off of Church

22   Street.

23   Q.    Church Street?

24   A.    Yes, sir.

25   Q.    Okay.  Why were you first called over to the Church

Zalewski, Jr. - Direct

1    Street address?

2    A.    I can't recall exactly what I was sent there for.  It

3    was something to do with the heat or the air not working, so

4    they placed a service call through the building owner, and I

5    was dispatched to take care of the issue.

6    Q.    Okay.  So what was it like when you walked in to the

7    clinic on Church Street?

8    A.    It was pretty crowded.  Basically it's -- just to

9    give you a rundown, I entered the facility through the -- I

10   guess the waiting area, which was -- there was probably

11   anywhere from ten to 12 people sitting in the room.

12   Q.    Okay.

13   A.    Do you need anything else?

14   Q.    Did you notice anything around the reception area?

15   A.    Initially, when I first walked in, the first thing I

16   saw was "No Insurance Accepted" which kind of struck me as

17   odd.  And then the next sign was "Cash Only To See The

18   Doctor."  I can't remember the exact amount, I think it was

19   like somewhere between 150 and $180.

20   Q.    Okay.  Let's take those in turn.

21         No insurance accepted, why did that strike you

22   as odd?

23   A.    I've never been to a doctor's office that does not

24   accept insurance.

25         MS. KOUSOULIS:  Your Honor, objection.

Zalewski, Jr. - Direct

1        THE COURT:  It's overruled.

2    BY MR. WOODARD:

3    Q.    Okay.  I think you were saying you've never been to a

4    doctor's office and not paid with insurance; is that --

5    A.    Correct.

6    Q.    Okay.  And then the cash schedule, why did that

7    strike you as unusual?

8    A.    Because most people will accept credit cards for your

9    co-pay, that type of thing.

10   Q.    Okay.  So we talked about the waiting room.

11          Did you observe anything in the parking lot?

12   A.    Actually, yes.  When I first came out of the

13   building, after going in initially, meeting with the office

14   manager, I came out of the parking lot to get my tools and

15   there was a crowd of people parked back behind the building.

16   And I actually witnessed one gentleman take some -- like a

17   bottle out of his shirt pocket and exchange it for cash with

18   another person standing in the parking lot.

19   Q.    Okay.  So you saw pills and cash being exchanged?

20   A.    Absolutely.

21   Q.    Okay.  About how many people would you say were

22   standing outside?

23   A.    I mean, it's been a while, but it had to have been --

24   it's not a normal crowd, so probably six to eight people.

25   Q.    Okay.

Zalewski, Jr. - Direct

1        MR. WOODARD:  Ms. Leal, could you pull up

2    Government's Exhibit 700?

3    BY MR. WOODARD:

4    Q.    Okay.  We're talking about Church Street.  Do you

5    recognize this picture?

6    A.    Yes, that's the Draper Building.

7    Q.    Okay.  All right.  Thank you.

8          Okay.  When you were in the parking lot, did

9    anyone approach you?

10   A.    Yes, actually, a gentleman came up to me and asked me

11   if I had gotten anything and if I was interested in

12   purchasing some.  I said, "I'm just here to do the

13   air-conditioning work."

14   Q.    Okay.  What did you think he was asking you about?

15        MS. KOUSOULIS:  Your Honor, objection.  Calls

16   for speculation.

17        THE WITNESS:  For pills of some sort.

18        THE COURT:  Well, so the objection is overruled.

19   BY MR. WOODARD:

20   Q.    What did you think this gentleman was asking you for?

21   A.    I -- it would have to have been some type of pill or

22   drug.

23   Q.    Did you visit the Church Street address several

24   times?

25   A.    Yes, several times.

985

Zalewski, Jr. - Cross

1    Q.    Okay.  Did you have concerns each time?

2    A.    Yeah, actually, it got to the point where I actually

3    contacted my service manager, and I told him, "I don't feel

4    comfortable going into the facility."  Obviously, my -- I

5    was concerned about the clientele that were hanging around.

6    I was concerned about my tools.  I was concerned about -- I

7    knew something was going on.

8                 MS. KOUSOULIS:  Objection, Your Honor.  Calls

9    for speculation.

10                MR. WOODARD:  Okay.  I'll move on, Your Honor.

11   BY MR. WOODARD:

12   Q.    You mentioned raising it with your supervisors.  Did

13   you ever report this, your concerns, to anyone else?

14   A.    I actually did contact the Milford Police Department,

15   yes.

16   Q.    Okay.

17                MR. WOODARD:  Just one moment, Your Honor.

18                No further questions.  Thank you, Mr. Zalewski.

19                THE COURT:  Cross-examination.

20                      CROSS-EXAMINATION

21   BY MS. KOUSOULIS:

22   Q.    Good afternoon, Mr. Zalewski.  Or good morning,

23   actually.

24                Now, you testified that you were approached in

25   the parking lot --

986

Zalewski, Jr. - Cross

1   A.      Yes, ma'am.

2   Q.      -- of the facility; correct?

3            And you testified that you observed what

4   appeared to be a drug transaction in the parking lot;

5   correct?

6   A.      Yes.

7   Q.      It's fair to say Dr. Titus was not in the parking

8   lot, as far as you know; correct?

9   A.      No, ma'am.

10  Q.      And no one from his staff was in the parking lot;

11  correct?

12  A.      Say again?

13  Q.      No one from his staff was in the parking lot at this

14  time; correct?

15  A.      Not that I saw, no, ma'am.

16  Q.      Okay.  And you testified that you told your

17  supervisor about your concerns; correct?

18  A.      Yes, ma'am.

19  Q.      And you said you contacted the Milford Police and

20  told them about your concerns; correct?

21  A.      That's correct.

22  Q.      But you never went inside Dr. Titus' office and told

23  his staff about your concerns; correct?

24  A.      No, ma'am.

25  Q.      And you never told Dr. -- contacted Dr. Titus and

Zalewski, Jr. - Cross

1    told him of your concerns; correct?

2    A.      No, ma'am.

3                  MS. KOUSOULIS:  I have no further questions.

4                  MR. WOODARD:  None, Your Honor.

5                  THE COURT:  All right.

6                  Mr. Zalewski, thank you very much.  You're

7    excused.  You may go.

8                  THE WITNESS:  Thank you.

9                  MS. SOBCZAK:  Your Honor, the Government calls

10   Ashley Webb.

11                 THE COURT:  All right.

12                 DEPUTY CLERK:  Ms. Webb, you can take your mask

13   down if you're comfortable with that.

14                 THE WITNESS:  Okay.  Thank you.

15                 DEPUTY CLERK:  Please state and spell your full

16   name for the record.

17                 THE WITNESS:  Ashley Webb, A-S-H-L-E-Y W-E-B-B.

18                 DEPUTY CLERK:  Do you affirm that the testimony

19   you are about to give to the Court and the jury in the case

20   now pending will be the truth, the whole truth, and nothing

21   but the truth, you do so affirm?

22                 THE WITNESS:  Yes.

23                 DEPUTY CLERK:  Thank you.

24                 ASHLEY WEBB, the witness herein, after having

25   been duly affirmed under oath, was examined and testified as

Webb - Direct

1    follows:

2                        DIRECT EXAMINATION

3    BY MS. SOBCZAK:

4    Q.     Hello, Ms. Webb.

5    A.     Hi.

6    Q.     Ms. Webb, where do you currently live?

7    A.     I live in Lewes, Delaware.

8    Q.     How long have you lived in Delaware?

9    A.     Since I was born in 1983.

10   Q.     And what do you do for a living?

11   A.     I'm a pharmacist.

12   Q.     When did you become a pharmacist?

13   A.     In 2007.

14   Q.     Where did you go to school for pharmacy?

15   A.     The University of the Sciences, the Philadelphia

16   College of Pharmacy.

17   Q.     And how long did you go to school?

18   A.     Six years.

19   Q.     Are you licensed to practice pharmacy in the State of

20   Delaware?

21   A.     Yes.

22   Q.     And when did you receive your license?

23   A.     In -- for Delaware, it was in 2009.

24   Q.     And where do you currently work?

25   A.     At Walmart.

Webb - Direct

1   Q.     How long have you worked at Walmart?

2   A.     Since July 4th, 2009.

3   Q.     And did you work anywhere before there in Delaware?

4   A.     Yes, I was licensed in Maryland starting in 2007, and

5   I worked for Superfresh grocery store.

6   Q.     And in your time at Walmart, have you worked at

7   different Walmart pharmacies throughout that time?

8   A.     Yes.

9   Q.     Which locations have you worked at?

10  A.     Rehoboth Beach, Berlin, Maryland, and Georgetown,

11  Delaware.

12  Q.     Are you familiar with an individual named Patrick

13  Titus?

14  A.     Yes.

15  Q.     And how did you become aware of him?

16  A.     He was a doctor in the area and patients brought me

17  his prescriptions.

18  Q.     And how did you know that the prescriptions these

19  patients were bringing were from Dr. Titus?

20  A.     They were on his prescription blank, and they were

21  signed by him.

22  Q.     And what kinds of prescriptions were they bringing in

23  to have filled?

24  A.     They were -- Oxycodone, 15 milligrams was a common

25  one.  Methadone, ten milligrams, some Fentanyls.

Webb - Direct

1  Q.    As a pharmacist, do you have training when it comes

2  to filling controlled substances?

3  A.    Yes.

4  Q.    And do you have certain obligations regarding filling

5  controlled substances?

6  A.    Yes.

7  Q.    What are some of those obligations?

8  A.    So a pharmacist has corresponding responsibility for

9  a prescription that they fill.  That means that they know

10 the prescription is written for a legitimate health reason,

11 that the patient and the doctor have an appropriate

12 relationship with each other, and that the doctor is

13 prescribing in the course of his or her practice.

14 Q.    And regarding the prescriptions that came in from

15 Dr. Titus, did that present -- did the prescriptions raise

16 any concerns for you?

17 A.    Over time, I saw a pattern develop that eventually

18 led me to be uncomfortable filling prescriptions written by

19 him.

20 Q.    And what was that pattern?

21 A.    So with controlled substance prescriptions, we have

22 to look for red flags and we have to clear red flags before

23 we fill the prescription.  Some common red flags would be --

24 so trade area, that the patient and the doctor are in the

25 close vicinity to your pharmacy; if -- for patients, if they

1    are coming in in groups; if they're coming in close to time

2    of closing; if the -- if they are trying to intimidate you

3    to fill the prescription.  So, like, threatening to talk to

4    the store manager or call corporate if you don't fill the

5    prescription.  Looking at the prescription itself to make

6    sure it's valid and not altered in any way.

7            And then for prescriber red flags, if they're

8    writing a lot of the same prescriptions for different

9    patients or high doses, high strengths of medications.

10   Q.    Okay.  So related to these red flags that you just

11   described, did you see any of them related to the

12   prescriptions that were coming in from Dr. Titus?

13   A.    Yes.

14   Q.    And what were you seeing that raised red flags for

15   you?

16   A.    So, initially, I had a few patients that were

17   attempting to fill prescriptions very early.  We have access

18   to the PMP, which is a prescription monitoring program in

19   the state, so I can see if -- at that time, I could only see

20   the State of Delaware.  So I could see if the patient had

21   filled anything recently, who the prescriber was, what they

22   were getting.  So I had a couple that were trying to fill

23   early.

24           And then over time, I saw a pattern develop

25   where the patients were bringing in a lot of the same

992

Webb - Direct

1  prescriptions, written for the same drugs and directions.

2  And then patients showing up in groups together to fill

3  prescriptions, and they were high-dose prescriptions, and

4  they were all for opiate controlled substance prescriptions.

5           I wasn't seeing any blood pressure, or diabetes,

6  or asthma medications.  It was just all pain medications.

7  And over time, I saw this pattern develop, and I became

8  uncomfortable to fill the prescriptions.

9  Q.    So I want to talk about a few of the ones you just

10  mentioned.  You said you didn't see any diabetes or asthma

11  medications.

12           Why did that raise a concern for you?

13  A.    So Dr. Titus was a general practitioner.  Prescribers

14  should be treating the whole patient.  So they shouldn't

15  just be treating pain.  They should be treating their

16  asthma, their diabetes, their high cholesterol.  And I

17  wasn't seeing those prescriptions from him.

18  Q.    And then regarding -- you noted that it seemed like a

19  lot of the same prescriptions were coming in from different

20  patients.  Why did that raise a concern?

21  A.    So it seemed like all the prescriptions were for

22  Oxycodone, 15 milligrams; and Methadone, ten milligrams.

23  And they were all the same.

24           When you're treating pain, you have to look at

25  the patient and their diagnosis and what condition is being

993

Webb - Direct

1    treated.  They should not all be on the same exact pain

2    meds.

3    Q.    So following seeing these patterns coming through,

4    did you do anything in response to it?

5    A.    So once I saw this pattern develop, I just -- I quit

6    filling his prescriptions.  And I filled out what's called a

7    Refusal to Fill.  My employer at, Walmart, is very

8    supportive that if we are not comfortable filling a

9    prescription, we can fill out a Refusal to Refill, and that

10   is what I did.

11   Q.    And did you provide any reasoning in your Refusal to

12   Fill for why you weren't filling?

13   A.    Yes, that I did not feel that the prescriptions --

14            MS. KOUSOULIS:  Your Honor, I would object at

15   this point and perhaps ask for a side-bar.

16            THE COURT:  All right.

17            (Beginning of conference held at side-bar:)

18            MS. SOBCZAK:  We can skip it.

19            MS. KOUSOULIS:  The Government did provide her

20   notes that she had being in the system.

21            THE COURT:  You say, "We can skip it."  What are

22   you talking about?

23            MS. KOUSOULIS:  The question.

24            MS. SOBCZAK:  I can withdraw the question.

25            THE COURT:  So are you going to go to somewhere

Webb - Direct

1    else where we're going to need to talk some more?

2                MS. SOBCZAK:  No, I think we'll cover what we

3    need to cover unless you --

4                THE COURT:  So does that mean, you're finished?

5                MS. SOBCZAK:  I still have questions related to

6    her.

7                MS. KOUSOULIS:  But not --

8                THE COURT:  All right.  Well then --

9                MS. SOBCZAK:  We're not introducing that.

10               MS. KOUSOULIS:  I didn't want her to testify for

11   a reason.  She said her reason was because she wasn't

12   prescribing for legitimate purpose.

13               THE COURT:  Okay.  Okay.

14               (Conclusion of conference held at side-bar.)

15   BY MS. SOBCZAK:

16   Q.    Ms. Webb, in addition to refusing to fill the

17   prescriptions, did you take any other steps?

18   A.    No.

19   Q.    Did you ever speak to Dr. Titus?

20   A.    Yes.

21   Q.    When did you speak with him?

22   A.    When I had called the office to ask questions about

23   prescriptions.

24   Q.    And around when did that occur?

25   A.    It was -- I would say fall of 2013 into the winter or

Webb - Cross

1    spring or '14.

2    Q.    So did you call multiple times?

3    A.    I can't remember specifically talking to him, but I

4    referred to my notes and my Refusal to Fills and I had notes

5    that said I had talked to him.

6    Q.    And based upon your notes and your recollection, what

7    did you say in these calls?

8    A.    So I know I called him about some early fills where

9    the patients were attempting to fill prescriptions early.

10   And I had checked the PMP to see that they were early.  And

11   he said to put the date that they were due to fill on the

12   prescription and to give the prescription back to the

13   patient to take to him.

14   Q.    Did you talk to anyone else at the office in addition

15   to Dr. Titus?

16   A.    Yes.  I talked to his staff.  I cannot remember

17   specific conversations, though.

18            MS. SOBCZAK:  Just a moment.

19            Okay.  Nothing further.  Pass the witness.

20            THE COURT:  All right.

21            Ms. Kousoulis.

22                     CROSS-EXAMINATION

23   BY MS. KOUSOULIS:

24   Q.    Good afternoon, Ms. Webb.

25   A.    Hi.

Webb - Cross

1   Q.      Now, you never examined the patients whose

2   prescriptions you refused to fill; correct?

3   A.      That is correct.

4   Q.      And you never reviewed their medical records?

5   A.      No.

6   Q.      And you testified that one of the red flags was that

7   Dr. Titus was not prescribing these patients prescriptions

8   for diabetes, or high cholesterol, high blood pressure;

9   correct?

10  A.      I did not fill prescriptions for those medications

11  from him.

12  Q.      But, again, you never reviewed their patient files,

13  so you don't know whether these patients had these

14  conditions that needed medication; correct?

15  A.      Correct.

16  Q.      Now, you testified that at one point you called

17  Dr. Titus' office, and you recall having a conversation with

18  him regarding his patients trying to fill the prescriptions

19  early; correct?

20  A.      Yes.

21  Q.      And fair to say that Dr. Titus, as you testified,

22  advised you to write on the prescription it was too early to

23  fill, and to have the patient return the prescription to his

24  office; correct?

25  A.      Correct.

Webb - Redirect

1   Q.     It's fair to say Dr. Titus did not give you a hard

2   time about that; correct?

3   A.     Correct.

4   Q.     And you never spoke to any of these patients directly

5   to assess what, if any, pain they were suffering from;

6   correct?

7   A.     I spoke to the patients, but I did not assess their

8   pain, no.

9              MS. KOUSOULIS:  I have no further questions.

10              THE COURT:  Any redirect?

11              MS. SOBCZAK:  Just a few questions, Your Honor.

12                   REDIRECT EXAMINATION

13   BY MS. SOBCZAK:

14   Q.     So, Ms. Webb, is it fair to say that you did not

15   examine the patients?

16   A.     Correct.

17   Q.     But did you see them when they came in to the

18   pharmacy?

19   A.     Yes.

20   Q.     And did that raise concerns for you?

21   A.     There were some concerns when they would show up in

22   groups.  And some of them did tell me how --

23              MS. KOUSOULIS:  Objection, Your Honor.  Hearsay,

24   Your Honor.

25              THE COURT:  Well, you know, I haven't heard the

Webb - Redirect

1    answer yet, so I'm going to allow it.  And if it's hearsay,

2    you can move to strike it.  Go ahead.

3              THE WITNESS:  So when I spoke to several

4    different patients, they told me about how the waiting room

5    in his waiting room would be full of patients waiting for

6    their prescriptions all day.  And that --

7              MS. KOUSOULIS:  Your Honor, objection.

8              THE WITNESS:  -- they would discuss --

9              MS. KOUSOULIS:  I don't think that conversations

10   these patients had with other patients and these things --

11   they're not here for us to cross-examine and --

12             THE COURT:  Right.  So --

13             MS. KOUSOULIS:  -- it's hearsay.

14             THE COURT:  So members of the jury, I'm going to

15   let Ms. Webb testify about it, but it's not being offered to

16   prove that the waiting room is full of patients.  It's being

17   offered to explain why she stopped filling prescriptions.

18             But go ahead, Ms. Webb.

19             THE WITNESS:  And then eventually, when I

20   started to refuse to fill the prescriptions, and they would

21   show up in groups, they would talk about which pharmacies

22   would still fill his prescriptions.

23   BY MS. SOBCZAK:

24   Q.    And one more question, Ms. Webb.  Did you need to

25   look at the patient charts to know whether or not to fill

Webb - Redirect

1    prescriptions for these patients?

2    A.    No.   It's not a pharmacist's job to diagnose a

3    patient, but we do have to ensure that they have a proper

4    relationship with their provider.   And we have to clear the

5    red flags that I talked about earlier before we can fill the

6    prescription.

7                   MS. SOBCZAK:   Thank you.

8                   THE WITNESS:   Mm-hmm.

9                   MS. SOBCZAK:   Pass the witness.

10                  THE COURT:   All right.

11                  Ms. Webb.   Thank you.   You're excused.   You may

12   go.

13                  THE WITNESS:   Okay.   Thank you.

14                  MS. REMIS:   Your Honor, we have another witness,

15   but it's going to be a long one.   I can call him --

16                  THE COURT:   All right.

17                  Well, so, members of the jury, we have to break

18   a little early for lunch today.   I'm not sure that your

19   lunch will actually be here -- oh, it is here, I'm told.

20   Oh, okay.   Good.

21                  So we'll start again, you know, probably about

22   20 after 1:00.

23                  So can we take the jury out?

24                  (Jury leaving the courtroom at 12:18.)

25                  THE COURT:   Yes, Mr. Bostic.

Webb - Redirect

1      MR. BOSTIC:  Your Honor, I just want to clarify

2  something.  I made a mistake.  I had the entry in my

3  calendar as a status conference.  It's actually a conference

4  with an expert and some other lawyers so I can give notice

5  for an expert in another matter.  So I apologize about that.

6  I thought the Court has having a status conference.

7      THE COURT:  All right.  You'll be back here at

8  20 after 1:00?

9      MR. BOSTIC:  Yes.  I just wanted to let the

10 Court know I made a mistake.

11     THE COURT:  I don't think it's any great big

12 harm, Mr. Bostic.

13     All right.  Who is your lengthy witness who's

14 coming up next?

15     MS. REMIS:  We have Jane Webb, and then we have

16 Michael Petron.

17     THE COURT:  Okay.  Just remind me, who is Jane

18 Webb?

19     MS. REMIS:  She's a former office employee.

20     THE COURT:  All right.  So I take it the way

21 things are going, we will finish Mr. Petron today?

22     MS. REMIS:  I think so.

23     THE COURT:  Okay.  All right.

24     And Dr. Thomas, I assume, whenever we finish

25 Mr. Petron, Dr. Thomas is going to be saved for tomorrow

1001

Webb - Redirect

1   morning or is he hanging around waiting to go?

2           MR. WOODARD:  I think we all agreed it would be

3   best just to start with Dr. Thomas, if the Court is inclined

4   to do so, tomorrow.

5           THE COURT:  I'm perfectly fine with that.

6           MR. WOODARD:  Okay.

7           THE COURT:  Okay.  So we'll be in recess until

8   20 minutes after 1:00.

9           DEPUTY CLERK:  All rise.

10          (Recess was taken.)

11          DEPUTY CLERK:  All rise.

12          THE COURT:  All right.  Are you all ready to

13  begin?

14          MR. WOODARD:  Yes, Your Honor.

15          THE COURT:  Okay.  Let's get the jury.

16          Ms. Webb, if you want, you can sit down.

17          THE WITNESS:  Thank you.

18          (Jury entering the courtroom.)

19          THE COURT:  All right.  Welcome back, members of

20  the jury.  You may be seated and you may call your next

21  witness.

22          MS. REMIS:  The United States calls Jane Webb.

23          DEPUTY CLERK:  Please state and spell your full

24  name for the record.

25          THE WITNESS:  My name is Jane Webb.  J-A-N-E

Jane Webb - Direct

1   W-E-B-B.

2           DEPUTY CLERK:  Do you affirm that the testimony

3   you are about to give to the Court and the jury in the case

4   now pending will be the truth, the whole truth and nothing

5   but the truth, you do so affirm?

6           THE WITNESS:  Yes.

7           DEPUTY CLERK:  Thank you.

8           JANE WEBB, the witness herein, after having been

9   duly sworn under oath, was examined and testified as

10  follows:

11              DIRECT EXAMINATION

12  BY MS. REMIS:

13  Q.    Good afternoon, Ms. Webb.  Could you introduce

14  yourself to the jury?

15  A.    My name is Jane Webb.

16  Q.    And where are you from?

17  A.    Scotland.

18  Q.    When did you move to the United States?

19  A.    1993, '4.  1994.

20  Q.    And where do you live now?

21  A.    Felton, Delaware.

22  Q.    How long have you lived in Delaware for?

23  A.    About 20 years, 23 years.

24  Q.    What's your educational background?

25  A.    I have -- I'm a registered nurse, though I haven't

1003

Jane Webb - Direct

1   done that in almost 35 years.  I did college in the U.K.

2   Q.    And where did you get your nursing degree?

3   A.    Simpson Memorial Hospital, Edinburgh, Scotland.

4   Q.    And have you ever practiced as a nurse?

5   A.    No, not in the U.S.

6   Q.    Have you ever been licensed to practice as a nurse in

7   the U.S.?

8   A.    No.

9   Q.    Are you familiar with Patrick Titus?

10  A.    Yes.

11  Q.    How are you familiar with him?

12  A.    I worked for Dr. Titus.

13  Q.    About when did you work for him?

14  A.    I think from 2008 until about 2013, around about.

15  Q.    And what was the name of the practice?

16  A.    Lighthouse Internal Medicine.

17  Q.    How did you first learn about the job at Dr. Titus'

18  office?

19  A.    I actually live across the street from his office --

20  his -- Josie Walters, who was his office manager.  I had

21  recently been diagnosed with a chronic illness and I had

22  quit my job.  And she actually called me and said did I know

23  someone who could help in their office just to file and

24  catch up on some stuff, and I offered myself, because by

25  that time I was kind of going stir crazy being in the house

1004

Jane Webb - Direct

1   all the time.

2   Q.      So who hired you?

3   A.      Josie.

4   Q.      And did Dr. Titus have the final say or interview

5   you?

6   A.      Yes.  He came to talk to me.  Mm-hmm.

7   Q.      What were you originally hired to do?

8   A.      Just clean up the mail room where the files are, the

9   patient files.  There were some extra files and some boxes

10  of paperwork that needed to be put in the files so that the

11  patient's chart was up -- is up to date as possible.

12  Q.      Where was the office located when you first started

13  at Lighthouse?

14  A.      It was on Lakeview Avenue in Milford.

15  Q.      Aside from you, who else worked for Dr. Titus then?

16  A.      Cindy Molesi.  Her daughter, Amanda.  Josie.  Chandra

17  Sharp.  And I can't remember if there's someone else, but

18  those were the main people that I remember.

19  Q.      So you mentioned that Josie who was your neighbor,

20  right, that she was the office manager?

21  A.      Yes, ma'am.

22  Q.      What was her role on a day-to-day basis?  What did

23  she do around the office?  Excuse me.

24  A.      She did everything.  I mean, Josie told us what we

25  needed to do.  If there was, you know, someone that needed

Jane Webb - Direct

1    to be at the front desk or she did the billing.  She was

2    really in charge of all facets of, you know, the practice to

3    make it run as smoothly as possible.

4    BY MS. REMIS:

5    Q.     Can you describe the relationship between Josie and

6    Dr. Titus?

7    A.     They had a very close relationship.

8    Q.     Who made final decisions?

9    A.     Dr. Titus.

10   Q.     And how were those decisions often communicated to

11   you and the other office ladies?

12   A.     Usually through Josie.

13   Q.     Okay.  Was it your understanding that those decisions

14   or directives came from Dr. Titus?

15   A.     Yes.

16   Q.     And if you had an issue, who would you bring that

17   issue to?

18   A.     Usually to Josie.

19   Q.     Okay.  And was it your understanding that she would

20   then communicate that issue to Dr. Titus?

