1180

1    IN THE UNITED STATES DISTRICT COURT

2        FOR THE DISTRICT OF DELAWARE

3

4    UNITED STATES OF AMERICA,     )
                                   )
5               Plaintiff,         )
                                   )  Criminal Action No. 18-45-RGA
6    v.                            )
                                   )  Trial Volume V
7    PATRICK TITUS,                )
                                   )
8               Defendant.         )

9
                                   J. Caleb Boggs Courthouse
10                                  844 North King Street
                                   Wilmington, Delaware
11
                                   Tuesday, July 13, 2021
12                                  9:00 a.m.
                                   Jury Trial
13

14   BEFORE:  THE HONORABLE RICHARD G. ANDREWS, U.S.D.C.J.

15   APPEARANCES:

16               U.S. DEPARTMENT OF JUSTICE - CRIMINAL DIVISION
                BY:  ALEZA S. REMIS, ESQUIRE
17               BY:  CLAIRE SOBCZAK, ESQUIRE
                BY:  JUSTIN WOODARD, ESQUIRE
18
                                   For the Plaintiff
19

20               OFFICE OF THE FEDERAL PUBLIC DEFENDER
                BY:  ELENI KOUSOULIS, ESQUIRE
21
                     -and-
22
                THE BOSTIC LAW FIRM
23               BY:  EDSON A. BOSTIC, ESQUIRE

24                                 For the Defendant

25

```
 1                      ***  PROCEEDINGS  ***

 2                 DEPUTY CLERK:  All rise.  Court is now in

 3     session.  The Honorable Richard G. Andrews presiding.

 4                 THE COURT:  All right.  Good morning.

 5                 (Everyone said, Good morning, Your Honor.)

 6                 THE COURT:  So is there anything that you want

 7     to discuss?

 8                 MS. REMIS:  No, Your Honor.

 9                 MR. BOSTIC:  No, Your Honor.

10                 MS. KOUSOULIS:  Not at this point.

11                 THE COURT:  Okay.  So I was curious.  I was

12     looking at this letter that, I guess, Ms. Kousoulis signed

13     the other day.  It starts off by saying:  "Agent Smith

14     distorted Dr. Titus' statements and indicated that Dr. Titus

15     had a zero tolerance policy for positive drug tests for

16     certain illicit substances, namely cocaine and heroin."

17                 How did Agent Smith distort his testimony or his

18     statement?

19                 MS. KOUSOULIS:  Your Honor, I think our point

20     was that if you read Dr. Titus' statements in their

21     entirety, both from 2015, 2018, I don't think it was as

22     clearcut as -- and maybe that was a poor choice of words.

23     Maybe it was like clips that were entered into and that he

24     was, you know, testifying.

25                 THE COURT:  But the clips that were entered into
```

1   were things that the Government designated, and you can pick

2   anything in that 2015 statement that was relevant to clarify

3   whatever it was he said then; right?

4           MS. KOUSOULIS:  Your Honor, our -- my

5   understanding -- maybe I misunderstood the ruling.  My

6   understanding of the ruling was that we weren't permitted to

7   bring in any other parts of the statement.  That's why we

8   stayed away from that.  That was my -- again, maybe it was

9   my misunderstanding of your ruling.

10          THE COURT:  Of the 2015 statement?

11          MS. KOUSOULIS:  Well, I just thought any --

12  like, the other parts of the statement that we were

13  attempting to bring in, maybe I misunderstood.

14          THE COURT:  Well, I thought -- I mean, you have

15  the -- you know, I see evidence in 2018, or maybe I'm wrong

16  about that.  But you're saying that for the 2015 statement,

17  you didn't try -- that there was stuff in there that you

18  wanted to play?

19          MS. KOUSOULIS:  Potentially, Your Honor.  Again,

20  I think some of it kind of runs together, but so, without

21  having it in front of me, I'd have to look, but my

22  recollection is --

23          THE COURT:  But the letter you wrote is not

24  about the 2015 statement at all, it's about the 2018

25  statement.

1    MS. KOUSOULIS:  I think the 2018 statement, Your

2   Honor.  It's more clear that he made other statements that

3   would maybe put into context the statements that were put

4   into evidence.  And so, you know -- and in our mind, based

5   on the case law, I think that since it's the same agent,

6   same questioning, you know, same topics, that it sort of

7   like -- you know, is almost like a continuation in that, you

8   know, that it should be permitted.

9    THE COURT:  And so what was it in particular in

10   the statement that was put into evidence that, whether you

11   use the word "distort" or something else, didn't at least

12   portray fairly what Dr. Titus was saying in 2015?

13    MS. KOUSOULIS:  Your Honor, and I'm not sure

14   without, again, without having the 2015 statement in front

15   of me, but I think it wasn't just the 2015.  I think it was

16   in combination with the 2018.  I think that the statements

17   that I think were more relevant were the 2018 statements.

18    THE COURT:  Okay.  But relevance is a different

19   kind of thing.

20    Was there something unfair in terms of the

21   context of the 2015 statement in terms of what the

22   Government actually selected?  Because among other things,

23   you didn't make any objection to it; right?

24    MS. KOUSOULIS:  What do you mean "objection"?

25    THE COURT:  Well, in other words, you say,

1    Judge, this is unfair because they've got this sentence, but

2    they don't have that sentence so you get a misunderstanding

3    of what he's saying.

4         I mean, my impression is, from the way things

5    have happened, that Agent Smith and the Government, that

6    whatever it is that they selected, the five or so excerpts,

7    that they were representative or, you know, otherwise fair

8    descriptions of whatever it was, because mostly or, you

9    know, significantly Dr. Titus speaking himself, that

10   whatever they put in, that is, in fact, what Dr. Titus was

11   saying at the time.

12        MS. KOUSOULIS:  Your Honor, again, I'd have to

13   go back and look.  I don't think it was as clear maybe in

14   the 2015 statement, but I think the reason -- but I think

15   the 2018 statement, in that it covered the same topic, it

16   was the same investigation, it was the same agents, that

17   that was sort of like -- even though there was that time

18   period gap, I don't think that's what's dispositive of

19   whether under the rule of completeness --

20        THE COURT:  So I'm not -- what I'm trying to --

21   that's not really what I'm asking about because it sounds to

22   me like what you're saying or what you're not saying is

23   that, at least if you just look in the 2015 statement, you

24   know, if you forget about the 2018 statement, the 2015

25   statement was a fair representation of what Dr. Titus said

1    on those topics at that time.

2            MS. KOUSOULIS:  With regard to just his

3    discharge policy, but he also talked about his drug testing

4    policy and some of the drug testing, like, intertwined kind

5    of in his statements.  Regarding the question regarding the

6    drug testing policy, there was some inferences regarding, in

7    my mind, like, the discharge policy.

8            And so without bringing -- and so that's why I

9    initially wanted to bring in his testimony regarding his

10   drug testing policy because that sort of was intertwined

11   with his discharge policy.  His discharge policy was based

12   on drug testing, and that was all throughout the 2015

13   statement.

14           THE COURT:  Okay.  All right.  And --

15           MS. KOUSOULIS:  And, you know, with regard to

16   the word -- again, maybe that was a poor choice of words,

17   but it was more so that, you know, when you -- right now,

18   when you look at, you know, what's in evidence and what was

19   testified to, it wasn't, you know -- especially when you

20   take into context the 2018 statement, which was sort of

21   almost like a continuation of, like, the 2015 statement, he

22   makes other -- he's not as definitive with his discharge

23   policy, and it's a little more nuanced in terms of, well,

24   somebody had an addiction, you know, and the advice was

25   maybe you, you know, counsel them and don't discharge them

1   right away.  And there's different -- you sort of feel

2   almost like a softening at that point, you know.  And again,

3   since it dealt with the same topic, same officers, same

4   investigation, you know, it's almost like they asked him the

5   same questions twice, and he gave two different answers, and

6   they just picked which answer they liked better.

7            THE COURT:  The second statement in 2018, I

8   didn't look this up, your letter said it was on June 21st,

9   2018.  Was that the day that Dr. Titus was arrested for

10  these charges?

11           MS. KOUSOULIS:  Yes, Your Honor.

12           THE COURT:  Okay.  All right.  I just wanted to

13  see about that.

14           Is there anything you want to say about that?

15           MS. REMIS:  Not unless Your Honor would like me

16  to respond.

17           THE COURT:  No, that's all right.

18           Okay.  Well, if there's nothing else, I will go

19  away and come back at 9:30.

20           MS. REMIS:  One other quick thing, Your Honor.

21  Very quick.  Special Agent McDonald was on our witness list.

22  We are no longer going to call him to testify.  Would he be

23  able to sit in on the Dr. Thomas testimony today?

24           I don't know if the Defense is planning to call

25  him today.

```
 1                    MS. KOUSOULIS:  That's fine, Your Honor.

 2                    THE COURT:  Okay.  Then, yes.

 3                    MS. REMIS:  Thank you.

 4                    THE COURT:  And, again, not trying to pin you

 5        down, Mr. Bostic, but ballpark estimate of how long your

 6        cross-examination might be?

 7                    MR. BOSTIC:  Surprisingly brief.

 8                    THE COURT:  Okay.  Less than half an hour?

 9                    MR. BOSTIC:  Definitely, Your Honor.

10                    THE COURT:  Okay.  All right.  That's all --

11        that's fine.

12                    MR. BOSTIC:  Surprisingly very brief.

13                    THE COURT:  Okay.  Well, now you've really got

14        me hoping.  Okay.

15                    All right.  And who's doing the direct of --

16                    MR. WOODARD:  I am.

17                    THE COURT:  Mr. Woodard, how long do you think

18        the direct of Dr. Thomas is going to be?

19                    MR. WOODARD:  At least into the afternoon.

20                    THE COURT:  Okay.  So like three hours?

21                    MR. WOODARD:  Yes, sir, maybe a little longer.

22                    THE COURT:  Okay.  All right.

23                    All right.  Well, we'll be in recess until 9:30.

24                    DEPUTY CLERK:  All rise.

25                    (Recess was taken.)
```

Petron - Cross

1    DEPUTY CLERK:  All rise.

2    THE COURT:  All right.  I think the jury is

3    here.  So we're ready to go?

4    MR. BOSTIC:  Yes, Your Honor.

5    THE COURT:  All right.  Let's get the jury.

6    (Jury entering the courtroom.)

7    THE COURT:  All right.  Members of the jury,

8    welcome back.  Everyone, you may be seated.

9    Mr. Bostic, you may proceed.

10   MR. BOSTIC:  Thank you, Your Honor.

11                    CROSS-EXAMINATION

12   BY MR. BOSTIC:

13   Q.    Good morning, Mr. Petron.

14   A.    Good morning.

15   Q.    Now, as I understand it, your analysis that you did

16   did not seek to draw any conclusions on how much time

17   Dr. Titus might have spent with a patient, for example;

18   right?

19   A.    I did not draw any conclusion about how much time he

20   spent with a patient.

21   Q.    And neither did you get into the -- any analysis as

22   to his engagement or treatment of patients in this case; am

23   I correct?

24   A.    Correct; outside of the prescriptions and the drug

25   tests I looked at.  That was the majority of my analysis.

Petron - Cross

1    Q.      And with respect to the analysis you did, that was

2    limited to, I think the 300 files that -- the sample that

3    you talked about?

4    A.      It was the sample and then the PMP data.

5    Q.      Okay.  PMP data.

6            And, obviously, you didn't talk to or didn't

7    have a need to talk to any patients?

8    A.      Correct.  I did not talk to any patients.

9    Q.      Now, I heard you, in describing what you do, the

10   sampling, you made an analogy to what pollsters do with

11   elections?

12   A.      Well, what I do is not what pollsters do.  I was

13   trying to give an analogy of something that people would

14   understand as sampling.

15   Q.      Right.  And what pollsters do, do sampling, like you

16   did, right, in terms of getting a smaller unit, and

17   projecting out?

18   A.      Correct.  Right.

19   Q.      And since you used that analogy, you would agree with

20   me that in the presidential election for 2016, the pollsters

21   got the sampling all wrong.  It didn't turn out the way they

22   said it would?

23   A.      Well...

24   Q.      Is that yes or no?

25   A.      It's far more complicated than that.

Petron - Cross

1    Q.     It's far more complicated than that.  Okay.  So

2    sampling is a complicated thing.

3              Now, with respect to the distance that

4    individuals may have traveled, in your chart, I think, as

5    you were talking about it, you talked about addresses and

6    making some correction -- or let me rephrase it and ask it

7    this way.

8              As you look at the PMP data, would it be correct

9    to say that, for example, some people that may at some point

10   have a Maryland address also had a Delaware address?

11   A.     There were patients that had -- the same patient that

12   had multiple addresses, yes.

13   Q.     And you talked about correcting for that.  Did I hear

14   you say that?

15   A.     I did not.

16   Q.     You did not.

17             So, for example, if a person had a Maryland

18   address and a Delaware address, you didn't use the Delaware

19   address, you used the Maryland address in your graph?

20   A.     No.  I would have used whatever address was present

21   for that patient in the data.

22   Q.     Okay.  So I'm clear, to the extent there were more

23   than one state address listed for a person in the PMP data,

24   dealing with Maryland again, you used the Maryland address?

25   A.     So let me explain it this way.  Every row in the data

Petron - Cross

1    had an address for a patient.  So when I was doing the

2    calculations, I used whatever address was there.  And so if

3    you look on that chart, if we want to bring it up, I think I

4    put a footnote that said something to the effect of:  If you

5    add up the patients, they're not going to add up because

6    every time an address were to change, I just used whatever

7    address was present.

8    Q.    So, and again, you know, you said it's a complicated

9    field.  But, again, to the extent a person may have -- a

10   patient had three addresses, two in Delaware, one in

11   Maryland, how did you differentiate in terms of which one

12   you put in your analysis to prepare the chart, the distance

13   charts?

14   A.    So in that situation, there would be three records.

15   Let's just call it a record from January, a record from

16   February, and a record from March.  And so the Maryland

17   address was the record from January, the Delaware address

18   one is the record from February.  And the Delaware address,

19   number two, was the record from March.  That person would

20   appear three times in my chart, one for each of those

21   addresses.

22   Q.    Now, with respect to those individuals that had both

23   addresses, again, staying with Maryland, in Delaware and

24   Maryland, you did no analysis to determine what relationship

25   may have existed between Dr. Titus and that patient that you

Petron - Cross

1    listed several times in your chart.  Would that be fair to

2    say?

3    A.     I didn't do any independent research into a

4    relationship.  I was merely looking at the data and

5    capturing the distances.

6    Q.     So your data would not account for if a patient who

7    lived in Delaware to, say, up to January 2014, and then

8    moved to Maryland, but had been seeing Dr. Titus for five

9    years before that, your analysis would not account for that?

10   A.     Again, my analysis would account for it to the effect

11   of before 2014, it would have the Delaware address -- and

12   I'm presuming here.  But after 2014, it would have the

13   Maryland address.  And those would be the addresses I would

14   use.

15   Q.     Now, as I understand it, you determined the universe

16   of patient files to be 1,142 patient, chronic pain patient

17   files?

18   A.     Correct.  1,142 patients.

19   Q.     And I'm going to show Page 803 of Exhibit 803 from

20   the Government, Page 5.

21          And then you did an extrapolation with respect

22   to the 300 patients that you sampled with respect to when

23   you talked of discharge and counseling letters.

24   A.     I know there was a slide.  I'm not sure --

25   Q.     Right.  I'm going to show you.

Petron - Cross

1   A.      Yeah.

2   Q.      -- the page.  There you go.

3           That is Government Exhibit 803, I believe,

4   Page 5.

5           You recognize that?  That's your work; right?

6   A.      Correct.  Yes.

7   Q.      Now, with respect to sample and counseling with

8   discharge letters, am I correct that you found that

9   49.2 percent of the files where patients received

10  sampling -- I'm sorry, counseling or discharge letters?

11  A.      Correct.  139 patients, 49.2 percent.

12  Q.      And when you extrapolated that out, that would be

13  true and correct for the entire 1,142 chronic patient files?

14  A.      When I extrapolate it, it's the next number to the

15  right, the 563.

16  Q.      Right.  But what I'm getting to, that 49.2 percent,

17  does not change?

18  A.      It should not change.

19  Q.      Right.  It should not.  And, in fact, you show that

20  out of the 11 -- 1,142, 1,142 chronic pain patients, that

21  approximately 563 or 563 received counseling and discharge

22  letters?

23  A.      That's my estimation.

24  Q.      So just about half of that entire population?

25  A.      Just about.

Petron - Cross

1    Q.      Now, my understanding is that you own a, is it the

2    Stout Company?

3    A.      I'm sorry, Stout?

4    Q.      Yes.

5    A.      That's the company I work at, yes.

6    Q.      Were you a principal in that company?

7    A.      I'm the manager of the company.

8    Q.      You're in management?

9    A.      Yes.

10   Q.      Okay.  And would it be fair to say that, as I

11   understand it, Stout does a lot of work for the Federal

12   Government -- for the United States Government?  Is that

13   correct?

14   A.      I do a lot of work for the United States Government.

15   I wouldn't say Stout in general does.

16   Q.      And you work for various U.S. Attorney's offices?

17   A.      I have.  Yes.

18   Q.      Who else do you work for in terms of the work that

19   you do for the Government?

20   A.      For the Government?

21   Q.      Yes.

22   A.      I do a lot of work for what's called the Criminal

23   Division Fraud Section.  I work for something called the

24   Executive Office for United States Attorneys, and that

25   loosely covers a lot of the United States Attorney's offices

Petron - Cross

1    across the country.

2    Q.      So you're the go-to person in many cases for the

3    United States Attorney's office; would that be fair to say?

4    A.      I don't know.  I get called a lot, so...

5    Q.      Right.  And, indeed, you talked somewhat about having

6    represented defendants in some private matters; right?

7    A.      Correct.

8    Q.      And those are business entities and business

9    defendants?  Let me rephrase that.

10          Those individuals that you consult with that you

11   term as "defendants," you're not talking about individuals

12   charged with a criminal matter; am I correct?

13   A.      Occasionally, yes.

14   Q.      Now, with respect to the -- as I understand it, in

15   sum total, Stout made over $8 million based on the work that

16   they do for the Government or that you do for the

17   Government?

18   A.      So I think I was asked to provide Stout's total

19   revenue from the D.O.J. over the last, I forget the time

20   period, two or three years.  And I think --

21   Q.      I think it was '19 -- I'm sorry, 2018 and 2019, if I

22   remember correctly, but I could be wrong.

23   A.      Yeah.  I'm sure it was over one year, I just don't

24   remember if it was two or three years.  But that number, $8

25   million, does ring a bell as the total revenue that my

Petron - Redirect

1    practice generated from the fraud section, yes.

2                    MR. BOSTIC:  If I may have a moment, Your Honor.

3                    Your Honor, I have no more questions.

4                    THE COURT:  Okay.

5                    MR. BOSTIC:  Thank you, Mr. Petron.

6                    THE COURT:  Thank you, Mr. Bostic.

7                    Any redirect?

8                    MS. REMIS:  Just two questions, Your Honor.

9                    THE COURT:  All right.  Two questions.

10                       REDIRECT EXAMINATION

11   BY MS. REMIS:

12   Q.     Good morning, Mr. Petron.  How are you?

13   A.     Good morning.

14                    THE COURT:  That's one.

15                    MS. REMIS:  Oh, that doesn't count.  Three

16   questions.  Sorry, Your Honor.

17   BY MS. REMIS:

18   Q.     Mr. Petron, you're just here to talk about numbers;

19   is that right?

20   A.     I consider myself a calculator, yes.

21   Q.     Okay.  And I want to ask you about Government

22   Exhibit 801, Page 10.  And you mentioned to Mr. Bostic that

23   there was a footnote, which I believe is Footnote Number 2,

24   "Number of patients is not additive due to some patients

25   having multiple addresses."

Petron - Redirect

1          When you were looking at the PMP data, were you

2    simply taking the information that is in the PMP data and

3    putting it into a chart form?

4    A.    Correct.  I wasn't changing the data or inferring

5    where someone lived.  I just used the information that was

6    presented to me.

7    Q.    Okay.

8          MS. REMIS:  No further questions.

9          THE COURT:  All right.  Thank you.

10         Mr. Petron, thank you very much.  You're

11   excused.  You may go.

12         MR. WOODARD:  United States calls Dr. Stephen

13   Thomas.

14         DEPUTY CLERK:  Dr. Thomas, if you're

15   comfortable, you can take your mask down.

16         Please state and spell your full name for the

17   record.

18         THE WITNESS:  Stephen, S-T-E-P-H-E-N, Michael,

19   M-I-C-H-A-E-L, Thomas, T-H-O-M-A-S, M.D.

20         DEPUTY CLERK:  Do you affirm that the testimony

21   you are about to give to the Court and the jury in the case

22   now pending will be the truth, the whole truth, and nothing

23   but the truth, you do so affirm?

24         THE WITNESS:  I do.

25         DEPUTY CLERK:  Thank you.

Thomas - Direct

1       STEPHEN THOMAS, M.D., the witness herein, after

2    having been duly affirmed under oath, was examined and

3    testified as follows:

4                   DIRECT EXAMINATION

5    BY MR. WOODARD:

6    Q.    Good morning, Dr. Thomas.

7    A.    Good morning.

8    Q.    All right.  How are you currently employed?

9    A.    I am a pain medicine physician.  I'm self employed.

10   My company is called Pain & Disability Management

11   Consultants.

12   Q.    Is your microphone on, by chance?

13   A.    Okay.  Yes.

14   Q.    Much better.  Thank you.  It's early.

15           All right.  You mentioned you're a physician.

16   What kind of medicine do you practice?

17   A.    I'm a pain medicine physician.  I am an

18   anesthesiologist by trade, but for the last 23 years I've

19   practiced solely in the area of pain medicine.

20   Q.    All right.  And, Dr. Thomas, where did you complete

21   your medical training?

22   A.    I went to medical school at the Stanford University

23   School of Medicine in Palo Alto, California, followed by

24   a -- followed by an internship at the Presbyterian

25   University of Pennsylvania Medical Center in Philadelphia.

Thomas - Direct

1    I then did a residency in anesthesiology at the Johns

2    Hopkins Hospital in Baltimore, Maryland.

3            At the completion of my residency, I did a

4    fellowship in pain medicine and regional anesthesia, also at

5    the Johns Hopkins Hospital, where I was the Chief Resident

6    in the Department of Anesthesiology and Critical Care

7    Medicine.

8    Q.    And did you provide any medical services in the Armed

9    Forces?

10   A.    After the completion of my residency and fellowship,

11   I owed the United States Air Force four years.  I went to

12   the Wright-Patterson United States Air Force Medical Center

13   in Dayton, Ohio, where I attained the rank of Major, served

14   as the Assistant Chief of Anesthesia Services for the

15   Wright-Patterson Medical Center, and was the founder of the

16   first pain medicine practice in the central region of the

17   Air Force at Wright-Patterson.

18   Q.    And after your four years, were you honorably

19   discharged?

20   A.    Yes, fortunately.

21   Q.    Okay.  After that service, Dr. Thomas, did you have a

22   clinical practice?

23   A.    Yes.  I decided to go back home to Pittsburgh where I

24   joined a large multi-center anesthesia group of 40

25   anesthesiologists and a hundred nurse anesthetists.  I

Thomas - Direct

1    initially worked as an anesthesiologist and did dedicated

2    work in pain medicine, about 50-50.

3            Over the course of the subsequent six years, I

4    transitioned to all pain medicines, ending my anesthesia

5    practice.  I served as the Medical Director of Pain Medicine

6    at the Wright -- at the Mercy Hospital of Pittsburgh, the

7    Health South Harmarville Rehabilitation Patient Center in

8    Pittsburgh, the St. Francis Medical System in Pittsburgh,

9    Pennsylvania.

10           At the conclusion of my service in PAA,

11   Pittsburgh Anesthesia Associates, I went into private

12   practice forming Pain & Disability Management Consultants,

13   which I operated as a private interventional and

14   rehabilitation practice until June of 2014, precisely 30

15   years from the day that I completed medical school.

16           Because I had an interest in trying to teach

17   doctors how to use medications appropriately, I set up

18   another company called SSEA, Safe Simple Effective

19   Analgesia.  We developed a program to give doctors feedback

20   on their prescribing, and hopefully get them in compliance

21   with the literature and the appropriateness of prescribing

22   of controlled substances and other pain medicines.

23           That business venture did not lead to what we

24   call product market fit and had to close in 2018.

25   Q.    Thank you, Doctor.

1201

Thomas - Direct

1    Do you hold any medical specialties or

2    certifications?

3    A.    I am certified by the American Board of

4    Anesthesiology with subspecialty certification in pain

5    medicine.  I have recertified in pain medicine.  Initial

6    certification and two recertifications, the last being in

7    2015.  I have -- pain medicine -- I am -- I am a -- I'm

8    board-certified by the American Board of Independent Medical

9    Examiners.  I have a subspecialty certification in

10   controlled substances practice from the American Board of

11   Interventional Pain Physicians.

12   Q.    All right.  And Dr. Thomas, other than your M.D.

13   degree, do you hold any other graduate degrees?

14   A.    In 2012, I obtained an MBA from the Katz School of

15   Business at the University of Pittsburgh.

16   Q.    And, Dr. Thomas, have you been qualified as an expert

17   by any courts in regards to pain medicine?

18   A.    Yes.  I've been qualified as an expert by Federal

19   Courts on 15 occasions, and by State Courts in Pennsylvania,

20   Delaware, and Maryland on 12 occasions.

21        MR. WOODARD:  Your Honor, may I proceed with the

22   questioning?

23        THE COURT:  Yes.

24   BY MR. WOODARD:

25   Q.    All right.  Dr. Thomas, now that you've been

Thomas - Direct

1    introduced, in connection with your work in this case, did

2    you have an opportunity to review medical records from the

3    practice of Dr. Patrick Titus?

4    A.    I did.

5    Q.    Okay.  And in your review of those records, what

6    questions were you specifically trying to answer?

7    A.    I was given the records with the task of answering

8    whether or not, for the charged counts in the indictment, if

9    Dr. Titus had prescribed the medications for a legitimate

10   medical purpose in the usual course of professional

11   practice.

12   Q.    And based on your review of the records from

13   Dr. Titus' practice, did you reach conclusions regarding

14   whether Dr. Titus' prescribing, with respect to the 14

15   patients named in the indictment on the specific instances

16   called out in the indictment, was consistent with the usual

17   course of professional practice and for a legitimate medical

18   purpose?

19   A.    Yes.  For at least those instances named in the

20   indictment, the prescribing of the controlled substances to

21   those 14 patients was not for a medically legitimate purpose

22   in the usual course of professional practice.

23   Q.    And did you also do a subsequent review of some

24   randomly selected files in this matter?

25   A.    I did.

Thomas - Direct

1    Q.     Did you conclude that for some of those files

2    reviewed or did you reach the same conclusion as to some of

3    those files?

4    A.     For an additional 30 files, I did find that the vast

5    majority, the prescribing was not for a medically legitimate

6    purpose in the usual course of professional practice.  But

7    because of the standard and the level of malfeasance that's

8    necessary to reach that, for some of the files I did not

9    find that.

10   Q.     Okay.  And when you said 30, I believe it was 24

11   supplemental files that you eventually reviewed and opined

12   on; does that sound correct?

13   A.     Oh, okay.  They handed me a stack of files.  And,

14   yes, I thought it was 30, but -- it felt like 30, but it was

15   24.  I'm sorry.

16   Q.     Fair enough.

17          Okay.  And, Dr. Thomas, we'll walk through your

18   conclusions here in a little bit, but let's set the stage.

19          So you've mentioned pain medicine.  Could you

20   please describe for the jury the term "pain medicine"?

21   A.     The specialty of pain medicine, and I am a

22   specialist, a subspecialist, is the specific interest in the

23   diagnosis and treatment and subsequent ongoing evaluations

24   of patients with acute; that is broken leg hurts right now;

25   subacute, it's been hurting for a while, but it's getting a

1204

Thomas - Direct

1   little better, the first 30 days; chronic, pain that has

2   lasted beyond the expected time of healing, usually 90 days

3   or more, arbitrary; and cancer pain or cancer-related pain.

4          I -- some many people call what I do pain

5   management.  I don't.  I call it pain medicine because it is

6   not just the management of the problem.  It's not just what

7   we're doing about the problem.

8          It's, number one, and most importantly, the

9   identification of what the problem is.  Because the practice

10  of medicine is about figuring out what's wrong with the

11  patient, translating that into medicalease, finding a way

12  forward that sometimes includes what doctors do, and

13  sometimes includes what patients do, and sometimes includes

14  what other people do in order to get the best possible

15  outcome for the patient.  And so it's always very important

16  for -- in the practice of medicine, that it always be about

17  the medicine.

18         Nonetheless, pain is the most common complaint

19  to which doctors are presented.  So every physician

20  practices pain medicine, and sometimes that includes the use

21  of controlled substances, which we'll talk about.

22  Q.    Okay.  So we've talked about pain medicine, and you

23  talked about some of the things you do in the practice of

24  pain medicine.

25         Are you familiar with the term "standard medical

Thomas - Direct

1    model"?

2    A.    Yes.

3    Q.    Is this something that's taught like in medical

4    school?

5    A.    Yes.

6    Q.    Okay.  Could you just give the jury, in broad

7    strokes, what the standard medical model includes?

8    A.    The standard medical model, every doctor knows it

9    because it's what we learned beginning the second year of

10   medical school, and every patient knows it because it's what

11   your doctor does to you.

12            The patient comes in and says, "Hey, Doc, I've

13   got," and the doctor says, "Tell me about that."  That "tell

14   me about it" question that goes on to a number of other

15   levels is called the history.  The history is taken from the

16   patient.

17            After the doctor asks all the questions about

18   where is it, what is it, why is it, what makes it better,

19   what makes it worse, what have you done for it up until now,

20   and gets some details about what's going on with the patient

21   through the history, then we do this thing that we only let

22   doctors do to people called a physical examination.  It's

23   one of the few places in our society where we allow people

24   to invade our space, and we invade all of the spaces.

25            And we do that in order to get more information

1   about what the patient is telling us when they say, "Hey,

2   Doc, I've got."  The history and physical examination give

3   us 80 to 90 percent of all the information we need to figure

4   out what's going on.  But because in modern medicine we have

5   other things that can help us, we get diagnostic testing.

6   That diagnostic testing may be any number of bodily fluids,

7   sweat, spit, blood, urine, and others.  And it may include

8   structural studies, x-rays, MRIs, CAT scans. But those

9   things only help to flesh out the details on "Hey, Doc, I've

10  got" and the physical examination.

11         Once we have history, physical examination,

12  diagnostic studies, then we get to the part where the doctor

13  does the work of medical naming.  We call that medical

14  naming diagnosis.  So the diagnosis of what the problem is,

15  what the problem might be if the doctor is wrong, because

16  we're frequently wrong, but never in doubt.

17         And then what are we going it do about it?  That

18  is, is it going to be medication, surgery, physical therapy,

19  injections?  What's the answer to the next thing that we do?

20         That's the treatment phase.  So the doctor comes

21  up with a plan for how they're going to treat it.  They then

22  institute the treatment.  And then the thing that we all

23  know happens after that is the doctor never knows what's

24  going to happen next.  We just pretend like we do.  Because

25  what we need is for the patient to come back to us and say,

Thomas - Direct

1   "Hey, Doc, that worked."  "It didn't work."  "It's great."

2   "It sucks.  You're no good."  "I'm sick."  Because all of

3   those things are possibilities.

4           So that circle has to continue where the doctor

5   again says, How are you?  And the patient knows everything

6   and the doctor knows the rest.  And the patient tells the

7   doctor what's going on.

8           And so that process repeats.  And the doctor

9   does every time some of that.  He doesn't have to do all of

10  it every time, but some of it has to occur in order for it

11  to be the practice of medicine.

12  Q.     Okay.  Let me just run back through this very quickly

13  and make sure I got it right.  So we start with history?

14  A.     Yes.

15  Q.     And then you mentioned physical exam?

16  A.     Yes.

17  Q.     Is a physical exam particularly important in the

18  practice of pain medicine?

19  A.     Oh, absolutely.  Because one of the things that

20  happens is the patient can say, "My back hurts."  But if you

21  feel right now, you can tell what's on your front a lot

22  better than what's on your back.  So the patient doesn't

23  know if their back pain is from their disc, their joint,

24  their sacroiliac, their muscle.  They can't localize that.

25  So laying our hands and trying to figure out what part or

Thomas - Direct

1    piece is hurting is an important part of diagnosis.

2    Q.     Okay.  So we get to diagnosis next?

3    A.     Yes.

4    Q.     Treatment plan?

5    A.     Yes.

6    Q.     Repeat the cycle?

7    A.     Well, execute the treatment.

8    Q.     Execute.

9    A.     Yes.  So you have to execute the treatment, then

10   repeat the cycle.

11   Q.     Okay.  And is the purpose of taking all these steps

12   and repeating the cycle, or one purpose, to promote

13   individualized patient treatment?

14   A.     Absolutely, because I've seen 50,000 people with back

15   pain and none of them were exactly the same because they

16   were 50,000 individual people with their individual

17   problems.  And one of the things that we must always

18   recognize that I learned from a guy named Zowin Mosler, one

19   of the first physicians developing medical models, is it's

20   as important to know what patient has the disease as what

21   disease the patient has.

22           Because some people will come in with their

23   tendons out and a rag wrapped around their hand and say,

24   "Hey, Doc, I cut my hand."  And other people will have a

25   paper cut and they'll be screaming.  So it's not just the

Thomas - Direct

1  diagnosis, it's also the person, because we treat people,

2  not diagnoses.

3  Q.    All right.  So we've covered the standard medical

4  model.  And when you're asked to review patient records to

5  determine whether the prescriptions were in the usual course

6  of professional practice and for a legitimate medical

7  purpose, are you looking for application of the standard

8  medical model in those files?

9  A.    Yes.  I'm looking to see if medicine is being

10  practiced, or are the patients being evaluated, or is

11  individualized care occurring.

12  Q.    And is it important that this standard medical model

13  and all the things you describe be documented in the patient

14  charts?

15  A.    Documentation is one of the elements of making the

16  prescribing for a medical legitimate purpose and usual

17  course of professional practice.

18  Q.    Okay.  Let's switch gears a  little bit.  And I'll

19  ask you, in reviewing the records in this case, were you

20  relying on any particular guidelines or standards applicable

21  to the usual course of professional practice?

22  A.    Yes.  So for a controlled substance prescribing,

23  there are a couple of standard generally-accepted references

24  for what the physician should be doing.  Particularly, in

25  the State of Delaware, as well as 70 other states and

Thomas - Direct

1  territories have adopted what's called a Federation of State

2  Medical Boards Model Policy for the use of opioids in the

3  treatment of chronic pain.  I will shorten that to "model

4  policy."

5           So the model policy was initially developed in

6  1998 as we began to liberalize our use of opioids.  Then it

7  was revised in 2004.  Again in 2013.  Again in 2017.

8           We will be talking particularly about the 2004

9  and 2013 revisions because they apply to the time frame of

10  the charged incidents in this occurrence.  Additionally,

11  there was a seminal article -- and by "seminal" we always

12  mean, like, this is the one everybody reads -- from the

13  American Academy of Pain Medicine written by a guy named

14  Roger Chou, and a whole bunch of other folks, called

15  guidelines for the use of opioids and in the treatment of

16  chronic pain.

17           And those guidelines, published in 2009, are

18  frequently -- continue to be referred to as the underlying

19  bases for our appropriate use of controlled substances,

20  opioids in particular -- by "opioids," I mean Morphine-like,

21  drugs.  Sorry -- and, again, the treatment of chronic pain.

22  Q.    Okay.  And let's look at those guidelines in just a

23  minute here.  It's not your testimony that a doctor who

24  fails to meet every single guideline is not prescribing for

25  a legitimate medical purpose; right?

Thomas - Direct

1    A.     Absolutely not.  I always think of it as a highway.

2    You know, when I'm driving down the road, if I stay right

3    between the lines and I'm in my lane and driving the speed

4    limit, then, in fact, I'm in a safe space.  And so any

5    doctor who prescribes just according to following all of the

6    guidelines is absolutely in a safe harbor in terms of any

7    attack or criticism of their treatment because they're

8    following it by the book.

9          However, one can get progressively further and

10   further away from that safe harbor, and such that, you know,

11   you can be a crappy doctor because you don't do half of it,

12   or you can be inattentive, or a whole bunch of other names

13   that can be called because you don't do some of the things.

14         When I say not prescribing for a medically

15   legitimate purpose in the usual course of professional

16   practice, that means that you are not on the road.  You are

17   not practicing medicine.  It's not just that you didn't do

18   one thing.  It's not that you didn't do two things.  It's

19   that you didn't do a whole bunch of things that would make

20   it recognizable that you were actually being a doctor, that

21   you were actually doing things that were for the best

22   interest of the patient in order to treat -- diagnose,

23   treat, or cure whatever ailment they brought to you.  You

24   have to be not anywhere close to the road.  You're off the

25   road.

Thomas - Direct

1   Q.     All right.  Let's dig into these model policies,

2   Dr. Thomas.

3              MR. WOODARD:  Ms. Leal, if you could pull up

4   Government's Exhibit 213.

5   BY MR. WOODARD:

6   Q.     Okay.  This is the document we've looked at so far in

7   this case, Dr. Thomas.  What are we looking at here?

8   A.     This is the 2004 version of the model policy.

9   Q.     Okay.

10  A.     And 2004 was -- the reason that it was rewritten at

11  this time is that additional warnings need to be -- needed

12  to be added from the observation of what had happened

13  between 1998 and 2004, because there were problems with the

14  way with -- in which physicians were prescribing opioids.

15             MR. WOODARD:  And, Ms. Leal, can you scroll

16  through to the next page?  And one more, please.  Okay.

