1                    IN THE UNITED STATES DISTRICT COURT

2                      FOR THE DISTRICT OF DELAWARE

3

4    UNITED STATES OF AMERICA,    )
                                  )
5                Plaintiff,       )
                                  ) Criminal Action No. 18-45-RGA
6    v.                           )
                                  ) Trial Volume VI
7    PATRICK TITUS,               )
                                  )
8                Defendant.       )

9
                                      J. Caleb Boggs Courthouse
10                                    844 North King Street
                                      Wilmington, Delaware
11
                                      Wednesday, July 14, 2021
12                                    9:00 a.m.
                                      Jury Trial
13

14   BEFORE:  THE HONORABLE RICHARD G. ANDREWS, U.S.D.C.J.

15   APPEARANCES:

16               U.S. DEPARTMENT OF JUSTICE - CRIMINAL DIVISION
                 BY:  ALEZA S. REMIS, ESQUIRE
17               BY:  CLAIRE SOBCZAK, ESQUIRE
                 BY:  JUSTIN WOODARD, ESQUIRE
18
                                      For the Plaintiff
19

20               OFFICE OF THE FEDERAL PUBLIC DEFENDER
                 BY:  ELENI KOUSOULIS, ESQUIRE
21
                         -and-
22
                 THE BOSTIC LAW FIRM
23               BY:  EDSON A. BOSTIC, ESQUIRE

24                                    For the Defendant

25

Thomas - Direct

1                    ***  PROCEEDINGS  ***

2                    DEPUTY CLERK:  All rise.  Court is now in

3     session.  The Honorable Richard G. Andrews presiding.

4                    THE COURT:  All right.  Good morning, everyone.

5                    MR. WOODARD:  Good morning, Your Honor.

6                    THE COURT:  Is there anything that you want to

7     discuss with me?

8                    MS. KOUSOULIS:  Not from the Defense.

9                    MS. REMIS:  No, Your Honor.

10                    THE COURT:  Okay.  I'll see you again in a half

11    an hour.

12                    DEPUTY CLERK:  All rise.

13                    (Recess was taken.)

14                    DEPUTY CLERK:  All rise.

15                    THE COURT:  All right.  The jury is here; right?

16    So the jury is here, so we're ready to begin?

17                    MR. WOODARD:  Yes, Your Honor.

18                    (Jury entering the courtroom.)

19                    THE COURT:  All right.  Members of the jury,

20    welcome back.  Everyone, you may be seated.

21                    Mr. Woodard, you may continue.

22                    MR. WOODARD:  Thank you.

23                    CONTINUED DIRECT EXAMINATION

24    BY MR. WOODARD:

25    Q.    Good morning, Dr. Thomas.

Thomas - Direct

1    A.      Good morning.

2    Q.      Dr. Thomas, yesterday do you recall we were

3    discussing Fentanyl patches?

4    A.      Yes.

5    Q.      And occasionally, did we review some prescriptions

6    for 100-microgram Fentanyl patches?

7    A.      Multiple.

8    Q.      Okay.  I want to show you one of those quickly.

9              MR. WOODARD:  Ms. Leal, if we could go to

10   Exhibit 113 at Page 96.

11   BY MR. WOODARD:

12   Q.      Okay.  What do we have here, Dr. Thomas?

13   A.      These are prescriptions for Gregg Smith dated 9/19/13

14   that includes ten Fentanyl 100-microgram patches and 75

15   Oxycodone 15-milligram tablets.

16   Q.      And Dr. Thomas, when you pointed out to the jury the

17   100 micrograms, what was the importance of that?

18   A.      I think one of the things that we -- that's always in

19   my head, and I'm not sure I communicated is that the

20   100-microgram patch, and I think I said it repeatedly, has a

21   Morphine equivalents of 240 milligrams.  And while I know

22   that's a lot, I want to make sure that you know that that's

23   a lot.

24              So the reason that it's a lot is that when I

25   think of the risk of opioid prescribing, one of the numbers

Thomas - Direct

1  that I have in my head is that above 200 milligrams of

2  Morphine equivalents per day, the risk of fatality rises

3  to one in 32.  That's a three-percent chance at greater than

4  200 milligrams of Morphine equivalents per day over the

5  course of five years.

6          For a treatment for a benign -- a non-malignant

7  condition, that's a whole lot.  And so when I add that to

8  the rest of it, that number always feels very big to me.

9  Q.    And Dr. Thomas, when we see 100 micrograms of

10  Fentanyl, can you translate that to the Morphine, the

11  equivalent you're discussing?

12  A.    Yes, it's a hundred -- it's not just 100 micrograms.

13  It's 100 micrograms, which is equal to roughly ten

14  milligrams.  It's 100 micrograms per hour of every day of

15  every week of every year.  So 100 micrograms per hour is 240

16  milligrams of Morphine equivalents in a 24-hour period.

17  Q.    So you mentioned, again, the risks associated with

18  these drugs and, in particular this strength of Fentanyl.

19  Is this something you would expect to be discussed with the

20  patient in the informed consent process?

21  A.    Yes.

22  Q.    Did you see a discussion in Mr. Smith's file to that

23  effect?

24          MR. BOSTIC:  Objection, Your Honor, as to

25  whether the witness saw this discussion.  I believe notation

Thomas - Direct

1    will be the correct question.

2                  THE COURT:  I'm sorry, you believe what would be

3    the question?

4                  MR. BOSTIC:  Notation, Your Honor.  The question

5    is:  Did he see a discussion?

6                  THE COURT:  All right.  It's overruled.

7                  THE WITNESS:  I saw no specific discussion of

8    these risks.

9    BY MR. WOODARD:

10   Q.    And when we speak of these risks, and I know this

11   prescription doesn't show -- well, it shows Oxycodone, but

12   what if things like Ambien and Soma and other drugs you

13   described yesterday were prescribed in combination with the

14   Fentanyl we're discussing?

15   A.    Sedatives of all sorts increase the risk of opioid

16   prescribing because they work on a different part of the

17   brain, the part that wakes you up, while opioids work on the

18   part that controls your breathing.  And those two parts

19   together keep us alive when we're unconscious.  And when you

20   suppress both of them, the risk increases.

21   Q.    And Dr. Thomas, on this prescription, do we see the

22   PRN notation that we discussed yesterday?

23   A.    Yes.

24   Q.    Okay.  If a patient's pain varies from day to day or

25   goes down one day, should they be taking Fentanyl as needed,

Thomas - Direct

1    PRN?

2    A.      No, because they wouldn't be able to regulate the

3    dose.  Using Fentanyl transdermal on a PRN basis is never

4    appropriate.

5    Q.      Okay.  And what about with the other opioids we've

6    discussed so far in your testimony?

7    A.      The dose can be regulated by the physician.  So if a

8    patient -- if -- if the physician picks a dose, which is why

9    titration to effect matters, you start low and you go up

10   until you get to the right spot.  If the patient is using

11   less, then the physician should give them less.  If the

12   patient is using more then the physician has to make a

13   decision about whether or not more is appropriate.  So the

14   patient can always use less, but only the physician can

15   decide about more.

16   Q.      But once a certain dose is selected for a patient,

17   let's say for that month, are they supposed to take that

18   medication on a regular basis?

19   A.      Yes.  And if they end up taking less, that means that

20   they could take less, which is to use a lower dose.

21   Q.      All right.  Okay.  Let's get back to your

22   supplemental review and finish that discussion.

23              MR. WOODARD:  So Ms. Leal, if we could go back

24   to Exhibit 903 at Page 17.

25   BY MR. WOODARD:

Thomas - Direct

1    Q.      And Dr. Thomas, does this summarize your conclusions

2    as to the randomly selected patient files you reviewed?

3    A.      Yes.

4    Q.      And in the right column, far right column, you did

5    find in some instances there were prescriptions within the

6    usual course of professional practice?

7    A.      Yes.

8    Q.      And did we highlight a couple of those at the end of

9    your testimony yesterday?

10   A.      Yes.

11   Q.      Okay.  So out of the randomly selected patient files,

12   how many instances of prescribing did you find were not for

13   a legitimate medical purpose?

14   A.      Well, not instances, but for the patient, there were

15   19 patients for whom the prescribing met the standard for

16   not being for a medically legitimate purpose in the usual

17   course of professional practice.  It may have been more than

18   one prescription per patient.

19   Q.      Okay.  Thank you.

20           MR. WOODARD:  Ms. Leal, can you go to the next

21   slide.

22   BY MR. WOODARD:

23   Q.      And Dr. Thomas, are these the patients we discussed

24   at the end of your testimony yesterday?

25   A.      Yes.

Thomas - Direct

1   Q.     And are those patients where you observed things like

2   low doses or decreasing doses?

3   A.     Yes.

4   Q.     Okay.  And did you also observe consistent or

5   expected drug test results for those patients?

6   A.     That's correct.

7              MR. WOODARD: Okay.  Can we go to the next page,

8   Ms. Leal?

9   BY MR. WOODARD:

10  Q.     Okay.  Are these -- am I showing you on Page 19 here

11  two patients where you found the prescribing was not for a

12  legitimate medical purpose in the usual course of

13  professional practice?

14  A.     That's correct.

15  Q.     Okay.  And was Thomas Allen one of those patients?

16  A.     He was.

17  Q.     All right.  Did you review the patient files for

18  Mr. Allen?

19  A.     I did.

20             MR. WOODARD:  Okay.  Ms. Leal, if we could go to

21  Exhibit 141 at Page 48.

22  BY MR. WOODARD:

23  Q.     Is this a prescription to Mr. Allen?

24  A.     Yes, for Percocet, Oxycodone, Acetaminophen, 75

25  tablets.

Thomas - Direct

1   Q.      All right.  And what date are we at here?

2   A.      February 18, 2013.

3   Q.      Okay.  And are we after the Consent Decree?

4   A.      Yes, which was on March 22nd of 2012.

5   Q.      Okay.  All right.  Let's go to Page 46, please.

6           So did this patient have a drug test following

7   the prescription we just looked at?

8   A.      Yes, this was his first drug test that I saw in the

9   record.

10  Q.      And what's highlighted?

11  A.      He was positive for cocaine and notably negative for

12  Oxycodone.

13  Q.      Okay.  And I believe you used the word drug abuse a

14  few times yesterday?

15  A.      Yes.

16  Q.      Why were you highlighting that to the jury when you

17  saw instances of cocaine and things of that nature?

18  A.      Well, when we think about the relative

19  contraindications to giving patients ad lib access, that

20  means as they would like, to abusable drugs, giving abusable

21  drugs to drug abusers is relatively contraindicated.  You

22  shouldn't do it.

23          However, while there are rare instances where

24  one would consider in a patient who is -- who has a high

25  risk for drug abuse using the drugs, that's only with a very

Thomas - Direct

1   tight rein and tight control on the controlled substances

2   that the physician is providing.

3   Q.     Okay.  Okay.  So when was this test reported?

4   A.     This was reported on 3/7 of 2013.

5   Q.     Okay.  Did Mr. Allen continue to be prescribed

6   Oxycodone after this date?

7   A.     Yes.

8   Q.     Okay.  Let's take a look at Page 11, please.

9           Is this one of those prescriptions for

10  Oxycodone?

11  A.     Yes.

12  Q.     Okay.  And did Mr. Allen continue to have

13  inconsistent drug test results?

14  A.     Yes, and as you can note, Methadone was added later

15  in his course.

16  Q.     Okay.  Let's just look at one more test at Page 4.

17           And what do we see, Dr. Thomas?

18  A.     This test was performed on -- was collected on 11/26

19  of 2013, and he is positive for Oxycodone and metabolites.

20  He is positive for Methadone, but he is -- he has continued

21  to use cocaine, and he's also positive for amphetamine,

22  which colloquially on the street is called speed.

23  Q.     Okay.  And following this drug test, did Dr. Titus

24  continue prescribing opioids?

25  A.     I don't have that.

Thomas - Direct

1    Q.      How about I show you.

2            MR. WOODARD:  Let's look at Exhibit 1 or yeah,

3    Page 3, please.

4    BY MR. WOODARD:

5    Q.    Okay.  What is this a prescription for?

6    A.    Two weeks later he obtained a prescription for

7    Oxycodone, 15 milligrams, dispensing 80 and Methadone, ten

8    milligrams, dispensing 45.  You will note that the doses

9    have increased.

