1                  IN THE UNITED STATES DISTRICT COURT

2                     FOR THE DISTRICT OF DELAWARE

3

4    UNITED STATES OF AMERICA,    )
                                  )
5                 Plaintiff,      )
                                  ) Criminal Action No. 18-45-RGA
6    v.                           )
                                  ) Trial Volume VII
7    PATRICK TITUS,               )
                                  )
8                 Defendant.      )

9
                                      J. Caleb Boggs Courthouse
10                                    844 North King Street
                                      Wilmington, Delaware
11
                                      Thursday, July 15, 2021
12                                    9:00 a.m.
                                      Jury Trial
13

14   BEFORE:  THE HONORABLE RICHARD G. ANDREWS, U.S.D.C.J.

15   APPEARANCES:

16               U.S. DEPARTMENT OF JUSTICE - CRIMINAL DIVISION
                 BY:  ALEZA S. REMIS, ESQUIRE
17               BY:  CLAIRE SOBCZAK, ESQUIRE
                 BY:  JUSTIN WOODARD, ESQUIRE
18
                                      For the Plaintiff
19
                 OFFICE OF THE FEDERAL PUBLIC DEFENDER
20               BY:  ELENI KOUSOULIS, ESQUIRE

21                      -and-

22               THE BOSTIC LAW FIRM
                 BY:  EDSON A. BOSTIC, ESQUIRE
23
                                      For the Defendant
24

25

```
 1                *** PROCEEDINGS ***
 2               DEPUTY CLERK:  All rise.  Court is now in
 3     session.  The Honorable Richard G. Andrews presiding.
 4               THE COURT:  All right.  Good morning, everyone.
 5     Please be seated.
 6               MS. KOUSOULIS:  Mr. Bostic had to step out to
 7     make a call to one of our witnesses, but I'm fine covering
 8     for him, and we can start.
 9               THE COURT:  Okay.  Well, just logistics.  So I
10     understand the first witness is Dr. Daley, who we've got a
11     monitor set up for and will testify at 9:30.  And then
12     probably when he's finished, we'll take a short break to
13     remove the equipment.
14               MS. KOUSOULIS:  That's fine.  And we tested --
15     at least his end, we did a test call with him this morning
16     from our office, and his equipment seemed to be working, so
17     hopefully it will all go off without a hitch.
18               THE COURT:  We'll see about that.  I don't doubt
19     that you did that, but half the time it doesn't matter.
20               All right.  So we're all good with that?
21               MS. REMIS:  Yes, Your Honor.
22               THE COURT:  Okay.  And then what's the rest of
23     your lineup this morning or today, Ms. Kousoulis?
24               MS. KOUSOULIS:  Your Honor, in addition to
25     Mr. Daley, we have four other witnesses that we expect to
```

```
 1    call this morning.  And then we just informed the Government
 2    that we would like to call Special Agent McDonald.  My
 3    understanding is he's available today.  We would ask to
 4    maybe do him like right after lunch unless, you know, we may
 5    be able to, you know, get to him this morning.
 6              But I think we need like -- I think we would
 7    prefer to do him right after lunch just because I think we
 8    need to get -- we weren't sure what the Government's issue
 9    was going to be, whether he was going to go today and if we
10    just need to get a few documents together.  But we're
11    prepared to do it this afternoon, if that's okay with
12    everyone.
13              THE COURT:  All right.  And at the end of the
14    day yesterday, there was talk about a stipulation relating
15    to the undercover officer.  Did that work out?
16              MS. KOUSOULIS:  Yes, Your Honor.  We came to an
17    agreement on what we thought was the portion of the tape
18    that was inaudible, and I'm just going to ask a somewhat
19    leading question to the agent, and she prepared for that.
20              THE COURT:  Is that going to be this afternoon,
21    too?
22              MS. KOUSOULIS:  She's going to be this morning.
23    Yeah, we're going to call her, two patients, and Sylvester
24    King, who was the Ameritox representative, and Dr. Daley
25    this morning.
```

```
 1                    THE COURT:  And does that mean that once you've

 2      done that, you'll be done for the day?

 3                    MS. KOUSOULIS:  Other than Agent McDonald, if we

 4      call him, yes.

 5                    THE COURT:  Okay.  Any comment from the

 6      Government?

 7                    MS. REMIS:  No comment, Your Honor.

 8                    THE COURT:  Okay.  And then I also was handed

 9      just, like, literally two minutes ago, Ms. Remis, the letter

10      that has your proposed jury instruction on knowingly and

11      intentionally, and I can look at that, and also the verdict

12      form.

13                    Did you, Ms. Kousoulis, have a chance to look at

14      the verdict form --

15                    MS. KOUSOULIS:  Yes, Your Honor.  We would -- I

16      mean, when -- yesterday, when we were having the conference,

17      I hadn't looked at the verdict form in a while, and I

18      thought the original verdict form wasn't as detailed as it

19      was.  And when I went back and looked at the verdict form,

20      for each count it actually says, you know, Brent Hood, Count

21      1, Brent Hood, and it says the date and the narcotic.

22                    So I'm not sure if -- we prefer the original

23      verdict form that was originally filed as opposed to the

24      chart.  I just think it's -- you know, I mean, it lays it

25      out.  I just think it makes it -- I think it makes it more
```

1    applicable to consider each count individually with the

2    chart.  I'm just afraid they're going to, like, just lump

3    everything together as opposed to each count individually,

4    and I'm afraid that may not be done with the chart the way

5    it is.  And I think the verdict form as it was does have

6    enough detail for them to be able to know what they're, you

7    know, deciding.

8              THE COURT:  All right.

9              MS. KOUSOULIS:  And we still would like our

10   proposed instruction for good faith as opposed to the

11   Government's.

12             THE COURT:  Yeah, yeah.  That's something I'm

13   going to think about.

14             MS. KOUSOULIS:  Okay.

15             THE COURT:  Do you have any comment, Ms. Remis?

16             MS. REMIS:  We don't have a strong feeling, one

17   way or the other, as to the verdict form, Your Honor.  I

18   might have misunderstood our conversation about that chart

19   yesterday, but I figured I'd put it in there.  That's what I

20   understood.

21             THE COURT:  Well, to the extent I was in the

22   conversation, you understood exactly what I was asking for.

23             MS. REMIS:  Oh, good.  Yeah.  Okay.

24             THE COURT:  The conversation with Ms. Kousoulis,

25   I'm not so sure about.

1    MS. KOUSOULIS:  Right.

2    MS. REMIS:  No.  I just meant with you, Your

3    Honor.  That's what I understood that you were referencing.

4    THE COURT:  Yeah, no, no.  I think there's a

5    certain advantage to having an easily accessible form, which

6    is kind of the reason why, you know, I thought -- because I

7    don't remember exactly how long the long version was, but I

8    don't think you got more than three counts per page.  So

9    it's probably about six pages long.

10   MS. REMIS:  Yeah.

11   THE COURT:  And so that's the -- well, in any

12   event, I will take that -- I will think about that.

13   So then one other thing that I wanted to address

14   was -- by the way, you all can sit, if you want.

15   MS. REMIS:  Thanks.

16   MS. KOUSOULIS:  Okay.

17   THE COURT:  Was the rule of completeness issue

18   that the Defendant had raised.  And I guess I'm working

19   under an assumption here, but I'm not entirely sure that the

20   assumption is right.  The portions of the 2015 interview

21   with Dr. Titus that talk about the zero tolerance policy,

22   what was the purpose of the Government admitting those

23   statements?

24   MS. REMIS:  I'm sorry.  Which one of the

25   statements?

1    THE COURT:  The statements where he's talking

2    about the, you know, we immediately discharge if it's heroin

3    or cocaine.

4    MS. REMIS:  Sure.

5    THE COURT:  What was the relevance of those?

6    MS. REMIS:  The relevance is, Your Honor, what

7    the Defendant told law enforcement was his policy at the

8    clinic, which wasn't actually the policy at the clinic.

9    THE COURT:  Okay.  And the relevance of it not

10   being the actual policy at the clinic, which seems like the

11   Government's case makes that pretty clear, how do you plan

12   to use this, like, say, in closing argument?

13   MS. REMIS:  Well, I think, Your Honor, that it

14   acknowledges a couple things.  His statement acknowledges a

15   couple things.  One of them is that he understood what the

16   policy should have been and what would have been the right

17   thing.  And when questioned by law enforcement in the

18   context of a search, he was able to say, you know, what

19   theoretically should have happened and what the guidelines

20   probably would have advised in some way.

21   So sort of an acknowledgment of what the actual

22   procedures should have been as well as, you know, some sort

23   of acknowledgment of wrongdoing in a way.  You know,

24   generally speaking, when people speak with law enforcement,

25   if they're less than truthful, it's because they

1      sometimes --

2                    THE COURT:  So a significant part of what you're

3      trying to do here is based on the fact that he's lying?

4                    MS. REMIS:  In theory, yes, Your Honor.  I mean,

5      we -- yes, that is true.  We also are -- you know, I mean, I

6      suppose they could say that this was his perception, but it

7      wasn't accurate, but...

8                    THE COURT:  Okay.  All right.

9                    Thank you.

10                    So I did go back and look at the five excerpts

11     that were played from 2015, and I read the entire 17 pages

12     or whatever it was from the 2018.  And I also looked at the

13     rules, at the commentary and a Third Circuit case.

14                    And so here's what I think:  The basic issue

15     here is the 2015 statement that was -- portions were played

16     to the jury had Dr. Titus saying there was what we'll call

17     for shorthand a zero tolerance policy for positive drug

18     tests for cocaine and heroin at the clinic.  And when there

19     were positive drug tests for cocaine and heroin, the patient

20     was discharged.

21                    So the 2015 statement, there were five excerpts

22     the Government played, the last two were on other topics,

23     but the first three were concerned with this discharge

24     policy.  And the Defendant said, and I quote, "If they have

25     a positive screen" -- and when I say I quote, I'm basing

1   this on the transcript, and I'm editing things for a bit of

2   clarity here, even though I think these things were pretty

3   clear.

4           But the Defendant said, "If they have a positive

5   screen for things like cocaine and heroin, we discharge them

6   immediately."  That was in the first excerpt.

7           "For things like heroin, cocaine, we have no

8   tolerance for that at all."  That was in the second excerpt.

9           "Question:  If a patient tests positive for

10  anything other than marijuana in terms of illicit drugs,

11  then you discharge; is that correct?

12          "Answer:  Yes.  Yes, sir."

13          That was in excerpt three.  So I don't think

14  there's a lot of -- these are not ambiguous statements.

15  There's no lack of clarity in what Dr. Titus was saying in

16  these statements.

17          And as the Government just suggested and as

18  seemed pretty obvious to me looking at this, the Government

19  wasn't offering this to prove that this was the policy.

20  They're offering it to show what Dr. Titus said to the

21  agents in 2015.  At least part of it is based on the theory

22  that what Dr. Titus said was a lie, which goes with mental

23  state.  So that was 2015.

24          In 2018, three-and-a-half years later, the story

25  isn't all that much different.  You know, now I saw

1    something like, "If it's like something like heroin or

2    cocaine, I usually just discharge from the beginning.  You

3    know, if I see that, I just discharge them automatically."

4              "Those patients do get discharged.  I mean,

5    that's something that we don't tolerate."

6              "Question:  You have a zero tolerance policy for

7    individuals who test positive for cocaine and heroin?

8              "Answer:  Once you find out that they test for

9    cocaine."

10             So that's kind of the factual background of

11   these two statements.  So there is a Third Circuit case,

12   *United States vs. Soures*, S-O-U-R-E-S, 736, F.2d 887 at 91,

13   Third Circuit from 1984 talking about Rule 106.  It says,

14   "Under Federal Rule of Evidence 106, when a party introduces

15   a writing or part thereof, the opponent may require the

16   other party to introduce any other parts or writing which

17   ought, in fairness, be considered contemporaneously with it.

18             Under this doctrine of completeness, the second

19   writing may be required to be read, if it's necessary, to

20   one, explain the admitted portion; two, place the admitted

21   portion in context; three, avoid misleading the trier of

22   fact; or four, ensure a fair and impartial understanding."

23             And so I looked at the Advisory Committee Notes

24   from 1972 which say, "The rule is based on two

25   considerations.  The first is the misleading impression

1   created by taking matters out of context.  The second is the

2   inadequacy of prepare work and delay to a point later in the

3   trial."

4             So I don't think there's any misleading

5   impression.  I don't think anything in 2015 was taking

6   matters out of context.  The quoted statements from 2015

7   clearly express what Dr. Titus was saying.  To the extent

8   that Dr. Titus changed his story or said it slightly

9   different three-and-a-half years later after he'd been

10  arrested, that does not mean that there's anything

11  misleading or unfair about admitting what he was clearly

12  saying in 2015, without also admitting portions of his 2018

13  statement.

14            The 2018 statement does not explain the 2015

15  statement.  It does not put it in context.  It is not

16  necessary to ensure a fair and impartial understanding of

17  what he said in 2015.  The 2015 statement is not misleading

18  without the 2018 statement.  So I'm going to overrule the

19  Defendant's objection.

20            So, all right.  Is there anything else we need

21  to discuss this morning?

22            MS. REMIS:  The only other thing I meant to say

23  earlier, Your Honor, is if they do call Special Agent

24  McDonald, I just wanted to point out he was in here

25  yesterday, but we had agreed that that was okay.

 1              MS. KOUSOULIS:  That's fine, Your Honor.

 2              MS. REMIS:  Okay.

 3              THE COURT:  Anything else from you all?

 4              MS. KOUSOULIS:  No, Your Honor.

 5              THE COURT:  Okay.  Well, we'll be in recess

 6      until 9:30.

 7              DEPUTY CLERK:  All rise.

 8              (Recess was taken.)

 9              DEPUTY CLERK:  All rise.

10              THE COURT:  All right.  We're ready to go.  The

11      jury's here.  Right?

12              MR. BOSTIC:  Yes, Your Honor.  And we just need

13      to get the doctor on.

14              THE COURT:  Okay.  Well, we can or you can be

15      working on that while we get the jury.

16              (Jury entering the courtroom.)

17              THE COURT:  All right.  Members of the jury,

18      welcome back.  Thank you for being here on time again this

19      morning.

20              The first witness is going to testify by video.

21              Mr. Bostic, call your witness, please.

22              MR. BOSTIC:  Thank you, Your Honor.  Your Honor,

23      we call Dr. Andrew Daley to the stand.

24              Can you hear me, Mr. Daley -- Dr. Daley?

25              THE WITNESS:  I can hear you.  Yes.

Daley - Direct

1          THE COURT:  Okay.  And, I'm sorry, before we

2     swear the witness, the testimony of the witness by video

3     counts just the same as if he were here in person.

4          All right.  Go ahead.

5          MR. BOSTIC:  Good morning, Dr. Daley.

6          THE COURT:  Mr. Bostic, hold on.  I meant, go

7     ahead to the Deputy Clerk.

8          DEPUTY CLERK:  Please state your full name and

9     spell it for the record.

10          THE WITNESS:  It's Andrew Daley, D-A-L-E-Y.

11          DEPUTY CLERK:  Do you affirm that the testimony

12     you are about to give to the Court and the jury in the case

13     now pending will be the truth, the whole truth, and nothing

14     but the truth, you do so affirm?

15          THE WITNESS:  Yes.

16          DEPUTY CLERK:  Thank you.

17          ANDREW DALEY, M.D., the witness herein, after

18     having been duly affirmed under oath, was examined and

19     testified as follows:

20                    DIRECT EXAMINATION

21     BY MR. BOSTIC:

22     Q.    Good morning, Dr. Daley.  Would you again state your

23     name for the record, please?

24     A.    Yes.  It's Andrew Daley.

25     Q.    And, sir, are you employed?

Daley - Direct

1    A.    I'm employed.  Yes.

2    Q.    What's the nature of your employment?

3    A.    Well, I'm an internal medicine physician practicing

4    in the State of Florida.

5    Q.    And are you in solo practice or do you practice with

6    a team of other doctors?

7    A.    I'm in solo practice currently.

8    Q.    And prior to operating your own medical office, what

9    is your education and background in terms of what you've

10   done before?

11   A.    Sure.  I -- I went to medical school at University of

12   Connecticut in Hartford, Connecticut.  After which I

13   graduated and began my residency training at Graduate

14   Hospital in Philadelphia.  After I completed my residency, I

15   volunteered in the United States Air Force.  I was stationed

16   initially at Dover Air Force Base, and that was my first

17   station from 2000 to 2003.

18          After which I was transferred to another

19   station.  I reupped my service, and I was stationed at --

20   again, at the MacDill Air Force Base in Tampa, Florida.

21   Q.    Okay.  Now, so all total, how long have you been

22   practicing as a medical doctor?

23   A.    It's over 20 years now, almost 21 years.

24   Q.    And do you know Dr. Patrick Titus?

25   A.    Yes.

Daley - Direct

1   Q.      How do you know him, sir?

2   A.      Dr. Titus and I served in the military at Dover Air

3   Force Base in 2000 to 2003.

4   Q.      Now, with respect to your service for the Air Force,

5   were you honorably discharged?

6   A.      Yes.  Dr. Titus and I were honorably discharged from

7   the United States Air Force.

8   Q.      Now, in terms of after you left the Air Force, is

9   that when you began your private practice here in the

10  states?

11  A.      Yes, after I left the Air Force at MacDill, I began

12  my private practice initially as part of a group practice,

13  and then later a solo practice.

14  Q.      Now, going back to the Air Force, obviously, you were

15  a medical doctor.  Did you know Dr. Titus in the capacity of

16  also being -- is it the medical board for the Air Force?

17  A.      Yes.  At Dover Air Force Base, Dr. Titus and I were

18  both part of the Internal Medicine Department, wherein we

19  practiced both outpatient medicine as well as inpatient

20  medicine.

21  Q.      Now, in terms of your current practice, I think you

22  indicated that you practiced pain medicine as part of your

23  current practice; is that right?

24  A.      Yes.  Yes, that's correct.

25  Q.      And you also have an internal medicine portion of

Daley - Direct

1    your practice?

2    A.    Yes.  Yes, I do.

3    Q.    Now, I want to turn your attention to the period of

4    2012 to 2014, that time period.

5    A.    Okay.

6    Q.    During that time period, did you have occasion to

7    speak with Dr. Titus regarding the practice of medicine,

8    particularly with respect to the management of chronic pain

9    patients?

10   A.    Yes.  Dr. Titus and I had conversations several times

11   over the years, including that period.

12   Q.    And how early did you start having these

13   conversations with Dr. Titus, if you recall?

14   A.    Well, it started out when we were both on service at

15   Dover Air Force Base.  We would -- we would generally

16   conference with each other, not just us, but all the doctors

17   that were assigned to the Internal Medicine Department.  It

18   was just part of what we do to hone our skills in our

19   clinical institution.

20   Q.    So you're getting feedback from each other as to how

21   to manage patients and practice medicine?

22   A.    Yes.

23   Q.    Now, with respect to the time period that I

24   referenced, 2012 to 2014, would you say that the -- during

25   that period, it was the same purpose in terms of the

Daley - Direct

1   conversations that you and Dr. Titus would have?

