1     IN THE UNITED STATES DISTRICT COURT

2      FOR THE DISTRICT OF DELAWARE

3

4 UNITED STATES OF AMERICA,  )
              )
5      Plaintiff,  )
              ) Criminal Action No. 18-45-RGA
6 v.          )
              ) Trial Volume IX
7 PATRICK TITUS,     )
              )
8      Defendant.  )

9

            J. Caleb Boggs Courthouse
10           844 North King Street
            Wilmington, Delaware
11
            Monday, July 19, 2021
12           9:00 a.m.
            Jury Trial
13

14 BEFORE:  THE HONORABLE RICHARD G. ANDREWS, U.S.D.C.J.

15 APPEARANCES:

16     U.S. DEPARTMENT OF JUSTICE - CRIMINAL DIVISION
      BY:  ALEZA S. REMIS, ESQUIRE
17      BY:  CLAIRE SOBCZAK, ESQUIRE
      BY:  JUSTIN WOODARD, ESQUIRE
18
           For the Plaintiff
19

20     OFFICE OF THE FEDERAL PUBLIC DEFENDER
      BY:  ELENI KOUSOULIS, ESQUIRE
21
        -and-
22
     THE BOSTIC LAW FIRM
23      BY:  EDSON A. BOSTIC, ESQUIRE

24           For the Defendant

25

```
 1                    ***   PROCEEDINGS   ***

 2                    DEPUTY CLERK:  All rise.  Court is now in

 3       session.  The Honorable Richard G. Andrews presiding.

 4                    THE COURT:  Good morning, everyone.  Please be

 5       seated.

 6                    (Everyone said, Good morning, Your Honor.)

 7                    THE COURT:  So I was just coming out to see

 8       whether everything's fine or whether there's anything that

 9       you want to address.

10                    MS. KOUSOULIS:  I believe there is one issue,

11       Your Honor.  We were going, with Dr. Warfield, to use some

12       demonstrative evidence that the Government is objecting to.

13                    THE COURT:  Uh-huh.

14                    MS. KOUSOULIS:  So just -- and I have it here.

15       I can even put it up on the screen.

16                    I think it has to do with, you know, when we

17       were -- one second.  In terms of whether, like, one of the

18       slides that we intend to have with Dr. Warfield, when we

19       talk about -- the two that are in dispute are -- one of them

20       is this, and it has to do with the term "malpractice."  So

21       one of them, she's going to be talking about standard of

22       care, and then -- and this is the chart she's going to use

23       in terms of best practices, what's in standard of care,

24       going all the way down to, you know, what's outside of

25       standard of care, and outside the usual course.
```

```
 1                    And then when -- and they're objecting to the
 2       word "malpractice."  And then there's one slide that just
 3       talks about what malpractice -- you know, what she means by
 4       malpractice.  And I guess what I can do -- I don't know if
 5       the Government wants to --
 6                    MS. SOBCZAK:  It's not showing up.
 7                    MS. KOUSOULIS:  Oh, it's not showing up?  Sorry,
 8       Your Honor.  Why is it not showing up?  Sorry.
 9                    I think we have to shut off the system.
10                    Let me just hand it up.  Mr. Bostic, just shut
11       the whole system down.  There, Your Honor.  These are extra
12       copies.
13                    DEPUTY CLERK:  Thank you.
14                    MS. KOUSOULIS:  Your Honor, I think it has to do
15       with -- and I guess I can let the Government state their --
16       like, as to -- at the Daubert hearing, we were talking about
17       Dr. Warfield's testimony.  There was a question of whether
18       she would talk about the civil burden of proof.  We don't
19       intend to have her talk about --
20                    THE COURT:  So instead of calling it
21       malpractice, which seems to be a thing, why don't you just
22       call it bad practice?
23                    MS. KOUSOULIS:  That's fine, Your Honor.
24                    THE COURT:  Do you object to that?
25                    MS. KOUSOULIS:  Do you have any problem with
```

1    that?

2              But, Your Honor, we would -- I mean, in terms

3    of -- I mean, I'm not sure -- like in terms of having the

4    jury maybe kind of understand, you know, her delineation.

5    And she was -- and in prior testimony, you know, in the Li

6    case in the Middle District of Pennsylvania and some other

7    courts, she's been permitted to use the term "malpractice."

8              And malpractice -- and she's not going to be

9    talking about, like, the burden of proof, but just in terms

10   of where it falls when describing the standard of care, and

11   what's inside and outside the standard of care and how it

12   relates to outside the usual course of professional

13   practice.

14             THE COURT:  So what is she going to say

15   malpractice is?

16             MS. KOUSOULIS:  Your Honor, well, I believe in

17   her -- where's the other side?

18             I believe, like, she's going to define it as

19   it's defined in the one slide that I handed up, that

20   malpractice is -- with regard to controlled substances

21   prescriptions, that they're prescribed in a way that's not

22   keeping with the standard of care.  For example, what a

23   similarly trained physician would do in a similar

24   circumstance.  So she's going to describe it in terms of the

25   standard of care --

1          THE COURT:  But --

2          MS. KOUSOULIS:  -- and talk about how mal --

3   like conduct that would be outside the standard of care akin

4   to malpractice would not -- would still be within the usual

5   course of professional practice.

6          THE COURT:  Well, all right.  What do you all

7   have to say about that?

8          MR. WOODARD:  Just that the jury shouldn't be

9   thinking about a civil case.  This is a criminal case.  We

10  agreed she can talk about the medical standard of care and

11  how that relates to the usual course of professional

12  practice.  But the reference to malpractice is clearly a

13  reference to a civil standard.  And I thought this came up

14  at the Daubert hearing and Your Honor inquired whether that

15  would come up, and Mr. Bostic represented that it would not.

16         So we think the reference to malpractice

17  necessarily raises an issue that the jurors should not be

18  thinking about.  It's prejudicial.

19         MS. KOUSOULIS:  And Your Honor, when talking

20  about malpractice in the other cases where she was permitted

21  to testify to it, she talked about malpractice -- like, for

22  example, in the Li case, you know, when she was talking

23  about malpractice, she said outside the standard of care is

24  essentially malpractice.

25         And you know, that might be a doctor who makes a

1  mistake or a doctor who just isn't smart enough to know that

2  this isn't what you're supposed to do or not supposed to do.

3  All of those things are malpractice.  They are outside the

4  standard of care, but they may still be within the usual

5  course of medical practice.  So she's just using it as sort

6  of like a reference to --

7           THE COURT:  So if that's what she wants to say,

8  if the word "malpractice" were replaced with outside the

9  standard, the standard of care --

10          MS. KOUSOULIS:  Well, Your Honor --

11          THE COURT:  Let me just -- I mean, in other

12  words, Dr. Thomas did something conceptually similar, and

13  this is also something I remember discussing in Daubert,

14  that, you know, there's a way to describe, which Dr. Thomas

15  said middle of the road, and all the way to, like, off the

16  road.

17          And so I see a problem with, you know, throwing

18  in a word "malpractice."  It's kind of outside the rest of

19  what we're talking about here.  But I think the idea that

20  there is something below not-so-great practice, which is

21  still practicing medicine, is entirely, A, consistent with

22  what Dr. Thomas said and entirely consistent with my

23  understanding of the law.

24          So the Defense should be able to call the space

25  between not-so-great practice and outside the usual course

1    something.  It doesn't strike me as -- it strikes me as

2    understandable.

3                    MR. WOODARD:  I agree, Your Honor.

4                    THE COURT:  Well, so --

5                    MS. KOUSOULIS:  And so, Your Honor, if she's not

6    going to -- I mean, to return to malpractice, if she's not

7    going to, you know, make references to the civil standard

8    and she's going to use it in that context --

9                    THE COURT:  But why is she using the word

10   "malpractice"?

11                   MS. KOUSOULIS:  I think, Your Honor, because

12   like, you know, to just delineate between inside the

13   standard of care and outside the usual course, like, she's

14   got to come up with some -- you know -- so, I mean, we would

15   prefer it to be malpractice because I think it is more

16   understood, but if Your Honor prefers bad practice --

17                   THE COURT:  No.  I just -- malpractice literally

18   does mean bad practice.

19                   MS. KOUSOULIS:  Right.

20                   THE COURT:  But on the other hand, nobody goes

21   around talking about "I'm going to sue my doctor for bad

22   practice."

23                   MS. KOUSOULIS:  Okay.  Then, that's fine, Your

24   Honor.  We can adjust it to --

25                       (Discussion held off the record.)

```
 1              MS. KOUSOULIS:  All right.  Your Honor, I guess,
 2    so in that respect, I guess, what -- if she's not going to
 3    delve into civil standard and get into it in those depths, I
 4    guess I'm not seeing the issue with her calling it
 5    malpractice.  Is it --
 6              THE COURT:  Well, because that, you know, will
 7    raise, at least possibly for some jurors, the specter of
 8    civil practice which bad practice does not, or even outside
 9    the usual standard of care, whatever it is, exactly this
10    other thing.  But the fact that she has to go around
11    defining what malpractice is, you know, that's like an
12    unnecessary thing in a criminal case, you know.
13              MS. KOUSOULIS:  Well, I think there would be
14    some jurors that don't -- even bad practice, what is
15    considered bad practice but not considered outside -- but
16    not considered --
17              THE COURT:  That's the reason why if she said,
18    you know, practice that is not in keeping with the standard
19    of care, you can do that.  I think there are a lot of
20    different things you can call it, but it does seem that
21    calling it malpractice is introducing concepts which are
22    unnecessary and, therefore, you know, would at least have
23    some potential to confuse and not actually convey anything.
24    So they have no probative value that you can't do by
25    something else.
```

1    MS. KOUSOULIS:  Well, Your Honor, again, we

2    would just, you know, point to that she -- like other courts

3    have allowed her to use that term.  But if Your Honor is not

4    going to, you know, permit us to use malpractice, we would,

5    at the very least, ask to use bad practice just so there's

6    something that she can convey.

7    THE COURT:  Okay.  Bad practice is fine by me.

8    Do you object to that?

9    MR. WOODARD:  No, Your Honor.

10   THE COURT:  All right.  Bad practice.

11   MS. KOUSOULIS:  Okay.  And if we could just --

12   give me one moment.  We might just have to adjust -- a

13   couple moments to try to adjust the one slide.

14   THE COURT:  You've got time.  You also have a

15   typo in the Defense Exhibit 20A for usual that you might

16   want to correct.

17   MS. KOUSOULIS:  Oh, usual.  Yeah, Thank you,

18   Your Honor.

19   THE COURT:  I mean.

20   MS. KOUSOULIS:  We went through it so many

21   times.  I can't believe I missed those.

22   THE COURT:  Was there anything else you want to

23   talk about?

24   MS. KOUSOULIS:  Not from the Defense.

25   MR. WOODARD:  Not from the Government, Your

1    Honor.

2              THE COURT:  Okay.  All right.  Well, then, we'll

3    see you in hopefully 20 minutes.

4              DEPUTY CLERK:  All rise.

5              (Recess was taken.)

6              DEPUTY CLERK:  All rise.

7              THE COURT:  All right.  So please be seated.  So

8    I guess you know that we're having some technical

9    difficulties.  And so the jury is all here.

10             I was wondering how -- I'm thinking there's some

11   possibility that a certain amount of what Dr. -- how soon

12   into Dr. Warfield's presentation were you going to start

13   needing slides?

14             MS. KOUSOULIS:  Your Honor, probably toward,

15   like, the first third, but I am going to go through all her

16   qualifications.  That will take a little bit of time.  That

17   won't require any slides.

18             THE COURT:  Well, so I guess what I was

19   wondering is whether you want to start and start doing her

20   qualifications.  And, you know, if it gets to the point

21   where you need a slide, I will tell them that we need to

22   take a break then.

23             MS. KOUSOULIS:  That's fine.

24             THE COURT:  Okay.  All right.  So why don't we

25   do that.  We'll start making some progress.

1    MS. KOUSOULIS:  I will keep Mr. Bostic away from

2   the electronics.

3    THE COURT:  I'm sorry, what?

4    MS. KOUSOULIS:  I will keep Mr. Bostic away from

5   the electronics.

6    THE COURT:  Off the record here.

7    (Discussion held off the stenographic record:)

8    (Jury entering the courtroom.)

9    THE COURT:  So members of the jury, welcome

10   back.  Everyone, you may be seated.

11    So we are having some technical difficulties,

12   which will not interfere with the first portion of the next

13   witness' testimony, but at some point, if the technical

14   difficulties aren't fixed, it would interfere.  So we may be

15   taking a break before too long, but we figured since there's

16   some portion that the parties could do without, that we'd

17   start.

18    All right.  Ms. Kousoulis.

19    MS. KOUSOULIS:  The Defense would call

20   Dr. Carol Warfield.

21    DEPUTY CLERK:  Please state and spell your full

22   name for the record.

23    THE WITNESS:  Carol Warfield, C-A-R-O-L

24   W-A-R-F-I-E-L-D.

25    DEPUTY CLERK:  Do you affirm that the testimony

1    you are about to give to the Court and the jury in the case

2    now pending will be the truth, the whole truth, and nothing

3    but the truth, you do so affirm?

4                    THE WITNESS:  I do.

5                    DEPUTY CLERK:  Thank you.

6                    DR. WARFIELD, the witness herein, after having

7    been duly affirmed under oath, was examined and testified as

8    follows:

9    BY MS. KOUSOULIS:

10   Q.     Good morning, Dr. Warfield.

11   A.     Good morning.

12   Q.     Dr. Warfield, what is your profession?

13   A.     I'm a medical doctor.

14   Q.     And what is your specialty?

15   A.     Pain management.

16   Q.     And where did you get your undergraduate degrees?

17   A.     I graduated from Tufts University with degrees in

18   mechanical engineering and mathematics, and then went to

19   Tufts Medical School where I received my M.D. degree.

20   Q.     And after medical school, what did you do?

21   A.     After medical school, I did an internship in medicine

22   and surgery.  And then I went to Massachusetts General

23   Hospital where I did a residency in anesthesiology at Beth

24   Israel Hospital in Boston, both teaching hospitals at

25   Harvard Medical School.  And I subsequently did a fellowship

1    in anesthesiology and pain medicine.

2    Q.    And are you currently a professor?

3    A.    Yes.  I am a full endowed professor at Harvard

4    Medical School currently.

5    Q.    And what do you teach at Harvard?

6    A.    I teach pain management.

7    Q.    And do you hold any certifications?

8    A.    Yes.  I'm board certified in anesthesiology and in

9    pain medicine.

10   Q.    And you testified you're board certified.  What does

11   it mean to be board certified?

12   A.    Well, generally, to be board certified, you need to

13   do a certain amount of training, a residency, a fellowship,

14   and then you need to sit for examinations.  Sometimes a

15   written examination combined with an oral examination, and

16   pass those in order to become board certified in a

17   particular specialty.

18   Q.    Is pain management board certified?

19   A.    Yes.

20   Q.    And do you know when pain management first became

21   board certified?

22   A.    Yes.  In fact, I was on the committee that developed

23   the board certification process for pain management.  In

24   1993, we gave the first examination.  I was one of the

25   people who composed the questions and served on that

1    committee.  And then I subsequently had to take the test

2    myself and became board certified in the first pass in 1993

3    when we developed that process.

4    Q.    Now, the jury has heard testimony previously that

5    Dr. Stephen Thomas, who testified earlier in this case, is

6    board certified by the American Board of Anesthesiology with

7    a pain management certification.  Is this the board that

8    you're talking about for which you were on the original

9    committee?

10   A.    Yes, that's the board that I -- that I served on and

11   worked on.

12   Q.    For how many years have you practiced medicine in the

13   field of pain management?

14   A.    Over 40 years.

15   Q.    And have you published any articles on pain

16   management?

17   A.    I've published hundreds of articles on pain

18   management since -- since my training in the 1970s.

19   Q.    And do you hold any editorial board positions

20   relating to pain management?

21   A.    Yes.  I'm currently on the editorial board of the

22   Journal of Opioid Management.  I've served on the editorial

23   board of many other national and international publications

24   regarding pain.  I served as a reviewer for the New England

25   Journal of Medicine, for other -- other prestigious medical

1    journals in this country as a reviewer and on the editorial

2    board.

3              And what that means is that if a researcher or a

4    doctor does some medical research in the area of pain

5    management, they send their article -- they write up a

6    article.  They send it to the journal, and the journal then

7    sends that article to a few specialists, experts in the

8    field, to have us review it to decide whether the statistics

9    are done right, whether it's an appropriate article, and

10   whether it should be published.  So I served on many of

11   those committees deciding what should be published and what

12   shouldn't.

13   Q.     Have you written any textbooks on pain management?

14   A.     Yes, I've written or edited four textbooks on pain

15   management.  The first one was in the 1990s.  It's been --

16   it's been in three editions so far.  It's widely used around

17   the world.  It's actually been translated into several

18   languages, including Chinese, Spanish, Italian.  And it's

19   widely used to train doctors who want to be pain management

20   experts.

21             And, also, one of them is used to train doctors

22   in internal medicine, and doctors who aren't pain

23   specialists, but doctors in internal medicine and residents

24   and interns on how to treat pain.

25   Q.     Have you testified in the area of pain management

1    before?

2    A.    Yes, several times.

3    Q.    Have you ever testified on behalf of the Government?

4    A.    Yes.

5    Q.    And have you also testified on behalf of Defendants?

6    A.    Correct.

7    Q.    How many times approximately have you served as an

8    expert witness, not just testified, but served as an expert

9    witness in the area of pain management?

10   A.    Well, I'd say probably in the last four years, I've

11   testified a couple times a year, and probably done twice as

12   many cases where I've reviewed and not testified.

13   Q.    Has a court ever refused to qualify you as an expert

14   in pain management?

15   A.    No.

16   Q.    Have you ever been asked by an attorney to review a

17   case or to render an opinion on a case, and then after

18   you've rendered that opinion, not been retained to work on

19   that case?

20   A.    Yes.

21   Q.    And what was the reason for that?

22   A.    Well, usually, if they don't like what I have to say,

23   they don't ask me to come and testify on their behalf.

24   Q.    Have you had the opportunity to review the medical

25   records of other physicians in your career?  And if so,

1   under what circumstances?

2   A.    Yes, I've reviewed thousands and thousands of medical

3   records of physicians.  I've served on the accreditation

4   board for residency programs, for example, and that board

5   sent me around the country to look at various teaching

6   hospitals to see how the doctors there practice, how they

7   train their doctors and specifically in pain management.

8           So I've reviewed many, many records there.  I've

9   served on committees where we do peer review.  That means we

10  look at how other doctors practice to see if they're

11  practicing appropriately and safely and such.

12          MS. KOUSOULIS:  Your Honor, I would offer

13  Dr. Warfield as an expert in the practice of pain

14  management.

15          THE COURT:  Any questions?

16          MR. WOODARD:  No questions, Your Honor.

17          THE COURT:  All right.  You may proceed.

18  BY MS. KOUSOULIS:

19  Q.    Dr. Warfield, let's talk for a minute about the

20  practice of medicine.  How do you instruct your students

21  when you teach?

22  A.    Well, in terms of the practice of medicine, we

23  instruct the students that there are lots of different ways

24  to practice medicine.  We encourage our students to get lots

25  of information, as much information as they can, from

1    textbooks, from doctors who are training them, from reading

2    articles.  And they each have to decide how they're going to

3    practice, what their particular practice is, because I think

4    no two doctors practice medicine the same.

5              It's often been said medicine is an art.  So

6    there are lots of different ways to do things, all of which

7    may be perfectly appropriate.

8    Q.    What is pain management?

9    A.    Well, pain management is a specialty where we -- we

10   diagnose and treat patients with different types of pain.

11   It may be acute pain, which means pain after surgery or

12   after an injury, like a broken leg.  It might be cancer

13   patients with pain.  It might be patients with chronic

14   intractable pains; in other words, patients who've had pain

15   for months and months, and they've been to all the various

16   specialists.  And nobody can treat the underlying cause, so

17   they end up with chronic pain and come to a pain doctor for

18   treatment of that type of pain.

19   Q.    Are the different classes of pain treated differently

20   that you describe, the acute pain, the cancer pain, the

21   chronic pain?

22   A.    Yes.

23   Q.    And are there doctors from different specialties

24   involved in pain management?

25   A.    Yes.  The most common specialty is anesthesiology.

1   My boards are -- my underlying boards are in anesthesiology,

2   so that's probably the most common type of doctor who

3   practices the specialty of pain management.  But when it

4   comes to treatments for pain, things like opioids, actually

5   primary care doctors, internists prescribe much more than

6   pain doctors do.

7          There are many different specialties involved in

8   pain medicine.  As I said, pain specialists tend to come

9   from anesthesiology, sometimes from physical medicine and

10  rehabilitation, sometimes from neurology, and other

11  practices such as internal medicine.  But the doctors out

12  there who are actually treating most of the patients with

13  pain aren't the pain specialists, they're doctors who are

14  primary care doctors, general practitioners, and internists.

15  Q.     And in your opinion, as a general matter, are

16  the general practitioners internists, the doctors that are

17  prescribing most of the pain medicine and opioids?

18  A.     Oh, definitely.  They are -- I mean, statistically,

19  definitely, most of the opiates are prescribed by the

20  primary care doctors.

21  Q.     And does the fact that doctors from different

22  specialties involve themselves in pain management result in

23  different approaches to pain management?

24  A.     Yes.  There are many, many different approaches to

25  pain management, all of maybe -- all may be perfectly

1    appropriate.  I mean, for example, there are some doctors

2    who never prescribe opiates for a variety of reasons, which

3    may be appropriate in their setting.

4              There are some doctors who prescribe opiates for

5    a lot of their pain patients, which may be very appropriate.

6    There are some doctors who do lots of nerve blocks and

7    steroid injections and some doctors who never do nerve

8    blocks and steroid injections.  There are some doctors who

9    send their patients for acupuncture.  There are doctors who

10   never do that.

11             And then there's everybody in between.  There

12   are doctors who sometimes send patients to acupuncture,

13   sometimes do massage therapy, sometimes prescribe opiates.

14             So I think the point is there's a wide variety

15   of how you can practice pain medicine, all of which may be

16   perfectly appropriate.  As I said, I don't think any two

17   doctors do it the same.  There may be lots of different ways

18   of treating pain medicine.

19             For example, if you have back pain, you may go

20   to a doctor who says, you know, what you need is

21   acupuncture, and so you do that.

22             You may go to another doctor who says, you know,

23   what you really need is a chiropractor and spinal

24   manipulation, so you try that.

25             Another doctor may say, you know, we really need

1    medications.  That's the best thing to do.

2              And yet another doctor may say, I need to take

3    you right to the operating room because you need surgery.

4    And you know, those all may be appropriate in a given

5    setting, but the point I'm making is that there are lots and

6    lots of different ways of treating pain.

7    Q.    Are you familiar with the model policy for the use of

8    opioids in the treatment of chronic pain?

9    A.    Yes, the Federation of State Medical Boards set up

10   one of the first guidelines to help doctors determine how to

11   most appropriately treat pain --

12   Q.    And --

13   A.    -- with opioids.  I'm sorry.  With opioids.

14   Q.    And are the guidelines outlined in the model policy

15   mandatory for doctors to follow?

16   A.    These are guidelines.  When we say "guidelines,"

17   that's exactly what it means.  It guides the doctors in

18   their practice, so they can refer to these to determine how

19   to treat their patients.  They're part of education and

20   training and guiding doctors in their practice.

21   Q.    Now, have you been asked by myself and Mr. Bostic to

22   review the 14 patient files of Dr. Titus that are part of

23   the indictment in this case, as well as an additional 24

24   files that were also reviewed by Dr. Thomas?

25   A.    Yes, I have.

1    Q.     And were you asked to render an opinion as to whether

2    the prescriptions written by Dr. Titus on particular dates

3    outlined in the indictment were for a legitimate medical

4    purpose in the usual course of professional practice?

5    A.     Yes, I was asked that.

6    Q.     Now, in addition to reviewing Dr. Titus' patient

7    files, did you also review the PMP data for Dr. Titus'

8    practice?

9    A.     I did.

10   Q.     And did you also review the 2012 Consent Decree --

11   A.     I did.

12   Q.     -- that Dr. Titus signed?

13   A.     Yes.

14   Q.     And did you also review Dr. Titus' statements to law

15   enforcement in 2015 and 2018?

16   A.     Correct.  Yes.

17   Q.     And did you also review Dr. Thomas' expert reports

18   for this case and his testimony from this trial?

