```
1                      IN THE UNITED STATES DISTRICT COURT

2                        FOR THE DISTRICT OF DELAWARE

3

4    UNITED STATES OF AMERICA,    )
                                  )
5                Plaintiff,       )
                                  ) Criminal Action No. 18-45-RGA
6    v.                           )
                                  ) Trial Volume X
7    PATRICK TITUS,               )
                                  )
8                Defendant.       )

9
                                      J. Caleb Boggs Courthouse
10                                    844 North King Street
                                      Wilmington, Delaware
11
                                      Tuesday, July 20, 2021
12                                    9:00 a.m.
                                      Jury Trial
13

14   BEFORE:  THE HONORABLE RICHARD G. ANDREWS, U.S.D.C.J.

15   APPEARANCES:

16               U.S. DEPARTMENT OF JUSTICE - CRIMINAL DIVISION
                 BY:  ALEZA S. REMIS, ESQUIRE
17               BY:  CLAIRE SOBCZAK, ESQUIRE
                 BY:  JUSTIN WOODARD, ESQUIRE
18
                                      For the Plaintiff
19
                 OFFICE OF THE FEDERAL PUBLIC DEFENDER
20               BY:  ELENI KOUSOULIS, ESQUIRE

21                      -and-

22               THE BOSTIC LAW FIRM
                 BY:  EDSON A. BOSTIC, ESQUIRE
23
                                      For the Defendant
24

25
```

```
1                    ***   PROCEEDINGS   ***

2               DEPUTY CLERK:  All rise.

3               THE COURT:  Good morning.  Have a seat.

4               Basically, I just wanted to check.  Based on the

5    correspondence with my deputy clerk, as I understand it, the

6    jury instructions and the verdict form that I sent out last

7    night, there are no additions or corrections to.  The

8    Defendant's objection on good faith is preserved.

9               But we're ready to go; is that right?

10              MS. REMIS:  We are ready, Your Honor.

11              MS. KOUSOULIS:  That's correct, Your Honor.

12   Mr. Bostic will be here shortly.  He just wanted me to let

13   you know that just for scheduling stuff, he thinks his

14   closing might be closer to an hour and a half.  But he just

15   wanted to inform the Court, just so when he wasn't done at

16   around an hour, that you weren't wondering, like, how much

17   longer is this.

18              THE COURT:  Well, I'll be wondering, as will the

19   jury, but what can I do.

20              MS. KOUSOULIS:  Right.

21              THE COURT:  All right.  Well, okay.

22              All right.  So otherwise, we're all good.  I

23   mean, we're going to -- and so, basically, I would expect --

24   I'm certainly going to take a break after your closing

25   before we get to the Defendant's closing.  If Mr. Bostic
```

1    really goes an hour and a half, we're going to take another

2    break before we do your rebuttal and, you know, the last

3    couple of things because the jury will be in a stupor

4    probably.

5              And the one thing I haven't figured out is,

6    after I do my instructions, whether I'm going to take a

7    five-minute break before we start the Government's closing,

8    which I might do because I can accomplish a stupor in a half

9    an hour.  So, you know, depending on how they look, I might

10   take a break then, but we'll get all this done before we

11   break for lunch.

12             Okay?

13             MS. SOBCZAK:  Okay.

14             THE COURT:  All right.  See you all later or at

15   9:30.

16             DEPUTY CLERK:  All rise.

17             (Recess was taken.)

18             DEPUTY CLERK:  All rise.

19             THE COURT:  So have a seat.  Basically what I

20   wanted to bring to your attention is one of the jurors,

21   Juror No. 2, is ill.  And I can go into more detail,

22   probably off the record, but she wants to stay on the jury,

23   but she also wants to be excused.

24             Off the record.

25             (Discussion held off the stenographic record:)

```
 1              So in any event, I propose to excuse her, but I

 2    obviously can't do that without consulting with you all.

 3    You know, we've got two alternates, so it's not a problem.

 4              And Ms. Kousoulis, I know that your client is

 5    not here.

 6              MS. KOUSOULIS:  I think they went to the

 7    restroom, him and Mr. Bostic.

 8              THE COURT:  So I'm not going to ask you.  It

 9    seems like you should at least -- your client should know

10    about this.

11              So why don't you hold your fire, Ms. Remis.

12              MS. REMIS:  Yes, sir.

13              MS. KOUSOULIS:  I can explain to Mr. Bostic.

14              THE COURT:  Sure.  Yes.

15              MR. BOSTIC:  Good morning, Your Honor.

16              THE COURT:  Good morning, Mr. Bostic.

17              MS. KOUSOULIS:  Sorry.

18              Your Honor, off the record.  I just want to ask

19    more questions, but initially our thought was if she feels

20    okay staying to let her, you know what I mean, to let her

21    make the decision.  But I wasn't sure it was something she

22    could get worse as the day's going on, and we don't want her

23    to start deliberating and then have to not come back.

24              THE COURT:  So off the record.

25              (Discussion held off the stenographic record.)
```

1        THE COURT:  Okay.  So now back on the record.

2        Just a moment ago off the record, we just had a

3   report from the case manager as to Juror No. 2's medical

4   status, and both the Government and the Defendant have

5   indicated no objection to excusing the juror.

6        Right, Ms. Kousoulis?

7        MS. KOUSOULIS:  That's correct, Your Honor.

8        THE COURT:  Right, Ms. Remis?

9        MS. REMIS:  Yes, Your Honor.

10        THE COURT:  All right.  So we're going to go and

11   excuse her, and we'll be back shortly.  All right.

12        DEPUTY CLERK:  All rise.

13        (Recess was taken.)

14        DEPUTY CLERK:  All rise.

15        THE COURT:  All right.  Everyone can be seated.

16   By the way, I just do want to make mention that during the

17   last part, before the Defendant stated his position on the

18   juror, Dr. Titus had returned to the courtroom and had

19   discussed the matter, to my observation, with his counsel.

20   So I just wanted to make sure the record was clear on that

21   subject.

22        All right.  Let's get the jury.

23        MS. KOUSOULIS:  Has the jury been informed yet

24   about Juror No. 2?

25        THE COURT:  I think they saw her leave the jury

1   room, so I think the answer is yes.

2              MS. KOUSOULIS:  Okay.  And are we going to let,

3   before we start, the first alternate know that they're up?

4              THE COURT:  No, no, no.  As far as I know, the

5   alternates don't know they're alternates.

6              MS. KOUSOULIS:  Oh, that's right.  Right.

7              THE COURT:  So they're just going to keep their

8   seating.

9              MS. KOUSOULIS:  That's fine.

10             (Jury entering the courtroom.)

11             THE COURT:  All right.  Members of the jury,

12   welcome back.

13             Everyone, you may be seated.

14             I think the jury is aware, but I have excused

15   Juror No. 2.  And so thank you again for being here on time

16   today.

17             We passed out copies of the final jury

18   instructions.  And so, members of the jury, you have seen

19   and heard all of the evidence.  Now, I will instruct you on

20   the law.

21             The law consists not only of these instructions,

22   but also the preliminary jury instructions and any

23   instructions I gave you during the trial.  Sometimes I

24   ordered that some testimony be stricken from the record.

25   You must disregard that evidence.  It's not evidence.  When

1    deciding this case, you must not consider or be influenced

2    in any way by the testimony or any other evidence that I

3    told you to disregard.  And, again, as I read these

4    instructions, you can listen, you can read along.  You will,

5    of course, have the written instructions with you in the

6    jury room.

7              You must make your decision in this case based

8    only on the evidence that you saw and heard in the

9    courtroom.  Do not allow sympathy, prejudice, fear, or

10   public opinion to influence you.  You should also not be

11   influenced by any person's race, color, religion, national

12   ancestry, gender, profession, occupation, economic

13   circumstances, or position in life or in the community.

14             Although the Government is required to prove the

15   Defendant guilty beyond a reasonable doubt, the Government

16   is not required to present all possible evidence related to

17   the case or to produce all possible witnesses who might have

18   some knowledge about the facts of the case.  In addition, as

19   I have explained, the Defendant is not required to present

20   any evidence or produce any witnesses.

21             In this case, the Defendant presented evidence

22   and produced witnesses.  The Defendant also is not required

23   to present all possible evidence related to the case or to

24   produce all possible witnesses who might have some knowledge

25   about the facts of the case.

1        Patrick Titus did not testify in this case.  A

2   Defendant has an absolute constitutional right not to

3   testify.  The burden of proof remains with the prosecution

4   throughout the entire trial and never shifts to the

5   Defendant.  The Defendant is never required to prove that he

6   is innocent.

7        You must not attach any significance to the fact

8   that Dr. Titus did not testify.  You must not draw any

9   adverse inference against him because he did not take the

10  witness stand.  Do not consider, for any reason at all, the

11  fact that Dr. Titus did not testify.  Do not discuss that

12  fact during your deliberations or let it influence your

13  decision in any way.

14       The Defendant, Patrick Titus, has pleaded not

15  guilty to the offenses charged.  Dr. Titus is presumed to be

16  innocent.  He started the trial with a clean slate, with no

17  evidence against him.  The presumption of innocence stays

18  with him unless and until the Government has presented

19  evidence that overcomes that presumption by convincing you

20  that Dr. Titus is guilty of the offenses charged beyond a

21  reasonable doubt.  The presumption of innocence requires

22  that you find Dr. Titus not guilty, unless you are satisfied

23  that the Government has proved guilt beyond a reasonable

24  doubt.

25       The presumption of innocence means that a

1    Defendant has no burden or obligation to present any

2    evidence at all or to prove that he is not guilty.  The

3    burden or obligation of proof is on the Government to prove

4    the Defendant is guilty, and this burden stays with the

5    Government throughout the trial.

6              In order for you to find Dr. Titus guilty of the

7    offenses charged, the Government must convince you that

8    Dr. Titus is guilty beyond a reasonable doubt.  That means

9    that the Government must prove each and every element of the

10   offenses charged beyond a reasonable doubt.  A Defendant may

11   not be convicted based on suspicion or conjecture, but only

12   on evidence proving guilt beyond a reasonable doubt.

13             Proof beyond a reasonable doubt does not mean

14   proof beyond all possible doubt or to a mathematical

15   certainty.  Possible doubts or doubts based on conjecture,

16   speculation, or hunch are not reasonable doubts.  A

17   reasonable doubt is a fair doubt based on reason, logic,

18   common sense, or experience.  It is a doubt that an ordinary

19   reasonable person has after carefully weighing all of the

20   evidence and is a doubt of the sort that would cause him or

21   her to hesitate to act in matters of importance in his or

22   her own life.  It may arise from the evidence, or from the

23   lack of evidence, or from the nature of the evidence.

24             If, having now heard all of the evidence, you

25   are convinced that the Government has proved each and every

1    element of the offense charged beyond a reasonable doubt,

2    you should return a verdict of guilty for that offense.

3    However, if you have a reasonable doubt about one or more of

4    the elements of an offense charged, then you must return a

5    verdict of not guilty for that offense.

6            You heard audio recordings that were received in

7    evidence and you were given, in some cases, written

8    transcripts of the recordings.  Keep in mind that the

9    transcripts are not evidence.  They were given to you only

10   as a guide to help you follow what was being said.  The

11   recordings themselves are the evidence.  If you noticed any

12   differences between what you heard on the recordings and

13   what you read in the transcripts, you must rely on what you

14   heard, not what you read.  And if you could not hear or

15   understand certain parts of the recordings, you must ignore

16   the transcripts as far as those parts are concerned.

17           If any reference by me or by counsel to matters

18   of testimony or exhibits does not coincide with your own

19   recollection of that evidence, it is your own recollection

20   of that evidence which should control during your

21   deliberations and not my statements or those of counsel.

22   You are the sole judges of the evidence in this case.

23           The rules of evidence ordinarily do not permit

24   witnesses to state their own opinions about important

25   questions in a trial, but there are exceptions to these

1    rules.

2            In this case, you heard testimony from

3    Dr. Thomas and Dr. Warfield.  Because of their knowledge,

4    skill, experience, training or education in the field of

5    pain medicine, Dr. Thomas and Dr. Warfield were permitted to

6    offer opinions in that field and the reasons for those

7    opinions.

8            The opinions these witnesses stated should

9    receive whatever weight you think is appropriate given all

10   the other evidence in the case.  In weighing this opinion

11   testimony, you may consider the witness' qualifications, the

12   reasons for the witness' opinion and the reliability of the

13   information supporting the witness' opinions, as well as the

14   other factors discussed in the preliminary instructions for

15   weighing the testimony of witnesses.

16           You may disregard the opinions entirely if you

17   decide that Dr. Thomas and Dr. Warfield's opinions are not

18   based on sufficient knowledge, skill, experience, training

19   or education.  You may also disregard the opinions if you

20   conclude that the reasons given in support of the opinions

21   are not sound, or if you conclude that the opinions are not

22   supported by the facts shown by the evidence, or if you

23   think that the opinions are outweighed by other evidence.

24           The parties made use of various charts and

25   summaries in order to help explain the facts in this case.

 1    Some of them were admitted into evidence.  You will have

 2    those charts and summaries with you while you deliberate.

 3    If a chart or summary was admitted into evidence, then you

 4    can use it as evidence.  If the underlying documents were

 5    also admitted into evidence, and the summaries or charts are

 6    inconsistent with the underlying documents, then you should

 7    disregard the summary or chart and rely upon the underlying

 8    evidence.  If the underlying documents were not admitted

 9    into evidence, then you can use the summary or chart as

10    evidence even though the underlying documents were not

11    admitted into evidence.

12            If a chart or summary was not admitted into

13    evidence, then it is not evidence, and you cannot use it as

14    proof of anything.

15            You've heard the testimony of law enforcement

16    officers.  The fact that a witness is employed as a law

17    enforcement officer does not mean that his or her testimony

18    necessarily deserves more or less consideration or greater

19    or lesser weight than that of any other witness.  You must

20    decide, after reviewing all the evidence, whether you

21    believe the testimony of the law enforcement witness and how

22    much weight, if any, it deserves.

23            Evidence was introduced during the trial that

24    some of the witnesses were using drugs when the events that

25    they testified about took place.  There is nothing improper

1    about calling such a witness to testify about events within

2    his or her personal knowledge.

3              On the other hand, his or her testimony must be

4    considered with care and caution.  The testimony of a

5    witness who was using drugs may be less believable because

6    of the effect the drugs may have on his or her ability to

7    perceive, remember, or relate the events in question.

8              After considering his or her testimony in light

9    of all the evidence in this case, you may give it whatever

10   weight, if any, you find it deserves.

11             Evidence was also introduced that a witness had

12   been previously convicted of crimes involving dishonesty.

13   You may consider this evidence, along with other pertinent

14   evidence, in deciding whether or not to believe the witness

15   and how much weight to give to that witness' testimony.

16             The Defendant, Patrick Titus, is charged with

17   several offenses, each offense is charged in a separate

18   count of the indictment.

19             The number of offenses charged is not evidence

20   of guilt and this should not influence your decision in any

21   way.  You must separately consider the evidence as it

22   relates to each offense, and you must return a separate

23   verdict for each offense.

24             For each offense charged, you must decide

25   whether the Government has proved beyond a reasonable doubt

1    that Dr. Titus is guilty of that particular offense.  Your

2    decision on one offense, whether guilty or not guilty,

3    should not influence your decision on any of the other

4    offenses charged.  Each offense should be considered

5    separately.

6              Counts 1 through 14 of the indictment charge the

7    Defendant, Patrick Titus, with distributing and dispensing a

8    mixture or substances containing controlled substances.

9    Specifically, the particular controlled substances alleged

10   for each of Counts 1 through 14 of the indictment, described

11   below, outside the usual course of professional practice and

12   not for a legitimate medical purpose, which is a violation

13   of federal law.

14             The patients, the approximate dates of

15   distribution, and the controlled substances for each of

16   Counts 1 through 14 are set forth on this page of the

17   instructions.

18             I'm not going to read the chart.  It's kind of

19   hard to read a chart, but you will have it with you to make

20   sure that you can keep straight which count relates to which

21   accusation.

22             In order to find Dr. Titus guilty of the offense

23   that we're talking about here, you must find that the

24   Government proved each of the following four elements beyond

25   a reasonable doubt:  First, that Dr. Titus distributed or

1    dispensed a mixture or substance containing a controlled

2    substance.

3              Second, that Dr. Titus distributed or dispensed

4    the controlled substance outside the usual course of

5    professional practice and not for a legitimate medical

6    purpose.

7              Third, that Dr. Titus distributed or dispensed

8    the controlled substance outside the usual course of

9    professional practice and not for a legitimate medical

10   purpose knowingly or intentionally.

11             And fourth, that the controlled substance was

12   the particular controlled substance or substances alleged

13   for each of Counts 1 through 14 of the indictment.

14             The first thing you must determine is whether

15   Dr. Titus distributed or dispensed the controlled substance

16   or substances alleged for each of Counts 1 through 14 of the

17   indictment.

18             Distribute, as used in the offenses charged,

19   means deliver or transfer possession or control of a

20   controlled substance from one person to another.  Distribute

21   includes the sale of a controlled substance by one person to

22   another, but does not require a sale.  Distribute also

23   includes a delivery or transfer without any financial

24   compensation, such as a gift or trade.

25             The term dispense means to deliver a controlled

1    substance to an ultimate user by, or pursuant to, the lawful

2    order of a practitioner, including the prescribing and

3    administering of a controlled substance.

4        The Government need only prove beyond a

5    reasonable doubt that the Defendant distributed or

6    dispensed.  Proving that the Defendant either distributed or

7    dispensed is sufficient for conviction.  Thus, for example,

8    if the evidence proves that the Defendant distributed

9    Oxycodone, you need not find that he also dispensed it, and

10   vice versa.

11       The term practitioner means a physician,

12   licensed, registered or otherwise permitted by the United

13   States for the jurisdiction in which he practices to

14   distribute, dispense, or administer a controlled substance

15   in the course of professional practice.

16       You are instructed that, as a matter of law,

17   Oxycodone, OxyContin, Morphine, Methadone, and Fentanyl are

18   controlled substances.

19       It is solely for you, however, to decide whether

20   the Government has proved beyond a reasonable doubt that

21   Dr. Titus distributed or dispensed a mixture or substance

22   containing the particular controlled substances alleged in

23   each of Counts 1 through 14 of the indictment.

24       For each count you must unanimously agree that

25   Dr. Titus distributed or dispensed a mixture or substance

1    containing one or both of the particular controlled

2    substances alleged in each of Counts 1 through 14 of the

3    indictment.

4            The Government may prove that Dr. Titus

5    distributed or dispensed a drug by showing beyond a

6    reasonable doubt either that Dr. Titus delivered the drug to

7    the ultimate user or that Dr. Titus wrote a prescription for

8    the drugs.

9            The Government need not prove that the

10   prescription was filled to prove that the practitioner

11   distributed or dispensed a drug.  A prescription is the

12   written representation of the drug and enables its possessor

13   to claim physical custody and control over the drug

14   prescribed.  When a practitioner writes a patient a

15   prescription for a drug, he is constructively transferring

16   the drug to the patient.

17           The second element the Government must prove

18   beyond a reasonable doubt is that the Defendant prescribed

19   or dispensed the drug other than for a legitimate medical

20   purpose and not in the usual course of medical practice.

21           In making a medical judgment concerning the

22   right treatment for an individual patient, physicians have

23   discretion to choose among a wide range of available

24   options.  Therefore, in determining whether the Defendant

25   acted without a legitimate medical purpose, you should

1   examine all of the Defendant's actions and the circumstances

2   surrounding them.

3           The third element the Government must prove

4   beyond a reasonable doubt is that Dr. Titus acted knowingly

5   or intentionally.

6           The phrase knowingly or intentionally requires

7   the Government to prove beyond a reasonable doubt that

8   Dr. Titus knew that what he distributed or dispensed was a

9   controlled substance and that the distributing or dispensing

10  was outside the usual course of professional practice and

11  not for a legitimate medical purpose.

12          To act knowingly means that Dr. Titus was

13  conscious and aware that he was engaged in the acts charged

14  and knew of the surrounding facts and circumstances that

15  make up the offenses.  Knowledge does not require that

16  Dr. Titus knew the acts charged and the surrounding facts

17  amounted to a crime.

18          To act intentionally means to act deliberately

19  and not by accident.  Intentionally does not require that

20  Dr. Titus intended to violate the law.

21          If a person acts on the basis of an honestly

22  held belief that is inconsistent with the charged conduct,

23  but the belief turns out to be inaccurate or incorrect, then

24  the person is not acting knowingly or intentionally.  Thus,

25  in this case, if Dr. Titus made an honest mistake about a

1    patient's medical needs, then he did not act knowingly or

2    intentionally.

3                When, as in this case, knowledge of a particular

4    fact or circumstance is an essential part of the offense

5    charged, the Government may prove that the Defendant knew of

6    that fact or circumstance if the evidence proves beyond a

7    reasonable doubt that the Defendant deliberately closed his

8    eyes to what would otherwise have been obvious to him.