21   A.     Yes.

22   Q.     Did you ever bring issues directly to Dr. Titus?

23   A.     Yes.

24   Q.     What kind of practice was Lighthouse when you first

25   started?

Jane Webb - Direct

1    A.      Mainly, it was primary care.

2    Q.      Okay.  So saw just normal primary care patients?

3    A.      Correct.

4    Q.      What kind of a doctor was Dr. Titus, to your

5    knowledge?  Do you know if he had a specialty?

6    A.      No, I don't know.

7    Q.      At a certain point, did Lighthouse shift from being a

8    family practice to seeing other types of patients?

9    A.      Yes.

10   Q.      And what types of patients?

11   A.      We saw predominantly pain management patients.

12   Q.      At some point did the office location change?

13   A.      Yes.

14   Q.      And how many more offices besides the Lakeview

15   location did it change to?

16   A.      We went to DuPont Highway and then to Downtown

17   Milford.

18   Q.      Okay.  I'm going to show you Government Exhibit 400,

19   please.

20               Do you recognize this?

21   A.      Yes.

22   Q.      Which location is this?

23   A.      That's the one on DuPont Highway.

24   Q.      And when you worked at this location, had Dr. Titus

25   already started seeing more and more pain patients?

Jane Webb - Direct

1    A.    Yes.

2    Q.    And then you mentioned the Downtown Milford location?

3    A.    Yes.

4    Q.    Let's look at Government Exhibit 700, please.

5          And what is this location?

6    A.    This is the Downtown Milford location.

7    Q.    Okay.  What was your role in the office when you

8    worked at this location?

9    A.    Well, it's a small practice and everybody does sort

10   of everything, but my role primarily was to pull the charts,

11   get the charts ready for the next working day, go through

12   any sort of correspondence that had come from other

13   physicians, or from the ER, or the labs, anything that

14   had -- that would be necessary for the patient's next

15   appointment.

16   Q.    Okay.  And what did the other -- is it okay if I call

17   them the other office ladies?

18   A.    Yes, that's fine.

19   Q.    What did the other office ladies do?

20   A.    Well, we had a front desk person.  That's the person

21   that checks in, checks the patient, makes sure everything is

22   okay, takes their co-pay or whatever for the morning.  Then

23   we had another window that we would -- that would be

24   checkout, that sort of thing.

25   Q.    Okay.  And you mentioned it was a small practice;

Jane Webb - Direct

1    right?

2    A.    Yes.

3    Q.    So is it fair to say that everybody sort of helped

4    out with everything?

5    A.    Yeah.

6    Q.    Okay.  I'm going to pull up on this document camera

7    Government Exhibit 201, Page 5.

8           Can you see that there?

9    A.    Yes.

10   Q.    Okay.  What is this a floor plan of?

11   A.    It's the last office we were in in Downtown Milford.

12   Q.    Okay.  And if you could, I'd like you to sort of tell

13   me where people sat and where you were located.

14           So is this the front door?

15   A.    Yes.

16   Q.    And what would this area be?

17   A.    That's the waiting room.

18   Q.    Okay.  And then what about this area?

19   A.    That's the check-in and checkout.

20   Q.    Okay.  And where would you sit?

21   A.    I sort of sat right at the back by the checkout,

22   right at the back by the checkout window.  Like sort of --

23   Q.    Right here?

24   A.    Yes, right back there.

25   Q.    So I'm just going to write JW for Jane Webb.

Jane Webb - Direct

1    A.    Okay.

2    Q.    And then what was happening back in this room back

3    here?

4    A.    That's Dr. Titus' office.

5    Q.    His exam room or just an office?

6    A.    No, that would be Dr. Titus' office.

7    Q.    Okay.  And right here, was this door closed?

8    A.    Yes.  When we first -- when we first moved in, they

9    did some sort of work to change it to accommodate how the

10   practice would be.  And a door was added that had to be

11   opened and closed by the person coming out from our side to

12   let a patient in.

13   Q.    And then what were these rooms here?

14   A.    Those are the exam rooms.

15   Q.    Okay.  So it says exam room already, so that's what

16   it was.

17         And then how about back in here, what was that?

18   A.    It was kind of a -- Josie's office was at the

19   front -- well, kind of that -- her office is a big office.

20   No, the other side.  No, here.  That was Josie's office.

21   Q.    This?

22   A.    Yes.

23   Q.    Okay.  Okay.

24         And then what was going on back here?

25   A.    That was the old -- I think it was a practice before

Jane Webb - Direct

1    because that was the old way you could get in.

2    Q.    Okay.

3    A.    And there was still a desk there like a still -- you

4    know, and then right across it was where we made the file

5    room.

6    Q.    This is the file room?

7    A.    Yes.

8    Q.    Okay.  And that's where all the patient files were

9    stored?

10   A.    Yes.

11   Q.    And that you said was the front door?

12   A.    Yes.

13   Q.    Where would people -- where would patients park

14   generally?

15   A.    There was parking at the back, and there was parking

16   at the side.  And then there was parking sort of where the

17   front door was.  There was some parking there.

18   Q.    So parking here?

19   A.    Yes.

20   Q.    Here?

21   A.    Yes.

22   Q.    And then also on this side?

23   A.    Yes, but not a lot of people parked there, but there

24   was parking available there.

25   Q.    Okay.  Most patients came in through this door;

Jane Webb - Direct

1    right?

2    A.    Yes.

3    Q.    Okay.  Thank you.

4          All right.  Now, I want to talk about the clinic

5    once it shifted mostly to pain patients.  So let's focus on

6    that.

7          Can you describe what the scene in the waiting

8    room was like once you shifted to mostly pain patients?

9    A.    It would be very busy from whenever we opened to

10   whenever we closed.

11   Q.    Okay.  And can you describe any of the patients that

12   might stick out in your mind, what their appearance was

13   like?

14   A.    Some of the patients were just ordinary patients, but

15   some patients could be quite belligerent, kind of rude,

16   especially when there was a long wait.  They would keep

17   coming up to the window saying, you know, "My appointment

18   time was 10 o'clock, it's now 11:30," that sort of thing.

19   Q.    Okay.  Were they belligerent or rude about anything

20   else?

21   A.    They could be if they felt they could get away with

22   it.

23   Q.    What do you mean by that?

24   A.    Well, they could just say, you know, if you tell the

25   doctor I'm here and stuff, but Dr. Titus would come out of

1012

Jane Webb - Direct

1    the room and tell them to "Please take a seat."  He was --

2    you know, people were seen at their scheduled time.

3    Q.    Okay.  Are you familiar with the signs of withdrawal?

4    A.    Yes.

5    Q.    And what generally are the signs?

6    A.    Anxiety.  You can be sweating.  Your eyes can be

7    dilated.  You can be anxious.  Up and down.  Outside smoking

8    a lot.  Coming in, that sort of thing.

9    Q.    And did you ever see patients who maybe displayed

10   some of those signs in the waiting room?

11   A.    Yes.

12   Q.    Approximately, what percent of the pain patients who

13   came in left the clinic with a prescription?

14   A.    Eighty percent.

15   Q.    And what kinds of drugs was Dr. Titus prescribing?

16   A.    Mainly the opioid narcotics, Oxycodone, Oxycontin,

17   Percocet, Fentanyl patches.

18   Q.    At some point, did Dr. Titus lose his ability to

19   prescribe controlled substances?

20   A.    Yeah, we were shut down for a little bit when we were

21   still at the DuPont Highway.

22   Q.    Okay.  The DuPont Highway location?

23   A.    Yes.

24   Q.    The blue one that we looked at?

25   A.    Yes.

Jane Webb - Direct

1    Q.    And do you recall about how long --

2    A.    No.

3    Q.    -- you were shut down for?  Was it months or years?

4    A.    It was just a couple of months, I think.  We were

5    still able to go in and do other things.

6    Q.    And at some point did Dr. Titus get his ability to

7    prescribe back?

8    A.    Yes.

9    Q.    Were there any changes that were made to the way the

10   practice ran?

11   A.    Yeah, we -- there were certain parameters that we had

12   to follow.  Pill counts, PMPs, tox screens, that sort of

13   thing.

14   Q.    Okay.

15   A.    Pain Management Agreements.

16   Q.    And how did you learn about those changes?

17   A.    Well, we had a meeting before we opened up again and,

18   you know, all these new parameters that were going to be

19   part of the practice were brought to our attention, what we

20   had to follow.

21   Q.    Who was at that meeting?

22   A.    I think myself, Cindy.  I think there was a girl

23   called Shannon.  I'm not sure if she was still there at that

24   point, I just honestly can't remember.  And Dr. Titus and

25   Josie.

Jane Webb - Direct

1    Q.      Mm-hmm.  Okay.  What was your understanding of the

2    purpose of all of these changes?  What was the goal?

3    A.      Well, it was there to, first of all, make sure that

4    we were following all pain management parameters that

5    patients have to be taken care of.  And also, that the

6    physician would be aware that these were, you know,

7    regulated, and we were following the rules.

8    Q.      So you said taking care of patients and following the

9    rules?

10   A.      Yes.

11   Q.      And whose ultimate decision was it to implement these

12   changes, in your understanding?

13   A.      It would be Dr. Titus.  I mean, we opened, and it was

14   his practice.

15   Q.      Let's talk about sort of a typical day and let's

16   focus on the time after the suspension.

17   A.      Mm-hmm.

18   Q.      What, if anything, did you or the other ladies in the

19   office do to prepare for the following day's patients?

20   A.      Everyone had their own little thing to do.  Mine

21   primarily, I would get a list of the next day's patients and

22   I would pull the charts.  I would take them to my desk, go

23   through them, see if there was anything to put - if we had

24   any faxes from, let's say, the hospital, another physician,

25   that sort of thing, make sure those were attached to the

Jane Webb - Direct

1    chart.  If patients had to be called, you know, to make sure

2    they knew they had an appointment.  You know, things change.

3    Sometimes patients call and leave a message on the machine

4    saying I can't make it today, can I come in tomorrow, that

5    sort of thing.

6              That was really it.  Just making sure that

7    everything was ready for the next day.  Every day you want

8    to be a day ahead.

9    Q.    And you mentioned that you would put some documents

10   and attach them to the chart?

11   A.    Yes.

12   Q.    Where in or on the chart would you attach those

13   documents?

14   A.    If the patient was coming in, a lot of times we would

15   put them on -- we would put them on the front of the chart,

16   especially if the patient was coming in the next day, we

17   hadn't seen them or we had seen them or something had come

18   in that was pertinent, so that, you know, the physician

19   could see it.

20   Q.    What types of things could come in that might be

21   pertinent?

22   A.    If they had done a tox screen, the results of their

23   tox screen.  If they had maybe gone to the ER, maybe they

24   hurt themselves over the weekend or just stuff like that.

25   Q.    And you said that they were on the top of the --

Jane Webb - Direct

1    A.    Yes, usually they were on the top.  Sometimes we put

2    them in the front page, but they were always easily

3    accessible.  Before you would see the note, you would see

4    whatever was pertaining to the patient that day.

5    Q.    And what was the purpose of putting the chart

6    together like that?

7    A.    So that when the physician goes in the room with the

8    patient, everything that's most -- the newest available

9    information is right there for the physician to see.

10   Q.    And the physician would have been Dr. Titus?

11   A.    Yes.

12   Q.    Was he the only physician at Lighthouse?

13   A.    Yes.  The only physician, yes.

14   Q.    Okay.  I'm going to show you Government Exhibit 179

15   at Page 14, please.

16         Is this a prescription?

17   A.    Yes, ma'am.

18   Q.    Do you recognize the handwriting on the top portion?

19   A.    That might be either Shannon's or Josie's.

20   Q.    Okay.  How about let's go to Government Exhibit 104

21   at Page 20, please.

22   A.    That's mine.

23   Q.    And so would you have filled out the top portion of

24   this prescription?

25   A.    Yes.

1017

Jane Webb - Direct

1  Q.     And that's everything other than the signature

2  basically?

3  A.     Yes.

4  Q.     Okay.  And when would you fill out the top portion of

5  these prescriptions generally?

6  A.     When we opened up down on Church Street and stuff, we

7  were -- we saw a lot of the -- well, the patients would come

8  twice a month.

9  Q.     Okay.

10  A.     So they would come in the beginning of the month and

11  see Dr. Titus and then if they -- everything was fine, then

12  the second part of the prescription would be written 15 days

13  later.

14  Q.     Okay.  And so how would you know what to write on the

15  top portion of the prescription?

16  A.     Because if it was the second portion, then I just

17  copied whatever the original part of the prescription, the

18  first part of the prescription was.

19  Q.     Okay.  Did you ever put together a prescription like

20  this the night before Dr. Titus would see the patient?

21  A.     That day, like those were always done the day before,

22  like I said, before the patient is seen.

23  Q.     What time -- and we can take this down.  Thank you.

24         What time in the morning did the office open?

25  A.     6:00.

Jane Webb - Direct

1  Q.      And who opened the office most days?

2  A.      Usually Josie.

3  Q.      Okay.  Did you ever open the office?

4  A.      Yes.

5  Q.      And when you arrived, were there already people

6  waiting there --

7  A.      Yes.

8  Q.      -- for the office to open?  Did Dr. Titus arrive on

9  time sometimes?

10  A.      Yes.

11  Q.      And sometimes did he not arrive on time?

12  A.      Sometimes he would be a few minutes late.

13  Q.      Okay.  What time was the first appointment?

14  A.      Six o'clock.

15  Q.      6:00 a.m.?

16  A.      Yes.

17  Q.      And about how much time was allotted for each

18  patient's appointment?

19  A.      Usually in the doctor's office, you're scheduling ten

20  to 15 minutes an appointment.

21  Q.      At what point in the process -- once the patients got

22  there, what did they do first?

23  A.      You signed in.  Sign your name.  And then the person

24  at the front desk would call you up.  If you have insurance,

25  you take your co-pay, ask if there's any changes going on.

1019

Jane Webb - Direct

1    And then if they were doing a tox screen, you would be sent

2    to do a tox screen.

3    Q.    Okay.

4    A.    And if not, they would just take a seat until they

5    were ready to be called back to the exam room.

6    Q.    And you mentioned that if the patients had insurance,

7    they would pay right after they signed in?

8    A.    Yes, ma'am.

9    Q.    And if they didn't have insurance, would they still

10   pay right then?

11   A.    Yes.

12   Q.    Okay.  And who collected payments?

13   A.    The person at the front desk.

14   Q.    Aside -- how did patients generally pay?

15   A.    Well, there's usually three ways of paying, credit

16   card, cash or check.

17   Q.    And also insurance; right?

18   A.    Yes.

19   Q.    Did Lighthouse accept Medicare?

20   A.    Yes.

21   Q.    And who did the billing?

22   A.    Josie.

23   Q.    I'm going to show you Government Exhibit 107 at

24   Page 85, please.  Sorry, 185.

25         This is kind of light, but can you see it if we

Jane Webb - Direct

1    blow it up?

2    A.     Yes.

3              MS. REMIS:  Can you blow it up, Ms. Leal?

4              THE WITNESS: Okay.

5    BY MS. REMIS:

6    Q.     And do you see the name of the patient?

7    A.     Maryjane Mench.

8    Q.     And what does it say under "Eligibility details"?

9    A.     She has Part A and B of Medicare.  Part A, B and D,

10   sorry.

11   Q.     And this is as of February 14th, 2013?

12   A.     Right.

13   Q.     And so what is this type of document?  What does it

14   mean?

15   A.     When you -- you can go in -- there's different ways

16   you can do it, but you can go in and check Medicare.  You

17   can go over the phone, and they tell you if a paytient has A

18   and B mainly, and it tells you what the deductible is for

19   the year and how much they've met.  It changes every year.

20             And the beginning of the year, usually patients

21   pay like -- I don't know.  Now, it's like 36 and then it

22   goes down -- as their deductible gets paid, it goes down to,

23   say, $15 or whatever for a visit.

24   Q.     So there were some patients who came in --

25   A.     Yes.

Jane Webb - Direct

1    Q.      -- and used Medicare?

2    A.      Yes.

3    Q.      What's your understanding of when a patient is

4    covered by Medicare?

5    A.      Medicare, you just take their -- if they have A and

6    B, you just take their co-pay.

7    Q.      Sorry.  Bad question.

8            How does somebody qualify for Medicare?

9            MR. BOSTIC:  Objection, Your Honor.  Unless the

10   witness has some special knowledge about how Medicare is

11   determined by the Social Security Office.

12           THE COURT:  I don't think that's the question

13   being asked.  I think she's asking -- but I'll let her ask.

14   So I'll let the witness answer.

15   BY MS. REMIS:

16   Q.      Do you know at what point in somebody's life they

17   start qualifying for Medicare?

18   A.      Depends.  If you're retired, or if you get Social

19   Security or if you're disabled, you can get Medicare.

20   Q.      So at a certain age or if you're disabled?

21   A.      Yes.

22   Q.      And let's go to Government Exhibit 204, Page 3,

23   please.  Now, we just looked at Maryjane Mench's Medicare

24   eligibility; right?

25   A.      Right.

Jane Webb - Direct

1   Q.      If we go up from the bottom here, does that say

2   Maryjane Mench?

3   A.      Yes.

4   Q.      Is that your handwriting or somebody else's?

5   A.      No, it's not mine.  That looks like Shannon's.

6   Q.      And how much is it there?

7   A.      $22.

8   Q.      And why would it only be $22?

9   A.      Because, again, you pay "X" amount until your

10  Medicare A and B is met.  And then after that, Medicare

11  dictates how much you pay.  Like this year, it's $203 at the

12  beginning of January.  Once that patient has met their

13  Medicare deductible, then it goes to that "X" amount.  Most

14  physicians you would pay $15 per visit.  Just depends on

15  what Medicare dictates for the year.

16  Q.      So does this $22 receipt suggest to you that

17  Ms. Mench paid with her Medicare?

18  A.      Yes.

19  Q.      And how did the majority of pain patients pay for

20  their appointments?

21  A.      Depends on if they had insurance or not.

22  Q.      Okay.  If they didn't have insurance?

23  A.      They would pay cash.

24  Q.      And would you -- I don't mean to ask you a specific

25  number, but about what percent of patients were paying cash,

Jane Webb - Direct

1   would you say?

2   A.    Most of the patients who had Medicaid because we were

3   not a Medicaid provider.

4   Q.    And were most of the patients Medicaid patients?

5   A.    Yes.

6   Q.    For patients who paid in cash, how much was a visit?

7   A.    It changed.  I think we went from 155 maybe to 200,

8   something like that.  I don't actually remember the amount.

9   Q.    Somewhere around there?

10  A.    Yeah.

11  Q.    Who decided the prices of the visits?

12  A.    Well, that would be the office manager and Dr. Titus.

13  Q.    And who communicated it to you and the other front

14  desk ladies?

15  A.    Josie.

16  Q.    And that would be when the price changed?

17  A.    Yes.

18  Q.    She would tell you?

19        You just mentioned that the office had a lot of

20  Medicaid patients; right?

21  A.    Yes.

22  Q.    And what is your understanding of how someone

23  qualifies for Medicaid as opposed to Medicare?

24  A.    From low income.  Again, if you have Social Security

25  and it pays, then you can get both.  You can get Medicare

1024

Jane Webb - Direct

1    and Medicaid.  It just depends on your particular set of

2    circumstances.

3    Q.    Okay.  And you have mentioned the office stopped

4    being a Medicaid provider at some point?

5    A.    Yes.

6              MS. REMIS:  I'm going to pull up Government or

7    could you please pull up, Ms. Leal, Government Exhibit 121

8    at 379.

9    BY MS. REMIS:

10   Q.    Do you recognize this document?

11   A.    Yes.

12   Q.    What are we looking at here?

13   A.    We were told that because the patients had to be

14   aware we were no longer a Medicaid provider, that they had

15   to be aware of that, that when they came to see us, we

16   wouldn't be billing their Medicaid.  So they would have to

17   pay for the visit, pretty much being a self-paid patient.

18   Q.    And so, this is that notice?

19   A.    Yes.

20   Q.    And what's the date here at the bottom?

21   A.    8/20/10.

22   Q.    And is that about the time when the office stopped

23   taking Medicaid?

24   A.    I don't know.  Probably.

25   Q.    Okay.  Did patients who had Medicaid continue to see

Jane Webb - Direct

1    Dr. Titus even after you notified them they'd have to pay

2    cash?

3    A.    Yes.

4    Q.    Was it clear from their patient files that they were

5    covered by Medicaid?

6    A.    A lot of times for a new patient in any practice, you

7    actually have to get a co-pay on an insurance and a driver's

8    license, some kind of, you know, picture ID.  But the

9    patients that were Medicaid, we were told categorically, who

10   didn't have a co-pay card, we had to make sure they signed

11   that so that they were aware they couldn't go to the

12   pharmacy later on and try and get a prescription filled

13   because we weren't a Medicaid provider.

14   Q.    Okay.  Let's look at Government Exhibit 123 at

15   Page 15, please.  It's a little bit hard to see, but if we

16   could blow it up.

17          Can you see that?

18   A.    Yeah, that's a patient's Medicaid card.

19   Q.    Okay.  Do you see the name on there?

20   A.    Tracie Owens.

21   Q.    Okay.  And this would be a document that was in the

22   patient file?

23   A.    Yes.

24          MS. REMIS: And could we please pull up -- can

25   you put it next to, side by side, please, Ms. Leal, with

Jane Webb - Direct

1    Government Exhibit 204 at Page 6.

2              MS. LEAL:  What was the first exhibit?

3              THE COURT:  Sure.  123 at Page 15 and 204 at

4    Page 6, please.

5              Could we just pull up 204 at 6 or are we at the

6    mercy of this?  No worries.

7    BY MS. REMIS:

8    Q.    So just give me one moment.

9    A.    That's fine.

10   Q.    Okay.  Okay.  Do you remember just looking at Tracie

11   Owens' --

12   A.    Yes.

13   Q.    -- Medicaid card?  Okay.  This might be a little bit

14   hard to see, but bear with me.

15             Can you see that, the second receipt down right

16   there?

17   A.    Yes.

18   Q.    And what's the date on that receipt, if you can tell?

19   A.    7/22/14.

20   Q.    And how much -- and what patient is it for?

21   A.    Tracie Owens.

22   Q.    And how much does it appear she paid on that day?

23   A.    180.

24   Q.    So is this an example of a patient with Medicaid who

25   was paying cash?

Jane Webb - Direct

1    A.    Yes.

2    Q.    Or I guess I should say it says credit card, another

3    way to pay cash essentially?

4    A.    Yes.

5    Q.    Was it your understanding that patients who were

6    covered by Medicaid, but who paid cash at the office also

7    had to pay cash at the pharmacy?

8    A.    Yes.

9    Q.    And so that would mean paying about $180 at the

10   office; right?

11   A.    Yes.

12   Q.    Plus, whatever it costs to fill the prescriptions?

13   A.    Yes.

14   Q.    And approximately how many prescriptions did

15   Dr. Titus usually write in one month for each patient?

16   A.    For each patient?

17   Q.    Mm-hmm.

18   A.    Well, they came in twice a month.

19   Q.    Okay.  So two prescriptions, two rounds of

20   prescriptions per month --

21   A.    Yes.

22   Q.    -- at the pharmacist -- pharmacy, plus $180?

23   A.    Yes.

24   Q.    Was there ever any discussion around the office about

25   how patients with Medicaid were affording those expenses?

Jane Webb - Direct

1    A.    Yes.

2    Q.    What was that conversation?

3    A.    We just found, you know, if you qualify for Medicaid

4    that's a lot of money every month that you're spending on

5    medication when you could go to a Medicaid provider and it

6    wouldn't come out of your -- you know, the money you were

7    getting from the Government.

8    Q.    Was there a way to track the money that was coming

9    into the office, the cash?

10   A.    Yes.  That's why you have -- you showed that receipt

11   book.  Every time a patient came in, they would pay.  They

12   would get -- they would get a copy of the receipt, and then

13   we would have a copy in the book.  And then at the end of

14   the night, there's a form that you would pull up and, you

15   know, you'd have to make sure everything tallied.

16         MS. REMIS:  Okay.  Let's go to Government

17   Exhibit 200, Page 365, please.  Great.

18         THE WITNESS:  Yes.

19   BY MS. REMIS:

20   Q.    Is this the form you were referencing?

21   A.    Yes.

22   Q.    And what's the date in the upper left corner there?

23   A.    4/3/14.

24   Q.    And how many total patients were seen according to

25   this document?

Jane Webb - Direct

1    A.    I can't see that.  I think it's 50 or 60.

2    Q.    Fifty.  And down sort of towards the bottom, it says

3    "cash, check, credit card, front desk money."  What was that

4    tracking?

5    A.    As I say, when a patient would come in and make a

6    payment, that's what it's tracking.

7    Q.    And on 4/3/14, how much in total did the office take

8    in from cash, check and credit card?

9    A.    I have no idea.  I think it's -- is that 6,251?

10   Q.    Yes.

11   A.    Sorry.  I can't see.

12   Q.    That's okay.

13            MS. REMIS:  If we can back out of this, please,

14   Ms. Leal.

15   BY MS. REMIS:

16   Q.    So just to be clear.  On the first column that says

17   cash, so that would be all the cash that the patients had

18   paid?

19   A.    Yes, ma'am.

20   Q.    And then all the way to the right, it says credit

21   card?

22   A.    Right.

23   Q.    All the credit card payments?

24   A.    Right.

25   Q.    Okay.  And was there one of these for basically every

Jane Webb - Direct

1    day?

2    A.    Yes.

3    Q.    What happened to the cash and the income that was

4    collected at the end of the day?

5    A.    Ninety percent of the time, Josie would come back --

6    if Josie left during the day, she would come back and

7    close --

8    Q.    Okay.

9    A.    -- and then she would deposit it the next day.  If

10   Josie was not there the next morning and say I had closed, I

11   would go to the M&T Bank and deposit what, you know, what

12   was in the envelope.

13   Q.    And you mentioned that sometimes Josie would leave

14   and come back.  Was she not there every single day at every

15   minute of the day?

16   A.    No, she was there every day, but sometimes she would

17   leave.

18   Q.    Okay.  Just for a period of time?

19   A.    Yes.

20   Q.    Okay.  How were you and the -- how were you paid as

21   an employee?

22   A.    I think we were paid biweekly.  I might be wrong.

23   It's been a while, but I think it was biweekly.

24   Q.    And by check or cash?

25   A.    It was check and then sometimes it was cash.  Near

1031

Jane Webb - Direct

1   the end, it was cash.

2   Q.    After the salaries and all the bills, what was your

3   understanding of who got the money from the clinic?

4   A.    I would presume it would be the doctor.  It was his

5   practice.

6   Q.    About how many patients were seen on an average day?

7   A.    It just depended on the day.  Sometimes it could be

8   like 33.  It could be 53.  It could be anywhere up to 60.