17  BY MR. WOODARD:

18  Q.     Does it talk about guidelines, Dr. Thomas?

19  A.     Yes, it does.

20  Q.     What's the purpose of these guidelines?

21  A.     This is basically to say, Hey, doctors and other

22  prescribers, here are the things that you should be doing in

23  order to standardize your care across -- across the country,

24  frankly, and to make sure that all patients are being

25  treated in an appropriate fashion with these drugs.

1    Q.    So let's just hit a few.  It talks about evaluation

2    of the patient.  Is that similar to what you just described

3    with the standard medical model?

4    A.    Exactly.  When a doctor evaluates the patient, they

5    come in, we ask them questions, we examine them, we do

6    things to make a diagnosis.

7    Q.    Okay.

8           MR. WOODARD:  Next page, please, Ms. Leal.

9    BY MR. WOODARD:

10   Q.    What's next?

11   A.    We develop a treatment plan.  We have a diagnosis.

12   We develop a treatment plan.  And here, one of the things

13   that became apparent is when we use opioids, Morphine-like

14   drugs, the fact of the matter is that there are downsides to

15   the use of these drugs.  There are no roses without thorns.

16          The thorns of any medical treatment requires

17   that we obtain informed consent from the patient.  Informed

18   consent simply means, I'm going to let you know what I know

19   about the upsides and the downsides of these drugs,

20   particularly when you take these drugs for a prolonged

21   period, you will become dependent.

22          Being dependent is not necessarily a bad thing.

23   It means that your body expects the drug to be there.  And

24   so letting patients know that your body will expect the drug

25   to be there, and if you stop taking it, you will go into

1214

Thomas - Direct

1   withdrawal, is something that we do in terms of informed

2   consent.

3           We also need to talk to them about the other

4   side effects.  The fact that it will make your bowels not

5   move.  It will suppress the hormones.  It can make you

6   intoxicated.

7           All those things are part of the informed

8   consent in terms of what we expect and what we don't expect

9   from the drugs.

10  Q.    So Dr. Thomas, we're in 2004 here with this model

11  policy?

12  A.    Yes.

13  Q.    And is it about a five-page-or-so document?

14  A.    It is.

15  Q.    Okay.  After the 2004 revision came out, did anything

16  happen in the world of pain medicine?

17  A.    From 2004 until 2010, the number of opioid

18  prescriptions roughly -- administered in the United States

19  roughly doubled.  As that occurred, we recognized that more

20  and more people were having problems in terms of overdose.

21  And so in 2011, the Center for Disease Control declared that

22  a opioid epidemic -- a prescription opioid epidemic was

23  afoot in the United States.

24          That epidemic was one of a greatly increased

25  problem in terms of use, abuse, visits to emergency rooms,

Thomas - Direct

1    overdoses, and deaths associated with the uses of these

2    drugs.  And as a result, not only were all physicians placed

3    on notice, it was part of the -- what went to the general

4    public.  It was on -- you know, for example, in 2010, and

5    2011, Oxycontin was on the -- one of the most widely used

6    prescription drugs -- was on the cover of Time and News

7    Week.

8    Q.    Okay.  So following the onset of the opioid epidemic

9    around 2011, did the Federation take any of that into

10   account with regard to the model policy?

11   A.    Yes, they did.  And so they revised it in 2012 and

12   published it after circulation to all the medical boards in

13   July of 2013, a revision to the model policy.

14   Q.    And what does a model policy mean?  How does that

15   relate to individual states?

16   A.    Well, the model policy was generally adopted by

17   medical boards.  As I said, 70 medical boards in the -- in

18   the states and the territories adopted the model policy as

19   part of their regulation.  In Delaware, in particular, in

20   2012, the Delaware State Medical Board included the model

21   policy as part of the regulatory framework for all Delaware

22   physicians.  And, thus, when it was revised in 2013, that

23   revision was also included as part of the Delaware Medical

24   Practice Act.

25   Q.    Okay.  All right.  I want to pause here in time,

Thomas - Direct

1    Dr. Thomas, and show you a document.

2                MR. WOODARD:  Ms. Leal, if you could pull up

3    Government's Exhibit 614.

4    BY MR. WOODARD:

5    Q.    Have you reviewed this document before, Dr. Thomas?

6    A.    Yes, I have.

7    Q.    Okay.

8                MR. WOODARD:  And Ms. Leal, if you could just

9    scroll to the last page.

10   BY MR. WOODARD:

11   Q.    So when was this document signed?

12   A.    On March 22nd of 2012, Dr. Titus entered into a

13   Consent Decree with the Delaware Department of State.

14   Q.    So about a year after the opioid epidemic was

15   announced?

16   A.    Yes.

17   Q.    And around the same time the model policy was being

18   updated yet again?

19   A.    Yes.

20   Q.    Okay.  And what is --

21               MR. WOODARD:  If you could go back to the top,

22   Ms. Leal.

23   BY MR. WOODARD:

24   Q.    What is this document?

25   A.    This is a Consent Decree that Dr. Titus entered into

Thomas - Direct

1    after a suspension of his controlled substances prescribing

2    privileges by the Delaware Secretary of State.

3              In this Consent Decree, Dr. Titus was placed on

4    notice that his practice in prescribing controlled

5    substances was substandard.  They particularly noted the

6    lack of physical examination, the lack of history taking,

7    the number of controlled substances that were being

8    prescribed to patients.

9              MR. BOSTIC:  Objection, Your Honor.  Your Honor,

10   may I have a moment?

11             THE COURT:  Yes.  Yes.

12             MR. BOSTIC:  Your Honor, we would move to strike

13   the last set of -- piece of the doctor's testimony with

14   respect to what was set forth in the Consent Decree.  I

15   believe that -- may I see you at side-bar.

16             THE COURT:  Yeah.  Why don't you come to

17   side-bar.

18             (Beginning of conference held at side-bar:)

19             MR. WOODARD:  I'm just not sure --

20             MS. KOUSOULIS:  Your Honor, I don't believe --

21             MR. WOODARD:  I think the issue was, Your Honor,

22   he may have been speaking to things we whited out.  So I

23   think Mr. Bostic made an appropriate objection, and I told

24   him just now I would agree with --

25             THE COURT:  All right.  So just strike --

1    MR. BOSTIC:  I don't know that striking -- the
2    problem is he started coming in --
3    THE COURT:  Why don't I just strike the last
4    answer.
5    MR. BOSTIC:  I should --
6    THE COURT:  Question and answer and ask you to
7    ask the question again.
8    MR. WOODARD:  I'll make sure he just follows the
9    document.
10    THE COURT:  Okay.
11    (Conclusion of conference held at side-bar.)
12    THE COURT:  Members of the jury, I'm going to
13    strike the last question and answer.  I think I told you at
14    the beginning, and I will probably tell you again at the
15    end, it means you can't consider that question and answer.
16    You just completely disregard that it was said.
17    Mr. Woodard, go ahead.
18    MR. WOODARD:  Thank you.
19    BY MR. WOODARD:
20    Q.    So Dr. Thomas, let's just look specifically at the
21    document and only read --
22    A.    Yes.
23    Q.    -- what's on here.
24    A.    Thank you.
25    Q.    Okay.  So what does it say in Paragraph 4?

Thomas - Direct

1   A.      In Paragraph 4, it states, "Dr. Titus currently

2   requires additional training, education, and knowledge to

3   manage chronic pain patients, and to safely and effectively

4   prescribe narcotics and other controlled substances for

5   patients with chronic pain."

6   Q.      And in Number five, what does it say about Dr. Titus'

7   prescribing?

8   A.      "Dr. Titus has been treating increased numbers of

9   chronic pain patients and has been prescribing increased

10  amounts of controlled substances to his chronic pain

11  patients."

12  Q.      Okay.

13          MR. WOODARD:  Next page, please, Ms. Leal.

14  BY MR. WOODARD:

15  Q.      Okay.  Starting here on Paragraph 9, was Dr. Titus

16  required to do anything in particular resulting from this

17  Consent Decree?

18  A.      He was required to submit to the secretary evidence

19  that he is practicing -- that his practice is fully equipped

20  to comply with the regulation of the control -- of the use

21  of controlled substances for the treatment of pain, the

22  model policy, as well as the guidelines of the American Pain

23  Society and the American Academy of Pain Medicine concerning

24  appropriate opioid practices published in the Journal of

25  Pain, February 2009.

Thomas - Direct

1    Q.    Okay.  So we see here the model policy.  Is that what

2    we've been going over this morning?

3    A.    Yes.

4    Q.    Okay.  And we also see an AAPM guideline?

5    A.    Yes.

6    Q.    Is that something you referenced earlier?

7    A.    Yes, that is the Roger Chou article that I spoke of,

8    published in Pain in 2009.

9            MR. WOODARD:  Your Honor, we would offer

10   exhibit -- let's see -- 901 into evidence without objection.

11           THE COURT:  All right.  It is admitted without

12   objection.

13           (Government Exhibit No. 901 was admitted into

14   evidence.)

15   BY MR. WOODARD:

16   Q.    Okay.  Is this the seminal article you referenced,

17   Dr. Thomas?

18   A.    Yes, it is.

19   Q.    Okay.  And we don't need to go through in detail this

20   medical article, but is this talking about some of the

21   things you've been talking about this morning?

22   A.    Yes.  It says in this article -- the phrase "thorough

23   history and physical" appears four times.  And it talks

24   about the appropriate diagnosis and treatment and use of

25   these drugs, as well as the things to do in followup.

Thomas - Direct

1    Q.    All right.

2              MR. WOODARD:  And Ms. Leal, if we could go back

3    to 614, and Page 2.  And down to Page 3, please.

4    BY MR. WOODARD:

5    Q.    Okay.  Towards the bottom, Dr. Thomas, was Dr. Titus

6    required to take any continuing medical education?

7    A.    Yes.

8    Q.    And what's your understanding of the importance of

9    continuing medical education?

10   A.    Continuing medical education is important in order to

11   continually update physicians on the appropriate guidelines

12   and current best practices in all of medicine, including

13   pain medicine.  The continuing -- the continuing education

14   and the use of opioids would include updating the -- for

15   example, the new version of the model policy would have been

16   an important part of the ways in which we updated physicians

17   regarding the use of opioids between 2012 and 2014.

18   Q.    All right.  I just want to quickly show you

19   Exhibit 206, please.

20              What do these appear to be, Dr. Thomas?

21   A.    These -- this is a record of continuing medical

22   education regarding pain medicine and other areas that

23   Dr. Titus submitted.

24   Q.    Okay.

25              MR. WOODARD:  And if we could go to 619,

Thomas - Direct

1    Ms. Leal.

2    BY MR. WOODARD:

3    Q.      What are we looking at here, Dr. Titus?

4    A.      This is a --

5    Q.      Sorry, Thomas.

6    A.      This is a certificate regarding the use of

7    extended-release long-acting opioids, REMS, which is -- I

8    forgot what that stands for right at this moment.  But it's

9    a safety program published by the FDA on the use of

10   long-acting opioids.

11   Q.      And what's the date of completion on this CME?

12   A.      Okay.  Oh, thank you.  August 14th, 2014.

13   Q.      Okay.  Are we after the point when the 2013 revision

14   to the model policy came out?

15   A.      Yes.

16   Q.      Okay.  Would that have been discussed in a course on

17   use of opioid medications?

18   A.      Yes.

19   Q.      Okay.

20           MR. WOODARD:  Ms. Leal, if you could just scroll

21   through this document.  Next page, please.  And keep going.

22   BY MR. WOODARD:

23   Q.      What's this one show here, Dr. Thomas?

24   A.      This is a certificate of credit regarding continuing

25   education on the Safe Use of Opioids and the Treatment of

Thomas - Direct

1    Pain.  Also on August 14, 2014.

2    Q.    Okay.

3              MR. WOODARD:  And, Ms. Leal, could you just go

4    to the last page of this document?  Okay.

5    BY MR. WOODARD:

6    Q.    And it looks like about 23 pages, if you could see

7    that towards the bottom.  How long would it take a doctor to

8    take this many CMEs?

9              MR. BOSTIC:  Objection, Your Honor.  I don't

10   know that there's a proper foundation for this question.

11             THE COURT:  All right.  Well, I think there is,

12   so I'm going to overrule the objection.

13             THE WITNESS:  In order to claim 24 hours of

14   Category 1 credit, a doctor is asserting that he has -- he

15   has performed 24 hours, clock hours, of study and

16   consideration of the material.

17   BY MR. WOODARD:

18   Q.    Okay.  So is each credit here about an hour?

19   A.    Each credit is precisely one hour.

20   Q.    Okay.  All right.  Thank you.

21             MR. WOODARD:  Your Honor, the Government offers

22   Exhibit 902, which is the 2013 model policy, into evidence,

23   I believe without objection.

24             MR. BOSTIC:  No objection, Your Honor.

25             THE COURT:  All right.  Admitted without

1224

Thomas - Direct

1  objection.

2              (Government Exhibit No. 902 was admitted into

3  evidence.)

4  BY MR. WOODARD:

5  Q.    Okay.  Is this the 2013 model policy we've been

6  leading up to?

7  A.    Yes.

8  Q.    Okay.  And we're after the announcement of the opioid

9  epidemic?

10  A.    In 2011.

11  Q.    And we're after Dr. Titus' Consent Decree?

12  A.    In 2012.

13  Q.    Okay.  But we're before his continuing education on

14  these topics --

15  A.    Yes.

16  Q.    -- or around the same time?

17  A.    They're concomitant.

18  Q.    Okay.

19  A.    And this applies for all times after July 2013.

20  Q.    Okay.  Is this document a good bit longer than the

21  first model policy we looked at?

22  A.    It's 29 pages in length rather than five.

23  Q.    Okay.  We won't read all 29, but let's go through a

24  little bit here.

25              And just to be sure, was this policy adopted

Thomas - Direct

1  specifically in Delaware?

2  A.    Yes, it was.

3  Q.    Okay.

4        MR. WOODARD:  Ms. Leal, if we could go to

5  Page 3, please.

6  BY MR. WOODARD:

7  Q.    Okay.  So is this the introduction part of the policy

8  here?

9  A.    Yes.

10       MR. WOODARD:  And if we could highlight the

11  second paragraph.

12  BY MR. WOODARD:

13  Q.    Could you read starting, "the FSMB," and tell us what

14  that stands for, the FSMB recognizes?

15  A.    "The Federation of State Medical Boards has sought to

16  provide a resource for use by State Medical Boards in

17  educating their licensees about cautious and responsible

18  prescribing of controlled substances, while alleviating

19  fears of regulatory scrutiny."

20  Q.    Okay.  And can you go on to the next one?

21  A.    "The FSMB recognizes that inappropriate prescribing

22  can contribute to adverse outcomes, such as reduced

23  function, opioid addiction, overdose, and death."

24  Q.    All right.  And the last one, please.

25  A.    "By promulgating" the -- "its model policy, the FSMB

Thomas - Direct

1   has sought to provide a framework for the legitimate medical

2   use of opioid analgesics for the treatment of pain while

3   emphasizing the need to safeguard against their misuse and

4   diversion."

5   Q.    And, Doctor, who is the board seeking to provide a

6   framework to?

7   A.    Both to the State Medical Boards as well as to the

8   prescribers of controlled substances and opioids.

9              MR. WOODARD:  Back to Page 3, Ms. Leal.  If we

10  could blow up the bottom paragraph.

11  BY MR. WOODARD:

12  Q.    And towards the bottom, could you read starting "the

13  model policy emphasizes"?

14  A.    "The model policy emphasizes the professional and

15  ethical responsibilities of physicians to appropriately

16  assess and manage patients' pain, assess the relative level

17  of risk for misuse and addiction, monitor for aberrant

18  behaviors and intervene as appropriate.  It also includes

19  references and the definitions of key terms used in pain

20  management."

21  Q.    So it talks about ethical responsibilities.  Does

22  that include assessing the level of risk for addiction?

23  A.    Absolutely.

24  Q.    All right.

25             MR. WOODARD:  Ms. Leal, if we could go to

Thomas - Direct

1   Page 4, please.  And let's highlight the third paragraph

2   under Issues Addressed.  Blow up, I mean.

3          Thank you.

4   BY MR. WOODARD:

5   Q.    Dr. Thomas, starting with the "2004 revision"?

6   A.    So "Since the 2004 revision, evidence for risk

7   associated with opioids has surged, while evidence for

8   benefits has remained controversial and insufficient."

9   Q.    So by 2013, was there significant evidence of the

10  risks associated with opioid prescribing?

11  A.    Certainly.  By the time we got to 2013, the rate of

12  opioid overdose death had increased by four-fold from the

13  late '90s.  In fact, in 2013, approximately 14,000 people

14  died in the United States from prescription drug overdose.

15  That is as if one-fifth of the population of Wilmington were

16  wiped out by prescription drug overdose in that year.

17         MR. WOODARD:  Let's go to Page 5, Ms. Leal.

18  BY MR. WOODARD:

19  Q.    Okay.  And under "Conclusion" here, so what's the

20  goal of this model policy that's being pushed out?

21  A.    The goal is to update the State Medical Boards and

22  physicians and other prescribers with the information

23  necessary to safely prescribe in what has clearly become a

24  riskier environment over time, and to help physicians in

25  determining what the appropriate things are to do in order

Thomas - Direct

 1    to protect themselves from concerns about scrutiny while

 2    balancing that against the risk and benefits of using the

 3    drugs for the population.

 4    Q.    Okay.  And are there some bullet points that follow

 5    here?

 6    A.    Yes.  These are particularly -- the reason that this

 7    is longer is because this contains more warnings.  So they

 8    warn about the things that contribute to increasing the

 9    risks.

10    Q.    Okay.  And we don't need to read every one, but let's

11    just get some quick summaries of what's being highlighted by

12    bullets here, starting with "inadequate attention".

13    A.    Yeah.  So there's "inadequate attention to assessment

14    to determine if opioids are indicated."  When we use the

15    word "indicated," that being -- so there are two words in

16    medicine that we use.  Indicated, you should do it.

17    Contraindicated, you shouldn't do it.

18              MR. WOODARD:  And, Ms. Leal, could you go down

19    to the next page.

20    BY MR. WOODARD:

21    Q.    Okay.  Could you highlight for the jury these

22    bullets?

23    A.    Sure.  The next one is inadequate monitoring during

24    the use of potentially abusable drugs.  So here, we

25    physicians are warned that they need to watch their patients

Thomas - Direct

1  and see how their patients are using the medications because

2  some patients may actually benefit from using less drugs as

3  opposed to more.

4          Inadequate attention to patient education and

5  informed consent.  Letting the patients know what is

6  expected, both in terms of their behavior, the physician's

7  behavior, what we expect to get from the drugs, and what the

8  pros and cons are of using the medications.

9          Unjustified dose escalation without adequate

10  attention to risks or alternative treatments.  Just because

11  the patient has -- says they have more pain doesn't mean

12  that you give them more drug.  It may be that the opioid is

13  at the appropriate dose and you can use something else

14  because there are other pain drugs to be used.

15          And if you simply go up and up on the dose of

16  the drug, there is very little evidence that that is

17  beneficial for patients because, as I noted, some patients

18  do better with less drug, not more.

19          Excessive reliance on opioids, particularly

20  high-dose opioids for chronic pain medicine.  High dose has

21  changed over time.  At the time of this writing, the -- what

22  we meant by "high dose" was what's called 200 Morphine

23  milligrams, Morphine equivalents.

24          All opioids are like Morphine.  So if Morphine

25  is one, a Morphine equivalent is any other opioid -- and

Thomas - Direct

1    we'll go through the names of them -- that would be

2    equivalent to one milligram of Morphine.  At 200 milligrams

3    of Morphine per day, there's almost no evidence that that's

4    beneficial in chronic non-cancer pain.

5              And high doses are associated with higher risks.

6    The more drug you give the patient, the higher the risk to

7    the patient.

8    Q.    And Dr. Thomas, just pausing here on bullet four,

9    what does it say starting "should use opioid therapy for

10   chronic non-cancer pain," can you read --

11             MR. WOODARD:  Ms. Leal, do you see that?  There

12   we go.

13             THE WITNESS:  Should be prepared -- oh, "they

14   should use opioid therapy for chronic non-cancer pain only

15   when safer and reasonably effective options have failed."

16             So this says something that we all know, first

17   things first, second things second, third things third.  And

18   if you can do something that is safer, then you should.  So

19   for example, while opioids are very potent drugs, Tylenol

20   works better for headaches.

21   BY MR. WOODARD:

22   Q.    Okay.

23   A.    And the last one is not making use of available tools

24   for risk mitigation.  And there, they're talking

25   particularly about the prescription drug monitoring programs

Thomas - Direct

1   that were established around the country.  Delaware's became

2   available and accessible to physicians in late 2012.

3   Q.     All right.

4              MR. WOODARD:  You can back out of this,

5   Ms. Leal.  Okay.

6              Next page, please.  And let's go to -- is this

7   Page 7?

8              MS. LEAL:  Yes.

9              MR. WOODARD:  Okay.

10  BY MR. WOODARD:

11  Q.     Okay.  On the sixth paragraph down --

12             MR. WOODARD:  If you could highlight or blow

13  that up, Ms. Leal.

14  BY MR. WOODARD:

15  Q.     -- does this talk about the phrase we've been using,

16  "legitimate medical purpose"?

17  A.     Yes.

18  Q.     What does it say?

19  A.     It says, "Particularly, the legitimate medical

20  purpose has several components.  One is sound clinical

21  judgment and current best clinical practices."  That is if

22  you're following the best practices in the literature and

23  using sound judgment, then you are protected, if it is

24  appropriately documented.  Having it in the medical record

25  matters, if -- "and is of demonstrable benefit to the

1   patient.  Demonstrable benefit to the patient includes a

2   decrease in pain intensity and an improvement in patient

3   function."

4                It further states that "This must occur within

5   the" -- "in order to be in the usual course of professional

6   practice, a legitimate physician-patient relationship must

7   exist.  And the prescribing or administration of the drugs

8   should be appropriate to the identified diagnosis.  It

9   should be accompanied by careful follow-up monitoring of the

10  patient's response to treatment, as well as his or her safe

11  use of the prescribed medication.  And should demonstrate

12  that the therapy has been adjusted as needed."

13               So the standard medical model that we talked

14  about is necessary for the prescribing to be for a medically

15  legitimate purpose in the usual course of professional

16  practice.

17               MR. WOODARD:  Let's back out of this, Ms. Leal.

18  And if you could go to Page 8.

19  BY MR. WOODARD:

20  Q.     Okay.  Do we see guidelines again?

21  A.     Yes.

22  Q.     Similar to the 2004?

23  A.     Yes.

24  Q.     Are they a little bit more detailed this go-around?

25  A.     They are.

Thomas - Direct

1    Q.    Okay.  And I don't want to read every single one, but

2    let's just highlight a few.

3              MR. WOODARD:  So let's go to Page 9.  And on the

4    second paragraph, if we could blow that up.

5    BY MR. WOODARD:

6    Q.    What's this talking about?

7    A.    This says that every patient, you should talk to the

8    patient and you should -- and find out what's going on with

9    them in terms of their medical history, their systems

10   review, and perform a relevant physical examination, and

11   relative laboratory investigations, which -- which include

12   the things that you would normally expect a physician to do,

13   and addressing the intensity of the pain and the things we

14   talked about in the history.

15   Q.    Okay.

16             MR. WOODARD:  And back out of this.  But on

17   Page 9, the sixth paragraph.

18   BY MR. WOODARD:

19   Q.    What is this talking about, "substance use disorder"?

20   A.    Yes, substance use disorder -- and I think this I

21   wanted to stress.  Substance use disorder is a medical

22   diagnosis.  It's not a social problem.  It's not a character

23   problem.  It's a brain problem, and therefore, it is

24   something that doctors are uniquely situated to manage.

25             So in patients who have this medical disorder,

1  it's important to be very careful in giving those patients

2  mood-altering substances because the exposure to those

3  substances can trigger the onset of their substance use

4  disorder.  And so it says that these patients are at greater

5  risk and the physician must be careful.

6  Q.    And Dr. Thomas, what does it say starting "patients

7  who have an active"?

8  A.    Yes.  "Patients who have an active substance use

9  disorder should not receive opioid therapy until they are

10  established in a treatment/recovery program, or alternatives

11  are established such as comanagement with an addiction

12  professional."

13  Q.    Okay.  Thank you.

14           MR. WOODARD:  And you can back out of that,

15  Ms. Leal.

16           And the next paragraph, please.  "Information

17  provided," towards the bottom.

18  BY MR. WOODARD:

19  Q.    Okay.  What's this one talking about?

20  A.    This is about whether or not doctors get information

21  from other places.  So information provided by the patient

22  is a necessary, but not sufficient part of the evaluation

23  process.

24           So the patients can come in and tell me

25  anything, but in order for me to be assured when they are --

Thomas - Direct

1    especially when they've been treated by other physicians,

2    the way to assure that is to establish the medical record.

3    That's why the other physician has a medical record.  It's

4    so that the next physician can get it.  And some patients,

5    you'll be surprised, will actually lie to you and they will

6    provide fraudulent records.  And so getting the records from

7    the physician, the Federation of State Medical Boards warns,

8    is a good practice to follow.

9    Q.    Have you ever heard the phrase "trust, but verify"?

10   A.    Yes.  I'm old enough to remember Ronnie Reagan.

11   So -- but the fact of the matter is is that because

12   patients, particularly patients who are attempting to

13   manipulate you for drugs, will not always tell you the

14   truth.  It is not good medicine to simply take their word

15   for it.

16   Q.    All right.

17              MR. WOODARD:  If we could go to Page 10,

18   Ms. Leal.  And if you could blow up, Informed Consent.

19   BY MR. WOODARD:

20   Q.    Is this something we talked about just a few minutes

21   ago?

22   A.    Yes.

23   Q.    Okay.  Are there specific informed consent issues at

24   issue when a doctor decides to prescribe opioids to a

25   patient?

 1   A.     Yes.  Many of those we talked about associated with

 2   the development of the dependence, the downside in terms of

 3   the side effects, that the patient may become tolerant.

 4   That is, the patient becomes tolerant to the various effects

 5   of opioids at different rates for different parts.

 6              So, for example, the constipation really never

 7   goes away.  You don't become tolerant to the constipating

 8   effect of opioids.  But people will get less sleepy and get

 9   less euphoric over time from the effects.  The analgesic

10   effect, the pain relieving effect is sort of in the middle

11   in terms of the development of tolerance.  So the doctor

12   needs to tell the patient about all of those things.

13              And the risk, because one of the risks that we

14   know about is if you never get an opioid, you can never

15   become addicted to an opioid.  It is exposure that produces

16   the risk.  And this controlled exposure, the patient needs

17   to know about the risk ahead of time.

18   Q.     So these are things that the doctor is supposed to be

19   weighing with a patient before deciding whether to prescribe

20   that particular patient an opoid?

21   A.     Yes.

22   Q.     Okay.  Can opioid drugs result in overdose and even

23   death?

24   A.     Absolutely.

25   Q.     Can a back pain-type syndrome kill someone?

Thomas - Direct

1    A.     I've seen a lot of patients with back pain, I've

2    never seen anyone die from back pain.  And one of the other

3    concerns is the concern about withdrawal.  Withdrawal from

4    opioids is very unpleasant, and people try to avoid it as

5    much as they can.  But unless they have some underlying

6    other problem, like heart disease, withdrawal from opioids

7    is also not deadly.  Overdose is.

8    Q.     And in weighing these factors when deciding to

9    prescribe opioids, is there also a consideration of whether

10   once you start to take these medications, you can

11   potentially become addicted, and that's something you always

12   have to deal with?

13   A.     Yes, but addiction is not in the pill, it's in the

14   person.  So the doctor needs to know to whom he's

15   prescribing and to watch for those things that increase the

16   risk of the development of addiction in that person.

17   Q.     Okay.

18           MR. WOODARD:  If we could back out, Ms. Leal.

19   BY MR. WOODARD:

20   Q.     And on Page 11, "Initiating an opioid trial," what is

21   this about?

22   A.     At the beginning -- you start at the beginning.  So

23   the phrase I think about for myself is "you start low, and

24   you go slow."  So you try the drug to see if it works.  And

25   by work, we mean reduction of pain intensity, improvement in

1    function.

2              If it works, then you assess how well it's

3    working.  You assess what the risks are.  But frequently,

4    frequently patients will either have unacceptable side

5    effects or it won't work.  So the fact of the matter is is

6    that a large number of patients who start on opioids

7    shouldn't be continued on opioids, and particularly, if you

8    see risky behavior emerge shortly after you begin.

9    Q.    What does "improve functioning" mean?

10   A.    It's what can you do with this drug that you couldn't

11   do without it that actually improves the quality of your

12   life.  Generally, I like to pick something before we start

13   the drug.  I say, "What is it that you want to do if we use

14   this medication?"  And the patient tells me what it is they

15   want to do.

16             And then I ask them after we start it, "Did it

17   allow you to do that?"  And that becomes part of the

18   evaluation of the patient's progress.

19   Q.    So Dr. Thomas, if a patient is started on an opioid

20   trial, and over the course of three-plus years they continue

21   to indicate that their pain is a ten out of ten, what is

22   that telling a doctor acting in the usual course?

23   A.    If there is no improvement in pain intensity, then

24   the drug is not working.  If you're using a drug that's not

25   working, then it's probably a good idea to stop.  If the

1239

Thomas - Direct

1   pain is ten out of ten -- and by ten, I ask the patient, "Is

2   the pain worse than you can possibly imagine?"  Then the

3   patient is telling me much more about themselves and the

4   lack of response to the drug than they're telling me about

5   the pain.

6            So it is -- it is not for a medically legitimate

7   purpose in the usual course of professional practice that we

8   give patients controlled substances that offer them no

9   benefit.

10           MR. WOODARD:  Ms. Leal, let's go to Page 11, the

11  last paragraph here, the very bottom.

12  BY MR. WOODARD:

13  Q.    So is this what we were just talking about with

14  looking for progress?

15  A.    Yes.  Progress toward treatment goals and the absence

16  of substantial -- and I think that's adverse effects, is the

17  next part.

18           MR. WOODARD:  And then up to the next -- top of

19  the next page, please, Ms. Leal.

20           THE WITNESS:  Yes, absence of substantial risk

21  or adverse events, such as overdose or diversion.

22  BY MR. WOODARD:

23  Q.    Okay.  So are these things a doctor acting in the

24  usual course of professional practice is looking at

25  constantly while continuing to prescribe opioids?

1  A.      Yes, they are the things that constitute the

2  legitimate prescribing of the drugs.

3  Q.     Okay.  All right.  Just a few more.

4          Page 12, and the second paragraph, what's the

5  caption here, the title?

6  A.      "Periodic Drug Testing."

7  Q.     Okay.  Why is this important?

8  A.     Drug testing is done in order to provide us with

9  two -- the answer to two questions.  One:  Is the patient

10  taking the medication that I'm prescribing them?  And two:

11  Is the patient taking anything else?

12          Those two questions are the only questions that

13  drug testing can answer.  But if the patient is -- so when

14  we get a drug test, we're looking for it to be -- either

15  it's expected, that it's all the things that I expect to be

16  in the urine are there, and none of the things that I don't

17  expect to be in the urine are there, or it's unexpected

18  which means something is missing or something is added.

19          So I think one of the -- one of the phrases that

20  comes up is that I -- that really makes me cringe is that

21  the patient passed or failed the drug test.  You don't pass

22  or fail a drug test because it's a medical test.  Because if

23  it's medical, it's either expected or unexpected.  Because

24  it's not on the patient, the test is not on the patient.

25  The test is on the doctor.  So does the doctor do what is

Thomas - Direct

1   expected or does the doctor not do what is expected of the

2   doctor?

3                And an unexpected drug test requires a medical

4   response.  It is not a judgment of the patient, it is a

5   judgment of the doctor.  So the doctor has to say, if the

6   test is unexpected, here is my medical response to that

7   unexpected result.

8                And I think that that's very important to

9   remember because it tells us something about what the

10  patient's doing when we're not looking at them when they're

11  not in our office.  And that's very important information in

12  terms of the risk of the drugs for the patient.

13  Q.    So Dr. Thomas, you said one unexpected outcome could

14  be that the patient's not taking the prescribed drugs?

15  A.    Yes.

16  Q.    What is that telling a doctor who acts in the usual

17  course of professional practice?

18  A.    Well, if the patient is negative -- and that means

19  the drug that is expected is not there -- then that means,

20  once again, either -- medicine is not that complex.  It's

21  either one of two things.

22               One, they took it all early on, and the drug is

23  no longer in their system.  Or two -- and that's a problem.

24  That's called drug abuse.

25               Or two, they didn't take it at all and it's

Thomas - Direct

1    somewhere else.  That's called diversion.  There really

2    aren't other choices.  Because you say, well, the patient

3    had more pain and they took it.  That's not the way this

4    works.

5              The drug has instructions and those instructions

6    are, here is how I expect you to take the drug.  If the

7    patient then says, "I'm not going to take the drug the way

8    you want me to take it, I'm going to take the drug the way I

9    want to take it," that's called drug abuse.  And the doctor

10   has a responsibility to the patient to respond to that

11   medically.

12   Q.    And the second scenario you mentioned was an

13   unexpected result where it shows the patient's taking

14   something not prescribed.  What does that tell a doctor?

15   A.    Well, it depends upon what it is.  So I will say that

16   for drugs that have low levels of danger and generally are

17   less problematic, by which I mean marijuana, I think that

18   that is a circumstance where the doctor can take these sort

19   of "I'm going to warn you about this.  Here's my policy on

20   this.  I don't want to see it again" approach.

21              However, if the patient is taking a -- another

22   prescription opoid, that means that the patient has diverted

23   that prescription opioid from whoever was supposed to get it

24   into them.  That's suggestive of substance use disorder.  It

25   doesn't make the diagnosis.  It suggests the patient is

Thomas - Direct

1    abusing the drug.

2            If the patient is taking a benzodiazepine, these

3    are all the drugs that end in "pam," Alprazolam, Diazepam,

4    Clonazepam, those drugs are sedatives.  When you take

5    benzodiazapines with opioids, you increase your risk of

6    overdose by 1,500 percent.  Fifteen times greater.

7            So I see that as a huge red flag, even though

8    it's a prescription drug, because you have just told me that

9    you are 1,500 percent more likely to overdose than without

10   it.  And I've already told you, don't take other drugs.

11           And lastly, we have the illegal drugs:  Cocaine,

12   methamphetamine, heroin.  The thing that I know is if you

13   have cocaine, you didn't get it at the drug store.  If

14   you're using heroin, you didn't take it from someone else's

15   prescription.  If you're smoking methamphetamine, that

16   didn't get there in any way except for the black market and

17   illegal drugs.  And if I am giving someone legal drugs and

18   they're in contact with the black market in illegal drugs, I

19   must be concerned about that.

20   Q.    Okay.  So let's keep on with this second example

21   where there's an unexpected result for an illicit drug, and

22   let's use heroin.  If a patient -- if the drug screen result

23   shows an inconsistent result, the patient has heroin in

24   their system, and the doctor decides to continue prescribing

25   opioids to that patient, what kinds of things should a

1244

Thomas - Direct

1    doctor acting in the usual course of professional practice

2    be thinking about?

3    A.    If a patient's using heroin, we know that the risk of

4    overdose with heroin is even greater than that with the

5    prescription drugs that they're using.  And it is very

6    difficult for me to see how that -- because that prescribing

7    is for a medically legitimate purpose.

8              If a doctor were to consider continuing, a full

9    evaluation for addiction would be necessary.  So referral to

10   some subspecialist and very, very careful monitoring of that

11   patient.  So the frequency with which you would see them

12   would have to decrease -- you would have to increase.  So if

13   I was seeing you every month, I'd have to see you every

14   week.  The number of pills I would give you would have to

15   decrease because I don't know what you're going to do with

16   them.  And you have told me that you are in danger of dying.

17             The number of times that I urine drug screen you

18   has to increase.  The number of times I count your pills has

19   to increase.  The amount of scrutiny I need to place upon

20   you using those drugs has to increase.  We have to go over

21   your informed consent again and talk to you about whether or

22   not you're capable of using these drugs because I don't want

23   you to die.

24   Q.    And Dr. Thomas, in the usual course of professional

25   practice, would simply telling this patient, "Hey, stop

Thomas - Direct

1   taking heroin" be sufficient?

2   A.    No.  If the patient has substance use disorder -- and

3   that particular label, to say a patient has substance use

4   disorder, addiction, requires a complete medical evaluation

5   regarding that, a complete history, physical examination.

6   You need to really look into it.  So it's not just "You have

7   a bad urine drug screen.  You are an addict."

8         But if the patient has substance use disorder,

9   telling them not to use drugs is like telling somebody with

10  dysentery not to move their bowels when they're sitting on

11  the toilet.  It's not going to happen.  The patient is ill.

12  It's not something that you warn away.

13        So, in fact, the doctor's medically legitimate

14  purpose in the course of professional medical practice is

15  figuring out what is wrong with this patient that they are

16  coming to me telling me that using -- they think that using

17  heroin might be a good idea.

18  Q.    Okay.  Let's keep moving through the document here.

19        MR. WOODARD:  And the last paragraph, please,

20  Ms. Leal.

21  BY MR. WOODARD:

22  Q.    And we've touched on this already, so just briefly,

23  what's the importance of pill counting?

24  A.    Pill counts are another mode of monitoring.  They

25  tell you about how fast the patient is using the drug.  So

Thomas - Direct

1    if you tell the patient, "I'm going to give you 60 pills for

2    a month, then I expect you to use one pill twice a day.  On

3    the 15th day, you should have between 28 and 32 pills."  So

4    if I count the pills in between your prescriptions, it gives

5    me another measure of appropriate use of the drug.

6           One of the things that can't be done to be a

7    pill count is the patient comes in on the 31st day and they

8    have zero pills.  Zero is not a pill count.  It's nothing.

9    And telling the patient, "I'm going to count your pills" on

10   the 12th -- on the 12th day" does not accomplish the purpose

11   of the pill count.  Because I want to know, what are you

12   doing when I'm not looking?