10   Q.    Okay.  And this is December 10th of '13?

11   A.    Yes.

12   Q.    I went -- jumped to the prescription here, but let's

13   go to Page 71.

14            Do you recall whether Mr. Allen received a

15   discharge letter?

16   A.    At some point, I believe he did.

17   Q.    Okay.  Can you see that?

18   A.    Yes.

19   Q.    Okay.  Is this a discharge letter on the same date as

20   that prescription we reviewed?

21   A.    That is correct.

22   Q.    Okay.  Similar to what we've seen with other

23   patients?

24   A.    Yes.

25   Q.    Okay.  So for this randomly selected patient file,

Thomas - Direct

1   what is your opinion as to the prescribing on the date of

2   discharge to Mr. Allen?

3   A.     That prescribing was for -- was not for a medically

4   legitimate purpose in the usual course of professional

5   practice.  And I think it's important when we go back to the

6   first urine drug screen that we had available is that very

7   early on, before Mr. Allen was dependent upon the drugs that

8   Dr. Titus was giving him, he let him know precisely who he

9   was and the way in which he used drugs.  And for drugs that

10  aren't clearly beneficial to the patient, knowing that you

11  are continuously prescribing to a drug abuser made, not just

12  the last prescription, but the earlier prescriptions, not

13  for a medically legitimate purpose in the usual course of

14  professional practice.

15  Q.     And Dr. Thomas, for a patient that the doctor learns

16  is abusing illicit drugs like cocaine, what would be the

17  usual course of professional practice in treating that

18  patient?

19  A.     First of all, to be careful.  To obtain history about

20  what they use, when they use, how they use, and how long

21  they've been using and to assess whether or not they're

22  suffering from a separate medical diagnosis, substance use

23  disorder.  And then to put that -- the risk of prescribing

24  to someone with substance abuse disorder into the context of

25  the risk of giving them opioids.  Because it's not a simple

Thomas - Direct

1    one off.  Although we know that opioids are always the last

2    choice, it's important to do all of the safer, simpler and

3    more effective things first.

4    Q.    Dr. Thomas, was Barbara Smith another of the randomly

5    selected files you reviewed?

6    A.    Yes, she was.

7              MR. WOODARD:  Okay.  Ms. Leal, if we could go to

8    Exhibit 169 at Page 36.

9    BY MR. WOODARD:

10   Q.    What was being prescribed to Ms. Smith?

11   A.    On May 7th, 2013, she was receiving Oxycodone

12   15 milligrams, dispensing 80; and Fentanyl transdermal,

13   50 micrograms per hour, dispensing ten.

14   Q.    Okay.  Is this May of 2013?

15   A.    Yes.

16   Q.    All right.  And let's look at Page 38.  Did Ms. Smith

17   receive a drug test?

18   A.    She did.

19   Q.    And what is shown?

20   A.    She is positive for Oxycodone and its metabolites,

21   but she is negative for the Fentanyl transdermal that she's

22   being prescribed.

23   Q.    Okay.  Can you read what's scratched out there?

24   A.    It says, "Patient counseled", but it's then deleted,

25   so I don't know what that means.  It seems like it started,

Thomas - Direct

1    but didn't complete.

2    Q.    Okay.  And can we go to Page 5, please.

3          Okay.  Was Ms. Smith another patient who was

4    discharged?

5    A.    She was discharged on July 15th of 2014.

6    Q.    Okay.  And let's look at Page 4.

7          Following discharge, was Ms. Smith prescribed

8    opioids?

9    A.    She was prescribed Oxycodone 15 milligrams on 7/15 of

10   2014.

11   Q.    Okay.  Was this prescription similar to the previous

12   prescription she had been receiving prior to discharge?

13   A.    Yes.

14   Q.    Okay.  Would this constitute a tapering dose?

15   A.    It would not.

16   Q.    And Dr. Thomas, what is the address here at the top

17   of this prescription, if you could read that, for Dr. Titus?

18   A.    10 North Church Street, Milford, Delaware.

19   Q.    Okay.  Is that similar to the address of many of the

20   prescriptions we've reviewed during your testimony?

21   A.    I hadn't noted.

22   Q.    I'm sorry?

23   A.    I hadn't noted.

24   Q.    Okay.  I'll try to point that out next time.

25   A.    Okay.

Thomas - Direct

1    Q.    Okay.  And what was your opinion as to the legitimacy

2    of this prescription to Ms. Smith?

3    A.    The prescriptions after discharge are never for a

4    medically legitimate purpose in the usual course of

5    professional practice.  The doctor-patient relationship

6    begins at the beginning.  It ends at the end.  And

7    prescribing after it's over is not part of the practice of

8    medicine.

9              MR. WOODARD:  Okay.  Ms. Leal, if we could go

10   back to Exhibit 903, at Page 19.

11   BY MR. WOODARD:

12   Q.    So for the two patients we just reviewed, did you see

13   a similar pattern as to the 14 patients we reviewed

14   yesterday?

15   A.    Yes.

16   Q.    Okay.

17   A.    There were unexpected drug urine screens.  There was

18   little or no intervention regarding that medical

19   intervention.  There were warning and discharge letters.

20   And after the completion of the doctor-patient relationship,

21   they continued to get controlled substances without

22   monitoring.

23   Q.    All right.  Okay.

24             MR. WOODARD:  Okay.  Let's go to the next -- I'm

25   sorry, Ms. Leal.  The next page of this exhibit.

Thomas - Direct

1   BY MR. WOODARD:

2   Q.      Okay.  So are we -- what are we looking at here?

3   A.      This is another five patients whom I reviewed.

4   Q.      And what did you find for these five patients?

5   A.      Similarly, that the prescribing was not for a

6   medically legitimate purpose in the usual course of

7   professional practice.

8   Q.      Okay.  And were these part of the randomly selected

9   files given to you?

10  A.      They were.

11          MR. WOODARD:  Okay.  And the next page,

12  Ms. Leal.

13  BY MR. WOODARD:

14  Q.      Same thing here, Dr. Thomas?

15  A.      Yes.  I reviewed all of these patients and came to

16  the same conclusion.

17          MR. WOODARD:  Okay.  Next page, please,

18  Ms. Leal.

19  BY MR. WOODARD:

20  Q.      Same result?

21  A.      Yes.

22  Q.      Okay.  These were all part of the randomly selected

23  patient files?

24  A.      Yes, they were.

25          MR. WOODARD:  Okay.  And one more page,

Thomas - Direct

1    Ms. Leal.

2    BY MR. WOODARD:

3    Q.     Okay.  And for these patients, did you, again, find

4    the prescribing was not for a legitimate medical purpose?

5    A.     Yes.  In the context of each of these patients

6    prescribing, their behavior and association with the drugs,

7    Dr. Titus' behavior in association with his prescribing

8    behavior and the overall results, I found that for none of

9    these patients was his prescribing for a medically

10   legitimate purpose in the usual course of professional

11   practice.

12            MR. WOODARD:  Could you back up one page,

13   Ms. Leal?  Or one more.  One more.

14   BY MR. WOODARD:

15   Q.     Okay.  Is Tyrone Blake one of the patients where you

16   made that conclusion?

17   A.     I did.

18   Q.     Let's just look quickly at Exhibit 144, at Page 9.

19            Okay.  For this randomly selected patient, did

20   he receive a drug test result?

21   A.     Yes.

22   Q.     And what does it show?

23   A.     It shows that he was positive for Oxycodone and its

24   metabolites and positive for cocaine and marijuana.

25   Q.     Okay.  Let's jump to Page 11, please.

Thomas - Direct

1   Was this patient discharged?

2   A.   Yes.

3   Q.   And what's the date?

4   A.   April 22, 2014.

5   Q.   Okay.  And Page 7, please.

6        What's the date on this?

7   A.   April 30, 2014.

8   Q.   Was Mr. Blake a patient of Dr. Titus' at this point?

9   A.   No, he was not.

10  Q.   Okay.  And what was prescribed?

11  A.   Opana ER 30 milligrams, and Oxycodone, 15 milligrams,

12  dispensing 30 and 76 respectively.  Remember, that Opana is

13  Oxymorphone, and Oxymorphone is twice as potent as

14  Oxycodone.  So Oxymorphone 30 milligrams is equal to 60

15  milligrams of Oxycodone, which is equal to 90 milligrams,

16  9-0 milligrams of Morphine equivalents.

17       So two of those per day is 180 milligrams of

18  Morphine equivalents plus an additional five of the

19  Oxycodone 15 per day, 75, 125.  So that's rough -- that's

20  over 200 milligrams of Morphine equivalents in those two

21  prescriptions.

22  Q.   And what was your conclusion as to the prescribing to

23  this patient?

24  A.   It was not for medically legitimate purpose in the

25  usual course of professional practice.

 1           MR. WOODARD:  Okay.  And Ms. Leal, could we go

 2    back to Exhibit 903 at Page 21.

 3    BY MR. WOODARD:

 4    Q.    Okay.  And was Jerry McCormick one of the patients

 5    who was randomly selected and you concluded the prescribing

 6    was not for a legitimate medical purpose?

 7    A.    Yes, absolutely.

 8           MR. WOODARD:  Okay.  Ms. Leal, can we go to

 9    Exhibit 145 at Page 64.  Can you blow -- can you zoom in,

10    please?

11    BY MR. WOODARD:

12    Q.    What do we see with regards to Mr. McCormick?

13    A.    This is a telephone message from the staff that

14    appeared in his chart, and it states someone called stating

15    that Mr. McCormick is selling his pills to get crack.  They

16    suggest that -- they suggest to do a drug test to check.

17    Q.    Okay.  And what year are we in?

18    A.    We're in October 2011.

19           MR. WOODARD:  Okay.  Let's jump to Page 130,

20    please.

21    BY MR. WOODARD:

22    Q.    And was -- did Mr. McCormick receive drug tests?

23    A.    This is the first drug test after that phone call

24    that I was able to see in the medical record.  It is dated

25    11/28/2012, one year and one month after the call.

1462

Thomas - Direct

1    Q.      What did the drug test show?

2    A.      That the caller was right.  Mr. McCormick was using.

3                    MR. BOSTIC:  Your Honor, I object to that.

4                    THE COURT:  Yeah, I'm going to sustain the

5    objection.  I'm going to strike the last answer and, members

6    of the jury, you should ignore it.

7                    Go ahead.

8                    MR. WOODARD:  Okay.  Thank you.

9    BY MR. WOODARD:

10   Q.      Just on the face of this document, what did the drug

11   test show?

12   A.      The drug test showed that, indeed, Mr. McCormick was

13   using cocaine.

14                   MR. WOODARD:  Okay.  Could we go to the next

15   page, Ms. Leal.

16                   THE WITNESS:  And importantly, he was negative

17   for the drugs being prescribed.

18   BY MR. WOODARD:

19   Q.      Okay.  And what was the report date on this drug test

20   result?

21   A.      11/30/2012.

22   Q.      Okay.  Let's go to Page 55, please.

23                   So what was prescribed a year after this phone

24   call and shortly after this drug test result?

25   A.      More Methadone, ten milligrams, dispensing 30; and

1   Oxycodone, 15 milligrams, dispensing 75.

2   Q.     Okay.  And did you see additional drug tests with

3   inconsistent results for this patient?

4   A.     Yes.

5   Q.     Did you also see continued prescribing of opioids?

6   A.     Yes.

7   Q.     And what was your conclusion, Dr. Thomas, regarding

8   whether these prescriptions were legitimate and in the usual

9   course?

10  A.     They were not for a medically legitimate purpose in

11  the usual course of professional practice, particularly

12  given that there was positive evidence that there was

13  concern that Mr. McCormick was, A, an abuser of cocaine,

14  either in crack or powder form; and that there was positive

15  evidence that he was not using the medications he was being

16  prescribed in that manner, having negative drug screens

17  suggestive of diversion.

18              MR. WOODARD:  Okay.  Okay.  You can take that

19  down, Ms. Leal.

20  BY MR. WOODARD:

21  Q.     Okay.  Dr. Thomas, have we reviewed several discharge

22  letters throughout your testimony?

23  A.     Lots.

24  Q.     Okay.  And upon discharge in the usual course is

25  followup and referrals, are those the types of things you

1464

Thomas - Direct

1   would expect to see in the usual course?

2   A.     Referrals and, for many of these patients, specific

3   referrals given the problems that they presented with.