2   A.    Yes, it is.  It's the same kind of conversation that

3   Dr. Titus and I had.  Dr. Titus would call me on occasions

4   to -- to run certain patients by me.  Not necessarily to get

5   the answer, but to really get an idea as to how to best

6   manage patients.  For example, patients that -- that needed

7   our -- pain to manage to -- for them to be managed very

8   well.

9           So we'd go through these back and forth very

10  often.  And, again, it's not to really give the answer, but

11  to make sure that -- make sure that we both get a different

12  perspective on managing these patients.

13  Q.    And would you from time to time talk about from your

14  perspective what may or may not be appropriate with a given

15  scenario that the two of you have talked about in terms of a

16  patient?

17  A.    I'm sorry.  Can you repeat that?

18  Q.    Let me repeat that question.  During these

19  conversations, from time to time would you talk some

20  specifics about, Can I try this with this patient?  Can I do

21  that?  What are your thoughts?  The give and take?

22  A.    Absolutely.  Absolutely.  We will -- we'll talk about

23  patients.  We talk about the medications.  We talk about the

24  dosing and dosing schedule of certain pain medicines and/or

25  narcotics, and we'll talk about the patients' background,

Daley - Direct

1    their past medical history, their -- their chronic diseases

2    that we have to keep in mind as internists.

3              And in doing so, we can formulate a schedule for

4    these patients that help them stay with regards to their

5    clinical obligations.

6    Q.    Now, had you ever seen Dr. Titus in terms of

7    personally engaging with a patient regarding whatever he is

8    trying to treat and diagnose with that patient?

9    A.    Yes.  It's -- we still talk about this, my other

10   colleagues that served us -- with us in the military.

11   Dr. Titus is an outstanding physician.  When he walks in a

12   room, he makes immediate eye contact with his patients and

13   with arms stretched out.  And the first thing he says is,

14   "How are you doing?"

15             And at the time it was very unique to have a

16   patient -- to have a doctor like this, so engaging and

17   really gets the patient's attention.  It allows a patient to

18   be almost immediately at ease.  And in our practice, in the

19   practice of medicine, the way to get at a point, the most

20   important information is to have our patients really be

21   confident that we are operating in their best interests.

22   Dr. Titus is one of those clinicians that -- that's rare,

23   unfortunately.  And some of the -- you know, some of the

24   things -- some of his office and bedside practice, I have

25   actually taken and incorporated in my practice moving

Daley - Direct

1   forward, and I still do.

2   Q.     Now, with respect to your discussions and

3   conversations with him during the 2012, 2014 time period,

4   were you aware that at some point his prescribing license in

5   terms of controlled substances was suspended?

6   A.     Yes.  Yes, we -- we talked about that.

7   Q.     And now, do you recall any specific case over the

8   years that you guys would talk about?

9   A.     Yes.  We -- we -- nothing really specific, but we

10  talked about management of patients on opioids, as well as

11  other prescribed medications.  We talked about safely

12  scheduling these medicines to make sure that they're --

13  there are no unfortunate or untowards interactions.  We

14  talked about counseling these patients to -- you know, as an

15  important part of managing both the patient and these -- and

16  these medications.

17             Yes, we did.  We did have several conversations

18  about that.

19  Q.     Now, did you talk about, in particular, what if a

20  patient came back with an illicit drug in their tox screen,

21  for example?

22  A.     Yes.  Yes, we -- we had conversations about that.

23  That, and even -- and even prior.  Then and even prior.

24  This is -- this is not unusual for us to have these

25  conversations.

Daley - Direct

1    And what we talked about is -- is really to --

2  to not forget to treat a patient as a whole, not to forget

3  that this patient is not just in your office for pain.  Some

4  of these patients have -- have other chronic diseases, like

5  hypertension, diabetes, depression, anxiety and heart

6  disease.  And we have to, you know, keep in mind that --

7  that when we do make our decisions, we have to make sure

8  that we first do them no harm, you know, in -- in moving

9  forward, you know, with adjusting the patient's pain

10  medications.

11  Q.    And would it be fair to say that in terms of once a

12  doctor's taken in the information that -- and I think this

13  relates to your conversation.  You said you wouldn't give

14  advice when you would talk about matters, but it was up to

15  Dr. Titus, then, based on what he was seeing and what he

16  thought, what conversations he had with the patient, to make

17  ultimately the determination as to how to prescribe to an

18  individual?

19        MR. WOODARD:  Objection; leading, Your Honor.

20        THE COURT:  All right.  Well, I think he's sort

21  of already said that, so I'm going to overrule the

22  objection.

23        But, Mr. Bostic, try not to lead in the future.

24        MR. BOSTIC:  Thank you, Your Honor.

25  BY MR. BOSTIC:

Daley - Direct

1   Q.     Did you get the basis of my question?  Did you

2   understand the question?

3   A.     Yes.  Yes, I believe I do.  Every physician has their

4   own style of practice.  Dr. Titus just wants to make sure

5   that he's not missing, you know, things of a very --

6            MR. WOODARD:  I'm going to object, Your Honor,

7   to what Dr. Titus thinks.

8            THE COURT:  All right.  So I'm going to sustain

9   that objection and strike the answer.

10           But, Mr. Bostic, you can reask the question.

11  BY MR. BOSTIC:

12  Q.     Would it be -- do you understand or can you state

13  exactly from your impression as to the purpose why Dr. Titus

14  would be calling you to discuss chronic pain patients?

15  A.     Well, I understand that as far as -- Dr. Titus is

16  very sensitive to -- to his patients and to his patients'

17  needs.  If there's anything that -- that arises that -- that

18  suggests that he's not doing the best for his patients,

19  Dr. Titus will reach out to me to discuss the issues because

20  he always wants to make sure that his practice remains

21  patient centered.

22           And if there's anything that needs to be

23  corrected on his part, we talk about it and try to get to,

24  you know, what he needs to correct or what he needs to make

25  better in his practice.  That's not uncommon for us to have

Daley - Cross

 1   these conversations.

 2              MR. BOSTIC:  If I may have one moment, Your

 3   Honor.

 4              Dr. Daley, I have no more questions at this

 5   time.  I turn the witness over to the Government.

 6              THE COURT:  All right.

 7              Mr. Woodard.

 8              MR. WOODARD:  Thank you.

 9                    CROSS-EXAMINATION

10   BY MR. WOODARD:

11   Q.    Hello, Dr. Daley.  Can you see me and hear me?

12   A.    Yeah, I can see you well.

13   Q.    Okay.  Thanks for being here or at least on the

14   screen this morning.

15   A.    Yes.

16   Q.    Okay.  Dr. Daley, you're an internist?

17   A.    Yes.

18   Q.    Okay.  And you have a controlled substance

19   registration; correct?

20   A.    That is correct.

21   Q.    Okay.  You would agree that's a pretty hefty

22   responsibility; right?

23   A.    It is a responsibility, yes.

24   Q.    Okay.  There's lots of risks associated with

25   prescribing Schedule II controlled substances, like

Daley - Cross

1    Oxycodone, Fentanyl, et cetera?

2    A.    There is risks associated with these medications as

3    well as other medicines, yes, but I do realize, yes.

4    Q.    Okay.  Okay.  So you and Dr. Titus go way back;

5    right?

6    A.    We go back 20 years plus, yes.

7    Q.    Okay.  And I think you said you saw him treat a

8    patient, this was in 2003?

9    A.    I'm sorry.  Can you repeat that?

10   Q.    You referenced --

11   A.    You cut off.

12   Q.    I'm sorry.  You referenced an instance where I

13   believe you said you saw Dr. Titus interact with a patient;

14   right?

15   A.    Yes.

16   Q.    Okay.  And that was in around 2003?

17   A.    Correct.

18   Q.    Okay.  You haven't seen him interact with a patient

19   in, let's say, 2010, '11, '12, '13, '14?

20   A.    Actually, yes.  Dr. Titus has -- has been down to

21   Florida to see -- to visit me in my practice.  And it was --

22   it was in large part to -- to shadow me in my practice over

23   a period of three to four days.

24   Q.    Okay.  And you have not been to Delaware to see him

25   in action?

Daley - Cross

1   A.      No, I have not been in Delaware to see him practice.

2   No.

3   Q.      Okay.  So it's fair to say you've never been to the

4   Church Street address where he practiced?

5   A.      No, I have not been there.   No.

6   Q.      Okay.  You don't know what the parking lot was like

7   there?

8   A.      No, I've not been to Dr. Titus' -- Dr. Titus'

9   practice in Delaware.

10  Q.      Okay.  You don't know what the waiting room was like

11  at Church Street?

12  A.      No.

13  Q.      Okay.  You don't know how long he spent with patients

14  or what he discussed with them in that room, do you?

15  A.      No, not -- not currently, no.

16  Q.      Okay.  And just to be sure, you're not here as any

17  kind of expert witness; right?

18  A.      I'm here as -- at the request of the -- of the

19  attorney, yes.

20  Q.      Okay.  As a friend; right?

21  A.      I'm sorry.  I didn't hear you.

22  Q.      As a friend; correct?

23  A.      I'm one of his colleagues, yes, and we're also

24  friends.

25  Q.      Okay.  It goes a little further; right?  You two have

Daley - Cross

 1  a financial relationship?

 2  A.      No, we don't have a financial relationship.

 3  Q.      Okay.  So if there were checks, about $2,000 per

 4  month, between you and Dr. Titus, that would be incorrect?

 5  A.      That is correct.  Dr. Titus rented a -- my home

 6  during that period.  He paid rent for a year.

 7  Q.      So I'm confused.  Is there a financial relationship

 8  or not?

 9  A.      There was.

10  Q.      Okay.

11  A.      Yes.  Yes.  Yes, I understand your question.  Yes,

12  there was at the time.

13  Q.      Okay.  Dr. Daley, you're actually a data waiver

14  physician; is that correct?

15  A.      I'm actually -- I'm sorry.  I didn't get that last

16  part.

17  Q.      Do you have a data waiver?

18  A.      A data waiver?

19  Q.      Yes.

20  A.      I don't understand what that means.

21  Q.      Okay.  Are you a certified Buprenorphine provider?

22  A.      Yes.  Yes, I am.

23  Q.      Okay.  And that means you treat patients for

24  substance use disorder; correct?

25  A.      That's correct.

Daley - Cross

1   Q.      Okay.  So you know the signs and symptoms of abuse

2   and addiction?

3   A.      Yes, I do.

4   Q.      And I'm sure these are the things that came up in

5   your many conversations with Dr. Titus?

6   A.      Yes.

7   Q.      And how sensitive it is to treat these patients

8   correctly and do no harm; right?

9   A.      That is correct.

10  Q.      Okay.  And you talked about treating a patient as a

11  whole; right?

12  A.      Yes.

13  Q.      Okay.  So I think you mentioned hypertension.  Do you

14  remember that?

15  A.      I remember, yes.

16  Q.      So if Dr. Titus has treated patients as a whole, you

17  would expect to see a patient with hypertension, the file

18  would be complete with records discussing this patient's

19  hypertension?

20  A.      Yes, there would -- there would be records of

21  treating the patient for hypertension.

22  Q.      Okay.  And same for diabetes, you would -- and that's

23  a pretty common condition; right?

24  A.      That is correct.

25  Q.      You would expect to see that throughout the files?

1555

Daley - Redirect

1    A.    If the patient has diabetes, yes, there would -- that

2    would be mentioned.

3    Q.    Okay.  And with your specialty as a Buprenorphine

4    provider, that means essentially you're taking care of

5    patients who suffer from addiction issues; right?

6    A.    That's correct.

7    Q.    I'm sure you carefully monitor these patients and put

8    them on regimented doses?

9    A.    Yes.

10   Q.    You check in with them frequently, see how they're

11   doing?

12   A.    They're checked on routinely.  Yes.

13   Q.    Okay.  You would never just hand them a prescription

14   and say, I'll never see you again; right?

15   A.    No, these patients have to be followed routinely.

16   Q.    Okay.  All right.

17              MR. WOODARD:  Thank you, again, Dr. Daley.

18              THE WITNESS:  Thank you.

19              MR. BOSTIC:  If I may, Your Honor?

20              THE COURT:  Yes, Mr. Bostic.

21                   REDIRECT EXAMINATION

22   BY MR. BOSTIC:

23   Q.    Dr. Daley, in regard to the last question by the

24   Government, you never hand them a prescription and say --

25   and never see them again, right, or whatever the question

1  was?  Did you ever have occasion to discharge a patient that

2  was treating for chronic pain -- that you were treating for

3  chronic pain?

4  A.     Repeat the question, please.

5  Q.     Did you ever have occasion to discharge a patient

6  that you were treating for chronic pain?

7  A.     Yes.

8  Q.     And with respect to prescribing to that patient that

9  you were discharging the patient, have you had the occasion

10  where you provided them with a prescription for the pain

11  medication that they were taking prior to your discharge of

12  them?

13  A.     Yes.

14  Q.     Will you tell the jury about that process and why you

15  would do that?

16  A.     Well, again, treating a patient as a whole and

17  understanding that these patients are on these medicines for

18  long periods of time, and it does change the brain chemistry

19  of that particular patient.  In addition to that, these

20  patients also have other chronic conditions.  It is

21  important that the -- that we not just abruptly discontinue

22  these pain medicines for the -- for what is likely to

23  happen, which is they can go into withdrawals and have --

24  and have situations where there's symptoms such as chest

25  pains, or angina, or seizures.

Daley - Redirect

1          So we're very careful when we do discharge our

2     patients to counsel them that -- that yes, they'll have this

3     medicine upon discharge, but that they should pick up or

4     find another practice that will continue their pain

5     management care.

6     Q.     Now, my follow-up question is this:  I get the

7     impression that your recordkeeping for your files is

8     impeccable.  But with respect to other doctors, would it be

9     fair to say that some --

10               THE COURT:  So, Mr. Bostic --

11               MR. BOSTIC:  Okay.  Let me rephrase the

12     question, Your Honor.

13               THE COURT:  Yeah, strike that question.  Ask a

14     question.

15               MR. BOSTIC:  Yeah.  Okay.

16     BY MR. BOSTIC:

17     Q.     With respect to recordkeeping of medical files --

18     A.     You're breaking up.  I can't hear you.

19     Q.     I'm sorry.  With respect to maintaining medical

20     files, the Government asked you whether or not you would

21     expect to see a note about diabetes if you're treating a

22     patient for diabetes, so on and so forth, in the file.

23     Would it be fair to say that not every -- strike that.

24               Would it be fair to say that there are occasions

25     where doctors may fail to put certain notations in files?

Daley - Redirect

1   A.      The way I would answer that is that sometimes the

2   visit might be focused, meaning that the patient would be

3   seen on occasion for just their pain management.  Yes,

4   they'll have hypertension.  Yes, they'll have diabetes.  But

5   on occasion, the visit is really to manage their pain.

6           Now, if you -- if you look at the -- their visit

7   history, that's where you'll see the -- the entirety or the

8   big picture of this patient wherein, you know, there will be

9   other charts that would actually not only involve their pain

10  management, but also involve the management of their

11  hypertension and also the management of their diabetes.

12          MR. BOSTIC:  Thank you, Dr. Daley.

13          THE COURT:  Thank you.

14          THE WITNESS:  Thank you.

15          THE COURT:  All right.  Dr. Daley, thank you

16  very much for appearing from the south here, and you're

17  excused.

18          All right?

19          THE WITNESS:  Thank you very much.  Have a good

20  morning.

21          THE COURT:  All right.  So members of the jury,

22  we're just going to take the briefest of breaks to get this

23  equipment out of here.  So I'm going to take you out, but

24  you'll be coming back very shortly.

25          (Jury leaving the courtroom.)

1559

Daley - Redirect

```
 1                THE COURT:  All right.  So do we have people to
 2    fix this?
 3                DEPUTY CLERK:  Yes.  I'll call up to be sure.
 4                (Recess was taken.)
 5                DEPUTY CLERK:  All rise.
 6                THE COURT:  All right.  Are we ready to go?
 7                MR. WOODARD:  Yes, Your Honor.
 8                MS. REMIS:  Yes, Your Honor.
 9                THE COURT:  I guess the answer is yes.  All
10    right.  Let's get the jury.
11                (Jury entering the courtroom.)
12                MS. KOUSOULIS:  Would you like me to bring the
13    witness in?
14                THE COURT:  Sure, if they're here.
15                MS. KOUSOULIS:  Yeah.
16                THE COURT:  All right.  Members of the jury,
17    welcome back.  It turns out it's more complicated removing a
18    video screen than I thought.
19                All right.  So Ms. Kousoulis, call your witness.
20                MS. KOUSOULIS:  Your Honor, the defense calls
21    Lisa Cody.
22                DEPUTY CLERK:  Please state and spell your full
23    name for the record.
24                THE WITNESS:  My name is Lisa Cody.  L-I-S-A
25    C-O-D-Y.
```

Cody - Direct

1    DEPUTY CLERK:  Do you affirm that the testimony

2    you are about to give to the Court and the jury in the case

3    now pending will be the truth, the whole truth, and nothing

4    but the truth, you do so affirm?

5    THE WITNESS:  Yes, I do.

6    DEPUTY CLERK:  Thank you.

7    LISA CODY, the witness herein, after having been

8    duly sworn under oath, was examined and testified as

9    follows:

10    DIRECT EXAMINATION

11    BY MS. KOUSOULIS:

12    Q.    Good afternoon, Ms. Cody.

13    A.    Good afternoon.

14    Q.    I'm sorry.  Good morning.  It's been a long day

15    already.

16    A.    Good morning.

17    Q.    Where do you currently live?  Like what city do you

18    live in?

19    A.    Greenwood.

20    Q.    Delaware?

21    A.    Yes.

22    Q.    And are you currently employed?

23    A.    No, I'm on disability.

24    Q.    And how long have you been on disability?

25    A.    Three years.

1   Q.      And did you work prior to that?

2   A.      Yes.

3   Q.      And where did you work?

4   A.      T.S. Smith.  It's in Bridgeville, Delaware.  It's a

5   produce stand, like farmer's stand.

6   Q.      And do you know Dr. Patrick Titus?

7   A.      Yes, I do.

8   Q.      And how do you know him?

9   A.      My boyfriend and his brother recommended me to go to

10  him.

11  Q.      And go to him for what purpose?

12  A.      Pain management.

13  Q.      And do you recall when that was that you started

14  seeing him as a patient?

15  A.      2010.

16  Q.      And at the time you went to see him as a patient,

17  what were you suffering from?  Like, why did you go to see

18  him?

19  A.      I had bad -- I had a bad back.  I had it for a long

20  time.  And my legs -- you know, I had -- my legs were a

21  problem.

22  Q.      And when you went to see him, did you see him -- are

23  you aware that Dr. Titus had three different offices --

24  A.      Yes.

25  Q.      -- at a different point?

1562

Cody - Direct

1   A.     Yes.

2   Q.     And did you see him at each of his offices?

3   A.     Yes, I did.

4   Q.     Okay.  When did you stop seeing him?

5   A.     When he couldn't practice no more.

6   Q.     So when his practice closed in 2000 -- around the

7   time his practice closed in 2014?