19   A.     Yes, I did review all of that.

20   Q.     And based on your review of the patient files and the

21   other materials that you just testified you reviewed, did

22   you reach an opinion regarding whether Dr. Titus'

23   prescribing on the specific instances relating to the 14

24   patients outlined in the indictment was for a legitimate

25   medical purpose in the usual course of professional

1   practice?

2   A.    Yes.  My opinion is that the prescriptions that were

3   written were for a legitimate medical purpose, that being

4   pain, and they were done within the course of a usual

5   medical practice.  He was practicing medicine when he wrote

6   those prescriptions.

7   Q.    And with regard to the additional patient files you

8   reviewed outside the 14 patients in the indictment, did you

9   reach the same conclusion and opinion regarding Dr. Titus'

10  prescribing?

11  A.    I did.

12  Q.    Now, let's talk for a second.  What kind of -- in

13  reviewing Dr. Titus' medical records and the other materials

14  in this case, what kind of practice did Dr. Titus have?

15  A.    Well, Dr. Titus' practice, where it concerns pain

16  medicine, was a practice where he saw very, very difficult

17  patients.  Patients who need opioids to treat their pain are

18  an extremely difficult group of patients to treat.  And

19  patients who need opioids who have other compounding

20  problems, like they're using other substances, they're not

21  necessarily following the doctor's directions perfectly, are

22  the most difficult of those most difficult patients to

23  treat.

24        And for that reason and many other reasons, a

25  lot of doctors won't even touch those patients.  They won't

1    see those patients.

2    Q.    Now, from your perspective, did Dr. Titus' patients

3    have severe pain problems?

4    A.    They did.  They had a number of very serious and very

5    severe pain problems.  For example, Mr. Hood had a reflex

6    sympathetic dystrophy.  This is one of the most excruciating

7    types of pain and the most difficult to treat.

8          Mr. -- I'm sorry.  Several of them had had

9    previous surgeries, what we call failed back syndrome.

10   Those are patients who've had very severe pain in their

11   spine requiring that they go to the operating room.  They

12   have screws and plates in their neck, like Mrs. Perry had.

13   They sometimes have spinal fusions.  I believe Ms. Moody had

14   a spinal fusion.  They've had multiple surgeries, and

15   sometimes end up, after surgery, with worse pain.  So

16   several of those patients had that sort of thing.

17         Another difficult category were patients like

18   Mr. Smith, who was morbidly obese.  He was almost

19   400 pounds, which means they couldn't do a lot of the other

20   treatments they might do for pain on a patient that large.

21   He might not even fit into an MRI to get MRIs.  They can't

22   do nerve blocks because of his size.  The surgeons won't

23   operate on him because of his size.

24         So he was treating the most difficult of

25   difficult patients, which, as I said, a number of doctors

1  won't even treat these patients.  And a number of doctors

2  today won't even prescribe opiates because they're afraid

3  they're going to lose their license or they're afraid that

4  they're going to end up in some sort of criminal proceeding

5  like this for prescribing opiates.

6          So a lot of doctors have just said, I'm not

7  prescribing opiates, which means a lot of patients who need

8  them aren't getting them.

9  Q.    Did you find that Dr. Titus attempted other

10 treatments other than opioid prescribing?

11 A.    Yes, these patients had other treatments that were

12 documented in the chart.  These patients had Cortisone

13 injections.  Many of them were sent out to pain specialists

14 by Dr. Titus for recommendations for other treatments and to

15 have treatments that Dr. Titus wouldn't have done himself,

16 such as injections, and pumps, and those sorts of things

17 that they -- that he wouldn't have done himself.

18         They -- they had consults with other doctors,

19 with orthopedic doctors.  They were on other medications,

20 other than opioids.  So there were many, many different

21 treatments, physical therapy and such that these -- these

22 individuals had.

23 Q.    Now, let's talk for a second.  You talked about,

24 like, what it means with regard to the usual course of

25 professional practice.

1    Is there one specific course of professional

2    practice that's written down somewhere?

3    A.    No.  As I said, there are lots of different ways of

4    doing things in medicine.  There's no one way.  And

5    depending on which doctor you go to, there may be different

6    things that are recommended.  So there's not one way to do

7    what -- what you need to do to treat a patient.

8    I read Dr. Thomas' testimony, and Dr. Thomas had

9    one way of doing things, and it was his way or the highway.

10   And I don't agree with that.  Because I think, with all due

11   respect to Dr. Thomas, the way he practiced was fine for

12   him, but it's not the way everybody practices.  And there's

13   no mandate out there that every doctor has to do what

14   Dr. Thomas does.

15   Q.    How about for the prescribing of opioids to treat

16   pain, is there a definitive set of rules that practitioners

17   must follow when prescribing opioids?

18   A.    There's no specific, again, way you have to practice

19   when you prescribe opiates.  There definitely are guidelines

20   and such.  There are laws that we all have to follow.  But,

21   again, for every patient, it's an individual judgment

22   decision by that doctor on a particular day.  So there's no

23   rule that says if a patient has this urine drug screen, you

24   must stop the drugs.  If a patient has a history of

25   addiction to heroin, you must never prescribe opiates.

1    You'll never see guidelines like that because

2    they don't exist because there are reasons you may need to

3    do things with particular patients.  So what you need to do

4    as a pain doctor, or any doctor, is look at the individual

5    patient, and decide on that day, when you're sitting there

6    with the patient, is it appropriate for me to prescribe this

7    opiate today for this patient?  And sometimes the answer is

8    yes, and sometimes the answer is no.  There's no guideline

9    that will tell you today, because the urine drug screen

10   shows this, you must not prescribe, or because the patient

11   has a history of this, you must not prescribe.

12   Q.    Now, you testified that different doctors have

13   different approaches in the way they treat pain.  Is that

14   okay that they do that?

15   A.    Yes, definitely.  I mean, we encourage that.  There

16   are different ways of doing things and there are different

17   treatments.  And, in fact, many patients need a combination

18   of treatments.  We use medications in combination with

19   physical therapy maybe or other things.

20         And, again, that may be why Dr. Thomas was

21   sending -- sorry, Dr. Titus was sending patients to the pain

22   doctors because they needed the medication, but maybe an

23   injection with steroids would have helped, also.  So it's

24   often a combination.

25   Q.    Now, you testified that you reviewed Dr. Thomas'

1    testimony from this trial?

2    A.    Yes.

3    Q.    And Dr. Thomas made several statements regarding what

4    he thought was outside the usual course of medical practice.

5    Do you agree that prescribing to patients who use illicit

6    substances or did not take their drugs as prescribed is

7    outside the usual course of professional practice?

8    A.    Absolutely not.  There are many reasons why you may

9    prescribe to those patients, and we can get into that in

10   more detail later.  But just because Dr. Thomas decided he

11   wasn't going to prescribe to those patients doesn't mean

12   that it wouldn't be appropriate under certain circumstances

13   to prescribe to these patients.

14            I mean, one thing we have to remember is that

15   patients who have substance issues, they have chronic pain

16   just like everybody else.  And you don't just say, Oh, you

17   know, you have a problem with this substance, you know, so

18   you can never get your pain treated.  You're going to have

19   to suffer for the rest of your life because you have this

20   other problem.

21            Again, those are the most difficult pain

22   patients to treat, but sometimes it's appropriate to use

23   opiates, to use other medications, other techniques for

24   these patients.

25            So whereas Dr. Thomas says, I will never

1    prescribe opiates to someone who has a urine drug screen

2    that shows cocaine, for example, there's no mandate.  You'll

3    find no guideline, nothing that will tell a doctor they

4    can't do that, because sometimes it's appropriate.  And

5    those patients have severe pain just like other people have

6    severe pain, and you need to figure out how to treat that

7    patient.  And sometimes the best treatment is that you

8    provide them with opioids.

9           MR. WOODARD:  Your Honor, I would just object to

10   the mischaracterization of Dr. Thomas' testimony, that he

11   would never prescribe.  He was providing opinions about the

12   usual course of professional practice based on specific

13   patients.

14          THE COURT:  And so your objection is what?

15          MR. WOODARD:  That she's mischaracterizing

16   Dr. Thomas' testimony.

17          THE COURT:  All right.  Well, so members of the

18   jury, your memory as to what Dr. Thomas said is controlling,

19   and you can evaluate Dr. Warfield's testimony, and, you

20   know, if she's characterizing it correctly, fine.  If she's

21   not, then not so fine.  But in the end, it's your memory as

22   to what Dr. Thomas said that's controlling here.

23   BY MS. KOUSOULIS:

24   Q.    Is doing a physical exam on each visit required in

25   order for prescribing opioids to that patient to be within

1   the usual course of professional practice?

2   A.      Absolutely not.  There is no guideline anywhere that

3   says a doctor has to do a physical exam on every visit for

4   anything.  And, typically, it's not done.  Typically, when a

5   patient comes in for a medication refill, they -- the doctor

6   sits down, talks with the patients, you know, how is your

7   pain?  Is the medication working?  Are you having side

8   effects, such and such.  And, typically, there's not an exam

9   done on every visit.

10  Q.      What about prescribing opioids after discharge.  The

11  patient's discharged for whatever reason, not following --

12  you know, testing positive for an illicit substance, not

13  taking their medication, or for any other reason.  Is

14  prescribing opioids, providing a prescription after the

15  discharge outside the usual course of medical practice?

16  A.      Absolutely not.  And this is one area where I very

17  adamantly disagree with Dr. Thomas.  What happens in these

18  cases is a patient for some reason is discharged from the

19  doctor's care, because they didn't do something the doctor

20  wanted them to do or they did something the doctor didn't

21  want them to do.

22          So let's say they've got a urine drug screen

23  that shows something, and the doctor said, you know what,

24  I'm no longer going to take care of you with these opioids.

25  But that patient has been on opioids for a long time,

 1    typically, so that means they're physically dependant on

 2    opioids.  They're not necessarily addicted, they're

 3    physically dependent.

 4              And let me just tell you what the difference is

 5    there.  Physical dependence means that if any of us here

 6    today take opiates for long enough, our body is going to get

 7    used to having them around.  And if we suddenly stop them,

 8    we're going to go into withdrawal, which is a very

 9    unpleasant thing to go through.  That happens to everybody

10    who goes on opiates.  That's not addiction.

11              Addiction is this insatiable craving for which a

12    drug addict wants the drug, takes the drug, procures the

13    drug, hoards the drug, and they take the drug even though

14    it's causing bad things.  It's causing bad things for

15    themselves.  It's disrupting their lives.  That's addiction.

16              Not everybody gets addicted to opiates.  A small

17    percentage of patients do, but everybody gets physically

18    dependent.  So going back to what I was talking about, when

19    you discharge a patient who's been on opioids, they're

20    physically dependent.  You can't just stop the opioids.  And

21    you can't say to them, you know, Go to a detox center.

22    Because if you need to go to a detox center, you can't walk

23    in the next day.  Sometimes there are months' waits to get

24    into a detox center or to get to an addiction specialist.

25    You can't just walk into an addiction specialist's office

1   that day and say, Oh, the doctor stopped my opiates, I

2   need -- I need addiction treatment.

3           You need to do something about maintaining that

4   patient's opioids until they can get to another doctor or

5   treatment.  And if you don't do that, that patient will

6   either end up in the emergency room or they'll go to the

7   street and buy drugs because they're physically dependent.

8   They need those drugs.

9           So, in fact, the humane thing to do is to

10  prescribe the drugs until the patient can get into treatment

11  with another physician, with an addiction specialist, with a

12  detox center.  And, certainly, in my experience, it's not

13  easy to get appointments into those kinds of facilities.  I

14  think that's a big problem today.  You read about it in the

15  news even that there aren't enough of these facilities to go

16  around for patients that need them.

17          So I think prescribing a dose of drug after you

18  discharge a patient is very appropriate.  And I would even

19  go a step further and say that I've seen situations where a

20  doctor discharges a patient and then brings them back in and

21  treats them again.  There's no rule that says you can't do

22  that.  Sometimes a doctor discharges a patient, and then a

23  week later, months later, the patient comes back, says, you

24  know, I'm really sorry, Doctor.  I understand what you said.

25  I did something wrong.  Would you take me back into your

1  practice?  And the doctor says, Okay.  There's no rule that

2  says you can't do that.

3  Q.    Now, what about in cases where someone's discharged

4  for not taking their prescribed medication and perhaps they

5  have urine drug screens where the prescribed medication

6  doesn't show up or there's some kind of inconsistent result,

7  is it still with the usual course of medical practice to

8  provide such a patient with a prescription upon discharge?

9  A.    Yes, absolutely.  You know, again, everything depends

10  on the particular patient on that particular day.  And I

11  think we're going to talk about urine drug screens later,

12  but urine drug screens are very, very tricky to interpret.

13       A patient may have a negative urine drug screen

14  for many, many reasons.  One reason might be they never took

15  the drugs you prescribed them.  Sure, that's one reason.

16  But that's not the most common reason that we see.

17       The most common reason is that they ran out of

18  the drugs.  And depending on what the drug is, the drug

19  doesn't stay around in your urine very long.  For drugs like

20  Oxycodone, it might be in your urine for several days.  But

21  for drugs like Fentanyl, a day.  So if you haven't taken it

22  for a day, it's out of your urine.

23       So the patient may say, Oh, you know, I had

24  worse pain.  I tripped and fell.  And so, Doctor, I know I

25  wasn't supposed to, but I took a few extra doses, and so I

1    ran out three days ago.  I ran out two days ago.  That

2    patient is still physically dependent.  That patient still

3    needs pain medication, but the urine drug screen may be

4    negative.

5            A urine drug screen can be negative if a patient

6    is very, very large, for example, and so the drug gets

7    diluted through their body.  Or they've had a lot of water

8    to drink or they've -- they've, as I said, not taken the

9    medication within a few days or a day or depending on what

10   the -- on what the drug is.

11           Or what a lot of people don't understand is when

12   you do a urine drug screen and it says negative, you really

13   need to look at what the negative means because every lab

14   has a level below which they call it negative.  So, for

15   example, let's say a lab said -- says below a hundred, we're

16   calling it negative; over a hundred, we're calling it

17   positive.  And that patient has 99 in their urine.  They

18   have Oxycodone in their urine, but it's still going to say

19   it's negative.  So you need to look at that.

20           You need to look at what the lab test is the

21   patient is getting.  There are drug screens and there are

22   different drug screens.  There are lots of drug screens that

23   test for opiates that don't include Oxycodone, because

24   Oxycodone is a very particular molecular compound, and it

25   often doesn't show up when you test for opiates.  So you

1    need to -- the doctor needs to know that.  So maybe you're

2    giving the patient Oxycodone and the opiate screen comes up

3    negative.

4              So there are lots of reasons why someone may

5    legitimately have a negative urine drug screen.  And in that

6    case -- and, again, back to your original question, of

7    course, you would continue to prescribe because they're

8    going to withdraw.  They're physically dependent.  They're

9    going to withdraw unless you give them drugs to tide them

10   over until they get the help they need.

11   Q.    Now, during earlier testimony, we heard from

12   pharmacists and Dr. Thomas regarding MME.  Can you explain

13   what that is?

14   A.    It's -- MME stands for Morphine milligram

15   equivalents.  Morphine is kind of the gold standard of

16   opiates.  It's been around for -- you know, since 1802, and

17   so it's the drug we compare other opiates to.  And about in

18   2016, actually, the CDC came out with guidelines, and they

19   talked about Morphine equivalents over 90.  So they talked

20   about doses of opiates that would be comparable to below 90

21   milligrams of Morphine and those above 90 milligrams of

22   Morphine.

23             Now, why did they pick that number?  No good

24   reason.  The only reason they picked that number -- they

25   could have picked 50, they could have picked 40, they could

1    have picked 120.  They picked that number because there was

2    some research done that showed that if a patient was on a

3    dose over 90, they had higher risks of side effects than if

4    they were on -- below 90.

5             Now, it's common sense that the higher dose of

6    drug you're on, the more side effects you're going to get,

7    no matter what the drug is, blood pressure medicine, heart

8    medicine, whatever.  The higher the dose, the more likely

9    you are to get side effects.

10             So this study was done that showed that if you

11   were on higher than 90 milligrams of Morphine, you were more

12   likely to get side effects.  And those side effects included

13   things like addiction, and respiratory depression, and

14   overdose, and the terrible side effects that you can get.

15   So the CDC came out with guidelines that didn't ever say you

16   can't prescribe over 90 milligrams.

17             If you look at these guidelines, what they say

18   is, Doctors, please be aware that if you prescribe over 90,

19   the risks are higher.  So if you're going to prescribe over

20   90 milligrams, you should be aware of these risks.  You

21   should consider these risks when you make that decision to

22   prescribe.  And you might even consider sending that patient

23   to a pain doctor or a pain specialist, if you need to

24   prescribe over 90.

25             It never says anywhere that you can't prescribe

1  over 90.  And that's where this number came from.  So as I

2  said, it could have been 50, it could have been 120, it

3  could have been whatever.  But, basically, what the CDC is

4  saying is the higher the dose, the more likely there are

5  risks.  So consider that.

6  Q.    So is prescribing over 90 MME outside the usual

7  course of medical practice?

8  A.    Absolutely not.  That's done -- it's done all the

9  time.  We just have to consider that the risks are higher

10 when we do that.

11 Q.    Now, let's talk about pill counts for a second.  Do

12 pill counts under the model plan have to be random?

13 A.    Absolutely not.  There's no -- no rule that a pill

14 count needs to be random.  I understand that Dr. Thomas felt

15 that they needed to be.  And in his practice, if he mandates

16 that all of the pill counts that his practice -- his private

17 does need to be random, that's fine, but it's certainly not

18 the way that everybody does it.

19       So there are lots of different ways of doing it.

20 And, certainly, to do a pill count that isn't random is not

21 outside the practice of medicine.

22 Q.    Now, is prescribing two short-acting opiates outside

23 the usual course of medical practice?

24 A.    No, sometimes there are reasons to do that.  For

25 example, I noted that Dr. Titus prescribed an opiate called

1    Tramadol, and an opioid -- and another opiate, I think it

2    might have been Oxycodone.  I forget the second one, but

3    another opioid.  And there are reasons for doing that.

4              Tramadol is a very specific opiate that has a

5    different mechanism of action.  By that, we mean it works

6    differently in the body.  It works on different

7    neurotransmitters in the body.

8              So we often, in pain management, use

9    combinations of drugs that work in different ways.  So

10   sometimes we combine Tylenol with an opiate because Tylenol

11   works in a different way than opiates work.  So it's not

12   uncommon to prescribe two drugs like that.

13             So, as I said, I noticed he prescribed Tramadol

14   and prescribed Oxycodone.  And there may be other reasons

15   for combining -- combining different drugs.  There are

16   different types of opiates that are -- that are from

17   different classes of opioids.  So someone who becomes very

18   tolerant to one type of opioid may not be tolerant to

19   another type of opioid.

20             So, again, there are reasons to combine these

21   drugs.  They find that if you combine drugs rather than just

22   going up on the dose of one drug, the side effects are less.

23   So there are good medical, and physiologic, and

24   pharmacologic reasons for using two different drugs.

25   Q.    Does the same hold true for combining opioids with

1    sedatives?

2    A.     Yes.  Again, as I mentioned before, when you -- when

3    you increase doses of drugs, the side effects become higher.

4    And when you in -- when you combine drugs that have the same

5    side effects then, of course, your incidence of side effects

6    are higher.  So if I give you two different drugs, both of

7    which will make you throw up, you're much more likely to

8    throw up if I give you both of those drugs than just one.

9             So opioids are very sedating.  So are some

10   sedatives.  So are sleeping pills.  That's what they're

11   meant for.

12            So, certainly, if I give you opioids and I give

13   you a sleeping pill, you're more likely to become sedated.

14   But, again, there's no mandate that says you can't combine

15   those.  The guidelines simply say, you should be aware that

16   combining these drugs increases the risk of sedation.  So if

17   you're going to combine these drugs, if you find your

18   patient needs a pain reliever and a sleeping pill -- and

19   many patients do.  Patients who are in horrible pain have

20   trouble sleeping.  If you find your patient needs a sedative

21   like a sleeping pill, and they need opiates, be careful.

22   Consider this, consider that you're increasing the risk.

23            That's what the guidelines say.  You will never

24   find a guideline that says you are not practicing medicine

25   unless you -- if you do this.  You're not practicing

1   medicine if you prescribe these two drugs.

2           I mean, Dr. Thomas opined that prescribing them

3   was outside the practice of medicine.  It's ridiculous.

4   Q.    Is prescribing to a patient who ran out of -- who ran

5   out -- who presumably ran out of their drugs outside the

6   normal course?

7   A.      No.  Again, sometimes if a patient runs out of a

8   drug, there's a good reason why they run out of a drug.

9   Sometimes when -- the reason they run out of a drug is

10  because they need more.  We start with a particular dose of

11  medication and sometimes it's not enough.  So the patient

12  will come back to the doctor and say, you know, that drug

13  helped, but I'm still having some pain.  I think I need a

14  higher dose.  And you give them a higher dose of drug.

15  That's something that's -- there's actually a name for that.

16  It's called pseudoaddiction.

17          A lot of people used to think that if a patient

18  asked for a higher dose of drug, that meant they were

19  addicted, but sometimes it just means they're in pain and

20  they need a higher dose of the drug.  So asking for a higher

21  dose of drug or needing a higher dose of drug or running out

22  because they used the drug up is not something that's

23  uncommon.

24          And sometimes it's as simple as you give the

25  patient a 30-day supply of drug and a few days before they

1   come back, they have -- they have an exacerbation of their

2   pain.  They did something.  They fell, or they exercised

3   more, or they did physical therapy and their pain got worse.

4   And they say, you know, Doctor, three days ago, my pain got

5   worse, and so I took a couple extra pills that day, so I ran

6   out.  That may be perfectly reasonable.

7            So there are times when a patient runs out of

8   drugs.  And, of course, it's still practicing medicine to

9   treat that patient.  Or why wouldn't that be practicing

10  medicine?  It's practicing medicine.  You're not selling

11  drugs to the patient.  You're practicing medicine.

12  Q.    Is prescribing to someone who's addicted to drugs or

13  has had some addiction issues in their past, is that outside

14  the usual course of medical practice?

15  A.    Absolutely not.  I mean, and we see this all the

16  time.  Very simplistically, there are people that are

17  addicted to nicotine.  There are people that are addicted to

18  alcohol.  And then there are people who are addicted to

19  other drugs.

20           And people in all of these classes have horrible

21  chronic pain just like everybody else does.  They're very,

22  very, very difficult patients to treat.  You will never see

23  a guideline that says, if a patient has a history of

24  addiction, you must never prescribe them an opiate because

25  you have to make a determination.

```
 1              You can try other things.  Sometimes they don't
 2     work.  And so sometimes you do need to prescribe to those
 3     patients, but you're still practicing medicine when you do
 4     that.  You're not selling drugs to the patient.  You're
 5     practicing medicine, doing what you feel is the most
 6     appropriate thing for that particular patient on that
 7     particular day.  Sometimes you need to do that.
 8              MS. KOUSOULIS:  Your Honor, I've reached the
 9     point where I would like to show the jury some exhibits.
10              THE COURT:  All right.  Well, so I think,
11     members of the jury, we're going to have to take a recess
12     now and see what's up with technology, and we'll try to keep
13     you informed.  All right?
14              But can we take the jury out?
15              (Jury leaving the courtroom.)
16              THE COURT:  You all can be seated.
17              (Discussion held off the stenographic record:)
18              THE COURT:  All right.  So my staff says the
19     server is back up, but there's apparently going to be some
20     rebooting of this and that.  So I'm going to take a break,
21     at least until 25 after, and probably until 10:30.  And if
22     we get it fixed -- in fact, we'll just take a break until
23     10:30, and hopefully it will be fixed by then.
24              Okay?
25              DEPUTY CLERK:  All rise.
```

```
 1                    (Recess was taken.)

 2              DEPUTY CLERK:  All rise.

 3              THE COURT:  All right.  Let's be seated.  As I

 4    understand it, everything is now working.  So let's get the

 5    jury and continue.

 6              Oh, you're just standing for when the jury comes

 7    in.  Yes.

 8              MS. REMIS:  Sorry, yes.

 9              THE COURT:  That's all right.  Everyone be

10    seated who wants to be seated.

11                    (Jury entering the courtroom.)

12              THE COURT:  All right.  Members of the jury,

13    welcome back.  Everyone, you may be seated.

14              Members of the jury, you can see we now have a

15    screen and so supposedly the problem was fixed.

16              And Ms. Kousoulis, you may continue.

17              MS. KOUSOULIS:  Thank you.

18    BY MS. KOUSOULIS:

19    Q.    Good morning, again, Dr. Warfield.

20    A.    Good morning.

21    Q.    Dr. Warfield, I'd like to talk for a minute regarding

22    the standard of care versus outside the usual course of

23    professional practice.  Did you prepare some slides to help

24    aid in your testimony?

25    A.    I did.
```

```
1              MS. KOUSOULIS:  And Mr. Marek, if you could
2    please pull up Defense Exhibit 20A.
3    BY MS. KOUSOULIS:
4    Q.    Is this one of the slides you prepared?
5    A.    Yes.
6    Q.    And can you explain to the jury, with regard to
7    standard of care, what we're seeing?
8    A.    Sure.  So within the standard of care of medical
9    practice, any kind of medical practice, there's the best
10   possible practice, what all the textbooks and everyone tells
11   you to do.  Then there's the average practice, which is what
12   the average doctor does in his practice for a particular
13   condition.  And then there's the maybe not-so-great
14   practice, but still considered within the standard of care.
15   And that's all within the umbrella of the standard of care.
16   All of those practices are considered within the standard of
17   care in medical practice.
18              Then there's practice outside the standard of
19   care, bad practice.  And, you know, some examples of bad
20   practice might be, oh, a surgeon leaves a sponge in
21   somebody's abdomen.  That's bad practice.  That's outside
22   the standard of care, but that's still within the usual
23   course of medical practice.  That doctor is practicing
24   medicine when he does that.
25              A doctor who gives the wrong dose of a medicine
```

1    because they just didn't know what the right dose was,

2    that's bad practice.  It's outside the standard of care, but

3    that doctor is still practicing within the usual course of

4    medical practice.  He's still practicing medicine.  He's not

5    selling drugs.  He's not doing something like that when he

6    is -- when he prescribes the wrong drug or the wrong dose of

7    drug.