9                No one can avoid responsibility for a crime by

10   deliberately ignoring what is obvious.  Thus, you may find

11   that Dr. Titus knew that he was distributing or dispensing

12   controlled substances outside the usual course of

13   professional practice and not for a legitimate medical

14   purpose based on evidence which proves that:

15               One, Dr. Titus subjectively believed that there

16   was a high probability that he was distributing or

17   dispensing controlled substances outside the usual course of

18   professional practice and not for a legitimate medical

19   purpose;

20               And two, Dr. Titus consciously used deliberate

21   efforts to avoid knowing about the existence of this

22   circumstance.

23               You may not find that Dr. Titus knew that he was

24   distributing or dispensing controlled substances outside the

25   usual course of professional practice and not for a

1    legitimate medical purpose if you find that the Defendant

2    actually believed that this circumstance did not exist.

3            Also, you may not find that Dr. Titus knew that

4    he was distributing or dispensing controlled substances

5    outside the usual course of professional practice and not

6    for a legitimate medical purpose if you find only that

7    Dr. Titus consciously disregarded a risk that the

8    circumstance existed, or that Dr. Titus should have known

9    that the circumstance existed, or that a reasonable person

10   would have known of a high probability that the circumstance

11   existed.

12           It is not enough that the Defendant may have

13   been reckless, or stupid, or foolish, or may have acted out

14   of inadvertence or accident.

15           Count 15 of the indictment charges Dr. Titus

16   with knowingly, intentionally, and unlawfully maintaining

17   the premises known as Lighthouse Internal Medicine, located

18   at 10-12 North Church Street, Milford, Delaware, for the

19   purpose of distributing Schedule II controlled substances

20   outside the usual course of professional practice and

21   without a legitimate medical purpose.

22           In order to prove that Dr. Titus is guilty of

23   maintaining a drug-involved premises, the Government must

24   prove each of the following elements beyond a reasonable

25   doubt:

1            First, that Dr. Titus permanently or temporarily

2    maintained, or leased, or used the place described in the

3    indictment;

4            Second, that Dr. Titus maintained that place for

5    the purpose of distributing any controlled substance outside

6    the usual course of professional practice and not for a

7    legitimate medical purpose;

8            And third, that Dr. Titus acted knowingly.

9            The first element which the Government must

10   prove beyond a reasonable doubt is that Dr. Titus

11   permanently or temporarily maintained, or opened, or leased,

12   or used the place described in the indictment.

13           The second element that the Government must

14   prove beyond a reasonable doubt is that Dr. Titus

15   maintained, or opened, or leased, or used the specified

16   place for the purpose of distributing any controlled

17   substance outside the usual course of professional practice

18   and not for a legitimate medical purpose.

19           To establish this element, the Government must

20   prove that the drug activity was a significant or important

21   reason why Dr. Titus maintained the place.  The Government

22   is not required to prove that the drug activity was

23   Dr. Titus' only purpose in maintaining the place, although

24   that would, obviously, satisfy this element.

25           The third element that the Government must prove

1   beyond a reasonable doubt is that the Defendant acted

2   knowingly.

3           To act knowingly, as used in the offense

4   charged, means that Dr. Titus was conscious and aware that

5   he was engaged in the acts charged and knew of the

6   surrounding facts and circumstances that make out the

7   offenses.  Knowingly does not require that Dr. Titus knew

8   that the acts charged and surrounding facts amounted to a

9   crime.

10          The question of whether a person acted with

11  knowledge is a question of fact for you to determine like

12  any other fact question.  Direct proof of knowledge is not

13  always available, and such proof is not required.  The

14  ultimate fact of whether someone knew something at a

15  particular time, though subjective, may be established by

16  circumstantial evidence, based upon a person's outward

17  manifestations, his words, his conduct, his acts, and all

18  the surrounding circumstances disclosed by the evidence, and

19  the rational or logical inferences that may be drawn from

20  them.

21          Knowingly is not an element of the offenses with

22  which Dr. Titus is charged.  Proof of bad motive is not

23  required to convict.  Further, proof of bad motive alone

24  does not establish that Dr. Titus is guilty, and proof of

25  good motive alone does not establish that Dr. Titus is not

1   guilty.  Evidence of Dr. Titus' motive may, however, help

2   you find Dr. Titus' intent.

3               Intent and motive are different concepts.

4   Motive is what prompts a person to act.  Intent refers only

5   to the state of mind with which the particular act is done.

6   Personal advancement and financial gain, for example, are

7   motives for much of human conduct.  However, these motives

8   may prompt one person to intentionally do something

9   perfectly acceptable, while prompting another person to

10   intentionally do an act that is a crime.

11               All right.  So there's about three more pages,

12   but I'm going to give them to you after the closing

13   arguments because they relate to your deliberations.

14               You know, I know you've only been listening to

15   me for a little more than 20 minutes, though I'm sure it

16   seems like much longer.  So before the Government starts to

17   argue, I'm going to ask my deputy clerk to take you out,

18   back to the jury room, just to make sure that you're awake

19   when the Government starts to argue.  And so this will

20   really be just as brief a walk as possible.  It's really to

21   get you to walk, which I believe helps.  And so we'll come

22   back very shortly.

23               (Jury leaving the courtroom.)

24               THE COURT:  All right.  Is there any setup that

25   you need to do or are you ready to go, Ms. Sobczak?

```
 1                    MS. SOBCZAK:  I'm basically ready to go.  Yes.

 2                    THE COURT:  Yeah, you can --

 3                    MS. REMIS:  Can I run to the bathroom?

 4                    THE COURT:  Yeah, yeah, yeah.

 5                    All right.  I knew there would be a point to

 6      this break.

 7                    MS. REMIS:  Sorry.

 8                    THE COURT:  All right.  So you don't have to

 9      run.

10                    All right.  So I'm going to leave for like two

11      minutes, but then we'll come back with the jury.  Okay?

12                    MR. WOODARD:  Okay.  Thank you.

13                    DEPUTY CLERK:  All rise.

14                    (Recess was taken.)

15                    DEPUTY CLERK:  All rise.

16                    MS. KOUSOULIS:  Oh, the Government isn't here,

17      either.

18                    THE COURT:  No, it's all right.  I was pretty

19      indistinct about exactly when I was coming back.

20                    MS. KOUSOULIS:  Janet is going to get our side,

21      try to find them.

22                    THE COURT:  Okay.  All right.  So we're ready to

23      go get the jury.  Let's do that.

24                    Ms. Remis, what is the over/under on your

25      partner's arguing?
```

```
 1                    MS. REMIS:  In terms of what, Your Honor?

 2                    THE COURT:  How long?

 3                    MS. REMIS:  Oh, I thought it was going to be a

 4      ten out of ten.  It will probably be an hour.

 5                    MS. SOBCZAK:  An hour.

 6                    THE COURT:  Okay.  We'll see.

 7                    (Jury entering the courtroom.)

 8                    THE COURT:  All right.  Members of the jury,

 9      welcome back.  Everyone may be seated.

10                    Ms. Sobczak, you may proceed on behalf of the

11      Government.

12                    MS. SOBCZAK:  Thank you, Your Honor.

13                    Good morning, everyone.  In just over one year,

14      the Defendant, Dr. Patrick Titus, prescribed more than one

15      million highly addictive opioid drugs, and made more than $1

16      million in the process.  The Defendant prescribed these

17      pills to people who were clearly suffering from addiction,

18      who were obviously abusing drugs, and who weren't even

19      taking the drugs at all.  And although some of these

20      patients suffered from real and sometimes severe pain, the

21      Defendant failed to treat them.  Instead, the sad irony is

22      that he left these people in even more pain.

23                    At the start of this case, my colleague,

24      Mr. Woodard, told you that this case was about a

25      drug-dealing operation dressed up as a doctor's office.  He
```

1    told you that Dr. Titus owned Lighthouse Internal Medicine

2    where he charged over $150 in cash per patient per month in

3    exchange for prescriptions, and that these prescriptions

4    were all the same or similar, for Oxycodone, Methadone,

5    Morphine, Oxycontin, and Fentanyl patches.  Often more than

6    one opioid for each patient, and often for no legitimate

7    medical purpose.

8            Mr. Woodard told you that this case was about

9    how the Defendant, the doctor, took advantage of vulnerable

10   people for personal gain.  And that's exactly what the

11   evidence has shown.

12           Ladies and gentlemen, there are plenty of facts

13   in this case that are not in serious dispute.  First, there

14   is no dispute that Dr. Titus distributed or dispensed

15   controlled substances, that he wrote most prescriptions for

16   Oxycodone, Methadone, Fentanyl, OxyContin, and Morphine.

17   There is no dispute that Dr. Titus owned Lighthouse, an

18   internal medicine clinic, that he leased at 10-12 North

19   Church Street in Milford, Delaware between late 2013 and

20   late 2014, and that he was the only doctor there.  He was

21   the boss, the one with the final say.

22           There's no doubt or dispute that during this

23   time at Lighthouse, Lighthouse was at Church Street, the

24   Defendant wrote thousands of prescriptions for opioid drugs

25   to patients that he knew had inconsistent drug tests,

1    showing that they were either abusing prescribed or illicit

2    drugs or that they were not taking the prescribed drugs at

3    all, and that he wrote hundreds of prescriptions to patients

4    he discharged from his practice.  And there's no dispute

5    that although Lighthouse accepted some insurance, the

6    Defendant was paid up to $180 in cash by the vast majority

7    of his pain patients, even by those he knew were poor and

8    indigent and covered by Medicaid.

9            The only real question left is whether the

10   Defendant, Patrick Titus, knew or intended that he was

11   prescribing controlled substances outside the usual course

12   of professional practice and not for a legitimate medical

13   purpose.

14           Ladies and gentlemen, over the past few weeks,

15   you have heard witness after witness and seen document after

16   document proving that he knew exactly what he was doing.  He

17   knew how to prescribe legitimately, how to treat patients in

18   the usual course of practice.  But instead, despite

19   receiving multiple complaints and concerned calls from other

20   doctors and people in the community, despite attempts by his

21   own employees to get him to pay attention to clear problems,

22   despite knowing that some of his patients were overdosing on

23   drugs, including opioids, despite warning sign after warning

24   sign, Dr. Titus continued prescribing.

25           The evidence has made clear that these

1   prescriptions were not the practice of medicine, that

2   Dr. Titus was not concerned with his patients' best

3   interests.

4           No.  The evidence has proven beyond a reasonable

5   doubt that the Defendant was running a drug-dealing

6   operation dressed up as a doctor's office.  And I'm going to

7   spend some time with you today going through the evidence

8   that proves that.

9           Here's how I will do that.  First, we'll talk

10  about how he knew.  We'll talk about the repeated red flags,

11  and then the sham safeguards he put into place after the

12  Consent Decree.

13          We'll talk about the why.  What motivated him to

14  continue prescribing knowing it was not legitimate?  It was

15  money.  It was power.  It was control.

16          Then we'll focus on the 14 patients you've heard

17  so much about over the last few weeks.  We'll go through why

18  you should find Dr. Titus guilty on each count in the

19  indictment.

20          Finally, we'll talk about Count 15, and we'll

21  explain why Dr. Titus should be convicted of maintaining a

22  drug-involved premises at North Church Street.

23          While we go through the evidence, remember this:

24  Dr. Titus was a licensed medical doctor.  He was entrusted

25  with the privilege of treating patients and with the ability

1    to prescribe controlled substances, when it was appropriate

2    and legitimate to do so.  And his responsibility in that

3    role was to treat each of his patients as an individual, to

4    put his patients' best interests above all, and at bottom,

5    to do no harm.

6           So let's talk about the evidence that proves

7    that the Defendant knew that he was prescribing opioid drugs

8    to his patients with no legitimate medical purpose and in a

9    way that was far outside the usual course of medical

10   practice.

11          You've heard extensively about what legitimate

12   medical purpose and the usual course of professional

13   practice mean.  But let's take a step back from that.  Even

14   with these definitions, you know what medicine looks like,

15   what it looks like for appropriate treatment on the one

16   hand, and on the other hand, what looks like a drug deal,

17   what looks like a crime, a prescription doled out for a

18   reason other than legitimate medical care.

19          You can draw on your own experiences and use

20   your common sense.  That's why you are jurors.  You're the

21   sole judges of the evidence in this case.

22          Now, let's turn to all of the notice that

23   Dr. Titus had about how to prescribe appropriately, the

24   warnings he purposely ignored and the results of those

25   actions.  Let's start in December 2011 when Dr. Titus'

1    controlled substance registration was suspended.  To resolve

2    that suspension, Dr. Titus entered into a Consent Agreement

3    with the State of Delaware on March 22nd, 2012.  That's at

4    Government Exhibit 614.

5           In that agreement, he admitted that he needed

6    additional training and knowledge to safely and effectively

7    prescribe controlled substances.  That some of the controls

8    he had had in his office may have led to diversion and abuse

9    of those drugs.

10          You see, this Consent Agreement was a chance for

11   Dr. Titus.  It was an opportunity for him to show that he

12   could safely prescribe controlled substances.  In that

13   agreement Dr. Titus promised that he would comply with the

14   policies that govern the prescribing of controlled

15   substances, the same guidelines that Dr. Thomas called

16   seminal, meaning that everyone reads them.

17          This Consent Agreement provided a blueprint for

18   Dr. Titus and by no later than March of 2012, well before

19   any of the counts that are charged in the indictment,

20   Dr. Titus knew what he needed to do to prescribe controlled

21   substances legitimately.

22          And you heard from Dr. Titus' employees that

23   things were supposed to change after the Consent Decree.

24   Jane Webb testified about a meeting with Dr. Titus and Josie

25   Walters, the office manager.  At this meeting they discussed

1    new policies, pill counts, checking the PMP, mandatory drug

2    testing.  Ms. Webb told you that the purpose of these

3    policies was to follow pain management parameters and to

4    ensure that patients were being taken care of.

5            But you saw how these efforts panned out.  They

6    were nothing more than rogue ^ box checking exercises that

7    provided no meaningful change in Dr. Titus' prescribing.

8            Let's start with the pill counts.  You heard

9    from the office employees that the point of the pill counts

10   was to ensure that patients were taking their medication

11   properly, that they weren't abusing it, that they weren't

12   selling it, that they -- and they had to be random to be

13   effective.  That's just common sense.

14           But in Dr. Titus' office, patients were given a

15   heads up.  You saw the appointment reminder cards throughout

16   the patient charts notifying patients weeks in advance about

17   a pill count.  You heard from Chasity Calhoun and Michael

18   Adams that when they knew they had a pill count coming up,

19   they would either borrow pills from friends, or they would

20   be sure to set enough pills aside to pass the pill count.

21           These pill counts were pointless.  Like so much

22   else, they were just for show.

23           But it wasn't just the pill counts that were

24   useless.  You've heard a lot about drug testing.  And over

25   the last couple weeks, we have looked at countless drug

1    tests.  By now, you can probably read them easily.  You have

2    seen for yourself that they're laid out clearly on the front

3    page.  These test results were not complicated.

4           The office staff, none of whom were physicians,

5    could read all of them and understand them.  And the

6    Defendant's own witness, Sylvester King, told you that

7    Dr. Titus, if he had a problem understanding the results,

8    there was a help line at Ameritox that he could call.

9           What was the purpose of these drug tests?  To

10   inform Dr. Titus whether or not the patients were taking the

11   drugs prescribed appropriately, whether or not they were

12   taking drugs he didn't prescribe or illegal drugs like

13   heroin and cocaine.

14          The evidence has proven that within days of

15   the -- within days of taking the drug tests, Dr. Titus'

16   office received the results.  Ms. Holleger, Ms. Molesi,

17   Ms. Webb, they all testified that they reviewed and

18   literally flagged, highlighted, circled unexpected results.

19   And then they attached those papers to the front of the

20   patient files the night before the patient's appointment so

21   that they were easily accessible to Dr. Titus.

22          And when Ms. Webb reviewed an unexpected result,

23   she prepared a warning letter or a discharge letter that she

24   also attached to the patient's chart.  The one time she told

25   Dr. Titus that he had to discharge a patient after an

1   inconsistent drug test, Dr. Titus told her it was his

2   practice, he was the doctor, and it wasn't her job to tell

3   him what to do.

4        Now, let's be clear, Dr. Titus did not have to

5   discharge patients after they tested positive for cocaine or

6   heroin or when they repeatedly demonstrated that they were

7   not taking the drugs that he prescribed.  No.  Dr. Titus

8   could have instead acted as the internal medicine doctor

9   that he was and treated the patients.  He could have

10  diagnosed the clear substance use disorder or tried to treat

11  the underlying causes of the patient's pain.

12       But instead of attempting any individualized

13  focused care, Dr. Titus dropped these patients.  And as

14  Dr. Thomas told you, Dr. Titus made the determination and

15  he, therefore, ended the doctor-patient relationship.

16       And Dr. Titus knew that.  He knew what he was

17  supposed to be doing.  He told you so himself in the

18  recorded statements you heard from 2015.

19       Dr. Titus told Special Agent Smith and Diversion

20  Investigator Eleazer that he ran a tight ship at Lighthouse.

21  He told them a lot of things.  Let's listen so some of those

22  things now.

23       (Government Exhibit Nos. 301 and 302 were

24  played.)

25       MS. SOBCZAK:  As you just heard, Dr. Titus said

1    that if a patient had a positive drug screen for things like

2    cocaine and heroin, "We discharge them immediately," and

3    that they have, "no tolerance for that at all."

4              Dr. Titus told law enforcement that he thought a

5    three-strike policy was a bit too liberal.  He said all of

6    this because he knew that's what he should have been doing.

7    But the evidence shows that even after patients tested

8    positive for illicit drugs, after they received multiple

9    warning letters, Dr. Titus continued to prescribe.

10             You've seen drug test results from Delores

11   Perry, Scott Jones, Maryjane Mench, Lisa Parsons, Loretta

12   Connelly, Chasity Calhoun, and backdoor patient Lucille

13   Moody.  They all tested positive for illicit drugs, heroin

14   or cocaine, and they all continued to receive prescriptions

15   for narcotics from Dr. Titus.  Despite what Dr. Titus may

16   have told the agents, the evidence shows that Dr. Titus

17   repeatedly broke his own rules.

18             Why would Dr. Titus continue to prescribe after

19   so many failed drug tests?  Because every prescription meant

20   more money, and he knew that patients would keep coming

21   back.

22             But what were the patients actually paying for?

23   The evidence has not proven or, sorry, the evidence has

24   proven that it wasn't for the visit or for Dr. Titus'

25   services as a physician.  The cash was for the prescription.

1    It was for the pills.

2            And how do you know that?  Because even after a

3    patient had been discharged, Dr. Titus still provided many

4    of them their second prescription.

5            Why?  Jane Webb told you why.  Because Dr. Titus

6    said, "They had paid at the beginning of the month for the

7    whole month."  This statement makes clear that Dr. Titus

8    knew that the patients were paying for their prescriptions,

9    not for any actual medical treatment.  And even

10   Dr. Warfield, she agreed that cash for prescriptions is not

11   within the usual course of professional practice.

12           If you have any doubt, take a look at Government

13   Exhibit 801 at Page 5.  It shows the near exact overlap

14   between the prescriptions that Dr. Titus wrote and the cash

15   he brought in every month.  So even though this twice month

16   prescribing was supposed to be an opportunity for

17   intervention, these second prescriptions were often filled

18   or filled out already the night before by the staff,

19   identical to the first, all because the patient had already

20   paid for it.

21           Think about it.  You did not see a single

22   example in which the second prescription in a month

23   meaningfully changed based upon the information that

24   Dr. Titus received.  That's because none of it mattered.

25   The prescriptions were predetermined.  They stayed the same

1    month after month.

2           How many prescriptions are we talking about

3    here?  Let's look at Government Exhibit 801 at Page 11.

4    This chart shows the top ten busiest days for prescriptions.

5    The ten days when Dr. Titus wrote over 136 and up to 194

6    prescriptions for controlled substances.

7           Now, he may not have seen all of those patients

8    on the days listed, but he wrote those prescriptions for

9    upward of 84 individual patients, at least 84 patients going

10   in and coming out of Lighthouse on those busiest days.

11          And that tracks with what Special Agent Bill

12   McDonald observed and when he sat on surveillance at

13   Lighthouse in the parking lot there.  Crowds of patients

14   going into Lighthouse and coming out with what appeared to

15   be a prescription just minutes later.  Get in, get a

16   prescription, get out.  And Dr. Titus made thousands of

17   dollars in the process, up to $180 per patient, per month,

18   amounts that Dr. Thomas told you were three to four times

19   more than what Dr. Titus would have made if he had billed

20   Medicaid.

21          How many patients are we talking about?  Again,

22   Dr. Titus told federal agents that he saw 27 patients on

23   average per day, but that was not true.  Flip through

24   Government Exhibits 200, 203 and 204.

25          Government Exhibit 203 is the hard copy cash

1   receipt books.  Between November 2013 and November 2014,

2   Dr. Titus brought in over $620,000 in cash, but only about

3   $480,000 in cash was in the deposited account.  This left

4   over $140,000 unaccounted for.  This was Dr. Titus'

5   business.  Where do you think that money went?