9   Q.    Okay.  Can we look at Government Exhibit 208, please.

10          Do you recognize this?

11  A.    Yes.

12  Q.    What was this?

13  A.    This was something that Josie did trying to

14  instigate, because we did have a long wait.  It was one of

15  the things that a lot of the patients did complain about.

16  So we tried to make it where we would see less patients

17  during the day, not double book.  But if you see a doctor,

18  you know, most of them double book during the day.

19  Q.    Okay.  And how many patients were you aiming for

20  between Monday and Wednesday?

21  A.    Forty-seven to see 45.

22  Q.    And how about Thursday?

23  A.    Thirty-eight to see 36.

24  Q.    And just looking at this, does that seem about right

25  on average or high or low?

Jane Webb - Direct

1    A.      There were days when that was exactly right.  Some

2    days we saw more, some days we saw less.  I guess it would

3    just depend on who needed to be seen.

4    Q.    Okay.  Let's look at Government Exhibit 200 at

5    Page 235, please.

6              This is November 7th, 2013.  According to this

7    tally, how many patients were seen at the office that day?

8    A.      Forty-nine.

9    Q.    And how many no-shows?

10   A.    One.

11   Q.    And how much money was collected?

12   A.    4,000 -- I'm sorry, $5,277.

13   Q.    Okay.  Let's go to Page 249 of that same document,

14   please.

15             And how many on -- oops.  I think that's this --

16   maybe not.

17             How many on November 14, 2013?

18   A.      Forty-seven.

19   Q.    And how much money came in that day?

20   A.    Four -- $5,088.70.

21   Q.    And just to be clear, this tally just has cash, check

22   and credit cards; right?

23   A.    Yes, ma'am.

24   Q.    So on top of this, there could have also been

25   insurance money coming in?

Jane Webb - Direct

1    A.    Well, that would include insurance money.

2    Q.    Where does it say that?

3    A.    Because a patient may pay cash for their -- even if

4    you -- like Ms. Owens, you may have Medicare, but you're

5    paying cash.  That's not -- it doesn't mean everyone

6    there -- that could be also patients who had insurance.

7    Q.    Right.  So just to be clear, so some of these say

8    like 20, 22.  Do you see the line that says 22, 20?

9    A.    Right.  So there you go.  Like 22 or 21 or 20, those

10   are patients who have insurance.  So that's -- so that's

11   what that means.

12   Q.    And that would be their co-pay; right?

13   A.    Yes.

14   Q.    Okay.  So on top of the co-pay, somebody at the

15   office would also bill the rest of the visit to insurance?

16   A.    Yes.

17   Q.    Sorry.  That was unclear on my part.

18         If we could go to Government Exhibit 200,

19   Page 365, please.  Just one more example.

20         And on April 3rd, 2014, I think we just looked

21   at this one.  Fifty patients.  If somebody said that the

22   average number of patients was 27 patients a day, would that

23   be true?

24   A.    No.

25   Q.    Okay.  Now, just from looking at these and from the

1034

Jane Webb - Direct

1    other document we looked at, it seems like there were more

2    than 35 or 40 patients on many days; is that correct?

3    A.    Yes.

4    Q.    And you mentioned that some patients would complain

5    about that?

6    A.    Yes.

7    Q.    That they were late?

8    A.    Yes.

9    Q.    About how long did patients have to wait, on average,

10   to see Dr. Titus?

11   A.    It would just depend on the day.  Some days, you

12   know, it would kind of chop right along, and other days

13   there would be a wait.  Some days you could wait an hour, an

14   hour and a half to see Dr. Titus.

15   Q.    Do you know what Dr. Titus was doing in the room with

16   the patients?

17   A.    No.

18   Q.    Would he spend a fair amount of time in there?

19   A.    Yes.

20   Q.    Did you ever have to hurry him along in any way?

21   A.    Sometimes we would knock and give him a little nudge

22   and stuff, but the patients would come out and a lot of

23   times it was because he was just talking to them.  Sometimes

24   they didn't see people all day, especially the older

25   patients and, you know, he just wanted somebody to talk to

Jane Webb - Direct

1    and that's what he was doing.  And they would come out and

2    say, "The doctor was the only one who's listened to me all

3    week."  So, you know, it just depends on the patient and on

4    the day.

5    Q.    So sometimes your understanding was that it would

6    just be sort of chatting?

7    A.    Yeah, it would just be general chitchat with the

8    patient.

9    Q.    Okay.  You mentioned, you know, we looked at days

10   that had dozens of patients.  Did Dr. Titus keep up with all

11   the patient paperwork in the charts?

12   A.    No.  We had an issue with paperwork.

13   Q.    What was the issue?

14   A.    Sometimes the notes wouldn't be finished.

15   Q.    Okay.  And did you or any of the other ladies help

16   fill in blank notes?

17   A.    We would do the basic stuff like their name, date of

18   birth, that sort of thing.  Yes.

19              MS. REMIS:  Okay.  Could we pull up Government

20   Exhibit 122, Page 3, please.

21   BY MS. REMIS:

22   Q.    And I'm showing you here -- do you recognize what

23   this type of document is?

24   A.    That's the start of a progress note.

25              MS. REMIS:  And if we could, Ms. Leal, if you

Jane Webb - Direct

1    could just sort of scroll down.

2    BY MS. REMIS:

3    Q.      The top of this is blank as to age, date, weight,

4    height, blood pressure?

5    A.      Right.

6           MS. REMIS:  And then scroll down.

7    BY MS. REMIS:

8    Q.      Some of these boxes are checked; right?

9    A.      Right.

10          MS. REMIS:  And if you could keep scrolling,

11   please.

12   BY MS. REMIS:

13   Q.      And now, is this the last page of the progress note?

14   A.      Yes.

15   Q.      So generally, four pages of progress notes?

16   A.      Yes.

17   Q.      So why is this progress note specifically, maybe not

18   this specific one, but why were there some progress notes

19   that were blank at the top and then blank at the bottom, but

20   had the middle part filled in?

21   A.      Because some -- some of that we can fill in or some

22   of that would be, you know, Cindy or whomever would fill in.

23   And then because it's not really going to change, you know,

24   it's -- if you're saying that -- you know, if the patient is

25   telling you, for example, if they're on medication, you

Jane Webb - Direct

1    would ask them has your medication changed.  If they say no,

2    then you can fill that in.  That's all.  That's just --

3    yeah.

4    Q.    So the middle two pages we looked at that had all the

5    checkmarks and everything, would that be the same by month?

6    A.    Pretty much for most patients unless they

7    specifically came in and said I have an earache or

8    something.

9    Q.    And how would somebody know -- how would one of the

10   office people know what to write under "Impression,

11   Diagnosis and Treatment Objectives"?

12   A.    That wouldn't be our job.

13   Q.    I'm showing you Government Exhibit 128 at 62, please.

14         Do you recognize this document?

15   A.    Yes.

16   Q.    What is this?

17   A.    This was something we were given for the chronic pain

18   patients.  It was to sort of help with some of the

19   paperwork.  If the first -- if we had -- for example, the

20   patient had said they had chronic pain secondary to, that

21   could be filled in.  And then if there's any changes, it

22   would save us some of the paperwork.

23   Q.    Okay.  And was somebody supposed to mark this in

24   order for the --

25   A.    Yes.

Jane Webb - Direct

1   Q.      -- billing and the charts to know?

2   A.      Yes.

3   Q.      Who?

4   A.      It would be whoever was doing the chart for that day.

5   That would be Cindy usually.

6   Q.      And would Dr. Titus sometimes circle these scenarios?

7   A.      Yes, absolutely.

8   Q.      And sometimes would it also be blank?

9   A.      Yes.

10          MS. REMIS:  So let's go to Government

11  Exhibit 128, Page 38, please.

12  BY MS. REMIS:

13  Q.      Whose chart are we looking at here?

14  A.      Lucille Moody.

15  Q.      And on what date, if you can see that?

16  A.      Looks like -- is that 9/22/17?  Seven -- I'm sorry,

17  7/29/17.

18  Q.      Was the office open in 2017?

19  A.      No.

20  Q.      Okay.  I think -- I don't know.

21  A.      Maybe it's -- I don't know.  It looks like a seven to

22  me, but I put the cross through it.  So I'm sorry.  You

23  don't have me on seven.

24          MS. REMIS:  All right.  So let's look at

25  Page 40, please.  I'm sorry, 41.  And if you can make the

Jane Webb - Direct

1    bottom part bigger, please.

2    BY MS. REMIS:

3    Q.    Are you familiar with Dr. Titus' handwriting from

4    working at his office for many years?

5    A.    Yes.

6    Q.    Is this his handwriting here?

7    A.    No.

8    Q.    Whose handwriting is it?

9    A.    I actually don't know whose handwriting that is.

10   Q.    But not Dr. Titus?

11   A.    No.

12   Q.    And does it appear just from looking at it like it's

13   copying one of those scenarios that we looked at?

14   A.    Yes.

15   Q.    Okay.  On some occasions, did the charts go unfilled

16   out completely?

17   A.    Yes.

18   Q.    Can we go to Government Exhibit 116 at 81.

19         Whose note is this?

20   A.    Donald Meck.

21   Q.    And what's the date?

22   A.    1/28/04.

23   Q.    And if we could look at Page 84, please.  Okay.

24         And is this mostly blank at the bottom here?

25   A.    Yeah, the bottom part is blank.

Jane Webb - Direct

1    Q.    Do you know what A/P stands for?

2    A.    No.

3    Q.    Okay.  Why would some of these charts be left blank?

4    A.    I have no idea.

5    Q.    Did you have dozens of patients everyday?

6    A.    Yes.

7    Q.    And was there an attempt to fill in the patient

8    files?

9    A.    Yes.

10   Q.    Was that successful?

11   A.    No.

12   Q.    Do you know whether or not anyone ever raised the

13   issue of the lack of notes in the patient files to

14   Dr. Titus?

15   A.    Yes.

16   Q.    And how do you know that?

17   A.    Because one of the -- one of the reasons -- one of

18   the stipulations when we reopened was that the chart notes

19   had to be done at the time of the visit.

20   Q.    Okay.  And did you hear somebody having this

21   discussion?

22   A.    Josie told us that the chart notes would be filled in

23   at the time of the visit, that's why we were going to see

24   less patients every day.

25   Q.    And when that didn't happen, did somebody raise that

Jane Webb - Direct

1    concern with Dr. Titus?

2    A.    Yes.

3    Q.    Who?

4    A.    Josie.

5    Q.    And what did she say?

6    A.    She just basically said --

7              MR. BOSTIC:  Objection, Your Honor.  It's

8    hearsay.

9              THE COURT:  So I'm going to allow the question

10   of what Ms. Walters told Ms. Webb because I think it's

11   admissible under the rules.  But let's make sure that that's

12   what she's testifying about.  Okay?

13             MS. REMIS:  Yes, Your Honor.  I just asked her

14   if she overheard a conver -- should I ask again?

15             THE COURT:  Well, just ask because I wasn't

16   clear --

17             MS. REMIS:  Okay.

18             THE COURT:  -- what her basis of knowledge was?

19             MS. REMIS:  Sure.

20   BY MS. REMIS:

21   Q.    Ms. Webb, did you overhear a conversation between

22   Josie and Dr. Titus about the patient charts?

23   A.    Yes.

24   Q.    And what did you overhear Josie --

25             MR. BOSTIC:  Your Honor, objection.

Jane Webb - Direct

1       THE COURT:  Okay.  Well, I'm going to overrule

2  that.

3       MR. BOSTIC:  Okay.  Very well.

4  BY MS. REMIS:

5  Q.    What did you overhear Josie telling Dr. Titus about

6  the blank charts?

7  A.    That the notes were, once again, not getting

8  completed at the time of the visit.

9  Q.    And how did you overhear that?

10  A.    Because Josie's office was in the back, and we had so

11  many charts that we weren't -- I wasn't just in the office

12  or the room where the chart notes were or the charts were.

13  We were spilling over to the desk that I told you was part

14  of the original --

15  Q.    Part of the original office?

16  A.    Yes.

17  Q.    And just to be clear, you're talking about this area?

18  A.    Yes.

19  Q.    And that --

20  A.    There were charts there, too.

21  Q.    And that was her office?

22  A.    Yes.

23  Q.    So you could hear?

24  A.    Yes.

25  Q.    Thank you.

Jane Webb - Direct

1    Okay.  You mentioned right at the beginning of
2    your testimony that part of your job was to field calls and
3    things like that from the community, or from hospitals, or
4    other doctors; is that right?
5    A.    Yes.
6    Q.    And so you answered the phone when those people
7    called sometimes?
8    A.    Yes.
9    Q.    Do you recall ever receiving phone calls from
10   concerned family members or friends?
11   A.    Yes.
12   Q.    And when you received those phone calls, what would
13   you do?
14   A.    There's a -- in all doctors' offices, you have like
15   what we call a note and you can put it there so that, say,
16   for example, I had answered the phone and put a note in
17   there, and someone else had called a patient on something
18   else.  They can read the same note so that they can be aware
19   of, you know, whatever.  Whether it was just, hey, your
20   prescription is ready for pickup or whatever.
21   Q.    And so what was the purpose of you putting that note
22   in the file?
23   A.    So it was documented.
24   Q.    Okay.  And for whom?  Documented for whom?
25   A.    For everyone in the office.

Jane Webb - Direct

1   Q.      Okay.  Including Dr. Titus?

2   A.      Yes.

3   Q.      Can you recall any examples of phone calls that you

4   got from family or friends of patients?

5   A.      Sometimes we get phone calls -- anonymous phone calls

6   saying, I know, for example, A, B, C is selling their pills,

7   and you guys should stop prescribing them.  And we would

8   say, Unless you give a name or unless you call Crime

9   Stoppers and have the police come up here with definite

10  proof, this is hearsay and this is just something -- but we

11  would make a note of it so it was available for everyone to

12  see.

13             MS. REMIS:  Okay.  Can we pull up Government

14  Exhibit 178 at Page 1, please.  178 at Page 1.

15  BY MS. REMIS:

16  Q.      Do you recognize this type of a document?

17  A.      Yeah, that's the note.

18  Q.      Okay.  And what patient is this for at the top?

19  A.      James Moody.

20  Q.      Okay.  If we look at the middle of the page at

21  10/10/2011, what is the -- next to "Operator", it says

22  Chandra.  What does it mean?  What does the person's name

23  next to "Operator" mean?

24  A.      That's the person that answered the phone.  So my

25  name would be next to it if I had answered or written a note

Jane Webb - Direct

1   or whatever.

2   Q.    And that would be the person who typed in the note?

3   A.    Yes.

4   Q.    What does this note say?

5   A.    "A man called and stated that this patient sees us

6   and gets pain meds, which he sells to his son.  I told him

7   to call Crime Stoppers."  And then she put in parenthesis,

8   "(We have not seen this patient since 2009.)"

9            MS. REMIS:  And if we could exit out of that

10  part, please.

11  BY MS. REMIS:

12  Q.    And just a couple months later or a few months later

13  on February 7, 2012, do you see that note right underneath

14  from Cindy?

15  A.    Yes.

16  Q.    And is that Cindy Molesi?

17  A.    Yes.

18  Q.    What does it say under the note?

19  A.    "Per Dr. Titus, patient is allowed back."

20  Q.    Okay.  And then let's look at Government Exhibit 122,

21  please.

22            And down at the bottom of the page, the last

23  entry.  Well, first of all, what patient is this associated

24  with?

25  A.    Chasity Calhoun.

Jane Webb - Direct

1    Q.      Okay.  And then down at the bottom on 5/21/14, you

2    are the operator there?

3    A.      Yes.

4    Q.      And that means you wrote this note?

5    A.      Yes.

6    Q.      What does it say right there at the bottom?

7    A.      "Anonymous caller stating she is selling her pills,

8    takes enough to pass drug screen, but no more."

9    Q.      And when you received this call, you obviously typed

10   it in here.  And would you also bring it to anybody's

11   attention?

12   A.      Yeah, we would usually take those and tell Dr. Titus

13   about them.

14   Q.      Okay.  And how would Dr. Titus respond?

15   A.      It would depend.  I mean, usually he would say,

16   again, it's an anonymous call.  And if you don't have

17   definite proof, you know, we have to treat the patient with

18   courtesy and concern.  And he would bring it up at the next

19   appointment, like he would address it.

20   Q.      How do you know that he would address it?

21   A.      Well, he would tell me he would address it.  Whether

22   he did or not, I wasn't in the room.

23            MS. REMIS:  Let's go to Government Exhibit 121,

24   Page 71, please.

25   BY MS. REMIS:

Jane Webb - Direct

1    Q.     And what is this?

2    A.     It's a prescription.

3    Q.     Okay.  And what's the date on it?

4    A.     I have no idea.  I can't see that.

5    Q.     Can you make that bigger, please?

6    A.     5/21/2014.

7    Q.     And is that the same date as the anonymous caller

8    note we just read?

9    A.     Yes.

10   Q.     And what's this prescription for?

11   A.     Oxycontin, 20 milligrams.

12   Q.     Okay.  And who's it for?

13   A.     Chasity Calhoun.

14   Q.     And then on the bottom one?

15   A.     It's Oxycodone, 15 milligrams.

16   Q.     Okay.  Did Lighthouse ever receive calls or paperwork

17   from other doctors or emergency rooms?

18   A.     Yes.

19          MS. REMIS:  Let's look at Government

20   Exhibit 100, Page 32, please.

21   BY MS. REMIS:

22   Q.     Where is this?  What medical center is this from?

23   A.     Bayhealth.

24   Q.     And do you recognize the patient name Brent Hood?

25   A.     Yes.

Jane Webb - Direct

1    Q.      Who is Brent Hood?

2    A.      He was a patient at the practice.

3    Q.      Okay.  And is this an example of a document you would

4    have received at the office?

5    A.      Yes.

6    Q.      And if you could see at the bottom, there's a date.

7    It's actually upside down, and I'm sorry for that.  Can you

8    read it upside down?

9    A.      8/6/2013.

10   Q.      And what is that?  What are we looking at?

11   A.      That's usually the date that we receive it at the

12   office.

13   Q.      Okay.  So you would have received this fax from

14   Bayhealth on August 6th, 2013?

15   A.      Yes.

16   Q.      And when a fax like this or a fax similar to this

17   came in, what would you do with it?

18   A.      Put it in the patient's chart.

19   Q.      Just like you described earlier?

20   A.      Yes.

21   Q.      The front of the chart?

22   A.      Yes.

23           MS. REMIS:  And if we could look at Government

24   Exhibit 115 at Page 80, please.

25   BY MS. REMIS:

Jane Webb - Direct

1    Q.     Did the office sometimes collect paperwork from other

2    physicians for the patients that were seeing Dr. Titus?

3    A.     Yes.

4    Q.     Okay.  And is this an example of somebody else's

5    paperwork that would have been --

6    A.     Yes.

7    Q.     -- in -- sorry.

8    A.     Yes.

9    Q.     And whose patient file are we looking at here?  It

10   says at the bottom right corner.

11   A.     Donald Meck.

12          MS. REMIS:  Okay.  And under "Hospital Course

13   and Pertinent Diagnostics," if you could blow up that --

14   sorry, the second paragraph under there.

15   BY MS. REMIS:

16   Q.     Can you read that or is it too small?

17   A.     Yes, I can read it.

18   Q.     Starting with the sentence, "He is on chronic

19   Oxycodone," could you read that, please?

20   A.     "He is on chronic Oxycodone for his chronic pain

21   which is apparently prescribed by Dr. Patrick Titus in

22   Delaware.  It is possible that he took too much pain

23   medication, became drowsy, thus confusing him.  He did not

24   eat or drink enough and possibly even took too much of his

25   Atenolol," which is another medication.  "I had a long

Jane Webb - Direct

1  discussion with the patient regarding this.  During this

2  hospital stay, he has not been given any Oxycodone at all,

3  and his pain has not been an issue at all.  I explained to

4  him that he does not need to take his Oxycodone.  It is

5  prescribed one every four hours as needed, and I told him he

6  can only take it once in a while if he has severe pain.

7  However, he says he is fine at this time.  No prescription

8  for Oxycodone is being provided at this time.  In fact, I

9  have not changed his other home medications except to

10  recommend reducing the frequency of Oxycodone."

11            MS. REMIS:  Okay.  And if we can get out of this

12  part.

13  BY MS. REMIS:

14  Q.    And down at the bottom, do you see that it says

15  "Dictating Physician's Copied" right there at the bottom?

16  Do you see that?

17  A.    Yes.

18  Q.    So this is a -- and copies for, who does it say the

19  name?

20  A.    Zarena Ahmed.

21  Q.    So this is not a Dr. Titus patient record; right?

22  A.    No, this was sent to us.  Yes.

23  Q.    From?

24  A.    Bayhealth.

25  Q.    Shore Health?

Jane Webb - Direct

1    A.      Yeah, Shore Health.

2    Q.      And it's about patient Donald Meck?

3    A.      Yes.

4            MS. REMIS:  And if we could go up to the top.

5    Sorry, Ms. Leal, to make you skip around.

6    BY MS. REMIS:

7    Q.      But up at the top, there's a date on the file.  What

8    does the date say?

9    A.      6/30/2013.

10           MS. REMIS:  And if we could go to Page 115.

11   Excuse me, Exhibit 115, Page 82, please.

12   BY MS. REMIS:

13   Q.      And then you see it says right under "Discharge

14   Medications," it says "Cc Dr. Patrick Titus."

15           Do you see that?

16   A.      Yes.

17   Q.      So are these the types of forms that you would have

18   received about various patients that Dr. Titus saw?

19   A.      Yes.

20   Q.      And when you received them, what would you do with

21   them?

22   A.      Put them in the chart.

23   Q.      Okay.  I want to talk about a couple of specific

24   patients, please.  Do you recall a patient named Bonita

25   Benson?

Jane Webb - Direct

1    A.     Yes.

2    Q.     What kind of patient was she?

3    A.     She was a pain medication patient.

4    Q.     And do you also know her from the community?

5    A.     Yes.

6    Q.     How do you know her?

7    A.     Her son was -- her son played high school football

8    with mine.

9    Q.     Okay.  Do you know anything about her son?

10   A.     Yes.

11   Q.     Did he have any issues?

12   A.     Yes.

13   Q.     What kinds?

14   A.     He was having drug-related issues.

15   Q.     And what was your understanding?

16          MR. BOSTIC:  Your Honor, objection.  Your Honor,

17   I don't see how this is relevant here.  And Ms. Benson, to

18   the extent there are going to be statements related about

19   Ms. Benson, Ms. Benson is not a witness present here.  And

20   those need to come from Ms. Benson, otherwise it will be

21   hearsay.

22          THE COURT:  All right.  Well, I think once we

23   started talking about Ms. Benson's son, we got too far

24   afield.

25          MS. REMIS:  I'll move on, Your Honor.

Jane Webb - Direct

1    BY MS. REMIS:

2    Q.    I'm going to show you Government Exhibit 179 at 129,

3    please.

4              What is this?

5    A.    Those are prescriptions for Ms. Benson.

6    Q.    Okay.  And what are they for, the two prescriptions

7    that are for drugs in there?

8    A.    Well, the one is for Oxycodone.

9    Q.    Okay.

10   A.    Soma is a muscle relaxer.

11   Q.    Okay.  And are these prescribed on the same day?

12   A.    Yes.

13   Q.    And what's the day?

14   A.    10/10/12.

15   Q.    And then if we look at Page 117, please.

16              And what was Ms. Benson prescribed six days

17   later?

18   A.    Xanax.

19   Q.    Okay.  And based on your recollection, was Bonita

20   Benson a regular patient of Dr. Titus'?

21   A.    Yes.

22   Q.    And can you remember anything specific about her,

23   anything special?

24   A.    She wasn't a very nice person.

25   Q.    Okay.  All right.

Jane Webb - Direct

1           MS. REMIS:  Let's see.  Can we move to

2    Government Exhibit 713, please?

3    BY MS. REMIS:

4    Q.     Do you recognize this person?

5    A.     I think it's Ms. Lucille Moody.

6    Q.     Okay.  And do you remember her?

7    A.     She was a patient.

8    Q.     What kind of a patient?

9    A.     She was a pain patient.

10   Q.     Okay.  Were any of her family members also patients

11   of Dr. Titus?

12   A.     Her husband.

13   Q.     I'm sorry?

14   A.     Her husband, James.

15   Q.     Okay.  Anybody else?

16   A.     I think some of her other family members, but I don't

17   recollect their names.

18   Q.     Okay.  Now, what do you recall about Ms. Moody and

19   the rest of the Moodys?

20           MR. BOSTIC:  Your Honor, objection.  This is a

21   wide question that probably calls for speculation.

22           THE COURT:  Well, so why don't you rephrase the

23   question.  You can be more direct about what it is that

24   you're directing her attention to.

25           MS. REMIS:  Sure.

Jane Webb - Direct

1   BY MS. REMIS:

2   Q.     Does anything stand out to you about the Moodys with

3   respect to their interactions with you, or the other staff,

4   or Dr. Titus at Lighthouse?

5   A.     They usually didn't have to make an appointment, they

6   would just come in.

7   Q.     And would they see the doctor?

8   A.     Yes.

9   Q.     And how would they contact the office or somebody at

10  the office?

11  A.     I don't know.  They -- I mean, they obviously had

12  somebody's telephone number because they would just come in

13  and say, "I was told I could come in and see the doctor

14  today."

15  Q.     Do you know whose phone number they had?

16  A.     No, ma'am, I don't.

17  Q.     And for how long were the Moodys patients of

18  Dr. Titus?

19  A.     I think as long as I worked there on and off.

20  Q.     Both before and after the suspension?

21  A.     Yes.

22  Q.     Do you know whether or not the Moodys saw or knew

23  Dr. Titus outside of the office?

24  A.     Yes, I think they did.

25  Q.     And how do you know that?

Jane Webb - Direct

1   A.     Dr. Titus got married, and I want to say James came

2   in and --

3               MR. BOSTIC:  Objection, Your Honor.  Anything

4   said by James Moody, I think this is basically hearsay at

5   this point.

6               THE COURT:  Well, you know, it's hard to say, so

7   let's listen to the answer.

8   BY MS. REMIS:

9   Q.     Do you know whether or not the Moodys attended the

10  wedding?

11  A.     Dr. Titus got married.  And Mr. Moody came in for his

12  appointment, and he said, "How come I didn't see you ladies

13  at the wedding?"

14  Q.     Okay.  And did you go to the wedding?

15  A.     No, ma'am.

16  Q.     When Dr. Titus got married, who was he marrying at

17  that point?

18  A.     Her name was Victoria.

19  Q.     And were you familiar with Victoria?

20  A.     Yes.

21  Q.     How?

22  A.     She was --

23              MR. BOSTIC:  Objection, Your Honor.  Relevance

24  here.  Can we see the Court at side-bar?