13          Because patients look best in the doctor's

14   office.  They look best when they know they're being

15   watched.  So, in fact, the randomness of the pill counts and

16   urine drug screens is important in terms of adequately

17   monitoring patients.

18   Q.    Dr. Thomas, if a prescription were to be given to the

19   patient that also showed their next pill count date, let's

20   say June 1st, would that obviate the purpose of the pill

21   counting you just described?

22   A.    Yes, it would make it useless.

23   Q.    All right.  Okay.  And I think this paragraph talks

24   about the PMP data.  You've touched on that just a minute

25   ago; right?

1    A.      Yes, because the importance of the PMP data, the

2    prescription drug monitoring program, is to find out, once

3    again, two things.  Are they only getting prescriptions from

4    one doctor?  Because that's what it says usually in their

5    controlled substances treatment agreement.  Are they getting

6    controlled substances from any other doctor?  And how many

7    pharmacies are they using?

8               As the number of physicians prescribing for a

9    patient and the number of pharmacies goes up, the likelihood

10   of medically illegitimate medication behavior goes up for

11   the patient, and it's a -- it's a risk factor for them.

12   Q.     I want to hit on a couple other risk factors briefly.

13   Is there anything regarding how far patients drive to see a

14   doctor that presents a possible risk factor?

15   A.     In the 2013 model policy, it mentioned that

16   physicians should be weary of patients who are driving long

17   distances because there may be criminal divergence of the

18   drug.  It is known -- because if someone is driving 50, 60,

19   70 miles to get to my office, I need to figure out why they

20   didn't see any other people in between.  Once again, you

21   need to know who the patient is as well as what the

22   patient's complaining about.

23   Q.     And let's touch on payments briefly.  In the usual

24   course of professional practice, how are doctors typically

25   paid?

Thomas - Direct

1    A.      Most payments occur in the form of insurance.  Cash

2    payments by themselves can be reasonable and legitimate.

3    Q.      What does a patient being on Medicaid indicate?

4    A.      This is part of the social history.  So knowing that

5    a patient is on Medicaid -- before I was a doctor, I knew

6    that that person was generally indigent.  If an indigent

7    person who can't afford medical insurance comes to me and

8    they're going to pay me several hundred dollars for a bottle

9    of pills, that's of great concern to me because every

10   physician knows -- and it is -- and you don't -- you don't

11   actually have to be a physician to know that pills have

12   street value.  And if I give someone who is indigent a

13   bottle of pills that is worth a thousand dollars or more, I

14   must be concerned about where the money that they're paying

15   me is coming from.

16   Q.      What would the street value of a prescription, a

17   bottle of Oxycodone 15-milligram pills run?

18   A.      Generally, Oxycodone has a street value of about $1

19   per milligram.  So if you give them a hundred pills at 15

20   milligrams, that would be $1,500.

21   Q.      Okay.  Let's wrap up with this document.

22           MR. WOODARD:  On Page 13, Ms. Leal.  If you

23   could blow up the second and third paragraphs.

24   BY MR. WOODARD:

25   Q.      So what's this talking about with regards to

Thomas - Direct

1  intervention?

2  A.     If a patient tells you -- and by "telling you," I

3  mean they have a urine drug screen that's inappropriate,

4  they're telling you, I've stolen prescriptions.  You look on

5  the PDMP, if they're obtaining prescriptions from multiple

6  doctors.  The patient is saying, I have a problem.  And the

7  doctor's job is to intervene medically in that process.

8           The fact is, some things are -- as the paragraph

9  says, some things are more worrisome than others, and we

10  must stratify how much risk we think the patient is in.

11          And the last part is diversion.  If I give the

12 patient medication and there's no evidence that they're

13 taking the medication, and that evidence could be gathered

14 both by having negative urine drug screens.  And in the

15 usual course of professional practice, you would look at

16 their pupils, you would listen to their gut, you would

17 evaluate them physically to see if they look like they're

18 taking the drug, then that means that something must be

19 done.  There's no medically legitimate purpose for giving

20 anyone a drug that you think they're not taking or you have

21 evidence that they're not taking.

22 Q.     And what does "intervention by a doctor mean,"

23 Dr. Thomas?

24 A.     Something medical.  That is, you have to go back

25 through the standard medical model.  So you reiterate the

Thomas - Direct

1   history.  You reiterate the informed consent.  You perform

2   examinations of various sorts.  You do pill counts.  You

3   shorten the visit length.  You do something that when -- you

4   respond to what the patient is telling you and showing you.

5           And the last thing on that list is discharge,

6   but you need not discharge a patient because you've stopped

7   giving them opioids.  Because if I say, Well, I'm going to

8   stop giving you opioids, okay, you're out of here, that

9   means that I'm saying that that's all there is.  But there

10  are non-opioid analgesics.  There are therapies.  There are

11  other things to do.  And part of -- and part of the other

12  thing to do is the interaction with the physician himself or

13  herself is part of the treatment of the patient.

14          So discharge is not necessary just because the

15  patient is abusing drugs.  Not giving them abusable drugs is

16  necessary when they're abusing drugs.

17  Q.     So, Dr. Thomas, when we're reading through this and

18  talking about information gathered from the patient, but

19  then intervention and responses, who are we focused on, the

20  patient or the doctor?

21  A.     It's the doctor.  Everything that I'm saying is about

22  the doctor.  You'll note that very little that I talk about

23  is about pain.  Because pain is the symptom, it's what the

24  patient tells you about.  But the issue and here -- and why

25  they're here is the physician's behavior.

1251

Thomas - Direct

1    So the physician is the one to whom this

2 document is addressed.  The physician's behavior is the

3 issue, not the patient's pain.

4 Q.    Okay.

5    MR. WOODARD:  Let's go to the last one in this

6 document, which is Page 13.  And if we could highlight,

7 again, with "discontinuing opioid therapy."  Okay.  And I

8 believe -- and I'm sorry, blow up -- if we could -- there we

9 go.

10 BY MR. WOODARD:

11 Q.    I think you just actually touched on discharge, but

12 let's just step back a little bit.  Is discharge always

13 required when a physician acting in the usual course decides

14 to discontinue opioid therapy?

15 A.    No.

16 Q.    Why not?

17 A.    And so if one decides to discontinue opioid therapy,

18 it depends upon where you are.  That is, we have to go back

19 to what are the circumstances.  So the patient comes in, and

20 they are in active withdrawal, then they're sweaty and

21 they're -- they have goose flesh, going cold turkey, and

22 they're -- and their joints are achy.  And you say, okay,

23 we're going to withdraw you.  We're going to discontinue the

24 drug.  You might decide to structurally taper the

25 medication.

Thomas - Direct

1          And remember, a taper is like this pen.  It's

2     thick and then it gets thin.  So you cannot taper with a

3     brick.  So if you give the patient the same amount as you

4     had been giving them, that's not a taper.  If you give the

5     patient less over time, that's a taper.  So you can

6     structure a taper.

7          You can -- however, if the patient comes in and

8     they have no drug in their urine and they're not in

9     withdrawal, they have told you something medically.  That

10    is, I have not taken this drug for at least a week because

11    I'm not in withdrawal, and there's none in my urine.  So

12    there's no reason to taper someone who is already off the

13    drug, who is not taking it appropriately.  You can simply

14    stop therapy and say, Here are the other things I can offer

15    you.

16         There -- and if one -- and it depends upon how

17    much risk, how much danger the patient is in.  The patient

18    comes in and says, "Yeah, Doc, I just overdosed yesterday

19    and I'm out of my meds."  That person was at risk for death

20    yesterday.  You don't give them more medication.  That

21    cannot be for a medically legitimate purpose because it's

22    dangerous.  We do -- as physicians, we do things that are

23    risky all the times.  Danger is always to be avoided.

24    Q.   Let me follow up on one thing you said, Dr. Thomas,

25    which -- and let me give you an example.  Let's say a

Thomas - Direct

1   patient presents who's being prescribed Oxycodone over and

2   over, but that patient has an inconsistent drug result

3   showing the lack of any Oxycodone in their system six, seven

4   times.  Would that patient need to be tapered off of

5   Oxycodone?

6   A.    No, because the patient has already told you that --

7   you know, if -- if we listen to the patient, the patient --

8   the patients know everything, the doctors know the rest.

9   They always tell us what's going on.  That patient has told

10  you, No, I'm either not going to take this appropriately or

11  I'm not taking it at all.  Either one of those two things is

12  true.  There are no other choices.

13          So there's no need to taper that person because

14  if they are not in acute withdrawal, increase in heart rate,

15  increase in blood pressure, pupils real big, goose flesh,

16  that's verbally -- that person doesn't need to be tapered.

17  You can just say no.

18          MR. WOODARD:  Okay.  I'm sorry.  Just one

19  moment, Your Honor.

20  BY MR. WOODARD:

21  Q.    So for a patient that does need to be tapered, and

22  you used your pen example of starting big and going small,

23  what does it say here -- or does it say here "safely

24  structured tapering regimen"?

25  A.    Yes.

Thomas - Direct

1    Q.      What does that mean?

2    A.      If one is going to taper a patient off, it depends

3    upon, once again, how much risk they are in.  So there are

4    some patients who need to be tapered off just because the

5    drug doesn't work and they're taking it appropriately.  So

6    you decrease the dose over the course of a period of time

7    that avoids withdrawal.  That -- the speed of that depends

8    upon the risk.

9           So in someone who's been taking the drug for a

10   year, they've been taking it appropriately, and you want to

11   taper them off, it may take three to four months.  For

12   someone who is taking the drug inappropriately, you may take

13   a week or two.  If -- but that's a medical decision that

14   needs to be documented in the record about what is it that

15   the doctor is thinking when they're doing it.

16   Q.      And Dr. Thomas, what does this say about who is

17   capable of conducting and supervising a tapering regimen?

18   A.      Either the treating physician or a specialist can be

19   enlisted in that process.  The treating physician can do it

20   with the drugs that they are using, but that should be a

21   relatively short period of taper and withdrawal.  And

22   referral to an addiction specialist, if the treating

23   physician feels uncomfortable with that, would be

24   appropriate.

25   Q.      So if a family medicine physician or an internal

Thomas - Direct

1    medicine physician learns that a patient is having these

2    issues and decides to begin on a tapering dose, could that

3    physician actually transition to that type of treatment?

4    A.    They could.  It's -- it -- and, once again, it -- you

5    know, everything depends.  It's medicine.  And so it depends

6    upon where you are.  It depends upon the risk to the

7    patient.  That physician could, but the important part is

8    that it still occur within the standard medical model.

9              It still is about, what's going on with you?

10   How are you doing?  What's your response to what I've done?

11   Here's our plan.  Here's what we're going to do next.  And

12   then come back and let me do that again.  It still has to be

13   the practice of medicine.

14   Q.    And in that example, does the doctor have to

15   discharge the patient?

16   A.    Absolutely not.

17   Q.    But Dr. Thomas, if the doctor decides to discharge

18   the patient, can he or she then prescribe an opioid to that

19   patient who's no longer a patient within the usual course of

20   professional practice?

21   A.    No, because as we noted previously, one of the

22   elements of the medically legitimate prescribing in the

23   usual course of professional practice is the maintenance of

24   the doctor-patient relationship.

25              When I discharge a patient from my practice,

Thomas - Direct

1    they move outside of my professional practice.  We end our

2    doctor-patient relationship.  There will be no ongoing

3    monitoring, assessment, history, physical examination.  We

4    are through.  And if you have ended the doctor-patient

5    relationship, no prescribing of controlled substances can be

6    for a medically legitimate purpose in the usual course of

7    professional practice because there is no professional

8    practice.

9    Q.    Upon discharge, in that example, would the patient

10   who may have presented with substance use disorder, do you

11   just say, you're discharged, goodbye?

12   A.    I don't.  I mean, I think one could.  One could say,

13   I'm going to discharge you from my practice.  I have

14   discharged patients from my practice for many reasons.  And

15   so a physician can make that decision.  But once one

16   terminates the doctor-patient relationship, further

17   prescribing is prohibited.

18   Q.    And the model policy talked about once a doctor

19   acting in the usual course recognizes that a patient has a

20   substance use disorder, there are things incumbent upon that

21   doctor to start treating and recommending?

22   A.    Certainly.  Substance use disorder is a medical

23   diagnosis.  If a patient comes to me and they say they're --

24   they're in chest pain, I don't say, I don't treat chest

25   pain.  Get out of here.  I get them to someone who treats

Thomas - Direct

1    chest pain.  And the same way I recognize the patient has

2    substance use disorder, I can't make them go to an addiction

3    specialist.  I can't make them go to detox, but I certainly

4    need to recommend and offer that and document that I have

5    done so.

6    Q.    Okay.  Dr. Thomas, if a doctor prescribes an opioid

7    to treat pain, is that always necessarily for a legitimate

8    medical purpose?

9    A.    Certainly not.  Once again, pain is not the issue.

10   Pain is an indication, but it's not the end all and be all

11   of our treatment.

12            For it to be for a medically legitimate purpose

13   in the usual course of professional practice, it has to

14   work.  There must be demonstrable benefit.  There must be

15   ongoing monitoring.  There must be an ongoing doctor-patient

16   relationship.  There must be sound medical judgment and

17   documentation.  All of those things must exist.

18            And pain  is -- is the tail, and the tail does

19   not wag the dog.  It's the other way around.

20   Q.    If a patient is in pain, does the doctor have to

21   prescribe opioid pain medications?

22   A.    Certainly not.  So, for example, if a patient comes

23   to me with a headache, and after I figure out what kind of

24   headache it is -- if it's a tension headache, I wouldn't

25   give them opioids.  I'd give them Tylenol.  If it's a

Thomas - Direct

1    migraine headache, I wouldn't give them opioids.  I would

2    give them a Triptan, a group of drugs that is specific for

3    the treatment of migraine headaches.

4              If it's a cluster headache, I would give them a

5    vasodilator verapamil.  I would not give them opioids.

6              So because a patient complains of pain, it is

7    the doctor's job to figure out what it is, why it is, what

8    is going on with it, and to figure out the best treatment.

9    And just because I have a hammer, doesn't mean that you're a

10   nail.

11   Q.    If a patient presents in legitimate pain, would it

12   always be unethical to deny that patient an opioid if they

13   asked for it?

14   A.    No.  In fact, it may be in the patient's best medical

15   interest to say no.  If a patient is -- has a substance use

16   disorder and may die from me giving them what they want, the

17   last thing I'm going to do is give them what they want.

18   Because it is the physician's job to act in the patient's

19   best medical interest, whether the patient likes it or not.

20              MR. WOODARD:  Your Honor, I can keep going, but

21   if this is a good time for a break.

22              THE COURT:  So we'll take our morning break, so

23   15 minutes.

24              Can we take the jury out?

25              And we'll start again at about 11:27.

Thomas - Direct

1                  (Jury leaving the courtroom.)

2                  THE COURT:  Okay.  So I'll see you again in

3     15 minutes.

4                  MR. WOODARD:  Thank you.

5                  DEPUTY CLERK:  All rise.

6                  (Recess was taken.)

7                  DEPUTY CLERK:  All rise.

8                  THE COURT:  All right.  Are we ready to resume?

9                  MR. WOODARD:  Yes, Your Honor.

10                 THE COURT:  All right.  Let's get the jury.

11                 (Jury entering the courtroom.)

12                 THE COURT:  All right.  Members of the jury,

13    welcome back.

14                 Mr. Woodard, you may proceed.

15                 MR. WOODARD:  Thank you.

16    BY MR. WOODARD:

17    Q.    Welcome back, Dr. Thomas.

18    A.    Yes.

19    Q.    Okay.  Let's get to your opinions in this case in

20    just a moment, but I want to first just run through some of

21    the opioids that were prescribed in this case.  So just to

22    help the jury understand, are you familiar with the

23    Controlled Substances Act?

24    A.    Yes.

25    Q.    What is that?

Thomas - Direct

1    A.     The Controlled Substances Act is the Federal law that

2    gives the Attorney General the authority to classify and to

3    restrict the use of controlled substances in the United

4    States.

5    Q.     Okay.  I think you said "classify."  Are there

6    several classes of drugs?

7    A.     There are.  The controlled -- excuse me.  Controlled

8    substances, which are the drugs that are abusable or may be

9    habit-forming, are classified into five different classes.

10   Class 1 is deemed by the Drug Enforcement Administration to

11   have no medical use in the United States.  That includes

12   heroin, THC, LSD.

13          In -- Schedule II are drugs that are highly

14   abusable, potentially addictive, but have a medical use.

15   Those include Morphine, Oxycodone -- excuse me -- Fentanyl,

16   and other very potent opioids and stimulants.

17          Schedule III are deemed to be less likely to be

18   abused and less likely to be habit-forming.

19          Schedule IV -- it goes down the list.  So

20   Schedule III opioids include things like buprenorphine,

21   which we'll hear mentioned once in this case, and also known

22   as Suboxone.  Schedule IV includes the benzodiazapines,

23   Alprazolam, Clonazepam, Xanax, Diazepam, Valium.

24          And Schedule V includes much less likely to be

25   abused, but still potentially habit-forming drugs of that

Thomas - Direct

1   nature.

2   Q.     Okay.  Will we mostly be talking about Schedule II or

3   Class 2 drugs during your testimony?

4   A.     Most of this will be about Schedule II drugs.

5   Q.     Okay.  But in some instances, did you review cases

6   where Dr. Titus prescribed Schedule II and Schedule III or

7   other similar scheduled drugs at the same time?

8   A.     Schedule II and Schedule IV in particular.

9   Q.     Okay.  All right.  So let's just focus on Schedule II

10  and run through a few of these quickly.

11         Morphine, can you describe that for the jury?

12  A.     So Morphine is the prototypical opioid.  When we use

13  the word "prototypical," we mean this is the one to which

14  all the others are compared.

15         Morphine is a naturally occurring drug.  It

16  comes from the poppy plant.  And from it is the stuff in

17  opium, that is an opiate.  And it is -- it works in parts of

18  the brain to produce pain relief and a number of other

19  physiologic effects.  One of those is it will get you high.

20  Q.     Let's move to Oxycodone.  How does that compare to

21  Morphine?

22  A.     Oxycodone is a semisynthetic opioid.  And it's --

23  it's made in the lab from some stuff that's in opium.  And

24  it's about one-and-a-half times as potent as Morphine.  So

25  one of the things we'll talk about is -- I mentioned earlier

Thomas - Direct

1  MME, milligrams Morphine equivalents.  And so to get to

2  milligrams Morphine equivalents for Oxycodone, you take the

3  number of milligrams of Oxycodone and multiply it by one and

4  a half, and that makes the equivalent of Morphine.

5  Q.      Oxycontin, what is that?

6  A.      Oxycontin is Oxycodone extended release.  It's the

7  same drug that's in Oxycodone, only the pill is altered so

8  as to make it release over a prolonged period of time.  The

9  formulation was changed in 2011 to make it less abusable.

10  Q.      And Methadone?

11  A.      Methadone is different from all of the other drugs

12  that we talk about because Methadone is long-acting, not

13  because of the kind of pill it is, but because of the kind

14  of chemical it is.

15          Methadone has really unique pharmacology among

16  the opioids in that it lasts a long time in the body, it

17  builds up over the course of five to seven days, and so the

18  effect gets to be greater over that time.  But it's really

19  very tricky because while the patient may not feel that

20  they're getting it, the drug is still building up in their

21  body, and so it becomes very risky to use that routinely,

22  particularly with patients who are abusing the drug.

23          The other thing about Methadone is that low

24  doses of Methadone are about four times as potent as

25  Morphine, but high doses of Methadone can be eight to 12

Thomas - Direct

1   times as potent as Morphine because of that property of it

2   building up in the system.  So it's generally recommended

3   that Methadone be used by those who are skilled and aware of

4   its unique properties.

5   Q.    And we talked about the model policy this morning.

6   Did the model policy, specifically in 2013, comment on

7   prescribing Methadone?

8   A.    Yes, it issued that -- it was another issue of

9   warning that one should be very careful and -- in using

10  Methadone, particularly as a routine add-on for the

11  treatment of pain disorder.

12  Q.    Okay.  For all the opioids we've discussed so far,

13  are these often prescribed in pill form?

14  A.    Oxycodone, Methadone, and Morphine are all prescribed

15  in pill form.  Fentanyl, however, is usually prescribed as a

16  patch, a transdermal patch.  So the term will be Fentanyl

17  transdermal.  That patch comes on very slowly and it

18  releases into the underlying fat, and it is taken up by the

19  bloodstream over a prolonged period of time.

20          So one patch will be left on for three days.  So

21  you expect that it will be continually present and

22  continually detectable.

23  Q.    And how about Fentanyl in comparison to Morphine?

24  A.    Fentanyl is a very potent drug.  We use it a lot in

25  the operating room.  It's about 70 to a hundred times as

Thomas - Direct

1    potent as Morphine.  So when we talk about Fentanyl, the --

2    when we talk about Morphine and the other drugs, you'll hear

3    me use the quantity of milligrams or thousandth of a

4    milligram.

5              When we talk about Fentanyl, we use micrograms

6    or ten-thousandths of a gram because Fentanyl is -- is so

7    much more potent than Morphine, and it's dosed in micrograms

8    per hour as opposed to milligrams per dose.

9    Q.    Are there any reasons why a physician acting in the

10   usual course of professional practice would try non-opioid

11   treatment options before beginning with these opioids you've

12   described?

13   A.    There are a number of reasons.  Number one, in many

14   ways, they're safer in terms, particularly in terms of the

15   addiction and abuse.

16             Number two, they frequently work better for many

17   patients, depending upon the type of pain.  And, certainly,

18   it doesn't place the patient at the risk of opioid

19   prescribing.  And additionally, the model policy calls for

20   the physician to do so.

21   Q.    Do these opioid drugs actually treat and resolve the

22   underlying cause of pain?

23   A.    No.  And interestingly, they don't make the pain go

24   away.  So anyone who's been treated with an opioid will know

25   that you still feel the sensation, you just don't care.  And

Thomas - Direct

1   so opioids are a treatment for pain.  They can be used in

2   certain and carefully selected patients with appropriate

3   monitoring, but they are by no means necessary to -- for all

4   pains at all times.

5   Q.     Can the use of or the long-term use of opioids with a

6   patient actually increase pain?

7   A.     Yes.  And one of the things that became apparent by

8   the time we were getting to the era of the 2013 model policy

9   is the problem of what's called opioid-induced hyperalgesia.

10  Algesia is -- means pain.  Hyper means extra.

11          So there's some patients who, particularly on

12  high-dose opioids, will have more pain because of the

13  presence of the drug.  And while that seems confusing, it is

14  what we in medicine call a paradox.  Things that you

15  wouldn't expect to be there, but there they are.

16  Q.     Are these opioids we've talked about effective with

17  every single type of pain?  I think you talked about

18  headaches earlier, for example.

19  A.     Absolutely not.  In fact, many pains are either

20  opioid resistant, that is, you have to use very high doses

21  to get there; or they're opioid non-responsive, or they

22  induce more pain in response to the opiates.

23          So migraine headache, opioids are relatively

24  contraindicated.  Fibromyalgia, a word that we'll hear,

25  opioids are relative -- it's relatively opioid insensitive.

Thomas - Direct

1    And then certainly in the diagnosis of pain in patients with

2    substance use disorder, opioids can be downright dangerous.

3    Q.     So for all the -- excuse me -- opioids we've

4    described, are they available in a range of doses and dosage

5    forms?

6    A.     Yes.  Oxycodone, the smallest pill, is two-and-a-half

7    milligrams.  The largest is 30.  And all of them have a dose

8    range.

9    Q.     And we looked at the model policy and talked about

10   starting on an opioid trial that was described.  Is there a

11   rule of thumb on when a doctor acting in the usual course of

12   professional practice selects the dosage to prescribe to a

13   patient beginning on opioids?

14   A.     Yes.  Generally, we would select not the lowest end

15   of the scale and not the upper end of the scale.  We'd start

16   at a moderate dose.  So for a patient who hasn't been using

17   Oxycodone, five milligrams at a time would be the increments

18   of -- and I'm going to throw in a medical word, titration.

19   Titration to effect is what we call the process that we use.

20   And we all know it before -- you don't have to be a doctor

21   to know titration to effect.

22         But if you made spaghetti sauce, you don't throw

23   in a whole box of salt at the beginning.  You add some and

24   then you taste it.  Medicine is very much like that.

25   Titration to effect is like adding salt to spaghetti sauce.

Thomas - Direct

1  The increments for opioids, ten for Oxycodone.  The most

2  frequently used opioid in this case is about 5 milligrams

3  per dose, would be the usual titration increments.

4         But if you start off and you get nothing and you

5  increase and you get nothing, that's telling you something.

6  And it's the doctor's job to respond to the information at

7  hand.

8  Q.    All right.  Without further adeu, Dr. Thomas, let's

9  turn to files you reviewed in this case.

10         So whose files were you reviewing, Dr. Thomas?

11 A.    I was reviewing the patient files of the 14 charged

12 patients in the indictment.

13 Q.    Okay.  And specifically for which doctor?

14 A.    Dr. Titus.

15 Q.    Okay.  And is it fair to say that Dr. Titus was

16 prescribing the opioids we just talked about?

17 A.    Yes.

18 Q.    And for a doctor deciding to venture into pain

19 medicine and prescribing those drugs, what would such a

20 doctor have a duty to know and understand?

21 A.    Well, he would have the duty to know and understand

22 the pharmacology of the drugs that he was using, the risks

23 and benefits of the medications being used, and the Federal

24 and State regulations that regulate the use of controlled

25 substances.  And, in this particular case, the model policy

Thomas - Direct

1    was that regulation for physicians practicing in the State

2    of Delaware -- from the State of Delaware.

3    Q.      Okay.  And we looked earlier at the Consent Decree

4    and the suspension.  Do you remember that?

5    A.      Yes.

6    Q.      Okay.  For a doctor who goes under a Consent Decree,

7    what steps would be expected of that doctor to then remain

8    in compliance going forward if he or she chooses to continue

9    prescribing opioids?

10   A.      The Consent Decree was a warning, and it said here

11   are the particular, initially the --

12   Q.      And Dr. Thomas, just don't talk about anything that I

13   may or may not have said, but you can talk about what it was

14   for.

15   A.      Oh, it actually said follow the model policy that

16   went from five to 29 pages.  That would assume that the

17   doctor read it.  Follow the American Academy of Pain

18   Medicine guidelines, which is 14 pages, plus references.

19   And to do those things, in order to remain in compliance,

20   along with continuing education in the area.

21   Q.      Okay.  And Dr. Thomas, if you learned that such a

22   physician had received multiple complaints against them

23   regarding their practice, what would be expected of that

24   doctor to remain compliant?

25   A.      That he would follow the guidelines and rules and

Thomas - Direct

1    regulations that had been promulgated.

2    Q.    Okay.  All right.  Let's talk about the records.

3              MR. WOODARD:  And Ms. Leal, if we could start by

4    showing Exhibit 1.

5    BY MR. WOODARD:

6    Q.    Okay.  Dr. Thomas, was Mr. Brent Hood a patient whose

7    medical records you reviewed in connection with this case?

8    A.    I did.

9    Q.    And does the particular prescribing to Mr. Hood

10   represent Count I of the indictment?

11   A.    Yes.

12   Q.    Okay.  Based on what you reviewed with respect to

13   Mr. Hood, did you reach a conclusion whether the prescribing

14   to Mr. Hood on August 7th of 2013 for Methadone and

15   Oxycodone was consistent with the usual course of

16   professional practice and for a legitimate medical purpose?

17   A.    It was not.

18   Q.    Okay.  Let's talk about how you reached that

19   conclusion.

20             MR. WOODARD:  So Ms. Leal, let's start with

21   Government's Exhibit 100 at Page 3.

22   BY MR. WOODARD:

23   Q.    What is this, Dr. Thomas?

24   A.    This is the patient information page from Dr. Titus'

25   medical record regarding Mr. Hood, dated October 1, 2012.

Thomas - Direct

1    Q.     Okay.

2                 MR. WOODARD:  Could you scroll through,

3    Ms. Leal?

4    BY MR. WOODARD:

5    Q.     What's being shown here?

6    A.     This is a form that was filled out by -- apparently

7    this is a patient form that states that Mr. Hood -- it was a

8    43-year-old man, and was presenting complaining of severe

9    pain in his hands and arms.

10   Q.     Okay.

11                MR. WOODARD:  Next page.

12   BY MR. WOODARD:

13   Q.     What about here?

14   A.     He stated that he had undergone surgery on his hands

15   on two occasions.

16   Q.     Okay.  All right.

17                MR. WOODARD:  Ms. Leal, let's jump to Page 145,

18   please.

19   BY MR. WOODARD:

20   Q.     Okay.  So is this the same date, Dr. Thomas?

21   A.     Yes.

22   Q.     And what are we looking at?

23   A.     This is Dr. -- what I've come to believe is

24   Dr. Titus' handwriting, and the history form that he filled

25   out for Mr. Hood.

Thomas - Direct

1    Q.      Okay.   What does it say, just the first couple

2    sentences under Chief Complaint?

3    A.      "This is a 42-year-old man who presents to clinic for

4    a routine" follow-up -- "for a routine follow-up/initial

5    visit."

6    Q.      And what is a routine follow-up/initial visit?

7    A.      That's like saying the end of the beginning.   It's --

8    that's an oxymoron.   Follow-up visits are those that occur

9    after the initial visit.   So this was an initial visit.

10   Q.      Okay.

11              MR. WOODARD:   If you could back out, Ms. Leal.

12   BY MR. WOODARD:

13   Q.      I want to go through this one because we'll look at

14   several of these progress notes, but could you just walk the

15   jury through, you know, an example four-page progress note

16   here?

17   A.      So importantly in this progress note, the next part

18   that Dr. Titus writes is that he was complaining of having

19   low back pain and lumbar back pain, or low back pain

20   secondary to disc protrusion at L4-5.

21              From the history form that the patient

22   completed, he was complaining of pain in his hands and arms.

23   At the bottom of this history, after he talks about his back

24   pain, he writes "also has bilateral upper extremity pain."

25   That's the last line in this writing.   So that disconnect is

Thomas - Direct

1    problematic because the history that the patient writes

2    about is not the history that's described.

3              The review of systems, which we will see

4    repeated, is this -- where you ask the patients, "Do you

5    have anything else?  And you go through each area of the

6    body.  Dr. Titus places lines that -- that means negative or

7    nothing or -- but it does not offer any additional

8    information about those areas.

9    Q.    And these lines or checkmarks, is that something

10   we're going to see as we go through the files quite

11   frequently?

12   A.    Repeatedly.

13   Q.    Okay.

14              MR. WOODARD:  Let's go to the next page,

15   Ms. Leal.

16   BY MR. WOODARD:

17   Q.    And we won't go through every single progress note

18   for every patient, but I just want to walk through what

19   we're looking at in general.  So what's this one showing?

20   A.    The second page completes the review of systems at

21   the top.  And then we see past medical history.  There's a

22   history -- it says that there's a history of an MVA, a motor

23   vehicle accident.  History of -- I can't read that.  Oh,

24   history of RSD of both hands and forearms.

25              RSD disorder, also called complex regional pain

Thomas - Direct

1    syndrome, is a very painful disorder that's associated with

2    a number of complex changes in the nervous system.  One

3    would expect that given that history, we would see certain

4    things in the physical examination because that becomes

5    important in terms of making a diagnosis.

6         He also notes some other -- the lumbar problems,

7    history of work injury, history of lumbar back pain, history

8    of brachial plexus block, that would have been a type of

9    treatment, and bilateral carpal tunnel repairs.  Carpal

10   tunnel being the nerve in the palm.

11        And then we come down to the urine toxification

12   screen history, and this is important.  It says, "History of

13   negative urine tox screen for illicit drugs."  This is an

14   initial visit.  There's been no urine tox screen to this

15   point in the medical record that I could find.

16        He mentions the lumbar -- the MRI of the lumbar

17   spine, and that the patient is taking Oxycontin and

18   Oxycodone.

19   Q.    Okay.

20        MR. WOODARD:  Next page, please.

21        THE WITNESS:  Surgical history, none.  Well, we

22   know that's not true because he had surgery on his hands.

23   And then the physical examination, the circles with the

24   minus sign means, I assume, negative.  And so this

25   examination is essentially normal at all of these places.

1    Next page.

2         MR. WOODARD:  Next page, please.

3         THE WITNESS:  Here, we have the musculoskeletal

4    examination.  There's no edema.  Good pulses.  Pain along

5    lumbar disc L3 through L5, and bilateral wrist and hands.

6    Decreased ROM, range of motion.  Tenderness.  Where

7    tenderness is -- I don't know what the range of motion is, I

8    don't know.

9         And the thing about it is is that because the

10   histories, this patient has complex regional pain syndrome,

11   I would want to know a whole bunch of other stuff about the

12   temperature of his hands, where he's tender, what his

13   neurological function is, how well his hands work, what his

14   grip strength is, a whole series of things that would be in

15   the usual course of treating him, to be able to tell if I

16   treat him, does he get any better?  But we don't get any of

17   that from the physical examination.

18        In the Impression and Diagnosis, chronic pain

19   syndrome, secondary to above.  He is clinically stable on

20   his current regimen of pain medication.  So he's to continue

21   with this present regimen of Oxycodone, ten milligrams PRN,

22   along with Oxycontin, long-acting b.i.d., RTC, return to

23   clinic in one month for reevaluation.

24        So that is what Dr. Titus has documented as his

25   treatment plan.

Thomas - Direct

1    BY MR. WOODARD:

2    Q.     Okay.  So let's look at what was prescribed.

3              MR. WOODARD:  If you could go to the next page,

4    it's 149.

5    BY MR. WOODARD:

6    Q.     Is this the same date, Dr. Thomas?

7    A.     Yes.

8    Q.     Okay.  Well, just first off, what was prescribed?

9    A.     Oxycodone, 15 milligrams, one tab every four hours,

10   PRN, dispensing 75 tablets.  That's not Oxycodone, ten

11   milligrams and Oxycontin.  And it's -- the other drug Ambien

12   is a sleep aid.

13   Q.     Okay.  Just a couple of questions here.  When you say

14   it wasn't ten, where did we see ten?

15   A.     In the progress note.

16   Q.     Okay.  And we see Ambien and Oxycodone.  Was Ambien

17   mentioned in the progress note?

18   A.     No, it was not.  Sleep disturbances was not mentioned

19   in the history.

20   Q.     Are you aware of any dangers of prescribing for a

21   patient taking Oxycodone and Ambien at the same time?

22   A.     Combining opioids and sedatives increases the

23   likelihood of opioid overdose.

24   Q.     And, Dr. Thomas, this prescription we're looking at

25   this first visit, what place and time are we at?  Is this

Thomas - Direct

1    after the Consent Decree?

2    A.    Yes.  The Consent Decree was in March of 2012.

3    Q.    Okay.  All right.  So let's move along through this

4    patient's history.

5              MR. WOODARD:  Let's jump to Page 177.

6    BY MR. WOODARD:

7    Q.    Okay.  And I think this is the first drug test we're

8    reviewing with you, so let's just kind of walk through page

9    by page.

10             What patient do we have here?

11   A.    This is Brent Hood.

12   Q.    And what's the date collected?

13   A.    It's collected on 10/1/2012.

14   Q.    So the first date he comes in to see Dr. Titus?

15   A.    Yes.

16   Q.    Okay.  And I believe you'd like to talk about the

17   second page.  Should we jump to that?

18   A.    Yes.  I mean, the second page makes it clearer for

19   the jury.

20   Q.    Okay.

21   A.    So here, what we're looking for is what was in the

22   urine and what was not in the urine.  The history was that

23   the patient was taking Oxycodone and Oxycontin.  So what we

24   should see is Oxycodone and the metabolites of Oxycodone.

25             When we come down the list, under "Positives,"

Thomas - Direct

1    because we have Oxycodone, Oxymorphone, this is the

2    screen -- the first line is the screen.  Is it there?  Is it

3    not there?  And so it says positive.

4            However, you'll note below that where it says

5    "MS," that's a more sensitive test.  What we'll say -- we

6    won't say it means mass spectrometry.  We'll say it means

7    more sensitive.

8            So MS, it's negative for Oxycodone, which is the

9    drug that you first ingest.  Oxymorphone is a longer acting

10   metabolite, and Noroxycodone is the metabolite in between

11   Oxycodone and Oxymorphone.  So there's some of the middle

12   metabolite of Oxycodone, none of the parent drug, and none

13   of the last of the drug.

14           That's not what you expect in a patient that's

15   taking Oxycodone and Oxycontin.

16           And then the next slide.

17   Q.    Just quickly, Dr. Thomas, what's a metabolite?

18   A.    Oh, when we take a drug, the body changes it into

19   other stuff so we can get rid of it.  So the metabolites --

20   and this comes up repeatedly -- are the things that the body

21   changes the drug into.  And you expect to see both the drug

22   that the patient is taking and the normal course of the

23   patient getting rid of the drug.

24           Because if you're taking the drug all the time,

25   some is going in, some is going out, and it goes out in an

Thomas - Direct

1    orderly fashion.

2    Q.     Okay.

3                 MR. WOODARD:  Next page, please, Ms. Leal.

4                 THE WITNESS:  And so we see that Methadone was

5    negative, but at the top here, we have EDDP.  EDDP is the

6    metabolite of Methadone.  And so that's positive which means

7    the patient was at some time in the past, prior to this,

8    taking Methadone.  That's not part of the history.

9                 So what the doctor knows from the first urine

10   drug screen is the patient wasn't taking Oxycodone

11   regularly, and they were taking Methadone.  And in this

12   instance, Methadone is an illicit drug because it didn't

13   come from the doctor, and it's not part of the medical

14   history.

15   Q.     And when you said it's not part of the history, you

16   mean we did not see Methadone when we went through that

17   progress note a minute ago?