4   Q.     Okay.  Okay.

5          Dr. Thomas, I'm showing you what's actually a

6   Defense exhibit containing a packet of discharge letters and

7   let me get the number here.  Defense Exhibit 501A.

8          And does this patient stand out to you?

9   A.     Yes.  This is Mr. Allen.

10  Q.     Okay.  Is this a discharge letter?

11  A.     Yes, it is.

12  Q.     Okay.  And have we already seen a prescription to

13  Mr. Allen on the date of discharge?

14  A.     Yes, we did.

15  Q.     Okay.  Is this a patient we have not discussed?

16  A.     No.  I haven't seen this one recently.

17  Q.     Okay.  Is this a discharge letter for Ms. Irving?

18  A.     Yes.

19  Q.     Okay.  And what's the date of this discharge letter?

20  A.     12/4/2013.

21  Q.     So is it fair to say, Dr. Titus discharged

22  Ms. Irving?

23  A.     Yes, for having three negative drug screens for the

24  drugs prescribed.

25  Q.     Okay.  And what was prescribed on December 5th of

Thomas - Direct

1    2013?

2    A.    More Oxycodone 15 milligrams, 75 tablets.

3    Q.    And what's the address on the prescription listed at

4    the top?

5    A.    10-12 North Church Street.

6    Q.    Okay.

7    A.    Milford.

8              MR. WOODARD:  Okay.  Ms. Leal, could we call up

9    Exhibit 803, please.  And can you go to Page 4.

10   BY MR. WOODARD:

11   Q.    Okay.  Dr. Thomas, do you see the caption of this

12   "Drug Test Administered"?

13   A.    Yes.

14   Q.    And have we reviewed a number of drug tests in your

15   testimony?

16   A.    Yes.

17   Q.    Okay.  On the first column there, for the sample

18   patient files analyzed, how many inconsistent drug test

19   results were there?

20   A.    874.

21   Q.    Okay.  And how many patients are we talking about?

22   The next row?

23   A.    230.

24   Q.    Okay.  And how many prescriptions for the drugs of

25   interest, which I'll show you in a minute, were there after

Thomas - Direct

1    inconsistent drug test results?

2    A.     7,241.

3              MR. WOODARD:  The next page, please, Ms. Leal.

4    BY MR. WOODARD:

5    Q.     Dr. Thomas, do you see the title of this, "Patients

6    with counseling or discharge letter"?

7    A.     Yes.

8    Q.     Okay.  Do you see the number of patients, this is the

9    first column, that had a discharge -- I'm sorry, the third

10   column, number of patients with a discharge letter?

11   A.     Yes, 87.

12   Q.     Okay.  And on the bottom there, how many

13   prescriptions were written to patients after their discharge

14   letter?

15   A.     383.

16   Q.     Is this consistent with your observations related to

17   Counts 1 through 14 and most of the 24 randomly selected

18   patient files you reviewed?

19   A.     Yes.  It was Dr. Titus' practice.

20   Q.     Can we go to Exhibit 801, please.  And let's go to

21   Page 2.

22             Okay.  Are these -- this is titled "Drugs of

23   Interest."  Are these the -- some of the drugs or most of

24   the drugs that you saw prescribed in this case?

25   A.     Yes.

Thomas - Direct

1    Q.    Okay.  Let's go to Page 9, please.  And I'm sorry,

2    could we go back to Page 2.

3              Did you see various combinations of these drugs

4    prescribed at times?

5    A.    Yes.  The combination of Endocet -- Endocet and

6    Percocet are the same thing, although they're at different

7    ends of the alphabet.  They were prescribed frequently along

8    with Fentanyl.  And Oxycodone, as we know, is frequently

9    prescribed with Fentanyl.

10             Oxycodone and Oxycontin.  Oxycodone and

11   Oxymorphone were frequently prescribed together.  We've seen

12   all of those combinations.

13             MR. WOODARD:  Okay.  Can we go to Page 9,

14   Ms. Leal.

15   BY MR. WOODARD:

16   Q.    Okay.  What is this slide showing, Dr. Thomas?

17   A.    This is the most frequently prescribed drugs from

18   Dr. Titus' practice between November 4th of 2013 and

19   December 31st of 2014.

20   Q.    And what was the most prescribed drug and dose?

21   A.    Oxycodone 15 milligrams was the most frequently

22   prescribed drug.

23   Q.    What was next?

24   A.    The second most frequently prescribed drug was

25   Methadone, ten milligrams.  This was of concern because in

Thomas - Direct

1  the model policy, in the 2013 revision that was published in

2  July of 2013, it specifically warned about the difficulties

3  that were being seen with prescribing Methadone to pain

4  patients for those who were not familiar with the drug's

5  pharmacology.

6           Additionally, even before that, the FDA had put

7  a -- what's called a black box warning on the prescribing

8  information.  So every drug comes with the thing that your

9  pharmacy gives you that you throw away without reading that

10  has a lot of stuff on it about the precautions of the drug.

11  But for the physician, the black box warning regarding

12  Methadone is something -- for any drug is the part that you

13  definitely read and don't throw away.

14           And the concerns about Methadone in terms of the

15  cardiovascular dysfunction and the difficulties with people

16  taking Methadone appropriately was something that physicians

17  were warned about repeatedly.  So to have Methadone as the

18  second most frequently prescribed drug was a concern.

19           MR. WOODARD:  And could we go to Page 13,

20  please.

21  BY MR. WOODARD:

22  Q.    Okay.  And it says "Prescription History" at the top

23  for one of the patients.  What are we showing here?

24  A.    This is for Mr. Hood, and these are the sequence of

25  prescriptions he received.  And for this chart the -- he

1   prescribed, Dr. Titus wrote prescriptions every two weeks.

2   So there's a lot of lines, but I think the thing that stands

3   out to me is that for this patient and for many others, the

4   place where we started was already at a high dose because

5   90 milligrams -- I'm sorry, 75 milligrams of Oxycodone per

6   day, 15 milligrams five times a day, if the patient was

7   taking the drug as prescribed, would be 125 milligrams of

8   Morphine equivalents.

9            So we're already over 100 milligrams Morphine

10  equivalents at the beginning.  This is dumping half a box of

11  salt into the sauce before you start.

12           MR. WOODARD:  And could we scroll down to

13  patient Scott Jones, Ms. Leal.

14  BY MR. WOODARD:

15  Q.    Okay.  What did you observe with regard to the dosage

16  and prescriptions to Mr. Jones?

17  A.    Once again, Mr. Jones, from the beginning he's

18  getting 180, which ostensibly would be six Oxycodone

19  15 milligrams per day if he took them as prescribed.  So

20  that would be 90 milligrams of Oxycodone equal to

21  135 milligrams of Morphine equivalents and Opana

22  40 milligrams twice daily.

23           If he took them as prescribed, that would be

24  80 milligrams of Opana, which is 240 milligrams of Morphine

25  equivalents.  When you add those up, we're at 375, 385.  No,

Thomas - Direct

1   375, 375 milligrams of Morphine equivalents to start.  This

2   is the whole box of salt.

3               MR. WOODARD:  And could we go back to Mr. Hood

4   briefly, Ms. Leal.

5   BY MR. WOODARD:

6   Q.    Dr. Thomas, if you were to learn that Mr. Hood had

7   been receiving opioid prescriptions from another doctor

8   before seeing Dr. Titus, would that make these prescriptions

9   necessarily legitimate?

10  A.    No.

11  Q.    Why not?

12  A.    Every physician is responsible for every prescription

13  that they write as a matter of independent judgment.  Nobody

14  can make another doctor's judgments for them and you can't

15  say I didn't think about it.  That's not the practice of

16  medicine.  The practice of medicine is individual judgment

17  of one person for the medical -- best medical interest and

18  benefit of another.

19              MR. WOODARD:  Ms. Leal, could you scroll to

20  Ms. Delores Perry's prescription history.  Okay.

21  BY MR. WOODARD:

22  Q.    What did you observe with regard to the prescribing

23  here?

24  A.    Again, from the beginning, we're at high dose.

25  Always a concern.  And while there was on the other side of

Thomas - Direct

1    the Consent Decree, there was a step down, which I would say

2    was certainly at least appropriate relative to the other

3    prescribing.  It continued in a relatively high dose.

4                MR. WOODARD:  And let's go to Gregg Smith,

5    please.

6    BY MR. WOODARD:

7    Q.    What stood out to you about Gregg Smith's

8    prescription history?  Did you notice whether Mr. Smith

9    received two short acting?

10   A.    Yes.  The -- so the idea that one would give a

11   patient two opioids at the same time is based on a practice

12   of giving a long-acting drug to sort of put in a floor and a

13   shorter acting drug for incident pain.  It's a concept

14   borrowed from cancer pain management where it works quite

15   well.  It doesn't work quite as well in non-cancer pain;

16   however, there is some support for that.

17                To give someone two short-acting drugs where the

18   drug is fast in and fast out is -- makes no sense at all

19   because they both -- all opioids do what opioids do.

20   Q.    And which ones are the short acting, just so we're

21   clear?

22   A.    The Hydrocodone and Ibuprofen and the Oxycodone 15

23   milligrams at the beginning of this prescription history are

24   both short-acting opioids.

25                MR. WOODARD:  Okay.  We can take that down,

1    Ms. Leal.

2    BY MR. WOODARD:

3    Q.     Just a few final questions for you, Dr. Thomas.   If

4    you were to hear that the patients Dr. Titus treated were

5    difficult patients, how would you respond to that?

6    A.     I wouldn't be surprised that they were human because

7    patients are difficult.   Medicine is difficult.   Are

8    patients in pain more difficult?   Only for those lacking

9    compassion.   They -- so they whine.   So they moan.   So they

10   scream.   That's the job.

11   Q.     And Dr. Thomas, just because a patient might be

12   difficult or suffer from a substance abuse disorder, does

13   that mean they don't deserve care that's for a legitimate

14   medical purpose?

15   A.     It calls upon more from us if we decide to venture

16   into the field.   I -- I mean, people have asked me:   How do

17   you do pain medicine for your entire career?   And the answer

18   is:   You take histories, do physical examinations, and don't

19   take it personally.   The job is to say yes when you're

20   supposed to say yes and say no when you're supposed to say

21   no because it is in the best interest of the other person.

22   Q.     Dr. Thomas, if you were to hear that pain is totally

23   subjective, what would you say to that?

24   A.     That's untrue, and we each know it to be untrue.

25   While I do not feel anyone else's pain and I can't tell them

Thomas - Direct

1   anything about it, we all understand that pain is not just

2   completely subjective.  It's also social.  So we can see

3   another person be injured and wince.  But if we see someone

4   screaming from a paper cut, we roll our eyes.  We expect --

5   because what we actually deal with is not other people's

6   pain, but with their pain behavior.

7            So someone can come in with a horrific injury

8   and be stoic.  I can ask them about their pain and I can

9   accept their -- their experience as being valid.

10           But what we're really talking about here is not

11  just pain, because pain is both personal and social.  We're

12  talking about something from the outside in.  We're talking

13  about, the practice of medicine, and the practice of

14  medicine is objective.  It must be based upon what is

15  observed.  It must be based upon what is thought.  It must

16  be based upon a rational, logical process which, as I

17  mentioned previously, is related to the other person's pain.

18  But it's not solely based upon their pain complaints because

19  that's simply their pain behavior.

20           Now, if I can help someone with their pain

21  behavior by helping them with their internal experience,

22  that's great.  But the practice of medicine is about doing

23  what's best.

24  Q.   Dr. Thomas, if it were to be said that urine drug

25  screens are notoriously difficult to interpret, what would

Thomas - Direct

1    you say?

2    A.    They -- some urine drug screens can be subjective to

3    some variability, and we've seen a couple of those, like the

4    ones from the hospital that didn't contain all of the

5    metabolites and didn't contain all of the concentrations.

6    They were literally screens, not tests.

7          But when we got to the ones that were labeled MS

8    that I said, let's call them more sensitive, it stands for

9    mass spectrometry.  It means that the test is the test.  And

10   the need to -- so there are some things to interpret in

11   them, like when you see Morphine and Codeine, is that heroin

12   or is that Morphine contaminated with Codeine.  That's

13   interpretation and that may be higher level than necessary.

14         But if the patient's on Oxycodone and you see

15   Morphine, then the interpretation is called a reading.  This

16   ain't that.

17         So the idea that doctors can't read what's

18   written is silly.  The idea that there's special

19   interpretation to things that are obvious is -- makes no

20   sense to me.  It's not that hard.