8   A.     Yes.

9   Q.     Okay.  Now, do you recall the first time in 2010 that

10  you saw him?

11  A.     I --

12  Q.     Okay.  Can you --

13         MS. KOUSOULIS:  The Defense would like to enter

14  into evidence Defense Exhibit 10, which is Ms. Cody's

15  patient file.  I believe there's no objection.

16         MS. SOBCZAK:  No objection, Your Honor.

17         THE COURT:  All right.  Admitted without

18  objection.

19         (Defense Exhibit No. 10 was admitted into

20  evidence.)

21         MS. KOUSOULIS:  Mr. Marek, if you could pull up

22  Defense Exhibit 10 at Page 11.

23  BY MS. KOUSOULIS:

24  Q.     Do you recall filling out this medical history when

25  you went the first time to see Dr. Titus?

Cody - Direct

1   A.      Yes.

2   Q.      And what's the date on the top of that?

3   A.      Okay.  It's February the 8th, 2010.

4   Q.      That's the 18th?

5   A.      Oh, the 18th.  I can't see too good this morning.

6           Yes.

7   Q.      And when you went to see Dr. Titus, did you have to

8   bring anything with you or did you have any requirements

9   to when you saw him?

10  A.      I don't think so.

11  Q.      Okay.

12  A.      I don't remember.

13  Q.      Do you recall whether or not you had any medical

14  records to bring him?

15  A.      I don't think I did have them.

16  Q.      Because at the time you went to see him, you hadn't

17  seen any other pain management specialist before that?

18  A.      No.

19  Q.      He was the first one you saw?

20  A.      He was the first one I went to.

21  Q.      So Dr. Titus, after that first visit, sent you for an

22  MRI?

23  A.      Later on, like in March, I think it was.

24          MS. KOUSOULIS:  And Mr. Marek, can you pull up

25  Defense Exhibit 10 at Page 7.

                               Cody - Direct

 1    BY MS. KOUSOULIS:

 2    Q.     So does this refresh your recollection?  And I

 3    believe it's dated -- the date of the exam was March 25th,

 4    2010.

 5           Do you recall going for an MRI at that time?

 6    A.     Yes.

 7    Q.     And did you go at the direction of Dr. Titus?

 8    A.     Yes.

 9    Q.     And was that because he wanted to get more

10    information regarding your pain?

11    A.     Yes.

12    Q.     Okay.  Now, do you recall when you went for

13    your visits -- strike that.

14           How often, when you were seeing him, would you

15    see him?

16    A.     I seen him once a month.

17    Q.     Okay.  And when you would go to his office, explain

18    what would happen when you got there.

19    A.     Well, he -- he examined me.  He always asked me

20    how -- what my pain was, like from one to ten, and I'd tell

21    him because I was in pain.  And then he always checked me

22    out to make sure -- you know, and when he presses on my back

23    and all, it hurts.  And like -- and all.

24    Q.     And did you have to fill out pain assessments when

25    you went?

Cody - Direct

1  A.     Like what?

2  Q.     Did he have you fill out pain assessments to identify

3  what your pain scale was?

4  A.     Yes, one to ten.  I always circled where my pain was.

5  Q.     Okay.

6          MS. KOUSOULIS:  Mr. Marek, if you can pull up

7  Defense Exhibit 10 at 71.

8  BY MS. KOUSOULIS:

9  Q.     Is this an example of one of the pain assessments he

10  had you fill out at every visit?

11  A.     Yes.

12  Q.     Okay.  Now, this one is dated December 4th, 2013 --

13  A.     Yes.

14  Q.     -- but you'd fill out this --

15          MS. KOUSOULIS:  And you can zoom back out,

16  Mr. Marek.

17  BY MS. KOUSOULIS:

18  Q.     But you'd fill out a similar one at each visit?

19  A.     Yes.

20  Q.     And would Dr. Titus discuss your pain scale and how

21  you were feeling at every visit?

22  A.     Yes.  Yes.

23  Q.     How did you pay for your appointments when you first

24  started seeing Dr. Titus?

25  A.     I had Medicaid.

Cody - Direct

1   Q.      Did there come a time when Dr. Titus stopped taking

2   Medicaid?

3   A.      Yes.

4   Q.      And how did you -- did you continue to see Dr. Titus

5   at that point?

6   A.      Yes.

7   Q.      And how did you pay for your appointments then?

8   A.      I paid cash.

9   Q.      And if you had Medicaid, you could have gone to --

10  could you have gone to another provider?

11  A.      Yes.

12  Q.      And why did you not go to another provider and

13  instead continued to pay cash?

14  A.      Because I like Dr. Titus.  I trust him.  I don't

15  trust too many doctors.

16  Q.      Now, prior -- did there come a time when Dr. Titus

17  began prescribing you Oxycodone?

18  A.      Yes.

19  Q.      And prior to prescribing you Oxycodone, did he have

20  any discussions with you about that?

21  A.      Yes.

22  Q.      And what were those discussions?

23  A.      He told me that people do get addicted to them, but I

24  don't get addicted to them.  I take them as prescribed.  I

25  don't take them like...

Cody - Direct

1    Q.    So did he explain to you the risks involved with

2    taking --

3    A.    Yes.

4    Q.    -- Oxycodone?

5    A.    Yes.

6    Q.    And do you recall how much -- when you first -- when

7    he first started prescribing you Oxycodone, how much he

8    prescribed you?

9    A.    Yes.

10   Q.    And how much was that?

11   A.    I take two a day.  I usually take one in the morning

12   and one at night before I go to bed.

13   Q.    When he initially started prescribing you, did he

14   prescribe ten milligrams?

15   A.    Yes.

16   Q.    And at some point, did he increase the dose to

17   15 milligrams?

18   A.    Yes.

19   Q.    And what is your recollection or understanding of why

20   he did that?

21   A.    Because the 10s weren't really working.

22   Q.    And at some point did Dr. Titus send you for physical

23   therapy?

24   A.    Yes.

25              MS. KOUSOULIS:  And Mr. Marek, if you can pull

Cody - Direct

1    up Defense Exhibit 10, 86.

2    BY MS. KOUSOULIS:

3    Q.      And did he send you to Southern Delaware Physical

4    Therapy?

5    A.      Yes, he did.

6    Q.      And was the purpose to see if there was some other

7    treatment he could give you to help your pain?

8    A.      Yes.

9    Q.      And did you continue with physical therapy?

10   A.      No.

11   Q.      And why not?

12   A.      Because it wasn't -- it hurt me more than -- going to

13   physical therapy than, you know...

14   Q.      And at some point, did Dr. Titus refer you to another

15   pain specialist for a consultation, Dr. Cemerlic?

16   A.      Yes, he did.

17           MS. KOUSOULIS:  And Mr. Marek, can you put up

18   Exhibit 10 at 64.

19   BY MS. KOUSOULIS:

20   Q.      And did he provide you with this prescription to go

21   see Dr. Cemerlic for an evaluation?

22   A.      Yes.

23   Q.      And did you go see Mr. Cemerlic?

24   A.      Yes.

25   Q.      Okay.  Now, during the time that you were being

Cody - Direct

1    prescribed Oxycodone from Dr. Titus, would you do pill

2    counts?

3    A.     Yes, he did.

4    Q.     Would he drug test you?

5    A.     Yes.

6            MS. KOUSOULIS:  And Mr. Marek, can you pull up

7    Defense Exhibit 10 at 88.

8    BY MS. KOUSOULIS:

9    Q.     And your drug -- when he would drug test you, did you

10   ever have, from your recollection, an in -- did you ever

11   have a problem urine?

12   A.     No.

13   Q.     Okay.  So, in fact, like -- and could you see this

14   document?  This is your drug test from November 8th, 2013;

15   correct?  And at that time, you were being prescribed

16   Oxycodones?

17   A.     Yes.

18   Q.     Okay.

19           MS. KOUSOULIS:  And you can zoom back out,

20   Mr. Marek.

21   BY MS. KOUSOULIS:

22   Q.     And Oxycodone was detected in your system; correct?

23   A.     Yes.

24   Q.     Okay.

25           MS. KOUSOULIS:  And could you pull up Defense

Cody - Direct

1    Exhibit 10, 77.

2    BY MS. KOUSOULIS:

3    Q.    And this test is another test he sent you on

4    January 9th, 2014.  And, again, you're being prescribed

5    Oxycodone?

6    A.    Yes.

7    Q.    And you tested positive for Oxycodone; correct?

8    A.    Yes.

9              MS. KOUSOULIS:  You can zoom back out,

10   Mr. Marek.

11   BY MS. KOUSOULIS:

12   Q.    With regard to your pain, can you -- at the time you

13   went to see Dr. Titus, can you explain a little bit more to

14   the jury about what you were going -- like what your

15   day-to-day life was like, how the pain affected your life or

16   your ability to do things?

17   A.    You want before?

18   Q.    Yeah.  When you first started seeing Dr. Titus in

19   2010.

20   A.    I was in a lot of pain.  See, I get these -- I've got

21   these lumps in my back and everything, and nobody seems to

22   know where they come from and everything.  And it's been --

23   they're very tender when they're being touched.  I got

24   spinal stenosis and degenerative disc in my back, and it's

25   very painful.  And it's hard for me to walk a lot.  I can't

Cody - Cross

1    walk very long.  I can't sit very long, and I can't lay very

2    long.  It's very painful.  And it seemed like nobody knows

3    what to do with it.

4    Q.    Did the medication, the Oxycodone that Dr. Titus

5    prescribed, did that help ease your pain?

6    A.    Yeah, it really does.  It really helps out.  It

7    relieves the pain a little bit, you know.  So...

8    Q.    Okay.

9              MS. KOUSOULIS:  Thank you very much.  No further

10   questions.

11                       CROSS-EXAMINATION

12   BY MS. SOBCZAK:

13   Q.    Good morning, Ms. Cody.

14   A.    Good morning.

15   Q.    So you are currently covered by Medicaid; is that

16   correct?

17   A.    Yes.

18   Q.    And you were covered by Medicaid at the time you saw

19   Dr. Titus?

20   A.    Yeah, I've been on Medicaid since 2010.

21   Q.    Okay.  And you don't currently pay out of pocket for

22   your medical costs, do you?

23   A.    No.

24   Q.    Medicaid covers it?

25   A.    Yes.

Cody - Cross

1    Q.     And you are currently prescribed Oxycodone; is that

2    correct?

3    A.     Not now, I am not.  I don't see a pain management

4    now.  I don't go to one.

5    Q.     But you were covered by Medicaid at the time you saw

6    Dr. Titus?

7    A.     Yeah.

8    Q.     And at the time you saw Dr. Titus, despite being

9    covered by Medicaid, you paid out of pocket?

10   A.     Right.

11   Q.     So I'd like to show you what's been marked as

12   Government Exhibit 203, and this is an exhibit from the

13   receipt book dated -- pages --

14            MS. SOBCZAK:  It's the receipt book.

15            MS. KOUSOULIS:  But is it in the -- can I see

16   it?

17            MS. SOBCZAK:  It's the hard copy.

18            MS. KOUSOULIS:  Right.

19            (Discussion held off the stenographic record:)

20   BY MS. SOBCZAK:

21   Q.     So Ms. Cody, this is your name, is it not?

22   A.     Yes.

23   Q.     And this is a receipt to Dr. -- for payment to

24   Dr. Titus' office?

25   A.     Yes.

Cody - Cross

1   Q.      And the other name on this is Johnny Diogo?

2   A.      Right.

3   Q.      And it is a receipt for $360?

4   A.      Right.

5   Q.      And Johnny Diogo is a significant other of yours?

6   A.      Yes.

7   Q.      And this was payment for both your and Johnny Diogo's

8   visit that day?

9   A.      Right.

10  Q.      And the date on that is January 1st -- January 6th,

11  2014?

12  A.      Right.

13  Q.      And you both went for controlled substances; is that

14  right?

15  A.      What?

16  Q.      You both went to receive prescriptions for controlled

17  substances?

18          MS. KOUSOULIS:  Objection, Your Honor.  I don't

19  think that's -- I mean, the form of the question, they

20  didn't go to receive prescriptions.  They went for pain

21  management.

22          THE COURT:  Well, so I'm going to overrule the

23  objection.

24          THE WITNESS:  That's -- that's to go visit

25  Dr. Titus' office.  That's his receipt.  They give us a

Cody - Cross

1    receipt for that.  That's not for controlled substances.

2    That's his visit.

3    BY MS. SOBCZAK:

4    Q.    Yes, Ms. Cody.  So I would like to show you -- so,

5    Ms. Cody, I'd like to show you what's been marked as Defense

6    Exhibit 101 at Page 65.

7          Do you recognize this document?

8    A.    It's a little blurry.

9    Q.    I'm sorry.  One second.

10         Okay.  Can you see that?  Okay.  This is my

11   first time with the elmo so it's fun for all of us here.

12         Do you recognize this document?  Is this your

13   name?

14   A.    Yeah, that's my prescription.

15   Q.    And is -- the date is January 6th, 2014?

16   A.    Yeah.

17   Q.    The same date that that receipt showed for $360?

18   A.    Yeah.

19   Q.    And the prescription is for Oxycodone 15 milligrams?

20   A.    Yeah.

21   Q.    And this is the signature of Dr. Patrick Titus?

22   A.    Right.

23   Q.    And you recognize that signature?

24   A.    Yeah.

25   Q.    That's the signature of Dr. Titus?

Cody - Cross

1    A.      Right.

2    Q.      And this is the same day that Johnny Diogo went with

3    you to Dr. Titus' office?

4    A.      Right.

5    Q.      And --

6    A.      Because, see, we had an appointment the same day to

7    go see Dr. Titus.

8             MS. SOBCZAK:  Your Honor, at this point the

9    Government seeks to admit Government Exhibit 1013.

10             MS. KOUSOULIS:  I haven't seen this exhibit yet.

11   Your Honor, can we see you at side-bar?

12             THE COURT:  All right.

13             (Beginning of conference held at side-bar.)

14             MS. KOUSOULIS:  Your Honor, these are

15   prescriptions for Johnny Diogo for January 6th, 2014.  I'm

16   not sure the relevance.

17             THE COURT:  I'm not sure, either, but it is what

18   it is.  And I don't have any idea what the Government is

19   actually trying to do here, but apparently it fits in with

20   what I think they're trying to suggest which is she's a drug

21   dealer.  So I'm going to allow it.

22             MS. SOBCZAK:  Thank you, Your Honor.

23             (Conclusion of conference held at side-bar.)

24             MS. SOBCZAK:  So Your Honor, the Government

25   moves to admit Exhibit 1013.

 1              THE COURT:  All right.  It's admitted.

 2              (Government Exhibit No. 1013 was admitted into

 3      evidence.)

 4      BY MS. SOBCZAK:

 5      Q.      And Ms. Cody, I'm just going to show you a few

 6      documents.  Try to do this a little better.

 7                      And this, again, is a prescription from

 8      Dr. Titus; is that correct?

 9      A.      Yeah.

10      Q.      And the name on this is Johnny Diogo?

11      A.      Right.

12      Q.      And the date is January 6th, 2014?

13      A.      Right.

14      Q.      And the prescription is also for Oxycodone 15

15      milligrams?

16      A.      Right.

17      Q.      And the signature is Dr. Patrick Titus?

18      A.      Right.

19      Q.      So you went on the same day --

20      A.      Yeah.

21      Q.      -- to Dr. Titus --

22      A.      Right.

23      Q.      -- and received the same prescription?

24      A.      Right.

25      Q.      Also, you stated that you began seeing Dr. Titus in

Cody - Cross

1   2010; is that right?

2   A.    Yeah.

3   Q.    And you saw him through his suspension in 2011?

4   A.    Yeah.

5   Q.    And were prescribed Oxycodone 15 at that point?

6   A.    Right.

7   Q.    And then there was a few-month hiatus before you went

8   back to see him?

9   A.    Right.

10  Q.    And at that time, he prescribed you Oxycodone 10s?

11  A.    Yeah.  He -- 10s and then went to 15s.

12  Q.    So he decreased from the 15s to the 10s when you went

13  back to him?

14  A.    I guess.  I don't know, but...

15  Q.    And then he prescribed you the 10s for a few months;

16  is that right?

17  A.    Right.  And then --

18  Q.    And then went back up to the 15's?

19  A.    Fifteeen's.

20  Q.    And another document I'd like to show you from

21  Government -- or Defense Exhibit 10 at Page 87.  Does this

22  state -- this is an MRI; is that right?

23  A.    Yes.

24  Q.    And this is your name right there, Lisa Cody?

25  A.    Yes.

Cody - Cross

1    Q.     And the summary states "Low back pain radiating to

2    right leg"?

3    A.     Right.

4    Q.     "The findings are unremarkable"; is that right?  Does

5    it state that?

6    A.     Yeah.

7    Q.     It also states "No herniation or stenosis"; is that

8    right?

9    A.     Yeah.

10   Q.     It states "Mild central lumbar stenosis"; is that

11   right?

12   A.     Yeah.

13   Q.     And it states "No evidence of disc herniation or

14   nerve compression"; is that right?

15   A.     Yeah.  But that's back then, but I do have one

16   because I got another opinion, too, and he's a back

17   specialist.

18   Q.     That was after you saw Dr. Titus?

19   A.     That was after I saw Dr. Titus.

20   Q.     But this was on March 25th, 2010; is that right?

21   A.     Yeah.  I seen one in 2014.

22   Q.     And that was --

23   A.     I may not have brought that evidence.

24   Q.     And you also stated that you saw Dr. Cemerlic; is

25   that right?

Cody - Redirect

1    A.    Yes.

2    Q.    But that was after you saw Dr. Titus?

3    A.    Yes.

4    Q.    And after Dr. Titus' practice closed down?

5    A.    Yeah, well, he -- Dr. Titus recommended me to go to

6    one, yes.

7    Q.    Okay.  But you saw Dr. Titus first?

8    A.    Yes.

9    Q.    And then saw Dr. Cemerlic?

10   A.    Yeah.

11            MS. SOBCZAK:  Okay.  No further questions, Your

12   Honor.

13            THE COURT:  All right.  Any redirect,

14   Ms. Kousoulis?

15            MS. KOUSOULIS:  One moment, Your Honor.

16                   REDIRECT EXAMINATION

17   BY MS. KOUSOULIS:

18   Q.    Ms. Cody, back in 2010, was your pain remarkable or

19   did you have significant pain?

20   A.    When?

21   Q.    Back in 2010, what was your pain like?

22   A.    It was pretty painful.

23            MS. KOUSOULIS:  And if you can, Mr. Marek, pull

24   up Defense Exhibit 10, 87.  87, yes.

25            Now, and if you could zoom in on the bottom

Cody - Redirect

1    portion of that, Mr. Marek, from the middle down.  Yes.

2    BY MS. KOUSOULIS:

3    Q.    Now, the Government just asked you about the results

4    being unremarkable.  That was with regard to L1, L2, and L3;

5    correct?

6    A.    Yeah.

7    Q.    But with regard to the other areas of your back,

8    there's other diagnoses; correct?

9    A.    Yes.

10   Q.    And although it says here "No disc herniation," at

11   some point did you develop a disc herniation?