8              So there's bad practice.  We see that.  Doctors

9    get sued for that.  There are things that can happen to

10   doctors for bad practice, but that typically is still within

11   the usual course of medical practice.

12             There are some things that could be outside, not

13   even practicing medicine, that a doctor could do.  But I'm

14   just trying to explain what the standard of care is and what

15   the difference is between bad practice that's just outside

16   the standard of care and practice that isn't even practicing

17   medicine.

18             MS. KOUSOULIS:  And Mr. Marek, can you pull up

19   Slide 20A at 3?

20   BY MS. KOUSOULIS:

21   Q.    So is this what you were talking about, Dr. Warfield,

22   with regard to bad practice when it comes to controlled

23   substances prescribed?

24   A.    Right.  So bad practice would be controlled

25   substances that are not in keeping with the standard of

1    care, not what a similarly trained physician would do in a

2    similar circumstance.  So if a doctor's doing that, he's

3    practicing badly.  He may still be practicing medicine.

4    He's legitimately practicing medicine doing what he thinks

5    is appropriate for his patients, but what he did because of

6    a mistake or just lack of knowledge was wrong.

7    Q.     So just to be clear, bad practice is still within the

8    usual course of medical practice?

9    A.     Yes.

10                MS. KOUSOULIS:  Mr. Marek, can you pull up slide

11   three.  Or maybe it's two.

12                One moment, Your Honor.

13   BY MS. KOUSOULIS:

14   Q.     Now, what's this slide we're seeing, Dr. Warfield?

15   A.     So then again, way outside the standard of care are

16   doctors who aren't even practicing medicine.  They're

17   prescribing drugs not for a legitimate medical purpose -- in

18   the case of opiates, not for relieving pain -- and outside

19   the usual course of medical practice.  They're not even

20   practicing medicine.  They're selling drugs.

21   Q.     Okay.  Sorry.

22                MS. KOUSOULIS:  Oh, perfect.  Thank you,

23   Mr. Marek.

24   BY MS. KOUSOULIS:

25   Q.     What is this slide that we're looking at,

1    Dr. Warfield?

2    A.    So these are some examples of a practice or

3    prescribing that would be outside the usual course of

4    medical practice and not for a legitimate purpose.  There's

5    no doctor-patient relationship.  You -- a doctor meets

6    somebody at a cocktail party and they say, Oh, you know,

7    you're a pain doctor?  Can you give me a prescription for

8    OxyContin?  And they do that.

9              There's no doctor-patient relationship there.

10   You never did a physical exam on the patient.  There's never

11   been any attempt to examine the patient.  You never even saw

12   the patient.  The patient comes to your office and gets a

13   script, but you've never even seen the patient.

14             There's no diagnosis for pain.  So you're

15   prescribing the drugs so the patient can get high, not for

16   pain.  Prescriptions in return for sex, and there have been

17   cases of this reported.  Payment by the pill.  They come in

18   and they pay for -- pay for a pill.  No medical records at

19   all are kept.  A doctor prescribing for themselves,

20   prescribing opiates for themselves or prescribing -- you

21   know, you're prescribing not to treat pain, but just so the

22   patient can get high.  Those would all be things that would

23   be not even practicing medicine.

24   Q.    And in your review of the 14 patient files in the

25   indictment and the additional files you reviewed in this

1   case, did you find any of these examples present?

2   A.    No, I found nothing whatsoever like this.  I saw a

3   practice of medicine that wasn't always the best practice of

4   medicine, I'll admit, but it was always practicing medicine.

5   Q.    In your opinion, did Dr. Titus make some mistakes?

6   A.    Yes, Dr. Titus definitely made some mistakes in his

7   treatment of these patients.

8   Q.    And if you recall, what were some of the mistakes you

9   saw?

10  A.    Well, I think some of the mistakes were -- first of

11  all, I think his medical recordkeeping was not good.  His

12  medical recordkeeping was outside the standard of care.  I

13  would call that a bad practice in the sense that I saw there

14  were a lot of missing medical records.  That's not outside

15  of the practice of medicine.

16          In fact, in the practice of medicine, we often

17  see records missing.  But I would say these records were

18  often incomplete.

19          I saw instances where the drugs looked like he

20  didn't know how to prescribe the drugs.  For example, I saw

21  that the Fentanyl patch was prescribed as needed.  That's

22  not the right way to prescribe Fentanyl.  So it looked like

23  he didn't know how to do that.

24          I would even say in some instances, he was very

25  naive and gave patients just too many chances.  He had

```
 1   patients who had urine drug screens that showed things that
 2   weren't supposed to be there, and he said, you know, I'm
 3   going to -- don't do that again.  I'm going to give you
 4   another chance.  And he gives them another chance and
 5   another chance.
 6               And I think at some point, that practice was
 7   outside the standard of care, but he was still practicing
 8   medicine in doing that.  I didn't see any evidence that that
 9   wasn't part of his practice of medicine.
10               So I guess what I'm saying is I think there were
11   some things here that were clearly, to me, outside the
12   standard of care, but they were always inside the usual
13   course of medical practice.
14   Q.    So in saying they were outside the standard of care,
15   would you say that some of Dr. Titus' prescribing or some of
16   the things he did was bad practice?
17   A.    Yes, I think some of the stuff he did, admittedly,
18   was bad practice.  I think -- I think some of his physical
19   examinations, for example, were not complete.  And I think
20   they were -- in the sense that that was outside the standard
21   of care.  He should have done some better physical
22   examinations.  But in so doing, he was practicing medicine.
23   He might not have been practicing the best medicine, but it
24   was the practice of medicine.
25   Q.    What about with urine drug screens, you did talk a
```

1  little bit before about urine drug screens, but what was

2  your thought on urine drug screens and -- there were several

3  instances where patients test -- tested inconsistent, you

4  know, with the drug regimen they were on or positive for

5  substances they weren't on.  What is your interpretation

6  with that and how that works into this model of standard of

7  care versus outside the usual course of professional

8  practice?

9  A.     In my looking at these records, I think that

10  Dr. Titus did not have a good understanding of how to

11  interpret urine drug screens.  And I think that for someone

12  prescribing these drugs, that was outside the standard of

13  care.  However, he did order these urine drug screens.  He

14  ordered many urine drug screens on many of these patients.

15  If he was selling drugs, he wouldn't have done that.

16       But I think that he didn't understand how to

17  interpret those urine drug screens.  It's a difficult thing

18  to do sometimes.  It's difficult.  Many, many doctors don't

19  understand what the metabolites are of these various drugs

20  and which metabolites should be in the urine and which

21  shouldn't.

22       But I think his -- his amount of time it took

23  him to discharge a patient who had repeated problems, he

24  would -- he seemed very naive, and he just kept giving these

25  patients the benefit of the doubt and giving them chance

1    after chance before he discharged them.  So I think that

2    wasn't good practice, but it was still practice.  He wasn't

3    selling the drugs.  He was practicing medicine trying to

4    help these patients with their pain.

5    Q.     Is a hands-on physical exam always necessary?  And

6    the fact that Dr. Titus might not have done a hands-on

7    physical exam for every patient at every visit, does that

8    factor into your opinion as to whether his prescribing was

9    outside the usual course of professional practice?

10   A.     No.  I think, you know, a hands-on physical

11   examination is definitely not required for every visit.  And

12   I think I mentioned that earlier.  You'll find no guidelines

13   that say that a hands-on physical examination needs to be

14   done whenever you prescribe a Schedule II medication.

15             I mean, then, for example, a psychiatrist

16   prescribes Schedule II drugs all the time and often never do

17   a hands-on physical examination.  There's no specific

18   requirement for that.

19             That being said, depending on the patient's

20   complaint, a physical examination should be done on the

21   first visit.  And in some situations that I read, I did not

22   feel that Dr. Thomas' -- I'm sorry, Dr. Titus' physical

23   examination was complete enough.  I would call that below

24   the standard of care, but it was still practicing medicine.

25             And that being said, every doctor's physical

1    exam is different.  You know, when you talk about a physical

2    exam for back pain, there are about 2,000 different things

3    you could do in a physical exam, and I would bet no two

4    doctors do the same ten things on their physical exam.

5          But I think -- you know, I saw situations where

6    I thought his physical exam was not complete enough to the

7    point where it was outside the standard of care, but again,

8    he was still practicing medicine.  He was doing a history.

9    He was doing -- he was doing exams or diagnosis --

10   diagnostic procedures or whatever as appropriate.

11         He was making the diagnosis.  He was treating

12   the patient, and then he was documenting that and following

13   up.  And in some of those steps, there was some -- there was

14   some things that were subpar, but it was still practicing

15   medicine.

16   Q.    All right.  Now, I'd like to focus your attention on

17   the 14 patients that are listed in the indictment.

18         MS. KOUSOULIS:  Mr. Marek, could you bring up

19   Defense Exhibit 21, please.

20         Now, with regard to Brent Hood -- can you

21   highlight that, Mr. Marek?  Number one.

22   By MS. KOUSOULIS:

23   Q.    Count 1, Brent Hood.  If Dr. Thomas concluded that

24   the prescription dated August 7, 2013, for Methadone and

25   Oxycodone was prescribed outside the usual course of

1  professional practice and not for a legitimate medical

2  purpose because Mr. Hood had received a discharge letter

3  that same date, and that, therefore, the doctor-patient

4  relationship no longer existed, would you agree with that

5  assessment?

6  A.    No, I wouldn't agree with that at all.  And as I

7  mentioned, I think it's perfectly appropriate to provide a

8  patient you're discharging a last prescription for their

9  opiate.

10  Q.    Now, if Dr. Thomas also concluded that factoring into

11  his opinion that this prescription was outside the normal

12  course of medical practice was because Mr. Hood had

13  unexpected drug test results with no intervention associated

14  with them, would that change your opinion as to whether this

15  prescription was outside the course of normal medical

16  practice?

17  A.    No, it would not.

18  Q.    Now, in reviewing Mr. Hood's records, are you aware

19  that he had overdosed a few days before this prescription

20  was written?

21  A.    Yes.

22  Q.    Does the fact that he had overdosed change your

23  opinion as to whether this prescription was a legitimate --

24  for a legitimate medical purpose in the usual course or

25  professional practice?

1    A.      It does not change my opinion.

2    Q.      So you know, in terms of prescribing someone who has

3    shown that they had a previous overdose, what's your opinion

4    with regard to that and how that falls into --

5    A.      Again, it -- it very much depends on the patient.  I

6    think, you know, the -- whether the dose he prescribed was

7    the appropriate dose, you know, again, that's all standard

8    of care stuff.  That doesn't mean he wasn't practicing

9    medicine.  That -- that addresses whether it was in the

10   standard of care or out of the standard of care.  Should he

11   have prescribed a lower dose, or change something, or

12   whatever, you know, that's certainly all debatable, but I

13   think he was practicing medicine in doing that.

14   Q.      Would your opinion change if -- with the knowledge

15   that Mr. Hood overdosed on cocaine and illicit drugs that

16   hadn't been prescribed to him, as opposed to overdosing on

17   just a prescription medication?

18   A.      No, it wouldn't change my opinion.

19   Q.      So this prescription on August 7th, 2013, for

20   Mr. Hood for Methadone and Oxycodone, was this within the

21   usual course of professional practice and for a legitimate

22   medical purpose?

23   A.      Yes.

24   Q.      Okay.  Now, let's talk about Count 2, Scott Jones.

25   If Mr. -- if Dr. Thomas concluded that the prescription

1    dated September 19th, 2013, for Oxycodone written to

2    Mr. Jones was provided to him after Mr. Jones had been

3    provided a discharge letter, thus, in Dr. Thomas' opinion,

4    severing the doctor-patient relationship, and that,

5    therefore, this prescription was outside the usual course of

6    professional practice and not for a legitimate medical

7    purpose, would you agree with that opinion?

8    A.     No.  Again, I don't agree with it.  I think it's

9    perfectly appropriate to write a prescription to a patient

10   you're discharging.

11   Q.     If Dr. Thomas, also factoring into his conclusion was

12   that Mr. Jones had tested negative for Oxycodone on several

13   occasions, but positive for cocaine and heroin, would that

14   change your opinion?

15   A.     No.

16   Q.     So the fact that Mr. -- so would the fact that

17   Mr. Jones was not testing positive for the prescribed drug

18   factor into your decision at all?  And how would it?

19   A.     No.  Again, we talked about -- talked a little bit

20   about many reasons a urine drug screen might be negative.

21   It might be negative because the patient ran out of the

22   medication, needed extra medication a few days before.

23   Maybe the drug test you're getting wasn't testing the drug

24   that you were looking for.  Maybe it was testing opiates,

25   but wasn't including Oxycodone in those opiates.  Maybe

1    there was drug in the -- in the urine, but it was below the

2    threshold the laboratory used.

3              There are many, many reasons why a urine drug

4    screen might test negative, and so it's by no means outside

5    the usual course of medical practice to -- to consider those

6    things.

7    Q.    Do different drug tests test differently, or is there

8    one standard drug test, or are all drug tests alike, or are

9    there some differences?

10   A.    No.  What makes things even more confusing is that

11   there are lots of different ways to do drug tests.  The

12   simplest is the doctor has a little in their -- in their

13   office.  They take the urine and they dip the little stick

14   in it, and it shows what drugs are there.  That's a very

15   crude test, but some doctors use that.

16             Then some doctors send the urine out to

17   laboratories, and each laboratory has their own system.  So

18   one laboratory, when you -- when you test for opiates, when

19   they say opiate positive, that means positive for Oxycodone.

20   Another laboratory might say opiate positive, and that means

21   negative for Oxycodone.  Another laboratory may include

22   alcohol in their test -- in their routine test.  Another one

23   might not include that.  So you need to know what's

24   included, what type of test it is, and you need to know what

25   the thresholds are.

1           In other words, some -- some laboratories might

2    say, you know, below a hundred nanograms, we're calling this

3    negative.  Another laboratory might say, below 500, we're

4    calling this negative.  So you need to know each of those

5    things.

6           You need to know about the metabolites.  In

7    other words, when you take a drug like Oxycodone, it's

8    broken down in your body by your liver into other -- other

9    drugs.  And you need to know which of those drugs are

10   metabolites; in other words, that would be found in your

11   body just because you took Oxycodone.  Or which of those

12   drugs are found in your body only because you took

13   additional drugs.

14          So you need to know a lot about metabolites and

15   when a metabolite should occur in your urine.  Is it there

16   two days after you take the drug?  Is it there five days?

17          Urine drug screens are very, very complicated to

18   interpret, and they are the cause of a lot of problems,

19   which is why a lot of doctors don't even like to use urine

20   drug screens.  Not to mention the fact that someone who's

21   faking and wants to obviate a urine drug screen, you can go

22   on the Internet and find all kinds of ways to take urine

23   drug screens and pass it, even though you're taking drugs.

24          So there are -- I don't want to get into a lot

25   of it, but there are lots of problems with your urine drug

1    screens, their interpretation, and the fact that even for

2    people who are taking bad drugs, they know how to fake the

3    urine drug screen.

4    Q.    So what is your opinion as to whether the

5    prescription written for Scott Jones on September 19th,

6    2013, for Oxycodone was written for a legitimate medical

7    purpose in the usual course of professional practice?

8    A.    I believe that it was.

9    Q.    If we could go to Count 3, Delores Perry.  If

10   Dr. Titus -- if Dr. Thomas concluded that the prescription

11   written for Delores Perry on October 16th, 2013, for

12   Morphine and Oxycodone was outside -- was written outside

13   the usual course of professional practice and not for

14   legitimate medical purpose because Ms. Perry had received a

15   discharge letter prior to that prescription being written,

16   would you agree with his conclusion that that was written

17   outside the normal course of medical practice because she

18   had been discharged from the practice?

19   A.    Absolutely not.  Again, you'll see no guideline even

20   that says after you discharge a patient, you can't give them

21   a last prescription until they get help.  You'll never see

22   that.

23   Q.    What if Dr. Thomas' opinion also factored in that

24   Ms. Perry exhibited multiple risky behaviors and unexpected

25   urine screens without any supposed intervention by

1   Dr. Titus, would that change your opinion?

2   A.    It wouldn't change my opinion.  He was still

3   practicing medicine in doing this.

4   Q.    So what is your opinion as to whether the

5   October 16th, 2013, prescription to Delores Perry was

6   written in the usual course of professional practice for a

7   legitimate medical purpose?

8   A.    It was.

9             MS. KOUSOULIS:  Let's go to Count 4, Maryjane

10  Mench.  Count 4, Maryjane Mench, Mr. Marek.  Okay.

11  BY MS. KOUSOULIS:

12  Q.    Now, if Dr. Titus concluded that the December 9th,

13  2013, prescription for Oxycodone and OxyContin was written

14  outside the usual course of --

15            THE COURT:  Ms. Kousoulis, Dr. Thomas.

16            MS. KOUSOULIS:  I'm sorry, Dr. Titus -- or

17  Dr. -- sorry.

18  BY MS. KOUSOULIS:

19  Q.    If Dr. Thomas -- all these T's.

20            If Dr. Thomas concluded that the prescription

21  written on December 9th, 2013, for Oxycodone and OxyContin,

22  was written outside the usual course of professional

23  practice and not for a legitimate medical purpose because

24  Ms. Mench had inconsistent drug results, a pattern of

25  noncompliance with the drugs she was being prescribed, and

1   testing positive for cocaine or methamphetamines on more

2   than one occasion, would you agree with his assessment that

3   that prescription was outside the usual course of

4   professional practice?

5   A.      No, I don't agree with that.

6   Q.      How does the fact that she had inconsistent drug

7   results and the presence of illicit drugs in her system, but

8   that she was negative for prescribed drugs affect your

9   opinion?

10  A.      Well, again, I think we talked about all of those

11  things.  I think at some point not discharging her sooner

12  may have been outside the standard of care, but it was all

13  within the practice of medicine.  He was practicing

14  medicine.  Even though some of that medicine might not have

15  been the greatest, he was practicing medicine when he did

16  this.

17  Q.      So what is your opinion as to whether the

18  December 9th, 2013, prescription for Oxycodone and OxyContin

19  to Maryjane Mench was prescribed for a legitimate medical

20  purpose within the normal course of professional practice?

21  A.      It was.

22  Q.      And for Count 5, Dione Dickerson.  If Dr. Thomas

23  concluded that the December 18th, 2013, prescription for

24  Morphine and Oxycodone written for Ms. Dickerson was outside

25  the usual course of professional practice and not for a

1  legitimate medical purpose because Ms. Dickerson was, in his

2  opinion, clearly not taking her drugs as specified, due to

3  repeatedly testing negative of the prescribed drugs, and

4  that she had multiple unexpected drug screens, and for that

5  reason -- and she also did not demonstrate any pain relief

6  or benefit from the drugs, and for that reason that

7  prescription was outside the usual course, would you agree

8  with that assessment?

9  A.     I don't agree with his assessment.

10  Q.     And why not?

11  A.     Again, for the reasons I mentioned, this is

12  practicing medicine.  It may not be the best medicine.

13  There clearly were some problems with this particular --

14  with this patient, but Dr. Titus was practicing medicine

15  when he was treating this patient.

16  Q.     So what is your opinion as to whether the

17  December 18th, 2000 prescription for Morphine and Oxycodone

18  to Ms. Dickerson was prescribed within the usual course of

19  medical practice for a legitimate medical purpose?

20  A.     It was.

21  Q.     Now, with regard to Count 6, Lisa Parsons.  If

22  Dr. Thomas concluded that because Ms. Parsons was discharged

23  from Dr. Titus' practice with no followup, that her

24  January 20th, 2014, prescription written after that

25  discharge was outside the usual course of professional

1   practice and not for a legitimate medical purpose, would you

2   agree with that opinion?

3   A.      I don't agree with his opinion.

4   Q.      And why not?

5   A.      And we talked about this.  It's very appropriate to

6   provide a prescription to a patient you're discharging.

7   Q.      And if Dr. Thomas also concluded, with regard to

8   Ms. Parsons, that her multiple unexpected drug screens and

9   any lack of medical intervention by Dr. Titus factored into

10  his decision -- into his opinion that this prescription was

11  written outside the usual course, would that change your

12  opinion?

13  A.      No.

14  Q.      And what is your opinion as to whether the

15  prescription written to Lisa Parsons on January 20th, 2014,

16  for Oxycodone was outside the usual course of professional

17  practice?

18  A.      It was not outside the usual course of professional

19  practice.

20  Q.      Now, with regard to Count 7, Gregg Smith.  If

21  Dr. Titus -- if Dr. Thomas concluded that Dr. Titus'

22  April 3rd, 2014, prescription to Mr. Smith for Fentanyl and

23  Oxycodone was outside the usual course of professional

24  practice because, in his opinion, Mr. Smith repeatedly

25  showed that he was not taking the medication appropriately

1    and demonstrated issues of abusing medication that he was

2    not prescribed, that for that reason, this prescription was

3    outside the usual course, would you agree with that opinion?

4    A.    I don't agree with his opinion.

5    Q.    Why not?

6    A.    Again, because this was the practice of medicine.

7    There are many reasons why urine drug screens show what they

8    show, as we've discussed.  And Dr. Titus was practicing

9    medicine when he prescribed these drugs.

10   Q.    So what is your opinion as to whether the April 3rd,

11   2014, prescription to Gregg Smith for Fentanyl and Oxycodone

12   was prescribed within the usual course of medical practice

13   for a legitimate medical purpose?

14   A.    It was.

15   Q.    Now, with regard to Count 8, Donald Meck.  If

16   Dr. Thomas concluded that the April 22nd, 2014, prescription

17   to Mr. Meck for Fentanyl and Oxycodone was outside the usual

18   course of professional practice because of Mr. Meck's

19   unexpected drug test results, and the fact that he showed up

20   in the hospital when he was admitted for an overdose, and he

21   didn't need opioids at that time to manage his pain, that

22   for that reason, it was inappropriate and outside the usual

23   course to prescribe him this prescription, would you agree

24   with that opinion?

25   A.    I do not agree with his opinion.

1    Q.     And how does the fact that Mr. Meck may have been in

2    the hospital, not on any opioids, and not seeming to be in

3    need of them, affect or factor into your opinion?

4    A.     Again, when someone's in the hospital, it's a totally

5    different situation, and we don't have all the details of

6    that.  But I think Dr. -- Dr. Titus here was practicing

7    within the usual course of medical practice when he saw this

8    patient after discharging this patient.  He had been

9    following and continued his medications.

10   Q.     And the fact that this patient had been admitted to

11   the hospital for an overdose, is your opinion similar to

12   what it was for Mr. Hood --

13   A.     Yes.

14   Q.     -- in terms of prescribing to someone after an

15   overdose?