6            That's Government Exhibit 804 at Page 7.  And

7   remember, in addition to the cash and credit card payments

8   Dr. Titus collected, he was also billing Medicare and

9   private insurance.  When you see payments of $22 and $27,

10  those are just co-payments.  It means Lighthouse got paid by

11  Medicare for those patients.

12           Let's look at the financial summary charts.

13  These are at Government Exhibit 804.  Check out Page 2.  It

14  shows that Dr. Titus brought in nearly a million dollars in

15  just over a year from cash and credit card deposits and

16  insurance payments primarily from Medicare.

17           And what happened with all this money?  The

18  testimony showed that the money was spent on trips to the

19  Ritz in Key Biscayne, the Ritz in Naples, Florida, and the

20  Ritz in Puerto Rico, as well as multiple trips to the

21  Bellagio ^ in Las Vegas.  Tens of thousands of dollars spent

22  on dining, shopping, travel, and other personal expenses.

23           Money you saw that was meant to fund the

24  Defendant's retirement.  Look at Government Exhibit 210 and

25  211.  It says, "Retire with $4.3 million by myself."

1          And with this volume of patients that came in

2     and the prescriptions going out, it's no surprise that

3     Dr. Titus couldn't keep up with the files.  You have seen

4     blank record after blank record and patient files clearly

5     filled out by the office ladies.  Even after Shannon

6     Holleger quit, even after Lighthouse closed down at the end

7     of 2014, she told you that she and Josie Walters continued

8     filling out prescription notes and progress notes in

9     Dr. Titus' patient files that had never been completed.

10         How would they know what to fill out?  They

11    weren't in the room with the doctor and sometimes they were

12    filling out charts months or even years after the visits.

13    You've seen the list of scenarios.  Four possible options

14    had to apply to all of the Defendant's pain patients.

15         But fitting over 1,000 patients into one of four

16    scenarios is impossible.  People are individuals and their

17    medical issues are unique.  What Dr. Titus did was apply a

18    one-size-fits-all approach to prescribing some of the most

19    dangerous drugs available.

20         But Dr. Titus isn't here because of his messy

21    paperwork.  So why are the records important?  The Defense

22    would have you believe that this paper proves that

23    Dr. Titus' practice meaningfully changed after the

24    March 2012 Consent Agreement, that he was taking the

25    patient's pain into account and that he had discussions with

1   them about informed consent.

2           But what does the evidence actually show?  It

3   shows that even after his suspension and even after

4   Dr. Titus instituted all this new paperwork, there was no

5   meaningful change in his prescribing.

6           Take Scott Jones for example.  He signed his

7   Pain Management Agreement in mid-2012, and he and Dr. Titus

8   agreed that Mr. Jones would not use illegal drugs, that he

9   would get unannounced drug tests, and that a violation of

10  the agreement meant no more prescriptions.

11          Look at Mr. Jones' file.  It's Government

12  Exhibit 102.  A quick comparison shows you that before the

13  Pain Management Agreement, Dr. Titus prescribed him Oxy

14  15 milligrams and after the Pain Management Agreement, it

15  was the same.  And in the mean time, his drug tests were

16  repeatedly inconsistent.  But Dr. Titus failed to enforce

17  these all-important Pain Management Agreements.

18          And what actually happened in the exam room?

19  You heard from Brent Hood, Michael Adams and Chasity

20  Calhoun.  They all said basically the same thing, that

21  Lighthouse was like a revolving door.  That other than a

22  cursory exam, most of the time Dr. Titus spent with them

23  was, as Ms. Calhoun put it, "a lot of friendly side talk,

24  how have you been?  You're so pretty like your mom."  Side

25  talk, as she described it.

1    Mr. Adams said he and Dr. Titus often talked for

2    a while about personal things like family, women, and

3    Dr. Titus' frequent trips to Florida.  What did not happen

4    was informing, counseling, discussing.

5    You heard Michael Adams himself, he was

6    mystified when Dr. Titus eventually discharged him.  Why?

7    Because Mr. Adams had no recollection that Dr. Titus

8    discussed with him the warning letters that littered his

9    file.  The letters that said that it was Mr. Adams' first

10   and only warning.

11   And although Ms. Calhoun agreed that she signed

12   a pain contract, she made it clear that Dr. Titus never

13   actually verbally counseled her on the risks associated with

14   these dangerous drugs.

15   All this paperwork, it was just another attempt

16   by Dr. Titus to make his practice look real, to seem

17   legitimate.  But at the end of the day, all these pain

18   scales, pain diaries, Pain Management Agreements, they were

19   nothing more than pieces of paper.

20   I'd like to pause here for a second and talk

21   about something that sheds no light on what was really going

22   on between Dr. Titus and his patients.  I'm talking about

23   the attempted undercover recordings that you heard last

24   week.  The Defense framed these recordings in its opening as

25   evidence that Dr. Titus "was not operating a medical

1    practice where he was prescribing opioids outside the normal

2    course of medical practice."

3            But this, ladies and gentlemen, is a red

4    herring.  What did those recordings actually reveal?  Only

5    that Dr. Titus' office assumed that every patient who came

6    in off the street was a pain patient, that before making an

7    appointment, they needed an x-ray to determine whether or

8    not the patient would be accepted.

9            Remember, this is an internal medicine clinic.

10   The patient could have had strep throat, acid reflux,

11   anything, but no one even bothered to ask what the actual

12   medical issue was before denying her an appointment based

13   upon an x-ray report alone.

14           The calls and visits are meaningless.  They're

15   forgettable.  Why?  Because as the undercover officer told

16   you, nothing happened.  They tell you nothing about how

17   Dr. Titus ran his practice, and they have nothing to do with

18   the thousands of other patients Dr. Titus did see and did

19   prescribe to.

20           So let's talk about the patients in Count 1

21   through 14 of the indictment.  You've heard from some of

22   them, some of their family members.  You know their stories.

23   Now, you've repeatedly seen the evidence that supports a

24   guilty verdict as to each of these counts.  But please just

25   bear with me one more time, grab your pens and note pads,

1    and let's go through this for one more time together.

2              First things first, Dr. Titus -- Dr. Thomas

3    testified that not a single one of the prescriptions in

4    Counts 1 through 14 of the indictment was issued for a

5    legitimate medical purpose and in the usual course of

6    professional practice.  Full stop.

7              And here's why.  Count 1 relates to a

8    prescription for Brent Hood on August 7th, 2013.  You'll

9    remember him as the patient who, unfortunately, overdosed,

10   but immediately went back to Dr. Titus.

11             How do you know to convict on Count 1?  Look at

12   Government Exhibit 1.  Consider what happened here.  Brent

13   Hood told you himself that he was an addict, and the records

14   support that.  He told you about his overdose, how he ended

15   up in the hospital, nearly dead after taking a cocktail of

16   drugs.  That was on August 4th, 2013.

17             You heard from his hospital doctor,

18   Dr. Marissa Conti, that he was intubated when he arrived at

19   the ER because he could not breathe.  Dr. Conti said that

20   she could see from the PMP data that Dr. Titus was Brent

21   Hood's doctor, and she was alarmed by the high dose of

22   Methadone and Oxycodone that Dr. Titus was prescribing.

23   That amount of medication was something she had only seen in

24   patients with metastatic breast cancer or bone cancer,

25   end-of-life treatment.

1           Two days later, on August 6th, 2013, when

2   Mr. Hood was released from the hospital, the hospital faxed

3   his records to Dr. Titus.  Despite knowing that Brent Hood

4   had overdosed on benzos, cocaine, and opiates just days

5   before, Dr. Titus dealt Brent Hood another prescription.

6   Collected $155 in return, and kicked Brent Hood out of the

7   practice.

8           And what did Mr. Hood tell you he did with the

9   pills?  He snorted them.  Why is that important?  Because at

10  the same time Dr. Titus gave him one last prescription, he

11  also cut Mr. Hood off from any supervision.  There was no

12  intervention, no followup, no medicine.

13          Count 2.  Count 2 relates to a prescription for

14  Scott Jones on September 19th, 2013.  He was the patient

15  with seven negative drug screens in seven months.

16          How do you know to convict on Count 2?  Let's

17  look at Government Exhibit 2.  You know all about Scott

18  Jones.  A man who came to Dr. Titus' practice with a letter

19  in his file saying that he had hit up his last doctor for

20  drugs.  That letter alone does not mean that Dr. Titus

21  should not have accepted him as a patient, but it does show

22  that Dr. Titus knew he was accepting a patient with

23  substance abuse issues.  Nevertheless, Dr. Titus prescribed

24  Mr. Jones over 3,000 Oxycodone and Oxycontin pills in just

25  two years.

1    In February 2013, Scott Jones tested positive

2  for cocaine, but negative for Oxycodone.  It was negative

3  for the Oxycodone that Dr. Titus had been prescribing him.

4  Though he was warned, nothing changed.  Seven more months,

5  seven more tests, each one negative for the Oxycodone that

6  Dr. Titus continued to prescribe.  You don't have to be a

7  doctor to know what the drug test shows.

8    Shannon Holleger testified that "If they were

9  prescribed a medication and it wasn't in their system, it

10  meant they weren't taking it."

11    Not only did Mr. Jones continue to test negative

12  for the prescribed Oxycodone on his last drug test, he also

13  tested positive for heroin, a result that was highlighted in

14  pink marker and flagged with a sticky tab that said "POS

15  heroin."

16    And despite discharging Scott Jones, Dr. Titus

17  wrote Mr. Jones yet another prescription for Oxycodone three

18  days later, on September 9th, 2013.  This was not a tapering

19  dose or weaning off.  There was zero medical need for the

20  prescription.  And this transaction, ladies and gentlemen,

21  it could not have been legitimate because there was no

22  medical relationship between Dr. Titus and Scott Jones.

23    Let's look at Count 3.  Count 3 relates to a

24  prescription for Delores Perry on October 16th, 2013.

25  You'll recall her as the patient who was allegedly selling

1   drugs to children.

2          How do you know to convict on Count 3?  Let's

3   look at Government Exhibit 3.  You've heard a lot about

4   Ms. Perry.  Her history is similar to Scott Jones'.  She

5   also took multiple drug tests at Lighthouse.  And in

6   July 2013, she tested positive for cocaine.  Even so,

7   between July 2013 and October 2013, Dr. Titus proceeded to

8   prescribe six more prescriptions for Morphine and Oxycodone.

9   Six prescriptions is not a zero tolerance policy.

10          And on October 2nd, 2013, Ms. Perry again tested

11   positive for cocaine.  On that same day, Shannon Holleger

12   received a call stating that Delores Perry was selling drugs

13   to children.  She put the note in Ms. Perry's chart.  But

14   when asked how Dr. Titus responded to calls like this one,

15   Ms. Holleger testified that Dr. Titus would shrug it off as

16   hearsay.

17          Sure.  Doctors do occasionally receive calls

18   like the ones Dr. Titus got about Delores Perry, and an

19   anonymous call in and of itself is not reason for a

20   discharge.  But the appropriate medical response is to get

21   more information.  Trust, but verify.

22          Dr. Titus discharged Ms. Perry for testing

23   positive for illicit drugs, no mention of the anonymous

24   call.  But what else did Dr. Titus do?  He wrote Ms. Perry

25   another prescription on September 16th, 2013, for the same

1   narcotics she had previously been prescribed two weeks after

2   he discharged her.  There was no referral, no intervention,

3   no followup.  This prescription was not the legitimate

4   practice of medicine.  It was something else.

5          Let's look at Count 4.  Count 4 relates to a

6   prescription for Maryjane Mench on December 9th, 2013.

7          How do you know to convict on Count 4?  Let's

8   look at Government Exhibit 4.  By now, you know the pattern,

9   and Dr. Titus' prescriptions to Ms. Mench are no different.

10  Maryjane Mench, a Medicare patient, provided numerous

11  inconsistent drug tests, showing that she had taken drugs

12  that Dr. Titus had not prescribed and that she had not taken

13  other drugs that he had prescribed.

14         After the sixth test showing that she was not

15  taking the prescribed Oxycodone, he prescribed her not one,

16  but two Oxycodone products on December 9th, 2013.  That

17  prescription was for no legitimate medical purpose and

18  outside the usual course of medical practice.

19         Even after that prescription, Dr. Titus

20  continued three more prescriptions.  Seven inconsistent

21  results before she was discharged for cocaine use in January

22  of 2014.  And on her way out the door, Dr. Titus prescribed

23  her one more for the road on January 23rd, 2014.  This was

24  not medicine.

25         Let's look at Count 5.  Count 5 relates to a

1    prescription for Dione Dickerson on December 18th, 2013.

2            How do you know to convict on Count 5?  Look at

3    Government Exhibit 5.  Like Ms. Mench and Mr. Jones before

4    her, Dione Dickerson repeatedly provided inconsistent drug

5    results in which she tested negative for the Oxycodone that

6    was prescribed to her.  And you know why she was often

7    testing negative.  Ms. Molesi told you that she saw Dione

8    Dickerson sell her prescriptions from Dr. Titus with her own

9    eyes.

10           And though Ms. Molesi and Ms. Dickerson may not

11   have told Dr. Titus that Ms. Dickerson was selling her

12   drugs, Dr. Titus knew as much through her drug tests, but he

13   continually ignored it.  The prescriptions Dr. Titus wrote

14   to Dione Dickerson were not for a legitimate medical

15   purpose.  This includes the Oxycodone and Morphine that he

16   prescribed to her on December 18th, 2013.

17           Let's go to Count 6.  Count 6 relates to a

18   prescription for Lisa Parsons on January 20th, 2014.

19   Ms. Parsons is the patient who showed up in the ER with

20   Fentanyl patches covering her body.

21           How do you know to convict on Count 6?  Let's

22   look at Government Exhibit 6.  You heard from Ms. Parsons'

23   stepfather, Henry Lankford, that she was not an addict when

24   she began seeing Dr. Titus, that she ran a company and

25   worked for the police department on weekends.  Mr. Lankford

1    told you that as time went on, Ms. Parsons became addicted

2    to these drugs.

3            By 2013, Dr. Titus was prescribing Ms. Parsons

4    Oxycodone and Fentanyl.  Remember, Fentanyl is measured in

5    micrograms because it is so much more potent than Morphine.

6    The highest dose of it is a hundred micrograms.  And by

7    October of 2013, Dr. Titus was giving Ms. Parsons ten

8    75-microgram patches every month, plus 180 Oxycodone.  All

9    the while, Ms. Parsons was testing negative for the drugs

10   that she had been prescribed.

11           And in December 2013, she tested positive for

12   cocaine.  Clearly, she was struggling, she needed help, but

13   Dr. Titus kept prescribing.  So it's no surprise that on

14   January 10th, 2014, Mr. Lankford discovered Ms. Parsons

15   nearly comatosed, unresponsive on her bed, and took her to

16   the ER immediately.

17           You heard from her ER doctor, Joseph Raziano,

18   who told you that when she arrived at the ER, she was

19   covered in Fentanyl patches all over her body, and that he

20   had never seen anything like it in his 30 years of

21   experience.  Even after Ms. Parsons' overdose, Dr. Titus

22   continued prescribing her another 90 Oxycodone

23   15 milligrams.

24           On January 20th, 2014, Dr. Titus issued

25   Ms. Parsons a discharge letter three days later,

1   acknowledging her overdose from January 10th, ten days

2   before his last prescription to her.  That discharge letter

3   is at Government Exhibit 111 at Page 34.

4            Take a look at that letter.  You've seen a

5   number of discharge letters at this point, but Ms. Parsons'

6   discharge letter is different.  It's more detailed, more

7   clinical.  It discusses oversight and intervention.

8            Why is it different?  Because Dr. Titus knew

9   that Dr. Raziano had filed a complaint against him.  Compare

10  that discharge letter to reality.

11           There is zero evidence in Ms. Parsons' file that

12  Dr. Titus followed through on any of the recommendations.

13  No referrals to a substance abuse program.  No weekly

14  appointments.  No reevaluation.  Like so much else,

15  Ms. Parsons' discharge letter was just paper in the file,

16  but it shows that Dr. Titus knew what he should have been

17  doing.

18           Let's look at Count 7.  Count 7 relates to a

19  prescription for Gregg Smith on April 3rd, 2014.  You'll

20  remember him as the truck driver who was also morbidly

21  obese.

22           How do you know to convict on Count 7?  Look at

23  Government Exhibit 7.  You learned about Gregg Smith from

24  his sister, Carla Haynes.  Ms. Haynes told you that her

25  brother struggled with addiction for years before he started

1   seeing Dr. Titus.  And although he got clean and sober at

2   some point, she had concerns that he had again started using

3   Oxycodone or some other opioid when he was Dr. Titus'

4   patient.

5           Ms. Haynes told you that she could tell when he

6   was using because his voice became very slurred.  She

7   testified that her brother was a long-distance truck driver,

8   and she was concerned for his safety as well as the safety

9   of others when he was on the road.

10           Mr. Smith's chart also showed that he was

11  morbidly obese.  You learned from Dr. Thomas that morbid

12  obesity often means that a patient has a greater likelihood

13  of not being able to breathe if they get too sedated, and

14  that opioids often do not mix with long-distance driving

15  because of the higher risks of intoxication.  But there was

16  no evidence in Mr. Smith's records that Dr. Titus considered

17  or counseled Mr. Smith on either risk factor.

18           That's not all, though.  Mr. Smith was yet

19  another patient who presented with inconsistent drug

20  screens.  He was essentially telling Dr. Titus what was

21  going on.  But instead of intervening, Dr. Titus continued

22  prescribing, eventually writing Mr. Smith the highest

23  possible dose of Fentanyl, ten patches per month of

24  100 micrograms per hour, plus 150 Oxycodone 15 milligrams.

25  That's 240 milligrams of Morphine equivalents to a morbidly

1    obese individual driving a truck.

2              Remember, even Dr. Warfield pointed out that the

3    CDC highlights just 90 milligrams of Morphine equivalents is

4    the point when side effects like addiction and trouble

5    breathing increase significantly.  And at 240 milligrams of

6    Morphine equivalent, the risk of fatality rises to one in

7    32.  And that's exactly what Dr. Titus prescribed to Gregg

8    Smith on April 3rd, 2014.

9              Counts 1 through 7, almost across the board,

10   unexpected drug test results, lack of intervention, warning

11   or discharge letters and continued prescribing without

12   monitoring.

13             Remember, in the face of all this information,

14   the only opinion by Dr. Warfield that she provided was that

15   Dr. Titus must have been practicing medicine.  But does this

16   seem like the practice of medicine to you?

17             Let's look at Count 8.  Count 8 relates to a

18   prescription for Donald Meck on April 22nd, 2014.  How do

19   you know to convict on Count 8?  Look at Government

20   Exhibit 8.  You heard about Donald Meck, a Medicare patient.

21   You also saw that when Mr. Meck went to the ER in June of

22   2013, the ER doctor noted that during his day's long stay,

23   Mr. Meck was not given any Oxycodone and his pain had not

24   been an issue.  Those records were sent to Dr. Titus and put

25   in Mr. Meck's chart.

1          Despite this note, what did Dr. Titus do?  He

2     continued to prescribe Oxycodone to Mr. Meck for months and

3     then tossed in prescriptions for Fentanyl patches.  All the

4     while, Mr. Meck's charts were mostly blank or filled in by

5     one of the office staff.  No notes about treatment plans or

6     his response to the extremely high dosage of opioids that he

7     was receiving.

8          Instead, after Mr. Meck was released from the

9     ER, he returned multiple unexpected drug tests that all

10    showed that he was not taking Oxycodone as prescribed.

11    Despite these results suggesting that Mr. Meck was abusing

12    Oxycodone, Dr. Titus continued to prescribe, including on

13    April 22nd, 2014.  This was not legitimate medical care.

14         Let's look at Count 9.  Count 9 relates to a

15    prescription for Loretta Connelly on June 12th, 2014.

16         How do you know to convict on Count 9?  Look at

17    Government Exhibit 9.  You learned about patient Loretta

18    Connelly.  You learned that by November 2013, Dr. Titus

19    prescribed her Fentanyl, Oxycodone, and Ambien all in the

20    same month.  Her drug screen showed that she was taking an

21    unprescribed benzo.  That's a sleeping pill, a sedative and

22    two opioids, a combination that only increases the risk of

23    overdose and death with no evidence that Dr. Titus counseled

24    Ms. Connelly about this.

25         Between January and May 2014, Ms. Connelly

 1    presented with multiple inconsistent drug screens, having

 2    tested negative for the drugs prescribed, all sandwiched

 3    between two positive screens for cocaine in January 2014 and

 4    May of 2014.  And on June 3rd, 2014, Dr. Titus discharged

 5    her for the cocaine.