25              THE COURT:  I'm going to sustain that objection.

Jane Webb - Direct

1           MR. BOSTIC:  Okay.  Thank you.

2           THE COURT:  I'm going to sustain that objection.

3           MS. REMIS:  Okay.

4    BY MS. REMIS:

5    Q.    Now, did Dr. Titus' attitude, based on your

6    observations at the office, change after he got married to

7    Victoria?

8           MR. BOSTIC:  Objection, Your Honor.  Again,

9    relevance.

10          THE COURT:  Well, do we know when this wedding

11   took place?

12          MS. REMIS:  I can ask some questions, Your

13   Honor.

14   BY MS. REMIS:

15   Q.    Ms. Webb, do you know which location you were at when

16   the wedding took place?

17   A.    I think we were at the Milford -- the Downtown

18   Milford location, I want to say.  I'm not sure.  I think so.

19   Q.    Was that the Church Street location?

20   A.    Yes, sorry.  Church Street, yes.

21          MS. REMIS:  And may I proceed, Your Honor?

22          THE COURT:  Yes.

23   BY MS. REMIS:

24   Q.    Did Dr. Titus' attitude change after the time that he

25   got married to Victoria?

Jane Webb - Direct

1    MR. BOSTIC:  Your Honor, objection again.  Your
2  Honor, may we have a side-bar on this issue?
3    THE COURT:  No, and overruled.  Go ahead.
4    MS. REMIS:  You can proceed.
5    THE WITNESS:  Oh, he became less personable,
6  less approachable.
7  BY MS. REMIS:
8  Q.    Okay.  And with respect to things in the office
9  specifically?
10  A.    He became very entrenched.
11  Q.    What do you mean by "entrenched"?
12  A.    Questions, concerns that we would have or even just
13  general day-to-day business of the practice that we used to
14  be able to approach Dr. Titus on, it became a little less --
15  it became -- you couldn't really talk to him the way that
16  you used to be able to talk to him.
17  Q.    Okay.  And you mentioned throughout your testimony
18  that you would bring issues to his attention.
19  A.    Yes.
20  Q.    Did his reaction to those issues or conversations
21  change?
22  A.    Yes.
23  Q.    In what way?
24  A.    Dr. Titus was always very personable and you could
25  always go to him if you had a question or a concern, but

Jane Webb - Direct

1  over time it changed.  And questions or concerns that we had

2  before that he would listen to or generally say, This is why

3  we're doing this and explain the situation, it would

4  basically be, No, I'm not -- you know, I'm not doing that.

5  We're not discharging a patient.  We're not counseling a

6  patient -- my patients.  When I go in the room, this is

7  between me and the patient, and I'll take care of it.

8  Q.    So did the way that you approached issues with

9  Dr. Titus --

10  A.    I stopped going to him with as many -- I just stopped

11  doing it.

12        MS. REMIS:  Okay.  Could I have just one moment,

13  Your Honor?

14  BY MS. REMIS:

15  Q.    Now, you talked earlier about after the suspension --

16  A.    Mm-hmm.

17  Q.    -- that different policies changed within the office,

18  and I think you mentioned PMP, and pill counts, and drug

19  tests; right?

20  A.    Right.

21  Q.    I want to talk about some of those things.

22  A.    Okay.

23  Q.    So you talked about prescriptions being twice a

24  month; right?

25  A.    Mm-hmm.

Jane Webb - Direct

1   Q.      And did Dr. Titus see the patients twice a month?

2   A.      No.

3   Q.      How did that work?

4   A.      Dr. Titus would see them, say, the first of the

5   month.  And then as long as everything was okay, you know,

6   no change, say we'd done a pill count in the middle of the

7   month, or a UDS had been done, or we checked the PMP and

8   everything was the way it should be, then the patient got

9   the second part of the prescription.

10  Q.      Even if there had been an issue, let's say a drug

11  test came in --

12  A.      Right.

13  Q.      -- did it happen that the patient's treatment would

14  remain unchanged?

15  A.      Yeah, because doctor -- you would send it to him and

16  he would make a determination based on the fact that he

17  would see them again at the end of the month.  And that was

18  his determination as to what he wanted to do with the

19  prescription.

20  Q.      Okay.  So who made the decision about how to proceed?

21  A.      Dr. Titus.

22  Q.      What was the purpose of splitting the prescription up

23  into two?

24  A.      I really don't know.  I think was part of the whole

25  checks and balances that we had in place.  You know, for

Jane Webb - Direct

1    example, say a patient hadn't done a tox screen and

2    something had come back or we had one of these anonymous

3    phone calls or whatever, and if we wanted to do a tox screen

4    or something, if they were coming back in the middle of the

5    month, then, you know, we could definitely do it then, or a

6    pill count, or that sort of thing.

7    Q.    Did the fact that the prescription was split into two

8    actually have any real effect on any of the concerns that it

9    was trying to address?

10                   MR. BOSTIC:  Objection, Your Honor.

11                   THE COURT:  I'm going to sustain the objection

12   to that question.

13                   MS. REMIS:  Okay.

14   BY MS. REMIS:

15   Q.    How were pill counts supposed to work?

16   A.    Pill counts are done -- you can do them where you can

17   actually schedule a pill count and tell Ms. Smith that

18   you've got 60 to do for 30 days, and we're going to call you

19   in.  So "X" amount should be done if you take it twice a day

20   or whatever.  Or we would call and say, "You need to come in

21   tomorrow.  We're doing a pill count."

22                   Or they would come in for their second part of

23   the prescription and we would say, "We're going to do a pill

24   count."  There are various ways of doing that.

25   Q.    So sometimes the patients would know in advance

1062

Jane Webb - Direct

1    when --

2    A.     Yes.

3    Q.     -- the pill count was?

4           MS. REMIS:  And let's look at Government

5    Exhibit 180 at Page 67, please.  And if we can just blow up

6    that bottom part right there.  Thank you.

7    BY MS. REMIS:

8    Q.     Is this an example of when a patient would know in

9    advance?

10   A.     Yes.

11   Q.     So what patient is this?

12   A.     Bonita Benson.

13   Q.     Okay.  And when was her pill count apparently going

14   to be?

15   A.     November 19th.

16          MS. REMIS:  And so if we back out of this,

17   please.

18   BY MS. REMIS:

19   Q.     The date of the prescription was what?

20   A.     10/28.

21   Q.     And so she knew that in a couple weeks she was going

22   to have a pill count?

23   A.     Yes.

24   Q.     Okay.  And then let's look at Government Exhibit 130

25   at Page 126, please.

1063

Jane Webb - Direct

1       What are we looking at here?

2  A.     That is a mandatory pill count.  Sometimes patients,

3  excuse me, have been seen.  We haven't done a pill count on

4  them in a while.  We would actually tell her or we had done

5  a pill count and the pill that we had -- we had done the

6  pill count and the pills had been incorrect, the amount in

7  the pill bottle was incorrect.  So this was sort of telling

8  the patient, This is the one you're having.  You have to

9  come in for it.

10  Q.     Okay.  Do you want a water?

11  A.     No, I have one right here.  Thanks.

12  Q.     And so what's the date on this letter?

13  A.     August the 28th, 2014.

14  Q.     And when was it notifying Ms. Silbereisen that she

15  had a pill count for?

16  A.     September 9th.

17  Q.     And did Ms. Silbereisen appear to sign at the bottom?

18  A.     Yes.

19          MS. REMIS:  Let's go to Exhibit 130 at Page 41,

20  please.  Now, if we could just blow up.

21  BY MS. REMIS:

22  Q.     Whose patient file are we looking at?  Do you see at

23  the top there?

24  A.     Which one?

25  Q.     What the patient's name is?

Jane Webb - Direct

1    A.    Oh, Melissa Silbereisen.

2             MS. REMIS:  And if you could blow up, Ms. Leal,

3    just the writing in the margin on the left.

4    BY MS. REMIS:

5    Q.    Do you recognize this handwriting?

6    A.    Yeah, that's Cindy's.

7    Q.    And what does it say?

8    A.    Non-compliant pill count 9/9/14.  I don't -- I

9    can't -- something 29 -- Cindy's writing, Oxycodone, did not

10   bring Fentanyl patches.  Talked about patches as well as

11   pills to pill count.  Now, count scheduled.  She was

12   informed that being something compliant -- non-compliant may

13   result in a discharge.

14   Q.    Okay.  And so this was the pill count that we just

15   looked at the letter?

16   A.    Yes.

17   Q.    Right?

18   A.    Yes.

19   Q.    9/9/14?

20   A.    Yes.

21             MS. REMIS:  If we could go to Government

22   Exhibit 130 at page 121, please.

23   BY MS. REMIS:

24   Q.    And what are we looking at here?

25   A.    Prescriptions.

Jane Webb - Direct

1  Q.      And for whom?

2  A.      Melissa Silbereisen.

3  Q.      And what's the date on them?

4  A.      9/16/14.

5  Q.      So just about a week after the non-compliant pill

6  count?

7  A.      Yes.

8  Q.      And what's it for?

9  A.      The Oxycodone and the Fentanyl patches.

10 Q.      And does it appear that Ms. Silbereisen was

11 discharged for lack of compliance?

12 A.      No.

13 Q.      Okay.  Let's talk a little bit about the PMP.

14 A.      Okay.

15 Q.      What is the PMP, just generally?

16 A.      You're actually checking to make sure that the

17 patient is -- when you decide on a Pain Management

18 Agreement, you also say you won't go to another physician

19 for the prescription that is being prescribed by this

20 physician and that they'll go to one specific pharmacy.

21          So the Delaware PMP that we pull up tells you

22 when the patient filled the prescription, where about, for

23 how many, and who the prescriber was.  When you pull the

24 PMP, you're making sure that in the column of prescriber is

25 the one that the patient is seeing for whatever you're

Jane Webb - Direct

1   prescribing for.

2   Q.     So you and the other office ladies would be looking

3   to make sure that the patient was only seeing Dr. Titus, for

4   example?

5   A.     For whatever we were prescribing them for, yes.

6   Q.     Okay.  And what would happen if they were seeing

7   another doctor for the same thing?

8   A.     Well, they shouldn't have been.  There are exceptions

9   to the rule.  For example, if you were getting your wisdom

10  teeth pulled and you were seeing an oral surgeon, they may

11  give you ten or 12 pills to do you over until you saw your

12  doctor, but that would be noted.  That should be noted in

13  the chart saying, you know, Jane Webb had her teeth pulled,

14  and we gave her ten Oxycodone or whatever.

15  Q.     Okay.

16  A.     But if you see that there's a pattern or there are

17  other physicians in there, the only other physicians that

18  should sometimes come up in the PMP if they're getting

19  benzodiazapines or anything like that, then that will come

20  up also.  But if you're aware of an issue, it should be

21  notated in the chart.

22  Q.     Like in the progress note or something?

23  A.     Yes.  But also -- yeah, at the top or in the notes

24  that we have.  You know, say the one that you showed

25  earlier, it would say Dr. Schwartz's office called and Jane

Jane Webb - Direct

1   Webb had, you know, oral surgery, and we did give her.  Any

2   questions, please call the office.

3   Q.      Mm-hmm.  So if there was some sort of inconsistency

4   in the PMP, it should be explained in the file?

5   A.      Yes, it should be.  Yes.

6   Q.      Did you or somebody else in the office pull the PMP

7   for every pain patient at every appointment?

8   A.      We did originally, yes.

9   Q.      And then did you continue to do so?

10  A.      No.  We did it for like every other visit and then

11  that sort of thing.

12  Q.      Why did you stop pulling it for every visit?

13  A.      It's a lot of paperwork.  It's a lot of paperwork.

14  Q.      And who told you to stop pulling it every time?

15  A.      I think it was Josie or Dr. Titus.  I mean, it was a

16  lot of paperwork.

17  Q.      Okay.  Okay.  You talked about drug screens as well.

18  A.      Yes.

19  Q.      And what was the purpose of doing the drug screens?

20  A.      Well, the main purpose is to ensure that the patient

21  is -- when you do a drug screen, that you're looking for

22  medications that you've prescribed, and that those

23  medications are in the patient's system, and there's --

24  also, no illicit drugs are in the patient's system.

25  Q.      So drugs that were prescribed were in the system,

Jane Webb - Direct

1    drugs that were illicit are not?

2    A.      Yes.

3    Q.      Are you also looking for drugs that were not

4    prescribed?

5    A.      And again, yes.  You -- sometimes they'll come up.

6    For example, say Xanax might come up or something like that.

7    But again, if it was easily -- you know, if a patient was

8    taking it from -- for their mental health provider, that

9    would be acceptable.

10   Q.      Mm-hmm.  And how would you receive the drug tests

11   back, the drug screens back from the --

12   A.      Usually on the fax.  When they -- depending how long

13   they would take to come back.

14   Q.      And would you ever pick them up off the fax?

15   A.      Yes.

16   Q.      And what would you do with them?

17   A.      You go through them.  If they were fine, you put them

18   in the patient's chart.  Most patients' charts have like

19   little tabs.  You know, it says like radiology results, lab

20   results, that sort of thing, and you would put them in

21   there.  If there was no issue, you would just put them in

22   there and that was great to go.  If there was an issue, you

23   would highlight it and that would be one the things that we

24   would -- we have little stickies we could put on, or we

25   would put them on the front, or we would, you know, let the

Jane Webb - Direct

1    person at the front desk know so that it was on the front of

2    the chart.  So not to put it in the chart so that it could

3    be easily accessible.

4    Q.      Easily accessible by whom?

5    A.      The physician.

6    Q.      Dr. Titus?

7    A.      Yes.

8    Q.      And when you would see a drug screen that was

9    inconsistent in some way or unexpected results, what would

10   you do in response?

11   A.      We would usually highlight them.

12   Q.      Okay.

13   A.      You know, if it was someone who hadn't had an issue,

14   we'd highlight it and just put it on the top of the chart.

15   If it was someone who we specifically had a drug screen

16   taken for because, you know, we had had an anonymous call

17   and it kept happening, or they'd had one done previously,

18   say the month before, and they had had illicit drugs, or

19   they were non-compliant with their opioids, then we wanted

20   to know, you know, because sometimes people are

21   non-compliant.  They don't have opioids.  It's been a long

22   time that they've been sick, and they haven't taken them.

23   There are different reasons.

24              So we would do one.  So we were giving the

25   patient the benefit of the doubt as to why they were doing

Jane Webb - Direct

1  another tox screen.

2  Q.    Okay.  And when you would see an unexpected result on

3  a drug screen, would you sometimes write up a warning letter

4  or a discharge letter?

5  A.    Yeah, we had -- excuse me.  We had counseling letters

6  which could vary depending on, you know, what the

7  circumstances were, whether it was a non-compliant with

8  opioids in the system or if they had an illicit drug,

9  heroin, cocaine, in their system.  So there were different

10  variations on a theme, and so we had counseling letters and

11  we also had discharge letters.

12  Q.    Who was responsible for putting those counseling

13  letters or discharge letters together?

14  A.    Usually it was me.

15  Q.    Okay.

16  A.    Yeah, especially if I was doing the next day.  If I

17  was off, it would be somebody else.  But 90 percent of the

18  time, it was me.

19  Q.    And what would you do with those warning letters or

20  discharge letters?

21  A.    Again, they'd be in the chart right there for you to

22  see.

23  Q.    When you would put those warning letters or discharge

24  letters on the chart, do you know whether or not Dr. Titus

25  would always give them to the patient?

Jane Webb - Direct

1    A.      If there was a signature or Dr. Titus, if he

2    cancelled the patient or there was a reason, again, I wasn't

3    in the room, so I wouldn't know.  He would put cancelled,

4    you know, and then the patient would still be seen and then

5    we'd see what was going on.  Maybe they'd get another drug

6    screen or that kind of thing.

7    Q.      Were there ever instances where you put a warning

8    letter or a discharge letter on the chart and then --

9    A.      Yes.

10   Q.      -- it would disappear?

11   A.      I don't know whether they were given to the patient

12   to sign and then we didn't get them.  I don't know.  They

13   just sometimes weren't there when we got the chart back.

14   Q.      Okay.  Let's talk about some of the patients whose

15   drug screens showed up with unexpected results.

16   A.      Mm-hmm.

17   Q.      Do you recall a patient named Dione Dickerson?

18   A.      Yes.

19   Q.      What do you recall about her?

20   A.      She had -- she had -- some of her drug screens would

21   come back with, I think they were either illicit drugs or

22   they would be non-compliant with her opioids.

23            MS. REMIS:  Okay.  Let's pull up Government

24   Exhibit 109 at 390, please.

25   BY MS. REMIS:

Jane Webb - Direct

1    Q.      What is the date of this drug screen?

2    A.      The date is 4/3/13.

3    Q.      Okay.  And when does it say that it got returned to

4    the office?

5    A.      4/5/13.

6    Q.      Okay.  And you see up at the top there's that fax

7    line?

8    A.      Yes.

9    Q.      Would that be when this document came back to the

10   office?

11   A.      Yes.

12   Q.      Okay.  Now, if we could just go back to one -- sorry.

13           What is the result of this drug screen?  What

14   does it say on there?

15   A.      It looks like whatever she was prescribed, which was

16   the Percocet tablets, there were none in her system at the

17   time of the drug screen.

18   Q.      Okay.  And then does it also, under number two, say

19   that there was metabolites detected, but not listed?

20   A.      Yes.

21   Q.      Does that mean she had something in her urine that

22   wasn't actually prescribed by Dr. Titus?

23   A.      Yes.

24   Q.      And what was that?

25   A.      Flexeril.

Jane Webb - Direct

1   Q.      And what about under number two?

2   A.      Hydrocodone.

3   Q.      What else?

4   A.      Hydromorphone and Norhydrocodone.

5   Q.      And if we could just go back to Page 164 of this same

6   exhibit, please.

7           What did Dr. Titus prescribe that same day as

8   the drug screen?

9   A.      Oxycodone and Morphine.

10  Q.      AD Oxycodone and 30 Morphine?

11  A.      Yes.

12  Q.      And if we could go to Government Exhibit 109 at

13  Page 161, please.  Do you recognize this handwriting?

14  A.      That looks like Josie's.

15  Q.      And does the handwriting, the fact that it's Josie's,

16  suggest to you that it was that bi-monthly prescription, the

17  second?

18  A.      Yeah, that would be probably the second.

19  Q.      Okay.  And what's the date of that?

20  A.      4/22/13.

21  Q.      And what is it for?

22  A.      Oxycodone and Morphine.

23  Q.      Okay.  And we talked earlier about the bi-monthly

24  prescriptions and the reason behind the bi-monthly

25  prescriptions; right?

Jane Webb - Direct

1    A.    Yes.

2    Q.    And was part of the reason that it gave Dr. Titus a

3    chance to intervene if there was an issue?

4    A.    Yes.

5    Q.    Now, what day did it say that the drug screen came

6    back for Ms. Dickerson?

7    A.    I don't remember.

8              MS. REMIS:  Okay.  If we could just go back.  It

9    was Page 390, please.

10   BY MS. REMIS:

11   Q.    Do you see that at the top?

12   A.    4/5.

13   Q.    That prescription was just 4/22?

14   A.    Yes.

15   Q.    So a couple weeks later?

16   A.    Yes.

17   Q.    And it was for the same thing that Dr. Titus

18   prescribed the previous time around?

19   A.    Yes.

20             MS. REMIS:  Now, let's take a look at Government

21   Exhibit 109, Page 394, please.

22   BY MS. REMIS:

23   Q.    And is this another drug screen for Ms. Dickerson?

24   A.    Yes.

25   Q.    And what's the fax date at the top?

Jane Webb - Direct

1    A.    6/5/2013.

2    Q.    And again, that's the date it would have come to the

3    office?

4    A.    Yes.

5    Q.    And what's the result here under number two it says?

6    A.    Hydromorphone.

7    Q.    And that was detected, but not prescribed?

8    A.    Right.

9             MS. REMIS:  Okay.  And on Government

10   Exhibit 109, Page 104.  Could we pull that up?

11   BY MS. REMIS:

12   Q.    Now, this is a few months later, but is it the same

13   prescription, same type of drugs and the amount of drugs we

14   looked at before?

15   A.    Yes.

16   Q.    Okay.  Do you recall a patient named Gregg Smith?

17   A.    Yes.

18   Q.    And -- do you recall any interactions you had with

19   Mr. Smith?

20   A.    He was just a patient.  He would come in.  I think he

21   was a truck driver or something.  So sometimes he would call

22   the office and say he had been on a long haul, and he would

23   like to be seen, and we'd put him in for an appointment.

24   Q.    Sometimes would he show up without an appointment?

25   A.    Yes.

Jane Webb - Direct

1    Q.      And would he be seen then?

2    A.      Yes.

3            MS. REMIS:  I'm going to show you Government

4    Exhibit 113 at Page 411, please.  I'm sorry.  I meant 401,

5    please.

6    BY MS. REMIS:

7    Q.      What's the date of this test?

8            MS. REMIS:  If you could blow up just the top

9    half where all the writing is, please.

10           THE WITNESS: 2/12/13.

11   BY MS. REMIS:

12   Q.      Okay.  And that's when it came to the office?

13   A.      Yes.

14   Q.      And what does it say under medications or metabolites

15   detected, but not listed on requisition?

16   A.      Norfentanyl.

17   Q.      And what's a requisition?

18   A.      A requisition is when we send the UDS, we tick off

19   what we're looking for.  So if it's not ticked off, then

20   they won't be looking for it specifically or we will be

21   looking for it, just depending on what you're --

22   Q.      So it's to tell the lab which --

23   A.      Yes.

24   Q.      -- drug you're looking for?  So it says Norfentanyl

25   there?

1077

Jane Webb - Direct

1    A.      Yes.

2    Q.      And that means that it was prescribed by Dr. Titus,

3    or excuse me, that means it was detected, but not prescribed

4    by Dr. Titus?

5    A.      Right.

6               MS. REMIS:  And let's go to Page 113 --

7    Exhibit 113 at Page 395, please.

8    BY MS. REMIS:

9    Q.      And what's the date on this one?

10   A.      4/8/13.

11   Q.      Okay.  And under this one, it shows that the

12   medication monitoring results are Oxycodone and Fentanyl; is

13   that right?

14   A.      Yes.

15   Q.      That's what Dr. Titus would have been prescribing?

16   A.      Yes.

17   Q.      And what were the results from the urine screen?

18   A.      The Oxycodone was positive and the Fentanyl patches

19   were negative.

20   Q.      So no Fentanyl patches in his system?

21   A.      No, not at that UDS, no.

22               MS. REMIS:  And if we could go to Page 387,

23   please.

24   BY MS. REMIS:

25   Q.      And what's the date on this one?

Jane Webb - Direct

1    A.      8/28/13.

2    Q.      Okay.  And what is the result under "Prescribed - Not

3    Detected" on the bottom corner?

4    A.      Fentanyl.

5    Q.      So Dr. Titus had prescribed Fentanyl, but it wasn't

6    detected in his urine?

7    A.      Yes.

8    Q.      Do you recall a patient named Tracie Owens?

9    A.      Yes.

10   Q.      What do you recall about Tracie Owens?

11   A.      She was a patient at the clinic.

12   Q.      Okay.  Let's pull up Government Exhibit 123,

13   Page 347, please.

14          What was missing from Ms. Owens' urine drug

15   screen that should have been there?

16   A.      The Oxycodone.

17   Q.      Okay.  And if we could go to 123, Page 345, please.

18          Is this a warning letter related to that missing

19   drug?

20   A.      Yes.

21   Q.      And what's the date?

22   A.      March 10th, 2014.

23   Q.      Okay.  Let's go to Government Exhibit 123, Page 339,

24   please.  I'm sorry, I meant Page 337.  My apologies.

25          Do you recognize that handwriting up at the top

Jane Webb - Direct

1   that says "2nd one"?

2   A.     That's me.

3   Q.     That's you.  And what was this?  What are we looking

4   at?

5   A.     It's another counseling letter saying that there was

6   absence of the prescribed medications in her UDS.

7   Q.     Same issue as before?

8   A.     Yes.

9           MS. REMIS:  Okay.  And then let's go to

10  Government Exhibit -- same exhibit, Page 329, please.

11  BY MS. REMIS:

12  Q.     Do you recognize that handwriting up at the top?

13  A.     That's Cindy's.

14  Q.     Okay.  And why were you and Cindy marking what notice

15  it was?

16  A.     Just because we kept putting these in the charts and

17  so we just wanted to be aware and so that -- because you

18  know, Dr. Titus did see a lot of patients, so maybe he

19  wasn't aware that there have been one or two.  And we were

20  just letting him know it wasn't her first time.

21  Q.     And this is also for absence of medications; right?

22  A.     Yes, ma'am.

23  Q.     The same issue she had?

24  A.     Yes.

25          MS. REMIS:  And let's go to Page 207, please.

Jane Webb - Direct

1    BY MS. REMIS:

2    Q.      Now, this prescription is about a month after that

3    last warning letter?

4    A.      Right.

5    Q.      And what is it for?

6    A.      Oxycodone.

7    Q.      How many?

8    A.      120.

9    Q.      Okay.  And so this is after the three warning

10   letters?

11   A.      Yes.

12   Q.      Let's talk about a patient named Melissa Silbereisen.

13   I think you pronounced her name differently than I did.  How

14   did you pronounce her name?

15   A.      Silbereisen.

16   Q.      Silbereisen.  And do you recall Ms. Silbereisen?

17   A.      Again, she was just a patient at the clinic.

18   Q.      Okay.  Nothing sticks out?

19   A.      I think we discharged her once or twice.

20   Q.      Okay.  Was it common to discharge some patients

21   multiple times?

22   A.      Yes.

23   Q.      How would they come back?

24   A.      Sometimes they would just turn up and say they would

25   like to speak to the physician.  And if Dr. Titus was

Jane Webb - Direct

1    available, he would speak to them.  Other times, they would

2    call numerous times and leave numerous messages saying they

3    had tried to find another physician, but no one was willing

4    to see them, so you know, they needed a doctor.  And

5    Dr. Titus would say that, "Everyone deserved to be seen by a

6    physician," and he would see them again.

7    Q.    And when those people would come back, do you recall

8    whether or not their treatment changed in any significant

9    way?

10   A.    I can't tell you that.  I don't know.

11          MS. REMIS:  Okay.  Let's go to -- just one

12   moment, please.  Let's go to page -- Government Exhibit 130,

13   Page 258, please.  That is not what I was looking for.  My

14   apologies.  Let's go to page -- just give me one moment.

15   Sorry.  Page 257, please.

16   BY MS. REMIS:

17   Q.    And what are we looking at here?  What are we looking

18   at, Ms. Webb?

19   A.    This is another counseling letter for the patient.

20   Q.    And at the bottom, there's a line for "Patient" and

21   "Physician."  Patient is not signed.  Does that suggest

22   anything to you?