18   A.     Yes.

19   Q.     Okay.

20   A.     We didn't see it on the patient's form.

21   Q.     So when this Methadone shows up on this drug test,

22   what does that tell Dr. Titus?

23   A.     That the patient's taking Methadone illicitly.

24   Q.     Okay.

25                 MR. WOODARD:  And, Ms. Leal, if you could go to

1279

Thomas - Direct

1    the -- well, maybe back to the first page of this -- yes,

2    please.

3    BY MR. WOODARD:

4    Q.    Okay.  The date collected is October 1st of 2012?

5    A.    Yes.

6    Q.    When was this reported to Dr. Titus?

7    A.    On the 9th of October.

8    Q.    Okay.  So at that point, Dr. Titus would know about

9    the Methadone?

10   A.    Yes.

11   Q.    Okay.

12             MR. WOODARD:  Ms. Leal, could we jump to

13   Page 144?

14   BY MR. WOODARD:

15   Q.    Okay.  So we were just at -- October 9th was the

16   report date.  How many days out are we to this prescription?

17   A.    Two weeks from the first prescription and from the

18   time -- and so it's another six days until this is -- this

19   prescription is written.

20   Q.    Okay.  So six days from the drug test result, this

21   prescription is written?

22   A.    That's correct.

23   Q.    Okay.  And what's it written for?

24   A.    For Oxycodone, 15 milligrams, dispensing 75 tablets.

25   Q.    Okay.  A doctor acting in the usual course upon

 1   receiving the information regarding Methadone, what would

 2   that doctor do prior to writing this subsequent prescription

 3   for Oxycodone?

 4   A.     Intervene with the patient.  Reiterate -- take the

 5   history again.  How did it get there?  Find out what the

 6   patient is telling them.  Reiterate with them the controlled

 7   substances treatment agreement and the limitations on

 8   prescribing.  Some intervention is required.

 9   Q.     Did you see intervention in the record you reviewed?

10   A.     No.

11   Q.     Okay.  All right.

12          MR. WOODARD:  Ms. Leal, let's jump to Page 137.

13   BY MR. WOODARD:

14   Q.     Okay.  And I believe this is the next visit.  We

15   don't have to go line by line, but what did you observe from

16   this follow-up visit, Dr. Thomas?

17   A.     It's still talking about back pain, although it does

18   mention his hand pain.  And there's no mention of the

19   abnormal urine drug screen.

20   Q.     Okay.

21   A.     Could you go to the last page of this one?  And just

22   stop right here, please.

23   Q.     Yes.

24   A.     Under the Section 4, "Urine Toxification Screen

25   History," it has exactly the same thing that it had before.

Thomas - Direct

1    Q.      And what about under "Pain Medications"?

2    A.      It has exactly the same thing that it had before,

3    Oxycontin, Oxycodone, even though those aren't being

4    prescribed -- or the Oxycontin is not being prescribed.

5    Q.      What about the Ambien?

6    A.      The Ambien is not listed.

7    Q.      Okay.  All right.

8              MR. WOODARD:  Let's jump ahead to Page 115.

9    BY MR. WOODARD:

10   Q.      So, Dr. Thomas, we're in March of 2013.  What stands

11   out to you here?

12   A.      He says that the pain is the same as it was since the

13   last visit.  And there is -- it's causing a decline in his

14   normal level of daily function, but otherwise, doesn't talk

15   about any response to the drugs.

16   Q.      Okay.

17             MR. WOODARD:  And can we go to the last page of

18   this progress note, please.

19   BY MR. WOODARD:

20   Q.      Okay.  And so what's mentioned with regards to drugs

21   prescribed under the "Treatment Objective"?

22   A.      That he's going -- that he has had some improvement

23   with Oxycodone 15 milligrams, up to four to five tablets

24   daily.  And that he is going to continue -- also continue

25   with Methadone, ten milligrams twice a day.

Thomas - Direct

1   Q.      Have we seen a Methadone prescription up until this

2   date?

3   A.      No.

4   Q.      Okay.

5              MR. WOODARD:  Okay.  Let's jump to Page 110,

6   please.

7   BY MR. WOODARD:

8   Q.      So following this visit, what's prescribed to

9   Mr. Hood?

10  A.      At this point, he's prescribed Oxycodone, 15

11  milligrams up to five times daily.  And Methadone, ten

12  milligrams twice daily.

13  Q.      Were you able to discern from the progress note why

14  Dr. Titus was prescribing Oxycodone and Methadone at this

15  point?

16  A.      No.

17  Q.      All right.

18             MR. WOODARD:  Okay.  Let's just jump quickly to

19  Page 109.

20  BY MR. WOODARD:

21  Q.      And are the same prescriptions being given here?

22  A.      Yes.

23  Q.      Okay.  And the date is March 28th of '13?

24  A.      Yes.

25  Q.      Okay.

Thomas - Direct

1       MR. WOODARD:  Let's jump to Page 168.

2   BY MR. WOODARD:

3   Q.      So did Mr. Hood get a drug test shortly after this

4   last prescription we looked at?

5   A.      Yes, on 4/11 of 2013.

6   Q.      Okay.

7       MR. WOODARD:  And if we could jump to the second

8   page.

9   BY MR. WOODARD:

10  Q.      What's this one showing?

11  A.      This one is remarkable for, once again, the presence

12  positive of morphine, which is an opioid that is not being

13  prescribed for him and is, therefore, an illicit drug.  He

14  is positive for Oxycodone, but negative for the metabolites.

15  So if he were taking Oxycodone regularly, he would have both

16  Oxycodone and the metabolites of the drug in his urine.  So

17  this says he's not taking it regularly.

18  Q.      So what does being negative for the prescribed drug

19  indicate to the doctor here?

20  A.      That the patient is non-compliant at best.  But the

21  use of morphine means the patient is a drug abuser, period.

22      MR. WOODARD:  Ms. Leal, could you jump to

23  Page 102?  And I'm sorry, could you pause there?  Go back.

24  Page 168.

25  BY MR. WOODARD:

Thomas - Direct

1   Q.    Okay.  This drug test result, when was that reported

2   to Dr. Titus?

3   A.    It was reported on 4/16 of 2013.  And the thing we

4   didn't note is that the prescribed Methadone was not present

5   in the patients.

6   Q.    Okay.

7            MR. WOODARD:  So let's jump to Page 102.

8   BY MR. WOODARD:

9   Q.    So despite the absence of the Methadone, what is this

10  next prescription for?

11  A.    Methadone and Oxycodone.  No change from prior

12  prescribing.

13  Q.    Okay.

14           MR. WOODARD:  And let's jump to the next

15  progress note.  So let's go to Page 97, please.  Okay.  And

16  maybe if we could go to the "Drug Test" section, Ms. Leal,

17  which I believe is the next page.

18           One up.  Okay.

19  BY MR. WOODARD:

20  Q.    Does this call out specifically the failed or, I'm

21  sorry, the inconsistent result that we just talked about?

22  A.    The unexpected result is not noted.  He says that

23  it's negative for illicit drugs, which is not true.  And he

24  does not mention that it's not positive for the prescribed

25  drugs.

Thomas - Direct

1    Q.     And what is decided to be prescribed?

2    A.     He continues to prescribe Oxycodone and Methadone.

3    Q.     Okay.

4    A.     I'm sorry -- yes, Oxycodone and Methadone.

5    Q.     And what did you say about Methadone with regard to

6    its potency as compared to morphine?

7    A.     At ten milligrams twice a day, it's four times as

8    potent as morphine.  So that would be -- so 20 milligrams of

9    Methadone per day is equal to 80 milligrams of morphine per

10   day.

11              MR. WOODARD:  Jump to Page 94, please, Ms. Leal.

12   BY MR. WOODARD:

13   Q.     All right.  We're in May of 2013.  What does Mr. Hood

14   continue to be prescribed?

15   A.     The same as he was.

16   Q.     Okay.

17              MR. WOODARD:  And Page 68, Ms. Leal.

18   BY MR. WOODARD:

19   Q.     Okay.  July of 2013, same question, what's

20   prescribed?

21   A.     The same prescriptions are given.

22   Q.     Okay.

23   A.     Without change.

24   Q.     And, specifically, this is July 22nd of '13?

25   A.     Yes.

Thomas - Direct

1   Q.     Okay.

2             MR. WOODARD:   Let's go to Page 32, Ms. Leal.

3   BY MR. WOODARD:

4   Q.     Dr. Thomas, what happened with Mr. Hood on August 4th

5   of 2013?

6   A.     He was admitted to the hospital after his friends,

7   according to the admission note, had -- had brought him to

8   the emergency room and dropped him off.   He was

9   unresponsive.   He had to go to the Intensive Care Unit.   He

10  had to be intubated, that is a breathing tube had to be

11  placed in his trachea in order for him not to not die.

12            He was diagnosed as having a polydrug overdose

13  with acute respiratory failure.   And probable aspiration

14  pneumonia, he had breathed the contents of his stomach into

15  his lungs.   And he did have a chronic pain syndrome.

16  Q.     Was the drug screen conducted while at the hospital?

17  A.     It was.   It was positive for cocaine, opiates, and

18  benzodiazapine.

19  Q.     Okay.

20            MR. WOODARD:   If you can back out, Ms. Leal.

21  BY MR. WOODARD:

22  Q.     Do you know whether this record was transmitted,

23  faxed to Dr. Titus?

24  A.     It was faxed to Dr. Titus, according to the stamp, on

25  August 6th, 2013, at 12:15.

Thomas - Direct

1    Q.    Okay.  And would a doctor acting in the usual course

2    take this ER record and all the information contained

3    therein into account when continuing to prescribe?

4    A.    Yes.

5    Q.    All right.  I just want to look at one more document

6    on this hospital record.

7              MR. WOODARD:  If we could go to Page 56.

8              And, actually, just scroll through, Ms. Leal.

9              Okay.  If you could zoom in on the medication

10   summary.

11   BY MR. WOODARD:

12   Q.    Dr. Thomas, if you know, what is this showing with

13   regard to the medications for Mr. Hood upon discharge?

14   A.    These are the -- these are the medications that they

15   noted he was taking at the time, and that he -- I'm not sure

16   if these were prescribed to him when he left.

17   Q.    Okay.

18              MR. WOODARD:  Could we go down one more page,

19   Ms. Leal?  And one more.  Okay.  Could we go to "Medications

20   will include.

21   BY MR. WOODARD:

22   Q.    What does this say about starting back on Methadone,

23   et cetera?

24   A.    They said he may start back his Methadone, ten

25   milligrams twice a day, and Oxycontin, but it's actually

1288

Thomas - Direct

1   Oxycodone, 15 milligrams every six hours as needed for pain.

2   Prescriptions were not given for this medication.

3   Q.     Okay.  So under this scenario, whose responsibility

4   was it to follow up with the patient?

5   A.     Dr. Titus.

6   Q.     Okay.  All right.  So you mentioned the records were

7   faxed.

8              MR. WOODARD:  Let's go to Page 33, please.

9   BY MR. WOODARD:

10  Q.     So the next day, what does Dr. Titus do?

11  A.     He writes Mr. Hood this letter of discharge that he

12  signed.

13  Q.     And just to be clear, is discharge the only option

14  once learned that a patient has a polydrug overdose?

15  A.     No.  Other medical care could be offered if the

16  doctor chose to.

17  Q.     Okay.  What did Dr. Titus choose to do here?

18  A.     He states, "I will no longer be your primary care

19  provider for the following reason:  Testing positive for

20  illicit drugs (cocaine and heroin).  This is reason for

21  immediate termination.  I will give you 30 days of emergency

22  care only.  After these 30 days, I will no longer provide

23  you with medical care."  Underlined, "Emergency care does

24  not include narcotic prescriptions."

25  Q.     Okay.  Let's break this down.  Dr. Thomas, did you

Thomas - Direct

1  see anything in the record we've reviewed so far about

2  Dr. Titus providing primary care services?

3  A.     There was no primary care -- there were no primary

4  care services provided to Mr. Hood, no blood pressure

5  treatment, no treatment of -- no testing of his blood sugar,

6  no testing of his cholesterol.  No preventative care was

7  noted in the record at all.

8  Q.     Is that something that you would expect to see of a

9  doctor acting in the usual course?

10  A.     Yes, for a primary care physician, yes.

11  Q.     Okay.  Okay.  And it says, "Emergency care does not

12  include narcotic prescriptions"; right?

13  A.     That's correct.

14  Q.     Okay.  It also mentions heroin.  Did we see heroin

15  anywhere so far?

16  A.     We didn't see heroin.  The -- because the test that

17  the hospital recorded only reported opiates.  It did not

18  report what type of opiate it was.

19  Q.     Okay.

20         MR. WOODARD:  Let's jump to Page 34.

21  BY MR. WOODARD:

22  Q.     So what else does Dr. Titus do?

23  A.     He writes him a prescription -- he writes him two

24  prescriptions, one for Methadone, ten -- 30 -- ten

25  milligrams, 30 tablets; and one for Oxycodone, 15

Thomas - Direct

1   milligrams, 75 tablets.

2   Q.      Are these narcotic prescriptions?

3   A.      They are opiates, yes.

4   Q.      What did the discharge letter say?

5   A.      It said that he wouldn't do that.

6   Q.      Okay.  For this prescription, specific prescription,

7   Dr. Thomas, what's your opinion as to whether it was in the

8   usual course of professional practice and for a legitimate

9   medical purpose?

10  A.      These prescriptions were not for a medical legitimate

11  purpose and the usual course of professional practice.  This

12  -- these were life-threatening prescriptions for Mr. Hood,

13  given that he had a history of life-threatening overdose

14  three days before.  He clearly had a problem that would not

15  be remedied by these drugs.  And the maintenance of his

16  substance use disorder with these drugs was not for

17  medically legitimate purpose in the usual course of

18  professional practice.

19  Q.      The prescription we're looking at, is that consistent

20  with the tapering dose, as you've described it?

21  A.      No.  This is what I've previously called a brick.  It

22  is the same prescription as he wrote for him before.  It is

23  occurring after the patient is discharged from his practice.

24  The doctor-patient relationship has ended and he is still

25  giving him medications.  It will not include any careful

Thomas - Direct

1    followup.  It will not include any further assessment of his

2    pain or his substance use disorder.  It will not include any

3    of the things that would be necessary for it to be a medical

4    and legitimate prescription.

5    Q.    And, Dr. Thomas, did you see any supervision by

6    Dr. Titus of this patient after giving him this prescription

7    upon discharge?

8    A.    None.

9    Q.    Okay.  And did you see any referrals by Dr. Titus to

10   anyone?

11   A.    None.

12   Q.    Okay.

13           MR. WOODARD:  And, Ms. Leal, if we could go to

14   Government's Exhibit 204 at Page 1.

15           And if you could zoom in on the third patient

16   here.

17   BY MR. WOODARD:

18   Q.    So what does this show happened on the same date of

19   this last prescription?

20   A.    Mr. Hood paid Dr. Titus $155 in cash.

21   Q.    All right.  Dr. Thomas, I'm going to show you what's

22   been marked as Government's Exhibit 903 and this is only for

23   demonstrative purposes, Your Honor.

24           THE COURT:  All right.

25   BY MR. WOODARD:

Thomas - Direct

1    Q.      Okay.  What are we looking at here, Dr. Thomas?

2    A.      This is a list of the -- the patients in the

3    indictment, with Mr. Hood being number one.

4    Q.      Okay.  And could you just talk us through the columns

5    here?

6    A.      So the unexpected drug test result is one of the

7    things that we have looked for in determining whether or not

8    the -- there was a problem.  Was there an intervention, a

9    medical intervention after the problem was identified?  Did

10   Dr. Titus write a warning or discharge letter?  And the

11   discharge letters all have the same text that we've seen

12   previously.  And did he continue to prescribe without

13   monitoring after discharge?

14   Q.      And how should we fill this out, Dr. Thomas?

15   A.      Well, for Mr. Hood, he had multiple unexpected drug

16   test results, which had no intervention associated with

17   them.  He did receive a discharge letter.  And there was

18   continued prescribing after discharge without monitoring of

19   his response.

20   Q.      Okay.

21           MR. WOODARD:  Ms. Leal, if you could select all

22   X's for all of those, please.  Thank you.

23           Okay.  Let's go to Exhibit 2, please.

24   BY MR. WOODARD:

25   Q.      All right.  Dr. Thomas, is Scott Jones a patient

Thomas - Direct

1    whose medical records you reviewed in this case?

2    A.    Yes.

3    Q.    And does a specific prescription to him represent

4    Count 2 of the indictment?

5    A.    It does.

6    Q.    Okay.  And for that prescription, did you reach the

7    conclusion about whether it was consistent with the usual

8    course of professional practice and for a legitimate medical

9    purpose?

10   A.    It was not.

11   Q.    All right.  Let's talk about that.

12              MR. WOODARD:  So let's go to Exhibit 102,

13   please, at Page 214.

14   BY MR. WOODARD:

15   Q.    What is this, Dr. Thomas?

16   A.    This is a letter from Mr. Jones' prior treating

17   physician, Dr. Fox, discharging him from his practice

18   because of his drug-seeking behavior, approaching the doctor

19   in the parking lot to attempt to obtain prescriptions from

20   him.

21   Q.    Is this one of the first things we see in the patient

22   file for Mr. Jones?

23   A.    Yes.

24   Q.    Okay.  Okay.

25              MR. WOODARD:  Let's jump to Page 10.

Thomas - Direct

1    BY MR. WOODARD:

2    Q.    What do we have here?

3    A.    This is a pain assessment form filled out by the

4    patient.  This is a Patient History Form.  I thought this

5    was notable because under the scratched-out portions of the

6    drugs, there's some writing.  And then he writes that he has

7    no allergies to medications.  I think that's in the wrong

8    spot.  He complains of lost left side body, whole left-sided

9    weakness.

10   Q.    Okay.

11         MR. WOODARD:  And let's go to the first progress

12   note that we can find in the file at Page 16.

13         THE WITNESS:  You'll note that the medication

14   section is blank.

15   BY MR. WOODARD:

16   Q.    Right.  Okay.  Is this the first progress note, as

17   best we could tell?

18   A.    This was present in the file.  And because it is

19   undated, I attributed no particular date to it.  But it

20   shows us something about Dr. Titus' practice.  This blank

21   form contains all of the negatives prior to the questions

22   being asked and -- next page.

23         And the second page is also prefilled with the

24   urine drug screens being interpreted as normative.

25         MR. WOODARD:  Next page, Ms. Leal.

Thomas - Direct

1    THE WITNESS:  The physical examination is

2    interpreted as being normative.  That is, everything is

3    normal.

4    MR. WOODARD:  And last page, please.

5    THE WITNESS:  This has -- is something that

6    appears a number of times because the handwriting changes.

7    And, in general, in my files, my handwriting is my

8    handwriting.  What I've identified as Dr. Titus' handwriting

9    does not complete the section labeled as "Physical

10   Examination."

11   BY MR. WOODARD:

12   Q.    Okay.  All right.  So let's look at what was

13   prescribed at the first visit.

14   MR. WOODARD:  If you could go to Page 213,

15   please.

16   BY MR. WOODARD:

17   Q.    So after Dr. Titus gets this letter from the other

18   doctor -- and we're in June of 2011 -- what does he

19   prescribe to Mr. Jones?

20   A.    He prescribes this patient 180 Oxycodone 15-milligram

21   tablets and 60 Opana 40-milligram tablets.  Now, Opana is

22   Oxymorphone.  We mentioned that is a metabolite of

23   Oxycodone, but it's available as a drug in and of itself.

24   Opana is twice as potent at Oxycodone, which makes it three

25   times as potent as morphine.

Thomas - Direct

1    So 40 milligrams of Opana is equal to 120

2    milligrams of morphine equivalents.  So it's 240 milligrams

3    of morphine equivalents, 120 plus 120, for the Opana.  And

4    if the patient were to take six Oxycodone 15's per day, that

5    would be another 135 milligrams of morphine equivalents.  So

6    this is 375 milligrams of morphine equivalents.

7    So a patient who came into his office, having

8    been discharged from another physician for drug-seeking

9    behavior, without a drug screen, with very -- with no other

10   information, Dr. Titus provided him with 375 milligrams of

11   morphine equivalents immediately.

12   Q.    Okay.  Let's see what happened next.

13         MR. WOODARD:  So let's go to Page 238.

14   BY MR. WOODARD:

15   Q.    So was a drug screen eventually collected and

16   conducted?

17   A.    Yes.  It was performed on 8/29 and reported on 9/10.

18   Q.    Okay.  So what do we see in this drug test result?

19   A.    That Codeine and morphine are present.  And Oxycodone

20   is not.

21   Q.    Okay.

22         MR. WOODARD:  Can you go to the second page,

23   Ms. Leal?

24   BY MR. WOODARD:

25   Q.    All right.  Do you see some things circled here?

Thomas - Direct

1    A.      Yes.

2    Q.      What do we see?

3    A.      So the positive for the morphine, which is very high,

4    and the Codeine, which is relatively high, are circled.  But

5    he wasn't prescribed Codeine and morphine.  Now, one of the

6    things in interpreting urine drug screens, the presence of

7    Codeine and morphine, which are both naturally occurring

8    opiates, usually if it were a contaminant, it would be --

9    there would be a little bit of Codeine and a whole bunch of

10   morphine.  But because this ratio of Codeine to morphine

11   that -- the interpretation I have of this is one must

12   suspect -- it does not prove, but it is suspicious for

13   heroin use.  Because heroin is Diacetylmorphine Morphine.

14   Heroin breaks down into morphine because it comes directly

15   from opium.  It tends to have a good deal of Codeine in it.

16            Importantly, the drug that's being prescribed,

17   Oxycodone, is absent.  The patient is not using the

18   medications that the doctor is prescribing in any manner

19   that can remotely be consistent with the prescription.

20   Q.      Dr. Thomas, would you say these results are difficult

21   to read?

22   A.      Oh, no.  The part about the morphine, Codeine does

23   require some interpretation, but we know he's using a drug

24   that's not prescribed, and we know he's not appropriately

25   using the drug that is prescribed.  It's very

Thomas - Direct

1  straightforward.

2  Q.    Okay.

3         MR. WOODARD:  Ms. Leal, if you could go to the

4  first page of the result and just show us when this was

5  reported to Dr. Titus.

6         THE WITNESS:  9/10.

7  BY MR. WOODARD:

8  Q.    All right.

9  A.    Of 2012.

10  Q.    Okay.

11         MR. WOODARD:  Let's jump to Page 149.

12  BY MR. WOODARD:

13  Q.    So following this result, what does Dr. Titus

14  prescribe to Mr. Jones?

15  A.    Oxycodone 15 milligrams, dispensing 60, admittedly a

16  lower dose.  And Oxycontin 20 milligrams, dispensing 30,

17  admittedly a lower dose than we saw previously.

18  Q.    But the same drugs?

19  A.    Relatively the same.  He continues with Oxycodone.

20  He eliminated Oxymorphone.

21  Q.    Okay.

22         MR. WOODARD:  And let's jump to another drug

23  test, Page 144.  Or I'm sorry, progress note.  Okay.  So

24  here's the note for the next visit.  If you'd scroll to the

25  drug test result.

1299

Thomas - Direct

1      THE WITNESS:  There's no mention of it in that

2  part of the history.

3  BY MR. WOODARD:

4  Q.    Okay.  Is that something you would expect to see,

5  Dr. Thomas?

6  A.    Yes.

7      MR. WOODARD:  And let's go to Page 148.

8  BY MR. WOODARD:

9  Q.    What's prescribed next time?

10  A.    The same as he prescribed previously, Oxycodone 15

11  milligrams; Oxycontin 20 milligrams, 60 and 30,

12  respectively.

13  Q.    Okay.  And just to place us in time, Dr. Thomas,

14  where are we with regard to the Consent Decree?

15  A.    We are six months after the consent decree.

16  Q.    Okay.

17      MR. WOODARD:  Okay.  Let's go to Page 234,

18  please.

19  BY MR. WOODARD:

20  Q.    And are we in 2013 now?

21  A.    Yes, we are.

22  Q.    Okay.  There's something right here on the front.  So

23  what did this drug test show?

24  A.    There was no Oxycodone present.

25  Q.    Okay.  And do you see a little sticky flag there?

Thomas - Direct

1    A.     Yes.

2    Q.     What does that say?

3    A.     It says "positive, cocaine."

4    Q.     Okay.  Let's interpret this really quickly.

5           MR. WOODARD:  The next page.

6    BY MR. WOODARD:

7    Q.     What's shown?

8    A.     So he's positive for cocaine, no doubt about it.

9    He's also positive, again, for morphine and Codeine, without

10   ever having been -- and we know that he was not prescribed

11   cocaine.  He was not prescribed Codeine.  He was not

12   prescribed morphine.  And he's negative for Oxycodone, which

13   he was prescribed.

14          This is a person who is in contact with the

15   black market and drugs.  We know that.  And we know that he

16   is not taking his medications as prescribed, in any way

17   whatsoever.

18   Q.     Okay.  What's the report date on this one?

19   A.     This is 2/21/2013.

20   Q.     Okay.

21          MR. WOODARD:  Ms. Leal, let's jump to Page 43.

22   BY MR. WOODARD:

23   Q.     So what do we have here?

24   A.     This is a -- this is a warning letter, a counseling

25   letter.  It mentions that his urine drug screen was positive

Thomas - Direct

1    for cocaine and that it would not be tolerated.  It ignores

2    that his urine drug screen was negative for Oxycodone.  It

3    ignores that his urine drug screen was suggestive that he

4    was using heroin.  But he counseled him about his use of

5    cocaine.

6    Q.    Is there a signature by the patient here?

7    A.    There is no signature by the patient.  There is

8    Dr. Titus' signature.

9    Q.    And I'm a little confused, Dr. Thomas.  You said the

10   drug screen was reported on February 21st, of 2013, but

11   what's the date of this letter?

12   A.    February 14th, 2013.  The -- which was in between the

13   taking of the drug screen on February 4th and the reporting.

14   Q.    Okay.

15            MR. WOODARD:  Let's jump to Page 104.

16   BY MR. WOODARD:

17   Q.    What does Dr. Titus continue to prescribe?

18   A.    Oxycontin 20 milligrams; Oxycodone 15 milligrams, 30

19   and 60.

20   Q.    Okay.  I want to pause on something here.  Do you see

21   the letters PRN?

22   A.    Yes.

23   Q.    What is that, Dr. Thomas?

24   A.    PRN stands for pro re nata, which means as needed.

25   Q.    Is PRN prescribing with these types of opioid drugs

Thomas - Direct

1  consistent with long-term use of opioids for pain

2  management?

3  A.     No.

4  Q.     Why not?

5  A.     If we say to use the medications as needed, ad-lib,

6  then we are -- the doctor is failing to determine the dose

7  of the drug.  When opioids began to be liberalized in the

8  '90s, one of the tenets, the ground rules for using these

9  drugs appropriately, is that the doctor determines the dose,

10 just as if the doctor would determine the dose for the

11 treatment of high blood pressure.

12         In patients who are using these medications

13 appropriately, they are used not as needed, but around the

14 clock.  To use a long-acting opioid, like Oxycontin, PRN, or

15 Methadone, PRN, literally makes no sense at all.  A drug

16 that isn't going to have -- that's going to have a very slow

17 onset, is designed to give you a longer lasting level, if

18 you take it when you need it, you won't -- you may not need

19 it by the time you feel it.  So the use of these drugs is

20 assumed to be as the treatment of high blood pressure, the

21 doctor determines the dose, not the patient.

22 Q.     Okay.  So let's fast-forward a little bit.  Is it

23 fair to say there were several unexpected drug test results

24 for this patient?

25 A.     Repeatedly.

Thomas - Direct

1    Q.     Okay.  And were those for the absence of one of the

2    prescribed medications?

3    A.     Both for the absence of prescribed medications and

4    the presence of illicit medications.

5    Q.     Okay.  Does seven sound like a fair number for the

6    inconsistent test results?

7    A.     Yes.  There were a lot.

8    Q.     Okay.  Dr. Thomas, in the usual course of

9    professional practice, after seven inconsistent results

10   showing the lack or absence of Oxycodone, is there any

11   legitimate medical purpose to continue with that

12   prescription?

13   A.     No.

14   Q.     Why not?

15   A.     Well, we know that the patient is not using it

16   appropriately.  We know that the patient is using other

17   drugs inappropriately.  We know that he is coming in and

18   telling the physician that "this medication is not in my

19   system now."  There is no manner in which the physician

20   could reasonably assume that the patient was appropriate for

21   the use of controlled substances, and particularly not

22   Oxycodone.

23   Q.     Okay.

24              MR. WOODARD:  Let's look at one last drug test,

25   on Page 4 -- 47.

1304
Thomas - Direct

1    BY MR. WOODARD:

2    Q.     Okay.  What does this show us?

3    A.     This is one of two drug tests that were performed on

4    this date, 9/5/2013.  It is positive for Codeine, morphine.

5    And in this instance, there's not just a suggestion that he

6    was using heroin.  It is the metabolite of heroin that we

7    expect to see 6-monoacetylmorphine or 6 MAO.

8             So this says the patient is using heroin,

9    period.  End.  No doubt.  And one will note there is no

10   Oxycodone.

11   Q.     Okay.

12             MR. WOODARD:  Let's go to Page 42.

13   BY MR. WOODARD:

14   Q.     So what happens on September 16th?

15   A.     This is the -- oh, this is a counseling letter for a

16   patient who has repeatedly been looking like he's using

17   heroin.  Now, we know he's using heroin and he's not using

18   Oxycodone.  And he's being counseled and stating that

19   further deviance will not be tolerated.

20   Q.     And in the last line, what does it say about "first

21   and only notice"?

22   A.     "Please review our treatment agreement and be advised

23   this is your first and only notice regarding this issue."

24   Q.     Okay.  September 16th, 2013.

25             MR. WOODARD:  Let's go to Page 44, please.

Thomas - Direct

1    BY MR. WOODARD:

2    Q.    Is this the same date?

3    A.    Same date.

4    Q.    What happens in this letter?

5    A.    This is a discharge letter.  It says the same thing

6    that the prior discharge letter said about.  This time the

7    reason is testing positive for an illegal substance, heroin,

8    and for the absence of prescribed medications in your

9    system.

10          This is the first mention, after multiple

11   negative tests for Oxycodone, that the patient didn't have

12   the prescribed medication in his system, and he discharges

13   him from his practice.

14   Q.    Does the decision to stop prescribing Oxycodone mean

15   Dr. Titus had to discharge him?

16   A.    No.

17   Q.    But if he did discharge him, was it in the usual

18   course to write him a prescription?

19   A.    No.

20          MR. WOODARD:  Let's go to Page 41, please.

21   BY MR. WOODARD:

22   Q.    What was prescribed to Mr. Jones?

23   A.    You will note the date on this is 9 -- is

24   September 19th of 2013.  He writes him for Oxycodone, 15

25   milligrams, dispensing 80 tablets, three days after he

1306

Thomas - Direct

1   discharged him from his practice.

2   Q.    Okay.  And, in your opinion, was this specific

3   prescription for a legitimate medical purpose and within the

4   usual course of professional practice?

5   A.    It could not be.  It occurred outside the scope of

6   the doctor-patient relationship.

7   Q.    For a patient who showed on several occasions not to

8   be taking the Oxycodone, would any sort of tapering dose of

9   Oxycodone be needed for that patient?

10  A.    No.  Mr. Jones was in danger.  To give Mr. Jones an

11  opioid, full-agonist opioid in this dose at that time was to

12  endanger his life.  He was -- he clearly had all of the

13  signs of substance use disorder.

14           Despite having been told, "You stop that," he

15  didn't stop that.  He continued to use heroin, which he was

16  fairly obviously using all along.  And no opioid

17  prescription or -- of that sort, particularly Oxycodone.  No

18  Oxycodone prescription could be for medical and legitimate

19  purpose.

20  Q.    You mentioned he's in danger.  Did you see any

21  referrals by Dr. Titus?

22  A.    No.

23  Q.    Okay.

24           MR. WOODARD:  Let's go to Exhibit 3, please,

25  Ms. Leal.

Thomas - Direct

1          MS. LEAL:  You said 3?

2          MR. WOODARD:  Exhibit 3.

3          Okay.  Sorry about that.

4    BY MR. WOODARD:

5    Q.     Was Ms. Delores Perry a patient whose medical records

6    you reviewed in connection with this case?

7    A.     Yes.

8    Q.     And does the prescribing to her on October 16th of

9    2013 represent Count 3?

10   A.     Yes.

11   Q.     Okay.  And did you form an opinion on -- you know the

12   language I'm about to ask.

13   A.     Yes.

14   Q.     What was that?

15   A.     The prescribing of this date, October 16, 2013, was

16   not for a medical and legitimate purpose in the usual course

17   of professional practice.

18   Q.     Okay.  Let's go through this quickly.

19          MR. WOODARD:  So we're going to be on

20   Government's Exhibit 104 at Page 237.

21   BY MR. WOODARD:

22   Q.     Okay.  What do we have here, Dr. Thomas?

23   A.     This is a Patient Intake Form for Ms. Perry.  You'll

24   note the date is 2008.  She was a patient of Dr. Titus prior

25   to his suspension.  And she notes that she is not using any

Thomas - Direct

1   drugs, and she's taking Oxycontin, Oxycodone, and Neurontin,

2   which is a drug used in the treatment of nerve pain.

3   Q.     Okay.

4                MR. WOODARD:  Let's jump to Page 239.

5   BY MR. WOODARD:

6   Q.     What is this showing about Ms. Perry?

7   A.     Ms. Perry was at this time a medical assistance

8   patient, and that was the way she paid for her care prior to

9   in 2008.  She was indigent.

10  Q.     Okay.

11               MR. WOODARD:  All right.  So let's jump to

12  Page 129 and talk about her prescriptions.

13  BY MR. WOODARD:

14  Q.     All right.  What is Dr. Titus prescribing?

15  A.     He's prescribing Neurontin, 800 milligrams.

16  Gentamicin solution is for her eye.  It's an antibiotic.

17  And Oxycodone 15 milligrams, dispensing 150 tablets.

18  Q.     Okay.

19               MR. WOODARD:  Let's jump to Page 198.

20  BY MR. WOODARD:

21  Q.     So we were in 2009 and now we're in 2010.  What's

22  being prescribed?

23  A.     Oxycodone, 15 milligrams, 150 tablets.

24  Q.     Okay.

25               MR. WOODARD:  And let's jump ahead another year.

Thomas - Direct

1    Page 97.

2    BY MR. WOODARD:

3    Q.     What's being prescribed here?

4    A.     In October of 2011, he was prescribing Oxycodone, 15

5    milligrams, 180 tablets.

6    Q.     Okay.  By this time, Dr. Thomas, would you expect to

7    see some sort of improvement in functioning?

8    A.     Decrease in pain intensity and increase in function,

9    yes.

10   Q.     Okay.  Let's fast-forward to 2013.  And I'll show you

11   Page 28.  Okay.  What's being prescribed to Ms. Perry at

12   this point?

13   A.     Oxycodone, 15 milligrams, dispensing 75; and Morphine

14   Sulfate, extended release, ER.

15   Q.     Okay.

16   A.     Fifteen milligrams.

17   Q.     Is Morphine what you were talking about -- I'm sorry,

18   you were talking about Methadone earlier?

19   A.     Right.

20   Q.     Okay.

21   A.     This is Morphine.  It is the prototype, yes.

22   Q.     All right.  Okay.  And in time, are we post-Consent

23   Decree at this point?

24   A.     Yes.

25   Q.     Okay.  So let's look at some drug tests.

Thomas - Direct

1              MR. WOODARD:  Let's go to Page 104.  I'm sorry.

2    Page 11.  Exhibit 104.

3    BY MR. WOODARD:

4    Q.    Okay.  So was this collected on the date of the

5    prescription we just saw?

6    A.    Yes, 7/9 -- I'm sorry, 7/8/2013.

7    Q.    Okay.  And what does this test result show?

8    A.    She is positive for cocaine and she is positive for

9    the metabolite of Oxycodone, but not Oxycodone itself.

10   Q.    And what does that tell you?

11   A.    That tells me that she is not taking her Oxycodone

12   regularly and she's abusing cocaine and is in contact with

13   the black market and drugs.

14   Q.    All right.

15              MR. WOODARD:  Ms. Leal, the first -- or zoom

16   out.

17   BY MR. WOODARD:

18   Q.    What was the date reported to Dr. Titus?

19   A.    7/11.

20   Q.    Okay.

21              MR. WOODARD:  Let's jump to Page 27.

22   BY MR. WOODARD:

23   Q.    What's prescribed after that test result was reported

24   to Dr. Titus?

25   A.    The same thing she was prescribed before, Oxycodone,

Thomas - Direct

1    15 milligrams, dispensing 75; and Morphine, extended

2    release, 15 milligrams, dispensing 30.

3    Q.     Okay.  Did you see any evidence of intervention by

4    Dr. Titus upon receiving the test results we discussed?

5    A.     No.

6    Q.     Okay.

7              MR. WOODARD:  Let's go to Page 22.

8    BY MR. WOODARD:

9    Q.     So at the next visit, does Dr. Titus at least put in

10   the medical record any discussion of those results?

11   A.     No.

12             MR. WOODARD:  Could you go down a page,

13   Ms. Leal?

14   BY MR. WOODARD:

15   Q.     What do we have under "Urine Intoxification Screen

16   History"?

17   A.     The same thing that he puts there all the time.  No

18   mention of the urine drug screen that she had just

19   undergone.

20   Q.     Okay.

21             MR. WOODARD:  Okay.  Let's jump to Page 9,

22   Ms. Leal.

23   BY MR. WOODARD:

24   Q.     What do we have here?

25   A.     This is a letter of counseling for substance abuse.

Thomas - Direct

1    Q.      Okay.  For what drug in particular?

2    A.      For cocaine.  It states that "the illegal substance

3    will not be tolerated and future positive screenings will

4    result in dismissal from this treatment program."