21   Q.    Dr. Thomas, if you were to hear that it would be

22   unethical to cut patients off opioids after discharging

23   them, what would you say?

24   A.    For many of these patients, the most unethical thing

25   that one could possibly do is to give them abusable drugs.

1  Withdrawal is painful.  The people who have negative urine

2  drug screens who are not taking the medication, and I can

3  say that I know that they're not taking the medication

4  because if they were taking the medication it would be in

5  their bodily fluids, that person does not need to be treated

6  with an opioid for withdrawal because it's either already

7  over or it never started.

8          And if the problem is withdrawal, in the United

9  States there are two drugs that are opioid -- that are

10 controlled substances that are useful for withdrawal.  One

11 is Methadone, but you have to be in an outpatient treatment

12 facility to use it for the treatment of addiction.

13         And the other is Buprenorphine or Suboxone.  And

14 every physician can get a DEA number after a little training

15 to use that drug for that purpose.

16         Otherwise, there are other drugs to use for

17 withdrawal that won't kill you.  But giving an addicted

18 individual an abusable drug because you're concerned about

19 withdrawal is not taking care of that person medically.

20 That's not the practice of medicine.  It's something else.

21         And lastly, when the doctor-patient relationship

22 ends, it ends.  I don't call my ex-wife up for sleep overs.

23 We're divorced.  It is done.

24         That relation -- so I mean, we act like medicine

25 is not like the other relationships in our lives.  It's

Thomas - Direct

 1   exactly like that.  It's about human beings.

 2   Q.     Two more, Dr. Thomas.

 3          Should a doctor always prescribe drugs that a

 4   patient wants?

 5   A.     No, obviously not, particularly when the patient is a

 6   person who has a brain disease that causes them to use a

 7   drug that is causing them harm for which they crave, for

 8   which they have compulsion, for which they have loss of

 9   control, for which they are doing things that are dangerous

10   for them like overdosing and getting dumped in front of the

11   ER.  We, obviously, should not give that person what they

12   want because what they want might kill them.

13   Q.     What would you say in response to a claim that a

14   doctor can't control what a patient does with their drugs?

15   A.     That's true.  Never tried, but the doctor's job is to

16   decide which patients he gives control of the controlled

17   substance to.  As important as it is to know what patient --

18   what disease the patient has is to know what patient has the

19   disease.  Knowing who that person is is what the doctor is

20   supposed to do.

21          So he doesn't have to control what the patient

22   does.  He has to control what the doctor does.

23   Q.     So Dr. Thomas, is this about the patient's choices or

24   the doctor's choices?

25   A.     Everything I talked about has been about the doctor's

Thomas - Cross

1    choices.  Some of the patients are ill, some of the patients

2    are denying, some of the patients are this and that and the

3    other thing, but the doctor had free independent choices to

4    make based upon information that he had available to him.

5    And so it's all about what the doctor does.

6              MR. WOODARD:  Thank you, Dr. Thomas.  No further

7    questions.

8              THE COURT:  All right.  Mr. Bostic.

9              MR. BOSTIC:  Thank you, Your Honor.

10                        CROSS-EXAMINATION

11   BY MR. BOSTIC:

12   Q.    Good morning, Dr. Thomas.

13   A.    Good morning, sir.

14   Q.    You would agree with me that in the field of

15   medicine, on occasion doctors talk about the difficult

16   population of patients in terms of treatment and treatment

17   modalities?

18   A.    I don't know what you mean by "difficult."

19   Q.    Okay.  Not every disease or medical issue is as easy

20   as another to treat and diagnose; is that right?

21   A.    Sometimes.  Some things work for some people

22   sometimes.  Sometimes what we do works and we get the

23   desired result, and other times what we do doesn't work and

24   we don't get the desired result.  We are frequently impotent

25   as practitioners to get the result that we want.

Thomas - Cross

1    Q.      Now, you started -- the questioning from the

2    Government started with you concerning the model plan, the

3    2013?

4    A.      The model policy.

5    Q.      I'm sorry, the model policy.  And also the opioid

6    treatment guidelines, the article that was referred to by

7    you as well?

8    A.      Yes.

9    Q.      All right.  And you would agree with me that the

10   model policy and the treatment, opioid treatment guidelines

11   really sets up a framework for doctors to consult with and

12   consider in how they practice medicine in the area of pain,

13   chronic pain management?

14   A.      The model policy and the American Academy of Pain

15   Medicine Guidelines represent best practices for physicians

16   practicing in the area of opioid prescribing.

17   Q.      And they make recommendations that doctors should

18   consider in practicing in the area of chronic pain

19   medication?

20   A.      Best practices are not just for consideration.

21   They -- while they don't tell you what to do, they tell you

22   what to think about.  And what we think about will generate

23   what we do.  They are not binding in the way of -- they're

24   not a cookbook.  Medicine is not done from books alone, but

25   they do represent the center line and the best practices

Thomas - Cross

1   about how we think about the problem.

2   Q.    For example, there was a lot of discussion about pill

3   counts during your testimony over yesterday; am I correct?

4   A.    We discussed pill counts, yes.

5   Q.    And you indicated that pill counts must be random?

6   A.    In order to accomplish the purpose, they must be

7   random.   Yes.

8   Q.    And I believe you said that the State Board -- the

9   model policy required that they be random?

10  A.    The model policy mentions pill counts as well as the

11  guidelines.   The thought behind pill counts requires that

12  the patient not know that their pills are going to be

13  counted.

14  Q.    My question to you was whether or not the model

15  policy states that pill counts must be random?

16  A.    I do not know if it -- if it has that specific

17  language in it because, as I said, it's not a cookbook.

18  However, the entire -- the thought process behind a pill

19  count is that one will be able to gauge what the patient's

20  rate of consumption of the drug is.   I know from my personal

21  experience that there's also a market for borrowing drugs in

22  order to beat pill counts.   I've seen that in my own

23  practice.

24          So having the patient know when the pill count

25  is is an invitation to say, Set off this number of pills so

Thomas - Cross

1   you can show them to the doctor on Tuesday and eat them on

2   Wednesday.  In order for it to accomplish its clinical

3   purpose, the thought process behind it, it must be random.

4                I do not know if that says that in the model

5   policy, but that's what I've thought about pill counts for

6   the past 20 years.

7   Q.    So I'm going to ask my question again because I

8   believe you said it several times.  Did you or did you not

9   say that the model policy states that pill counts should be

10  random?

11               That's a yes or no question.  I just want to

12  move on from here.

13  A.    I don't know.

14  Q.    Okay.  You had a discussion with the Government about

15  medical treatment and cash payments during the course of

16  your testimony yesterday?

17  A.    Yes.

18  Q.    All right.  And would it be fair to say that the --

19  in the medical field, at least at present, there's no

20  universal health care --

21  A.    Yes.

22  Q.    -- that covers individuals, every person in the

23  country?

24  A.    That is correct.

25  Q.    Is that right?

1    Some people have insurance, and some people have

2    Medicare or Medicaid, and some people have nothing at all;

3    would that be fair to say?

4    A.    That is correct.

5    Q.    And for those that don't have coverage or have

6    coverage that doesn't cover a particular type of treatment,

7    they have to resort to paying out of pocket?

8    A.    Yes.

9    Q.    All right.  And so the payment for medical services

10   in cash in and of itself says no more than perhaps an

11   insurance company doesn't cover a particular treatment or

12   the individual has no other recourse than to use his or

13   her own money to make the payment for the office visit?

14   A.    You will remember that the first thing that I said

15   about the payments in cash was there is no prohibition

16   against cash payments for medical services.

17   Q.    Now, I think the Government, and you also discussed,

18   I'm going to see if I can recall specifically.  I think

19   Mr. Woodard asked you a question about what does patients

20   being on Medicare mean.  And you talked something about the

21   past social history, but you said this, and I want to get to

22   it.  Before a doctor -- before I was a doctor, I knew that

23   persons -- persons were indigent.  If an indigent person

24   comes to me and will pay me several hundred dollars for

25   pills, that is of great concern.

Thomas - Cross

1     Do you remember that?

2  A.     Yes, I remember it.

3  Q.     And you said every physician knows that pills have a

4  street value.

5  A.     Yes.

6  Q.     And you said if I give an indigent person a bottle of

7  pills, I must be concerned about where the money is coming

8  from and that they're -- why they're paying me?

9  A.     Yes.

10  Q.     Right.  And then you went on to say this and you

11  put -- you went into street value of Oxycodone pills?

12  A.     Yes.

13  Q.     I assume it was your intent to suggest to this jury

14  that when poor people go to the doctor and they have to pay

15  cash for their medication, that they are more likely to go

16  in the street and sell that medication than a person who has

17  insurance?

18  A.     No.

19  Q.     So you agree with me, then, that just because a

20  person is poor and has to pay out of pocket, that they're

21  not anymore likely than any other person to sell their

22  prescription?

23  A.     If that were all of the information and the amount

24  that was paid was equivalent to the amount that would be

25  paid with insurance, then I might agree with that.  But

1   given that that's not all of the information we have and the

2   amount that is paid with insurance was considerably greater

3   than the amount that would be paid by Medicaid for the same

4   service, I cannot agree with that.

5   Q.     Well, isn't it true that with respect to insurance,

6   the insurer, whether it's Medicaid or United Healthcare,

7   cuts a global deal with the provider where they pay "X"

8   number of dollars versus the individual who has to pay out

9   of pocket; isn't that correct?

10  A.     That depends upon the practice.  So for example, one

11  of the things that is not understood about the business of

12  medicine is that there are charges and there are receipts.

13  The amount that the physician -- the physician can charge

14  whatever he likes for.  For most insurers, there is what's

15  called a fee schedule, and that fee schedule contains a list

16  of fees that they will pay for giving services.

17             And if one is participating with that insurer,

18  then one has agreed to accept that amount of money.

19  However, most insurance companies do not pay the amount of

20  the charges, and so it's up to the physician what they will

21  accept for their services.  To decide that a person who

22  can't afford health insurance and was on Medicaid should pay

23  me three to four times the amount that Medicaid would have

24  paid me when I was seeing him under that -- under that

25  agreement, in my own personal experience, I do not feel is

Thomas - Cross

1    reasonable.  Others can decide differently.  But if I have a

2    poor person paying me several hundred dollars, then one of

3    the things that would generally occur is we would have a

4    social history where they would tell me about what they did

5    and -- what they did during the day, and what their

6    activities were and almost always, even with my patients

7    that have jobs and are insured, the issue of how to pay for

8    medical services arises as part of that interaction.

9    Q.    So Dr. Thomas, you're talking a lot about what you

10   would do personally; right?  In your last answer, you talked

11   about what you might do?

12   A.    My last answer was personal, yes.

13   Q.    Right.  Now, you would agree with me that most

14   doctors don't set their fee schedule the way you do by

15   questioning a person, Can you afford "X" number of dollars

16   or are you making "X" number of dollars a month or a week?

17   That would be true, right, most doctors?

18   A.    Most doctors who see patients who are on Medicaid

19   participate with Medicaid.

20   Q.    So you didn't answer my question.  So I want to take

21   you back to that question, and then we'll get to what you

22   just said.

23         Most doctors do not determine how to charge a

24   patient for services based upon an analysis of how much that

25   person is making a week or a month; would that be true?

Thomas - Cross

1    A.      I don't know.

2    Q.      Really?

3    A.      I have never done a survey of what most doctors do

4    with indigent patients, so I told you what I do.

5    Q.      Okay.  When you were -- I think your credentials say

6    that you worked as a director of a pain management clinic?

7    A.      Yes.

8    Q.      Right.  And you had other doctors working with you;

9    correct?

10   A.      Yes.

11   Q.      Okay.  And you have doctors in the medical -- you

12   know, doctors in your field, you know, people in your field

13   beyond those that work with you?

14   A.      Yes.

15   Q.      And you're telling the jury here today that you have

16   no concept as to how other doctors go about setting fee

17   schedules?

18   A.      Doctors don't talk about money a lot because price

19   fixing is against the law.  However, when I was the Medical

20   Director of the Mercy Hospital Pain Management Center, we

21   did discuss with indigent patients how they were going to

22   pay their bills because Mercy Hospital was a Catholic

23   institution and we had a mission to take care of them.