12   A.    Yeah.

13   Q.    And prior to being diagnosed in 2014 with a disc

14   herniation, were you feeling pain from that?

15   A.    Yes.

16   Q.    So would you say that you perhaps had a disc

17   herniation before the diagnosis in 2014?

18   A.    Yeah.

19   Q.    And is it possible that you had the disc herniation

20   some time after 2010, but before you stopped seeing

21   Dr. Titus?

22   A.    Yes.

23          MS. KOUSOULIS:  I have no further questions.  Or

24   wait one moment, Your Honor.  No further questions.

25          THE WITNESS:  Okay.

Ryan - Direct

1                   THE COURT:  All right.

2                   Ms. Cody, thank you.  You're excused.  You may

3      go.

4                   THE WITNESS:  Okay.  Thank you.

5                   MS. KOUSOULIS:  We're getting our next witness.

6                   The Defense calls Joelle Ryan.

7                   DEPUTY CLERK:  Please state and spell your full

8      name for the record.

9                   THE WITNESS:  Joelle Ryan, J-O-E-L-L-E R-Y-A-N.

10                  DEPUTY CLERK:  Do you affirm that the testimony

11     you are about to give to the Court and the jury in the case

12     now pending will be the truth, the whole truth, and nothing

13     but the truth, you do so affirm?

14                  THE WITNESS:  I affirm.

15                  DEPUTY CLERK:  Thank you.

16                  JOELLE RYAN, the witness herein, after having

17     been duly affirmed under oath, was examined and testified as

18     follows:

19                         DIRECT EXAMINATION

20     BY MS. KOUSOULIS:

21     Q.    Good morning, Officer Ryan. How are you currently

22     employed?

23     A.    I work at the University of Delaware Police

24     Department.

25     Q.    And how long have you been employed in that capacity?

Ryan - Direct

1    A.      Approximately 13 years.

2    Q.      Okay.  Back in 2014, were you assigned as a Task

3    Force Officer with the DEA?

4    A.      I was.

5    Q.      Okay.  And as part of your duties back in 2014, did

6    you take part in the investigation of Dr. Patrick Titus?

7    A.      I did.

8    Q.      And what was your role in that investigation?

9    A.      I assisted the case agent in that investigation as

10   needed.

11   Q.      And did part of your duties include taking part in an

12   undercover operation in August and September of 2014?

13   A.      Yes.

14   Q.      And who made the -- and did the undercover operation

15   involve you attempting to become a patient of Dr. Titus' to

16   see how the practice operated from the inside?

17   A.      It did involve me trying to become a patient, yes.

18   Q.      Okay.  And who made the -- can you describe just for

19   the jury the Task Force that you were on, who else was on

20   it?  How many people did that involve?  Like, who was -- how

21   is the Task Force made up?

22   A.      There were several special agents.  We had a group

23   supervisor.  And then in addition to me, there were a few

24   Task Force Officers from the local police departments.

25   Q.      Do you recall how many people total were on the Task

Ryan - Direct

1   Force?  I know it was a long time ago.

2   A.    I don't specifically, but -- no, I don't

3   specifically.

4   Q.    Okay.  That's fine.

5         Who made the decision to conduct the undercover

6   operation involving Dr. Titus?

7   A.    I don't recall exactly who it was, but -- I don't

8   know.

9   Q.    What was the purpose of the undercover operation?

10  A.    To see what information we could obtain.

11  Q.    Information regarding what?

12  A.    Information regarding the practice, just to help with

13  the investigation.

14  Q.    And was an operational plan created in connection

15  with the undercover operation?

16  A.    I don't recall.

17  Q.    And can you explain what took place with regard

18  to this undercover operation?

19  A.    For this operation, it never came to fruition.  It

20  was just attempts to try and get into the practice via phone

21  call and in person.

22  Q.    So this undercover operation involved you placing

23  several phone calls to Dr. Titus' office to try to become a

24  patient and later going to his office to try to become a

25  patient; is that fair to say?

Ryan - Direct

1   A.      That's fair to say, yes.

2   Q.      Okay.  And as part of the undercover operation, when

3   you were making your phone calls to his office and going

4   there in person, did you wear a wire, or did you wear a

5   recording device to help record conversations you would have

6   with his office members?

7   A.      I did.

8   Q.      Okay.  Now, you placed three calls to his office and

9   visited his office three times?

10  A.      Yes.

11  Q.      And the first call to Dr. Titus' office was on

12  August 18th, 2014?

13  A.      I don't recall the dates specifically.

14  Q.      Okay.  But there was a time that you -- your first

15  attempt to reach out to him and become a patient was by

16  phone?

17  A.      That's correct.

18  Q.      Okay.  And you recorded the phone conversation;

19  correct?

20  A.      Correct.

21          MS. KOUSOULIS:  Mr. Marek, can you play --

22  Defense would like to offer into evidence Defense Exhibit 13

23  A through F, which are the three audio recordings of her

24  phone calls and the three audio recordings of her visits to

25  the practice.

                        Ryan - Direct

1              MS. REMIS:  No objection, Your Honor.

2              THE COURT:  All right.  Admitted without

3    objection.

4              (Defense Exhibit Nos. 13A through F were

5    admitted into evidence.)

6              MS. KOUSOULIS:  Mr. Marek, can you pull up

7    Defense Exhibit 13A.

8    BY MS. KOUSOULIS:

9    Q.    And before you play that, was your name at the time

10   Joelle Forrester?

11   A.    It was.

12   Q.    Okay.

13             MS. KOUSOULIS:  Do I have to hit anything here?

14             MR. MAREK:  No.

15             (Whereupon Defense Exhibit No. 13A was played.)

16   BY MS. KOUSOULIS:

17   Q.    Were you able to make an appointment that day?

18   A.    I was not.

19   Q.    And the reason is because Dr. Titus' office required

20   you to produce a record before making the appointment?

21   A.    That is what they said, yes.

22   Q.    Did you place a second call to Dr. Titus' office on

23   August 19th, 2014?

24   A.    Again, I don't recall the date.

25   Q.    But did you place -- do you recall placing a second

Ryan - Direct

1    call?

2    A.    I do, yes.

3    Q.    And was the purpose again to try to schedule an

4    appointment?

5    A.    That's correct.

6          MS. KOUSOULIS:  Mr. Marek, can you please play

7    Defense Exhibit 13B.

8          (Whereupon Defense Exhibit No. 13B was played.)

9    BY MS. KOUSOULIS:

10   Q.    So at that time, you were also not able to get an

11   appointment because they didn't have your records; correct?

12   A.    That's correct.

13   Q.    And then on August 21st, 2014, did you make a third

14   attempt through a phone call to schedule an appointment?

15   A.    Again, I don't remember the date, but I did make a

16   third call.

17         MS. KOUSOULIS:  And Mr. Marek, can you please

18   play Defense Exhibit 13C.

19         (Whereupon Defense Exhibit No. 13C was played.)

20         MS. KOUSOULIS:  Mr. Marek, so we don't have to

21   listen to the silence, can you fast-forward to 4:10, four

22   minutes, ten seconds, or approximately there.  That's fine.

23         (Defense Exhibit No. 13C continued to be

24   played.)

25   BY MS. KOUSOULIS:

Ryan - Direct

1    Q.    So following that third call, did you decide to visit

2    Dr. Titus' office in person and bring your records?

3    A.    Someone did decide that I should do that, yes.

4    Q.    Okay.  But that wasn't -- you don't recall if that

5    was you or not?

6    A.    I wasn't the case agent, so I was likely just taking

7    direction.

8    Q.    Okay.  Who was the case agent at that time; do you

9    recall?

10   A.    I believe Linda Eleazer.

11   Q.    Oh.  Okay.  Now, you used the name -- referred to

12   yourself as Katie McGrath on the video.  Is that your

13   undercover name?

14   A.    That's correct.

15   Q.    Okay.  So when you went to Dr. Titus' office in

16   person, you also had a recording device that could record

17   the conversation between you and his staff?

18   A.    That's correct.

19   Q.    Okay.  Did your first visit take place on

20   August 25th, 2014 at around 11:00 a.m.?

21   A.    I don't recall the date.

22        MS. KOUSOULIS:  Mr. Marek, can you please play

23   Defense Exhibit 13D.

24        (Whereupon Defense Exhibit No. 13D was played.)

25   BY MS. KOUSOULIS:

Ryan - Direct

1    Q.     And this is you walking into the office from the

2    parking lot?

3    A.     I believe so.

4               (Defense Exhibit No. 13D continued to be

5    played.)

6    BY MS. KOUSOULIS:

7    Q.     And did you bring your medical records with you this

8    time?

9    A.     I don't recall.

10              (Defense Exhibit No. 13D continued to be

11   played.)

12   BY MS. KOUSOULIS:

13   Q.     So were you told that Dr. Titus would look at your

14   records and give you a call in a couple of days?

15   A.     Yes.

16   Q.     And then did you make another, a second visit to

17   Dr. Titus' office on September 4th, 2014?

18   A.     Right.  I'm unsure of the date, but I did make a

19   second visit.

20              MS. KOUSOULIS:  Mr. Marek, if you could please

21   play Defense Exhibit 13B.

22              (Defense Exhibit No. 13B continued to be

23   played.)

24   BY MS. KOUSOULIS:

25   Q.     At this point, you're walking through the parking lot

Ryan - Direct

1   into the office?

2   A.    I believe so.

3             MS. KOUSOULIS:  Mr. Marek, can you just

4   fast-forward to 1:10.

5             (Defense Exhibit No. 13B continued to be

6   played.)

7   BY MS. KOUSOULIS:

8   Q.    Is that a TV on in the background?

9   A.    It sounds like it.

10            (Defense Exhibit No. 13B continued to be

11  played.)

12  BY MS. KOUSOULIS:

13  Q.    And at this point, you're inside Dr. Titus' office;

14  right?

15  A.    Yes.

16            MS. KOUSOULIS:  Mr. Marek, can you fast-forward

17  to 6:10.

18            (Defense Exhibit No. 13B continued to be

19  played.)

20  BY MS. KOUSOULIS:

21  Q.    So Dr. Titus did not see you that day either because

22  they still didn't have your records?

23  A.    Correct.  That's what they said.

24  Q.    But Josie in the office told you if you brought in

25  your records, he would take a look at them and determine

Ryan - Direct

1    whether or not he would take you as a patient?

2    A.    Yes.

3    Q.    And do you know who you were talking to at the end of

4    that clip there?

5    A.    I don't.

6    Q.    Would it have been somebody else on the Task Force

7    that was there with you?

8    A.    I don't recall.

9    Q.    When you would go to Dr. Titus' office during this

10   time, would you go as another individual or would you go by

11   yourself?

12   A.    I don't recall.

13   Q.    And were you able to make an appointment that day?

14   A.    I was not.

15   Q.    Now, did you make a third visit to Dr. Titus' office

16   on September 9th, 2014?

17   A.    I don't recall the date, but I did make a third

18   visit.

19   Q.    And your purpose in going that day to the office was,

20   again, to try to make an appointment?

21   A.    Correct.

22   Q.    And this time you brought your medical records with

23   you?

24   A.    I believe so.

25   Q.    And then when you got there, did you hand your

Ryan - Direct

1    records to a member of the staff?

2    A.    I don't specifically recall that.

3    Q.    Do you recall if you waited for a little while while

4    Dr. Titus reviewed your records?

5    A.    I did wait inside the office, but I don't know what

6    they were doing.

7              MS. KOUSOULIS:  Can you please play, Mr. Marek,

8    Defense Exhibit 13F.

9              (Whereupon Defense Exhibit No. 13F was played.)

10   BY MS. KOUSOULIS:

11   Q.    At this point, you're waiting in the office for

12   Dr. Titus to review your records; correct?

13   A.    At this point, I'm waiting outside.  Again, I don't

14   know what they're doing.

15             (Defense Exhibit No. 13F continued to be

16   played.)

17   BY MS. KOUSOULIS:

18   Q.    And would you agree that it's pretty quiet in the

19   office when you're there?

20   A.    In this visit, it does sound like it's relatively

21   quiet.

22             MS. KOUSOULIS:  And Mr. Marek, can you

23   fast-forward to 11:10 or thereabouts.

24             (Defense Exhibit No. 13F continued to be

25   played.)

Ryan - Direct

1    BY MS. KOUSOULIS:

2    Q.    Did Dr. Titus agree to take you as a patient?

3    A.    Whoever I spoke to said he did not.

4    Q.    And when you asked the person that you spoke to why

5    he wouldn't take you as a patient, were you told because

6    Dr. Titus didn't see anything?

7    A.    That's what it sounds like, yes.

8    Q.    And then when you went to the parking lot, you were

9    speaking to someone and you said shot down?

10   A.    I thought I heard shut down, but I said something

11   along those lines.

12   Q.    Okay.  And who were you speaking to?

13   A.    I don't recall.

14   Q.    And prior to conducting this undercover surveillance,

15   were you briefed on what to look for and what to do?

16   A.    I don't recall that now.

17   Q.    Were you briefed on the background of the

18   investigation or were you familiar with the investigation

19   based on the work you had conducted on the investigation to

20   date?

21   A.    I would think at the time I was, but I don't recall

22   specifically.

23   Q.    Okay.  During any of the three visits to Dr. Titus'

24   office, did you take any notes or make any reports?

25   A.    I don't recall.

Ryan - Direct

1    Q.    And with regard to any of the phone calls, did you

2    make any reports or take any notes?

3    A.    I don't recall.

4    Q.    Now, would you agree with me that the -- with regard

5    to this undercover investigation in its entirety, did you

6    make any notes -- take any notes or make any reports?

7    A.    I don't recall.

8    Q.    Okay.  Would you agree with me that it's important

9    to --

10           MS. KOUSOULIS:  One moment, Your Honor.  Can I

11   just have one moment?  One moment, Your Honor.

12   BY MS. KOUSOULIS:

13   Q.    Would you agree with me that it's important to

14   prepare reports and take notes when you're doing an

15   investigation to memorialize what happened?

16           MS. REMIS:  Objection, Your Honor, to relevance.

17           THE COURT:  Yeah, I'm going to sustain the

18   objection.

19   BY MS. KOUSOULIS:

20   Q.    Did you make any reports in this case?

21           MS. REMIS:  Objection, Your Honor, asked and

22   answered.

23           THE COURT:  Well, I'm going to allow her to ask

24   a second time.

25           THE WITNESS:  I don't currently have access to

Ryan - Direct

1    that system, so I'm not sure.

2    BY MS. KOUSOULIS:

3    Q.    Are you familiar with operational plans in general,

4    like, with regard to undercover operations?

5    A.    Yes.

6    Q.    And what is an operational plan, as far as you

7    understand it?

8    A.    From my understanding, we use them as a way to

9    safeguard what the objectives were for the day and to ensure

10   safety of the occupants or the people involved.

11   Q.    Okay.  And then -- but with regard to the

12   investigation, the undercover investigation with Dr. Titus,

13   you said that no operational plan was created?

14   A.    I don't recall if a plan was created.

15   Q.    And if a plan was created, would it be important to

16   document that plan?

17   A.    Yes.

18   Q.    Now, a lot of the questions I asked, you indicated

19   you didn't recall any of the details; is that correct?

20   A.    For some of them, yes.

21   Q.    Okay.  And would it be fair to say that creating

22   reports is a good way to document what happens so you can

23   later recall events?

24   A.    It's one way to document.

25   Q.    Are you aware of any other surveillance that occurred

Ryan - Direct

1    at Dr. Titus' office in this investigation?

2    A.      At the office itself?

3    Q.      Yes.  Any other surveillance, whether it be

4    surveillance from the parking lot, other people going into

5    the office, like any surveillance of Dr. Titus' practice?

6    A.      Yes.

7    Q.      Okay.  And what other surveillance was conducted, to

8    your recollection?

9    A.      Surveillance of the office itself and just the local

10   area with the local pharmacy, I believe.

11   Q.      Is it fair to say that there was surveillance

12   conducted from the parking lot area of Dr. Titus' office on

13   at least three or four other occasions?

14   A.      I don't recall the number.

15   Q.      Okay.  Now, during any of your three visits to

16   Dr. Titus' office, you didn't notice any drug selling going

17   on in the parking lot; correct?

18              MS. REMIS:  Objection, Your Honor, to leading.

19              THE COURT:  It's cross-examination.  Overruled.

20   Oh, wait.

21              MS. REMIS:  No.

22              THE COURT:  It's not cross-examination.  Sorry.

23   In any event, it's still overruled.

24              THE WITNESS:  Sorry.  Could you repeat --

25   BY MS. KOUSOULIS:

Ryan - Cross

1    Q.    Did you observe any drug selling going on in the

2    parking lot during your time doing undercover surveillance

3    at Dr. Titus' office?

4    A.    Not that I can recall.

5    Q.    And did you notice any drug selling going on or any

6    inside Dr. Titus' waiting area when you were there?

7    A.    I don't believe so.

8              MS. KOUSOULIS:  I have no further questions,

9    Your Honor.

10             THE COURT:  All right.  Any cross-examination?

11             MS. REMIS:  Yes, Your Honor.

12                    CROSS-EXAMINATION

13   BY MS. REMIS:

14   Q.    Good morning, Ms. Ryan.

15   A.    Good morning.

16   Q.    Now, we all know, sitting here today, that one of

17   the -- you mentioned on direct that one of the goals of

18   these recordings was to sort of get some information about

19   the practice; is that right?

20   A.    That's correct.

21   Q.    But back in August and September of 2014, you never

22   notified the office when you spoke with them that that was

23   what you were doing; right?

24   A.    Correct.

25   Q.    And, in fact, when you called the office, you never

Ryan - Cross

1    said anything about what kind of appointment you were

2    seeking, did you?

3    A.    I did not.

4    Q.    And on the first call that we listened to earlier,

5    the only thing that you told the office staff at Lighthouse

6    was that you wanted to make an appointment as a first-time

7    patient; right?

8    A.    Correct.

9    Q.    You didn't say that you had pain, did you?

10   A.    I did not.

11   Q.    Or that you were looking for any sort of

12   prescription?

13   A.    I did not.

14   Q.    And nobody asked you why you needed to come into the

15   office; right?

16   A.    Correct.

17   Q.    Nobody asked you if you had insurance?

18   A.    They did not.

19   Q.    Whoever answered the phone immediately told you that

20   you needed to send an MRI or an x-ray; right?

21   A.    Yes.

22   Q.    Your understanding is that Lighthouse was an internal

23   medicine clinic; right?

24   A.    Correct.

25   Q.    And internal medicine is not just pain management, is

Ryan - Cross

1    it?

2    A.      I don't believe so.

3    Q.      Internal medicine is where somebody would go if they

4    had a sore throat, or a headache, or something like that; is

5    that right?

6    A.      Yes.

7    Q.      You made another call on August 19th, and again, you

8    said you were trying to make an appointment as a new

9    patient; right?

10   A.      Correct.

11   Q.      Again, you weren't asked what kind of new patient you

12   were?

13   A.      I was not.

14   Q.      And you weren't asked about any of your issues that

15   you were seeking to get help for; right?