16   A.     Yes.

17   Q.     And do different doctors have different ways they

18   deal with patients who have had overdoses, in prescribing

19   opioids?

20   A.     Yes.

21   Q.     And did you see evidence of that in this case with

22   Mr. Hood?

23   A.     Yes.  There are -- there are doctors who taper the

24   medications after an overdose.  There are doctors who change

25   the medications.  There are doctors who send the patients

1750

1    into -- into rehab.  There are lots of different treatments

2    that could be done.

3    Q.    Is there any requirement that after an overdose, the

4    doctor taper the medications?

5    A.    No.

6    Q.    So with regard to the April 22nd, 2014, prescription

7    to Donald Meck for Fentanyl and Oxycodone, what is your

8    opinion as to whether that was prescribed within the usual

9    course of medical practice for a legitimate medical purpose?

10   A.    It was.

11   Q.    Now, with regard to Count 9, Loretta Connelly.  If

12   Dr. Thomas concluded that this June 12th, 2014, prescription

13   of Oxycodone to Ms. Connelly was prescribed outside the

14   usual course of professional practice and not for a

15   legitimate medical purpose because Ms. Connelly, you know,

16   had inconsistent drug results, that, in Dr. Thomas' opinion,

17   showed that she was an inappropriate candidate for ongoing

18   opioid prescriptions, and, therefore, this prescription was

19   outside the normal course, would you agree with that

20   assessment?

21   A.    I don't agree with that.

22   Q.    And would the fact that someone had inconsistent drug

23   screens make them an inappropriate candidate for continued

24   opioid prescriptions, in your opinion?

25   A.    It would not.

1    Q.      Why not?

2    A.      Again, each patient is different.  You need to assess

3    the particular patient and do what the doctor feels is

4    appropriate.  That's the practice of medicine.

5    Q.      So what is your opinion as to whether the June 12th,

6    2014, prescription to Ms. Connelly for Oxycodone was

7    prescribed in the normal course of professional practice for

8    a legitimate medical purpose?

9    A.      I believe it was.

10   Q.      Now, with regard to Count 10, Chasity Calhoun.  If

11   Dr. Thomas concluded that Ms. Calhoun's July 16th, 2014,

12   prescription for Oxycodone and OxyContin was outside the

13   usual course of professional practice and not for a

14   legitimate medical purpose because Ms. Calhoun was

15   prescribed opioids at the time of her discharge, following

16   several inconsistent drug screens, would you agree with that

17   opinion?

18   A.      I don't agree with that.

19   Q.      Why not?

20   A.      Again, we talked about the validity of prescribing

21   drugs after discharge.

22   Q.      And so what is your opinion as to whether this

23   July 16th, 2014, prescription for Oxycodone and OxyContin to

24   Ms. Calhoun was prescribed within the usual course of

25   professional practice for a legitimate medical purpose?

1    A.      I believe it was.

2    Q.      Now, with regard to Count 11, Tracie Owens.  If

3    Dr. Thomas concluded that Ms. Owens' July 22nd, 2014,

4    prescription for Oxycodone was prescribed outside the usual

5    course of professional practice and not for a legitimate

6    medical purpose because he wrote that prescription at the

7    time of her discharge, would you agree with that opinion?

8    A.      I don't agree with that.

9    Q.      Would the fact that Ms. Owns had inconsistent drug

10   screens that showed she tested negative for Oxycodone on

11   several occasions change your opinion as to whether it was

12   appropriate to prescribe her Oxycodone upon her discharge?

13   A.      No.

14   Q.      Why not?

15   A.      Again, we talked about urine drug screens and how

16   there may be many reasons why a urine drug screen is -- is

17   negative or shows substances or whatever.  So it would not

18   change my opinion.

19   Q.      Now, if Dr. Titus was prescribing Ms. Owens opioids

20   in part to manage her migraine headaches, would that be

21   inappropriate?

22   A.      No.  There's no rule that says you can't use opiates

23   for migraine headaches.  Again, each patient needs to be

24   looked at individually, and there are situations where it's

25   very appropriate.

1   Q.      So what is your opinion as to whether this July 22nd,

2   2014, prescription for Oxycodone written to Tracie Owens was

3   prescribed in the usual course of professional practice and

4   for a legitimate medical purpose?

5   A.      My opinion is that it was.

6   Q.      Now, with regard to Count 12, Michael Adams.  If

7   Dr. Thomas concluded that a prescription on September 24th,

8   2014, for Oxycodone and OxyContin written to Michael Adams

9   was outside the usual course of professional practice and

10  not for a legitimate medical purpose, would you agree with

11  that if -- if the reason -- strike that.

12          If Dr. Thomas concluded that because Michael

13  Adams had been discharged from the practice at the time that

14  prescription was written, would you agree with that opinion,

15  that that prescription was outside the usual course because

16  there was no doctor-patient relationship because he had been

17  discharged?

18  A.      Again, I don't agree with that.

19  Q.      Okay.  So what is your opinion as to whether the

20  September 24th, 2014, prescription to Michael Adams was

21  appropriate and prescribed in the usual course of medical

22  practice for a legitimate medical purpose?

23  A.      It was prescribed within the usual course of medicine

24  for a legitimate medical purpose.

25  Q.      Now, with regard to Count 13, Lucille Moody.  If

1    Dr. Thomas concluded that the October 27th, 2014,

2    prescription for Fentanyl and Oxycodone prescribed to

3    Ms. Moody was written outside the normal course of

4    professional practice and not for a legitimate medical

5    purpose because Dr. Thomas concluded that Ms. Moody had

6    tested negative for the drugs she was being prescribed, that

7    she had multiple unexpected drug tests, that there was a

8    lack of intervention by Dr. Titus in terms of monitoring and

9    behavior, and that she was issued multiple warning and

10   discharge letters with continued prescribing, would you

11   agree with Dr. Thomas' assessment that that prescription was

12   outside the usual course of professional practice and not

13   for a legitimate medical purpose?

14   A.    No.

15   Q.    And, again, why would her negative drug screens for

16   Fentanyl and Oxycodone not show that it was prescribed

17   outside the usual course?

18   A.    Again, there are lots of reasons why drug screens can

19   be negative, especially Fentanyl, which is a drug that only

20   lasts -- will only show up in the urine for maybe 24 hours.

21   So I believe this was for a legitimate purpose -- a

22   legitimate medical purpose and within the usual course.

23   Q.    And would the fact that Ms. Moody was issued multiple

24   warnings, counseling letters, and she was actually

25   discharged one other time before being discharged a second

1    time, would that factor into your decision or affect your

2    decision as to whether or not this prescription was written

3    within the usual course of medical practice?

4    A.    No.  Again, I believe this is the usual course of

5    medical practice, that this was a very, very difficult

6    patient to handle.  Dr. Titus gave her many, many chances.

7    He recognized that there were issues, and then finally

8    discharged her.  That's the practice of medicine.

9    Q.    And, again, you testified earlier that the fact that

10   Dr. Titus gave these patients many, many chances was not

11   outside the usual course of medical practice, but perhaps

12   under the standard of care and bad medicine?

13   A.    Yes, I -- I agree.  This is within the usual course

14   of medical practice.  He's not selling drugs.  But within

15   the usual course of medical practice, he may have done

16   things that were outside the standard of care.  He may have

17   given these patients too many chances.  He should have

18   discharged them earlier, perhaps, but that's still

19   practicing medicine.

20   Q.    Now, with regard to the October 27, 2014,

21   prescription written to Lucille Moody for Fentanyl and

22   Oxycodone, what is your opinion as to whether that was

23   prescribed in the usual course of professional practice and

24   for a legitimate medical purpose?

25   A.    It was.

1    Q.    Now, with regard to Count 14, Melissa Silbereisen.  I

2    think I pronounced that right.  If Dr. Thomas concluded that

3    the October 30th, 2014, prescription written to

4    Ms. Silbereisen for Oxycodone was outside the usual course

5    of professional practice because she had been discharged

6    from the practice at the time that was written, what would

7    your opinion be?  Would you agree with Dr. Titus' --

8    Dr. Thomas' opinion?

9    A.    No.

10   Q.    And why not?

11   A.    Again, we talked about the validity of prescribing

12   drugs to patients who have been discharged.

13   Q.    And if Dr. Thomas concluded that because

14   Ms. Silbereisen's pain seemed to be relieved with pain

15   medication that she was receiving and that Dr. Titus

16   increased the dose of her medication to add a Fentanyl

17   patch, would you agree that that was within the normal

18   course of professional practice?

19   A.    Well, again, it is within the usual course of medical

20   practice.  Yes.

21   Q.    So with regard to the October 30th, 2014,

22   prescription for Oxycodone Dr. Titus wrote to Melissa

23   Silbereisen, what is your opinion as to whether that was

24   within the usual course of professional practice for a

25   legitimate medical purpose?

1    A.     It was.

2    Q.     Okay.

3             MS. KOUSOULIS:  One moment, Your Honor.

4             Andy.  I'm sorry, Mr. Marek, if you could pull

5    up Government Exhibit 100 at 33.

6    BY MS. KOUSOULIS:

7    Q.     Is this the discharge letter, dated August 7th, that

8    was provided to Brent Hood?

9    A.     Yes.

10   Q.     And did you see similar discharge letters like this

11   throughout Dr. Titus' files?

12   A.     Yes.

13   Q.     Okay.  Now, in this letter, it indicates that

14   Dr. Titus will give 30 days of emergency care only to the

15   patients, and after these 30 days, he will no longer provide

16   them with medical care.  "Emergency care does not include

17   narcotic prescriptions."

18             What does -- in reaching your opinion that the

19   prescriptions written after discharge were for a legitimate

20   medical purpose within the usual course of professional

21   practice, what, if anything -- how, if anything, did this

22   letter factor in regarding what Dr. Titus was telling his

23   patients?

24   A.     Well, I think this is a perfectly reasonable letter.

25   This is pretty typical.  He's going to provide emergency

1    care for 30 days.  He's giving them a last prescription

2    and -- but if the patient -- if it's an emergency, they can

3    call the doctor.  I mean, this is a pretty typical discharge

4    letter.

5    Q.    So in your opinion, does this letter indicate that

6    the patient-doctor relationship is still intact at the time

7    of the discharge?

8    A.    Yes.

9    Q.    And what about the fact that it states, "Emergency

10   care does not include narcotic prescriptions, and the fact

11   that Dr. Titus provided them with a prescription on their

12   last day?

13   A.    Oh, again, when he -- first of all, when he provided

14   the prescription on the last day, when he's seeing the

15   patient, he has a doctor-patient relationship then.  And he

16   even has a doctor-patient relationship afterwards, when he's

17   providing emergency care.  And even if two weeks later the

18   patient comes back and he decides to take them back, there's

19   nothing wrong with that.  There's no law, or rule, or

20   anything that says that once you decide to discharge a

21   patient, you can't prescribe medications if you decide to do

22   that.

23   Q.    Now, if you were aware that 49 percent of Dr. Titus'

24   patients were given a warning letter, a counseling letter,

25   or discharge, how would that factor into your decision as to

1   whether he was prescribing within the usual course of

2   professional practice for a legitimate medical purpose?

3   A.     That -- that would not change my opinion.  That would

4   just bolster my opinion that he was working with an

5   extremely difficult group of patients that other doctors --

6   many, many other doctors would not even treat these

7   patients.  These patients would have trouble finding other

8   doctors.

9   Q.     Now, with regard to these 14 patients in the

10  indictment that we just talked about, in your review of

11  their patient records, did you find that each one of them

12  had a legitimate chronic pain issue that was being treated?

13  A.     Yes, definitely.  And many of them had very serious

14  medical conditions.  As I said, screws and plates in their

15  neck and pinching of nerves in their backs where the bones

16  were growing into where those nerves were.  Fusions of their

17  spine.  Reflex sympathetic dystrophy.  They had very serious

18  pain complaints.

19             MS. KOUSOULIS:  If I may have one moment, Your

20  Honor.

21             Mr. Marek, if you can pull up Government

22  Exhibit 116 at 104.

23  BY MS. KOUSOULIS:

24  Q.     In Dr. Titus' patient files, did you see --

25             MS. KOUSOULIS:  And if you can zoom out for one

1    second, Mr. Marek.

2    BY MS. KOUSOULIS:

3    Q.      -- did you see sheets that resembled this?

4    A.      Yes.

5    Q.      Okay.  And what was your -- like, if Dr. Titus was

6    having his staff complete patient files at his direction

7    under one of these scenarios, what would your interpretation

8    of that be with regard to whether he was providing

9    individualized care to each patient?

10   A.      Oh, he can provide individualized care, but still use

11   these tools that doctors use to expedite their

12   recordkeeping.  I mean, some doctors dictate, so they'll say

13   something in a Dictaphone and somebody else types it.  Some

14   doctors have an electronic drop down menu that they look at.

15   They might click on one of these.

16              This was another way to do it.  It was a piece

17   of paper where he chose one of these, and then someone else

18   would be a scribe and write it in.  This is a perfectly

19   reasonable way to handle medical records to expedite the

20   amount of time it takes the doctor himself to write the

21   medical records.

22              MS. KOUSOULIS:  And Mr. Marek, can you pull up

23   Defense exhibit -- I mean, Government Exhibit 116 at 116.

24   BY MS. KOUSOULIS:

25   Q.      And Dr. Warfield, do you remember reviewing Donald

1    Meck's file?

2    A.    Yes.

3    Q.    And was this a progress note that was inside Donald

4    Meck's file?

5    A.    Yes.

6              MS. KOUSOULIS:  Now, Mr. Marek, can you go to

7    Page 119 of this Document?  116 at 119.  And can you put up

8    side by side with that 116 at 104, the document we just saw

9    earlier?  Yeah.  119 -- 116 at 119, next to 116 at 104.

10   BY MS. KOUSOULIS:

11   Q.    Now, Dr. Warfield, when you were talking about

12   doctors, you know, sometimes using their staff as scribes,

13   and Dr. Titus doing that, do you remember reviewing

14   Mr. Meck's file and seeing this page?

15   A.    Yes.

16   Q.    Now, with regard to what's in scenario three at

17   106 -- 116 at 104, and what's written in 116 at 119, can you

18   read what is in the progress note?

19   A.    Yes.  It's essentially the same thing, "Chronic pain

20   syndrome, secondary to above-mentioned conditions.

21   Clinically stable with occasional worsening symptoms.

22   Continue with Fentanyl," et cetera.

23   Q.    Okay.  Now, both of these documents came from

24   Exhibit 116, so this was also -- scenario number three on

25   the bottom was in Donald Meck's file, also?

1     A.      Yes.

2              MS. KOUSOULIS:  And Mr. Marek, you can zoom back

3     out.

4     BY MS. KOUSOULIS:

5     Q.      Now, underneath -- now, you reviewed a lot of

6     Dr. Titus' files; correct?

7     A.      Correct.

8     Q.      And can you tell whether or not what's written in the

9     impression and diagnosis objective section, after A/P, is

10    that Dr. Titus' handwriting, from what you recall?

11    A.      I don't believe it is.

12    Q.      Okay.  And what about the signature on the bottom?

13    A.      That is his signature.

14    Q.      And what is your opinion as to what that signature

15    means with regard to the progress note?

16    A.      It means that he used this piece of paper on the left

17    in place of dictating, or pull down menu, or whatever.

18    Someone else typed -- wrote it in, in this case.  Not typed

19    it in, wrote it in.  And then Dr. Titus reviewed it and

20    signed it.

21    Q.      Okay.  And did you see this happening a lot

22    throughout Dr. Titus' files?

23    A.      Yes.

24    Q.      Okay.

25              MS. KOUSOULIS:  Mr. Marek, you can pull that

1    down.

2    BY MS. KOUSOULIS:

3    Q.    Now, in your review of Dr. Titus' patient files, did

4    you see evidence that he was consulting patients and

5    explained to them the risks of opioid therapy --

6    A.    Yes.

7    Q.    -- and what was that -- and do you recall what you

8    saw?

9    A.    Yes.  I saw opioid agreements and I saw pain

10   agreements that outlined the risks or providing informed

11   consent to these patients of the risks of opioids, yes.

12           MS. KOUSOULIS:  And Mr. Marek, can you pull up

13   Government Exhibit 121 at 293?

14   BY MS. KOUSOULIS:

15   Q.    And is this an example of the consent for opioid

16   therapy that you saw throughout Dr. Titus' files?

17   A.    Yes.

18   Q.    And did you see some -- a document like this in each

19   of the 14 patient files that were listed in the indictment?

20   A.    I believe so.

21           MS. KOUSOULIS:  And can you scroll down to the

22   end, Mr. Marek?

23   BY MS. KOUSOULIS:

24   Q.    And this was for Chasity Calhoun; is that correct?

25   A.    Correct.

1   Q.      And she signed and dated this; correct?

2   A.      Correct.

3              MS. KOUSOULIS:  And if you can scroll back up,

4   Mr. Marek, to the first page.  Now, in paragraph -- and can

5   you highlight Paragraph 2, "I am aware."

6   BY MS. KOUSOULIS:

7   Q.      What does providing the patients with this document

8   with this in it indicate to you?

9   A.      This is informed consent.  This is explaining to the

10  patient what the potential downsides are, and making sure

11  the patient understands the downsides of it and agrees.

12  Q.      Now, in reviewing Dr. Titus' patient files, with

13  regard to the 14 in the indictment and the additional files

14  you reviewed, did you find that he -- did this signal to you

15  that he was informing his patients of the risks involved

16  with opioid therapy and obtaining informed consent?

17  A.      Yes, this is informed consent.

18             MS. KOUSOULIS:  And Mr. Marek, can you also pull

19  up Government Exhibit 121 at 297?

20  BY MS. KOUSOULIS:

21  Q.      And you testified earlier that you also saw Pain

22  Management Agreements in the patient files.

23  A.      Correct.

24  Q.      Is that correct?

25             And is this the Pain Management Agreement

```
 1    similar type of -- that you saw in the patient files?

 2    A.     Yes.

 3              MS. KOUSOULIS:  And can you scroll down to the

 4    end, Mr. Marek?

 5    BY MS. KOUSOULIS:

 6    Q.     And this was the Pain Management Agreement that

 7    Chasity Calhoun signed on October 25th, 2012?

 8    A.     Correct.

 9              MS. KOUSOULIS:  Thank you, Mr. Marek.

10              One moment.

11    BY MS. KOUSOULIS:

12    Q.     Did you see any evidence in Dr. Titus' files that you

13    reviewed that he referred patients to other pain management

14    doctors for second opinions?

15    A.     Yes, he often did.

16    Q.     Did you see any evidence that he referred patients

17    out for other therapy, other than opioid therapy, physical

18    therapy and other things?

19    A.     Yes.

20    Q.     Based on your review of Dr. Titus' patient files, the

21    14 in the indictment, and the additional files you reviewed,

22    and the other information you had, did you draw a conclusion

23    whether Dr. Titus' prescribing habits were within the usual

24    course of medical practice for a legitimate medical purpose?

25    A.     Yes, I did.
```

Warfield - Cross

1    Q.      And what is that opinion?

2    A.      My opinion is that his prescribing of these drugs was

3    within the usual course of medical practice.  He was

4    practicing medicine, and he was prescribing them for a

5    legitimate reason, which was the pain that these patients

6    were experiencing.

7    Q.      If you also knew that during the indictment period

8    Dr. Titus had also been consulting with another internist in

9    pain management, a doctor by the name of Dr. Daley, twice a

10   month regarding how to manage and treat chronic pain

11   patients, what impact would that knowledge have on your

12   opinion here today?

13   A.      I think that would just underscore my belief that he

14   was practicing medicine.  He was trying to do what he could

15   to learn more about how to appropriately help these -- these

16   very difficult patients and treat their pain.

17              MS. KOUSOULIS:  I have no further questions.

18              THE COURT:  All right.  Thank you.

19              Mr. Woodard.

20              MR. WOODARD:  Yes, Your Honor.

21                        CROSS-EXAMINATION

22   BY MR. WOODARD:

23   Q.      Hello, Dr. Warfield.

24   A.      Hello.

25   Q.      I want to see if we can agree on a few things here at

Warfield - Cross

1    the outset.  All opioids are addictive?

2    A.     Correct.

3    Q.     Okay.  They can make people feel euphoric?

4    A.     Yes.

5    Q.     Okay.  And patients can die from taking opioids;

6    correct?

7    A.     Yes.

8    Q.     Okay.  There are serious risks involved in the

9    prescribing of opioids; correct?

10   A.     Yes.

11   Q.     Okay.  And you talked about certain combinations of

12   drugs.  Is it fair to say there are certain risks that are

13   even heightened when you have certain combinations of drugs?

14   A.     Yes.

15   Q.     And it would be all the more important to counsel

16   patients on the potential risks so they're informed as to

17   what they're getting into when taking these drugs?

18   A.     Well, we inform them no matter what, but yes, it's

19   important to inform them.

20   Q.     Okay.  And opioids sell for a lot of money on the

21   street; correct?

22   A.     Yes.

23   Q.     Okay.  Can we agree that opioids should not always be

24   a first-line therapy for every patient who presents with

25   pain?

Warfield - Cross

1   A.      Correct.

2   Q.      Okay.  And we certainly agree that patient care must

3   be individualized?

4   A.      Yes.

5   Q.      Okay.  And a doctor has to decide whether for each

6   patient, opioid therapy is appropriate for that particular

7   patient?

8   A.      Yes.

9   Q.      Okay.  And you would agree it's outside the usual

10  course of professional practice to prescribe to a patient

11  when there's no doctor-patient relationship?

12  A.      Yes.

13  Q.      Okay.  And prescriptions sold for money or I think

14  you said selling drugs is always outside the usual course of

15  professional practice; right?

16  A.      Yes.

17  Q.      Okay.  And you referenced a hard-to-treat population.

18  Would you agree that those patients in particular deserve

19  really good individualized treatment?

20  A.      Well, any patient deserves individualized treatment.

21  Q.      Okay.  All right.

22          You're aware of the Federation of State Medical

23  Board's model policy; right?

24  A.      Yes.

25  Q.      Okay.  And, in fact, you relied on that in reaching

1    your opinions in this case?

2    A.    I took it into consideration.

3    Q.    Okay.  And you're aware that the model policy has

4    been adopted here in Delaware in the Medical Practice Act?

5    A.    Yes, many states have adopted it in some form.

6    Q.    Okay.  And you're aware that the model policy states

7    that "Prescribers should only use opioid therapy for chronic

8    pain when other safer and more effective options have

9    failed"; correct?

10   A.    I think it says "as appropriate."

11   Q.    Okay.

12   A.    I don't think -- I think what you say is incorrect

13   because you left that out.

14   Q.    Okay.  Thank you.

15   A.    "As appropriate."  So in other words, for some

16   patients, it's not appropriate to do that.

17   Q.    Okay.  You referenced the Consent Decree.  You're

18   familiar with the Consent Decree that was signed in this

19   case?

20   A.    Yes.

21   Q.    Okay.  And a few times in your testimony, you

22   referred to the model policy as guidelines; right?

23   A.    Well, they're -- it's not just a model policy, but

24   there are lots of guidelines out there.  I was referring to

25   different things, but there are lots of guidelines, yes.

Warfield - Cross

1    Q.     Okay.  But you would agree that when Dr. Titus signed

2    the Consent Decree, he specifically agreed to review the

3    model policy; right?

4    A.     Yes.

5    Q.     In fact, he actually agreed that he would comply with

6    the model policy?

7    A.     Yes.

8    Q.     Okay.  All right.  So we've been using this term

9    "usual course of professional practice"; right?

10   A.     Correct.

11   Q.     And is it fair to say you equate the usual course of

12   professional practice to practicing medicine?

13   A.     Well, I think appropriate practice of medicine, yes.

14   Q.     Okay.  I think you said a doctor selling drugs is not

15   the usual course of professional practice?

16   A.     Yes, a doctor who's just selling drugs without doing

17   all of the other things.  I mean, you know, when you say

18   "selling drugs," there are doctors who dispense -- legally

19   dispense drugs.  They have a pharmacy in their office and so

20   they actually do dispense drugs.

21   Q.     Mm-hmm.

22   A.     So...

23   Q.     Okay.  But basically a doctor, in your view, in his

24   office practicing medicine is the usual course of

25   professional practice?

Warfield - Cross

1    A.      Yes.

2    Q.      Okay.  You're aware that the model policy defines

3    usual course of professional practice; right?

4    A.      Yes.

5    Q.      Okay.  You did not tell the jury in your direct

6    examination how it defines the model policy; correct?