 6           At that point, she was no longer Dr. Titus'

 7    patient.  But nine days later, on June 12th, 2014, he

 8    prescribed her one for the road, 75 more Oxycodone 15s, even

 9    though Dr. Titus knew she hadn't actually been taking the

10    Oxycodone that he had been prescribing.  This prescription

11    was not legitimate, and it was not within the usual course

12    of medical practice.

13           Let's look at Count 10.  Count 10 relates to a

14    prescription for Chasity Calhoun on June 12th, 2014.  You

15    know Chasity Calhoun well.  You heard her testify.  She was

16    the 17-year-old who got hooked on opioids.

17           How do you know to convict on Count 10?  Look at

18    Government Exhibit 10.  Suffice it to say, Chasity Calhoun

19    was a young girl when she started seeing Dr. Titus.  Right

20    off the bat, he prescribed her a dangerous combination of

21    Soma, a muscle relaxer, and an opioid.  Instead of

22    counseling her that these two drugs should be taken together

23    with caution, he told her that they actually, "worked better

24    together for pain."

25           Ladies and gentlemen, that is the exact opposite

1  of what he should have counseled Ms. Calhoun.  So it's not

2  surprising that just months after Dr. Titus started

3  prescribing Oxycodone to Ms. Calhoun, she became addicted.

4  But he continued prescribing.

5          Ms. Calhoun told you herself that even though

6  she had Medicaid, she sold pills to pay for her

7  prescriptions in cash, that she borrowed pills to pass pill

8  counts.  When her July screen taken from an oral swab came

9  back testing positive for heroin, Dr. Titus discharged her

10  for a second time, but two days later, after he had ended

11  the doctor-patient relationship again, Dr. Titus wrote her a

12  prescription for Oxycontin and Oxycodone.  No referrals.  No

13  intervention.  No concerns.  And after Dr. Titus discharged

14  her, she got hooked on heroin.

15          Remember, this is the same doctor who was so

16  generous and kind that he offered to send Ms. Calhoun on an

17  all expenses paid trip to the Ritz in Florida.  And when she

18  didn't go, he wrote her a check for $4,200.  The same doctor

19  who had dinner with Ms. Calhoun and her parents, Sheri and

20  Vergil Warner, people you've heard were also addicted to the

21  drugs that Dr. Titus prescribed.  Yet month after month,

22  Dr. Titus took $180 cash from a patient he knew was on

23  Medicaid.

24          That behavior is not generous, ladies and

25  gentlemen.  It's manipulative and it blurs the

1    doctor-patient relationship.  This was not legitimate

2    medical care.

3             Let's look at Count 11.  Count 11 relates to a

4    prescription for Tracie Owens on June 22nd, 2014.  She is

5    the patient who presented with migraines and had three

6    separate first and only warning letters.

7             How do you know to convict on Count 11?  Look at

8    Government Exhibit 11.  You learned from Dr. Thomas that

9    opioids are contraindicated for migraines, meaning they are

10   not recommended.  Why?  Because mixing opioids with

11   migraines often results in getting even more headaches.

12   Dr. Warfield agreed that opioids would not be what she would

13   use to treat a migraine and that it's not a common

14   treatment.

15            But when Ms. Owens showed up in July 2013,

16   Dr. Titus immediately prescribed her Oxycodone.  And he

17   continued prescribing Oxycodone even though month after

18   month in March, May, and June of 2014, her drug tests showed

19   that she was negative for Oxycodone.  The office staff went

20   so far as to write second notice and third notice on her

21   warning letter, each of which clearly said it was her first

22   and only notice, but he kept going.

23            On July 22nd, 2014, Dr. Titus again prescribed

24   Ms. Owens 100 Oxycodone 15s, drugs he knew she was either

25   not taking or was abusing.  No intervention.  No referrals.

1    No questions asked.  This was not legitimate medical care.

2           Let's look at Count 12.  Count 12 relates to

3    prescriptions for Michael Adams on September 24th, 2014.

4    Mr. Adams was the gentleman who felt compelled to tell you

5    about the anxiety and shame he feels about his substance use

6    disorder.

7           How do you know to convict on Count 12?  Look at

8    Government Exhibit 12.  Mr. Adams testified before you on

9    the second full day of trial.  He told you right off the bat

10   that he still takes 30 milligrams of Methadone every day

11   that he buys illegally from a friend.  He admitted that he

12   has an addiction.  He needs pills to get up and go in the

13   morning, and he fears the day that his supply will be cut

14   off.

15          You also heard from him that Dr. Titus did

16   nothing to actually treat his pain.  And you heard about

17   countless warning signs that Mr. Adams was, as he admitted,

18   abusing drugs.  For example, after requiring Mr. Adams to

19   see Dr. Xing per the Consent Agreement, the only time we've

20   actually seen evidence of a visit following Dr. Titus'

21   otherwise meaningless referrals, Dr. Titus ignored

22   Dr. Xing's recommendation to reduce Mr. Adam's Oxycodone

23   amount.

24          Mr. Adams himself raised a concern with

25   Dr. Titus that he thought he might be addicted.  What did

1    Dr. Titus do?  He shrugged it off and said, "It was merely a

2    habit."

3             And in the face of multiple drug tests showing

4    that Mr. Adams had taken his Oxycodone too quickly or that

5    he had taken Methadone that Dr. Titus never prescribed,

6    Dr. Titus kept on going.  After four warning letters, three

7    of which Mr. Adams had no recollection of discussing with

8    Dr. Titus, Dr. Titus dismissed him.

9             And on that same day, September 24th, 2014,

10   Dr. Titus gave Mr. Adams two more prescriptions.  This time

11   double his normal dose, 160 Oxycodone 15s and 60 Oxycodone

12   10s.  It was Mr. Adam's birthday, after all.

13            Probably the most telling reaction came from

14   Mr. Adam's himself when he was testifying days ago.  After

15   looking at several of his prescriptions from Dr. Titus,

16   Mr. Adams remarked, he said it is, "truly embarrassing to

17   see all these prescriptions that I have consumed over the

18   years.  I am just appalled by it, to be honest.  I'm sorry.

19   I'm sad.  I don't know what else to say."

20            He continued that you "don't realize you're

21   doing this much when you're doing it.  I'm looking at them

22   like how did I function?  I don't know.  I guess the

23   immunity.  You get so used to it that you don't know what

24   you're taking.  That's all I can say."

25            Let's look at Count 13.  Count 13 relates to a

1    prescription for Lucille Moody on October 27th, 2014.

2    Lucille Moody was a backdoor patient.

3         How do you know to convict on Count 13?  Look at

4    Government Exhibit 13.  As you heard from Amanda Molesi,

5    Lucille Moody was a backdoor patient.  This meant that she

6    had Dr. Titus' phone number.  She could get in to see him

7    whenever she wanted.  And when she didn't get her way, she

8    called Dr. Titus and he would have her walk around and come

9    through the back.  And it wasn't just her.  It was her

10   husband, James Moody, too.

11        She and Dr. Titus went way back, all the way

12   back to 2007 when Dr. Titus started seeing her and started

13   her on Percocets.  From just the end of 2012 through 2014,

14   Dr. Titus wrote Ms. Moody 86 prescriptions for over 5,700

15   pills and patches.  And during that time, Ms. Moody provided

16   eight inconsistent drug tests, all negative for the drugs

17   that Dr. Titus was prescribing.

18        What could this mean?  By now you know.  She was

19   either taking her drugs too soon, drug abuse, or she was

20   selling them, diversion.

21        Part way through her tenure at Dr. Titus',

22   Ms. Moody also tested positive for cocaine.  And while her

23   file shows a discharge letter, she wasn't gone.  Why?

24   Because Ms. Molesi told you, Lucille Moody was never going

25   to be discharged.  She testified that every time Ms. Moody

1   was discharged, Dr. Titus brought her right back.

2   Ms. Moody's patient file shows that around November 2013,

3   she made an appointment for drug counseling, but on that

4   same day, Dr. Titus prescribed her the same Oxycodone and

5   Fentanyl he had prescribed her before her discharge.

6           And there is no evidence that Ms. Moody actually

7   went to the drug counseling program.  Nothing more than

8   paper in the file to make it look like Dr. Titus was doing

9   the right thing.

10          After her eight drug tests showing she wasn't

11  even taking the uber-strong Fentanyl patches that Dr. Titus

12  was prescribing, he sent her a warning letter.  But two

13  weeks later, on October 27th, 2014, Dr. Titus again

14  prescribed her Oxycodone 15 milligrams and Fentanyl

15  100 micrograms, the highest possible dose on the market.

16          Finally, let's look at Count 14.  Count 14

17  relates to a prescription for Melissa Silbereisen on

18  October 30th, 2014.

19          How do you know to convict on Count 14?  Look at

20  Government Exhibit 14.  Like Ms. Moody, Ms. Silbereisen and

21  Dr. Titus went way back to June 2008 when the Defendant

22  started her on Percocets.  In October 2013, with no

23  explanation whatsoever, Dr. Titus started Ms. Silbereisen on

24  a high dose of Fentanyl, eventually increasing her

25  prescription to the highest possible option, 100 micrograms

1    of Fentanyl per hour on top of almost 150 Oxycodone

2    15 milligrams a month.  That's the same dose he was giving

3    to Gregg Smith who you heard was over 350 pounds.

4              Ms. Silbereisen, on the other hand, was about

5    half that weight.  Remember, this amount of Morphine

6    equivalent kicks the risk of fatality to one in 32.  Like so

7    many of Dr. Titus' patients, Ms. Silbereisen repeatedly

8    tested negative for the drugs prescribed.

9              And in August 2014, she tested positive for

10   Naloxone.  What is that?  It's an opioid reversal drug.

11   Dr. Thomas testified that the drug is only present when a

12   patient has an opioid overdose or when a patient is treating

13   an opioid addiction.

14             You would think that if a patient presented with

15   Naloxone in their system, that a doctor would inquire why.

16   But instead, Dr. Titus kept on prescribing the same thing,

17   Fentanyl 100s and Oxy 15s.  For two more months, the same

18   super strong medications, until October 9th, 2014, when

19   Dr. Titus discharged her for the Naloxone that had been in

20   her system two months prior.  Dr. Titus continued

21   prescribing.

22             And on October 30th, 2014, 21 days after her

23   discharge, he prescribed her yet another 74 Oxycodone

24   15 milligrams, after the physician-patient relationship was

25   over.  Like so many of his others, this prescription was not

1   in the usual course of practice, and it certainly was not

2   legitimate.

3          Okay.  Fourteen patients, 14 different dates, 14

4   separate prescriptions.  Across the board, unexpected test

5   results, lack of intervention, warning, or discharge

6   letters, and continued prescribing without monitoring.  Find

7   Dr. Titus guilty on all 14 counts of this indictment.

8          And, finally, Count 15.  Dr. Titus' lack of

9   individualized care, the meaningless warning letters,

10  irresponsible discharge letters, no followup or vigilance.

11  The failure to regularly refer his patients in need of detox

12  for alternate medical treatment, to actually take care of

13  them, it wasn't limited to the 14 patients we discussed

14  throughout trial.  No.  It was a years-long pattern that

15  continued every day, every week, every month, including the

16  entire time Dr. Titus leased Lighthouse Internal Medicine at

17  10-12 North Church Street in Milford, Delaware.  And that is

18  Count 15, maintaining a drug-involved premises.

19         Here's what you need to find:  First, that

20  Dr. Titus permanently or temporarily maintained, or leased,

21  or used the place described in the indictment.

22         Second, that Dr. Titus maintained that place for

23  the purpose of distributing any controlled substance outside

24  the usual course of professional practice and not for a

25  legitimate medical purpose.

1    And third, that Dr. Titus acted knowingly.

2    Let's go through the evidence that supports each

3    element.  The first is simple.  There's no dispute that

4    Dr. Titus leased 10-12 North Church Street.  You've seen the

5    lease.  It's Government Exhibit 202.  And you've seen the

6    rent checks.  They're Government Exhibit 502.

7    Second, the evidence proves beyond a reasonable

8    doubt that the primary purpose of the Defendant's operation

9    at Church Street was to prescribe opioids in exchange for

10   cash, not for a legitimate medical purpose.  All of the

11   evidence we've discussed so far supports this element.  We

12   won't go through it again, but think about the sham

13   paperwork, the ignored drug screens, and meaningless pill

14   counts, the lack of intervention or actual treatment, and

15   Dr. Titus' continued prescribing in exchange for cash.

16   There may have been some patients here or there

17   who received legitimate prescriptions.  In fact, you heard

18   about a couple from Dr. Thomas' review.  That's because

19   Dr. Thomas came here as a pain medicine expert, not as an

20   advocate for doctors who prescribe opioids.

21   You heard from Judge Andrews that to find that

22   Dr. Titus ran a drug-involved premises, you need to find

23   that the drug activity was a significant or important reason

24   why Dr. Titus ran that premises.  It does not have to be the

25   only purpose.

1          The evidence has clearly shown that the most

2     significant reason that Dr. Titus maintained Church Street

3     was to prescribe opioids in exchange for cash.  Think about

4     the numbers, the testimony, and analysis of Michael Petron.

5     Look at Government Exhibit 803.

6          He reviewed files associated with 282 patients

7     that were randomly selected from a universe of over 1,100.

8     What did his analysis show?  Let's focus on two charts.

9     Government Exhibit 803 at Page 4.  This chart shows that in

10    the sample of 282 patients alone, there were 874

11    inconsistent drug results.  And Dr. Titus prescribed 7,241

12    prescriptions following those inconsistent results.  That's

13    29,323 prescriptions after inconsistent drug screens when

14    estimated for the population of 1,100 patients.

15         And what about Government Exhibit 803 at Page 5?

16    This chart shows just how many prescriptions Dr. Titus wrote

17    after warning or discharge letters.  Mr. Petron estimated

18    that for the entire population, Dr. Titus would have written

19    over 1,500 prescriptions after a discharge letter.

20         The last element is that Dr. Titus acted

21    knowingly.  And how do you know that?  Think about all the

22    notice Dr. Titus had.  The suspension, the Consent

23    Agreement, the 2013 model policy, the complaints from

24    members of the community, and the continuing medical

25    education.

1         And that's not all.  You saw the notes in his

2    patient files, anonymous calls complaining that his patients

3    were selling their pills to children or were abusing their

4    prescriptions.  You saw notes from other physicians, pain

5    doctors, ER doctors, even pain doctors to whom Dr. Titus was

6    required to refer under the Consent Agreement.  All saying

7    the same thing:  Beware.  Too many pills.  Slow down.  Stop.

8         Look at Government Exhibit 102 at Page 214, and

9    Government Exhibit 115 at 80, and Government Exhibit 125 at

10   218.  And it wasn't just doctors.  You heard from three

11   different pharmacists who each independently made the

12   decision to stop filling Dr. Titus' prescriptions in the

13   face of all the warning signs they saw.

14        And you heard from Christine Armstrong, a former

15   probation officer, who testified that she supervised Gerald

16   Bradley, who was enrolled in a program specifically designed

17   for people suffering from substance abuse disorder.  When

18   Mr. Bradley tested positive for opioids and provided her a

19   letter from Dr. Titus, she called Dr. Titus out of concern

20   for Mr. Bradley's health.  What was Dr. Titus' response?  He

21   laughed at her and said, "I'm the doctor, not you.  I have

22   the medical license, not you."

23        When she asked him whether he had taken an oath

24   to put the patient first and to do no harm, what was his

25   response?  "This is my business, not yours."

1          Despite Ms. Armstrong's warnings, Dr. Titus

2     continued to prescribe over 1,700 Oxycodone and Oxycontin

3     pills after Ms. Armstrong's complaint.

4          And John Zalewski, an HVAC repairman with no

5     other connection to Lighthouse, he went to Church Street in

6     2014 on a service call, and he literally witnessed someone

7     exchange pills for cash in the parking lot right there at

8     Church Street.  And when someone approached Mr. Zalewski and

9     asked if he was interested in buying or selling, that was

10    enough.  Mr. Zalewski refused to go back to Lighthouse and

11    reported it to the police.

12         And it wasn't just in the parking lot.

13    Mr. Adams described the waiting room as a circus.

14    Ms. Calhoun said people were talking about selling their

15    pills, and that Dr. Titus sometimes talked to these patients

16    from the reception area.

17         The Defense wants you to believe that Dr. Titus

18    was oblivious to all of this.  But if people who were there

19    on rare occasions saw it and heard these things, how is it

20    possible that the person who owned the clinic, the person

21    who was there from 6:00 a.m. to 6:00 p.m., who saw every

22    single one of those patients every day, who called the

23    shots, was the boss, the owner, how did he not know?  That

24    is absurd.

25         These alarm bells, combined with all the other

1    red flags that were waving in Dr. Titus' face, the

2    predetermined pill counts, the repeatedly inconsistent drug

3    screens, the anonymous calls, the letters from other

4    doctors, the overdoses, the complaints, the broken

5    safeguards, all of this made clear that Dr. Titus knew he

6    was prescribing.  And it was not in the patients' best

7    interests.  It was not for a legitimate medical purpose.

8    And it was far outside legitimate medical practice.

9              Ladies and gentlemen, you heard testimony that

10   Dr. Titus believed every patient deserves a doctor, that he

11   took on these difficult patients who no one else would see.

12   Of course, every patient deserves a doctor.  But what these

13   patients were getting from Dr. Titus was not medicine, it

14   was the opposite.  It was a drug-dealing operation dressed

15   up as a doctor's office.

16             A medical license does not place Dr. Titus above

17   the law.  Convict him on all 15 counts.

18             THE COURT:  All right.  Thank you, Ms. Sobczak.

19             All right.  So members of the jury, now we will

20   take a 15-minute morning break.

21             So can we take the jury out, please?

22             (Jury leaving the courtroom.)

23             THE COURT:  All right.  So we'll be in recess

24   for 15 minutes.

25             DEPUTY CLERK:  All rise.

```
 1                    (Recess was taken.)

 2                    DEPUTY CLERK:  All rise.

 3                    THE COURT:  All right.  Let's get the jury.  For

 4       what it's worth, I am thinking that after Mr. Bostic

 5       finishes, now anticipated it will be one o'clock, that we

 6       may have to break for a short lunch.  So basically what I

 7       would expect is assume that he comes in roughly, as

 8       predicted, we'll say half hour for lunch.  Their lunches

 9       will be here.  They can eat quickly.  If they have cookies

10       or something, they can save them for later on.

11                    MS. KOUSOULIS:  Are you talking about before

12       rebuttal or --

13                    THE COURT:  Yeah, before.  I mean, I can't just

14       make these people -- and, you know, kind of -- I expected

15       these things to be shorter, and it would have all worked

16       out.

17                    MS. KOUSOULIS:  So if Mr. Bostic is maybe a

18       little shorter, maybe, like, depending on how long Ms. Remis

19       is --

20                    THE COURT:  Well, we'll see.  But in any event,

21       that's what I'm thinking.

22                    (Jury entering the courtroom.)

23                    THE COURT:  All right.  Members of the jury,

24       welcome back.  Everyone, you may be seated.

25                    Mr. Bostic, you may proceed.
```

1    MR. BOSTIC:  Thank you, Your Honor.

2    If the Government's case is as strong as they

3    put forth to you, why does the Government continue to twist

4    the facts as you heard in the courtroom, as co-counsel,

5    Ms. Kousoulis, mentioned in her opening statement?  The

6    Government is aware through the testimony of Jane Webb and

7    Shannon Holleger, that discharge letters were written at the

8    time that Ameritox screens came into the office.  They're

9    warned.  They're written.  Then the discharge letters were

10   given to the patients when they came in for their next

11   appointment, five, ten days later.

12   Why do they twist the facts?  Because I suggest

13   the evidence is not what they claim it to be.  The

14   Government knows from the testimony of their own witnesses

15   in this case that Dr. Titus, in his effort to try to control

16   diversion of prescriptions, took the steps of breaking his

17   prescriptions into two pieces, the time when the person

18   appeared for his or her monthly appointment and he examines

19   them, you get half the prescription.  And then they were

20   required to come back two weeks later to get the other half.

21   He thought he could control things a little better that way.

22   But yet, they talk about him prescribing after discharge and

23   weeks and days later.  They know the facts.

24   Shannon Holleger told you from the witness stand

25   that the reason why she had files at her house and Josie

1    Walters had files at their house, it was pursuant to the

2    request of former patients asking for their files to send to

3    other doctors.  And she told you that because Dr. Titus had

4    always been behind in updating his files and notations, they

5    took the effort to get those files, the slips of papers, the

6    different scenarios and what have you that were connected to

7    the files, so the next pain management doctor could have a

8    full understanding of the patient that would be presenting

9    to him or her.  Why twist things if your case is so strong?

10             Now, while I talk about Jane Webb, I want to

11   mention something that Jane Webb said to me on

12   cross-examination in answer to my question.  I think she

13   said something to the effect -- and I'll tell you this, this

14   is what I recall, but your memory controls.  She said, "If I

15   believed Dr. Titus was not trying to do the best and caring

16   for treating his patients, chronic pain patients, I would

17   have left.  If he was doing something illegal, as I recall,

18   I would have left."

19             Those are the words of Jane Webb, who was there

20   from about 2008 until the practice was closed.  Firsthand

21   view.