23   A.    She didn't sign it.

24   Q.    Do you know why?

25   A.    I mean, either she didn't want to or, you know,

Jane Webb - Direct

1    Dr. Titus did do his signature.  That's usually when he's

2    just signing it for the -- or she refused to sign.  I don't

3    know.

4    Q.    Okay.  And then let's go to Government Exhibit --

5    same Exhibit 130, Page 250, please.

6          And is this another warning letter on June 6th,

7    2014?

8    A.    There's a signature with hers on it there.  Yes.

9    Q.    Okay.  Okay.  Sorry.  Just one moment.

10         Let's go to Government Exhibit 130 at Page 247,

11   please.

12         And what are we looking at here?

13   A.    This is a tox screen for the same patient.

14   Q.    Okay.  And what date was it faxed back to the office?

15   A.    6/26/14.

16   Q.    And another situation of prescribed not detected?

17   A.    Yes.

18   Q.    And what drugs are prescribed not detected?

19   A.    Fentanyl and Percocet.

20         MS. REMIS:  Okay.  If we could look at

21   Government Exhibit 130 at Page 240, please.  Sorry, 130 at

22   Page 140.  My apologies.

23   BY MS. REMIS:

24   Q.    Okay.  And what was the date of this prescription,

25   ma'am?

Jane Webb - Direct

1   A.     7/7/14.

2   Q.     Okay.  And what was it for?

3   A.     Oxycodone.

4   Q.     And that's a drug that was not in her system

5   previously; right?

6   A.     Right.  Yes.

7   Q.     And then, finally, let's look at Page 130 at 110,

8   Government Exhibit 130 at 110, please.

9              And what are we looking at here?

10  A.     This is a -- this is a discharge letter.

11  Q.     Okay.  And on what date?

12  A.     9 -- I'm sorry.  October 9th, 2014.

13  Q.     And for Ms. Silbereisen?

14  A.     Yes.

15  Q.     Silbereisen?

16  A.     Silbereisen.

17  Q.     But Ms. Silbereisen wasn't actually discharged fully

18  on that date, was she?

19  A.     No.

20             MS. REMIS:  Can we go to Government Exhibit 130

21  at 111, please.

22  BY MS. REMIS:

23  Q.     What are we looking at there?

24  A.     It's a prescription.

25  Q.     For what?

Jane Webb - Direct

1    A.      Oxycodone.

2    Q.      Okay.  And for how many pills?

3    A.      Seventy-four.

4    Q.      Is that about the same number of pills as the prior

5    prescription we looked at?

6    A.      I think so, yeah.

7    Q.      Are you familiar with the idea of a tapering dose?

8    A.      Yes.

9    Q.      And what does a tapering dose mean?

10   A.      You get the same dose of a medication, but you

11   start -- if you get 75, you get 70, and then 65, and then

12   60, that sort of thing, or you can go from Oxycodone 30 to

13   Oxycodone 15, maybe the same amount, but then you're going

14   to start --

15   Q.      Lowering?

16   A.      -- lowering the dose.

17   Q.      So it's either you're lowering the dose or you're

18   lowering the strength?

19   A.      Yes.

20   Q.      This is the same as the one before; right?

21   A.      Yes.

22   Q.      All right.  Did you ever discuss with Dr. Titus why

23   patients who had been discharged would still get another

24   prescription after the discharge date?

25   A.      Pretty much because, as Dr. Titus said, if they were

Jane Webb - Direct

1   seeing him and he felt in his medical -- you know, it was

2   his medical decision that a patient should still get enough

3   medication to do them for the 30 days.  I think if you saw

4   in that letter, it did say we would give them 30 days so

5   they could at least try and find another physician that

6   could fill their next prescription.

7                MS. REMIS:  Okay.  And if we could just go back.

8   I'm sorry.  If we could just go back to that letter,

9   Page 130 -- Exhibit 130 at Page 110, please.

10  BY MS. REMIS:

11  Q.    What does it say at the bottom line right there under

12  emergency care?

13  A.    Yeah.  Yes.  "Emergency care does not include

14  narcotic prescriptions."

15               But he was going to give them 30 days.  And a

16  lot of times he would give them one last prescription until

17  we could find another physician to see them to take over

18  their care.

19  Q.    And we talked earlier how there were two

20  prescriptions per month; right?

21  A.    Yes.

22  Q.    Were some patients given a second prescription even

23  after discharge?

24  A.    Yes.

25  Q.    And why was that?

Jane Webb - Direct

1   A.      Because they had paid for -- they had paid for the

2   month.  They had paid at the beginning of the month for the

3   whole -- you know, the whole month.  So say they paid $205

4   or whatever, and again, it was the same reason that a

5   patient had the right to take his medication, you know,

6   until he could find someone else to continue the care.

7   Q.      Okay.  And that was, in part, because they had paid

8   for it at the beginning of the month?

9   A.      Yeah.

10  Q.      Okay.  You mentioned earlier that the drug screens

11  were also looking for illicit drugs; is that right?

12  A.      Yes.

13  Q.      And what kinds of drugs were you looking for

14  specifically?

15  A.      Suboxone, but mainly we were looking for things like

16  heroin, cocaine, marijuana.  But marijuana was usually just

17  a counsel, it wasn't treated, you know.

18  Q.      The same as heroin or cocaine?

19  A.      Yeah, it was -- heroin and cocaine.  Especially

20  heroin.

21  Q.      Okay.  And did you ever discuss discharging patients

22  who tested positive for illicit drugs with Dr. Titus?

23  A.      Yes.

24  Q.      And do you recall any specific instances where you

25  raised that with him?

Jane Webb - Direct

1   A.    Yes.  Yeah, I mean, I would take -- if there was a

2   patient who had -- maybe we had done another tox screen and

3   stuff, and he did counseling, and then the same -- the tox

4   screen would come back with exactly the same.  You know, I

5   would go in and say, you know, you're supposed to see Jane

6   Webb today, and she still has heroin in her system and

7   stuff, and Dr. Titus would make the determination as to what

8   he wanted to do.

9   Q.    Did you ever have disagreements about whether or not

10  to do --

11  A.    Only once.  I didn't phrase it correctly.  I'm not a

12  doctor.  I didn't go to medical school.  And I once said,

13  you know, we have to, and Dr. Titus told me that, it was his

14  practice, and I could bring this to his attention, which

15  that's absolutely what he wanted me to do, but telling him

16  he had to do something, that wasn't my job.

17  Q.    What did he say to you exactly?

18  A.    That it wasn't my job.  That, you know, that I could

19  bring these things to his attention, and it would be his

20  determination as to what happened after he had seen the

21  patient.

22  Q.    I want to talk a little bit about a patient named

23  Scott Jones.  Do you remember him?

24  A.    Yes.

25  Q.    What do you remember about Scott Jones?

1088

Jane Webb - Direct

1    A.    I know he was another patient that I think we

2    discharged, and he came back, and he would be seen.

3    Q.    Okay.  Let's look at Government Exhibit 102 Page 234,

4    please.

5          What is this?  What are we looking at here?

6    A.    This looks like Ameritox.  I don't know if they're

7    still in business, but they were who we used for a while to

8    do our tox screens, and he tested positive for cocaine.

9    Q.    Okay.  And those highlightings, is that something you

10   or one of the other office ladies would do?

11   A.    Yes.

12         MS. REMIS:  And if we could go out of this.

13   BY MS. REMIS:

14   Q.    And what does it say down there at the sticky?

15   A.    Cocaine.

16   Q.    Can you tell whose handwriting that is?

17   A.    That -- it looks like Josie's.

18         MS. REMIS:  Okay.  If we could look at

19   Government Exhibit 102, Page 230, please.

20   BY MS. REMIS:

21   Q.    What are we looking at here?

22   A.    It's another tox screen.

23   Q.    Okay.  What were the results?

24   A.    It says that Oxycodone and Oxycontin were both

25   negative.

Jane Webb - Direct

1    Q.    And they should have been in the urine?

2    A.    If that was what the patient was being prescribed,

3    yes.

4    Q.    Okay.  And if we could go out of that, please.

5          Is that another one of those little stickies

6    there?

7    A.    Yeah.

8    Q.    And the date on this is what?

9    A.    4/8/13.

10   Q.    That is the fax date?

11   A.    Yes.

12   Q.    Okay.  And then if we could go to Government

13   Exhibit -- and so this is another unexpected drug result

14   after the cocaine.

15   A.    Yes.

16   Q.    Right.

17          MS. REMIS:  If we could go to Government Exhibit

18   102, Page 227, please?

19   BY MS. REMIS:

20   Q.    And what is the date on this drug screen?

21   A.    4/18/2013.

22   Q.    And that's the fax date?

23   A.    Yes.

24   Q.    And what is the result of the test here?

25   A.    That the medications that were detected, but not

Jane Webb - Direct

1    listed are Codeine, Morphine, Hydromorphone, but there was

2    no Oxycodone or Oxycodone -- Oxycontin.   Sorry.

3    Q.     That is what Dr. Titus had been prescribing?

4    A.     If that's what the prescription says, yes.

5                 MS. REMIS:  Okay.  And if we could go to

6    Government Exhibit 102, Page 223, please.

7    BY MS. REMIS:

8    Q.     And again, what's the date on this drug screen?

9    A.     I think it's 5/16/2013.

10   Q.     Okay.  And what's the result?

11   A.     There's no illicit drugs.  There's no illicit

12   medications, but there's also no Oxycodone or Oxycontin.

13   Q.     Okay.  And this is maybe the third or fourth time in

14   a row that we've seen this on a drug screen?

15   A.     Yes.

16                 MS. REMIS:  And let's go to same patient file,

17   Page 55, please.

18   BY MS. REMIS:

19   Q.     Do you recognize this?

20   A.     Yes.

21   Q.     Whose handwriting is that?

22   A.     That looks like mine, my scroll.

23   Q.     And what does it say?

24   A.     "Every month per Dr. T."  That you have to have a

25   drug screen every two weeks.

Jane Webb - Direct

1   Q.     And if we look at Government Exhibit -- and that's on

2   May 28th, 2013; is that right?

3   A.     Yes.

4          MS. REMIS:  If we could look at Government

5   Exhibit 102, Page 219, please.

6   BY MS. REMIS:

7   Q.     What's the date of this drug screen?

8   A.     7/11/13.

9   Q.     Okay.  So just about a month and a half after that

10  note?

11  A.     Right.

12  Q.     And what's the results of the drug screen?

13  A.     He had Codeine and Morphine in his system.

14  Q.     Okay.

15  A.     He had no Oxycodone or Oxycontin.

16  Q.     Okay.  And that's what Dr. Titus was prescribing?

17  A.     Yes.

18         MS. REMIS:  And then if we could go to Page 59,

19  please.

20  BY MS. REMIS:

21  Q.     What's the date up there at the top?

22  A.     August the 15th.

23  Q.     Okay.  Again, Scott Jones?

24  A.     Yes.

25  Q.     And what's prescribed not detected there?

Jane Webb - Direct

1    A.      Oxycodone.

2            MS. REMIS:  Okay.  And then let's go to

3    Exhibit 102, Page 45, please.

4    BY MS. REMIS:

5    Q.      Again, is this for Mr. Jones?

6    A.      Yes.

7    Q.      On what date?

8    A.      8/16/13.

9    Q.      Is it 8/16 or 9/16?

10   A.      Oh, 9.  I'm sorry, 9/16/13.

11   Q.      And again, what's the result?

12   A.      There's no Oxycodone.

13           MS. REMIS:  Okay.  And then, finally, if we

14   could go to Page 47, please.

15   BY MS. REMIS:

16   Q.      What do we have here?

17   A.      It's another drug screen for Scott Jones dated

18   9/16/13.

19   Q.      And what's confirmed in this drug screen?

20   A.      And it looks like it's confirmed heroin.

21   Q.      Okay.  And that's after -- this is the month after

22   the one we just looked at?

23   A.      Yes.

24   Q.      What does it tell you when a patient keeps turning up

25   with drug screens where the drug prescribed is not in their

Jane Webb - Direct

1  system?

2  A.    Well, there can be different reasons, but as many as

3  that -- that he's not taking the prescription as prescribed

4  by the prescriber.

5  Q.    And would you have brought this to Dr. Titus'

6  attention?

7  A.    Yes.

8  Q.    And do you have a specific memory of bringing this --

9  A.    No.

10  Q.    -- just in general?

11  A.    Yes.

12  Q.    This is the type of thing --

13  A.    Yes.

14  Q.    -- you would bring?

15        Okay.  I want to just show you Government

16  Exhibit 102, Page 41, please.

17        Do you recognize this?

18  A.    Yes.

19  Q.    What is it?

20  A.    It's a prescription for Scott Jones.

21  Q.    Whose handwriting is that?

22  A.    That's mine.

23  Q.    And what's the date on it?

24  A.    9/19/13.

25  Q.    And what's it for?

Jane Webb - Direct

1    A.      Oxycodone.

2    Q.      How many?

3    A.      Eighty.

4    Q.      And this is after all that slew of drug screens we

5    looked at?

6    A.      Yes.

7    Q.      And whose signature is that at the bottom?

8    A.      Dr. Titus.

9             MS. REMIS:  May I have a moment, Your Honor?

10            THE COURT:  Yes.

11   BY MS. REMIS:

12   Q.      Okay.  We just looked at a couple of examples of some

13   patients who tested positive for illicit drugs; right?

14   A.      Right.

15   Q.      Was it common for Dr. Titus to refer patients who

16   tested positive for illicit drugs to drug rehabilitation

17   programs?

18   A.      We did do that once we got to Church Street.  We did

19   it closer to the end.  We started to send patients out.

20   Q.      And was that a common thing to do?

21   A.      No.  I mean, we sent some out, not a lot.

22   Q.      Okay.  Was it common for Dr. Titus to change to use

23   alternative treatments other than opioid narcotics?

24   A.      No.

25   Q.      And was it common for Dr. Titus to refer people to,

Jane Webb - Direct

1   like, detox programs?

2   A.    We did at the end.  Yes, he did start sending

3   patients out.

4   Q.    Regularly?

5   A.    I -- I don't remember.  I don't think so -- too many,

6   but we did start doing it, yes.

7   Q.    Okay.  Now, you described earlier that there were all

8   these procedures being put in place after the suspension.

9   A.    Right.

10  Q.    And when something, when a new procedure needed to be

11  put in place, who communicated that to you?

12  A.    Well, like I say, usually Josie did.

13  Q.    And based on your perceptions in the office, who was

14  the one who was trying to sort of keep up with those

15  procedures?

16  A.    Everyone was.

17  Q.    Okay.  Now, one of those requirements was relating to

18  Dr. Titus having to take CME courses; is that right?

19  A.    Yes.

20  Q.    And do you know whether or not he took those CME

21  courses?

22  A.    I have no idea.

23  Q.    Did you overhear a conversation between him and

24  Josie?

25             MR. BOSTIC:  Objection, Your Honor.

Jane Webb - Direct

1    THE COURT:  All right.  Overruled.

2    BY MS. REMIS:

3    Q.    Did you overhear a conversation between him and

4    Josie?

5    A.    Just once Josie -- it was -- it was not long after

6    the patient that had stolen the script pads.  It was during

7    that time, and we were just trying to keep, you know, doing

8    what we were doing.  And Josie said that I guess he had an

9    exam to take or something and, you know, he had to get on

10   it, like on it because it had to be taken care of because

11   they only had a certain amount of time to take care of these

12   things.

13   Q.    Based on your perceptions and what you saw and heard

14   in the office, was Josie's role often to try and keep

15   Dr. Titus doing what he was supposed to be doing?

16   A.    Yes.

17   Q.    And were you also an enforcer, for lack of a better

18   term?

19   A.    I wasn't an enforcer.  Josie was the one who really

20   spent most of her time -- you know, if we had an issue, we

21   wanted to go to her with it.  We knew that Josie would bring

22   it up with Dr. Titus.  They had a very close relationship.

23   You know, they were a very close relationship.

24   Q.    And did Josie's attempts to keep the office running

25   properly, were they effective in the end?

Jane Webb - Cross

1    A.    No.

2    Q.    Who was the person who broke the rules the most?

3    A.    The person that was writing the prescriptions.

4    Q.    And who was that?

5    A.    Dr. Titus.

6          MS. REMIS:  Pass the witness, Your Honor.

7          THE COURT:  All right.  So why don't we take a

8    15-minute break and just can we take the jury out?

9          (Jury leaving the courtroom.)

10         THE COURT:  All right.  So we'll take a

11   15-minute break until 17 minutes after 3:00.

12         DEPUTY CLERK:  All rise.

13         (Recess was taken.)

14         DEPUTY CLERK:  All rise.

15         THE COURT:  All right.  Are we ready to begin?

16         MS. REMIS:  Yes, Your Honor.

17         MR. BOSTIC:  Yes, Your Honor.  Thank you.

18         THE COURT:  All right.  Let's get the jury.

19         (Jury entering the courtroom.)

20         THE COURT:  All right.  Members of the jury,

21   welcome back.  Everyone, you may be seated.

22         Mr. Bostic, you may proceed.

23         MR. BOSTIC:  Thank you.

24                   CROSS-EXAMINATION

25   BY MR. BOSTIC:

Jane Webb - Cross

1    Q.      Good afternoon, Ms. Webb.  How are you today?

2    A.      Good, thank you.

3    Q.      Okay.  I heard you testified earlier that Dr. Thomas

4    would spend a lot of time -- I'm sorry, Dr. Titus would

5    spend a lot of time with patients, particularly the

6    geriatric patients?

7    A.      Sorry.

8    Q.      Particularly the geriatric patients?

9    A.      Yes.

10   Q.      And at times, those that would come in for other

11   issues other than geriatrics, he was a caring doctor; right?

12   A.      Yes.

13   Q.      And he had much concern about how his patients were

14   doing and trying to tend to their needs as best as he could?

15   A.      Yes.

16   Q.      Now, you talked about the practice.  And when you got

17   there, I think it was in 2008; approximately?

18   A.      Yes.

19   Q.      And you were brought on particularly to help with the

20   backlog of medical notes that -- and files that hadn't been

21   gotten to?

22   A.      Yes.

23   Q.      And would it be fair to say that from the time you

24   got to the office and started working, it was clear to you

25   that Dr. Titus was struggling with getting his medical notes

Jane Webb - Cross

1   done and in the system properly?

2   A.      Yes.

3   Q.      And that continued to be the case even with the pain

4   management patients?

5   A.      Yes.

6   Q.      And would it be fair to say that struggling with

7   getting the notes done after a physician who spends time

8   with patients is not isolated to Dr. Titus?  You've worked

9   under other doctors before; right?

10                  Yes?

11                  MS. REMIS:  Objection, Your Honor.

12                  THE COURT:  Well, overruled.

13  BY MR. BOSTIC:

14  Q.      So this is not something uncommon in the -- in

15  medicine?

16  A.      No.

17  Q.      Now, you talked about the fact that when you came

18  in -- strike that.

19                  After the suspension, there were rules and

20  guidelines set down?

21  A.      Yes.

22  Q.      And that Dr. Titus was there.  Josie Walters was

23  there when the new rules were put in place?

24  A.      Yes.

25  Q.      Would you agree with me that in unfortunate times

Jane Webb - Cross

1   Dr. Titus continued to struggle with issues that you

2   mentioned, that he was one of the individuals that was

3   having difficulty with all the guidelines?

4   A.     Yes.

5   Q.     Now, you said something, a very interesting thing

6   that when the Government asked you about this, his

7   difficulty in making decisions about whether or not to

8   discharge a patient or to try to work with them, you said

9   something to the effect that Dr. Titus said to you that,

10  Patients need to be seen by a doctor?

11  A.     Yes.

12  Q.     And that was heartfelt.  That was something he truly

13  believed?

14  A.     I'm sure he did.

15  Q.     Now, the Government showed you an exhibit -- and I'll

16  show you some, but I think we can talk this through.  Showed

17  you an exhibit in which the part of the progress note was

18  written, I think, by you or someone else taking information

19  from the file.

20         MR. BOSTIC:  Mr. Marek, could you pull up

21  Government Exhibit 121, Page 179, please.  Mr. Marek, you

22  can take this down.  121, 178.

23  BY MR. BOSTIC:

24  Q.     A couple questions.  I think that on the A/P in the

25  upper corner right below "Impressions" -- and were you aware

Jane Webb - Cross

1    that "A/P" stood for assessment plan?

2    A.    No.

3    Q.    Okay.  Does it make sense now hearing that?

4    A.    Yeah.

5    Q.    Okay.  Thank you.

6          And at the end of that note, at the bottom, who

7    wrote the content there?

8    A.    I have no idea.

9    Q.    Okay.  But at the bottom of that note, you recognize

10   the signature; right?

11   A.    Yes.

12   Q.    And that's Dr. Titus signing this document?

13   A.    Yes.

14   Q.    Yes.  Okay.  Thank you.

15         MR. BOSTIC:  You may take that down, Mr. Marek.

16   BY MR. BOSTIC:

17   Q.    Now, you mentioned at some point that you had the

18   ability to talk to Dr. Titus and discuss different things

19   with him, and that changed after he got married to Victoria

20   Titus; right?

21   A.    Yes.

22   Q.    But before then -- let me, before I even say this:

23   Who he was was reflected in how he dealt with you and others

24   in the office.  He was kind?

25   A.    Yes.

Jane Webb - Cross

1   Q.    And he had a big heart?

2   A.    Yes.

3   Q.    And many times he would do things for patients that

4   you wouldn't see other doctors doing like buying a

5   wheelchair for --

6              MS. REMIS:  Objection, Your Honor.  Relevance.

7              THE COURT:  I'm going to overrule it.

8   BY MR. BOSTIC:

9   Q.    Like buying a wheelchair for one geriatric patient?

10  A.    Yes.

11  Q.    Now, you talked to the Government about the forms of

12  payment that would come into the office.  You talked about

13  sometimes it was credit cards, co-pay.  You talked about

14  insurance being used, and you talked about cash.

15  A.    Yes.

16             MR. BOSTIC: And Mr. Marek, would you pull up

17  Government Exhibit 204, Page 1, I believe.

18  BY MR. BOSTIC:

19  Q.    And you were shown these receipts here; am I correct?

20  A.    Yes.

21  Q.    And there were numerous books in the office that

22  contained every receipt for every set of money, cash money

23  that Dr. Titus received in the office?

24  A.    Yes.

25  Q.    And you know this because he didn't try to hide this.

Jane Webb - Cross

1   You knew this was available and aware of their existence; am

2   I correct?

3   A.      Yes.

4   Q.      Now, you talked to the Government about times

5   Dr. Titus overruling individuals as to whether or not to

6   discharge an individual.  And you mentioned a conversation

7   that you and he probably had on several occasions where he

8   talked about where there may be a dirty urine or a

9   medication missing, that he would counsel the patients?

10  A.      Yes.

11  Q.      Now, in spite of that, there were lots of discharges

12  from the office; am I correct?

13  A.      Yes.

14  Q.      And in fact, let me show you a document and ask you

15  if you recognize this document here.

16           MR. BOSTIC:  Mr. Marek, would you pull up --

17           MS. REMIS:  Objection, Your Honor.  I'm not sure

18  where this comes from.  Where does this come from?

19           (Discussion held off the stenographic record:)

20           MR. BOSTIC:  Sorry.

21  BY MR. BOSTIC:

22  Q.      You know what, with respect to -- let me show you

23  what's been marked as Defense Exhibit 501 and ask you if you

24  have ever seen this document before.  Yeah.

25           MR. BOSTIC:  Hold it, Mr. Marek.  Let me do

1104

Jane Webb - Cross

1  this.

2  BY MR. BOSTIC:

3  Q.    You're aware that there were -- within the office

4  when individuals were discharged, a list was created of

5  discharged individuals; am I correct?

6  A.    Yes.

7           MR. BOSTIC: Okay.  Mr. Marek, would you pull up

8  Defense Exhibit 501.

9           MS. REMIS:  Your Honor, this has not been

10  admitted into evidence yet.

11           THE COURT:  All right.  Well --

12           MR. BOSTIC:  Your Honor, may I approach the

13  witness?

14           THE COURT:  All right.

15           THE WITNESS:  Yes.

16  BY MR. BOSTIC:

17  Q.    Ms. Webb, I just showed you what was marked as

18  Defense Exhibit 501 and asked if you recognize the document?

19  A.    Yes.

20  Q.    Can you tell what this document is that I showed you?

21  A.    When we started to discharge patients, we were trying

22  to keep a tally of the patients, who they are, the discharge

23  date, and what they were discharged for.

24           MR. BOSTIC:  Your Honor, permission to publish?

25           THE COURT:  Yes.

Jane Webb - Cross

 1              MR. BOSTIC:  Mr. Marek, would you pull up the

 2     Defense Exhibit 501.

 3     BY MR. BOSTIC:

 4     Q.    Ms. Webb, you just indicated that you recognized this

 5     document here, Defense Exhibit 501.  And I believe it

 6     consists of about six pages, seven pages.

 7     A.    Okay.

 8              MR. BOSTIC:  Mr. Marek, could you scroll through

 9     the next page, please.

10              And onto --

11     BY MR. BOSTIC:

12     Q.    Do you recognize this part of the document?

13     A.    Yes.

14     Q.    Okay.  Can you scroll through to Page 3, 4, 5, 6, 7.

15              Ms. Webb, this is one of the lists that the

16     office kept --

17     A.    Yes.

18     Q.    -- identifying discharged patients?

19              MR. BOSTIC:  And again, I'll approach the

20     witness with the Court's permission?

21              THE COURT:  Yes.

22              MR. BOSTIC:  Thank you.

23              THE WITNESS:  They're discharge letters.

24              MR. BOSTIC:  Thank you.  Permission to publish,

25     Your Honor.

Jane Webb - Cross

1    BY MR. BOSTIC:

2    Q.    Let me rephrase and go this way.  Ms. Webb, I just

3    showed you what's marked as Defense Exhibit 501A; am I

4    correct?

5    A.    Yes, sir.

6    Q.    And you had a chance to peruse these; am I correct?

7    A.    Yes.

8    Q.    And you indicated to me that these are discharge

9    letters?

10   A.    Yes.

11   Q.    Correct?  Thank you.

12          MR. BOSTIC:  Permission to publish, Your Honor.

13          THE COURT:  All right.

14          MR. BOSTIC:  Mr. Marek, would you -- my

15   apologies, Your Honor.  Apparently, I have to do it the

16   old-fashioned way.

17          If I may approach the witness, Your Honor,

18   sorry, before I put them on the doc cam.

19          THE COURT:  All right.

20          THE WITNESS:  Yes, sir.

21   BY MR. BOSTIC:

22   Q.    I'm just going to show you a sample of these letters,

23   if I may, 501A.  Do you recognize this as a discharge letter

24   that was sent out on April 30, 2013?