5    Q.      What does it say about the first and only notice?

6    A.      That "this is your first and only notice regarding

7    this issue."

8    Q.      All right.  And the date here is September 4th?

9    A.      Yes.

10   Q.      Okay.

11           MR. WOODARD:  Can we go to Page 19, please.

12           THE WITNESS:  The prescriptions there are

13   exactly the same.

14   BY MR. WOODARD:

15   Q.      Okay.

16           MR. WOODARD:  Okay.  Let's jump to Page 7.

17   BY MR. WOODARD:

18   Q.      What does this show a little bit later, October of

19   '13?

20   A.      On October 2nd of 2013, they received a phone call

21   from a lady, no name, who stated that she had just come from

22   Troop 3 because Delores is selling her medication to

23   children.  She has reported it to police.  And if it happens

24   again, she will call the police on everyone.

25   Q.      Dr. Thomas, what does a doctor acting in the usual

Thomas - Direct

1  course of professional practice do with information like

2  this?

3  A.      This occurs occasionally.  You get a call and you

4  don't know who the call is from.  You don't know if the

5  information is true.  And so we're back to trust, but

6  verify.

7          In order to find out if information is true,

8  it's the same for a doctor as it is for anybody else.  You

9  have to ask some questions.  So you have to question the

10 patient.  You have to count the patient's pills, because if

11 someone is selling drugs, then they generally don't have the

12 drugs that you would expect them to have.

13         So you perform a pill count, either by having

14 the patient take the -- if she says she can't come to your

15 office, you have her take it to the pharmacy where she got

16 it.  And then you call the pharmacist and enlist that

17 professional's help in counting the pills.  You have the

18 patient come in for a urine drug screen.  You reiterate with

19 the patient -- and you ask them what's going on, why is this

20 person saying this about you?  And you monitor that person

21 more carefully than you would otherwise.

22         If the woman says she called the police, the

23 police have her number.  You call them and say, "Did

24 somebody call you and say this?"  Because if there's an

25 ongoing investigation, that would be something reasonable to

Thomas - Direct

1    know about.

2              This is not the doctor acting as a policeman.

3    This is the doctor acting as a doctor.  Because if that is

4    happening with one of my prescriptions, I darn sure want to

5    know where my prescriptions are going.  And that's the

6    standard.  The standard of care is to care.

7    Q.    And did you see anything to indicate what you just

8    described in the file you reviewed?

9    A.    No, nothing.

10   Q.    Let's talk about what did happen.

11              MR. WOODARD:  If we could go to Page 5.

12   BY MR. WOODARD:

13   Q.    What is this, Dr. Thomas?

14   A.    This is a discharge letter.

15   Q.    Same as before?

16   A.    Yes.

17   Q.    Okay.  Okay.  Following this discharge letter, did

18   Dr. Titus continue to prescribe to Ms. Perry?

19   A.    Yes.

20              MR. WOODARD:  Let's go to Page 2.

21   BY MR. WOODARD:

22   Q.    What is this?

23   A.    This is a prescription on 10/16.

24   Q.    Two weeks later?

25   A.    Yes, two -- yes, two weeks later, after she is no

Thomas - Direct

1  longer his patient.  She's been discharged from his

2  practice.  He gives her a prescription for the same drugs

3  that she has been getting, Morphine extended release; and

4  Oxycodone, 15 milligrams.

5  Q.    In your opinion, was this specific prescription

6  within the usual course of professional practice and for a

7  legitimate medical purpose?

8  A.    It could not be.  It wasn't.  No.

9  Q.    Why not?

10  A.    Because the doctor-patient relationship had ended.

11  There was no ongoing care.  There was no followup.  The

12  patient was exhibiting multiple risky behaviors.  And her

13  use of the drug was erratic at best.  It was circumstances

14  where the doctor had no basis for giving the patient an

15  additional opioid prescription.

16  Q.    Is this a tapering dose?

17  A.    No.

18  Q.    Would a tapering dose be needed for this patient?

19  A.    No.

20  Q.    Okay.

21  A.    It's two weeks out.

22  Q.    Okay.

23        MR. WOODARD:  Ms. Leal, if we could go back to

24  Government's Exhibit 903.  And I skipped Mr. Jones.

25  BY MR. WOODARD:

Thomas - Direct

1    Q.      How should we fill that one out?

2    A.      As it is.

3    Q.      Okay.  And how about Ms. Perry, who we just

4    described?

5    A.      Clearly unexpected urine drug screens without any

6    intervention or medical action by the doctor.  There are

7    warning and discharge letters, which includes the phrase,

8    "Emergency care does not include narcotic prescriptions."

9    And following that discharge, she continued to receive

10   controlled substances from Dr. Titus, not for medically

11   legitimate purpose, not in the usual course of professional

12   practice.

13   Q.      Okay.

14           MR. WOODARD:  Your Honor, should I proceed?

15   Okay.  All right.

16           Let's go to Exhibit 4, please.  Okay.

17   BY MR. WOODARD:

18   Q.      Did you review patient records for Ms. Maryjane

19   Mench?

20   A.      I did.

21   Q.      Okay.  And does the prescribing to Ms. Mench on

22   December 9th of '13 represent Count 4?

23   A.      It does.

24   Q.      Okay.  And did you reach a conclusion on whether

25   those specific prescriptions were within the usual course

Thomas - Direct

1    and for a legitimate medical purpose?

2    A.    I reached a conclusion.  They were not.

3              MR. WOODARD:  Let's go to Page 107, please.

4              MS. LEAL:  What exhibit was this?

5              MR. WOODARD:  I'm sorry, 107 at 14.

6    BY MR. WOODARD:

7    Q.    Okay.  What do we have here?

8    A.    This is the intake form for Ms. Mench.

9    Q.    And when did her treatment start?

10   A.    Oh, this is 10/5 of 2011.

11   Q.    Okay.

12             MR. WOODARD:  Let's go to Page 325.

13   BY MR. WOODARD:

14   Q.    Is this the first visit or first progress note?

15   A.    This is the first progress note on the same date.

16   Q.    Okay.  What is Dr. Titus treating this patient for?

17   A.    Chronic neck and back pain.

18   Q.    Okay.

19             MR. WOODARD:  So let's go to Page 327.

20   BY MR. WOODARD:

21   Q.    What's prescribed?

22   A.    He provides her with Vicoprofen.  Vicoprofen is a

23   combination of Ibuprofen and Hydrocodone.  Hydrocodone is

24   another slightly weaker Schedule II opioid.  It's about

25   equivalent to Morphine.  And Tramadol.  Tramadol is a weaker

Thomas - Direct

1  opioid, considerably weaker than Morphine.

2            But it's two short-acting opioids at the same

3  time which is somewhat nonsensical because once it's wet,

4  you don't pour water on it.  And he also orders an MRI of

5  the cervical and lumbar spine.

6  Q.    Okay.

7            MR. WOODARD:  Let's jump ahead.  So Page 321.

8  BY MR. WOODARD:

9  Q.    What's also being prescribed back in 2011?

10  A.    Well, this is one week later.

11  Q.    Mm-hmm.

12  A.    Without an adequate file or with no notation for why,

13  he then gives her another short-acting opioid.  Oxycodone,

14  15 milligrams, along with Motrin, Ibuprofen.

15  Q.    Okay.  Let's look at the drug test.

16            MR. WOODARD:  Page 228.  228, Ms. Leal.

17  BY MR. WOODARD:

18  Q.    Okay.  So we're in 2012.

19            MR. WOODARD:  Let's go to the second page of

20  this drug test.

21            THE WITNESS:  You skipped that part -- okay.

22  This is the August drug test?

23  BY MR. WOODARD:

24  Q.    Yes.

25  A.    Okay.  This is notably positive for benzodiazepines,

Thomas - Direct

1    specifically the metabolite of Clonazepam, and negative for

2    Oxycodone and its metabolites.  So this is an unexpected

3    urine drug screen which the patient is taking illicit

4    Benzodiazepine and not taking the medication she's

5    prescribed.

6    Q.    Was there also a drug screen from earlier in this

7    year, around March?

8    A.    Yes, it was more striking because it was negative for

9    all drugs.

10   Q.    Okay.  All right.  So -- and orient us with time.

11   We're in 2012, late 2012.  Where are we with respect to the

12   Consent Decree?

13   A.    We're a year beyond the Consent Decree.

14   Q.    Okay.  So after this drug test --

15            MR. WOODARD:  Let's go to Page 247.

16   BY MR. WOODARD:

17   Q.    -- did you find any indication that Dr. Titus took

18   that result into consideration of the patient's care?

19   A.    No.  There's no mention of it in the "Chief

20   Complaints and History of Present Illness," and there's no

21   mention of it under the prefilled urine tox screen result.

22   Q.    Okay.

23            MR. WOODARD:  And Page 252, please.

24   BY MR. WOODARD:

25   Q.    What did Ms. Mench continue to be prescribed?

Thomas - Direct

1    A.      The Oxycodone dose was reduced to ten milligrams, but

2    she also received Morphine Sulfate, sustained release, 15

3    milligrams.

4    Q.      Okay.  All right.  After this, did you see additional

5    inconsistent drug test results?

6    A.      Multiple.

7    Q.      Okay.  Did you also continue to see prescriptions

8    following those results being reported to Dr. Titus?

9    A.      Yes.

10   Q.      Okay.  Are there any in particular you'd like to

11   highlight, Doctor?

12   A.      July 9, 2013.

13   Q.      Okay.

14           MR. WOODARD:  Let's go to Page 110.

15           THE WITNESS:  The thing you can note is that

16   under medications or metabolites, there's a lot of writing,

17   and she is positive for Oxycodone.

18           Can we go to the next page?

19           So here we see that she is positive for Morphine

20   and positive for hydromorphone.  Hydromorphone is a

21   metabolite of Morphine.  So that one is -- given that she

22   was prescribed Morphine, that's an expected result.

23           Next page.

24           Or had she stopped the Morphine?

25           MR. WOODARD:  Let's go to Page 139.

Thomas - Direct

1          THE WITNESS:  I'm sorry.  I got confused because

2     the drugs were changed.  No, this is -- okay.  He had -- he

3     had not stopped the Morphine.  On July -- July 9th, this --

4     there was a prescription before that, wasn't there?

5          Okay.  So at -- the 5/28 was prescribing

6     Oxycodone and Methadone.

7          And then we go to that drug screen again.

8          MR. WOODARD:  Let's go to Page 110, Ms. Leal, or

9     111.

10         THE WITNESS:  So Morphine that she had

11    previously been prescribed but was no longer being

12    prescribed was still in her urine, making that an illicit

13    drug.

14         And the next page.  And here we see that she's

15    positive for the Oxycodone she's being prescribed, positive

16    for the Methadone she's being prescribed, but also positive

17    for benzodiazepines.  All of these are metabolites of

18    Valium.  So she's taking Valium that she's not prescribed,

19    and then stimulants, because that's the part I wanted to

20    show.

21    BY MR. WOODARD:

22    Q.    Okay.

23         MR. WOODARD:  Okay.  So Ms. Leal, if you could

24    show when this was reported, please.

25         THE WITNESS:  But she's also positive for

Thomas - Direct

1    amphetamines and methamphetamines, and those are not

2    prescribed drugs.  Methamphetamine is not a prescribed drug.

3    BY MR. WOODARD:

4    Q.    Okay.  So when was this reported to Dr. Titus?

5    A.    7/12.

6    Q.    All right.

7             MR. WOODARD:  Let's go to Page 107.

8    BY MR. WOODARD:

9    Q.    Okay.  Dr. Thomas, what's prescribed to this patient?

10   A.    Oxycodone and Methadone, as she had previously been

11   prescribed.

12   Q.    Okay.  Did you see any evidence of intervention with

13   this patient?

14   A.    None.

15   Q.    Okay.  Did you see additional inconsistent test

16   results following this prescription?

17   A.    Yes, including inappropriate metabolites, the

18   presence of cocaine, methamphetamine, and amphetamine on

19   more than one occasion.

20   Q.    Okay.

21             MR. WOODARD:  Okay.  Let's go to Page 60.

22   BY MR. WOODARD:

23   Q.    What do we have here?

24   A.    This is a discharge letter on January 20th of 2013.

25   Q.    Okay.  Weren't we just looking at prescriptions dated

Thomas - Direct

1     later in 2013?

2     A.     I believe we were.

3     Q.     Okay.

4     A.     In December.

5     Q.     Okay.  Regardless, what does this letter say?

6     A.     That he is going to discharge her because of the

7     positive test for cocaine, and that he won't be prescribing

8     her any more opiates.

9     Q.     Okay.

10              MR. WOODARD:  Let's jump to Page 61, the next

11    page.

12    BY MR. WOODARD:

13    Q.     Although the years are off, a few days later, what

14    does Dr. Titus prescribe?

15    A.     Oxycodone, 15 milligrams, dispensing 70; and

16    Methadone, ten milligrams, dispensing 90.

17    Q.     And, Dr. Thomas, in your opinion, was this specific

18    prescription for a legitimate medical purpose and within the

19    usual course of professional practice?

20    A.     No, it could not be.  The doctor-patient relationship

21    had ended.  The patient was clearly in contact with the

22    black market and drugs.  She was taking the medications

23    inappropriately and was at risk.  These prescriptions could

24    not be for a medically legitimate purpose.

25    Q.     And how soon into the treatment did you find that

Thomas - Direct

1    Ms. Mench was non-compliant with her medications?

2    A.    August 2012, she was -- and she was non-compliant

3    earlier.  So it's not just a single instance of

4    non-compliance that leads to the prescribing not being for a

5    medically legitimate purpose.  It is a pattern of

6    noncompliance and the absence of physician intervention that

7    leads to the prescription -- the prescribing not being for a

8    medically legitimate purpose and, in my opinion, that

9    started in August 2012.

10   Q.    Okay.  And when was this or when are these final

11   prescriptions written?

12   A.    January, 2014.

13   Q.    Okay.  And let me show you another prescription right

14   around this date.

15              MR. WOODARD:  Page 62.  I'm sorry.  Let's see.

16   Page 69.

17   BY MR. WOODARD:

18   Q.    Okay.  Is this the prescription on December 9th of

19   '13?

20   A.    Yes.

21   Q.    And for the reasons you just described, do you have

22   the same opinion as to this prescription?

23   A.    Yes.

24   Q.    Okay.  All right.

25              MR. WOODARD:  Ms. Leal, if we could go to

Thomas - Direct

 1   Exhibit 903.

 2   BY MR. WOODARD:

 3   Q.    And, Dr. Thomas, how should we fill out Ms. Mench?

 4   A.    She had multiple unexpected urine drug screen results

 5   for which there were no medical interventions.  She had

 6   warning and discharge letters that stated she would not

 7   receive any further opioid prescriptions, and yet, despite

 8   that, after the ending of the doctor-patient relationship,

 9   there was continued prescribing without monitoring or

10   medical supervision.  The prescribing was not for a

11   medically legitimate purpose in the usual course of

12   professional practice.

13            THE COURT:  All right.  So is this a good time

14   for lunch?

15            MR. WOODARD:  Yes, Your Honor.

16            THE COURT:  All right.  We'll take our lunch

17   break until two o'clock.

18            If we can take the jury out, please.

19            (Jury leaving the courtroom.)

20            MS. KOUSOULIS:  Your Honor, if I may, I noticed

21   throughout his testimony, Dr. Thomas is reading his report.

22   I would just -- I mean, normally, if the witness is -- if

23   they had -- it was like a police officer or somebody had --

24   you know, had a report prepared, they would, you know, be

25   testifying from independent recollection.  And I would just

Thomas - Direct

1    either note that for the record or object and have him

2    testify and answer questions and not be reading from his

3    report.  I'm not sure that's appropriate.

4              THE COURT:  All right.  Well, I hadn't noticed

5    that.  I take it you have a copy of his report?

6              MS. KOUSOULIS:  Yes, Your Honor.  I believe it's

7    his expert report.  But I would just state -- you know,

8    instead of -- you know, I'm not sure how appropriate that is

9    for him to be reading from his report as opposed to just

10   testifying answering the questions independently.

11             THE COURT:  Any comment?

12             MR. WOODARD:  I don't know that he's reading

13   from it, and I can ask him not to read from it.  But I hope

14   this isn't supposed to be a memory test.  It's obviously

15   very document intensive, so I think for the jury, if he

16   could just refresh his memory at times with his report.

17             THE COURT:  We'll see what happens after the

18   lunch break.  I take it the way things are going, we're not

19   really expecting to finish Dr. Thomas today, are we?

20             MR. WOODARD:  Your Honor, I'm going to go take a

21   lunch break and try to maybe cut things down a little bit.

22   It's just there's 14 patients, so...

23             THE COURT:  No, no.  Basically --

24             MR. WOODARD:  Yeah.

25             THE COURT:  -- one of the things I'm trying to

Thomas - Direct

1    do is figure out what we're doing with the jury.  And so the

2    question I have is:  If we don't finish Dr. Thomas today, is

3    he coming back tomorrow?

4              MR. WOODARD:  He certainly can, but if that's

5    our only witness -- I mean, the answer is, yes, he can be

6    here tomorrow.

7              THE COURT:  Okay.  Can he also be here on

8    Thursday?

9              MR. WOODARD:  I don't know.  I can talk to him.

10             THE COURT:  Okay.  Why don't you find out,

11   because it's not the biggest problem in the world, but we

12   have certain logistical things in terms of hotel

13   accommodations and stuff for the jurors --

14             MR. WOODARD:  Okay.

15             THE COURT:  -- and it kind of makes a difference

16   what we're doing tomorrow.  So why don't -- maybe I'll come

17   back like two minutes before, and you can tell me where you

18   think things stand.

19             MR. WOODARD:  Okay.

20             THE COURT:  Okay.  We'll be in recess.

21             DEPUTY CLERK:  All rise.

22             (Recess was taken.)

23             DEPUTY CLERK:  All rise.

24             THE COURT:  All right.  Before we bring the jury

25   back in, one of my staff said that they saw Dr. Thomas

Thomas - Direct

1    shaking his head that he can't come here on Thursday.  So I

2    assume we're going to continue.  And then to the extent that

3    he's not finished today, we will pick it up again tomorrow?

4                MR. WOODARD:  Exactly.  Yes, Your Honor.

5                THE COURT:  All right.  Well, let's get the

6    jury.

7                (Jury entering the courtroom.)

8                THE COURT:  All right.  Welcome back.  Everyone,

9    you may be seated.  Mr. Woodard, you may continue.

10               MR. WOODARD:  Thank you.  Ms. Leal, if you could

11   go to Exhibit 903.

12   BY MR. WOODARD:

13   Q.    And Dr. Thomas, we just concluded patient Maryjane

14   Mench?

15   A.    Yes.

16   Q.    Okay.  Based on the opinion you gave right before the

17   break, how should we fill out the chart with respect to

18   Ms. Mench?

19   A.    Ms. Mench clearly had unexpected urine drug screen

20   results that resulted in no medical intervention by

21   Dr. Titus.  She was issued a discharge letter and after the

22   ending of the doctor-patient relationship, there was

23   continued prescribing without monitoring.

24               MR. WOODARD:  Okay.  Ms. Leal, could you fill

25   out that chart?  Thank you.

Thomas - Direct

1              All right.  Let's go to Exhibit 5, please.

2      BY MR. WOODARD:

3      Q.     All right.  Dr. Thomas, is Ms. Dione Dickerson a

4      patient whose records you reviewed in connection with this

5      case?

6      A.     Yes, I did.

7      Q.     And does the specific act of prescribing on

8      December 18th of 2013 represent Count 5?

9      A.     Yes, it does.

10     Q.     Okay.  And did you reach a conclusion with regard to

11     whether that prescription was within the usual course of

12     medical professional practice and for a legitimate medical

13     purpose?

14     A.     I did reach a conclusion and it was not.

15             MR. WOODARD:  Okay.  Ms. Leal, if we could go to

16     Exhibit 109 at 294.  Okay.

17     BY MR. WOODARD:

18     Q.     Starting in 2009 with Ms. Dickerson, what do we see?

19     A.     We see that Ms. Dickerson was prescribed Percocet.

20     Percocet is a combination of Oxycodone and acetaminophen.

21     Has ten milligrams of Oxycodone, which is less than the

22     previous prescriptions we see.  She was dispensed 150

23     tablets.

24             She was also prescribed a non-opioid analgesic

25     Lyrica.  Lyrica is an anticonvulsant.  It is useful for the

Thomas - Direct

1    treatment of some patients with nerve pain, and it is a

2    medically reasonable treatment, although it, too, is a

3    controlled substance.  It is a Schedule V controlled

4    substance.

5    Q.    Okay.  Let's go to Page 176.

6           Okay.  So in 2011, is Ms. Dickerson still being

7    prescribed Percocet?

8    A.    Yes, the number in the prescription has been

9    increased to 108.  And again, she's prescribed a second

10   short-acting opioid, Vicoprofen, which contains Hydrocodone

11   and ibuprofen.  And she was given 180 and 90 of those.

12   Q.    And what month are we in in 2011?

13   A.    We're in October of 2011.

14           MR. WOODARD:  Okay.  Ms. Leal, if we could go to

15   Page 169.

16   BY MR. WOODARD:

17   Q.    Okay.  We haven't seen a document like this yet.

18   What is this?

19   A.    This is from Medco, which is the prescription benefit

20   manager or PBM for her insurance plan.  They are informing

21   Dr. Titus that she is receiving controlled substances

22   prescriptions from him and other physicians.  So the -- his

23   prescriptions are noted on 11/21 of 2011 and -- but other

24   prescriptions are noted on 12/20 of 2011 and from another

25   unidentified physician on 1/20 of 2012.

Thomas - Direct

1    Q.     Is this similar to the PMP-type information we

2    discussed earlier?

3    A.     It is similar to the PDMP, but it's provided by the

4    private company that's paying for the prescriptions.  So it

5    only includes the prescriptions that they are paying for.

6    It is, however, a warning that the -- that the patient is

7    receiving medications from other prescriptions from other

8    physicians, not Dr. Titus.

9    Q.     Okay.

10              MS. KOUSOULIS:  What exhibit number was that?

11              MR. WOODARD:  109 at 176.

12              Okay.  And Ms. Leal, if you could back out.  Can

13   you go to the next page?  Okay.  Could you zoom in on this

14   first paragraph?

15   BY MR. WOODARD:

16   Q.     And was this in the patient record of Dr. Titus?

17   A.     Yes, it was.

18   Q.     Okay.  So what's this letter suggesting to Dr. Titus?

19   A.     Well, it shows that since she's obtaining

20   prescriptions from multiple pharmacies and multiple

21   physicians, there is an increased risk for adverse drug

22   events, particularly opioid poisoning, which is overdose, is

23   increased under those circumstances.  So it's a warning.

24   Q.     Okay.  We can back out of that.

25              And so the dates being discussed here, are we

Thomas - Direct

1    still in around 2011?

2    A.    Yes, late 2011.

3    Q.    Okay.  All right.  Let's see what's prescribed next.

4    Let's jump to 164, please.

5          Okay.  What's Ms. Dickerson prescribed at this

6    point by Dr. Titus?

7    A.    Oxycodone, ten milligrams removing the acetaminophen

8    that's in Percocet and Morphine Sulfate extended release,

9    15 milligrams dispensing 80 and 30 tablets of each.

10   Q.    Okay.  And the date on this prescription?

11   A.    This is in 2013, in April of 2013, April 3rd.

12   Q.    Okay.  April 3rd.  Let's go to Page 390.

13         All right.  On April 3rd, was Ms. Dickerson --

14   did Ms. Dickerson provide a urine sample?

15   A.    Yes, she did.

16   Q.    And when was that reported to Dr. Titus?

17   A.    Two days later on April 5th.

18   Q.    Okay.  And what do we see on the test result?

19   A.    She is positive for Hydrocodone, the opioid that's in

20   Vicoprofen, Hydrocodone, and Norhydrocodone, a metabolite of

21   Hydrocodone.

22         MR. WOODARD:  Okay.  Can you go to the next

23   page, Ms. Leal?

24   BY MR. WOODARD:

25   Q.    Okay.  Anything to point out here?

Thomas - Direct

1    A.    Most importantly, she is negative for Oxycodone.  The

2    drug that she's prescribed is not in her system, but drugs

3    that she is no longer prescribed are in her system.  That's

4    drug abuse.

5    Q.    Okay.  So reported on April 5th.  Let's go to

6    Page 161.

7          What does Dr. Titus do a couple weeks later?

8    A.    He provides her with more Oxycodone and Morphine.

9    Q.    Okay.  Did you see any intervention by Dr. Titus

10   based on the drug result we just reviewed?

11   A.    No, given that both Morphine and Oxycodone weren't in

12   her system, he was clearly on notice.

13   Q.    Okay.  Let's go to Page 156.

14         So for the progress note, the next time

15   Dr. Titus sees Ms. Dickerson.  Is anything discussed

16   regarding this drug test?

17   A.    No, nothing whatsoever.

18         MR. WOODARD:  Okay.  Could you just flip

19   through, Ms. Leal.

20   BY MR. WOODARD:

21   Q.    Does this look similar to the other records we

22   reviewed previously?

23   A.    Yes.  There is no change at the area of urine

24   toxification screen history at all.

25   Q.    Okay.  All right.  Let's look at one more drug test

Thomas - Direct

1    at Page 101, please.

2            And when is this urine collected and reported?

3    A.    It's collected on 11/22 -- 11/20 of 2013, and it's

4    reported on 11/27 of 2013.

5    Q.    And what do we see?

6    A.    Patient is prescribed Morphine and Percocet or

7    Oxycodone actually.  Has no Morphine in her urine and no

8    Oxycodone or Oxycodone metabolites.  She is not -- she has

9    either taken them all and is out or she is not taking any.

10   One or the other is true.

11   Q.    So do you see a pattern emerging at this point?

12   A.    Yes, this is a pattern that's consistent with

13   diversion and or abuse of other opioids.

14   Q.    Okay.  And the report date here was November 22nd?

15   A.    That's November 27th.

16   Q.    I'm sorry.  Thank you.

17           Okay.  And let's go to Page 103.

18           What does Dr. Titus prescribe a few days later?

19   A.    Oxycodone, ten milligrams, dispensing 80.  Morphine

20   Sulfate extended release, 15 milligrams, dispensing 30.

21   Q.    Okay.  And let's go to Page 74.

22           What about here, Dr. Thomas?

23   A.    On 12/18/13, he prescribes the same combination of

24   drugs.

25   Q.    Okay.  Specifically with regard to this prescription

1   on 12/18, in your opinion, was this within the usual course

2   of professional practice and for a legitimate medical

3   purpose?

4   A.      No, it was not.

5   Q.      Why not?

6   A.      The patient clearly was not taking the drugs as

7   specified.  The fact that she was repeatedly negative was

8   more suggestive of diversion, and there was no medical

9   intervention, history, discussion, anything to attempt to

10  alter that behavior or even to ascertain what was going on.

11  Q.      Okay.  Dr. Thomas, let me show you Exhibit 204 at

12  Page 2.

13          Okay.  Do you see Ms. Dickerson here?

14  A.      I do.

15  Q.      And do you see the date of the prescription we just

16  looked at?

17  A.      Yes.

18  Q.      How much was paid on that date?

19  A.      On 12/18, she paid $155 by credit card.

20  Q.      Okay.  Dr. Thomas, is it within the usual course of

21  professional practice to give a patient a prescription just

22  because they had already paid for it?

23  A.      Patients never, never pay for prescriptions.

24  Patients pay for medical services.  They pay for the time

25  and history, the thoughtfulness of physical examination, the

Thomas - Direct

1    interpretation of diagnostic testing, for medical

2    decisionmaking and for medical care.  The prescriptions are

3    free.

4    Q.    Okay.  Thank you.

5          Let me show you Page 67 before we leave this

6    patient.

7          MR. WOODARD:  I'm sorry, Ms. Leal.  Exhibit 109.

8    BY MR. WOODARD:

9    Q.    Okay.  At some point, was Ms. Dickerson admitted to

10   the hospital?

11   A.    Yes, she was.

12   Q.    Okay.  And what was found, if you remember?

13   A.    After Dr. Titus discontinued his care, after the last

14   prescription, she went to the emergency room with abdominal

15   pain and was found to have pancreatic cancer.

16   Q.    Okay.  Just to be clear, the records don't show that

17   Dr. Titus knew that while he was treating her.

18   A.    There was no evidence of it.

19   Q.    Okay.  And this doesn't change anything with regard

20   to your opinion as to the prescription we reviewed?

21   A.    Not at all.  Dr. Titus' intent was the treatment of

22   chronic non-cancer pain.  The lack of diagnostic workup to

23   find what was eventually found is irrelevant.

24   Q.    Okay.  All right.

25          MR. WOODARD:  Ms. Leal, if we could go to our

Thomas - Direct

1   chart, please.

2   BY MR. WOODARD:

3   Q.    Okay.  How would we fill this one out with regard to

4   Ms. Dickerson?

5   A.    She had multiple unexpected drug screen results for

6   which there was no medical intervention.  I did not see a

7   warning or discharge letter, but there was continued

8   prescribing without monitoring.

9   Q.    Okay.  Let's move on to Ms. Parsons.

10          MR. WOODARD:  And Ms. Leal, to the extent you

11   just put X's there, I think we agree that an "X" should not

12   be in the third column.

13   BY MR. WOODARD:

14   Q.    Is that correct?

15   A.    Yes, that's correct.

16   Q.    Okay.  Let's go to Exhibit 6, please.

17          Okay.  Is Ms. Lisa Parsons a patient whose

18   records you reviewed in this case?

19   A.    Yes, I did.

20   Q.    And does the prescribing to Ms. Parsons on

21   January 20th of 2014 represent Count 6 of the indictment?

22   A.    It does.

23   Q.    Okay.  And you know my question, Dr. Thomas, as to

24   that specific prescription.  What's your opinion?

25   A.    The prescribing was not for a medically legitimate

Thomas - Direct

1    purpose and usual course of professional practice.

2              MR. WOODARD:  Okay.  Ms. Leal, let's go to

3    Exhibit 111 at Page 27, please.

4    BY MR. WOODARD:

5    Q.    Okay.  Is this the intake for Ms. Parsons?

6    A.    Yes, it is.

7    Q.    Okay.  When did she start seeing Dr. Titus?

8    A.    This is early in September of 2008.

9    Q.    Okay.  Can you tell what she's complaining of?

10   A.    She has complaints of chest pain, shortness of

11   breath, lightheadedness, low back problems, and headache.

12   Q.    Okay.  Let's jump to Page 30, please.

13              What's this?

14   A.    This is a Medical Assistance Card from Delaware

15   Medical Assistance informing that she is an indigent

16   patient.

17   Q.    Okay.  All right.  Let's see what was prescribed.  So

18   let's go to Page 292.

19              Okay.  So we're back in 2008.  What is Dr. Titus

20   prescribing at that point?

21   A.    He's prescribing Percocet with 7.5-milligrams of

22   Oxycodone, a lower dose than we've seen previously, and

23   Soma.  Soma has another name, Carisoprodol.  It's marketed

24   as a muscle relaxant.  It is primarily a sedative.  It is --

25   it can be useful in the short run with patients who have

Thomas - Direct

1   acute pain syndromes with muscle spasm because it puts them

2   to sleep, but otherwise, it's relatively contraindicated.

3   Shouldn't do it with opioids because the sedative action,

4   along with the opioids, increases the possibility of

5   overdose.

6   Q.    In the usual course of professional practice when

7   prescribing these in combination, should risks associated

8   with taking these drugs in combination be discussed?

9   A.    Yes, that would be part of the informed consent for

10  the patient and the warnings that you expect the physician

11  to give them.

12  Q.    Let's go to Page 227, please.  So later in 2009, what

13  is Dr. Titus prescribing?

14  A.    He continues to prescribe Percocet, increasing the

15  number of pills to 180, and then he adds Xanax.  Xanax is

16  the brand name for the Benzodiazepine sedative called

17  Alprazolam.  Once again, Benzodiazepines increase the risk

18  of overdose in patients, chronically prescribed opioids and

19  are generally contraindicated unless you have a really good

20  reason, which should appear in the medical record.

21  Q.    Okay.  Did you see such reasons in the medical

22  record?

23  A.    No, none.

24  Q.    Okay.  All right.  So we're just kind of going year

25  by year.  Let's go to Page 149.

Thomas - Direct

1      Okay.  So in 2010, what is Ms. Parsons being

2   prescribed?

3   A.     The Xanax is increased to two milligrams, three times

4   daily.  This is now a high dose of the Benzodiazepine, along

5   with Percocet, 7.5-milligrams of Oxycodone, dispensing 180.

6   Q.     Okay.  All right.  And so the date is September 20th?

7   A.     Of 2010.

8   Q.     Okay.  Let's go to Page 139.

9          So let's take a look at a drug test.  Is this

10   shortly after that prescription we just reviewed?

11   A.     Yes, it is.

12   Q.     What do we see in this drug test result?

13   A.     She's positive for Benzodiazepines.  And while it

14   says abnormal, he's prescribing her Xanax, so that would be

15   consistent.  She is positive for opiates.  And while it says

16   abnormal, he's prescribing her Percocet which may or may not

17   be positive in this particular test because this is a less

18   specific test than the ones we've been looking at.  And

19   she's positive for THC or marijuana which, as I noted

20   previously, is somewhat of a gray area, but you would expect

21   a physician to have some medical response to that currently

22   or at the time.  Certainly, an illegal drug.

23   Q.     Okay.  And to be clear, where does this record appear

24   to be from?

25   A.     It's from Bayhealth Medical Center.

Thomas - Direct

1    Q.    Okay.

2    A.    But Dr. Titus was the ordering physician.

3    Q.    Got you.  Okay.

4          So let's jump ahead from 2010 up to 2013, and

5    let's go to Page 124.  And Dr. Titus, you know my question,

6    but could you orient us in time with regards to the Consent

7    Decree?

8    A.    We are now a year and five months after the Consent

9    Decree and the prescriptions are for Fentanyl transdermal or

10   Fentanyl patches, 15 micrograms per hour, dispensing ten and

11   Oxycodone, 15 milligrams, dispensing 75.

12   Q.    Okay.  And the specific date here?

13   A.    The date is 8/13/2013.

14   Q.    Okay.  Let's go to Page 118.

15         So was a urine specimen collected on that date?

16   A.    Yes, it was.

17   Q.    What do we see in the result?

18   A.    In the result, she is positive for Oxycodone, but not

19   for -- but not for all of the metabolites, which suggests

20   irregular use.  And she is negative for Fentanyl, although

21   there is evidence that it was previously prescribed.

22   Q.    And this was reported on August 21st?

23   A.    Yes, that's correct.

24   Q.    Okay.  Let's go to Page 126.

25         So what do we have prescribed a few days later?

Thomas - Direct

1    A.      Oxycodone, 15 milligrams.

2    Q.    Okay.  And let's go to the next patient visit on

3    9/12, which is Page 103.

4            Anything about this drug test result in the

5    progress note?

6    A.     No.

7            MR. WOODARD:  If you could go to the next page,

8    Ms. Leal.  Okay.

9            THE WITNESS:  And the same false statement that

10   her urine drug screen was normative appears in this.

11           MR. BOSTIC:  Your Honor, we would move to object

12   and move to strike the last answer with respect to the

13   statement as to whether something was false and may be

14   inconsistent, but I don't believe the doctor is in a

15   position to determine whether it was false or correct.

16           THE COURT:  So --

17           MR. WOODARD:  I could rephrase.

18           THE COURT:  Yeah, so I'm going to strike that,

19   the reference to false, and you can ask a question.  And

20   again, you can say the same thing, but a different way.

21           MR. WOODARD:  Okay.

22   BY MR. WOODARD:

23   Q.    Based on what's written here, is that different from

24   what you saw in the records?

25   A.    The copied adaptation that there's a history of

Thomas - Direct

1   normal urine drug screen is inconsistent with the reported

2   urine drug screen that is in the medical record in black and

3   white.

4   Q.     Okay.  Okay.  Just to step back.  We saw an

5   inconsistent result relating to Fentanyl just a minute ago;

6   right?

7   A.     Yes.

8   Q.     Okay.  Let's go to Page 107, please.  Okay.

9          What do we see shortly after that test result?

10  A.     Dr. Titus continues to prescribe Fentanyl

11  transdermal, 15 micrograms per hour and Oxycodone,

12  15 milligrams.

13  Q.     Did you see any evidence of intervention, Dr. Thomas?

14  A.     No.  And in the case of the Fentanyl transdermal,

15  there is a very simple physical examination that can be

16  performed.  The patient wears a patch continuously.  So if

17  it's not in the urine, the doctor saying, Do you have your

18  patch on, it takes five seconds.

19  Q.     Okay.  Let's go to Page 90, please.

20          So was there a drug test the next month?

21  A.     There was.

22  Q.     All right.  And what do we see?

23  A.     On 10/10, reported on 10/18, the patient was positive

24  for Alprazolam, negative for Oxycodone, and negative for

25  Fentanyl.

Thomas - Direct

1    Q.    Okay.  Had a pattern emerged with regard to Fentanyl?

2    A.    Yes.  She is -- there is no evidence that the patient

3    is using the drug regularly.

4    Q.    Okay.  Let's go to Page 89, please.

5          What's prescribed shortly after this?

6    A.    Oxycodone.

7    Q.    Okay.

8    A.    A drug that was not in her last urine drug screen.

9    Q.    And let's go to Page 84, please.

10         What's prescribed next?

11   A.    Oxycodone and Fentanyl continued to be prescribed

12   despite evidence of the patient not using them in the manner

13   prescribed.

14   Q.    Okay.  And did you see additional inconsistent drug

15   test results as we've discussed so far with this patient?

16   A.    There were.

17   Q.    Okay.  Let's go to Page 63, please.

18         And first, Dr. Thomas, did you say this patient

19   began around 2009 or so?

20   A.    Yes.

21   Q.    Okay.  With the long term use of opioids, would you

22   expect to see a decrease in pain and an increase in

23   functioning?