24           So I'm not sure how other doctors do it;

25   however, if the social history is that a person is poor or

Thomas - Cross

1    indigent, and the social history is a standard part of the

2    medical history, then some consideration about how someone

3    is bringing me several hundred dollars a month has to enter

4    at least into my thought process.  It does not mean that

5    they are selling the pills, but if they then show up with a

6    negative urine drug screen and a phone call from somebody

7    saying they're selling them for crack, then I might want to

8    consider it.

9    Q.    The medical files of Dr. Thomas -- I'm sorry,

10   Dr. Titus, contain certain forms.  As you went through, you

11   saw certain forms that were common to each patient file.

12         Let me give you an example.  You saw Pain

13   Management Agreements?

14   A.    Yes.

15   Q.    Okay.  And all of those that you saw were signed by

16   the patient?

17   A.    I'm not sure all of them were signed by the patient,

18   but some of them were.

19              MR. BOSTIC:  If I may have moment, Your Honor.

20              THE COURT:  Sure.

21   BY MR. BOSTIC:

22   Q.    Let's start with one of the patients.  I'm not going

23   to go through every one of these.

24              MR. BOSTIC:  Mr. Marek, can you pull up

25   Government Exhibit 102, page, I think, 166.  And do I have

Thomas - Cross

1    this on.

2    BY MR. BOSTIC:

3    Q.      In Mr. Jones' file, this is taken from his file; am I

4    correct?

5    A.      I believe so.  I can't see the second page.

6    Q.      Can you -- can you pull that out for me, Mr. Marek?

7    A.      Yes.  So yes, it is.

8             MR. BOSTIC:  And if we can go, same exhibit,

9    163, Page 163.  102, I'm sorry, 102, Page 163.

10            And can you go to the signature page, please.

11   Now, that form, sorry.

12   BY MR. BOSTIC:

13   Q.      And that is signed; right?

14   A.      Yes.

15   Q.      I'm going to do another one of these.  Exhibit 107 --

16   strike that.

17            MR. BOSTIC:  Let's do Exhibit 109 and page 007.

18   Take that down for me please.  I might have given you the

19   wrong page.  Exhibit 111, page 016.

20   BY MR. BOSTIC:

21   Q.      And if you go to the signature page.  And this is for

22   Lisa Parsons?

23   A.      Yes, it is.

24   Q.      Do you see her signature there?  And if you go back

25   to the first page of that document, that's the Consent to

Thomas - Cross

1    Opioid Treatment Agreement; right?

2    A.    Yes, it is.

3              MR. BOSTIC:  You can take that down.

4    BY MR. BOSTIC:

5    Q.    Now, those forms or forms similar to those are

6    contained in the Opioid Treatment Guidelines; am I correct?

7    A.    Yes.

8              MR. BOSTIC:  And Mr. Marek, if you would pull up

9    Government Exhibit 90 -- 90 -- I'm sorry, 901.  And if

10   you'll go to page, I think it's 025.

11   BY MR. BOSTIC:

12   Q.    This is a sample of a form attached to the Opioid

13   Treatment Guidelines that was suggested or recommended that

14   practitioners in the area of chronic pain management

15   utilize; am I correct?

16   A.    Yes.

17   Q.    And would it be fair to say that you saw a version of

18   this form in the files, in the patient files, that were

19   being prescribed pain medication by Dr. Titus?

20   A.    Yes.

21             MR. BOSTIC:  And if you can go to Page 028.

22   BY MR. BOSTIC:

23   Q.    The Opioid Risk Tool, you saw a version of that form

24   in Dr. Titus' files?

25   A.    Yes.  Not all of these were filled, but there were a

1  number of opioid risk tools, and it is a standard form that

2  is recommended as an assessment for the risk of prescribing

3  opioids before the fact.

4          MR. BOSTIC:  You can take that down, Mr. Marek.

5  BY MR. BOSTIC:

6  Q.    Now, you said that not all of them were filled.  And

7  you've indicated that Dr. Titus' medical files did not

8  necessarily contain all the information that you expected to

9  see in those files?

10 A.    That's correct.

11 Q.    And indeed, some of the files, the sequence as to how

12 documents were in the files may have been apparently out of

13 order?

14 A.    On occasion, there were things that I couldn't tell

15 where they were dated.

16 Q.    And you are aware that the files were collected, some

17 from storage and some from former employees' home offices or

18 residences about a year after Dr. Titus' practice was

19 closed?

20 A.    I'm not sure I was aware of that until this time.

21 Q.    Okay.  Would it be fair to say that in any medical

22 practice or in some medical practices, it is not necessarily

23 unusual for medical files to be missing a document or

24 something being out of order because you're depending on

25 other individuals to file away documents and what have you

Thomas - Cross

1   as part of the medical file?

2   A.     Medical files can be out of order, yes.  And missing

3   documents, yes.

4   Q.     Now, with respect to notations in the file, you had

5   an exchange with Mr. Woodard this morning in which you were

6   talking about you didn't see a discussion, so on and so

7   forth, as to a certain incident.  Would it be fair to say

8   that, I think you said this or alluded to it at many, many

9   times, patients are individuals, doctors are individuals?

10  A.     Right.

11  Q.     Right.  And it would fair to say that one person's

12  style may be somewhat different from another in terms of how

13  they -- what notes they would put in the file versus what

14  another doctor or an individual might do?

15  A.     Conceded.

16  Q.     All right.  So the fact that you did not see a

17  notation regarding a particular discussion in the file

18  doesn't mean, would it be fair to say that, that the

19  discussion did not take place between Dr. Titus and the

20  individual patient?

21  A.     As a matter of fact, I don't know what discussions

22  Dr. Titus had with his patients.  As a matter of training in

23  documentation, the standard aphorism is if it's not written,

24  it didn't happen.  That's what I was trained as.

25              However, the issue of documentation is not just

Thomas - Cross

1    style.  It is also about the recording of important events.

2    So there may have been some unimportant events that were not

3    recorded and make no difference, but there were some

4    important events that were not recorded, and they make all

5    the difference because that is part of the requirement for

6    documentation as laid out by the Federation of State Medical

7    Board's model policy in the -- for the use of opioids in the

8    treatment of chronic pain.

9    Q.    The failure to -- let me ask it this way.  Poor

10   recordkeeping in and of itself -- I'll withdraw that

11   question.

12           When it comes to discharging a patient from a

13   practice, would it be fair to say that discharge occurs on

14   the day that the person, the patient is told that they're no

15   longer going to be a patient at a given practice; right?

16   The doctor comes out, informs a patient, You're no longer

17   going to be my patient as part of my practice.

18           Would that be fair to say?

19   A.    Yes.

20   Q.    Okay.  But up until the point that that discharge is

21   made official, I'm going to say official of, but when you're

22   told you're no longer one of my patients, the doctor and the

23   patient still have a doctor-patient relationship?

24   A.    Yes.

25   Q.    Okay.  So things done up until the point of discharge

Thomas - Cross

1   are still done within the course of a patient-client -- a

2   doctor relationship?

3   A.     You're using this word point of discharge as if it is

4   a moment in time.  I'm not -- so for example, what we've

5   talked about --

6   Q.     Sir, there's no question to you at this point, but --

7   A.     So I don't understand what you mean by "point of

8   discharge."

9   Q.     Okay.  So let me rephrase it.

10          So hypothetically speaking, a patient comes into

11  a doctor's office at ten o'clock.  The doctor sees -- on a

12  given day, the doctor sees that patient.  And at the

13  conclusion of his or her meeting with the patient, informs

14  the patient that, You're no longer going to be part of my

15  practice.

16          That would be the point of discharge, would it

17  not be, sir?

18  A.     Yes.

19  Q.     Okay.  Now, I believe that there was some discussion

20  about distance individuals traveled or patients traveled in

21  your -- during your direct examination by Mr. Woodard?

22  A.     Yes.

23  Q.     And I believe that there was some discussion about

24  some individuals traveling, I guess, in the vicinity of

25  50 miles or so to see Dr. Titus.

Thomas - Cross

1    A.      Did you say 15, 1-5?

2    Q.      No.  I'm sorry, 50, 5-0.  Is that correct?

3    A.      I'm not sure if that particular number was used.

4    Q.      Is there or do you have any personal knowledge --

5    let's use the radius of 50 miles, for example.  Do you have

6    any personal knowledge as to how many doctors in that

7    50-mile radius of Dr. Titus' office were seeing chronic pain

8    patients between the years of 2010 and 2014?

9    A.      No.

10           MR. BOSTIC:  One moment, Your Honor.

11           THE COURT:  Yes.

12   BY MR. BOSTIC:

13   Q.      In terms of the forms that I discussed with you that

14   were in the patient files that you saw, the forms of Opioid

15   Pain Management Agreements and Opioid Therapy Agreements,

16   those are the forms that create the basis of a doctor

17   informing a patient about the type of therapy, opioid

18   treatment therapy would be and -- go ahead.  And having the

19   patient agree to undergo that type of treatment?

20   A.      They are part of the informed consent process.

21   Q.      And based upon the forms that are in there and

22   conversations that would be had between the doctor and the

23   patient, that's the basis for the doctor ensuring that the

24   patient is aware of the treatment and the patient agreeing

25   to the treatment that they're then given?

Thomas - Cross

1    A.      They are part of the informed consent process, which

2    is an ongoing process with the patient.  Yes.

3    Q.      And would it be fair to say that when -- the process

4    ordinarily involves the patient being given the form, for

5    example, the opioid therapy treatment form, to read prior to

6    going into the examination room to meet with the doctor?  Is

7    that usually how it's done?

8    A.      Yes.  Right.  Sure.

9    Q.      And the patient has an opportunity to read, digest.

10   Sometimes the form is signed at that point, sometimes it's

11   signed when they go into the examination room with the

12   doctor?

13   A.      Yes.

14   Q.      And then the doctor will discuss the important parts

15   of that form, if not take them through the entire form again

16   beyond the patient having read it?

17   A.      One would hope.

18   Q.      Okay.  And the same would be true with the Pain

19   Management Agreement?  That was also one of the documents

20   that I showed you.

21   A.      One would hope.

22   Q.      You talked a lot about the normal practice and

23   processes.  That is normal practice, right, in terms of what

24   we just described, the patient having the form, reviewing

25   the form, reading it, signing it, going in and speaking with

Thomas - Redirect

1   the doctor about the contents of the form?

2   A.    Yes.

3   Q.    Okay.  So when you say "one would hope," my

4   discussion with you is what is ordinarily done.  And the

5   fact that these forms are signed are indicative of the

6   patients that you discussed having read and consented to the

7   treatments that were given to them by Dr. Titus?

8   A.    The patients signed the forms.

9            MR. BOSTIC:  I have nothing else.  Thank you.

10           THE COURT:  All right.  Any redirect?

11           MR. WOODARD:  Yes, Your Honor.

12                        REDIRECT EXAMINATION

13  BY MR. WOODARD:

14  Q.    Dr. Thomas.  Do you recall you were asked a moment

15  ago about discharge letters?

16  A.    Yes.

17  Q.    Okay.  If a doctor handed a patient a prescription

18  and discharged them ten seconds later, would that have any

19  change or effect on the opinions you've expressed?

20  A.    No.  I think the idea that the doctor has made a

21  clinical decision, because remember, as we've talked about,

22  the process is one of the doctor doing an evaluation and

23  making clinical decisions and what we -- and what the

24  service -- the service that we deliver is based upon our

25  clinical decisionmaking.  So if the doctor has decided to

1    discharge the patient for whatever reason, then to have

2    those two things happen at the same time, I'm still your

3    doctor, here's a prescription, now I'm not your doctor, it

4    still places that prescription on the other side of the

5    door.  It's one for the road.

6             It's not a prescription that is given to the

7    patient in which the doctor will follow up on the

8    effectiveness of the prescription, in which the doctor will

9    monitor for adverse effects, in which the doctor will

10   monitor for addictive use, in which the doctor will attempt

11   to document demonstrable benefit to the patient.  So it's

12   not a point.  It is a day.

13            And what happens on that day is based upon

14   what's in the doctor's head based upon how the doctor is

15   thinking.  And what the decision to discharge means is, I

16   think you need to not be on these drugs, but here's one

17   more.  That is absolutely incompatible with sound clinical

18   judgment.

19   Q.    Dr. Thomas, do you recall you were shown a pain

20   contract signed by patient Scott Jones?