16   A.      I was not.

17   Q.      And you called a third time; is that right?

18   A.      I did.

19   Q.      And on the third call, you mentioned to the office

20   that you had faxed your -- that the diagnostic imaging place

21   had faxed your records twice; right?

22   A.      That's correct.

23   Q.      But the office told you they still didn't have them?

24   A.      Correct.

25   Q.      And at that time, you asked if you could just make an

Ryan - Cross

1    appointment and bring your records; is that right?

2    A.    Yes.

3    Q.    But, again, you didn't say what kind of appointment

4    you were trying to make?

5    A.    Correct.

6    Q.    And someone responded during that third call that --

7    they said something like, "he has to review them and decide

8    if he wants to accept you or not," the doctor; right?

9    A.    Yes.

10   Q.    And you understood them to be talking about

11   Dr. Titus?

12   A.    I did.

13   Q.    Deciding whether or not to accept a new patient based

14   only on an x-ray, that doesn't sound like somebody --

15             MS. KOUSOULIS:  Objection, Your Honor.

16             THE COURT:  Yeah, I'm going to sustain the

17   question or sustain the objection.

18   BY MS. REMIS:

19   Q.    Now, at this point in your phone calls, still nobody

20   had asked you any question about what kind of care you were

21   seeking?

22   A.    Correct.

23   Q.    And they never asked you if you had any issues that

24   wouldn't show up on an x-ray, for example?

25   A.    They did not.

Ryan - Cross

1   Q.      And then you decided to go in person; right?

2   A.      Yes.

3                  MS. REMIS:  And so, if we could pull up

4   Government Exhibit 700, please.

5   BY MS. REMIS:

6   Q.      Officer Ryan, do you recognize this location?

7   A.      I do.

8   Q.      Is this the location that you had visited?

9   A.      It is.

10  Q.      Okay.  And now this is in Milford, Delaware at Church

11  Street?

12  A.      I recall it being in Milford, Delaware, yes.

13  Q.      Okay.  Did you bring an x-ray with you on your first

14  in-person visit to the office?

15  A.      I brought some type of documentation.  Yes.

16  Q.      Okay.  And just to be clear, the documentation that

17  you would have brought, would that have been an actual x-ray

18  of you?

19  A.      Of me, yes.

20  Q.      And was it photographs or just the paperwork

21  associated with it, if you remember?

22  A.      I don't recall.

23  Q.      Okay.  Now, when you enter on this first visit, if

24  you recall the recording, it sounds pretty lively in the

25  office, doesn't it?

Ryan - Cross

1   A.      It does.

2   Q.      And you spoke with somebody at the desk, again, about

3   making a new patient appointment?

4   A.      Correct.

5   Q.      Again, no mention of what kind of appointment?

6   A.      Correct.

7   Q.      And no questions about why you were there?

8   A.      That's correct.

9   Q.      But the question you were asked was whether or not

10  you had seen a pain doctor in the past?

11  A.      Yes.

12  Q.      And you hadn't; is that right?

13  A.      I believe I responded that I had not.

14  Q.      Okay.  You told the office you hadn't?

15  A.      Correct.

16  Q.      And then you visited again, just about a week or so

17  later, again, with your records; is that right?

18  A.      Correct.

19  Q.      And you told the office that you had faxed them over

20  twice and you dropped them off once, but they still didn't

21  have the paperwork; right?

22  A.      I apologize.  On that second visit, I don't think I

23  brought records with me that day.

24  Q.      Okay.  You just went to follow up and see if they had

25  them?

1602

Ryan - Cross

1   A.     Correct.

2   Q.     And according to the recording, it's hard to hear the

3   person responding to you, but it sounds like you spoke with

4   someone named Josie; right?

5   A.     Correct.

6   Q.     And that's the fifth time that you had either called

7   or visited Lighthouse?

8   A.     That's correct.

9   Q.     And still nobody asked you about your medical issues?

10  A.     Correct.

11  Q.     Now, you visited one final time, the third time; is

12  that right?

13  A.     I did.

14  Q.     And at this time, you walk in and you told them that

15  Josie had said come back and that the doctor would review

16  your records while you waited; is that right?

17  A.     Correct.

18  Q.     And then you waited for about ten or 12 minutes; is

19  that right?

20  A.     Yes.

21  Q.     And finally, somebody came back and gave you an

22  answer that said something like, "He says no,

23  unfortunately"; right?

24  A.     Correct.

25  Q.     And you asked did he say why or something like that?

Ryan - Cross

1    A.      Correct.

2    Q.      And then somebody in the office, whoever you were

3    talking to, said something along the lines of he says he

4    doesn't see anything; right?

5    A.      Correct.

6    Q.      And that was the entirety of your discussion; right?

7    A.      That's correct.

8    Q.      And when you were in the office that morning, did you

9    see Dr. Titus there?

10   A.      Not that I recall.

11   Q.      Do you have any idea if he was in the office at that

12   time?

13   A.      I don't know that.

14   Q.      Did you see somebody hand him your x-rays?

15   A.      I did not.

16   Q.      Did you see him review any records of yours?

17   A.      Not that I recall.

18   Q.      And assuming Dr. Titus did review your records, would

19   anybody have had anything of yours or any information about

20   you other than this x-ray?

21   A.      No.

22   Q.      So assuming Dr. Titus did review your records, he

23   would have based his decision based solely on this one --

24              MS. KOUSOULIS:  Objection, Your Honor.

25              THE COURT:  All right.  I'm going to sustain the

Ryan - Cross

1    objection.

2              MS. REMIS:  Okay.

3    BY MS. REMIS:

4    Q.    Now, you're no longer a TFO, a Task Force Officer at

5    DEA, are you?

6    A.    That's correct, I'm not.

7    Q.    When you were at DEA, did you act as an undercover in

8    other cases as well?

9    A.    I did.

10   Q.    And did you act as an undercover in some other

11   physician investigations?

12   A.    I did.

13   Q.    About how many total, like, in-person visits or

14   undercover operations would you say you've participated in

15   over that time?

16   A.    I'd estimate about 20.

17   Q.    You mentioned on direct examination a lot that you

18   don't recall a lot of stuff about this sort of calls and

19   visits to Dr. Titus' office; is that right?

20   A.    That's correct.

21   Q.    Do you have a recollection of the other types of

22   operations that you did around that time?

23   A.    I do seem to have more of a memory of this.

24   Q.    And what's the difference between what happened here

25   and what happened in those that you recall?

Ryan - Cross

1   A.     Those, I was actually meeting with the doctor and

2   acting as an undercover as far as telling them a story and

3   having to stick to that story, more like an acting -- it was

4   stressful, it was anxiety causing.  And this, listening back

5   to the tapes, seemed relatively like nothing happened.

6   Q.     And is it fair to say that in other cases where an

7   undercover is attempted, sometimes the person trying to get

8   into the clinic or wherever you're trying to go gets should

9   shut down, as you say?

10  A.     Yes.

11  Q.     And there are a lot of reasons why that might happen;

12  right?

13  A.     Correct.

14          MS. KOUSOULIS:  Objection, Your Honor.

15          THE COURT:  I'm going to sustain the objection.

16  BY MS. REMIS:

17  Q.     Okay.  And when you were attempting to go into the

18  clinic, you were using the name Katie McGrath; right?

19  A.     That's correct.

20  Q.     And your visit and your attempt at making an

21  appointment only had to do with Katie McGrath; right?

22  A.     That's correct.

23  Q.     Had nothing to do with the over 1,000 other patients

24  that Dr. Titus saw for pain; right?

25  A.     Correct.

Ryan - Redirect

1           MS. REMIS:  Pass the witness, Your Honor.  I

2    have no further questions.

3           THE COURT:  All right.

4           Any redirect?

5                     REDIRECT EXAMINATION

6    BY MS. KOUSOULIS:

7    Q.    Other than this undercover operation that happened in

8    August and September of 2014, were there any other times

9    that you participated in an undercover operation with

10   Dr. Titus?

11   A.    No.

12          MS. KOUSOULIS:  No further questions, Your

13   Honor.

14          THE COURT:  All right.

15          Thank you.  You're done.  You're excused.  You

16   may go.

17          THE WITNESS:  Thank you.

18          THE COURT:  All right.  Shall we take the

19   morning break?

20          MS. KOUSOULIS:  That's fine, Your Honor.

21          THE COURT:  All right.  So we'll take a

22   15-minute break and then come on back at 11:25.

23          (Jury leaving the courtroom.)

24          THE COURT:  And, Ms. Kousoulis, so you still

25   have Sylvester King who has some tox screens.  And you have

Ryan - Redirect

1    another patient?

2              MS. KOUSOULIS:  Yes, Your Honor, and then --

3              THE COURT:  And then you want to break for

4    lunch?

5              MS. KOUSOULIS:  Right.  And then we want to call

6    McDonald.

7              THE COURT:  Yes, okay, but you definitely want

8    to call him after the lunch break?

9              MS. KOUSOULIS:  Yes.  Yeah, because we weren't

10   sure if it was going to --

11             THE COURT:  Yeah, yeah.  You don't need to

12   explain.  I just wanted to make sure I knew what we were

13   doing.

14             MS. KOUSOULIS:  Yes, Your Honor.

15             THE COURT:  Okay.  We'll take a break and come

16   back at 11:25.

17             DEPUTY CLERK:  All rise.

18             (Recess was taken.)

19             DEPUTY CLERK:  All rise.

20             THE COURT:  All right.  Are you ready to go?

21             MR. BOSTIC:  Yes, Your Honor.

22             MS. KOUSOULIS:  Yes.

23             THE COURT:  Great.  So get the jury.

24             How long do you expect the direct of Agent

25   McDonald to be?

Ryan - Redirect

1   MR. BOSTIC:  Probably 15 or 20 minutes.  I don't

2   believe too long at all.

3   THE COURT:  All right.  Thanks.

4   (Jury entering the courtroom.)

5   THE COURT:  All right.  Members of the jury,

6   welcome back.

7   Everyone, you may be seated.

8   Mr. Bostic, you may call your witness.

9   MR. BOSTIC:  Thank you, Your Honor.  We call

10  Sylvester King to the standard, Your Honor.

11  DEPUTY CLERK:  Please --

12  MR. BOSTIC:  May I proceed?

13  DEPUTY CLERK:  Please state and spell your full

14  name for the record.

15  THE WITNESS:  Sylvester King, S-Y-L-V-E-S-T-E-R.

16  Last name King, K-I-N-G.

17  DEPUTY CLERK:  Do you affirm that the testimony

18  you are about to give to the Court and the jury in the case

19  now pending will be the truth, the whole truth, and nothing

20  but the truth, you do so affirm?

21  THE WITNESS:  Yes.

22  DEPUTY CLERK:  Thank you.

23  SYLVESTER KING, the witness herein, after having

24  been duly affirmed under oath, was examined and testified as

25  follows:

King - Direct

                        DIRECT EXAMINATION

1

2    BY MR. BOSTIC:

3    Q.      Good morning, Mr. King.

4    A.      Good morning.

5    Q.      Sir, are you also known -- your full name is

6    Sylvester King; is that correct?

7    A.      That's correct.

8    Q.      Are you also known as "Sly"?

9    A.      Yes.

10   Q.      Okay.  And I'm not going to ask you to explain the

11   "Sly" thing.  I think it's pretty obvious.

12              But are you currently employed?

13   A.      Yes, I am.

14   Q.      Okay.  How are you employed?

15   A.      Owner of a pharmacy called King Rx in Bala Cynwyd.

16   Q.      Okay.  And prior to being the owner of a pharmacy,

17   were you employed in, broadly speaking, the medical field?

18   A.      Yes, I was.

19   Q.      And can you tell the jury briefly the history of your

20   employment in that field?

21   A.      I started in the pharmaceutical sales industry back

22   in 1997.  I started out with several pharmaceuticals.  And

23   from there, I started working for Jackson -- excuse me, a

24   division of Johnson & Johnson.  And then a couple global

25   biotech companies.  Subcore being one.  Cephalon being

King - Direct

1     another.

2              And then from there, I went into the urine

3     toxicology industry.  I started out with Ameritox.

4     Q.    Now, with respect to your employment with Ameritox,

5     what was your job title?

6     A.    Account manager.

7     Q.    And do you know Dr. Patrick Titus?

8     A.    Yes, I do.

9     Q.    Okay.  And how do you know about Dr. Patrick Titus?

10    A.    He was one of the accounts I called on with Ameritox.

11    Q.    And do you recall -- strike that.

12             Do you recall when you -- you said you called on

13    him as one of the accounts for Ameritox.  Do you recall when

14    this occurred?

15    A.    Yes, approximately from 2011 all the way until the

16    end of 2012.

17    Q.    Okay.  Do you recall whether your -- well, strike

18    that.

19             Now, when you say you "called on him," exactly

20    what do you mean by that?

21    A.    So with Ameritox, the toxicology industry, my

22    particular role was to call on physicians that would

23    prescribe pain management for their patients to get them

24    to -- explain to them the service that we offered, which was

25    urine drug screen.  That was just one tool physicians would

King - Direct

```
 1    use to make sure their patients were compliant.  It wasn't
 2    the only tool, but it was just one of many that they would
 3    use.
 4    Q.    Now, when you called on him, did you actually visit
 5    with Dr. Titus and speak to him about the service that
 6    Ameritox was providing?
 7    A.    Yes, I did.
 8    Q.    And where did that occur?
 9    A.    In his office.
10    Q.    And do you recall where that -- we're talking about
11    20- -- I think you said 2011?
12    A.    ' 11, correct.
13    Q.    Do you know where that office was located?
14    A.    Yes, he had one office -- before he moved to the
15    Lighthouse office, it was another office.  I can't remember
16    exactly in Milford where it was, but the main office that I
17    would see him at was his Lighthouse office.  I forgot the
18    address.
19    Q.    I'm going to show you what's been previously marked
20    as Government Exhibit 400.
21             MR. BOSTIC:  Mr. Marek, can you pull that up,
22    please?
23    BY MR. BOSTIC:
24    Q.    Do you recognize --
25    A.    Yes.
```

King - Direct

1    Q.      -- the office building in that photo?

2    A.      Yes, I do.

3    Q.      Can you tell the ladies and gentlemen of the jury

4    what you recognize it to be?

5    A.      Dr. Patrick Titus' office.

6    Q.      And where is that office located, if you know?

7    A.      I don't remember the exact address, but his office

8    was in -- there were other physicians in that facility as

9    well.

10   Q.      Okay.  Do you know if it was -- does the street

11   DuPont Highway mean any --

12   A.      Yes.

13   Q.      And is that the DuPont --

14   A.      Yes.

15   Q.      -- office?

16   A.      Yes, it is.

17           MR. BOSTIC:  You may take that down.

18   BY MR. BOSTIC:

19   Q.      And you referenced a second office or another office.

20   I'm going to show you what's been marked, previously marked

21   as Government Exhibit Number 700.

22           MR. BOSTIC:  Mr. Marek, can you pull that up.

23   BY MR. BOSTIC:

24   Q.      Do you recognize that location, sir?

25   A.      Yes, I do.

1   Q.      And can you tell the ladies and gentlemen of the jury

2   where that location is?

3   A.      That's also in Milford.  The exact address, I

4   believe, is Church Street, somewhere in that area.  But that

5   was his -- that was the primary office that I spent the

6   majority of my time with Dr. Titus in that new facility

7   there.  So I would see Dr. Titus for minimum once a month, a

8   lot of times twice a month.

9   Q.      And would you see him personally or would you go to

10  the office --

11  A.      I always would see Dr. Titus personally.  I would

12  wait and he would spend time with me.  A couple minutes --

13  he was very busy -- in between patients, just to check in

14  and see how the urine samples and specimen was going, if he

15  needed anything.

16  Q.      And your purpose for going to the -- visiting the

17  offices, Dr. Titus' offices, what was the general purpose?

18  A.      Well, the purpose, again, like I mentioned earlier,

19  was to provide a service based on urine drug specimens.  So

20  in that pain management industry, a lot of physicians would

21  require their patients to provide a urine sample in the

22  office.  That specimen would be collected in the office and

23  our specimen processors, which work for Ameritox, would

24  process the specimen, make sure the name is correct, verify

25  the address.  All patients had to show ID with their urine

King - Direct

1     sample.  They would sign in in front of the urine -- urine

2     specimen processor.  Then they would tag it, bag it up with

3     a UPS bag, and they ship it out to the lab, which was

4     located in Baltimore.

5     Q.     Okay.  Now, in terms of that process, were there

6     supplies or any items that you needed to take to the office

7     locations --

8     A.     Yes.  So some of the supplies in question were urine

9     cups.  Also, requisition forms, which was a form used to

10    fill out the patient's demographic information.  And then

11    also urine bags, specimen bags, UPS bags.

12    Q.     Now, I'm assuming that you just didn't only do this

13    for Dr. Titus' office.  You did it for other doctors'

14    offices?

15    A.     Yes.  My territory encompassed the whole state -- or

16    actually Southern Philadelphia, the whole State of Delaware,

17    all the way down to Seaford, Eastern Shore, Maryland.

18    Q.     Okay.

19    A.     Excuse me.  Salisbury, Eastern Shore, Maryland.

20    Q.     Now, would you drive to these offices, I'm assuming,

21    also?

22    A.     Yes, I would.

23    Q.     And when you would go to these offices, were you

24    aware of your surroundings and, you know, making

25    observations as to what was going on?

1    A.    Yes.  I always paid attention to my surroundings.

2    Q.    Now, with respect to either the DuPont office or

3    the -- let's do DuPont first.  Let me rephrase it.

4          At any time that you visited Dr. Titus' office,

5    either of them, were there any observations that you made

6    that caused you concern?

7    A.    No, I haven't seen anything.  Parking lot was always

8    orderly, very well kept.  Especially the main office, I used

9    to call on, that facility was very well managed, clean,

10   orderly.  Patients were very calm.

11   Q.    Now, in terms of the -- let's just start with the

12   parking lot.  Did you ever see anything in the parking lot

13   that concerned you?

14   A.    Not to my knowledge.

15   Q.    Okay.  And did you see what may be considered any

16   illicit drug activity in the parking lot?

17   A.    No, I haven't.

18   Q.    Specifically, did you see anybody selling pills or

19   exchanging pills in the parking lot?

20   A.    No.

21   Q.    With respect to when you would go inside the offices,

22   and let's concentrate on the Church Street office.

23   A.    Mm-hmm.

24   Q.    When you walk in the main part of the office, can you

25   tell us if your observations in terms of what you saw in the

King - Direct

1    area, the waiting room, just how it was physically made up?

2    A.    Well, what stood out to me initially when I first

3    went to the office, and it stayed consistent throughout, was

4    how orderly the waiting room was.  All the patients were

5    sitting down.  There wasn't any crazy talking or moving

6    around, any chaos.  They were waiting for their name to be

7    called.

8              And every time -- like I said, I would go in

9    there a couple times a month, and it was the same every

10   time.  My territory was so large that that typically wasn't

11   the norm.  I mean, there was other offices that was ran that

12   way, and there was some crazy offices that I didn't want to

13   go in because it just -- the doctors just lost control, and

14   it was just a lot going on.  But not in Dr. Titus' office.