7    A.      I don't believe I quoted anything.

8    Q.      Okay.  Let me know if this is the correct recitation

9    of what the model policy says:  "There must be a legitimate

10   physician-patient relationship.  The prescribing of

11   medications should be appropriate to the identified

12   diagnosis.  It should be accompanied by careful follow-up

13   monitoring of the patient's response to treatment, as well

14   as his or her safe use of the prescribed medication.  And

15   the physician should demonstrate that the therapy has been

16   adjusted as needed."

17           Is that what the model policy defines as the

18   usual course of professional practice?

19   A.      Well, I couldn't -- I haven't memorized what they

20   say, but I think all of those things seem like reasonable

21   guidelines.

22   Q.      Okay.  So it's not just practicing any medicine, it's

23   following these guidelines I just described from the model

24   policy; correct?

25   A.      Well, it's practicing medicine, as I outlined, taking

1772

Warfield - Cross

1    a history, doing what you feel you need for -- for

2    information, a physical exam, laboratory tests as needed,

3    making a diagnosis, doing a treatment, and following up and

4    documenting it.

5    Q.     Right.   Okay.

6             So a prescription cannot be in the usual course

7    of professional practice when it's not accompanied by

8    careful follow-up monitoring; correct?

9    A.     When it's not accompanied -- well, I guess it depends

10   on your interpretation of what's careful follow-up

11   monitoring.   I mean, I haven't memorized what they say

12   there, but I would agree that within the usual course of

13   medical practice, there needs to be -- there needs to be

14   followup and monitoring, as appropriate, to that patient.

15   Q.     Okay.  And a prescription cannot be in the usual

16   course of professional practice if a doctor can't determine

17   whether the patient is using that medication safely;

18   correct?

19   A.     I wouldn't agree with that because a doctor can't

20   always determine what a patient's doing.  Patients do crazy

21   things sometimes.  So sometimes the doctor doesn't know what

22   the patient is doing, but they're still practicing

23   appropriately.

24   Q.     Okay.  So that's fair.  So that's your opinion;

25   correct?

Warfield - Cross

1    A.      That's my opinion.

2    Q.      That's not what the model policy says, though;

3    correct?

4    A.      Again, I haven't memorized what the model policy

5    says, but I don't believe the model policy is saying the

6    doctor has to know what the patient is doing.  The doctor

7    has to -- has to do their best to assure that things are

8    being done safely.  But what I'm saying is the doctor

9    doesn't always know that.

10   Q.      Okay.  Dr. Warfield, you said there were several

11   instances where Dr. Titus' practice fell below the standard

12   of care; correct?

13   A.      Correct.

14   Q.      Okay.  And one was recordkeeping.  You called that

15   bad practice; right?

16   A.      Yes.

17   Q.      Okay.  That was the lowest one on the list you

18   showed, but still above usual course; correct?

19   A.      Well, I think -- I think the point I was making was

20   that there's the standard of care.  There's some practices

21   that are bad practices that are outside the standard of

22   care.  And then way below that bad practice is something

23   that isn't even practicing medicine.

24   Q.      Okay.  But in rendering your opinions in this case,

25   you relied on the recordkeeping that you said was bad

1774

Warfield - Cross

1    practice; correct?

2    A.    I -- I relied on recordkeeping in general.  So for

3    example, when I reviewed these types of cases, if I looked

4    at 20 cases and there was something there in 18 of them, but

5    it was missing in a couple of them, then my assumption is

6    typically the doctor does all of those things, but in these

7    two cases it's missing from the record.  So there are some

8    assumptions I make when there are things missing from the

9    record.

10   Q.    Okay.  So if an assumption is made, it's in favor of

11   the doctor; right?

12   A.    Depends on the record.  If I saw records and there

13   was only one physical exam out of a hundred, I would say

14   this doctor probably doesn't -- probably doesn't do a

15   physical exam very often.  But you know, it's a statistical

16   thing.  And it's my opinion, based on my having reviewed

17   thousands and thousands of doctors' medical records over the

18   years, my opinion that there are records where things look

19   like they're missing.

20   Q.    Okay.  I believe you said that Dr. Titus gave too

21   many chances; right?

22   A.    I think in some situations, I would -- I would concur

23   with that --

24   Q.    Okay.

25   A.    -- that he gave too many chances.

Warfield - Cross

1  Q.     Okay.  And your thought was that he's naive; correct?

2  A.     I think -- yes.

3  Q.     Okay.  And you're saying he was naive even after

4  signing the Consent Decree; right?

5  A.     Yes.

6  Q.     Even after being required to take CMEs; correct?

7  A.     Yes.

8  Q.     Even after having to read the model policy; correct?

9  A.     Yes, I think he was.

10  Q.     Okay.  You also talked about the physical

11  examinations being incomplete in some instances; right?

12  A.     Yes.

13  Q.     Okay.  But you opine that for all 14 patients,

14  Dr. Titus was treating intractable pain; right?

15  A.     Yes.

16  Q.     Okay.  So how do you know that Dr. Titus, in treating

17  this intractable pain, was physically examining the patients

18  where they had their pain?

19  A.     I don't understand what you mean.  I -- I think I

20  opined that there were some physical exams that were below

21  standard.

22  Q.     Okay.  You also talked about urine drug screens, and

23  I think you said they were difficult to interpret; right?

24  A.     Yes.

25  Q.     Okay.  Did you hear the testimony in this case where

Warfield - Cross

1    Dr. Titus had a number he could call if he had any questions

2    about how to interpret drug screens?

3    A.    Yes.

4    Q.    You did hear that?  You reviewed that testimony?

5    A.    I recall that from somewhere.  I don't recall where

6    it came from.

7    Q.    Okay.  All right.  Dr. Warfield, in the past, you've

8    been asked questions in other cases about what is a

9    legitimate practice of medicine.  And, in fact, that was

10    some of the last questions here today; right?

11    A.    Yes.

12    Q.    Okay.  And you've testified in other criminal trials;

13    correct?

14    A.    Correct.

15    Q.    Okay.  And isn't it true that you've testified that a

16    hallmark of a legitimate medical practice is that a doctor

17    is treating common ailments, like diabetes and high blood

18    pressure and things of this nature; correct?

19    A.    I don't recall that specifically, but I guess a

20    medical practice, they could be treating that.

21    Q.    Okay.  That's something you expect to see in a

22    medical practice; correct?

23    A.    Well, it depends on what kind of medical practice.  I

24    mean, there are lots of different kinds of medical

25    practices.  I don't personally treat diabetes in my medical

1777

Warfield - Cross

1    practice.  There are lots of different medical practices.

2    Some -- some doctors just treat back patent.  Some doctors

3    just treat thyroid disease.  Some doctors just treat high

4    blood pressure and diabetes.

5    Q.    Okay.  In a difficult population with pain, would you

6    also expect to see a significant amount of patients with

7    high blood pressure?

8    A.    Not necessarily.

9    Q.    Okay.

10   A.    I -- in my population, I have patients with -- with

11   severe pain and probably they have the same amount of high

12   blood pressure as...

13   Q.    Okay.

14   A.    Not necessarily, I guess is the answer.

15   Q.    What about diabetes?

16   A.    I don't understand what you're asking.  Do patients

17   with pain also sometimes have diabetes?

18   Q.    Yes.

19   A.    Sometimes.

20   Q.    Okay.  And when a patient goes to see a family

21   practitioner, wouldn't you expect to see some sort of

22   notation regarding anything other than pain, such as their

23   high blood pressure, or their diabetes, or their other

24   common ailments?

25   A.    It totally depends.  Maybe.  Maybe not.

Warfield - Cross

1   Q.    Okay.  So we're talking about the usual course of

2   professional practice and the standard of care, and I just

3   want to give a couple hypotheticals.  If a doctor flirts

4   with a teenager who is his patient while he's evaluating

5   whether to prescribe opioids, is that within the usual

6   course of professional practice?

7   A.    I guess -- what do you mean "works with"?  Is that

8   what you said, works with a patient?

9   Q.    Flirts with.

10  A.    Oh, I thought you said works with.  Flirts with a

11  patient?

12  Q.    While he's evaluating whether to prescribe that

13  patient opioids, is that within the usual course of

14  professional practice?

15          MS. KOUSOULIS:  Your Honor, I would object to

16  the relevance of that question.

17          THE COURT:  Well, I'm going to overrule the

18  objection.

19          THE WITNESS:  I would need more information

20  about that.

21  BY MR. WOODARD:

22  Q.    Did you review the testimony of Chasity Calhoun?

23  A.    Not specifically the testimony.

24  Q.    Okay.  So you can't tell this jury whether it's in

25  the usual course to flirt with a patient while deciding

Warfield - Cross

1   whether to prescribe that teenage patient opioids?

2   A.      I didn't review the testimony.  I'd be happy to do so

3   if you could give it to me.

4   Q.      I'm just asking for your opinion.  You're here to

5   provide opinions to this jury; correct?

6   A.      Yes.  So --

7   Q.      Okay.

8   A.      -- what's the question?

9   Q.      If a doctor flirts with a teenager while evaluating

10  whether to prescribe opioids to that patient, is that within

11  the usual course of professional practice?

12  A.      I think that would be inappropriate, but he certainly

13  could be doing that within his usual course of medical

14  practice.

15  Q.      Okay.  If a doctor offers personal vacations to his

16  patients while evaluating whether to prescribe opioids, is

17  that within the usual course of professional practice?

18  A.      It certainly could be practicing medicine and -- and

19  doing that.  I don't see what -- I don't see that that's a

20  problem.

21  Q.      Okay.  Now, we talked about some -- an example of a

22  patient with, say, several inconsistent drug screens; right?

23  A.      Yes.

24  Q.      Okay.  If a doctor prescribes opioids to a patient

25  who has seven inconsistent drug test results indicating the

Warfield - Cross

1   absence of the prescribed opioids, is it within the usual

2   course to prescribe that patient those same opioids?

3   A.      I would need more information about why -- why the

4   screens were inconsistent.

5   Q.      Okay.  So it's fair to say, you have to evaluate and

6   opine on these patients on a very specific basis; right?

7   A.      Yes.

8   Q.      Okay.  We looked at an Opioid Risk Agreement a few

9   minutes ago.  Do you remember that?

10  A.      Yes.

11  Q.      Okay.

12              MR. WOODARD:  Ms. Leal, if you're plugged in,

13  could we go to Exhibit 121 at 293?

14  BY MR. WOODARD:

15  Q.      Okay.  Do you remember this, Dr. Warfield?

16  A.      Yes.

17  Q.      Okay.  First off, what is a diagnosis of Oxycodone?

18  A.      Well, I think that was probably misput in there.

19  Q.      Okay.

20  A.      That would be my opinion, that they wrote it in the

21  wrong place.

22  Q.      Okay.  And we talked about earlier one of the factors

23  in the model policy for the usual course is that the

24  prescriptions are tailored or based on the diagnosis;

25  correct?

Warfield - Cross

1    A.      Well, among other things.  There are many things

2    they're tailored on.

3    Q.      Okay.  You don't know whether this piece of paper was

4    ever discussed with Ms. Calhoun; correct?

5    A.      I'd have to scroll down to the bottom to see where

6    she signed it.  But typically, what happens in these cases

7    is the patient reads it, and they're asked if they have any

8    questions, and they sign it.  And sometimes they don't have

9    any questions, so they don't have a discussion.

10   Q.      Okay.

11   A.      It depends.  You know, it depends on the practice.

12   Q.      And you didn't review the testimony of Ms. Calhoun;

13   right?

14   A.      No.

15   Q.      Okay.  If you were to learn that Ms. Calhoun

16   testified that she never discussed this with Dr. Titus,

17   would that change your opinion as to whether there was

18   informed consent in this case?

19   A.      If she signed this, she had informed consent, whether

20   or not there was a discussion.  As I said, with the informed

21   consent, typically what happens is often, the patients, if

22   you're going into surgery, for example, you fill out the --

23   you read the informed consent and sign it, and they say, Do

24   you have any questions?  Do you want to discuss anything

25   with the doctor?  And if you say, no, then the doctor

1782

Warfield - Cross

1    doesn't necessarily come and discuss it with you further.

2              So it varies tremendously, but if someone has

3    read this and signed it, they have been given informed

4    consent.

5    Q.    Okay.  And when you're sort of opining on what

6    happens out in the world, you're not talking specifically

7    about what you know happened in this case; correct?

8    A.    Well, if it's signed and -- can you scroll down, and

9    I can see the signature?

10   Q.    Sure.

11   A.    Okay.  So she -- he read this and signed it.

12   Q.    Okay.  You're assuming that because she signed this,

13   she read it; correct?

14   A.    Yes.

15   Q.    Okay.

16              MR. WOODARD:  You can take that down, Ms. Leal.

17   BY MR. WOODARD:

18   Q.    Okay.  So we've covered usual course, standard of

19   care.  And then another term we're talking about is

20   legitimate medical purpose; right?

21   A.    Yes.

22   Q.    Okay.  And I think you said earlier a prescription

23   was for a legitimate medical purpose, that being pain;

24   right?

25   A.    Yes.

Warfield - Cross

```
 1    Q.      Okay.  So your opinion is, if a prescription is used
 2    or indicated to treat pain, that's a legitimate medical
 3    purpose?
 4    A.      It's a legitimate medical purpose if it's -- pain is
 5    a legitimate medical purpose for using opioids.  But, of
 6    course, there are all sorts of other things that come into
 7    whether it's legitimate.
 8    Q.      Okay.  And let's talk about the model policy again.
 9    You're aware that the model policy discusses what a
10    legitimate medical purpose is; correct?
11    A.      Yes.
12    Q.      Okay.  And let me know if it's true that the model
13    policy says, "For it to be a legitimate medical purpose, it
14    must be based on sound clinical judgment and current best
15    clinical practice.  It must be appropriately documented, and
16    it must be of demonstrable benefit to the patient"; right?
17    A.      Yes.
18    Q.      Okay.  Did you tell the jury in your direct testimony
19    any of those things regarding legitimate medical purpose?
20    A.      I don't think I was asked that specific question.
21    Q.      Okay.  When prescribing opioids, isn't the goal to
22    reduce pain and increase functionality?
23    A.      In general.
24    Q.      Okay.  If opioids are helping or alleviating a
25    patient's pain, wouldn't you expect their pain rating to go
```

Warfield - Cross

1  down at some point?

2  A.     Sometimes.

3  Q.     Okay.  That would be the demonstrable benefit to the

4  patient, or one of them; correct?

5  A.     Could be one of them, yes.

6  Q.     Okay.  If a patient is complaining of ten out of ten

7  pain for years, what's the demonstrable benefit of the

8  patient -- to the patient of those opioids?

9  A.     Well, again, that number is just a number.  My ten

10  might be your two.  So what's more important is that the

11  doctor talks to the patient; and, often times what happens

12  is the doctor says, Well, you know, you're still saying your

13  pain is a ten.  Oh, yes, but -- it's a ten, but now I'm able

14  to take a walk around the block, and take a shower, and cook

15  my dinner even though it's still a ten.

16          So there's still a benefit there.  The patient's

17  functioning better even though their pain score is the same.

18  So it's an individual thing.  You can't say, oh, the pain

19  score didn't change so, therefore, they shouldn't have the

20  medications.

21  Q.     Right.  It's all individual?

22  A.     Correct.

23  Q.     Okay.  Now, if the pain was being alleviated, you

24  would expect the pain score to go down at some point;

25  correct?

Warfield - Cross

1    A.      It usually does, but not always.

2    Q.      Okay.

3    A.      It, again, depends on the patient and how -- I've had

4    patients who I give that zero to ten and they come in and

5    they say, Every time my pain's a 15, you know.  And you try

6    to explain it to them and then they say, Oh, no, that's what

7    it is.

8              So, yes, in general, you kind of like to see it

9    come down.  It doesn't always, but there are other things

10   you need to look at.

11   Q.      Okay.  Okay.  On the model policy, it also warns

12   about unjustified dose escalations.  Are you familiar with

13   that?

14   A.      Yes.

15   Q.      Okay.  And you're familiar with the phrase "titration

16   to effect"?

17   A.      Yes.

18   Q.      Okay.  Did you observe titration to effect in

19   Dr. Titus' patient charts?

20   A.      I saw the doses being adjusted in these patients,

21   but, as I said, I think there were some lack -- there was

22   some lacking in these medical records.  So I agree that

23   there was some things lacking in these medical records.

24   Q.      Okay.  But not just the medical records, I'm talking

25   about the prescriptions.  Could you name some patients where

Warfield - Cross

1    Dr. Titus titrated those for specific patients?

2    A.     I'd have to look through the medical records, but any

3    time a dose goes up or down or changes the drug, that's

4    titration.

5    Q.     Okay.  So none of the 14 patients come to mind right

6    now with respect to titration?

7    A.     I'd have to -- I'd have to look at these.  I have

8    some notes here that I could look at and tell you, but off

9    the top of my head, I don't remember on what date he changed

10   what dose or what -- whatever.

11   Q.     Okay.  Dr. Warfield, if a patient believes or a

12   doctor believes a patient is not taking their opioids or

13   potentially abusing them, in the usual course of

14   professional practice, there's several options; right?

15   A.     If a doctor -- if a doctor believes the patient is --

16   yeah, there are always several options.

17   Q.     Okay.  One is you could send them, like, to detox;

18   right?

19   A.     One option.

20   Q.     Okay.  One is you could stop opioid therapy

21   altogether; right?

22   A.     Well, not without titrating them downwards or such.

23   Q.     Okay.

24   A.     You can't really just stop it.

25   Q.     Right.  Right.  And when you said titrate down, is

Warfield - Cross

1    that another word for tapering?

2    A.    Well, you might taper.  You might continue them on

3    the same dose until they could get into a detox clinic.

4    Because the -- you know, for example, if the doctor is not

5    familiar with how to taper, they might wait until they get

6    to an addiction specialist and have them taper.  So, again,

7    there are lots of different ways of doing it.

8    Q.    Okay.  But we can agree tapering means, like, going

9    down; right?

10   A.    That's what tapering means.

11   Q.    Okay.  Now, you stated in your report, you found

12   instances where Dr. Titus' patients were given a tapering

13   dose; correct?

14   A.    I believe so.

15   Q.    Okay.  Could you tell the jury which patients

16   Dr. Titus gave a tapering dose to?

17   A.    I don't recall the specifics.

18   Q.    Okay.  Let's talk about discharge.  And when does the

19   doctor-patient relationship end?

20   A.    Well, the doctor-patient relationship ends when the

21   doctor is no longer caring for the patient.

22   Q.    Okay.  You would agree it ends when a --

23   A.    I'm sorry.

24   Q.    -- doctor -- oh.

25   A.    Go ahead.  It's probably a little more nuanced than

Warfield - Cross

1    that.

2    Q.    Okay.  I think we can agree, it ends when a doctor

3    writes, "I am no longer your family care physician";

4    correct?

5    A.    I don't believe that's the case because, as I said,

6    there are patients who come back, and then they become

7    patients again.  So I think -- you know, to be honest with

8    you, I'm very infrequently asked when a doctor-patient

9    relationship ends.

10          The question is more when it begins.  Do you

11   have a doctor-patient relationship?  And I think once you

12   have a doctor-patient relationship with a patient, you

13   pretty much always have some kind of relationship.

14          In other words, you understand -- if that

15   patient comes back to you, you understand their medical

16   condition.  You understand their history.  You understand

17   what their physical exam shows, what their needs are, what

18   drugs they're on.  That's kind of having a doctor-patient

19   relationship.

20          Not having a doctor-patient relationship means

21   you know nothing about this patient.  You met them at a

22   cocktail party, and you don't know if they have diabetes.

23   You don't know who they are.  You don't know what their

24   history is.  You've never done an exam on them.  So you have

25   no formal -- you have no -- any kind of relationship with

1789

Warfield - Cross

1    them.  So it's a tough -- it's a tough question to answer.

2    Q.     Okay.  And the question was just about when it ends.

3    And when a doctor says, "I'm no longer your doctor," we can

4    agree that the relationship has ended; right?

5    A.     I've really never -- never thought about that.

6    Q.     Okay.  Okay.  When a doctor offers -- or, I'm

7    sorry -- writes a prescription for opioids after saying,

8    "I'm no longer your doctor," that doctor cannot determine

9    whether the drug is of demonstrable benefit to the patient;

10   correct?

11   A.     A doctor is prescribing the drug until the patient

12   can get some treatment for whatever it is.

13   Q.     And --

14   A.     And I don't think the model -- you're quoting the

15   model guidelines.  I don't think that's what they were

16   referring to.

17   Q.     Okay.  If a doctor prescribes opioids on or after

18   discharge, the doctor cannot follow up with that patient and

19   see if the opioids are working; correct?

20   A.     Again, I don't think that's what the model policy was

21   referring to.  A dose when the patient is being

22   discharged -- it's not after discharge.  It's during

23   discharge, first of all.  And I believe that's perfectly

24   legitimate, and I don't think that's what the model policy

25   is referring to at all.

Warfield - Cross

1    Q.     Okay.  Did you not see instances where Dr. Titus

2    wrote a prescription to a patient weeks after discharge in

3    this case?

4    A.     And, again, I've seen many cases where a patient is

5    discharged and then they come back into the doctor's care.

6    It's not uncommon.

7    Q.     Okay.  And the point of watching for a demonstrable

8    benefit is so a doctor can make decisions about that

9    patient's treatment going forward; right?

10   A.     Yes.

11   Q.     Okay.  Okay.  Let's say a doctor learns that a

12   patient is not taking the opioids that were prescribed.  And

13   I think you said there are several scenarios that can -- or

14   inferences that can be made, let's say, from an inconsistent

15   drug test?

16   A.     Correct.

17   Q.     Okay.  If it's determined that the patient has not

18   taken that drug in many days, wouldn't you agree that that

19   patient does not need any tapering dose of those opioids?

20   A.     I wouldn't agree with that.

21   Q.     You would not?

22   A.     No.

23   Q.     Why is that?

24   A.     Well, first of all, the patient could be on other

25   opioids, and they -- so they still could withdraw if you

Warfield - Cross

1   stopped giving them the opioids.  Secondly, it depends on

2   how many days it's been since they haven't taken the

3   opioids.

4   Q.    Okay.

5   A.    They still could withdraw.  So it's an individual

6   choice with an individual patient.  I'm not going to say

7   that -- that one should never give an opioid prescription to

8   a patient who has urine drug screens that don't show the

9   drug in them.

10  Q.    Okay.

11  A.    I won't say that because it's not -- that's not good

12  practice.

13  Q.    What if the patient has already gone through

14  withdrawal by the time they're seeing the doctor again, you

15  would agree that the opioids at that point are not needed

16  for the withdrawal?

17  A.    You mean the patient has already gone through

18  withdrawal?

19  Q.    Yes.  Let's say the patient ran through their pills

20  15 days before seeing the doctor.  You would agree at the

21  point they see the doctor next, they're not going through

22  withdrawal at that point; right?

23  A.    They may still be going through a lengthy withdrawal.

24  I don't understand what you mean by they're not -- they've

25  already gone through withdrawal.  What do you mean?

Warfield - Cross

1    Q.     Okay.  Do you remember testifying in a case called

2    *U.S. vs. Caroni*?

3    A.     Yes.

4    Q.     Okay.  And correct me if I'm wrong here, but in that

5    case, did you testify if you found that the patient had no

6    medication in their urine, and you thought they were selling

7    them, then you don't really need to wean in that case?

8    A.     If you had evidence that a patient was selling the

9    drugs and never was taking the drugs --

10   Q.     Right.

11   A.     -- then -- then, in that case, you may choose not to

12   wean.  However, there could be other scenarios where you

13   think the patient is taking it and you choose to wean it.

14   It's a -- it's a judgment call.

15   Q.     Okay.  Now, one of the options we discussed is that a

16   doctor can choose to discontinue opioid therapy; correct?

17   A.     Discontinue with and potentially give some drug until

18   the patient gets care.

19   Q.     Okay.  Are you aware that the model policy

20   specifically advocates against kicking out a patient at the

21   point of discontinuing opioid therapy?

22   A.     I don't recall their specific advocacy, but again,

23   there are many ways of doing it.  They might -- they may be

24   recommending a particular way, but that isn't the only way

25   to do it.

Warfield - Cross

1    Q.    Okay.  But the family practitioner doctor can pivot

2    to treating that patient for substance abuse addiction,

3    similar medical issues; correct?