22             She's the one who had discussions with Dr. Titus

23   about whether he should discharge or not discharge, and to

24   whom he said, "Well, I'm going to use my discretion.  I have

25   a medical discretion.  I'm going to use it."

```
 1                    So if Dr. Titus was running a medical practice
 2       that was a sham, as the Government claims, one of their star
 3       witnesses told you, if that were true, if he wasn't acting
 4       in the best interest of his pain management, chronic pain
 5       management patients, she would have left.  She would not
 6       have hung around.  She would not want to be part of an
 7       illegal operation.
 8                    Ladies and gentlemen of the jury, good morning.
 9       My co-counsel, Ms. Kousoulis, and I, on behalf of Dr. Titus,
10       we thank you for your attentiveness during this long trial.
11       And we thank you ahead of time because we are aware that you
12       will apply all the instructions, the jury instructions, and
13       the law as it's given to you fairly and impartially to
14       Dr. Titus as to any other person charged with a criminal
15       offense, and a Defendant in a case.
16                    Now, I usually don't read my closing argument.
17       I like to be upfront and be more animated, but I'm getting a
18       little older and I think that in the last two-and-a-half
19       weeks you've heard so many things that it might be good if I
20       try to stick to my script and read most of my closing to
21       you.
22                    We trust that you'll hold the Government to the
23       highest burden of proving guilt beyond a reasonable doubt.
24       Our country is unique in that ^ it's amount of a few that
25       require the Government to carry such a high burden of proof
```

1    beyond a reasonable doubt.  And as the Court has instructed

2    you, no burden of proof is placed upon a Defendant in a

3    criminal case.

4              In fact, Dr. Titus or any other Defendant is

5    presumed innocent, and that presumption stays with him

6    throughout this trial.  It stays with him as you take this

7    case back into the jury room and deliberate.

8              And you know, my little daughter asked me once

9    when I was practicing a closing argument, but what does it

10   mean the presumption of innocence, this reasonable doubt?

11   And I used an analogy that I am going to use here today

12   because I thought it had meaning.  Reasonable doubt and the

13   presumption of innocence go hand in hand.  Like a glove in a

14   hand, I should say.

15             See, I've already forgotten my analogy.  But

16   with respect to the presumption of innocence, it's like when

17   the Defendant walks into a courtroom, he or she is clothed

18   in this cloak of presumption of innocence and down the front

19   it has 12 buttons on there.  And that cloak remains with the

20   Defendant throughout the trial until and if you find the

21   Government has proven its case beyond a reasonable doubt,

22   and it remains with him as to each and every one of you as

23   you deliberate.  And each and every one of you have to open

24   up one of those buttons to remove this -- all 12 to remove

25   this cloak of presumption of innocence.

1              Now, look, some things are clear in this case.

2      One thing that is clear, contrary to the Government's

3      position, is that this is not an open and shut case.

4              But something else that's clear is that

5      Dr. Titus struggled with maintaining orderly and fulsome

6      medical records.  Contrary to what the Government is telling

7      you, that problem with maintaining the best records didn't

8      start when he went into managing chronic pain.  It started,

9      as Jane Webb told you, as early as she knew back in 2008 or

10     so when she joined his office.  She was brought on initially

11     to primarily manage the backflow of medical records that

12     needed to be updated.

13             He didn't get better at managing his records,

14     but that's not criminal.  Contrary to what the Government

15     may tell you, that's not criminal.  It's not intent to

16     commit a crime.

17             You know, some folks, whether you're a

18     professional, whether you're a doctor, lawyer, whether, you

19     know, even in your own lives, tend to keep a lot of

20     information in their heads.  We see it a lot in the legal

21     profession.  You know, we work with co-counsel, and I think

22     Ms. Kousoulis is probably smiling inwardly because I'm

23     notorious for it.  Files are not the best as they should be.

24     I don't write everything down.  But if she calls me and she

25     wants to talk about what's going on in a case that she may

1     be taking over for me or I'm passing off or vice versa, I

2     can tell her of my conversations with witnesses or a client.

3     There's no crime in not writing every iota, every single

4     transaction between a doctor and a patient in the chart.

5     Sloppy recordkeeping, but it's not criminal.

6              I want to ask you to keep your eye on the ball

7     in this case.  I want to ask you to keep your eye on the

8     prize that the Government is seeking here, because as I've

9     said before, my co-counsel said in the beginning, there is a

10    lot of twisting of evidence and lack of evidence.  You know,

11    the Government has come against Dr. Titus gangbuster style.

12    The mighty and awesome power of the Government has been

13    leveled at Dr. Titus.

14             You look at the Defense table and when we were

15    doing jury selection, you saw Ms. Kousoulis, and I, and our

16    client, and I believe Mr. Marek from time to time would come

17    in to help us through this trial with the presentation of

18    electronic evidence.  But if you remember when we -- you

19    came in to be for determination whether you would be on this

20    jury, when you look at our side, you see Ms. Kousoulis and

21    myself and then Dr. Titus.

22             You look at the Government's side, I think there

23    were about eight to ten lawyers and paralegals and case

24    agents over on their side.  That's awesome power, and they

25    leveled all of that at Dr. Titus.  And there were agents and

1     Task Force officers that were involved in this investigation

2     that probably quadruple what you saw in court as we were

3     getting the jury, you members as a jury here.

4               Now, to be clear, it's not a crime for a

5     physician to write a prescription for controlled substances

6     if that physician has a good faith belief that the

7     prescription is being written for a legitimate medical

8     purpose and in the usual course of a professional or medical

9     practice.  There is no question here, I think the Government

10    conceded to this, that the -- let me -- I don't know if they

11    conceded it or not, but let me say this, there's no question

12    here that the prescriptions written by Dr. Titus in this

13    case were written for a legitimate medical purpose.  Every

14    patient file that was gone through and every patient that

15    testified here, whether called by the Government or by the

16    Defense, testified about having real and severe pain.  The

17    type of pain or area of pain may be different, whether it's

18    lumbar, cervical, whether it was, I think the term is RDS,

19    and I probably didn't get that right, but I'll come back to

20    it, that nerve pain that some people get.  It was real.  And

21    when you write a prescription to manage real pain, that's

22    for a legitimate medical purpose.

23              And every patient that testified talked about

24    how their prescription helped them get through that pain.  I

25    think Mr. Adams that was referred to in the Government's

1    closing and the others told you, he told you -- and if you

2    remember, he and I were joking and talking about drywall and

3    what have you, and he told you he struggled every single

4    day.  The pain to get up and go to work and do a full day's

5    work to support his family, real pain.

6         So I suggest to you -- I will say this, you

7    heard from some patients that talked about maybe they

8    developed a dependency.  Dr. Warfield, the defense expert,

9    talked about the difference between dependency and

10   addiction.  And some said that they realized they had become

11   addicted at some point.

12        Those that told you, these patients that came in

13   here and told you that they were addicted, they told you

14   something else that's really important.  They said,

15   Ms. Calhoun did, Mr. Brent Hood did, Mr. Adams did, as I

16   recall, all of these are Government witnesses, they told you

17   they hid their addiction from Dr. Titus because they

18   believed that he would discharge them.  They presented false

19   faces to Dr. Thomas (sic).  And they told you that on the

20   witness stand.

21        Therefore, the Government has failed to prove

22   beyond a reasonable doubt that there was no legitimate

23   medical purpose for the prescriptions written by Dr. Titus

24   identified in the indictment.  That really only leaves the

25   question of whether the prescriptions that were written were

1     written in the usual course of a professional medical

2     practice.  And as Dr. Warfield explained to you, in her

3     expert opinion, they were.

4               You know, we should talk about a couple elements

5     that the Government has to prove here and let's talk about,

6     I think it's element number two, no legitimate medical

7     purpose.  The instruction that Judge Andrews gave you points

8     out that in making a medical judgment concerning the right

9     treatment for an individual patient, physicians have

10    discretion to choose among a wide variety of available

11    options.  Therefore, in determining whether the Defendant

12    acted without a legitimate medical purpose, you should

13    examine all of the Defendant's actions and circumstances

14    surrounding them.

15              And Dr. Warfield talked about the wide available

16    range of options that a medical doctor managing chronic pain

17    has available.  There's no one way to prescribe and treat a

18    chronic pain patient.  It's based on the discretion, the

19    interviews, the examinations, the exchange between the

20    doctor and that patient.  And not everything is written

21    down.  But we know that Dr. Titus had extended meetings with

22    many patients.

23              The Government talks about the wait and there

24    being sometimes people waiting for long times.  And I

25    believe it was Mr. Pucci who came in here fully infirmed,

1     fully suffering from his chronic pain, couldn't sit to

2     testify, and told you that Dr. Thomas -- I'm sorry,

3     Dr. Titus spent time examining him, made him bend over.

4     Sometimes on later appointments, he would check his blood

5     pressure and different things, but he would talk to him.  He

6     would talk to him about his pain.

7               You can take that slide down.

8               The evidence shows here that the prescriptions

9     that Dr. Titus wrote were written in good faith for the

10    treatment of his patients, chronic pain patients, which was

11    a legitimate medical purpose.

12              Now, we should talk about the next element and

13    about knowing and intentional because my colleague told you

14    in the beginning, in the opening, that Dr. Titus acted in

15    good faith in managing his patients.  And this instruction

16    part tells you that if a person acts on the basis of an

17    honestly held belief that is inconsistent with the charged

18    conduct, but the belief turns out to be inaccurate or

19    incorrect, then the person is not acting knowingly or

20    intentionally.

21              Thus, in this case if Dr. Titus made an honest

22    mistake about a patient's medical needs, then he did not act

23    knowingly or intentionally.  That is good faith.  This is

24    the body and soul of the good faith defense in this case.

25              You can take that down.

1        So in this case if Dr. Titus made an honest

2   mistake about a patient's medical needs, then he's not

3   acting knowingly or intentionally to improperly prescribe

4   medication.

5        The offenses charged in this indictment require

6   proof that Dr. Titus knowingly or intentionally distributed

7   and dispensed controlled substances outside the usual course

8   of a professional practice and not for a legitimate medical

9   purpose and maintained premises and a dwelling, his medical

10  offices, for the illegal distribution of drug and pain

11  medication.  His good faith actions put a stop to this

12  notion that he was doing something illegal, that he was

13  running a sham.  Because if you find that he acted in good

14  faith, it would be a complete defense of these charges

15  because it would be inconsistent with Dr. Titus' acting

16  knowingly and intentionally.

17       We heard from the evidence here that the

18  testimony that Dr. Titus routinely performed exams on

19  patients, some days not as fully as what another doctor may

20  have done.  Look at their medical records.  He got MRIs.

21  There was always a pain assessment in the file that a

22  patient did through self report.  He conducted urine tests

23  to help him determine what the patient was doing and how to

24  prescribe, and he discharged patients when he believed it

25  was appropriate.

1    He did not prescribe for any controlled

2    substances for anything other than a legitimate medical

3    purpose.  He believed in good faith that his patients were

4    in pain, that his patients had a legitimate medical need for

5    the prescriptions he was writing, and that he was acting in

6    good faith.  He treated his patients.

7    We talked about the pain level.  You heard he

8    counseled patients, and not everything is in the file

9    because he was sloppy at maintaining his file.  But he

10   counseled them.  And he discharged them when he got to the

11   point that he felt that he could no longer work with them.

12   You know, the evidence shows, and I believe

13   Dr. Warfield talked about this, that Dr. Titus was not a

14   perfect doctor.  He's not here because he was supposed to be

15   a perfect doctor.  He has imperfections.  Those

16   imperfections do not rise to the level of criminality.

17   We cannot dispute the fact that Dr. Titus gave

18   patients chances and sometimes perhaps too many chances.

19   While the Government says that that is prescribing outside

20   the course of a medical practice, Dr. Warfield explained to

21   you that in the field of pain medicine, there's a wide

22   variety in the standard of care when it comes to treatment

23   of chronic pain patients with opioids.

24   She said that while some practitioners may never

25   prescribe opioids to treat chronic pain, other practitioners

1    believe that it is not appropriate to deny a patient with

2    severe pain these pain killers simply because there's a

3    chance of addiction or abuse or simply because they've been

4    addicted to drugs before at some point in their lives.

5           And that is contrary to the Government's

6    assertion.  That's contrary to the Government's assertion

7    that there's no requirement that all other alternative

8    treatment options must fail before opioids are prescribed

9    for pain relief.  She explained that it's -- Dr. Warfield

10   stated to you that it's not uncommon or outside the normal

11   course of a medical practice to provide patients that are

12   being discharged with a prescription for their medical

13   needs.

14          Dr. Titus made mistakes.  He was not perfect.

15   Far from it.  But the evidence, the lack of evidence showed

16   that Dr. Titus was working at his practice, he treated every

17   patient he encountered, every one of them, in good faith,

18   wanted to help them manage their chronic pain.  As I said,

19   did he give too many patients second, third, fourth chances?

20   But his perseverance, he continued to treat them and

21   prescribe them opioids, even after they violated the pain

22   management agreement, was because he believed that they

23   needed the medication to treat their pain.

24          You know, Dr. Warfield talked about naivety, and

25   I'll come back to that, but it's something of importance

1    here in terms of how he approached and dealt with his

2    clients, wanting to believe in them and help them get

3    through their chronic pain.

4            The Government also alleges that the types of

5    pills and the doses that Dr. Titus prescribed was way too

6    much, alleging that his dosing habits and types of narcotics

7    that he was prescribing is evidence that he was prescribing

8    outside the normal course of medical practice.

9            Dr. Warfield, on the other hand, explained to

10   you why in her expert opinion, this was not the case.  That

11   dose escalations are commonly needed in the treatment of

12   chronic pain patients, especially in patients who have

13   previously been taking opioids.

14           We will talk about some of the charts the

15   Government brought up here today.  But as I sit and see this

16   case unfold, it seems to me that the Government is throwing

17   a whole bunch of dirt and mud up in the air trying to get

18   something to stick.  But we have confidence in you, the

19   jury, to separate the weeds from the shaft to understand

20   what's going on here.

21           Sometimes the Government claimed that he didn't

22   discharge patients quickly enough, sometimes they complain

23   about when he did discharge patients.  They complain about

24   his use of a scribe to make entries into the medical chart.

25   They complain about the exceptions of the cash payments for

1  medical appointments.  They complain that there was an

2  increase or uptake in his income in his practice over the

3  years.  They complain that perhaps some patients traveled

4  too far to visit with him.  They complain that possibly he

5  may have violated or not acted consistent with the Consent

6  Decree of 2012.  They complain that he worked too long

7  hours, of six to twelve four days a week.

8         Let's break into that for a second, because we

9  know in the medical field, many nurses, technicians work a

10  four-day workweek.  Ten, 12 hours.  That's 48 hours in the

11  workweek.

12         What if he instead was working five days a week,

13  eight hours a day?  That's 40.  A difference of eight hours

14  in the Government's mind makes this gentleman here, this

15  former Air Force doctor, honorably discharged, makes his

16  medical practice in chronic pain management a sham?  Eight

17  hours' difference.

18         I tell you, the existence of all those things,

19  even if they were true, is in no way criminal.  They do not

20  change the fact that when he met and dealt with his clients

21  and prescribed opioids to them, it was for a legitimate

22  purpose, to address their severe chronic pain.  And it was

23  done within the usual course of medical practice.

24         There are a lot of red herrings the Government

25  threw up.  A lot of mud and innuendo, false narratives that

1941

1    the Government threw up, hoping that something would stick

2    on this wall.  In their mind, they're saying, find him

3    guilty of something.

4             But the blind truth here is that Dr. Titus was

5    acting in good faith in treating his chronic pain patients

6    with opioid treatment therapy.  He made some mistakes, but

7    he was always acting and serving his patients in good faith.

8             You know, about that four-hour day schedule,

9    12 hours a week, I think Jane Webb told you that the

10   schedule was put in place to accommodate people that were

11   working.  Some people can't get off.  You come early in the

12   morning or later in the day.  There's nothing nefarious

13   about that.

14            The Government mentioned that Dr. Titus was a

15   generous individual.  And you heard from, I think it was,

16   Ms. Webb and others here, that he had a big heart, and that

17   he chose to share what he had back when he was making a

18   hundred thousand through all the way up with people that he

19   thought was less fortunate.  He bought wheelchairs.  He did

20   whatever.

21            And, yeah, he probably should not have done that

22   because now his compassion and his generosity as a human

23   being is being turned and twisted against him.  Yes, it may

24   have blurred some guideline or some issue, but it is not

25   criminal.

1    Some of the other things the Government talked

2    about was the urine tox screens and what have you.  And, you

3    know, I think Dr. Warfield addresses that well.  She talked

4    about the naivety and digging deeper into these tox screens

5    and making sense out of them.  She talked about, yeah,

6    something can be negative or states negative, but it has to

7    depend on what the testing -- the drug it's actually testing

8    for, it has to depend on what their cutoff is.  Because some

9    cut off at the lower rates or higher rates in terms of

10   measuring for a particular metabolite or a particular

11   medication.  So these are some things you've got to know to

12   drill down into these urine tox screens.

13   And the Government mentioned Sylvester King, who

14   talked to you about his observations with Dr. Titus' office

15   and talked about Dr. Titus requesting or getting a contract

16   with Ameritox to conduct these tox screens.  And he said,

17   "Well, there was a number that could be called."

18   Are you to believe that Dr. Titus never called

19   that number and perhaps talked to somebody and got advice

20   that may have helped him determine whether or not to

21   discharge a person?  We talk about lack of evidence.  If the

22   Government wants to throw that up there, where's the person

23   from Ameritox that can tell you they either never received a

24   call from Dr. Thomas -- Dr. Titus to discuss this.

25   The lack of evidence tells you as much as

1   evidence presented because the Government had the burden of

2   proof.  The awesome power of this Federal Government, with

3   all the agents, and all the attorneys and all the paralegals

4   in here, have the ability to present someone to talk about

5   whether or not Dr. Titus called them to discuss tox screens

6   and his takeaway from it.  But they did not.

7           The Government argues -- while I'm on this urine

8   screen, I just want to mention something to you because you

9   saw a chart that was presented that basically indicated that

10  Dr. Titus, over the years of his practice, warned,

11  counseled, and or discharged about 50 percent of his patient

12  base.  But to the Government, that's not important.

13          They tell you about supposedly prescriptions

14  made on discharge to individuals that still needed

15  maintenance, still needed medication, as Dr. Warfield told

16  you, to get into a detox program.  Common sense tells you

17  that there's not a bed always there waiting for you.  People

18  have to wait or time to get to another pain management

19  doctor.

20          And I believe there was testimony in this case

21  about the scarcity of people wanting to treat chronic pain.

22  Dr. Warfield talked to you about why many doctors do not go

23  into this area because of the high level of scrutiny and the

24  criminal prosecutions that the Government determined they

25  would bring.  People are afraid.  There's a scarcity of

1    pain, chronic pain doctors.

2              The Government talked to you about the Consent

3    Decree, and perhaps that Dr. Titus did not stick to all the

4    terms of the Consent Decree.  The consent Decree in this

5    case is just like a contract.  It's evidence where if you

6    break a contract, you get civil penalties.  You get to lose

7    your license.  You get to have them shut your practice down.

8              We know that Dr. Titus no longer has a practice.

9    He's no longer practicing medicine, but breaching a Consent

10   Decree is not criminal.  It is not criminal.

11             There was a piece of paper that Dr. Titus had

12   amongst his documents.

13             Mr. Marek, can you pull up Government

14   Exhibit 212 at 611?

15             And the Government showed you Exhibit 212, and

16   they're going to make some inference from it, if they

17   haven't already.  I thought they did in their questioning.

18             Dr. Titus, when he decided to enter into the

19   Consent Decree, he reflected on his reasons for doing so,

20   and it helped him to get -- decide that he, indeed, would

21   enter into this Consent Decree.  And Paragraph 6 tells you

22   that he recognized that some of the things he had done prior

23   to the Consent Decree to prevent diversion of controlled

24   substances from his office may have actually led to the

25   abuse of some controlled substances.

1            Now, I don't know how the Government will try to

2    use this in closing.

3            You can take that down, Mr. Marek.

4            But the important thing is that reflection, as

5    you're making the big decision and writing those thoughts

6    down, do not equate to something nefarious.  It has no

7    impact on these charges, other than he sought to determine

8    for himself why he should enter into that Consent Decree.

9            Any attempt by the Government to say otherwise

10   or to use this in some other way would be based on

11   speculation, innuendo.  And this is extremely true since the

12   document is not dated.  And you, ladies and gentlemen of the

13   jury, cannot speculate.  You cannot operate on innuendos, as

14   much as the Government may want you to, in your

15   determination whether the Government can prove their case

16   and carry the heavy burden of proof beyond reasonable doubt.