25   A.    Yes, sir.

1107

Jane Webb - Cross

1    Q.    Would it be fair to say that the second page is also

2    a discharge letter sent out June 26th, 2013?

3    A.    Yes, sir.

4    Q.    The third page is a letter to Mr. Kelly for discharge

5    date of November 14th, 2013?

6    A.    Yes, sir.

7    Q.    I'll also show you a letter for Jaime Hughes dated

8    November 12th.  I'm sorry, May 12th, 2014.

9    A.    Yes, sir.

10   Q.    And I'm not going to show you all of them.

11   A.    Thank you.

12   Q.    But I know you've seen a lot of documents here today,

13   but this was something that was done consistently throughout

14   the practice while you were there?

15   A.    Yes.

16            MR. BOSTIC:  Now, there are -- if I may approach

17   the witness again, Your Honor.

18            THE COURT:  Yes.

19            MR. BOSTIC:  Let me show you three documents.

20   `        (Discussion held off the record:)

21            THE WITNESS:  Okay.

22   BY MR. BOSTIC:

23   Q.    Okay.  Ms. Webb, I just showed you what's been marked

24   as Defense Exhibit 500, Defense Exhibit 500A and Defense

25   Exhibit 500B.  Did you recognize those exhibits?

Jane Webb - Cross

1  A.    No.

2  Q.    Are you aware of whether -- do they look familiar as

3  if they would be documents that would be contained in

4  patient files for Dr. Titus?

5  A.    I don't know, sir.  I don't recognize them.  They

6  look like billing, and I didn't do billing.

7  Q.    Okay.  I think you left the office in 2014?

8  A.    Yes.

9  Q.    And from the time you met Dr. Titus and worked for

10 him through 2014, would it be fair to say that he continued

11 to try to serve his patients?

12 A.    Yes.

13            MR. BOSTIC:  If I may have a moment, Your Honor.

14 BY MR. BOSTIC:

15 Q.    I do have one other question for you now that I think

16 about it.  We know Dr. Titus took cash.  He took credit

17 cards.  He took insurance and what have you.

18            There was never a sign posted in Dr. Titus'

19 office that said cash only; am I correct?

20 A.    No.

21 Q.    And if there was such a sign posted, you would not be

22 working there; would it be fair to say?

23 A.    Yeah.  But as I said, when we said we took money, we

24 took cash, credit cards and insurance, yes, sir.

25            MR. BOSTIC:  Thank you.  I have nothing else,

Jane Webb - Redirect

1    Your Honor.

2                Your Honor, we would move Defense exhibits into

3    the record at this time.

4                THE COURT:  This would be the 501 exhibits?

5                MR. BOSTIC:  Yes.

6                THE COURT:  501 and 501A?

7                MR. BOSTIC:  501, 501A, yes, those would be it.

8                THE COURT:  All right.  Is there any objection?

9                MS. REMIS:  Just 501 and 501A; is that right?

10   No objection, Your Honor.

11               THE COURT:  All right.  Admitted without

12   objection.

13               (Defense Exhibit Nos. 501 and 501A were admitted

14   into evidence.)

15               THE COURT:  Any redirect?

16               MS. REMIS:  Just a little bit, Your Honor.

17                     REDIRECT EXAMINATION

18   BY MS. REMIS:

19   Q.    Hi Ms. Webb.  Just quickly, I promise.

20               You were asked on cross-examination about

21   several discharges.  I'm just going to put them up here.  Do

22   you remember that?

23   A.    Yes.

24   Q.    And what is the year on all of the discharge dates

25   here?

Jane Webb - Redirect

1    A.     It was like 2010 and '11.

2    Q.     Okay.  And then at the bottom of this page is a date.

3    Do you see that fax date?

4    A.     12/15/2011.

5    Q.     Okay.  And what about the discharge dates here?

6    A.     2011.

7    Q.     And at the bottom, what's the fax date?

8    A.     12/15/2011.

9    Q.     Okay.  Again, year here?

10   A.     2011.

11   Q.     Same here, '11?

12   A.     Yes.

13   Q.     Okay.  And here, the only date is the fax date at the

14   bottom; right?

15   A.     Yes, 12/15/2011.

16   Q.     Okay.  And same with this one; right?

17   A.     Yes.

18   Q.     And that one, too?

19   A.     Yes.

20   Q.     Okay.  If we could pull up Government Exhibit 614,

21   please.

22          Now, this is a Consent Agreement.  If we could

23   go to the last page, which I think is Page 5.  Do you see

24   who signed this agreement?

25   A.     Dr. Titus and someone from the department -- the

Jane Webb - Redirect

1   Deputy Attorney General.

2   Q.    And on what date?

3   A.    3/22/12.

4   Q.    Okay.  And if we could go to the first page of this

5   exhibit, please.  And if you could read Paragraph 2, please.

6   A.    "Number C1-0006175 was first issued in" -- I'm sorry.

7   "Dr. Titus' controlled substances registration, number

8   MD3949, was issued in 2001 and was suspended on December 8,

9   2011."

10  Q.    Okay.  And so you testified on direct about the

11  suspension; right?

12  A.    Right.

13  Q.    And this is the suspension that started on

14  December 8th, 2011?

15  A.    Okay.

16  Q.    And so this date here -- let me just switch back

17  here -- at the bottom here, December 11, 2011, that's just a

18  few days after the suspension of his controlled substance

19  registration; correct?

20  A.    Yes.

21  Q.    So patients that were getting controlled substances

22  had to be discharged because he didn't have a controlled

23  substance registration; right?

24  A.    Yes.

25  Q.    Now, you were also asked on cross-examination about

Jane Webb - Redirect

1    this packet of discharge letters; right?

2    A.    Right.

3    Q.    Was it fairly common for you to write up discharge

4    letters when you saw a reason for discharge?

5    A.    Yes.

6    Q.    And sometimes that would be because of a drug test,

7    or heroin, or some other sort of issue; right?

8    A.    Right.

9    Q.    Now, did Dr. Titus always, in fact, discharge the

10   patients when there was a typed-up discharge letter?

11   A.    No.

12   Q.    I'm going to show you just some of these.  This is

13   Defense Exhibit 501A.  It's the discharge letter for Deborah

14   Johnson on July 24th, 2014.  Do you see that?

15   A.    Yes.

16   Q.    And you know what, I got the wrong one.  So I will

17   take that back.

18        Let's look at Philip Williams on page -- I don't

19   know what page this is, but it's December 26th, 2013.

20   A.    Okay.

21   Q.    And copied on this same page is a prescription for

22   Mr. Williams dated four days later; is that right?

23   A.    Yes.

24   Q.    And that prescription is for 90 Percocet ten, 325s?

25   A.    Yes.

Jane Webb - Redirect

1   Q.     And there's also a discharge letter in here for Annie

2   Irving on December 4th, 2013; right?

3   A.     Right.

4   Q.     And then I'm going to show you, which is Government

5   Exhibit 137 at Page 2.  That is a prescription for Annie

6   Irving; right?

7   A.     Yes.

8   Q.     On what date?

9   A.     12/5/13.

10  Q.     And what's it for?

11  A.     Oxycodone.

12  Q.     And the reason for Annie Irving's discharge the day

13  before was having three tox screens that are negative for

14  prescribed pain medication; is that right?

15  A.     Yes.

16  Q.     So fair to say that just because there was a

17  discharge letter doesn't mean the patient was actually

18  discharged; right?

19  A.     Right.

20          MS. REMIS:  Just one moment, please.

21          No further questions, Your Honor.

22          THE COURT:  All right.

23          MR. BOSTIC:  Your Honor, very, very briefly.

24          THE COURT:  All right.

25              RECROSS EXAMINATION

1114

Jane Webb - Recross

1    BY MR. BOSTIC:

2    Q.    Would you agree with me that the discharge would

3    ordinarily be prepared prior to the patient coming in the

4    office?

5    A.    Yes, sir.

6    Q.    And in fact, you can have a discharge of 5/13 and

7    signed, the patient comes in three days later, and that's

8    when they're actually discharged?

9    A.    Yes, sir.

10   Q.    And in fact, you talked a little bit about that

11   Dr. Titus believed that he had to provide a script for pain

12   medication to individuals that he was discharging to allow

13   them time to have the medication while they searched for

14   another doctor?

15            THE COURT:  So I'm going to sustain the

16   objection to that question as asked.

17   BY MR. BOSTIC:

18   Q.    Let me rephrase that question for you.  The

19   Government showed you a discharge letter in 501A, am I

20   correct, in which they also showed you a prescription for

21   Ms. Irving, I believe it was?

22   A.    Okay.

23   Q.    And you had testified earlier on direct to the

24   Government's initial examination that Dr. Titus believed

25   that once he discharged an individual, that he had to

Jane Webb - Recross

1   provide them with a prescription to allow them time to have

2   the medication before seeing another doctor?

3              THE COURT:  All right.  So Mr. Bostic, the

4   question as to what he believed, I'm going to sustain the

5   objection to that as many times as you ask it.

6              MR. BOSTIC:  I'll rephrase it again.

7   BY MR. BOSTIC:

8   Q.    You indicated on direct that Dr. Titus would provide

9   a prescription at the time of discharge to an individual so

10  that individual would have medication as the person searched

11  for a new lawyer -- I'm sorry, a new doctor.  Let me

12  rephrase that question.

13             You testified on direct that Dr. Titus, upon

14  discharging a patient, would also provide them a

15  prescription for pain medication which would allow them to

16  have the medication while they searched for another pain

17  doctor?

18  A.    Yes, sir.

19  Q.    You're shaking your head.  Thank you.  I finally got

20  it right.

21             Now, Defense Exhibit 501.

22             MR. BOSTIC:  Mr. Marek, could you pull up

23  Defense Exhibit 501 for me, please.

24  BY MR. BOSTIC:

25  Q.    The Government showed you a fax line, I believe, on

Jane Webb - Recross

1   the bottom of these pages, 501.  Would it be fair to say

2   that these discharges took place prior to the day the

3   document being faxed to whomever it was faxed?

4   A.    Yes.

5           MR. BOSTIC:  Thank you.  Nothing else, Your

6   Honor.

7           THE COURT:  All right.  Ms. Webb, you're

8   excused.  You may go.

9           THE WITNESS:  Thank you.

10          MS. REMIS:  The United States calls Michael

11  Petron.

12          DEPUTY CLERK:  You can just, yeah, right there.

13          THE WITNESS:  Can I take this off?

14          DEPUTY CLERK:  Yeah.  Please state and spell

15  your full name for the record.

16          THE WITNESS:  It's Michael John Petron,

17  P-E-T-R-O-N.

18          DEPUTY CLERK:  Do you affirm that the testimony

19  you are about to give to the Court and the jury in the case

20  now pending will be the truth, the whole truth and nothing

21  but the truth, you do so affirm?

22          THE WITNESS:  I do.

23          MICHAEL PETRON, the witness herein, after having

24  been duly affirmed under oath, was examined and testified as

25  follows:

Petron - Direct

1          DEPUTY CLERK:  Thank you.

2                  DIRECT EXAMINATION

3    BY MS. REMIS:

4    Q.      Good afternoon, Mr. Petron.

5    A.      Good afternoon.

6    Q.      Could you, please, introduce yourself to the jury?

7    A.      Sure.  My name is Michael Petron.  I'm from

8    Arlington, Virginia, and I work at a firm named Stout,

9    S-T-O-U-T.

10   Q.      And what is Stout?

11   A.      Stout is a global advisory firm that specializes in

12   investment banking valuations and dispute consulting.

13   Q.      And where is Stout located?

14   A.      We're headquartered in Chicago.  We have offices in

15   23 different cities across the world.  I am located in

16   Washington, D.C.

17   Q.      What did you do or how long have you worked at Stout

18   for?

19   A.      A little over seven years.

20   Q.      And what did you do before you worked at Stout?

21   A.      The same thing for a different firm.

22   Q.      What's your educational background?

23   A.      I have an undergraduate degree with a double major in

24   economics and statistics from the George Washington

25   University.  I have one master's degree in statistics from

Petron - Direct

1    George Mason University and a second master's degree in

2    accounting from the George Washington University.

3    Q.     Do you have any professional qualifications or

4    licenses?

5    A.     I do.  I'm a certified public accountant licensed in

6    Virginia and a certified fraud examiner.

7    Q.     And what's a certified fraud examiner?

8    A.     It is a credential obtained from the Association of

9    Certified Fraud Examiners, which is an organization that's

10   devoted to detecting white collar crime.

11   Q.     Do you have any areas of specialty at Stout?

12   A.     I do.  I have two principal functions.

13   Q.     And what are those?

14   A.     The first is what I'd call client service, what I'm

15   doing here today, working in the arenas of data analysis and

16   forensic accounting.  And the second is I run

17   administratively our entire dispute consulting practice.

18   Q.     And what kinds of tools do you use in your forensic

19   accounting work at Stout?

20   A.     I use a variety of tools, a variety of different

21   software, the computer mainly.  I'm looking, constantly

22   looking at financial statements and large groups of data.

23   Q.     And what kinds of tools do you use to conduct data

24   analysis and data analytics?

25   A.     Again, a variety of them.  Anything from something

1119

Petron - Direct

1    called SQL, which is S-Q-L to a programming language called

2    SAS, S-A-S, to just generalized Microsoft Office, Microsoft

3    Excel, that type of thing.

4    Q.    You mentioned you have an educational background in

5    statistics; right?

6    A.    I do.

7    Q.    Do you utilize your statistics background at Stout?

8    A.    I do.

9    Q.    And in what way?

10   A.    Well, the statistics background leads me to a few

11   different things.  Primarily, I would say data analysis.  So

12   the examination of large amounts of data, data that you

13   couldn't print out and just look at, things that are in the

14   computer.  And I also do a lot of what's called statistical

15   sampling.

16   Q.    And what is statistical sampling?

17   A.    It's merely the act of taking a small group from a

18   larger group.

19   Q.    And what's the purpose of sampling?

20   A.    It's basically to infer about the larger group, but

21   only having to look at a small group.

22   Q.    Can you give a real-life example of when sampling

23   might be used?

24   A.    Sure.  Most common that comes to mind is say

25   political polling, right.  If you think about every

Petron - Direct

1    election, there is a poll about who thinks who is going to

2    win.  That's all done through sampling.

3    Q.    And so when a poll comes out, are the pollsters

4    asking, for example, everybody in Vermont what they think

5    about a candidate?

6    A.    No, they would not.

7    Q.    What are they asking?

8    A.    So they're going to ask, again, a small subset of

9    people of Vermont who they're going to vote for and that is

10   extrapolated to the state.

11   Q.    When you say "extrapolated," what do you mean

12   exactly?

13   A.    I mean inferred.  So you take that small sample of

14   folks in Vermont and then from their responses, you infer

15   how the state will act and vote.

16   Q.    Have you testified in the past?

17   A.    I have.

18   Q.    About how many times?

19   A.    Twenty-five approximately.

20   Q.    Okay.  And have you ever testified as an expert

21   before?

22   A.    I have.

23   Q.    Have you testified as an expert in criminal cases?

24   A.    I have.

25   Q.    Who, generally speaking, are your clients that hire

Petron - Direct

1   you to testify?

2   A.    Generally speaking, my largest client is the

3   Department of Justice, but I work for private industry.  I

4   work for defense, and I work for a variety of law firms.

5   Q.    And do we work for the Department of Justice?

6   A.    You do.

7   Q.    How much of the work that you do at Stout is for the

8   Department of Justice?

9   A.    It varies from time to time.  I would say anywhere

10  between 50 to 75 percent of my work.

11  Q.    Now, you mentioned you have other clients as well.

12  Who are those other clients?  Not specifically, but just

13  generally?

14  A.    In general, they could be other regulators, State

15  regulators.  They are private defendants, so these are

16  corporations or individuals.  They can be companies that

17  need help on internal control issues, or systems issues, or

18  document issues.  It really runs the range and a lot of law

19  firms.

20  Q.    You mentioned "private defendants."  Have you ever

21  testified on behalf of a private defendant?

22  A.    I have.

23          MS. REMIS:  And Your Honor --

24          THE COURT:  You may proceed.

25          MS. REMIS:  Okay.  Without asking him.

Petron - Direct

1           THE COURT:  Mr. Bostic or Ms. Kousoulis, do you

2    have any questions?

3           MR. BOSTIC:  No objection to his qualifications.

4           MS. REMIS:  Okay.

5    BY MS. REMIS:

6    Q.     Were you hired to assist the Government in its

7    investigation into Patrick Titus?

8    A.     I was.

9    Q.     And about when were you retained?

10   A.     I believe some time in February of 2020.

11   Q.     And what were you hired to do, just in general?

12   A.     In general, two things.  I was asked to review some

13   data, data from a prescription monitoring program, and I was

14   also asked to draw a sample of patients.

15   Q.     And when you say the "prescription monitoring

16   program," is that called PMP for short?

17   A.     Correct.

18   Q.     And then you mentioned drawing a sample of patients?

19   A.     That's right.

20   Q.     How many patient files did you review in order to get

21   that sample?

22   A.     Well, we reviewed a bunch of data to arrive at a

23   patient population and then we took a sample of 300 patients

24   from the population.

25   Q.     Okay.  And was that a random sample?

Petron - Direct

1    A.      It was.

2    Q.      Were you hired to make any medical conclusions?

3    A.      Absolutely not.

4    Q.      Do you have a medical background at all?

5    A.      I do not.

6    Q.      Do you have any personal knowledge of the facts in

7    this case?

8    A.      I have no knowledge, no.

9    Q.      So will your testimony today be based only on your

10   review of the PMP and of the patient files that you

11   selected?

12   A.      That is correct.

13   Q.      Was Stout paid for its analysis in this case?

14   A.      It was.

15   Q.      And to date, how much has Stout billed the Government

16   for its services?

17   A.      Approximately $100,000.

18   Q.      What did those services entail?

19   A.      So I would say of those principle tasks, the data

20   analysis was of four different states of PMP records, and

21   then the sample review selection and the sample review of

22   the 300 patient files, and then my time today, and the time

23   we put together the summary exhibits that I'm showing.

24   Q.      Sorry what was the last part?

25   A.      And the summary exhibits that I am assuming we will

1124

Petron - Direct

 1    review.

 2    Q.    About how many hours did Stout spend on this case,

 3    would you say?

 4    A.    I'd say probably somewhere in the 400 to 450-hour

 5    range.

 6    Q.    Did you personally do all four?

 7    A.    Absolutely not.

 8    Q.    Who helped you with it?

 9    A.    I have a great team of folks who assist me doing a

10    lot of the tasks that I'd rather not do.

11    Q.    Did you review the work of your team members?

12    A.    Absolutely.

13    Q.    Are you here to testify to the conclusions that you

14    drew with respect to the work that Stout did analyzing the

15    files and the PMP?

16    A.    I am.

17    Q.    And were you paid to make a specific conclusion?

18    A.    No, I was paid to do the work and to report my

19    findings.

20    Q.    And did your ultimate conclusions depend on the

21    payment that you received?

22    A.    They did not.

23    Q.    Okay.  I want to start by talking a little bit about

24    the PMP data.  Were you provided with various sets of

25    prescription monitoring program data?

Petron - Direct

1    A.      Correct.  Four sets.

2    Q.      And where were the four sets from?

3    A.      Delaware, New Jersey, Pennsylvania and -- Delaware

4    New Jersey Pennsylvania.  Where is the fourth one?

5    Q.      I think Maryland.

6    A.      Maryland, there we go.

7    Q.      The four states that are nearby to including

8    Delaware?

9    A.      The four states that are nearby.  I drove through

10   Maryland today.

11   Q.      Whose PMP data were you provided?

12   A.      Dr. Titus'.

13   Q.      What's your understanding of what the PMP data is?

14   A.      It's my understanding that that data is the data on

15   filled prescriptions in each of those states by

16   beneficiaries or patients of Dr. Titus for certain

17   medications.

18   Q.      And what kind of information does the PMP track?

19   A.      It would track information about the prescription

20   itself so that, say, the date written, the date that those

21   prescriptions are filled in a pharmacy, what the

22   prescription is for, the strength of the prescription, the

23   patient's name, the patient's demographic information

24   potentially, their address, the doctor's information, the

25   doctor's address, that type of thing.

Petron - Direct

1   Q.      And in what format were you provided the PMP data?

2   A.      They were in Microsoft Excel files, if I recall.

3   Q.      Is it generally the same types of information from

4   each state that you received?

5   A.      It is.

6   Q.      After reviewing the raw PMP data from Maryland,

7   Delaware, Pennsylvania and New Jersey, did you do anything

8   to the data?

9   A.      Yes, I did.

10  Q.      What did you do?

11  A.      So a few things.  First, I took the four, if you

12  think about the four data sets, and I made them into one

13  data set because why do something four times if I could do

14  it once.  And then that led to me realizing that there's

15  duplicates within that data.  So I de-duplicated any records

16  I found that were in two states.

17  Q.      Aside from combining and de-duplicating, did you or

18  Stout manipulate the data in any way?

19  A.      No.

20  Q.      What were you looking for when you reviewed the PMP

21  data?

22  A.      Really, a variety of things.  We were looking for the

23  number of patients.  We were looking for patient locations.

24  We were looking for the types of drugs that were being

25  prescribed.  We were looking for the location of the

Petron - Direct

1    patients themselves.  The strength of the drugs.  The

2    delivery mechanism of the prescriptions.  Really as much

3    information as was available, we tried to analyze it.

4    Q.    And did you create several summary charts based on

5    your review of the PMP data?

6    A.    I did.

7    Q.    Okay.

8          MS. REMIS:  Your Honor, the Government moves to

9    admit Government Exhibits 801, 802 and 803, which we'll use

10   throughout this testimony.

11         MS. KOUSOULIS:  No objection.

12         THE COURT:  All right.  Admitted without

13   objection.

14         (Government Exhibit Nos. 801, 802 and 803 were

15   admitted into evidence.)

16         MS. REMIS:  May I approach the witness, Your

17   Honor?

18         THE COURT:  Yes.

19   BY MS. REMIS:

20   Q.    Okay.  Mr. Petron, do you have before you Government

21   Exhibit 801?

22   A.    I do.

23   Q.    And did you create and review these exhibits before

24   coming to court today?

25   A.    I did.

Petron - Direct

1    Q.      About how many pages are in Government Exhibit 801?

2    A.      Sixty-seven.

3    Q.      Okay.  Let's start on Page 1.  So Government

4    Exhibit 801, Page 1, please.  Okay.

5            And what are we looking at here?

6    A.      So this is a summary of the data that I received, the

7    PMP data I received.  And there are two columns of subset

8    information.

9            The first column is just all of the data I had.

10   And the second column is a column of what I say is a limited

11   data subset that was limited by time.

12           So just to walk you through it, I had data from

13   approximately January 11th, 2011 through January 2nd, 2015,

14   for 1,854 patients.  I was asked to limit that data to the

15   specific dates in the far right column, November 4th, '13

16   through December 19th, and that led to a reduction of

17   patients.  And so I had a final patient count of 935.

18   Q.      And when you say "935," is that 935 unique patients?

19   A.      That's correct.

20   Q.      Meaning different individuals?

21   A.      Correct.

22   Q.      And did you also limit the data by specific types of

23   prescriptions?

24   A.      Eventually I did, yes.

25           MS. REMIS:  Okay.  Let's go very quickly to

Petron - Direct

1    Government Exhibit 202, please.

2    BY MS. REMIS:

3    Q.     Now, you mentioned you limited the database on

4    November 4th, 2013; is that right?

5    A.     That is correct.

6    Q.     And I'm showing you just the Lease Agreement that is

7    signed between Mobious Investments and Lighthouse Internal

8    Medicine.  And the date on the top, what is it right there?

9    A.     It's November the 4th, 2013.

10            MS. REMIS:  Okay.  If we could go back to 801,

11   Page 2, please.

12   BY MS. REMIS:

13   Q.     Now, there was a little notation on the first

14   graph chart we looked at that said that it was including

15   only certain prescriptions; is that right?

16   A.     That is correct.

17   Q.     And are these the drugs that you were looking for,

18   specifically?

19   A.     Correct.  So I -- I refer to these drugs as drugs of

20   interest, and they were on Schedule II.  That's, I think,

21   all of the drugs on Schedule II that I was able to find, and

22   then a certain list of drugs on Schedule IV.

23   Q.     And how did this list get created?

24   A.     I think you gave me the list.

25   Q.     Okay.  Now, let's move on to Government Exhibit 801,

Petron - Direct

1    Page 3, please.

2              And just limited to the shorter time frame you

3    looked at, November 4th, 2013 through December 19th, 2014,

4    what information did you find out from the PMP?

5    A.    So, again, with those dates, we have 935 patients.

6    There were a total of 20,504 unique prescriptions.  Those

7    prescriptions accounted for 1,288,000 pills and 9,820

8    patches.  There was one drug that was delivered through a

9    patch instead of a pill.

10   Q.    And which drug was that?

11   A.    Fentanyl.  Or one type of Fentanyl.

12   Q.    Okay.  And so for those 935 patients during that time

13   frame, according to the PMP, Dr. Titus prescribed almost 1.3

14   pills and almost 10,000 patches of Fentanyl?

15   A.    1.3, just shy of 1.3 million pills and 9.820 patches.

16   Q.    Okay.

17             MS. REMIS:  Let's go to Government -- the next

18   page, Page 4, please.

19   BY MS. REMIS:

20   Q.    What are we looking at in this graph?

21   A.    So this is a graph of basically that same

22   information.  I tend to like to look at pictures and not

23   numbers, even though I'm an accountant.  So this is a

24   monthly total of all of those prescriptions by month during

25   that relevant time period.  So to read this, if you start on

1131

Petron - Direct

1    the left, November '13, there's roughly, I'll estimate,

2    1,800 prescriptions.  Right.  And as you move along that

3    orange line, all the way to December '14, it goes eventually

4    to zero.

5    Q.    Okay.  And do you know factually why the graph ends

6    at December 14th, 2014?

7    A.    I believe I read at some point that that's when the

8    practice closed --

9    Q.    Okay.

10   A.    -- but I don't have any independent knowledge of

11   that.

12   Q.    Okay.  And so did you contrast this monthly

13   prescriptions for drugs of interest with any other

14   information you received?

15   A.    I did.

16   Q.    What did you compare it to?

17   A.    I was provided with an Excel file that had a summary

18   of payments from the patients, and so I did a monthly

19   comparison of prescriptions to payments.

20   Q.    Okay.  If we could go to Government Exhibit 804,

21   Page 8, please.

22         Was this the information you compared the

23   monthly prescriptions to?

24   A.    That's correct.

25   Q.    And what is this information?

Petron - Direct

1   A.     So this is, again, a timeline or a chart of monthly

2   payments by patients to Dr. Titus.