24   A.    That is the goal of therapy.

25   Q.    Okay.  Was that something that was evident to you

Thomas - Direct

1    through the review of the medical record?

2    A.     It was not documented in Dr. Titus' records.

3    Q.     Is that something that would be important to

4    document?

5    A.     It's required to be documented.

6    Q.     Okay.  So we are in 2014, Dr. Thomas.  And what are

7    we looking at here?

8    A.     This is a drug screen performed at a hospital,

9    Milford Memorial Hospital.  The patient is positive for

10   Benzodiazepines and positive for opiates and positive for

11   marijuana in her urine at that time.

12   Q.     Okay.  Was this in Dr. Titus' medical record, patient

13   file?

14   A.     Yes, it was.

15   Q.     Okay.  So let's go to Page 52.

16          What happens after this hospital record?

17   A.     Dr. Titus continues to prescribe Oxycodone,

18   15 milligrams.

19   Q.     Okay.  Based on the pattern we discussed, and the

20   other records, and your opinion, was this prescription

21   within the usual course of professional practice and for a

22   legitimate medical purpose?

23   A.     It was not.  This patient was consistently not using

24   the medications in the way prescribed in the absence of

25   ongoing pain, in the absence of documented pain relief and

Thomas - Direct

1   demonstrative benefit.  These prescriptions were not for

2   medically legitimate purpose in the usual course of

3   professional practice.

4   Q.    Okay.  And I want to show you one more document with

5   this patient, which is Page 34.

6            Is this dated a few days after the prescription?

7   A.    Yes.

8   Q.    Okay.  Is it fair to characterize this as a discharge

9   letter?

10  A.    It is a discharge letter.  It says, I feel that it's

11  in your best interest to discharge you from this practice.

12  Q.    It says some other things as well; right?

13  A.    Yes.

14  Q.    Does this look a little different than the other

15  letters we've talked about so far?

16  A.    It's not in exactly the same form, but it's

17  performing the same function.

18  Q.    Okay.  But does it also mention things like referral

19  to a substance abuse program?

20  A.    And to have a psychiatrist take over her care for

21  resolution of her substance abuse.

22  Q.    Okay.  What does it say also about weaning you down?

23  A.    Over the course of the next month, I will wean you

24  down off your prescribed medications.

25  Q.    Okay.  So despite discussing weaning down and

Thomas - Direct

1    referrals, did you see evidence of such in the patient

2    record?

3    A.      I did not.

4    Q.      Okay.  Ms. Leal, if we could go to Exhibit 903.

5            And recognizing again the error as to Count 5,

6    for Count 6, how would you fill this out?

7    A.      There were multiple unexpected urine drug screens.

8    There was a lack of medical intervention on the part of

9    Dr. Titus in response to those.  We have the discharge

10   letter.  Since I'm not looking at my report, I don't

11   remember the date of the last prescription.

12   Q.      I can show you.  The letter was dated a couple days

13   after the prescription.  However, did you see evidence of

14   whether Dr. Titus monitored the taking of that prescription

15   for the length of prescription?

16   A.      Yes.  In fact, she was discharged without further

17   followup to monitor the ongoing response to that

18   prescription.

19   Q.      Okay.

20   A.      Ending the doctor-patient relationship.

21   Q.      Okay.  Thank you.

22           MR. WOODARD:  Can you fill that one out,

23   Ms. Leal?

24           Okay.  Let's go to Exhibit 7, please.

25   BY MR. WOODARD:

Thomas - Direct

1    Q.     Okay.  Dr. Thomas, is Gregg Smith a patient whose

2    records you reviewed in this case?

3    A.     He is.

4    Q.     Okay.  And does the prescribing to him on April 3rd

5    of 2014 represent Count 7 of the indictment?

6    A.     It does.

7    Q.     Okay.  Based on your review of the records up here

8    and others, did you determine whether the prescribing on

9    that date was consistent with the usual course of

10   professional practice and for a legitimate medical purpose?

11   A.     I did and it was not.

12   Q.     Okay.  Let's go to Exhibit 113 at 20.

13          Is this the intake for Mr. Smith?

14   A.     Yes.

15   Q.     Okay.  About when did he become a patient?

16   A.     On January 23, 2009.

17   Q.     Okay.  Let's go to Page 21, please.

18          I know this is hard to tell or read, but can you

19   tell what kind of insurance he was on?

20   A.     Once again, this is the State of Delaware Medical

21   Assistance Program.

22   Q.     Okay.  Let's go to Page 202.  Okay.

23          So let's look at a progress note related to

24   Gregg Smith.  And I want you to look at the top.

25          Primarily, what was Mr. Smith's weight?

Thomas - Direct

1    A.     Mr. Smith was a large man, 6 feet, 3 inches in

2    height, 370 pounds.

3    Q.     Okay.

4    A.     That would make him morbidly obese.

5    Q.     And with respect to someone who's morbidly obese, are

6    there certain factors to consider for a physician acting in

7    the usual course when prescribing opioids to such a person?

8    A.     Because morbidly obese individuals tend to have an

9    increase in their work of breathing and a greater likelihood

10   of closing off their airway if they get too sedated, they

11   are a greater risk with the use of opioid analgesics.

12   Q.     Okay.  Did you see these risks described at least in

13   the progress notes and other records you reviewed?

14   A.     No.

15   Q.     Okay.  If I were to tell you Mr. Smith was a long

16   distance truck driver, would there be any factors that a

17   physician acting in the usual course would take into

18   consideration when prescribing opioids to that individual?

19   A.     Absolutely.  Because opioids can be intoxicating,

20   particularly if they're mixed with any other drugs, one

21   would have to be especially careful because of the patient's

22   occupation in assuring that there are no signs of

23   intoxication that are occurring with the drugs.

24   Q.     And how would you go about determining whether a

25   patient who's prescribed opioids and is in that kind of

Thomas - Direct

1    profession could drive on the road safely?

2    A.      Once again, the physical examination becomes an

3    important thing for the physician to do and document.  The

4    way that a doctor tells if someone is intoxicated is the

5    same way -- is basically a field sobriety test.  And so

6    assuring that the patient had no swaying, that their sleep

7    was not encumbered, that they were not intoxicated on the

8    drugs when on a stable dose would be part of the examination

9    of the patient routine.

10   Q.      Did you see any evidence of those field-sobriety-type

11   tests in Dr. Titus' files?

12   A.      No, none.

13   Q.      Okay.  Also, for like a commercial truck driver, are

14   there any risks for them to understand, you know, if they're

15   going to be taking opioids and getting on the road, what

16   might happen if, let's say, they were pulled over?

17   A.      For a commercial truck driver or anyone who is taking

18   these drugs and driving, that would be part of the informed

19   consent, because while the physician could say at -- at most

20   the physician could say that when I evaluated them, there

21   was no evidence of intoxication and could document that they

22   could not actually speak to when the person was not there.

23   And so, patients who are found to be taking these drugs,

24   particularly in that circumstance, it could be problematic

25   for them, and they should know the risk of it.

Thomas - Direct

1   Q.      Did you see any of those specific informed consent

2   discussions in the notes you reviewed?

3   A.      None.

4   Q.      Okay.  All right.

5           Let's talk about the prescribing.  So let's go

6   to Page 173 of this exhibit.

7           In late 2012, where are we in time, Dr. Thomas?

8   A.      We are 15 months after -- or no, 18 months after the

9   Consent Decree.

10  Q.      Okay.  What's prescribed?

11  A.      Oxycodone, 15 milligrams, Fentanyl transdermal,

12  15 micrograms per hour.

13  Q.      Okay.

14  A.      And I've forgotten to give you some idea of how much

15  that is.  Oxycodone, 50 micrograms per hour is equal to 120

16  milligrams of Morphine equivalents.  So we're talking about

17  high-dose therapy with just the Fentanyl patch onto which

18  we're adding the Oxycodone -- the Oxycodone 15.

19          Did I say that right?

20  Q.      When you said Oxycodone, did you mean Fentanyl,

21  Dr. Thomas?

22  A.      Sorry, Fentanyl transdermal.  I heard it and it

23  didn't sound right.  The Fentanyl transdermal, 50 micrograms

24  per hour is equal to 120 milligrams Morphine equivalents per

25  day.  The Oxycodone, 15 milligrams, five times a day, is

1352

Thomas - Direct

1   equal to a hundred -- approximately another 120 milligrams

2   of Morphine equivalents.  So the total is 240 milligrams of

3   Morphine equivalents.  To a morbidly obese individual who is

4   driving a truck --

5   Q.      Okay.

6   A.      -- it's a high dose.

7   Q.      So we're at the end of 2012.  Let's go to Page 401,

8   please.

9               Was a urine sample collected from Mr. Smith?

10  A.      Yes.

11  Q.      Okay.  And are we in 2013?

12  A.      Yes.

13  Q.      Okay.  What was resulted from that test?

14  A.      Norfentanyl is detected, but the parent drug,

15  Fentanyl was not.  And Oxycodone wasn't detected.

16              MR. WOODARD: Okay.  Can you go to the next page

17  on this, Ms. Leal?

18  BY MR. WOODARD:

19  Q.      Do we see the Fentanyl here or is it --

20  A.      It's on the next page.

21  Q.      Okay.  One more.

22              Okay.  Could you just walk us through quickly

23  the Fentanyl here?

24  A.      Sure.  So when someone's wearing a Fentanyl patch,

25  they're going to be absorbing Fentanyl first and converting

Thomas - Direct

1   it into Norfentanyl.  The fact that you're seeing

2   Norfentanyl with no Fentanyl means that they are not using

3   the Fentanyl appropriately because the patch would

4   continuously release it, and they would always have Fentanyl

5   on board.

6   Q.    Okay.  Okay.  When was this result received by

7   Dr. Titus' office?

8             MR. WOODARD:  If you could go to the first page,

9   Ms. Leal.

10            THE WITNESS:  It was received on 2/12/2013.

11  BY MR. WOODARD:

12  Q.    Okay.  Let's go to Page 157.

13            All right.  What did Dr. Titus prescribe here?

14  A.    Oxycodone, 15 milligrams unchanged.

15  Q.    And go to Page 151, please.  What about here?

16  A.    And two weeks later, he prescribed Oxycodone and

17  Fentanyl.  He added Motrin, ibuprofen three times daily.

18  Q.    Okay.  So the Fentanyl continued to be prescribed?

19  A.    Yes.  And in fact, he increased the dose.  He

20  increased the dose of the drug that the patient wasn't using

21  appropriately.

22  Q.    Okay.  If the patient had complained the patch had

23  fallen off or wouldn't stick to their arm, what would a

24  doctor do at that point?

25  A.    Well, a medical intervention.  So when a patient --

Thomas - Direct

1    if you believe that Fentanyl transdermal is the thing for

2    the patient, then you can have him use a bio-occlusive

3    dressing, a dressing that gets it to stick and holds it in

4    place.  If the patient is simply not sticky and the patch

5    won't stick, then it's the wrong drug for them.  And you do

6    something else.

7                There's -- these are all Morphine in different

8    forms.  There's no requirement that they use the Fentanyl

9    transdermal or any other opiate.

10   Q.    So we're in March of '13.  Let's go to 395.

11               Was there a drug test shortly after this?

12   A.    Yes, taken on 4/4/2013.

13               MR. WOODARD:  And the next page, Ms. Leal or one

14   more.

15   BY MR. WOODARD:

16   Q.    What do we see with regards to Fentanyl?

17   A.    There's no Fentanyl in his system.

18   Q.    Okay.  Has a pattern emerged?

19   A.    Yes.  The patient is clearly not using the Fentanyl

20   transdermal as would be expected, and there's a problem with

21   that because the physician doesn't know what's happening

22   with it.  There's nothing in the record to suggest that he

23   took history to find out.

24   Q.    All right.  Let's look at the next progress note,

25   Page 138.

Thomas - Direct

1           Okay.  Any discussion of this Fentanyl issue

2    with the patient?

3    A.     No.

4           MR. WOODARD:  Okay.  Could you scroll through,

5    Ms. Leal?

6    BY MR. WOODARD:

7    Q.     Okay.  What about here?

8    A.     Yes, so here we can see something distinctly

9    different than what we've seen before.  In the handwriting

10   that is not Dr. Titus', it is noted that he's negative for

11   Fentanyl, and he was counseled on the absence of the

12   prescribed pain medications.

13   Q.     Okay.  Let's go on to Page 137, please.

14          What continues to be prescribed?

15   A.     Yet despite his continued misuse of the drug,

16   Fentanyl transdermal continues to be prescribed with a dose

17   increasing to 100 micrograms per hour or 240 milligrams of

18   Morphine equivalent, while the Oxycodone, 15 milligrams is

19   continued.

20   Q.     Okay. All right.  Let's jump to 2014 and look at

21   Page 378.

22          Did Dr. Titus continue to prescribe Fentanyl?

23   A.     Yes, he did.

24   Q.     Okay.  Was a drug test done in March of 2014?

25   A.     Yes.

1356

Thomas - Direct

Q.      Okay.  And what do we see with regards to Fentanyl?

A.      Here the Fentanyl and Norfentanyl are present in the urine.

Q.      Okay.

A.      But he's also positive for another opioid, Tramadol, that was not prescribed.

Q.      Right.

A.      This is drug abuse.

Q.      So we see multiple types of issues with this patient?

A.      Yes.

Q.      Okay.  Let's go to Page 34, please.

        Okay.  Is it fair to say we saw several inconsistent results with regard to Fentanyl with this patient?

A.      Yes, we did.

Q.      Okay.  In April of 2014, what did Dr. Titus prescribe?

A.      He prescribed Fentanyl transdermal 100 micrograms per hour.  That is the largest dose of Fentanyl that's available and Oxycodone, 15 milligrams.

Q.      Dr. Thomas, in your opinion, was this prescription for a legitimate medical purpose in the usual course of professional practice?

A.      No, it was not.

Q.      Why not?

Thomas - Direct

1  A.      Mr. Smith had repeatedly shown that he was not taking

2  the medication appropriately.  There were issues of abuse of

3  medications that he wasn't being prescribed and there -- and

4  he had physiologic reasons that placed him at greater risk

5  than necessary for the use of these drugs.  And in my

6  opinion, they were not for a medically legitimate purpose in

7  the usual course of professional practice.

8            MR. WOODARD:  Ms. Leal, could we go to

9  Exhibit 204 at Page 4?

10  BY MR. WOODARD:

11  Q.      For this prescription, how much was paid?

12  A.      $180 cash.

13  Q.      Okay.  Let's go to Exhibit 8, please.

14            MS. LEAL:  I'm sorry.  I didn't hear you.

15            MR. WOODARD:  Exhibit 8.

16  BY MR. WOODARD:

17  Q.      All right.  Dr. Thomas, is Mr. Donald Meck a patient

18  whose records you reviewed in connection with this case?

19  A.      Yes.

20  Q.      Okay.  Does the prescribing to him on April 22nd of

21  2014 constitute Count 8 of the indictment?

22  A.      Yes.

23  Q.      Okay.  And with respect to that particular

24  prescription, did you determine whether it was in the usual

25  course of professional practice and for a legitimate medical

Thomas - Direct

1   purpose?

2   A.      I did.  It was not.

3   Q.      Okay.  Let's go, please, to Exhibit 115 at 156.

4           Okay.  What is this?

5   A.      These are prescriptions written by Edwin Bellis,

6   M.D., a pain management physician --

7   Q.      Okay.

8   A.      -- for Oxycodone.

9   Q.      What was the milligram prescribed to Mr. Meck?

10  A.      Ten milligrams were prescribed.  Three sequential

11  prescriptions were written.

12  Q.      Okay.  Ten milligrams?

13  A.      Yes.

14  Q.      Okay.  Let's jump to Page 45, please.

15          Now, who's prescribing at this point?

16  A.      Dr. Titus.

17  Q.      Okay.  And what is being prescribed by Dr. Titus?

18  A.      Oxycodone, 15 milligrams.

19  Q.      Okay.  Is that different than the prescription we

20  just saw from the different doctor?

21  A.      Yes, it's 50 percent more per dose.

22  Q.      Okay.  Let's go to Page 80, please.

23          All right.  What are we looking at here?

24  A.      This is a discharge summary for Mr. Meck.

25          MR. WOODARD:  And Ms. Leal, could you zoom in

Thomas - Direct

1    under "Hospital Course and Pertinent Diagnostics."

2              THE WITNESS:  He presented with -- this was for

3    his -- his heart, and he was observed, had some vomiting.

4    He improved.

5              MR. WOODARD:  Can you go to the next paragraph,

6    Ms. Leal?

7    BY MR. WOODARD:

8    Q.    Okay.  What does it talk about with regard to this

9    patient's medications?

10   A.    He's on chronic Oxycodone for his chronic pain which

11   is apparently prescribed by Patrick Titus in Delaware.  It

12   is possible he took too much pain medication and became

13   drowsy, thus confusing him.  He did not eat or drink enough

14   and possibly even took too much of his Atenolol, so this is

15   descriptive of an overdose.

16   Q.    And did this doctor have a discussion with the

17   patient?

18   A.    Yes.

19   Q.    And what's it say during this hospital stay?

20   A.    During this hospital stay, he has not been given any

21   Oxycodone at all, and his pain has not been an issue at all.

22   I explained to him that he does not need to take his

23   Oxycodone.  It is prescribed every four hours as needed, and

24   I told him he could only take it once in a while if he had

25   severe pain.  However, he says he is fine at this time.  No

Thomas - Direct

1    prescription for Oxycodone is being provided.

2    Q.    Okay.  Was this in the patient file of Dr. Titus for

3    Mr. Meck?

4    A.    Yes.

5    Q.    Okay.  Is it important for a treating physician to

6    obtain records like this?

7    A.    This is very important information about Mr. Meck,

8    his response to his pain medication, his -- and the observed

9    responses by another physician to his pain.

10   Q.    Okay.  All right.  Let's go back to Dr. Titus'

11   treatment.  Let's go to Page 72, please.

12            Okay.  Is this a drug test for Mr. Meck?

13   A.    Yes.

14   Q.    And what date are we on now?

15   A.    We're at 9/11/2013, reported on 9/16/2013.

16   Q.    Are we after the Consent Decree?

17   A.    Yes, we are.

18   Q.    What's shown here with regard to the test results?

19   A.    Mr. Meck has no Oxycodone in his system.

20   Q.    What does that tell you?

21   A.    It means that he is not taking the medication

22   regularly.

23   Q.    Okay.

24   A.    Certainly not within the last four days.

25   Q.    Okay.  And could we go to Page 25, please.

Thomas - Direct

1              What is this?

2    A.     This is a warning letter noting the absence of the

3    medication in his drug screen stating that this won't be

4    tolerated.

5    Q.     And what does it say with regard to the first and

6    only notice?

7    A.     This is your first and only notice regarding this

8    issue.

9    Q.     Okay.  And we're in September of '13?

10   A.     Yes.

11   Q.     Okay.  Let's go to Page 26.  What is prescribed to

12   Mr. Meck?

13   A.     Oxycodone, 15 milligrams.

14   Q.     Okay.  Dr. Thomas, we started at ten milligrams from

15   the first doctor; is that right?

16   A.     Yes.

17   Q.     And then we saw the hospital record discussing no

18   need to take Oxycodone.  Did you see that?

19   A.     Yes.

20   Q.     Okay.  Is the goal of opioid treatment, like you

21   discussed at the beginning, to use the lowest effective

22   dose?

23   A.     Yes.  And the -- the model policy specifically states

24   that you should use the lowest effective dose for the

25   shortest period of time because that minimizes the risk.

Thomas - Direct

1   Q.      Okay.  What dose do we see here?

2   A.      Fifteen milligrams in a patient who has overdosed on

3   15 milligrams.

4   Q.      Okay.  Let's go to Page 22.

5           And what's being prescribed still in 2013?

6   A.      Oxycodone and the antidepressant Prozac.

7   Q.      And later in 2013, let's go to Page 11.

8           What's being prescribed at this point?

9   A.      Fentanyl transdermal has been added at a dose of

10  50 micrograms per hour, 120 milligrams Morphine equivalent

11  per day, and the Oxycodone 15 milligrams has been continued

12  at the same dose.

13  Q.      Page 66, please.

14          So after this last prescription we looked at,

15  was a drug test done?

16  A.      Yes.

17  Q.      And what's the date?

18  A.      The date is January 28th of 2014.

19  Q.      Okay.  What do we see?

20  A.      We see that the patient is -- the patient is positive

21  for Fentanyl and Norfentanyl and negative for Oxycodone and

22  its metabolites.

23  Q.      Okay.  So what does that tell you?

24  A.      Once again, the patient is non-compliant with a

25  high-dose regimen in a patient who overdosed on a lower dose

1363

Thomas - Direct

1  regimen.

2  Q.     Page 65, please.

3         What do we have here?

4  A.     He is warned against the absence of the drugs in his

5  urine and, again, given his first and only notice regarding

6  the same issue --

7  Q.     Okay.

8  A.     -- the second time.

9  Q.     All right.  And finally, Page 62, please.

10        Did Mr. Meck continue to be prescribed the drugs

11 we've reviewed?

12 A.     Yes, he did.

13 Q.     Okay.  Now, by March of 2014, was another drug test

14 done?

15 A.     It was.

16 Q.     And what do we see?

17 A.     Again, Fentanyl and Norfentanyl were detected.

18 Oxycodone and Noroxycodone were detected, but not

19 Oxymorphone, which one would expect if the patient were

20 taking the drug regularly.

21 Q.     Okay.  Let's move on to the continued prescribing at

22 Page 164.

23        What do we have here?

24 A.     This is a prescription for Oxycodone, 15 milligrams

25 dispensing.

Thomas - Direct

1   Q.     Has a pattern emerged with regard to this patient's

2   Oxycodone use?

3   A.     Yes.

4   Q.     What is that?

5   A.     His pattern is inconsistent of a drug that is at high

6   enough dose to previously have caused him to overdose, but

7   has continued, despite both the problems he's had with

8   taking the opioids as well as the lack of demonstrable

9   benefit.

10  Q.     And Page 159.  What do we see?

11  A.     Continued prescription of Fentanyl transdermal,

12  50 micrograms per hour and Oxycodone, 15 milligrams, 80

13  tablets.

14  Q.     And what's your opinion as to this specific

15  prescription, Dr. Thomas?

16  A.     It was not written for a medically legitimate purpose

17  in the course of professional practice as the patient had

18  already demonstrated the things we talked about in terms of

19  the inappropriateness of the drug for him, the excess of the

20  dosing for him, and the inconsistent drug use that he

21  presented.

22  Q.     And Exhibit 204 at 5, please.

23         Was there a payment on the same date as that

24  prescription?

25  A.     Yes, this was for $22 in cash.

Thomas - Direct

1    Q.    Okay.  All right.  And let's get back to our chart.

2    Exhibit 903, please.

3              And we're on to Count 8.  How would we fill out

4    Donald Meck?

5    A.    There were multiple unexpected drug test results.

6    There was no intervention even after overdose.  There were

7    warning letters for multiple first and last chances, and

8    there was continued prescribing without monitoring.

9    Q.    Okay.  Thank you.

10             MR. WOODARD:  Can you fill that out, Ms. Leal.

11   And let's go to Exhibit 9, please.

12   BY MR. WOODARD:

13   Q.    Okay.  Dr. Thomas, was Ms. Loretta Connelly a patient

14   whose records you reviewed?

15   A.    She was.

16   Q.    Okay.  Does her prescribing on or the prescribing to

17   her on June 1st of 2014 represent Count 9?

18   A.    Yes.

19   Q.    Okay.  Did you draw an opinion as to the specific

20   prescriptions on the date in Count 9?

21   A.    I did.  They were not for medical legitimate purpose

22   in the usual course of professional practice.

23   Q.    Okay.  Let's go to Page 119.  Let's see.  I'm sorry.

24   Exhibit 119 at 5.

25             Okay.  Is this Ms. Connelly's intake?

Thomas - Direct

1   A.     Yes, on 11/1/2013.

2   Q.     Okay.  So are we after the Consent Decree with this

3   patient?

4   A.     Yes, more than two years.

5   Q.     Okay.  Let's go to Page 113.

6              What is Ms. Connelly being prescribed by

7   Dr. Titus?

8   A.     She's being prescribed Oxycodone, 15 milligrams, 90

9   tablets, and Fentanyl transdermal, 75 micrograms per hour,

10  dispensing ten.

11  Q.     Okay.  And a quick look at 112, please.  What is she

12  also being prescribed?

13  A.     She's also prescribed Ambien, a sleep agent, which is

14  of great risk when using two opioids together.

15  Q.     Okay.  And do you mean Fentanyl, Oxycodone and

16  Ambien?

17  A.     Yes.  Well, the two opioids are the Fentanyl and the

18  Oxycodone.  And so when you add a sedative, that increases

19  the risk of the opioid prescribing.

20  Q.     Would you expect to see counseling and informed

21  consent discussions in the file for such a patient?

22  A.     Informed consent regarding that would certainly be at

23  issue and would be part of what you would expect the

24  physician to inform the patient of in order to safely

25  prescribe the drug.

Thomas - Direct

1   Q.      Page 130, please.  All right.

2           Did Ms. Connelly get a drug test in November of

3   2013?

4   A.      Yes, she did.

5   Q.      What did we see?

6   A.      At this time, it says she's being prescribed Morphine

7   and Oxycodone.  And we see that it's positive for Diazepam

8   and the metabolites in Diazepam, Valium.  It's positive for

9   Morphine and its metabolites and it's positive for Oxycodone

10  and its metabolites.

11  Q.      Okay.  What about under "Not Prescribed - Detected"?

12  A.      That's the Diazepam metabolites.  So she's taking an

13  illicit Bbenzodiazepine which increases her risk for

14  overdose.

15  Q.      Okay.  And let's look at Page 105.

16          What is Ms. Connelly prescribed after this test

17  is resulted?

18  A.      She continues to receive Fentanyl.  I can't look at

19  my report.  She continues to receive Fentanyl that was not

20  in her urine drug screen.

21  Q.      What about --

22  A.      And Oxycodone.  She's prescribed Neurontin as well

23  for her nerves.

24  Q.      And let's go to Page 99.

25          So a month or so later, what happens with the

1368

Thomas - Direct

1    Fentanyl dose?

2    A.    It's increased to 100 micrograms per hour and the

3    Oxycodone is continued.

4    Q.    Okay.  Let's go to Page 124, please.

5          And I'm sorry, just to ask you here, are we

6    still on the Ambien, Fentanyl and Oxycodone?

7    A.    Yes.

8    Q.    All right.  Page 124, please.

9          Was a drug test done in -- I think we're in

10   March of 2014 now.

11   A.    Can you remind me what the date of that Fentanyl

12   prescription, the last prescriptions were?

13   Q.    Sure.  Let's go back to 105, please, or I'm sorry,

14   99.

15   A.    Okay.  Thank you.

16   Q.    Okay.

17   A.    January of 2014.

18   Q.    Okay.  124, please.

19          So was a drug test done a month or so, two

20   months later?

21   A.    Yes.

22   Q.    What do we see in this drug test?

23   A.    This drug test we see that she is positive for

24   Morphine, which she was not prescribed.  She is negative for

25   Oxycodone and its metabolites, which she was prescribed.

1369

Thomas - Direct

1    She is positive for Methadone, which she was not prescribed.

2    And she is negative for Fentanyl, which she was prescribed.

3           So we're two for two.  So two drugs that she was

4    prescribed, she's not taking.  Two opioids that she was not

5    prescribed, she is taking.  This is drug abuse.

6    Q.    Let's go to Page 123.  What does Dr. Titus do

7    following that drug test result?

8    A.    He counsels her, stating that the absence of the

9    medications prescribed by this facility, this is your first

10   and only notice regarding this issue and that it won't be

11   tolerated.

12   Q.    Okay.  And I asked what did Dr. Titus do, but is

13   there a signature from the patient here?

14   A.    No, this is -- this only contains Dr. Titus' scroll.

15   Q.    Okay.  So let's go to Page 85.

16          So after this letter, what's prescribed?

17   A.    Oxycodone, 15-milligram tablets.

18   Q.    And Page 80, please.  What's prescribed?

19   A.    Fentanyl, 100 micrograms per hour and Oxycodone.

20   Q.    Okay.  Did you see additional drug tests with

21   inconsistent results following this prescription?

22   A.    Yes, there were.

23   Q.    Okay.  Let's just take one more.  Let's go to

24   Page 59, please.

25          When was this drug test done, if you can see?

Thomas - Direct

1    A.    This was performed on 5/29/2014.

2    Q.    Okay.

3    A.    Reported on 6/2/2014.  Notably, it is negative for

4    Oxycodone and its metabolites, the drug she was prescribed.

5    Q.    Okay.  Has a pattern emerged for this patient,

6    Dr. Thomas?

7    A.    Yes, she is not using the medications in the manner

8    prescribed, thereby -- and using medications that are not

9    prescribed in an abusive fashion, thereby, making her an

10   inappropriate candidate for ongoing opioid prescription.

11   Q.    I won't try to pronounce this word, but under "Not

12   Prescribed - Detected," what's that word starting with a B?

13   A.    Oh, yes, benzoylecgonine.  Benzoylecgonine is the

14   metabolite of cocaine.

15   Q.    What does that tell you?

16   A.    Oh, she's using cocaine and she's using amphetamines.

17   Q.    Dr. Thomas, let's go to Page 58.

18   A.    Oh, that's drug abuse.

19   Q.    So what happens with Ms. Connelly?

20   A.    On June 3rd, 2014, Dr. Titus discharges her for the

21   testing positive for cocaine.

22   Q.    Okay.  Was discharge the only option for Dr. Titus at

23   this point?

24   A.    No, however, the continued prescription of opioids

25   would be not for a medically legitimate purpose in the usual

Thomas - Direct

1  course of professional practice.

2  Q.    Okay.  Was referral and treatment of substance abuse

3  an option?

4  A.    Yes, because that would be the medical response that

5  would be expected.

6  Q.    Okay.  So after this discharge letter, let's go to

7  Page 57.  And what's the date on this prescription?

8  A.    Thank you.  6/12/2014.

9  Q.    Okay.  Was Ms. Connelly a patient of Dr. Titus' on

10  this date?

11  A.    She was not and had not been for nine days.

12  Q.    And what was the prescription for?

13  A.    Oxycodone, 15 milligrams.

14  Q.    And what's your opinion, Dr. Thomas, as to this

15  prescription on this date?

16  A.    In the absence of doctor-patient relationship, there

17  can be no medically legitimate prescribing.  Ms. Connelly

18  clearly had a drug problem, the extent of which was never

19  explored by the physician, but she was given a prescription

20  after discharge without appropriate followup and without

21  evidence of medical legitimacy.

22            MR. WOODARD:  And Ms. Leal, if we could fill out

23  Exhibit 903, please.

24            THE WITNESS:  Yes.  So unexpected urine drug

25  screen, yes.  Lack of intervention, yes.  Discharge letter,

Thomas - Direct

1   yes.  Continued prescribing without monitoring, yes.

2   BY MR. WOODARD:

3   Q.    Okay.  All right.  We're on the home stretch,

4   Dr. Thomas.

5                 Let's go to Exhibit 10, please.  Okay.  Was

6   Ms. Chastity Calhoun a patient whose medical records you

7   reviewed?

8   A.    Yes, she was.

9   Q.    Okay.  And the prescription on July 16th of 2014, was

10  that Count 10 of the indictment?

11  A.    Yes, it was.

12  Q.    Okay.  And was the prescription on that date for a

13  legitimate medical purpose within the usual course of

14  professional practice?

15  A.    No, it was not.

16  Q.    Okay.  Let's go to Exhibit 120 at Page 21.

17                Okay.  What's this?

18  A.    This is the intake form where -- because I was

19  confused with this.  Is that a '91 or an '81.  It must be

20  '91 because she says she's 17 years old.

21  Q.    We'll try to show you another one as we go through,

22  Dr. Thomas.

23  A.    Thank you.  I read that wrong when I was reading it.

24  Q.    Okay.  What does it show -- what does it show?

25  A.    Eighteen-year old girl who presented with complaints

Thomas - Direct

1    of low back pain.

2    Q.     Okay.  All right.  So let's go to the first progress

3    note.  Let's go to Page 423, okay, or one of the first

4    progress notes.

5             What do we see here with regards to Ms. Calhoun?

6    A.     That she presented with low back pain.

7    Q.     Do you see an adrenal insufficiency?

8    A.     Yes.

9    Q.     What does that mean?

10   A.     The adrenal glands, adrenal means atop the kidney, so

11   they sit on top of the kidney and they produce stress

12   hormones, particularly Cortisol.  If you don't produce

13   enough Cortisol, you have a deficient stress response and

14   the disease is called Addison's disease.

15   Q.     How does Addison's disease make one feel?

16   A.     Well, there are a number of things.  Primarily, it

17   makes you feel sluggish and rundown and you don't respond

18   normally to adrenaline or stress or anything.

19             So there's fatigue.  There is low energy.  And

20   additionally patients tend to get hyperpigmented in spots

21   because your brain makes more of the adrenal stimulating

22   hormone and that leads to signs that you can see on the

23   patient of darker skin.

24   Q.     How is that typically treated?

25   A.     It's generally treated with replacement of Cortisol.

Thomas - Direct

1    Because if you aren't making enough Cortisol, you give them

2    Cortisol, and low and behold, they are cured or treated.

3    Q.     Okay.  All right.

4           So we're in 2009.  Let's go to the prescription

5    on Page 421.  What is prescribed to Ms. Calhoun?

6    A.     Her initial prescriptions are for Soma, the muscle

7    relaxer, and sedative, and Tramadol, a weak opioid

8    analgesic.

9    Q.     Okay.  Are there any risks associated with taking

10   Tramadol and Soma at the same time?

11   A.     They are relatively contraindicated because they are

12   both sedatives.  They can intoxicate you taken together.

13   Q.     If a patient came in complaining of symptoms being

14   tired, as you described, or sluggish, what's something a

15   doctor acting in the usual course would prescribe to treat

16   that?

17   A.     A diagnosis of why that was the case.  Certainly, the

18   combination of Soma and Tramadol would only worsen those

19   symptoms.

20   Q.     Okay.  And let's say Ms. Calhoun was around the age

21   of 18 or so at this time.  Are there any risks associated

22   with prescribing an opioid like Tramadol to a younger

23   person?

24   A.     Younger people are more likely to develop

25   difficulties with substance use disorder.  And in general,

1375

Thomas - Direct

1    younger people, whatever complaints they had, tend to heal.

2    So it's less likely that it's an ongoing and chronic problem

3    and it requires primarily a diagnosis.

4    Q.      Do younger people have issues with impulse control?

5    A.      Certainly.

6    Q.      Let's go to Page 537, please.

7              Okay.  And I believe we're in 2011, Dr. Thomas.

8    What is this?

9    A.      This is an MRI of the lumbar spine.  So while

10   structural studies give us more information, they don't

11   determine whether or not someone is having pain.  But this

12   one is informative.  The -- there are five lumbar vertebrae.

13   1, 2, 3, 4, 5.  The discs in between are numbered by the

14   number above and the number below, so 1-2, 2-3, 2-3, down to

15   5-S1 because they're sitting on the sacrum.  This says that

16   her lumbar disc from 1 through 4-5 are normal with small

17   bulges.  Small bulges are normal.  And that there is some

18   mild disc desiccation, that means drying, and a small

19   central protrusion, which generally will produce -- this is

20   a very close to normal MRI and certainly not one that

21   suggests that she has marked structural derangement of her

22   back.

23   Q.      Okay.  So let's see what was prescribed.  And this is

24   August 18th.  Let's go to Page 331.

25              What do we see prescribed to Ms. Calhoun?

Thomas - Direct

1   A.     Oxycodone, ten milligrams, dispensing 120.

2   Q.     Do you find that to be substantiated by the MRI we

3   just reviewed?

4   A.     The MRI by itself wouldn't substantiate any

5   Oxycodone.  The need for Oxycodone in this patient is low to

6   begin with.  The MRI didn't add or subtract anything from

7   it.

8   Q.     And what dose are we at at this point?

9   A.     Ten milligrams, four times daily, which would be 40

10  milligrams of Oxycodone or 60 milligrams of Morphine

11  equivalents.

12  Q.     Okay.  Let's go to Page 321.

13         Okay.  A couple months later, what's prescribed?

14  A.     We have Oxycodone, 15 milligrams, dispensing 120 and

15  the addition of Adderall, 30 milligrams.  Adderall is an

16  amphetamine.  It is used in the treatment of attention

17  deficit hyperactivity disorder.  It is a controlled

18  substance.  It should only be used in the treatment of

19  attention deficit hyperactivity disorder if that diagnosis

20  has been established.

21  Q.     Okay.  Let's skip ahead to 2013 and look at Page 241.

22         And Dr. Thomas, what happened before 2013 with

23  regard to Dr. Titus?

24  A.     The Consent Decree was entered into.

25  Q.     Okay.  What's being prescribed at this point?

1    A.     Oxycodone, 15 milligrams, dispensing 75.

2    Q.     Okay.  All right.  Let's jump ahead another year.

3           And is it fair to say Ms. Calhoun kept receiving

4    prescriptions about every month for Oxycodone?

5    A.     Yes, she did.

6    Q.     Okay.  Go to Page 447, please.

7           All right.  What are we looking at?

8    A.     This is a urine drug screen from January 15th.  Yeah.

9    Q.     2014?

10   A.     Yeah, January '14 -- 2014, in which the patient is

11   being prescribed Oxycodone.  It notes that she is positive

12   for Morphine and its metabolites, drugs that she's not

13   prescribed.  She is positive for Oxycodone as well.  Yes, so

14   she is abusing Morphine.

15   Q.     All right.  Okay.  Let's go to Page 47.

16          So what happens after this drug test?

17   A.     She is informed that on February 12th, that as of

18   February 10th she will be discharged and that he will only

19   provide her with emergency care and she will -- he will no

20   longer provide -- after 30 days, I will no longer provide

21   services to you.