21   A.    Yes.

22            MR. WOODARD:  Okay.  Ms. Leal, could we pull up

23   Exhibit 102 at Page 168.

24   BY MR. WOODARD:

25   Q.    Is this what you were shown a moment ago?

1497

Thomas - Redirect

1   A.      Yes.

2   Q.      And what was the date on that?

3   A.      8/29/2012.

4   Q.      Okay.  Let's go quickly to Page 179.

5           Before this, what was Mr. Jones being

6   prescribed?

7   A.      Oxycodone, 15 milligrams, dispensing 180.  And Opana

8   ER, 40 milligrams, dispensing 60.

9   Q.      Okay.  And could we go to Exhibit 614, please.

10          Do you remember talking about the Consent

11  Agreement?

12  A.      Yes.

13  Q.      Okay.  And if you could scroll to the last page of

14  this exhibit.  When was that entered into?

15  A.      3/22/2012.

16  Q.      Okay.  And could we go back up to Paragraph 2.

17          Was Dr. Titus' controlled substance registration

18  suspended?

19  A.      On December 8th, 2011.

20          MR. WOODARD:  Okay.  Ms. Leal, let's go back to

21  Exhibit 102 at Page 168.

22  BY MR. WOODARD:

23  Q.      When Dr. Titus was practicing again, did you see more

24  forms like this in the patient files?

25  A.      Yes.

Thomas - Redirect

1    Q.      Okay.  And what was the date on this contract?

2    A.      8/29/2012.

3    Q.      Okay.  Let's go to Page 238.

4            MR. BOSTIC:  Objection, Your Honor.  This is

5    beyond the scope of cross.

6            THE COURT:  I'm not sure that it is, so I'm

7    going to allow the questions.  But you're on notice.

8            MR. WOODARD:  Yes, Your Honor.

9    BY MR. WOODARD:

10   Q.      Okay.  After this pain contract, was a drug test

11   provided?

12   A.      Yes.

13   Q.      And what was the result?

14           MR. BOSTIC:  Your Honor, objection.  Again, this

15   is way beyond the scope of my cross.

16           THE COURT:  Well, you actually showed him the

17   document for this same day, did you not?

18           MR. BOSTIC:  Yes, I did, Your Honor, with

19   respect to the Pain Management Agreement.

20           THE COURT:  Well, I think it's not beyond the

21   scope, so I'm going to overrule the objection.

22   BY MR. WOODARD:

23   Q.      Just to speed things along, Dr. Thomas, after the

24   pain contract was signed, did we see inconsistent drug test

25   results for this patient?

Thomas - Redirect

1    A.      Multiple.

2    Q.      Did we see continued prescribing of the same type and

3    dose of prescriptions?

4    A.      Yes.

5            MR. WOODARD:  Okay.  It we could go back to

6    Page 167, the contract, please.  And Paragraph 7, could you

7    highlight that.

8    BY MR. WOODARD:

9    Q.      What was this talking about in the contract?

10   A.      "Unannounced urine or serum toxicology screens may be

11   requested and your cooperation is required.  Presence of

12   unauthorized substances may prompt referral for assessment

13   for addictive disorder."

14   Q.      And Paragraph 14, please.

15   A.      "It is understood that failure to adhere to these

16   policies may result in cessation of therapy with controlled

17   substance prescribing by this physician and or referral for

18   further special assessment."

19   Q.      Okay.  And Paragraph 15, please, the next page.

20   A.      "Renewals are contingent on keeping scheduled

21   appointments.  Please do not phone for prescriptions."

22           MR. WOODARD:  I'm sorry, Paragraph 5.  One more

23   up, Ms. Leal.

24           THE WITNESS:  "You may not share, sell or

25   otherwise permit others to have access to these medications.

 1   You will not use any illegal controlled substances,

 2   including marijuana, cocaine, et cetera."

 3   BY MR. WOODARD:

 4   Q.    Okay.  Despite the inconsistent drug test results we

 5   reviewed previously with Mr. Jones, did Dr. Titus continue

 6   prescribing opioids --

 7   A.    Yes, he did.

 8   Q.    -- following this Pain Management Agreement?

 9   A.    Yes, he did.

10         MR. WOODARD:  Okay.  Could we just show

11   Page 104.

12   BY MR. WOODARD:

13   Q.    What's prescribed in 2013?

14   A.    Oxycontin, 20 milligrams, dispensing 30; and

15   Oxycodone, 15 milligrams, dispensing 60.

16   Q.    So Dr. Thomas, following the Consent Decree and the

17   additional paperwork you saw in the file, did you see a

18   meaningful change in Dr. Titus' prescribing practices?

19   A.    He was slightly lower in that he stopped using

20   Oxycodone 30-milligram tablets, but otherwise, the pattern

21   of prescribing remained the same.

22   Q.    And was this specific to patient Jones?

23   A.    No.

24   Q.    Dr. Thomas, what's the meaning or importance of the

25   paperwork if it's not followed?

1   A.     It's -- it, of course, is meaningless.  And I never

2   called the treatment agreements contracts because contracts

3   are things that lawyers do.  In opioid and pain -- opioid

4   and other controlled substances treatment agreements, the

5   physician is setting out all of the rules.  The physician

6   has all of the power.  We tell the patients what they're

7   going to agree to.  If you agree, then I will.

8              But it's not a discussion.  It's not a

9   negotiation.  It's about the physician.

10             MR. WOODARD:  Thank you, Dr. Thomas.

11             THE COURT:  All right.  Dr. Thomas, thank you.

12  You're excused.  You may go.

13             THE WITNESS:  Thank you, Your Honor.  Ladies and

14  gentlemen.

15             MR. WOODARD:  Your Honor, may we have just one

16  minute before.

17             THE COURT:  All right.  Yes.

18             MR. WOODARD:  Okay.

19             MS. REMIS:  Your Honor, the Government rests.

20             THE COURT:  All right.  All right.  And I think

21  that means that we are through for the day.

22             MS. REMIS:  I believe so.

23             THE COURT:  All right.  So members of the jury,

24  as you can see, yesterday I said mid-day.  So it is hard to

25  predict these things.

```
 1              In any event, so we're finished for the day.
 2    You're going to be able to go in a minute.  I do want to
 3    tell you that we will start again tomorrow morning at 9:30.
 4              MS. KOUSOULIS:  I'm sorry, Your Honor.  I
 5    forgot.
 6              THE COURT:  Okay.  We will start tomorrow
 7    morning at 9:30.  And once again, you were all here on time
 8    today.  I appreciate that and hope you will be tomorrow,
 9    too.
10              I do want to remind you, again, because these
11    are very important things, don't talk to anyone about the
12    case.  Don't talk to each other about the case.  Don't let
13    anyone talk to you about the case.  And you know, any way
14    people can communicate, don't let that happen.  And if it
15    did happen, tell me.
16              The second thing is don't do any research.  You
17    know, the only fair way for the proceeding to happen is
18    everything you learn about the case, you learn while you're
19    in the courtroom with your fellow jurors and the parties.
20              So thank you very much.  I'll see you tomorrow.
21    Have a good day.
22              (Jury leaving the courtroom.)
23              THE COURT:  All right.  You all can be seated.
24              So why don't we take a break for 15 minutes and
25    then come back and talk about why you have disagreements on
```

1    the jury instructions.  Okay?

2              MS. REMIS:  That's fine.

3              MS. KOUSOULIS:  We came to some agreement on

4    some of them, so we did pare down.

5              THE COURT:  Okay.  Well, you can tell me about

6    that, and then I will be happy I didn't spend any time

7    trying to resolve them myself.

8              All right.  So I'll be back in 15 minutes.

9              (Recess was taken.)

10             DEPUTY CLERK:  All rise.

11             THE COURT:  All right.  Have a seat.

12             So I have the Joint Proposed Jury Instructions

13   which I have looked through, and I basically tabbed the

14   places where I thought there was disagreement.  But I do

15   understand that you've resolved some of these, so why don't

16   you tell me what you've resolved.

17             MS. REMIS:  Sure.  So if it's helpful, we can

18   just go through it page by page where there were footnotes.

19             THE COURT:  Yeah, just telling me which page

20   number.

21             MS. REMIS:  So first on Page 20.

22             THE COURT:  Yes.

23             MS. REMIS:  I don't -- I think it is one that

24   the Defendant still objects to, use of the word Defendant

25   throughout the -- is that right?

```
 1                    THE COURT:  Okay.

 2                    MS. KOUSOULIS:  Your Honor --

 3                    THE COURT:  So that one is not resolved.

 4                    MS. REMIS:  Not resolved.  Right.  So the next

 5      one is page --

 6                    THE COURT:  Forty-three.

 7                    MS. REMIS:  Forty-three is not resolved.  Then

 8      we have 47.

 9                    THE COURT:  Yeah.

10                    MS. REMIS:  And the objection was to our

11      addition of the phrase that is a medical doctor, and we can

12      take that out. We're good on that.

13                    THE COURT:  Okay.  All right.  Well, that was

14      one I could have resolved myself, but okay.

15                    MS. REMIS:  On Page 50 for the controlled --

16                    THE COURT:  Wait, wait.

17                    MS. REMIS:  Sorry, Your Honor.

18                    THE COURT:  There was a different thing about

19      the distributed or dispensed.

20                    MS. KOUSOULIS:  Yeah.

21                    THE COURT:  And as I understand it, the only

22      actual theory here is dispensed; right?

23                    MS. REMIS:  I believe the case law, Your Honor,

24      defines distribute as issuing a prescription as well, so out

25      of an abundance of caution and due to some appellate
```

1  litigation we've had in other cases, we would request

2  distribute or dispense to be both included here.

3            THE COURT:  All right.  We'll come back to that.

4            MS. REMIS:  I believe the Defense has agreed to

5  that as well.

6            THE COURT:  Oh.

7            MS. KOUSOULIS:  I mean, that was our initial

8  concern, Your Honor, but I believe to dispense means to give

9  the prescription to the individual who's going to be using

10 it and distribute would include giving it to someone, to

11 like a third party.  And I don't think there's been any

12 evidence of that in this case.  The reason we want it out is

13 because we think it could be confusing since there's no

14 evidence of distribution in this case, it's just dispensing,

15 but --

16           THE COURT:  Okay.  But in any event, but

17 you're --

18           MS. KOUSOULIS:  But if the Court --

19           THE COURT:  -- good with what the Government has

20 done?

21           MS. KOUSOULIS:  Yes, Your Honor.

22           THE COURT:  And the Government's telling me,

23 because independent of the Defense agreement, which of

24 course, I always appreciate, but you know, one of the other

25 things that I've always tried to do is to simplify these

 1    things so that the jury -- you know, the fewer messages

 2    you're trying to deliver to the jury in court, the better

 3    the chance they will understand the messages, you know, if

 4    you don't cover it up with all kinds of other stuff.

 5              But you're telling me that for -- essentially,

 6    it's -- there's enough doubt out there in terms of

 7    litigation that it would be better to give the more

 8    complicated explanation.

 9              MS. REMIS:  Yes, Your Honor.

10              THE COURT:  Okay.  All right.  Well, I'll cross

11    that one off and remove this tab.

12              All right.  Next one is Page 53.  Oh, wait, I

13    skipped one.

14              MS. REMIS:  There's one on 50 as well, Your

15    Honor, and I believe that's the --

16              THE COURT:  Oh, that's the for example one.  Did

17    you resolve that?

18              MS. KOUSOULIS:  No, Your Honor.

19              MS. REMIS:  Oh, no.

20              MS. KOUSOULIS:  No.  Oh, okay.  Unless you're

21    going to take out that last paragraph.  On Page 50, we're

22    talking about?

23              MS. REMIS:  Yes.  My apologies, Your Honor, I

24    didn't realize this one was still in dispute, so not

25    resolved.  Page 50.  And then Page 53 is the --

```
 1              THE COURT:  That's the one where you have the

 2    competing willful blindness instruction?

 3              MS. REMIS:  Yes, but we've resolved that, Your

 4    Honor, and the Dfense has agreed to the Government's

 5    version.

 6              MS. KOUSOULIS:  That's correct, Your Honor.

 7              THE COURT:  Okay.  So the version that's on

 8    Page 53 and 54 --

 9              MS. REMIS:  Correct.

10              MS. KOUSOULIS:  Correct.

11              THE COURT:  -- is agreeable to both sides, and

12    the one that's on 55 is --

13              MS. REMIS:  Struck.

14              THE COURT:  -- struck.  Okay.  And I think the

15    next thing is on Page 56.

16              MS. REMIS:  Yes, Your Honor, and that one is

17    still in dispute.

18              THE COURT:  Okay.

19              MS. REMIS:  And then --

20              THE COURT:  The one on 61.

21              MS. REMIS:  Yes, I believe the Defendant has

22    agreed to the way that it's written here.

23              MS. KOUSOULIS:  That's correct, Your Honor.

24              THE COURT:  Okay.

25              MS. KOUSOULIS:  We agree.  We agree.  Like, I
```

1  believe the Government objects to the first line of the

2  second paragraph, and so we're fine with taking that out.