15   Q.    Now, you talked about the process of collecting the

16   urine samples and how they were shipped out and whatever.

17   Did you personally do that yourself?

18   A.    No, I didn't.

19   Q.    Did you have individuals working under you, your

20   subordinates that did that?

21   A.    Yes, I did.

22   Q.    Do you remember the names of any of the individuals?

23   I know -- strike that.

24              I know you indicated you had several offices,

25   but do you recall the names of any individuals that worked

King - Direct

1    under your supervision in any of Dr. Titus' offices?

2    A.    I don't remember the names.  I had roughly close to

3    30, 32 specimen processors throughout my whole territory.

4    There was probably, in the two-year period, probably three

5    or four that I rotated through Dr. Titus' office.

6    Q.    Now, do you have a personal relationship with

7    Dr. Titus?

8    A.    Yes.  Well, we didn't hang out after work or

9    anything, but he was very -- always kind to me.  We spoke,

10   you know, talked about, you know, sports here and there, and

11   you know, any current and extensive news.  And obviously,

12   talked about while I was there.  So it was -- I thought it

13   was a good business-professional relationship.

14   Q.    Okay.  Business-professional relationship?  You're

15   shaking your head yes; right?

16   A.    Correct.

17   Q.    And was there a personal friendship or anything like

18   that?

19   A.    No.  We didn't hang out outside of his office.

20   Q.    And do you recall the last time you saw Dr. Titus

21   outside of today?

22   A.    No, I don't.

23            MR. BOSTIC:  Thank you.  I have nothing else,

24   Your Honor.

25            THE COURT:  All right.

King - Cross

1      Cross-examination, Ms. Sobczak.

2           MS. SOBCZAK:  Thank you, Your Honor.

3                     CROSS-EXAMINATION

4  BY MS. SOBCZAK:

5  Q.     Hello, Mr. King.

6  A.     How are you?

7  Q.     I'm good.  How are you?

8  A.     Not bad.

9  Q.     So working for Ameritox, going through the process

10  there, Ameritox would receive the urine samples from

11  Lighthouse; is that correct?

12  A.     Correct.

13  Q.     And then Ameritox would conduct the test of the urine

14  samples; is that correct?

15  A.     That's correct.

16  Q.     And then they would either fax or email the results

17  of those tests back to Lighthouse; is that correct?

18  A.     That's correct.

19  Q.     And that was conducted in a timely manner.

20  A.     Yes.

21  Q.     And those results were accurate?

22  A.     I didn't -- I didn't -- I don't review results, so --

23  I didn't work in the lab, but all physicians -- when I would

24  promote the service, all physicians knew that the results

25  shouldn't be the sole, exclusive reason whether or not they

King - Cross

1   make a decision about moving forward with a patient, as far

2   as making a decision about either changing medications,

3   referring them to another physician's office.  That was just

4   one tool of many that the physician can use to make an

5   overall assessment of the patient.

6   Q.    And as you stated before, this is one aspect of

7   medical care that is provided and that Ameritox provided?

8   A.    Yes, and it also states it on the report that -- in

9   the disclaimer section, that this is just one tool used --

10  that a physician can use to manage their patients.

11  Q.    But the results provided by Ameritox were timely or

12  were provided in a timely fashion?

13  A.    Yes, they were.

14  Q.    And, also, the results were easy to understand as

15  well?

16  A.    Well, now, with that, with regard to that question,

17  physicians also knew to call the medical director at

18  Ameritox if they had any questions.  They wouldn't ask me

19  about the questions because -- because of HIPAA, I couldn't

20  really get into the results or the report.

21              My role was to make sure that the report was

22  received, and that's pretty much it, and make sure they had

23  the supplies necessary to collect the urine.

24  Q.    And so there were mechanisms, if there were

25  questions, for those questions to be directed to Ameritox?

King - Cross

1   A.      Yes.

2   Q.      And is it safe to say you had a lot of duties and

3   projects when you worked for Ameritox?

4   A.      I wouldn't say safe to say.  Can you be more specific

5   about that?

6   Q.      Did you have other projects than the Lighthouse

7   account while you worked for Ameritox?

8   A.      I called on other physicians' offices, yes.

9   Q.      So you weren't on-site at Lighthouse all day, every

10  day?

11  A.      No.

12  Q.      In fact, you stated you went to Lighthouse about once

13  or twice every month?

14  A.      Correct.

15  Q.      And you met with Dr. Titus while at Lighthouse for a

16  few minutes on those occasions?

17  A.      Yes.

18  Q.      And you weren't in the room with Dr. Titus when he

19  met with the patients?

20  A.      No, I wasn't.  No, I wasn't.

21          MS. SOBCZAK:  No further questions, Your Honor.

22          THE COURT:  All right.

23          Any redirect?

24          MR. BOSTIC:  Your Honor, may I have one moment?

25          THE COURT:  Yes.

King - Cross

  1                MR. BOSTIC:  I have nothing else, Your Honor.

  2    Thank you, Mr. King.

  3                THE COURT:  All right.

  4                Mr. King, you may go.  Thank you very much for

  5    being here.  You're excused.

  6                MS. KOUSOULIS:  Your Honor, the defense would

  7    call Cliff Waples.  I believe my colleague is getting him.

  8                THE COURT:  All right.  Is it Ms. Waples?

  9                MS. KOUSOULIS:  Mr. Waples.

 10                THE COURT:  Mr. Waples.  Okay.

 11                (Discussion held off the record:)

 12                DEPUTY CLERK:  Mr. Waples.

 13                THE WITNESS:  Yes.

 14                DEPUTY CLERK:  Please state and spell your full

 15    name for the record.

 16                THE WITNESS:  Clifford, C-L-I-F-F-O-R-D, S.,

 17    Waples, W-A-P-L-E-S.

 18                DEPUTY CLERK:  Do you affirm that the testimony

 19    you are about to give to the Court and the jury in the case

 20    now pending will be the truth, the whole truth, and nothing

 21    but the truth, you do so affirm?

 22                THE WITNESS:  Yes.

 23                DEPUTY CLERK:  Thank you.

 24                CLIFFORD WAPLES, the witness herein, after

 25    having been duly affirmed under oath, was examined and

1  testified as follows:

2  BY MS. KOUSOULIS:

3  Q.     Good morning, Mr. Waples.

4  A.     Good morning.

5  Q.     Can you tell the jury where you currently live?

6  A.     Lincoln, Delaware.

7  Q.     And are you currently employed?

8  A.     Yes.

9  Q.     And where do you work?

10 A.     Janitorial -- janitorial work, Star Building.

11 Q.     And how long have you had that position?

12 A.     Approximately about six, six or seven years.  I'm not

13 sure of which one, six or seven years.

14 Q.     And do you know Dr. Patrick Titus?

15 A.     Yes.

16 Q.     And how do you know Dr. Titus?

17 A.     He -- I was referred to him.

18 Q.     And when was that?

19 A.     In -- back in '06.

20 Q.     And what were you referred to him for?

21 A.     Pain.

22 Q.     And can you explain to the jury how that came about?

23 A.     Yeah.  Well, back then, I was doing light gauge steel

24 work, steel worker, and it was manual lifting.  And so, you

25 know, I got hurt, you know, doing that type of work.  And

1  so -- and I got sent to what's the -- the big name of the

2  place -- I forget the name of the place where --

3  Q.    Did you get sent to someone through workers'

4  compensation?

5  A.    Yeah, through workers, yeah, compensation, and then

6  they referred me to Dr. Titus.

7  Q.    And what was the purpose of referring you to

8  Dr. Titus?

9  A.    For pain.

10 Q.    And at the time, can you explain to the jury what

11 pain you were suffering from and how it affected you?

12 A.    My lower back, you know.  And because I was doing a

13 lot of lifting and it was, you know, I couldn't -- I

14 couldn't handle it, you know, working and, you know, with

15 all that pain, so you know, I went to him.

16 Q.    And how did the pain -- did the pain affect your

17 day-to-day life?

18 A.    Not so much day-to-day life, but it's when I went to

19 work, that's when it really bothered me.  Yes.

20 Q.    And how often were you working at that time?

21 A.    Five days a week, Monday through Friday.

22 Q.    And when you first started seeing Dr. Titus, were you

23 seeing him at his Lakeview location?

24 A.    Yes.  That's the first place, I believe, yes.

25 Q.    And then at some point, were you also seeing him at

Waples - Direct

1   his DuPont Highway location?

2   A.      Yes.

3   Q.      Were you still seeing Dr. Titus when he moved to

4   Church Street?

5   A.      No.

6   Q.      Now, you testified you started seeing Dr. Titus in

7   2006.  When can you -- if you recall, can you recall what

8   happened when you went to your first appointment?

9   A.      Yeah.  You know, I had -- you know, had to get a pain

10  assessment and stuff like that, you know.  Fill out some

11  paperwork and -- you know.

12  Q.      Did Dr. Titus examine you?

13  A.      Yes, he did.

14  Q.      Can you explain to the jury that process?

15  A.      You had to fill out -- like I said, you had to fill

16  out paperwork and stuff like that.  Then he -- he would

17  come, you know, and check all over.  You know, ask to see

18  where the pain was at and stuff like that.  And then -- you

19  know, then he would describe -- prescribe something for me

20  for my pain.

21  Q.      Did you have to complete a pain assessment every time

22  you went to see him?

23  A.      Yes, ma'am.

24  Q.      And on that pain assessment, did you talk about

25  your -- did you indicate your level of pain?

Waples - Direct

1   A.     Yes, I had to every time, every visit.

2   Q.     And would Dr. Titus discuss that with you at your

3   visits?

4   A.     Yes.  Yes, he did.

5   Q.     And did there come a time when you -- you testified

6   that at some point Dr. Titus started giving you

7   prescriptions for your pain?

8   A.     Yes.

9   Q.     And do you recall what he prescribed you the first

10  time he prescribed you anything, what it was?

11  A.     Let's see.  I believe it was -- was it Tylenol? I'm

12  not sure if it was Tylenol.  And then --

13  Q.     Could it have been Motrin?

14  A.     Yeah, I'm sorry.  Yes, Motrin.  And then Percocets,

15  and then Oxycodone.

16          MS. KOUSOULIS:  And Mr. Marek, can you pull

17  up --

18          Well, Your Honor, I would move into evidence

19  Defense Exhibit 15, which is a patient file for Clifford

20  Waples.

21          MR. WOODARD:  No objection.

22          THE COURT:  Admitted without objection.

23          (Defense Exhibit No. 15 was admitted into

24  evidence.)

25          MS. KOUSOULIS:  Mr. Marek, if you can pull up

1626

Waples - Direct

1    Exhibit 15 at 289.

2    BY MS. KOUSOULIS:

3    Q.     Now, is this one of the prescriptions for Motrin that

4    Dr. Titus prescribed you back in April of 2007?

5    A.     Yes.

6    Q.     And so when you first started seeing him, he was

7    prescribing you Motrin?

8    A.     Yes.

9    Q.     Did there come a time when the Motrin wasn't helping

10   relieve your pain?

11   A.     Oh, yes.

12   Q.     And what happened then?

13   A.     You know, I would tell him, you know, and then he

14   said, Well, maybe, we'll try a -- something a little

15   stronger, you know.  And then we just went to Percocet.

16           MS. KOUSOULIS:  And can you please pull up,

17   Mr. Marek, Defense Exhibit 15 at 281.

18   BY MS. KOUSOULIS:

19   Q.     Now, this prescription is in June of 2007, and it's

20   for Percocet.

21   A.     Mm-hmm.  7.5.

22   Q.     Is that correct?

23   A.     That's correct.

24   Q.     And then at some point, did the Percocet not work to

25   relieve your pain?

1627

Waples - Direct

1    A.    Yes.  Yes.

2    Q.    And would you discuss that with Dr. Titus?

3    A.    Yeah, because, like I said, the type of work I'm

4    doing, light gauge steel, lifting, and most times we had

5    pretty big orders and stuff like that.  And so, you know,

6    the pain would vary from day to day.  So, you know, it got

7    to a point where it got worse and so, you know, I asked for

8    something a little stronger.

9    Q.    And so at that point, did he start prescribing you

10   Oxycodone?

11   A.    Yes, he did.

12         MS. KOUSOULIS:  And Mr. Marek, can you pull up

13   Defense Exhibit 15 at 55?

14   BY MS. KOUSOULIS:

15   Q.    And this was in September of 2011 that he was

16   prescribing you Oxycodone?

17   A.    That's right.  Yes.

18   Q.    Now, prior to prescribing you Oxycodone and other

19   opioids, did Dr. Titus explain to you the risks involved in

20   taking opioids?

21   A.    Yes, he did.

22   Q.    And what did he talk about?

23   A.    He would tell me, you know, in the long run, it

24   probably would affect, you know, my health and stuff like

25   that, you know.  And, you know -- and, so...

1628

Waples - Direct

1     Q.     Would he talk to you about any -- about it being

2     addictive?

3     A.     Yes, also that, too.  You know, you could get

4     addicted -- become addicted to it and, you know, stuff like

5     that, yes.

6     Q.     And in addition to giving you physical examinations,

7     did Dr. Titus also send you for MRIs?

8     A.     Yes, he did, I believe.

9              MS. KOUSOULIS:  And can you please pull up

10    Defense Exhibit 15 at 346 -- or at 344.

11    BY MS. KOUSOULIS:

12    Q.     Is this an MRI he sent you for in March of 2007?

13    A.     Yes, it is.

14    Q.     And it was for your lower back pain?

15    A.     You're correct.

16    Q.     And then did there come a time when he sent you

17    for -- again, in 2010, for another MRI?

18    A.     Yes, I believe.

19             MS. KOUSOULIS:  And can you please pull up

20    Defense Exhibit 15 at 346.

21    BY MS. KOUSOULIS:

22    Q.     And this was an MRI he sent you for on November 19th,

23    2010?

24    A.     Yes.

25    Q.     Okay.  And did he discuss with you why he was sending

Waples - Direct

1   you for MRIs?

2   A.     Yes, he did.

3   Q.     And what did he tell you?

4   A.     You know, he wanted to find out where it was at, you

5   know, where the pain was at in my back and stuff like that.

6   Q.     So he wanted to get a better assessment of the pain?

7   A.     Yes.  Yes, so we know how to treat it.  Yes.

8   Q.     And during your patient visits, did Dr. Titus spend

9   time discussing with you your treatment needs?

10   A.     Yes.

11   Q.     Did the opioids that he prescribed you, did they help

12   manage your pain?

13   A.     Yes.

14   Q.     And when did you stop seeing Dr. Titus?

15   A.     I believe it was in 2012, I believe.

16   Q.     Was that after his practice closed for a short time?

17   A.     Yes.  Yes.

18   Q.     And then after that happened, did you continue to

19   seek pain medication through another source?

20   A.     Yes.

21   Q.     And did you see someone else for your pain needs?

22   A.     Yes.

23   Q.     Okay.

24   A.     Yes.

25   Q.     How did you pay for your appointments with Dr. Titus?

Waples - Cross

1   A.    I had Blue Cross and Blue Shield.

2   Q.    So you used insurance to pay?

3   A.    Yes.

4   Q.    And Dr. Titus accepted your insurance at that time?

5   A.    Yes.

6             MS. KOUSOULIS:  I have no further questions.

7             THE COURT:  Cross-examination?

8             MR. WOODARD:  Yes, Your Honor.

9                 CROSS-EXAMINATION

10  BY MR. WOODARD:

11  Q.    Hi, Mr. Waples.

12  A.    Hi.

13  Q.    Okay.  So you talked about seeing Dr. Titus.  During

14  the course of your treatment, did you ever fail a drug test?

15  A.    Not that I'm aware of.

16  Q.    Okay.

17  A.    No, not that I'm aware of.

18  Q.    Did you ever get discharged?

19  A.    No.

20  Q.    Okay.  So, Mr. Waples, you don't know anything about

21  the patients we may have discussed previously in this trial?

22  A.    No.

23  Q.    Okay.  And you never saw Dr. Titus at the Church

24  Street address; is that right?

25  A.    No.

Waples - Cross

1   Q.      Okay.  You talked about eventually you received a

2   prescription from Dr. Titus in around 2011; right?

3   A.      I believe so.

4   Q.      Okay.  And that was for Oxycodone 15?

5   A.      Yes.

6   Q.      Okay.  And that was actually 180 pills a month;

7   right?

8   A.      That is correct.

9   Q.      Okay.  Do you recall, right after he got suspended,

10  you saw Sherel Ott at Dr. Titus' office?

11  A.      Yes, I believe I did.

12  Q.      Okay.  And right away, she dropped you down to

13  Oxycodone, ten milligrams and cut you down to 120 pills

14  right away; correct?

15  A.      That is correct.

16  Q.      Okay.  And you left the practice at that point;

17  right?

18  A.      I believe so.

19  Q.      Okay.  And then you went to go see Dr. Udezulu, and

20  he cut you immediately down to 60 pills a month of

21  Hydrocodone; right?

22  A.      That is correct.

23  Q.      So we're now at a third lower -- I'm sorry,

24  two-thirds lower from where Dr. Titus had you; is that fair?

25  A.      I guess you could say that.

1632

Waples - Cross

1   Q.      Okay.  And today, sir, you're still seeking pain

2   treatment; is that fair?

3   A.      Yes.

4   Q.      Okay.  And the Oxycodone, ten milligrams is

5   sufficient for your pain needs?

6   A.      Yes, that is correct.

7   Q.      Okay.  At some point, had you been prescribed a

8   Fentanyl patch?

9   A.      At some point, yeah.

10  Q.      Okay.

11  A.      Mm-hmm.

12  Q.      Does around like 25 micrograms sound about right?

13  A.      That is correct.

14  Q.      Okay.  And you're a bigger, a stronger gentleman; is

15  that fair to say?

16  A.      Yes, somewhat now.  I have picked up weight.

17  Q.      Okay.  A hundred micrograms of Fentanyl, that's four

18  times what you just said you were prescribed; right?

19          MS. KOUSOULIS:  Your Honor, I object to this

20  line of questioning.

21          THE COURT:  Yeah, I'm going to sustain the

22  objection.

23          MR. WOODARD:  Okay.  Nothing further.

24          Thank you for being here, Mr. Waples.

25          THE WITNESS:  Mm-hmm.  Thank you.

Waples - Redirect

| 1 | THE COURT: All right. |
|---|---|

2        Ms. Kousoulis.

3                    REDIRECT EXAMINATION

4    BY MS. KOUSOULIS:

5    Q.    Mr. Waples.  Oh, sorry.  I have another question.

6    A.    Oh, okay.

7    Q.    Mr. Woodard just asked you about whether what you're

8    being prescribed now for your pain is helping you manage

9    your pain.  Do you recall that question?

10   A.    Yes.

11   Q.    Now, you're no longer working at the steel mill;

12   correct?

13   A.    No.

14   Q.    So when you were working at the steel mill, was the

15   work you were doing there aggravating your pain?

16   A.    Oh, yes, definitely.  Yes.

17   Q.    So your pain was worse then than it is now because of

18   the type of work --

19   A.    It's, like I said, everything I was doing then was

20   manual, you know, lifting, strength.  You know, so it's a

21   lot different now.  You know, just have a broom and a mop

22   now.