4    A.    Not necessarily.  I mean, depending on how the doctor

5    decides to treat that patient for addiction, you need a

6    specific certification to do that.  So let's say you felt

7    this patient needed to be on Methadone maintenance, you need

8    a special certification to do that.  So you need to wait

9    until that patient can get into a doctor who has a Methadone

10   clinic.

11          And the same thing is true for Buprenorphine,

12   which is another drug they use to treat addiction, you need

13   to have a special certification.  I don't have that

14   certification so I don't treat those kinds of patients.

15          So you may not be able to treat those patients

16   yourself, so you may need to maintain them, their pain

17   relief on whatever they were taking until they can get into

18   to see that sort of doctor.

19   Q.    Okay.  How many referrals to addiction specialists

20   did you see in Dr. Titus' records?

21   A.    I didn't see referrals to addiction specialists, I

22   don't believe.  I saw referrals to pain specialists often.

23   Q.    Okay.  What about referrals to detox centers?

24   A.    I didn't see that.

25   Q.    Okay.  I think you believe -- sorry, I believe you

Warfield - Cross

1    said referrals to physical therapy.  You did see that;

2    right?

3    A.    I saw that patients had had physical therapy.  I

4    didn't see a specific referral slip or -- if that's what

5    you're talking about.

6    Q.    Okay.  So you mean you saw, like, the actual results

7    of going to physical therapy?

8    A.    I saw mention in the chart that the patients tried

9    physical therapy.

10   Q.    Okay.

11   A.    Maybe not in so many words, but something like that.

12   Q.    Okay.  I think you said you saw Cortisone treatments?

13   A.    Yes.

14   Q.    Okay.  Who received that?

15   A.    I'd have to go through my records.  You want me to

16   take a few minutes to go through the records?

17   Q.    Does it not jump out to you?

18   A.    It doesn't jump out to me specifically who had them,

19   but let's see.  Okay.  Here.  Perry.  Perry had facet blocks

20   and transforaminal epidural steroid injections.

21   Q.    Okay.

22   A.    That's one at least.  You want me to go on?

23   Q.    That's fine.  Okay.

24         And you testified that for all the 14 patients,

25   they each had chronic intractable pain; correct?

Warfield - Cross

1   A.      Yes.

2   Q.      Okay.  Let's talk about Ms. Chasity Calhoun.  What

3   was her chronic intractable pain she was suffering from?

4   A.      I don't know if I have that specifically here.  I'd

5   be happy to take a look at the record if you have it.  Could

6   I see the medical record?  I'd be happy to look at it.  I

7   don't have that note right here.

8   Q.      You're here to testify before this jury about the

9   patients under indictment that the Government charged

10  prescriptions for; right?

11  A.      Right.

12  Q.      Okay.  And you testified that they each had chronic

13  intractable pain?

14  A.      Correct.

15  Q.      Okay.  But you don't have a recollection right now as

16  to Ms. Calhoun's chronic intractable pain?

17  A.      I don't recall, but if I could look at the record, I

18  could tell you what it is.

19  Q.      Okay.  What about for Tracie Owens, do you remember

20  her chronic intractable pain?

21  A.      I don't remember off the top of my head, but again,

22  if you give me the record, I could tell you.

23  Q.      Okay.  But you did remember that she had headaches;

24  right?

25  A.      Owens, I believe, is the one -- one of the patients

Warfield - Cross

1    who had migraine headaches.

2    Q.    Okay.  And you said there's no rule against using

3    opioids to treat migraine headaches; is that right?

4    A.    It's not the first thing I would use.  It's not a

5    common treatment, but there's no rule saying you must never

6    use opiates to treat migraines.

7    Q.    Okay.  Have you ever prescribed opiates to a person

8    with migraine headaches?

9    A.    I don't treat migraine headaches.

10   Q.    Okay.

11   A.    We have a special doctor in our pain clinic who does

12   all the migraine headaches, so the answer to that is no.

13   Q.    Okay.  Okay.  We're wrapping up here in a couple of

14   minutes.  You said that the drug tests are difficult to

15   read; right?

16   A.    Correct.

17   Q.    Okay.

18            MR. WOODARD:  Ms. Leal, could we go to

19   Exhibit 102 at Page 238?

20   BY MR. WOODARD:

21   Q.    Okay.  Do you recognize this, Dr. Warfield?

22   A.    Yes, it looks like a drug screen for Mr. Jones.

23   Q.    Okay.  What's difficult to read here?

24   A.    Well, I didn't say all of them were difficult to

25   read, I said drug screens in general are difficult to

Warfield - Cross

1    interpret.  In this particular one, this says, "There are no

2    drugs of abuse.  Percocet was prescribed."  And -- well,

3    what is difficult to -- I'll tell you what's difficult on

4    this one is, is Codeine or Morphine a metabolite of

5    Percocet?  Do you know the answer to that?

6    Q.    Okay.  Let's go to the next page.

7          Okay.  What does this show, Dr. Warfield?

8    A.    I'm sorry.  It shows that there's Codeine and

9    Morphine.  And this is a perfect example of being difficult

10   to interpret.  This is a patient who's on Oxycodone, and the

11   opiates that are found are Codeine and Morphine.  So the

12   question -- and I don't see the whole -- the whole thing

13   there.

14         And so the question is:  Are those metabolites

15   of Oxycodone?  That's a very difficult question for a lot of

16   doctors to answer.  So when you have a patient who's on

17   Oxycodone, is it normal to find opiates positive?  Is it

18   normal to find Codeine?  Is it normal to find Morphine?

19         In other words, when you take Oxycodone, which

20   sounds like Codeine, and it breaks down in your body, do you

21   get Codeine?  That is what makes these so difficult to

22   interpret.  It's not that I have trouble reading "it's

23   negative for illicit substances."  I can read that.  But to

24   know whether these things that say they're positive are

25   abnormal is what's difficult.

1798

Warfield - Cross

1    Q.      Okay.  Do you see it actually has an explanation of

2    the results right there?  It says, Morphine is a metabolite

3    of Codeine"?

4    A.      Yes.

5    Q.      Okay.  Is that part hard to interpret?

6    A.      Well, that sentence is not hard to interpret, but how

7    about Oxycodone?  I know that Codeine -- I know that Codeine

8    is a -- I'm sorry, that Morphine is a metabolite of Codeine,

9    but is Codeine a metabolite of Morphine?  Is Codeine a

10   Morphine metabolite of Oxycodone?  It doesn't say anything

11   about that here.

12           Those are things that are intricacies of reading

13   urine drug screens that many, many doctors don't understand.

14           MR. WOODARD:  You can take that down, Ms. Leal.

15   BY MR. WOODARD:

16   Q.      Okay.  Just to follow up on this discussion of

17   headaches.  And you said there's no rule that you can't

18   prescribe opioids in the instance of a headache; right?

19   A.      It's not commonly prescribed.  It's not the

20   first-line treatment of migraine headaches, there are other

21   drugs, but there's no rule that says you cannot ever

22   prescribe opiates for migraine headaches.

23   Q.      Okay.  It's fair to say we're not here about the

24   rules for prescribing opioids and whether the rules say A,

25   B, or C.  It's what Dr. Titus did with each particular

Warfield - Cross

1    patient; correct?

2    A.      I think we're here about the rules and whether

3    Dr. Titus was -- was following the rules, aren't we?

4    Q.      I'm asking you.

5    A.      I thought we were here also about -- certainly, it's

6    individual, but whether Dr. Titus was following rules and

7    whether there were rules that said he shouldn't be doing

8    something he was doing.

9    Q.      Okay.

10   A.      That's one thing.

11   Q.      And one of those rules is the model policy; correct?

12   A.      Model policy isn't rules.  They're guidelines.

13   Q.      Okay.

14   A.      There's a big difference between a rule and a

15   guideline.  Guidelines are just what they say, they guide

16   the doctor.  They're not rules.  You don't have to abide by

17   a particular thing that a policy or guideline is

18   recommending.  They're recommendations.  Sometimes things

19   fall outside of those.

20   Q.      Okay.  This is a little bit of a different case

21   because Dr. Titus actually agreed he would follow those

22   guidelines, didn't he?

23   A.      He agreed that he would follow those guidelines, but

24   I'm not -- I'm not here to discuss his agreement with the

25   Government or whatever.  I'm here to tell you what's within

Warfield - Cross

1  the standard of care and what's outside the usual course of

2  medical practice.

3  Q.     Okay.  All right.  Dr. Warfield, you've given

4  presentations in the past; correct?

5  A.     Yes.

6  Q.     Okay.  Do you recall presenting at the International

7  Conference on Opioids in 2015?

8  A.     Yes.

9  Q.     Okay.  Did you prepare some slides for that

10 presentation?

11 A.     Yes.

12 Q.     Okay.

13         MR. WOODARD:  Just one moment, Your Honor.  May

14 I approach, Your Honor?

15         THE COURT:  Yes.

16         MS. KOUSOULIS:  Your Honor, could we see you at

17 side-bar for a second?

18         THE COURT:  All right.

19         (Beginning of conference held at side-bar:)

20         MS. KOUSOULIS:  Your Honor, as a practical

21 matter, I don't have an issue with this, with him showing a

22 former PowerPoint, but in here, she talks about standard

23 care and malpractice on other slides.  So I'm not sure what

24 the question he's going to ask and whether she's going to

25 have to talk out of context if she's not allowed to talk

Warfield - Cross

1    about the slides that talked about malpractice.

2              MR. WOODARD:  I was only going to show her two

3    slides, one of which is identical to the list that she

4    brought into court today, to ask her whether she's been

5    using this for six or seven years now.  And I was going to

6    ask her whether her PowerPoint today, looking at this list

7    slide, which has nothing to do with the --

8              THE COURT:  Can I see it?

9              MS. KOUSOULIS:  Yeah, that's the last slide.  I

10   haven't read it yet.

11             MS. KOUSOULIS:  I mean, one moment, Your Honor.

12             (Discussion held off the record:)

13             MS. KOUSOULIS:  If it's going to be that

14   limited, Your Honor.  I don't just want to get into where

15   she has to say things out of context.

16             THE COURT:  He said it's limited to that, so why

17   don't we do that.  All right?

18             (Conclusion of conference held at side-bar.)

19   BY MR. WOODARD:

20   Q.    Okay.  Dr. Warfield, did you have a chance to look

21   over that presentation?

22   A.    Yes.

23   Q.    Was that a copy of the presentation from 2015?

24   A.    Yes.

25   Q.    Okay.

Warfield - Cross

1      MR. WOODARD:  And, Your Honor, I'm only offering

2   Page 7 and Page 10 of this exhibit to publish to the jury.

3      THE COURT:  Publish, yes.  All right.

4      MR. WOODARD:  All right.  Okay.

5   BY MR. WOODARD:

6   Q.    And Page 6 and Page 10 --

7      MR. WOODARD:  And, Ms. Leal, if you could go to

8   Exhibit 1014 at page -- well, it's Government's Exhibit,

9   Page 7.

10      Okay.  Ms. Leal, could you zoom in on the top

11   there?  Okay.

12   BY MR. WOODARD:

13   Q.    Does this look pretty similar to something we looked

14   at in court this morning?

15   A.    Yes.

16   Q.    Okay.  Is it essentially the same slide that you used

17   at the 2015 presentation?

18   A.    It looks the same.

19   Q.    Okay.  How long have you been using this slide in

20   your presentations, Dr. Warfield?

21   A.    I don't remember.  Obviously, I was using it in 2015.

22   Q.    Okay.

23      MR. WOODARD:  If we could go to Page 10, please,

24   Ms. Leal.  Can you zoom in there?  Okay.

25   BY MR. WOODARD:

Warfield - Cross

1   Q.      Dr. Warfield, it's fair to say you're not an advocate

2   of using opioids for chronic pain in your own practice;

3   correct?

4   A.      It says I'm -- it says I'm not a big advocate --

5   Q.      Okay.

6   A.      -- which means I don't use them very much in my own

7   practice.  I'm one of these people who fall in the middle.

8   Remember, before I talked about doctors who use them for

9   lots of their patients, doctors who use them for none of

10  their patients.  I would say I fall in the middle and I do a

11  lot of interventional things.  So I'm not a big advocate.  I

12  don't use them for a lot of my patients.

13  Q.      Okay.  But you are an advocate of the doctor's right

14  to do so; correct?

15  A.      Yes.  As I said, I think there's a whole umbrella of

16  how to treat pain, and I'm an advocate of doctors who do use

17  opiates for a lot of their patients to -- to be able to do

18  that.  Yes.

19  Q.      Okay.  And you're here as an advocate; correct?

20  A.      No, I'm here to review the medical records and to

21  give you my opinion as to whether Dr. Titus' practice

22  specifically was within the usual course of medical records.

23  Q.      Okay.  And you talked about where you fall in the

24  continuum there on prescribing, but you haven't actually

25  treated a patient since 2013; correct?

1804

Warfield - Cross

1    A.    I still -- I still have a full-time practice at

2    Harvard Medical School, but I no longer see patients.  I do

3    teaching mainly and administrative work.

4    Q.    Okay.  You're mostly a professor; right?

5    A.    Yes.

6    Q.    Okay.  When you were seeing patients back in 2013 and

7    prior, how many patients would you see a day?

8    A.    Thirty or so.

9    Q.    Okay.

10   A.    Sometimes more.

11   Q.    Okay.  And you worked at like a pain management

12   center; right?

13   A.    Yes.

14   Q.    Okay.  And where you worked, the pain management

15   center actually did not provide long-term opioids for pain

16   management; correct?

17   A.    What we did was we would see patients for opioids, we

18   would make the determination that they needed opioids or

19   didn't.  And if we thought they needed opioids, we would

20   prescribe them.  We'd titrate the dose up, we'd titrate the

21   dose down until we got to the right dose of opioids, and

22   then we'd send the patient back to their primary care

23   doctor.

24         So a patient isn't coming to a specialist every

25   month just to get the prescription refilled.  We don't -- so

Warfield - Cross

1    we don't -- we don't prescribe them long term in the sense

2    that we make a determination if they need them.  We decide

3    on the dose.  We titrate it.  And then we send the patients

4    back to their primary care doctors.  And part of that is

5    because of the insurance situations.

6    Q.    Okay.  So in your own practice, you would be

7    titrating up and down, based on the patient's response to

8    the medications?

9    A.    Correct.

10   Q.    Okay.  And so you have patients -- let's say pain

11   patients in these years leading up to 2013; correct?

12   A.    Yes.

13   Q.    Okay.  And you're familiar with the prescription drug

14   monitoring program data; correct?

15   A.    Yes.

16   Q.    Okay.  If I were to tell you that your PMP data for

17   your DEA number showed that you prescribed Oxycodone to

18   exactly two patients, would that sound about right?

19   A.    I would tell you that when I practiced medicine at a

20   teaching hospital, it goes under the resident's DEA number,

21   not my DEA number.  So when I see patients -- which I would

22   say 99.9 percent of the time when I'm seeing patients in the

23   Warfield Clinic, I see a patient with a resident.  And so --

24   or a fellow -- or a pain fellow.

25               And so we make the determination together that

1806

Warfield - Cross

1  this patient needs opiates.  The resident actually writes,

2  and it goes under the resident's DEA number.  So I'm not at

3  all surprised that my DEA number is almost never used.

4  Q.    Okay.  So you would agree about two patients,

5  Oxycodone, under your DEA number?

6  A.    Probably.  That was that 99.9 percent.  That was the

7  .1 percent patient where the resident was sick that day or

8  something, and I wrote the script.

9  Q.    Okay.  And when you wrote the script, one of these

10 patients you prescribed five milligrams of Oxycodone, 45

11 pills; correct?

12 A.    I have no idea which -- what you're talking about or

13 which patient or -- I have no clue.

14 Q.    Okay.  Any reason to dispute for the second patient

15 you prescribed five-milligram Oxycodone, 60 pills?

16 A.    I have no -- I mean, I'd have to -- even commenting

17 on that, I'd have to know who the patient was, what the

18 diagnosis was, why I was prescribing.  There's a wide range

19 of doses and drugs and -- I don't know what -- what are you

20 asking me?

21 Q.    Whether you dispute that that's what would show up

22 under your DEA number?

23 A.    I have no idea what would show up.

24 Q.    Okay.  You've been asked this question before in

25 court; correct?

Warfield - Cross

1    A.     I've been asked a question -- I've never been asked

2    that question, no.

3    Q.     Okay.

4    A.     That's a new one.  I've been asked -- I've been asked

5    how often I've prescribed, but I've never been asked that

6    question about prescribing five milligrams to a patient ten

7    years ago.

8    Q.     Okay.  So we've talked about presentations.  You've

9    also written some articles; correct?

10   A.     Correct.

11   Q.     Okay.  And I'm sorry.  Just one moment.

12          Okay.  Around 2012, did you write an

13   editorial -- and I guess it's a journal, Pain Medicine?

14   A.     Yes.

15   Q.     Okay.  Titled "The Importance of Qualified Expert

16   Witnesses"; right?

17   A.     Right.

18   Q.     Okay.  And you wrote as follows:  "In my opinion, no

19   one else, not an addictionologist, not a DEA agent, not a

20   judge, nor an attorney should be in a position to determine

21   whether a pain physician was acting reasonably when he or

22   she prescribed opioids for a particular pain condition."

23          Correct?

24   A.     Correct.  That was about pain physicians, yes.

25   Q.     Okay.  So with all due respect, you don't think the

Warfield - Cross

1   judge sitting here today can determine whether a doctor

2   prescribed --

3               MS. KOUSOULIS:  I'd object to that.

4               THE COURT:  I'm going to sustain it.  I don't

5   have to decide anything.

6   BY MR. WOODARD:

7   Q.    Okay.  Your editorial was about who could be

8   qualified to testify in such cases; correct?

9   A.    It was about who is an expert in pain medicine.

10  Q.    Okay.  And if Dr. Titus were to testify in this case,

11  would he meet the criteria?

12              MS. KOUSOULIS:  Your Honor, I object to that.

13              THE COURT:  I think he means Dr. Thomas.

14              MR. WOODARD:  I did not, Your Honor.

15              THE COURT:  Let's come to side-bar.

16              MR. BOSTIC:  Your Honor.

17              (Beginning of conference held at side-bar:)

18              THE COURT:  What are you possibly thinking of by

19  asking a question about whether he's going to testify or

20  would testify?  We know he's not going to testify.

21              MR. WOODARD:  I don't know that that --

22              MR. BOSTIC:  Your Honor, we immediately move for

23  a mistrial.  There's no coming back from this.  The jury now

24  expects to hear from Dr. Titus.  It is clear that Dr. Titus

25  is not going to testify.  This cannot be remedied.

Warfield - Cross

1    We are asking for a mistrial.  There's certain

2  due process rights that are built into the criminal

3  instructions that the client does not have to testify and

4  not to have any negative inference drawn to the attention

5  that he is not testifying.  And I don't see how the Court

6  can cure this.

7    MR. WOODARD:  I'm sorry, Your Honor.  My point

8  was about whether Dr. Titus is specialized in addiction

9  things.  We would request an instruction, a reminder that

10  Dr. Titus, of course, has no obligation to testify in this

11  case.

12    THE COURT:  It seems to emphasize the point.

13  Well, so let's assume for the sake of argument that I'm not

14  going to grant a mistrial.  What would be the best thing for

15  me to do?

16    MR. BOSTIC:  Your Honor, there's nothing you can

17  do other than grant a mistrial because this cannot be cured.

18    THE COURT:  Wait.  I'm sorry, Mr. Bostic.  I

19  didn't quite catch -- you said there's nothing I can do and

20  then there was something.

21    MR. BOSTIC:  Other than to grant a mistrial.

22    THE COURT:  Okay.  But let's assume I'm not

23  going to do that.  Is there a second best alternative from

24  your point of view?

25    MR. BOSTIC:  There is no second best.  This is

Warfield - Cross

1     uncurable if we go to put before the jury that a Defendant

2     is required to testify or even must consider testifying.

3     And the reason we do that, because in random criminal cases,

4     Defendants choose not to testify.  And the instruction the

5     Court gives is that they have a right not to.  They don't

6     have the burden of proof the Government has insinuated on

7     some obligation to testify here on my client's behalf.  And

8     I don't see how you can cure that.

9              So there's no second best here.

10              THE COURT:  Ms. Remis, do you have anything to

11    add here?

12              MS. REMIS:  Yes, Your Honor.  I believe the

13    purpose of the testimony --

14              THE COURT:  I'm sorry.

15              MS. REMIS:  Sorry.  I believe the purpose of the

16    question, however, you know, we agree that an instruction to

17    reiterate what the Court has already told the jury about the

18    Defendant's not required in any way to testify, what the

19    purpose of the question, Your Honor, was was to point out

20    that even Dr. Warfield believes that a physician who's not a

21    pain management specialist, as Dr. Titus is not, would not

22    be qualified to opine on whether anything was for a

23    legitimate medical purpose if she believes that only certain

24    people who make that determination.  And the whole question

25    is whether Dr. Titus was able to make that judgment for

1811

Warfield - Cross

1   himself.

2          THE COURT:  So here's what I propose to do:  I

3   propose not to declare a mistrial, as I am going to strike

4   the question --

5          MS. REMIS:  And the --

6          THE COURT:  -- and I'm going to give the jury an

7   instruction that tracks whatever I have in the prior jury

8   instructions, and I think you should skip this topic.

9          All right?  And --

10         MR. BOSTIC:  Your Honor, may I be heard?

11         THE COURT:  Mr. Bostic, yes.

12         MR. BOSTIC:  Two things.  The purpose of the

13  question has no relevance or significance here, and so I

14  want that to go on the record.

15         The second piece is that, with respect to the

16  Court's decision, I want the record to reflect that the

17  Defense substantially objects and takes exception to the

18  Court's final determination.

19         THE COURT:  No, that's fine.  I would expect you

20  to object.  I mean, but that's what I'm going to do.

21         All right.

22         (Conclusion of conference held at side-bar.)

23         THE COURT:  So members of the jury, thank you.

24  So I'm going to strike the last question and instruct you to

25  put it out of your mind, not to consider it, and not to

1812

Warfield - Cross

1    refer to it again.

2                I also want to tell you that there is absolutely

3    no burden on any Defendant ever to testify in a trial, a

4    criminal trial, and that you cannot draw any inference from

5    the fact that a Defendant doesn't testify.  The burden of

6    proof is always on the Government to prove the Defendant

7    guilty, and the Defendant has an absolute constitutional

8    right not to testify.  And when a Defendant chooses to

9    exercise that right, you cannot draw any negative inference

10   from it.

11               All right.  Mr. Woodard.

12               MR. WOODARD:  Yes, Your Honor.  Thank you.

13   BY MR. WOODARD:

14   Q.    Okay.  Just a couple final questions, Dr. Warfield.

15   We've been talking a lot about whether there's guidelines

16   and rules regarding the practice of medicine; correct?

17   A.    Yes.

18   Q.    Okay.  And I think you said there's no specific rule

19   on, like, physical examination; right?

20   A.    Well, there needs to be a physical examination.  I

21   mean, I don't know what you mean.

22   Q.    Okay.  I think you said there's, like, no specific

23   rule saying there can't be a prescription after discharge;

24   right?

25   A.    That one cannot write a prescription the day of the

Warfield - Redirect

1    discharge?  That -- I've never seen a rule saying that.

2    Q.    Okay.  Is it fair to say, though, that all these

3    things are factored into whether a doctor is acting within

4    the usual course of professional practice?

5    A.    All of what things?

6    Q.    All of these things, like whether a doctor should do

7    a physical examination, whether pill counts should be done,

8    whether prescriptions should or shouldn't be done after

9    discharge.

10   A.    Well, there are lots of things that go into

11   determining if something is within normal course of medical

12   practice.

13   Q.    Okay.  And these things can't be determined in

14   hypotheticals, it has to be based on the individualized care

15   that was given to each specific patient; correct?

16   A.    Well, I think it needs to be determined by reviewing

17   the medical records, and the doctor's practice, and that

18   sort of thing.

19              MR. WOODARD:  Okay.  Thank you, Dr. Warfield.

20              THE COURT:  All right.  Thank you, Mr. Woodard.

21              Ms. Kousoulis.

22              MS. KOUSOULIS:  Yes.

23                   REDIRECT EXAMINATION

24   BY MS. KOUSOULIS:

25   Q.    Let's just start on where Mr. Woodard ended.  From

Warfield - Redirect

1     what you saw in reviewing Dr. Titus' patient files, did you

2     find that everything -- taking everything into account, as

3     Mr. Woodard indicated, did it show whether or not Dr. Titus

4     was making an individualized determination as to each

5     patients' needs?