17           As I said, Dr. Titus is like any other

18   Defendant.  He's presumed innocent throughout these

19   proceedings.

20           I want to talk to you a little bit about another

21   document.  And the Government's prosecutor mentioned it in

22   her closing, about Dr. Titus, if I recall, looking to retire

23   with "X" number of dollars and what have you.  I want to

24   talk about the money he's made during the course of his

25   practice.

1    I'm holding my head because I don't know if the

2    Government is saying, but I think they're saying or implying

3    that Dr. Titus doesn't have the right to earn income in his

4    business, medical practice, his business.  We know that

5    doctors make some of the -- are the highest level on the pay

6    scale in terms of income.  That's why people go to medical

7    school.  That's why some people go into the profession.

8    But for some reason, I get the impression that

9    the Government is saying that this honorably discharged Air

10   Force officer who served his country cannot expand his

11   medical practice to take in pain management patients and

12   then to increase his income as his business grows.  Why is

13   his level of income and his earning ability an issue for the

14   Government when he's prescribing for a legitimate medical

15   purpose and in the course of medical practice?

16   You ask yourself, as I did, what's wrong with

17   that?  Think about it.  We have a country built on our labor

18   as individuals, and every professional and every employee

19   and every worker is looking to earn money.  So I ask:

20   What's wrong with that?

21   The Government threw up the note and suggests

22   that Dr. Titus should not be thinking about his retirement

23   years.  I think if you take a poll in this courtroom for

24   people who are over a certain age and have been working for

25   a certain period of time, we've all got some idea of what

1   we -- how we would like to retire, or what we would like to

2   have in the bank, or have in stocks, or real estate

3   properties, or what have you.

4           Why is it wrong for this man to do that?  I want

5   you to look at him.  Why is it wrong for this doctor, this

6   Air Force veteran to plan for retirement?  There's nothing

7   nefarious about that.  And I kept scratching my brain.

8           And I started to see something there that

9   troubled me.

10          Mr. Marek, can you pull up the transcript from

11  7/13 with Dr. Thomas, the Government expert's exchange with

12  one of the prosecutors?

13          I think maybe we get an inkling of where they're

14  going with what occurred on the direct examination between

15  Mr. Woodard and Dr. Thomas.  The question presented to

16  Dr. Thomas was:  "What does a patient being on Medicare

17  indicate to you?"

18          Mr. Marek, can you pull up the -- you'll

19  highlight as I go along?  Thank you.

20          This is part of the social history.  "So knowing

21  that a patient is on Medicare, before I was a doctor, I knew

22  that that person was generally indigent."

23          Okay.  "If an indigent person, who can't afford

24  medical insurance comes to me and they're going to pay me

25  several hundred dollars for a bottle of pills" -- let me

1    stop you right there.  Did you hear what he told you?  This

2    indigent person, this poor person is coming in to pay

3    several hundred dollars for a bottle of pills.  When anybody

4    else goes to the doctor on a medical appointment and they

5    get a prescription for whatever, it's okay.  They're paying

6    for the medical appointment.  But poor people are paying for

7    a bottle of pills.  And he continues.  "That's of great

8    concern to me."

9            He doesn't stop there.  "Because every physician

10   knows -- and it is -- and you don't -- you don't actually

11   have to be a physician to know that pills have street value.

12   And if I give someone who is indigent a bottle of pills that

13   is worth a thousands dollars or more, I must be concerned

14   about what -- about where the money that they're paying me

15   is coming from."

16           Mr. Woodard then asked another question.  "What

17   does the street value of a prescription, a bottle of Oxy 15"

18   millimeter "pills run?"  Generally the answer was, Oxycodone

19   has a street value of, I think, $1 per milligram.  So if you

20   give them 100 pills at 15 milligrams, that would be $1,500.

21   I promised to stay behind the podium, but I need you to look

22   me in the eye and look Dr. Thomas (sic) in the eye and look

23   every poor person that you come across in the eye who's less

24   fortunate than one of us may be, and I need you to silently

25   say just because you're poor, just because you're indigent,

1   it doesn't make you a drug dealer.  Because that's the

2   indictment that the Government is placing on every poor

3   person that visited Dr. Titus for pain management.

4          Poor people have pain issues.  And all the

5   medication, whether it be Medicare or whatever, don't always

6   pay for all of those issues.  And all of that treatment.

7          If it doesn't hit you in your gut, if it's not

8   offensive to you, I ask you to think about it again because

9   I think that somehow they're taking that innuendo, that

10  insinuation -- actually, it's more pretty direct -- and

11  transferring it to Dr. Titus because he's treating indigent

12  people for chronic pain issues.  They must be drug dealers

13  and selling their pills, and he is a drug dealer.

14         You know, they went even further and they said

15  it in their closing, they said it in their opening, that

16  patients were paying for prescriptions.  You remember Lisa

17  Cody?  I think the Government asked her or made a statement

18  like that to her.  She said, Whoa, she was having none of

19  it.  Back up here.  I paid for my medical appointment when

20  I'd go to the doctor when I went to see Dr. Titus.  I pay

21  for my pills at the pharmacy when I pick up my prescription

22  that they had provided to me at the pharmacy.

23         I touched upon this before, but I have to say it

24  again.  It is clear that Dr. Titus made an assessment plan

25  for a patient for a month, and he prescribed the medication

1    for that month, and he broke it into two pieces.  Nobody

2    ever paid Dr. Titus for a prescription.  The Government

3    talked about this, you know, and continued to prescribe for

4    the rest of the month and nothing changed, and you heard the

5    testimony.  He didn't see these patients when they came in

6    the second part of the month to get the other part of the

7    prescription.  The plan stayed in place for the month.

8              Again, red herrings.  Again, the twisting of

9    evidence.  Again, the false narratives.  If their case is so

10   strong, why all of this manipulation of these facts?

11             Let's talk a little bit more about money.  You

12   know, the Government presented Mr. Petron.  Do I dare say, I

13   probably shouldn't, but I'm going to say it anyway, the $8

14   million chart maker.  And in this case, I think they paid

15   about $100,000 for the pretty glossy charts that you saw.

16   And over a two-year period, Mr. Petron told you in working

17   for the Government doing these charts and other things

18   related to statistical sampling, that he made and his

19   company or for his company, the Stout Company, over $8

20   million.

21             Hey, that's interesting.  Mr. Petron can make $8

22   million in two years.  Dr. Titus gets questioned over an

23   increase in his income from work he's doing and services

24   he's providing.  What a paradox.  What hypoc -- you know,

25   I'm getting a little heated, and I should not.  But the

1    hypocrisy here is unbelievable.  It's astonishing.

2            And what did these charts tell you?  They really

3    tell you nothing, but it's the Government's attempt, again,

4    to blind you with these shiny objects and hide the ball.

5    I'm not going to even pull up these charts, not here and

6    now, but there was a chart that talked about money in and

7    what he earned.  I think it was his income jumped from

8    259,000 in 2012 to 750 and then to 899 or something, 809 in

9    2014.  I don't remember them exactly.

10           What does that tell you?  What does that tell

11   you in the field, the medical field for pain doctors

12   prescribing the patients with chronic pain?  If you're going

13   to compare apples, you compare apples to apples.  You put

14   the thing in context.  A Granny Smith may be sweeter than a

15   red apple, but you have comparison, you have context.

16           And I asked Mr. Petron:  Did you do any

17   comparative analysis?  He said, The Government didn't ask me

18   to.

19           Why would they not ask him to?  Why would they

20   not want to know what other pain management doctors treating

21   chronic pain, similarly situated to Dr. Titus, having the

22   same patient base is making in a given year?  I suggest to

23   you they didn't ask for the analysis, because he was willing

24   to do that and get another hundred thousand dollars, because

25   they didn't want you to know what that person would be

1   making.  Because I suggest to you that there's nothing

2   inconsistent with what another pain doctor would have made

3   with a similar patient base over a period of time.

4           Evidence.  A lack of evidence.  You've got to

5   question their motive in not doing that.

6           It seems like a simple thing.  A child comes

7   home and says, Well, you know, Mom, Dad, Michael, my

8   brother, is a better student or I'm a poor student.  What do

9   parents do?  They say, Well, what are you doing that Michael

10  isn't doing?  What type of grades is he getting?

11          You have the comparison.  You have the context.

12  There's none of that here.

13          They talk about cash and money coming in.  Do we

14  know what other pain patient doctors are getting and

15  receiving in cash in the Delaware area, in the tri-state

16  area?  We have nothing.  No context.

17          They talk about, well, maybe Dr. Titus didn't

18  deposit every penny that he got in cash payments for

19  appointments with people in his office.  Do you remember my

20  cross-examination or conversation with one of the witnesses

21  when I asked her do drug dealers create -- you saw the

22  books.  Every patient that paid with cash got a receipt, and

23  those receipts were kept in books in his office.

24          Does that sound like a drug dealer to you?  You

25  run a sham.  You're selling prescriptions.  Here's the

1    money.  Here's your prescription.  That's it, between you

2    and me.

3              That's not what happened here.  Every iota of

4    every penny was written down and the bulk of it went into

5    the bank.

6              Now, I guess they're saying that if you are a

7    business owner, carpenter, whatever, and you go fix a

8    balcony and a person gives you -- or a deck -- a thousand

9    dollars and you don't put the entire thousand dollars in the

10   bank, then there's something nefarious.  I think common

11   sense tells you otherwise.  It tells you otherwise.

12             There's a chart in which they showed you what

13   Dr. Titus may have spent when the years got better when he

14   was making more money on his family and different things.

15   They talked about vacations and what have you.  Some of us

16   hope that when this trial is over, we'll go on vacation.  Is

17   there something that's nefarious about that?  Is it

18   something nefarious that when you're making more money, and

19   this is so common, people tend to spend more as they make

20   more.

21             There's nothing nefarious about that.  Nothing

22   nefarious about taking care of your children, helping out

23   your wife or your ex-wife.  There's nothing nefarious about

24   that.  There's nothing criminal about that.

25             But they will ask you to speculate, form some

1    innuendo or false narrative as a basis to try to convict

2    Dr. Titus.  But we agree, and you know that you can't do

3    that.

4         It's the evidence they brought in and the lack

5    of evidence and their -- whether they can prove the case

6    beyond a reasonable doubt, and I suggest to you that these

7    charts do nothing.  You know, I asked Mr. Petron, you know,

8    how can you account for this chart with travel distance and

9    whatever when people actually have a tie to Delaware and

10   were residing here?  You know, how many of us have a doctor

11   that we have continued to go to because he or she was a

12   doctor we felt was concerned about us, and we thought was a

13   good medical doctor?  Sometimes you go the extra mile.

14        But also, do we know how many pain management

15   doctors were in that range, that 50-mile range?  We do not.

16   Again, the context or the lack of context.

17        Mr. Marek, I do have to show some of these

18   slides because we've got to put this to rest.  Can you pull

19   up Government Exhibit 801, 008.  And in yellow, I think it's

20   yellow, the Government has the number of pills provided over

21   the course of some time frame, I think November 2013 to

22   December 31, 2014.

23        And they tell you that's a crazy number.  A

24   crazy number in the context to what?  Do we know how much

25   medication another pain doctor in Delaware with the same

1    number of patients, pain patients is prescribing during that

2    time frame?  Another shiny object that doesn't mean a thing.

3              And Dr. Warfield told you that internal medicine

4    doctors that treat pain prescribe the bulk of opioids.  So

5    wouldn't you want to know to make sense out of this?  It's

6    useless to you in terms of determining whether or not

7    Dr. Titus was prescribing for legitimate purpose and within

8    the course of a usual course of medical practice.

9              Why don't you go to the next slide, Slide 600.

10   I'm sorry.  Six, page -- oh, you have it up.  Pretty things.

11   Oxycodone products.  Methadone.  Blah, blah, blah, blah,

12   what have you.

13             You can take it down because it's meaningless.

14   It's meaningless without context.  It's meaningless without

15   a comparison for you to grapple with what's going on here.

16             And I talked about this one before.  You can --

17   I believe it's 801, Page 10, 0110.

18             If you can't find it, don't worry about it

19   because I think we all understand this.  There needs to be

20   context.  Common sense tells you we need context to

21   understand and appreciate any significance with respect to

22   when we're presented with a chart or what have you.

23             You can take it down.

24             You know, the interesting thing is when the

25   chart speaks to something other than what the Government

1    wants to say, they twist it.  And I mentioned that chart in

2    which it showed that Dr. Titus was discharging 49 or

3    50 percent of his patients.

4              I think, Mr. Marek, that's Government

5    Exhibit 803, Page 1 and Page 5.

6              803 tells you that in your universe that these

7    charts are based on 1,142 patients.  And the other chart

8    tells you -- and can you pull out for me the 49 percent and

9    the 563?  That Dr. Titus actually discharged, counseled

10   about just shy of 50 percent of his patients.  And out of

11   that sample, 563 patients out of the 1142.  You can take

12   that down.

13             The Government twisted that to suggest it means

14   something different.  They didn't concentrate on that.  They

15   were concentrating on saying, well, he prescribed "X" number

16   of doses to discharged individuals.

17             I suggest to you that contrary to what the

18   Government is saying here and as Jane Webb said to you, I

19   think it was just about the last thing she said on the

20   witness stand that Dr. Titus is trying to do his best.  He

21   tried to manage his chronic patients and that he cares about

22   him.  And that if she believed he was doing something

23   illegal, prescribing illegally, she would have quit his

24   office as an employee, and she never did.  She left the

25   office when it was closed.

1            Now, I'm going to try to move a little more

2     quickly because I know you've been here a long time, but

3     let's talk a bit about the surveillance here, the

4     non-surveillance or -- you know, there's testimony from

5     Mr. Zalewski, and I don't question what he said.  You know,

6     maybe there was a drug sale going on that he saw or he

7     believed he saw.

8            But the main thing that we asked him:  Did you

9     tell anybody in the office what you saw?  No.  And then the

10    Government set up surveillance to determine whether they

11    could get proof of anything nefarious, any criminal activity

12    outside of Dr. Titus' premises.

13           And I think on June 30th, they're out there for

14    several hours, and they saw nothing that was criminal.  No

15    observations of criminality, no arrests, no selling of

16    pills.  All they saw was no criminal behavior.  Because if

17    they had seen something different, it would have been in the

18    report and somebody would have been arrested.

19           July 1st, 2014, many hours outside his premises

20    and business office, the place that they said is a sham,

21    that they say is a dwelling, a place or premises for

22    illegally distributing drugs, again, no drug sales.  No

23    disturbances.  No criminality.  No arrests.

24           August 16th, 2014, the same thing.  August 25th,

25    the same thing.  September 4th, the same thing.  No observed

1    drug sales.  No disturbances.  No criminality.  No arrests.

2            September 9, 2014, the same thing.

3    October 20th, the same thing.  And I think on October 20th,

4    they followed Dr. Titus from the office to the pizza shop to

5    his home, my goodness, and they saw nothing.  They saw this

6    man purchasing two pizzas to take home to feed his family.

7    Uh-oh.  Maybe that was part of the cash he may have received

8    and the payment.  Did he do something wrong there?

9            We talk about the evidence and the lack of

10   evidence.  Ladies and gentlemen of the jury, this is lack of

11   evidence.  If he was doing what they're claiming, and if his

12   premises is what they claimed, and if there is drug dealing

13   going on outside with people selling pills and what have

14   you, one, two, three, four, five, six, seven times, that law

15   enforcement, the Task Force were out there, Joelle Ryan, I

16   think she changed her name, she got married, was there on

17   two of those occasions, the undercover officer, that day.

18           And then we had, I'm going to call him Percy

19   because if he were here, I would mess up his name, and I'm

20   not going to mess it up when he's not here.  He told you he

21   went out and looked at the premises as well.  And all he saw

22   were some cars from out of town was in the parking lot --

23   were in the parking lot.  And he noted about, however, there

24   were other businesses in the vicinity, again.

25           Now, I mentioned Joelle Ryan, and I'm going to

1    refer to her as Ms. Ryan because, by golly, I've forgotten

2    her pre-married name.  So they sent her in to conduct an

3    undercover operation to substantiate what they're claiming,

4    and there was no one there.

5              But something interesting happened.  And in

6    that, we can learn from the tape.

7              And, Mr. Marek, would you play, I don't know the

8    date offhand, but I think it was -- let's see -- I think it

9    was perhaps the September 4th or 9th date.

10             (Audio playing.)

11             MR. BOSTIC:  You can skip ahead so we get where

12   she goes into the office.

13             (Audio playing.)

14             MR. BOSTIC:  I think she's walking up to the

15   office.

16             (Audio playing.)

17             MR. BOSTIC:  You can take it down, Mr. Marek.

18             What you hear in there on that tape, people in

19   the waiting room, the TV in the waiting room playing a show.

20   What you don't hear is the commotion that the Government

21   claimed was going on.  What you don't hear is people talking

22   about selling pills.

23             And what we know is that Ms. Ryan is a trained

24   police officer.  She was part of the Task Force.  She knew

25   why she went there.  And she knew that if she saw

1    observations of somebody drug dealing or talking about

2    drugs, it would have gone into a report.  The Government

3    can't even find the operational plan for the undercover

4    operation.  They can't find any report.

5              And Agent McDonald was forthcoming when he tells

6    you that when he does it -- he wasn't part of this.  When he

7    does it, there's an operational plan.  There's at least

8    another officer with the individual, and we make

9    observations, and we make reports.  And he told you about

10   the importance of these reports because the Defense counsel

11   rely on these reports to show what's going on.

12             Now, I talk about the paradox in this whole

13   case, the hypocrisy in this whole case.  The Government

14   didn't bring that to your attention.  In my mind, they tried

15   to sweep it under the rug.  And when we brought it out, they

16   said, no harm, no foul.  There was nothing to report upon.

17   There was no reason to write a report.  I bet you if that --

18   if any of their observations in contact with Dr. Titus'

19   offices was anything other than a failure, there would have

20   been, ten, 20 reports.

21             So the Government gets to determine not to

22   prepare reports that are ordinarily prepared in the normal

23   course of police operations.  They tell you, Don't look over

24   here.  Don't look at Dr. Titus because he may not have all

25   of his records up to date.  Let's crucify him.  Let's

1    prosecute him because his records may not be as pristine as

2    other doctors.

3            The silence that you heard other than the TV is

4    golden here because it tells you there wasn't any frenzy and

5    craziness going on in Dr. Titus' office.  The Government,

6    however, put on a tape of Dr. Titus during one of two

7    interrogations that he agreed to speak with the Government,

8    when he didn't have to and without an attorney.  And you

9    heard testimony that there were interviews or interrogations

10   on September 2015.

11           I think that's the one in which you heard with

12   the young child in the background or whatever, and he's

13   caring for his child.  And they just searched his home, they

14   just raided his home, and he sat and talked to them,

15   nonetheless.  I think altogether they played about

16   15 minutes.

17           And then you heard -- I think that one lasted

18   about two hours.  And there was another one in 2018 that

19   lasted about an hour and a half.  Fifteen minutes they

20   played for you.

21           We talk about context.  In their tape, they have

22   control.  Wouldn't you want to know the fulsome of their

23   conversation that Dr. Titus had with these Task Force

24   officers to get a full flavor of the discussion?  You got

25   15 minutes, and you're left to speculate as to fulsome and

1    the areas and topics discussed.

2              I submit to you that if it weren't for the

3    Government, you would have heard the entire three-and-a-half

4    hours.  Let's talk about the lack of evidence, and the

5    importance, and the hiding of the ball.

6              Now, I said I would speed it up.  I'm going to

7    try to speed it up.  We talked that there were two experts

8    that testified in this case, and I kind of suggested there

9    were maybe three experts because you had Dr. Thomas, who's

10   no longer in the -- practicing medicine.  He's running his

11   business, one that he intended to instruct doctors on pain

12   management and whatever, but he said that failed.  And I

13   suggest to you it failed because he was very rigid, and it

14   was his way or the highway.

15             Dr. Warfield tells you, no, there are variations

16   in practice.  Doctors get to use their discretion and

17   formulate ways that they believe were -- best served the

18   patient that they're dealing with.  But he came in and he

19   told you that he opined that Dr. Thomas (sic) is a criminal,

20   that he's basically selling prescriptions.  That was the

21   conversation he and the Government had.

22             You know, the amazing thing about the exchange

23   that the Government had with Dr. Thomas is that Dr. Thomas

24   spent a lot of time talking about the model policy and about

25   the opioid treatment guidelines.  And I believe he suggested

1    to you time and time again these are mandatory requirements.

2    Never mind that even the -- I think the opioid treatment

3    guidelines has "guidelines" in its name, that article, the

4    seminal article that the Government mentioned where he tried

5    to convince you they were mandatory.  And if you strayed

6    from these guidelines, you're guilty.  You're prescribing

7    outside the normal course of the medical purpose and for no

8    legitimate purpose.

9         And you remember, five, ten different times he

10   said "and pill counts must be random."  The model

11   guidelines -- the model policy states that.  The opioid

12   guidelines say that.  And I showed him the area, and it said

13   nothing of the sort.