3   Q.     Okay.  If we could go back to Government Exhibit 801,

4   Page 5, please.  What is this?  Is this that comparison?

5   A.     It is.  So it's that chart that we just looked at

6   that I was provided.  I overlayed it on -- the blue line

7   onto the orange line and really the only complicated factor

8   was I had to put the dollars on the right-hand axis and the

9   prescriptions on the left-hand Y axis so you can see them

10  both together.

11  Q.     And what is the relationship between these two lines

12  generally?

13  A.     They look relatively correlated to me.

14  Q.     So the more payments that came in, the more drugs of

15  interest that were prescribed and filled?

16  A.     Correct.

17  Q.     Okay.  Let's go on to Government Exhibit 801, Page 6,

18  please.

19         Could you walk the jury through this pie graph,

20  please?

21  A.     Sure.  So this is a graphic of purely the Schedule II

22  drugs.  And I tried to break this down visually so that you

23  can see the relative proportion of what Schedule II drugs

24  were prescribed.

25  Q.     Okay.  And what were your findings based on the PMP

Petron - Direct

1    data?

2    A.      So as you can see, the vast majority were some type

3    of Oxycodone product and that could be a generic or a brand

4    name, say Percocet, something like that.  I lumped them all

5    together and that accounted for roughly 69 percent of the

6    total Schedule II.  And then the next largest is the orange

7    there on the right, that's Methadone.  Almost 13 percent for

8    2,583 prescriptions.

9    Q.      And what is -- okay.  So that's -- the number next to

10   the percentage is the prescription?

11   A.      Yeah, I'm sorry.  I should have -- yeah, the first

12   number is the number of prescriptions, and the second number

13   is the relative ratio.

14   Q.      Okay.  And let's go on to the next page, please,

15   Page 7.

16           Does this show similar information?

17   A.      It does.

18   Q.      And what does it describe?

19   A.      This is basically the chart of the top, I'd say, five

20   drugs in all other categories.  So all Schedule II drugs is

21   proportioned and then the bottom line is all drugs of

22   interest.  So it's comparing the Schedule II drugs versus

23   all drugs.

24   Q.      So in total, there were 1,298,773 pills and patches

25   related to the drugs of interest that you were considering;

Petron - Direct

1    is that right?

2    A.      Correct.

3    Q.      And of that, how many were Schedule II drugs?

4    A.      97.6 percent.

5    Q.      Okay.  And what was the most commonly filled

6    prescription?

7    A.      Some type of Oxycodone product.

8    Q.      And about how many pills of Oxycodone products were

9    there in total?

10   A.      Just over a million.

11   Q.      Are there any patches included in that number?

12   A.      No.  No, there would not be any patches in that

13   number.  The patches would be in row four, the Fentanyl.

14   The 9.820, those were patches.

15   Q.      So all the others are pills?

16   A.      That is correct.

17   Q.      Let's go to Page 8, please.

18           And we looked at the pie chart on Page 6.  And

19   then in the previous charts on Page 7, there was a topic, a

20   segment called Oxycodone products; correct?

21   A.      Correct.

22   Q.      Does this chart break out what's included in those

23   Oxycodone products?

24   A.      It does.

25   Q.      And what did you find from the PMP?

Petron - Direct

1    A.     Well, in the PMP, as you can see, there was one

2    Oxycodone product that was clearly -- I mean, the vast

3    majority, 76.8 percent of the patients received that first

4    row, Oxycodone 15-milligram tablet.  That accounted for

5    10,075 prescriptions, just shy of 800,000 pills.

6    Q.     And what were the other very common type of Oxycodone

7    that were prescribed?

8    A.     So you had the, I'd say, the compounds, the Oxycodone

9    and acetaminophen mixtures.  Those are all delineated, say,

10   row two, row seven, row eleven, the double numbers.  Those

11   are the compound, the two drugs in one, and then just

12   varying strengths of Oxy or Oxycontin or other forms of

13   Percocet.

14   Q.     So just based on looking at this graph, there are

15   various strengths available for Oxycodone; right?

16   A.     Correct.  There are, yes.

17   Q.     And the same is true for Oxycontin; right?

18   A.     Correct.

19   Q.     And how many total Oxycodone products were prescribed

20   between November 4th, 2013 and December 31st, 2014?  And I

21   should say how many were filled?

22   A.     Yeah, so the -- in the PMP data, that's that yellow

23   row.  So 13,848 different prescriptions were filled.  Just

24   over 100 million pills for 868 unique patients.

25   Q.     Okay.  And it says -- there's like a little two next

Petron - Direct

1   to the 868 that says at the bottom, "Number of patients is

2   not additive due to some patients receiving prescriptions

3   for multiple drugs."

4            What does that mean?

5   A.     So if you look at the column that says number of

6   prescriptions, and you were to add all those numbers

7   together, you will get 13,848.  If you do that for the

8   patients, you're not going to get 868.  And it's not because

9   I made a math error, it's because one patient, I could be in

10  the first two rows, right.  I could have gotten different

11  types of Oxycontin or Oxycodone.  And so what I'm trying to

12  give you is the number of patients that got a unique type of

13  prescription, but also the total number of unique patients

14  that got any prescription.  And that's what's the bottom

15  number.

16  Q.     So included in the 868 could be, for example, a

17  patient who got a prescription for both Oxycodone 15 and

18  Oxycontin 30?

19  A.     Correct.

20  Q.     Okay.  And now just going back to the top line, is

21  this saying that 718 of the 935 patients got a prescription

22  for Oxycodone 15 milligrams?

23  A.     Exactly.

24  Q.     Okay.  And what percent of the patients is that?

25  A.     That's 76.8 percent of the patients.

Petron - Direct

1    Q.      Okay.  Let's go to Page 9, please.

2    A.      So Page 9 is a list of just the most frequent

3    prescriptions ranked in order by number of prescriptions

4    and, again, most of them will be one type of that Oxycodone

5    project -- product, but Methadone ended up being the second

6    largest at 2,583 prescriptions for just over 112,000 pills.

7    And then what do -- we got some Morphine 5, row five and

8    row seven were in the top ten.  And Fentanyl was the tenth

9    largest.

10   Q.      And so just on the last chart we were looking at,

11   there were 718 patients you said who had gotten Oxycodone 15

12   prescriptions.  That's the same as the line here, Number 1?

13   A.      That's correct.

14   Q.      And I think you said 76.8 percent of the 935 patients

15   got a prescription for Oxycodone 15?

16   A.      That's correct.  It's the same.  It's the same

17   numbers on this one.  It's the same project.

18   Q.      Yeah.  Okay.  Again, you have a note here that the

19   number of patients is not additive.

20   A.      Same reason.

21   Q.      Same reason.  So one patient could have gotten

22   Methadone and Oxycodone?

23   A.      And in that case, it would only be one in the 870

24   number, but it would be obviously two for each respective

25   row above.

Petron - Direct

1    Q.      Okay.  So in total, you looked at the total drugs of

2    interest and that was about 1.3 million pills or patches.

3    How many of those pills or patches came from one of these

4    top ten categories?

5    A.      You can see 1.119 million.

6    Q.      Let's go on to Page 10, please.

7            What information were you trying to capture in

8    this chart?

9    A.      So this chart has a good deal of information.  So

10   I'll try to take it line by line.  What I was attempting to

11   capture was the location of the patients with respect to the

12   doctor's office that was prescribing the drugs.  And so what

13   I did was I would put a few pieces of information here.  One

14   is the blue line which represents the number of patients.

15           Then I have a bar that represents the percentage

16   of prescriptions written.  And those bars, so the first

17   yellow bar, roughly, call it 24 percent, just give or take,

18   but then that bar represents 272 patients that when I did a

19   calculation of their location versus the prescribing

20   physician was less than ten miles between the two.

21           So take it to the far right-hand side, there

22   were 61 patients that their location was greater than

23   50 miles from one of Dr. Titus' offices or the main

24   Dr. Titus office.

25   Q.      And where did you get the information about or how

1139

Petron - Direct

1   did you get the information about where these patients

2   lived?

3   A.      It's within the PMP data.

4   Q.      That would be their address?

5   A.      Yes, correct.

6   Q.      Okay.  And where did you get the information about

7   where Dr. Titus' office was located?

8   A.      That's also contained within the PMP data, and

9   99 percent of the time it was that -- we looked it up,

10  basically, and I believe it was that address.

11  Q.      That's 10-12 North Church Street?

12  A.      That sounds right.

13  Q.      And based on your review of the PMP data and of the

14  patient files we'll talk about in a little bit,

15  approximately how many prescriptions did Dr. Titus appear to

16  write to these patients every month?

17  A.      By and large, most patients got two every month.

18  Q.      So when we're looking at this chart, this means that

19  129 patients drove between 30 and 50 miles to get to

20  Dr. Titus' office twice a month?

21  A.      That's correct.

22  Q.      And 61 patients likely drove over 50 miles to get to

23  Dr. Titus' office to pick up their prescriptions two times a

24  month?

25  A.      Correct.

Petron - Direct

1    Q.    Okay.  And all of that information in this chart is

2    contained in the PMP; right?

3    A.    That is right.

4             MS. REMIS:  Okay.  Let's move on to Government

5    Exhibit 801, Page 10.  Page 11, please.

6    BY MS. REMIS:

7    Q.    And what are we looking at on this chart?

8    A.    So the PMP data had information on when a

9    prescription was written in it.  So all I did was I

10   basically summarized all of the data by the date the

11   prescriptions were written and then sorted largest to

12   smallest and captured the ten, what I call, the busiest

13   days.  So the ten days for which the most prescriptions were

14   written, and providing the number of patients, the number of

15   prescriptions, number of pills and or patches that were

16   prescribed on those days.

17   Q.    And again, just to be clear, you testified a moment

18   ago that you saw on the PMP and in the patient files that

19   patients got prescriptions twice a month; right?

20   A.    In general.

21   Q.    And just because there's 194 prescriptions here,

22   you're not testifying that that's how many people were in

23   Dr. Titus' office on a day; right?

24   A.    I mean, I have no -- just looking at the data, I have

25   no idea what happened.

Petron - Direct

1    Q.     Okay.  So how many pills were prescribed on the

2    busiest days for prescriptions, as you've called it?

3    A.     So the busiest day, January 2nd, 2014, there were

4    prescriptions for 124 unique individuals.  Those individuals

5    got 194 prescriptions and that amounted to 13,639 pills and

6    30 patches.

7    Q.     Okay.  And did you observe any sort of patterns about

8    the dates that are included in the top ten busiest days?

9    A.     My first inclination when I saw this was I noticed

10   the relative nature of the dates to holidays.

11   Q.     So like New Year's on the first one?

12   A.     Correct.

13   Q.     Christmas on the fourth one?

14   A.     Thanksgiving, yes.

15             MS. REMIS:  Let's move on to Government

16   Exhibit 801, Page 12, please.

17   BY MS. REMIS:

18   Q.     What does this chart show?

19   A.     So this is a chart -- there was -- I reviewed an

20   indictment.  There were certain patients called out in that

21   indictment.  And so I went and found those patients, and I'm

22   summarizing all of the PMP data relating to those patients.

23   Q.     And so did you -- you know, we talked earlier about

24   how you limited the time frame for your other analysis to

25   November 4th, 2013 through December 2014.  Did you do the

1142

Petron - Direct

1    same with respect to these 14 patients?

2    A.    So with respect to these patients, I used all of the

3    data I had.  I don't know if I have all the data, but I used

4    what I had.

5    Q.    Okay.  And so did you limit your review to the time

6    period that these patients showed up in the PMP whether or

7    not it was before November 2013?

8    A.    Correct.  If it was in 2011 or '12, I captured that

9    information here, but I don't know if there's data before

10   2011 or after 2014.  I never got any data.

11   Q.    So for some of these patients, it's possible that

12   they got prescriptions before the first prescription date

13   listed on this chart?

14   A.    I guess it's possible.  I have no knowledge, one way

15   or the other.

16   Q.    Okay.  And again, would you just walk us through --

17   for example, let's talk about the first line, Brent Hood.

18         What did you find?

19   A.    So I found the first prescription date -- I'm sorry.

20   I used Rx for prescription.  First prescription date was

21   October 1st, 2012.  The last date I have a prescription,

22   August 21st, 2013.  There were 30 prescriptions written in

23   total during that time period.  And there were prescriptions

24   for 1,350 Oxycodone pills and 360 Methadone pills.  No

25   Fentanyl patches and no Morphine pills.

Petron - Direct

1   Q.      And under the column called Oxycodone, is that all

2   Oxycodone products or just Oxycodone specifically?

3   A.      It's all of the products that we talked about before.

4   Q.      So that could be Oxycontin, Percocet, all of those?

5   A.      Correct.  Yes, ma'am.

6   Q.      Okay.  Let's go down next to Scott Jones.  How many

7   total prescriptions did Scott Jones get between

8   September 2011 and September 2013?

9   A.      Fifty-nine total prescriptions.

10  Q.      And all of them for Oxycodone?

11  A.      Correct.

12  Q.      And or I should say Oxycodone products?

13  A.      Oxycodone products.

14  Q.      Okay.  And how about Delores Perry?

15  A.      Twenty prescriptions, and she got Oxycodone products

16  and Morphine.

17  Q.      Okay.  What about Maryjane Mench?

18  A.      Seventy-two prescriptions and she received all four

19  types.

20  Q.      And I keep doing this to people, but could you do a

21  little mental math and tell us about how many pills

22  Ms. Mench received in those 72 prescriptions that she

23  received?

24  A.      Sure.  4,750 and some change.  4,750, around there.

25  Q.      You said you have an accounting degree; right?

Petron - Direct

1    A.    I have a degree in statistics, but doing math on a

2    witness stand is more calculated, let's just say that.

3    Q.    Let's do Ms. Dione Dickerson.  How many prescriptions

4    did she get in about a two and a little bit year time

5    period?

6    A.    All right.  She got 43 prescriptions for Oxycodone

7    and Morphine, and I can do that math.  That's 2,600.

8    Q.    That was pretty straightforward.  What about Lisa

9    Parsons?

10   A.    Eighteen prescriptions for Oxycodone and Fentanyl.

11   Q.    And Gregg Smith?

12   A.    Sixty-six prescriptions.  Again, Oxycodone and

13   Fentanyl.

14   Q.    And then let's go down to Chasity Calhoun on line

15   number ten.  During the time period she received

16   prescriptions, according to the PMP, how many total

17   prescriptions did she get?

18   A.    Sixty-one prescriptions, mostly Oxycodone, but a

19   little Methadone.

20   Q.    Okay.  Over 4,100 Oxycodone pills?

21   A.    Not over.

22   Q.    Sorry.  Forty-one?

23   A.    4,100.

24   Q.    This is exact?

25   A.    Yes.

Petron - Direct

1    Q.    Okay.  And how about Michael Adams, how many

2    prescriptions did he get during the course of the three or

3    so years that he saw Dr. Titus?

4    A.    He got 89 prescriptions, just over 5,200 Oxycodone

5    pills, 720 Methadone.

6    Q.    Okay.  And Lucille Moody?

7    A.    Eighty-six prescriptions, 4,070 Oxycodone.

8    Q.    And what about Ms. Silbereisen?

9    A.    Seventy-seven prescriptions.  4,771 Oxycodone pills

10   and 140 Fentanyl.

11   Q.    So just for these 14 patients, the 14 patients alone,

12   how many prescriptions did they get between September 2011

13   and November 2014?

14   A.    So we have 720 prescriptions, just over 40,000

15   Oxycodone pills, 2,385 Methadone pills, 900 Fentanyl

16   patches, and 900 Morphine pills.

17   Q.    Okay.  Did you then break out each specific patient's

18   PMP into their own graph?

19   A.    Correct.  So I would take each of the data that

20   represents a row, and then provide a summary of every one of

21   the prescriptions.

22          So for example, number one, Brent Hood, we

23   should, if I've done this correctly, hopefully I did, have a

24   chart of 30 prescriptions.

25          MS. REMIS:  Okay.  Let's go to the first one,

Petron - Direct

1    Page 13, please.

2    BY MS. REMIS:

3    Q.    And now it says at the top, this is for Brent Hood?

4    A.    Correct.

5    Q.    And it says one of two.  What does that mean?

6    A.    There are two pages.  I could have made it really

7    small, but then some of them didn't look right.  So some of

8    them got multiple pages.  Brent Hood is one.

9          And so there are 20 prescriptions on the first

10   page and then should be ten more on the second page.

11         MS. REMIS:  Okay.  And if we could go to that

12   second page, please, Ms. Leal.

13   BY MS. REMIS:

14   Q.    There's two lines highlighted right there.  Why are

15   those highlighted in yellow?

16   A.    These two lines were specifically identified in the

17   indictment.

18   Q.    So those are the prescriptions that make up the count

19   in the indictment associated with Brent Hood?

20   A.    That's my understanding, yes.

21   Q.    Okay.  And then the total under -- on total, that

22   should match the total number of pills on Government

23   Exhibit 801, Page 12 that we just looked at; right?

24   A.    It should.

25   Q.    My mental math says that it does.

Petron - Direct

1    A.     It does.  And I saw one number and it was different,

2    and I realized I had added two numbers together.  But yes,

3    it does match.

4    Q.     Okay.  Let's go to Government exhibit -- and so is

5    there a prescription history similar to this for every one

6    of the 14 patients in the indictment?

7    A.     Yes.

8    Q.     Okay.  Let's go to Government Exhibit 801, Page 19,

9    please.

10   A.     Okay.

11   Q.     And this is patient Maryjane Mench; is that right?

12   A.     Correct.

13   Q.     And how many pages' worth of prescription lines did

14   you have from the PMP?

15   A.     We have four pages.

16   Q.     Okay.  Let's go to the fourth page, please.  And

17   again, the yellow is the count listed, the date of the count

18   listed in the indictment?

19   A.     That is correct.

20   Q.     And how many total pills did Ms. Mench -- pills and

21   patches did Ms. Mench get?

22   A.     Just over 5,000.

23   Q.     Okay.  And then let's look at page -- one moment,

24   please.  Let's look back at Page 15, please.

25          And this is Scott Jones.  Do you recall from the

Petron - Direct

1    earlier chart summarizing that Scott Jones only received

2    Oxycodone products?

3    A.     I do.  Yes.

4    Q.     Okay.  And so if we look at this line-by-line

5    history, every single line is for an Oxycodone product

6    between September 7th, 2011 and the last page,

7    September 19th, 2013; is that right?

8    A.     Correct.

9    Q.     And a total of 300 -- 3,397 Oxycodone pills?

10   A.     Correct.

11   Q.     And the prescription that's highlighted in yellow,

12   that's his last prescription from Dr. Titus?

13   A.     Correct.

14   Q.     And that is the count that's listed in the

15   indictment; is that right?

16   A.     Correct.

17   Q.     Okay.  And one last one, let's go to Government

18   Exhibit, same exhibit, Page 38, please.

19              And what patient are we looking at here?

20   A.     This is Michael Adams.

21   Q.     Okay.  And if you recall from your first chart,

22   Page 12, Michael Adams received 89 total prescriptions?

23   A.     Correct.

24   Q.     And the vast majority of those prescriptions were for

25   what?

1149

Petron - Direct

1   A.      Oxycodone.

2   Q.      Okay.  If we could go to Page 4, please.  And

3   according to the PMP data -- sorry.  Page 41.  Sorry.

4           According to these last two lines, those are the

5   ones that are contained in the indictment, the prescriptions

6   contained in the indictment?

7   A.      That is correct.

8   Q.      And as compared with all the earlier prescriptions on

9   this page, was the quantity of pills prescribed on

10  October 3rd, 2014 more or less than what had been previously

11  prescribed to Michael Adams by Dr. Titus?

12  A.      So this -- these represented basically almost a

13  month's supply, 27 and 30 days.  That was unusual in what I

14  normally saw, which was a half a month supply.  So it was

15  more.

16  Q.      Well, about double; right?

17  A.      Correct.

18  Q.      Okay.  Let's go on to Government Exhibit 801,

19  Page 50, please.  Were you also asked to pull the PMP data

20  for other individuals who are not mentioned in the

21  indictment?

22  A.      I was.

23  Q.      And so whose PMP data is this?

24  A.      This is Shari and Vergil Miller.

25  Q.      Okay.  And what did you find with respect to Shari

Petron - Direct

1  and Vergil Miller?

2  A.     So taken together, they had 102 prescriptions for

3  just over 6,900 pills or patches.  And that went from

4  September 11th through July 2014.

5  Q.     And the vast majority of those 102 prescriptions, who

6  were they for?

7  A.     The vast majority were for Vergil Miller.  Shari's

8  last prescription was in December of 2011.

9          MS. REMIS:  And if we go back to Page 1 --

10  sorry, Page 50, but the first page of this.  Okay.  You're

11  there already.

12  BY MS. REMIS:

13  Q.     Can you count how many of these 102 prescriptions

14  were for Shari Miller?

15  A.     I count four.

16  Q.     Four.  So four out of 102.  The rest were for Vergil

17  Miller?

18  A.     Let me just double-check.  That's correct.

19  Q.     Okay.  Let's go to Page 55, please.

20          Whose prescription monitoring program data is

21  this?

22  A.     This is James Moody.

23  Q.     Okay.  And what did you find with respect to James

24  Moody?

25  A.     There were 77 prescriptions that ranged from

Petron - Direct

1    September '12 through September 2014 and just over 4,500

2    pills or patches.

3    Q.     So James Moody received 77 prescriptions, you said?

4    A.     That's correct.

5    Q.     And what mostly were those prescriptions for?

6    A.     They were mostly for Oxycodone.

7    Q.     And was he also prescribed Fentanyl and Carisoprodol

8    as well?

9    A.     He was, to a lesser degree, yes.

10   Q.     Now, some of these -- actually, let's move on to

11   Page 59, please.

12            And what patient is this?

13   A.     Gerald Bradley.

14   Q.     Okay.  And what did your review of the PMP show with

15   respect to Gerald Bradley?

16   A.     There were 45 prescriptions between April 2013 and

17   September 2014.

18   Q.     Okay.  And what were they or nearly all of them for?

19   A.     Mostly some type of Oxycodone product.  There's a few

20   Methadone as well.

21   Q.     Okay.  And in total, how many pills did Mr. Bradley

22   get between April 29th, 2013 and September 3rd, 2014?

23   A.     2,770.

24   Q.     And that would be all pills because there's no

25   Fentanyl; is that right?

Petron - Direct

1   A.      That's correct.

2   Q.      And then let's go to Page 62, please.

3               What patient is this?

4   A.      This is Bonita Benson.

5   Q.      Okay.  And it says 1 of 6 at the top; is that right?

6   A.      Correct.

7   Q.      And so are there six pages' worth of lines for Bonita

8   Benson?

9   A.      There are.

10  Q.      How many total prescriptions, according to the PMP,

11  did Dr. Titus write for Bonita Benson between October 2012

12  and October 2014?

13  A.      121 unique prescriptions.

14  Q.      So that's 121 in just about two years; is that right?

15  A.      That's correct.

16  Q.      And how many total pills and patches?

17  A.      8,530.

18  Q.      Okay.  Now, I want to talk about the second part of

19  the review that you conducted.  You said you looked at PMP

20  data which is what we just discussed; right?

21  A.      Correct.

22  Q.      And what was the second thing that you looked at?

23  A.      Patient charts.

24  Q.      Okay.  And how did you -- how many patient charts or

25  how many patients' charts did you look at?

Petron - Direct

1    A.      Ultimately, we took a sample of 300 randomly, and we

2    were provided 282 of those 300 back.

3    Q.      Okay.  Let's talk about how you got to the sample of

4    300 patients.

5    A.      Sure.

6    Q.      Where did you start?

7    A.      Well, I started with all that information we just

8    looked at.  So I had a set of patients from that data.

9    Q.      And when you say, sorry, "that data," you mean the

10   PMP data?

11   A.      Correct, the PMP data.  I was then provided a list by

12   the Government that contained patient names.  It was my

13   understanding that the file I got was all of the patient

14   files for Dr. Titus that the Government had obtained.  I'm

15   not sure if you want mechanism of consent search or a

16   subpoena or something, but the list of all the patient files

17   the Government had.  That list had, I forget the exact

18   number, 6,900 and something, okay, patients on it.

19          So I have the PMP data and then I have this

20   list.  So I compared the two of them, and I tried to extract

21   the names from those patient files listed I got from you all

22   to match the PMP data.

23   Q.      And what was the purpose of comparing the entire list

24   of all the patients' names in the 6,900 or so names to the

25   PMP data specifically?

Petron - Direct

1   A.      I wanted to isolate the patients that got

2   prescriptions.

3   Q.      Okay.

4   A.      And I was under the understanding that those patients

5   were seen at one location and all the other patients had

6   been somewhere else.

7   Q.      Okay.  And of that 6,900-ish group of patients, do

8   you have any idea of what time period that covered?

9   A.      I don't.  I know it covered a much longer time period

10  than when I had the PMP data.

11  Q.      Okay.  And so once you compared the large list with

12  the PMP data, what did you do next?  Did you trim the list

13  in any other ways?

14  A.      Right.  So I -- one, if I didn't find someone or I

15  couldn't get a match, then they obviously fell out.  But

16  then I also trimmed it for a particular time period, 2012 to

17  through 2014.

18  Q.      Okay.  And did you do anything else to trim it

19  further?

20  A.      I got to 1,142 patients.  No, I'm not sure I did

21  anything else to it.

22  Q.      Okay.  And so 1,142 patients, what did that number

23  represent?

24  A.      That's basically what I would refer to as the

25  universe of patients that I sampled.

Petron - Direct

1    Q.    Okay.  And those were all patients who had received a

2    controlled substance prescription during the time frame 2012

3    through 2014?

4    A.    I'd phrase it a little different.

5    Q.    Please phrase it properly.

6    A.    Those are the list of patients that I was able to

7    identify that had a controlled substance that were also

8    identified as having a file present in the documents that

9    you all had.

10   Q.    Okay.  So what types of information were you looking

11   for within the patient files?

12   A.    A few categories of things I was asked to look for.

13   I was asked to look at the prescriptions.  Again, we've been

14   talking a lot about prescriptions.  I was asked to look at

15   the prescriptions.

16          I was asked to look at a series of drug tests.

17   If the patients received the drug test result, I was asked

18   to look at that.

19          I was asked to look at, I don't know what the

20   technical word is, but there were letters from Dr. Titus to

21   the patient about behavior, you know, bad behavior.  And so

22   I was asked to look at those.

23          And I also was asked to look at the pain scale

24   of the patients that they reported to Dr. Titus.

25   Q.    Okay.  And did you look at all 1,142 files for that

Petron - Direct

1    information?

2    A.      No.  No, that's the purpose of the sample was to not

3    do that.

4    Q.      Okay.

5    A.      Because that's -- that would be a lot of work.  So

6    that's why we took the sample.