22   Q.     Page 49, please.

23          So despite this letter, what is prescribed on

24   February 11th of '14?

25   A.     He prescribes Oxycodone, 15 milligrams, 75 and he

Thomas - Direct

1    adds Methadone, ten milligrams, dispensing 30.

2    Q.    Okay.  Just a few more.  Page 83, please.

3          What's prescribed here?

4    A.    This is in April.  The last was in February.  He

5    prescribes again Oxycodone, 15 milligrams, dispensing 74 and

6    changes to Oxycontin, ten milligrams, dispensing 30.

7    Q.    And this is again after the discharge letter?

8    A.    Yes.

9    Q.    Okay.  Let's go to Page 81.

10         Same drugs?

11   A.    Same drugs.  In June -- I'm sorry.  That's wrong, no.

12   I'm sorry.  At the end of April, April 23, 2014, he

13   prescribes Oxycontin and Oxycodone.

14   Q.    Okay.  And Page 40.  I'm sorry, Page 73, please.

15         Do we see these drugs again?

16   A.    Yes.  Only this time, in May, he gives her Oxycodone,

17   15 milligrams, but he increases the dose of Oxycontin to 20

18   milligrams.

19   Q.    Did you see that dose increase substantiated in the

20   medical record?

21   A.    No, there was no medical record.  The patient had

22   been discharged.

23   Q.    Okay.  And let's go to the drug test, Page 43.

24         Okay.  What does this drug test show?

25   A.    This is a urine drug screen on seven -- what's the

1    date?  7/2 of 2014, reported on 7/8 on 2014.  She is

2    positive for ^ benzodiazapine called Pirazolac, which she

3    has not been prescribed.  She's also positive for Morphine

4    and 6-Monoacetylmorphine.  She is using heroin.

5    Q.    Okay.  And what does -- let's go to Page 39.

6    A.    And she is also positive for Oxycodone.

7    Q.    Thank you.  Okay.

8          I'm sorry.  Can we just go back to Page 43?

9          It says oral fluid.  Can you just describe that?

10   A.    So when we -- when we test -- the usual drug screen

11   fluid is urine.  It's the most information.  It's readily

12   available, et cetera.  Some people use oral fluid samples,

13   saliva, because all of them are what are called

14   ultrafiltrates of plasma.  So your body makes all the fluids

15   that we have by filtering out stuff and generating urine and

16   saliva, and they're very similar. But most importantly, they

17   concentrate drugs from the bloodstream into these fluids so

18   they can be detected.  This is on oral fluid specimen.

19   Q.    Okay.  So let's go to Page 39.

20          What happens here?

21   A.    She's discharged again because of testing positive

22   for heroin.

23   Q.    And was discharge the only option available to

24   Dr. Titus?

25   A.    No, referral and treatment while continuing as a

Thomas - Direct

1    primary care provider was an option.

2    Q.    You mean Dr. Titus himself continuing to treat this

3    patient?

4    A.    Yes.

5    Q.    Okay.  Okay.  Let's go to Page 41.

6              After discharge, what's prescribed?

7    A.    He prescribes Oxycontin and Oxycodone, the same

8    prescriptions that he gave her prior to discharge.

9    Q.    Would that be considered a tapering dose?

10   A.    No.

11   Q.    Did you see any evidence of a referral?

12   A.    No.

13   Q.    Did you see any evidence that Dr. Titus supervised

14   this patient after discharge?

15   A.    No.

16   Q.    Okay.  Dr. Thomas, what's your opinion as to this

17   specific prescription?

18   A.    This prescription could not be for a medically

19   legitimate purpose in the usual course of professional

20   practice because it occurred after the doctor-patient

21   relationship had ended again.

22              MR. WOODARD:  Okay.  And Ms. Leal, if we could

23   fill in our chart, please, for Count 10.

24   BY MR. WOODARD:

25   Q.    What do we have here, Dr. Thomas?

1   A.     So there were multiple unexpected urine drug

2   screen -- urine drug test results.  There was no

3   intervention by Dr. Titus.  The warning letter,

4   notwithstanding, she had multiple discharge letters and no

5   apparent monitoring and continued prescribing after those.

6          MR. WOODARD:  Okay.  Could you fill that out,

7   Ms. Leal?

8   BY MR. WOODARD:

9   Q.     And Dr. Thomas, if you learned that a doctor was

10  giving a patient money and offering to pay for vacations,

11  how would that affect your consideration of whether the

12  prescriptions were within the usual course of professional

13  practice?

14  A.     Those activities would certainly be outside of the

15  scope of the doctor-patient relationship and not in the

16  usual course of any professional practice.  While physicians

17  can have those relationships, it heightens the necessity for

18  documenting and assuring that everything else they did was

19  in the usual course of professional practice and for a

20  medically legitimate purpose relative to the opioid

21  prescriptions.

22          However, it otherwise -- at least according to

23  the American Medical Association Code of Ethics, that is

24  over the line.  It blurs the relationship and makes it

25  inappropriate for the physician to continue to treat the

Thomas - Direct

1    patient at any level.

2    Q.    Okay.  Dr. Thomas, let's take a look at Exhibit 11.

3          And is Tracie Owens a patient whose records you

4    reviewed in this case?

5    A.    Yes.

6    Q.    Does the prescribing on July 22nd of 2014 represent

7    Count 11 of the indictment?

8    A.    It does.

9    Q.    And what's your opinion as to that prescription?

10   A.    The prescribing was not for a medically legitimate

11   purpose in the usual course of professional practice.

12   Q.    Okay.  If we could go to Exhibit 123, at 23, please.

13         Is this Ms. Owens' intake?

14   A.    Yes, on 7/1/2013.

15   Q.    And what's she appear to be complaining of here?

16   A.    Chronic migraine headache.

17   Q.    Okay.  And are opioids responsive to chronic

18   migraines?

19   A.    No.  In fact, opioids are relatively contraindicated.

20   You should not do it in chronic migraines because patients

21   rapidly develop what is called rebound or medication overuse

22   headache.  So they end up getting more headaches, not fewer

23   headaches under that circumstance.  And there are a number

24   of things that one can do other than that, but they are at

25   the bottom of the list.

Thomas - Direct

1    Q.      Okay.  And let's go to Page 309.

2            What's prescribed?

3    A.      Ibuprofen and Oxycodone, 15 milligrams.

4    Q.      Okay.  On Page 347, please.

5            Where are we in time, Dr. Thomas?

6    A.      We are two years -- more than two years after the

7    Consent Decree.

8    Q.      Okay.  Was a drug test given?

9    A.      Yes.  This occurred on 3 -- 3/4 of 2014.

10   Q.      What does it show?

11   A.      And it shows that the patient was not taking the

12   Oxycodone that was prescribed.

13   Q.      Okay.  Let's go to Page 345.  And what is this?

14   A.      She's given a warning letter about not taking

15   Oxycodone for her headaches.  It is signed by the doctor,

16   but not by the patient.

17   Q.      And does this say this is the first and only notice?

18   A.      It does.

19   Q.      Let's go to Page 233.

20           What does Dr. Titus prescribe?

21   A.      He continues to prescribe Oxycodone, 15 milligrams,

22   dispensing 120 tablets.

23   Q.      Okay.  Let's go to Page 339.

24           And was another drug test done?

25   A.      Yes, it was.  And again, while she was allegedly

1384

Thomas - Direct

1   taking Oxycodone, she was not taking Oxycodone, and she was

2   negative for the presence of the drug.  And there's another

3   note in Dr. Titus' hand that says patient counseled about

4   absence of medication.

5   Q.     Okay.  Has a pattern emerged?

6   A.     Yes.

7   Q.     What is that?

8   A.     She's not taking the drug.

9   Q.     Okay.  Let's go to Page 337.  What is this?

10  A.     This is another warning letter.  It says at the top,

11  it's the second one for her.  First and only notice

12  regarding this issue.

13  Q.     Okay.  And Page 213, please.

14                What is then prescribed?

15  A.     A one month supply of Oxycodone, 15 milligrams,

16  dispensing 120.

17                MR. WOODARD: And can you back out of that,

18  Ms. Leal?

19  BY MR. WOODARD:

20  Q.     Okay.  One more, Dr. Thomas.  Let's go to Page 331.

21                Was a drug test done again?

22  A.     Yes, on 8 -- is that 8 or 6?

23  Q.     Dr. Thomas, can you make sure your microphone is --

24  A.     I'm sorry.  I'm moving away from it.  On 6/24/2014,

25  another sample is collected and unsurprisingly she is

Thomas - Direct

1    negative for Oxycodone as she has been consistently

2    throughout her treatment course.

3    Q.    Okay.  And Page 329, please.

4          What's this one say?

5    A.    She's given a third, first and only notice of

6    counseling.

7    Q.    Okay.  After this third notice, let's go to Page 207.

8          What is prescribed, Dr. Thomas?

9    A.    Oxycodone, 15 milligrams, 120, no detriment in dose.

10         MR. WOODARD:  And can you back out here, but

11   stay here and zoom in on the bottom, please, Ms. Leal?

12   BY MR. WOODARD:

13   Q.    What's circled there?

14   A.    Pill count.

15   Q.    Okay.  And what's next to it?

16   A.    July 31st, it says that she must do it.

17   Q.    Having the date here, is that consistent with what we

18   read in the model policy earlier about pill counts?

19   A.    No, it makes it a planned pill count.  It's

20   inconsistent with an attempt to ascertain the patient's

21   actual medications.

22   Q.    Okay.  And can we go back to 207.

23         Dr. Thomas, what's your opinion with regards to

24   this prescription for Oxycodone?

25   A.    It's not for a medically legitimate purpose in the

Thomas - Direct

1    usual course of medical practice.  She's undergone a series

2    of urine drug screens, all of which show that she is not

3    using a medication that is relatively contraindicated for

4    the thing that she came in complaining of to begin with.

5    There was no reason to write a second prescription, much

6    less the entire series.  This prescription was not for a

7    medically legitimate purpose.

8              MR. WOODARD:  Can we do our chart, Ms. Leal?

9    BY MR. WOODARD:

10   Q.    What do we say for Tracie Owens?

11   A.    Multiple unexpected drug screen results.  No

12   intervention whatsoever.  There were three warning letters

13   giving her her first and only chance, and there was

14   continued prescribing without monitoring.  But the

15   monitoring, such as it was, made no difference at all.

16             THE COURT:  All right.  Would this be a good

17   time for the afternoon break?

18             MR. WOODARD:  Yes, Your Honor.

19             THE COURT:  So members of the jury, we'll take a

20   15-minute break until quarter of 4:00.

21             (Jury leaving the courtroom.)

22             THE COURT:  All right.  You can be seated.  So

23   Mr. Woodard, I figure you've got 45 minutes more of going

24   through the last three patients.

25             Do you have more after that?

Thomas - Direct

1      MR. WOODARD:  Unfortunately so.  We did a

2   supplemental review of patients, but of course, I won't be

3   talking about all 24 he reviewed, but we did plan to

4   highlight some.  But I'd say we're in the latter third of

5   the outline, if that gives you a sense.  I don't -- but I

6   don't believe we would finish by -- with everything by 5:00.

7      THE COURT:  We won't finish your direct by 5:00?

8      MR. WOODARD:  Yes, Your Honor.  Correct, sir.

9      THE COURT:  All right.  And which one of you is

10  doing the cross?

11     MR. BOSTIC:  I am, Your Honor.

12     THE COURT:  And recognizing that we're a long

13  ways away or at least until tomorrow, but is your cross

14  likely to be in the, you know, one hour or less vicinity,

15  one to three hours, or more than three hours?

16     MR. BOSTIC:  I think I have to go through every

17  exhibit that Mr. Woodard used.  Your Honor, I expect our

18  cross is going to be substantially shorter, probably about

19  an hour, if that much.

20     THE COURT:  Okay.

21     MR. BOSTIC:  We'll see where it goes.

22     THE COURT:  And so if I told the jury that

23  tomorrow, you know, the parties estimated that we'd probably

24  be breaking for the day around about lunchtime, does that

25  sound about right?

Thomas - Direct

```
 1              MR. WOODARD:  It does.

 2              MR. BOSTIC:  Yes, it does, Your Honor, for us.

 3    Mr. Woodard, I'm not certain, though.

 4              MR. WOODARD:  Come on.

 5              THE COURT:  Yeah.  Okay.  All right.  So we'll

 6    take or we'll break until quarter of 4:00.

 7              DEPUTY CLERK:  All rise.

 8              (Recess was taken.)

 9              DEPUTY CLERK:  All rise.

10              THE COURT:  All right.  We're ready to begin;

11    right?

12              MR. WOODARD:  Yes, Your Honor.

13              THE COURT:  And so, just because I would like to

14    tell the jury where I think we stand at the end of the day,

15    in terms of Thursday, do you expect that whoever the

16    Defendant's calling in terms of witnesses on Thursday, we're

17    going to get them all done, and we don't need to have trial

18    on Friday?

19              MS. KOUSOULIS:  That's what we anticipate, Your

20    Honor.  Yes.

21              THE COURT:  Okay.  How confident are you of that

22    anticipation?

23              MR. BOSTIC:  I'm extremely confident.

24              MS. KOUSOULIS:  Ninety-five percent.

25              THE COURT:  Okay.  All right.
```

Thomas - Direct

```
 1            Okay.  Great.  Well, let's get the jury.  So I'm
 2    going to tell them I don't expect to have trial on Friday.
 3              MS. KOUSOULIS:  Excuse me.  Sorry, Your Honor?
 4              THE COURT:  I was just going to say I'm going to
 5    tell the jury that I don't expect to have trial on Friday.
 6              MS. KOUSOULIS:  That's fine.
 7              (Jury entering the courtroom.)
 8              THE COURT:  All right.  Members of the jury,
 9    welcome back.  Everyone, you may be seated.
10              Mr. Woodard, you may continue.
11              MR. WOODARD:  Thank you.
12    BY MR. WOODARD:
13    Q.    Dr. Thomas, we just concluded with Ms. Tracie Owens
14    and let's fill out our chart.  What do we say with regard to
15    Ms. Owens?
16    A.    Oh, that she had multiple unexpected urine drug test
17    results.  There was no intervention, particularly in terms
18    of adjusting her dose appropriately.  She had multiple
19    warning letters and there was continued prescribing without
20    monitoring.
21              MR. WOODARD:  Okay.  Ms. Leal, can you fill that
22    out?
23              Thank you.
24    BY MR. WOODARD:
25    Q.    All right.  Let's go to Exhibit 12, please.
```

Thomas - Direct

1          Dr. Thomas, is Michael Adams a patient whose

2   records you reviewed in this case?

3   A.     Yes.

4   Q.     And is the prescription to him on September 24th of

5   2014, does that represent Count 12 of the indictment?

6   A.     Yes, it does.

7   Q.     Okay.  And did you come to a conclusion as to the

8   prescription on that date?

9   A.     Yes.  The prescribing was not for a medically

10  legitimate purpose in the usual course of professional

11  practice.

12          MR. WOODARD:  All right.  Ms. Leal, can we go to

13  Exhibit 125 at 40, please.

14  BY MR. WOODARD:

15  Q.     What do we have here?

16  A.     This is his intake form on April -- on August 4th,

17  the year 2009.

18  Q.     Okay.  So the treatment started around 2009?

19  A.     Yes.

20  Q.     Okay.  Let's go to Page 233.

21          Okay.  I can't tell the year here, but what are

22  we looking at?

23  A.     This is in 2009.  He underwent an MRI of the lumbar

24  spine.  It showed things that you would expect for a man of

25  his age.  He had multi-level degenerative -- degenerative

1  disc disease, which is essentially a normal finding in

2  people in their -- at the end of their sixth decade of life.

3  Q.     What does it say under "Impression"?

4  A.     Diffuse degenerative spondylosis.  That is arthritic

5  change.  There is multi-level outlet narrowing as described.

6  There's no evidence for herniated disc or central stenosis.

7  Q.     Okay.  All right.  Let's fast forward a bit to 2013

8  and we'll go to Page 176.

9        All right.  Dr. Thomas, where are we in time?

10 A.     We're at October 27, 2013, so we're two-and-a-half

11 years after the Consent Decree.  The patient is prescribed

12 Oxycodone, ten milligrams, dispensing 75.  I don't know what

13 that is.  It's not a controlled substance.

14 Q.     Okay.

15 A.     And behind that is Methadone, ten milligrams,

16 dispensing 60.

17 Q.     Okay.  And this was October of '13?

18 A.     Yes.

19 Q.     Okay.  Let's go to Page 174, please.

20        Okay.  What is this?

21 A.     This is a progress note describing his prescribing

22 for -- I don't see a date on it.

23 Q.     Well, let me ask first:  Does this look a little

24 different than what we've looked at before?

25 A.     Yes.  This is an electronic health record --

Thomas - Direct

1    Q.    Okay.

2    A.    -- as opposed to the handwritten records previously

3    provided.

4                MR. WOODARD:  Could you go to the next page,

5    Ms. Leal?

6                THE WITNESS:  Yeah, so this is for April 8th of

7    2014.

8    BY MR. WOODARD:

9    Q.    Okay.  It says it was signed on that date; right?

10   A.    Signed on that date, that's correct.

11   Q.    But did this progress note appear shortly after the

12   prescription we just reviewed?

13   A.    Yes.

14   Q.    All right.  Let's look at a drug test.  Let's go to

15   Page 187, please.

16                Okay.  What's the date on the collection here?

17   A.    This is collected on 11/20 of 2013.

18   Q.    And what do we see?

19   A.    And we see that the patient who is prescribed

20   Methadone and Oxycodone is negative for Oxycodone and its

21   metabolites and positive for Methadone and its metabolite.

22   Q.    All right.

23   A.    It's in Dr. Titus' handwriting.  It states that the

24   patient was counseled.

25   Q.    All right.  Let's go to Page 186.

Thomas - Direct

1        So after that drug test, what do we see in the

2   record?

3   A.     This is a warning letter noting the absence of the

4   medications prescribed, that non-compliance will not be

5   tolerated and that this is his first and only notice

6   regarding the issue.  It is signed by both the patient and

7   Dr. Titus.

8   Q.     Okay.  And this is December 4th of '13?

9   A.     Yes.

10  Q.     All right.  Let's go to Page 163.

11         So on the same date, what's prescribed?

12  A.     Oxycodone, dispensing 75 tablets.

13  Q.     Okay.  Are we still at ten milligrams?

14  A.     Yes.

15  Q.     Okay.  Let's jump to Page 158.

16         Okay.  What happens a couple weeks later?

17  A.     He's prescribed Oxycodone, 15 milligrams, dispensing

18  75 tablets, an increase in dose, and Methadone, ten

19  milligrams, dispensing 60 tablets.

20  Q.     Okay.  And the date on this prescription?

21  A.     12/18/2013.

22  Q.     All right.  Let's look at the associated progress

23  note, Page 155.

24         Okay.  So we just saw an increase in dose.  Do

25  you see anything in the record regarding improvement in

Thomas - Direct

1  function with this patient?

2  A.     No.   In fact, he has a moderate pain complaint that

3  is rated at -- with a verbal digital pain score of five to

4  six out of ten and no mention of his response to the

5  medications.

6  Q.     And what's the date of service at the top?

7  A.     The date of service is 12/18/2013.  It mentions that

8  it's relieved with the medications.  And if it's relieved

9  with the medications that was with the ten-milligram dose.

10 So this would actually be contrary to the idea that he

11 needed to get more medication.

12 Q.     Okay.  And the service date was the date of the

13 prescription we just saw?

14 A.     Yes.

15              MR. WOODARD:  Ms. Leal, can you go to the last

16 page or the next page or -- okay.  One more.

17 BY MR. WOODARD:

18 Q.     When does this say it was electronically signed?

19 A.     4/8 of 2014.

20 Q.     Okay.  Are we talking about four months or so after

21 the progress note was dated?

22 A.     Yes, that's correct.

23 Q.     All right.  Let's go to Page 118, please.

24              Okay.  What do we have here?

25 A.     This is a prescription for 4/23 of 2014.  So directly

Thomas - Direct

1    after that, there's a switch to Oxycontin, ten milligrams to

2    be taken twice daily and the Oxycodone is maintained at

3    15 milligrams, dispensing 76.

4    Q.    Okay.  Okay.  Let's look at one more drug test.

5    Page 184.

6          Okay.  So a little bit later in 2014, is another

7    drug test done?

8    A.    Yes.

9    Q.    And what happens?

10   A.    While taking Oxycodone and Oxycontin, the patient is

11   negative for Oxycodone.  Actually, he's negative for all the

12   drugs tested.

13   Q.    Has a pattern emerged?

14   A.    Yes, particularly relative to the Oxycodone, the

15   patient has never -- has -- during this period of time has

16   not taken that in a regular fashion and certainly is not

17   taking it at the time of this urine drug screen.

18   Q.    Okay.  And Page 183, please.

19          So what do we have here?

20   A.    This is another first and only notice regarding the

21   absence of the medication in his urine, that it would not be

22   tolerated.  It is signed by the patient and Dr. Titus on

23   July 8, 2014.

24   Q.    Okay.  Let's jump to Page 99.

25          What's prescribed?

1    A.    Oxycontin, ten milligrams; Oxycodone, 15 milligrams.

2    Q.    Same doses?

3    A.    Same doses as previously.

4    Q.    Okay.  And Page 94, please.

5          What's prescribed?

6    A.    Oxycontin, ten milligrams, 30; the Oxycodone dose

7    that -- the dose remains the same, the 15 milligrams, but

8    the number of tablets is increased slightly to 80 on

9    7/30/2014.

10         MR. WOODARD:  Okay.  Could you back out of this,

11   but stay here and zoom in on the bottom, Ms. Leal?

12   BY MR. WOODARD:

13   Q.    What does this show?

14   A.    This is for his next appointment.  It will be on

15   August 27th.  He can pick up his next prescription on

16   August 13th, and he will have a pill count on August 6th.

17   Q.    And given the date of the pill count on August 6th,

18   how does that comport to the model policy we discussed

19   earlier?

20   A.    Well, once again, it doesn't allow the pill count to

21   perform its function of finding out what the patient is

22   doing when the doctor is not looking at him, and it informs

23   him of exactly when his pills would have to be appropriate.

24   Q.    Okay.  Let's go to Page 191.

25         Let me ask you before we get here, was there

Thomas - Direct

1    another inconsistent drug test result?

2    A.    Yes.

3    Q.    What happened?

4    A.    The same thing that happened previously.  There's

5    another warning letter regarding the absence of the

6    medications in his urine.

7    Q.    Okay.  And now that we've looked at three, let me ask

8    you, Doctor, what is the purpose of this paper being in the

9    file?

10   A.    The medical purpose, I have no idea.

11         MS. KOUSOULIS:  Calls for speculation.

12   BY MR. WOODARD:

13   Q.    Why is it important to document these warning

14   letters?

15   A.    The warning letter is some evidence of the physician

16   saying something to the patient.  Unfortunately, these

17   warning letters say something that does not occur in the

18   physician's behavior.

19   Q.    If this paperwork is in the file, but not discussed

20   with the patient, is it still meaningful?

21   A.    Then it serves no purpose.  The intervention is a

22   medical intervention, which means the doctor needs to find

23   out something, tell the patient something, and do something.

24   That is a medical service.  The letter is just a piece of

25   paper with signatures on it.

Thomas - Direct

1   Q.     Okay.  So after this third letter, let's jump to

2   Page 93.  Here we go.

3              And what is prescribed?

4   A.     On 8/13/2014, the patient gets Oxycontin, ten

5   milligrams and Oxycodone, 15 milligrams.  The number of

6   pills remains the same.

7   Q.     Okay.  All right.  Page 180, please.

8              Is another drug test done?

9   A.     Yes.  Urine drug screen reported on 9/4/2014.

10  Q.     What do we see?

11  A.     There is Oxycodone and Methadone.  Notably, Methadone

12  is not being prescribed, so it is now an illicit drug.  And

13  the Oxycodone is not detected, so he's getting Oxycontin and

14  Oxycodone which is not detected.  Methadone which is not

15  prescribed is detected.  This is drug abuse.

16  Q.     When Oxycodone is not detected, to remind us, what

17  does that tell the doctor?

18  A.     Well, he knows that the Oxycontin and the Oxycodone

19  that he's been prescribing has not been taken by the patient

20  for at least four days.  And the medical response is to find

21  out why.  It's primarily a discussion with the patient, the

22  obtaining of history, finding out what's going on and why is

23  it going on so there can be an appropriate medical response

24  to the patient's behavior.

25  Q.     Okay.  Let's go to Page 179.

Thomas - Direct

1      Following this drug test, what's in the file?

2    A.     Another warning letter dated September 9, 2014,

3    because of the inclusion of medication not prescribed by

4    this facility, ignoring the absence of the medication that

5    was prescribed by Dr. Titus and stating that this behavior,

6    which has been tolerated, will not be tolerated and that

7    this warning will be the first and only warning in a series

8    of at least three.

9    Q.     Okay.  And Page 87, please.

10     The next day, what's prescribed to Mr. Adams?

11   A.     Oxycontin, same dose.  Oxycodone, same dose, same

12   frequency, same number of pills.

13   Q.     Okay.  Now, finally, Dr. Thomas, let's look at

14   Page 81.  A couple weeks later, what does this document

15   show?

16   A.     That on September 24th, Dr. Titus informed the

17   patient that as of September 24th, he would be discharged

18   from his practice and that he would provide him emergency

19   care for 30 days to avoid abandoning him.  But emergency

20   care did not include narcotics.

21   Q.     Was an option for Dr. Titus to continue treating this

22   patient?

23   A.     Yes.  I mean, there was little evidence that

24   Mr. Adams took Oxycodone, so certainly treating him absent

25   Oxycodone was certainly an option.

1400

Thomas - Direct

1  Q.     Was a tapering dose called for?

2  A.     There was little to no evidence that Mr. Adams took

3  Oxycodone, therefore, giving him additional Oxycodone to

4  taper him was tapering from zero.  The taper was done.

5  Q.     Okay.  And let's look at Page 82.

6         On the same day of his discharge, what does

7  Dr. Titus prescribe?

8  A.     He wrote for what he called a one-month supply of

9  Oxycodone, 15 milligrams, dispensing 160.  That is twice as

10  much as he had previously given the patient, whom he was

11  seeing, when he was not seeing him; and Oxycontin, ten

12  milligrams, dispensing 60, giving the patient twice as many

13  pills as he did when he was his patient.

14  Q.     And even if a tapering dose were needed, would this

15  be consistent with a tapering dose?

16  A.     No.  This would be consistent with an increased dose

17  from what he was previously supplying him with on a regular

18  basis in the absence of a doctor-patient relationship.

19  Q.     Was there any evidence of supervision by Dr. Titus

20  with regard to this prescription?

21  A.     None.

22  Q.     Okay.  Dr. Thomas, what's your opinion with regard to

23  this prescription on September 24th of 2014?

24  A.     As with all prescriptions that occur in the absence

25  of a doctor-patient relationship, it is not possible for it

Thomas - Direct

1    to be for a medically legitimate purpose in the usual course

2    of professional practice.  Giving a patient who is not --

3    for whom there is no evidence that he is taking the drug an

4    increased dose of that drug is not for a medically

5    legitimate purpose and in the usual course of professional

6    practice.  It cannot be.

7              MR. WOODARD:  Okay.  Let's take a look at our

8    chart, please, Ms. Leal.

9    BY MR. WOODARD:

10   Q.    And Dr. Thomas, for Michael Adams, how do we fill

11   this out?

12   A.    There were multiple unexpected drug test results.

13   There was no intervention based upon those drug test

14   results.  While there were multiple warning letters, none of

15   those warning letters were followed through with the action

16   that the physician placed in them.  There was a discharge

17   letter that discharged the patient from Dr. Titus' practice.

18              After that discharge letter, the patient was

19   provided with twice as much of Oxycodone preparations with

20   Oxycontin and Oxycodone as he was when he was Dr. Titus'

21   patient, and it was done so in a manner where that

22   prescription was unmonitored by the physician as the

23   doctor-patient relationship had ended.

24              MR. WOODARD:  Could you fill that out, Ms. Leal?

25   Thank you.

Thomas - Direct

1    BY MR. WOODARD:

2    Q.    Okay.  Dr. Thomas, let's take a look at Exhibit 13.

3          And is Lucille Moody a patient whose records you

4    reviewed in this case?

5    A.    Yes.

6    Q.    Is the prescribing to her on October 27th, 2014,

7    representative of Count 13 of the indictment?

8    A.    Yes.

9    Q.    Okay.  And did you reach an opinion as to whether

10   those prescriptions were within the usual course of

11   professional practice and for a legitimate medical purpose?

12   A.    I did.  They were not.

13   Q.    All right.  Is it fair to say that Ms. Moody was a

14   long-standing patient of Dr. Titus' based on your review of

15   the records?

16   A.    Yes.

17   Q.    Okay.  Let's start with Exhibit 127 at 368.  Is this

18   around the time of the first visit?

19   A.    Yes.  This is in March of 2007.

20   Q.    Okay.  And let's just jump ahead a little bit to 2008

21   and look at exhibit or Page 203.

22         Okay.  A little hard to read, but what's being

23   prescribed, if you can tell?

24   A.    She's being prescribed Percocet, ten milligrams of

25   Oxycodone, dispensing 200; Ambien, ten milligrams,

Thomas - Direct

1    dispensing 30; Klonopin and Alzapam, a benzodiazepine, a

2    half milligram, dispensing 60; and Zithromax is an

3    antibiotic.

4    Q.    Okay.  Can you walk through this combination and if

5    there's any interactions at play?

6    A.    Well certainly the interaction of the benzodiazepine

7    and the opioid is a relative contraindication, as we've

8    discussed.  The need for a sleeping aid while taking a

9    benzodiazapine is another drug-drug interaction that can be

10   problematic, because while Ambien is not a benzodiazepine,

11   it is a sedative.  So it's two sedatives and an opioid which

12   together -- altogether are relatively contraindicated.

13   Q.    And is this a combination like before where you would

14   expect discussion or documentation in the record of

15   discussion with the patient, and informed consent, and

16   warning of the risks?

17   A.    Of the diagnosis, the risks, the benefits, and follow

18   up on the effectiveness or adverse effects associated with

19   each of the drugs.

20   Q.    Did you see that, Dr. Thomas?

21   A.    No.

22   Q.    Okay.  Let's look at 196, please.

23            What's Ms. Moody getting at this point?

24   A.    Ambien, ten milligrams, dispensing 30.  Percocet,

25   10/335, dispensing 200; and Soma, Carisoprodol, the muscle

Thomas - Direct

1    relax -- the sedative muscle relaxant, to be taken four

2    times daily, dispensing 120.

3    Q.    Similar combination issues at play here?

4    A.    Yes.  This is a combination that is likely -- taking

5    Soma four times a day plus an opioid is likely to lead to

6    some level of intoxication.

7    Q.    All right.  Dr. Thomas, let's jump to 2012.  Look at

8    Page 114.

9               Okay.  Some different drugs here.  What do we

10   have?

11   A.    We have Fentanyl transdermal, 50 micrograms per hour;

12   120 milligrams of morphine equivalents per day.  Oxycodone,

13   15 milligrams, dispensing 75.  Oxycontin, a second

14   long-acting opioid, ten milligrams, dispensing 30.  And

15   Seroquel, Seroquel is a sedating atypical antipsychotic.

16              Now, one of the things that we know about the

17   risks of opioids is that patients who have mental health

18   disorders are at greater risk for non-medical use of opioids

19   than other people.  So we have two long-acting opioids,

20   which is pharmacologically nonsensical.  Cannot make sense

21   of why that would be.  A short-acting opioid, the

22   combination with which increases risk and an atypical

23   antipsychotic, which does not prove, but suggests a mental

24   disorder.

25   Q.    Let's look at Page 94, please, the progress note

Thomas - Direct

1    associated with these prescriptions.

2              Do you see anything that explains the conundrum

3    you just described?

4    A.    No.  The history is all about her back pain, the fact

5    that she's had spine surgery and the things that aggravate

6    her back pain.

7    Q.    Okay.  All right.  So let's see what happens moving

8    forward.  Let's look at Page 65, please.

9              Okay.  We had a drug test?

10   A.    Yes.

11   Q.    And where are we in time, Dr. Thomas?

12   A.    We're at the December 6th, 2012, so we're 18 months

13   past the or 21 months after the Consent Decree.

14   Q.    Does nine months sound right, 2011?

15   A.    It was March of 2011.  So it's nine months in 2012

16   and 12 months in -- oh, no, nine months in 2011 and

17   12 months in 2012.  That's 21 months.

18   Q.    Okay.  All right.

19              Regardless, is this after the Consent Decree,

20   Dr. Thomas?

21   A.    Yes.

22   Q.    Okay.  What do we have with regards to this drug

23   test?

24   A.    The patient is positive for Oxycodone and for

25   Fentanyl, and Temazepam is detected, a drug not or I don't

1406

Thomas - Direct

1    know what that means, but she's positive for both the

2    Oxycodone and the Fentanyl.

3              MR. WOODARD:  Okay.  Can you zoom out, Ms. Leal?

4    Can you go to the next page?  Okay.

5    BY MR. WOODARD:

6    Q.    What is it showing for Fentanyl?

7    A.    Oh, okay.  So she is negative for the parent

8    compound.  That is, she would be wearing a patch.  The

9    parent compound would go in first and then be metabolized,

10   Norfentanyl.  She is positive for the metabolite.  That's an

11   unexpected result.

12   Q.    Okay.  Let's jump forward in the treatment and go to

13   Page 91.

14              Okay.  What's prescribed?

15   A.    She continues to be prescribed Oxycodone,

16   15 milligrams, increasing to 90 tablets, and Fentanyl

17   transdermal, 50 micrograms.

18   Q.    And are we in November of 2012?

19   A.    Yes.

20   Q.    Okay.  Let's look at Page 65.  Was a drug test done

21   the next month?

22   A.    Yes.

23              MR. WOODARD:  Okay.  If you can go to the next

24   page, Ms. Leal.

25   BY MR. WOODARD:

1407

Thomas - Direct

1    Q.      Okay.  What are we seeing for Fentanyl here?

2    A.      We're, again, seeing negative for the parent compound

3    and positive only for the metabolite.  She's positive for

4    the Oxycodone.

5    Q.      Okay.  Is a pattern emerging here?

6    A.      Yes.

7              MR. WOODARD:  Okay.  Let's go to Page 52,

8    please.  And if you could scroll down, Ms. Leal.

9    BY MR. WOODARD:

10   Q.      Any specific discussion of the drug test results

11   we've seen so far?

12   A.      No, none.

13   Q.      Okay.  Dr. Thomas, I want to show you something else

14   related to this progress note.

15             MR. WOODARD:  Ms. Leal, if you could go to

16   Exhibit 128 at 62.

17   BY MR. WOODARD:

18   Q.      Okay.  From the same file, have you seen something

19   like this in your review, Dr. Thomas?

20   A.      Yes, this piece of paper occasionally appeared.

21   Q.      Okay.  What does this appear to be?

22   A.      It describes four separate clinical scenarios.  That

23   is, the patient is clinically stable with unchanged

24   symptoms, the patient is clinically stable with improving

25   symptoms, the patient is clinically stable with occasional

Thomas - Direct

1    worsening symptoms, and the patient is clinically unstable

2    with worsening symptoms.  And it basically states that we

3    would -- that they would continue and return in a month

4    under the first three circumstances.  And in the fourth,

5    they would start physical therapy and continue medications

6    and return in a month.

7    Q.     Is the note blank or unfilled here?

8    A.     Yes.

9    Q.     Did you see examples where this language was then put

10   into various progress notes or applied?

11   A.     On occasion.

12   Q.     Okay.  In your experience, is it consistent with the

13   usual course of professional practice to limit oneself to

14   four scenarios when treating 50 or more patients a day and

15   still providing individualized patient care?

16   A.     No, because what it means to be clinically stable or

17   unstable differs from patient to patient, and certainly

18   there are patients who are clinically unstable and their

19   behaviorally unstable, or they are financially unstable, or

20   they are psychologically unstable, or their pain is

21   unstable.  And there are more things to think about than

22   these four responses, three which are exactly the same.

23   Q.     Okay.  Okay.  Dr. Thomas, let's go back to the

24   prescriptions, and let's go on to Exhibit 128 at 220.

25                   Okay.  So we're in the fall of 2013.  What's

Thomas - Direct

1    being prescribed?

2    A.      She's being prescribed Soma, the sedative muscle

3    relaxant in high dose; Oxycodone, 15 milligrams, dispensing

4    90; and the Fentanyl patches, increased to 100 micrograms

5    per hour, the equivalent of 240 milligrams of Morphine

6    equivalents.

7    Q.      Do you have similar concerns about this combination

8    as described previously?

9    A.      Precisely the same concerns.

10   Q.      Okay.  Let's look at Page 283.

11            On the same date of this prescription, was a

12   urine specimen collected?

13   A.      Yes, it was.

14   Q.      Okay.  And what was shown in the results?

15   A.      Yes.  It showed that she was using cocaine and

16   there's a note in Dr. Titus' hand that says patient

17   discharged today, 9/29/14.

18   Q.      Okay.  Going up, what does it show under "Prescribed

19   - Not Detected"?

20   A.      The Fentanyl that had been increased to 100

21   micrograms was not detected.

22   Q.      Okay.  Is that something we've seen before with this

23   patient?

24   A.      Yes.

25   Q.      Okay.  Let's go to Page 213.

Thomas - Direct

1          So what happens with Ms. Moody on September 7th

2   of 2013?

3   A.      September 17th?

4   Q.      17th, I'm sorry.

5   A.      It states that she's being discharged for testing

6   positive for an illegal substance, cocaine, and that she

7   will not be provided with -- she will be provided emergency

8   care that does not include narcotic prescriptions.