3            THE COURT:  Is that what your agreement is, that

4  the first line, "An act is done knowingly when it's done

5  voluntarily and intentionally and not because of accident,

6  mistake or some innocent reason"?  Both sides now agree I

7  should take that out?

8            MS. KOUSOULIS:  Yes, Your Honor.

9            MS. REMIS:  Yes, Your Honor.

10            THE COURT:  And that resolves that dispute?

11            MS. REMIS:  Yes, Your Honor.

12            THE COURT:  Okay.  And then I think there's one

13  more.  Actually, I think I skipped one.  But on -- oh, this

14  one, this is not actually your dispute.  So I will be

15  changing Page 63 because the way I select a foreperson is

16  it's Juror Number 1.

17            MS. KOUSOULIS:  I was wondering about that.

18  That's what I thought, but I thought maybe that Judge

19  Robinson did it, and I thought maybe I was confused as to

20  how you did it.

21            THE COURT:  As far as I know, Judge Robinson,

22  she used to pick one.

23            MS. KOUSOULIS:  No, no, no.  She used to do

24  Juror Number 1, and I thought you did it that way too, but

25  when this was in here, I was thinking maybe I was wrong

1    about it.

2              THE COURT:  No, no, no.  You should go with your

3    instincts there.

4              And then the other thing is I've got to change

5    the fourth and the fifth because we do the arguments -- wait

6    a second.  Well, it doesn't matter.  I will change that as

7    needed.

8              MS. KOUSOULIS:  You instruct them and then we

9    argue; correct?

10             THE COURT:  Yeah, I instruct and then you argue.

11             MS. KOUSOULIS:  Do the closings; right?

12             THE COURT:  And actually, though, I don't read

13   the deliberations and verdict.

14             MS. KOUSOULIS:  Until the end.

15             THE COURT:  So basically the way that I do it is

16   I will read up to Page 62 before you argue.  The

17   deliberations and verdict, I will read after you argue.  So

18   in any event --

19             All right.  Let's go back over the things that

20   you have a dispute on.  And I thought there was one more.

21             Okay.  All right.  So the first thing is whether

22   I should call the Defendant the Defendant or Dr. Titus

23   throughout this; right?

24             MS. KOUSOULIS:  Yes, Your Honor.  And I thought,

25   and again, I mean, I know that from looking at it in the

1    Dr. Esham case, in the Esham case you referred to, when I

2    was looking at the jury instructions, to Dr. Esham, and I

3    recall that it's done both ways.  But I mean, like, in terms

4    of my recollection is that normally I thought you did refer

5    to the Defendant by their name.

6            THE COURT:  Well, certainly I have the Dr. Esham

7    instructions in front of me, and I certainly see Dr. Esham's

8    name a lot.  One of the things you can never be too sure

9    about, though, is whether that was something I decided after

10   a dispute or whether the parties just submitted it like

11   that, and it was fine.  You know, that's not the kind of

12   thing --

13           MS. KOUSOULIS:  Right.

14           THE COURT:  -- that I'm going to change.  But,

15   you know, and so let me just think about this for a second.

16           Why shouldn't I refer to him as Dr. Esham?

17           MS. KOUSOULIS:  Dr. Titus.

18           THE COURT:  Or Dr. Esham.

19           MS. KOUSOULIS:  That's fine.  If they want to

20   convict Dr. Esham again, we're fine.

21           THE COURT:  How about Dr. Titus, if I refer to

22   him as that, what's wrong with that?

23           MS. REMIS:  There's nothing wrong with it, Your

24   Honor.  The pattern instructions use Defendant, and I

25   believe in the instructions here there's sort of like a

1   mixture between Dr. Titus and Defendant.

2           THE COURT:  I might mix it up, but I certainly

3   think I probably will just say Dr. Titus and then forever

4   after refer to him as Defendant.  I mean, I think, if

5   nothing else, it helps the jury focus.

6           Actually, while we're talking about other -- one

7   other thing, I guess I noted, but I didn't mark it.  On

8   Page 45, how do you expect me to read a chart to the jury?

9           MS. REMIS:  Your Honor, what we were trying to

10  avoid here was instructing the jury just on the general idea

11  of Counts 1 through 14, but having them be very confused

12  about what 1 through 14 were.

13          THE COURT:  Well, no, no.  I agree there's

14  certainly a problem that you -- one needs because no juror

15  could possibly remember --

16          MS. KOUSOULIS:  Right.

17          THE COURT:  -- what is Count 3 versus what is

18  Count 8, even though you have actually very helpfully done

19  Government Exhibits 1 to 14.

20          MS. REMIS:  Thank you.

21          MS. KOUSOULIS:  Your Honor, we had no issue with

22  this for the same reason the Government -- because I think

23  in this case the jury -- we're not going to send the

24  indictment back because I don't think that's appropriate.

25  However, there has to be a way for them to --

```
 1              THE COURT:  Well, so what about this, we're

 2   going to have this in writing.  We're going to hand it out

 3   in writing.  Would you agree that I can say that the list of

 4   the counts, the patients, the approximate date of

 5   distribution of controlled substances is in the chart, which

 6   you can refer to and I don't have to read it?

 7              MS. REMIS:  Sure.  And we're just

 8   double-checking.  I believe the verdict form specifically,

 9   if it doesn't --

10              THE COURT:  No, I think the verdict form did

11   have -- I forget.  I did see -- I was actually thinking of

12   converting the verdict form to a chart, too.

13              MS. REMIS:  Okay.

14              MS. KOUSOULIS:  I don't have the verdict form in

15   front of me.

16              THE COURT:  In fact, it might even -- I mean, is

17   there any reason why I shouldn't actually convert the

18   verdict form to kind of look like the chart that's on

19   Page 45 and, you know, have then a column for --

20              MS. REMIS:  Guilty.

21              THE COURT:  -- guilty or not guilty to check?

22              MS. REMIS:  That's fine with the Government and

23   we're happy to provide something like that.

24              MS. KOUSOULIS:  That's fine, Your Honor.  If

25   they provide it, we can look at it.  And we --
```

```
 1              MS. REMIS:  We'll do that.

 2              THE COURT:  We'll have plenty of time to do

 3    that.  Okay.  Let me make a note here.

 4              All right.  Well, let's go over the things you

 5    have a dispute about.  So we just talked a little bit about

 6    Dr. Titus.

 7              And then the next thing I think is the sympathy

 8    instruction?

 9              MS. KOUSOULIS:  Yes, Your Honor.  We just object

10    to that because I believe that there is -- in the bold jury

11    instruction, they were instructed both in the preliminary

12    instructions and in the final instruction, they are

13    instructed not to -- not to base their verdict on any

14    sympathy they may have for anybody, you know, any person.

15              THE COURT:  Well, Ms. Kousoulis, I have the same

16    reaction that it's in here somewhere else --

17              MS. KOUSOULIS:  Yes.

18              THE COURT:  -- and I didn't take the time to go

19    find it.  Hold on a minute.

20              So Page 21, the last paragraph starts, "Do not

21    allow sympathy, prejudice, fear or public opinion to

22    influence you."  I guess I'm wondering, you know, it doesn't

23    really say a whole lot more in this instruction.

24              MS. REMIS:  Just one moment, Your Honor.

25              That's fine, Your Honor.  We'll abandon this
```

 1    one.

 2                    THE COURT:  Okay.

 3                    MS. REMIS:  Yeah.

 4                    THE COURT:  Thank you.  That one's resolved.

 5                    All right.  So I think the next one is on

 6    Page 50.  And that involves the paragraph, the for example

 7    paragraph which -- hold on just one second.  Let me check.

 8                    Because I kind of had the vague memory that in

 9    the Dr. Esham case, we had the same kind of argument and not

10    that you would necessarily look at this as authority, but on

11    Page 23 of the Dr. Esham instructions, I deleted the entire

12    paragraph that starts with for example.  And the reason is

13    because it's basically just putting, you know, in this case,

14    the Government's arguments into an instruction.  And you

15    know, I don't think that's the right way to do it.  And I

16    think by the time Dr. Warfield gets finished testifying, you

17    know, it's a factual dispute which things --

18                    MS. REMIS:  Sure.

19                    THE COURT:  -- you know, make out no legitimate

20    medical purpose and which ones don't.  So I'm inclined to

21    strike that paragraph.

22                    MS. REMIS:  Okay.

23                    THE COURT:  Okay?  All right.  So that's

24    resolved.

25                    All right.  So Page 56, and that's the good

1   faith defense.  So again, I did have a good faith defense in

2   Dr. Esham, and I recall from other cases that the Court of

3   Appeals generally seems to -- you know, my impression is you

4   can get in a lot of trouble not putting in a good faith

5   defense.  And even though it's kind of just a mirror image

6   of knowing -- you know, it's kind of a mirror image of a

7   mental state, I don't think it's really a different thing,

8   it's just a different way of saying the same thing.

9          So is there a legal reason why I shouldn't be

10  doing this?

11         MS. REMIS:  Well, I think, Your Honor, there's

12  two -- there's a legal reason and a factual reason.  I

13  think -- not I think.  I know Your Honor is right that the

14  Third Circuit has essentially said the judge can give it,

15  but the Third Circuit also said, but it's also not required

16  when the mens rea associated with the substantive crimes is

17  properly instructed upon.

18         And so I can read you, it says from -- it's a

19  Third -- this is from *United States vs. James*, a Third

20  Circuit case from 2017.  Good faith instructions are not

21  required where the mens rea elements of a crime are properly

22  set out.  Failure to give a good faith instruction is not an

23  abuse of discretion where the instructions given already

24  contain a specific statement of the Government's burden to

25  prove the elements of a knowledge crime.

1      And most recently, in a very similar case, in

2  *United States vs. Li*, the Third Circuit affirmed or found no

3  abuse of discretion where the District Court did not give

4  the instruction.  I want to be clear, though, that the

5  Defense withdrew that instruction prior to not being given.

6  But it was an issue on appeal and that's how the Third

7  Circuit --

8      THE COURT:  So it withdrew it.  It was an issue

9  of a plain error on appeal.

10     MS. REMIS:  I believe so, yes, Your Honor.

11     THE COURT:  Yeah, that doesn't count for too

12  much.

13     MS. REMIS:  So essentially what I read from

14  *United States vs. James* is the Third Circuit sort of

15  standard that it's not required.  There's no harm in giving

16  it.  But if it's not given, then there's no error.

17     THE COURT:  So you just said there's no harm in

18  giving it.

19     MS. REMIS:  Which goes to my second point, my

20  factual point.

21     THE COURT:  Well, so all right.  But in any

22  event, you would request that before I make a decision on

23  this, I look at this James case from 2017.

24     MS. REMIS:  Sure, Your Honor.  And this James

25  case is -- I can give you the citation.

1        THE COURT:  Sure.

2        MS. REMIS:  712 F. Appendix 154 and it's quoting

3    several other Third Circuit cases.  Okay.

4        THE COURT:  Okay.  So the F. Appendix, they are

5    non-precedential decisions.

6        MS. REMIS:  It's just the most recent.

7        THE COURT:  I've learned in the past that

8    relying on them is dicier than relying on the actual

9    precedential decisions.

10        MS. REMIS:  Understood, Your Honor.  I can give

11    you the more precedential ones.

12        THE COURT:  Well, no.  So usually the way it

13    works is the F. Appendix cases cite precedential decisions

14    which is why technically they can be in the F. Appendix

15    because they're not making any law, but sometimes the

16    precedential decisions and the non-precedential decisions,

17    the nuances are a little different.

18        MS. REMIS:  Understood.

19        THE COURT:  So, but I'll look at that.  Is there

20    any -- you know, don't just read me the citations that are

21    in that opinion.

22        MS. REMIS:  Sure.

23        THE COURT:  But basically, you don't really have

24    anything else right now?