23   Q.    So you don't have as much pain now --

24   A.    No.

25   Q.    -- generally as you did then?

1    A.      Right.  Right.

2              MS. KOUSOULIS:  I have no further questions.

3              THE COURT:  All right.

4              Mr. Waples, thank you.  Now you may go.  You're

5    excused.

6              THE WITNESS:  Thank you.

7              THE COURT:  All right.  So members of the jury,

8    I believe that we're going to take our lunch break now.

9    That will be until one o'clock.

10             My expectation is there's one more witness today

11   at one o'clock.  And, you know, he's not going to be all

12   afternoon, but beyond that, I don't want to predict.

13             So in any event, can we take the jury out?  And

14   you can have your lunch.

15             (Jury leaving the courtroom.)

16             THE COURT:  All right.  So I'll see you at

17   one o'clock.

18             MS. KOUSOULIS:  Thank you, Your Honor.

19             MS. REMIS:  Thank you, Your Honor.

20             DEPUTY CLERK:  All rise.

21             (Luncheon recess was taken.)

22             DEPUTY CLERK:  All rise.

23             THE COURT:  All right.  Are we ready to go?

24             MR. WOODARD:  Yes, Your Honor.

25             MR. BOSTIC:  Your Honor, briefly I just want to

1    address the Court.  Your Honor, I would ask the Court to

2    allow me to cross Agent McDonald as an adverse witness.

3    It's routinely done where you have an agent in the

4    Government's case.  Particularly in this case, I do believe

5    it's necessary.

6              The Rule 611 talks about the ability of counsel

7    to conduct cross of an adverse witness.  I think the case

8    law supports that where a person is closely aligned with

9    another -- the opposing side, particularly law enforcement,

10   where the defense counsel is calling the law enforcement

11   officer, that the Court should give serious consideration

12   and, in fact, permit counsel to cross-examine the witness.

13             THE COURT:  All right.  Ms. Remis, any comment?

14             MS. REMIS:  Your Honor, our understanding of the

15   purpose for calling Special Agent McDonald was just to speak

16   about surveillance that he had done.  Obviously, Special

17   Agent McDonald hasn't done anything hostile thus far and --

18             THE COURT:  Well, so the rule has three

19   categories.  One, is hostile witness, yeah.  Agent McDonald

20   is not a hostile witness or at least he hasn't shown himself

21   to be yet.

22             He's not an adverse party.  You are the adverse

23   party.  But I think he is a witness identified with an

24   adverse party as the case agent.

25             So I'm going to let the leading questions be

```
 1    asked and, of course, you will have an opportunity to
 2    elaborate on whatever the subjects of the leading questions
 3    are.  And what's more is, you know, my normal experience is
 4    that special agents with the United States usually can
 5    resist being overcome by leading questions if the leading
 6    questions are not relatively fair.  So --
 7                 MS. REMIS:  I agree, Your Honor.  Thank you.
 8                 THE COURT:  Okay.  So Mr. Bostic, your request
 9    is granted.
10                 MR. BOSTIC:  Thank you, Your Honor.
11                 THE COURT:  All right.  Let's get the jury.  And
12    Agent McDonald is out there, so let's get him in.
13                 (Jury entering the courtroom.)
14                 THE COURT:  All right.  Members of the jury,
15    welcome back.  We're ready to begin.
16                 Mr. Bostic, call your witness.
17                 MR. BOSTIC:  Thank you, Your Honor.  The defense
18    calls Special Agent William McDonald to the stand.
19                 DEPUTY CLERK:  Please state and spell your full
20    name for the record.
21                 THE WITNESS:  My name is William McDonald.  Last
22    name is spelled M-c-D-O-N-A-L-D.
23                 DEPUTY CLERK:  Do you affirm that the testimony
24    you are about to give to the Court and the jury in the case
25    now pending will be the truth, the whole truth and nothing
```

McDonald - Direct

1    but the truth, you do so affirm?

2              THE WITNESS:  I do.

3              WILLIAM MCDONALD, the witness herein, after

4    having been duly affirmed under oath, was examined and

5    testified as follows:

6              DEPUTY CLERK:  Thank you.

7              MR. BOSTIC:  May I proceed, Your Honor?

8              THE COURT:  Yes.

9                   DIRECT EXAMINATION

10   BY MR. BOSTIC:

11   Q.     Good afternoon, Special Agent McDonald.

12   A.     Good afternoon.

13   Q.     You have been in law enforcement for how long?

14   A.     Around 16 years.

15   Q.     Sixteen years.  And did you always work as a special

16   agent for I think it's -- it's not the DEA.  Who -- you work

17   for Health and Human Services?

18   A.     So as -- I started my career as a special

19   agent/criminal investigator with the United States

20   Department of Health and Human Services, Office of Inspector

21   General, Office of Investigations.  It's a long name.  And

22   in 2017 in March, I moved to, also under the U.S. Department

23   of Health and Human Services, but the Food and Drug

24   Administration's Office of Criminal Investigations.  So

25   that's where I am now.

McDonald - Direct

1    Q.      And before getting the job, you were trained on how

2    to do the job?

3    A.      Yes.

4    Q.      Right.  And that training included how to conduct

5    various types of investigations?

6    A.      Yes.

7    Q.      Right?  And in fact, I think at some point you were

8    specially assigned to the Diversion of Controlled Substances

9    Task Force?

10   A.      I -- I did sit for a period of a few years with the

11   DEA's Tactical Diversion Squad.  TDS is what we call it,

12   yes.

13   Q.      And in the training that you received, in terms of on

14   how to conduct investigations, you were taught about the

15   importance of an officer or an agent, special agent's

16   ability to make observations connected with the matter

17   they're investigating; would that be fair to say?

18   A.      Can you say that again?

19   Q.      In connection with your training, you were taught

20   about the need for a special agent to be keenly aware of his

21   or her circumstances vis-a-vis the investigation they're

22   conducting?

23   A.      You are taught as a special agent to be aware of your

24   investigations.  Yes.

25   Q.      Right.  And reminded of the ability to document any

McDonald - Direct

1    observations that may very well be important in the case for

2    which you're investigating?

3    A.      Yes.

4    Q.      And that documentation consists of preparation of

5    reports?

6    A.      Documentation does consist of reports, yes.

7    Q.      And ordinarily this reporting requirement requires

8    also a supervisor to sign off on the matter, on the report

9    that you're writing?

10   A.      Well, I can only speak for my agencies that I've

11   worked with.  Many times supervisors do have to sign off on

12   reports, but there are many reports that supervisors do not

13   have to sign.

14   Q.      Okay.  And when you're doing these reports, what type

15   of things -- strike that.

16           Would it be fair to say that, particularly with

17   reports, you're making documentation of the important events

18   in connection with an investigation?

19   A.      Well, there are many different types of reports, but

20   reports, generally speaking, since we're being general, I

21   assume is to report factual events, factual things that

22   happen, observations, things like that, yes.

23   Q.      Right.  So for example, so if you were to go to a

24   scene which would involve, say, an entry into a federal

25   building, a federal crime, and the window is broken, that's

McDonald - Direct

1    something you would go put in your report; it's important?

2    A.    Yeah, I've never investigated anything like that, so

3    I can't speak for what you would document there.  But I

4    think I get what you're saying that important things, which

5    is sort of subjective, but things that happen that you

6    observe, they are important to document.  Yes.

7    Q.    Right.  Right.

8          And have you participated as part of a

9    surveillance team during the history, I think it's 16 years?

10   A.    Oh, yeah, many times.

11   Q.    Many.  And in connection with the type of case that

12   we're here for today?

13   A.    Yes.

14   Q.    All right.  And now, were you a supervisor during the

15   time -- strike that.

16         Did you play any supervisory role in the

17   investigation of this matter?

18   A.    I've never been a supervisor with the Government.

19   Sometimes I tell people I supervise my own cases, so I feel

20   like I am a supervisor of my cases, but I do not supervise

21   other people.  No.

22   Q.    Okay.  But you served as a case agent in the past?

23   A.    Yes.

24   Q.    Right.  And a case agent is responsible to know all

25   the activity that's going on with respect to a particular

McDonald - Direct

1    investigation?

2    A.    You would hope that's what the case agent gets to do.

3    Yes, that's the goal.

4    Q.    Right.  That's the goal.  But it's also the

5    responsibility and the duties of a case agent?

6    A.    As the case agent, you do everything you can to make

7    sure you do know what's going on, but often times with many

8    agencies working together, sometimes you have cases with

9    five, six, seven different federal agencies and a lot of the

10   events happening.  Sometimes, unfortunately, communication

11   is not as good as it should be.

12   Q.    Okay.  With respect to the surveillance -- strike

13   that.

14            As part of your experience, would it be fair to

15   say that you have also engaged in undercover operations

16   where you or a member of a Task Force that you're on goes

17   undercover into a doctor's office?

18   A.    Yes.

19   Q.    Have you yourself done that?

20   A.    Have I been an undercover?

21   Q.    An undercover.

22   A.    Well, interestingly enough, now I've done several

23   undercover where I'm the undercover, but they're Internet

24   pharmacy cases.  So it's me communicating with people

25   online, not actually in person.

McDonald - Direct

1   Q.      But not physically going out to --

2   A.      I have not done a physical undercover where I was the

3   person, correct.

4   Q.      And when an undercover operation is -- strike that.

5           When a surveillance is put together, right,

6   would it be fair to say that there's a team meeting and

7   people integral to the investigation come together to talk

8   about the surveillance and the surveillance that is about to

9   be undertaken?

10  A.      No.  It depends on the type of surveillance.  Often

11  times surveillance is a short amount of time to take a look

12  at the license plates that you see in a certain area or

13  general activity that you see in a certain area.  It could

14  be you and another case agent.  It could be you and another

15  agent who's just helping you.

16          But it's -- in my experience, there are -- there

17  are a few unique situations that would actually call for an

18  operations briefing before a surveillance operation.

19  Q.      Would it be fair to say that with respect to

20  undercover investigations, where it's someone that's going

21  into a doctor's office, that's one of those unique

22  situations where the team comes together to put together

23  that undercover event?

24  A.      My agencies at HHS, we have had policies where if

25  you're going to send someone in undercover, you have a

McDonald - Direct

1    meeting, yes.

2    Q.    Okay.  And in this case, there was -- strike that.

3    Let me go back.

4              With respect to surveillances, would it be fair

5    to say on many occasions when you're conducting

6    surveillance, photographs are taken; right?

7    A.    It does happen sometimes, but a lot of times it does

8    not happen.  I can't give you percentage.  I would if I

9    could, but it -- sometimes photos happen, sometimes they

10   don't.

11   Q.    Okay.  And then who makes that decision, the

12   supervisor or someone else, as to whether or not to take

13   photographs?

14   A.    It depends on the type of case you're working and the

15   reason why you're on surveillance.  Like I said earlier,

16   sometimes the surveillance is just to take down license

17   plates to see who is in the location you're surveilling.

18   And other times you might be looking for a specific person

19   doing a specific thing or not doing a specific thing, and

20   then photographs would be very helpful, yes.

21   Q.    And with respect to a surveillance, as I understand,

22   you're stating that there are different buckets in terms of

23   how the surveillance should go; right?  Whether it's just to

24   take license plates, see what cars are maybe in the area,

25   right, that's one method; right?  Is that correct?

McDonald - Direct

1    A.      That's one type of surveillance.

2    Q.      Oh, one type.  Okay.

3              And then there could be a surveillance to

4    observe what type of criminal activity might be afoot?

5    A.      That is another type, yes.

6    Q.      And it would be fair to say that sometimes those two

7    are put together and they're one in the same, meaning you're

8    out looking and taking license plate numbers, but you're

9    also being aware of the nature of the allegations in the

10   investigation, that you're also looking at what individuals

11   are doing to see if there's any criminal activity afoot?

12   A.      Yeah, sometimes the surveillance is very sort of open

13   objective, just to observe.  And sometimes you are correct,

14   it's very specific.  You are looking for a certain thing.

15   You are waiting for a certain thing.

16              If I could give an example that might be

17   helpful.  It's up to you.  I don't have to.

18   Q.      Let me move on to my next question.  Maybe we'll come

19   back to that.

20   A.      Yeah.

21   Q.      Maybe you can tie that in.  Now, with respect to --

22   strike that.

23              You're aware that there was an undercover

24   operation that took place during the investigation of

25   Dr. Titus?

McDonald - Direct

1    A.    I am aware of that now.

2    Q.    Okay.  So as I understand, it occurred somewhere

3    between August and September 2014?

4    A.    According to the recordings that were played earlier,

5    yes.

6    Q.    You were in the courtroom and you heard those

7    recordings; right?

8    A.    Yes.

9    Q.    You had no knowledge that that was being undertaken

10   during the time that -- contemporaneous to when it occurred?

11   A.    I do not believe that I did.  No.

12   Q.    You have the ability and access to check the

13   documents and records to see whether or not there were any

14   reports made in connection with that undercover event?

15   A.    No, I don't because I no longer work for the Office

16   of Inspector General.  That's where my case file was

17   located, in their electronic case filing system.  I don't

18   have any access to that anymore.

19   Q.    Well, let me ask a different question from you.

20   Would the case agent have that ability, the case agent on

21   this case?

22   A.    The Health and Human Services case agent would not,

23   no.  That would -- that was kept in the DEA records, I

24   think.

25   Q.    And is agent -- Special Agent, I think, Smith, is it,

McDonald - Direct

1    he's a DEA agent?

2    A.    He's the DEA agent, yes.

3    Q.    Now, so I'm not going to take you through the

4    undercover part of it other than to ask you this:  It's

5    customary when there's an undercover operation going on that

6    more than one individual would go out to the location as

7    part of that undercover investigation?

8    A.    It really depends on the situation.  The one we're

9    talking about, I'd say most likely, but often times, as you

10   can imagine with an undercover, the person can't be with

11   another person who could be feared to be a cop, or a federal

12   agent, or anything like that, so it really does depend on

13   the situation.

14   Q.    You said in a case like this, it is likely that

15   another person would go out with the undercover who

16   conducted the -- actually the person going into the office,

17   that individual would have someone else with him or her?

18   A.    If I was doing it, yes.

19   Q.    Okay.

20   A.    But if I can clarify, if I was doing it, because I

21   just did a similar operation a couple weeks ago.  The

22   agents -- there was a team of agents out there, but they did

23   not go with the individual because the individual had to be

24   by themselves.  So the agents were nearby just in case

25   something went wrong.

McDonald - Direct

1    Q.      Right.  And thank you for that example.

2            You know, the partner or the individual

3    accompanying the officer or the agent who is going into the

4    doctor's office would not necessarily be immediately outside

5    the building where the office is located, right, from what

6    you just said?

7    A.      Generally speaking, yes.

8    Q.      Right.  But that individual would be close by so in

9    the event, God forbid, there's an incident, he or she could

10   be there to support the undercover?

11   A.      I would hope so, yes.

12   Q.      Now, with respect to the surveillances, right, you

13   were involved in several that were conducted during the

14   course of the investigation of Dr. Titus?

15   A.      Yes.

16   Q.      Right.  And as I recall, there was a surveillance on

17   around June 30, 2014?

18   A.      Possibly.  There were several.  I don't know the

19   dates of them.

20   Q.      If I may approach, Your Honor.  This is only to

21   refresh the witness' --

22              THE COURT:  All right.

23              MR. BOSTIC:  -- knowledge.

24   BY MR. BOSTIC:

25   Q.      Special Agent McDonald, I'm handing you --

McDonald - Direct

1    A.      Thank you.

2    Q.      -- what is a report.  Can you tell us the date of

3    that?

4    A.      It says surveillance was conducted on June 30th,

5    2014.

6    Q.      And you were involved in that surveillance?

7    A.      Yes.

8    Q.      And I'm going to show you another document here and

9    tell me if that refreshes your recollection.

10   A.      Another surveillance on July 1st, 2014.

11   Q.      And I'm going to show you a third document.  You tell

12   me if that refreshes your recollection.

13   A.      Another surveillance on August 6th, 2014.

14   Q.      I'll show you yet another document.  Can you give us

15   the date?

16   A.      Sure.  October 20th, 2014.

17   Q.      And I'll show you a final document.  I think this

18   relates to the last one I gave you, but is that --

19   A.      This isn't my report, but if you give me a moment

20   here, this is additional surveillance on October 20th, 2014,

21   but this is a DEA report.

22   Q.      And were you part of that last surveillance on the

23   20th?

24   A.      Yes.

25   Q.      Okay.  So every document I've handed you and every

McDonald - Direct

1  date that you've given me, you were involved in the

2  surveillance?

3  A.    Yes.

4  Q.    Okay.  Now, and these surveillances were of

5  Dr. Titus' office?

6  A.    I believe so, yes.

7  Q.    And for example, the June 30th one -- strike that.

8          All of the surveillances that I referenced to

9  you, I think as I count them, there were one, two, three,

10  four, five of them, they were in connection with

11  surveillances started at Dr. Titus' office on Church Street?

12  A.    I believe that's where they started.

13  Q.    And with respect to each and every one of those,

14  would it be fair to say that you or any person involved in

15  this surveillance never reported any criminal activity that

16  you observed?

17  A.    I don't believe we reported any criminal activity,

18  no.

19  Q.    And you would have reported that if you had seen

20  individuals in the parking lot engaging in drug sales, for

21  example, selling pills?

22  A.    Can you be more specific?

23  Q.    If you -- so on June 30, 2014, when you were there

24  outside of Dr. Titus' office, the reporting case that you

25  were there for approximately 11:00 a.m., approximately 12:30

McDonald - Direct

1   and approximately 2:00 p.m.?

2   A.    Okay.

3   Q.    Right?  Had you seen two individuals engaging in a

4   drug transaction or what appeared to be a drug transaction,

5   you would have noted that in one of your reports?

6   A.    Yes.

7   Q.    All right.  So it would be fair to say you didn't see

8   that at any time on those three times that you were there on

9   June 30th?

10  A.    Yeah, that specific thing you described, correct, I

11  did not see those.

12  Q.    And it would be fair to say that with respect to the

13  July 1st, 2014 surveillance, which again was at different

14  times, 11:00 a.m., 1:00 p.m. and 2:00 p.m., you didn't see

15  any criminal activity such as a drug sale or anything that

16  appears to be --

17  A.    Again, I need you to be more specific on that

18  question.

19  Q.    Did you see any people out in the parking lot making

20  drug sales or attempting to make a drug sale?

21  A.    No, I don't believe I did.

22  Q.    Okay.  On August 6th, 2014, again, you were involved

23  in a surveillance of Dr. Titus' office.  Do you remember

24  that?

25  A.    I don't remember it specifically, but I saw the

McDonald - Direct

1   report, so...

2            MR. BOSTIC:  Well, I'll approach.  If I may,

3   Your Honor?

4            THE COURT:  Sure.

5   BY MR. BOSTIC:

6   Q.    I'll ask you to look at the report that's dated

7   August 6th, 2014 --

8   A.    Thank you.

9   Q.    -- and read it to yourself.  Peruse it.

10  A.    (Witness reviewing.)

11          Okay.  Sorry for that delay.

12  Q.    And that helps to refresh your recollection; right?

13  A.    Yes.

14  Q.    And would it be fair to say that the surveillance

15  started at Dr. Titus' office?