6     A.     Yes.  Each patient had medical records.  They had

7     notes on every visit.  And that told me that he was

8     practicing medicine.  He was making a determination as to

9     what the diagnosis was, what the needs of the patient

10    were -- was, what to prescribe.

11            And, again, as I said, I don't think he always

12    did things perfectly.  I think there were things he did that

13    were below the standard of care, but he was still practicing

14    medicine, even when he made those bad decisions.

15    Q.     And Mr. Woodard asked you regarding when you were

16    practicing and the patients that you saw and the patients

17    that were seen in your pain management clinic and that

18    whether you did certain things with regard to patients.  Do

19    you remember those questions?

20    A.     Correct.  Yeah.

21    Q.     So with regard to the chart you prepared --

22            MS. KOUSOULIS:  Mr. Marek, can you please pull

23    up Defense Exhibit 20A at 1?

24            It isn't working.  I hit Defense.  Don't you

25    touch it.

Warfield - Redirect

1        Are you plugged in, Mr. Marek?

2   BY MS. KOUSOULIS:

3   Q.      Okay.  This is a chart that we talked about during

4   your direct examination; correct?

5   A.      Yes.

6   Q.      Now, in terms of your practice, when you were

7   practicing, seeing patients, would you say that your

8   practice was more about maybe toward the best possible

9   practice with regard to all the things your clinic did?

10  A.      Well, I certainly like to think we aspired to the

11  best possible practice.  I'm sure there are things that we

12  did that might not be considered the best possible practice,

13  but, certainly, that's what we aspired to in our practice.

14  Q.      And Mr. Woodard seemed to suggest that there were

15  things that you were doing in your practice that Dr. Titus

16  was not doing.  Would you agree with that?

17  A.      Yes.

18  Q.      And so where would you say Dr. Titus in some of his

19  practice fell within this chart?

20  A.      I think in some of his practice, he fell within the

21  average practice.  I think with some of his practice, it was

22  not so great, and with some of his practice, it was the bad

23  practice.  And I think in some of his practice, it was the

24  best possible.  I mean, he had the drug agreements.  He had

25  referrals to outside pain doctors, the Pain Management

Warfield - Redirect

1    Agreements.  I mean, he had some things that were best

2    practices, but I think there were also things that fell into

3    the bad practice category.

4    Q.    Was there anything that you saw that fell -- that

5    would constitute falling outside the usual course of medical

6    practice or not for a legitimate medical purpose?

7    A.    Nothing at all in all of the records that I reviewed.

8    Q.    Now, Mr. Woodard also asked you about this training

9    you did on legal issues from a physicians' viewpoint where

10   he showed you two PowerPoint slides.  Do you remember that?

11   A.    Yes.

12   Q.    In that presentation, who were you presenting to?

13   A.    To pain doctors.

14   Q.    And what were you talking to them about, generally?

15   A.    I was talking with them about some of the risks of --

16   to physicians, as I mentioned earlier, that many physicians

17   won't even prescribe opiates any more to patients who need

18   them because they're afraid of criminal proceedings like

19   this.

20   Q.    So you were presenting to them as sort of an expert

21   in this field?

22   A.    Exactly.

23   Q.    And he also showed you a chart that you did that was

24   similar to the chart that you did in this case, with all the

25   different examples of outside the usual course of

Warfield - Redirect

1    professional practice; right?

2    A.     Yes.

3    Q.     And you indicated -- he indicated that was like six

4    or seven years ago, and your chart hasn't changed; is that

5    correct?

6    A.     Yes.

7    Q.     Now, is there -- with respect to those examples,

8    would anything have changed or is that -- does that mean

9    that it's not as -- like, why hasn't your chart changed in

10   six or seven years?

11   A.     I think those are still very good examples, and those

12   are the examples that I -- I would give.

13   Q.     Okay.  Now, did you see any evidence in this case

14   that Dr. Titus was aware -- or any reason to believe that

15   any of the 14 patients he was seeing listed in the

16   indictment were selling their drugs?

17   A.     No.

18   Q.     Does the fact that there were no referrals to detox

19   centers or drug treatment centers in any of the records, you

20   don't recall seeing in any of the records that you reviewed,

21   does that -- would that indicate that Dr. Titus was

22   practicing outside the usual course of professional

23   practice?

24   A.     No, absolutely not.

25   Q.     Is there any requirement in the model policy that

Warfield - Redirect

1    doctors make such referrals?

2    A.      No.

3    Q.      Would making such referrals be considered, like, the

4    best possible practice and something doctors should do?

5    A.      Again, it depends on the patient.  It depends on the

6    situation.  And sometimes it's appropriate to send them to

7    detox, sometimes it's appropriate to make referrals,

8    sometimes it's not appropriate to do that.

9    Q.      Now, you were also asked questions about when does a

10   doctor-patient relationship end.

11   A.      Yes.

12   Q.      Okay.  Is there any requirement under the model

13   policy that a doctor follow up with a patient after

14   discharge, even if they prescribe them with a prescription

15   at that final --

16   A.      No.

17   Q.      And are you aware that Dr. Titus split his

18   prescriptions in two to make sure that patients were taking

19   them properly?

20   A.      I did see that.

21   Q.      And would that account for maybe why two weeks after

22   discharge, a patient would be written a prescription?

23   A.      Yes.

24   Q.      Now, showing you what's been marked Government

25   Exhibit 801 at -- sorry -- at 007.  Or I'm sorry, 801 at

Warfield - Redirect

1    008.

2              Now, have you seen this chart before regarding

3    the prescriptions that Dr. Titus wrote?

4    A.    Yes.

5    Q.    And this indicates that between November 4th, 2013

6    and December 31st of 2014, he wrote 13,848 prescriptions for

7    1,000 and -- 1,012,006 number of pills to 868 patients?

8    A.    Yes.

9    Q.    In your estimation, is that a large number?

10   A.    I wouldn't know unless I saw how many pills.  I guess

11   this is number of pills that they -- that he prescribed.

12   The number of pills that other doctors who treated the same

13   kind of pain and the same group of patients were

14   prescribing, I mean, there's no -- there's no denominator

15   here.

16   Q.    So without context, can you say whether or not

17   Dr. Titus was prescribing more pills and issuing more

18   prescriptions than other doctors in this area at that time?

19   A.    Absolutely not.  This tells me nothing about his

20   practice relative to other doctors who were treating pain.

21              MS. KOUSOULIS:  And, Mr. Marek, if you could

22   pull up 801 at 6.

23   By MS. KOUSOULIS:

24   Q.    Did you also see this chart before?

25   A.    Yes.

Warfield - Redirect

1    Q.     Now, does the fact that Dr. Titus prescribed the

2    majority of his patients, 69.2 percent Oxycodone products,

3    does that in any way change your opinion as to whether he

4    was prescribing within the usual course of professional

5    practice?

6    A.     It doesn't change my opinion at all as to whether

7    most of his prescriptions were Morphine, or Oxycodone, or

8    Fentanyl or Methadone.  It wouldn't matter.

9    Q.     Does the fact that he was prescribing the majority of

10   his patients the Oxycodone product mean that he wasn't

11   making an individualized assessment for each patient's

12   treatment needs?

13   A.     No, it doesn't mean that at all.

14          MS. KOUSOULIS:  Mr. Marek, can you pull up

15   Government Exhibit 100 at 33?

16   BY MS. KOUSOULIS:

17   Q.     Now, in talking about discharging patients,

18   Mr. Woodard also asked you questions, you know, regarding

19   whether or not the language of whether -- the fact that

20   patients were told that Dr. Titus, in this letter, would no

21   longer be their primary care provider, you know, how that

22   affected the doctor-patient relationship.

23          Do you remember that line of questioning?

24   A.     Yes.

25   Q.     Now, in this letter, does it indicate that patients

Warfield - Redirect

1   that receive this letter, and this particular patient, Brent

2   Hood, would be given 30 days of emergency care only?

3   A.      That's what it says.

4   Q.      Now, during -- would that indicate to you that

5   Dr. Titus is still treating this patient post-discharge

6   letter?

7   A.      It would indicate that he could still treat this

8   patient.  He potentially could be providing emergency care

9   for 30 days.  But as I said, you know, I don't see a

10  clearcut end to when you stop having a relationship with a

11  patient.

12  Q.      Okay.

13          MS. KOUSOULIS:  You can take that down,

14  Mr. Marek.

15  BY MS. KOUSOULIS:

16  Q.      Now, you also -- he also asked you questions

17  regarding your description of Dr. Titus as being naive.

18  When you use that word, what are you -- how are you using

19  that word and how are you using it in the context of

20  describing Dr. Titus?

21  A.      Well, I think in the sense that many of these

22  patients may not have been telling him the truth and he

23  believes them.  So I think he was naive in the sense that --

24  that he -- he believed a lot of the patients who probably

25  weren't -- weren't being honest with him.

1822

Warfield - Redirect

1    Q.    Now, you were asked questions regarding whether

2    someone can die from taking opioids or something to that

3    effect?

4    A.    Yes.

5    Q.    If Dr. Thomas had testified that he had never seen

6    anyone die from back pain, but a lot of people dying from

7    opioids, would you agree with that assessment?

8    A.    I wouldn't agree with that at all.  It's a

9    fascinating question.  You know, years and years ago, people

10   used to say, Oh, a little bit of pain never killed you.  But

11   then there was data done in the 1990s that showed that

12   people who are chronically in pain actually had lower

13   thresholds for getting things like infections and even

14   tumors, that it actually decreased your threshold to

15   becoming sick and dying from things.

16         So chronically being in pain is a tremendous

17   stress to your body.  It makes your heart beat faster.  It

18   puts your blood pressure up.  And so, yeah, you can -- we

19   now know you actually can die from pain.

20   Q.    And in your opinion, is 15 milligrams of Oxycodone a

21   high dose?

22   A.    No.  It's not a high dose at all.  I mean, if

23   someone -- if someone had an operation of their gall bladder

24   or a hernia operation in the hospital, a typical dose for

25   someone who's never been on opiates, they give them five to

Warfield - Redirect

1    ten milligrams.  That's for someone who's never been on

2    opiates.  So 15 is not a big dose at all.

3    Q.    And in reviewing -- and you were -- you also talked

4    about referring patients to drug counseling and things of

5    that sort.  Are you -- do you recall, in your review of the

6    files, Dr. Titus referring Lucille Moody to drug counseling

7    and making her attendance at drug counseling a requirement

8    for her being let back into the practice?

9    A.    Yes.

10   Q.    Now, Mr. Woodard also asked you about whether you

11   would expect to see treatment records for high blood

12   pressure, or diabetes, or other things in the files, given

13   that Dr. Titus was a primary care physician.  Is it fair to

14   say that if patients were being seen for their chronic pain

15   and that was their reason for seeing Dr. Titus, they might

16   not necessarily have treatment records associated with

17   diabetes or high blood pressure?

18   A.    Of course.

19   Q.    And that might account for the absence of those

20   records in those chronic pain patient files?

21   A.    Of course.

22   Q.    Now, Mr. Woodard also spoke to you regarding the

23   Consent Decree in this case, and Dr. Titus' behavior with

24   regard to that.  Do you recall those questions?

25   A.    Yes.

Warfield - Redirect

1    Q.    Is the fact that Dr. Titus -- the fact that Dr. Titus

2    may not have complied to a tee with the model policy, was

3    that maybe a violation of his Consent Decree?

4    A.    It could have been if he's -- if he said he was going

5    to do something and he didn't do it, then that would be a

6    violation.

7    Q.    Yeah.  Does violating a Consent Decree mean that he

8    was prescribing outside the normal course of professional

9    practice?

10   A.    Absolutely not.

11   Q.    Could violating a Consent Decree be a reason to

12   perhaps lose your medical license?

13   A.    It might be.  It might be.  They could do that if you

14   violated it.

15   Q.    But in your opinion, it's not a reason to -- - it's

16   not -- it doesn't mean -- violating the Consent Decree would

17   not necessarily mean that you're practicing outside the

18   course of professional practice?

19   A.    Correct.

20   Q.    And, again, just to be clear, the model policy are

21   just guidelines; correct?

22   A.    Correct.

23   Q.    They're not -- and in this case, you know, based on

24   all your review of the records, it's your opinion that

25   Dr. Titus was practicing within the normal course of

Warfield - Redirect

1  professional practice and issuing prescriptions for

2  legitimate medical purpose?

3  A.     Yes, it is.

4           MS. KOUSOULIS:  I have no further questions.

5           THE COURT:  All right.

6           Mr. Woodard, who is shaking his head, so I take

7  that to be no recross.

8           Dr. Warfield, thank you.  You're excused.  You

9  may go.

10          THE WITNESS:  Thank you, Your Honor.

11          THE COURT:  All right.  So we're going to break

12  for lunch now.  Do you have more witnesses after lunch?

13          MS. KOUSOULIS:  Yes.  We will have our other

14  witnesses here after lunch.

15          THE COURT:  Okay.  So we'll take an hour for

16  lunch until, let's say, 1:30.

17          Can we take the jury out?

18          (Jury leaving the courtroom.)

19          MS. KOUSOULIS:  Your Honor, we perhaps should

20  have -- I should have consulted with Mr. Bostic before I

21  spoke up too soon.  We do have other witnesses that will be

22  here, but we want to discuss whether or not we're going

23  to -- intend to call those witnesses.

24          THE COURT:  Okay.  Well, so while you're

25  thinking about that, one other thing I'd like you to think

Warfield - Redirect

1    about is, and you don't have to answer right now, but

2    normally -- not normally.  A lot of times in the jury

3    instructions, there's a specific instruction for a Defendant

4    who doesn't testify.  And I noticed a few minutes ago that

5    we don't actually have that instruction in the final set

6    here.  And I'm also aware that sometimes Defendants don't

7    want that instruction, and so I assume that it's not

8    in because it wasn't in what was submitted to me because you

9    didn't want it.

10            If anything that happened this morning changes

11   your mind, you can bring that up, and I will do pretty much

12   whatever it is you ask.

13            MR. BOSTIC:  Your Honor, over the weekend, I was

14   reviewing the instructions and realized I was going to bring

15   that to the Court's attention.  With respect to the

16   instruction about taking -- no inference from him not

17   testifying, under the circumstances and what occurred

18   earlier for which I moved for a mistrial, I'm caught between

19   a rock and a hard place because now it puts even more

20   emphasis on what occurred in Mr. Woodard's

21   cross-examination.

22            So we will consult, and we'll let the Court know

23   which way we think the Court should go.  But I am -- I just

24   want to make a record that there is no way to cure what

25   happened this morning, and I think the instruction now even

Warfield - Redirect

1   compounds that -- this point.

2          THE COURT:  Okay.  But one thing that you're not

3   making a record is that there's something more I could have

4   done short of declaring a mistrial.

5          MS. KOUSOULIS:  That's correct.

6          MR. BOSTIC:  I am sorry.  I didn't hear the

7   question, Your Honor.

8          THE COURT:  So one thing that you -- so you've

9   made a record that, yes, you believe I should have declared

10  a mistrial.  One thing you have not made a record is that

11  there's something more that you think I should have done

12  once I decided not to declare a mistrial that I didn't do.

13         MR. BOSTIC:  Your Honor, to answer that, as I

14  said, there's no coming back from this.  So for me to

15  suggest some way that it can be cured when it cannot be

16  cured would be inappropriate.  There's nothing that can cure

17  what occurred this morning.

18         THE COURT:  Okay.  Okay.  All right.  So see you

19  all at 1:30.

20         Do you have a sense -- the witnesses that you're

21  thinking about calling, if you call them, my impression from

22  before was they're not going to be long.

23         MS. KOUSOULIS:  Right.  Your Honor, I would say

24  less than an hour.

25         THE COURT:  Okay.  All right.  We'll be in

1828

Warfield - Redirect

 1    recess.

 2                    DEPUTY CLERK:  All rise.

 3                    (Luncheon recess was taken.)

 4                    DEPUTY CLERK:  All rise.

 5                    THE COURT:  I see it's cooled down in here.  Be

 6    seated.

 7                    Mr. Bostic, what is your plan for this

 8    afternoon.

 9                    MR. BOSTIC:  Your Honor, we will be calling

10    William Pucci.

11                    THE COURT:  Okay.  And is that it?

12                    MR. BOSTIC:  And that's it, yes.

13                    THE COURT:  Okay.  After they call Mr. Pucci,

14    does the Government expect to have anything more?

15                    MS. REMIS:  No, Your Honor.

16                    THE COURT:  Okay.  So after Mr. Pucci is

17    finished, you will rest.  You'll rest.  And I will send the

18    jury home.

19                    MS. KOUSOULIS:  And we may -- yes, we may do a

20    motion for judgment of acquittal.

21                    MR. BOSTIC:  We will do a motion for a judgment

22    of acquittal.

23                    THE COURT:  Okay.  All right.  Let's get the

24    jury.

25                    MS. REMIS:  Your Honor.

Warfield - Redirect

1      THE COURT:  I'm sorry, what?

2      MS. REMIS:  I was really just going to ask you

3  is there a chance that Your Honor will instruct them this

4  evening or do you prefer to do it all at once?

5      THE COURT:  I prefer to do it all at once.  I

6  mean, the instructions, they will only take half an hour.

7      MS. REMIS:  Yes, you cut down all that good

8  stuff.  Thank you, Your Honor.

9      (Jury entering the courtroom.)

10      THE COURT:  All right.  Members of the jury.

11  Everyone, you may be seated.  Mr. Bostic, you may proceed.

12      MR. BOSTIC:  Thank you, Your Honor.  The Defense

13  calls William Pucci to the stand.

14      Your Honor, with the Court's permission, I

15  believe Mr. Pucci would prefer to stand as opposed to sit.

16      THE COURT:  That's fine, whatever is most

17  comfortable for you.  Just make sure you speak loudly.

18      DEPUTY CLERK:  Please state and spell your full

19  name for the record.

20      THE WITNESS:  William Wallace Pucci.

21  W-I-L-L-I-A-M W-A-L-L-A-C-E, Pucci, P-U-C-C-I.

22      DEPUTY CLERK:  Do you affirm that the testimony

23  you are about to give to the Court and the jury in the case

24  now pending will be the truth, the whole truth and nothing

25  but the truth, you do so affirm?

Pucci - Direct

1           THE WITNESS:  I do.

2           DEPUTY CLERK:  Thank you.

3           WILLIAM PUCCI, the witness herein, after having

4    been duly sworn under oath, was examined and testified as

5    follows:

6                   DIRECT EXAMINATION

7    BY MR. BOSTIC:

8    Q.    Good afternoon, Mr. Pucci.  Thanks for coming in

9    today.

10          Do you have anyone here with you?

11   A.    Yes, I have my wife with me.

12   Q.    And she helped get you to court today?

13   A.    Yes, she did.

14   Q.    Now, Mr. Pucci, are you currently employed?

15   A.    No.

16   Q.    When you were employed, what type of job did you do?

17   A.    I was a stone mason in Washington, D.C.

18   Q.    For how many years?

19   A.    I was on my third gig.

20   Q.    Did there come a point in time that you suffered an

21   injury?

22   A.    Yes, I fell off the Senate Building in Washington,

23   D.C.

24   Q.    Do me a favor, if you will stand and address the

25   jury.

1831

Pucci - Direct

```
 1                MR. BOSTIC:  If I may approach?  As best you can
 2     speak to the jury.
 3                THE WITNESS:  I was working on the Senate
 4     Building in Washington, D.C.
 5     BY MR. BOSTIC:
 6     Q.    And what happened?
 7     A.    I --
 8                THE COURT:  Hold on a second.
 9                MS. KOUSOULIS:  I just wanted to adjust that.
10                THE COURT:  Okay.  Go ahead.
11                THE WITNESS:  I slipped on the scaffolding on
12     the outside of the scaffolding, and I slipped off, and I
13     busted my back all up.
14     BY MR. BOSTIC:
15     Q.    And how many floors did you fall during that slip?
16     A.    I went down about nine stories.  Seven to
17     nine stories.
18     Q.    Now, as a result of that injury, have you had
19     occasion to receive treatment for that injury?
20     A.    Yes, I have.
21     Q.    And what did they do for you after the injury
22     specifically?
23     A.    I was paralyzed for a while.  They did a lot of
24     lumbar spine operations.
25     Q.    And how many operations have you had over the years
```

Pucci - Direct

1    in connection with your lumbar spine?

2    A.      Three.

3    Q.      And now, how did those operations work out?  Were

4    they able to improve your pain?

5    A.      No.  They -- after my first operation, I was

6    paralyzed for about a year.

7    Q.      Now, during -- since the injury, have you been

8    treating with pain management doctors?

9    A.      Yes, I have.

10   Q.      And where did you -- what places, or what states, or

11   areas have you gone to see pain doctors and received

12   treatment?

13   A.      Well, we moved to Florida, and I received treatment

14   down in Florida.

15   Q.      There came a time that you moved to Delaware; is that

16   correct?

17   A.      Correct.

18   Q.      And when was that about?  What time frame; do you

19   recall?

20   A.      That was about 2008, 2007, somewhere around there.

21   Q.      And when you came to Delaware, did you seek out and

22   was treated by a pain -- chronic pain management doctor?

23   A.      Yes, I was.

24   Q.      And how long did you stay with that doctor, if you

25   recall?

Pucci - Direct

1    A.    For about a year or so.  I had a workmen's comp

2    hearing in Washington, D.C.  I had to get my records from

3    him.

4    Q.    And what about that caused you to leave him, getting

5    your records?

6    A.    He was mis-billing my Medicare.  And when I found out

7    about that, I didn't like it, so I left him.

8    Q.    And when you left him, what did you do for a new pain

9    doctor?

10   A.    I went to my wife's primary doctor.

11   Q.    And who was that?

12   A.    Dr. Titus.

13   Q.    And you know Dr. Titus from having been a patient of

14   his?

15   A.    Yes.

16   Q.    And were you both -- did he see you for other things

17   other than your chronic pain issues?

18   A.    He became my primary care doctor, also.

19   Q.    Now, do you remember what year the first appointment

20   was with Dr. Titus, in terms of chronic pain problems?

21   A.    I don't remember really.

22   Q.    But when you went to see him the first time, were

23   there any records or documents that you were required to

24   bring with you the first time you saw him for your chronic

25   pain?

Pucci - Direct

1    A.      Yes, there was records that I had.  I had MRIs and

2    CAT scans, probably.

3    Q.      And upon your presentation at his office or the very

4    first time you were there, I see you have a cane.  You walk

5    with that cane?

6    A.      Yes, I do.

7    Q.      Okay.  When you presented to him, did you have the

8    cane at that time?

9    A.      I believe I did, yes.

10   Q.      And during that first visit, do you recall whether

11   any -- well, tell me what he did during that first visit

12   when you came in to see him as a new patient with a pain --

13   chronic pain concerns.

14   A.      He looked at me and seen that I was standing and

15   asked me to sit down.  I told him I was having a hard time

16   doing that.  He said, "Okay.  Do your best."

17           So I did.  And he checked my knees and put pins

18   in my legs and things like that.  Did a basic nerve test, I

19   guess.

20   Q.      Did he do anything with your back in terms of

21   examining your back area?

22   A.      Yes, he touched the upper part, the middle part and

23   the lower part and felt it.

24   Q.      Okay.  During the course of that first examination,

25   did there come a point in time when Dr. Titus discussed

Pucci - Direct

1    possible opioid treatment with you?

2    A.    Yes, there was.

3    Q.    Okay.  And do you recall whether or not prior to that

4    discussion or during the course of that discussion, that

5    there were certain documents presented to you that you read

6    and signed?

7    A.    Yes, there was.

8    Q.    Okay.  Let me bring up what is marked as Defense

9    Exhibit 17, Page 16 through Page 17.

10             MR. BOSTIC:  My apologies, Your Honor.  Before

11   we bring that up --

12             MS. REMIS:  That's fine.

13             MR. BOSTIC:  -- Your Honor, we would mark Dr. --

14   I'm sorry, Mr. Pucci's patient file as Defense Exhibit 17

15   and move the entire file into the record if there's no

16   objection from the Government.

17             MS. REMIS:  No objection, Your Honor.

18             THE COURT:  All right.  Admitted without

19   objection.

20             (Defense Exhibit No. 17 was admitted into

21   evidence.)

22             MR. BOSTIC:  Mr. Marek, could you please bring

23   up Defense Exhibit 17 at Page 16.

24   BY MR. BOSTIC:

25   Q.    And Mr. Pucci, do you recognize this document?

1836

Pucci - Direct

1    Can you see it?

2    MR. BOSTIC:  If you give us one minute, we'll

3    get you a separate copy.