14        I want you to ask yourselves, this supposedly

15   independent expert, why would he misrepresent on that?  He

16   knows these guidelines.  He knows this is the framework.  He

17   knows that it's not mandatory.  Why would he try to convince

18   you that these pill counts, for example, were mandatory?

19   Why would he color that small, in my mind, a throwaway fact?

20        Because in his book, since Dr. Titus told his

21   patients, Well, when you show up on this day, I need you to

22   do a pill count.  He's twisting the evidence.  And if you

23   color the small issues, the insignificant things, then

24   common sense suggests to you that perhaps you do -- you're

25   also coloring the bigger things.

1    Now, let's talk about the nonsensical aspect of

2    a random pill count.  So a doctor has a patient.  He needs

3    to count the pills.  He's not a probation officer.  He can't

4    do administrative searches.  He can't go to their house,

5    Open up, let me in.  I want to count your pills.  How is a

6    patient going to know to bring those pills to the office

7    unless the doctors say, "You've got a pill count on such and

8    such a date".  I leave it to you to figure out all the

9    uproar about the fact that Dr. Titus had to inform his

10   patients when he would do pill counts.

11   You know, Dr. Warfield, the defense expert, told

12   you she's a fully endowed professor at Harvard Medical

13   School.  She teaches and she monitors the treatment of

14   patients through those that she teaches.  She has a medical

15   specialty in pain management.  She's board certified in

16   anesthesiology and pain management.  We didn't know this

17   until she testified, she's the original one of the original

18   committee members of the board that developed board

19   certification for pain management specialists.  She helped

20   create those rules and that accreditation certification

21   process.

22   She's authored many books and articles, or

23   edited, and I think for, like, four textbooks that are in

24   print in different languages around the world.  As she said,

25   she goes overseas and trains numerous medical students on a

1      day-to-day basis on pain management medical practice.

2                   And the Government brought up that she also

3      presents at many international conferences to doctors that

4      deal with pain management.  And they said, Well, she's an

5      advocate for the prescribing of opioids.  Talk about the

6      twisting of facts.

7                   Dr. Warfield told you that opioid for chronic

8      pain management is not necessarily her go-to treatment, but

9      she has over the years.  And, however, there are various

10     approaches that are quite appropriate for a pain doctor.

11     There's no one set of hard and fast rules as to how you care

12     for your patient.

13                  You know, think about that.  You go to a doctor

14     and the doctor says, Mr. Bostic, you need whatever.  You

15     say, Okay.  And he says, Well, you can get a second opinion.

16                  And you go to the second doctor and get that

17     opinion.  If we all had to do it -- if they all had to

18     practice medicine the same way, you don't need that second

19     opinion.  It's not Dr. Thomas' way or the highway.

20                  Dr. Warfield, she said that medicine is an art,

21     and that doctors practice and apply -- they're practicing in

22     different ways.  She discussed the standard of care with

23     you.

24                  Can you pull up Defense Exhibit 20A?

25                  And I'm going to try to move through these

1  because you saw them before.  But this first line tells you

2  that the best possible practice, the average practice, and

3  not-so-great practice are all within the standard of care.

4  And below that is bad practice, and while not the standard

5  of care is not criminal.

6           And she said that on occasion, Dr. Titus had

7  some bad practices.  She said that things outside the usual

8  course of medical practice and not for legitimate medical

9  purpose would violate that standard of care and may, indeed,

10  be criminal.

11          Why don't we go over to the next slide.

12          Broad margin between bad practice and outside

13  the standard -- the course of a medical practice.  She told

14  you bad practice, controlled substances were prescribed in a

15  way that is not in keeping with the standard of care, i.e.

16  what a similarly trained physician would do in a similar

17  circumstance.

18              The next slide.

19          She said that is not criminal.  She identified

20  for you what is criminal.  Controlled substances prescribed

21  not for a legitimate medical purpose or outside the usual

22  course of medical practice.

23          And she went further and she talked about what

24  would be criminal.  She said no doctor-patient relationship.

25  We know that Dr. Titus saw his patients on a monthly basis.

1           The doctor never did a physical exam.  We know

2    he did physical exams.  He may not have done each one as

3    thoroughly as someone else would want to, but you heard

4    Mr. Pucci come in and say he was tapping his knee and stuff

5    and caused him to bend over and what have you.

6           He never saw the patient.  Some type of back

7    alley drug dealing.

8           No pain diagnosis.  Clearly pain diagnoses for

9    every patient that Dr. Titus saw and every patient that was

10   presented to you.  Payment by the pill.  Hey, Doctor, let me

11   have ten pills here.  Here's some money.  Didn't happen.

12          No medical records.  There were medical records

13   for every patient.

14          No issue about prescribing for himself.

15          And clearly no testimony that he was prescribing

16   so patients can get high.  He was treating people with

17   chronic pain.  All measures of chronic pain.  All variations

18   of chronic pain.

19          You can take that down, Mr. Marek.

20          Now, Dr. Warfield opined that with respect to

21   the 14 prescriptions and patients in the indictment,

22   Dr. Titus was prescribing for a legitimate medical purpose

23   in the usual course of medical practice.  She said that, in

24   essence, while Dr. Titus' prescribing while at times may

25   have been at the low end of the standard of care or even

1   considered to be bad practice, it was not criminal.  And I

2   think she gives some hypotheticals about, well, you know,

3   doctor doing experiments in a personal operation, doctor

4   prescribing too much of the medication that causes a person

5   to die, what have you.  Bad practice, but not criminal.

6          She told that you she based her opinion on

7   reviewing the files, the 14 patient files and the other

8   additional 24, on listening to the interviews of Dr. Titus

9   with the Government law enforcement agents with -- I think,

10  read testimony from the board hearing.  And she went through

11  each chart.

12         And she was aware of the testimony of Mr. Hood,

13  Ms. Calhoun, Ms. Molesi, Lisa Cody, Clifford Waple and those

14  individuals.  Mr. Pucci testified after.

15         But she identified that each of them had real

16  pain and reported real pain to Dr. Titus, and he prescribed

17  in conjunction with that pain for a legitimate medical

18  purpose.  She testified that his files had referrals.  And

19  she talked to you about the fact that it is probably not

20  to -- proper not to discharge a person necessarily because

21  they have a foreign substance in their urine.  And that

22  while she may have discharged some individuals sooner than

23  Dr. Titus, that that doesn't in any way indicate that what

24  he did was outside the normal course of medical practice in

25  prescribing.

1          She talked about prescriptions on the -- when

2    the patient was discharged from the practice, and she made

3    it clear that it's important not to cut patients off who are

4    on opioid therapy treatment.  She talked about withdrawals.

5    She talked about the time to get into detox.  She talked

6    about the time to find another pain patient.

7          Now, the fact is that I think you heard

8    something similar from Dr. Daley, with whom Dr. Titus

9    conferred throughout his pain management practice.

10   Dr. Daley came to you by remote testimony, but he explained

11   to you that his practice in many ways is similar in nature.

12   He doesn't always discharge patients because of dirty tox

13   urine screens, and that when he discharges them that it's

14   more than okay to prescribe them a prescription to carry

15   them over to the next pain management doctor or to get them

16   into a detox.

17         With every patient she went through, Brent Hood

18   she told you that -- and by the way, Brent Hood, you know,

19   some patients have motive to color the facts.  And we know

20   that Brent Hood has a couple of convictions, is a convicted

21   felon.  But you decide about his testimony.

22         But she noted that he had real pain.  I think

23   it's RSD, that nerve issue where the pain she said is

24   excruciating.  Dr. Titus prescribed to treat that pain.

25         And the Government made much adeu about

1   Dr. Titus providing a prescription for Mr. Hood at the time

2   of his discharge.  Dr. Conti, the Government witness, came

3   in and testified, Well, I don't think he should have been on

4   Oxycodone or whatever.

5           My colleague brought it to her attention that

6   her partner, Dr. Sweeney, who wrote up the discharge

7   instructions for Mr. Hood, instructed him to go see

8   Dr. Titus as soon as possible so he can continue with his

9   pain medication.  That speaks volumes.  Because you know

10  what?  It tells you that there are different approaches to

11  the same issue.  Her partner, her medical partner, to state,

12  Go continue on your pain meds.  And so there's no issue that

13  Dr. Titus prescribed for him to give him a chance to get

14  into -- with another doctor.

15          I can go through all of these.  In terms of

16  Delores Perry, you know, and they talk about the call coming

17  through and what he did and whatever, and Dr. Titus may have

18  said, Well, how can I prove that?  Well, like the

19  Government, a pain medicine doctor is not a law enforcement

20  officer.  He can't go and set up for surveillance and see

21  what a patient is doing.  He may have been naive to take her

22  at her word, but they're -- the Government presented no

23  evidence.

24          How difficult is it for the Government to put

25  Delores Perry on the witness stand and talk to her about

1    what she was doing or was not doing?  But they made all

2    these insinuations.

3              Similar with Maryann (sic) Mench in terms of --

4    and I'm trying to move through this, and I hope you don't

5    hold it against my client and myself because I know you've

6    been here a long time.  But Dr. Warfield tells you that, in

7    her opinion, the prescriptions were for medical purpose and

8    in the course -- usual course of professional or medical

9    practice.

10             I know there may have been issues about illicit

11   drug use or what have you in her tox screen, but again,

12   everybody says you don't have to discharge solely because of

13   that.  And again, Dr. Warfield said that to the extent that

14   Dr. Titus was slow in discharging and gave too many breaks,

15   that that does not connote criminality.  It does not connote

16   that he was prescribing outside the course of medical

17   practice and that he was not prescribing for a legitimate

18   medical purpose.

19             Same thing with Dione Dickerson.  You know, they

20   make these leaps and bounds.  I think you heard the

21   Government's attorney said that the aberrant drug test

22   connotes that she was either selling her drugs or something

23   to that effect.  It could be that she used it all too

24   quickly.  It could be that the test didn't measure the way

25   that another test may have.  There's so many variables.

1    With Gregg Smith -- you know, again, Delores

2    Perry had real pain.  Gregg Smith, the fact is that he had

3    clear significant pain.  Dr. Warfield talked about the fact

4    of the inability, given his size, to conduct or treat him in

5    certain ways with nerve blocks and what have you.  And she

6    said that the prescriptions written to him were also in the

7    course of for a legitimate purpose or medical reason.

8    You know, the Government pointed to Carla

9    Haynes, and you remember Carla Haynes talked about she

10   hadn't been in Delaware for about 18 years, but she would

11   talk about when she could tell from his voice what was going

12   on with him because he was tired from doing a long haul.

13   And we know, and I asked him about his partner, I think,

14   Betty Whaley.  You know that Betty Whaley was available to

15   the Government.  She could come in and tell you exactly what

16   was going on with her partner.

17   Donald Meck, it's a similar thing in terms of

18   how Dr. Warfield discusses it.  We know it's different from

19   Dr. Thomas, but Dr. Thomas ignores the fact that different

20   physicians can approach the same problem differently, ergo

21   Dr. Conti and her partner, Dr. Sweeney.

22   And you know, we know that -- and I may have all

23   of these -- Loretta Connelly, she felt that her

24   prescriptions were for medical purpose and within the course

25   of a professional practice.

1    Ms. Calhoun, you know, there's references about

2    well, maybe Dr. Titus was flirting with her or what have

3    you.  Right.  And I'm scratching my head because I don't

4    know what that has to do with whether a prescription was

5    written for a medical purpose or not.

6    But he had dinner with her family.  I don't know

7    what that has to do with whether the prescription was

8    medical purpose or not or whether it was done in the

9    course of -- usual course of professional practice.

10    Tracie Owens, the issue was well, should she be

11    getting treatment of a migraine with opioids?  And

12    Dr. Warfield tells you that it is available to a pain

13    management doctor to use opioids for such treatment.

14    There's no hard and fast rules it can't be done, and her

15    prescriptions were in the course of medical practice.  She

16    clearly had real pain and that was in the usual course, or

17    for legitimate medical purpose, or within the usual course

18    of professional practice.

19    Michael Adams, talked to you about he was an

20    witness that actually testified.  He talked about what he --

21    in retrospect, that his dependence may have been an

22    addiction.  And he talked to you about how he would use the

23    medication too quickly, but he also told you about real pain

24    and that he needed that medication to get through the day.

25    Lucille Moody, we know that she was discharged

1    maybe too late.  We know that Dr. Titus sent her to a

2    referral to drug counseling.  And the Government suggests,

3    Well, we don't know if she really went.

4         Government, do what you do.  Bring Ms. Moody in

5    and ask her that question.  It clears the air.  There's no

6    lack of evidence.  There's no speculation.  No insinuation.

7         And then Dr. Warfield noted that both the

8    prescribing and their prescription when she was terminated,

9    and I believe he took her back at some point which she said

10   is something that doctors do all the time.  It was within --

11   for legal medical practice, medical purpose and within the

12   course of a professional practice.

13        The same thing with Melissa Silbereisen.  And

14   you know, there was such talk about prescribing on discharge

15   and whether or not he needed to do some other intervention,

16   as Dr. Thomas would put it.  There are guidelines, and I

17   don't believe the guidelines in any way say that you must or

18   that you cannot prescribe a maintenance dose until the

19   person gets to the next pain management doctor or gets into

20   a detox program.  In fact, Dr. Warfield told you that.  And

21   in fact, Dr. Daley, who practices every day, tells you that

22   he does it in his practice.

23        So in sum, and in total, it's our position --

24   and Mr. Marek, if you bring up, I think it's Counts 1

25   through 14.  I think you see a chart like this.  Based on

1  Dr. Warfield's testimony, based on testimony from or not

2  testimony, Dr. Sweeny's testimony and then -- not testimony,

3  discharge statement, you should find that the Government has

4  not proven their case.

5            Find my client not guilty all the way down.

6  Scott Jones, not guilty.  Mary Mench.  Count 5, Dione

7  Dickerson.  Lisa Parsons.  Gregg Smith.  Donald Meck.

8  Loretta Connelly.  Chasity Calhoun.  Tracie Owens.  Michael

9  Adams.  Lucille Moody.  And Melissa Silbereisen.

10           We say that because of competent and stellar

11 testimony from Dr. Warfield, supported by what is actually

12 going on in the field currently through Dr. Daley and

13 supported by the fact that each of these individuals had

14 real pain, and that it is not inconsistent with proper care

15 in prescribing for legitimate medical purpose and in the

16 course of a practice to prescribe a discharge maintenance

17 dose of their medication.

18           And again, don't be fooled by when they got half

19 on a day they came in for the discharge and then got the

20 other half later, because you've heard the testimony why he

21 was doing that.  He was trying to manage, trying to ensure

22 that there was no diversion.

23           And you know, with respect to Count 15, you

24 heard from patients, for example, Ms. Cody, Mr. Whaley,

25 Clifford Whaley (sic), and Mr. Pucci.  And keep in mind that

1    we didn't have to present any evidence.  The burden is on

2    them.  It's on them, and it doesn't change because we

3    presented witnesses.  It stays on the Government.  The

4    Defendant doesn't have any burden.

5           They all explain about the chronic pain and told

6    you that Dr. Titus' treatment -- prescriptions helped --

7    prescriptions helped them.  And other patients who were part

8    of the indictment also testified or their charts show that

9    they were treating for real pain and that they were

10   receiving benefit from the prescriptions in connection with

11   their pain.

12          Cody and -- Lisa Cody, and Clifford Whaley (sic)

13   and Mr. Pucci told you that Dr. Titus would talk to them,

14   examine them, send them for MRIs and x-rays, receive their

15   records and counsel them on the risks of opioid therapy.

16   Doctor -- I mean, Lisa Cody put this notion that somehow

17   people were paying for prescriptions to rest when she told

18   you she paid Dr. Titus for her office visit and treatment

19   and not for prescriptions.

20          The Government, at the end of the day, I suggest

21   to you have not proven guilt beyond a reasonable doubt with

22   respect to Count 15.  They have a heavy burden to carry, and

23   the evidence, and the lack of evidence, and the innuendos,

24   and the false narratives, and the different issues that I

25   discussed in these pretty shiny charts don't mean a thing.

1  All to cause you to come back and say not guilty to all of

2  these charges.

3          You do not take a person's freedom and liberty

4  away on this type of evidence and on this type of innuendo.

5  And this is what the Constitution is about.  This is what

6  the right to fair trial is about.  And this is what the

7  burden of proof beyond reasonable doubt is about.

8          Now, I talked about rules and I talked about the

9  Constitution, and you saw that the Government got to present

10  their evidence.  And I'm sorry, got to do closing argument.

11  And after I sit down, they'll get a chance to stand up again

12  and give you a rebuttal argument.  And that's just the

13  rules.

14          And these rules are mandatory.  These rules are

15  mandatory.  So they'll get a chance to come back up and talk

16  to you.  And I want you to ask them in your mind and listen

17  for whether or not they heard my -- the issues and questions

18  that I raised.  Ask them:  What about the rest of the tape?

19  These two hours and a half of Dr. Titus voluntarily willing

20  to sit down with law enforcement that he knows is there to

21  pin something on him and discuss.  And the fact that, well,

22  yeah, maybe he said he discharged people for using heroin or

23  cocaine, but we know he struggled with that.  We know he

24  gave them chances.  We know this is a man with a big heart,

25  and this is a man who is compassionate, and this is a man

1    that consulted bi-monthly, Dr. Daley told you that, with

2    another pain management doctor for whom he had a lot of

3    respect and admiration to try to get it right.  That is his

4    pain.

5         So when I sit down, you ask them all the

6    questions that I've raised with you, and you keep in mind

7    that, again, the Defense does not have to prove anything.

8    And I know that it's been a long time, but I want to take

9    this opportunity to thank you again on behalf of Dr. Titus

10   for your attentiveness and ask you to do your duty based on

11   this evidence and come back with a verdict of not guilty on

12   all counts.

13        Thank you.

14        THE COURT:  All right.  Thank you, Mr. Bostic.

15        So members of the jury, your lunches are here

16   and it has been quite a while.  So rather than taking a

17   15-minute break, we're going to take a half hour.  You can

18   have your lunch.  We'll come back.

19        The Government's rebuttal, by rule, is going to

20   be pretty short, so it won't be long after this lunch break

21   that you will get the case.  Though, I do want to remind you

22   over lunch don't talk to each other about the case.  It's

23   not time to deliberate yet.  So you can talk about anything

24   else, but don't talk about the case.

25        So we'll take a 30-minute lunch and I'll see you

 1    again at 20 of 2:00.

 2                    (Jury leaving the courtroom.)

 3                    THE COURT:  All right.  Ms. Remis.

 4                    MS. REMIS:  Yes, Your Honor.

 5                    THE COURT:  I am expecting to limit you to

 6    15 minutes.  All right?

 7                    MS. REMIS:  A hundred percent, Your Honor.

 8                    THE COURT:  Okay.  All right.  We'll be in

 9    recess.

10                    DEPUTY CLERK:  All rise.

11                    (Luncheon recess was taken.)

12                    DEPUTY CLERK:  All rise.

13                    THE COURT:  All right.  Are we ready to go?

14                    MS. REMIS:  Yes, Your Honor.

15                    THE COURT:  Okay.  Let's get the jury.

16                    (Jury entering the courtroom.)

17                    THE COURT:  All right.  Members of the jury,

18    welcome back.  You can see that we've managed to lower the

19    temperature by about ten degrees in here.

20                    And everyone else can be seated.

21                    Ms. Remis, you may proceed.

22                    MS. REMIS:  Thank you, Your Honor.

23                    Ladies and gentlemen, over the last hour and a

24    half, you heard all about the Government.  You heard all

25    about investigation.  You heard all about witnesses that you

1    could have heard from, documents that you didn't see, things

2    that were never presented to you over the last three weeks

3    of trial.

4              But let me remind you of an instruction that

5    Judge Andrews gave you just a couple hours ago.  It's on

6    Page 4 of your instructions, and it says, "The Government is

7    not required to present all possible evidence related to the

8    case or to produce all possible witnesses who might have

9    some knowledge about the facts of this case."

10             Why did the Defense focus for the last hour and

11   a half on the Government, the investigation, and all the

12   information that you didn't see and didn't hear?  Because

13   they don't want you focusing on the mountain of evidence

14   that you have heard over the past three weeks that shows,

15   without a reasonable doubt, that Dr. Titus distributed and

16   dispensed controlled substances with no legitimate medical

17   purpose and outside the usual course of professional

18   practice.

19             They don't want you to focus on the over

20   1.2 million pills of controlled substances that Dr. Titus

21   prescribed in just over a year.  They don't want you to

22   focus on the Fentanyl 100 patches, on the dangerous

23   combinations of drugs that Dr. Titus prescribed to all the

24   patients that you've heard so much about over the last few

25   weeks.

1    You also heard about some of Mr. Bostic's

2    recollection of the evidence, and I'd just like to remind

3    you that your memory controls.  And you don't have to guess

4    about what certain evidence shows because you're going to

5    have it with you back in the jury room.