7    Q.      Okay.  And how many patients were in the sample that

8    you took?

9    A.      300.

10   Q.      And how did you select those 300 patients?

11   A.      Randomly.

12   Q.      Can you elaborate on "randomly" a little bit?

13   A.      Like how does one get random?

14   Q.      Yeah.

15   A.      So I could spend a few hours if you really want, but

16   the short version is I put in -- I have a computer program

17   and that computer program will assign what's called a random

18   number to it.  It's assigned based upon -- this will get a

19   little too technical -- but a uniform distribution between

20   zero and one.  It has like 12 decimal places.  So imagine

21   random numbers getting put next to each one of my 1,142

22   people.

23           So I have all these random numbers between zero

24   and one.  I then sort the random numbers and I take the

25   smallest ones.

Petron - Direct

1    Q.      Okay.  So you took the smallest 300?

2    A.      I did.

3    Q.      Why did you choose 300?

4    A.      So I've done a lot of sampling.  And sampling is

5    always a sort of a cost benefit analysis, right.  So I knew

6    300 was going to be large enough that any extrapolation I

7    did is going to be precise enough.  And -- but it's not too,

8    too many that I thought it was going to cost $200,000, not

9    $100,000.

10   Q.      And so for those 300 patients, that's 300 patients,

11   right, not 300 files?

12   A.      Correct.  300 patients.

13   Q.      And did some of those patients have multiple files?

14   A.      Yes, they did.

15   Q.      How many files did you receive from the Government in

16   the end?

17   A.      282.

18   Q.      Do you have an understanding of why there were 18

19   missing files?

20   A.      My understanding is the Government couldn't find

21   them.

22           MS. REMIS:  Okay.  Let's look at Government

23   Exhibit 802, please.

24   BY MS. REMIS:

25   Q.      How many pages are in 802?

Petron - Direct

1    A.       There are 12 pages.

2    Q.       And if we could just go to Page 12 quickly.

3             Is this the 300 patients that make up the

4    sample?

5    A.       It is.

6    Q.       Okay.  And there's two highlighted people on this

7    list.  What does the bright blue at 291 mean?

8    A.       So the light blue is a count.  So one of those

9    patients, one of those 14 that we already looked at, and

10   then the gray is one of those 18 that I was not provided.

11   Q.       Okay.  So Lucille Moody is one of the counts in the

12   indictment; is that right?

13   A.       Correct.

14   Q.       And then if we could go to Page 2, please.

15            Is Brent Hood another count in the indictment?

16   A.       Correct.

17   Q.       And then if we could go to Page 7, please.

18            Lisa Parsons as well at 157 right there?

19   A.       Correct.

20   Q.       And were those the only three patients in the

21   indictment who are also in the random sample?

22   A.       If there are no more blue, yes, that's right.

23   Q.       Did you purposely choose those three people to be in

24   the random sample?

25   A.       No, no.  I mean, it wouldn't be random then.

Petron - Direct

1   Q.      It just happens that way?

2   A.      Well, there's 1,142 people.  If you sample 300, you

3   got a one in -- you know, a little less than one -- a little

4   more than one in four chance of being in.

5   Q.      So aside from using these 300 patients or more

6   precisely the 282 that you got for this purpose that we're

7   about to talk about, which is to create some summaries and

8   look for specific things that you discussed, was a small

9   subset of them also used for any other purpose in this case

10  that you know of?

11  A.      Yes.

12  Q.      And what was that?

13  A.      So the first 30 were given to a medical doctor to

14  review.

15  Q.      Okay.  And so those were randomly selected, also?

16  A.      Yeah, the first 30 random are if I had selected a

17  sample of 30 and not a sample of 300, it would have been the

18  first 30.  So it's the same randomness.

19  Q.      Okay.  Now, did you create several summary charts

20  with respect to the information you reviewed in the patient

21  files that you selected?

22  A.      I did.  I did.

23  Q.      Okay.  Let's pull up Government Exhibit 803, please.

24  Okay.

25          What are we looking at here?

Petron - Direct

1    A.    So 803 is just a summary of everything that we've

2    just discussed.  1,142 patients.  A sample of 300.  And

3    ultimately reviewed 282 charts.

4    Q.    Okay.  And if we could go on to the next page,

5    please.  Just to -- sorry, just to look at this number, you

6    said 282 sampled patients analyzed; is that right?

7    A.    Correct.

8    Q.    And you said you chose 300 because it was a good

9    enough number to extrapolate from?

10   A.    Correct.

11   Q.    Does the fact that there's only 282 change your

12   ability to extrapolate?

13   A.    It does not.

14   Q.    And again, what does extrapolate mean?

15   A.    It means use the data from the sample to estimate to

16   the whole population.

17   Q.    Okay.  So we're on Page 2 here.  Can you walk the

18   jury through what we're looking at here?

19   A.    Sure.  The first column is information related to all

20   282 patients.  So we've got just over 10,000 prescriptions.

21   37.8 is the average prescription for patient.  The most

22   common prescription Oxycodone 15 and then the average number

23   of pills.  Each successive column -- well, the next column

24   is -- if you recall, I looked at certain drugs.  I called

25   them drugs of interest, Schedule II drugs and sub-Schedule

Petron - Direct

1    IV.

2              So I wanted to look in the sample for that same

3    set of drugs.  And so 269 patients out of the 282 had one of

4    those drugs of interest.  And then you can see the number of

5    prescriptions there, 9,278.  The average prescriptions, the

6    most common prescription, again Oxycodone 15 and the average

7    number of pills of Oxy is the same.

8              So what I did next in the last column was take

9    the information from that 269 and then estimate it back to

10   the 1,142 which is the purpose of the sampling, right.  So

11   how many -- what would my expectation be for how many people

12   had a drug of interest out of the population of 1,142 and my

13   estimate is 1,089.  And then I would estimate that there are

14   a total of 37,573 prescriptions and that the average

15   prescription per patient for drugs of interest would be

16   32.9.

17   Q.     And so how confident are you able to be in the third

18   column when you estimate or extrapolate from the sampled

19   patients to the entire population of 1,142?

20   A.     So I'm not very confident, right, if the exact number

21   is the precise correct number.  That's not what sampling is

22   all about.  What I'm comfortable in, if you look in the

23   footnote, is you can see I provided a confidence interval,

24   what's called a 95-percent confidence interval for that

25   1,089.  And that interval is 1,059 to 1,110.  So I'm very

Petron - Direct

1  comfortable that the real answer, because I don't -- no one

2  knows the real answer unless we look at 1,142 charts.  I'm

3  confident that the real answer is in that range.

4  Q.   And you're 95 percent comfortable that the real

5  answer is in that range?

6  A.   The 95 percent is -- it's not so much my comfort as

7  in the statistical science.  If I took a thousand more

8  samples like this, 950 of them would have the right number.

9  Q.   So just to go back to just the 282 sampled patients,

10  of those 282 patients, 269 of them received a drug of

11  interest?

12  A.   Correct.

13  Q.   And just to go back to 801, Page 2, please.  These

14  are the drugs of interest that you were looking at; right?

15  A.   Yes, ma'am.  Yes, ma'am.

16  Q.   Okay.  And then let's go back to 803, Page 2, please.

17  In the bottom line, it says the average number of pills for

18  Oxycodone 15 is 76.7; correct?

19  A.   Correct.

20  Q.   That was true of both the sampled patients analyzed

21  and the sampled patients with drugs of interest?

22  A.   Well, it's the same.  It's the same.

23  Q.   So that -- and again, based on your review of both

24  the files and the PMP, how many prescriptions per month were

25  most of these patients getting?

Petron - Direct

1    A.      So the average number of prescriptions for patient,

2    I'm estimating to be 32.9.

3    Q.      So 76.7 pills, that would be two prescriptions per

4    month; right?

5    A.      In general, yes.

6    Q.      Okay.  Let's go to the next page, please, Page 3.

7            And what are we looking at here?

8    A.      These are the most frequent prescriptions for those

9    patients with the drugs of interest within the sample.

10   Q.      Okay.  And you did a similar estimate, you did a

11   similar review for the PMP as well; right?

12   A.      Correct.

13   Q.      And was your review of the PMP similar to what

14   resulted from this review?

15   A.      Absolutely.  By and large, if you recall the Oxy 15

16   and the Methadone ten were the two by and far away largest

17   in the PMP data.  And that holds true here as well.

18   Q.      And so in total, there were 9,278 prescriptions for

19   the drugs of interest just within the 282 patients whose

20   files you reviewed?

21   A.      Correct.

22   Q.      Okay.  And let's go to the next page, please.

23           Okay.  And what are we looking at on Page 4?

24   A.      So I also went through the 282 patients and examined

25   any drug test that was provided to those patients, and I had

Petron - Direct

1   the results in the patient file.  And of the 282 patients,

2   256 of them had at least one drug test result in the file

3   somewhere.  In total, there were 1,577 different drug tests

4   for those 256 patients.  And of the 1,577 drug tests, 874 of

5   them I classified as something that is inconsistent.

6          All right.  Inconsistent was -- I think it's my

7   word, but there's -- on the face of the drug test, there

8   would be a marker for a prescription that was prescribed, so

9   you'd think it would be in the body was not.  That is an

10  inconsistent result.

11         And then the vice versa.  So a drug that was not

12  prescribed is present in the drug test, that would be an

13  inconsistent result.  So these are not things I determined,

14  like I wasn't looking at blunt specimens.

15         But on the results of the test, I just captured

16  every time I saw that and that happened 874 times.  And

17  in -- that 874 times were spread out over 234 patients.  And

18  then I looked at those 234 patients, and I counted how many

19  prescriptions for the drugs of interest were there after one

20  of those inconsistent test results, and that amounted to

21  7,241 prescriptions.

22  Q.   And so just to be clear, you looked at multiple

23  different types of drug tests, right, or different tests

24  from different companies in the charts?

25  A.   Yeah, there were, I don't know, four or five, six

Petron - Direct

1    maybe different companies providing drug tests.

2    Q.    Okay.  Let's look at Government Exhibit 180, Page 35,

3    please.  Was this an example of one of the drug tests that

4    you looked at for Bonita Benson?

5    A.    Correct.  Yes.

6    Q.    And --

7    A.    Yes.

8    Q.    So when you were trying to classify things as

9    inconsistent or consistent, what part of this drug test were

10   you looking at?

11   A.    So I would have classified this as inconsistent.

12   There's, I guess, an X.  You can see the two X's there on

13   the screen.

14   Q.    Mm-hmm.

15   A.    And it has the Oxycodone and then it has prescribed,

16   yes.  Inconsistent, yes.  So I guess maybe I could make a

17   board of consistent.  There's inconsistent yes and then not

18   detected.

19   Q.    Okay.

20   A.    So I would classify this drug test as an inconsistent

21   drug test.

22   Q.    Okay.  And then let's look at Government Exhibit 128

23   at 283, please.  Is this another brand of drug screen that

24   you saw in the patient charts?

25   A.    Yes.

Petron - Direct

1   Q.     Okay.  And this one as well, how would you have

2   classified this one and what boxes were you looking at?

3   A.     So I looked in the top of this in the right-hand

4   side.  It's kind of hard to see.  Is there a way to --

5              MS. REMIS:  Can you make it bigger, please,

6   Ms. Leal?  There you go.

7              THE WITNESS:  So you can see there's

8   prescriptions there.  Fentanyl, Oxycodone, and then to the

9   right it says not prescribed, but detected, the benzo.

10  BY MS. REMIS:

11  Q.     Mm-hmm.

12  A.     And then further it says, prescribed and not detected

13  Fentanyl.  So those boxes would lead me to believe it was an

14  inconsistent test result.

15  Q.     Okay.  So you weren't making any calls about what was

16  consistent or what wasn't, you were just looking at the face

17  of the drug test?

18  A.     Oh, correct, yeah.  I mean, I have no idea.

19  Q.     Okay.  Let's go back to page -- Government

20  Exhibit 803, Page 4, please.  So once you collected all of

21  the information about drug tests and inconsistent drug tests

22  and how many prescriptions Dr. Titus prescribed after an

23  inconsistent drug test, could you then extrapolate that from

24  the 282 patients to the full 1,142 population?

25  A.     Correct.  So that last column is just my

Petron - Direct

1    extrapolation of each of those numbers to the full

2    population.  I won't bore you reading them, but the same

3    holds true for all those little footnotes.  I give you that

4    confidence interval at the bottom so you can assess the

5    reliability of each of those estimates.

6    Q.    So once you extrapolated those numbers, how many

7    patients would you have estimated you would find in the full

8    sample with inconsistent drug test results?

9    A.    I would have estimated that there are 948 patients

10   with an inconsistent drug test result out of the 1,142.

11   Q.    Okay.  And how many prescriptions after inconsistent

12   test results would you have anticipated Dr. Titus wrote

13   based on the full 1,142?

14   A.    29,323.

15   Q.    Okay.  Let's go on to the next page, please, which is

16   Page 5.  And what were you looking at in this document?

17   A.    So this is a summary of those letters that Dr. Titus

18   would have wrote to the patients.  They were basically two

19   types of letters.  I call them a counseling letter or a

20   discharge letter.

21   Q.    Okay.  And let's go to Page 180, Page 34, please.

22   Exhibit 180, Page 34.  Would this be an example of a warning

23   letter or a counseling letter?

24   A.    Yes.  This would be an example of a counseling

25   letter.

Petron - Direct

1  Q.      Okay.  And then Government Exhibit 100, Page 33,

2  please.

3          Is this an example of a discharge letter?

4  A.      Correct.

5  Q.      Okay.  And let's go back to Page 5 of 803, please.

6  Could you walk the jury through what you found?

7  A.      Sure.  So of those patients, the 282 that were

8  sampled, 139 of them had at least one counseling or

9  discharge letter.  That's roughly 49.2 percent of the

10  population.  Of those patients, 108 had prescriptions that

11  were written after, dated after that letter.  And then those

12  prescriptions numbered 1,609.

13          So there were 1,609 prescriptions written on 108

14  patients after that patient would have received a counseling

15  or a discharge letter.

16  Q.      Okay.  And if you could skip to Column 3 and tell us

17  what you found there.

18  A.      That's the same information, but only the discharge

19  letter, not the counseling letter.  So if I just eliminated

20  the counseling letters and only looked at you're no longer a

21  patient letter, there are 87 patients that had at least one.

22  Forty-seven of them had a prescription after that letter.

23  And there were 383 of those prescriptions.

24  Q.      So 383 prescriptions after a discharge letter given

25  to 47 patients?

Petron - Direct

1   A.      That's correct.

2   Q.      Okay.  And if you could explain your extrapolations

3   as well, please.

4   A.      So every number on the right is the extrapolation of

5   the number on the left.  So the second column, 563 is the

6   total that I would estimate had any letter in the population

7   of 1,142.  That's an extrapolation from the 139.  Same goes

8   for the 352 on the far right top, extrapolates from the 87

9   and so forth.

10          So I would estimate on the bottom right, just to

11  kind of jump to the end there, I estimate that there's 1,552

12  prescriptions for drugs of interest after a patient received

13  a discharge letter.

14  Q.      Okay.  And that would be for the 1,142 patients that

15  received controlled substances during the time frame?

16  A.      Correct.

17  Q.      Okay.  Now, did you also make a few timelines with

18  respect to four different patients that were in the sample?

19  A.      I did.

20  Q.      If we could go to the next page, please.  What was

21  the purpose of these timelines?

22  A.      I don't know.  I thought the last chart was a lot of

23  information, kind of busy, so I wanted to just provide an

24  example of what it meant to have a discharge letter or

25  dismissal letter and then have prescriptions occurring

Petron - Direct

1  afterward.  So I isolated a few patients here.

2         This is Darlene Hewitt.  I'll just walk through

3  this.  There's a big block of time, August '12 through March

4  '14.  In that block of time, there are 67 prescriptions.  In

5  that same block of time, there are eight lab tests and six

6  of those eight had inconsistent results.

7         So then I took a smaller period of time and sort

8  of tried to break it out by month just so you could see what

9  I was seeing in the patient chart.  In April '14, there were

10  two Oxy and one Fentanyl prescription.  In May of '14, the

11  same.  There was one inconsistent lab result in May of '14.

12  Also, a discharge -- I call it dismissal letter, a discharge

13  letter in May of '14.

14         Then in June, there are three Oxycodone, one

15  Fentanyl and one Valium prescription.  And July of '14, we

16  go back to the same two Oxy and one Fentanyl.  One

17  inconsistent lab test result and a dismissal letter.

18         And then, finally, the rest is explanatory.

19  August to September '14, there are the same prescriptions

20  given with one more inconsistent lab test result.

21  Q.    Okay.  So multiple prescriptions given after the

22  first discharge letter and continuing after the second

23  discharge letter?

24  A.    That's correct.

25  Q.    Okay.  Let's go to the next page, please.

Petron - Direct

1          And what are we looking at here?

2   A.     This is Lucille Moody who I believe was a count in

3   the indictment.  Again, a block of time, 37 prescriptions

4   with five inconsistent lab test results.

5          Then in the second half of '13, we've got the

6   monthly prescription, you know, August '13, September '13.

7   There's the prescriptions.  Then one inconsistent lab test

8   result where cocaine was detected.  There were two counts in

9   the letters provided and one dismissal letter provided.

10  There were no drugs of interest prescribed in October '13.

11  But in November and December, and subsequent to that,

12  obviously, many more drugs of interest prescribed with

13  inconsistent lab test results.

14  Q.     Okay.  And let's go to Page 8, please.  What patient

15  is this?

16  A.     This is Bonita Benson.  We looked at her prescription

17  history.  Again, 85 prescriptions, seven lab tests,

18  inconsistent results for the longer block of time.  And then

19  in the monthly time period, we have four inconsistent lab

20  test results with prescriptions on a monthly basis until

21  finally a counseling letter in November of '14.

22  Q.     And just to go back to the PMP for a second, I think

23  Bonita Benson was the patient whose PMP we looked at which

24  was six pages long; is that right?

25  A.     That's right.

Petron - Direct

```
 1              MS. REMIS:  And let's go to 803, Page 9, please,
 2   and let's go -- last, please.
 3              THE WITNESS:  This is a patient, Rebecca Benson.
 4   We have 70 prescriptions, seven of eight inconsistent lab
 5   test results and a counseling letter of February '14.
 6              And then the middle part of '14, numerous
 7   prescriptions.  The consistent lab result in May and
 8   inconsistent lab in July.  And another inconsistent lab in
 9   September.  Another inconsistent lab in October.  And both
10   in September and October months had a counseling letter.
11   BY MS. REMIS:
12   Q.    But you saw no discharge letter despite these
13   multiple counseling letters?
14   A.    I did not find a discharge letter.
15   Q.    Mr. Petron, we just went through several charts
16   detailing inconsistent drug screens, warning letters,
17   dismissal letters, prescriptions and prescriptions after
18   each of those things.  Based on your review of these sample
19   files, can you draw any big-picture conclusions?
20   A.    The conclusion --
21              MR. BOSTIC:  Your Honor, I'm going to object.
22   My understanding is this witness is only testifying as to
23   the information in these charts.  I don't know what the
24   conclusion the Government is asking for.  Perhaps -- I think
25   it would be outside his expertise.  I don't know where the
```

1    Government is going.

2              THE COURT:  So you want to ask the question

3    again and --

4              MS. REMIS:  Sure.

5    BY MS. REMIS:

6    Q.    Just with respect to the conclusions that you made

7    relating to your analysis, obviously, no medical

8    conclusions, what is the big-picture takeaway that you found

9    with respect to the things that you were looking for from

10   the data?

11   A.    I would expect that the 1,142 patients would have

12   predominantly drugs of interest prescribed to them over this

13   time, this two-year time period.  And I would expect those

14   drugs of interest to follow the same patterns in

15   prescriptions that we've seen throughout the charts.

16   Q.    So you can apply the conclusions that you made with

17   respect to the 282 patient files to the larger 1,142

18   patients in the entire universe?

19   A.    I -- I can, and I would just say that that's being

20   done through sort of scientific process.  And I've described

21   each of those extrapolations with that confidence interval

22   at the bottom.

23             MS. REMIS:  Pass the witness, Your Honor.

24             THE COURT:  All right.  So I assume you have

25   more than one minute here, Mr. Bostic.

1    MR. BOSTIC:  That's correct, Your Honor.

2    THE COURT:  All right.  So let's finish for the

3  day.  You can do cross-examination tomorrow.

4    Members of the jury, we are going to start again

5  at 9:30 tomorrow.  You were all here on time today, so thank

6  you for that.  I do want to remind you of two things.

7    One of which is don't talk to anyone about the

8  case, and don't let anyone talk to you about the case.

9    And the second thing is don't do any research

10  about the case.  Don't try to find out anything other than

11  what you hear here in court.  That's the only fair way for

12  both the parties, and so please follow those instructions.

13    So you're excused and see you tomorrow.  Have a

14  good evening.

15    THE JURY:  You, too.  Thanks.

16    (Jury leaving the courtroom.)

17    THE COURT:  All right.  Mr. Petron, please come

18  back tomorrow.  You don't have to hang around now, though.

19  I'm just going to talk to the lawyers for a couple of

20  minutes.

21    MS. REMIS:  You can leave those.

22    THE COURT:  And yeah, you can just leave those

23  there.  So is it still your plan that Dr. Thomas tomorrow

24  will be your final witness?

25    MS. REMIS:  Yes, Your Honor.

1175

```
 1              THE COURT:  Okay.  And Mr. Bostic, do you have
 2     any sense as to how long your cross-examination of
 3     Mr. Petron might be?
 4              MR. BOSTIC:  Your Honor, I am hoping not to be
 5     too long, but Mr. Petron covered a lot of information here.
 6     I just need to reassess tonight and probably we'll try to
 7     cut it down to make it as short as possible.
 8              THE COURT:  Okay.  Well, I'm not trying to --
 9     all right.  Well, in any event, I assume Dr. Thomas will be
10     here and ready to go whenever he is needed.
11              Is there anything -- and I realize, Mr. Bostic,
12     you and Ms. Kousoulis have been busy all day.  In terms of
13     your witnesses, are you still thinking they're going to be
14     here on Thursday?
15              MR. BOSTIC:  That's correct, Your Honor.  We
16     finalized with the one person that we weren't able to reach,
17     and they're only available on Thursday.
18              THE COURT:  Okay.  So basically, right now you
19     expect that you'll be able to do everything else you need to
20     do other than Dr. Warfield on Thursday?
21              MS. KOUSOULIS:  Well, Your Honor, there still
22     may be with regard to the Task Force Officer because we're
23     not exactly -- you know, and we don't want to have her
24     subpoenaed and come on Thursday and have her come again on
25     Monday, so we're probably just going to subpoena her for
```

1    Monday just --

2              THE COURT:  And I understand the Task Force

3    Officer is not employed by the Federal Government, but I

4    presume that you're encouraging this person to be available

5    whenever she's needed?

6              MS. REMIS:  Yes, I will just say I don't think

7    Your Honor is sitting on Friday; right?  Is that the --

8              THE COURT:  Well, that was -- I had said last

9    week I would sit on Friday, but that was when I thought we

10   were going to be rushing to get to Dr. Warfield.  I would

11   prefer -- so one of the things we don't want to have the

12   jury traveling for, you know, 15 minutes of testimony --

13             MS. REMIS:  Yeah.

14             THE COURT:  -- not to sit on Friday.  But I also

15   would prefer to make sure that or I would prefer that

16   Dr. Warfield, you know, be the end of the defense case, as

17   much as that's within my power to encourage.

18             MS. KOUSOULIS:  That's what we anticipate, Your

19   Honor.

20             MS. REMIS:  The only reason I ask is because she

21   was not available on Friday.  Sorry, I should have led with

22   that.

23             So I think, otherwise, she is aware that there's

24   a possibility that she might be subpoenaed.  Obviously, it

25   sounds like they haven't subpoenaed her yet, but I'll -- I

1    can --

2              MS. KOUSOULIS:  We have not only because we

3    weren't sure which day.  We didn't know when to tell her.

4              THE COURT:  Right, right.  But so I guess what

5    I'm wondering or what I'm hoping is you're in touch with her

6    is she shouldn't make other plans for Thursday until they

7    say we're not going to get you a subpoena because we can't

8    be ready on Thursday.

9              MS. REMIS:  I'll reach out to her tonight, Your

10   Honor, and just give her a heads up.

11             MS. KOUSOULIS:  Make sure she's available

12   Monday.  Thursday or Monday.

13             MS. REMIS:  I'll talk to her.

14             THE COURT:  Anything else you all want to talk

15   about?

16             MS. REMIS:  I just want to make a request on the

17   record, Your Honor.  We've requested multiple times for

18   reciprocal discovery under Rule 16, but haven't received

19   any.  Seeing as their case is coming up, I just wanted to

20   make that official request and then we would also request

21   any reverse Jinx for any of the witnesses that they intend

22   to call.

23             THE COURT:  All right.  Do you have any reverse

24   Jinx?

25             MR. BOSTIC:  None, Your Honor.  We don't have

 1    any.

 2              THE COURT:  All right.  And in terms of

 3    reciprocal discovery, do you have any of that?

 4              MR. BOSTIC:  Reciprocal discovery, Your Honor,

 5    the witnesses that we're calling are patients primarily, and

 6    we believe the Government has those files in their

 7    possession.  Whether it be for the Puccis, Betty Whaley, for

 8    example, and any other witness that's listed.

 9              THE COURT:  Are you planning on using the files?

10              MR. BOSTIC:  Your Honor, we -- with respect to

11    the Puccis, we may use their file and -- but it is in the

12    discovery provided by the Government.

13              THE COURT:  Okay.

14              MS. REMIS:  We've made a specific request as to

15    one patient file that we have not been able to find which is

16    in the files that we had provided them in hard copy.  And so

17    we just request that whatever they have, if they could just

18    provide it to us.

19              THE COURT:  Okay.  But this is a file, this is

20    not the Puccis.  This is something else?

21              MS. REMIS:  Somebody else.  Lisa Cody.  I sent a

22    few emails.

23              MR. BOSTIC:  Your Honor, we will look for that

24    file and provide that to the Government.

25              THE COURT:  All right.  Sure.  If you can

1   provide it tomorrow, they can do whatever they need to do

2   before Thursday, so that should be no problem.

3           Okay.  Well, I'll see you tomorrow morning at

4   9:00 if you have anything that you want me to deal with.

5   And otherwise, have a good evening, and I guess I will still

6   see you tomorrow morning.

7           DEPUTY CLERK:  All rise.

8           (Court was recessed at 5:05 p.m.)

9           I hereby certify the foregoing is a true and

10  accurate transcript from my stenographic notes in the

11  proceeding.

12          /s/ Heather M. Triozzi
            Certified Merit and Real-Time Reporter
13          U.S. District Court

14

15

16

17

18

19

20

21

22

23

24

25