9   Q.      Okay.  Let's look at the next prescription, Page 214.

10          What do we see?

11  A.      She's given Oxycodone, 15 milligrams, 90 tablets on

12  9/24/13, six days after the last -- I'm sorry, a week after

13  the letter.

14  Q.      And is it fair to say actually the treatment

15  continues for just about a year after this first discharge

16  letter?

17  A.      Yes.

18  Q.      Okay.  We'll try to hit some highlights.  So let's go

19  to Page 131 of the same exhibit.

20          After this discharge letter, what's happening

21  here?  What's being prescribed?

22  A.      This is on the date that Dr. Titus wrote on the

23  prescription -- on the urine drug screen that she was being

24  discharged that she's given Oxycodone, 15 milligrams and

25  Fentanyl patches, 100 micrograms.

1   Q.     Okay.  This is in 2014, so about a year later; does

2   that sound right?

3   A.     Oh, okay.  I'm confused.

4   Q.     I jumped ahead on you, Dr. Thomas.

5   A.     Okay.  I had 9/29 in my head.  Yes, so a year later,

6   she's getting the same drug that wasn't in her urine.

7             MR. WOODARD:  Okay.  And Ms. Leal can you zoom

8   in on the bottom there?

9   BY MR. WOODARD:

10  Q.     What do we see with regards to the pill count?

11  A.     That she's to bring in her pills and her patches on

12  October 6th.

13            MR. WOODARD:  Okay.  Ms. Leal, do you want to go

14  to Exhibit 129 at 1 for a moment here?  Okay.

15  BY MR. WOODARD:

16  Q.     I know this looks a little different, but let's go

17  back to that discharge we talked about in September of '13.

18  Do you see the date -- well, let's see, the date is towards

19  the bottom where it says date entered 11/19/13?

20  A.     Yes.

21            MR. WOODARD:  Okay.  And actually, could you go

22  up a little bit to November 18, 2013, Shannon?

23  BY MR. WOODARD:

24  Q.     Okay.  And can you see just at the very top, is this

25  still Ms. Moody's patient file?

Thomas - Direct

1    A.      Yes, it is.

2    Q.      Okay.  What does it say here?

3    A.      It says, "Patient must be enrolled in a drug

4    treatment program before being seen."

5    Q.      Okay.  Did you see evidence of Ms. Moody being

6    enrolled in drug treatment before receiving the

7    prescriptions like the one I just showed you in 2014?

8    A.      Yes.

9    Q.      You did see?

10   A.      No, there was not -- there was no record.  I'm sorry.

11   Q.      Okay.  You did not see Ms. Moody being referred to

12   drug treatment?

13   A.      No, I did not.

14   Q.      Okay.  Did you continue to see the same prescriptions

15   we've discussed so far?

16   A.      Yes.

17   Q.      Okay.  In the usual course of practice, when a doctor

18   receives this kind of information from his or her staff,

19   what should be taken into account at that point?

20   A.      If -- I would generally expect this to flow in the

21   other direction with the physician making the decision about

22   a patient needing to be enrolled in drug treatment.  But if

23   that were to occur, then that would be a circumstance where

24   the patient was at high risk.  And after being enrolled in

25   drug treatment, if the physician was not facile in that

1413

Thomas - Direct

1   aspect of care themselves, then coordination of care with

2   the people who were evaluating and treating her would be in

3   the patient's best medical interest.  And in fact,

4   necessary, because if the drug treatment is one that led to

5   abstinence, that is the patient's off of all drugs, then

6   giving them opioids would have to be done very carefully.

7   Q.    Okay.  All right.  Let's conclude with Ms. Moody and

8   jump to Page 259.

9           So about a year after the discharge letter, do

10  we -- is Ms. Moody still a patient and do we see a drug

11  test?

12  A.    Yes, on 9/29/14, there is a drug screen that shows

13  that she is positive for Oxycodone and its metabolites which

14  she's been prescribed, but negative for Fentanyl once again.

15  Q.    Okay.  And what is this negative for Fentanyl telling

16  the doctor?

17  A.    That she's not using the Fentanyl patches that he's

18  giving her in the highest available dose.

19  Q.    Okay.  Page 130, please.

20          What does Dr. Titus prescribe next?

21  A.    Oxycodone, 15 milligrams, dispensing 70 tablets.

22  Q.    And Page 126, finally.  What does Dr. Titus prescribe

23  here?

24  A.    Another prescription for Oxycodone, 15 milligrams in

25  the same dose and another prescription for Fentanyl patches,

1414

Thomas - Direct

1   dispensing ten 100-microgram patches.

2   Q.     Okay.  Dr. Thomas, in your opinion, was this

3   prescription within the usual course of professional

4   practice and for a legitimate medical purpose?

5   A.     It was not.

6   Q.     Why not?

7   A.     The patient clearly -- something was happening to the

8   Fentanyl, but it wasn't entering the patient.  The using of

9   medication that -- giving a patient a medication that they

10  are not using cannot be for a medically legitimate purpose.

11  And the evidence that the doctor had to evaluate did not

12  speak to that, nor did he respond to the absence of the drug

13  as he gave it to her over time.  That prescribing can't be

14  for a medically legitimate purpose.

15  Q.     Dr. Thomas, if you learned that the patient had the

16  doctor's personal cell phone number and could call and get

17  into the clinic any time, how would that weigh on your

18  opinion?

19  A.     That would be unusual in the standard professional

20  behavior in medicine.  It would be of concern because it

21  would mean that the practice -- because the practice is what

22  one does repeatedly -- that the practice pattern is being

23  broken.  And it would require even greater concentration on

24  what's in the medical record to justify that the prescribing

25  is within the scope of the doctor-patient relationship.

Thomas - Direct

1    MR. WOODARD: All right.  And Ms. Leal, could we
2    go to Exhibit 903?
3    BY MR. WOODARD:
4    Q.    Okay.  Dr. Thomas, what do we say with regards to
5    Ms. Moody?
6    A.    Multiple unexpected urine drug screen results.  A
7    lack of intervention in terms of monitoring the behavior --
8    doctor behavior in prescribing.  There were multiple warning
9    and discharge letters, and there was continued prescribing
10   after that.
11           MR. WOODARD:  May I have a moment, Your Honor?
12   BY MR. WOODARD:
13   Q.    Let's go to Exhibit 128 at 211, please.
14           Okay.  I just wanted to clarify something.  We
15   were talking about this referral.  Do you remember seeing
16   this, Dr. Thomas?
17   A.    Yes.
18   Q.    What is this?
19   A.    This is a letter to Ms. Moody confirming her
20   appointment with a drug -- Certified Alcohol and Drug
21   Counselor, CADC.  And given that it was in the record, it
22   informed Dr. Titus that she was going to be evaluated.
23   Q.    Okay.  Let's look at Page 208, please.
24           Okay.  And around the same time, what was
25   Dr. Titus prescribing?

Thomas - Direct

1   A.      He continued to prescribe Fentanyl patches at high

2   dose and Oxycodone, 15 milligrams, dispensing 90.

3   Q.      Okay.  Thank you.

4           Okay.  Let's go to Exhibit 14, please.

5           All right.  Was Ms. Silbereisen a patient whose

6   records you reviewed in connection with this case?

7   A.      Yes.

8   Q.      And does the prescribing on October 30th in 2014

9   represent Count 14 of the indictment?

10  A.      Yes.

11  Q.      Okay.  And Dr. Thomas, did you reach an opinion as to

12  those prescriptions?

13  A.      They were not for a medically legitimate medical

14  purpose in the usual course of professional practice.

15  Q.      Okay.  Let's go to Exhibit 131 at Page 348.

16          All right.  Is this the intake for

17  Ms. Silbereisen?

18  A.      Yes, in June 2008.

19  Q.      Okay.  And let's go to Page 350.

20          So what is she being prescribed?

21  A.      At this point, she's being prescribed Percocet with

22  7.5 milligrams of Oxycodone and Naproxen, a non-steroidal

23  antiinflammatory agent.

24  Q.      Is this a little bit lower than what we've seen?

25  A.      It's half the dose of Oxycodone, and it includes two

1    non-opioid analgesics, Acetaminophen and Naproxen.

2    Q.    Now, let's go to Page 339.

3          So about a year later, what's Ms. Silbereisen

4    being prescribed?

5    A.    The dose of Percocet is increased to ten milligrams

6    of Oxycodone, and the number has increased to 150 tablets

7    per prescription.

8    Q.    Okay.  And let's go to Page 242.

9          Okay.  We're in 2010.  What's being prescribed?

10   A.    Oxycodone, 15 milligrams, dispensing 180 tablets.

11   Q.    Okay.  Higher than the prior two?

12   A.    An increasing dose over time.

13   Q.    Okay.  Okay.  So let's break down the treatment from

14   here.  Let's go to Page 151.

15         And what is this?

16   A.    This is a progress note from 6/1 of 2011.

17   Q.    Okay.  Do you see where it says, "No new complaints"?

18   A.    Yes.

19   Q.    Okay.  Based on your review of the record, do you

20   remember anything that happened with this patient around

21   this time?

22   A.    Shortly before this progress note, she delivered a

23   child by cesarean section.

24   Q.    Did you find it unusual not to see remarks regarding

25   that event here in the note?

1418

Thomas - Direct

1   A.     That would be a significant historical event in a

2   patient's medical history, so I would generally expect it to

3   be noted at some point.

4   Q.     Okay.  Okay.  So we're on, is it June 1st of '11?

5   A.     Yes.

6   Q.     All right.  And let's go to Page 153.

7          What's prescribed?

8   A.     Oxycodone, 15 milligrams, dispensing 150.

9   Q.     Okay.  All right.  Let's go to 2012.  And this is

10  Exhibit 131 at 27.

11         And in 2012, I won't make you do the math, but

12  are we after the Consent Decree, Dr. Thomas?

13  A.     Yes.  And the dose is actually decreased to

14  Oxycodone, ten milligrams, dispensing 65.

15  Q.     Okay.  Let's go a year later.

16         MR. WOODARD:  And Ms. Leal, it's Exhibit 130 at

17  202.

18  BY MR. WOODARD:

19  Q.     What are we at now, Dr. Thomas?

20  A.     In July -- in July 2013, she's taking Oxycodone,

21  15 milligrams, dispensing 70.

22  Q.     Okay.  Did you have something to add there?

23  A.     No.  I'm stuck on the date.

24  Q.     Okay.  All right.  And let's go to Page 306, please.

25         Okay.  In the note, Dr. Thomas, did you see

Thomas - Direct

1    anything substantiating the increase of the Oxy 15?

2    A.    No, but this is --

3    Q.    I'm sorry?

4    A.    This is 2009.

5              MR. WOODARD: Okay.  Ms. Leal, can you go to

6    page -- it's Exhibit 130 at 203.

7    BY MR. WOODARD:

8    Q.    Okay.  How's that?

9    A.    Yes.

10   Q.    Okay.

11   A.    And that states that her pain was relieved with the

12   pain medication she was previously receiving.

13   Q.    Okay.  Let's go to Page 184.

14             What's prescribed at this point?

15   A.    Oxycodone, 15 milligrams, dispensing 75; and Fentanyl

16   transdermal is added at 50 micrograms per hour.

17   Q.    Did you see anything in the record substantiating the

18   addition of the Fentanyl patch at this point?

19   A.    No.  Indeed, I would note that Fentanyl transdermal

20   is available in a number of different strengths, and it's

21   usually recommended to start with the lower strengths.

22   Because when we give a patient a drug, we don't know what

23   the response is going to be.  So it's 12.5, 25, 50, 75, 100

24   micrograms per hour.  And we see start with the 50-microgram

25   patch in this instance.

Thomas - Direct

1    Q.      Okay.  Why would a Fentanyl patch be added if a

2    patient was finding some relief from the pain?

3    A.      Medically, I do not know.

4    Q.      Okay.  Let's go to Page 247, please.

5            Okay.  First drug test here, and what date are

6    we in for collection?

7    A.      6/23/2004.

8    Q.      Okay.  What do we find with regard to

9    Ms. Silbereisen?

10   A.      The Oxycodone metabolites are detected, but the

11   parent drug is not.  Morphine is detected, but that has not

12   been prescribed.  And Fentanyl, the parent compound, is not

13   detected, but the metabolite is.  So she's had recent use,

14   but not very recent.

15   Q.      And what date was this reported to Dr. Titus?

16   A.      6/26/2014.

17   Q.      Okay.  Let's go to Page 140, please.

18           What's prescribed?

19   A.      Oxycodone, 15 milligrams on 7/7/2014.

20   Q.      Okay.  And Page 135.

21           What's prescribed?

22   A.      Oxycodone, 15 milligrams on 7/22/2014 and the

23   Fentanyl patch is increased to 100 micrograms per hour.

24   Again, 240 milligrams of Morphine equivalents per day on --

25   along with the Oxycodone.

Thomas - Direct

1    MR. WOODARD:  Okay.  And could you zoom out?

2    BY MR. WOODARD:

3    Q.    And what do we see with regard to the pill count date

4    here?

5    A.    The pill count date is predetermined as August 12th

6    and her prescription pickup on August 5th.

7    MR. WOODARD:  Okay.  And can you go back to the

8    prescription, Ms. Leal?

9    BY MR. WOODARD:

10   Q.    Okay.  Under Fentanyl patch, do we have the PRN?

11   A.    Yes.

12   Q.    Okay.  We talked about PRN earlier; is that right?

13   A.    Yes.

14   Q.    Does the same thought process apply with regard to

15   PRN and Oxycodone and those type of pills as with Fentanyl

16   patches?

17   A.    No, because while a patient could, under some

18   circumstances, use an Oxycodone tablet PRN, like let's say

19   they just had an operation, and they were given some

20   medication for post-surgical pain, that would appropriately

21   be used PRN.  One could never -- yeah, and the rarity with

22   which we say never in medicine, I want to emphasize.  One

23   could never use a Fentanyl transdermal system PRN.  It takes

24   12 hours for it to have its first effect.

25   Q.    Okay.  Let's go to Page 113, please.

Thomas - Direct

1          So about a month later, does Ms. Silbereisen

2    have a drug test?

3    A.     Yes, on 8/19 of 2014.

4    Q.     What do we see?

5    A.     She is positive for Oxycodone and its metabolites.

6    She's positive for Norfentanyl, the metabolite of Fentanyl,

7    and she is also positive for Morphine and Hydromorphone as

8    well as Naloxone.

9          Naloxone, also known as Narcan, is an opioid

10   reversal drug.  Naloxone would only be present, as far as I

11   can tell, under two circumstances.  One, is the patient had

12   had an opioid overdose reversed by a medical person, either

13   an EMT or an emergency medical technician or someone at a

14   hospital, or it could -- it's occasionally found in patients

15   who are using Buprenorphine, Suboxone, a drug for treating

16   addiction, because it's included in the Suboxone.  There

17   aren't other places where Naloxone enters into medical care.

18   Q.     Okay.  So let's see what was prescribed after this

19   test result.  If we could go to Page 121.

20          What do we see?

21   A.     Oxycodone, 15 milligrams, dispensing 74, and Fentanyl

22   transdermal, 100 micrograms per hour, dispensing ten

23   patches.

24   Q.     Okay.  On Page 110, please.

25          What does Dr. Titus do on October 9th of 2014?

1423

Thomas - Direct

1    A.      This is another of Dr. Titus' discharge letters

2    stating that as of that date, she would no longer be treated

3    and the reason given is because of the presence of Naloxone

4    in her urine drug screen.

5    Q.      Was Dr. Titus' only option to discharge this patient?

6    A.      No, certainly not.  Finding out why she had Naloxone

7    in her urine drug screen would have been in her best medical

8    interest to address whatever had happened in a medical way.

9    Q.      Having decided to discharge the patient, would a

10   subsequent prescription be outside the usual course of

11   professional practice?

12   A.      It would.

13   Q.      Let's look at Page 112.  What is this?

14   A.      This is a prescription for Oxycodone, 15 milligrams,

15   same number dispensed, and Fentanyl transdermal, 100

16   micrograms per hour, same number dispensed.

17   Q.      And Page 111.  What is this, Dr. Thomas?

18   A.      A second prescription for Oxycodone, 15 milligrams,

19   dispensing 74 after the patient had been discharged, more

20   than 20 days prior.

21   Q.      Dr. Thomas, in your opinion, was this prescription

22   for a legitimate medical purpose and within the usual course

23   of professional practice?

24   A.      The doctor-patient relationship had ended.  It could

25   not be.

Thomas - Direct

1    Q.    Were there other issues you saw with regard to this

2    patient that would weigh on your opinion as to this

3    prescription?

4    A.    Well, certainly.  The presence of Naloxone and

5    Morphine are clear signs of drug abuse, and the Naloxone in

6    particular is a sign of drug abuse that would be life

7    threatening in nature.  And therefore, the appropriateness

8    of continuing to give that patient full agonists, that is,

9    Schedule II opioids, in a way that depended upon her ability

10   to control her use, could not be for a medically legitimate

11   purpose.

12   Q.    Okay.  Let's finish our chart.

13            MR. WOODARD:  Ms. Leal, if you can go to

14   Exhibit 903.

15   BY MR. WOODARD:

16   Q.    And Dr. Thomas, what should we mark with regard to

17   Ms. Silbereisen?

18   A.    Multiple unexpected urine drug test results.  A lack

19   of intervention on the part of the physician.  Warning and

20   discharge letters.  And continued prescribing without

21   monitoring after discharge.

22            MR. WOODARD:  Okay.  Can you fill that out,

23   Ms. Leal?

24            All right.  Thank you.  You can take that down.

25   BY MR. WOODARD:

Thomas - Direct

1    Q.      Okay.  Dr. Thomas, other than the 14 patients

2    identified in the indictment, did you review any additional

3    patient files?

4    A.      Twenty-four.

5    Q.      Okay.  Why did you do that?

6    A.      Because you sent them to me and asked me to.

7    Q.      Okay.  How were these files selected?

8    A.      You informed me that they were selected randomly, but

9    from a statistical sample by a statistician who you

10   employed.

11   Q.      Okay.  Is it fair to say you didn't pick these files?

12   A.      I did not.

13   Q.      Okay.  And did you conduct or review using the same

14   methodologies we've described all day today?

15   A.      Precisely the same.

16   Q.      Okay.  We won't go through all of those patients, but

17   we'll just highlight a couple.  But before we do that, I

18   want to ask you some overall takeaways you may have observed

19   from your review of these randomly selected files.

20           So did you notice any changes in Dr. Titus'

21   medical records following entry of the Consent Decree?

22   A.      There tended to be -- the forms changed as had been

23   mandated by the Department of State.  So the -- the amount

24   of writing for the initial evaluations increased, although

25   it tended to be relatively repetitive.  And we tended to

Thomas - Direct

1   have the very repetitive second page in which virtually no

2   one had a positive review of systems and the repetition

3   of -- in almost all instances of the urine tox screens being

4   normative.

5   Q.      Did you see --

6   A.      And there were more forms involved.

7   Q.      Okay.  That's what I was about to ask you about.  Did

8   you see additional forms, like pain diaries and checklists?

9   A.      Yes.

10  Q.      In your review, did it appear that Dr. Titus took

11  into account those forms, that information into his

12  treatment of the patients?

13  A.      There was no obvious response to the papering of the

14  record.

15  Q.      Okay.  What about the history section of the progress

16  notes, and you talked this morning about the importance of

17  the history taking; right?

18  A.      Yes.

19  Q.      How did the history section appear across patients?

20  A.      The history tended to be very much the same.  It

21  contained, as we've seen, many of the same phrases from

22  patient to patient and was not necessarily descriptive of

23  individualized care.

24  Q.      Okay.  What about the part we've looked at regarding

25  the urine drug screen?

Thomas - Direct

1    A.      That was repeated and appeared to be copied.

2    Q.      Okay.  I think you used the word "papering" a second

3    ago.  Why did you say that?

4    A.      The insertion of forms, and charts, and things of

5    that nature, pain diaries only matters if the response of

6    the physician varies into -- in accordance with the

7    insertion of those papers as information.  Papers that

8    contain marks but don't contain information are papers.

9    They have nothing to do with the medically legitimate

10   treatment of the patient, because it is primarily the

11   interaction of the physician and the patient that generates

12   the medical service.

13   Q.      What about the physical exam portion of the notes,

14   what did you notice about those?

15   A.      As we noted, from time to time, there was a different

16   handwriting in those sections.  Very few of the physical

17   examinations contained what I would call an adequate

18   physical examination, even if only considering a part, like

19   the primary issue being back pain.  Because the back pain --

20   the examination for back pain is to determine what's going

21   on in your back and how it affects the nerves to your legs.

22   So that includes not just range of motion, but an anatomical

23   palpation.

24           So saying that you're tender from L3 to L5

25   doesn't mean anything.  Are you tender in the middle?  Is it

Thomas - Direct

1   axial tenderness?  Is it perivertebral tenderness?  Is it

2   vaccinial tenderness?  Is it sacroiliac tenderness?  Is it

3   muscular tenderness?  Where is it?  Is it above the waist?

4   Below the waist?  Is it in the hips?  Is it in the sciatic

5   notches?  Do you have a positive straight leg raise?  When I

6   tap on your knee and your ankle, do they move?  What are

7   your reflexes?  Are your toes down going?  What's your

8   strength?  Do you have a foot drop?  Are you -- do you have

9   some area where you're numb or not numb?  All of those

10  things literally take five minutes to do, and they are part

11  of the back pain exam.

12           And there -- and I've learned them.  I didn't

13  learn them when I was a fellow.  I learned them in 1982 when

14  I was a second-year medical student.  I can do them faster

15  now.

16           But that's what medicine is in physical

17  examination.  Even if you only say that you need to examine

18  the part, and you should do it at least once.

19  Q.     And Dr. Thomas, finally, so we were just talking

20  about physical exam, the history taking, all these things in

21  the form.  What about the part towards the end we looked at

22  over and over, the impression, diagnosis and treatment

23  objectives.

24           First off, is that one of the most important

25  parts of the note?

Thomas - Direct

1    A.      Certainly.

2    Q.      Okay.  Why?

3    A.      Well, it tells us what the medical decisionmaking is.

4    Because the service that we provide is a medical service and

5    one of the most important parts of that medical service is

6    medical decisionmaking.

7    Q.      Okay.  What did you observe with regard to that last

8    piece of the progress notes?

9    A.      It tended to be relatively repetitive, as above, see

10   below, and continuation of whatever treatment was going on.

11   Q.      And Dr. Thomas, with those being repetitive, is that

12   consistent with individualized patient treatment?

13   A.      No.

14   Q.      Okay.  Let's talk about this supplemental review you

15   conducted.  Was it 24 patients you looked at?

16   A.      Yes, it was.

17          MR. WOODARD:  Okay.  Ms. Leal, if you could call

18   up Exhibit 903 at Page 17.

19   BY MR. WOODARD:

20   Q.      What are we looking at here?

21   A.      This is a summary of my findings.  So I reviewed 24

22   patients, and I determined that for 19 of them, the

23   prescribing was not for a medically legitimate purpose in

24   the usual course of professional practice.  And for five of

25   them, I determined that the -- that the prescribing could

Thomas - Direct

1    not be stated to be not for a medically legitimate purpose

2    in the usual course of professional practice.

3    Q.    Okay.  Let's talk about a couple of these briefly.

4    Let's go to the column where you have five here, and I just

5    want to call out an example or two.

6          Does Ms. Patricia Bosley fit into this, the

7    column on the right?

8    A.    Yes, she does.

9    Q.    Okay.  And do you recall roughly the dates of

10   service?

11   A.    No.  I don't have that report with me, and I can't

12   tell you.

13   Q.    Okay.

14   A.    You'll have to show me.

15   Q.    Yeah.  Let's pull up Exhibit 171 at 14.

16          Okay.  What was Ms. Bosley prescribed by

17   Dr. Titus?

18   A.    In September of 2011, she was prescribed 180

19   Oxycodone, 15-milligram tablets.

20   Q.    Okay.  Let's go to Page 7.

21          So about a year later, what was Dr. Titus

22   prescribing?

23   A.    He decreased the dose to Percocet, Oxycodone,

24   Acetaminophen with an Oxycodone dose of ten milligrams.

25   Q.    Okay.

Thomas - Direct

1    A.     And decreased the number of tablets from 180 to 120,

2    and he referred her for physical therapy.

3    Q.     And whose prescription appears to be on the right

4    here?

5    A.     On the right, it's in a hand other than -- oh, I'm

6    sorry.  This is Sherel Ott, M.P.

7    Q.     Okay.

8    A.     On the left is Dr. Titus.

9    Q.     Okay.  And what was going on, if you know, around

10   March of 2012?

11   A.     This was during a period when Dr. Titus had not yet

12   been reinstated for prescribing controlled substances, and

13   he enlisted Ms. Ott to assist him in that regard.

14   Q.     Okay.  So when Ms. Ott came in, she gave a lower dose

15   prescription than Dr. Titus had been prescribing?

16   A.     Yes, considerably.

17   Q.     And let me show you Exhibit 171 at Page 2.  Is it

18   fair to say that Ms. Bosley had a consistent or expected

19   drug test result?

20   A.     Yes.

21   Q.     Okay.  For these reasons and others, based on your

22   review, what did you conclude about the prescribing with

23   respect to Ms. Bosley?

24   A.     That there -- that while the prescribing was not

25   perfect, it was for medically legitimate purpose and usual

Thomas - Direct

1    course of professional practice.  It's not just the dose,

2    it's the dose, and the manner, and the patient responses,

3    and the evidence or lack thereof that the patient should not

4    get the drug.

5            MR. WOODARD:  Okay.  And could we go to

6    Exhibit 903 at Page 18.

7    BY MR. WOODARD:

8    Q.    So this chart looks a little different.  What do we

9    have here?

10   A.    These are two patients who I found the prescribing to

11   be for medical legitimate purpose.  They had relatively low

12   doses and the doses decreased over time.  And their urine

13   drug screens were consistent with the medications they were

14   being prescribed.

15   Q.    Okay.  And let's just look at Ms. Lister real quick.

16           MR. WOODARD:  So Ms. Leal, if you could go to

17   Page 173 or Exhibit 173 at Page 2.

18   BY MR. WOODARD:

19   Q.    What strength was Dr. Titus prescribing to Ms. Lister

20   at this point?

21   A.    Oxycodone, ten milligrams, dispensing 60.

22   Q.    When you called out 60, was that for a certain

23   reason?  Was that lower than some of the other?

24   A.    Well, it's lower than almost all of the ones we went

25   through today where it was 70, 75, 80, 180, et cetera.

Thomas - Direct

1    Q.      Okay.  And if we could go to Page 7, please.

2            Did   Ms. Lister have a consistent or expected

3    drug test result?

4    A.      Yes, she did.

5    Q.      Okay.  Was this a fairly short patient chart, if you

6    recall?

7    A.      It was.

8    Q.      Okay.  And in the end, what did you conclude about

9    the prescribing to this patient?

10   A.      The prescribing was for medical legitimate purpose in

11   the usual course of professional practice.  There were no

12   adherences.

13   Q.      So let's go back to Exhibit 903 at Page 8.  And is

14   that correctly marked as to Ms. Lister?

15   A.      That's correct.

16   Q.      Okay.  And so is it fair to say this happened a few

17   times in your review of these randomly selected files?

18   A.      Yes.

19   Q.      But were there 19 instances where you found the

20   prescribing was outside the usual course of professional

21   practice?

22   A.      Yes.

23            MR. WOODARD:  Okay.  Your Honor, if I may?

24            THE COURT:  Unless if you're -- why don't we end

25   for the day.

1      MR. WOODARD:  I was about to suggest that,

2  Judge.  Thank you.

3      THE COURT:  All right.  So members of the jury,

4  before I let you go, I did want to tell you what I think is

5  happening in terms of the schedule.  And you know, it's

6  always difficult to know what to tell the jury because

7  trials are subject to things happening that you don't

8  expect, and so everything is always kind of tentative.

9      But what I expect, after talking with the

10  lawyers, is that Dr. Thomas is going to be the last

11  Government witness and that he should finish, you know, some

12  time towards the middle of the day tomorrow maybe.  And so

13  when he finishes, that's going to be it for tomorrow.

14      Part of scheduling witnesses for a trial that

15  you kind of, it's hard to tell when they're going to be

16  needed, is that Defendant's witnesses are going to be

17  starting to show up on Thursday.  And so based on what --

18  and there's one witness at least who isn't actually

19  available until Monday of next week.

20      So what I think is going to happen is I think

21  we're going to have a day, Thursday, where we'll have some

22  witnesses, but it won't take all day, but it may take most

23  of the day.  I think we won't have trial on Friday.  And

24  then we'll have trial on Monday, and that should be the end

25  of the defense case probably.  In which case, if it is or

Thomas - Direct

1    even if the case spills over a little bit into Tuesday, you

2    know, I'm thinking that we'll probably have closing

3    arguments on Tuesday of next week.  And if we do that, then

4    you'll get the case some time on Tuesday and then it will be

5    yours to deliberate about.

6              So don't go around making any plans for any of

7    these times because it's all tentative, but that's what I'm

8    sort of expecting.  And you know, sometimes it's nice, you

9    know, if you're sitting in the airport waiting for the

10   airplane and it's delayed, I'm always frustrated that they

11   don't tell you what's going on.  So that's kind of what's

12   going on.  And hopefully the airplane will take off on that

13   schedule, but you know, it's always subject to a later

14   change.

15             Okay.  So we will start tomorrow morning at the

16   same time as usual.  And once again, you were all on time

17   today, and I appreciate that.  And so let's do that for

18   tomorrow.

19             You know, again, make sure that you don't talk

20   to anyone about the case.  And even more important, don't

21   let anyone talk to you about the case, you know, by any

22   means, in person, telephone, computer, Internet.

23             And the other thing is don't do any research

24   about the case.  Make sure that everything that you learn

25   about this case, you learn here in court with all the rest

Thomas - Direct

1    of the jury and the parties.

2            All right.  So thank you for your attention

3    today, and you can take the jury out.  I'll see you tomorrow

4    morning.

5            (Jury leaving the courtroom.)

6            THE COURT:  All right.  So have a seat for a

7    second.  So what I'm expecting is tomorrow, whenever

8    Dr. Thomas is finished, and depending on what time he

9    finishes, maybe after a break, but to sort of go over the

10    jury instructions with you in this sense:  Other than with

11    the instruction for willful blindness, all the objections to

12    instructions are just a footnote saying one side or the

13    other objects.

14            So if you're the side that's objecting to

15    something tomorrow, I'd like you to be ready to explain to

16    me why you're objecting.  And if you actually have some

17    authority for your objection, to tell me what that is, too.

18            I may not rule on some or all of your objections

19    because I'm not all that inclined to start doing my own

20    research without knowing what the objector is actually

21    objecting to, what their basis is.  But I would expect that

22    we will for sure have a good draft of the jury instructions,

23    you know, by Friday.  So that's one thing.

24            In terms of the witnesses on Thursday -- so

25    actually skipping ahead, so one other thing that's occurred

Thomas - Direct

1  to me is you all have said or particularly the Defendant has

2  said, Yes.  Dr. Warfield, she'll be here on Monday.  She can

3  only be here on Monday.  You know, just based on the

4  observation of how long Dr. Thomas is testifying, are you

5  confident that if we don't have some ground rules that she

6  will be finished on Monday?

7              MS. KOUSOULIS:  Well, Your Honor, from our

8  perspective, we don't anticipate going through the evidence

9  the way the Government has.  So based on how long we expect

10  our direct to be, unless the Government plans on doing the

11  cross-examination similar to their direct examination of

12  Dr. Thomas, which if they are, they should let us know

13  because we won't be done with her, obviously, on Monday.  We

14  can't anticipate how the Government is planning on crossing

15  her, but we don't plan on getting into the same detail.

16              THE COURT:  Well, so again, I'm not holding you

17  to it, but are you saying you're imagining two hours of

18  direct examination or --

19              MS. KOUSOULIS:  Two to three hours, Your Honor.

20              THE COURT:  Okay.  So if they do that, is that

21  going to work with whatever your cross-examination plans

22  are?

23              MR. WOODARD:  Yes.  Just kind of speaking from

24  the cuff, but I would say like an hour of cross if they were

25  to do two to three hours of direct.  It may be even less.

Thomas - Direct

1             THE COURT:  Yeah?

2             MR. WOODARD:  Yeah.

3             THE COURT:  I don't want to be in a situation

4    where, you know, they take four-and-a-half hours, and then

5    you say, Well, we've got four hours of cross and, you know,

6    it's Monday at five o'clock and what am I going to do.

7             MR. WOODARD:  Right.  Right.  I won't do 14

8    patients as we did today with Dr. Warfield, that's for sure.

9             THE COURT:  Okay.  All right.  And I forget, I

10   may have lost track, I know -- oh, and Mr. Bostic, you said

11   there's some other witness who's out of town, and you don't

12   know what their status is.

13            MS. KOUSOULIS:  Yes.  Your Honor, there's two

14   things.

15            With regard to Monday, we just -- because we

16   weren't sure when we were going to have the tape back, we

17   expect to have it this week for the -- so that one is going

18   to be short, though.  I don't think she remembers anything,

19   so we'll basically play the tape.  But so that witness is

20   going to be on Monday before Dr. Warfield.  I don't

21   anticipate that's going to take very long.

22            And then there's one --

23            THE COURT:  So just to be sure, I would

24   recommend that that be after Dr. Warfield just in case.  You

25   know, if we only have so many hours on Monday, let's not

Thomas - Direct

1    start off with somebody who can be here on Tuesday unless --

2            MR. BOSTIC:  May I have a moment with

3    Ms. Kousoulis, Your Honor?

4            Your Honor, to clarify, after Ms. Kousoulis and

5    I spoke, we will need to put the Task Force Officer on right

6    before Dr. Warfield.  It doesn't fit in our case to call the

7    Task Force Officer last.  So I apologize for that, but I

8    assure the Court we will get done with Dr. Warfield, at

9    least on our direct, in two, two-and-a-half hours at the

10   outset, if that long.

11           THE COURT:  Okay.  All right.  Well, okay.  If

12   that -- all right.

13           But besides for the Task Force Officer, there

14   was somebody else, Mr. Bostic, who I thought you said was

15   out of town, which I did not think was a Task Force Officer.

16   Whatever that is, did you get that straightened out?

17           MR. BOSTIC:  We got that straightened out.

18   Ms. Kousoulis just reminded me that they also are not

19   available until Monday.  So --

20           THE COURT:  So we keep --

21           MR. BOSTIC:  -- we might have to end with that.

22           THE COURT:  I keep on digging up witnesses for

23   you that aren't until Monday.

24           MR. BOSTIC:  We may have to end with the Puccis

25   to make certain that Dr. Warfield --

Thomas - Direct

1    MS. KOUSOULIS:  That's fine.

2    MR. BOSTIC:  -- meets her schedule and the

3    Government has enough time to cross Dr. Warfield.

4    MS. REMIS:  The only question that I have, Your

5    Honor, is whether the Task Force Officer can go on Thursday,

6    if that's an option.

7    MS. KOUSOULIS:  Your Honor, it's not because I'm

8    not sure we're going to have the tape back by then.  So

9    that's it.  I don't think we're going to get that back.  I

10   think the earliest was Wednesday.  We might have it back on

11   Thursday, and that's because we got it late and we had to --

12   THE COURT:  Okay.

13   MS. KOUSOULIS:  I mean, we subpoenaed her.

14   Because we weren't sure, we subpoenaed her today for Monday

15   because we didn't want to make her come Thursday and Monday.

16   And you know, but if we get the tape in earlier than we

17   think and we can call her as last minute, and she can come

18   on Thursday, we have no problem putting her on Thursday.  We

19   didn't want to inconvenience her too much and expect her on

20   Thursday if we weren't ready for her.  But if the

21   Government -- and we don't have -- you know, we subpoenaed

22   her.  We don't have her information other than where she

23   works, and that's where my investigator, I'm assuming he

24   went today down to the University of Delaware to take the

25   subpoena.

1    So if the Court wants -- we don't have any other

2    way to contact her.  We don't have her contact information.

3    If the Government wants to see if she can be on-call for

4    Thursday, if we're able to, we can let them know tomorrow

5    whether or not we can call her on Thursday.

6         MS. REMIS:  I can speak with her, but we also

7    provided her email address.

8         MS. KOUSOULIS:  Right.

9         THE COURT:  Okay.  Well, you all should try to

10   stay in touch.  And just going to Thursday, leaving aside

11   this officer and the tape recording, what's your estimate of

12   how much of Thursday your witnesses will take up?

13        MS. KOUSOULIS:  Yeah, I don't think our

14   witnesses -- again, I don't know what the cross is going to

15   be like.  I think we're planning to call one fact -- in

16   addition to the officer, one fact witness and three to four

17   patients.

18        THE COURT:  So --

19        MS. KOUSOULIS:  We don't anticipate the patients

20   are going to be very long.  Similar, along the lines to most

21   of the patients that have been called, you know, already.

22   So we anticipate, you know, it would -- we don't anticipate,

23   even with cross, it taking the whole day.

24        THE COURT:  Okay.  All right.  Anything else you

25   want to talk about right now?

Thomas - Direct

1              MS. REMIS:  No, Your Honor.  Thank you.

2              MS. KOUSOULIS:  No, Your Honor.

3              MR. BOSTIC:  No, Your Honor.

4              THE COURT:  Okay.  Well, I'll see you tomorrow

5    morning at 9:00, though I'm going to be relatively

6    optimistic that you might not have anything for me.  But

7    I'll come and make sure.

8              DEPUTY CLERK:  All rise.

9              THE COURT:  All right.  Have a good evening.

10             MR. WOODARD:  You, too.

11             MS. REMIS:  You too, Your Honor.

12             (Court was recessed at 5:07 p.m.)

13             I hereby certify the foregoing is a true and

14   accurate transcript from my stenographic notes in the

15   proceeding.

16                    /s/ Heather M. Triozzi
                      Certified Merit and Real-Time Reporter
17                    U.S. District Court

18

19

20

21

22

23

24

25