25        MS. REMIS:  Well, just factually, Your Honor --

1           THE COURT:  Okay.

2           MS. REMIS:  -- the other piece of the puzzle,

3    factually I don't believe there's really been any evidence

4    that Dr. Titus had good faith.  The only suggestion to the

5    effect of the good faith defense has been in the Defendant's

6    opening and that is not evidence, of course.

7           I mean, obviously, we don't know where their

8    case is going, of course, with respect to their witnesses,

9    but there's -- the only suggestion to that effect has been

10   from counsel which is not in and of itself evidence.

11          THE COURT:  But you know, that goes with --

12   okay.  I understand what you're saying.  And so

13   Ms. Kousoulis, is there some -- I realize you don't have to

14   prove good faith --

15          MS. KOUSOULIS:  Right.

16          THE COURT:  -- but is there some evidentiary

17   basis for recasting whatever is happening in this case or

18   will happen in this case, you know, as being good faith as

19   opposed to just the knowledge standard that I think both

20   sides agree to?

21          MS. KOUSOULIS:  Well, Your Honor, I would say

22   that good faith is not an affirmative defense, that it is a

23   reiteration that the Government must carry its burden of

24   demonstrating that the Defendant acted knowingly.  And I

25   think the instruction further helps explain the mens rea to

1    the jury because them finding he acted in good faith means

2    that they found he didn't act knowingly.  I think even

3    with -- so I don't think it's necessarily -- it's not an

4    affirmative defense that we would necessarily factually have

5    to develop certain things.  This is all part of the

6    Government's burden to show that Dr. Titus acted knowingly.

7              You know, and given the complexities of the case

8    and given, I think, some of the testimony regarding his

9    practice and certain things he did do, you know, with the

10   patients and the patient files and how he conducted his

11   practice, I think there is some -- I do think there is

12   evidence that he acted in good faith and that -- you know,

13   and that he wasn't acting knowingly.

14             THE COURT:  Is Dr. Warfield going to say

15   something along the lines of, you know, after the Consent

16   Agreement, he changed his practices?

17             MS. KOUSOULIS:  Yes, Your Honor.  I think she'll

18   be able to point to certain things in the patient files,

19   certain things in his practice that show that he wasn't

20   acting, you know, knowingly or intentionally in

21   misprescribing narcotics.

22             THE COURT:  All right.  Anything more you want

23   to say about that?

24             MS. REMIS:  Yes, Your Honor.  So as

25   Ms. Kousoulis and, you know, as the law is clear, the good

 1   faith defense is not an affirmative defense and it is just

 2   essentially a mirror image, a reiteration of the opposite of

 3   knowledge, essentially.  And so if the Court is inclined to

 4   instruct in some way on good faith, the Government would

 5   request that instead of sort of calling this out with a

 6   basically one and a little bit page instruction, a lot of

 7   which factually doesn't relate to the facts in evidence

 8   right now, that the Court would simply add maybe a line or

 9   something like that to the knowledge or an intent

10   instruction to make clear that basically knowledge is not

11   proven if the jury thinks that there is good faith or

12   something along those lines.

13           Because, for example, there's no evidence in

14   this case, if we look at Page 56, that Dr. Titus made an

15   honest mistake about his patient's medical needs.  And some

16   of this is just -- it's just, I think, putting undue

17   emphasis on something that really hasn't come up very

18   frequently or really at all throughout the evidence in this

19   case.

20           MS. KOUSOULIS:  Your Honor, I don't think

21   that -- that's how the Government characterizes it, but I

22   don't think there's going to be -- there's no evidence that

23   certain things he did were not mistakes as opposed to

24   intentional.

25           THE COURT:  Well, so in that regard, one of the

```
 1    things you said in your opening, Ms. Kousoulis, maybe even

 2    more than once even was, and I'm paraphrasing here, yeah, he

 3    made mistakes.

 4              Now, I understand that's not evidence, but I'm

 5    wondering:  Is Dr. Warfield going to say he made mistakes?

 6              MS. KOUSOULIS:  I think there are things she

 7    will be able to point to in his practice that could be

 8    characterized as mistakes.

 9              THE COURT:  Is that the way she's going to

10    characterize it?

11              MS. KOUSOULIS:  Yes, Your Honor, I believe so.

12    And also, Your Honor, I would point out the instruction that

13    we are proposing is the model Third Circuit instruction and

14    in this circuit the other -- all of the other, you know, at

15    least what we could find, other cases where the Defendant in

16    prescribing cases requested the good faith instruction, it

17    was always given in camera, which is in ADCPA case.  Esham,

18    which was a jury case.  Joseph, which was, it was -- well,

19    they are not all Third Circuit cases, but in other cases,

20    prescribing cases that we could find it was -- you know, the

21    instruction was given.

22              THE COURT:  Okay.  Well, I'll take it under

23    advisement.  You know, it's funny and not -- Ms. Kousoulis

24    said something about reiterating and the Government repeated

25    what -- reiterated what Ms. Kousoulis had said.  And to some
```

1   extent, it is an issue if you're basically just saying the

2   same thing two different ways.

3               So I'm going to think about this.  And you know,

4   one thing the Government could do is if your suggestion of,

5   you know, somehow adding to the knowledge, if you would, you

6   know, some time maybe by the end of the day figure out what

7   you propose and just, you know, submit -- you know, it can

8   be a letter saying, Here's our proposed jury instruction.

9   Just attach it.

10              MS. REMIS:  Sure.

11              THE COURT:  Not saying I'm going to do it, but I

12  would like to know exactly what you have in mind.

13              MS. REMIS:  Absolutely, Your Honor.

14              THE COURT:  All right.  And so I'll take that

15  under advisement.

16              And then Page 63.  Oh, yeah.  Yeah, sorry.  So

17  basically that's everything, isn't it?

18              MS. REMIS:  Yes, Your Honor.

19              MS. KOUSOULIS:  Yes, Your Honor.

20              THE COURT:  All right.  And I take it the

21  question -- so oh, yeah, so one other thing.

22              I don't have exactly what it is that I did --

23  actually I do.  So some of the instructions -- so some of

24  the instructions like credibility of witnesses, role of the

25  jury, I think evidence, maybe nature of the indictment, the

1    things that I already gave in the preliminary instructions

2    other than the presumption of innocence and burden of proof

3    and reasonable doubt, you know, my strong preference is not

4    to give them again.

5              And they have the original -- they have the

6    preliminary instructions, Leigh, right?  They do?

7              DEPUTY CLERK:  Yeah.  Oh, the jurors?

8              THE COURT:  Yeah.

9              DEPUTY CLERK:  Yeah.

10             THE COURT:  So they already have the preliminary

11   instructions, so you know, there's no reason why if you want

12   to refer to something in closing arguments that's in one of

13   these instructions why I have to give it again.

14             So I was just wondering, at least role of the

15   jury, evidence, credibility, witnesses and nature of the

16   indictment, is there any objection if I don't give them a

17   second time?

18             MS. KOUSOULIS:  So to be clear, so they're going

19   to have the preliminary instructions with them.  You'll

20   instruct them that they can also refer to the preliminary

21   instructions?

22             I'm fine with that then, Your Honor.

23             MS. REMIS:  Your Honor, the only hesitation that

24   the Government would have with respect to removing -- sorry,

25   one second.  Role of the -- so you said role of the jury,

1    and then evidence?

2                 THE COURT:  Right.

3                 MS. REMIS:  So two things.  So for the role of

4    the jury, one, we just discussed the sympathy issue and

5    that's where the sympathy --

6                 THE COURT:  Right, but the sympathy, I've

7    already given that instruction.

8                 MS. REMIS:  But that was before, Your Honor,

9    several questions about the Defendant having a good heart

10   and all of those things, you know, buying somebody a

11   wheelchair.  That has been sort of a predominant theme in

12   their cross-examination that we believe is improper

13   essentially and request jury nullification based on that

14   sympathetic feeling.

15                And then the second thing, Your Honor, is with

16   respect to evidence, the only hesitation would be for --

17   sorry, the numbering is a little bit off.  Oh, no, it's not.

18                Under the second set of numbers, you struck the

19   testimony that was the basis for the mistrial motion and the

20   Government wonders if reiterating it would be prudent just

21   for purposes of appeal down the line, just to reiterate that

22   struck testimony is struck and not to be considered.

23                THE COURT:  All right.  Well, that's a

24   reasonable point.

25                MS. KOUSOULIS:  We're fine with that.  We're

1    fine with either way.

2             THE COURT:  Okay.  So wait.  So somehow or

3    another, because I can work in the any testimony I've struck

4    or told you to disregard without giving the whole thing over

5    again.  And I think I can probably work in the sympathy,

6    prejudice, you know, national ancestry, gender, profession,

7    et cetera.

8             MS. REMIS:  Right.

9             THE COURT:  I could work those things in without

10   giving a whole instruction again.

11            MS. REMIS:  That's fine, Your Honor.  So just

12   the last paragraph on Page 21, is that what you're

13   referencing?

14            THE COURT:  Yeah.

15            MS. REMIS:  And then the struck testimony, I

16   think is just --

17            THE COURT:  I'll figure out a way to do that, I

18   think.

19            MS. REMIS:  Okay.  Thank you, Your Honor.

20            THE COURT:  Okay.  And then the one other thing

21   is do either of you want a description of direct and

22   circumstantial evidence?  I didn't give that in the opening

23   because, you know, I've been in like a hundred trials, and

24   I've never seen it make any difference.  So I'm just trying

25   to get rid of the extraneous ones.

```
 1              Do either of you want me to give the
 2    instruction?
 3              MS. KOUSOULIS:  We're fine about getting rid of
 4    it.
 5              MS. REMIS:  I guess the only question the
 6    Government would have is if there's going to be argument
 7    that certain things are circumstantial and shouldn't be
 8    believed as a result, and you haven't heard direct testimony
 9    and blah, blah, blah.
10              THE COURT:  Yeah, I'd be surprised if that's
11    what their argument is going to be.
12              MS. KOUSOULIS:  Mr. Bostic is doing closing, but
13    I don't think that's what he's planning.
14              THE COURT:  Yeah.  Well, all right.  So I'm
15    going to get rid of that one, too.
16              MS. REMIS:  Okay.
17              THE COURT:  All right.  Well, in any event, and
18    so what I expect to do is I will get you a clean version of
19    what I would like to give that's, obviously, subject to
20    whatever testimony comes in after, you know, I give it to
21    you.  But I will have something to you no later than Friday
22    for you to think about.  Hopefully, maybe early on Friday.
23    Well, I'll try to get it to you sooner rather than later so
24    that we can have another review of what's proposed will be
25    the final instructions.
```

1        Okay.  And in terms of tomorrow, I take it,

2   Ms. Kousoulis, the question of enhancing the tape or

3   enhancing the recording, it's still up in the air as to when

4   you're going to get that?

5        MS. KOUSOULIS:  Well, Your Honor, we're not --

6   we may have been able to come to an agreement as language

7   for the tape which might make us actually having the

8   recording in hand unnecessary.  And I believe we came to an

9   agreement, so we will be able to have that witness testify

10  tomorrow.

11        THE COURT:  Okay.  And you know, when either you

12  or Mr. Bostic were saying what you were planning on doing

13  tomorrow, you know, it doesn't really make any difference

14  other than ordering lunch.  Are you pretty confident that

15  we're going to get through lunch tomorrow?

16        MS. KOUSOULIS:  Oh, yes, and probably -- yeah.

17        THE COURT:  Okay.  All right.  So in any event,

18  you think if you come to this agreement, then Monday will be

19  Dr. Warfield and the two people known as the Puccis?

20        MS. KOUSOULIS:  The Puccis, yes.

21        THE COURT:  Puccis.

22        MS. KOUSOULIS:  Yes, Your Honor.

23        THE COURT:  Okay.  All right.  Anything else you

24  want to talk about today?

25        MS. KOUSOULIS:  Not from the Defense.

```
 1                    MS. REMIS:  No, Your Honor.

 2                    THE COURT:  Okay.  Well, have a nice day.  We

 3    will be in recess.

 4                    DEPUTY CLERK:  All rise.

 5                    (Court was recessed at 11:57 a.m.)

 6                    I hereby certify the foregoing is a true and

 7    accurate transcript from my stenographic notes in the

 8    proceeding.

 9                    /s/ Heather M. Triozzi
                      Certified Merit and Real-Time Reporter
10                    U.S. District Court

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```