16  A.    Yes.

17  Q.    And the surveillance also includes other individuals

18  that worked at Dr. Titus' office during that time frame?

19  A.    Yes.

20  Q.    Right.  And in fact, with respect to Dr. Titus, he

21  was followed from his office to a pizzeria; is that right?

22  A.    Yes, but now that I'm looking at my report, I don't

23  know if she worked there, the other person in the report.

24  Q.    Okay.  And the other person in the report is Josie

25  Walters -- strike that.  Strike that.  Let me rephrase that.

McDonald - Direct

1   Let me rephrase that.

2          Let me ask it this way.  With respect to

3   Dr. Titus, the surveillance included following him to a

4   pizzeria; right?

5   A.     Yes.

6   Q.     No criminal activity there, right, that you observed?

7   A.     No, not that I observed.

8   Q.     In fact, you observed him going into the pizzeria,

9   buying two pizzas and coming out with them in his hand;

10  right?

11  A.     Yes.

12  Q.     And the surveillance went to his home; am I correct?

13  A.     Yes.

14  Q.     And you observed him coming from the car and heading

15  into his house with those two boxes of pizzas; correct?

16  A.     Correct.

17  Q.     You saw his four kids playing in the backyard?  Last

18  page of the report, I believe.

19  A.     No, that's a different residence where I saw four

20  children playing.

21  Q.     Okay.  My apologies then.

22          Now, as to October of 2014, I think

23  October 10th, you and several members of the tactical team

24  were there and you made observations with respect to cars in

25  the parking lot?

McDonald - Direct

1    A.    I believe so.

2    Q.    And you made notations of different license plates;

3    is that right?

4    A.    I didn't -- I don't think I wrote that report, but

5    I'm sure I was part of the team that noticed license plates,

6    yes.

7    Q.    Right.  Right.  And some were from in state, some

8    were from out of state, to be fair, right, if you recall?

9    A.    Probably.

10   Q.    Right.  Now, you didn't see any drug sales or no one

11   reported having observed any drug sales or --

12   A.    Again, I need you to be more specific with that.

13   Q.    The same hypothetical question I asked you.  You

14   didn't see anybody or nobody reported seeing any exchanges

15   of pills, or sale of pills, or anything like that?

16   A.    I don't believe that was reported.  No.

17   Q.    Okay.  And as you told me before, that would have

18   been an important aspect of a case like this; right?  In a

19   case --

20   A.    What would be, reporting it?

21   Q.    Yeah, reporting it if it happened.

22   A.    Sure.

23   Q.    Right.  So you can agree that the absence of a report

24   that documents that really means it didn't happen?

25   A.    I don't think that's fair to say because you're being

McDonald - Direct

1    very specific about what I did or didn't see, and yes, for

2    that very specific thing, if I had seen people in the

3    parking lot passing pills back and forth for money, I think

4    you said, I would say that's very important to document.

5    Yes.

6    Q.    Now, you were also present when a search was

7    conducted of Dr. Titus' home; am I correct?

8    A.    I was not present at his home.  I was present at a

9    different site when that happened, but I -- I was at one

10   point in his house, yes.

11   Q.    Okay.  And when you were in his house, he had his

12   four-year-old -- three-year-old stepson there; am I correct?

13   A.    I don't know how old the child was and I -- I don't

14   know if the child was his stepson, but there was a young boy

15   there.  Yes.

16   Q.    And he was caring for that young boy?

17   A.    There was a young boy there.  I don't know if he was

18   caring for him.

19   Q.    Were you present during the -- any part of the

20   interrogation of Dr. Titus on that date?

21   A.    I was not.

22   Q.    Okay.

23             MR. BOSTIC:  If I may approach the agent, and

24   get that copy.

25             THE COURT:  Sure.

McDonald - Direct

1          MR. BOSTIC:  Thanks.

2    BY MR. BOSTIC:

3    Q.    And agent, finally, the purpose of recording

4    significant events or creating reports of them, would it be

5    fair to say that it is done so there's a record of important

6    events in the case?

7    A.    Generally speaking, yes.

8    Q.    Right.  And in fact, you're aware that a case may

9    come to trial six years later; right?

10   A.    Yes.

11   Q.    And one of the reasons you have the reports is so it

12   can refresh your memory about what you did and what you saw

13   or didn't see in the course of an investigation?

14   A.    That's one of the reasons for a report, yeah.

15   Q.    And another reason is that, of course, the defense

16   counsel will be given those reports?

17   A.    Sure.

18          MS. REMIS:  Objection, Your Honor.  Relevance.

19          THE COURT:  All right.  Well, the question is

20   asked and answered, but you can't -- are there going to be

21   any more questions along this line?

22          MR. BOSTIC:  No, Your Honor.

23          Agent McDonald, thank you.

24          THE COURT:  Okay.  Go ahead, Ms. Remis.

25          CROSS-EXAMINATION

McDonald - Cross

1    BY MS. REMIS:

2    Q.      Good afternoon, Agent McDonald.

3    A.      Good afternoon.

4    Q.      You were asked just now about four instances of

5    surveillance that were conducted at Dr. Titus' office back

6    in 2014.

7    A.      Yes.

8    Q.      And you were a member of some of that surveillance;

9    is that right?

10   A.      That is correct.

11   Q.      And can we pull up Government Exhibit 700, please.

12           Do you recall the location of that surveillance?

13   A.      Church Street in Milford, Delaware.

14   Q.      And is that this office right here that we're looking

15   at?

16   A.      That is the side.  The entrance is -- the main

17   entrance where patients would go in is what you see on the

18   right, the door with the white paper on it, yes.

19   Q.      And when you would conduct surveillance, where would

20   you be located?

21   A.      You can't see it here, but behind the building is a

22   parking lot, and we would try to sit there.  But again, if

23   there were a lot of people in the parking lot, and you're

24   sitting in a vehicle that doesn't fit in -- am I being too

25   loud?  Is that okay?

McDonald - Cross

1   Q.      No.

2   A.      You don't want to -- when you're doing surveillance,

3   you want to stay covert.  You don't want to be seen,

4   otherwise, all you're doing is watching people who know

5   you're there.  So we would try to sit in the back parking

6   lot, but sometimes that wasn't possible.  We'd have to find

7   somewhere else.

8   Q.      And is it fair to say that one of the main purposes

9   of your surveillance at that time was to see about the cars

10  that were coming and going to the clinic?

11  A.      That was one of the main reasons, yes.

12  Q.      And you were looking at like license plates and

13  trying to identify who was in those cars?

14  A.      Yes.

15  Q.      Is it also fair to say that with respect to

16  surveillance reports, there's no policy requiring you to

17  write down every single thing that you observed; right?

18  A.      Correct.

19  Q.      And you mentioned with Mr. Bostic that you didn't see

20  or observe any people passing back and forth like pills or

21  pill bottles in exchange for cash; right?

22  A.      Correct.

23  Q.      But is it fair to say that you did see other

24  behaviors that stood out to you?

25  A.      Yes.

McDonald - Cross

1    Q.    And could you describe some of those things that

2    stood out to you when you were on surveillance then?

3    A.    Sure.  I could try.  It's difficult to describe all

4    of it, but I'll do my best.  So based on training,

5    experience, data that I had at the time, based on people I

6    had interviewed up until the points where I'm doing

7    surveillance, knowing the type of practice I'm doing

8    surveillance on, knowing the type of case I'm working, when

9    you see things like a lot of people hanging out in the

10   parking lot of a doctor's office, a car full of one person,

11   sometimes two people, sometimes four, five people who all go

12   in together at the same time and many times sitting there on

13   surveillance, the people went in and were out in -- when I

14   say five minutes, I'm being very generous.  I think many

15   were probably in and out in less than one minute leaving

16   with pieces of paper in their hand that, to me, based on my

17   training and experience, and it's a doctor's office, were

18   prescriptions.  And knowing the data that I had specifically

19   for Medicare at the time because I was with Health and Human

20   Services, the percentage of patients getting controlled

21   substances prescriptions, the data, the people, the number

22   of people, how many people were in and out very quickly, and

23   like I said earlier, briefly, hanging out in the parking

24   lot, sometimes with kids, sometimes -- sometimes it appeared

25   to me to be three generations of the same family hanging out

McDonald - Cross

1    in the parking lot.

2              And to be clear, not every patient was in and

3    out in less than a minute.  Sometimes, again, watching

4    license plates, you'd see -- and we know they're not people

5    who worked there because you could run who the car belongs

6    to and who worked there.  Some people would be in for over

7    an hour.  I believe sometimes they were there for more than

8    two hours.  So there were a lot of things that, to me, were

9    very important that I saw, yes.

10   Q.    And so you mentioned two types of patients.  One type

11   of patient that would go in for, you said, a minute or five

12   minutes and come right back out; right?

13   A.    Yes.

14   Q.    And at that time, did you have an understanding that

15   Dr. Titus prescribed two prescriptions a month to patients?

16   A.    I -- I did have data from the PMP, so I did see that

17   many, if not all, patients did receive, when they were

18   getting controlled substances, two different prescriptions

19   each month, every 14 days or so.

20   Q.    But did you understand at the time that for the

21   second prescription, Dr. Titus didn't actually have a visit

22   with them?

23   A.    I don't believe I knew that at the time with all of

24   the surveillance, no.

25   Q.    And you also mentioned some patients who were there

McDonald - Cross

1    for a longer time; right?

2    A.    Yes.

3    Q.    Can you describe what you would see those patients

4    whose cars were there for an hour or two, what were they

5    doing during that hour or two?

6    A.    Some of the patients I never saw because they were

7    inside the whole time, but others were the people I

8    described earlier.  They were never alone.  They were

9    hanging out in the parking lot, you know, smoking

10   cigarettes, I think, talking to other people.  There seemed

11   to be people who knew each other.  It was just an odd thing

12   to see at an internal medicine practice.

13   Q.    And you were asked about some surveillance on

14   August 6th, 2014, and a pizza place and following someone's

15   car and somebody else going home.  Who was the other person

16   that you were following on that day?

17   A.    I believe, from the quick glance of the report, it

18   looks like it was Victoria Titus.

19   Q.    And was Victoria Titus, Dr. Titus' wife at the time?

20   A.    I believe she was married to him at the time.

21   Q.    And was she also a former patient of Dr. Titus'?

22   A.    Yes.

23   Q.    And when you mentioned that you were a part of the

24   search team, what location did you say you were primarily

25   at?

McDonald - Cross

1    A.      I was at Josie Walters' house.

2    Q.      Okay.  And did you seize records of Dr. Titus' office

3    from Josie Walters' house?

4    A.      Yes.

5    Q.      And were some of those records patient files that

6    appeared to be blank in many cases?

7    A.      Yes.

8    Q.      And you also mentioned, I believe, that you stopped

9    by Dr. Titus' house at some point?

10   A.      On the day of the search, yes.

11   Q.      Okay.  And about how long were you there for?

12   A.      I don't recall specifically, but I -- I would

13   estimate it was well less than an hour that I was at his

14   residence.

15   Q.      And you mentioned, you were asked about a young boy

16   who was at the clinic -- excuse me, at the house; right?

17   A.      Yes.

18   Q.      Is that Victoria Titus' son?

19   A.      Yes.

20   Q.      And Victoria Titus was not present at the time of the

21   search; right?

22   A.      No, she was not.

23           MS. REMIS:  Just one moment, Your Honor.  No

24   further questions, Your Honor.

25           THE COURT:  All right.  Thank you.

McDonald - Redirect

1        MR. BOSTIC:  Your Honor, I just have very brief

2  questions on rebuttal.

3                      REDIRECT EXAMINATION

4  BY MR. BOSTIC:

5  Q.    On August 6th, 2014, you were there for about or your

6  team for about three to four hours; right?

7  A.    I don't know without the report in front of me.  I'm

8  sorry.  If the report --

9  Q.    You were there for an extended period of time; right?

10  A.    That -- I wouldn't necessarily call three or

11  four hours of surveillance an extended time.  Sometimes they

12  go 12, 14 hours, so --

13  Q.    Well --

14  A.    -- three hours is relatively short.

15        MR. BOSTIC:  If I may approach?

16        THE COURT:  Yes.

17  BY MR. BOSTIC:

18  Q.    Agent McDonald.

19  A.    Thank you.

20  Q.    I'll ask you to take a look at that.

21  A.    Okay.

22  Q.    Yeah.

23  A.    Okay.  (Witness reviewing.)

24        So the total amount of time I was at the

25  business or on surveillance that day?

McDonald - Redirect

1   Q.      The business.  Well, on surveillance.

2   A.      On surveillance that day, it looks like about

3   five-and-a-half hours, maybe.

4   Q.      And with respect to the October surveillance, would

5   it be fair to say it started at about 6:00 a.m. and went

6   until about the middle of the day?

7   A.      I think so.  Yeah.

8   Q.      And in all the events that you discussed and what you

9   saw with the various cars and what may or may not be found

10  in records, you never saw one of them engage in any criminal

11  behavior; would that be correct?

12  A.      Well, I can't say because I -- again, when I describe

13  somebody arriving to a doctor's office and going in for less

14  than -- less than 20 minutes, but less than two minutes and

15  coming out with what I believe were prescriptions, that -- I

16  just want to be very clear answering your questions, what I

17  believe I saw versus how you phrased that.

18  Q.      Okay.  The Government in their questions to you

19  referenced that Dr. Titus wrote prescriptions, part of the

20  medication early in the month and the other half the second

21  part of the month.

22  A.      Yes.

23  Q.      Right?  Okay.

24          So you agree with me that when you saw some

25  person going in and coming out with a prescription in a

1    couple minutes, I think the Government asked this question

2    or told you this, Dr. Titus was not seeing that individual

3    on that day?

4    A.    I don't know what happened when they went inside.

5    Q.    Okay.

6           MR. BOSTIC:  Okay.  Thank you.  Nothing else,

7    Your Honor.

8           THE COURT:  All right.  Agent McDonald, thank

9    you.  You're done.  You're excused.  You may step down.

10          THE WITNESS:  Thank you, Your Honor.

11          THE COURT:  All right.  Am I correct that --

12          MS. KOUSOULIS:  We have no more witnesses for

13   today, Your Honor.

14          THE COURT:  All right.  So members of the jury,

15   this is where I think we are.  We're through for the day.

16   We're not going to have any trial tomorrow.  I expect on

17   Monday that we will have more or less a full day of

18   testimony, but I also think that we will be ready for

19   closing arguments on Tuesday.

20          So that, again, it's just my expectation.  Don't

21   make vacation plans around it or anything, but that's what I

22   think is happening.  And as for there being no trial

23   tomorrow, I'm sure of that.

24          So I'm going to ask that you be taken out in a

25   minute.  We will start again Monday at 9:30.  Please do what

1    you've been doing all week, being here on time, and we will

2    hopefully be ready to go at 9:30.

3              For the three days between then and now, you

4    know, remember the instructions that I give every time.

5    Don't talk to anyone about the case.  Don't let anyone talk

6    to you about the case, you know, by any means.

7              And don't do any research.  Don't look anything

8    up.  You know, make sure that everything you learn about the

9    case, you learn in here with your fellow jurors.  That's the

10   only fair way to do this.

11             And so have a good day tomorrow.  Have a good

12   weekend, and I will see you on Monday.

13             (Jury leaving the courtroom.)

14             THE COURT:  All right.  So you all can be

15   seated.  So what's the order of business on Monday?  Is it

16   going to be Dr. Warfield first or these other people first?

17             MS. KOUSOULIS:  Your Honor, we anticipate

18   Dr. Warfield first to make sure she gets done and then, you

19   know, we have two witnesses, Pucci subpoenaed.  Whether we

20   call one or both, we're not sure of yet, but we'll do that

21   right after her.  We anticipate that Dr. Warfield is not

22   going to take all day, and we will get to them and finish

23   our case on Monday.

24             (Whereupon the lights flickered.)

25             MS. KOUSOULIS:  That's just par for the course.

1    The elevator was making things weird earlier.

2             THE COURT:  And it seemed like an East Coast

3    brown out starting.  Okay.  And basically you expect that

4    Dr. Warfield and one or both of the witnesses that you're

5    talking about, that's going to be the end of your case?

6             MS. KOUSOULIS:  Yes, Your Honor.

7             THE COURT:  Does the Government right now expect

8    to have any rebuttal?

9             MS. REMIS:  Not at this time, Your Honor.

10            THE COURT:  Okay.  All right.  So we ought to

11   have a time, I think tomorrow, to just go over the revisions

12   of the or the jury instructions and that I will put out some

13   time soon.  And I don't know what your all plans are.

14            If we had a jury conference at 11:30, would that

15   work for you.

16            MS. REMIS:  We are free any time, Your Honor.

17            THE COURT:  All right.

18            MS. KOUSOULIS:  That's fine, Your Honor.

19            THE COURT:  Okay.  So hopefully, I'm not sure

20   when, but we'll get out the sort of draft final

21   instructions.

22            Is there anything else that we need to discuss

23   now?

24            MS. KOUSOULIS:  Not from the Defense, Your

25   Honor.

 1            MS. REMIS:  Nothing from us, either.

 2            THE COURT:  Actually, let me -- I'm not going to

 3     be holding either side to this.  I'm trying to work around a

 4     scheduling thing that I have.

 5            Ms. Remis, do you expect to be doing the main

 6     closing for the Government?

 7            MS. REMIS:  No, Ms. Sobczak is doing the main

 8     closing.  I'll do rebuttal, Your Honor.

 9            THE COURT:  Okay.  Ms. Sobczak, do you have any

10     sense as to what you think a reasonable estimate of your how

11     long your closing is going to be?

12            MS. SOBCZAK:  I estimate about 45 minutes, Your

13     Honor.

14            THE COURT:  Okay.  Who's doing the closing for

15     your side?

16            MR. BOSTIC:  Your Honor, I will be.  Your Honor,

17     unless I can guess your rebuttal, I at least have to do an

18     hour; right?  So I would say about an hour of time for

19     closing.

20            THE COURT:  Okay.  All right.

21            And Ms. Remis, I take it you do understand that

22     you're going to be limited in your rebuttal amount of time,

23     though I haven't figured out how much yet.

24            MS. REMIS:  Limited in time?

25            THE COURT:  Yes.

```
 1                    MS. REMIS:  Yes, Your Honor.  That's fine.

 2                    THE COURT:  Yeah, yeah, that's all I meant.

 3        Don't --

 4                    MS. REMIS:  I won't go overboard, Your Honor.

 5                    THE COURT:  All right.  Well, that's helpful.

 6                    Okay.  Well, if there's nothing else, I'll see

 7        you tomorrow.

 8                    DEPUTY CLERK:  All rise.

 9                    (Court was recessed at 1:45 p.m.)

10                    I hereby certify the foregoing is a true and

11        accurate transcript from my stenographic notes in the

12        proceeding.

13                    /s/ Heather M. Triozzi
                      Certified Merit and Real-Time Reporter
14                    U.S. District Court

15

16

17

18

19

20

21

22

23

24

25
```