4    MS. KOUSOULIS:  May I approach?

5    THE COURT:  Yes.

6    THE WITNESS:  Yes, that's right.  I had my wife

7    sign for me.

8    BY MR. BOSTIC:

9    Q.    Why did you not sign?

10   A.    Well...

11   Q.    You're indicating your cane?

12   A.    I don't -- I don't write well.

13   Q.    Okay.  And this was after -- since the accident --

14   A.    Yes.

15   Q.    -- that you lack the ability to sign properly?

16   A.    Yes.

17   Q.    Now, did you review the document?

18   A.    Yes, I did.

19   Q.    And did Dr. Titus discuss with you and your wife, who

20   I believe was in the room with you, the purpose of this

21   consent for opioid treatment?

22   A.    Oh, yes.

23   Q.    Yeah.  And I see in the middle of the form --

24   MR. BOSTIC:  Mr. Marek, if you can pull this up.

25   BY MR. BOSTIC:

Pucci - Direct

1    Q.      -- there's a notation of injection therapy.

2    A.      Yes.

3    Q.      Did Dr. Titus discuss that with you?

4    A.      Yes, he did.

5    Q.      And so it's clear, over the years of your treatment

6    with various doctors --

7    A.      Yes.

8    Q.      -- would it be fair to say that you have been

9    subjected to various treatments?

10   A.      Oh, a lot of different procedures and treatments,

11   yes.

12   Q.      Well, what type of treatment modalities did the

13   doctors put you through that you've seen over the years?

14   A.      They put me through epidural steroids, trigger point

15   shots, nerve blockers, multiple -- multiple different

16   treatments.

17   Q.      Did you have physical therapy, too, as well as part

18   of that?

19   A.      I'm sorry?

20   Q.      Did they require you to get physical therapy as well?

21   A.      Oh, yes.  Yes, been through physical therapy a few

22   years.

23   Q.      So when you first started seeing Dr. Titus, you had

24   gone through all of those things before?

25   A.      Yes.

Pucci - Direct

1   Q.      And did those things help to ease your pain?

2   A.      The physical therapy aggravated it a little more.

3   And they can only do so much for me and said they couldn't

4   do anymore.

5   Q.      So when you saw Dr. Titus on -- and this is dated, I

6   believe, around August 6th, 2012.  When you saw Dr. Titus at

7   this time, can you describe the type of pain that you were

8   in and the parts of the body that it was affecting?

9   A.      I'm not exactly sure of the time you're talking

10  about.

11  Q.      When you first saw Dr. Titus, to start with him, as

12  your chronic pain --

13  A.      When I initially started going to him?

14  Q.      Yes.

15  A.      Yes.

16  Q.      And the very first time that you went in, can you

17  describe to the ladies and gentlemen of the jury the type of

18  pain that you were in when you went to see him?

19  A.      Severe, severe pain.

20              MR. BOSTIC:  And Mr. Marek, if you can pull up

21  Defense Exhibit 17 at Page 18 and 19, I believe.  You can

22  show him.

23              MS. KOUSOULIS:  Can I approach the witness, Your

24  Honor?

25              THE COURT:  Yes.

Pucci - Direct

1    MS. KOUSOULIS:  Thank you.

2    THE WITNESS:  Yes.

3    BY MR. BOSTIC:

4    Q.    And did you recall whether you or your wife signed

5    that document?

6    A.    Yes.

7    Q.    And was it reviewed with you at some point during the

8    meeting with Dr. Titus that very first time?

9    A.    Yes, and we'd review it once in a while, too.

10   Q.    From time to time?

11   A.    Yes.

12   Q.    Now, was more injection therapy ordered for you by

13   Dr. Titus, if you recall?

14   A.    I -- I don't recall.  I've been a pin cushion for

15   doctors for a long time.

16   Q.    Do you recall whether or not he sent you to get any

17   other therapy beyond the opioid treatment?

18   A.    Physical therapy, yes.

19   Q.    Now, do you recall what you were prescribed by

20   Dr. Titus to manage your pain?

21   A.    He finally got to the Hydrocodone and the muscle

22   relaxers, and I've had problems sleeping.  Sleeping

23   medications.

24   Q.    That sleeping medication was Ambien?

25   A.    I believe so.

Pucci - Direct

1   Q.     Now, in terms of your sleeping problems, are you --

2   how many hours a night sleep or rest would you get on a

3   given night?

4   A.     Without any -- without any medication, two hours

5   during the night.

6   Q.     Okay.  And did the pain medication, the Vicodin that

7   were prescribed to you and the muscle relaxer, did that have

8   any impact on the pain that you had been experiencing

9   before?

10  A.     Yes.  Yes.

11  Q.     Would you tell the ladies and gentlemen of the jury

12  the impact that it had?

13  A.     The Vicodin brought me down to a mellow -- a level

14  where I could function and do things, walk around and not be

15  in as severe pain.

16  Q.     And I assume the Ambien helped you to get more than a

17  couple hours of sleep at night?

18  A.     Yeah, I was able to get about four.

19  Q.     Okay.  Now, there came a point in time, I believe,

20  when you left Dr. Titus' practice; am I correct?

21  A.     Yes.

22  Q.     And that was in connection with when the practice --

23  he closed the practice?

24  A.     Yes.

25  Q.     Okay.  And now, over the course of time that you

Pucci - Direct

1    treated with various pain management doctors, about how many

2    had you seen over this time frame?

3    A.      From -- from the time --

4    Q.      From the time of the accident until you --

5    A.      Oh, the time after the accident?

6    Q.      Yeah.  Mm-hmm.

7    A.      I would say about eight doctors.

8    Q.      Okay.

9    A.      Eight different doctors.

10   Q.      And what did you think in terms of -- what do you

11   think in terms of Dr. Titus and how he managed your pain in

12   terms of -- compared with the other eight doctors or so that

13   you've seen?

14   A.      I'd rate him as the top three, that amount.  Top

15   two --

16   Q.      And --

17   A.      -- in pain management.

18   Q.      -- in terms of when you would go in and see Dr. Titus

19   for an examination after the initial visit, about how long

20   would those examinations last?

21   A.      The examination would last about an hour, hour and a

22   half.

23   Q.      And during the course of that --

24   A.      Well, excuse me.  I'm sorry.

25   Q.      Go ahead.

Pucci - Direct

1    A.    The examination would be about 45 minutes to an hour,

2    but I'd be at the office for about an hour, hour and a half.

3    Q.    And in terms of when you spoke to him and where you

4    were in the room with him, right, you're saying that lasted

5    about 45 minutes?

6    A.    Yes.

7    Q.    Okay.  And during the course of that meeting with

8    Dr. Titus, do you recall whether you were subjected to a

9    physical examination every time or how did that --

10   A.    I think about 99 percent of the time, it would be a

11   physical examination.  Blood pressure, the -- you know, the

12   standard stuff.

13   Q.    And would the two of you discuss your pain?

14   A.    Yeah, every time.

15   Q.    And would it be --

16   A.    Plus other things.

17   Q.    Plus other things.  Would it be fair that you -- to

18   say, and you just said it, that you would discuss other

19   things; right?

20   A.    Yeah, he knows more about my family than I do.

21   Q.    So you'd talk about family matters?

22   A.    Yeah.

23   Q.    Right?  And I think also, if I can ask you this, you

24   would discuss -- he would discuss religion with you and

25   different principles --

Pucci - Direct

1    A.    Yes.

2    Q.    -- from his perspective?

3    A.    Yes.

4    Q.    Now, during the time that you were treating with

5    Dr. Titus, did there ever come a point in time where you

6    were privy or overheard a conversation where another patient

7    was saying something to Dr. Titus as he came to the waiting

8    room area?

9    A.    I got -- I was in the waiting room and I heard some

10   screaming going on, some lady was yelling at Dr. Titus

11   because he wouldn't refill her prescriptions because he

12   found cocaine in her system.  And he had to dismiss her.  He

13   said, "Don't come back again."

14            Is that what you mean?

15   Q.    Well, I think you hit it right on -- the nail right

16   on the head.  Now, in terms of -- with respect to -- outside

17   of that incident, did you ever make any observations of any

18   improper behavior by patients that you saw out in the

19   parking lot or otherwise?

20   A.    No, not -- not at Dr. Titus' office, no.

21   Q.    What do you mean "not at Dr. Titus' office"?

22   A.    I've seen it at other doctors' offices.

23   Q.    Other pain management doctors' offices?

24   A.    Yes.

25   Q.    In Delaware?

Pucci - Cross

1    A.      Yes.

2                MR. BOSTIC:  If I may have a moment, Your Honor.

3    BY MR. BOSTIC:

4    Q.      Now, in reviewing your patient file, I saw what

5    appeared to be, we call it an aberrant urine test in which

6    there was -- I believe there was THC or something was

7    referenced, something that Dr. Titus did not prescribe and

8    probably was still illegal at that time; right?  Do you

9    recall when that occurred?

10   A.      There might have been.  Not particularly, no.  He

11   mentioned it -- he mentioned it to me once.

12   Q.      When you say "he mentioned it" to you once, did you

13   and he have a discussion about that being in your urine tox

14   screen?

15   A.      That it -- the reactions with the medication I was

16   on, you shouldn't do it.

17   Q.      Okay.

18   A.      He wouldn't be able to see me if I did.

19               MR. BOSTIC:  I have nothing else, Your Honor.

20   Thank you, Mr. Pucci.

21               THE COURT:  Thank you, Mr. Bostic.  Ms. Remis.

22               MS. REMIS:  Just briefly, Your Honor.

23                    CROSS-EXAMINATION

24   BY MS. REMIS:

25   Q.      Good afternoon, Mr. Pucci.

Pucci - Cross

1   A.      Good afternoon.

2   Q.      I'll just be very quick, I promise.  So you mentioned

3   that you are on Medicare, covered by Medicare; right?

4   A.      Yes.

5   Q.      And so when you went to Dr. Titus' office, would you

6   pay using your Medicare?

7   A.      No.  I would pay the -- the -- what do you call it.

8   Q.      The co-pay?

9   A.      Co-pay, yes.

10  Q.      So you would pay a co-payment when you went to his

11  office; right?

12  A.      Yes.

13  Q.      And was that about 25 or $30?

14  A.      Most of the time, depending.

15  Q.      And then did you understand that after you paid that

16  co-payment, Dr. Titus' office would bill your Medicare;

17  right?

18  A.      I believe so.

19  Q.      And then Medicare would pay for the rest of your

20  appointment?

21  A.      Yes.

22  Q.      And I noticed that you went to see Dr. Titus for

23  probably at least a couple years; is that right?

24  A.      Yes.

25  Q.      And during those years, Dr. Titus prescribed you

1    Hydrocodone; is that right?

2    A.      Hydrocodone, yes.

3    Q.      And it was almost always Hydrocodone ten milligrams;

4    right?

5    A.      Correct.

6              MS. REMIS:  And just one moment.  No further

7    questions, Your Honor.

8              THE COURT:  All right.

9              MR. BOSTIC:  No redirect.

10             THE WITNESS:  I've had other doctors prescribe

11   me stronger medications, but I can't take the stronger ones

12   because they put me to sleep.  I don't function.  I need

13   something to function.

14             MS. REMIS:  Thank you.  Thank you, Your Honor.

15   I appreciate it.

16             MR. BOSTIC:  Thank you, Your Honor.

17             THE COURT:  Thank you, Mr. Pucci.  You're

18   excused.  You may go.

19             MR. BOSTIC:  Your Honor, the Defense has no

20   further witnesses.  Your Honor, I would ask the Court for a

21   five-minute indulgence.  There is one matter that I need to

22   discuss with the Government, if the Court --

23             THE COURT:  All right.  Sure.  Do you want the

24   jury to go out?

25             MR. BOSTIC:  Yes, Your Honor.

1    THE COURT:  Okay.  Can we take the jury out?  It

2    will be brief.

3         (Jury leaving the courtroom.)

4         MR. BOSTIC:  Your Honor, the Government was good

5    enough to agree to bring in a file for us, and I just want

6    to peek at it very quickly.

7         THE COURT:  Okay.

8         (Discussion held off the stenographic record:)

9         MR. BOSTIC:  Your Honor, with that, and I thank

10   the Government for bringing that document in for us so we

11   could eyeball it ourselves, the original.  But at this time,

12   Your Honor, we would -- as I said, the Defense rests.

13        MS. KOUSOULIS:  Well, we want to make sure

14   exhibits have been entered.  I think we entered them as we

15   went along, but before we actually rest, can we make sure

16   our exhibits have been entered, or do you want to do that in

17   front of the jury?

18        THE COURT:  Well, you should rest in front of

19   the jury.  In terms of the exhibits, I don't know how many

20   you had or I don't know that you necessarily have to --

21   well --

22        MS. KOUSOULIS:  We can do it after.  We just

23   wanted to make sure we didn't rest and say, oh, sorry, we

24   were supposed to make sure they were in before we rested.

25   And again, we did introduce -- some of the exhibits we

1    introduced early on was before we were set up being able to

2    pull up the Government's files.  To the extent that any of

3    our Defense exhibits were portions of the patient files that

4    the Government already admitted, we're not admitting them,

5    like, you know independently, but we just had the patients

6    we called to testify, Cody, Waples and Pucci, those files.

7    And I believe it was Exhibits 10, 15 and 17, and then Ryan,

8    the video evidence, 13A through F.

9               THE COURT:  So basically three patient files and

10   the evidence relating to the undercover?

11              MS. KOUSOULIS:  Yes, I believe they were the

12   evidence that we moved that we would ask to be admitted into

13   evidence.

14              MS. REMIS:  I think.

15              THE COURT:  I am sure that --

16              MS. KOUSOULIS:  I think we did.

17              THE COURT:  -- the tape recordings came in.  I'm

18   sure of that.

19              MS. KOUSOULIS:  I'm pretty sure I entered them,

20   they were all mine, with the exception of what we did today.

21   So I'm pretty sure I did, but I just want to make sure

22   because sometimes I forget.

23              MS. REMIS:  We have no objection to any of

24   those, but I also believe there were two exhibits that you

25   showed for Jane Webb.  It was Defense Exhibit 501.  So I

1    just -- we don't object to whatever was shown.

2                THE COURT:  Okay.  All right.  Well, we can take

3    care of that or you can take care of that with the deputy

4    clerk later on.

5                So are you ready to bring the jury back?  You

6    rest, you rest, and then I will send them home for tomorrow?

7                MS. REMIS:  Yes.

8                MR. BOSTIC:  Yes.

9                THE COURT:  And just because I do like to give

10   them a roadmap, the last estimates I heard were 45 minutes,

11   an hour, and we'll say 15 minutes as the approximate closing

12   argument times.  Is there any change to those claims?

13               MS. SOBCZAK:  Your Honor, we're anticipating it

14   being a little longer, probably about an hour for the

15   Government.

16               THE COURT:  An hour.

17               Mr. Bostic, are you now going to go to

18   90 minutes?

19               MR. BOSTIC:  Your Honor, I'll try my best not to

20   and try to keep it as close to just about an hour, give or

21   take, but it depends on how things come out and what the

22   flow is with --

23               THE COURT:  Well, it can still be -- so I think

24   I got it.

25               All right.  So let's get the jury.

1          (Jury entering the courtroom.)

2          THE COURT:  All right.  Members of the jury,

3    welcome back.  Everyone, you may be seated.

4          Mr. Bostic.

5          MR. BOSTIC:  Your Honor, the Defense formally

6    rests its case.

7          THE COURT:  All right.  Thank you.

8          Is there any rebuttal case?

9          MS. REMIS:  No rebuttal, Your Honor.  The

10   Government rests.

11         THE COURT:  All right.  So members of the jury,

12   that means we're finished for the day.  So we will be ready

13   tomorrow morning to have basically the rest of the

14   presentation, which is going to be me reading jury

15   instructions which you'll have a copy in writing, you know,

16   possibly up to 30 minutes' worth or so.  Then we'll have

17   closing arguments.  And based on what the attorneys have

18   told me, you know, that may take two-and-a-half hours, more

19   or less.  Any errors in prediction, blame them, not me.

20         But the bottom line is we'll get this to you,

21   you know, barring computers crashing or something else, to

22   coincide with your lunchtime and then it will be your case.

23         I do want to remind you what I've told you, I

24   think every -- so and we'll start at 9:30, so make sure

25   you're here on time.  You were here this morning, once

1     again.  I think you all have a perfect record of being here

2     on time, so it's only maybe one more time that you have to

3     do that.

4               But overnight, you know, don't talk to anyone

5     about the case.  Don't start discussing the case amongst

6     yourselves.  Don't let anyone talk to you about the case.

7     And, you know, if anyone does -- if there is any discussion

8     of the case, whether it's an accident or whatever, make sure

9     that you bring it to our attention, but there shouldn't be.

10              And then the other thing is don't do any

11    research.  You know, don't look things up on the Internet.

12    Even though the evidence portion is finished, the arguments

13    of the attorneys as well as my instructions, they're

14    important in different ways.  But part of the job of the

15    closing arguments of the attorneys is to try to tie together

16    what you've heard from the evidence, and so don't do any

17    homework between now and when you show up here again

18    tomorrow.

19              And so thank you.

20              And can we take the jury out?  We'll see you

21    tomorrow morning.

22              (Jury leaving the courtroom.)

23              THE COURT:  All right.  Everyone can be seated.

24              So I have two things that I need to bring up,

25    but before I do that, is there anything that the parties

1    want to bring up?

2              MR. BOSTIC:  Your Honor, the Defense would move

3    for judgment of acquittal.  We believe the Government has

4    not carried its burden of proof proving up their case.  The

5    evidence has been insufficient on that count, and so without

6    much more, we would prefer a judgment of acquittal.

7              THE COURT:  All right.  Well, I think there's

8    sufficient evidence so that the jury could find the

9    Defendant guilty of each of the counts, so I'm going to deny

10   that motion.

11             So I have two jury instruction matters.  One of

12   which was, Mr. Bostic and Ms. Kousoulis, have you decided

13   whether you want me to add in the jury instruction about the

14   Defendant not testifying?

15             MR. BOSTIC:  We will add it in, Your Honor.

16   This morning I came with the intent of reminding the Court

17   that we'd like it, but --

18             THE COURT:  So you'd like it in?

19             MR. BOSTIC:  We would like it in.

20             MS. KOUSOULIS:  Yes.

21             THE COURT:  Okay.  Well, it will be added.

22             Then the other thing is at the end of or on

23   Friday when we were discussing jury instructions, I sort of

24   reserved that if Dr. Warfield said something that caused

25   some reason to change what was in the instruction about

1    knowledge, that I would consider it.  So did Dr. Warfield

2    say anything that means that I should change the

3    instruction?

4              MS. KOUSOULIS:  We believe so, Your Honor.  We

5    believe that there's a basis for the Court to give the good

6    faith defense instruction as was requested initially in the

7    initial jury instructions that was -- that the Defense

8    requested when we submitted the jury instructions.  Again,

9    it's a practice.  You know, it's the practice -- like a

10   Third Circuit model instruction, it's been given in other,

11   you know, prescription cases.  It was given in this court,

12   you know, not too long ago.  We feel there's a basis for it.

13   We would ask that the Court, you know, give that

14   instruction.

15             THE COURT:  Okay.  All right.  Well, I'm going

16   to stick with my original view of this, and so I'm not going

17   to give it because I think the instruction that you drafted

18   up and submitted that we discussed on Friday covers all the

19   concepts and does it in a less confusing way than the good

20   faith instruction that's in the model instructions.

21             MS. KOUSOULIS:  Your Honor, would you at least

22   consider giving what the Government had proposed?  Like

23   again, the instruction that the Court is planning on giving

24   doesn't even mention the term, you know, good faith.  Like

25   again, you know, given that this is -- has been given in

1   this type of case in this courtroom, you know, we opened

2   with it, using that language.  I believe there's a basis for

3   it like at least and it -- it's a defense.

4           I think nowhere in the Court's version does it

5   even talk about that.  And I think using the Government's

6   version, you know, if the Court wanted to simplify it a

7   little more would be, you know, a good compromise and, you

8   know, the better practice just to make sure the jury

9   understands it in the context of this case.

10          THE COURT:  All right.

11          MS. KOUSOULIS:  And you had indicated that, you

12  know, depending on Dr. Warfield's testimony, our

13  understanding was she talked about mistakes, she talked

14  about, you know, like Dr. Titus', you know practice.  You

15  know, we believe, again, that there's a basis for it.

16          THE COURT:  Okay.  All right.  Well, I'm going

17  to stick with what I had just said a minute ago, and so I'm

18  going to overrule that objection.

19          Is there anything else either side wants to

20  bring up?

21          MS. KOUSOULIS:  No, Your Honor.

22          MS. REMIS:  Your Honor, I just have a question

23  that I don't know the Court's practice or strictly I don't

24  know the practice in this jurisdiction, and I apologize if

25  this is presumptuous.  But in other jurisdictions sometimes

1     the Defendant is admonished about his right to testify and

2     his choice not to testify.  I don't know if Your Honor

3     usually does that, but I'm just raising it in case.

4               THE COURT:  Well, I don't usually do that

5     because he's got two very experienced attorneys, and I have

6     full confidence that they have discussed the matter with him

7     and that he understands it's his decision to make, and

8     they're honoring his request.

9               Right, Mr. Bostic?  Ms. Kousoulis?

10              MS. KOUSOULIS:  That's correct, Your Honor.

11              THE COURT:  Okay.

12              MS. REMIS:  Great.  Thank you, Your Honor.

13              THE COURT:  All right.

14              MS. REMIS:  I appreciate that.

15              THE COURT:  That's a reasonable thing.  I think

16    my colleagues over in State Court routinely do that, and so

17    I do understand that happens in various courts across the

18    country.

19              All right.  Anything else?

20              MS. REMIS:  No, Your Honor.

21              THE COURT:  All right.  So I would like to see

22    you at nine o'clock tomorrow morning, though, just to make

23    sure we're all set up and ready to go.  And I will send you,

24    some time later this afternoon, the final version of the

25    jury instructions and the verdict form, and I do want you to

1   look at them once more as, obviously, Mr. Bostic did over

2   the weekend.  And, you know, if there's a mistake or

3   whatever, get back to me today because, you know, we're

4   going to go into production of making lots of copies, and so

5   I prefer not to waste paper if there's more, you know,

6   different things that could be corrected.

7           MS. KOUSOULIS:  Your Honor, just because

8   Mr. Bostic wasn't sure, we are allowed to talk about good

9   faith in our -- in our -- is your estimation --

10          THE COURT:  You can call it good faith.  You

11  know, I mean, no reason why you can't call it that.

12          MS. KOUSOULIS:  Okay.  That's what my

13  understanding was.  My understanding is that the Court's

14  saying that the instruction you're giving is the Court's

15  interpretation of the good faith in how you're --

16          THE COURT:  Right.  I mean, the -- it is, and so

17  you can say, if you want to say, you know, the evidence

18  shows he was operating in good faith, you can say that.  But

19  you know, if you're going to use the jury instructions, you

20  need to tie it into the way the jury instructions are

21  written.

22          MS. KOUSOULIS:  Right.  Correct, Your Honor, but

23  that's my -- I guess, just so we're clear, so the paragraph

24  that we talked about the other day in the jury instructions,

25  that was -- if we refer to that as good faith, is that going

1    to be an issue?

2              THE COURT:  I don't think it's going to be a

3    problem.

4              MS. KOUSOULIS:  Okay.

5              THE COURT:  Because the point is that it's the

6    instruction I actually give them --

7              MS. KOUSOULIS:  Right.

8              THE COURT:  -- so you can talk about good faith

9    or I don't think the Government is going to talk about bad

10   faith.  They're going to talk about other things.

11             But you can call it what you like as long as,

12   you know -- I mean, I think you can call it, it's just as if

13   you called it, you know, no criminal intent, you can call it

14   what you want and, you know, argue the evidence, one way or

15   the other.

16             MS. KOUSOULIS:  Thank you.  Thank you, Your

17   Honor.

18             THE COURT:  Okay.  So I'll see you tomorrow

19   morning, and I will send you some jury instructions later

20   today.

21             DEPUTY CLERK:  All rise.

22             (Court was recessed at 2:15 p.m.)

23             I hereby certify the foregoing is a true and

24   accurate transcript from my stenographic notes in the

25   proceeding.

1858

1          /s/ Heather M. Triozzi
           Certified Merit and Real-Time Reporter
2          U.S. District Court

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25