6    Look at the evidence.  We gave you a lot of

7    Government exhibit numbers in our closing, and we'd like you

8    to take a look at, because the evidence is what proves that

9    Dr. Titus is guilty.

10    Now, I want to go through some of the things

11    that were brought up in closing.  And I want to be very

12    clear about one thing.  I want to be very clear about the

13    legitimate medical purpose.

14    There was some suggestion that the Government is

15    not disputing that these prescriptions were for a legitimate

16    medical purpose.  That is not true.  The Government

17    certainly does not concede that the prescriptions that

18    Dr. Titus wrote were legitimate in any way.  That's the

19    entire case, ladies and gentlemen.

20    And you know that these prescriptions were not

21    legitimate.  You heard all about why they weren't

22    legitimate, because there was no medicine involved.  And I'm

23    not going to spend my entire time talking again about all

24    the things that we've already discussed, because you've

25    heard all about these patients.  You know all of their

1    stories.  You know essentially every drug test they failed,

2    every attempt at getting more prescriptions.  And you've

3    seen why Dr. Titus failed to actually provide any medical

4    care whatsoever.

5           I want to also talk about something that was

6    brought up which is pain.  Now, this case is not about

7    whether or not these patients had pain.  Of course, some of

8    these patients had pain.  Some of our witnesses came in and

9    told you that they were in pain.  Defense witnesses came in

10   and told you that they were in pain.

11          But the Defense says that any time a doctor

12   writes a prescription to manage real pain, it must be for a

13   legitimate medical purpose.  That is preposterous.  It's not

14   about pain.  It's about Dr. Titus' response to that pain.

15   And we're not here to have any sort of philosophical debate

16   about how to treat pain in America or how to use opioids.

17          We're here to talk about what actually happened.

18   We're here to talk about whether Dr. Titus was acting as a

19   medical doctor when he prescribed those 14 prescriptions

20   that are listed in the indictment, and when he treated or

21   attempted to treat all of those patients that he saw at

22   North Church Street between 2013 and 2014.

23          And how do you know that it's not about pain?

24   You know because Dr. Titus knew all of the steps that he was

25   supposed to have taken to treat their pain, if he really

1   wanted to do so.  You know about how he was supposed to

2   refer patients to all sorts of specialists.

3           But like so much else that you've seen,

4   everything in there was for show.  Those paper referrals,

5   they were just referrals.  There was never any evidence of

6   any sort of followup, except for one person, which was

7   Michael Adams, who actually did go to Dr. Xing's office.

8   And Dr. Xing said, Enough is enough.  Lower his dose.  But

9   nothing changed.

10          This isn't about the patient's pain.  It's about

11  Dr. Titus' response.  It's about what he did.

12          And you know what he did?  He abused his

13  position of trust.  And instead of treating patients as

14  individuals, he treated them like customers.

15          Now, you heard throughout the case, and you

16  heard in closing again, about how Dr. Titus acted in good

17  faith, how he's a kind and generous man, how he had

18  difficult patients, and how he got tricked.  There is no

19  evidence about whether or not Dr. Titus acted in good faith.

20          What you do have evidence about is all of the

21  different ways that Dr. Titus knew what he was doing was not

22  practicing medicine.  All of the different ways that he knew

23  that the prescriptions he was writing were not legitimate.

24          He wants you to think that he was naive to what

25  was going on, that he was just trying to do the right thing,

1    that he was giving these desperate patients chances.  But he

2    wants you to believe that even after the suspension in 2011,

3    the Consent Agreement in 2012, the repeated complaints from

4    the State, the dismissal that he had from Rite Aid, calls

5    and concerns from the community, repeated and consistent

6    drug screenings, attempts by his staff to keep him in line,

7    that he was still naive after that.  It's just -- it's

8    impossible.

9          And I want you to consider his responses when

10   anybody questioned his authority.  Jane Webb told you that

11   when she -- the one time she told him, You have to discharge

12   somebody.  He told her, "I'm the boss.  I'm the doctor.

13   I'll make the decision."

14         And when Christine Armstrong, somebody who was

15   simply calling out of concern for a probationer that she was

16   supervising, when she called Dr. Titus and she raised her

17   concerns, his response to her was mocking her, telling her

18   that he was the doctor, not her, and essentially that she

19   should mind her own business.  Is that the attitude of

20   somebody who's naive, of somebody who's kind, of somebody

21   who's generous and has the best interests of their patients

22   at heart?

23         Now, you've also heard about how there are

24   different ways that doctors can practice medicine.  Of

25   course, there are different ways doctors can practice

1   medicine.  The Defense is trying to make it seem as if there

2   is a rule that governs A, B, or C.  That because there's no

3   specific rule that says you have to see -- you have to do a

4   physical examination, that nothing was wrong here.

5          This isn't some hypothetical case.  This isn't

6   some theory.  There are guidelines and there are policies.

7   And the reason for those guidelines and policies is because

8   we're talking about dangerous opioid drugs.  And while

9   simply violating a policy is not a crime, when a doctor is

10  repeatedly, and intentionally, and knowingly practicing bad

11  medicine, that is a crime.  It's not just bad medicine.

12         Now, let's talk about this kindness and this

13  generosity for just another moment.  The defense has

14  suggested that Dr. Titus had compassion, that he was kind,

15  he was generous, he bought gifts for people.  But like we

16  said in our closing, Dr. Titus had a hold on these patients.

17  These were patients who believed that getting a prescription

18  from him was a privilege that they didn't want to lose.

19  That they drove hours every couple weeks just to get those

20  prescriptions, not because Dr. Titus was providing some sort

21  of specialized care, but because they knew they could get

22  their opioid prescriptions from him.

23         The evidence has shown you that Dr. Titus'

24  relationship with these patients was just transactional, a

25  business deal.  This is not kind, ladies and gentlemen.

1    When those patients showed signs of needing the

2    most help for their substance abuse, what did Dr. Titus do?

3    He kicked them out, without any followup, without any

4    referrals, without anything to follow up on these massive

5    amounts of dangerous drugs that he was prescribing them on

6    their way out the door.  This is the same poison that they

7    were struggling with that he continued to prescribe after

8    kicking them to the curb.

9    Now, let's talk a little bit about money, and I

10   want to be very clear about something.  Of course, Dr. Titus

11   had the right to make money in his practice.  Everybody has

12   a right to make money and to plan for retirement.  This is

13   not about that.

14   But remember, Dr. Titus was a licensed medical

15   professional.  He had a way to make money legitimately.  He

16   wasn't desperate.  He wasn't out on the street.  He could

17   have made money legitimately.  But instead, what he did was

18   he unlawfully prescribed controlled substances in exchange

19   for cash.  The money that he made was not legitimate, and it

20   wasn't legal.

21   There's also been some discussion and some

22   discussion that somehow giving somebody who's poor or

23   indigent a controlled substance prescription means that they

24   must be going and selling it.  That suggestion is offensive.

25   The point of discussing these indigent patients who were

1    covered by Medicaid is that Dr. Titus knew they were covered

2    by Medicaid, but instead of accepting their Medicaid or

3    sending them to another doctor who would accept their

4    Medicaid, he charged them three to four times what it would

5    have cost them to go to a regular doctor who accepted

6    Medicaid.

7             The point is he knew that they were paying for

8    these expensive visits, for their expensive pills in cash

9    that he knew that they probably didn't have.  That's the

10   point of this testimony.

11            And, again, we are not here to blame or to judge

12   these patients.  We are here because of Dr. Titus.  We are

13   here because of a physician who perverted his license in or

14   order to enable these addictions, enable these.

15            Thank you.  All right.

16            I want to go to two more things.  I want to talk

17   about Government Exhibit 212.  If we could pull that up,

18   please.  You've seen this.  You've seen this exhibit a

19   couple times now.  Apologies.  It will just take a moment.

20            This is the exhibit that the Defense showed you

21   with all of the writing on it.  Now, the Defense wants you

22   to believe that this is an exhibit that was in Dr. Titus'

23   car at the time of his arrest in 2018, but that he wrote it

24   in advance of the 2012 Consent Decree.  Fine.

25            Let's say that it was written in 2012, after the

1  consent -- before the Consent Decree.  Want to know what

2  that would tell you?  That would tell you that before the

3  Consent Decree, before any of the counts in this indictment,

4  before any of the time that we are talking about in Count

5  15, Dr. Titus knew what he was supposed to be doing.  He

6  knew about the guidelines.  He knew about the importance of

7  diversion prevention.

8         But I want to think for a moment that maybe this

9  was from 2018.  Maybe this was three years after the

10  Defendant's practice closed down.  What does that tell you?

11        He had some time to ruminate.  He had some time

12  to think about it.  Well, I'm just going to read it to you,

13  and you can look at it back in the jury room.

14        Here's what he wrote.  He wrote four words:

15  "Remorse.  Rehabilitation.  Regret.  Humility."  He wrote,

16  "I failed to comply with some of the guidelines outlined in

17  the Medical Practice Act."  He wrote, "I see the importance

18  of diversion prevention in light of the opioid abuse

19  epidemic."  And most importantly, he wrote, "I see how some

20  of my actions could have contributed to diversion, to the

21  abuse and misuse of controlled substances by my patients."

22        These realizations, ladies and gentlemen, they

23  were too little, too late.  And now it's your turn to hold

24  him accountable.

25        And here's how.  You're going to have a verdict

1    form back there with you, and this is what it looks like.

2    There's one paragraph for each count.

3           Here's what you need to do when you go back

4    there.  Think about all these patients.  Think about the

5    Lisa Parsons of the world.  Think about the Chasity

6    Calhouns, and the Michael Adams, and the Dione Dickersons,

7    and the Melissa Silbereisens.  And find him guilty of Count

8    1.  Find him guilty of Count 2.  Find him guilty of Count 3,

9    Count 4, Count 5.  Find him guilty of Count 6.  Find him

10   guilty of Count 7.  Find him guilty of Count 8, 9, 10, 11,

11   12, 13, and 14.  And find him guilty for all of the other

12   behavior that we talked about that has nothing to do with

13   these 14 counts.  Find him guilty of Count 15.

14          Ladies and gentlemen, it's time to hold

15   Dr. Titus accountable.  Thank you for your time.

16          THE COURT:  All right.  Thank you, Ms. Remis.

17          So members of the jury, now that you heard the

18   arguments, in addition to that, let me explain some things

19   about your deliberations in the jury room and your possible

20   verdicts.

21          First, by custom of this Court, Juror Number 1,

22   you are the foreperson.  So Juror Number 1 will speak for

23   the jury here in court.  He will also preside over your

24   discussions; however, the views and vote of the foreperson

25   are entitled to no greater weight than those of any other

1    juror.

2              Second, I want to remind you that your verdict,

3    whether guilty or not guilty, must be unanimous.  To find

4    Dr. Titus guilty of an offense, every one of you must agree

5    that the Government has overcome the presumption of

6    innocence with evidence that proves each element of that

7    offense beyond a reasonable doubt.  To find Dr. Titus not

8    guilty, every one of you must agree that the Government has

9    failed to convince you beyond a reasonable doubt.

10             Third, if you decide that the Government has

11   proved Dr. Titus guilty, then it will be my responsibility

12   to decide what the appropriate punishment should be.  You

13   should never consider the possible punishment in reaching

14   your verdict.

15             Fourth, as I have said before, your verdict must

16   be based only on the evidence received in this case and the

17   law I have given to you.  You should not take anything that

18   I may have said or done during trial as indicating what I

19   think of the evidence or what I think your verdict should

20   be.  What the verdict should be is the exclusive

21   responsibility of the jury.

22             So the evidence is in.  The arguments are

23   completed.  Once I finish these instructions, you will be

24   free to talk about the case in the jury room.  In fact, it

25   is your duty to talk with each other about the evidence and

1    to make every reasonable effort you can to reach unanimous

2    agreement.

3            Talk with each other, listen carefully and

4    respectfully to each others' views, and keep an open mind as

5    you listen to what your fellow jurors have to say.  Do not

6    hesitate to change your mind if you are convinced other

7    jurors are right and your initial position was wrong.  But

8    do not ever change your mind just because other jurors see

9    things differently or just to get the case over with.  In

10   the end, your vote must be exactly that, your own vote.

11           It is important for you to reach unanimous

12   agreement, but only if you can do so honestly and in good

13   conscience.  Listen carefully to what the other jurors have

14   to say and then decide for yourself if the Government has

15   proved the Defendant guilty beyond a reasonable doubt.

16           No one will be allowed to hear your discussions

17   in the jury room and no record will be made of what you say.

18   You should all feel free to speak your minds.

19           Sixth, once you start deliberating, do not talk,

20   communicate with or provide any information about this case

21   by any means to the court officials, or to me, or to anyone

22   else except each other.  During your deliberations, you may

23   not use any electronic device or media such as a telephone,

24   cell phone, smartphone, computer, the Internet, any Internet

25   service, any text or instant messaging service, or any

1    Internet chat room, blog or website such as Facebook,

2    MySpace, LinkedIn, YouTube, Instagram, Snapchat, TikTok or

3    Twitter to communicate to anyone any information about this

4    case or to conduct any research about this case.

5              Seventh, if you have any questions or messages,

6    your foreperson should write them down on a piece of paper,

7    sign them, and then give them to the court official who will

8    give them to me.  I will first talk to the lawyers about

9    what you have asked, and I will respond as soon as I can.

10   In the mean time, if possible, continue with your

11   deliberations on some other subject.

12             One more thing about messages.  Do not ever

13   write down or tell anyone how you or anyone else voted.

14   That should stay secret until you have finished your

15   deliberations.  If you have occasion to communicate with the

16   Court while you are deliberating, do not disclose the number

17   of jurors who have voted to convict or acquit on any

18   offenses.

19             I guess one more thing about messages.  Don't

20   expect an instant reply.  Any message I have to talk with

21   the lawyers.  Sometimes I have to look things up, the law

22   that is.  And so sometimes it will take longer than perhaps

23   you think it should to get back to you if there are messages

24   or questions.

25             So a verdict form has been prepared that you

1    should use to record your verdict.  Take this form with you

2    to the jury room.  When you have reached your unanimous

3    verdict, the foreperson should write the verdict on the

4    form, date, and sign it, return into the courtroom and in

5    the courtroom give the form to my courtroom deputy who will

6    give it to me.

7             If you decide that the Government has proved

8    Dr. Titus guilty of any or all of the offenses charged

9    beyond a reasonable doubt, say so by having your foreperson

10   mark the appropriate place on the form.  If you decide that

11   the Government has not proved Dr. Titus guilty of some or

12   all of the offenses charged beyond a reasonable doubt, say

13   so by having your foreperson mark the appropriate place on

14   the form.

15            So I think there's two other things.  One of

16   which is if you all decide that you want to stay until some

17   other time besides five o'clock, you can do that.  You can

18   stay later if you want.  You can leave earlier if you want.

19   But the main thing is if you decide to leave, I'm going to

20   need to at least bring you into court to sort of say good

21   night to you.  So don't leave without telling us that that's

22   what you're planning on doing.

23            And the second thing is regrettably, juries are

24   only 12 people and Juror Number 14, you're going to be

25   excused, and I do want to thank you for your service.  As

1     you can see from the fact that we had to excuse Juror Number

2     2, you know, we need to have some spares.  And so having

3     extra people sort of makes the process -- allows us to

4     finish the process.

5              It used to be the case that, you know, if you

6     had 12 and one person had to, you know, leave for some

7     reason, you had to declare a mistrial and do it over again.

8     So having you here and actually having Juror Number 13 who's

9     now part of the jury, that's a big help.

10             So I'm going to ask if we could have Juror

11    Number 14, if you can come and sort of wave goodbye.  All

12    right.  And as you go and get your stuff, talk to my case

13    manager.  She'll be there.

14             Okay?

15             THE JUROR:  Thank you, Your Honor.

16             THE COURT:  Thank you very much.  All right.

17             So now if we could have the court security

18    officer come forward.  We're going to swear him and then he

19    will take you to the jury room.

20             DEPUTY CLERK:  Do you solemnly swear that you

21    will keep this jury in some quiet and convenient place, that

22    you will not suffer anyone to speak to them nor to speak to

23    them yourself touching the issue before them unless it be to

24    ask them if they have agreed upon their verdict, so help you

25    God?

1      THE MARSHAL: I do.

2      DEPUTY CLERK:  Thank you.

3      THE COURT:  I forget exactly how we're doing

4  this.  I guess you're going to go out this way and come

5  around that way?  Yes, good idea.

6            (Discussion held off the stenographic record:)

7            (Jury leaving the courtroom.)

8      THE COURT:  All right.  Have a seat for a

9  minute.

10      Are there any objections to the jury

11  instructions as read?  In other words, did I misread

12  something that I had written down?

13      MS. REMIS:  No, Your Honor.

14      MS. KOUSOULIS:  Not that I noticed.

15      MR. WOODARD:  No, Your Honor.

16      THE COURT:  Okay.  So that's good.

17      So the second thing is this is I don't know

18  whether they'll have any notes or whatever.  You know, if

19  they don't have a verdict today, which is obviously entirely

20  possible, I will bring them in at five o'clock or some other

21  time, if that's when they tell me they want to, to basically

22  give them the same two instructions I give them every

23  evening.

24      And then the third thing is if they have a

25  question or a note, so you need to make sure that my deputy

1    clerk knows how to get in touch with you while they're in

2    the other room or while they're deliberating.  But if we get

3    a note or a message, I will expect you to reassemble here

4    and to get here from wherever it is you're staying or

5    hanging out as quickly as you can.

6            But I do authorize the deputy clerk to tell you

7    what the message says so you can be thinking about it while

8    you're walking here.  If it's such an interesting question

9    that you want to start doing research, delegate that to

10   someone.  You know, get here quickly, but you can think

11   about it while you're getting here.

12           All right.  I'm not sure that I have anything

13   else.

14           Is there anything else from the Government?

15           MS. REMIS:  No, Your Honor.

16           MS. KOUSOULIS:  Just that we have the exhibits

17   and we have Defense exhibits here.  We're going to give them

18   back to the jury.

19           THE COURT:  Okay.  Good luck with that.

20           MS. KOUSOULIS:  Other than that, nothing else

21   from the Defense.

22           THE COURT:  Okay.  Well, thank you very much.

23   We'll be in recess.

24           DEPUTY CLERK:  All rise.

25           (Recess was taken.)

1           THE COURT:  Let's get the jury.

2           (Jury entering the courtroom.)

3           THE COURT:  All right.  Have a seat.  Members of

4    the jury -- everyone, have a seat -- I understand you're

5    going home for the evening, which is fine.

6           I do want to remind you that even though you're

7    now deliberating while you're here, you still can't talk to

8    anyone when you're not here, you know, and don't let anyone

9    talk to you, offer you advice on, you know, how to reach

10   verdicts or anything.  You know, make sure that nothing

11   happens to upset the rules that you've been following that

12   you can't talk to anyone or let anyone talk to you.

13          Don't do any research.  Don't look anything up.

14   Come back tomorrow refreshed.

15          Are you starting tomorrow at 9:30?

16          THE JUROR:   We can.  Yes.

17          THE COURT:  It's up to you really, but 9:30?

18          THE JUROR:   Yes.

19          THE COURT:  But some of you will get here before

20   others of you get here.  Until all 12 of you are here, don't

21   deliberate.  You can only deliberate as the entire group.

22   All right?

23          So that's it.  Have a good evening.

24          THE JUROR:   Thank you.

25          THE COURT:  Thank you very much.

```
 1                    (Jury leaving the courtroom.)

 2                    THE COURT:  All right.  You can be seated.  So I

 3      don't normally, and I certainly wasn't planning to, you

 4      know, call them into court to greet them tomorrow morning.

 5      Basically they will come here and presumably follow my

 6      instructions.  And whenever they're all here, they will

 7      start deliberating.  And so we'll see what happens.

 8                    Where are you all staying or how far away are

 9      you?

10                    MS. REMIS:  We're just by the U.S. Attorney's

11      office, Your Honor.  It's like --

12                    THE COURT:  I'm not sure entirely I know where

13      the U.S. Attorney's Office is anymore.

14                    MS. REMIS:  It's like a seven-minute walk

15      really.

16                    THE COURT:  Okay.  All right.  Well, you all

17      have a good evening, too, and we'll see you tomorrow.

18                    MS. KOUSOULIS:  Judge Andrews, to be clear, so

19      we can just go to our offices, and you'll call us if we need

20      to come in.  Be here at 9:30 in our office and then --

21                    THE COURT:  Yeah.  I would be in your office at

22      9:30, but you don't need to come here unless we give you a

23      call to come here.

24                    MS. REMIS:  Thank you.

25                    MS. KOUSOULIS:  Okay.
```

1        (Court was recessed at 4:47 p.m.)

2        I hereby certify the foregoing is a true and

3   accurate transcript from my stenographic notes in the

4   proceeding.

5           /s/ Heather M. Triozzi
            Certified Merit and Real-Time Reporter
6           U.S. District Court

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25